1
2
3
4
5
6
7

Youssef H. Hammoud (SBN: 321934)
**THE CREDIT ATTORNEY, INC.**
601 N Parkcenter Drive Suite 202
Santa Ana, CA 92705
T: (949) 301-9692
F: (949) 301-9693
E: yhammoud@thecreditattorney.com
Attorney for Plaintiff,
*Victor Manuel Ramirez Najera*

8
9
10
11

## IN THE UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF TEXAS

12
13
14
15
16
17
18
19
20
21
22

VICTOR MANUEL RAMIREZ
NAJERA,
              Plaintiff,

              v.

EXPERIAN INFORMATION
SOLUTIONS, INC.; APPFOLIO, INC.;
and NATIONSTAR MORTGAGE LLC
d/b/a RUSHMORE SERVICING.

              Defendant.

Case No.: 4:25-cv-443

**COMPLAINT AND DEMAND FOR JURY TRIAL**

1.  FCRA, 15 U.S.C. §1681 *et seq.*

23
24
25
26
27
28

Plaintiff Victor Manuel Ramirez Najera ("Plaintiff"), by and through the

undersigned counsel, brings this action on an individual basis, against Experian

Information Solutions, Inc. ("Experian"), AppFolio, Inc. ("AppFolio") and

Nationstar Mortgage LLC d/b/a RUSHMORE SERVING ("Rushmore"), for

actual, statutory, and punitive damages and costs, and attorney's fees, for violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681, *et. seq.*, arising out of Defendant's mixing Plaintiff's credit file with another consumer.

## **INTRODUCTION**

1.     The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

2.     However, unfortunately this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can and do sustain substantial damage, both economically and emotionally, whenever inaccurate or fraudulent information is disseminated and/or obtained about them. In fact, Defendant acknowledges this potential for misuse and resulting damage every time they sell their respective credit monitoring services to a consumer.

3.     The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

4.     These CRAs sell information to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers, and other similar interested parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, or a car or mortgage loan.

5.     Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile and sell about individual consumers.

6.     "Credit is the lifeblood of the modern American economy, and for the American consumer access to credit has become inextricably tied to consumer credit scores as reported by credit reporting agencies."  *Burke v. Experian Info. Sols., Inc.*, 2011 WL 1085874, at *1 (E.D. Va. Mar. 18, 2011).

7.     Congress made the following findings when it enacted the FCRA in 1970:

    i.     The banking system is dependent upon fair and accurate credit reporting.  Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

    ii.     An elaborate mechanism has been developed for investigating and evaluating the credit worthiness, credit standing, credit capacity, character, and general reputation of consumers.

    iii.     Consumer reporting agencies have assumed a vital role in assembling and evaluating consumer credit and other information on consumers.

iv.    There is a need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy.

15 U.S.C. § 1681(a)(1-4).

8.    Thus, one of the fundamental purposes of the FCRA is "to require that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information in accordance with the requirements of this subchapter." 15 U.S.C. § 1681(b). Accordingly, "[t]he FCRA evinces Congress' intent that consumer reporting agencies, having the opportunity to reap profits through the collection and dissemination of credit information, bear 'grave responsibilities.'" *Cushman v. Trans Union*, 115 F.3d 220, 225 (3d Cir. 1997).

9.    The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed.

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 cong. Rec. 36570 (1970)] (emphasis added).

10.     Since 1970, when Congress enacted the Fair Credit Reporting Act, as amended, 15 U.S.C. § 1681 *et. seq.*, ("FCRA"), the federal law has required CRAs to have in place and to utilize reasonable procedures "to assure the maximum possible accuracy" of the personal and financial information that they compile and sell about individual consumers.

11.     The FCRA also requires CRAs to conduct a reasonable reinvestigation to determine whether information disputed by consumers is inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which the CRA receives the notice of dispute from the consumer. This mandate exists to ensure that consumer disputes are handled in a timely manner and that inaccurate information contained within a consumer's credit report is corrected and/or deleted so as to not prevent said consumer from benefiting from his or her credit and obtaining new credit.

12.     In light of these important findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy." *See* 15 U. S.C. § 1681(a)(4).

13.     The FCRA also requires furnishers of information, a creditor or other third party that provides information about consumer to a CRA, upon notice, to conduct a reasonable reinvestigation of all disputes with regard to the completeness or accuracy of any information it provides to the CRAs regarding a consumer and

modify, delete, or permanently block any items of information found to be inaccurate, incomplete, or unverifiable after said reinvestigation is completed.

14.    A recurring and *known* issue within the credit reporting industry is the creation of "mixed files."

15.    A "mixed file" occurs when personal and credit information belonging to Consumer B appears in one or more of Consumer A's credit files.

16.    "Mixed files" create a false description and representation of a consumer's credit history.

17.    The Federal Trade Commission defined a mixed credit file as a file that "refers to a Consumer Report in which some or all of the information pertains to Persons other than the Person who is subject to that Consumer Report." *F.T.C. v. TRW, Inc.*, 784 F. Supp. 361, 362 (N.D. Tex. 1991).

18.    Mixed files are not a new phenomenon. CRAs have been on notice of the existence of mixed files, and the fact that their procedures for creating credit files, including their matching algorithms, are prone to frequently cause mixed files, for over thirty (30) years. *See Thompson v. San Antonia Retail Merchants Ass'n*, 682 F.2d 509, 511 (5th Cir. 1982).

19.    More recently, Defendant and the other CRAs (non-parties Equifax and Trans Union) have been the subject of numerous state attorney general actions relating to their mixed file problem.

20.    For example, in 2015, the New York Attorney General filed charges and settled claims with Experian over mixed files. *See In the Matter of Eric T. Schneiderman, Attorney General of the State of New York v. Experian Information Solutions, Inc.; Equifax Information Services, LLC; and Trans Union LLC.*

21.    Notwithstanding Experian's notice and being subject to repeated enforcement actions, mixed files continue to occur despite consumers' unique personal identifying information, such as Social Security numbers, date of birth, and addresses.

22.    Another consequence of mixed files is the resulting disclosure of a consumer's most personal identifying and financial information absent the consumer's knowledge or consent, or both. This occurs when a consumer's file is mixed with that of another consumer, and either of those consumers applies for credit, housing, insurance, or employment, and Experian sells information pertaining to one consumer in response to the application of the other.

23.    Experian has been sued thousands of times wherein an allegation was made that Experian violated the FCRA. Moreover, Experian is sued, at a minimum, hundreds of times each year wherein an allegation is made that Experian mixed a consumer's credit files with that of another consumer.

24.    FCRA lawsuits have resulted in multi-million-dollar verdicts for consumers who fall victim to a mixed credit file.

25.    For example, in 2002, the jury in *Judy Thomas v. Trans Union LLC*, District of Oregon, Case NO. 00-1150-JE, found Trans Union had willfully violated the FCRA by mixing Judy Thomas's personal and credit information with another consumer's and failing to unmix them despite Ms. Thomas' numerous disputes. The jury awarded Ms. Thomas $300,000.00 in actual damages and $5,000,000.00 in punitive damages. Despite the verdict, Experian continues to mix consumers' credit files with other consumers' credit files.

26.    In 2007, the jury in *Angela Williams v. Equifax Information Services, LLC*, Circuit Court for Orange County Florida, Case No. 48-2003-CA-9035-0, awarded Angela Williams $219,000.00 in actual damages and $2,700,000.00 in punitive damages for willfully violating the FCRA by mixing Angela Williams with another consumer and failing to unmix them despite Ms. Williams' disputes. Despite the verdict, Experian continues to mix consumers' credit files with other consumers' credit files.

27.    In 2013, the jury in *Julie Miller v. Equifax Information Services, LLC*, District of Oregon, Case No. 3:11-cv-01231-BR, awarded Julie Miller $180,000.00 in actual damages and more than $18,000,000.00 in punitive damages for willfully violating the FCRA by mixing Julie Miller with another consumer and failing to unmix them despite Ms. Miller' numerous disputes. Despite the verdict, Experian continues to mix consumers' credit files with other consumers' credit files.

28.    More recently, a jury assessed a $60 million dollar verdict against Trans Union for mixing innocent persons as terrorists and drug dealers by matching consumers with the Office of Foreign Asset Control's "terrorist alert" list based on first and last name alone. *See Ramirez v. Trans Union, LLC*, No. 12-CV-00632-JSC, 2017 WL 5153280, at *1 (N.D. Cal. Nov. 7, 2017), *aff'd in part, vacated in part, rev'd in part sub nom. Ramirez v. TransUnion, LLC*, 951 F.3d 1008 (9th Cir. 20020). Despite the verdict, Experian continues to mix consumers' credit files with other consumers' credit files.

29.    "Evidence that a defendant has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful would provide relevant support for an argument that strong evidence is required to cure the defendant's disrespect for the law." *Dalton v. CAI*, 257 F.3d 409, 418 (4th Cir. 2001) (noting that whether "other consumers have lodged complaints similar to Dalton's against CAI" is relevant to willfulness under the FCRA). Moreover, repeated noncompliance with statutory duties can establish that the defendant acted willfully. *See Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 53 (2007) (punitive damages can be awarded based on "reckless disregard for a statutory duty").

30.    No less than three federal Courts of Appeal have held a consumer reporting agencies violate 15 U.S.C. § 1681e(b) and may be found to have willfully violated the FCRA when they mix a consumer's file with another consumer.

31.    Notably, the Federal Trade Commission has specifically warned consumer reporting agencies, including Equifax and Experian, to review their procedures when a mixed file occurs.

32.    Despite federal and state law, Congressional mandate, federal and state enforcement actions, and thousands of consumer lawsuits, mixed credit files remain a significant problem for innocent consumers, including Plaintiff.

33.    Plaintiff's claims arise out of the Experian's blatantly inaccurate credit reporting, wherein Experian mixed and/or merged Plaintiff's credit files with that of another consumer.

34.    Accordingly, Plaintiff brings claims against Experian for failing to follow reasonable procedures to assure the maximum possible accuracy of Plaintiff's credit reports, in violation of the FCRA, 15 U.S.C. § 1681e(b), and for failing to conduct a reasonable reinvestigation of the disputed information, in violation of 15 U.S.C. § 1681i.

35.    Plaintiff also brings this claim against Rushmore for failing to conduct a reasonable investigation after being notified by Defendant Experian of Plaintiff's dispute in violation of the FCRA, 15 U.S.C. § 1681s-2(b).

36.    As part of this action, Plaintiff seeks actual, statutory, and punitive damages, costs and attorneys' fees from the Defendant for their willful and/or negligent violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq*., as described herein.

# PARTIES

37.     Plaintiff, Victor Manuel Ramirez Najera ("Plaintiff") is a natural person residing in Fort Worth, Texas and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

38.     Defendant Experian Information Solutions, Inc. is a corporation with a principal place of business located at 475 Anton Blvd., Costa Mesa, CA 92626 and can be served through its agent for service, C T Corporation System, located at 1999 Bryan St., Ste 900, Dallas, TX 75201.

39.     Experian is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Experian is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d), to third parties.

40.     Defendant AppFolio Information Solutions, Inc. is a corporation with a principal place of business located at 475 Anton Blvd., Costa Mesa, CA 92626 and can be served through its agent for service, CSC – Lawyers Inco, located at 211 E. 7th Street, Suite 620, Austin, TX 78701.

41.     AppFolio is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). AppFolio is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d), to third parties. AppFolio is also a "reseller" – which means AppFolio is a consumer reporting agency that (1)

assembles and merges information contained in the database of another consumer reporting agency or multiple consumer reporting agencies concerning any consumer for purposes of furnishing such information to any third party, to the extent of such activities; and (2) does not maintain a database of the assembled or merged information from which new consumer reports are produced.

42.    Defendant Rushmore Servicing ("Rushmore") is a corporation with a principal place of business located at 8950 Cypress Waters Boulevard in Coppell, TX 75019 and can be served through its agent for service, Corporation Service Company, located at 211 E. 7TH STREET SUITE 620 AUSTIN, TX 78701.

## JURISDICTION AND VENUE

43.    This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

44.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## FACTS
### Summary of the Fair Credit Reporting Act

45.    The FCRA governs the conduct of consumer reporting agencies in an effort to preserve the integrity of the consumer banking system and to protect the

rights of consumers to fairness and accuracy in the reporting of their credit information.

46.    The FCRA was designed to protect consumers from the harmful effects of inaccurate information reported in consumer reports (commonly referred to as "credit reports"). Thus, Congress enshrined the principles of "fair and accurate credit reporting" and the "need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness" in the very first provision of the FCRA. *See* 15 U.S.C. § 1681(a).

47.    Specifically, the statute was intended to ensure that "consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information. *See* 15 U.S.C. § 1681(b).

48.    To that end, the FCRA imposes the following twin duties on consumer reporting agencies: (i) consumer reporting agencies must devise and implement reasonable procedures to ensure the "maximum possible accuracy" of information contained in consumer reports (15 U.S.C. § 1681e(b)); and (ii) consumer reporting agencies must reinvestigate the facts and circumstances surrounding a consumer's dispute and timely correct any inaccuracies (15 U.S.C. § 1681i).

49.    The FCRA provides consumers with a private right of action against consumer reporting agencies that willfully or negligently fail to comply with their statutory obligations under the FCRA.

### Experian's Processing of Credit Information

50.    Experian regularly receives information from various sources around the country including banks, credit unions, automobile dealers, student loan providers, public information vendors, and others.

51.    These sources are known as "furnishers" within the credit reporting industry and under the FCRA.

52.    Experian collects information from thousands of furnishers.

53.    The process by which Experian receives, sorts, and stores information is largely electronic.

54.    Furnishers report credit information to Experian through the use of coded tapes that are transmitted to Experian on a monthly basis through software known as Metro 2.

55.    Experian takes credit information reported by furnishers and creates consumer credit files.

56.    Experian maintains credit files on more than 200 million consumers.

57.    Credit files are updated electronically by the furnishers to reflect new information regarding the reported accounts (sometimes referred to within the industry as "tradelines").

**Experian's Mixed File Problem**

58.    Experian knows that different consumers have similar names.

59.    Experian knows that many consumers share the same and/or similar name with their family members.

60.    Experian also knows that family members with the same and/or similar name may also have the same home address.

61.    Experian knows that some consumers have two last names.

62.    Upon information and belief, Experian is aware of Spanish naming customs in which Hispanic culture uses two surnames.

63.    Upon information and belief, Experian is aware that this double surname is the norm in Hispanic tradition.

64.    In the double surname Hispanic tradition, a person's first surname is the surname of their father, followed by the surname of their mother.

65.    Experian also knows that different consumers can have similar Social Security numbers.

66.    Experian knows that while most credit card applications ask for your SSN, there are some that will allow you to apply for credit even if you don't have an SSN.

67.    Experian knows that public records often do contain identifying information such as Social Security numbers or dates of birth.

68.    Experian  matches tradelines and public records to a consumer credit file by comparing the information about the consumer associated with the tradeline or public record to the information they maintain about the consumer in the consumer's credit file or files.

69.    Experian  accomplishes this matching of credit information to consumer credit files through the use of certain matching algorithms or database rules.

70.    From time to time, Experian's matching algorithms match information belonging to one consumer to the credit file of another consumer; resulting in what's commonly known in the credit reporting industry as a mixed or merged credit file.

71.    Experian's procedures for matching consumer information to a consumer report often cause the mixing of one consumer with another. Or worse yet, the merging of data pertaining to two different consumers into a single consumer file.

72.    Another consequence of mixed files is the resulting disclosure of a consumer's most personal identifying and financial information absent the consumer's knowledge or consent, or both. This occurs when a consumer's file is mixed with that of another consumer, and either of those consumers apply for credit, housing, insurance, or employment, and Experian sells information pertaining to one consumer in response to the application of the other. This violates the consumers' privacy and also greatly increases their risk of identity theft.

73.    With a merged file, wherein Experian assumes two different consumers are the same person and entitled to one file, the data pertaining to both of those

consumers are comingled and piled into a single file, forcing two consumers to share a file unbeknownst to them. In this scenario, at times, Experian will refuse to sell a consumer report to a third party in response to a consumer application for credit or otherwise, thereby frustrating that consumer's access to credit. Or Experian will sell a consumer report reflecting the data pertaining to both consumers.

**The "Mixed File" Problem is Known to Experian**

74.    Mixed files are not a new phenomenon. In fact, as long ago as the early 1990s, the Federal Trade Commission ("FTC") (the government agency charged with enforcement of the FCRA), entered into individual Consent Decrees with each of the major CRAs, specifically including Experian, regarding their significant failures and deficiencies with respect to mixed files.

75.    Experian mixes files even though every consumer has unique personal identifying information, such as a Social Security number and/or ITIN. That is so because Experian's system allows information to be included in a consumer's file when the Social Security number and/or ITIN reported with the information is different from the Social Security number and/or ITIN on the consumer's file.

76.    Experian knows that its matching procedures are causing inaccurate consumer reports, consumer disclosures, mixed files and merged files.

77.    Despite Experian's long-standing and specific knowledge of the mixed and merged file problem, Experian still mixed and/or merged Plaintiff's files with that of another consumer.

COMPLAINT AND DEMAND FOR JURY TRIAL

78.    A mixed or merged credit files is the result of Experian's inaccurately mixing personal identifying information and credit information and/or an entire credit file belonging to one consumer into the credit files of another consumer.

79.    There are many different possible causes for the mixing of credit files but all of them relate in one way or another to the algorithms and/or database rules used by Experian to match personal identifying information and credit information, including public record information, to a particular consumers' credit file.

80.    The success or failure of these algorithms or rules is both a function of the rules themselves and of the information provided by the furnishers of the tradeline information to Experian.

81.    A mixed consumer report could be caused by an improper algorithm just as it could be caused by the inaccurate reporting of a consumer's personal "indicative" information (e.g., name, Social Security number, ITIN, address, date of birth, etc.) by the furnishers to Experian.

82.    Accordingly, the database rules determine which credit files are selected by the algorithm and merged to create a complete consumer report.

83.    Therefore, a mixed consumer report is sometimes the result of the mixing of two or more consumer credit files belonging to different consumers into one consumer report.

84.    In the 1990's, the Federal Trade Commission ("FTC") sued Experian Experian's predecessor TRW (together with non-parties Equifax and Trans Union)

COMPLAINT AND DEMAND FOR JURY TRIAL

because of their failure to comply with the FCRA including the mixing of consumers' files.

85.    In the 1990's, the Attorneys General of numerous states sued Experian's predecessor TRW (together with non-parties Equifax and Trans Union) because of their failure to comply with the FCRA including the mixing of consumers' files.

86.    In 1991, TRW signed a Consent Order with the FTC. To prevent the occurrence or reoccurrence of a mixed file, TRW agreed to use, for matching and identification purposes, a consumer's full identifying information, defined as full first and last name, full street address, zip code, birth year, any generational designation and social security number.

87.    In 1992, non-party Trans Union signed a Consent Order with the Attorneys General of 17 states. Non-Party Trans Union agreed that it would maintain reasonable procedures to prevent the occurrence or reoccurrence of mixed files. For example, procedures during the reinvestigation process include, assigning mixed file cases to Senior Investigators who, as appropriate, must pull all files related to the consumer, fully verify disputed information, make any changes, deletions or additions to correct the file and resolve the dispute, and prepare a summary of the problem to be filed with another department for corrective action.

88.    In 1992, Equifax signed an Agreement of Assurances with the State Attorneys General and agreed to take specific steps to prevent the occurrence of

mixed files and to adopt procedures designed specifically to reinvestigate consumer disputes resulting from mixed files.

89.    In 1995, Equifax signed a Consent Order with the FTC. Equifax agreed it would follow reasonable procedures to assure the maximum possible accuracy of the information on a consumer's file including, but not limited to, procedures to detect logical errors prior to reporting information on a consumer's file, procedures to prevent mixing as a result of data entry by third parties when the third party requests a consumer's report, and procedures during a reinvestigation specifically designed to resolve consumer disputes related to a mixed file.

90.    To prevent the occurrence of a mixed file, Experian together with non-parties Equifax and Trans Union entered into agreements not to place information in a consumer's file (other than certain public record information) unless they have identified such information by at least two of the following identifiers: (i) the Consumer's name; (ii) the Consumer's Social Security number; (iii) the Consumer's date of birth, or (iv) the Consumer's account number with a Subscriber or a similar identifier unique to the Consumer.

91.    Experian and non-parties Equifax and Trans Union continue to repeatedly mix consumers' files despite agreements with the FTC and State Attorneys General and hundreds of lawsuits filed against them by consumers whose files have been mixed.

92.     When those lawsuits have gone to trial, juries have found that Defendant Experian and non-parties Equifax and Trans Union, willfully violated the accuracy and reinvestigation requirements of the FCRA - §§ 1681e(b) and 1681i – and awarded punitive damages as high as $18 million.  Yet the "mixed file" problem continues.

93.     For example, in 2015, the New York Attorney General filed charges and settled claims with Defendant Experian and non-parties Equifax and Trans Union over mixed files.  *See In the Matter of Eric T. Schneiderman, Attorney General of the State of New York v. Experian Information Solutions, Inc.; Equifax Information Services, LLC; and Trans Union LLC*.

94.     Equifax's matching logic mixed two consumers' files when only seven out of the nine digits of the two consumers' Social Security numbers matched. *Apodaca v. Discover Fin. Servs.*, 417 F. Supp. 2d 1220, 1224 (D.N.M. 2006).

95.     In 2002, the jury in *Judy Thomas v. Trans Union LLC*, District of Oregon, Case NO. 00-1150-JE, found Trans Union had willfully violated the FCRA by mixing Judy Thomas's personal and credit information with another consumer's and failing to unmix them despite Ms. Thomas' numerous disputes. The jury awarded Ms. Thomas $300,000.00 in actual damages and $5,000,000.00 in punitive damages. Despite the verdict, Defendant Experian continues to mix consumers' credit files with other consumers' credit files.

96.    In 2007, the jury in *Angela Williams v. Equifax Information Services, LLC*, Circuit Court for Orange County Florida, Case No. 48-2003-CA-9035-0, awarded Angela Williams $219,000.00 in actual damages and $2,700,000.00 in punitive damages for willfully violating the FCRA by mixing Angela Williams with another consumer and failing to unmix them despite Ms. Williams' disputes. Despite the verdict, Defendant Experian continues to mix consumers' credit files with other consumers' credit files.

97.    In 2013, the jury in *Julie Miller v. Equifax Information Services, LLC*, District of Oregon, Case No. 3:11-cv-01231-BR, awarded Julie Miller $180,000.00 in actual damages and more than $18,000,000.00 in punitive damages for willfully violating the FCRA by mixing Julie Miller with another consumer and failing to unmix them despite Ms. Miller' numerous disputes.  Despite the verdict, Experian continues to mix consumers' credit files with other consumers' credit files.

98.    More recently, a jury assessed a $60 million dollar verdict against Trans Union for mixing innocent persons as terrorists and drug dealers by matching consumers with the Office of Foreign Asset Control's "terrorist alert" list based on first and last name alone. *See Ramirez v. Trans Union, LLC*, No. 12-CV-00632-JSC, 2017 WL 5153280, at *1 (N.D. Cal. Nov. 7, 2017), aff'd in part, vacated in part, rev'd in part sub nom. *Ramirez v. TransUnion, LLC*, 951 F.3d 1008 (9th Cir. 20020). Despite the verdict, Defendant Experian continues to mix consumers' credit files with other consumers' credit files.

99.   Experian has been sued thousands of times wherein an allegation was made that Experian violated the FCRA.

100.   FCRA lawsuits have resulted in multi-million-dollar verdicts for consumers who fall victim to a mixed credit file.

101.   "Evidence that a defendant has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful would provide relevant support for an argument that strong evidence is required to cure the defendant's disrespect for the law." *Dalton v. CAI*, 257 F.3d 409, 418 (4th Cir. 2001) (noting that whether "other consumers have lodged complaints similar to Dalton's against CAI" is relevant to willfulness under the FCRA). Moreover, repeated noncompliance with statutory duties can establish that the defendant acted willfully. *See Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 53 (2007) (punitive damages can be awarded based on "reckless disregard for a statutory duty").

102.   No less than three federal Courts of Appeal have held a consumer reporting agency violates 15 U.S.C. § 1681e(b) and may be found to have willfully violated the FCRA when it mixes a consumer's file with another consumer.

103.   Notably, the Federal Trade Commission has specifically warned consumer reporting agencies to review their procedures when a mixed file occurs.

104.   Despite federal and state law, Congressional mandate, federal and state enforcement actions, and thousands of consumer lawsuits, mixed credit files remain a significant problem for innocent consumers, including Plaintiff.

**AppFolio's Failure to Follow Reasonable Procedures is Known**

105.    AppFolio furnishes credit history, rent payment history, criminal/public records history, landlord-tenant history and other information about consumers to thousands of client property management companies to, among other things, assist the clients in selecting tenants ("Tenant Screening Reports").

106.    AppFolio obtains the information for its Tenant Screening Reports from other consumer reporting agencies (such as Defendant Experian) and is a "reseller" as defined under 15 U.S.C. § 1681a(u).

107.    Defendant's Tenant Screening Reports includes credit information that it obtains from Defendant Experian.

108.    The Tenant Screening Reports that AppFolio furnishes to its clients are "Consumer Reports" as defined under 15 U.S.C. § 1681a(d).

109.    On or about December 8, 2020, the United States of America, acting upon notification and authorization to the Attorney General by the Federal Trade Commission ("FTC") brought a complaint for civil penalties, permanent injunction and other equitable relief against AppFolio for violations of, among others, the FCRA.

110.    The FTC alleged that AppFolio implemented insufficient procedures to assess the accuracy of information it obtained from other credit reporting agencies before including the information in tenant Screening reports.

111. Rather, AppFolio generally relied on the credit reporting agencies procedures for matching the information and AppFolio had limited knowledge of the procedures used by the credit reporting agencies.

112. AppFolio entered into a settlement with the FTC and agreed to pay $4.25 million over the allegations that it failed to follow reasonable procedures to ensure the accuracy of its reports about potential tenants.

113. As such, AppFolio has been on notice that its procedures are insufficient and that it was required to do more to ensure the accuracy of information it obtains from other credit reporting agencies about consumers when preparing Tenant Screening Reports.

114. However, AppFolio has continued its pattern and practice of generally relying on credit reporting agencies for the matching of information without implementing any reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates.

**Plaintiff's Inaccurate Consumer Reports**

115. On or about May 22, 2023, AppFolio prepared a Tenant Screening Report on Plaintiff and provided it to its client, Alexander Forrest Investments, for a studio at Hartford House Apartments.

116. The Tenant Screening Report correctly listed Plaintiff's date of birth (XX/XX/1995).

117.  The Tenant Screening Report prepared by AppFolio included credit information about Plaintiff that was obtained from Defendant Experian.

118.  As such, upon information and belief, on or about May 22, 2023, Defendant Experian prepared a consumer report about the Plaintiff and furnished it to Defendant AppFolio.

119.  The Tenant Screening Report included the following account:

    i.   RUSHMORE LOAN MGMT SERVICES, a mortgage account with a high credit of $109,370, 11 instances of 30+ days late, 6 instances of 60+ days late, and that the account had been transferred to another office. (the "Rushmore Account").

120.  The consumer report prepared by Defendant Experian and provided to Defendant AppFolio also contained the inaccurate Rushmore Account.

121.  Plaintiff has never had a mortgage before.

122.  The Tenant Screening Report indicated that the Rushmore Account was opened on 01/27/2009.

123.  A simple review of the Tenant Screening Report should have alerted that it would be impossible for Plaintiff to have opened up a mortgage account in 2009, when he was only 13 years old.

124.  Upon information and belief, AppFolio does not have any procedures in place to ensure that the information it obtains from Experian is accurate.

125.   Plaintiff's application for the studio with Hartford House Apartments was denied.

126.   Upon information and belief, the Rushmore Account played a significant factor in the denial of Plaintiff's rental application.

127.   In or around March 2024, Plaintiff disputed the Rushmore Account with Defendant Experian.

128.   Plaintiff's dispute stated that the Rushmore Account did not belong to him.

129.   In or around March 2024, Defendant Experian responded to Plaintiff's dispute indicating that Defendant Rushmore certified that the information was accurate.

130.   As such, Defendant Experian continued to inaccurately report the Rushmore Account on Plaintiff's consumer report.

131.   In or around July 2024, Plaintiff submitted another dispute to Experian.

132.   In the July 2024 dispute, Plaintiff stated that he had never taken out a mortgage and the information was inaccurate.

133.   To support his dispute, Plaintiff provided a copy of his birth certificate and stated, "I was 13 years old at the time this mortgage was taken out in 2009, making it impossible for me to have entered into this agreement."

134.   In addition, Plaintiff provided a copy of his school records as further proof of his age and that he was a minor during the time the mortgage was opened.

135.   Plaintiff sent the July 2024 via certified mail.

136.   Defendant Experian received Plaintiff's July 2024 dispute.

137.   Upon information and belief, Defendant Experian forwarded Plaintiff's dispute letter and supporting documents to Rushmore, as required under 15 U.S.C. § 1681i(a)(2).

138.   In or around August 2024, Defendant Experian responded to Plaintiff's July 2024 dispute letter.

139.   Defendant Experian's dispute results indicated that the Rushmore Account was verified as accurate.

140.   Defendant Experian's dispute results indicated that the

141.   As such, Defendant Experian continued to inaccurately report the Rushmore Account on Plaintiff's consumer report, indicating that it was a mortgage account belonging to him.

142.   Defendant Experian's dispute results indicated that it was still reporting the Rushmore Account with a late payment history.

143.   Defendant Experian did not investigate Plaintiff's dispute, and pursuant to their unreasonable procedures, merely forwarded an automated dispute to Rushmore, despite possessing information indicating that it was impossible for the Rushmore Account to belong to Plaintiff.

144.   Rather than perform a reasonable investigation based on Plaintiff's dispute and rely on information known by Defendant Experian through Plaintiff's

credit file, Experian merely parroted information parroted information by Rushmore despite awareness that the information was factually inaccurate, misleading and conflicted with information known by Experian.

145.   Further, Defendant Rushmore failed to conduct a reasonable investigation after receiving notice of Plaintiff's dispute from Experian.

146.   Defendant Rushmore failed, among other things, to review all relevant information regarding the dispute or ignored this information. Consequently, Defendant Rushmore continued to furnish inaccurate data to Defendant Experian despite knowledge of Plaintiff's dispute and otherwise possessing information from which Defendant Rushmore should have reported accurate information about the Rushmore Account.

147.   Defendant Experian's reporting was patently false and/or materially misleading, as Plaintiff never opened a mortgage and the Rushmore Account did not belong to him.

148.   At all times pertinent hereto, Defendants were acting by and through their agents, servants, and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Defendants herein.

149.   At all times pertinent hereto, Defendants' conduct, as well as that of their respective agents, servants, and/or employees, was intentional, willful, reckless,

grossly negligent and in utter disregard for federal law and the rights of Plaintiff herein.

150.   Defendants are aware of the shortcomings of their procedures and intentionally choose not to comply with the FCRA to lower their costs. Accordingly, Defendants violations of the FCRA are willful.

151.   As a result of Defendants' conduct, action, and inaction, Plaintiff suffered damages including but not limited to, the damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials and having another consumer's derogatory information included into Plaintiff's credit files.

## COUNT I
**Defendant Experian and AppFolio**
**15 U.S.C. § 1681e(b)**
**Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy**

152.   Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

153.   The FCRA imposes a duty on consumer reporting agencies to devise and implement procedures to ensure the "maximum possible accuracy" of consumer reports, as follows:

> Whenever a consumer reporting agency prepares a consumer report, it shall follow reasonable procedures to assure ***maximum possible***

*accuracy* of the information concerning the individual about whom the report relates.

15 U.S.C. §1681e(b) (emphasis added).

154.   On at least one occasion, Defendants prepared patently false consumer reports concerning Plaintiff.

155.   Defendants mixed another consumer's personal and credit account information into Plaintiff's credit file, thereby misrepresenting Plaintiff, and ultimately, Plaintiff's creditworthiness.

156.   Defendants did not "follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the reports relates." 15 U.S. Code § 1681e(b)

157.   Defendants violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy of the credit information they published and maintained concerning Plaintiff.

158.   As a result of Defendants' conduct, action, and inaction, Plaintiff suffered damages including but not limited to, the damage by loss of credit; loss of ability to purchase and benefit from her good credit rating; detriment to her credit rating; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials and having another consumer's derogatory information included into Plaintiff's credit files.

159.   Defendants' conduct, actions, and inactions were willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, Defendants were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

160.   Plaintiff is entitled to recover attorneys' fees and costs from Defendants in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

### COUNT II
### Defendant Experian
### (Violations of the 15 U.S. Code § 1681i *et seq.*)

161.   Plaintiff incorporates by reference all the above paragraphs of this Complaint as though full stated herein.

162.   When a consumer disputes the accuracy or completion of information included in a CRA's credit file, the FCRA requires the agency to either conduct a reasonable reinvestigation into the disputed information **or** delete the disputed information from the consumer's credit file within thirty (30) days of receiving notice of the dispute. 15 U.S.C. § 1681i(a)(2)(A).

163.   When conducting its reinvestigation of disputed information in a consumer report, the credit reporting agency is required to "review and consider all relevant information submitted by the consumer."

164.   Additionally, the CRA must notify the person who furnished the disputed information of the consumer's dispute within five business days of its

receipt. When notifying the furnisher of the consumer's dispute, the CRA is to "include all relevant information regarding the dispute that the agency received from the consumer." 15 U.S.C. § 1681i(a)(2)(A).

165.    Defendants' violations of 15 U.S.C. § 1681i include, but are not limited to the following:

     i.   Failing to reasonably reinvestigate the inaccurate information Plaintiff disputed.

     ii.   Failing to consider all relevant information while investigating Plaintiff's dispute.

     iii.   Failing to include all relevant information when notifying Rushmore of Plaintiff's dispute.

166.    Instead of reasonably reinvestigating Plaintiff's dispute, Defendant "verified" the Rushmore Account as accurate and continued to report it with a late payment history.

167.    Defendants' conduct, actions, and inactions were willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, Defendants were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

168.    Plaintiff is entitled to recover attorneys' fees and costs from Defendants in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

169.   As a result of Defendant's conduct, action, and inaction, Plaintiff suffered damages including but not limited to, the damage by loss of credit; loss of ability to purchase and benefit from her good credit rating; detriment to her credit rating; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials and having another consumer's derogatory information included into Plaintiff's credit files.

### COUNT III
**Defendant Rushmore**
**(Violations of the 15 U.S. Code § 1681s2(b) *et seq.*)**

170.   Plaintiff incorporates by reference all the above paragraphs of this Complaint as though fully stated herein.

171.   Defendant violated 1681-s2(b) by failing to follow reasonable procedures to assure maximum possible accuracy of the information concerning Plaintiff when preparing a consumer credit report.

172.   Defendant violated 1681-s2(b) because after receiving notice of a dispute under 1681i(a)(2), the furnisher (Rushmore) must:

    i.   (A) Conduct an investigation with respect to the disputed information;

    ii.   (B) Review all relevant information provided by the CRA;

    iii.   (C) Report the results of the investigation to the CRA;

COMPLAINT AND DEMAND FOR JURY TRIAL

iv.   (D) If the investigation finds the information to be incomplete or inaccurate, report those results to all CRAs to whom the information was furnished;

v.   (E) If information is found to be inaccurate or incomplete or cannot be verified:

(1) Modify, delete, or permanently block the reporting of that information, as appropriate.

(2) These steps must be completed within 30 days of receiving the dispute (with some exceptions for extended timeframes).

173.   When Defendant Rushmore reported back to the CRA Experian, it notified Experian that this report was indeed accurate as according to the information received by the Plaintiff.

174.   Had Defendant Rushmore conducted a reasonable investigation, it would've realized that this mortgage account did not belong to the Plaintiff but to someone else.

## **TRIAL BY JURY**

Plaintiff is entitled to and hereby demands a trial by jury on all issues so triable.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests judgment be entered against Defendants for the following:

A. Actual damages pursuant to 15 U.S.C. §§ 1681n(a)(1) and 1681o(a)(1);

B. Statutory damages of $1,000.00 pursuant to 15 U.S.C. § 1681n(a)(1);

C. Punitive damages pursuant to 15 U.S.C. § 1681n(a)(2);

D. Costs and reasonable attorney's fees pursuant to 15 U.S.C. §§ 1681n(a)(3) and 1681o(a)(2);

E. Any pre-judgment and post-judgment interest as may be allowed under the law; and

F. Other and further relief as the Court may deem just and proper.

Respectfully submitted this on April 22 2025.

*/s/ Youssef H. Hammoud*
Youssef H. Hammoud (SBN: 321934)
**THE CREDIT ATTORNEY, INC.**
601 N Parkcenter Drive Suite 202
Santa Ana, CA 92705
T: (949) 301-9692
F: (949) 301-9693
E: yhammoud@thecreditattorney.com
*Attorney for Plaintiff,*
*Victor Ramirez Manuel Najera*

COMPLAINT AND DEMAND FOR JURY TRIAL