**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**

|  |  |
|---|---|
| VICTOR MANUEL RAMIREZ NAJERA,<br><br>             Plaintiff,<br>      v.<br><br>EXPERIAN INFORMATION SOLUTIONS, INC.; APPFOLIO, INC.; and NATIONSTAR MORTGAGE LLC d/b/a RUSHMORE SERVICING.<br><br>             Defendant. | Case No.: 4:25-cv-00443-P |

**APPENDIX IN SUPPORT OF PLAINTIFF'S**
**MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST**
**DEFENDANT EXPERIAN INFORMATION SOLUTIONS, INC.**

| Exhibit | Description | Page No. |
|---------|-------------|----------|
| A | Excerpts from Deposition Transcript of Plaintiff, Victor Ramirez Najera ("Plaintiff's Depo.") | Appendix 0001-0262 |
| B | Plaintiff's AppFolio Report, dated May 22, 2023 ("AppFolio Report") | Appendix 0263-0268 |
| C | Plaintiff's Mailed Dispute to Experian, dated July 10, 2024 ("Second Dispute") | Appendix 0269-0285 |
| D | Plaintiff's Experian Long Admin Report, dated October 8, 2025 ("Long Admin Report") | Appendix 0286-0324 |
| E | Audio Recording of Plaintiff's Telephone Dispute to Experian, dated February 12, 2024 ("First Dispute") | Appendix 0325-0326 |

1

| F | PennyMac ACDV Response, dated February 15, 2024 ("PennyMac ACDV Response") | Appendix 0327-00328 |
|---|---|---|
| G | Rushmore ACDV Response, dated February 28, 2024 ("First Rushmore ACDV Response") | Appendix 0329-0330 |
| H | Deposition Transcript of Experian 30(b)(6) Deponent Teresa Iwanski, dated October 8, 2025 ("Iwanski Depo. I") | Appendix 0331-0682 |
| I | Plaintiff's Experian Dispute Results, dated March 7, 2024 ("First Dispute Results") | Appendix 0683-0687 |
| J | 2023 Credit Reporting Resource Guide ("2023 CRRG") | Appendix 0688-1063 |
| K | Rushmore ACDV Response, dated August 19, 2024 ("Second Rushmore ACDV Response") | Appendix 1064-1065 |
| L | Plaintiff's Experian Dispute Results, dated August 19, 2024 ("Second Dispute Results") | Appendix 1066-1070 |
| M | Deposition Transcript of Christina Hamilton, dated December 9, 2025 ("Hamilton Depo.") | Appendix 1071-1121 |
| N | Declaration of Paola Espinoza, ("Espinoza Decl.") | Appendix 1122-1126 |
| O | Plaintiff's Emergency Room Medical Reports, dated March 5, 2024 ("Plaintiff's Medical Records") | Appendix 1127-1147 |

| P | Deposition Transcript of Paola Espinoza, dated November 14, 2025 ("Espinoza Depo.") | Appendix 1148-1243 |
|---|---|---|
| Q | Deposition Transcript of Timothy Sumida, dated November 18, 2025 ("Sumida Depo.") | Appendix 1244-1432 |
| R | Deposition Transcript of Experian 30(b)(6) Deponent Peter Henke, dated October 3, 2025 ("Henke Depo.") | Appendix 1433-1615 |
| S | Rushmore Membership Application, dated May 2, 2016 ("Rushmore Membership Application") | Appendix 1616-1618 |
| T | Deposition Transcript of Experian 30(b)(6) Deponent Teresa Iwanski, dated October 8, 2025 ("Iwanski Depo. II") | Appendix 1619-1794 |
| U | Contract Between Experian and Rushmore, dated May 2, 2016 ("Rushmore Contract") | Appendix 1795-1803 |
| V | Deposition Transcript of Experian 26(a)(2) Deponent Mary Methvin, dated December 11, 2025 ("Methvin Depo.") | Appendix 1804-2074 |
| W | Experian ACDV Procedures Participant Guide ("ACDV Procedures") | Appendix 2075-2203 |
| X | Experian Disputes Trades Participant Guide ("Disputes Trades") | Appendix 2204-2313 |
| Y | Experian EPC Sorting Procedures Manual ("EPC Sorting Procedures") | Appendix 2314-2354 |

| Z | Plaintiff's Rule 26(a)(2) Expert Witness Report from Douglas Hollon ("Hollon Expert Report") | Appendix 2355-2403 |
|---|---|---|
| AA | Plaintiff's Rule 26(a)(2) Supplemental Expert Witness Report from Douglas Hollon ("Hollon Supplemental Expert Report") | Appendix 2404-2431 |
| BB | Plaintiff's Experian Dispute Response Log ("Dispute Response Log") | Appendix 2432-2438 |
| CC | Plaintiff's Experian Report, dated May 28, 2025 ("Plaintiff's Experian Report") | Appendix 2439-2447 |
| DD | Experian's Motion for Summary Judgment from Butler ("Butler MSJ") | Appendix 2448-2464 |
| EE | Northern District of Illinois Order Granting Experian's Motion for Summary Judgment from Butler ("Butler Order") | Appendix 2465-2476 |
| FF | Declaration of Victor Ramirez Najera ("Plaintiff's Decl.") | Appendix 2477-2478 |

RESPECTFULLY SUBMITTED on December 22, 2025.

By: */s/ James Ristvedt*
James Ristvedt, AZ Bar #035938
**CONSUMER JUSTICE LAW FIRM PLC**
8095  N. 85th Way
Scottsdale, AZ 85258
E: jristvedt@consumerjustice.com
T: (480) 626-1956

- 4 -

F: (480) 613-7733

Youssef H. Hammoud (SBN: 321934)
**THE CREDIT ATTORNEY, INC.**
601 N Parkcenter Drive Suite 202
Santa Ana, CA 92705
T: (949) 301-9692
F: (949) 301-9693
E: yhammoud@thecreditattorney.com

*Attorneys for Plaintiff,*
*Victor Manuel Ramirez Najera*

## CERTIFICATE OF SERVICE

I hereby certify that on December 22, 2025, I electronically filed the following document with the Clerk of the Court using the ECF system. Notice of such filing will be sent to all attorneys of record in this matter. Since none of the attorneys of record are non-ECF participants, hard copies of the foregoing have not been provided via personal delivery or by postal mail.

**CONSUMER JUSTICE LAW FIRM**
By: */s/ Shaun Pambid*
Shaun Pambid

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

VICTOR MANUEL RAMIREZ )
NAJERA, )
)
    Plaintiff, )
)
Versus ) CASE NO. 4:25-CV-00443
)
)
EXPERIAN INFORMATION )
SOLUTIONS, INC.; APPFOLIO )
INC.; and NATIONSTART )
MORTGAGE LLC d/b/a )
RUSHMORE SERVICING, )
)
    Defendants. )

---------------------------------------

ORAL DEPOSITION OF

VICTOR MANUEL RAMIREZ NAJERA

SEPTEMBER 23, 2025

VOLUME 1

---------------------------------------

    ORAL DEPOSITION OF VICTOR MANUEL RAMIREZ NAJERA, produced as a witness at the instance of the Defendant, and duly sworn, was taken in the above-styled and -numbered cause on September 23rd, 2025, from 9:01 a.m. to 4:21 p.m., before Shawna Gauntt-Hicks, Certified Shorthand Reporter in and for the State of Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.



A  P  P  E  A  R  A  N  C  E  S

FOR THE PLAINTIFF:

        Mr. Youssef H. Hammoud
        THE CREDIT ATTORNEY
        601 N. Parkcenter Drive
        Suite 202
        Santa Ana, California 92706
        Phone: 949.301.9692
        E-mail: Yhammoud@thecreditattorney.com


FOR THE DEFENDANT EXPERIAN INFORMATION SOLUTIONS, INC.:

        Mr. Chance B. McCraw
        JONES DAY
        2727 N. Harwood Street
        5th Floor
        Dallas, Texas 75201
        Phone: 214.969.5104
        E-mail: Cmccraw@jonesday.com



The deposition of VICTOR MANUEL RAMIREZ NAJERA taken before Shawna Gauntt-Hicks, Certified Shorthand Reporter, pursuant to notice.

The reading and signing of the deposition is not waived.



```
                        I N D E X


                                                      PAGE

Appearances.........................................  2

VICTOR MANUEL RAMIREZ NAJERA

Examination by Mr. McCraw...........................  6

Signature and Changes............................... 257

Reporter Certification.............................. 259


                        EXHIBITS

NO.       DESCRIPTION                                 PAGE
```

Exhibit 1  Plaintiff's Initial Disclosure Statement..  47

Exhibit 2  Interrogatory Responses..................  89

Exhibit 3  Interrogatory Responses.................. 103

Exhibit 4  Tenant Screening Report.................. 129

Exhibit 5  NorthCrest Medical Center records........ 147

Exhibit 6  Experian Credit Report................... 162

Exhibit 7  Experian Dispute Results................. 181

Exhibit 8  Experian Credit Report................... 191

Exhibit 9  Letter to Experian....................... 194

Exhibit 10 Experian Dispute Results................. 203

Exhibit 11 Experian Credit Report................... 208

Exhibit 12 Experian report.......................... 212

Exhibit 13 Dispute.................................. 228

Exhibit 14 Experian Credit Report................... 230



Exhibit 15 Experian Dispute Results.................. 237

Exhibit 16 Experian Credit Report................... 238

                    REQUESTED DOCUMENTS/INFORMATION


NO.        DESCRIPTION                          PAGE/LINE

Number 1  Referal information...................... 45

Number 2  Medical records.......................... 96

Number 3  Letter.................................. 118


                    CERTIFIED QUESTIONS
                         (NONE)



P R O C E E D I N G S

(REPORTER'S NOTE:  Quotation marks may not reflect direct/exact quote.)

(On the record at 9:01 a.m.)

THE COURT REPORTER:  Mr. Najera, if you'll raise your right hand for me.

Do you solemnly swear or affirm that the testimony you're about to give will be the truth, the whole truth, and nothing but the truth?

THE WITNESS:  Yes, I do.

THE COURT REPORTER:  Okay.  And if you'll speak up just a tad.

THE WITNESS:  Okay.

THE COURT REPORTER:  Will all parties present please state your appearances for the record.

MR. MCCRAW:  Chance McCraw for Defendant Experian Information Solutions, Inc.

MR. HAMMOUD:  Yousef Hammoud on behalf of the plaintiff.

THE COURT REPORTER:  All right.

VICTOR MANUEL RAMIREZ NAJERA, having been first duly sworn, testified as follows:

EXAMINATION

BY MR. MCCRAW:



Q.  Good morning, Mr. Ramirez.  My name's Chance McCraw, and I represent Experian Information Solutions, Inc.

If I use the term "Experian," will you understand that I'm referring to Experian Information Solutions, Inc.?

A.  I understand.

Q.  Okay.  And then -- so you're the plaintiff in this case; correct?

A.  Correct.

Q.  Okay.  And then would you prefer that I refer to you as Mr. Ramirez?  Something else?

A.  That's fine.

Q.  And then have you ever been deposed before?

A.  I have not.

Q.  Okay.  So this is your first time.  So we'll go over some ground rules here in just a minute because things do have to go a certain way just so that we make sure everything gets on a written record.

So -- so you understand that you're testifying under oath, just as if you were in a court of law; correct?

A.  Correct.

Q.  And then everything we say today while we're on the record will be recorded by the court reporter.  And



because of that, it's important that we speak clearly and avoid speaking at the same time.

Do you understand that?

A.  I understand.

Q.  And then -- so I ask that you do your best to wait for me to finish a question before responding, and I'll try my best to make sure you have finished your answer before I ask another question.

Agreed?

A.  Agreed.

Q.  Okay.  Doing good so far.

All right.  And then -- so your counsel may object after I ask a question.  Once he's finished stating his objections, you can always still answer my question, unless he specifically instructs you not to answer.

Do you understand that?

A.  I understand.

Q.  And then rather than shaking or nodding your head in response to my questions, you'll need to always provide an audible "yes," "no," or some kind of other response.

Do you understand that?

A.  I understand.

Q.  Doing good so far.



If at any point you do not understand my question, will you agree to let me know?

A.  I agree.

Q.  And then if you do respond to my question, is it fair for me to assume that you understood my question?

A.  It's fair.

Q.  And then if you need a break at any time, just let me know.  We can go off the record.  But I'll ask that you answer my pending question before we take a break.

Do you agree to that?

A.  I agree.

Q.  Okay.  And then are you aware of any physical or mental condition that might prevent you from giving accurate testimony today?

A.  No, none.

Q.  Are you under the influence of any kind of medicine or drugs, alcohol, anything that might impair your ability to testify truthfully today?

A.  None.

Q.  Okay.  All right.  So, Mr. Ramirez, what have you done to prepare for today's deposition?

A.  I've just gone over a couple things with my attorney.



Q.  Okay.  And I'm not going to ask about the substance of those communications, but how often did you meet with your attorney regarding this deposition?

A.  I don't remember.

Q.  Did you meet, you know, more than once regarding this deposition?

A.  Just once.

Q.  Just once.

And was that -- how recently was that?

A.  Yeah, I don't remember.

Q.  Okay.  Was it within the last week?

A.  Correct.

Q.  Okay.  So within the last week, you met one time regarding this deposition; is that correct?

A.  Correct.

Q.  And then did you meet with anybody else?

A.  No.

Q.  Did you review any documents?

A.  I did.

Q.  Okay.  And do you recall what those documents were?

A.  I do not, no.

Q.  If -- as we're going through today, if you recognize the document, would you say, "Oh, yes.  This is one of the documents I've reviewed before"?



A.  Possibly.

Q.  Okay.  Did you do anything else to prepare besides meeting with your counsel?

A.  No.

Q.  Did you review any documents on your own in preparing for this deposition?

A.  No.

Q.  And so just want to get a little bit of general background.

So where do you currently live?

A.  Fort Worth.

Q.  And what is the address -- the address?

A.  4821 Dorsey Street, Forest Hill, Texas.

Q.  So is that technically a separate city, Forest Hill, than Fort Worth?

A.  It's part of Tarrant.

Q.  And you mean Tarrant County?

A.  Correct.

Q.  But is Forest Hill a separate city from Fort Worth?

A.  Yes.

Q.  And how long have you lived there?

A.  About to be four months.

Q.  And where were you before that?

A.  Can you clarify that?



Q.   Where were you living before you were living at 4821 Dorsey?

A.   Lake Worth, Texas.

Q.   And how long did you live in Lakewood [sic], Texas?

A.   I don't remember.

Q.   Do you remember when you first moved to Lakewood, Texas?

A.   June of 2024.

Q.   And so you lived there up until about four months ago; is that right?

A.   Correct.

Q.   And then where were you before Lakewood, Texas?

A.   Nashville, Tennessee.

Q.   And how long were you in Nashville?

A.   About a year.

Q.   So that would have been from about June 2023 to June 2024; is that right?

A.   That's about right.

Q.   Where were you -- before you lived in Nashville, Tennessee, where were you living?

A.   Lake Worth, Texas.

Q.   Lakewood or Lake --

A.   Worth.

Q.   Worth, okay.



Is that the same place you said you were living up until June of 2020 -- or from June 2024 until four months ago?

A.  Right.

Q.  Okay.  I think I -- I put Lakewood.  Sorry.  All right.  So Lake Worth, Texas.  Got you.  Good clarification.

All right.  And so you were living in Lake Worth, Texas, in the same home, I'm guessing, same location, address that you were up until four months ago?

A.  Correct.

Q.  And how long were you living in Lake Worth, Texas?

A.  It was December to April.  So December 2023 to April 2024 -- I'm sorry -- '22 to '23.

Q.  And then, I guess, where were you before?  Where were you living before Lake Worth, Texas, in December 2022?

A.  Nashville, Tennessee.

Q.  Nashville, okay.

So you went to Nashville a couple different times?

A.  Correct.

Q.  And how long -- I guess, what were the dates



800.211.DEPO (3376)
EsquireSolutions.com

APPENDIX 0014

you were living in Nashville, Tennessee, this time previous to December 2022?

A.  October 2021 to that date, December 2022.

Q.  It's a little over a year.

And then I guess we'll continue going backwards.  So where were you living before October 2021 when you were in Nashville, Tennessee?

A.  I was living in Lake Worth.  So that same address.

Q.  And how long were you living from -- in that Lake Worth address?

A.  I don't remember.

Q.  Do you remember the dates or, generally, the months of when you were living at that Lake Worth address?

A.  No.  I couldn't tell you, like, exact dates on that, no.

Q.  All right.  So I guess we'll try and go from a different angle.

So where were you born, Mr. Ramirez?

A.  Sabinas, Coahuila.

Q.  And that's in Mexico; correct?

A.  Correct.

Q.  And when did you move to the United States?

A.  I don't remember.



Q.  Do you remember about how old you were?

A.  Two years old.

Q.  Two.

And have you lived in the United States since then?

A.  Correct.

Q.  And do you remember when you first moved in -- or moved to Fort Worth?

MR. HAMMOUD:  Objection.  Form.

You can answer.  So from time to time, like he said at the beginning, I may place an objection.  It is just for the record, for the court reporter to get it down.  But unless I instruct you not to answer, you will proceed to answer his question after I place my objection.

A.  Can you repeat the question?

Q.  (BY MR. MCCRAW)  I'll rephrase it.

So do you remember when you first -- how old were you when you first started living in Fort Worth?

A.  Two years old.

Q.  And did you live in Fort Worth from the age of two years old until you graduated high school?

A.  Correct.

Q.  And so what is your current legal status here



in the United States?

MR. HAMMOUD:  Objection.  Form, relevance, harassing.

You can answer.

A.  I am on DACA.

Q.  (BY MR. MCCRAW)  DACA?  Okay.

So is that you're allowed to temporarily reside here, or are you a naturalized citizen?  I just want to --

MR. HAMMOUD:  Same objections.

And I'm going to ask you to not answer right now.

But what's the point of this line of questioning?  What does his immigration status have to do with the claims at issue?

MR. MCCRAW:  I'm allowed to ask any questions I -- I need to ask here.  Relevance is not an objection.  And right now, you're doing a speaking objection, which is not allowed under the federal rules.

MR. HAMMOUD:  At the same time, I'm not going to have you try and harass my client with questions.

MR. MCCRAW:  I'm not harassing him.  These are just facts.

MR. HAMMOUD:  His immigration status has



nothing to do with the claims at issue.

MR. MCCRAW:  There are implications of certain things, and that's why I'm -- I'm just trying to get the relevant information.

MR. HAMMOUD:  You can answer.

A.  Can you repeat the question?

Q.  (BY MR. MCCRAW)  All right.  So you mentioned that you're under DACA status; correct?

A.  Correct.

Q.  So under DACA, are you a naturalized citizen?  Is it you're allowed to temporarily reside here?  What does DACA mean -- DACA status?

A.  I wouldn't be able to answer the -- with -- like, correctly.  I don't know all the details of that.

Q.  Well, are you a naturalized citizen?

MR. HAMMOUD:  Same objection as before.

A.  I can't answer you with, like, definitive answer.  I'm not too familiar with the law on that side, yeah.

Q.  (BY MR. MCCRAW)  Have you taken a citizenship test and done the other forms in order to then take your oath in order to become a naturalized citizen?

A.  No.

Q.  Now, when you were living in Fort Worth -- you said from two years to 18 years -- who all were you



living with there?

A.  My mom, my dad, and my -- yeah.

Q.  Any siblings?

A.  So I have a younger sister.

Q.  Was she with -- there at the Fort Worth address as well?

A.  Correct.

Q.  Anybody else?

A.  Nobody else.

Q.  And do your mom, dad, and younger sister still live at that Fort Worth address?

A.  Only my mom.

Q.  And, I guess, when did your dad and younger sister stop living at that Fort Worth address?

MR. HAMMOUD:  Objection.  Form.

A.  I don't remember.

Q.  (BY MR. MCCRAW)  Was your dad living at that address in 2022?

A.  Yes.

Q.  And was he still living there in 2023?

A.  Yes.

Q.  Was he still living there in 2024?

A.  Yes.

Q.  Okay.  So did he stop living there in 2025?

A.  No.



Q.   Does he still live there as of this year?

A.   I guess I need clarification on that.

Q.   Does your dad still live at that Fort Worth address that you lived in from when you were two years old to 18 years old?

A.   No.

Q.   Where does he live now?

A.   In Mexico.

Q.   And he moved there in 2025; is that right?

A.   Correct.

Q.   And so we mentioned that you've lived in a few different places.  So why did you initially move from Fort Worth to, I guess, Nashville when you were there from October 2021 to December 2022?

A.   For work.

Q.   And then whenever you left Nashville in December 2022 and you moved back to Lake Worth, what brought you back to Lake Worth?

A.   Work.

Q.   And then when you moved back to Nashville -- and you were there, I believe, until about June 2023 -- what brought you there?

A.   Work.

Q.   And then when you moved back to Lake Worth in 2024, I believe it was, what brought you back there --



brought you back to Lake Worth?

A.  Work.

Q.  All right.  And are you married, Mr. Ramirez?

A.  I am not.

Q.  Are you engaged?

A.  Yes.

Q.  And when did that happen?

A.  Don't quite remember, yeah.

Q.  She might not like that answer.

Okay.  Do you remember what year you got engaged?

A.  End of last year.

Q.  And to whom are you engaged?

A.  Paola.

Q.  And what's her last name?

A.  Espinoza.

Q.  And how long did you -- or scratch that.

When did you start dating Ms. Paola Espinoza?

MR. HAMMOUD:  Objection.  Form.

A.  Couldn't tell you.  I don't know.

Q.  (BY MR. MCCRAW)  When did you meet Ms. Espinoza?

A.  I couldn't tell you an exact date.

Q.  Do you remember the general year you met



Ms. Espinoza?

A.  2022.

Q.  And did you meet her when you were living in Nashville?

A.  Correct.

Q.  Is that where she's from?

A.  Correct.

Q.  And then, Mr. Ramirez, do you have any children?

A.  Yes.

Q.  How many?

A.  Two.

Q.  And when were they born?

A.  2017, 2023.

Q.  For the one born in 2023, do you remember what month?

A.  June.

Q.  And then for the one born in 2017, do you remember what month they were born?

A.  August.

Q.  And is -- I'm going to guess that the one born in 2023 is between you and Ms. Espinoza; is that right?

A.  Correct.

Q.  Okay.  Is the one from 2017 with another individual and you?



A. Correct.

Q. And do you have custody of the one from -- that was born in 2017?

MR. HAMMOUD: Objection. Form.

A. I couldn't answer you correctly. I don't know what the correct term for that is.

Q. (BY MR. MCCRAW) Do you -- does that child -- is that child in your care right now, Mr. Ramirez?

A. Yes.

Q. And since 2017, has that child been living with you and in your care?

A. I need you to clarify that.

Q. So the -- the child that was born in August 2017, has that child lived with you since August of 2017?

A. Yes.

Q. And then, Mr. Ramirez, what's the highest degree that you've obtained?

A. High school diploma.

Q. Have you done any kind of follow-on training or education related to your work?

A. I don't know what you mean by that question.

Q. Do you have any other, like, certifications, any other kind of, you know, courses maybe that you've completed? Some of them might have been related to work



or other courses maybe you've done online.

A.   Trimble technician, OSHA 30.

Q.   What was the first one you mentioned?

A.   Trimble technician.

Q.   Can you spell that, Trimble?

A.   T-R-I-M-B-L-E.

Q.   What is that?

A.   So it's like a layout machine.  So commercial construction.  So it's like a laser, and it shoots it out and it tells you where everything goes in the building.

Q.   Okay.  Pretty cool.

And then OSHA 30, is that related to OSHA laws?

A.   Yeah.  Construction safety.

Q.   So where do you currently work, Mr. Ramirez?

A.   Like as in the name of my employer?

Q.   Correct.

A.   Integrated Interiors, Inc.

Q.   And how long have you worked for them?

A.   A little over a year.

Q.   And are they located in Fort Worth?

A.   Correct.

Q.   And what is your current job title with them?

A.   Commercial construction foreman.



Q.  And how long have you had that title?

A.  Four years.

Q.  So how long have you worked for Integrated Interiors, Inc.?

A.  A little over a year.

Q.  So you've been a construction foreman, I'm guessing, for other companies, then?

A.  Correct.

Q.  And so as a construction foreman, what are your job responsibilities?

A.  Manpower; schedule, make sure everything goes on -- is constructed on time; safety.

Q.  And have those job responsibilities stayed the same for the past four years, even when you were with other employers?

A.  Correct.

Q.  I'm just trying to speed it along.

All right.  And then -- so what is your current salary with Integrated Interiors, Inc.?

A.  I get paid hourly.

Q.  And what is -- what do you get paid hourly?

A.  $28.

Q.  And so who were you with before Integrated Interiors, Inc.?

A.  Precision Walls, Inc.



Q.  And what were your dates of employment with them?

A.  They would match what my living situation was.

Q.  Okay.  So you -- was that when you were in Nashville?

A.  Correct.

Q.  Okay.  So that would have been up through -- from about April of 2022, I think, to June 2023.

Does that sound right?

A.  Sounds right.

Q.  Okay.  And just to confirm, your job title was construction foreman with them as well?

A.  Correct.

Q.  And what was your salary with them?

A.  $29.

Q.  And then who were you with before Precision Walls, Inc.?

A.  I can't remember the name right now.

Q.  Okay.  But it was a different construction company and -- is that right?

A.  Different construction company; correct.

Q.  And you were living back in Lake Worth, Texas, when you were working for them; is that right?

A.  Correct.

Q.  And would the dates of employment with that



employer match the dates that you were living there in Lake Worth, Texas, which was, I believe -- was it -- well, no, I think it was December 2022 to April 2023? That could be wrong.

A. Correct.

Q. And how much -- what was your salary with that employer?

A. I don't remember.

Q. Do you remember if it was more or less than Precision Walls, Inc.?

A. Less.

Q. Less.

And was that also an hourly?

A. Hourly.

Q. And was that your first construction foreman job?

A. No.

Q. So who did you work for before that as a construction foreman?

A. Are you asking the employer before?

Q. Correct.

A. I don't remember.

Q. Was that an employer in Nashville, Tennessee?

A. Yes.

Q. So back in Nashville.



And were you a construction foreman the entire time that you worked for that company?

A. Correct.

Q. And was that your first position as a construction foreman?

A. Can you clarify that question?

Q. Was that the first employer that you worked for where you were a construction foreman?

A. No.

Q. So I'm guessing there was one at Lake Worth when you were back in Lake Worth in 2021; is that right?

A. Right.

Q. And was that the first construction foreman position you held?

A. Yes.

Q. And so what position did you have before construction foreman?

A. You would call it labor, construction.

Q. So construction foreman is kind of a management position?

A. Supervision; correct.

Q. And for each of these different employers, how did you apply for the construction foreman position?

MR. HAMMOUD: Objection. Form.

A. Online.



Q.  (BY MR. MCCRAW)  And so you submitted an online application for each of these employers; is that right?

A.  No.

Q.  Which one did you not submit an online application for?

A.  The Nashville 2021 to -- that one.

Q.  So how did you get that position?

A.  In person.

Q.  And why were you applying to positions in Nashville, Tennessee, in October 2021?

A.  Job opportunity.

Q.  How did you hear about the job opportunity?

A.  Coworker.

Q.  Was this a coworker from your employer in -- that you were with in Lake Worth, Texas?

A.  Correct.

Q.  What was it about this job opportunity that seemed appealing to you?

A.  Higher wage.

Q.  Were there no other jobs in and around Lake Worth, Texas, that provided the same job opportunity?

A.  It was for the higher wage.

Q.  Any other reasons that you were looking for a job in Nashville, Tennessee, besides this job



opportunity?

A.  No.

Q.  So for the documents that you have reviewed, you said in preparation for this deposition, were you provided copies of those documents electronically or physically?

A.  I'm not familiar with what documents you're talking about.

Q.  So earlier today, Mr. Ramirez, do you remember when we asked what you had done to prepare for this deposition?

A.  Yes.

Q.  Do you remember whenever I asked you if you had reviewed any documents in preparation for this deposition?

A.  Yes.

Q.  So those documents, were you provided electronic or physical copies of those?

A.  Right.  I was provided a copy.

Q.  Was it provided electronically or physically?

A.  Electronically.

Q.  And were you provided any other documents, electronically or physically, regarding this case?

MR. HAMMOUD:  Objection.  Form.

A.  I don't know what you would be talking about.



Q.  (BY MR. MCCRAW)  Have you -- all right.

So during the course of this case or even leading up to this case, have you ever been asked to preserve any documents that are related to this case?

A.  Can you repeat the question?

Q.  So during this case, when -- since you've filed the complaint or even leading up to that time period, have you ever been asked to preserve documents related to this case?

MR. HAMMOUD:  Objection to the extent that calls for any communications between the plaintiff and myself.

A.  Yeah, I wouldn't be able to answer that question.  I -- I don't know.

Q.  (BY MR. MCCRAW)  Did anyone ever tell you that you have a duty to preserve documents related to this case?

MR. HAMMOUD:  Same objection.

If it's any discussions you and I have had, then I'd instruct you not to answer.  To the extent there's communications with third parties, you're welcome to answer.

A.  I can't answer you correctly.  I don't know.

Q.  (BY MR. MCCRAW)  Have you preserved any documents related to this case?



A.  I -- I wouldn't be able to answer you correctly.  I'm sorry.  No, I don't know.

Q.  Why can't you answer that correctly?

A.  I don't understand the question.

Q.  Have you deleted any documents related to this case?

A.  No.

Q.  Have you taken steps to save e-mails, documents, those things that might relate to this case?

A.  Yeah, I can't -- I can't answer that.  I don't know.

Q.  Why don't you know?

A.  I guess I just need you to clarify the question for me.

Q.  Have you taken any steps to preserve documents or communications related to this case?

A.  No.

Q.  Are you aware of any documents in your possession that relate to Experian but have not been provided to Experian?

A.  No.

Q.  And then are you aware of any documents that relate to this case generally that have not been provided to Experian?

A.  Nope.



Q.  Did you review your credit report from other credit reporting agencies since you filed this case?

MR. HAMMOUD:  Objection.  Form.

A.  Yes.

Q.  (BY MR. MCCRAW)  And have you reviewed your credit report from other credit reporting agencies when you were filing disputes with Experian?

A.  I can't remember.  I wouldn't be able to tell you.

Q.  Did you ever review your credit report from other credit reporting agencies since 2022 to present?

A.  Yes.

Q.  And how did you review those credit reports?

A.  Online.

Q.  And did you save copies of those credit reports?

A.  Nope.

Q.  Are they available in an online profile with those credit reporting agencies?

A.  I wouldn't be able to tell you.  I don't know.

Q.  So whenever you said you viewed them online, what website, what application what were you using in order to view them?

MR. HAMMOUD:  Objection.  Form.

A.  Chase bank account.



Q.  (BY MR. MCCRAW)  And was that a website, or was that an application?

A.  Application.

Q.  And was that application -- were you viewing it through your phone?

A.  Correct.

Q.  And when you viewed these credit reports, were they saved in your Chase bank account?

A.  I don't know.

Q.  So how did you go about accessing them in your Chase bank account?

A.  It's on the homepage.

Q.  So you logged in to your Chase bank account. You're now on the homepage.  What does it show?

A.  I can't tell you what it shows.  I don't know. Can't remember off the top of my head.

Q.  But did it show your entire credit report on the homepage?

A.  No.

Q.  So you clicked something; is that right?

A.  Correct.

Q.  And then it took you to your credit report; is that right?

A.  Correct.

Q.  And did it open, like, a different browser



whenever it did that?

A.  No.

Q.  And whenever you clicked that to go to the credit report, did it show only the credit report or was there other things involved with it?

A.  I couldn't tell you off the top of my head.  I don't remember.

Q.  So you said you've recently reviewed your credit score from other credit reporting agencies; is that right?

MR. HAMMOUD:  Objection.  Form.

A.  I said I recently -- I don't remember, no.

Q.  (BY MR. MCCRAW)  Okay.  Have you recently reviewed your credit report with the other credit reporting agencies?

A.  Can you clarify that?

Q.  Have you reviewed your credit report within the last six months with other credit reporting agencies, such as TransUnion and Equifax?

A.  I don't remember the timeline.

Q.  When was the last time you reviewed your credit report with TransUnion or Equifax?

A.  I don't remember.

Q.  Generally, when was the last time you reviewed it?



A.  Generally?  I -- I really don't remember.

Q.  Have you reviewed it within the last year?

A.  Yes.

Q.  Okay.  And do you remember your credit scores that TransUnion and Equifax were reporting?

A.  Don't remember exact scores, no.

Q.  Do you remember generally what those scores were?

A.  Yes.

Q.  Okay.  Generally, what were those scores from the past year that you saw on either a TransUnion or Equifax credit report?

A.  Like I said, I couldn't tell you exact numbers.

Q.  Were they above 500?

A.  Yes.

Q.  Were they above 800?

A.  No.

Q.  Were they above 700?

A.  Yes.

Q.  For both of them?  They were both above 700?

A.  I couldn't tell you which ones.  I don't remember.

Q.  Okay.  But do you think it was only for one or for both?

A.  I couldn't tell you.  I don't remember.



Q.   When would review your credit reports from Equifax or TransUnion, would you also review your credit report from Experian?

A.   Yeah, I don't remember.

Q.   Would you ever compare scores across the three credit reporting agencies:  Equifax, TransUnion, and Experian?

A.   Yes.

Q.   And when you did compare your credit report between Experian, Equifax, and TransUnion, were there any differences that you saw?

A.   Yes.

Q.   What were those differences?

A.   I couldn't tell you every single difference. So I don't know that off the top of my head.

Q.   What were some of the differences?

A.   The one that comes to mind is the mortgage.

Q.   And what do you mean by "the mortgage"?

A.   Rushmore Nationstar mortgage.

Q.   Okay.  And what was different between Equifax, TransUnion, and Experian regarding the Rushmore mortgage?

A.   It was on Experian credit report.

Q.   Was it on Equifax or TransUnion?

A.   It was not on Equifax.



Q. But was it on TransUnion?

A. No, I can't remember.

Q. And when did you notice that it was on Experian and not on Equifax?

A. I couldn't tell you an exact date.

Q. Do you remember the year?

A. I can't remember.

Q. Was it prior to you applying for an apartment in Nashville through AppFolio?

A. No.

Q. Was it after that date?

A. Correct.

Q. Do you remember when you -- when was the first time that you started tracking your credit on your credit report?

MR. HAMMOUD: Objection. Form.

A. I don't remember.

Q. (BY MR. MCCRAW) Do you remember the year that you began looking at your credit report?

MR. HAMMOUD: Same objection.

A. Can't remember.

Q. (BY MR. MCCRAW) Did you review your credit report prior to applying for the apartment in Nashville with AppFolio?

A. Honestly, can't remember.



Q.  Do you remember when you first saw the Rushmore mortgage on your credit report?

A.  Can't give you an exact date.

Q.  Do you remember -- generally, do you remember the year when you first saw that on your credit report?

A.  It's going to be that same year as the AppFolio.

Q.  Okay.  And did you see it on -- was the AppFolio credit report -- or the AppFolio report, was that the first time you saw the Rushmore mortgage on your credit report?

A.  I can't remember.

Q.  Is it possible you saw the Rushmore mortgage on your credit report prior to that date?

A.  No.

Q.  It's not possible?  Why do you say it's not possible?

A.  Can you repeat the question?

Q.  So I had asked, is it possible you saw the Rushmore mortgage account on your credit report prior to the AppFolio report that you received?

A.  Right.

Q.  And you said, "I can't remember."  And then I said, "Is it possible?"  And you said, "No."

Why is it not possible that you could have



seen the Rushmore mortgage on your credit report prior to the AppFolio report?

A.   Yeah, I don't remember seeing it.  So I can't give, you know, an exact date on when I saw it.

Q.   But is it possible that you did see the Rushmore mortgage on your credit report prior to the AppFolio report?

A.   I can't remember.

Q.   Well, if you can't remember, is it then possible?

A.   No.  No.

Q.   Why is it not possible if you just can't remember?

A.   I can't remember the exact date when I saw it. I just know it was after AppFolio.

Q.   Okay.  So you had never seen the Rushmore account on a credit report prior to the AppFolio report?

A.   Correct.

Q.   What about the Pennymac loan account?  Had you ever seen that account on a credit report prior to the AppFolio report?

A.   No.

Q.   Mr. Ramirez, are you familiar with what we call the FCRA for short, Fair Credit Reporting Act?

A.   I couldn't tell you what's in it.



Q.  Where did you, I guess, gain the knowledge that you have about how to submit a dispute to a credit reporting agency?

MR. HAMMOUD:  Objection.  Form.

A.  I can't remember off the top of my head.

Q.  (BY MR. MCCRAW)  Did you do any online research that told you how to submit a dispute to a credit reporting agency?

A.  It would be online.

Q.  And did you talk with anybody online about submitting a dispute to a credit reporting agency?

A.  No.

Q.  All right.  Did you communicate in any way with anybody regarding submitting a dispute to a credit reporting agency?

A.  No.

Q.  So, Mr. Ramirez, what is your end goal for this lawsuit?

MR. HAMMOUD:  Objection.  Form.

A.  That would be in between my attorney and I.

Q.  (BY MR. MCCRAW)  So you don't have any end goal besides what your attorney has instructed you about?

MR. HAMMOUD:  Objection.  Form, misstates testimony.

A.  I guess I need you to clarify that.



Q.   (BY MR. MCCRAW)   Absent discussions that you had with your attorney, you don't have any goal of what you would like to achieve with this lawsuit.

Is that what you're saying?

A.   The goal is, I believe, what I'm entitled to. So whatever it is that I'm entitled to and what myself and my attorney believe that I'm entitled to.

Q.   So what do you believe you're entitled to?

A.   What myself and my attorney believe we're entitled to.

Q.   Okay.  So you don't have an independent belief of what you're entitled to absent what you've discussed with your attorney?

A.   I don't have enough knowledge about -- about what I would be entitled to.

Q.   What knowledge do you have about what you'd be entitled to?

A.   Little.  I'm not an expert in these subjects.

THE COURT REPORTER:  Can you repeat that answer?

A.   Can you repeat the question?

Q.   (BY MR. MCCRAW)  What knowledge do you have about what you would be entitled to?

A.   The basics.  I'm not an expert in this field.

Q.   So what are the basics that you understand?



800.211.DEPO (3376)
EsquireSolutions.com

A.  That I can file a complaint and basics of how credit works.  I'm not an expert.  I don't know the details to everything.

Q.  Are you familiar with the relief you're seeking in your complaint?

A.  I don't understand the question.

Q.  Have you reviewed your complaint in this case?

A.  Yes.

Q.  And in that complaint, you ask for certain forms of relief; right?

A.  Right.

Q.  Are you familiar with those forms of relief?

A.  I can't give them -- state them to you off the top of my head.

Q.  Do you know any of them that you're seeking -- any forms of relief that you're seeking?

A.  I wouldn't be able to correctly give them to you, and I don't want to misspeak.

Q.  So when did you first decide to seek counsel regarding a credit dispute?

MR. HAMMOUD:  Objection.  Form.

A.  I don't remember off the top of my head.  I don't.

Q.  (BY MR. MCCRAW)  Do you remember what year you decided to try and seek an attorney?



A.  I do not.

Q.  Do you remember where you were living when you tried to seek an attorney?

A.  I don't.

Q.  Did you seek out an attorney in 2024?

A.  I -- I couldn't tell you.  I don't remember.

Q.  Would it have been -- did you seek out an attorney in 2023?

A.  No.

Q.  So it would have been 2024, at the earliest, that you sought an attorney regarding the credit dispute?

A.  I can't give you a definitive answer on that. I don't remember.

Q.  Well, if you didn't seek an attorney in 2023, did you seek an attorney prior to 2023 regarding a credit dispute?

A.  No.

Q.  So would 2024 have been the earliest that you would have sought an attorney regarding a credit dispute?

A.  I don't remember.

Q.  How did you learn about your attorney in this case?

A.  I was referred.



Q.  Okay.  And who referred you?

A.  I don't remember.

Q.  Where did the referral come from?

A.  I don't remember.  I don't know.

Q.  How did the individual get your information in order to make a referral?

A.  I don't quite remember.

Q.  Were -- did you submit an online form?

A.  I wouldn't be able to tell you.  I don't know.  I don't remember.

Q.  Did you call somebody regarding your referral?

A.  I can't give you a definitive answer.  I don't remember.

Q.  But it was somebody other than your current counsel and anybody that works in their office that made the referral; is that right?

A.  I couldn't tell you "yes" or "no."  I don't know.

Q.  Do you remember when the referral was made?

A.  No.

Q.  Do you remember how you were notified about the referral?

A.  Nope.

Q.  Did you attend an event that maybe led to a referral being made on your behalf?



A.  Nope.

Q.  Do you remember anything regarding your referral at all?

A.  No, just that I was referred.

Q.  And do you remember anything regarding how you came to have a referral?

A.  No.

Q.  Do you have any documents related to the referral?

A.  I don't know.  I don't remember.

Q.  Have you looked for any?

A.  No.

Q.  Have you looked for any communications related to a referral?

A.  No.

Q.  Would it be possible that you have an e-mail related to the referral?

A.  I don't know.

Q.  Okay.  But you haven't looked; right?

A.  I haven't looked.

Q.  Okay.

        MR. MCCRAW:  We'll ask those be produced pursuant to our request for production that we've made.

Q.  (BY MR. MCCRAW)  All right.  Do you remember when you first contacted your attorney?



A.  I don't remember.

Q.  Do you remember what year it was when you first contacted your attorney?

A.  No, I don't remember.

Q.  Do you remember where you were living at the time when you first contacted your attorney?

A.  No.

Q.  Were you living in Fort Worth or Nashville at the time you first contacted your attorney?

A.  I don't remember.

MR. MCCRAW:  We've been going for about an hour.  Now is probably a good time to take a break.

THE COURT REPORTER:  Going off the record at 10:06.

(Off the record at 10:06 a.m.)

(On the record at 10:16 a.m.)

THE COURT REPORTER:  We can go back on the record at 10:16.

Q.  (BY MR. MCCRAW)  Okay.  Mr. Ramirez, are you ready to proceed?

A.  Ready.

Q.  While we were on the break, did you have any conversations with anyone?

A.  Mr. Hammoud.

Q.  Okay.  And what did you discuss?



A.  That I've built buildings like this before, you know.  Commercial construction, we build buildings just like this.

Q.  Did you discuss anything related to the case?

A.  No.

Q.  Did you have any communications with anybody else while you were on break?

A.  No.

Q.  All right.  So we're going to go ahead and we're going to move on to our first exhibit.

MR. MCCRAW:  So this will be Exhibit 1.  Mark it for the court reporter before I forget.

(Exhibit 1 marked.)

Q.  (BY MR. MCCRAW)  Mr. Ramirez, have you seen this document before?

A.  Yes.

Q.  Okay.  And what do you recognize this document to be?

A.  I don't know the correct term for it.

Q.  Are these plaintiff's initial disclosure statements?

A.  Right.

Q.  Okay.  So I want to start on what is page 2.  There are two at the bottom.

And do you see subparagraph A where you've



been identified as a witness with knowledge about this case?

A.  I see it.

Q.  And so it says that you would have knowledge -- I specifically want to look at that last phrase -- regarding embarrassment.

What do you mean by "embarrassment" that you've suffered as damages related to this case?

A.  Embarrassment?  It's that feeling, you know, when someone looks at your credit report and they see what's on there.  You know, that mortgage isn't mine.  So what -- what is embarrassing is having to explain that to people, having to explain, you know -- I'm sure you've seen it.  It's late payments to it.  And that's embarrassing having to explain that and that, you know, that's my parents.  So that's -- that's quite embarrassing.

Like, imagine having to say that to somebody, you know, a stranger that looks at it.  Kind of having to go through that and explaining it and -- that's quite embarrassing.

Q.  Okay.  So on a scale of one to ten, from, like, zero being no embarrassment at all to ten being, like, the most embarrassing thing that could ever happen in life, how would you rate it?



A.  I mean, it's -- it's pretty much up there.
It's, like -- I would give it 9.9.  It's really
something that you don't -- you shouldn't have to
explain to people.

Q.  Okay.  So almost a ten.

All right.  So, I guess, for you, what
would be a ten, if we're just trying to relate?

A.  I mean, I don't -- I can't think of anything
off the top of my head right now.

Q.  Is this the, I guess, most embarrassing thing
that's happened to you in your life?

A.  Pretty much.  I mean, I don't have to explain
things like this with other people.  It's, like, really
something you don't want to do.  You know, you feel
embarrassed to have to explain things to, I mean, almost
strangers it is, you know.  When you're dealing with
certain things and someone looks at your credit report,
it's quite embarrassing having to explain that that's
what your parents are going through.

Q.  What do you mean by "what your parents are
going through"?

A.  Late payments.

Q.  Is there anything else that, I guess, your
parents were going through during that time that would
cause the late payments?



A.  No.

Q.  Do you know what caused the late payments?

A.  I do not.

Q.  And then you mention emotional and mental pain. What do you mean by that?

A.  So along with embarrassment, you feel that mental pain of -- when I first filed the dispute, it's -- it's -- you know, that anxiety starts building. You're waiting.  It's like, "Why is this on my credit report?  Why?"  You know, you have agency over a lot of things in your life, but this is one thing where you feel like you kind of lose control of what -- where you don't have that control over things.  This is something that's not mine.  You almost feel like you're being, like, lied about.

Q.  And so just so I'm understanding, the emotional and mental pain is, I guess, the building of anxiety regarding this once you've submitted a dispute?

A.  Yeah, I mean, the anxiety.  Like, you feel -- when I first put that first dispute, it's like, you know, you can feel your heart kind of racing.  It's like you envision yourself in that apartment that I was going to get.  And, you know, you're looking online and -- you know, you probably feel the same way when you're going to move into an apartment or a house or something.



You envision yourself moving in there and having your life there and, you know, "My room is this one, and my baby's room is this one and that's" -- that kind of thing.  And then when you get denied, it's kind of like, "Whoa, what am I supposed to do?"  And so you -- you're -- you know, it's just that anxiety builds.

Q.  And then what do you mean in regards to, I guess, the stress related to this case?

A.  The stress of having to -- you're in limbo. You're just waiting.  You -- it's almost like you put my life on pause because I can't just go and be -- do normal things like my friends.  I know they make a little bit less than I do, and they can go and get an apartment.  And I go and I can't do the same, even though I know I can afford it.  And it's kind of like my life is just on pause.  And it's really -- that part is the stressful part about wanting to move forward, like, as an adult.

As an adult, you get your own things. You -- you know, the -- one of the biggest things is getting your own place, being independent.  And I felt like that was kind of being taken away from me, in a way.  And so that stress builds from -- from not being able to -- to kind of move on with your life in this



aspect of, you know, the big part of being an adult.

And being stressful is just, you know, this is really the only thing that's holding me back. It's -- I'm good everywhere else, and this is the one place I don't have control of.

Q.  So just to clarify.  So you said this is the only -- the Rushmore mortgage is the only thing that is holding you back.

I guess, what do you mean by that?

A.  It's what I don't have control of.

Q.  And when you say it's holding you back, what do you mean by that?

A.  It's what I don't have autonomy over.  It's what I can't control.

Q.  Oh.  So it's just the only thing you don't have control over.

Is that what you're saying?

A.  I filed a complaint, and they denied me. That's...

Q.  Okay.  But is it -- are you saying the Rushmore account is holding you back from doing the things that you mentioned your friends are doing, that sort of thing?  Is that what you're saying, or are you just saying, "I don't have autonomy, and that's holding me back"?



A.   Right.

Q.   I gave you either/or.  I guess, which --

A.   The latter.

Q.   Yeah, okay.

Now, you also mentioned harm to your credit score.  What is it that you believe the Rushmore mortgage did to your credit score?

A.   It's pretty straightforward that if you look at my credit score and you see the number of delinquencies on it, it's way -- it outweighs anything else that's on there by a long shot.

Q.   So the Rushmore mortgage is the, I guess, most delinquent or most negative account on your credit report?

A.   By a long shot.

Q.   And then what about for your creditworthiness?  How has the Rushmore mortgage impacted your creditworthiness?

A.   I'm not an expert on exactly the specific details on that.

Q.   Okay.  Well, this says you -- you've been identified with having knowledge of the harm to your creditworthiness.

So what harm have you suffered to your creditworthiness as a result of the Rushmore mortgage?



A.  I mean, it's pretty straightforward.  You see the number of delinquencies on it.

Q.  So how has that harmed your creditworthiness?

A.  It's late payments on a mortgage that's not mine.

Q.  Are you aware of, I guess, any tangible -- can you give me any descriptions of harms to your creditworthiness?

A.  I'm not an expert.  I just know the basics, which is, if you're late on payments, that negatively affects your credit score.  I can't...

Q.  Do you have any other damages besides embarrassment, emotional and mental pain, stress and harm to credit score and creditworthiness?

A.  Can you repeat the question?

Q.  Are you alleging any other damages or seeking to recover any other damages besides embarrassment, emotional and mental pain, stress and harm to your credit score and creditworthiness?

A.  No.

Q.  And all of these damages that we've mentioned here -- embarrassment, emotional and mental pain, stress, harm to your credit score and creditworthiness -- are because of the Rushmore account; is that right?



A.  Correct.

Q.  No other cause to those damages at all?

A.  I don't quite understand the question.

Q.  Did anything else cause the damages that you mentioned of embarrassment, emotional and mental pain, stress, harm to your credit score and creditworthiness?

A.  No.

Q.  I'll go ahead and move on.  So I want to go to Number 5.  And that is Ms. Espinoza.  You'll see her there.  So I just want to ask a little bit about Ms. Espinoza.

So it says that she's got knowledge about, essentially, the same information that we covered when we were discussing about what you have knowledge about.

Do you see that?

A.  I see it.

Q.  And where would she have gained the knowledge about your embarrassment, emotional and mental pain, stress, harm to your credit score and creditworthiness?

A.  We live together.

Q.  Okay.  So this is from what she's experienced with you?

A.  Correct.

Q.  What about events and circumstances giving rise to the lawsuit?  How would she have knowledge about



those?

A. I don't know.

Q. All right. So I guess I would just like to get a few facts about Ms. Espinoza.

What does she do for a living?

A. Stay-at-home mom.

Q. And has she been -- when did she start, I guess, being a stay-at-home mom?

A. When our child was born.

Q. And so she -- before that, she was -- which we had discussed was -- your child was born in June of 2023. She was working?

A. A student.

Q. A student? Okay.

And where was she studying?

A. Belmont University.

Q. There in Nashville?

A. Correct.

Q. That's a nice school.

What was she studying?

A. I don't remember.

Q. And Belmont's a private university; right?

A. I don't know the facts on that. I don't know.

Q. Did she finish her degree?

A. I -- no.



Q.   Do you know how far along she was in her degree?

A.   I don't.  I don't know.

Q.   And whenever you were in Nashville up through at least June 2023, when your second child was born, were you living with your fiancee, Ms. Espinoza?

A.   Can you repeat the question?

Q.   Were you living with your fiancee, Ms. Espinoza, while she was a student at Belmont?

A.   No.

Q.   Were you living with her at any point in time while she was a student at Belmont?

A.   While she was a student?  No.

Q.   When did she cease being a student at Belmont?

A.   I don't remember.

Q.   When did you and Ms. Espinoza start living together?

A.   I don't remember the exact date.

Q.   Do you remember the month?

A.   I don't, no.

Q.   Okay.  Do you remember the year?

A.   I don't, no.  I don't know.

Q.   Was it before or after your child was born with Ms. Espinoza?

A.   Oh, before.



Q.  Before.

So, then, before June 2023, you were living together; is that right?

A.  Correct.

Q.  And where is Ms. Espinoza originally from?

MR. HAMMOUD:  Objection.  Form.

A.  I don't know.

Q.  (BY MR. MCCRAW)  Is she originally from Tennessee?

A.  No.

Q.  Is she also a DACA recipient?

A.  No.

MR. HAMMOUD:  Same objection.

Q.  (BY MR. MCCRAW)  How would you describe your relationship with Ms. Espinoza?

A.  I mean, she's the love of my life.  I mean, I got down on one knee and I proposed to her.  So she's everything.  She helps me out a lot.  She has been with me throughout this whole time.  She's never left my side.  I mean, even when we first met, we got along right away.

Q.  So you mentioned you've had a lot of ups, you know, getting engaged, you know, having a child, all that.  Have you had any downs in your relationship?

MR. HAMMOUD:  Objection.  Form.



A.  I would say no.  Just your normal, typical small disagreements is about it.  No downs, really.

MR. MCCRAW:  So we'll go on to Number 6, Maria Najera.

Q.  (BY MR. MCCRAW)  Now, that's your mother; correct?

A.  Yes, correct.

Q.  Okay.  And then it lists everything that it does for Ms. Espinoza.  I believe that's right.

So how would your mother have, I guess, knowledge about your embarrassment, emotional and mental pain, stress, harm to your credit score and creditworthiness?

A.  She's living at the address where the -- where the mortgage is at and, you know, just speaking to her, trying to get the relevant documents.

Q.  Okay.  So she -- you communicated with her, and that's how she would generally have knowledge about those things?

A.  Right.

Q.  What does your mother do for a living?

A.  Works at Dairy Queen.

Q.  Everybody loves a Blizzard.

And how long has she worked at Dairy Queen?

A.  I don't know.  I couldn't tell you.  I don't



APPENDIX 0060

know.

Q. Has it been a really long time that she's worked at Dairy Queen?

A. I don't -- not -- no, I couldn't tell you. I don't know.

Q. Has it been five years that she's worked at Dairy Queen?

A. No.

Q. Three years?

A. I guess that's close.

Q. Do you know what she -- where she worked before Dairy Queen?

A. I don't remember, no.

Q. Was she working before Dairy Queen?

A. Yes.

Q. And has your mother, during any of this relevant period from 2022 to the present, had any kind of medical issues?

A. No.

Q. And how would you describe your relationship with your mother?

A. She's -- top of my head, she's the nicest person you'll meet. She's super nice to me. She's always taken care of me. She was the one always had my back, you know. I love her. So that's my mom.



Q.   And where is she originally from?

A.   She is from Sabinas, Coahuila.

Q.   That's where you were born?

A.   Right.

Q.   And then I do not see your father listed on here.

Why is your father not listed on here?

A.   I don't know.

Q.   Would he have knowledge about the allegations in the complaint?

A.   No.

Q.   Okay.  Why would he not?

A.   My mom's, like, the one who handles the paperwork.

Q.   Okay.  Did you discuss this case with your father?

A.   I don't know.

Q.   Would you say you've got a closer relationship with your mother than your father?

A.   Only by a little bit.

THE COURT REPORTER:  Can you speak up just a little bit when you answer?

A.   Okay.

Q.   (BY MR. MCCRAW)  So why did your father move back to Mexico recently?



             MR. HAMMOUD:  Objection.  Form.

     A.  Can you clarify that for me, please.

     Q.  (BY MR. MCCRAW)  Why did your father move back
to Mexico?

     A.  Self-deportation.

     Q.  And your mother stayed, though; right?

     A.  Yes.

     Q.  Did -- your mother and father, when they came
over when you were two, did they come over together to
the United States?

             MR. HAMMOUD:  Objection.  Form.

             What do the questions about the immigration
status of parents and when they came have to do with
anything related to this case?  I've let you ask a lot
of questions, Counsel, but this is, like, harassing at
this point.

             MR. MCCRAW:  I'm not harassing --

             MR. HAMMOUD:  In light of the climate with
everything going on, like, you don't need to be picking
on the immigration status, when they came.  It has
nothing to do with the facts, the claims, the defenses,
nothing like that.

             So unless you can give me a reason for why
when his parents came and how they came, then you can
ask questions.  Until then, he's not going to ask any



more -- he's not going to answer any more questions related to immigration status.

MR. MCCRAW:  It has a lot to do with things.  We're talking about stress.  We're talking about things like that.  These are things that cause stress, are they not?  So they're related to the case.  And I -- and speaking objections are not allowed.  So let's follow the federal rules.

MR. HAMMOUD:  We're following the federal rules.  And harassing questions are also not allowed.

MR. MCCRAW:  It's not harassing.  It's not harassing.  It's just facts.

Q.  (BY MR. MCCRAW)  All right.  So did your mother and father come over together with you when you were two years old?

A.  I don't remember what I was doing when I was two years old.

Q.  Did they tell you that they came over together when you were two years old?

A.  I don't know.

MR. HAMMOUD:  Just speak up so the court reporter can hear you.

THE WITNESS:  Okay.

Q.  (BY MR. MCCRAW)  Does the threat of deportation cause any stress in your life for your family or anyone



that you know?

                MR. HAMMOUD:  Objection.  Form.

     A.  No.

     Q.  (BY MR. MCCRAW)  Why did your father decide to self-deport but your mother did not?

     A.  My mother is a resident.

     Q.  What do you mean by "resident"?

     A.  A resident of the United States.

     Q.  Is she a naturalized citizen?

     A.  She's a resident of the United States.

     Q.  Was your father not a resident of the United States?

     A.  Correct.

     Q.  Where was he a resident of?

     A.  I don't know.

     Q.  Did your father not reside at the 3924 Orcas Street throughout most of -- most of your upbringing?

     A.  He did.

     Q.  So how was he not a resident of the United States, if he resided in the United States?

     A.  I'm not a lawyer.  I don't know.  I don't know details on that.

     Q.  Okay.  What do you mean by your mother was a resident, but your father was not a resident?

     A.  Just that.  My mom was a resident and my dad



Case 4:25-cv-00443-P    Document 116    Filed 12/22/25    Page 71 of 1862    PageID 1920

was not.

Q.  What's your definition of "resident"?

A.  I don't know the details.  I just know the, I guess, legal terms for it.

Q.  And what is it?  What is your understanding of that legal term?

A.  I wouldn't be able to tell you.  I just know the term that they give.

Q.  Who gives?

A.  The government.

Q.  Well, what's the difference between your mother and your father that makes her a resident and him not a resident?

A.  I couldn't tell you the legal details of that. I don't know.

Q.  Do you have any understanding of why your father is deemed a nonresident and your mother is deemed a resident?

A.  I couldn't tell you their specific case, no.

Q.  You couldn't tell me the specific case?  What do you mean by that?

A.  Like, I don't know their details.

Q.  All right.  So Mr. Albert T. Harina, that's your cousin; correct?

A.  Yes.



Q.  Okay.  And did he live with you at any point in time?

A.  No.

Q.  Okay.  So it says that he would know about the allegations in your complaint and your damages, you know, we've listed out earlier.

How would he have knowledge about those?

A.  He's my cousin but also my best friend.

Q.  Okay.  So you communicated to him about these?

A.  We see each other pretty often.  He would know about the -- me filing a complaint.

Q.  Do you text with him at all?

A.  We text.

Q.  Would you have texted about anything regarding this case, including your damages?

A.  No.

Q.  Why would you not have texted about that?

A.  Because we see each other often, as in, in person.

Q.  We'll go ahead and move to page 7.  So 6 to 7 starts talking about your computation of damages.  And at the top of 7, you mention emotional distress.

Is that any different than any of those categories of damages that you listed at the bottom of page 2?



A.   I don't understand the question.

Q.   What do you mean by "emotional distress"?

A.   Emotional distress is the anxiety, the embarrassment, the time lost that I've gone through. It's -- you know, it takes a toll on -- on the way that you feel, the -- you know, it's -- anxiety is -- it feels horrible, you know.  You feel -- gives you a sick feeling to your stomach.

Q.   Okay.  So you said emotional stress is anxiety, emotional pain, and the time lost; is that right?

A.   I said that.

Q.   Anything else?

A.   I mean, with it -- emotional distress is what, unfortunately, led to me being -- you know, feeling this way about, you know, my health.  And I thought, you know, I was literally sick until I knew what actual, you know, emotional distress -- like, what that anxiety was.

Q.   What do you mean by you were sick?

A.   Yeah, I believed that I was, you know, sick more than what -- sick as in, like, sick to your stomach, like, you feel tired, you feel -- your mind is boggy.  That's being sick.  You feel -- you know, your heart's kind of racing.  Your palms are sweaty.  You aren't able to function at a hundred percent.  That's emotional distress to me.  It's being in that state of



<mark>mind.  It's not optimal.</mark>

Q.  I'm sorry.  Going back.

When you said you were sick, are you referring to the time that you visited the emergency room?

A.  Correct.

Q.  So how much are you seeking in emotional distress damages?

A.  What I'm entitled to.

Q.  And what do you think you're entitled to?

A.  I mean, what I'm entitled to under -- what I'm entitled to and what -- that'll -- you know, I don't know the exact details of what -- no, I'm not an expert. I don't know what these numbers would be.

Q.  Well, they're your damages.

So what do you think your emotional distress entitles you to?

MR. HAMMOUD:  Objection.  Form.

A.  When I said that, I was kind of put on -- it's almost like your life is put on pause.  To me, you can't -- I mean, that's priceless.  You can't just take a year of my life and say that's worth something. That's priceless.

Q.  (BY MR. MCCRAW)  So are you saying that the Rushmore mortgage -- the reporting of that on your



credit report took a year of your life?

A.  It put my life -- my adult life on pause.

Q.  For an entire year?

A.  I can't give you the exact timeline.  We could -- you know, I can't give you the exact timeline on that.

Q.  Was it more than a year?  Less than a year?

A.  More than a year.

Q.  More than a year, okay.

So going back to my question.  So how much are you claiming you're entitled to for emotional distress?

MR. HAMMOUD:  Objection.  Form, asked and answered.

A.  What I'm entitled to.  What my attorney and I believe I'm entitled to.

Q.  (BY MR. MCCRAW)  So you don't have an independent evaluation of how much damages you're entitled to for emotional distress?

A.  Right.  I'm not an expert.

Q.  Okay.  How much in damages -- how much -- strike that.

So in order to make you whole from the damages you allege you've suffered from emotional distress, how much money would that take?



MR. HAMMOUD:  Same objection.

A.  I'm not an expert.  I couldn't give you a number.

Q.  (BY MR. MCCRAW)  I'm asking to make you whole. How much money would it take regarding emotional distress to make you whole from the damages you allege you suffered regarding the Rushmore mortgage that caused emotional distress?

MR. HAMMOUD:  Same objection.

A.  What I'm entitled to.

Q.  (BY MR. MCCRAW)  And do you think you're entitled to $100 million?

MR. HAMMOUD:  Objection.  Form.

A.  It's what I'm entitled to -- what my attorney and I believe we're entitled to.

Q.  (BY MR. MCCRAW)  Okay.  So you don't have any idea of what would make you whole based on the damages you have suffered?

A.  Well, that year and -- a little over a year, like I said, my adult life was put on pause.  That's -- it's priceless.  I can't get that year back.

Q.  Okay.  And whenever you're talking about this year, year-plus, what's the time frame we're talking about?  From what date to what date?

A.  I couldn't give you exact dates.  AppFolio



forward.

Q. So from that AppFolio date you applied? Date you got the report? What's the beginning date?

MR. HAMMOUD: Objection. Form.

A. I can't remember.

Q. (BY MR. MCCRAW) Okay.

A. I can't remember.

Q. And when did your emotional distress stop?

A. Can you repeat that?

Q. So when are you -- you claimed there's this year, year-plus of time period. What's the end date, end event? What marks the end of that time period?

A. There is no end. It's still going on.

Q. Okay. So you're still suffering emotional distress to this day?

A. Yes.

Q. And it's as a result of the Rushmore mortgage being on your credit report; is that right?

A. It's my Experian showing that the Rushmore -- Rushmore mortgage was on my account, yes.

Q. Okay. So it's -- so the emotional distress you're feeling today is not because the Rushmore mortgage is on your credit report; is that right?

MR. HAMMOUD: Objection. Form.

A. Can you repeat that?



Q.  (BY MR. MCCRAW)  What is causing your emotional distress today?

A.  The mortgage being on my credit report.

Q.  So you believe today the mortgage is on your credit report.

Is that what I'm understanding?

A.  The effects and everything that was caused by it are still here today, yes.

Q.  What are those effects?

A.  Stress, anxiety, losing a year of my adult life by not being able to move forward.

Q.  Do you have any medical issues right now?

A.  I do not.

Q.  Are you taking any medications for any medical issues?

A.  No issues.

Q.  Seeing a physician?

A.  Nope.

Q.  You're -- do you continue to experience stress and anxiety today?

A.  Yes.

Q.  And is that stress related to the Rushmore mortgage account?

A.  Yes.

Q.  How is that stress related to the Rushmore



mortgage account?

A.  It's me rebuilding the year that I lost.  So I'm still rebuilding what happened in terms of the stress, the anxiety, the pain that I went through of not knowing and being rejected in those complaints.

Q.  Sorry.

You said "being rejected in those complaints."  What do you mean?

A.  I'm sorry.  The complaints that I filed -- I'm not sure the correct term for it, but they weren't accepted, I guess, the complaints.

Q.  You're talking about the disputes you --

A.  Right, the disputes.  The disputes.  Yeah, the disputes.  Sorry.

Q.  Yeah.  All right.

And then are you still suffering anxiety today?

A.  Yes.

Q.  And is that anxiety a result of the Rushmore mortgage account?

A.  Yes.

Q.  All right.  And then you also mentioned that you're seeking punitive damages.

How much are you seeking in punitive damages?



MR. HAMMOUD:  Objection.  Form.

A.  What I'm entitled to.

Q.  (BY MR. MCCRAW)  And so what do you think you're entitled to?

A.  What my attorney and I believe we're entitled to.

Q.  So you don't have any independent evaluation of what you're seeking of punitive damages?

A.  I'm not the expert.

Q.  So my question was, you don't have an independent evaluation, aside from what you've discussed with your attorney, of how much you are seeking punitive damages; is that correct?

A.  Correct.  I'm not an expert.

Q.  What's the basis for seeking punitive damages?

MR. HAMMOUD:  Objection.  Form.  It calls for a legal conclusion.

You can answer, if you know.

A.  I'm not familiar with the terms.

MR. MCCRAW:  Yousef, you've got to stop with the speaking objections.  Okay?  I mean, if I have to bring it to the Court, I'll bring it to the Court. We will be before him tomorrow.

MR. HAMMOUD:  I'm just putting my objections on the record.  That's fine.



Q.  (BY MR. MCCRAW)  All right.  So we'll go to the next page, page 8.  Here, you say in IA where it's talking about categories and types of actual damages.

Are you claiming damage to your reputation due to publication to a third party?

A.  Was that a question?

Q.  Yeah.  I can say it again.

So have you suffered any damages due to the publication of any alleged inaccurate information to a third party?

A.  Yes.

Q.  Okay.  And what was the damage to your reputation?

A.  So having to explain -- yeah, I'm -- can you repeat that?

Q.  What was the damage to your reputation?

A.  Having that on my account -- on my credit report.  Sorry.

Q.  And that's what you said damaged your reputation?

A.  Yes.  So having to go and explain that and having that on my credit report.  I'm sure those delinquencies will hurt my reputation when I go and, you know, do certain things that involve showing that.

Q.  So it's your belief that having that account on



there has resulted in people -- scratch that.

All right.  So we'll go on to B.  You said here that there might have been an impact to interest rates on loans or credit.

Which loans do you allege were impacted by the inclusion of the Nationstar mortgage on your credit report?

A.  I don't know which one you're talking about.

Q.  Were any of your interest loans -- was the interest on your loans -- do you feel that they were higher because of the Nationstar mortgage?

A.  I don't know how to quite answer that correctly.

Q.  Do you think the interest that you're paying on any of the loans during this relevant period were impacted by the Rushmore account?

A.  Yes.

Q.  Okay.  Which ones?

A.  I couldn't tell you the exact loans off the top of my head.

Q.  Okay.  Do you think that those interest rates are higher because you had the Rushmore mortgage?

A.  Can you repeat that real quick?

Q.  Do you think the interest rates were higher because of the Rushmore mortgage?



A.  I think so.

Q.  And what's your basis for that?

A.  I'm not an expert.  Just my basic knowledge of more delinquencies on there is a bad credit score.

Q.  Okay.  So is it your belief that account lowered your credit score, which led to a higher interest rate?

A.  Like I said, I'm not -- I'm not the expert.  I just know delinquencies is negative.

Q.  Okay.  So it's -- do you have any denial letters that you produced in this case?

A.  Yes.

Q.  For what?  What denial letters have you produced?

A.  The apartment.

Q.  So did you have -- so you have a denial letter from the apartment?

A.  I'm not familiar with the exact details.  It was denied.

Q.  And did you get a denial letter saying that you were denied?

A.  I don't know the exact details.

Q.  Did you produce that denial letter?

A.  Like I said, I don't know the exact details.

Q.  Do you have a copy of that denial letter?



A.  I don't know.

Q.  Have you looked for a copy of that denial letter?

A.  I don't remember.

Q.  Have you been asked to look for a copy of that denial letter?

A.  I don't remember.

Q.  Is it possible that you were not asked to look for a copy of that denial letter?

A.  I don't remember.

Q.  I'm just asking if it's possible.

A.  Right.  I don't remember.

Q.  That's -- it's a yes-or-no question.

Is it possible that you were not asked to look for that denial letter?

A.  Is it possible?  I don't know.  Sorry.  I don't know.

Q.  Did you produce a copy of the denial letter to your counsel?

A.  I don't remember.

MR. MCCRAW:  He needs to go look for the denial letter.  It sounds like he hasn't looked for it. So that's clearly one of the requests for production.

MR. HAMMOUD:  You want to talk on the record?  I'm happy to talk on the record.



MR. MCCRAW:  I'm just -- I'm --

MR. HAMMOUD:  You're asking me a question. So do you want me to respond --

MR. MCCRAW:  I'm not asking you a question.

MR. HAMMOUD:  -- or are you going to say there's a speaking objection?

MR. MCCRAW:  I'm not asking a question. I'm saying, we need that to be looked for, like the other things.

MR. HAMMOUD:  It has been.

MR. MCCRAW:  Moving along.

MR. HAMMOUD:  And we provided documents.

MR. MCCRAW:  We've not received a denial letter.

MR. HAMMOUD:  He has looked, I'm saying, and we've provided documents.  If you recall, in the last production, you received documents.

MR. MCCRAW:  But not the denial letter.

MR. HAMMOUD:  And we indicated when he clicked into it, if you look at the documents, it says the link was expired.

So like I said, if you want to chat on the side, I'm happy to chat about the document production and, you know, what you need us to do and what we've done.



Case 4:25-cv-00443-P   Document 116   Filed 12/22/25   Page 86 of 1862   PageID 1935

Q.   (BY MR. MCCRAW)  Do you have any other denial letters that you've received from any requests for credit?

A.   I don't quite remember the details on that.

Q.   Did you ever receive a credit denial letter from anyone you ever applied for credit for?

A.   Yes.

Q.   And what did you do with those letters?

A.   I don't know.

Q.   Would you have received them electronically via e-mail?

A.   I don't know.

Q.   Have you looked in your e-mail for denial letters?

A.   I have.

Q.   Okay.  And did you find any?

A.   I don't remember.  It was a while back.

Q.   Okay.  So when was this "a while back" that you looked?

A.   I couldn't give you an exact date.  I don't know.

Q.   What year?

A.   I don't know.

Q.   Was it 2025?

A.   I couldn't -- I don't know.  I don't remember



exactly.

Q.  Did you look in 2024?

A.  I don't know.

Q.  Okay.  You also are claiming damages from the loss of considerable time.

How much time are you claiming you lost?

A.  Like what we discussed before, it's AppFolio to date.

Q.  So it's the -- not the loss of time you've spent doing things.  It's your life is not where you thought it would be back on the AppFolio application date; is that right?

A.  Can you repeat that?

Q.  I'll move on.

On 13.  So -- you mention a specific example of actual damages.  You say, "Spending time and money correcting and disputing the inaccurate information."

How much time did you spend?

A.  I don't remember the exact time.  It was a lot.

Q.  Generally, what does "a lot" mean, then?

A.  Spending time.  To me, that's months -- months and months.

Q.  So you spent months in total time disputing the inaccurate information, as you sit here?



A.  It was a long time.

Q.  And so, in total, if you calculated up all the time that you spent just disputing inaccurate information, it would total up to months.

Is that what you're saying?

A.  Yes.  It was a long time.

Q.  And then how much money did you spend correcting, disputing the inaccurate information?

A.  I don't know an exact number.

Q.  What's your estimate?

A.  I mean, honestly, I can't give you an estimate. I don't -- I don't know.

Q.  Did you spend a million dollars?

A.  No.

Q.  Less than that?

A.  Yes.

Q.  How about $100,000?  Did you spend that?

A.  Wow.  I mean, I just couldn't give you, like, an exact number.  I don't know what...

Q.  Did you spend a hundred thousand dollars correcting and disputing the inaccurate information?

A.  I guess I need you to verify -- or clarify that.  It's kind of a vague question.

Q.  Did you spend a hundred thousand dollars correcting and disputing the inaccurate information?



A.  No.

Q.  Did you spend more than that?

A.  Did I spend more than that?  No.

Q.  Okay.  So did you spend less than that correcting and disputing the inaccurate information?

A.  I, myself, spent less than that; correct.

Q.  So how much did you yourself spend?

A.  I can't give you an exact number.  I really don't know.  It's been a while, yeah.

Q.  Did you spend over a thousand dollars?

A.  I don't know.

Q.  Did you spend over $50,000?

A.  I don't know.  I can't give you, like, an exact number.  But me, myself, I don't know.  I don't remember.

Q.  Well, what is your basis for the amount of money that you have spent correcting and disputing the inaccurate information?

A.  I'm sorry.  I don't understand your question.

Q.  What have you spent money on correcting and disputing the inaccurate information?

A.  Sending the letter, the -- what did I spend money on?  Yeah, I mean, I couldn't tell you the rest. I don't know.

Q.  Did you spend money on anything else besides



sending the letter, correcting and disputing the inaccurate information?

A.  I mean, it's the -- you know, it's probably, like, the gas and -- that I spent to get there, the -- you know, I had to go somewhere to look this stuff up, you know.  It's -- that would be the money I physically spent to get there, yeah.

Q.  What is -- what do you mean by "gas to get there"?

A.  To the mail.

Q.  To the mailbox?

A.  Right.

Q.  So where did you mail it from?

A.  I don't remember.

Q.  Well, you said you had to go there.

A.  Right.  To the mailbox, USPS.

Q.  So like the United States Postal Service office.

         Is that what you're saying?

A.  Right.

Q.  Okay.  So we've got gas to go there.  We've got the cost to send the letter.  And then you said, "looking this up."  What do you mean by "looking this up"?

A.  I mean, you don't -- you need a computer.  You



need WI-Fi.  You need other stuff.  I mean...

Q.  Okay.  And so in looking this up, you used some resources, electricity, et cetera, maybe.

Is that what you're saying?

A.  Right.

Q.  And what were you looking up?

A.  I don't quite remember.

Q.  Do you remember anything about what you looked up?

A.  It was, generally, what can I do about the mortgage on my credit report?  That's generally the area, like, the direction.

Q.  And then for specific examples of credit denials, adverse actions, you only list the housing rental denial; correct?

A.  I don't remember.

Q.  Well, I'm just saying it's a -- that's the only thing that's listed there; correct, is the housing rental denial?

A.  I'm not familiar with the way it's stated on this document.

Q.  Have you seen this document before?

A.  Yes.

Q.  Okay.  When did you see this document?

A.  I don't remember the exact date.



Q.  About when?

A.  I couldn't tell you.  I don't know.

Q.  Did you see it before July 23, 2025?

A.  July 23?  I don't know.

Q.  Was the first time seeing it whenever you were preparing for this deposition?

A.  I couldn't -- I don't know.

Q.  Did you see it before you prepared for this deposition?

A.  I don't know.

Q.  Did you ever review this and approve it before it was sent to opposing counsel?

A.  Yes.

Q.  You did?  Okay.

So then the only thing that's listed for specific examples of credit denials and adverse actions is the housing rental denial; correct?

A.  I'm not familiar with how to, like, read this specific document.  I'm not an expert.

Q.  Is there -- okay.

So for punitive damages, it says "Punitive damages will be proven through the plaintiff's testimony."

What testimony are you going to be providing regarding punitive damages?



A.   That's on 13, Number 2?

Q.   Yep.

A.   I'm not an expert on how to read this document. I'm sorry.

Q.   I'm -- it's not regarding the document.

A.   Right.

Q.   What testimony are you going to be providing regarding punitive damages?

A.   Yeah, I'm not familiar with the terms.

Q.   So do you have any testimony regarding punitive damages?

A.   I'm sorry.  I don't know what "punitive damages" means.

Q.   Okay.  So if you don't know what the term means, does that mean you likely -- does that mean that you don't have any testimony regarding it?

A.   I couldn't tell you specifically.  I don't know.  I don't want to give you a wrong answer, yeah.

Q.   If you can't speak -- if you don't know what it means, can you speak about it?

A.   You could if stated differently.

Q.   What do you mean by that?

A.   I mean, I'm not familiar with the terms that the document uses.

Q.   Are you familiar with punitive damages?



A.  I'm not familiar with the terms that are used in law, no.  Sorry.

Q.  Are you familiar with the term "punitive damages"?

A.  Like I said, I'm not familiar with the terms used in law.

Q.  And I'm not --

A.  Right.

Q.  -- talking about terms, plural.  I'm asking about one specific term, "punitive damages."

A.  I'm not familiar with the term.

Q.  Let me ask my question and then answer.  Okay?

Are you familiar with the term "punitive damages"?

A.  Right.  I said I'm not familiar with the term.

MR. MCCRAW:  I think we can probably take a break, and then we'll go to the next subject.

THE COURT REPORTER:  We're going off the record at 11:23.

(Off the record at 11:23 a.m.)

(On the record at 11:34 a.m.)

THE COURT REPORTER:  Going back on the record at 11:34.

MR. MCCRAW:  You ready?

MR. HAMMOUD:  Ready.



Q. (BY MR. MCCRAW)  All right.  Mr. Ramirez, ready to proceed?

A. Ready.

Q. All right.  So we're going to move on to the next exhibit, which will be Exhibit Number 2.

(Exhibit 2 marked.)

Q. (BY MR. MCCRAW)  We can set that first one to the side.

All right.  Have you seen this document before, Mr. Ramirez?

A. Yes.

Q. And could you go to the very last page where it's dated 8/14/2025.

Is that your signature in the top right?

A. Correct.

Q. Okay.  So you signed these.  And then it was under penalty of perjury; correct?

A. I'm not sure what that means.

Q. At the very top, it says "I declare under penalty of perjury..."

A. Okay.

Q. Do you see that?

A. Yeah, I see it.

Q. Yeah.

So you signed that these were correct under



penalty of perjury; is that correct?

A. Correct.

Q. All right. So we'll go back -- let me go back to the front.

All right. So if you go to Number 2, Response 2, which is on the back of the first page, start there. It says you believe your credit scores are above 600 with each credit reporting agency.

Are you referring to TransUnion, Equifax, and Experian with that -- whenever you say that?

A. Correct. I believe they are.

Q. Okay. And then you believe that you've had at least a 600 for the last year with all three of those: Experian, Equifax, and TransUnion?

A. Correct.

Q. And have the TransUnion, Equifax, and Experian scores been relatively similar to each other?

A. Not too sure. Off the top of my head, I don't remember.

Q. Okay. Do you remember if they were vastly different from each other?

A. I remember one, but I'm not -- can't remember off the top of my head which one.

Q. You said you remember one --

A. Being a little bit different.



Q.  Okay.  And how was it different?

A.  I don't remember.  They kind of differ anyway; so...

Q.  Okay.  But besides that one anomaly that you're talking about, they generally were similar to each other; is that right?

A.  Generally, yes.

Q.  All right.  So if we look at Response Number 5, it's asking for your economic damages.  And the first thing you list is the denial to rent an apartment at Hartford House Apartments.

How much in economic damages did you suffer from that denial?

A.  Number 5?  Exactly where are you reading?

Q.  If you see Number 5, it asks with respect to economic damages, and then it asks a few categories.  And then in your response, you say, "Plaintiff received a denial to rent an apartment at Hartford House Apartments."

A.  Right.

Q.  Do you see that?

A.  Yes.

Q.  Okay.  So how much economic damages did you suffer from the denial of -- the denial to rent an apartment at Hartford House Apartments?



A.   I don't quite remember the number.

Q.   What's the basis for the number?

A.   Basis, as in the...

Q.   How would you calculate this number?  You said you don't remember the number.  How would you just go about calculating it?

A.   I guess you could say it's easier and cheaper to just go and find an apartment like this, like Hartford.

Q.   And what would you do with that information?  Sorry.  I'm just --

A.   What do you mean?

Q.   I don't, I guess, understand the calculation.  So you said it'd be easier to go and find an apartment similar to Hartford House Apartments.

Is that what you -- am I understanding?

A.   Right.  More options.  You have the cheapest option.

Q.   Are you saying -- sorry.  What do you mean by "the cheapest option"?

A.   Like renting at Hartford is cheaper.  I got -- I went there because it was cheaper.  So the denial meant not getting the cheapest option.

Q.   Okay.  And so you ended up renting somewhere else; is that correct?



VICTOR RAMIREZ NAJERA                    September 23, 2025
Victor Ramirez Najera vs Experian Info Solutions                    93

A.  Correct.

Q.  And what was the difference in that amount?

A.  I don't quite remember the exact difference, yeah.

Q.  What was the amount you ended up paying monthly for rent at the place you ended up renting?

A.  At the other place?  I don't remember the exact number.

Q.  Do you remember roundabout?

A.  Roundabout $1600.

Q.  $1600 a month?

A.  Yes.

Q.  Okay.  And what was the name of that other place?

A.  No name because it was a family friend.

Q.  And was that an apartment?

A.  Correct.

Q.  And where was that apartment located?

A.  On someone's -- on the family friend's residence -- piece of land.

Q.  And so was that an apartment, like, attached to the home or was this an apartment in an apartment complex that we're talking about?

A.  Neither.  So it's kind of like a separate building apart from the main home, kind of an apartment,



studio.

Q.  So like a guest home is kind of what you were renting; is that --

A.  I guess you could say that.

Q.  Was this, like, a single-floor home you're renting?

A.  It was on the second floor because the first floor was a garage -- car garage.

Q.  Okay.  So you're renting an above-the-garage kind of apartment that they had set up above the garage?

A.  Right.

Q.  Okay.  And you list costs incurred as a result of the emergency medical visit to NorthCrest Medical Center.

How much did you incur in costs due to that visit?

A.  Sorry.  I don't -- I'm not going to remember the exact amount, yeah.

Q.  Okay.  Did you make a copay?

A.  No.

Q.  A deductible?

A.  No.

Q.  Did you have to pay before you were seen by the doctor?

A.  No.



Q.  Did you pay after you were seen by the doctor?

A.  No.

Q.  Okay.  Did you pay anything at all?

A.  I don't know.

Q.  And then if we go down to Response Number 6, you list headaches.

How often have you had headaches as a result of the Rushmore mortgage?

A.  What I can say is often.  I don't know the exact, you know, numbers or when.

Q.  What does "often" mean to you?

A.  "Often" means multiple times a week.

Q.  Okay.  And all of those are attributable to the Rushmore mortgage being on your Experian credit report; is that right?

A.  Right.

Q.  And have those continued up through even today?

A.  Yes.

Q.  And when did those start?

A.  Three weeks before the ER visit.

Q.  And have you seen a doctor since the ER visit for these headaches?

A.  So I got seen when I was there.

Q.  Since the ER visit, have you seen a doctor or medical professional of any kind regarding these



headaches?

A.  Primary care physician.

Q.  So you've seen your primary care physician?

A.  Uh-huh.

Q.  And where are they located?

A.  Don't know exactly.

Q.  City?

A.  Fort Worth.

Q.  Fort Worth?

A.  Yeah.

Q.  And when did you see them?

A.  I don't really know exactly either.  It's probably 2024, but I can't give you the exact date.

MR. MCCRAW:  We'll need those medical records as well.

Q.  (BY MR. MCCRAW)  And then you mention sleepless nights.

How often have you had sleepless nights as a result of the Rushmore mortgage being on your Experian credit report?

A.  So, again, can't put an exact, but it's often.

Q.  And what is often in that context?

A.  Just the same as the previous.  So a couple times a week.

Q.  And do those continue through to today?



A.  Correct.  Right.

Q.  All right.  So Number 7, I just want to ask a few questions about that one.

Are you -- have you paid any attorney's fees regarding this case?

MR. HAMMOUD:  Objection to the extent it infringes upon the attorney-client privilege.  And the response lists the further objections within it.

MR. MCCRAW:  This isn't regarding the answer.

Q.  (BY MR. MCCRAW)  Have you paid any attorney's fees regarding this case?

MR. HAMMOUD:  I'm going to instruct him not to answer.

MR. MCCRAW:  I'm not asking about what y'all have discussed.  It's not attorney-client privilege in any way.  It's just, has he paid any attorney's fees.

MR. HAMMOUD:  You can answer that question.

A.  Just repeat it one more time.

Q.  (BY MR. MCCRAW)  Have you paid any attorney's fees regarding this case?

MR. HAMMOUD:  Objection.  Form.

A.  No.

Q.  (BY MR. MCCRAW)  Have you received payment



regarding this case?

MR. HAMMOUD:  Objection to the extent it infringes upon any settlement agreement with confidential provisions.  I'm going to instruct him not to answer.

MR. MCCRAW:  It's just, have you received any payment.

MR. HAMMOUD:  I'm instructing you not to answer.

He's not going to answer the question.

MR. MCCRAW:  That's -- it doesn't infringe on attorney-client privilege.

MR. HAMMOUD:  There's a settlement agreement in place.  There's confidentiality provisions.  You're familiar with them.  They're all in Experian settlement agreements.  He's not going to talk about any of the terms related to the settlements.

MR. MCCRAW:  I'm not asking about the terms.

MR. HAMMOUD:  He's not going to answer the question.

Q.  (BY MR. MCCRAW)  Is there a financial benefit for you to pursue this case?

MR. HAMMOUD:  Objection.  Form.

A.  Where are we at?



Q.   (BY MR. MCCRAW)  We're not -- I'm just asking you generally.

A.   Can you repeat the question?

Q.   Is there a financial benefit to you in pursuing this case?

A.   I don't know.

Q.   Have you been paid to appear today?

MR. HAMMOUD:  Objection.  Form.

A.   No.

Q.   (BY MR. MCCRAW)  Have you received any compensation to participate in this case?

MR. HAMMOUD:  Same objection.

A.   No.

Q.   (BY MR. MCCRAW)  Let's go ahead and go to Response Number 9.

So you state, in part, the application was denied -- meaning for the Hartford House Apartments application -- it was denied, in part, due to the inaccurate Rushmore tradeline.

Do you see that?

A.   I see that.

Q.   Do you know that -- for a fact that it was the Rushmore tradeline that caused the denial of the application?

MR. HAMMOUD:  Objection.  Form.



A. Can you repeat that?

Q. (BY MR. MCCRAW) Do you know for a fact that it was the Rushmore tradeline that caused the denial of your apartment?

A. Rushmore tradeline, or what did you say?

Q. As you've written here, "the Rushmore tradeline."

A. Oh, yes. I'm not an expert in what they look at or don't look at.

Q. So you do not know whether it was the Rushmore tradeline that led to your denial?

A. They're the experts on what they look at. My basic knowledge is that the amount of delinquencies on that is negative.

Q. Who's -- when you said "they're the experts," who's "they"?

A. The people who make the decisions in looking at the -- my credit report.

Q. Okay. And so you don't know -- you personally, Mr. Ramirez, don't know that it was the Rushmore tradeline that led to the denial of your application?

A. I'm not -- you know, I don't know what the -- the basis of what exactly they look at, but I do know it's negative on my report.

Q. And then you got a loan through Geneva



Financial in April 2025; is that correct?

A.   In or around April 2025; correct.

Q.   And they -- at that time, the Rushmore account was still on your Experian credit report; is that right?

A.   Right.

Q.   So even though the Rushmore mortgage tradeline was on your Experian credit report, you were able to get approval by Geneva Financial for that home loan; is that right?

A.   That's partly right.

Q.   What's not right about it?

A.   That the lender was able to disregard the Rushmore account because of the facts of the case, yeah.

Q.   Okay.  So not, I mean -- well, that's fine.

All right.  We'll go on to what I think is Number 12, yeah.  Here, you say on paragraph C that you spent several hours to mitigate and/or repair damage you sustained.

What is "several hours"?

A.   I'm not familiar with the way it's worded in C.

Q.   Are these your words, Mr. Ramirez?

A.   I mean, it's written in third person.  So they wouldn't be my -- like I'm writing it, no.  I'm not writing it.

Q.   Well, whenever it says "several hours," how



many hours are you stating there?

A. I wouldn't be able to calculate right now at this point in time the exact hours.

Q. Can you provide an estimate?

A. I mean, it says "hours." So I imagine it's what it is -- what is stated, hours, yeah. I mean, what -- you can't really go over a certain amount of hours before it becomes...

Q. Before it becomes what? Before it becomes days? Is that what you're saying or...

A. I mean, several hours. I can't quite remember what -- exactly the amount.

Q. Would it be less than 24 hours?

A. I would say not, no.

Q. It would be more than 24 hours?

A. Yes.

Q. Would it be more than a hundred hours?

A. I couldn't say at that point.

Q. Would -- I mean, is it less than a hundred hours?

A. It was a lot of time. I couldn't quite say the exact amount.

Q. But it's more than 24 hours; right?

A. Right.

Q. And less than how many?



A.  I mean, I spent time on and off throughout, you know, this whole process.  So it's been -- there's been some hours put in by myself, yes.

Q.  And what are you including in those hours?

A.  I mean, what it states, my efforts to mitigate and repair the damage.

Q.  Are you including the time that you've spent on this case?

A.  I'm not sure.

Q.  So you're not sure what goes into your hours that you've spent mitigating damages?

A.  Right.  I'm not the expert in saying what exactly is -- pertains to this.

Q.  All right.  We'll go on to the next.

MR. MCCRAW:  This will be Exhibit 3.

(Exhibit 3 marked)

Q.  (BY MR. MCCRAW)  All right.  So do you recognize this document, Mr. Ramirez?

A.  Yes.

Q.  Okay.  If we go to the last page, similar to the other one, you see where it's dated August 28th, 2025.

And is that your signature on there?

A.  That's my signature.

Q.  And it similarly states that you "declare under



penalty of perjury that the foregoing answers are true and correct"; right?

A.  Right.

Q.  All right.  So this first question asked for any -- for you to identify your full name, any nicknames, and other names.

Have you ever gone by Victor Ramirez, Jr.?

A.  No, I don't remember going by that.

Q.  You've never had a Junior affixed by your name?

A.  So I am Junior, yes.

Q.  And so have you ever put that on any documents?

A.  I don't put that on documents.

Q.  But have you ever put that on any documents?

A.  I don't remember.

Q.  And then for your addresses, we have the Fort Worth address, the 3924 Orcas.

That's your parents' home; is that right?

A.  3924 Orcas is my parents'; correct.

Q.  Yep.

And then 3915 Baxter Road in Joelton, Tennessee, when did you live at that address?

A.  Don't quite remember the exact dates, but it was -- yeah, I don't remember the exact dates.  Yeah.  Sorry.

Q.  What years?



A.  I don't remember the years.  It was the second time I went to Nashville.

Q.  The most recent time you were in Nashville; is that right?

A.  Correct.

Q.  So that would have been during the time that your second child was born; is that right?

A.  Correct.

Q.  So during at least beginning to middle of 2023, because he was born in June; right?

A.  Yes.

Q.  And who did you live at that address with?

A.  In-laws.

Q.  And whenever you say "in-laws," are you -- is that Ms. Espinoza's parents?

A.  Correct.  Mother and father.

Q.  And is this where you were renting the garage apartment?

A.  No.

Q.  No?  Oh.

And was this -- so this would have been after you did the AppFolio application; is that right?

A.  Not quite sure on the exact timeline.

Q.  Were you living with them whenever you applied for that Hartford apartment?



APPENDIX 0106

A.  Not sure.

Q.  What about the 6364 Old Hickory Boulevard in Whites Creek, Tennessee?  When were you living there?

A.  So that second time I went to Nashville.  Can't remember the exact dates.

Q.  Is it the same time or -- I mean, is it the same time you were in Nashville that you also lived with your in-laws?

A.  Right.  The second time I was in Nashville.

Q.  And what was 6364 Old Hickory Boulevard?  Was that an apartment?  A house?

A.  It was that residence we were talking about.  Right.

Q.  Okay.  And how did you know the people that owned the home and that garage apartment?  Excuse me.

A.  It was my mother-in-law's friend.

Q.  And so you moved.

Were you, I'm guessing, dating Ms. Espinoza at the time, if you knew her mother then?

A.  Right.

Q.  And then -- so going to the next page, it says you previously worked in Flowood, Mississippi.

When was that?

A.  Oh, that was just where my employer headquarters was at.



Q.  Oh, okay.

A.  The office, yeah.

Q.  But where were you working at the time?

A.  Nashville.

Q.  Okay.  So you were not working in Tennessee -- or Mississippi; correct?

A.  Yeah; correct.

Q.  With all your employment history that's listed here, was there any gaps in employment?

A.  No gaps.

Q.  And this dates back five years.  So to 2020; right?

A.  Correct.

Q.  So you've been permanently employed from 2020 to the present day?

A.  Correct.

Q.  Or consistently employed, I should say?  Did you understand it?  I'll just restate the question.

So you've been consistently employed from 2020 to the present day; is that right?

A.  Yes, that's right.

Q.  And have you ever received any advice from anyone regarding your credit report or credit history?

A.  Just from a friend.  Just get a credit card and just do the 10 percent, and that's about it.  Basics.



Q.  What's the "do the 10 percent"?

A.  Like, don't go over 10 percent spending of your limit; right.

Q.  Okay.

A.  Yeah.  Just the basics.

Q.  All right.  And then have you ever been convicted of a crime?

A.  Speeding tickets.

Q.  Only speeding tickets.

Ever pled guilty to any crimes?

A.  Speeding tickets.

Q.  Speeding tickets, okay.

Ever been arrested?

A.  One time.

Q.  And what was that in relation to?

A.  What do you mean by "what was that in relation to"?

Q.  Why were you arrested?

A.  For brass knuckles.

Q.  So you had a prohibited weapon, brass knuckles; is that right?

A.  That's right.

Q.  And was that Tarrant County court?

A.  Incorrect, no.

Q.  Where was that?


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

A.  I don't remember.

Q.  Where were you living at the time?

A.  Fort Worth.

Q.  Fort Worth.

         Was it a state court or a federal court?

A.  I don't know.

Q.  And were you convicted of that crime?

A.  No.

Q.  What ended up happening to the -- happening to those charges?

A.  I don't quite remember.

Q.  Did you pay a fine?

A.  Don't quite remember.

Q.  Did you go to jail?

A.  Right.

Q.  Okay.  And how long did you spend time in jail?

A.  Some hours.

Q.  Sorry?

A.  Hours.

Q.  Hours?  So you didn't have to go to jail for months or years; is that right?

A.  No.

Q.  Okay.  Were you sentenced by a judge?

A.  I don't know.

Q.  Did a judge ever issue you a punishment?



A.  No -- I'm not sure.  I'm not familiar with exact details on the case anymore.

Q.  Were you put on probation?

A.  Not sure.  I'm not sure.  Sorry.

Q.  Did you ever have to wear an ankle bracelet?

A.  No.

Q.  Did you ever have to report to anyone about your location, maybe check in once a week, something like that?

A.  I just did the paperwork.  I'm not sure if I -- no, I didn't have to report to anyone.

Q.  Okay.  And when was this -- was the prohibited possession of brass knuckles?  When did that occur?

A.  I'm not sure.  It was a long time ago.

Q.  Okay.  Was this before you were in -- before you met Ms. Espinoza, I'm guessing?

A.  Yes.

Q.  Okay.  Was this before you had your first kid?

A.  Yes.

Q.  Okay.  So that would be a while back because your first kid was born in 2017; right?

A.  Correct.

Q.  So it would have been before 2017?

A.  Correct.

Q.  Were you still in high school?



A.  No.

Q.  So you were an adult at the time?

A.  Yes.

Q.  And what had happened -- what happened in order for you to get arrested for having brass knuckles?

A.  I don't quite remember too many details because it was a while back.  Just -- I'm not sure why.  He just -- it was just a normal traffic stop.

Q.  Oh.  So you were -- it was a traffic stop, and that's whenever they uncovered that you had brass knuckles; is that right?

A.  Don't quite remember too many details, yeah.

Q.  Okay.  So why were you pulled over for the traffic stop?

A.  I don't remember.

Q.  And where were the brass knuckles located whenever you were arrested?

A.  I don't remember.

Q.  Were they on your person?

A.  No.

Q.  They were in the vehicle?

A.  I don't remember exactly where they were.

Q.  Had you been in an altercation earlier in the day?

A.  No.



Q.  So would you, then, say that you have -- having this -- having committed this crime of possession of owning or possessing a prohibited weapon, brass knuckles, you committed a crime?

MR. HAMMOUD:  Objection.  Form.

A.  I wouldn't be able to answer that correctly.  I don't know.

Q.  (BY MR. MCCRAW)  Okay.  Would you say that you have a criminal record --

A.  No.

Q.  -- since you had this problem?  Okay.

All right.  So we'll go on to Response Number 7.  So we will talk about some of these.

So we've already talked about the Alexander Forrest Investments, LLC.  That's the Hartford apartment; right?

A.  Right.

Q.  And then you say in April 2024, you applied for a JPMorgan Chase Bank card.

Do you see that?

A.  I see it.

Q.  And you say that you were denied that application.

Did you receive a denial letter?

A.  I'm not sure.



Q.  Do you remember what kind of card you were applying for at the time?

A.  Besides it being a credit card, I don't.

Q.  And do you remember what your credit score was whenever you were applying in April 2024?

A.  I do not.

Q.  And are you familiar with how high of a credit score you have to have in order to get a JPMorgan Chase Bank credit card?

A.  Off the top of my head, I don't know.

Q.  But if you didn't have that minimum credit score, is it fair to say that you would have been denied?

A.  I don't know the exact things they look at.

Q.  But if one of the things that they look at is a credit score, if you don't have that credit score, is it fair to say that you would have been denied?

A.  I mean, I don't know what they look at.

Q.  But then you were able to get a Credit One Bank card; is that right?

A.  Yes.

Q.  And that was three months after you were denied the JPMorgan Chase Bank card; right?

A.  Yes.

Q.  And the Rushmore mortgage was still being



reported on your credit report at that time; right?

A.  Yes.

Q.  And then you applied again for the JPMorgan Chase Bank card in January 2025, and you were denied; right?

A.  Correct.

Q.  Do you remember what kind of card you were applying for then?

A.  I don't remember.

Q.  And do you remember what your credit score was then?

A.  I don't remember.

Q.  All right.  And then you had a couple of applications with CCR Centennial Bank.

Do you see that in -- what was it -- February 2025 and April 2025?

A.  Right.

Q.  And you didn't receive an approval or denial from them; right?

A.  Right.

Q.  Okay.  Why did you not continue with the application for CCR Centennial Bank?

A.  Don't remember the exact details.  I just wasn't ready yet.

Q.  You weren't ready yet to buy a home?



A.   I don't remember the exact details.  Yeah, I just wasn't ready to go through with the application.

Q.   But then you were approved by Geneva Financial in April 2025 for a mortgage; right?

A.   Right.

Q.   And the Rushmore account was on your credit report at that time; correct?

A.   Yes, it was.

Q.   Okay.  And then here you say you had to provide an explanation about the Rushmore account.

What do you mean by you "had to provide an explanation"?

A.   Similar to the complaint I've -- the dispute I filed, I had to provide documents of -- like, besides the regular things that you would usually put for when you're going to get a mortgage.

Q.   Okay.  And what did Geneva Financial have to say about your application whenever they were talking about the Rushmore account?

A.   It was going to be possible that I might not be able to get a mortgage.

Q.   Okay.

A.   They were having to kind of battle with it.

Q.   Okay.  And then what did they say -- once they were able to disregard the Rushmore mortgage, what did



they say about your application and your chances of getting approved?

A.   Don't quite remember details on that, yeah.

Q.   And then for the GreenSky installment, you say that that application was denied; right?

A.   Right.

Q.   And did you receive a denial letter?

A.   I don't remember.

Q.   How do you know you were denied?

A.   Sent something in the mail.

Q.   Okay.  So you received a letter in the mail?

A.   Yes.

Q.   And that was in June 2025, which would have been two to three months after you filed your complaint; right?

A.   Right.

Q.   And are you claiming damages for that credit denial?

A.   I wouldn't be able to tell you.  I don't know the specifics on this.

Q.   No.  Are you, in this case, trying to recover damages for that credit denial?

A.   I'm sorry.  I don't -- I wouldn't be able to tell you.

Q.   It's a -- just "yes" or "no."  Are you --



A.  Right.  And I'm --

Q.  -- seeking to recover damages?

A.  -- sorry that I wouldn't be able to tell you.

Q.  Why wouldn't you be able to tell me?

A.  I'm not the expert on this.  Sorry.

Q.  Who is the expert on this?  On your damages, who's the expert?

A.  Well, that would be my attorney.

Q.  So he would be the one that would have the most knowledge about your damages?

MR. HAMMOUD:  Objection.  Form.

A.  Right.  I'm not an expert on what the credit report is going to -- I'm just not an expert on what's considered, you know, a damage or not in terms of credit.

Q.  (BY MR. MCCRAW)  Would you say that whether you got approved or denied by GreenSky installment is relevant to this case?

A.  My belief?  I believe it is.

Q.  It is?  Okay.

And so what did you do with that denial letter that you received from GreenSky installment?

A.  Not sure.

Q.  Do you still have a copy of it?

A.  I can't be certain.  I don't know.



Q.  If you don't have a copy of it, is it safe to say that you've thrown it away?

A.  It's not safe to say I've thrown it away.  I don't know.

Q.  What would have happened to it?

A.  I can't give you it.

Q.  If you don't have a copy of it, where would it be?

A.  I don't know, yeah.

MR. MCCRAW:  So to the extent there is a letter, that, of course, needs to be produced.  I think we've established that it is relevant.

Q.  (BY MR. MCCRAW)  All right.  So -- all right.  So we'll go on to Response Number 9.

So regarding your loan that you got with Geneva Financial, it's a 6.5 percent interest rate; right?

A.  Right.

Q.  So they disregarded the Rushmore account whenever they approved you for that account; is that right?

A.  Right.

Q.  And so then the Rushmore account would not have had an impact on your interest rate; correct?

A.  I'm not sure.  I'm not -- I wouldn't know if it



would or not.

Q.  Well, if they disregarded the account, how could it impact your interest rate?

A.  Right.  I don't -- like, I've never been in that -- I just don't know enough about that stuff to say "yes" or "no."

Q.  So do you know what it means to disregard something?

A.  I know what it means.  I know what the exact word "disregard" means.  I don't know exactly what the whole world of, you know, these guys is.  I don't know exactly what they can or can't do.

Q.  Well, if they're not taking the Rushmore account into consideration --

A.  Uh-huh.

Q.  -- then how could it impact your interest rate?

A.  Yeah, I'm not an expert in that.  I don't know.

Q.  Okay.  And so is it possible that it had no impact on that 6.5 percent interest rate?

A.  I wouldn't know.

Q.  Is it possible?

A.  I mean, I just wouldn't know.  I'm sorry.

Q.  You don't know even if it's possible?

A.  I mean, I don't.  It's just I don't like to speak when I don't know that.  I'm not an expert in



this, you know.  I know I'm not -- you know, I'm an
expert at my own thing.  I -- these guys, I don't know
what they do.  Sorry.  I don't.

Q.  When you say you're an expert at your own
thing, what's your own thing?

A.  Commercial construction.

Q.  Okay.  And so that's about the only thing you
can speak --

A.  At 100 percent, yes.

Q.  Now, for your income, do you receive any
sources of income besides from your employer?

A.  No.

Q.  So you don't receive any kind of government
paychecks, disability, anything like that?

A.  No.

Q.  All right.  And then -- so you claim that your
credit report was mixed with that of another person.

Who is that other person that you claim
your credit report was mixed with?

A.  I'm sorry.  Are you reading something from
here?

Q.  No.

A.  Okay.  With my father.

Q.  And what is your father's name?

A.  Victor.  I don't know the -- his exact name,



but I do know it's Victor Ramirez.

Q.  Okay.  And that's your first name and at least your first last name?

A.  Part of my last name.

Q.  And then what do you believe in -- from his credit file ended up on your credit report?

A.  Can you repeat that?

Q.  So what from his credit file do you believe ended up within your credit file?

A.  Oh, the mortgage.

Q.  Okay.

A.  Right.

Q.  The Rushmore mortgage?

A.  Yes.

Q.  And that's it?

A.  From what I know, yes, the mortgage.

Q.  Okay.  I've just got to close the loop.

All right.  And so what is your belief for how that information ended up in your credit report?

MR. HAMMOUD:  Objection.  Form.

A.  I don't know.

Q.  (BY MR. MCCRAW)  So you don't know how it ended up in here?

A.  No, I don't.

Q.  So whenever you say, in response to



Interrogatory Number 14, that, "Experian's matching algorithms and procedures caused a mixed file and attributed another consumer's mortgage to Plaintiff, despite Plaintiff's unique identifiers," do you have any basis for that answer?

A.  I mean, I don't know what you're trying to ask.  Sorry.

Q.  Do you have any basis for the response that you put for Number 14?

A.  Yeah.  My father and I, we don't share the same name.

Q.  Okay.  So what makes you believe that Experian's matching algorithms and procedures caused a mixed file?

MR. HAMMOUD:  Objection.  Form.

A.  So we don't have the same name.  We don't have the same age.  We don't have the same Social.

Q.  (BY MR. MCCRAW)  Do you know what Experian's matching algorithms and procedures are?

MR. HAMMOUD:  Objection.  Form.

A.  I'm not an Experian expert.

Q.  (BY MR. MCCRAW)  So do you know what Experian's matching algorithms and procedures are?

MR. HAMMOUD:  Same objection.

A.  I'm not an expert in Experian's algorithms and



procedures.

Q. (BY MR. MCCRAW) So would -- is that a "yes" or a "no"?

A. That's an "I don't know."

Q. All right. So do you think Experian acted with malice towards you?

A. Yes.

Q. How?

A. By me filing the dispute once; they denied the validity of that dispute. And I filed a second one; they also denied that.

Q. When you say you filed two disputes, what do you mean by "filed"?

A. Well, the first one was an online dispute. The second one was -- I sent physical evidence --

Q. Okay.

A. -- to Experian directly through the mail, yeah.

Q. And you think by them denying your two disputes, that they acted with malice?

A. My belief, yes.

Q. Anything else that Experian did that shows that they acted with malice?

A. I'm sorry. Where are we at?

Q. We're not anywhere.

A. Okay. Okay.



Sorry.  Can you repeat the question?

Q.  Anything else, in your opinion, that shows Experian acted with malice, besides denying your two disputes?

A.  Denying the two disputes and just how far we've had to take it so far.  So yeah.

Q.  Okay.  And whenever you say taking it this far, you mean by bringing a case against Experian?

Is that what you mean?

A.  Right.

Q.  And then do you believe that Experian targeted you in any way?

A.  I don't know.

Q.  And regarding the Rushmore account and that home, which was on -- was it Ochoa Drive?  Is that right?

A.  Orcas, yeah.

Q.  Orcas?  Sorry.  I said "Ochoa."

Okay.  So the home that's on Orcas, do your parents still own that home?

A.  Right.  They still own the mortgage, yeah.

Q.  So there's still a mortgage on it; is that right?

A.  They still own the home, yeah.

Q.  So they own the home or there's a mortgage or



both?  Which -- which is it?  We're talking past each other.

A.  Yeah.  So there's a mortgage on the home, yeah.

Q.  And they still own that home?

A.  Right.

Q.  Whenever you did your first dispute that you said was online, did you submit any documents with that first dispute?

A.  I don't quite remember.

Q.  If Experian didn't receive any documents, would it be fair to believe that you did not submit any documents, since you can't remember?

A.  I wouldn't say it's fair.  I don't know.  I honestly don't know if I submitted any.

Q.  Would you have kept records if you had submitted it, similar to your other letter?

A.  I'm not sure.

Q.  All right.  And so on Response Number 19, on that last sentence, it talks about how you visited the emergency room in March 2024.  And you say that the emotional distress and mental pain and anguish you were suffering was caused in significant part from the inaccurate reporting.

Do you see that?

A.  I see it.



Q.  And whenever you're talking about inaccurate reporting, are you talking about the Rushmore account?

A.  Correct.

Q.  Okay.  And then you say, "in significant part."

So what were the other causes of your emotional stress, mental pain and anguish that you were suffering at that time?

A.  I mean, that's basically what it was.  It was just this one thing that was going on that was the negative part of my life, which was just this.  It was just -- everything was going perfectly well.  It was just the -- the actual Rushmore account that I was having that feeling about.

Q.  This was the only stressful event in your life at the time?

A.  Right.

Q.  Okay.  So you weren't feeling any stress from your girlfriend being pregnant?

A.  No.  I mean, that's -- that was a good thing.  I come from a big family.  I want to have -- you know, I have 11 uncles and aunts put together.

Q.  Okay.

A.  So I've always wanted a big family.

Q.  And work was going well at the time?

A.  Oh, yeah.  It's still going well.  So, yeah, it



APPENDIX 0127

was going really well.

Q. And you were living away from your parents at the time and expecting; right?

A. Correct.

Q. And that wasn't stressful?

A. No, not stressful at all. No.

Q. And things were going well with your parents back home at that time?

A. Yes. So they're always supportive. They've always been having my back, yeah.

Q. So no stress in the family life?

A. There's no stress from the family at all. Everyone's been really supportive.

Q. And the mother of your first child, was she back in Texas at the time?

A. Correct, in Texas.

Q. And did you have that child -- that first child that you have, was that child with you in Tennessee?

A. At that time, no, she was not in Tennessee.

Q. Okay. And being separated from that child, did that cause any stress?

A. No. There's no stress.

Q. No stress from that? Okay.

And were you paying child support for that first child?



A. No. So we're -- I'm not on child support, no.

Q. Okay. Do you send her money to support the child?

A. So at that point in time, I was sending money, yes.

Q. And were any -- was -- you sending money, you having to pay other bills, you know, money in general, was there any stress from that?

A. No. I keep within my means, and I get paid a decent amount for -- you know, I don't like to buy a whole bunch of stuff. So no.

Q. And you pay all of your accounts on time, don't have any delinquent accounts? Those weren't stressing you?

A. No. So I started to get everything into -- in order. Right now, I don't have any delinquent accounts. I don't have anything that's in delinquency.

Q. But in March of 2024, did you have any delinquent accounts?

A. Right. I didn't have any delinquent accounts.

Q. No delinquent accounts, no missed payments that would cause you stress?

A. Right. Yeah. There's no delinquency in that time.

Q. Okay. All right.



MR. MCCRAW:  Should we break right now and take lunch?

MR. HAMMOUD:  Do you know how much longer we have?

MR. MCCRAW:  We've got quite a bit.

MR. HAMMOUD:  Okay.

THE COURT REPORTER:  All right.  We can go off the record at 12:34.

(Off the record at 12:34 p.m.)

(On the record at 1:24 p.m.)

THE COURT REPORTER:  We can go back on the record at 1:24.

Q.  (BY MR. MCCRAW)  Mr. Ramirez, welcome back from lunch.  You ready to proceed?

A.  Ready.

MR. MCCRAW:  I'm going to mark what's going to be Exhibit 4.

(Exhibit 4 marked.)

Q.  (BY MR. MCCRAW)  All right.  Do you recognize this document, Mr. Ramirez?

A.  Yes.

Q.  What is this document?

A.  Tenant screening report from AppFolio.

Q.  Okay.  And is this your tenant screening report for the Hartford House Apartments that we discussed in



your initial disclosures and your interrogative -- interrogatories?

A.  Yes.

Q.  And here we see the applicant name of Victor Manuel Ramirez.

Do you see that?

A.  I see it.

Q.  Is that you?

A.  That's me.

Q.  Okay.  And here we do not see the name Najera; right?

A.  Right.  We do not see it.

Q.  And did you apply with your fiancee, or did you apply alone?

A.  Alone.

Q.  And why did you not apply with your fiancee?

A.  I don't remember.  I just applied by myself.  I don't remember, to be honest.

Q.  Okay.  Was she going to be living with you in this apartment?

A.  Yes.

Q.  And -- all right.  Would having her on here as an applicant have helped your application?

MR. HAMMOUD:  Objection.  Form.

A.  I don't know.



Q.   (BY MR. MCCRAW)  Are you -- does your fiancee have a better credit score than you?

A.   I honestly don't know.

Q.   Have you seen her credit score before?

A.   No.

Q.   All right.  And so we see a report date of May 22, 2023.

Do you see that?

A.   I see it.

Q.   Okay.  So would you have applied before that date of May 22, 2023?

A.   The actual application would have been before that; correct.

Q.   Okay.  Do you know when you actually submitted the application?

A.   I don't remember.

Q.   Do you remember if it was in April or even before then?

A.   Don't remember the exact date, no.

Q.   Okay.  And do you remember what information you submitted with the application?

A.   I don't remember the exact information I submitted, no.

Q.   Do you remember any of the information you submitted?



A.  I mean, just my name, Social, the basic stuff. I don't remember the exact things, no.

Q.  What do you mean by "basic stuff"?

A.  Name, Social Security, date of birth, you know, kind of like what's on here, the employer.

Q.  Okay.  And what kind of apartment were you trying to rent?

A.  It was a studio apartment.

Q.  Did you apply anywhere else?

A.  No.

Q.  So this was the only apartment you had applied for?

A.  Yes.  From what I remember, yes.

Q.  So -- all right.  So under your application, we kind of -- section, we see your name.  And then we see an AKA, and it lists "Victor Manuel Ramirez, Jr."

Do you see that?

A.  I see it.

Q.  Do you know how they would have gotten that information, unless you had put that on an application somewhere?

MR. HAMMOUD:  Objection.  Form.

A.  Yeah, I don't remember.  No, I don't know.

Q.  (BY MR. MCCRAW)  Okay.  Do you think it's possible that they got that from an application for



credit or a rental application that you submitted in the past?

A.  I honestly don't know.  No, I don't know.

Q.  And then if we go to the next page, we see your credit score.

And what is your credit score?

A.  It says "467," credit score.

Q.  Okay.  And would you consider that a high or a low credit score?

A.  I guess it's not that great.

Q.  Okay.  And when you're saying "not that great," would you say below average?

A.  I don't know what the average would be.  But I'm guessing it's not too good.

Q.  Okay.  And then -- but your score is higher than that now today; right?

A.  Correct.

Q.  Okay.  So with a credit score of 467, do you think it was possible -- did you think it was possible that you would be accepted for this apartment owned by Hartford House Apartments?

MR. HAMMOUD:  Objection.  Form.

A.  Did I think that it was possible?  Yes.

Q.  (BY MR. MCCRAW)  Okay.  And why did you think that it was possible?



A.  Why did I think that was possible?  To be honest, I don't have the greatest response.  I mean, it's my first -- I didn't really do too much, like, credit building or anything before this.  So not very knowledgeable about what would be accepted or not.

Q.  Okay.  And you applied back -- was it May 22, 2023?  So you would have been -- what -- 26 years old at the time?

A.  Right.

Q.  So fairly young; right?

A.  I would say so.

Q.  All right.  And then -- so you've got two potentially negative items on here.

Do you see that?

A.  Negative, two.  Okay.  Yes.

Q.  Okay.  And then we also have one collection account.

Do you see that?

A.  Collection?  Okay.  Yes.

Q.  And then a total past due amount of $601.

Do you see that?

A.  I see it.

Q.  A collection balance of $233.

Do you see that?

A.  I see it.



Q.  And then you've got an estimated monthly payment of $125.

Do you see that?

A.  I do.  I see it.

Q.  And so of your trades, do you see that you've got 12 total trades listed on your credit report?

A.  I see that.

Q.  And then you've got one trade that's open.

Do you see that?

A.  Yes.

Q.  And then kind of repeating what was up top, two are considered negative.

Do you see that?

A.  I see it.

Q.  Okay.  So if we go over to the other side of the page, do you see, once again, it's got your credit score of 467 up at the top left?

A.  Yes.

Q.  Okay.  And then we've got four contributing factors.  And the first one says "The balances on your account are too high compared to loan limits."

Do you see that?

A.  I see it.

Q.  And then of the accounts listed on your credit report, do any of them list a balance, besides the first



two, which are the Oportun Progreso Financial and
Southwest Credit Systems?

A.   They don't.

Q.   Okay.  And so the Rushmore Loan Management
Services tradeline shows a zero-dollar current balance.
          Do you see that?

A.   I see it.

Q.   And if you go over to the next page, the
Pennymac Loan Services also shows $0.
          Do you see that?

A.   I see it.

Q.   So if the Rushmore and Pennymac loans have a
current balance of $0, could they be too high compared
to your loan limits?

MR. HAMMOUD:  Objection.  Form.

A.   I'm not sure what the -- what that means.  "The
balances of your accounts are too high compared to loan
limits."  I honestly don't know what that -- I would
have to look into that to know.

Q.   (BY MR. MCCRAW)  Okay.  Well, what does it mean
to you, sitting here today, without looking into it?

A.   I mean, I guess just what it says.  They're
compared -- they're too high compared to loan limits.

Q.   Okay.  And so if it's got a zero-dollar
balance, could it be too high compared to a loan limit?



A.   I don't know.

Q.   Okay.

A.   I really don't know.

Q.   But the only two accounts that have a balance are the Oportun Progreso Financial and the Southwest Credit Systems; right?

A.   The only two that are what?

Q.   That have a current balance.

A.   A current balance, yes.

Q.   Okay.  All right.  So --

A.   On -- yeah.  On this report, that's what it says.

Q.   Okay.  So then would you agree that the Contributing Factor Number 1 that talks about, "The balances on your accounts are too high compared to loan limits," would only refer to the two accounts that have a current balance, which are the Oportun Progreso Financial and the Southwest Credit Systems accounts?

A.   If we're talking about Factor 1, yes.

Q.   Okay.  And then Contributing Factor 2, it says "The date you opened your oldest account is too recent."
          Do you see that?

A.   I see it.

Q.   Okay.  And so we see, "Origination dates."
          Do you see that column?



A.  Origination date?  I see it.

Q.  And what is the origination date for Rushmore Loan Management?

A.  Rushmore, on this first page -- or on this page says "1/27/2009."

Q.  Is that older than all of the other origination dates, except for Pennymac Loan Services, which also reports January 27, 2009?

A.  Right.

Q.  Okay.  So having an older account from 2009 would be a net positive, then, according to this contributing factor; right?

            MR. HAMMOUD:  Objection.  Form.

A.  I don't interpret it that way, no.  Not a positive.

Q.  (BY MR. MCCRAW)  What do you interpret it as?

A.  I don't know.  I don't have enough expertise in this, but...

Q.  What is your interpretation of Contributing Factor Number 2?

A.  I mean, just what it says.  "Your oldest account is too recent."  But it doesn't really say negative or positive about the 1/27/2009, of Rushmore. So I don't...

Q.  Well, if all the other accounts were more



APPENDIX 0139

recent --

A. Right.

Q. -- would that mean that those accounts were more negatively viewed than the oldest account?

MR. HAMMOUD: Same objection.

A. Yeah, I wouldn't be able to know. I don't know. Sorry.

Q. (BY MR. MCCRAW) All right. So Contributing Factor 3, do you see where it says "You have either too few loans or too many loans with recent delinquencies"?

A. Right. I see it.

Q. Okay. And then if we look at the Oportun Progreso Financial line, do you see that you got delinquencies there at 60-plus days of two and 90-plus days of two?

A. I see it.

Q. Okay. And then for the Southwest Credit Systems, do you see that this is a collection account?

A. Collection account? Yes.

Q. Okay. And then in the text right underneath the name of the tradeline before it says "24-month history," do you see where it says "Account seriously past due"?

A. "Account seriously past due"? On Southwest Credit?



Q.  Right.

Do you see it says "Collection department, agency, attorney" semicolon?

A.  Uh-huh.

Q.  And then it says "Account seriously past due date.  Account assigned to attorney, collection agency, or credit grantor's internal collection department."

Do you see that?

A.  I see it.

Q.  So after that first semicolon, it says "Account seriously past due."

Do you see that?

A.  I see it.

Q.  Okay.  If an account is past due, would that mean it's delinquent?

MR. HAMMOUD:  Objection.  Form.

A.  I wouldn't know exactly how they categorize, you know, this stuff.  But, yeah, I mean, it's past due it says on here.

Q.  (BY MR. MCCRAW)  What does "delinquent" mean to you?

A.  Delinquency is -- I don't know the exact definition.  Delinquency is, like, negative.  It's, like, probably something bad.  You know, it's -- in this case, it's probably tied to being past due.



Q.  Okay.  So being late on a payment --

A.  Right.

Q.  -- would be past due?

A.  Right.

Q.  Okay.  All right.

        And so the Oportun Progreso, it shows that you -- that there are past due payments; right?

A.  Oportun Progreso?  Right.

Q.  Yep.

        And then -- so the Southwest Credit Systems, since it is past due, then it would be delinquent; right?

A.  Yeah.  Possibly, yeah.

Q.  So Contributing Factor 3, when it says "Recent delinquencies," Oportun Progreso had a recent delinquency in April of 2023.

        Do you see that if you look in the 24-month payment history of --

A.  Of which one?

Q.  APR for April.

        Do you see that?

A.  Of which one?

Q.  The Oportun Progreso Financial.  It's on the first -- or that current page.

A.  APR?



Q.  Yeah.

A.  Yeah, April.

Q.  April.

And April, it's got a "90" for 90 past days -- 90 days past due.

Do you see that?

A.  I see it.

Q.  Okay.  And so you had applied in May.  And April 2023 was the month before; right?

A.  Right.

Q.  So April 2023 would be recent compared to May 2023.

Would you agree with that?

A.  It's recent.

Q.  Okay.  And so Oportun Progreso Financial had a recent delinquency.

Would you agree with that?

A.  Yes.  There's -- yes.

Q.  Okay.  And then if we go down to Southwest Credit Systems, you see that from May of 2023 all the way back to June of 2022, there's a "B" in there.

Do you see that?

A.  Yes.

Q.  Okay.  This is an account seriously past due and in collections, and it has not been closed out



because it still says it's open with a current balance of $233. And May 2023 is the most recent payment history.

Would that be a recent delinquency?

MR. HAMMOUD: Objection. Form.

A. Yes.

Q. (BY MR. MCCRAW) And then Contributing Factor Number 4, where it says "Lack of sufficient relevant real estate account information."

Do you see that?

A. I see it.

Q. What are the only two real estate accounts on your credit report at this time?

A. Real estate? I interpret that as the Rushmore and the Pennymac.

Q. Okay. So those are the only two with real estate information. Everything else would not be a real estate account; is that right?

A. Right.

Q. Okay. And it says "You have insufficient real estate information."

Is that how you read Contributing Factor Number 4?

MR. HAMMOUD: Objection. Form.

A. Well, it says "Lack of sufficient."



Q.   (BY MR. MCCRAW)  So, I mean, would "lack of sufficient" to you mean the same as insufficient?

A.   Yeah.

Q.   So would, then, having two accounts that have real estate information be a net positive for Contributing Factor Number 4?

MR. HAMMOUD:  Objection.  Form.

A.  I wouldn't know.  I don't know.

Q.   (BY MR. MCCRAW)  But if you didn't have those two accounts, you would have no relevant real estate account information; right?

MR. HAMMOUD:  Same objection.

A.  Right.

Q.   (BY MR. MCCRAW)  Okay.  So having those two real estate accounts, would you agree that that increased your odds of having sufficient real estate account information?

MR. HAMMOUD:  Same objection.

A.  I wouldn't know, no.

Q.   (BY MR. MCCRAW)  Okay.  All right.  And then if we go over to the next page, I just want to talk about the Pennymac Loan Services account.

Do you see the "Delinquency" column to the far right?

A.  I see it.



Q.   Okay.  And how many delinquencies are shown for the Pennymac Loan Services account?

A.   Zero.

Q.   Okay.  So the Pennymac Loan Services account was not showing any delinquencies; right?

A.   Right.  My understanding is that is because it was transferred to Rushmore.

Q.   Okay.

A.   And it shows up on the Rushmore delinquencies.

Q.   So that's your understanding.

And whether that's right or wrong -- do you have a sufficient basis to know whether that's right or wrong?

A.   I'm not an expert, but the amount of delinquencies on the Rushmore is a lot more than anything else I have on my report.

Q.   And --

A.   Even if you add all the other ones up together, it's still not more than what the Rushmore is showing.

Q.   Okay.  But for the Pennymac Loan Services, there's zero delinquencies; right?

A.   That's correct.

Q.   Okay.  So is it possible, then, that the Pennymac Loan Services account was actually helping you because it is an older account and has zero



delinquencies?

MR. HAMMOUD:  Objection.  Form.

A.  I honestly wouldn't know if it's helping me or not.

Q.  (BY MR. MCCRAW)  Is it possible?

MR. HAMMOUD:  Same objection.

A.  I wouldn't know.  Sorry.

Q.  (BY MR. MCCRAW)  And why don't you know?

A.  I mean, I'm not an expert on the intricate details of what would be helping in terms of the Pennymac loan.

Q.  And since you're not an expert, then is it possible that it is possible?

MR. HAMMOUD:  Same objection.

A.  I mean, I don't want to misspeak and say, you know -- yeah, I'm just not an expert on what it would be or not.

Q.  (BY MR. MCCRAW)  I understand you're not an expert.

But just, is it possible?

A.  I -- yeah, I don't know.

Q.  Is it in the realm of possibility?

MR. HAMMOUD:  Same objection.

A.  I mean, I guess so, yeah.

MR. MCCRAW:  All right.  We're going to



move on to the next.  So this should be Exhibit 5.

        (Exhibit 5 marked.)

        MR. MCCRAW:  Just for the record, this is Ramirez 00021.  I don't think I have enough zeros in there.  It's four zeros and then a 21.

        MR. HAMMOUD:  That's correct.

Q.  (BY MR. MCCRAW)  Okay.  All right.  So, Mr. Ramirez, do you recognize this document?

A.  I do.

Q.  Okay.  And what is this document?

A.  It's the medical report from the ER.

Q.  All right.  And what is the admit date there in the top center?

A.  Admit?  March 5, 2024.

Q.  And is that the date that you went to the emergency room?

A.  Correct.

Q.  And then it lists you as the patient; is that correct?

A.  Yes.  "Patient information," yes.

Q.  All right.  And is there "Najera" listed there at all?

A.  No.  I don't see it.

Q.  And then your address then was 3915 Baxter Road; is that right?



A.  That's correct.

Q.  And is that the in-laws' apartment?

A.  No.  That's the in-laws' -- my mother- and father-in-law's house.  So that's separate from the apartment.

Q.  Okay.  So you were living in the house at that time instead of the apartment -- or -- oh, sorry.  Never mind.  I'm misunderstanding, aren't I?

You were living with your in-laws at that time; right?

A.  This, yes.

Q.  I was thinking of that garage apartment.

All right.  And so "person to notify," it says "Paola Espinoza."

Do you see that?

A.  I see it.

Q.  Okay.  And that is your fiancee; right?

A.  Right.

Q.  And she's also living at 3915 Baxter Road; right?

A.  Yes.

Q.  So you were living together at this point in time; is that right?

A.  Yes.

Q.  All right.  And then it says that -- the



"Accident, illness, condition."

          Do you see that kind of to the right?

     A.  Right.

     Q.  And it has the onset of symptoms and illness listed as May -- March 3, 2024.

          Do you see that?

     A.  I see it.

     Q.  Okay.  And so that was the onset of your symptoms; is that right?

     A.  Onset?  What do you mean by that?  As in when it started?

     Q.  I guess, what is your definition of "onset"?

     A.  I don't know.  And this -- yeah, I don't know what this means in this sense.

     Q.  All right.  And then if we go down to "Insurance," we see that you've got three different insurances listed; is that right?

     A.  Yeah.

     Q.  All right.  And the first one is, "Pending, TN Care."

          Is that commonly known as TennesseeCare?

     A.  I believe so.  Not too sure.

     Q.  And is that Tennessee's form of Medicaid?

     A.  Not sure.  I don't know, to be honest.  I don't know.



Q.  But it's a government insurance?

A.  I don't know, yeah.

Q.  Okay.  And then next one is, "Charity, pending."

Do you see that?

A.  I see it.

Q.  Okay.  And so "charity, pending," that would be whether the hospital decided to reduce or pay off your account with them; is that right?

MR. HAMMOUD:  Objection.  Form.

A.  Not sure what "charity, pending" is.  Yeah, I'm not sure.

Q.  (BY MR. MCCRAW)  And then, "Uninsured discount plan."

Do you see that?  That's your third one.

A.  I see it.

Q.  Okay.  So since you didn't have insurance, there's a possible discount plan.

Is that your understanding of that?

A.  My understanding from reading it on this document, yes.

Q.  Okay.  Did you have any other insurance at this time?

A.  No.

Q.  Okay.  And then down at the bottom, it says



you're -- next to "RFV," which is reason for visit, it says "Chest pain that radiates to back."

Do you see that on the bottom left?

A.  I see it.

Q.  Okay.  And was that the reason that you went to the ER?

A.  Yes.

Q.  All right.  Let's back up just -- sorry -- for a second.

So regarding the insurance, did you end up paying a copay, deductible, or coinsurance?

A.  No.

Q.  Okay.  Did you pay anything for this visit?

A.  That visit?  I have not paid for that visit.

Q.  All right.  And then if we go to the next page towards the top right, do you see where it says "PCP phys," which stands for primary care physician?

A.  Right.

Q.  Do you see that?

A.  Yeah.

Q.  Okay.  And then it says "No primary"?

A.  Yeah.

Q.  So were you under the care of a primary physician at this time?

A.  No.



Q.  Okay.  So you did not have a regular doctor that you would go and visit at this time?

A.  No.

Q.  And then it says "Patient describes chest pain that has been ongoing and intermittent for three weeks."

Do you see that?

A.  I see it.

Q.  And when did -- so what was the event that started all of -- that started the chest pain three weeks before March 5, 2024?

A.  Coincides with the first dispute.

Q.  I understand it coincides, but what started it?

A.  Yeah, that's what started it, the -- the stress and anxiety that came from the dispute.

Q.  Okay.  And nothing else?

A.  Nothing else.

Q.  All right.  And then you state you are under a lot of stress.

Do you see that in the very last line?

A.  I see it.

Q.  All right.  So what was stressing you at that time?

A.  The -- what I formerly stated, which was the dispute that I was going through.  Just having that -- you know, just waiting for -- just kind of thinking over



and over about it, about whether it was -- why it was there, being confused, being kind of -- you know, this -- it takes you aback, like, well, I've never dealt with anything like this before.  I don't have anyone to, you know, go and ask about it.  It's pretty overwhelming trying to go through that by yourself.

Q.  And so nothing else was stressing you out at this point in time?

A.  I had no other negative things going on in my life.  No.

Q.  You had no collection accounts that were stressing you out?

A.  No, I wasn't stressed about those.

Q.  Okay.  Were individuals calling regarding those collection accounts, trying to collect?

A.  I don't remember.

Q.  Don't remember?

A.  No.

Q.  Is it in the realm of possibility that they were?

A.  I don't remember, but possibly.

Q.  Okay.  And other -- being late on other accounts, that wasn't stressing you having late payments on anything?

A.  No.  Just for the reason that I had control



over that.  I had agency over that.

Q.  Okay.  So everything, you felt, was underneath -- within your control in your life, besides the Rushmore account on your Experian credit report?

A.  Right.  Yes.  It was -- everything else I could control and I could fix.  And the Rushmore account was just not mine.

Q.  All right.  If we go to what's labeled as "Page 5 of 8," underneath the reevaluation and MDM section, you see where it says "Labs neg," for negative. "The ED" -- meaning the emergency department -- "stay was uneventful."

Do you see that?

A.  Yes.

Q.  Okay.  And then it says there was no pain; right?

A.  Where does it say that?

Q.  Right after, "ED stay uneventful."

A.  Okay.

Q.  "No pain."

So you weren't experiencing pain at that time; right?

A.  I mean, it kind of contradicts itself from saying at the beginning that there was pain, and now it's no pain all of a sudden.



Q.  So this is the reevaluation; correct?

A.  Yeah.

Q.  So that -- what we had looked at before was the initial evaluation.  And so this is from later in time, which is why it's called the reevaluation.  So let me see if I can find a time on here.  That's kind of how they are organized.

Does that make sense to you?

A.  Yeah.  I mean, I see it.  It makes sense.  It just -- yeah.

Q.  Okay.  Yeah.

All right.  And so -- well, we can go back if you want to look.  So on that first -- whenever we did the free-text HPI notes, when we talked about the chest pain --

A.  Right.

Q.  -- that was at 15:52, which is 3:52 in the afternoon.

Do you see that?

A.  Right.  I see it.  It was kind of, like, a coming and going of pain.  So that's why, I guess, they put "no pain" at that moment in time.

Q.  Okay.  Because here at 16:37, which is almost like 40 minutes later --

A.  Right.



Q.  -- you know, there's no pain; right?

A.  Right.  It's a fade, going in and out of pain, yeah.

Q.  Okay.  Okay.

All right.  And then overall, they said that the event -- that your stay in the emergency department was uneventful.  So no significant events happened.

Is that your understanding?

MR. HAMMOUD:  Objection.  Form.

A.  That's my understanding of "uneventful."

Q.  (BY MR. MCCRAW)  Yeah.

Even has your trop was negative, which is troponin.

Do you see that?

A.  I see, "Trop, negative."

Q.  Okay.  And do you understand troponin is -- it's a chemical in the system that, if you had positive, it would indicate a heart attack?

Do you know that?

A.  I didn't know that, but now I do.

Q.  Okay.  So you having negative means you weren't having a heart attack?

A.  Yeah.

Q.  Do you understand that?



A.   Yeah.

Q.   Okay.  All right.  So if we go on to the discharge plan, which is on page 7, they gave you two drugs while you were there, is what it looks like.

Do you see that?

A.   They prescribed it.  They didn't give it to me.  Right.

Q.   They didn't give it to you?

A.   No.

Q.   Oh, okay.

Okay.  And so the first one that they prescribed was Pepcid.

Do you see that?

A.   I see it.

Q.   And do you know what kind of drug that is?

A.   No.  I never ended up picking any of these up.

Q.   Okay.  Do you know what Pepcid AC is?

A.   I don't.

Q.   And do you know if that's commonly used in order to control acid in the stomach?

A.   I don't know anything about it, yeah.

Q.   All right.  And then the next one that they prescribed was Vistaril.

Do you see that?

A.   I see it.



Q.   Okay.  And you also never picked this drug up; right?

A.   Right.  I never picked them up.

Q.   Okay.  So to this date, you have never taken Pepcid and Vistaril as prescribed here in the emergency room visit?

A.   No.

Q.   Okay.

A.   Because according to them, everything was negative.  So it was all associated to the anxiety reaction.

Q.   Okay.  And do you understand that these drugs are meant to treat anxiety and depression?

A.   I don't have, like -- I don't know anything about them.  I haven't looked them up probably since that time and then, obviously, forgot until now.  I don't know.  No, I didn't know.

Q.   Okay.  And so, here, if we see, "Patient instructions," it shows that you have anxiety and depression.

Do you see that?

A.   In "Patient instructions," yes.

Q.   Okay.  And then in the second paragraph, do you see where it says "The patient will pursue further outpatient evaluation with a primary care physician or



other designated or consulting physician, as outlined in the discharge instructions"?

A.  Right.

Q.  Okay.  And did you do that?

A.  I know I went to, like I said earlier, my primary care physician -- well, PCP -- well, I guess I misunderstood, like, what a PCP is.  I went to, like, a regular, you know, checkup doctor later, but I don't remember when exactly it was.

Q.  When you say you went to "a regular checkup doctor," are you saying, like, you went for an annual kind of eval?

A.  Right.  Right, right, right.

Q.  Okay.  And during that annual eval, did you discuss your anxiety and depression?

A.  I wouldn't say I have depression.  I would say it was just an anxiety from the dispute and the credit stuff that was going on.

Q.  But did you discuss that in your --

A.  The anxiety.

Q.  -- annual eval?

A.  Right.

Q.  You did?  Okay.

And have you produced those medical records?



A.  I mean, I just go to, like, the Mexican doctor, which is -- like, they would have -- she's probably just printed stuff.  But I wouldn't -- I don't know -- I don't even know if I would have that anymore.

Q.  What do you mean by you "go to the Mexican doctor"?

A.  So it's, like, just, you know, your neighborhood clinic kind of thing.

Q.  Okay.

A.  Yeah.

Q.  But, like, they're in a brick-and-mortar store?

A.  Right.  Right, right.

Q.  It's a doctor?

A.  Kind of old school, yeah.  Yeah.

Q.  Went to medical school?

A.  Kind of just printed everything, yeah.

Q.  I didn't know what you were trying to say there.

A.  Yeah.  Because, like, you know, you have your other ones, which are kind of -- everyone's kind of interconnected.  They send the records back and forth to different -- yeah.

Q.  Okay.  And are you -- and you're not taking any medication right now for anxiety or depression; right?

A.  No.  Because I found out that it was all



connected to that.  So I was able to, in a way, slightly manage because of that.

Q.  Okay.  And how do you manage it?

A.  A lot of meditation, a lot of -- you know, it still comes back.  So, like, it's still -- that anxiety is still there, you know, like, to this day because, you know, we're still having to go through and kind of go through the details of everything, kind of like we're doing today.

And it's really just knowing that we are taking steps in, you know, the right direction of trying to -- trying to kind of get control of the situation of that being on my credit report.  And a lot of meditation and just being able to kind of calm down and say, you know, my anxiety was caused because of this.  So I know what the cause is.  Knowing the cause, you can kind of just go from there and be able to handle the situation better.

Q.  Okay.  Do you experience chest pain anymore?

A.  It's slightly still there.

Q.  What do you mean by "it's slightly still there"?

A.  I just feel like my -- like I said, my meditation and being able to understand that -- where the cause -- the root cause of where it is coming from



800.211.DEPO (3376)
EsquireSolutions.com

APPENDIX 0162

is able to handle -- I'm able to handle it a lot better than I did at that point in time when I kind of didn't put two and two together because it was so recent from the dispute to this ER visit.

Q.  Okay.  But to this day, you still have chest pain; is that right?

A.  Just slight every now and then, yes.

MR. MCCRAW:  We're going to move on to the next.  This will be Exhibit Number 6, which is Bates labeled Experian 0001.

(Exhibit 6 marked.)

Q.  (BY MR. MCCRAW)  All right.  Mr. Ramirez, do you recognize this document?

A.  Experian credit report?  Yes.

Q.  Okay.  And what's the date on this credit report there in the top right?

A.  February 12, 2024.

Q.  Okay.  So this would have been before you went to the emergency room; is that right?

A.  Yes, that's correct.

Q.  Okay.  And then on the top left, it says "Victor Ramirez, 3924 Orcas Street, Fort Worth, Texas 76106."

Do you see that?

A.  Yes, I see that.



Q.   Were you living there at the time, February 12, 2024?

A.   I was not living there.

Q.   Okay.  And you were living at the Baxter Road?

A.   Right.

Q.   All right.  Now, where it says "February 12, 2024," how many months after that -- or how many months had transpired between when you got the AppFolio credit report to this credit report?

A.   Not too sure.

Q.   So if that was May 2023 and this is February 2024, does that --

A.   What is that?  Seven months-ish?

Q.   Nine.

A.   Nine.

Q.   Nine months?  Okay.

All right.  And so nine months had transpired between the AppFolio report and this credit report.  So why hadn't you looked at your credit report within those nine months?

A.   Why haven't I looked at it?

Q.   Why hadn't you looked at it, yeah.

A.   I mean, I have looked at it between then and here.

Q.   Oh, you did?



A.  So looking at it is different from -- yeah -- filing a dispute; right.

Q.  Okay.  So why were you looking at it here on February 12, 2024?

A.  February 12, 2024?  To file a dispute.

Q.  Okay.  So this was you getting ready to file a dispute?

A.  Right.

Q.  Okay.  But you had known about the Rushmore account at least since May of 2023; right?

A.  Not necessarily.  So I kind of had to dig through to find out -- oh, the -- the actual mortgage? Yes.  Yes, yes.  It was since May 2023.  Right, right.

Q.  Yeah.

But you waited nine months in order to look at your credit report and begin to prepare a dispute with Experian; right?

MR. HAMMOUD:  Objection.  Form.

A.  I had to, first, make sure that I was -- you know, that my -- that it was really on there.  So I kind of, you know, was in disbelief.  It's like, hold up. You had to really -- you know, in my mind, I'm like, hold up.  I had to really see if this is on there. Maybe it's just, you know, this one-time error or something.  So first is trying to see if it's really on



there.  And after -- so being prepared and actually getting your documents and everything in correctly is what is the timeline of kind of -- you know, from those nine months.

Q.  (BY MR. MCCRAW)  Okay.  So you were getting documents together in order to make this dispute.

Is that what you're saying?

A.  And, also, my baby boy was born.  So -- on June 23rd.  So, you know, with the baby on the way, you know, I had doctor visits.  I have -- you know, I take my fiancee to the doctor, getting ready for the baby.  You know, it's a -- you know, it's exciting.  You -- you -- you -- you know, that's -- that's really something big that's going on.  And -- and after that, it was more doctor visits after the baby's born and everything.

So, you know, your mind is kind of prioritizing.  You know, my baby's more important than anything else.  Like, what's more important than the human life that's coming, you know?  That's my child.  So that's kind of the timeline.  And then as well as trying to find somewhere to stay after that -- after being denied, baby's being born.  You had to find somewhere to stay as well.

Q.  And you had somewhere to stay because you were at the Baxter residence; right -- the Baxter Street



residence?

A.   Right.  It was always supposed to be a -- kind of like a temporary place to stay.

Q.   All right.  If we go to the second page, you can see the top account -- well, it says -- you know, there at the top left, do you see where it says "Your potentially negative account activity"?

A.   I see it.

Q.   Okay.  And the first one listed is a Capital One account.

Do you see that one?

A.   Right.

Q.   And then it has -- it says to the right, for "Status," it says "Written off."

Do you see that?

A.   I see, "Paid, closed, written off."  Yes.

Q.   Yep.

And then for October, November, December 2022 and then January, February, March, April 2023, it has the letters "CO," meaning charge-off.  You can look at the first page, if you need to refresh yourself.

Do you see that?

A.   I see the "CO."

Q.   Okay.  So this was a -- Capital One was a charge-off account; right?



A.   Okay.  Yeah.

Q.   Do you agree that that's a charge-off account?

A.   "CO," that's what it says.  Yes.

Q.   And so that would be a negative account; right?

A.   It would be negative.  It would be -- that was later paid off and closed.  Right.  Written off.

Q.   Okay.  But it's reporting negatively on your credit at this point in time, February 12, 2024?

A.   Right.  Reporting negatively that I closed off; right.

Q.   Okay.  Well, it's not showing that you closed it off.  It's saying that it was closed.

A.   Paid and closed, yeah.

Q.   If you look at the comment, it says "Account was closed at credit grantor's request," which you're not the credit grantor; right?

A.   I wouldn't know.  I guess not, no.

Q.   Okay.  So the credit grantor, Capital One, closed this account?

A.   Right.

Q.   That's why it shows closed.

And then they wrote off the charge-off; right?

MR. HAMMOUD:  Objection.  Form.

A.   Yeah, I don't know how to -- I guess you could



say that.

Q.  (BY MR. MCCRAW)  Okay.  That's fine.

So then the next one is Oportun Progreso Financial.  And this is also listed in your potentially negative account activity; right?

A.  Potentially, yes.

Q.  Okay.  And so this says in May 2023, it was refinanced; is that right?

A.  Refinanced, yes, is what it says.

Q.  In May 2023, you were able to get approval for this refinance; right?

A.  Right.

Q.  Okay.  And May 2023 is the same month of the AppFolio application; right?

A.  I'm not -- I would have to check that.  I'm not too sure.  I believe it was April, and then we got the results in May.

Q.  Okay.

A.  Right.

Q.  So May 2023 is the same month as the AppFolio results?

A.  Results, yeah.

Q.  And so you were able to refinance this account that same month?

A.  Yes.  Trying to fix -- trying to clean up the



Capital One, which was paid, and then the Oportun as well, to get back on track on that.  So those two was my doing of getting back on track.

Q.  Okay.  And in order to refinance the Oportun Progreso Financial, did you look at your credit report before that -- before you refinanced it?

A.  No, I don't -- I don't remember what credit report was looked at.

Q.  Okay.  But that Oportun Progreso Financial shows that you were 60 days late in February, 90 days late in March, and 90 days late in April; right?

A.  That's what this report shows.

Q.  And then if we go over to the right, we can see that there's both the Pennymac loan and the Rushmore loan accounts.

Do you see those?

A.  I see them.

Q.  Okay.  And these are both -- both show transferred, closed.

Do you see that?

A.  Right.

Q.  Okay.  So they both -- and then they both, in the comments, say, "Transferred to another lender."

Do you see those?

A.  "Transferred to another lender"?  Okay.  I see



it.

Q.  Yeah.

And then if we go down to the Rushmore Loan Management Services and -- it shows the first payment being made in that payment history was in May of 2019.

Do you see that?

A.  I see it.

Q.  And so the Rushmore is not reporting any payment activity before May of 2019; right?

A.  According to this, it does not show that.  Yes.

Q.  Okay.  And so how old were you May of 2019?

A.  So that was five, six years ago?  23.

Q.  Okay.  So you would have been of age to have a mortgage at the age of 23; right?

A.  It's not typical, but yes.

Q.  What do you mean "it's not typical"?

A.  If you look at the statistics of when people get their mortgage, it's not typical for a 23-year-old to have a mortgage, but yes.

Q.  But is it possible for a 23-year-old to have a mortgage?

A.  It's possible.

Q.  Okay.  Is it possible for an 18-year-old to have a mortgage?

A.  Right.  Not a 13-year-old.



Q.  But, here, you were 23 as of May 2019; right?

A.  Right.  This report goes back to that date. We're not sure how far it goes back in the system. Right.

Q.  Well, we are.  So the Pennymac loan was transferred to the Rushmore mortgage.

A.  Yeah.

Q.  That's why you see the dates changing off. That's just how that's read.

All right.  And then below that, we see the Southwest Credit Systems account.

Do you see that?

A.  Yes.

Q.  And we previously discussed that this was a collection account; right?

A.  That's what it says, "Collection account." Yes.

Q.  Okay.  And then we can actually see that the original creditor here was Charter Communications.  It gives us a little bit more detail than the AppFolio account.

Do you see that?

A.  Yes.

Q.  And so we have, at least as of January 2024, this is an open collection account.



Do you see that in the payment history box?

A.  I see 2024, C, January.

Q.  Okay.  And if you go to the first page, do you see that "C" stands for collection?

A.  Yes.

Q.  Okay.  So then January 2024, it was a collection account; right?

A.  In January 2024 was the last one of it being a C, collection, yes.

Q.  Okay.  Yeah.

And then I just want to point out, I think, one more thing here.  So if we go to what is Experian 0005, which is page 5 of 10 of this document, at the top, you'll see an Oportun Progreso Financial account.

Do you see that?

A.  Page 5?  Yes.

Q.  All right.  And you see a date opened of May 2019.

Do you see that?

A.  I see it.

Q.  Do you see any other accounts that have an earlier open date?

A.  Date opened?  Date opened?  The Pennymac, Rushmore.

Q.  Okay.  So just those two accounts?



A.   I'm looking through it.

Yes.

Q.   All right.  And May 2019, the date you opened the Oportun Progreso Finance account is the same month and year that the Rushmore Loan Mortgage Services started reporting a payment history; right?

A.   Rushmore, when they started?  I guess so, yeah. But it says "Date opened, January 2009."

Q.   Okay.  But the payment history is May 2019; right?

A.   The payment history.

Q.   Yep.

A.   Right.

Q.   Which is the same as the Oportun Progreso we were just looking at; right?

A.   Date-wise, yes.

Q.   All right.  And then -- so we'll go to look at your hard inquiries down at the bottom.  Do you see where it says "Who has viewed your consumer information?"  And then, "Credit applications, hard inquiries."

Do you see that?

A.   Yes.  Page 5 at the bottom.

Q.   Okay.  And then if it continues on to page 6, we only see one hard inquiry, and that's Oportun



Progreso Financial.

          Do you see that?

     A.  I see it.

     Q.  All right.  And do you remember what your credit score was regarding this Oportun Progreso Financial hard inquiry?

     A.  I don't remember my credit score.  I don't.

     Q.  Okay.  Did you review your credit report or did Oportun Progreso Financial provide that to you?

     A.  I honestly don't know.  They probably looked at it, but I don't know the exact details of that.

     Q.  Whenever you did any of the Oportun Progreso accounts -- because you've got a number of these; right?

     A.  That's what it shows on the report, yes.

     Q.  So whenever you did any -- whenever you applied for an Oportun Progreso Financial account, did they ever provide you a copy of your credit report?

     A.  I honestly don't remember.

     Q.  Okay.  Did you ever inquire about your credit?

     A.  Honestly don't remember.  It was a while ago, yeah.

     Q.  All right.  And then if we go down to your soft inquiries, we see that AppFolio resident screening there on May 22, 2023.

          Do you see that one?



A.  I see it.

Q.  Okay.  And then we see a few others, including -- did you apply for, I guess, an AXCSSFN -- I'm not really sure what that is -- credit card or account regarding that inquiry date?

A.  You're talking about 6/26/23?

Q.  Correct.

A.  I -- I don't know what that is, yeah.

Q.  Okay.  What about -- did you apply for maybe a Capital One account just below that?

A.  Yes.

Q.  You did?  Okay.

And did you review your credit report for that application?

A.  I don't remember, to be honest.

Q.  Okay.

A.  Yeah, I don't remember.

Q.  Did you receive a copy of your application for that?

A.  I mean, I know they all -- basically, every -- everyone kind of sends something, but I don't know exactly what I got sent.

Q.  Okay.

A.  Yeah.  Sorry.

Q.  But you were sent something by Capital One and



AXCSSFN?

A.  I wouldn't be able to tell you about AXCSSFN because I don't know what that stands for or means.

Q.  Okay.

A.  Yeah.

Q.  But for Capital One, you were sent maybe a denial letter and credit report; is that right?

A.  Possibly.  I don't remember off the top of my head, but yeah.

Q.  Okay.  And on that credit report, would it have shown your credit score?

A.  Possibly.

Q.  Okay.  And would it have shown accounts that you have that are impacting your credit -- credit score?

A.  Like I said, I don't remember the details on that, but possibly.

Q.  Okay.  And so then is it possible that the Rushmore and Pennymac loans were being reported on whatever you'd receive from Capital One?

A.  I -- I can't be 100 percent sure about it at this date.

Q.  Okay.  But is it possible?

A.  Possible.

Q.  Well, did you apply for a Conn Appliances account?



A.  I don't really remember this one.

Q.  Okay.  What about Credit Karma?  Have you had a Credit Karma account for a while?

A.  I know I have one.

Q.  Okay.  And do you review it?

A.  It looks like I have, yes.

Q.  Well, this is just showing that they have pulled your credit --

A.  Oh, okay.

Q.  -- in order to provide an update.

A.  Every now and then.  I can't give, you know, when.  Like, maybe once every five, six months or something.

Q.  Okay.  And what information is shown on your Credit Karma account?

A.  Like, don't know every single detail that's on it, but I know it's your credit score and some things like -- I guess, like a very bird's-eye view of your credit report.

Q.  And, I guess, how bird's-eye view when you're saying "bird's-eye view"?

A.  Yeah.  Like -- it's kind of, like, just very simple, just -- you know, it's not like something like this, no.

Q.  Okay.  Does it show soft inquiries or hard



inquiries?

A.   I don't know.

Q.   Okay.

A.   I don't know off the top of my head.  I don't know.

Q.   Does it show accounts?

A.   Accounts?  What do you mean?

Q.   Like, does it show that you've got a Capital One and Oportun Progreso?

A.   Like these first pages?

Q.   Yeah.

Does it show any of that information?

A.   I believe so.

Q.   Okay.  And would you have looked at -- I mean, since it shows that it was pulling your credit, doing a soft inquiry, as early as February 15, 2023, would you have viewed it back in February of 2023?

A.   I don't remember, but it's possible.

Q.   Okay.  And is it possible that you were able to see your credit score back then?

A.   Maybe.  Maybe so.  I don't remember the details on that.

Q.   And is it possible that you were able to view what accounts were on your credit report back then?

A.   I don't know if I did.  I just don't remember

 ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

APPENDIX 0179

that far back.

Q.  Okay.  And then do you have an account with Experian?

A.  I do.

Q.  Okay.  And what kind of account do you have with Experian?

A.  What kind of account?  I'm not sure.  Just, you know, your basic, regular account.  I don't know.

Q.  Do you have a membership?

A.  No.

Q.  No membership?  Okay.

And whenever you say simple, basic account, is that so you can just go in and look at your credit report?

A.  Right.  I guess you could say it's, like, your free tier.

Q.  Okay.  And whenever you look at your credit report, does it look like what we have here?

A.  I can't say.  I don't know.  I don't remember what -- exactly what it looks like.

Q.  All right.  But it says maybe as of February 17, 2023, you've been viewing your credit report.

Would that be right?

MR. HAMMOUD:  Objection.  Form.

A.  I can't remember, really.



Q.   (BY MR. MCCRAW)  Okay.  Is it possible?

A.   That's possible.

Q.   Okay.  And is it possible, then, that the Rushmore and Pennymac loan accounts were on your credit report back then?

A.   I mean, I don't remember.  I don't know what was on there or not.

Q.   Okay.  And then we'll go over here to JPMorgan Chase Bank.  Did you apply for a credit report -- or credit card with them in March or February of 2023, maybe?

A.   Possible.

Q.   Okay.  Did you look at your credit report in regards to those?

A.   I don't remember the details on that.

Q.   Okay.  All right.  What about the Cash Store?  What is -- do you remember applying for a loan or credit of some sort with the Cash Store?

MR. HAMMOUD:  Objection.  Form.

A.   I don't remember.

Q.   (BY MR. MCCRAW)  Okay.  All right.

A.   The Cash Store?

Q.   All right.

MR. MCCRAW:  So we'll go to the next -- we'll go through one more exhibit and maybe take a



APPENDIX 0181

bathroom break.

This will be Exhibit Number 7.  This is Experian 0015 for the Bates number.

(Exhibit 7 marked.)

Q.  (BY MR. MCCRAW)  All right.  Mr. Ramirez, do you recognize this document?

A.  Yes.

Q.  What is this document?

A.  "Your dispute results."

Q.  Okay.  And what's the date?

A.  March 7, 2024.

Q.  All right.  And would this be your results from the first dispute that you sent to Experian?

A.  Correct.

Q.  And how did you make this dispute with Experian?

A.  Don't remember the exact details, but it was online on the computer.

Q.  Okay.  And so it was not a phone call?

A.  No.

Q.  Okay.  And you're adamant it was not a phone call?

A.  I don't remember.  But this exact dispute was online.

Q.  It was an --


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

A.   Online, yes.

Q.   -- online portal?

A.   Yes.  Right.

Q.   All right.  Okay.  And what exactly did you dispute?

A.   The Rushmore and the Pennymac loan.

Q.   And did you provide any documents with this dispute?

A.   This dispute, I believe I did not provide documents.

Q.   Okay.  And then we see it says -- on the top left, it says "3924 Orcas Street."

Were you at that address at this time?

A.   No.  So that's just the address I used for -- because I was moving back and forth.  So it was easier to send my mail there.

Q.   Okay.  So you were having your mail sent there and then forwarded on to you?

A.   Right.

Q.   All right.  Do you see underneath kind of, basically, that second paragraph there, it says "If you disagree with an item, you may dispute it"?

Do you see that?

A.   "How to read"?  "How to read"?  Is that where it's at or up here?



Q.  It's right before that, that paragraph right before, "How to read."

A.  "In response"?

Q.  So the second sentence, yep.  So, "In response," if you go to the sentence --

A.  Okay.  Yes.

Q.  -- third sentence.  Sorry.

A.  "If you disagree with an item, you may dispute it."  Right.

Q.  Okay.  So is that telling you what you can do if you do not agree with the dispute results?

A.  That is what I understand, if you disagree with an item.  Right.

Q.  Okay.  And then -- so they gave -- Experian provided you instructions what to do if you don't agree with this; right?

A.  You could say that, yes.

Q.  And then it says, "We will process disputes, generally, by sending your dispute to the furnisher of the information or to the vendor who collected the information from a public record."

         Do you see that?

A.  I see it.

Q.  Is that explaining to you how Experian conducted its investigation?



VICTOR RAMIREZ NAJERA                                    September 23, 2025
Victor Ramirez Najera vs Experian Info Solutions                    184

A.  That's how they conduct -- I see it.

Q.  Okay.  Do you understand that that is Experian communicating to you how they conducted their investigation?

A.  Not how they conduct it.  It says "We will process," so future tense.

Q.  Okay.  And so you'd submitted a dispute; right?

A.  Right.

Q.  And so when they process a dispute, generally, they send your dispute to the furnisher of information or to the vendor who collected the information from a public record; right?

A.  Right.  That's on there, yeah.

Q.  Okay.  And then do you see where it says "If we are able to make changes to your credit report based on information you provided or if you requested the addition of a statement, we have done so."

Did you request the addition of a statement?

A.  I don't know what that is.

Q.  Okay.  So if you don't know what it is, does that mean you did not do it, then?

A.  It's possible I could have done it without knowing this exact term for it.

Q.  Okay.  But you don't know one way or another



whether you did it; right?

A. Based off of this and what we're doing right now, I don't know.

Q. All right. And then it says "Otherwise, we have contacted the company reporting the information you disputed, supplied them all relevant" -- "relevant information and any documents you gave us with your dispute, and instructed them to review all information we provided them about your dispute, verify the accuracy of the information, provide us a response to your dispute, and update the records and systems as necessary."

Do you see that?

A. I see it.

Q. Okay. Does that tell you how Experian was handling the dispute that you submitted?

A. It seems that they are outlining the way that they handle the disputes. Correct.

Q. And so they did four things; right? They, one, reviewed all information -- or sorry -- scratch that.

All right. So they instructed the furnisher to do four things; right? One, review all information Experian provided them; two, verify the accuracy of the information; three, provide a response; and then, four, update records and systems as necessary;



right?

A.  Right.  It says -- yeah -- generally, that's how they do it.

Q.  All right.  And then if we look at the results, you see, "Pennymac Loan Services.  Outcome, deleted"; right?

A.  Right.

Q.  And so that item was removed from your credit report; is that right?

A.  Right.

Q.  And then the Rushmore loan remains.

Do you see that?

A.  Yes, it remains.

Q.  Okay.  And then it instructs you that, "The company that reported the information has certified to Experian that the information is accurate."

Do you see that?

A.  Right.  I see that sentence.

Q.  So then do you understand that Rushmore certified to Experian that the information was accurate?

MR. HAMMOUD:  Objection.  Form.

A.  Right.  It says "The company that reported the information has certified to Experian that the information is accurate.  The item was not changed as a result of our processing of your dispute."



Q.   (BY MR. MCCRAW)  And so "the company" here refers to Rushmore; right?

A.   Yeah.  Our -- when it says "as a result of our" is Experian, yes.

Q.   But "the company" --

A.   Right.  Refers to Rushmore.

Q.   Okay.  All right.  And then if we go to the next page, you see underneath the Rushmore Loan Management Services account, there in the small text, it says "If the reinvestigation does not resolve your dispute, you have the right to add a statement of up to 100 words to your file disputing the accuracy or completeness of the information."

A.   I see that first sentence, yes.

Q.   Okay.  Did you submit a statement of up to 100 words?

A.   Yes.

Q.   You did?

A.   Right.  That was the second dispute.

Q.   That -- that was your statement of 100 words?

A.   Right.

Q.   Was that a dispute or was that a statement of 100 words that would be added to this?

A.   I guess I'm not too sure on the terms, but it was a second dispute.  Right.



Q.  All right.  And then if you look at the second paragraph there, the second sentence, there in the middle, do you see where it says "You may contact the company that reports the information to us and dispute it directly with them"?

A.  I see that sentence.

Q.  So did you contact Rushmore regarding this account?

A.  No.

Q.  Did you ever dispute the account directly with them?

A.  No.

Q.  Why did you not contact them or dispute it with them?

A.  I believe that it was through Experian that everything was being reported through.

Q.  Okay.  But if Rushmore reported that -- the information and certified it to Experian --

A.  Right.

Q.  -- why did you not go to the source of --

A.  Because in the next sentence it says "This item was not changed as a result of our processing."  So that means our processes -- processes, as in "our" is Experian.

Q.  Okay.  But if -- the preceding sentence tells



you that the company reported the information, and they're the ones that certified it to Experian that it's accurate.  So if they're reporting it as accurate and you're claiming it's inaccurate, why would you not go to the source of the inaccuracy?

          MR. HAMMOUD:  Objection.  Form.

     A.  Like I said, I'm not an expert.  So what that means to me is, reading that next sentence, it says "our processing of your dispute."

     Q.  (BY MR. MCCRAW)  All right.  And then here, if you look at the two pages next to each other, pages 2 and 3, you can compare the Rushmore Loan Management Services accounts to each other.  And do you see that the one on the left is your dispute results before, and the one on the right is dispute results afterwards?

          Do you see that?

     A.  I see them side by side.  Where does it say that one was before and after?

     Q.  So if you go back to the first page at the very bottom --

     A.  Right.

     Q.  -- it says "Before dispute."

     A.  Okay.  Okay.  Gotcha.

     Q.  And then this one should say, "After dispute," somewhere, but I'm not seeing it.



And so the one on the right on Experian 0017, page 3 of the document, do you see how it now has a comment that says "This item remained unchanged from our processing of your dispute in February 2024"?

A.  Yes.  I see it right in the middle.

Q.  Okay.  And so this was added to the account and -- as of this date of this dispute, at the very latest.  And so when a creditor would review this account, they would be able to see this comment; right?

A.  I'm not --

MR. HAMMOUD:  Objection.  Form.

A.  -- not too sure.  I believe so.

Q.  (BY MR. MCCRAW)  Okay.  And so if they saw that comment, would that communicate to them that you had disputed this account?

MR. HAMMOUD:  Same objection.

A.  Right.  It says "Dispute, February."

MR. MCCRAW:  Okay.  All right.  I think now we will take a quick break.

THE COURT REPORTER:  We can go off the record at 2:37.

(Off the record at 2:38 p.m.)

(On the record at 2:48 p.m.)

THE COURT REPORTER:  We can go back on the record at 2:48.



MR. MCCRAW:  Okay.

Q.  (BY MR. MCCRAW)  All right.  Mr. Ramirez, ready to continue?

A.  Ready.

Q.  So we'll go on to the next exhibit, which will be Exhibit 8.

MR. MCCRAW:  This is Bates numbered Experian 0019.

(Exhibit 8 marked.)

Q.  (BY MR. MCCRAW)  All right.  Mr. Ramirez, do you recognize that document?

A.  Yes.

Q.  What is this document?

A.  A credit report.

Q.  And is this dated March 7, 2024?

A.  Yes.

Q.  All right.  And it's for you, Victor Ramirez; right?

A.  Yes.

Q.  And this corresponds to the same date -- sorry -- the -- of your dispute results; right?

A.  Correct.

Q.  Okay.  And we already said you weren't living at 3924 Orcas Street, but you were actually there in Tennessee at the time; right?



A.  Right.

Q.  All right.  So if we go on to the second page, we can see on here where it starts with, "Your potentially negative account activity."

Do you see that?

A.  I see it.

Q.  Yeah.

And so we see that Capital One account, which we discussed earlier was a charge-off account; right?

A.  Charge-off?  Paid, closed, written off, yes.

Q.  Okay.  But it shows, like, April.  It's got the CO.

Does that mean --

A.  Oh.  Charge-off, yeah.

Q.  -- charge-off?

Okay.  And that would be a negative account; right?

A.  Potentially negative account; correct.

Q.  Well, would a charge-off account be negative?

A.  I believe so.

Q.  Okay.  And then underneath that, we've got an Oportun Progreso Financial account, which shows a 60, 90, and 90 days late for February, March, and April.

Do you see that?



A.  Right.  Payment history, yeah.

Q.  Okay.  And so this would be a negative account;
right?

A.  Right.

Q.  And then we show the Rushmore Loan Management
Services.

Do you see that?

A.  I see it.

Q.  And then do you see that comment we were just
discussing that was added in regards to your dispute
that says "This item remained unchanged from our
processing of your February 2024" -- sorry -- "of your
dispute in February 2024"?

A.  I see it.

Q.  Okay.  And so then we also see the Southwest
Credit Systems account over on the next page.

Do you see that one?

A.  I see it.

Q.  And we discussed that this was a collection
account; right?

A.  C, collection.

Q.  Okay.  So this was also a negative account
reporting on your credit report as of March 7, 2024;
right?

A.  As of that date, yes.



Q.  All right.  All right.  Some of these we'll fly through a bit faster.

We will go on to Exhibit 11 -- or not 11 -- 9.

MR. HAMMOUD:  9.

THE COURT REPORTER:  9.

MR. MCCRAW:  Sorry.  It's my Tab 11.  And this is Experian 0148.

(Exhibit 9 marked.)

Q.  (BY MR. MCCRAW)  Do you recognize this document?

A.  Yes.

Q.  What is this document?

A.  This is the second dispute.

Q.  Okay.  And what's the date of this document?

A.  It is dated July 10, 2024.

Q.  All right.  So this is four months after you received the results of your first dispute; right?

A.  Right.  Or March -- right.  Right.  Right.

Q.  So why did you wait four months before disputing it again?

A.  If you recall how we said my address on the March 7, 2024, document is this, but I was living in Nashville.  And on the timeline that we had, we had me moving back to Texas -- from Nashville, Tennessee, to



Texas in June of 2024.  So to be able to provide the documents in this -- I felt more comfortable reviewing them at home when I'm in Texas, because all these documents were in Texas.

Q.  Okay.  So you wanted to wait until you got home to gather documents?

A.  To review them carefully and make sure I had everything I needed to, yes.

Q.  Okay.  And did anyone tell you to submit documents with this dispute?

A.  Nobody told me.

Q.  Nobody told you?  Okay.

Why did you think to submit documents with this dispute but not the prior dispute?

A.  The first dispute, I believed that it was going to be straightforward to be able to take off both the Pennymac and -- which was taken off -- and the Rushmore because it would seem pretty straightforward to me.  You know, the Socials don't match, date of birth don't match.  That's pretty straightforward in my eyes.

Then I had to go ahead and file a dispute, like the one shown here that we have in front of us, which kind of showed everything and that I provided all the documents, my Social, different dates of birth, you know, how old I was when the account was actually taken



out, the mortgage, in 2009.  So that's what this shows.

Q.  Okay.  And where did you get the template for this letter?

A.  I believe I was, you know, doing some research -- research online.

Q.  What were you researching online?

A.  How to -- don't remember exact details, but how to file, like, a better, like, more thorough dispute.

Q.  And you found this template just online?

A.  I kind of looked at quite a few, you know, looked at -- you know, compared -- read a whole bunch and compared them and kind of mixed together -- put this together, yeah.

Q.  So you put this together yourself?

A.  Yes.

Q.  Okay.  Nobody provided you this template?

A.  No.

Q.  Okay.  And whose desk is this from?

A.  Mine, Victor Ramirez.

Q.  Who else is Victor Ramirez?

A.  I guess that's a pretty vague question.

Q.  Is your dad also Victor Ramirez?

A.  He is also a Victor Ramirez, yes.

Q.  Okay.  And then we see in the -- underneath that, we've got an address and e-mail, phone number.



And it also says "Victor Ramirez" again; right?

A. Yeah. Victor Ramirez, 3924. And then e-mail, Ramirez, Victor. Yeah.

Q. And were you living at 3924 Orcas Street at this time?

A. July 10th? Yes.

Q. Okay. And your dad, Victor Ramirez, was living there as well; right?

A. Correct.

Q. Okay. And then -- and in your dispute, if we go down, the only account you're disputing is the Rushmore loan account; right?

A. Right. Because Pennymac was taken off.

Q. Now, does "Najera" appear at all on this first page?

A. On this first page? No.

Q. Okay. So if someone were looking at this first page of this dispute, would anything indicate to them that Victor Ramirez Najera and not Victor Ramirez, your father, was submitting this dispute?

A. If you were to only look at this first page, there is no "Najera" on it.

Q. Okay. And then if we go to the second page, you list your name. And that's where -- the first instance where we see "Najera"; right?

 ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

APPENDIX 0198

A.  Right.

Q.  Did you sign this?

A.  Did I sign it?  I did not sign it.  It's from my computer.

Q.  Okay.  But did you print it out?

A.  Yes.  Yes, I printed it out.

Q.  Okay.  And you could have signed it; right?

A.  I could have.

Q.  If you add your signature, does it seem more likely that it came from you than just a printout from a computer?

A.  If you only read this first page, yeah.

Q.  I'm just -- in general, if you had signed it, would it seem like -- more likely that it came from an individual as opposed to just a computer?

MR. HAMMOUD:  Objection.  Form.

A.  Right.  Like I said, if you looked at this first page, yes.  Only at the first page.

Q.  (BY MR. MCCRAW)  Let's go -- well, I'm just going to ask you about this, the next page where you've got your Social Security card.  And it says "Valid for work only with DHS authorization."

A.  Right.

Q.  Is that DACA?

A.  Right.



Q.  Okay.  And then is that your signature on the signature line?

A.  That is my signature; right.

Q.  Okay.  Why is it different than what we saw on the interrogatories?

A.  Because this was made when -- it's the same signature on there from when I was -- when I first got DACA, which I was young.

Q.  So your signature has changed over time?

A.  Only once, from just having my name.  Because I was really young, and I didn't really sign anything to actually having, like, a signature.

Q.  Okay.  So when did you, I guess, get this?

A.  I can't remember the exact date.  It was -- I was 15.  15-ish.

Q.  Okay.  And then we'll go to what is Experian 0152 at the bottom.

Do you see there, kind of in the middle where it lists the lender name?  Who's the lender listed there?

A.  In the middle?  Lender, CitiMortgage, Inc.

Q.  Is that Rushmore?

A.  That specific question, it's not Rushmore.

Q.  Okay.  Where did you say you were born again?

A.  Sabinas, Coahuila.



Q.  Is that the same as Nueva Rosita?

A.  Oh, that's the city, I guess, of the -- the exact place of -- the hospital.

Q.  Okay.  So Nueva Rosita is the hospital.

A.  Like --

Q.  Sabinas is --

A.  Yeah.  It's like saying Dallas, and then it's like Frisco, yeah.

Q.  Okay.  Just to clarify.

All right.  Now, if we go to Experian 0158, it shows eighth-grade football; right?  Does this show photos from the eighth-grade football season?

A.  Yes, I see it.

Q.  Okay.  And then you're down in this bottom photo; correct?

A.  Right.

Q.  And then if we look, I guess it's the fourth line from the bottom up on the far left, there's a Victor Ramirez.

Is that you?

A.  That is me.

Q.  Okay.  And there's no "Najera" in that; right?

A.  There is no "Najera."

Q.  Okay.  And if we go to the next page, in the top right, it says "Left, Albert Tijarina and Victor



Ramirez."

Is that Victor Ramirez it's referring to you?

A.  Yes, that is referring to me.

Q.  And there's no "Najera"; right?

A.  There is no "Najera" on this page.

Q.  Okay.  And if we go to the next page, there kind of in the middle, it says "Victor Ramirez prepares to vault."

Is that referring to you?

A.  Where are you at?

Q.  Kind of there in the middle.

A.  Okay.  Yeah, I see it.  I see it, yeah.

Q.  Is that "Victor Ramirez" referring to you?

A.  Correct, to me.

Q.  Okay.  And that also does not have "Najera"; right?

A.  No "Najera."

Q.  Okay.  And if we go to the next page, there's an athletic achievement certificate.  And it says "Victor Ramirez," which is you; right?

A.  Yes.

Q.  But no "Najera"; right?

A.  No.  Collins Middle School, Victor Ramirez, 08-09 school year.  Right, no "Najera."



Q.  Okay.  And then if we look at the next certificate, it also says "Victor Ramirez," which is you; right?

A.  Yes.

Q.  And there's no "Najera"; right?

A.  Yeah.  It says "2009, Victor Ramirez, Spanish class."

Q.  And if we go to the last page, do you recognize this as the envelope that you sent to Experian?

A.  Don't quite recall, but, I mean, it's an envelope.  It looks just like it, yeah.

Q.  Okay.  And then "from" it says "Victor Ramirez."

Do you see that?

A.  "Victor Ramirez," yes.

Q.  Okay.  And there's no "Najera"; right?

A.  There's no "Najera."

Q.  And there's two Victor Ramirezes that were living at 3924 Orcas Street at this time; right?

A.  At this time, yes.

Q.  Okay.  So is there any way, looking at this, for any -- for someone at Experian to determine whether this came from Victor Manuel Ramirez Najera or Victor Manuel Ramirez?

MR. HAMMOUD:  Objection.  Form.



A.   If you look at only this back page without looking at -- thoroughly through the document, no.

MR. MCCRAW:   We'll go to the next one. This will be Exhibit 10, which is Bates numbered Experian 0073.

(Exhibit 10 marked.)

Q.   (BY MR. MCCRAW)   Mr. Ramirez, do you recognize this document?

A.   Dispute results.   Yes.

Q.   And what's the date of these dispute results?

A.   August 19th, 2024.

Q.   And are these results from your second dispute that we just looked at?

A.   Correct.

Q.   And it lists Victor Ramirez in the top left as the recipient; right?

A.   Right.

Q.   And you were living at the 3924 Orcas Street at this time?

A.   Right.

Q.   Okay.  All right.  And then if we look at the Rushmore Loan Management Services down at the bottom, it says "Outcome verified and updated."

Do you see that?

A.   I see the -- yeah -- "Outcome verified and



updated."

Q.  Okay.  And then it says "The information you disputed has been verified as accurate."

Do you see that?

A.  I see it.

Q.  Okay.  So if something has been verified, does that mean that it has been investigated?

MR. HAMMOUD:  Objection.  Form.

A.  Not necessarily, no.

Q.  (BY MR. MCCRAW)  Okay.  And why not?

A.  "Verified" and "investigated" are two different words with two different definitions.

Q.  Okay.  So if something was verified, what does that mean?

A.  It's supposed to mean that it's been, well, verified, looked at.

Q.  Okay.  So it's been looked at, at least?

A.  Yeah.

Q.  Okay.

A.  At least, yeah.

Q.  All right.  And then if we go to the next page, we can see the dispute results before at the top and then after dispute at the bottom.

Do you see that?  It's Experian 0074.

A.  Right.



Q.  And then we see that -- in the comment section, that that has been updated.  And this now says "This item was updated from our processing of your dispute in August 2024."

Do you see that?

A.  I see it.

Q.  So if a creditor looked at this account and it had that comment, would they then understand that you dispute this account?

MR. HAMMOUD:  Objection.  Form.

A.  I need you to clarify that question.

Q.  (BY MR. MCCRAW)  So if a creditor looked at your credit report at this account --

A.  The after dispute?

Q.  Correct.

A.  Okay.

Q.  So if a creditor looked at your credit report as of August 19, 2024, and it has this comment that says "This item was updated from our processing of your dispute in August 2024," would they understand that you dispute the Rushmore account?

MR. HAMMOUD:  Same objection.

A.  From my understanding, it doesn't say anything about a dispute -- oh, wait.  "Your dispute."  Yeah, yeah, yeah.  Right, right, right.



Q.  (BY MR. MCCRAW)  Okay.  So they would understand that you dispute that account?

MR. HAMMOUD:  Same objections.

Q.  (BY MR. MCCRAW)  Right?

A.  That there was a dispute in August 2024, that's all it says.  Yeah.

Q.  Okay.  And it's a dispute from you; right?  Because it's your dispute?

A.  Yes.  It says "Your dispute."

Q.  Okay.  So to understand -- they would understand that you dispute --

A.  That I tried --

Q.  -- this account; right?

A.  Right.

Q.  Okay.  And then it says, beneath that, "If the reinvestigation does not resolve your dispute, you have the right to add a statement of up to 100 words to your file disputing the accuracy or completeness of the information."

Do you see that?

A.  I see it.

Q.  Did you try and submit a 100-word statement to get added to this disputed account?

A.  To this dispute?  No.

Q.  Okay.  And then below that --



APPENDIX 0207

A.  Oh, I'm sorry.  I -- sorry.  I misspoke.  So there was no dispute after this.  So I did not send anything after this; right.

Q.  Okay.  And then second line of the next paragraph, it says "You may contact the company that reports the information to us and dispute it directly with them."

Do you see that?

A.  I see it.

Q.  Did you ever contact Rushmore?

A.  I did not contact Rushmore.

Q.  Okay.  Did you ever dispute directly with them the validity of this account?

A.  I did not.

Q.  And why not?

A.  It goes to the same thing.  It says -- where it says "Our review."

Q.  Okay.

A.  So I understand that as being Experian's review.

Q.  Right.

But if Experian is relying on information from a source you think is providing incorrect information, why would you not go to that source and dispute it?



A.  I'm not an expert.  In my eyes and with the knowledge -- the basic knowledge that I would have, it would be through Experian.

Q.  Okay.  Were you instructed to not go submit a dispute directly to Rushmore or Nationstar?

A.  No, I was not instructed.

MR. MCCRAW:  So we'll go on to Exhibit 11, which is Experian 0077.

(Exhibit 11 marked.)

Q.  (BY MR. MCCRAW)  Do you recognize this document?

A.  Credit report.

Q.  Okay.  And is this from Experian?

A.  Yes.

Q.  All right.  And what's the date of this?

A.  August 19, 2024.

Q.  All right.  And is this for you, Victor Ramirez?

A.  Right.

Q.  And you're living at 3924 Orcas Street at the time; right?

A.  Yes.

Q.  And if we go to the second page, which starts, "Your accounts," do you see the Capital One account is still on here?



A.  Right.

Q.  Okay.  And then the Oportun Progreso that had this 60, 90, 90 days late in February, March, and April is still on here; right?

A.  Right.  60, 90, 90.

Q.  Okay.  And then the Rushmore Loan Management Services account has come off -- or sorry -- the Rushmore Loan Management Services is still on there as well; right?

A.  Yes, it's still on there.

Q.  Okay.  And then it has that comment we just read and discussed on your dispute results showing that you disputed this in August 2024; correct?

A.  Yes.

Q.  All right.  But the Southwest Credit Systems account has fallen off; right?

A.  Right.

Q.  So that collection account is no longer showing on this credit report; right?

A.  Right.

Q.  If we go to the -- what is page 4, which is Experian 0080, there's two Oportun Progreso Financing accounts.

Do you see those?

A.  I see them.



Q.  Okay.  If you look at the second one, it has a status as of September 2022.

Do you see that?

A.  Yes.

Q.  It says it was refinanced?

A.  Right.

Q.  And then if we look over to the next page where you've got a hard inquiry, also in September of 2022, for Oportun Progreso Financing.

Do you see that?

A.  Yes, I see it.

Q.  Okay.  Were you approved based on -- for that refinance based on how that account was closed, it appears as of September 2022, and the hard inquiry from September 22, 2022?

A.  Yes.

Q.  Okay.  So you were able on September 22, 2022, to get approval for a loan, which was this Oportun Progreso Financing; right?

A.  Right.  For a small loan, yes.

Q.  Okay.  And then if we go down to -- back on Experian 0080, we've got two other hard inquiries. We've got the Credit One Bank, which is July 10, 2024.

Do you see that one?

A.  I see it.



Q.  And that one, you were approved for that credit card; correct?

A.  Yes.  I believe so, yes.

Q.  Because we discussed that earlier.  That was the credit card you were able to obtain; right?

A.  Right.

Q.  Okay.  And then we have a couple months before that one, April 11, 2024, the JPMorgan Chase Bank card listed on there.  But you were denied for that one; right?

A.  Right.

Q.  So even with the Rushmore mortgage on here, you were still able to get approved for that Credit One Bank; right?

A.  I'm not sure what credit report they're looking at.  So we don't know that, if -- what they're looking at exactly.

Q.  Well, there's a hard inquiry on your Experian credit report; right?

A.  Right.  So they looked at Experian?  Okay.

Q.  So they looked at your Experian credit report.

A.  Right.  If they looked at Experian, then yes.

Q.  Okay.  So -- sorry.  I'm just going to ask that question to get it closed out.

So the credit -- you were able to get



approved for a Credit One Bank credit card, even though the Rushmore mortgage was on your credit report; right?

A. Right. If it -- the way I understand it, if this is showing that they went through Experian. So yes.

Q. All right.

MR. MCCRAW: So we'll move on to the next one. Moving right along. This will be Exhibit 12. This one is a little awkwardly printed. Thank you.

(Exhibit 12 marked.)

Q. (BY MR. MCCRAW) Okay. This actually goes that way, and you're going to hold it landscape. This is how it was produced to us. If you look at the very last page, it's Bates stamped Ramirez 000020. But you got to flip it over the other way and -- yeah, it'll go that way. All right. Let's just start with this.

All right. So, Mr. Ramirez, have you seen this document before?

A. Yeah. Possibly, yeah. Looks familiar.

Q. So if it has the Bates stamp of "Ramirez," then it was produced by you.

A. Okay. Yes.

Q. So whenever we -- I will say whenever we received this, it was one giant image that came across.

A. Okay.



Q.  And that's why it's printed this way.

Okay.  So what is this document?

A.  It says "Experian at a glance."  So it's kind of your credit report at a glance.

Q.  Okay.  So this is your credit report that you have produced in this case; right?

A.  Right.

Q.  And what's the date it was generated?

A.  September 20th, 2024.

Q.  All right.  So this would have been a month after the dispute results and the credit report we just looked at; correct?

A.  Right.

Q.  Okay.  And so why did you end up printing this out?

A.  I don't know.

Q.  Why did you think of saving this document in September 2024?

A.  What comes to mind is after this was still on my credit report, it's kind of like, okay, start taking, you know, notes and start kind of keeping stuff because they're doing this to me; so...

Q.  Were you instructed to keep this?

A.  No.

Q.  Did you have counsel at this time?



A.  No.

Q.  And so what is your credit score?

A.  This document shows 608.

Q.  And so as of this date, which is after the dispute results we've just looked at, the Southwest collection account would have come off; right?

A.  Right.

Q.  And the Southwest collection account was on your AppFolio account; right?

A.  Right.

Q.  And you had a credit score of 467 with that collection account with AppFolio; right?

A.  Right.  From AppFolio, yeah.

Q.  So with that account being removed, you're now up to a 608; right?

            MR. HAMMOUD:  Objection.  Form.

A.  If you're saying that because Southwest Credit fell off, it moved up to a 608, we don't know that, no.

Q.  (BY MR. MCCRAW)  Okay.  Is it -- would the removal of South- -- of the Southwest collection account have increased or decreased your credit score?

            MR. HAMMOUD:  Same objection.

A.  My belief is, slightly increased.

Q.  (BY MR. MCCRAW)  And what's the basis for that belief?

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

A.  Because it's a negative report that's falling off.

Q.  So removing that negative account of Southwest; right, would only slightly increase your credit score, in your opinion?

A.  In my opinion, yes.

Q.  All right.  And so if we look on here at the account summary, do you see that section?

A.  Account summary?  Yes.

Q.  And then we see, "Accounts ever late."

What's the number listed there?

A.  Accounts ever late, one.

Q.  Okay.  And then we've got, "Overall credit usage," there in the center.

Do you see that?

A.  Right.

Q.  And we've got credit used is $249.

Do you see that?

A.  Right.

Q.  And a credit limit of $300; correct?

A.  Yes.

Q.  So if we did the math, that would be 83 percent?

A.  Right.  It shows that.

Q.  Okay.  And if we continue to scroll down as it



goes through all of your accounts, you'll eventually get to the Capital One account.

Do you see that?

A. Capital One?  Yes.

Q. All right.  And what is the date that this account was opened?

A. June 17, 2021.

Q. And then the last payment date there on the right, what is that?

A. April 13, 2023.

Q. Okay.  So would this account be more recent than the Rushmore account?

A. According to this document, yes.

Q. And then in the top left, how many potentially negative months are on the Capital One account?

A. 11.

Q. And then below that, you can see the payment history where it's got several months of charge-off; right?

A. Yeah.  Payment history?  I see it.

Q. And then you've got several months of 30, 60, 90, 120, 150; right?

A. Right.  I see it.

Q. And so in May of 2022 is whenever you started to miss the payments for the Capital One account; right?



A.  Right.  That's what it shows.

Q.  Why were you missing payments in May of 2022?

A.  I don't remember.

Q.  Were you employed at the time?

A.  Yes.

Q.  Okay.  Did you have enough money to make the payment?

A.  I don't remember.

Q.  Is it possible that you did not?

A.  I don't remember.

Q.  Is it in the realm of possibility?

A.  Yes.

Q.  And so it appears it wasn't closed until May of 2023; right?

A.  Yes.  That's what this shows.

Q.  Is that maybe about the time -- well, that would be the time that you got the AppFolio report; right?

A.  Yes.

Q.  So up until that time, is it within the realm of possibility that you had some financial struggles?

A.  I don't quite remember, but it's possible.

Q.  All right.  And then if we go to the next page, we've got the Oportun Progreso Financial account.

Do you see that?



A.  Wait.  So that last question was up to 2023 that I've had financial struggles?

Q.  Up to, yeah, May 2023.

A.  No.

Q.  And why not?

A.  Because it would only be up to about 2022, September.

Q.  And why is that?

A.  Because I got up to date with everything in May of 2023 -- May, June.

Q.  So you got up to date in May of 2023?

A.  Right.

Q.  So up until you were up to date, you were not up to date?

A.  So just because the report shows it at that point in time doesn't mean that there was only the financial struggles when it was, like, right here in this time period before that, 2022 of September.

Q.  Okay.  So when were there financial struggles?

A.  The date I'm telling you.

Q.  Just September 2022?

A.  Up to, yeah.

Q.  Okay.  And what was the cause of those financial struggles?

A.  I don't remember.



Q.   Did you have employment issues?

A.   No.  I was employed.

Q.   But you do remember you had financial issues?

A.   Very minimal.

Q.   But, nonetheless, you didn't pay off that charge-off account until May of 2023, at the earliest; right?

A.   That's what it shows.

Q.   Okay.  And is that accurate?

A.   Is me closing it off in May 2023 accurate?

Q.   Right.

A.   Is that what you're asking?

Q.   Right.

A.   Yes.

Q.   Okay.  And then if you go to the next account, which will be on the next page, for Oportun Progreso Financial --

A.   Right.  Right.

Q.   -- do you see that one?

A.   I see it.

Q.   All right.  And so here it's got an open date of September 23, 2022.

        Do you see that?

A.   Yes, I see it.

Q.   And then the last payment date of May 22, 2023.



Do you also see that?

A.  I see it.

Q.  Okay.  And is -- May 22, 2023, is that the same date as the AppFolio report?

A.  I don't remember.  I don't know.

Q.  Let me look back at --

A.  AppFolio?

Q.  -- Exhibit 4.

A.  Okay.  I don't -- I don't see a date on this thing.

Q.  It's in that top left of Exhibit 4.

A.  5/22; right.

Q.  Okay.  So those dates match; right?

A.  Yes.

Q.  And on this Oportun Progreso Financial account, this is the one that has the 60, 90, 90 days late for February, March, and then April?

A.  Right.  That's what it shows.

Q.  Okay.  So were you having financial difficulties in February, March, and April of 2023?

A.  I don't remember.  No.

Q.  Why were you not making the payment on this account, then?

A.  I think that was when I was trying to fix it and close it off to refinance.


DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

APPENDIX 0221

Q.  Okay.  But you didn't make the payments either way; right?

A.  I guess.  It shows that I didn't.

Q.  And were you employed during February, March, April?

A.  Yes, I was employed.

Q.  And this account here is more recent than the Rushmore account; right?

A.  Yes.

Q.  All right.  So if we go towards the end where it talks about your credit score and we've got, "What's helping, what's hurting," please look for that for me.

A.  Okay.

Q.  Okay.  So under, "What's helping," do you see the first bullet that says "You have an established credit history"?

A.  Right.

Q.  What does that mean to you?

A.  What it says, "established credit history."

Q.  And so what is an established credit history?

A.  Like, you've had credit history.

Q.  So you've got maybe a lengthy credit history?

A.  It's kind of vague the way they say it, but you could interpret it that way.

Q.  Okay.  And so having accounts that have been



open longer than others, would that help with having an

established credit history?

        A.  I guess that could.

        Q.  Okay.  And then the bullet point underneath it

actually says "Your oldest account was opened 15 years,

eight months ago."

                Do you see that?

        A.  15 years, eight months.  I see it.

        Q.  And what account is that referring to?

        A.  It doesn't say.

        Q.  But which account was opened -- which account

is the oldest on here?

        A.  The Rushmore.

        Q.  Okay.  So would that be the account that was

opened 15 years, eight months ago?

        A.  I -- from this, from what it's saying, I

believe so.

        Q.  Okay.  And so it's saying having that old

account is listed as the fact that it's helping;

correct?

        A.  That's what it states on the document.

        Q.  Okay.  And then we've got the average age of

your accounts as four years and three months.

                Do you see that?

        A.  I see it.



Q.  And having an account that is 15 years, eight months old would help increase the average age of your accounts; right?

A.  I believe so.

Q.  And so having a higher average age of your accounts would be better for your credit score, according to this; right?

A.  According to this, yes.

Q.  Okay.  And so having the Rushmore account, which is 15 years, eight months old, is helping the average age of your accounts, which is helping your credit score; right?

A.  It's helping in that certain aspect, yes.

Q.  Okay.  All right.  And then if we go to what's hurting, we see the first one is serious delinquency.
         Do you see that?

A.  I see it.

Q.  Okay.  And it says you have a serious delinquency 60 days past due or greater or derogatory indicator on your credit report; right?

A.  Right.  I see it.

Q.  And Capital One has a 60 days past due or greater indicator; right?

A.  Right.

Q.  And so does the Oportun Progreso that we looked



at?

A.  Right.

Q.  In fact, the Capital One and Oportun Progreso both have 90-day indicators; right?

A.  Right.  We have two -- yeah, we have three accounts.

Q.  Okay.  But the Rushmore account does not have a 90-day indicator; right?

A.  I think on this document it shows 30 and 60.

Q.  Okay.  So no 90 for the Rushmore account; right?

A.  It does not show that.

Q.  Okay.  Then if we go to that next bullet, it says "Number of your accounts that were ever 60 days late or worse or have a derogatory indicator."  And then it lists three accounts.

So at least two of those accounts are not the Rushmore account; right?

A.  Right.

Q.  Okay.  If we go down to the next page where it says "Few accounts paid on time," do you see that section?

A.  I see it.

Q.  And then it says "You have an insufficient number of accounts that are currently paid as agreed."



Do you see that?

A.  I see it.

Q.  And so it says "currently paid as agreed."

So that would indicate it would have to be an open account; correct?

A.  From my understanding, yes.

Q.  And so the Rushmore account is not showing as an open account; right?

A.  Right.

Q.  Okay.  So this could not be referring to the Rushmore account; right?

A.  No.

Q.  I just want to clarify the "no."

No, it could not be referring to Rushmore?

A.  Right.

Q.  All right.  So the next bullet says "Number of your accounts currently being paid as agreed."  And it shows one account.

Do you see that?

A.  Right.

Q.  And the Rushmore account would not be that one account; correct?

A.  No, it would not be.

Q.  All right.  And then if we go to the, "High credit usage," if you look at the second bullet, it says



"Ratio of your revolving balances to your credit limits, 83 percent."

Do you see that?

A. Right.

Q. And so that -- when we looked at the 83 percent on the second page of this document, that did not include any amounts from Rushmore; right?

A. It did not.

Q. Okay. So Rushmore is not -- the Rushmore account is not leading to high credit usage; right?

A. To the -- to this certain thing, no.

Q. All right. And then, "Loan balances," the first bullet, it says "The remaining balance on your mortgage or non-mortgage installment loans is relatively high."

Do you see that?

A. Yes.

Q. Now, if you look at the Rushmore mortgage, is the balance being shown?

A. It is not being shown on this report.

Q. Okay. So then the Rushmore mortgage could not be a cause of the remaining balance on your mortgage or non-mortgage installment loans being relatively high; correct?

A. I'm not familiar with how they would do that.



Q.  So if the Rushmore loan does not have a balance --

A.  Right.

Q.  -- then could its balance be affecting the -- the balance that is owed on your mortgage or non-mortgage installment loans?

MR. HAMMOUD:  Objection.  Form.

A.  In that specific case, with the way that you're saying it, no.

Q.  (BY MR. MCCRAW)  And then, "Percentage of principal you have paid down on your open non-mortgage installment loans," it says 19 percent; right?

A.  Right.

Q.  So this specifically learns to -- this specifically refers to non-mortgage installment loans; right?

A.  Right, non-mortgage.

Q.  So this would not be inclusive of Rushmore; correct?

A.  Right.

Q.  Okay.  We're done with that document.

MR. MCCRAW:  Do we need to take a break?

MR. HAMMOUD:  No.  I'm good.

MR. MCCRAW:  Okay.

We'll go on to the next.  This will be 13.



This is Bates numbered Experian 0164.  This page should go quick.

                    (Exhibit 13 marked.)

    Q.  (BY MR. MCCRAW)  All right.  Do you recognize this document, Mr. Ramirez?

    A.  Yes.

    Q.  What is this document?

    A.  I don't know the exact term for it.  It's a dispute.

    Q.  Who's this from?

    A.  I don't know.

    Q.  Did you submit this to Experian?

    A.  No.

    Q.  Did you give somebody permission to submit on behalf of you?

    A.  I don't know.

            MR. HAMMOUD:  Objection.  Form.

    Q.  (BY MR. MCCRAW)  Sir, what was your response?

    A.  I don't know.

    Q.  Do you have any idea where this document came from?

    A.  I couldn't tell you at this moment in time.

    Q.  What do you mean by you couldn't tell me "at this moment in time"?

    A.  I mean, I don't know every single detail off



the top of my head.

Q.  Okay.  Was this submitted by your attorney on your behalf?

A.  I honestly don't remember.

Q.  Okay.  Was this submitted by someone you were applying for a loan with?

A.  I really don't remember.

Q.  But you have seen this document before?

A.  It seems familiar.

Q.  Okay.  But you don't remember anything else about the document?

A.  I'm sorry.  I couldn't tell you more about it right now.

Q.  What would you need in order to be able to tell me more about the document?

A.  I mean, I don't know.  I would have to sit down to review everything that I have.  I don't -- I don't -- I can't tell you more than that, to be honest.

Q.  Do you have a copy of this document in your possession?

A.  I couldn't tell you if I do or not.

Q.  Okay.  Would you have any other documents related to this document in your possession?

A.  I could not tell you, no.

Q.  Okay.  I'll move on.



MR. MCCRAW:  We're getting close to the end.  This will be 14.

(Exhibit 14 marked.)

Q.  (BY MR. MCCRAW)  All right.  Mr. Ramirez, do you recognize this document?

A.  Credit report, June 3rd.  Yes.

Q.  And is it from Experian?

A.  That's what it seems to be, yes.

Q.  Okay.  And it's June 3, 2025; right?

A.  Right.

Q.  Okay.  So -- and this is to Victor Manuel Ramirez Najera; correct?

A.  Correct.

Q.  And this is the first one we've seen that has "Najera" on here; right?

A.  Right.

Q.  And you were residing at the 3924 Orcas on this date?

A.  Right.

Q.  And what's your credit score?

A.  645.

Q.  And does that say that's a fair credit score?

A.  It says "Fair," on -- yeah.

Q.  All right.  If we look at the payment history in the top left, do you see where it says "77 percent of



your accounts always paid as agreed"?

A.  I see it.

Q.  So then that would mean 23 percent of your accounts were not paid as agreed; right?

A.  Right.

Q.  And then that makes up 35 percent of your credit score; right?

A.  That's what it says.  Right.

Q.  And then to the right, you see the amount of debt; right?

A.  Yes.

Q.  And then do you see where it says you have 34 percent revolving credit utilization?

A.  I see it.

Q.  And then amount of debt makes up 30 percent of your score.

Do you see that?

A.  I see it.

Q.  In the bottom left, it says "You've initiated four credit applications in the past year."

Do you see that?

A.  Yes.

Q.  And the amount of new credit makes up 10 percent of your score.

Do you see that?



A.  I see it.

Q.  And then down the bottom middle, it says "Credit mix," which is different types of accounts.

Do you see that?

A.  I see it.

Q.  And your credit mix makes up 10 percent of your score; right?

A.  Right.

Q.  And then to the right, we've got, "Credit history length."

Do you see that?

A.  I see it.

Q.  And your average account age is 4.7 years; right?

A.  That's what it says on it.  Yep.

Q.  And the credit history length makes up 15 percent of your score; correct?

A.  Correct.

Q.  Now, a higher credit score is more likely to get you approved for credit; right?

A.  Yes.  For the most part, yes.

Q.  What do you mean by "for the most part"?

A.  Yeah, higher credit means, you know, usually you're better on every single thing that's on here. Right.



Q.  Okay.  And then if we go to the next page, we can see what that fair score range is.  Do you -- which is 580 to 669; right?

A.  I see it.

Q.  So you're kind of there in the middle of it at 645; right?

A.  Towards the top middle, yeah.

Q.  Yeah.

All right.  And then to the top right, do you see where it says you've got three potentially negative accounts?

A.  "What may be hurting"?  Right.

Q.  And then underneath that, we've got 23 percent of potentially negative accounts; right?

A.  Okay.  Yeah.

Q.  And then also on, "What may be hurting," is 34 percent revolving credit utilization; right?

A.  I see it.  Yeah.

Q.  And then on the left, which is the, "What may be helping" --

A.  Right.

Q.  -- you've got ten accounts paid as agreed; correct?

A.  Right.

Q.  And then 77 percent of accounts paid as agreed;



right?

A.   Right.  Helping, yeah.

Q.   Okay.  And then for your financial profile, underneath that, it says "Nice job making some payments on time.  Make sure to pay all of" -- "all your accounts on time because late payments can stay on your credit report for seven years."

Do you see that?

A.   I see it.

Q.   All right.  So this is indicating that maybe you didn't have some accounts that were paid on time; correct?

A.   It's just a statement saying, "Make sure to pay them all on time"; right.

Q.   Okay.  All right.  And then it says "Ideal credit utilization is 30 percent and under."

Do you see that?

A.   I see it.

Q.   And if you look to the right, we said yours is at 34 percent; correct?

A.   Right, yeah.

Q.   Which is 4 percent over that 30 percent they're talking about; correct?

A.   Right.  30 to 34, four, yeah.

Q.   Okay.  All right.  And if we go to the next



page, which is Experian 0125, we see that Capital One account, which we discussed earlier, the charge-off account; correct?

A.  Yeah, I see it.

Q.  And then there's that Oportun Progreso Financing with the 60, 90, 90 days late for February, March, and April; correct?

A.  Right.  Same one that's been showing up, yeah.

Q.  All right.  And then you've got the Rushmore Loan Management Services as the third negative account; correct?

A.  Right.  Still on there, yeah.

Q.  Okay.  All right.  And then if we go over to page 6 of the document, which is Experian 0128, you see a number of credit applications and hard inquiries; correct?

A.  Yeah.  Yeah.

Q.  Okay.  So we've got the Xactus Avantis Geneva Financing, which was a hard inquiry on April 27, 2025.

Do you see that?

A.  Yes.  The first one.

Q.  And you got an approval on that one; correct?

A.  To my knowledge, it would be this one, yes.

Q.  Yeah.

Because this is your mortgage for your



home; correct?

A.  Right.

Q.  All right.  And you got that approval even though the Rushmore loan account is reporting on your credit report; correct?

MR. HAMMOUD:  Objection.  Form.

A.  They had to, you know, look through that and review documents.  Yes.

Q.  (BY MR. MCCRAW)  But the Rushmore account was on your credit report at the time you got approved for the Geneva Finance loan?

A.  They took a look at that, and they noticed it. Yes.

Q.  Was the Rushmore account on the credit report?

A.  Right.  That's what I said.  They look at -- they looked at it, yes.

Q.  Okay.  Okay.  I just wanted a clear answer.

All right.  Below that, we've got two CCR Centennial Bank hard inquiries, one on April 24th and another on February 12th, both of 2025; correct?

A.  Correct.

Q.  And those were -- those were the not-completed applications; correct?

A.  Right.

Q.  And we have discussed the others.  So we'll



just move along.

MR. MCCRAW:  All right.  I think we'll only have, like, two more.  This will be 15.

(Exhibit 15 marked.)

Q.  (BY MR. MCCRAW)  All right.  So this will be Exhibit 15, which is Experian 0166.

Do you recognize this document?

A.  June 11th?

MR. HAMMOUD:  We said 15; right?  Exhibit 15?

MR. MCCRAW:  15, yes.

A.  "Your dispute results"; right.

Q.  (BY MR. MCCRAW)  And this is from Experian?

A.  Yes.  That's what it says, yes.

Q.  And dated June 11, 2025; right?

A.  Correct.

Q.  And so that credit report we just looked at was June 3, 2025; correct?

A.  Right.  Nine days.

Q.  So this would be eight days afterwards?

A.  Oh, yeah.

Q.  And, here, do you see down in the "Results" section, it says the Rushmore account was deleted?

A.  Yeah.  It says "Results, credit items."  Right.

Q.  Okay.  So as of at least June 11, 2025, the



Rushmore account has been deleted from your credit report; right?

A.  That's what this document shows; correct.

Q.  And have you confirmed that by looking at your credit report?

A.  Yes.

MR. MCCRAW:  This should be 16.

(Exhibit 16 marked.)

Q.  (BY MR. MCCRAW)  Mr. Ramirez, what is this document?

A.  An Experian credit report.

Q.  What's the date of it?

A.  June 11, 2025.

Q.  So it's eight days after the previous credit report we looked at; right?

A.  Right.  And the same day as the other dispute results.

Q.  All right.  And so on here, what is your credit score?

A.  640.

Q.  And how does that compare to your credit score from eight days earlier?

A.  It's fair.  Stayed the same.  It's five points less.

Q.  It's five points less.  Okay.



So your credit score has gone down; right?

A.  Correct.

Q.  Okay.  And if we look at the amount of debt, it says you have 34 percent revolving credit utilization.

Do you see that?

A.  Right.  It's the same as the other one, yeah.

Q.  Same as the other one.

If you look at your payment history, it says 83 percent of your accounts are always paid as agreed; right?

A.  Right.  It's gone up.

Q.  So it's gone -- that has gone up.

Did the amount of new credit go up?  Go down?  Stay the same?

A.  Here, it looks like it's the same.  Four.

Q.  So it's the same as the June 3rd; right?

A.  Right.

Q.  Your credit history length, did that go -- is that longer or shorter on -- as of June 11th?

A.  Shorter.

Q.  Okay.  And do you see that bold underneath, it says "A longer active credit history is better for your score"; right?

A.  I see it.

Q.  So now you have a shorter credit history;



correct?

A.  According to the documents, yes.

Q.  And that would be worse for your score; correct?

A.  According to the document, it would not -- I mean, it says longer credit activity is better.  So yes.

Q.  All right.  And credit mix.  With the Rushmore loan off of here, would that impact your possible credit mix?

A.  I'm not familiar with what that means.

Q.  All right.  And so if we go to the next page, we can look over here on the left, "What may be helping."  And it says "Ten accounts are paid as agreed"; right?

A.  Right.

Q.  And that's the same as the June 3rd?

A.  Right.

Q.  And then we did mention that the 83 percent of accounts being paid as agreed is 6 percent higher than June 3rd; right?

A.  Yes.

Q.  But even still, your credit score's gone down; right?

A.  Those are two different statements, but, yes, they are both correct.



Q.  Okay.  And then, "What may be hurting," we see that there's now only two potentially negative accounts instead of three; correct?

A.  Right.

Q.  And it says 17 percent potentially negative accounts as opposed to 23 percent on the June 3rd; right?

A.  Right.

Q.  So that has trended in a positive direction; correct?

A.  Right.

Q.  And even though that has trended in a positive direction, your credit score still went down; correct?

A.  Yeah.  Like I said, those are two separate, but, yes, both of them are correct.

Q.  And then 34 percent revolving credit utilization.  That stayed the same; correct?

A.  Stayed the same.

Q.  All right.  And then the financial profile, that stayed the same; correct?

A.  Yes.  It looks the same.

Q.  If you go through your June 11th and your June 3rd credit reports --

A.  Right.

Q.  -- account by account -- and you can take the



time if you want to do that -- is there a single payment that is reflected in the June 11th credit report that is not paid -- not reflected in the June 3rd credit report?

And I can state the question differently. Is there anything different between the two besides what we've discussed and the removal of the Rushmore account?

A. Yeah. So on this one, my potentially negative, the Rushmore is here. On this one, potentially negative, it's not here.

Q. Right.

So besides removal of the Rushmore account --

A. From my potentially negative list? Yes, that's -- that's the difference.

Q. Okay. Because if you go through and you look at the payment history for both of them for the -- for all of the accounts on June 3rd versus June 11th, they're the exact same; correct?

A. I mean, I would -- you would have to look through everything. It would take a while. But from just looking at this like this, yes.

Q. Let's look at the Capital One.

Do you have the Capital One in front of you?

A. Yeah, it's the same.



Q.   It's the exact same payment history; right?

A.   Right.

Q.   Does it show paid, closed, $416 written off?

A.   Right.

Q.   It shows the original loan amount of $300; right?

A.   Right.  And then -- yeah.

Q.   Balance, $416.

So that account looks the exact same on both; right?

A.   Right.

Q.   What about the Oportun Progreso Financing that's just below it?

A.   Right.  It's the same.  The only thing is the Rushmore fell off of the negative account activity.

Q.   Okay.  And then for your positive account activity --

A.   Right.

Q.   -- it's the exact same on June 11th versus June 3rd; correct?

A.   Right.

Q.   So by removing the Rushmore account, your credit score has gone down by five points; correct?

A.   By removing it from my potentially negative account activity.



Q. Okay. And if you have a lower credit score than you did before, are you more or less likely to get approved for credit?

MR. HAMMOUD: Objection. Form.

A. I'm not an expert, but I don't think five points makes that much of a difference.

Q. (BY MR. MCCRAW) Okay. So is it possible, then, if it doesn't make a difference, that it wouldn't have made a difference with the AppFolio application?

MR. HAMMOUD: Same objection.

A. The negative on it -- I'm not -- like I said, I'm not a credit expert. So I wouldn't know exactly how much it will or wouldn't. I just know it's negative, and it needs to -- and it has a lot of delinquencies on it. So that's negative.

Q. (BY MR. MCCRAW) But is it in the realm -- is it in the realm of possibility that, looking at this, how your credit score went down by five points when the Rushmore account was removed, that it did not impact the decision for the AppFolio application?

MR. HAMMOUD: Same objection.

A. I wouldn't be able to answer that. I don't know.

Q. (BY MR. MCCRAW) Is it in the realm of possibility?



A.  I mean, that's a very vague question, but...

Q.  Just is it in the realm of possibility; "yes" or "no"?

A.  Like I said, I'm not an expert.  I wouldn't know.

Q.  Who would be an expert?

A.  I don't know.

Q.  But is it -- you, sitting here today with all the knowledge that you have, would you say it's in the realm of possibility?

MR. HAMMOUD:  Same objection.

A.  Realm of possibility?  Like, I wouldn't be able to answer that with, you know, the expertise that probably others would have.

Q.  (BY MR. MCCRAW)  With the expertise you have sitting here today, is it within the realm of possibility?

A.  What was the question?

Q.  Is it within the realm of possibility that the removal of the Rushmore loan account that lowered your credit score --

A.  Well, from -- from my belief, it says "Potentially negative account."  So if it comes off, it should increase it.

Q.  But we just saw it did not; right?



A.  Right.  It's contradictory.

Q.  It lowered your credit score because you don't have --

A.  I mean, we don't know that.  It says "Potentially negative."  So if it's negative, if it falls off, just like the Credit -- the Credit Suisse or whatever it was, it jumped up.  So...

Q.  Because do you understand a collection account is one of the worst type of accounts you can have on your credit history?

MR. HAMMOUD:  Objection.  Form.

A.  Was that a question?

Q.  (BY MR. MCCRAW)  Yeah.

A.  I mean, I don't know.  I'm not an expert on this stuff.

Q.  Okay.  So if a collection account is one of the worst types of accounts you can have on your credit report --

A.  Right.

Q.  -- and it gets removed --

A.  Right.

Q.  -- would you expect your credit score to increase, maybe even by a couple hundred points, like yours did?

MR. HAMMOUD:  Objection.  Form.



A. I wouldn't know. I would know it would increase. I couldn't tell you -- a couple hundred? 40? I don't know.

Q. (BY MR. MCCRAW) Okay. So you don't really know anything about credit reports, in general?

MR. HAMMOUD: Objection. Form.

A. Basic thing is, if this falls off, then I would expect it to go up.

Q. (BY MR. MCCRAW) But it didn't; right?

A. I mean, we saw that. Yeah.

Q. Okay. Is there any other reason you can see, looking at these, that it did not go up?

A. Don't know.

Q. Looking at these, is there anything?

A. Yeah. Like I said, I don't know. There's no other reason.

Q. So -- okay. All right. And then you've, I guess, said you got denied by GreenSky; correct?

A. Correct.

Q. If you go to the June 11th credit report and you go to the hard inquiries section, do you see GreenSky listed here at all?

A. June 11th, hard inquiries? Centennial. Centennial. I don't see it on hard inquiries.

Q. Okay. So as of June 11th, GreenSky had not



done a hard inquiry; correct?

A.  According to this document, no.

Q.  Okay.  And as of June 11th, the Rushmore mortgage came off your credit report; right?

A.  As of June 11th, this document shows that it's not on there, yeah.

Q.  Okay.  So if GreenSky pulled your credit after June 11th, the Rushmore mortgage would not have been on there; right?

A.  I believe if the dates are correct, that would be -- yeah -- correct.

Q.  Okay.  And so if the Rushmore mortgage was not on the credit report that GreenSky requested, which was after June 11th, then the Rushmore mortgage could not be the cause of you being denied by Greensky?

A.  Right.  If the dates are correct, yes.

MR. MCCRAW:  Let's just take a quick break, and I'll look through my notes.

THE COURT REPORTER:  We can go off the record at 4:03.

(Off the record at 4:03 p.m.)

(On the record at 4:11 p.m.)

THE COURT REPORTER:  We can go back on the record at 4:11.

Q.  (BY MR. MCCRAW)  All right.  Mr. Ramirez, you



ready to continue?

A. I'm ready.

Q. Okay. So I want to go back to the GreenSky loan just real quick.

Did you look into what qualifications you needed in order to qualify for the GreenSky loan?

A. I don't -- I didn't. I don't remember anything about that.

Q. Okay. So if a GreenSky loan required you to have good or excellent credit and yours is fair, would you have qualified?

A. In the scenario you just stated, no.

Q. And then you've also recently taken out a mortgage; correct?

A. Correct.

Q. And so your amount of debt that you have outstanding has increased; correct?

A. Yes, that'd be correct.

Q. And whenever you were applying for a GreenSky loan, you were looking to take out more debt; right?

A. I mean, generally, yeah. That would be correct, yeah.

Q. So because you just took out a lot of debt to buy a home --

A. Right.



Q.  -- and now you're looking to take out even more debt, is it possible that your debt-to-income ratio might not have been high enough at that point for the additional debt?

A.  Yeah, I'm not sure if it would show up or not.  Right.

Q.  But is it possible?

A.  I guess it could be possible.

Q.  Okay.  And then for your current mortgage, have you made all payments on time?

A.  Yes.  It's only been four months.  Yes.

Q.  And then you have settled with the other two defendants in this case; is that right?

MR. HAMMOUD:  Objection.  Form.

You -- you can answer the question.  Just don't talk about any terms of any type of settlement.

A.  Okay.  Can you repeat that question.

Q.  (BY MR. MCCRAW)  Have you settled with the other two defendants in this case?

A.  The way I understand it, we have settled with one.

Q.  And which one have you settled with?

A.  AppFolio.

Q.  Okay.  And so you understand that you haven't settled with Nationstar; correct?



A.  Correct.

Q.  All right.  So what do you believe Experian should have done differently regarding the Rushmore account?

A.  So with the Rushmore account, pertaining to myself, it should have been -- you know, I don't know what kind of investigation or what the algorithms do, if it's a person looking through there.  But I feel like it -- because, like, I'm pretty tech forward.  So I program a little bit on the side.  And even with the algorithm, it would be easy to understand that the Socials are not the same and the date of births are not the same.

And maybe there was a lack of, you know, sophisticated enough -- which barely even sophisticated, it would be -- algorithms to kind of flag that down and have someone actually look at it, you know, a real person to look at it.  Like I said, I don't know what the whole processes of Experian is when they go about this.  But it was really quite shocking to see how this could just happen.  It's really quite straightforward, even for me, just looking at it, yeah.

Q.  Okay.  So am I understanding correctly, you think an individual should have been reviewing your credit report?



MR. HAMMOUD:  Objection.  Form.

A.  I guess you misunderstood a little bit.  It's pretty easy to see and understand the dispute that I laid forth.  And even though I'm not an expert, I can easily see how this could have been resolved correctly just with the documents that I provided.  And that's me not being an expert.  I could easily see how this would have been resolved a long time ago.

Q.  (BY MR. MCCRAW)  And so before you provided those documents, was -- do you think it was, in your opinion, easy to see how it should have been corrected?

MR. HAMMOUD:  Objection.  Form.

A.  Yes.  In my opinion, yes.

Q.  (BY MR. MCCRAW)  And why is that?

A.  So, like I said, I do a little bit of programming on the side, and I know how algorithms and I know how, you know, a little bit of -- just looking at the -- at the different numbers, I mean, you're not going to have the same date of birth as the other, you know, thousands and thousands of people that have your same name.  And it's pretty easy to -- because, I mean, I'm going to -- just because my dad has my same name doesn't mean there's another -- you know, there's probably other Victors.  There's other people with your name as well.



And I'm sure Experian hasn't gotten, you know -- I mean, maybe they have.  They probably do have -- but, like, it's pretty easy to understand that people are going to have the same names.  And you should be able to have some sort of system to -- in place already to be watching out for that.  I mean, we all know there's same names everywhere.

Q.  So is it your belief that they don't have a system in place to watch out for people with the same names?

A.  Not a very good one.

Q.  Oh, you -- they -- you just think that they don't have a very good system for names?

A.  If they even do.  I don't know if they do.  I'm not familiar with the processes that Experian has.

Q.  Okay.  So if the information that Experian was provided was just your name and your address, what would distinguish you from your father?

MR. HAMMOUD:  Objection.  Form.

A.  I -- like I said, there should be a way for this to be visible to somebody so that they could see the -- for example, the first one, it should be able to flag somebody down for somebody to see it, an algorithm to see it, whatever it may be.  Like I said, I'm not an expert.  I don't know the processes.  But, I mean,



there's thousands and thousands of people with the same name.

And it shouldn't be happening to just -- for you just to have the same name, and then you have someone else's car or house or, you know, whatever it is loan they took out. That seems like a -- you know, something that Experian could do a lot -- a lot better, knowing the kind of, you know, big company that they are.

Q. (BY MR. MCCRAW) So going back to my question. What distinguishes just your name and your address of Orcas from your father, his name and the address of Orcas?

A. Date of birth, Social Security.

Q. If that's the only information you have.

A. That shouldn't be the only information you have. Experian does have the information of -- like, my information and also my father's information.

Q. Say they didn't have that information --

A. Well, we don't --

Q. -- for every account.

MR. HAMMOUD: Objection. Form.

A. I'm not an expert. I wouldn't know.

Q. (BY MR. MCCRAW) All right. Are you aware that counsel for Experian has sent your counsel an offer of



judgment?

A.  Can you clarify that, please?

Q.  Do you know what an offer of judgment is?

A.  It seems pretty straightforward, but I just need clarification.

Q.  Has your -- are you aware that Experian -- myself -- counsel --

A.  Right.

Q.  -- has sent your counsel an offer of judgment?

A.  From my understanding, if I'm understanding you correctly, yes.

Q.  And then -- so what is your understanding of what an offer of judgment is?

A.  Offer of judgment is a way to settle -- settle this.

Q.  Yeah, I agree.

So are you aware that if you do not obtain a judgment of an amount greater than that offer, you may be personally liable for Experian's attorneys' fees?

MR. HAMMOUD:  Objection.  Form.  And misstates how an offer of judgment actually works.

You can answer.

A.  I understand.

Q.  (BY MR. MCCRAW)  Okay.  And then are you aware that such an amount could exceed tens of thousands or



hundreds of thousands of dollars?

MR. HAMMOUD:  Same objection.

A.  I understand.

MR. MCCRAW:  Okay.  I think that's all I have.

MR. HAMMOUD:  I don't have any questions. Just, you know, on the record, if you could do a read and write.  We'll request a read and sign.  And then no further questions from me.

All right.  So read and sign is, you'll get a copy of, like, the draft.  You will be able to take a look at it.  You just sign to make sure that what you said was accurately reflected within the transcript. And then you have an opportunity to make changes.  But if you make substantive changes, like from a "yes" to a "no" or something like that, you could potentially reopen the deposition and counsel can request to, you know, revisit those questions.

THE WITNESS:  Okay.

(Off the record at 4:21 p.m.)



CHANGES AND SIGNATURE

WITNESS NAME: VICTOR MANUEL RAMIREZ NAJERA

DATE: SEPTEMBER 23, 2025

PAGE LINE      CHANGE              REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____



I, VICTOR MANUEL RAMIREZ NAJERA, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.


_____
VICTOR MANUEL RAMIREZ NAJERA


THE STATE OF _____)

COUNTY OF _____)


Before me, _____, on this day personally appeared VICTOR MANUEL RAMIREZ NAJERA, known to me (or proved to me under oath or through _____) (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this _____ day of _____, _____.


_____
NOTARY PUBLIC IN AND FOR
THE STATE OF _____
COMMISSION EXPIRES: _____



```
             IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF TEXAS
                    FORT WORTH DIVISION

VICTOR MANUEL RAMIREZ        )
NAJERA,                      )
                             )
             Plaintiff,      )
                             )
Versus                       ) CAUSE NO: 4:25-CV-00443
                             )
                             )
EXPERIAN INFORMATION         )
SOLUTIONS, INC.;             )
APPFOLIO INC.; and           )
NATIONSTART MORTGAGE LLC     )
d/b/a RUSHMORE SERVICING,    )
                             )
             Defendants.     )
```

REPORTER'S CERTIFICATION
DEPOSITION OF VICTOR MANUEL RAMIREZ NAJERA
SEPTEMBER 23, 2025

I, Shawna Gauntt-Hicks, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, VICTOR MANUEL RAMIREZ NAJERA, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That examination and signature of the witness to the deposition transcript was requested by the witness and agreement of the parties at the time of the deposition;

That the original deposition was delivered to



Mr. McCraw, Custodial Attorney;

That the amount of time used by each party at the deposition is as follows:

Mr. Youssef H. Hammoud - 00 HOURS:00 MINUTE(S)
Mr. Chance B. McCraw - 05 HOURS:51 MINUTE(S)

That $_____ is the deposition officer's charges to the Defendant for preparing the original deposition transcript and any copies of exhibits;

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes all parties of record:

Mr. Youssef H. Hammoud, Attorney for Plaintiff
Mr. Chance B. McCraw, Attorney for Defendant
EXPERIAN INFORMATION SOLUTIONS, INC.

I further certify that pursuant to FRCP Rule 30(f)(1), that the signature of the deponent, VICTOR MANUEL RAMIREZ NAJERA, was requested by the deponent or a party before the completion of the deposition and that the signature is to be before any notary public and returned within 30 days from date of receipt of the transcript.  If returned, the attached Changes and Signature Page contains any changes and the reasons therefore;

I further certify that I am neither counsel, related to, nor employed by any of the parties in the action in which this proceeding was taken, and further



that I am not financially or otherwise interested in the outcome of the action.

    Certified to by me this the 6th day of October, 2025.

_____
Shawna Gauntt-Hicks
Texas CSR No. 9353
Expiration Date:  12/31/25
Esquire Depositions Solutions, LLC
7000 N. 10th Street
Suite C-2B
McAllen, Texas 78501
Phone: 470.826.1996



# EXHIBIT B

# Tenant Screening Report



| | | | |
|---|---|---|---|
| Applicant Name | **Victor Manuel Ramirez** | Report ID | **0-54307-00798673** |
| Applying For | **TNHFH - Hartford House Apartments - Studio Apartment - 111 Whitsett Rd, Nashville, TN 37210** | | |
| Ordered By | **Alexander Forrest Investments** | | |
| Report Date | **05/22/2023** | | |

## —— REPORT SUMMARY ——

### Application

| | Rental Application | Provided By Experian ™ |
|---|---|---|
| First name | **Victor** | ✔ VICTOR |
| Middle name | **Manuel** | |
| Last name | **Ramirez** | ✔ RAMIREZ |
| AKA | | VICTOR MANUEL RAMIREZ JR |
| SSN | **XXX-XX-0996** | ✔ XXX-XX-0996 |
| DOB | ▮1995 | ✔ ▮995 |
| Current Address | ▮ **Fort Worth, TX 76106** | ▮ FORT WORTH, TX 761062604 |
| Previous Address | | ▮ FORT WORTH, TX 761353852 |
| Previous Address | | ▮ FORT WORTH, TX 761353807 |
| Employer | **Precision Walls Inc.** | |

RAMIREZ000001

APPENDIX 0264

## Credit History



**467** Credit Score
Vantage Score 3.0

**2** Potentially Negative Items

| | | |
|---|---|---|
| Collection Accounts | | 1 |
| Total Past Due Amount | | $601 |
| Collection Balance | | $233 |
| Estimated Monthly Payment | | $125 |
| Trades | Total: | 12 |
| | Open: | 1 |
| | Negative: | 2 |
| Delinquency History (2 years) | 30+ days: | 12 |
| | 60+ days: | 9 |
| | 90+ days: | 5 |

## Rent Payment History



━━━━  Potentially Negative Items

| | | |
|---|---|---|
| Total Properties | | 0 |
| Total Negative Items | | — |
| Payment History (2 Year) | On-time: | 0 |
| | Delinquent: | 0 |
| | Write-offs: | 0 |
| Total Amount Outstanding | | $0 |

## Criminal / Public Records History



**0** Cases Found

## Landlord-Tenant History



**0** Cases Found

## Sexual Offender Registry

**No** Not on Registries

## Watchlist



**No** Not on Watchlists

RAMIREZ000002                                    APPENDIX 0265

───────────────────── **REPORT DETAILS** ─────────────────────

## Credit Score Factors Provided by Experian™

**467** Credit Score
Vantage Score 3.0

| | |
|---|---|
| **CONTRIBUTING FACTOR 1** | The Balances On Your Accounts Are Too High Compared To Loan Limits |
| **CONTRIBUTING FACTOR 2** | The Date That You Opened Your Oldest Account Is Too Recent |
| **CONTRIBUTING FACTOR 3** | You Have Either Too Few Loans Or Too Many Loans With Recent Delinquencies |
| **CONTRIBUTING FACTOR 4** | Lack Of Sufficient Relevant Real Estate Account Information |

## Credit and Collection History Provided by Experian™

| Creditor | Type | Status | Last Updated | Origination Date | High Credit/ Original Amt. | Current Balance | Past Due Amt. | Delinquency (2 yrs.) | |
|---|---|---|---|---|---|---|---|---|---|
| **OPORTUN/PROGRESO FINAN** | Installment Account | Past Due | 04/30/2023 | 09/23/2022 | $2,000 | $2,147 | $368 | 30+ days:<br>60+ days:<br>90+ days: | 0<br>2<br>2 |

UNSECURED LOAN; OPEN ACCOUNT; ACCOUNT DELINQUENT 90 DAYS
PAST DUE DATE

**24 MONTH PAYMENT HISTORY**

| APR | MAR | FEB | JAN | DEC | NOV | OCT | SEP |
|---|---|---|---|---|---|---|---|
| 90 | 90 | 60 | 60 | ✓ | ✓ | ✓ | ✓ |

2023 / 2022

| Creditor | Type | Status | Last Updated | Origination Date | High Credit/ Original Amt. | Current Balance | Past Due Amt. | Delinquency (2 yrs.) | |
|---|---|---|---|---|---|---|---|---|---|
| **SOUTHWEST CREDIT SYSTE** Originally: **CHARTER COMMUNICATIONS** | Collection Account | In Collections | 05/01/2023 | 03/30/2022 | $113 | $233 | $233 | 30+ days:<br>60+ days:<br>90+ days: | 0<br>0<br>0 |

COLLECTION DEPARTMENT/AGENCY/ATTORNEY; ACCOUNT SERIOUSLY
PAST DUE DATE/ACCOUNT ASSIGNED TO ATTORNEY, COLLECTION
AGENCY, OR CREDIT GRANTOR'S INTERNAL COLLECTION DEPARTMENT

**24 MONTH PAYMENT HISTORY**

| MAY | APR | MAR | FEB | JAN | DEC | NOV | OCT | SEP | AUG | JUL | JUN |
|---|---|---|---|---|---|---|---|---|---|---|---|
| B | B | B | B | B | B | B | B | B | B | B | B |

2023 / 2022

| Creditor | Type | Status | Last Updated | Origination Date | High Credit/ Original Amt. | Current Balance | Past Due Amt. | Delinquency (2 yrs.) | |
|---|---|---|---|---|---|---|---|---|---|---|
| **CAPITAL ONE** | Revolving | Paid as Agreed | 05/16/2023 | 06/17/2021 | — | $0 | — | 30+ days:<br>60+ days:<br>90+ days: | 1<br>1<br>3 |

CREDIT CARD; PAID ACCOUNT/ZERO BALANCE; PAID ACCOUNT/WAS A
CHARGE-OFF; ACCOUNT CLOSED AT CREDIT GRANTOR'S REQUEST

**24 MONTH PAYMENT HISTORY**

| MAY | APR | MAR | FEB | JAN | DEC | NOV | OCT | SEP | AUG | JUL | JUN | MAY | APR | MAR | FEB | JAN | DEC | NOV | OCT | SEP | AUG | JUL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| — | B | B | B | B | B | B | B | 90 | 90 | 90 | 60 | 30 | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |

2023 / 2022 / 2021

| Creditor | Type | Status | Last Updated | Origination Date | High Credit/ Original Amt. | Current Balance | Past Due Amt. | Delinquency (2 yrs.) | |
|---|---|---|---|---|---|---|---|---|---|---|
| **RUSHMORE LOAN MGMT SER** | Mortgage | Account Transferred | 01/05/2023 | 01/27/2009 | $109,370 | $0 | — | 30+ days:<br>60+ days:<br>90+ days: | 11<br>6<br>0 |

CONVENTIONAL REAL ESTATE LOAN, INCLUDING PURCHASE MONEY
FIRST; ACCOUNT TRANSFERRED TO ANOTHER OFFICE; ACCOUNT
TRANSFERRED TO ANOTHER OFFICE; TRANSFERRED TO ANOTHER
LENDER

RAMIREZ000003

APPENDIX 0266

| Creditor | Type | Status | Last Updated | Origination Date | High Credit/ Original Amt. | Current Balance | Past Due Amt. | Delinquency (2 yrs.) | |
|---|---|---|---|---|---|---|---|---|---|

**24 MONTH PAYMENT HISTORY**

| JAN | DEC | NOV | OCT | SEP | AUG | JUL | JUN | MAY | APR | MAR | FEB | JAN | DEC | NOV | OCT | SEP | AUG | JUL | JUN | MAY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| — | 60 | 30 | 60 | 30 | 30 | 30 | 30 | 30 | 30 | 30 | ✓ | 30 | ✓ | 60 | 30 | 60 | 60 | 30 | 60 | — |

2023 | 2022                                           2021

| Creditor | Type | Status | Last Updated | Origination Date | High Credit/ Original Amt. | Current Balance | Past Due Amt. | Delinquency (2 yrs.) | |
|---|---|---|---|---|---|---|---|---|---|
| **OPORTUN/PROGRESO FINAN** | Installment Account | Refinanced | 09/22/2022 | 10/05/2021 | $2,625 | $0 | — | 30+ days:<br>60+ days:<br>90+ days: | 0<br>0<br>0 |

UNSECURED LOAN; ACCOUNT RENEWED OR REFINANCED; ACCOUNT RENEWED OR REFINANCED; ACCOUNT CLOSED DUE TO REFINANCE

| **AFFIRM INC** | Installment Account | Paid as Agreed | 08/27/2022 | 02/28/2022 | $351 | $0 | — | 30+ days:<br>60+ days:<br>90+ days: | 0<br>0<br>0 |
|---|---|---|---|---|---|---|---|---|---|

UNSECURED LOAN; PAID ACCOUNT/ZERO BALANCE; ACCOUNT/PAID SATISFACTORILY

| **ACIMA DIGITAL FKA SIMP** | Installment Account | Paid as Agreed | 10/31/2021 | 07/18/2021 | $5,179 | $0 | — | 30+ days:<br>60+ days:<br>90+ days: | 0<br>0<br>0 |
|---|---|---|---|---|---|---|---|---|---|

LEASE; PAID ACCOUNT/ZERO BALANCE; ACCOUNT/PAID SATISFACTORILY

| **OPORTUN/PROGRESO FINAN** | Installment Account | Paid as Agreed | 10/04/2021 | 09/22/2020 | $1,080 | $0 | — | 30+ days:<br>60+ days:<br>90+ days: | 0<br>0<br>0 |
|---|---|---|---|---|---|---|---|---|---|

UNSECURED LOAN; PAID ACCOUNT/ZERO BALANCE; ACCOUNT/PAID SATISFACTORILY

| **ACIMA DIGITAL FKA SIMP** | Installment Account | Paid as Agreed | 02/28/2021 | 11/16/2020 | $3,010 | $0 | — | 30+ days:<br>60+ days:<br>90+ days: | 0<br>0<br>0 |
|---|---|---|---|---|---|---|---|---|---|

LEASE; PAID ACCOUNT/ZERO BALANCE; ACCOUNT/PAID SATISFACTORILY

| **OPORTUN/PROGRESO FINAN** | Installment Account | Paid as Agreed | 01/22/2020 | 05/30/2019 | $540 | $0 | — | 30+ days:<br>60+ days:<br>90+ days: | 0<br>0<br>0 |
|---|---|---|---|---|---|---|---|---|---|

UNSECURED LOAN; PAID ACCOUNT/ZERO BALANCE; ACCOUNT/PAID SATISFACTORILY

| **PENNYMAC LOAN SERVICES** | Mortgage | Account Transferred | 02/01/2019 | 01/27/2009 | $123,178 | $0 | — | 30+ days:<br>60+ days:<br>90+ days: | 0<br>0<br>0 |
|---|---|---|---|---|---|---|---|---|---|

CONVENTIONAL REAL ESTATE LOAN, INCLUDING PURCHASE MONEY FIRST; ACCOUNT TRANSFERRED TO ANOTHER OFFICE; ACCOUNT TRANSFERRED TO ANOTHER OFFICE; TRANSFERRED TO ANOTHER LENDER

| **OPORTUN/PROGRESO FINAN** | Installment Account | Paid as Agreed | 09/15/2018 | 01/23/2018 | $642 | $0 | — | 30+ days:<br>60+ days:<br>90+ days: | 0<br>0<br>0 |
|---|---|---|---|---|---|---|---|---|---|

UNSECURED LOAN; PAID ACCOUNT/ZERO BALANCE; ACCOUNT/PAID SATISFACTORILY

# Rent Payment History

No Rent Payment history.

RAMIREZ000004

APPENDIX 0267

## Landlord-Tenant History

Our nationwide criminal and landlord-tenant dispute scans are pulled from hundreds of national, state and county courts across the US., including OFAC and Sex Offender Databases.

Please note that reporting of criminal and unlawful detainer records is based upon limited identification information and varies according to restrictions placed on reporting by the different court jurisdictions. While AppFolio has applied industry best practices in the attempt to accurately match and report the information, we cannot guarantee that the record match(es) definitively belong to the applicant. Because of this, it is highly recommended to cross-check against the applicant supplied information to verify the data prior to making decisions based on the data provided.

No reportable records found.

## Criminal / Public Records

Our nationwide criminal and landlord-tenant dispute scans are pulled from hundreds of national, state and county courts across the US., including OFAC and Sex Offender Databases.

Please note that reporting of criminal and unlawful detainer records is based upon limited identification information and varies according to restrictions placed on reporting by the different court jurisdictions. While AppFolio has applied industry best practices in the attempt to accurately match and report the information, we cannot guarantee that the record match(es) definitively belong to the applicant. Because of this, it is highly recommended to cross-check against the applicant supplied information to verify the data prior to making decisions based on the data provided.

No reportable records found.

## Sexual Offender Registry

No reportable records found.

## Watchlist

No reportable records found.

## Bankruptcies and Liens

No reportable records found.

This report is confidential and is not to be disclosed except for persons who have permissible purposes as defined in the Fair Credit Reporting Act and other applicable Federal and State regulations.

AppFolio, Inc. | 50 Castilian Drive | Santa Barbara, CA 93117 | 866.648.1536 | consumer.relations@appfolio.com
© 2023 AppFolio, Inc. All rights reserved.

RAMIREZ000005                                          APPENDIX 0268

# EXHIBIT C

FROM THE DESK OF

# Victor Ramirez

Victor Ramirez

▮▮▮▮▮▮▮

Fort Worth, Texas, 76106

▮▮▮▮▮▮▮▮▮

▮▮▮▮▮

July 10, 2024

Certified Mail Return Receipt Requested

Experian
P.O. Box 4500
Allen, TX 75013

Subject: Dispute of Incorrect Mortgage Entry on Credit Report

Dear Experian Dispute Department,

I am writing to formally dispute an incorrect entry on my credit report. The report lists a mortgage that does not belong to me. I have never taken out a mortgage, and the information being reported is inaccurate.

The details of the incorrect mortgage are as follows:

- **Lender Name**: Rushmore Loan MGMT Service
- **Account Number**: 102760XXXXXXX
- **Date Opened**: 1/27/2009
- **Original Balance**: $109,370

To support my dispute, I have included the following documents that clearly demonstrate the inaccuracy of this mortgage entry:

1. **Birth Certificate**: This shows my date of birth and verifies that I was 13 years old at the time this mortgage was taken out in 2009, making it impossible for me to have entered into this agreement.
2. **School Records**: These provide further proof of my age and that I was a minor and a student during the time the mortgage was reportedly opened.
3. **House Paperwork Agreement**: Shows that my Social Security number does not match the social security number on the paperwork.

EXPERIAN_NAJERA_00478

Please conduct a thorough investigation of this matter and remove the inaccurate mortgage entry from my credit report. I request that you send me a confirmation once this error has been corrected.

I appreciate your prompt attention to this matter. If you need any additional information, please contact me at the phone number or email address provided above.

Thank you for your assistance.

Sincerely,


Victor Manuel Ramirez Najera

EXPERIAN_NAJERA_00249



EXPERIAN_NAJERA_0150



✳ my fathers info contract
which matches house

**Department of the Treasury**
**Internal Revenue Service**

IRS Individual Taxpayer Identification Number

5759

This number has been established for
VICTOR MANUEL RAMIREZ

To be used for tax purposes only

Signature

✳ Not a "Najera"

EXPERIAN_NAJERA_001718

*Almost identical name but he does not have "Najera"*

NOTICE OF NO ORAL AGREEMENTS
PURSUANT TO SECTION 26.02 TEXAS BUSINESS AND COMMERCE CODE

| | |
|---|---|
| BORROWER(S): | VICTOR MANUEL RAMIREZ AND SPOUSE, MARIA D. RAMIREZ |
| BORROWER ADDRESS: | ▮▮▮▮▮ FORT WORTH, TEXAS 76106 |
| LENDER: | CITIMORTGAGE, INC. |
| LENDER'S ADDRESS: | 1000 TECHNOLOGY DRIVE, O'FALLON, MO 63368-2240 |
| NOTE DATE: | JANUARY 27, 2009 |
| LOAN AMOUNT: | $123,178.00 |

SECURITY:  A Deed of Trust of even date therewith, executed by Borrower(s) hereof to WILLIAM M. WOODALL, Trustee, upon the following described real property:

BEING LOT 49, BLOCK 11, OF THE VILLAGES OF MARINE CREEK, AN ADDITION TO THE CITY OF FORT WORTH, TARRANT COUNTY, TEXAS, ACCORDING TO THE PLAT THEREOF RECORDED IN CABINET A, SLIDE 9020A, OF THE PLAT RECORDS OF TARRANT COUNTY, TEXAS.

THE WRITTEN LOAN AGREEMENT FOR THE LOAN OR OTHER EXTENSION OF CREDIT DESCRIBED ABOVE REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES, AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.
THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

The undersigned Borrower(s) hereby represent(s) and warrant(s) that I/we have each received and read a copy of this **Notice** on or before the execution of the **"Loan Agreement." "Loan Agreement"** used herein means one or more promises, promissory notes, agreements, undertakings, security agreements, deeds of trust or other documents, or commitments, or any combination of those actions or documents, pursuant to which a financial institution loans or delays repayment of or agrees to loan or delay repayment of money, goods, or another thing of value or to otherwise extend credit or make a financial accommodation.

*I was 13 years old, couldn't have bought house*

Date:     JANUARY 27, 2009

_____      _____
VICTOR MANUEL RAMIREZ             MARIA D. RAMIREZ
Borrower                          Borrower

*Dad*                             *mom*

_____      _____
Borrower                          Borrower

CITIMORTGAGE, INC.
a New York corporation

By:     _____
Name:   _____
Title:  _____

                    Lender

Notice of No Oral Agreements                                    001120507342

EXPERIAN_NAJERA_00152

*These are the house documents my father signed.*

*my father same first name but no "Najera" "Najera"*

## Uniform Residential Loan Application

001120507342

This application is designed to be completed by the applicant(s) with the Lender's assistance. Applicants should complete this form as "Borrower" or "Co-Borrower," as applicable. Co-Borrower information must also be provided (and the appropriate box checked) when ☐ the income or assets of a person other than the "Borrower" (including the Borrower's spouse) will be used as a basis for loan qualification or ☐ the income or assets of the Borrower's spouse or other person who has community property rights pursuant to state law will not be used as a basis for loan qualification, but his or her liabilities must be considered because the spouse or other person has community property rights pursuant to applicable law and Borrower resides in a community property state, the security property is located in a community property state, or the Borrower is relying on other property located in a community property state as a basis for repayment of the loan. If this is an application for joint credit, Borrower and Co-Borrower each agree that we intend to apply for joint credit (sign below):

_Victor Manuel Najera_

| Borrower | Co-Borrower |
|---|---|

### I. TYPE OF MORTGAGE AND TERMS OF LOAN

| Mortgage Applied for: | ☐ V.A. ☒ Conventional ☐ Other: ☐ FHA ☐ USDA/Rural Housing Service | Agency Case Number | Lender Case Number |
|---|---|---|---|
| Amount $123,178.00 | Interest Rate 6.125 % | No. of Months 360 | Amortization Type: ☒ Fixed Rate ☐ GPM ☐ Other (explain): ☐ ARM (type): |

### II. PROPERTY INFORMATION AND PURPOSE OF LOAN

| Subject Property Address (street, city, state, ZIP) 3924 ORCAS STREET, FT WORTH, TX 76106-2604 County: TARRANT | | No. of Units 1 |
|---|---|---|
| Legal Description of Subject Property (attach description if necessary) SEE SCHEDULE A | | Year Built 2008 |

| Purpose of Loan | ☒ Purchase ☐ Construction ☐ Other (explain): ☐ Refinance ☐ Construction-Permanent | Property will be: ☒ Primary Residence ☐ Secondary Residence ☐ Investment |
|---|---|---|

Complete this line if construction or construction-permanent loan.

| Year Lot Acquired | Original Cost $ | Amount Existing Liens $ | (a) Present Value of Lot $ | (b) Cost of Improvements $ | Total (a + b) $ |
|---|---|---|---|---|---|

Complete this line if this is a refinance loan.

| Year Acquired | Original Cost $ | Amount Existing Liens $ | Purpose of Refinance | Describe Improvements ☐ made ☐ to be made Cost: $ |
|---|---|---|---|---|

| Title will be held in what Name(s) Victor Manuel Ramirez & Maria D. Ramirez | Manner in which Title will be held Husband and Wife | Estate will be held in: ☒ Fee Simple ☐ Leasehold (show expiration date) |
|---|---|---|

Source of Down Payment, Settlement Charges and/or Subordinate Financing (explain)
Gift Funds, Checking/Savings, Deposit on Sales Contract TOTAL : $8,000.00

### III. BORROWER INFORMATION

| Borrower | Co-Borrower |
|---|---|
| Borrower's Name (include Jr. or Sr. if applicable) Victor Manuel Ramirez | Co-Borrower's Name (include Jr. or Sr. if applicable) |
| Social Security Number 5759 | Home Phone (incl. area) | DOB (mm/dd/yyyy) 1970 | Yrs. School | Social Security Number | Home Phone (incl. area) | DOB (mm/dd/yyyy) | Yrs. School |

*my fathers Dob*

| ☒ Married ☐ Unmarried (include single, divorced, widowed) ☐ Separated ☐ Registered Domestic Partner | Dependents (not listed by Co-Borrower) no. ages | ☐ Married ☐ Unmarried (include single, divorced, widowed) ☐ Separated ☐ Registered Domestic Partner | Dependents (not listed by Borrower) no. ages |

| Present Address (street, city, state, ZIP) ☒ Own ☐ Rent 3y 0m Fort Worth, TX 76135- | No. Yrs. | Present Address (street, city, state, ZIP) ☐ Own ☐ Rent | No. Yrs. |

*my fathers*

| Mailing Address, if different from Present Address | Mailing Address, if different from Present Address |
|---|---|

If residing at present address for less than two years, complete the following:

| Former Address (street, city, state, ZIP) ☐ Own ☐ Rent | No. Yrs. | Former Address (street, city, state, ZIP) ☐ Own ☐ Rent | No. Yrs. |

### IV. EMPLOYMENT INFORMATION

| Borrower | | Co-Borrower | |
|---|---|---|---|
| Name & Address of Employer ☐ Self Employed Victor Munoz Sandblast & Paint 2161 Gerite Barrel Rd. Mansfield, TX 76063- | Yrs. on this job 3y 0m Yrs. employed in this line of work/profession 3y 0m | Name & Address of Employer ☐ Self Employed | Yrs. on this job Yrs. employed in this line of work/profession |
| Position/Title/Type of Business Construction/Sandblast And Paint | Business Phone (incl. area code) (817) 825-3006 | Position/Title/Type of Business | Business Phone (incl. area code) |

If employed in current position for less than two years or if currently employed in more than one position, complete the following:

| Name & Address of Employer ☐ Self Employed | Dates (from - to) | Name & Address of Employer ☐ Self Employed | Dates (from - to) |
|---|---|---|---|
| | Monthly Income $ | | Monthly Income $ |
| Position/Title/Type of Business | Business Phone (incl. area code) | Position/Title/Type of Business | Business Phone (incl. area code) |
| Name & Address of Employer ☐ Self Employed | Dates (from - to) | Name & Address of Employer ☐ Self Employed | Dates (from - to) |
| | Monthly Income $ | | Monthly Income $ |
| Position/Title/Type of Business | Business Phone (incl. area code) | Position/Title/Type of Business | Business Phone (incl. area code) |

| Borrower's Signature X _Victor Manuel Ramirez_ | Date 2/27/09 |
|---|---|
| Co-Borrower's Signature X | Date |

1003-NBW - 11/26/05 CalMortgage 3 2 18 02 V1
CalMortgage 3.2.18.02 V1

Page 1

Fannie Mae Form 1003 07/05
Freddie Mac Form 65 07/05

EXPERIAN_NAJERA_00153

001120507342

## VI. ASSETS AND LIABILITIES (cont.)

**Schedule of Real Estate Owned** (If additional properties are owned, use continuation sheet.)

| Property Address (enter S if sold, PS if pending sale or R if rental being held for income) | Type of Property | Present Market Value | Amount of Mortgages & Liens | Gross Rental Income | Mortgage Payments | Insurance, Maintenance, Taxes & Misc. | Net Rental Income |
|---|---|---|---|---|---|---|---|
| | | $ | $ | $ | $ | $ | $ |
| | | | | | | | |
| | | | | | | | |
| | Totals | $ | $ | $ | $ | $ | $ |

List any additional names under which credit has previously been received and indicate appropriate creditor name(s) and account number(s):

| Alternate Name | Creditor Name | Account Number |
|---|---|---|
| | | |

## VII. DETAILS OF TRANSACTION

| | | |
|---|---|---|
| a. Purchase price | $ | 126,988.00 |
| b. Alterations, improvements, repairs | | |
| c. Land (if acquired separately) | | |
| d. Refinance (incl. debts to be paid off) | | |
| e. Estimated prepaid items | | 1,172.49 |
| f. Estimated closing costs | | -1,440.00 |
| g. PMI, MIP, Funding Fee | | |
| h. Discount (if Borrower will pay) | | 769.86 |
| i. Total costs (add items a through h) | | 127,490.35 |
| j. Subordinate financing | | |
| k. Borrower's closing costs paid by Seller | | |
| l. Other Credits (explain) Seller Credit | | 4,500.00 |
| m. Loan amount (exclude PMI, MIP, Funding Fee financed) | | 123,178.00 |
| n. PMI, MIP, Funding Fee financed | | |
| o. Loan amount (add m & n) | | 123,178.00 |
| p. Cash from/ to Borrower (subtract j, k, l & o from i) | | -187.65 |

## VIII. DECLARATIONS

If you answer "Yes" to any questions a through i, please use continuation sheet for explanation.

| | Borrower | | Co-Borrower | |
|---|---|---|---|---|
| | Yes | No | Yes | No |
| a. Are there any outstanding judgments against you? | | X | | |
| b. Have you been declared bankrupt within the past 7 years? | | X | | |
| c. Have you had property foreclosed upon or given title or deed in lieu thereof in the last 7 years? | | X | | |
| d. Are you a party to a lawsuit? | | X | | |
| e. Have you directly or indirectly been obligated on any loan which resulted in foreclosure, transfer of title in lieu of foreclosure, or judgment? ... | | X | | |
| f. Are you presently delinquent or in default on any Federal debt or any other loan, mortgage, financial obligation, bond, or loan guarantee? ... | | X | | |
| g. Are you obligated to pay alimony, child support, or separate maintenance? | | X | | |
| h. Is any part of the down payment borrowed? | | X | | |
| i. Are you a co-maker or endorser on a note? | | X | | |
| j. Are you a U.S. citizen? | | X | | |
| k. Are you a permanent resident alien? | | X | | |
| l. Do you intend to occupy the property as your primary residence? If "Yes," complete question m below. | X | | | |
| m. Have you had an ownership interest in a property in the last three years? | | X | | |
| (1) What type of property did you own - principal residence (PR), second home (SH), or investment property (IP)? | | | | |
| (2) How did you hold title to the home - solely by yourself (S), jointly with your spouse (SP), or jointly with another person (O)? | | | | |

## IX. ACKNOWLEDGMENT AND AGREEMENT

Each of the undersigned specifically represents to Lender and to Lender's actual or potential agents, brokers, processors, attorneys, insurers, servicers, successors and assigns and agrees and acknowledges that: (1) the information provided in this application is true and correct as of the date set forth opposite my signature and that any intentional or negligent misrepresentation of this information contained in this application may result in civil liability, including monetary damages, to any person who may suffer any loss due to reliance upon any misrepresentation that I have made on this application, and/or in criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Sec. 1001, et seq.; (2) the loan requested pursuant to this application (the "Loan") will be secured by the mortgage or deed of trust on the property described in this application; (3) the property will not be used for any illegal or prohibited purpose or use; (4) all statements made in this application are made for the purpose of obtaining a residential mortgage loan; (5) the property will be occupied as indicated in this application; (6) the Lender, its servicers, successors or assigns may retain the original and/or an electronic record of this application, whether or not the Loan is approved; (7) the Lender and its agents, brokers, insurers, servicers, successors and assigns may continuously rely on the information contained in the application, and I am obligated to amend and/or supplement the information provided in this application if any of the material facts that I have represented herein should change prior to closing of the Loan; (8) in the event that my payments on the Loan become delinquent, the Lender, its servicers, successors or assigns may, in addition to any other rights and remedies that it may have relating to such delinquency, report my name and account information to one or more consumer credit reporting agencies; (9) ownership of the Loan and/or administration of the Loan account may be transferred with such notice as may be required by law; (10) neither Lender nor its agents, brokers, insurers, servicers, successors or assigns has made any representation or warranty, express or implied, to me regarding the property or the condition or value of the property; and (11) my transmission of this application as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or my facsimile transmission of this application containing a facsimile of my signature, shall be as effective, enforceable and valid as if a paper version of this application were delivered containing my original written signature.

**Acknowledgement.** Each of the undersigned hereby acknowledges that any owner of the Loan, its servicers, successors and assigns, may verify or reverify any information contained in this application or obtain any information or data relating to the Loan, for any legitimate business purpose through any source, including a source named in this application or a consumer reporting agency.

| Borrower's Signature | Date | Co-Borrower's Signature | Date |
|---|---|---|---|
| X *Pieter Manuel Ramirez* | 1/27/09 | X | |

Handwritten in left margin:
January 27th 2009. I was 13 years old

## X. INFORMATION FOR GOVERNMENT MONITORING PURPOSES

The following information is requested by the Federal Government for certain types of loans related to a dwelling, in order to monitor the Lender's compliance with equal credit opportunity, fair housing and home mortgage disclosure laws. The law provides that a lender may not discriminate either on the basis of this information, or on whether you choose to furnish it. If you furnish the information, please provide both ethnicity and race. For race, you may check more than one designation. If you do not furnish ethnicity, race, or sex, under Federal regulations, this lender is required to note the information on the basis of visual observation and surname if you have made this application in person. If you do not wish to furnish the above information, please check the box below. (Lender must review the above material to assure that the disclosures satisfy all requirements to which the Lender is subject under applicable state law for the particular type of loan applied for.)

| BORROWER | I do not wish to furnish this information | | CO-BORROWER | I do not wish to furnish this information | |
|---|---|---|---|---|---|
| Ethnicity: | X Hispanic or Latino | Not Hispanic or Latino | Ethnicity: | Hispanic or Latino | Not Hispanic or Latino |
| Race: | American Indian or Alaskan Native | Asian / Black or African American | Race: | American Indian or Alaskan Native | Asian / Black or African American |
| | Native Hawaiian or Other Pacific Islander | X White | | Native Hawaiian or Other Pacific Islander | White |
| Sex: | Female | X Male | Sex: | Female | Male |

| To be Completed by Interviewer | Interviewer's Name (print or type) Lisa Gratz | Name and Address of Interviewer's Employer CitiMortgage, Inc. |
|---|---|---|
| This application was taken by: | Interviewer's Signature | |
| ☐ Face-to-face interview | | Date 12/29/08 |
| X Mail | | 1000 Technology Drive |
| ☐ Telephone | Interviewer's Phone Number (incl. area code) | O'Fallon, MO 63304- |
| ☐ Internet | (972) 424-7305 | |

1003-NBW - 11/08/05 CitiMortgage 3.2 19.02 V1
CitiMortgage 3.2.19.02 V1

Page 3

Fannie Mae Form 1003 07/05
Freddie Mac Form 65 07/05

EXPERIAN_NAPERA_0154

En caso de que el titular de este pasaporte requiera de asistencia o protección del gobierno mexicano, se recomienda acuda a la representación diplomática o consular más cercana. Para su protección escriba nombre y dirección de una persona a quien se pueda avisar en caso de emergencia.

Nombre: _____

Dirección: _____

Entidad Federativa: _____

C.P. _____ Teléfono: _____

DOMICILIO DEL TITULAR / HOLDER'S ADDRESS
ADRESSE DU TITULAIRE

Dirección: _____

Entidad Federativa: _____

C.P. _____ Teléfono: _____

Firma del titular / Holder's signature / Signature du titulaire

ESTE PASAPORTE ES VALIDO PARA TODOS LOS PAISES
THIS PASSPORT IS VALID FOR ALL COUNTRIES
CE PASSEPORT EST VALABLE POUR TOUS PAYS

ESTADOS UNIDOS MEXICANOS

Pasaporte No /Passport No /No du
241

Clave del pais de expedición/Code of issuing State/Code du pays émetteur
MEX

Tipo/Type/ Catégorie
P

Apellidos/Surname/Nom
RAMIREZ
NAJERA

Nombres/Given names/Prénoms
VICTOR MANUEL

Nacionalidad/Nationality/Nationalité
MEXICANA

Sexo/Sex/Sexe
M

Fecha expedicion Date of issue/Date de delivrance
14 OCT 1997

Num personal/Personal No /No
[redacted]

Date of birth/Date de naissance
1995

Lugar de nacimiento/Place of birth/Lieu de naissance
NUEVA ROSITA, COAH.

Fecha caducidad/Expiration date/Date d'
14 OCT 1998

Observaciones Remarks Obs

PASAPORTE PASSPORT PASSEPORT

This is me.

"Najera" side → my mom's side

my father is not from Najera's

*Dad's DOB 1970

is in will

*Dad's DOB

TO EXPERIAN_NAJERA_0165

**TEXAS DEPARTMENT OF PUBLIC SAFETY**
**LIMITED TERM**

LOCATION: 115

TIME STAMP: 15:30:52

DATE STAMP: 01-27-2014

TEMPORARY PERMIT VALID UNTIL 03-13-2014
UNDER 21 UNTIL 12-14-2016



DL/ID/UNL NUMBER: ███9149   CLASS: C   LICENSE TYPE: DL
RESTRICTION CODE: NONE   ENDORSEMENT CODE: NONE

ORGAN DONOR: N

VOTER REGISTRATION: N

NAME: RAMIREZ NAJERA,
VICTOR M

RECEIPT NUMBER: 405DLA021521638

ADDRESS:
███████

FORT WORTH, TX 76106

*Same address
because hes my dad

RESTRICTION TEXT:
NONE

*Dads POB
is 1970

DATE OF BIRTH: ███1995   EXPIRATION DATE: 11-26-2014
SEX: M   HEIGHT: 5'07"   ISSUANCE DATE: 01-27-2014
EYE COLOR: BRO

ENDORSEMENT TEXT:
NONE

SIGNATURE: _____

MAILING ADDRESS:
████████

FORT WORTH, TX 76106

EMPLOYEE _____

- For driver license related questions, please call 512-424-2600 or refer to the DPS website at www.dps.texas.gov or at www.texas.gov.
- Your DL/ID Card will be processed and mailed within 30-60 days.
- You must continue to carry this Temporary Permit until your new card is received.
- For roadside assistance related to the following issues, please call 1-800-525-5555.
    - Stranded with car problems
    - Hazardous road conditions
    - Debris in the roadway

EXPERIAN_NAJERA_0156

*EQUAL OPPORTUNITY EMPLOYER*
COURTESY • SERVICE • PROTECTION

Page 1

APPENDIX 0278

CURP.-050280195008349

## ESTADOS UNIDOS MEXICANOS
### REGISTRO CIVIL

No. DE CONTROL

Nº 166749

EN NOMBRE DEL ESTADO LIBRE Y SOBERANO DE COAHUILA DE ZARAGOZA
Y COMO _OFICIAL PRIMERO_ DEL REGISTRO CIVIL EN _SABINAS_
CERTIFICO: QUE EN EL LIBRO No. _PRIMERO TOMO IV_ DEL ARCHIVO _DE SABINAS_
EN LA HOJA No. _147683_ SE ENCUENTRA ASENTADA EL ACTA No. _00834_
DE FECHA _26 DE DICIEMBRE DE 1995_ LEVANTADA POR EL C. OFICIAL _PROFRA. ELBA G. RENDON G._
DEL REGISTRO CIVIL, CON RESIDENCIA EN _SABINAS, COAHUILA_
EN LA CUAL SE CONTIENEN LOS DATOS SIGUIENTES: _____

### ACTA DE NACIMIENTO

NOMBRE _VICTOR MANUEL RAMIREZ NAJERA_
FECHA DE NACIMIENTO _1995_ AÑO — MES — DIA — HORA _14:05_
PRESENTADO: VIVO (X) MUERTO ( ) SEXO: MASCULINO (X) FEMENINO ( )
LUGAR DE NACIMIENTO _NUEVA ROSITA, COAHUILA_
COMPARECIO: EL PADRE ( ) LA MADRE ( ) AMBOS (X) PERSONA DISTINTA ( ) REGISTRADO ( )

### PADRES
NOMBRE _VICTOR MANUEL RAMIREZ SAUCEDO_ EDAD _26_ NACIONALIDAD _MEXICANA_
LUGAR DE NACIMIENTO _SABINAS, COAH_ DOMICILIO _CARLOS GARZA No. 1370_ OCUPACION _EMPLEADO_
NOMBRE _MARIA DE LA LUZ NAJERA ZAMBRANO_ EDAD _26_ NACIONALIDAD _MEXICANA_
LUGAR DE NACIMIENTO _SABINAS, COAH_ DOMICILIO _CARLOS GARZA No. 1370_ OCUPACION _HOGAR_

### ABUELOS PATERNOS
NOMBRE _REYES RAMIREZ GONZALEZ_ NACIONALIDAD _MEXICANA_
DOMICILIO _____ OCUPACION _FINADO_
NOMBRE _DORA ALICIA SAUCEDO SANCHEZ_ NACIONALIDAD _MEXICANA_
DOMICILIO _VIESCA No. 686_ OCUPACION _HOGAR_

### ABUELOS MATERNOS
NOMBRE _SIMON NAJERA CASTILLO_ NACIONALIDAD _MEXICANA_
DOMICILIO _CARLOS GARZA No. 1370_ OCUPACION _EMPLEADO_
NOMBRE _SANTOS ZAMBRANO PUENTE_ NACIONALIDAD _MEXICANA_
DOMICILIO _CARLOS GARZA No. 1370_ OCUPACION _HOGAR_

### TESTIGOS
NOMBRE _MARIA SANTOS ZAMBRANO PUENTE_ NACIONALIDAD _MEXICANA_
DOMICILIO _CARLOS GARZA No. 1370_ OCUPACION _HOGAR_ EDAD _60_
NOMBRE _MARIA DEL ROSARIO SAUCEDO SANCHEZ_ NACIONALIDAD _MEXICANA_
DOMICILIO _DEL CARMEN No. 1212_ OCUPACION _HOGAR_ EDAD _48_

### PERSONA DISTINTA A LOS PADRES QUE PRESENTA AL REGISTRADO
NOMBRE _____ PARENTESCO _____
NACIONALIDAD _____ DOMICILIO _____
OCUPACION _____ EDAD _____

SE EXTIENDE ESTA CERTIFICACION, CON FUNDAMENTO EN LOS ARTICULOS 48 DEL CODIGO CIVIL VIGENTE EN EL ESTADO Y 3°, 4°, 5° Y DEMAS RELATIVOS DE LA LEY REGLAMENTARIA DEL REGISTRO CIVIL PARA EL ESTADO DE COAHUILA, EN _SABINAS_ A LOS _16_ DIAS DEL MES DE _ENERO_ DE _1996_

EL C. _OFICIAL PRIMERO_ DEL REGISTRO CIVIL. DOY FE.

PROFRA. ELBA G. RENDON GUAJARDO
NOMBRE — FIRMA

ASIENTA ESTA CERTIFICACION EL C. _J.M.M._

RUBRICA

_my Birth certificate_
_DOB_

# 8th Grade Football

## PRACTICE. EVERY DAY. NOW THAT'S DEDICATION!





**JAVIER PALOS**    **DAMIAN JOHNSON**    **JUAN MEZA**




## SCENES OF THE SEASON









### THE FIRST-EVER COLLINS GAME




## WE ARE THE BULLFROGS



Top Row: Anthony Hernandez, PJ Landa, Coach Belloc, Coach Atchison, Coach Bell, Coach Pate, Cayden Vandergriff, James E. Smith, Kenneth Zuniga. Row 2: Richard Eddings, Daniel Carrasco, Dennis Ralon, Ivan Perez, Rafael Guerrero, Eric Salgado, Derric Benavides, Pete Reyes, Osvaldo Cruz, Javier Palos, Jiovanni Salas, Joshua Lopez. Row 3: Anthony Frias, Jose Ramirez, Luke Wilks, Dalton Frizzell, Josh Sinku, Raekwon Williams, Juan Meza, Joe Gaitan, Victor Ramirez, AJ Atchison, Jose Ortiz. Row 4: Rafael Silva, Hayden Tucker, Christian Harris, Casey Murray, Luis Gutierrez, Christian Flores, Michael Myatt, Edgar Hernandez, Jorge Solano, Oscar Alvarez, Tristan Zamarripa. Bottom Row: Anthony Reyes, Robert Trejo, Mikey Rollins, Damian Johnson, Hector Ramirez, David Rodela, Ryan Warren, Albert Tijerina, Anthony Byrd, & Jordan Whaley

8

EXPERIAN_NAJERA_01739



Lidia & Jackie

P.J. Landa





Top: Raphael Guerrero
Left: Albert Tijerina,
and Victor Ramirez

Coach Pate sings some of his old west country music for the audience of our fall concert.

Jimmy Pate





Jazmone Butler sings her favorite song.





Daniel Carrasco, Christian Flores, and Raekwon Williams are singing their favorite song of the Christmas concert.

Mr. Lowrance directing the best choir in the state of Texas!

Did you know that kids who are in choir also tend to be more active in school in general? It's tru Just look at how many of these kids are also in athletics, band, student council, National Junio Honor Society, Spanish, journalism, yearbook, FFA, and agriculture. Kids who are in choir generally score higher on their state standardized tests, earning commended scores in more subjects. What does all this mean? Only that choir is one of the best electives you can choose

EXPERIAN_NAFERMDX0159

# Victor Track and Field



School Spirit

Great Friends

Tristan Zamarripa takes flight

Victor Ramirez prepares to vault

Glory Gilmore, Izaiah Garcia, & Jack Zizzo

James E. Smith

Peace, Love & SPEED

Tarann Riley

APPENDIX 0282

EXPERIAN_NAJERA_0160

EXPERIAN_NAJERA_0161



Collins Middle School

Athletic    Department

awards this    certificate to

Victor Ramirez

In Recognition of Athletic Achievement in

Football, Track

During the 08-09 School Year

Percy Whitmore
ATHLETIC DIRECTOR

COACH

COACH

APPENDIX 0283



EXPERIAN_NAJERA_0162

APPENDIX 0284



EXPERIAN_NAJERA_0133

# EXHIBIT D

# FILED UNDER SEAL

(Appendix 0286-0324)

# EXHIBIT E

**AUDIO PROVIDED IN NATIVE FORMAT**

APPENDIX 0326

# EXHIBIT F

# FILED UNDER SEAL

(Appendix 0327-0328)

# EXHIBIT G

APPENDIX 0329



| PROGRAM: | CAPRESPA | EXPERIAN-CONSUMER ASSISTANCE - CAPS | PAGE: 1 | | |
|---|---|---|---|---|---|
| RUN DATE: | 07/02/2025 | **ACDV Response:** | DOCUMENT VIEWED: | | |
| RUN TIME: | 08:41:23 | Auto Response: | | 3466487041002 | |
| SUBCODE: | 1937638 | ACCOUNT# ▮▮▮▮ 296 | | | |
| | | SUBSCRIBER: Nationstar Mortgage LLC | | | |

| | | | | Office: | 1 |
|---|---|---|---|---|---|
| DISPUTE | | | | Date Sent: | 02/12/2024 |
| REASON: | 001 - Not his/hers. Provide complete ID. | | | Date Due: | 03/06/2024 |
| REMARKS: | | | | **Resp Date:** | **02/28/2024** |
| | CONSUMER IDENTIFICATION | SUBSCRIBER CONSUMER ID | | **DNR Date:** | 03/06/2024 |
| Name: | VICTOR RAMIREZ | VICTOR RAMIREZ | | **Name Flag:** | S    S |
| SSN:        DOB: | ▮▮▮ 996    ▮▮▮ 995 | ▮▮▮ 996    ▮▮▮ 995 | | Second Name: | |
| Curr Address: | | | | **Curr Addr Flag:** | **Same** |
| | FORT WORTH TX | FORT WORTH TX | | Prev Addr Flag: | |
| ZIP: | 76106 | 76106 | | **SSN Flag:** | **Same** |
| Prev Addr 1: | | | | **DOB Flag:** | **Same** |
| Prev Addr 2: | | | | Authorized Verifier: | Sandra Brown |
| Account Name: | | | | Phone: | |
| RESPONSE: | **01 - Account information accurate as of date reported. No changes.** | | | DF Contact Phone #: | |

| TRADE INFORMATION | | SUBSCRIBER RESPONSE | ON PROFILE | CONSUMER CLAIMS |
|---|---|---|---|---|
| Acct Condition/Cumm Status: | | | TRANSFERRED/ DEL 60-4+ | |
| Act Status/Rating: | | | | |
| Payment Rating: | | | | |
| CII:        ECOA: | | 1 | 1 | |
| Balance:   Balance Date: | | 0 | 01/05/2023 | |
| Amt Past Due: | | | | |
| Orig Delinq Date: | | | | |
| Credit Limit/Orig Amt: | | | | |
| High Credit Balance: | | 109,370 | | |
| Charge Off Amt: | | | | |
| Sch Monthly Pay:   Act Pay: | | | | |
| Portfolio Name: | | | | |
| Date Last Pay: | | 12/30/2022 | | |
| Open Date:   Closed Date: | | 01/27/2009 | | |
| Spec Comm Code: | | O | | |
| Cons Compl Code: | | | | |
| Type:   Terms:   Freq: | | 26        030        M | | |
| Original Creditor: | | | | |
| Special Payment/Date/Amt: | | | | |

| Response History Grid: | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Year | Dec | Nov | Oct | Sep | Aug | Jul | Jun | May | Apr | Mar | Feb | Jan |
| 2025 | | | | | | | | | | | | |
| 2024 | | | | | | | | | | | | |
| 2023 | | | | | | | | | | | | |
| 2022 | | | | | | | | | | | | |
| 2021 | | | | | | | | | | | | |
| 2020 | | | | | | | | | | | | |
| 2019 | | | | | | | | | | | | |
| 2018 | | | | | | | | | | | | |

| On File History Grid: | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Year | Dec | Nov | Oct | Sep | Aug | Jul | Jun | May | Apr | Mar | Feb | Jan |
| 2025 | | | | | | | | | | | | |
| 2024 | | | | | | | | | | | | |
| 2023 | | | | | | | | | | | | |
| 2022 | | | | | | | | | | | | |
| 2021 | | 2 | 1 | 2 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 0 |
| 2020 | 1 | 0 | 2 | 1 | 2 | 2 | 1 | 2 | D | D | D | D |
| 2019 | D | D | D | D | 0 | D | D | D | D | D | 2 | 1 |
| 2018 | 0 | 1 | 0 | 1 | 1 | 1 | 0 | 0 | 1 | | | |

EXPERIAN_NAJERA_0146

APPENDIX 0330

# EXHIBIT H

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF TEXAS

VICTOR MANUEL RAMIREZ NAJERA,   )
                                )
          Plaintiff,            )
                                )   Case No.:
v.                              )   4:25-cv-00443-P
                                )
EXPERIAN INFORMATION SOLUTIONS, )
INC.; APPFOLIO, INC.; and       )
NATIONSTAR MORTGAGE, LLC d/b/a   )
RUSHMORE SERVICING,             )
                                )
          Defendants.           )
_____)

30(b)(6) VIDEOCONFERENCE DEPOSITION OF
EXPERIAN INFORMATION SOLUTIONS, INC.
BY TERESA IWANSKI

Richland, Washington

October 8, 2025

Prepared by:

Daniel Rohan, CER
Certified Electronic Reporter
CER No. 4137

**CERTIFIED TRANSCRIPT**

Coash Court Reporting & Video, LLC      602-258-1440
staff@coashcrv.com      www.CoashCourtReportingandVideo.com

I N D E X

WITNESS                                                        PAGE

TERESA IWANSKI

      Examination by Mr. Hammoud                                 5

      Examination by Mr. McCraw                                309

      Further Examination by Mr. Hammoud                       310


                         EXHIBITS MARKED

EXHIBIT                  DESCRIPTION                           PAGE

Exhibit 1     Plaintiff's 30(b)(6) Notice of                   11
              Deposition of Experian Information
              Solutions, Inc. Case No. 4:25-cv-443

Exhibit 2     Disclosure Log                                  176
              EXPERIAN_0209 - 0218
              CONFIDENTIAL

Exhibit 3     Audio of dispute phone call                     184

Exhibit 4     Credit Report of Victor Ramirez dated           189
              2-12-24
              EXPERIAN_0001 - 0010

Exhibit 5     D/R Log Report dated 6-3-25                     179
              EXPERIAN_0219 - 0222
              CONFIDENTIAL

Exhibit 6     Pennymac ACDV Response                          192
              EXPERIAN_0147

Exhibit 7     Nationstar ACDV Response                        203
              EXPERIAN_0146

Exhibit 8     Dispute Results dated 3-7-24                    209
              EXPERIAN_0015 - 0018

Exhibit 9     Admin Report                                    210
              EXPERIAN_0171 - 0208
              CONFIDENTIAL

Exhibit 10    Dispute letter from Victor Ramirez to    251
             Experian dated 7-10-24
             EXPERIAN_0148 - 0163

Exhibit 11    Nationstar ACDV Response    285
             EXPERIAN_0145

Exhibit 12    Dispute Results dated 8-19-24    288
             EXPERIAN_0073 - 0076

Exhibit 13    Credit Report of Victor Ramirez dated    289
             5-28-25
             EXPERIAN_0115 - 0122

Exhibit 14    Reseller Dispute    292
             EXPERIAN_0164 - 0165

Exhibit 15    Dispute Results dated 7-11-25    299
             EXPERIAN_0166 - 0169

              30(b)(6) VIDEOCONFERENCE DEPOSITION OF

              EXPERIAN INFORMATION SOLUTIONS, INC.

                        BY TERESA IWANSKI

was taken on October 8, 2025, commencing at 9:12 a.m.,

with the witness appearing from Richland, Washington; with

all other participants appearing via videoconference from

their respective locations, before Daniel Rohan, a

Certified Electronic Reporter and Notary in the State of

Arizona.


                            *    *    *

APPEARANCES:

        For the Plaintiff:
            THE CREDIT ATTORNEY, INC.
            By:  Youssef H. Hammoud, Esq.
                 601 North Parkcenter Drive
                 Suite 202
                 Santa Ana, California  92705
                 949-301-9692
                 yhammoud@thecreditattorney.com

            CONSUMER JUSTICE LAW FIRM, PLC
            By:  James Ristvedt, Esq.
                 72-47 139th Street
                 Flushing, New York  11367
                 480-626-1956
                 jristvedt@consumerjustice.com

        For the Defendant:
            JONES DAY
            By:  Chance McCraw, Esq.
                 2727 North Harwood Street
                 Suite 500
                 Dallas, Texas  75201
                 214-220-3939
                 cmccraw@jonesday.com

APPENDIX 0335

TRANSCRIPT OF PROCEEDINGS

THE COURT REPORTER:  Okay.  We're going on the record.  Today is October 8, 2025, at 9:12 a.m., with Teresa Iwanski.

Would you please raise your right hand?

Do you solemnly swear or affirm that the testimony you're about to give at this time and place will be the truth, the whole truth, and nothing but the truth, under penalty of perjury?

THE WITNESS:  Yes, it will.

THE COURT REPORTER:  Thank you, ma'am.

Mr. Hammoud, you may proceed.

TERESA IWANSKI,

the witness herein, having been first duly sworn by the Certified Reporter, was examined and testified as follows:

EXAMINATION

BY MR. HAMMOUD:

    Q.   Can you state your first and last name for the record?

    A.   My first and last name is Teresa May Iwanski.

    Q.   Okay.  Can you please spell your name for the record?

APPENDIX 0336

A.    Sure.  It's Teresa, T-e-r-e-s-a, middle name, M-a-y, last name is I-w-a-n-s-k-i.

Q.    Have you ever testified in court before a judge or jury?

A.    Yes, I have.

Q.    And when was the last time you were in court testifying before a judge or jury?

A.    It was a small claims court.  And I don't know how long ago it was, quite a few years ago.

Q.    Okay.  And was it in your capacity as an employee on behalf of Experian?

A.    Yes, it was.

Q.    And was it related to a -- can you describe what type of claim was at issue?

A.    I don't remember the exact allegations, but it was in my capacity as a representative of Experian to be in the small claims court.

Q.    Did somebody make a claim against Experian for a credit reporting violation?

A.    I don't know the specifics about it, but it would have been something along those lines.

Q.    Okay.  And have you had your deposition taken before?

A.    Yes, I have.

Q.    Approximately how many times?

A.   I don't keep count.  It varies from month to month.  I would say over 70.  I just don't have a particular number.

Q.   All right.  And when was the last time you had your deposition taken?

A.   I believe it was last week.

Q.   Okay.  And was it -- strike that.

And again, in your -- when you had your deposition taken, it was in your capacity as a representative on behalf of Experian?

A.   Yes, it was.

Q.   Okay.  And is that a case where somebody was making a claim against Experian for credit reporting violations?

A.   Yes, it was.

Q.   Okay.  And you understand that you're here today under oath, correct?

A.   Yes, sir.

Q.   Okay.  And what does that mean to you?

A.   That means that I am going to tell the truth and nothing but the truth, the same as if I was in a courtroom with a judge and jury.

Q.   Okay.  And the testimony today that you'll be giving is on behalf of your employer Experian, the defendant in this matter.  Is that correct?

A.    Yes, it is.

Q.    Okay.  And you understand that your testimony will bind Experian, so it is as if Experian itself is talking here today?

A.    Yes, I understand.

MR. MCCRAW:  Objection.  I think the law can speak for itself.

MR. HAMMOUD:  What was that, Chance?

MR. MCCRAW:  I said objection, the law can speak for itself as to whether that's correctly characterized.

MR. HAMMOUD:  Okay.  So we'll just -- you know, I guess at the outset, I'll just make it clear.

Experian, you can just place your form objection.  No speaking objections.  And then after your objection, nothing further.

BY MR. HAMMOUD:

Q.    Is there any reason that you're unable to testify truthfully or accurately today?

A.    No, sir.

Q.    Okay.  And are you on any drugs or alcohol that will impair your ability to testify today?

A.    No, sir.

Q.    Are you on any prescription medication?

A.    No, sir.  Not at this time.

Q.   Okay.  Do you prefer to be called Ms. Iwanski or Teresa for today's deposition?

A.   It's entirely up to you, however you would like to address me.

Q.   Okay.  So I just want to go over some ground rules.  I know you're probably familiar with them if you've sat for over 70 depositions, but I just want to ensure that we're on the same page today.

If you don't understand what I'm asking or you don't hear what I'm saying, this is not a guessing game, so just let me know and I can repeat the question.  Okay?

A.   Okay.

Q.   And you're doing a great job.  As you know, we have a court reporter here who's going to transcribe everything that's said today, so we need verbal answers to all the questions that are asked of you today.  Okay?

A.   Okay.

Q.   I'm going to try my best not to interrupt you when you're giving your answer, and I'm going to ask that you show the same courtesy and not interrupt me as I'm placing a question to you.  Okay?

A.   Okay.

Q.   From time to time your attorney, Mr. McCraw, will place an objection.  That objection is for the record, but

APPENDIX 0340

unless he instructs you not to answer, you are required to answer all of my questions.  Okay?

A.   I understand.

Q.   Okay.  And I am entitled to your best estimate, so long as there's a basis for that estimate or approximation.

So, for example, if I asked you how long my computer desk was, you've never seen my computer desk, you have no idea, so you wouldn't be able to give me any type of estimate.  You would be guessing.  But if I asked you how long your computer table was or your dining room table, you may not know exactly, but you have a basis to give an estimate or approximation.  Do you understand the difference?

A.   Yes, I do.

Q.   Okay.  And finally, if you need any breaks, let me know.  This is not a marathon.  The only caveat is if I'm in the middle of a question or a small line of questioning, I would ask that we complete before we break.  Okay?

A.   Okay.  I do have a cough, and I do have a lozenge.  I just want to let you know.

Q.   Sure.  I know there's something going around the last couple of weeks.  It left my household not too long ago, hopefully it doesn't come back.

Victor Manuel Ramirez Najera vs. Experian Information Solutions, Inc. -
30(b)(6) of Experian Informtion Solutions, Inc., by Teresa Iwanski

October 8, 2025
11

Okay.  So I want to share my screen.  And what I'm going to put in front of you is being labeled as Exhibit 1.

(Deposition Exhibit 1 was marked for identification.)

BY MR. HAMMOUD:

Q.   Can you see my screen, Teresa?

A.   Yes, I can.

Q.   Okay.  If you need me to zoom in whenever I show you exhibits, let me know.  If it hasn't loaded or anything like that, just let me know.  Okay?  So I can make sure we're on the same page.

A.   I understand.

Q.   Have you seen this document before?

A.   Yes, I have.

Q.   Okay.  And what is your understanding of what this document is?

A.   This document is a request for a deposition, and it is for the deposition that I'm appearing on behalf of Experian today.

Q.   Okay.  So this is what brought us all here today.  Is that correct?

A.   Yes, sir.

Q.   Okay.  And have you reviewed this document in its entirety?

A.    Yes, I have.

Q.    Okay.  Have you reviewed all the topics that were listed within this deposition note?

A.    Yes, I have, for the topics that I'm designated for.

Q.    Okay.  Do you know which topics you're designated to testify to today?

A.    Anything relating to the disputes and how Experian handled the disputes.  Those I can speak to. Anything related to -- and maybe towards the end, I don't know exactly where it starts.

Q.    Okay.  So if I go -- if I go line by line by each topic, would you be able to tell me whether you're prepared to testify as to that topic today?

A.    Sure.

Q.    Okay.  So let's start with Topic Number 1, "The factual basis of the allegations in the Complaint as related to You," Experian.

        MR. MCCRAW:  Objection.  That's outside the scope.  That's subject to our objections.

        THE WITNESS:  I can speak to what the allegations state in the complaint.

BY MR. HAMMOUD:

Q.    Okay.  And Topic 2?

        MR. MCCRAW:  Objection.  That's outside the

scope, as we've discussed.

THE WITNESS:  That would be something that the attorney would answer to, not specifically what Experian did in handling the disputes.

BY MR. HAMMOUD:

Q.  Can you repeat that for me?

A.  Sure.  Topic Number 2, affirmative defenses. That's more of what the attorney writes for Experian or has a design for Experian.  Not necessarily a topic for me, but anything as it relates to the -- how Experian handled the disputes, I'll be able to answer to those.

Q.  Okay.  How about the factual basis for any defenses that have been asserted by Experian?

A.  Those would be something that the attorney would be able to speak to.

Q.  Okay.  And you wouldn't -- you wouldn't be prepared to testify about the factual basis for any of the defenses that Experian has asserted to the claims that Mr. Ramirez Najera has alleged?

A.  If there's something within the complaint, I can definitely read the complaint.  Outside of that is if there's anything particular to facts in this case, those -- the answers to those questions would be in Experian's documents.

Q.  Okay.  Topic Number 3?

MR. MCCRAW:  Objection.  Also outside the scope.

MR. HAMMOUD:  So, Chance, again, I want -- I want to limit this to form objections.  So if she's --

MR. MCCRAW:  Outside the scope -- I'm allowed to say outside of the scope.

MR. HAMMOUD:  No, you're not.  I'm asking her if she's prepared to testify as to the topics.  She's going to tell me whether she is or whether she isn't, and we're going to move on.  But I don't need you to signal to her in any which way whether she should, you know, indicate that she is prepared or not prepared, and your objection is doing that.  So stick to form objections and, you know, she can continue answering without your interruptions.  Thank you.

BY MR. HAMMOUD:

Q.   Ms. Iwanski, are you here to -- let's talk about Topic Number 3.

A.   I can speak to whatever is in Experian's records and how we handled the disputes.

Q.   Okay.  So this -- this talks about the contents of Experian's Rule 26 initial disclosures or any supplemental disclosures.  Are you prepared to testify about that?

A.   If it's within Experian's documentation that was

produced in this case, I can speak to the documents.

Q.   Okay.  Topic Number 4, your -- Experian's responses to plaintiff's discovery requests?

MR. MCCRAW:  Also object.  Same objection as earlier.

THE WITNESS:  And I'll be able to answer to any documents that Experian produced in this case.

BY MR. HAMMOUD:

Q.   Okay.  Topic Number 5, how Experian obtains information they maintain on consumers like the plaintiff?

A.   It is a little vague.  But if there's a particular question that you have, I will be able to answer those questions.

Q.   Okay.  Did you -- did you -- did you go over these topics with your attorney, the deposition topics?

A.   Yes, I did, the topics I was designated for.

Q.   Okay.  And by "attorney," I'm referring to Mr. McCraw.  Did you -- did you meet with anybody else other than Mr. McCraw regarding these deposition topics?

A.   Not regarding these deposition topics, no.

Q.   Okay.  So the only attorney you spoke to about these deposition topics is Mr. McCraw?

A.   Yes.

Q.   Okay.  You never talked to any attorney within Experian, in-house counsel?

A.    No, I did not.

Q.    Okay.  How about Topic 6, "What you do with the information You obtain about consumers like Plaintiff"?

A.    Again, kind of a vague question.  But definitely if you have a specific question, I'll be able to answer it based on -- on how Experian handles information.

Q.    Okay.  Can you -- I'm going to put this in front of you.  You can see it in front of you.  Can you tell me which topics you are not prepared to testify about today?

MR. MCCRAW:  I'm going to just object and say all of this is subject to our objections that we've already previously provided.

BY MR. HAMMOUD:

Q.    And if you need me to scroll down, just let me know.

A.    Can you make it just a little bit bigger?

Okay.  Now, Topic Number 7, I can generally speak to credit scores.  Any specific information about changes and what may have specifically changed to cause a score to go up or down, I don't have particular knowledge of, but I do have knowledge, and I can speak to it, as our records show.

Q.    So I want you to tell me if there are any topics that you're not going to testify about or you're not prepared to testify about.

APPENDIX 0347

A.   Okay.  And I'm just -- I'm sorry.  I'm -- I'm reading as fast as I can.  I didn't memorize all of the topics in order, so I'm just reading along same as anybody else.

Okay.  If you can scroll down, please.

Okay.  If you can please scroll down.

18, I'm not going to know any particular laws, state or federal, so I won't be able to speak to that.  So 18, 19, 20, are all related to either a statute or a state-particular law.  I can speak to Experian's policies and procedures and how that is trained to employees.

Q.   So with respect to this -- you know, the California Civil Code, just ignore that.  That was an oversight, so ignore that state law.

But with respect to 15 USC 1681e(b), are you familiar with what that statute is?

A.   I'm familiar with the statute, but as it relates to Experian's policies and procedures that are created to comply, I do not have a specific knowledge of -- of specific language of -- of the statutes.  I -- it's not something that I would have memorized to prepare for this case.

Q.   Okay.  But you're familiar with the procedures that Experian has to comply with these statutes -- the

APPENDIX 0348

statute?

A.    Yes, as it relates to Experian's policies and procedures.  Yes, I do.

Q.    Okay.  So let's continue.

A.    One second.

For 22, I do not have specific knowledge about those cases.

Q.    Okay.

A.    25, I'm not quite sure.  The wording is state analogs.  I'm not quite -- I'm -- I'm not familiar with that term.

Q.    Okay.  So if we just -- you know, just strike that part of it.  So 25, just read it as your obligations under 15 USC Section 1681 regarding plaintiff's disputes.

A.    And that's what I'm here to testify for, as far as what Experian's policies and procedures are to comply.

Q.    Okay.  Same thing for 26, you can strike "and any applicable state analogs" and read it without that.

A.    I'm not going to know specifics as far as the interpretation that creates the policies and -- policies and procedures.  I can speak to what Experian has as policies and procedures.

Q.    Okay.

A.    For 27, the language is a little bit confusing, the time spent by you.  I don't have specifics as far as

the time frame.  I don't believe that was produced as far as how long the agents took to process disputes.

Q.    Okay.

A.    For 31, I will not have information about that.

I can speak to 32 on a general basis.  I don't believe there was anything produced in that -- any kind of agreements.

For 33, no.

34, I do not believe we have the names.  34, I can speak to what the agents did, and those are in our records.

Q.    What -- what was that, 34?

A.    The -- 34.

Q.    You said you won't be able to name the individuals who had involvement in plaintiff's credit file?

A.    I do not have their names, but I can speak to what they did in Experian's documents.

Q.    Okay.

A.    And 35, no.

36, yes, I do have knowledge of the training materials.

And 37, depending on what you're asking for, I'll be able to speak to what Experian's codes are within our documents.

38, no.  And 39, no.

Q.   All right.  So for 35, you won't be able to discuss productivity targets or any quotas that dispute agents have?

A.   I can speak generally to it.  These specific agents, their quotas, their goals for the year, things like that, I don't have knowledge of.  I can speak to, on a high level, the fact that there is a salary structure and how that -- how that is -- how it works within the employee's payroll.

Q.   Okay.  I guess we'll get into this -- into more detail.

My understanding is that, you know, when I met and conferred with your client, that you would be able to discuss productivity targets and quotas, but we'll get into that when -- when we come to that line of questioning.  Okay?

A.   Sounds good.

Q.   Okay.  When did you first learn that you would be sitting for this deposition?

A.   I'm not entirely sure.  It would have been maybe a few weeks ago.  I'm not entirely sure.

Q.   Okay.  And who first told you about the deposition, that you'd be sitting for a deposition?

A.   It'd be Experian's attorney Chance McCraw.

Q.   Okay.  And who designated you to speak on behalf of Experian?

A.   I'm not quite sure what you mean, Experian designates me.

Q.   Okay.  So somebody above you within Experian made the decision that you would be sitting for today's deposition for this matter?

A.   It was more availability to sit for this deposition.

Q.   Is there a specific person who makes the decision about who sits for what deposition?

A.   Not that I'm aware of.

Q.   Okay.  Do you report to anybody?

A.   Yes, I do.

Q.   And who do you report to?

A.   Kim Cave.

Q.   Okay.  Do you know if Kim Cave is the one who makes the decision about who will sit for what deposition on behalf of Experian?

A.   Not to my knowledge.

Q.   So you don't know who would have designated you to sit for today's deposition?

MR. MCCRAW:  Objection.  Asked and answered.

THE WITNESS:  My understanding, it'd be availability to sit here today to -- to do this

deposition.

BY MR. HAMMOUD:

Q.   But again, my question is asking if you know who makes that decision?

MR. MCCRAW:  Objection.  Asked and answered.

MR. HAMMOUD:  Chance, again, I'll say your objections should just be form objections.  I don't need speaking objections.

MR. MCCRAW:  They're not speaking objections.  They're valid objections.

THE WITNESS:  It would be availability.  So it'd be the attorney contacting Experian.  And between -- there's three of us, we would -- by availability, we would take the deposition if we have availability.

BY MR. HAMMOUD:

Q.   You said between the three of us, who's the three of us?

A.   Anna Simmons and Christina Hamilton.

Q.   Okay.  Anna Simmons and Christina Hamilton, are these in-house counsel for Experian?

A.   No.  Those are the other 30(b)(6) witnesses.

Q.   Are there any other individuals employed by Experian who are designated as 30(b)(6) witnesses other than you, Ms. Simmons, and Ms. Hamilton?

A.   I believe Sarah Levell also sits for depositions.

I don't believe there's any others at this time.

Q. Does Mary Methvin sit for depositions as a witness on behalf of Experian?

A. Yes, she does. In a different capacity, but she does.

Q. Okay. And how about Kimberly Cave?

A. Yes, she does, but also in a different kind of capacity.

Q. What do you mean by in a different type of capacity?

A. So Kim Cave and Mary Methvin do more of the expert witness type of depositions and writing.

Q. What did you do to prepare for today's deposition?

A. I spoke with counsel and prepared with the documents that were produced in this case.

Q. Okay. And so did you review documents?

A. Yes, I did.

Q. Okay. Can you tell me what documents you reviewed to prepare for today's deposition?

A. It was the documents that Experian -- Experian produced in this case, so it would be any contacts, letters. There was a phone call. Any of Experian's logs as well to prepare for this deposition.

Q. So would that review be limited to only the

documents produced in this case by Experian?

A.    Yes.

Q.    Okay.  Did you review any documents produced by the plaintiff in this case?

A.    No, I did not.

Q.    Did you review any documents produced by anybody else?

A.    No, I did not.

Q.    Okay.  Have all the documents you reviewed been produced in this lawsuit?

A.    To my knowledge, yes.

Q.    Okay.  And you said you met with your attorney to prepare for today's deposition?

A.    Yes, I did.

Q.    Okay.  When did you meet with your attorney to prepare for today's deposition?

A.    Yesterday.

Q.    Okay.  And how long was that meeting for?

A.    I'm not entirely sure, a few hours.  I wasn't paying attention to the clock.

Q.    Was it more than two hours?

A.    I believe it was more than two hours, but I wasn't paying attention to the clock.

Q.    Was it more than three hours?

A.    I don't remember.

Q.   Do you know if this was, like, during the normal work hours?

A.   Yes, it was during normal work hours.

Q.   Okay.  And was this over Zoom or by phone?

A.   It was through Teams.

Q.   Okay.  And then how many times did you meet with your attorney to prepare for today's deposition?

A.   Just the one time.

Q.   Okay.  Did you speak to anybody else to prepare for today's deposition?

A.   Yes, I did.

Q.   And who did you speak with?

A.   Mary Methvin.

Q.   Other than Mary Methvin, did you speak to anybody else?

A.   No, I did not.

Q.   Okay.  And when did you speak to Mary Methvin?

A.   Yesterday.

Q.   Okay.  And how long did you guys speak for?

A.   It was during the time that I was speaking to Experian's attorney, so I'm not quite sure how long she was on the call.

Q.   Okay.  So it was the three of you on a call together.

A.   Yes.  I'm sorry.  Not on a call.  On a Teams

meeting.

Q.   On a Teams meeting.

Okay.  I'm trying to close this phone application.  It's ringing in my ear.  Hopefully that did the trick.

Have you signed any written statements, like affidavits or declarations, about the events of this litigation?

A.   I don't believe so.  I don't remember specifically signing any -- any rogs or anything like that.

Q.   Okay.  Have you made any audio or video recordings about the events of today's litigation -- of this litigation, not today's litigation?

A.   No, I have not.

Q.   Did you take any personal notes in preparation for this deposition?

A.   No, I did not.

Q.   Okay.  Do you have any documents in front of you today?

A.   No, I do not.

Q.   Okay.  So I understand that you first began working for Experian sometime in September 2003.  Is that correct?

A.   Yes, sir.

Q.   Okay.  And your first position was as a dispute agent?

A.   Yes, sir.

Q.   Okay.  And within that role, you performed reinvestigations of consumer disputes, correct?

A.   Yes, I did.

Q.   Okay.  And so you handled disputes that were made both by mail and phone, correct?

A.   Yes, I did.

Q.   Okay.  You also initiated ACDVs that were sent to data furnishers, correct?

A.   Yes, I did.

Q.   Okay.  In some cases you completed reinvestigations where you were able to update a tradeline disputed by a consumer based on documents submitted by the consumer, correct?

            MR. MCCRAW.  Objection.

            THE WITNESS:  Yes, I have.

BY MR. HAMMOUD:

Q.   Okay.  How often were you able to update a tradeline based on documents submitted by a consumer?

            MR. MCCRAW:  Objection to form.

            THE WITNESS:  I'm not -- I have no idea how many times.  I have no idea.

APPENDIX 0358

BY MR. HAMMOUD:

Q.    If you had to give me like a -- like, was it, like, 90 percent of the time you were able to do this, or was it more like 10 percent of the time you were able to do this?

A.    It would be whatever was received with the piece of mail.  I just don't have a memory of how many times that was done.

Q.    Is there -- would you be able to tell me if it was something that happened often or was -- or if it was something that didn't happen as often?

A.    I just don't remember.  Compared to how many times an ACDV was sent compared to how many times an internal policy would apply, I just don't know for sure.

Q.    Well, if you had to say whether one happened more times than the other, what would you say?

MR. MCCRAW:  Objection.  Form.

THE WITNESS:  I just don't know if it was a 50-50 or something different than that.  I really don't remember.  It was a very long time ago.

I do remember the fact that -- that there are times when we can take documents, but it depends whether or not the consumer provides documents.  And so each -- each and every time would be a little bit different and what Experian would do with that dispute.

BY MR. HAMMOUD:

Q.    Is there anything that you could look at that would refresh your memory or help you answer that question?

A.    No.  This was back in 2003, and I don't remember specifically.  And we were doing -- at that time, we were doing paper mail, so it was a little bit different as well.

Q.    Okay.  And you were in that dispute investigator role for approximately one year, correct?

A.    I would just -- I was a dispute agent.  Experian does not have any investigators.

Q.    Okay.  So -- okay.  So you were in the dispute agent role for approximately one year?

A.    Yes, I was.

Q.    Okay.  And after that, you were a quality control associate, correct?

A.    Yes, sir.

Q.    Okay.  And that role was largely centered around reviewing the work of dispute agents to make sure that they were following Experian's policies and procedures?

A.    Yes.

Q.    Okay.  And my understanding is that you held that role for about two years?

A.    Yes, I did.

APPENDIX 0360

Q.    Okay.  So that brings us to about -- like, 2006, right?

A.    Correct.

Q.    Okay.  And then between 2006 and 2013, your title changed to senior litigation analyst?

A.    The title itself has changed over time, but yes, it was the same role.

Q.    Okay.  And between 2013 and 2021, you did not work for Experian, correct?

A.    That is correct.

Q.    And during that time period, I understand you worked as a legal assistant for a law firm and then a legal assistant for a collection company.  Is that correct?

A.    Yes, sir.

Q.    Okay.  And then since you resumed working for Experian in 2021, you've held the same role that you did back in 2013?

A.    Yes, I have.

Q.    Okay.  And that title is the senior litigation analyst?

A.    Yes, that is the current title.

Q.    So in total, you've been in your current role a combined 11 years or so?

A.    In this role, yes.

Q.   And my understanding of your current position is that you primarily work for Experian's attorneys to retrieve documents in federal court and small claims cases, attend 30(b)(6) depositions on Experian's behalf, and attend small claims hearings on Experian's behalf.  Is my understanding correct?

A.   Yes, sir.

Q.   Yeah.  Okay.  And when you were a dispute agent and a quality control associate, you became familiar with Experian's policies and procedures.  Is that fair?

A.   Yes, it is.

Q.   Okay.  And since transitioning into your role as a senior litigation analyst, is it fair to say that you've become more familiar with Experian's policies and procedures?

A.   I don't know if it's more fair -- more understanding, but it's -- it's more the fact that I'm -- it's -- it's the same knowledge.  I'll put it that way.  It's the same knowledge.  I wouldn't have the same knowledge going from quality to my new position.  There was nothing particularly learned that I didn't learn prior.

Q.   But you -- you haven't become less familiar with Experian's policies and procedures?

A.   No, I have not.

Q.    Okay.  So is it safe to say that you are personally very familiar with Experian's policies and procedures?  Is it fair to say that?

A.    Yes, I am.

Q.    Okay.  Experian is a consumer reporting agency or a CRA, correct?

A.    Yes.

Q.    Okay.  And you work within the litigation support department, correct?

A.    Yes.

Q.    And the head -- the head of this department is Kimberly Cave -- Kim Cave?

A.    Yes.

Q.    Okay.  Does Experian have, like, a regulatory compliance department?

A.    Yes.

Q.    Who is the head of that department?

A.    I am not sure at this time.

Q.    Do you know who works in that department?

A.    Not at this time, I do not.

Q.    Do you know a single name of an individual who works within that department?

A.    I do not.

Q.    Okay.  Does Experian have an internal legal department?

A.    Yes, Experian does have internal counsel.

Q.    Okay.  And who is that head of the legal department?

A.    I believe it is Ann Sterling.

Q.    Does Experian keep up to date on the requirements of the FCRA -- or the Fair Credit Reporting Act?

A.    Yes, Experian is up to date as far as any kind of changes, if there were any changes, and makes changes accordingly.

Q.    How does Experian stay up to date with the requirements of the FCRA?

A.    That would be Experian's legal team, having knowledge if there's any changes, having knowledge if there's any other requirements, state requirements, federal requirements, that we would -- Experian would then need to create a process or a policy for.

Q.    Have you spoken to anybody on the legal team about these -- about how they keep up to date with the requirements of the FCRA?

A.    No, I have not.

Q.    So how do you know that that's what they do?

A.    That's my knowledge that I've -- I've been told that that's -- that's what their process would be.

Q.    Okay.  And who -- and who gave you this knowledge?

Victor Manuel Ramirez Najera vs. Experian Information Solutions, Inc. -
30(b)(6) of Experian Informtion Solutions, Inc., by Teresa Iwanski

October 8, 2025
34

A.    It was over the course of being employed.  I don't remember exactly who.

Q.    Okay.  Was it -- would it have been somebody within your own department that would have shared this knowledge with you?

A.    I just don't remember who.  So it may -- it may have been somebody within my own department, but I don't know specifically.  I don't remember who.

Q.    Okay.  Do you work -- do -- do you communicate with -- with the individuals on the legal team?

A.    Yes, I do.

Q.    Do you guys communicate often?

A.    No, not often.

Q.    When was the last time you spoke to somebody from the legal department?

A.    I can't think of a specific time.  It would have been maybe months.  Sorry, maybe a couple weeks ago.

Q.    Okay.

A.    Two weeks ago.  I really don't remember.

Q.    Okay.  But it's correct that nobody from the legal department has told you how they keep up to date on the requirements of the FCRA?

A.    That have told me directly, no.

Q.    Okay.  Do you know if Experian keeps up to date on case law interpreting the FCRA?

MR. MCCRAW:  Objection.  Outside the scope. Same for the prior topics that you're discussing.

THE WITNESS:  I'm not quite sure what happens in case law.  And that's more of like what the attorneys would do, and I don't have specific knowledge of that.

BY MR. HAMMOUD:

Q.  Okay.  So you have no knowledge on whether the legal department or anybody else within Experian keeps up to date on case law interpreting the FCRA?

A.  Experian's policies and procedures are created by the interpretation of the FCRA to comply with the FCRA, and that is done on -- on a level that I am not privy to. I don't have that knowledge specifically, what they do and how they go about that.

Q.  So I just want, like, a straight answer.  This is yes or no.

So do you know if Experian keeps up to date on case law interpreting the FCRA?

MR. MCCRAW:  Same objection.

THE WITNESS:  Yes, I believe they do.  How they do what they do, I don't know.

BY MR. HAMMOUD:

Q.  And why do you say yes, you believe they do? What do you believe -- what do you base that belief on?

A.   I base that belief on the fact that Experian is always looking for possibilities if there's a need to change a policy, if there's a need to make something more consumer-friendly.  And if there's any case law that -- that would cause Experian to have to make a change, then Experian would comply.  Outside of that, I just don't know specific day-to-day what they do.

Q.   Is there a specific example that you could point to in which you knew that there was a specific decision made and, you know, Experian made any changes based off of that court decision?

MR. MCCRAW:  Same objection.  Outside the scope.

THE WITNESS:  I can just think of one right now.

BY MR. HAMMOUD:

Q.   And what is that?

A.   The White-Hernandez.

Q.   Okay.  Was that regarding post-bankruptcy reporting?

A.   Yes.

Q.   Okay.  Are there any other court decisions that you could think of that impacted Experian's understanding of the FCRA?

MR. MCCRAW:  Objection.

THE WITNESS:  I do not have -- I do not have knowledge of any other cases.  That's the only case that I have knowledge of.

BY MR. HAMMOUD:

Q.   Okay.  And then what is your understanding of, you know, what Experian did when they learned of this -- the White-Hernandez case when the decision came down?

MR. MCCRAW:  Same objection.

THE WITNESS:  My understanding is very specific on what the judge came back with as far as creating a scrub and creating a process where it would be an automated process and it would include or exclude certain types of accounts.  It would typically be discharged in bankruptcy.  And at that time, it was the Chapter 7 bankruptcies that were viewed, and Experian created the scrub process based off of that.

BY MR. HAMMOUD:

Q.   Okay.  So is this -- is it this one case that you base that belief off that Experian keeps up to date on case law interpreting the FCRA?  Is it because of your -- your personal knowledge on this case and what happened as a result?

MR. MCCRAW:  Same objection.

THE WITNESS:  It's -- it's within my knowledge as far as I've been told, if there was any kind

APPENDIX 0368

Victor Manuel Ramirez Najera vs. Experian Information Solutions, Inc. -
30(b)(6) of Experian Informtion Solutions, Inc., by Teresa Iwanski

October 8, 2025
38

of changes, things of that nature.  I don't specifically know the case law, if there was any other changes.  The one that I do have a knowledge of is the White-Hernandez.

BY MR. HAMMOUD:

Q.   I'm just trying to understand if somebody gave you the knowledge by saying, "Hey, Teresa, this court decision came down.  This is how we view it.  This is what we're going to be doing as a result of this court decision," or is it that Experian makes changes from time to time and you just believe that those changes may be impacted by case law?

MR. MCCRAW:  Same objection.

THE WITNESS:  Well, it could be both.  It could be case law or it could be the fact that Experian's changing a policy.  I specifically don't know if -- if policies change, to my knowledge, based off of case law or the fact --

BY MR. HAMMOUD:

Q.   Okay.

A.   -- that Experian is changing a policy.

Q.   Okay.  So -- okay.  Understood.

Do you know if Experian keeps up to date on advisory opinions from the CFPB, the Consumer Financial Protection Bureau, about the FCRA?

MR. MCCRAW:  Same objections.

THE WITNESS: Experian is very involved in the CFPB, and that would be something that that group would have knowledge of. And they're in contact with CFPB daily, any kind of opinions, any kind of observations, Experian would take those under advisement. And Experian has a department dedicated just to the CFPB.

BY MR. HAMMOUD:

Q. This is different than the legal department?

A. Yes.

Q. Okay. What is that department called?

A. I'm not exactly sure what the department is called. It is the CFPB team.

Q. Okay. And how do you know that they're like in constant communication with the CFPB?

MR. MCCRAW: Same objection.

THE WITNESS: It's something that I have knowledge of, and I have knowledge of their process.

BY MR. HAMMOUD:

Q. How -- how did you obtain that knowledge? Did somebody -- did you speak to somebody from that team and they said, "Hey, Teresa, we're talking to the CFPB all the time. We're in constant communication with them"?

MR. MCCRAW: Same objection.

THE WITNESS: Yes. Part of my daily job, if Experian has ever communicated in CFPB cases and on the

onset of Experian creating -- or being involved in the CFPB portal and the processes that were developed.  I was part of the team at that time, and I did assist with responses to the CFPB.  And that was -- I don't -- I'm sorry, I don't even know the timeframe.  Whatever the timeframe that CFPB created the portal and started that dispute process or the complaint process.

BY MR. HAMMOUD:

Q.   Okay.  When you say "portal," you mean this is a portal that the CFPB set up specifically for Experian to relay over disputes to them?

A.   Yes.

Q.   Okay.

A.   The complaint.  Sorry.  The complaints come through and Experian response to the complaints.

Q.   Okay.  And you were part of the team that helped set up the procedures related to the response to the complaints from the CFPB?

          MR. MCCRAW:  Same objection.

          THE WITNESS:  No.  I assisted with the CFPB complaints during a short time frame when it was new and developing.

BY MR. HAMMOUD:

Q.   Okay.  So you -- so if CFPB complaints would come through the portal, and then Experian would have to

respond to those complaints, and you would assist in responding to whatever those complaints were dealing with?

MR. MCCRAW:  Same objection.

THE WITNESS:  When asked to do so, correct.

BY MR. HAMMOUD:

Q.   Okay.  But other than, you know, whether Experian obtains advisory opinions, reviews them, their procedures related to CFPB advisory opinions, do you have knowledge on that?

MR. MCCRAW:  Same objections.  Outside the scope.

THE WITNESS:  Just that Experian's in constant communication with them.  Outside of that, I don't know specifically what they're viewing, what they're communicating.  That's just not something I am -- I have knowledge of.

BY MR. HAMMOUD:

Q.   Okay.  And I just want to understand.  When you say Experian is in constant communication with them, you're referring to the CFPB, correct?

MR. MCCRAW:  Same objection.

THE WITNESS:  Yes.  Experian is receiving complaints daily, responding to complaints daily.  So Experian is in constant communication with the CFPB.

Coash Court Reporting & Video, LLC
staff@coashcrv.com
602-258-1440
www.CoashCourtReportingandVideo.com

APPENDIX 0372

BY MR. HAMMOUD:

Q.   Okay.  So by constant communication, you mean, you know, the exchange of complaints and responses to complaints from the CFPB?

MR. MCCRAW:  Same objection.

THE WITNESS:  Yes.  Yes.  Those would be any kind of communications relating to complaints, or if they have questions, things of that nature.

BY MR. HAMMOUD:

Q.   Okay.  And when you say, like, if they have questions, you mean if the CFPB has questions to Experian about something related to what they do?

MR. MCCRAW:  Same objection.

THE WITNESS:  Generally, yes.  I don't know the specifics of it, but -- but there is a process that -- that has been developed for them to ask questions of Experian.

BY MR. HAMMOUD:

Q.   How do you know that there was a process that was developed?

A.   I just remember when -- on the onset of -- of the CFPB asking questions of Experian and Experian answering those questions.  I don't remember specifics, you know, other than that.

Q.   Okay.  Do you know what timeframe this was at the

onset of when this was happening and you were involved?

MR. MCCRAW: Same objection.

MR. HAMMOUD: And, Chance, I just want to say, you just keep placing the same objection. Outside the scope is not a proper objection. So she's obviously -- she's testifying that she has personal knowledge on these things, so your objection is doing nothing other than trying to frustrate the deposition.

So, again, you know, I don't know how many times I've told you, you know, so far, but keep your objections to form objections. Outside the scope of, you know, the deposition notice is not a proper objection.

MR. MCCRAW: It is a proper objection, Youssef, and I will continue to make it because anything that's outside of her -- outside of what you have designated for the topics, it's not actually open to be used in a transcript or in any form or motion going forward. So I'm going to reserve that objection.

MR. HAMMOUD: Your objection is that you're doing nothing but trying to frustrate the deposition.

BY MR. HAMMOUD:

Q. So, Ms. Iwanski, let's continue.

MR. MCCRAW: Do you want to ask about the actual topics you noticed?

MR. HAMMOUD: I -- I don't -- I don't need

you to add additional information, Chance.  You place your objection and then you're done.  Nothing further.

Mr. Rohan, do you mind repeating the -- the last question?

THE COURT REPORTER:  One moment, please.

MR. HAMMOUD:  Okay.

(The record was read by the court reporter as follows:

QUESTION:  Do you know what timeframe this was at the onset of when this was happening and you were involved?)

MR. MCCRAW:  Same objection.

THE WITNESS:  I don't remember specifically.

BY MR. HAMMOUD:

Q.  Was it -- usually we all kinda say before Covid or after Covid type thing, right?

So I'm going to tell you, was this before Covid or after Covid?

MR. MCCRAW:  Same objection.

THE WITNESS:  Before -- it would have been before 2013.

BY MR. HAMMOUD:

Q.  Okay.

A.  When that was, I really don't remember.

Q.  Okay.  So post-2013, do you have any idea what

that department is doing, the CFPB team?

MR. MCCRAW:  Same objection.

THE WITNESS:  I believe it's the same kind of structure.  Outside of that, I don't know specifics, what have been changed, but the process itself is -- is the same.

BY MR. HAMMOUD:

Q.  Okay.  And when you say you believe it's the same structure, why do you believe that?

MR. MCCRAW:  Same objection.

THE WITNESS:  Because Experian is still getting the complaints and Experian is still responding to complaints in the portal.

BY MR. HAMMOUD:

Q.  Okay.  But after 2013, you haven't been involved, you just assume that the process is still operating similar to how it was because complaints are still coming in from the CFPB?

MR. MCCRAW:  Same objection.

BY MR. HAMMOUD:

Q.  Is that fair?

A.  And policies regarding that process is still the same.

Q.  Okay.  And you've -- you've reviewed those policies?

MR. MCCRAW:  Same objection.

THE WITNESS:  Yes, I have.

BY MR. HAMMOUD:

Q.   When was the last time you reviewed those policies?

A.   I don't remember.  It would have been the last couple of years.

Q.   Okay.  We'll go back to our benchmark, pre-Covid or post-Covid?

A.   Post.

Q.   Okay.  Do you know what those policies and procedures are called?

MR. MCCRAW:  Same objection.

THE WITNESS:  I don't know what -- the specific manual, but it -- but it is how to handle those kinds of complaints and the steps that the agents take in handling those kinds of complaints.

BY MR. HAMMOUD:

Q.   Okay.  So they're specific policies and procedures for CFPB complaints?

MR. MCCRAW:  Same objection.

THE WITNESS:  Yes, there are.

MR. HAMMOUD:  Okay.  Let's take like a 10-minute break.  It's 10:08.  Let's just say like 10:18, we'll be back.

APPENDIX 0377

THE WITNESS:  Okay.

MR. HAMMOUD:  Thank you.

THE COURT REPORTER:  We're off the record.  Time is 10:08 a.m.

(A recess ensued.)

THE COURT REPORTER:  We are on the record.  Time is 10:19 a.m.

BY MR. HAMMOUD:

Q.  Okay.  Is it Experian's understanding that it is regulated by the FCRA?

MR. MCCRAW:  Objection.

THE WITNESS:  It is -- my understanding is the FCRA -- Experian complies with the FCRA.

BY MR. HAMMOUD:

Q.  Okay.  So do you -- do you view that as different than being regulated by the FCRA?

A.  In my understanding of it, it would be a little bit different as far as regulated.  I'm not quite sure if your meaning is the same as mine.

Q.  By -- by "regulated," I mean the FCRA sets out duties and obligations by which Experian is required to follow.

A.  With that definition, then yes.

Q.  Okay.  What is your understanding of the claims alleged by Mr. Ramirez Najera, the plaintiff against

APPENDIX 0378

Experian?

MR. MCCRAW:  Objection.  Form.

THE WITNESS:  My understanding, there was a mortgage that did not belong to him, and it was on his consumer report.

BY MR. HAMMOUD:

Q.   Was it one mortgage or more?

A.   Two mortgages.

Q.   Okay.  And you're aware that he disputed these mortgages?

A.   Yes, I'm aware of that.

Q.   Okay.  And then these mortgages, one of them was a Rushmore Mortgage, also known as Nationstar, correct?

A.   Yes, sir.

Q.   Okay.  If I refer to, you know, this specific account, the mortgage account, the Rushmore account, will you understand what I'm referring to?

A.   Yes, I will.

Q.   Okay.  And then the other mortgage account that was reporting was the Pennymac account.  Is that correct?

A.   Yes.

Q.   Okay.  Do you have any understanding of the sections of the FCRA under which Mr. Ramirez Najera has filed against Experian?

A.   No.  I -- I did not memorize that portion of it.

Q.   Is it your understanding that he alleged a violation of FCRA's Section 1681e, subsection (b)?

A.   If you're telling me that that's what the allegations were in the complaint, then I -- I trust what you would say.  I just -- I didn't memorize that information.

Q.   Okay.  So you're not -- but 1681 -- are you familiar with 1681e, subsection (b)?

A.   Not the wording itself.

Q.   Okay.  So I'll -- I'll -- I'll recite it for you word for word to refresh your memory.  Would that help?

A.   Sure.

Q.   Okay.  So 1681e, subsection (b) states, "Whenever a consumer reporting agency prepares a consumer report, it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

        Did you hear all that?

A.   Yes, I did.

Q.   And did that refresh your memory about what this specific section or provision of the FCRA is about?

A.   Yes, I do understand that.

Q.   Okay.  And is it your understanding that this provision of the FCRA applies to a credit reporting agency like Experian?

APPENDIX 0380

A.   Yes.  Experian's ultimate goal is to have reasonable procedures and follow the guidelines -- or the procedures set out to comply with the FCRA.

Q.   And then is it your understanding -- now that I read the specific provision, is it your understanding that Mr. Ramirez Najera alleged that Experian violated this provision of the FCRA?

A.   If that's what it was in the complaint, then -- then yes.

Q.   Okay.  And then with respect to the other section that Mr. Ramirez Najera indicated Experian violated, it was 1681i.  are you familiar with that section of the FCRA?

A.   Yes, I am.

Q.   Okay.  And is it your understanding that Mr. Ramirez Najera alleged Experian violated this section of the FCRA?

A.   If it's in the complaint, then -- then yes, that's what the allegations would be.

Q.   Okay.  What does Experian understand its obligations to be when a consumer disputes the accuracy or completeness of an account that Experian has in their file?

MR. MCCRAW:  Objection.  Form.

THE WITNESS:  Each and every contact would

be a little bit different.  If it was by mail, Experian would consider -- has policies and procedures to consider documents, in order to use them.  Outside of that, there's not documents to use, Experian would then send an ACDV to the company that's reporting the information.  And they, in turn, would respond back, certifying the information to Experian to be accurate.

BY MR. HAMMOUD:

Q.   Okay.  So you're saying Experian's obligations depend on the form -- the -- the method in which the dispute was made?

MR. MCCRAW:  Objection.  Form.

THE WITNESS:  Not the obligation.  It's -- what I'm saying is it's different than a phone call.  It's different than by mail or by Internet.  If it's a phone call, Experian is not receiving a document to use.  If it's by mail, there may be documents included.  So that -- that would be the only difference.  Outside of that, the process itself, meaning if Experian is going to send an ACDV to the data furnisher and ask them to look at their records and report back to Experian with the ACDV, then that information is the same.

BY MR. HAMMOUD:

Q.   Okay.  So you mean that if a dispute is received by mail with documentation, the procedures in responding

APPENDIX 0382

to this dispute could be different than if a dispute was made over the phone and no documentation was provided. Is that correct?

A. Yes. That was an example.

Q. Okay. How about online, does -- are consumers allowed to attach documents when submitting a dispute online or upload documents when making a dispute online?

A. Yes. So currently the -- the consumers can start the process, upload a document, and then Experian would then attach it to the ACDV. If -- if they are receiving it with the reinvestigation, it was started online.

Q. Okay. So if a consumer goes online to make a dispute, at the time they're creating this initial dispute online, can they attach a document at the same time, or does that -- attaching a document or uploading a doc has to happen, you know, in a different instance?

A. So the attachment -- the upload would need to be sent to Experian. Experian would then attach the document to the ACDV. So it's not happening online, it's happening when Experian receives it.

Q. And when Experian receives it -- so the -- how would the consumer upload a -- a document to Experian to attach to a dispute? Would they do that online or do they have to send it by mail?

A. They can do that online at the time that they're

processing the dispute.

Q.   Okay.  So simultaneous -- so simultaneously while they're submitting a dispute, they could upload a document online, and then Experian can attach that document to the dispute?

A.   Yes.

Q.   Okay.  Does Experian's online dispute allow for freeform texting?  So, you know, I'm trying to understand the -- the steps --  Strike that.

When a consumer disputes online with Experian, can they freeform type what it is that they're disputing?

A.   Yes.  There's a section, if -- if they want to type in information in the additional relevant information section, that would also then be sent to the data furnisher within the ACDV.

Q.   Is there a limit to the amount of characters that they could input?

A.   I believe it's 100 characters.

Q.   Okay.  So they would have to choose, like, from a drop-down to classify what their dispute is, and then they have up to 100 characters to include as well?

A.   Yes, I believe so.

Q.   Okay.  And then in addition to that, they can, at the same time, upload documents with their dispute.  Is

that correct?

A.   Yes, they can.

Q.   Okay.  And then you said --  Strike that.

Does Experian have any understanding about whether they're required to perform a reasonable reinvestigation in response to a consumer's dispute?

MR. MCCRAW:  Objection.  Form.

THE WITNESS:  Yes.  Experian is -- Experian's ultimate goal is to have reasonable procedures in place so that consumers can dispute information. Experian then contacts data furnishers or uses documents to update.

BY MR. HAMMOUD:

Q.   So I'm -- so I'm asking about whether Experian is obligated to conduct a reasonable reinvestigation in response to a consumer's dispute?

MR. MCCRAW:  Same objection.

THE WITNESS:  Yes.

BY MR. HAMMOUD:

Q.   So it's your understanding that Experian must do a reasonable reinvestigation whenever they receive a consumer's dispute?

A.   Yes.  And Experian has created policies and procedures to have those reasonable reinvestigations.

Q.   Okay.  And how does Experian define what a

reasonable reinvestigation is?

A.   That would be something that Experian's attorneys would create, as far as policies and procedures, things of that nature.  And -- and Experian then uses those policies and procedures in conducting the reinvestigations.

Q.   So somebody within the legal department or a team within the legal department would be responsible for defining what a reasonable reinvestigation is and then drafting policies and procedures that would ensure a reasonable reinvestigation is conducted?

A.   Yes, that is my understanding.

Q.   Okay.  Do you know who in the legal department is responsible for that, defining what a reasonable reinvestigation is?

MR. MCCRAW:  Objection.  Outside --

THE WITNESS:  Experian's ultimate goal is to have a -- reasonable reinvestigations and reasonable policies and procedures.  Specifically who in the legal department is part of that process, I don't know.

BY MR. HAMMOUD:

Q.   Okay.  Do you take part in that process of defining or determining what a reasonable reinvestigation is?

MR. MCCRAW:  Same objection.

THE WITNESS:  No, I do not.

BY MR. HAMMOUD:

Q. Okay. Does Kim Cave?

MR. MCCRAW: Same objection.

THE WITNESS: I don't know.

BY MR. HAMMOUD:

Q. So with respect to, you know, your -- your response that the legal team will make that determination and then craft policies and procedures, how do you know that that's the process? How do you know that's what happens?

MR. MCCRAW: Same objection.

THE WITNESS: I'm sorry. I'm not understanding your question.

BY MR. HAMMOUD:

Q. Yeah, I -- I asked how does Experian define what a reasonable reinvestigation is. Do you remember me asking you that?

A. Yes, I do.

Q. Okay. And then you -- your response, I'm not reciting it verbatim, right? -- but you said something to the effect of that would be something that, you know, the legal team would handle. They would make that determination of what that definition is and then craft policies and procedures for how to carry out reasonable reinvestigations. Is that a fair summary of your

response?

MR. MCCRAW:  Same objection.

THE WITNESS:  Yes, sir.

BY MR. HAMMOUD:

Q.  Okay.  So I'm asking how you came to have that knowledge, like the -- the response.  What do you base that response off of?  How do you know that's the process that happens?

MR. MCCRAW:  Same objection.

THE WITNESS:  I have knowledge of the process itself that's in place and the steps that Experian takes to create policies and procedures to comply with the FCRA.  I'm just not familiar with who in the department is actually doing that actively.

BY MR. HAMMOUD:

Q.  So I think that those are separate.

So I -- so I understand you're stating that you know what the process and procedures are for handling or conducting a reasonable reinvestigation.

I'm asking you how do you know that it is the legal department that defines what that term means and then crafts policies and procedures to ensure or attempt to ensure that Experian is doing a reasonable reinvestigation?

MR. MCCRAW:  Same objection.

THE WITNESS:  As far as the process itself, it is set up to -- to have our legal department input, influence, and follow the process when Experian is -- is creating any kind of policies or procedures.  There is an approval process outside of that.  I just don't know specifically who in the legal department is currently doing that.

BY MR. HAMMOUD:

Q.    And this -- this process that you're talking about, is it memorialized in writing somewhere that the legal team determines the definition of reasonable investigation and they're responsible for updating or creating or drafting policies and procedures related to the conducting of reasonable reinvestigations?

MR. MCCRAW:  Same objection.

THE WITNESS:  Not that I'm aware of.

BY MR. HAMMOUD:

Q.    Okay.  Did anybody talk to you and specifically tell you, "Hey, this is the process.  This is how it works.  The legal team is the one that defines what reasonable reinvestigation is and then creates these policies and procedures related to it"?

MR. MCCRAW:  Same objection.

THE WITNESS:  It would just be knowledge over the course of -- of being in this position.

APPENDIX 0389

Specifically, I don't remember if there was a person that told me, but that's been the process for a number of years.

BY MR. HAMMOUD:

Q. Okay. But with respect to what the legal team does, how they define it, why they craft the policies and procedures the way that they do, do you have any knowledge on that?

MR. MCCRAW: Same objection.

THE WITNESS: No, I do not.

BY MR. HAMMOUD:

Q. Okay. Have you ever spoken to anybody from the legal team about how they came up with the definition of reasonable reinvestigation or why they crafted the policies and procedures the way that they did?

MR. MCCRAW: Same objection.

THE WITNESS: No, I have not.

BY MR. HAMMOUD:

Q. Have you ever asked anybody, like your supervisor or anybody, "Hey, you know, how does Experian define reasonable reinvestigation?"

MR. MCCRAW: Same objection.

THE WITNESS: No. I don't think I've had that -- those specific kinds of conversations. I'm aware of policies and procedures that have been created.

APPENDIX 0390

Outside of that, is -- it would be if there was any kind of questions about policy changes, things of that nature. I don't have a specific memory of -- of discussing one particular policy.

BY MR. HAMMOUD:

Q.    Okay.  So what is your understanding of what a reasonable reinvestigation is?

A.    My understanding of a reasonable reinvestigation is to create policies and procedures for agents to follow, policies and procedures that the agents are educated and trained and monitored to follow policies and procedures. With that, the agents then would be able to process mail, process phone calls, and be able to apply those policies and procedures to do whatever it is that they're trying to do, if they're trying to internally update something or send out an ACDV, and those procedures are in place for the agents to follow.

Q.    Does Experian in its policies and procedures define what a reasonable reinvestigation is?

A.    I don't believe so.  If there is something, I don't have knowledge of it or have seen it.

Q.    Okay.  And then also in your response, you indicated that, you know, the agents -- part of your response was that the agents will then process mail and phone disputes and apply those policies and procedures.

Victor Manuel Ramirez Najera vs. Experian Information Solutions, Inc. -
30(b)(6) of Experian Informtion Solutions, Inc., by Teresa Iwanski

October 8, 2025
61

You never mentioned online disputes.

Was that an intentional omission?  Are they handled differently, online disputes?

A.   The process itself is a little bit different than when the agents are -- are reading the piece of mail or talking to the consumer.

So online, the consumer is going on, looking at their report, selecting the reason why something -- that they want to dispute, and typing in additional relevant information.  At that point, if there's nothing uploaded, the ACDV is immediately sent to the data furnisher.

So in that -- in that -- those instances it's a little bit different, but the process itself is the same.  Meaning it's the same reason codes, the same type of additional relevant information section that they can type in, the process of the ACDV being sent to the data furnisher is also the same, and the response back for the company to certify the accuracy is also the same.

Q.   Okay.  So online, if a consumer just clicks from the drop-down as a reason for the dispute and free form text, an ACDV would automatically be generated and sent to the furnisher.  Is that correct?

A.   Yes, that's correct.

Q.   Okay.  So there wouldn't be a live human being

Victor Manuel Ramirez Najera vs. Experian Information Solutions, Inc. -
30(b)(6) of Experian Informtion Solutions, Inc., by Teresa Iwanski

October 8, 2025
62

who reviews the dispute made by the consumer prior to it being sent off to the furnisher?

MR. MCCRAW:  Objection.  Form.

THE WITNESS:  Only if there was an upload that they're requesting to be sent with that ACDV would an agent be reviewing it.  Outside of that, the policies, procedures, how -- how Experian sends ACDVs is all built into that web-based program.  So the agent is not involved unless there's an attachment that's needed.

BY MR. HAMMOUD:

Q.    Okay.  And then upon receipt of the response to the ACDV from the furnisher for an online dispute without documents, is there some -- is there a dispute agent that reviews that response before it gets placed or before it gets certified?

A.    The ACDV is sent to the data furnisher.  The data furnisher on their side is looking at their records, what they have within their own system.  Experian does not have access to that kind of information.  And that response to the ACDV is certifying to Experian -- the data furnisher is certifying to Experian that the information is -- is accurate.  Based off of that information, Experian then takes the ACDV, applies its own policies and procedures to see if we're going to keep the data.  There are times when we do not keep the data depending on the reason code,

depending on what is -- what the response is in the ACDV itself.

Q.   Okay.  And this is -- this procedure, this part of the process, this would apply to online, phone, or mail disputes when receiving the response from the furnisher?

A.   Online, mail, telephone, it's -- it's the same.

Q.   Online, no?  Telephone, yes?

A.   It's the same whether or not they contact Experian by mail by phone or by Internet.  The ACDV response itself is the same.

Q.   Okay.  So it's just about how it gets sent out that is different between the three ways in which a consumer can dispute, whether by mail, by phone, or by online?

            MR. MCCRAW:  Objection.  Form.

            THE WITNESS:  Each of them is a little bit different depending on how Experian -- how -- how the consumer is contacting Experian.  So each of those may be a little bit different depending on what's received, depending on what the consumer's disputing.  It's hard to capture and categorize a hypothetical like that in an overall kind of answer.  Each dispute would be a little bit different depending on what the consumer's disputing.

BY MR. HAMMOUD:

Q.   Okay.  And -- and you testified that Experian has

APPENDIX 0394

written policies and procedures that detail how Experian's employees are supposed to handle -- or supposed to respond to consumer disputes, correct?

A.   Yes.

Q.   Okay.  Do you know those policies and procedures by heart?  Are you able to recite them step by step, what a dispute agent is supposed to do when receiving any type of dispute?

A.   Yes, I am.

Q.   So you're able to recite verbatim the words within the policies and procedures?

A.   I can recite the steps that are taken in order to process the disputes and explain what would be given in the manual.  If there's a particular word that I'm using or didn't use, it won't be verbatim.  But I do have the process and what Experian's agents are trained to do.

Q.   So when you say you have the process, like, is it fair to say that you have a general understanding of how -- of how the -- of what the procedures say?

MR. MCCRAW:  Objection.  Form.

THE WITNESS:  I have an understanding, and I'm here to testify about the policies and procedures that Experian used in this case.

BY MR. HAMMOUD:

Q.   Okay.  So Experian used policies and procedures

to respond to the plaintiff's disputes?

MR. MCCRAW:  Objection.  Form.

THE WITNESS:  Yes.  Experian agents are trained to use policies and procedures when processing disputes.

BY MR. HAMMOUD:

Q.   All right.  If I had, like, specific questions about specific parts of a procedure, let's say, like page 37 from a specific document, are you able to tell me what's contained on that page?

A.   No.

Q.   So is it fair to say that you'd have to have the policy and procedure in front of you to be able to discuss specific parts about specific procedures?

MR. MCCRAW:  Objection.

THE WITNESS:  No, I would not need the manual in front of me.

BY MR. HAMMOUD:

Q.   Okay.  So, again, you know, I asked you if -- if I had specific questions about specific parts of a procedure, like from page 37 of a certain document, you indicated that you wouldn't be able to tell me what's on that specific page.

MR. MCCRAW:  Objection.  Form.

APPENDIX 0396

BY MR. HAMMOUD:

Q.    Was that your testimony?

MR. MCCRAW:  Objection.  Form.

THE WITNESS:  Without knowing what manual you're talking about, without knowing anything about it, you just say page 37, I don't know what you're -- what you're relating that to.  If it's something specific in a policy, I can tell you about the policy.

BY MR. HAMMOUD:

Q.    Okay.  So you said that there were policies and procedures used to handle the plaintiff's disputes in this matter.  Is that correct?

A.    Yes.  The agents are trained to follow Experian's policies and procedures.

Q.    Okay.  And is it Experian's position that those policies and procedures are relevant to the claims or defenses at issue?

MR. MCCRAW:  Objection.  Form.

THE WITNESS:  It is what the agents are trained to use, so it would be part of the process.

BY MR. HAMMOUD:

Q.    Okay.  Do you know if those policies and procedures were produced in this matter?

A.    I don't believe so.

Q.    Do you know why they were not produced?

A.    I do not know why.

Q.    Okay.  Can you tell me -- can you name the policies and procedures that you believe are relevant to the claims and/or defenses at issue here?

A.    It would be the manual, dispute manual, dispute trades, and possibly the additional information manual. And if there was any ACDV responses, and if an agent handled those.

Q.    How long is the dispute manual -- how many pages is it?

A.    Maybe 90 pages.  I'm not quite sure.

Q.    Okay.  How about the dispute trades?

A.    Right about the same, I think.  I'm not quite sure the number of pages.

Q.    Additional information manual?

A.    Maybe 50.  I'm not sure the exact number.

Q.    Okay.  So we're talking over 220 pages in total between these three procedures -- policies and procedures?

A.    Possibly.  Each page would not be the procedure that pertains to this case, but those are the -- roughly the amount of pages that would be in the manuals.

Q.    Okay.  So if I said, you know, what does page 37 of the dispute manual talk about, would you be able to tell me sitting here today?

MR. MCCRAW:  Objection.  Form.

THE WITNESS:  Of the dispute manual, page 37, I would need to know what topic you were talking about.

BY MR. HAMMOUD:

Q.   So if I just -- well, I don't have the policies and procedures in front of me.  But if I said, "Can you tell me what's located on page 37 of the dispute manual?" Do you have that part of the manual committed to memory and you could talk about it?

MR. MCCRAW:  Objection.  Form.

THE WITNESS:  No, I do not have the page numbers memorized.  What I do have memorized is the policies and procedures.  So if there's a particular question that you had about the policy and procedure, I'd be able to tell you about those.

BY MR. HAMMOUD:

Q.   If an -- if an Experian employee intentionally disregarded Experian's policies and procedures for reinvestigating disputes, would that qualify as a reasonable reinvestigation?

MR. MCCRAW:  Objection.  Form.

THE WITNESS:  The Experian agents are trained to process according to Experian's policies and procedures.  I don't believe there would be any kind of intentional mistake that they would make.  Experian spends

a lot of time training agents, monitoring agents, to make sure that they are complying with Experian's policies and procedures.

BY MR. HAMMOUD:

Q.   Okay.  I appreciate that, Teresa, but that wasn't my question.

My question is, if an Experian employee intentionally disregarded Experian's policies and procedures for reinvestigating disputes, would that qualify as a reasonable reinvestigation?

MR. MCCRAW:  Objection.  Form.

THE WITNESS:  Again, there's not any knowledge of an agent purposely making a mistake.  So agents are trained to follow policies and procedures.

BY MR. HAMMOUD:

Q.   Yeah.

A.   So if there's an instance --

Q.   I'm not -- and I don't -- I don't mean to be rude by cutting you off.  But I'm not saying that that's -- that there is somebody who did that.

I'm asking you a hypothetical.  If a dispute agent intentionally disregarded Experian's policies and procedures for responding to disputes, the procedures for reinvestigating disputes, would that qualify as a reasonable reinvestigation?

MR. MCCRAW:  Same objections.

THE WITNESS:  Since Experian has policies and procedures in place, if there was a mistake, intentional or otherwise, Experian would still have the policies and procedures that that agent was trained to use, Experian has monitoring to make sure that they are complying.  So Experian's policies and procedures would be reasonable.

BY MR. HAMMOUD:

Q.   Yeah, I'm not talking about Experian's policies and procedures.  I'm -- you know, we've -- you've testified that Experian has put together policies and procedures for dispute agents to follow so that these reasonable reinvestigations are completed.  Is that fair?

A.   Yes.

Q.   Okay.  So I'm saying if the dispute agent, hypothetically, decided to disregard these policies and procedures when handling a dispute by a consumer, would that qualify as a reasonable reinvestigation?

MR. MCCRAW:  Same objections.

THE WITNESS:  Yes.  I would say yes to that because Experian does have training, does have monitoring systems in place to make sure the agents are following policies and procedures.  If there's an instance where Experian's agents make a mistake, the policies and

APPENDIX 0401

procedures are already in place.  They've already been taught, they've been trained and monitored.  So whether or not they make a mistake, it's still a reasonable reinvestigation in the fact that we do have policies and procedures in place.

BY MR. HAMMOUD:

Q.    So if the procedure says in this type of dispute with this type of information, the dispute agent should do X, and the agent said, "Disregarding, I'm going to do Y," you're saying even in that instance, what they did would still constitute a reasonable reinvestigation even if they went against the policies and procedures and did something other than what was stated that they should do?

MR. MCCRAW:  Objection.  Form.

THE WITNESS:  Yes.  And, again, it's -- it's -- Experian builds these policies and procedures to comply with the FCRA.  Experian spends a lot of time training employees.  Experian also monitors employees to make sure that they're complying with Experian's policies and procedures.  And if they're not, there are -- a process where agents are terminated.

So these policies and procedures are built, and those are reasonable policies and procedures.  Whether or not an employee makes a mistake or human error, it's still reasonable reinvestigations, reasonable policies and

procedures that were created.

BY MR. HAMMOUD:

Q. So even if they made a mistake and respond or handled the reinvestigation -- Strike that.

Okay. Do you understand that Mr. Ramirez Najera has alleged that Experian failed to reasonably reinvestigate his dispute?

A. Yes.

Q. Okay. And is it your -- Strike that.

Did Experian reasonably reinvestigate the plaintiff's disputes?

MR. MCCRAW: Object.

THE WITNESS: The Experian agents, as far as the process itself, there was an instance where the agent made a mistake. These agents are trained to follow policies and procedures, but there was an instance where the agent did not follow policy and procedure.

BY MR. HAMMOUD:

Q. And are you talking about -- which instance?

A. It would be the mail correspondence that was received. I would have to look at the logs to show you the particular communication.

Q. Okay. So just so I understand, Experian's position is that the dispute that occurred in February 2024, it was handled correctly, and Experian believes it

was a reasonable reinvestigation?

MR. MCCRAW:  Objection.  Form.

THE WITNESS:  Yes.  Experian does have policies and procedures and have monitoring in place in order to make sure that the agents are processing these correctly.  There are times when there's a human error that may occur, but the agents have been trained to follow policies and procedures for each reinvestigation.

BY MR. HAMMOUD:

Q.  Okay.  That wasn't my question.

My question was, I had asked you generally if -- if Experian reasonably reinvestigated plaintiff's disputes.  You indicated that there was an instance where that never happened.  Is that correct?

MR. MCCRAW:  Objection.

THE WITNESS:  No, that's not the words that I used.

BY MR. HAMMOUD:

Q.  Okay.  So let's -- let's -- let's -- I guess I want to -- let's separate the line of questioning with the February 2024 dispute and then the July 2024 mail dispute.  Okay?

A.  Okay.  And in order to answer these questions, I would need to look at Experian's logs or the mail correspondence as well.

Q.   Okay.  Did you review those documents before this deposition?

A.   I did, but I did not memorize specifically each date.  So in order for me to answer your question, I would need to have the logs in front of me.

Q.   Okay.  We'll -- we'll -- you know, when we get to questions about the log, I'll pull it up, and then we can -- we can discuss it.

But for purposes of this line of questioning I want to ask, with respect to the February 2024 dispute, did Experian reasonably investigate that dispute?

MR. MCCRAW:  Objection.  Form.

THE WITNESS:  In order for -- for me to answer that question, I would need to have the logs in front of me.  This is not a hypothetical question.  You're asking about a specific date, and I would need the logs in order to answer that question.

BY MR. HAMMOUD:

Q.   Okay.  Is it your understanding that there was a dispute made by the plaintiff to Experian in February of 2024?

A.   I don't remember the exact date.  In order for me to answer the question, I would need to review the logs.

Q.   So I'll represent to you that there was a dispute made in February 2024 by the plaintiff.  Okay?  So with

APPENDIX 0405

that representation, do you -- do you -- with that representation, do you believe -- is it Experian's position that they reasonably reinvestigated that dispute?

MR. MCCRAW:  Objection.  Form.

THE WITNESS:  In order for me to answer the question, I would need to look at the logs.

BY MR. HAMMOUD:

Q.    Now, you indicated something about the July 2024 mail dispute, correct?

A.    I did not specifically state the date.

Q.    Okay.  So there was -- there was a dispute that was made and sent by the plaintiff by mail to Experian. Is that your understanding?

A.    Yes.

Q.    Okay.  And with respect to that dispute, did Experian reasonably reinvestigate that dispute?

A.    Again, in order to answer these questions -- these are not hypotheticals.  These are very specific dates and what Experian did -- the answers to those questions are within Experian's logs.

Q.    Okay.

A.    We believe that the policies and procedures that were created are reasonable.  If there was a mistake, the -- the policies and procedures are still in place.  So in order for me to answer the question about a particular

Victor Manuel Ramirez Najera vs. Experian Information Solutions, Inc. -
30(b)(6) of Experian Informtion Solutions, Inc., by Teresa Iwanski

October 8, 2025
76

date, I would need to see the logs.

Q.   Okay.  So I'm -- and we're going to get -- we're going to get to those exhibits.

But I'm asking because you were -- you mentioned something about there was an instance where maybe a mistake was made here.  So are you saying that there was a mistake in handling the dispute sent by the plaintiff in the mail?

A.   Within the mail correspondence, yes.  And in order for me to answer more questions about this, I would need the logs in order to answer the question.

Q.   Okay.  And what is that mistake?  Is it that the dispute agent who handled that mail correspondence, they didn't follow the policies and procedures?

MR. MCCRAW:  Objection.  Form.

THE WITNESS:  That is correct.  And in order for me to answer further, I would need to look at the logs.

BY MR. HAMMOUD:

Q.   Okay.  But even -- even in this instance where they failed to follow the policies and procedures and made a mistake, its Experian's position that the investigation was still reasonable?

MR. MCCRAW:  Objection.  Form.

THE WITNESS:  Yes.  Experian does have

policies and procedures in place for reasonable reinvestigations.  And the fact that there was a mistake by the employee doesn't mean that Experian does not have reasonable procedures in place.  These agents are trained to follow policies and procedures, and Experian does have monitoring to make sure that they are complying with policies and procedures.  Beyond that, I would need to look at the logs to answer further questions about that contact.

BY MR. HAMMOUD:

Q.   You know what -- what mistake was made by this dispute agent?

A.   I would need to look at the logs to remember specifically what the agent did.

Q.   So we -- we indicated that the mistake was that maybe they didn't follow a policy -- Experian's policies and procedures, correct?

MR. MCCRAW.  Objection --

THE WITNESS:  Correct.  So I would need the mail correspondence, as well as the DR log, in order to give you further information about that -- what the agent did.

BY MR. HAMMOUD:

Q.   Okay.  Would it also be helpful if we had those policies and procedures to look at and we can go to the

APPENDIX 0408

specific page that -- that talks about the steps that should have happened?

MR. MCCRAW: Objection. Form.

THE WITNESS: No. I can tell you the policies and procedures.

BY MR. HAMMOUD:

Q. Okay. So it's your position that the policies and procedures would not be helpful for us to take a look at and discuss?

MR. MCCRAW: Objection. Form.

THE WITNESS: No. I have knowledge of the policies and procedures.

BY MR. HAMMOUD:

Q. Okay. And for the policies and procedures that should have been applicable here, you have those policies and procedures committed to memory, and you could recite them verbatim?

A. I can recite the steps that Experian takes verbatim, yes.

Q. Can you recite the -- the wording verbatim for each step that needs to happen?

A. I did not memorize hundreds of pages and specifically what is stated. What I do have knowledge of is of policies and procedures that the agents are trained with and how they should process mail correspondence, as

APPENDIX 0409

we're talking about right now.

Q.   Okay.  Would you say that it's impossible to have a 100 percent perfect memory?

MR. MCCRAW:  Objection.  Form.

THE WITNESS:  I'm not quite sure what you mean by that.  I'm not -- I'm not understanding your question.

BY MR. HAMMOUD:

Q.   So -- so even though you say that you know what the steps are, is it possible that maybe you could forget a step or not mention certain things and that looking at the policies and procedures and reading directly from -- from that document would be better than just going off of your memory?

MR. MCCRAW:  Objection.  Form.

THE WITNESS:  No.  I have knowledge of these policies.  Working for Experian for a number of years, I know what -- which policy that the agent should have taken.  I know -- by reading the piece of mail, I'll be able to tell you specifically what actions that the agent did take.  And I would need the mail correspondence and the DR log in order to answer your question.

BY MR. HAMMOUD:

Q.   Okay.  So you think that talking about the policies and procedures, it would be less helpful if we

had them in front of us rather than just go off of your memory about what's contained within them.  Is that your -- is that your testimony?

MR. MCCRAW:  Objection.  Form.

THE WITNESS:  No, sir.  The policies and procedures that we're talking about today, I have knowledge of.  Having the document in front of me is something that I just wouldn't need.  I already know them.  And what I would need then is the DR log and the mail correspondence to answer your questions.

BY MR. HAMMOUD:

Q.  Okay.  Does Experian maintain procedures intended to assure maximum possible accuracy of the consumer information that Experian reports even before a consumer disputes -- submits a credit reporting dispute?

A.  I -- I did not follow that question.  I think there was multiple questions in there.  Can you rephrase that?

Q.  So section 1681e(b), you recall that provision of the FCRA that we discussed?

A.  Yes.

Q.  Okay.  And it's your understanding that that specific provision applies to Experian, correct?

A.  Correct.

Q.  Okay.  And it states that it requires a consumer

APPENDIX 0411

reporting agency like Experian to maintain reasonable procedures to assure maximum possible accuracy of the consumer information about which it reports.  Is that correct?

MR. MCCRAW:  Objection.  Form.

THE WITNESS:  Yes, that's my understanding.

BY MR. HAMMOUD:

Q.    Okay.  And this means that these procedures apply and they're intended to assure maximum possible accuracy even before a dispute is submitted by a consumer.  Is that correct?

MR. MCCRAW:  Objection.  Form.

THE WITNESS:  Yes, there is a process in place that looks at information before it's loaded into the database.

BY MR. HAMMOUD:

Q.    Okay.  What is that process?

A.    Sorry, just one second.  My computer wants to restart.  Just one second.

Okay.  The process is reviewing the information, the data that that data furnisher is supplying to Experian, looking at the data to see what's making -- making sure that it's complying with Metro 2. If there's instances where the trade is either illogical or it's not complying with Metro 2, Experian will then

communicate that information to the data furnisher, either that we're not loading it to the database or for them to correct that information.

So Experian does have multiple processes in place to look at data before it's even loaded into the database.

Q.   Is there anything else, other than what you stated, that Experian does, any other procedures or processes that it does to assure maximum possible accuracy?

A.   Experian has agreements with data furnishers to participate in the dispute process.  And then during the dispute process, they would then be certifying in the response to the ACDV that that information is accurately reporting.

Q.   Okay.  So you indicated that Experian reviews the data that's supplied to it.  Is that correct?

A.   I'm sorry.  I didn't quite hear that.

Q.   You said that Experian reviews the information or the data that is supplied to it by the data furnishers. Is that correct?

A.   Yes, it is.

Q.   What does that mean?  What does the review entail?

A.   The review itself is -- is making sure that it

APPENDIX 0413

is -- the data, the account tradeline itself is meeting Metro 2 standard that is set up. And the instances where the data furnisher submits information that is illogical or does not meet Metro 2, instead of loading that information to the database, Experian will send a notification to -- to the data furnishers for them to either correct the information or Experian will notify that we're not loading it to the database.

Q. Okay. And Metro 2, this is the standardized electronic data format that's used by furnishers when transmitting information to the credit reporting agencies such as Experian. Is that correct?

A. I'm sorry. Could you repeat that one more time?

Q. Yeah. Metro 2 is the standardized electronic data format that's used by furnishers when transmitting credit information to consumer reporting agencies such as Experian. Is that correct?

A. Yes, it is.

Q. Okay. So it governs how the data is structured and coded, how to label the account types, the payment history grid, the ECOA code, and things like that, correct?

A. Yes.

Q. Okay. So Metro 2 deals with whether the formatting is correct, not whether the information, the

data itself is correct.  Is that fair?

A.   As far as the data furnishers supply the information, they are part of the agreement to supply accurate information.  The structure itself to -- to comply with Metro 2 is ensuring that -- that it meets standards for display.  So if there's a collection account that doesn't have an original delinquency date, Experian will not load that kind of information to its database.

Q.   Okay.  So but -- but, again, I want to -- you know, I understand that you have -- you know, Experian has agreements with data furnishers and they certify they'll supply accurate information.

But with respect to the Metro 2 format, that only applies to the format and way in which the credit information is transmitted, but it doesn't govern and it doesn't determine whether the data itself is accurate.  Is that correct?

A.   That's correct.  So Experian --

Q.   Okay.

A.   -- would not have any independent knowledge outside of if we were standing right next to the person that's applying for the credit or have access to that data furnisher's transactions or histories or bank statements.

Q.   Okay.  So when you say that Experian reviews the information that the data furnisher supplies to make sure

that they're complying with Metro 2, you mean that Experian is just ensuring that the format, the way in which this data is being transmitted, complies with the formatting set out by Metro 2.  Is that correct?

MR. MCCRAW:  Objection.  Form.

THE WITNESS:  The format itself, yes, as well as the -- the information is -- is meeting the Metro 2 standard.

Like, for example, if there's a situation where -- where the data furnisher is not applying the original delinquency date with a collection account, then Experian would not load that kind of information to the database.

BY MR. HAMMOUD:

Q.    Okay.  But again, that goes back to the formatting and transmitting the data, but not whether the data itself is accurate, correct?

MR. MCCRAW:  Objection.  Form.

THE WITNESS:  There are pieces of it that -- that we would look at to see accurate.  The example I was giving was -- was a collection account.  We need that original delinquency date or else we're not going to load it to the database, in order for it to purge correctly and not be on the file for past seven years.  So that's an accuracy situation.  There might be others.  I'm not

thinking of one in particular right now, but -- but it is the structure as well as pieces of information that Experian is ensuring that it is accurate.

BY MR. HAMMOUD:

Q.   Okay.  So every -- so let me ask this.

Every data point that's sent to Experian, does Experian -- does Experian review every single data point to ensure that the information is accurate?

A.   At the point that it's given for each and every piece of information, Experian would believe the information to be accurate as reported by the data furnisher.

Q.   Okay.

THE WITNESS:  And if we have one more question, I just need to run to the restroom real quick.

MR. HAMMOUD:  Sure.  Let's take -- let's take a break.  That's fine.

THE COURT REPORTER:  We're off the record --

MR. HAMMOUD:  Ten minutes -- sorry.  Let's take a 10-minute break.

THE WITNESS:  Thank you.

THE COURT REPORTER:  We're off the record. Time is 11:13.

(A recess ensued.)

THE COURT REPORTER:  We're back on the

record.  Time is 11:26 a.m.

BY MR. HAMMOUD:

Q.    Okay.  Teresa, did you speak to anybody during any of the breaks that we've taken?

A.    No.

Q.    Okay.  So when we left off, we were talking about Experian's procedures for assuring maximum possible accuracy and compliance with 1681e(b).  Is that correct?

A.    Yes.

Q.    Okay.  And you had indicated that, you know, Experian believes that the information they get from the furnishers is accurate.  Is that correct?

A.    Not verbatim as far as my answer.

But Experian believes the information to be accurate.  They are certifying the information to be accurate to Experian.

Q.    Why does Experian believe that, that the information is accurate?

A.    The data furnishers have the accounts -- have the account information.  They have if there was on-time payments, original information about the loan.  Experian does not have access to that.  And so when data furnishers supply information to Experian, we have an agreement that they would report accurate information to Experian.  Part of that agreement is also then complying with the FCRA.

APPENDIX 0418

And the information that they're supplying in the ACDV, they're also certifying to Experian that the information is accurate.

Q.    Okay.  Have you seen these agreements between data furnishers and Experian?

A.    Yes, I have.

Q.    Are they all the same or are they all, you know, different?

A.    I believe they're all the same.

Q.    Okay.  Have you reviewed -- does Experian have a an agreement with Rushmore?

A.    I believe so.  I don't know if it's Rushmore or another name that would be on the agreement, but --

Q.    Okay.

A.    -- in order for them to report information, they do -- we do have an agreement with them.

Q.    And in order for somebody to want to report information to Experian, do they just submit a request and then Experian sends an agreement and that's the end of it?

A.    As far as being a data furnisher, there's a lot of processes in place in order for them to report information to Experian.  We do go through a vetting process where we are looking at the location to make sure that they have the security levels that they're stating that they have.  We're also looking at the data they'll be

supplying to Experian and also looking at their data when they're first supplying that information to Experian to make sure it is compliant with the Metro 2 and with what they are saying that they're going to be reporting to Experian.  There's a lot of processes involved in that, but that's generally how -- how the process works.  They do go through an extensive vetting process in order to report information to Experian.

Q.    Are you familiar with this vetting process?

A.    I am familiar with it on a high level.  I am not involved in the vetting process, but we do on-site visits and we do check the -- oh, sorry.  My dog got in here. I'm going to -- just one second -- I'm going to put the dog out.  I'm sorry.

Q.    Okay.  Sure.

A.    And could you repeat the question again?

Q.    Yeah.  I was asking if you're familiar with the vetting process.  And I think you were talking about being familiar with it on a high level, but not with the day-to-day processes?

A.    Yes, on a high level, I'm familiar with the processes that's in place to report information.  They go through a vetting process.  Yearly visits are also done to ensure that they are continuing to have the security measures in place in order to report information to

Experian.  But again, that's on a high level.  I'm not part of that group, and I don't have specifics on what they do on a day-to-day basis.

Q.    Okay.  So there's like a group or a department within Experian that deals with credentialing and vetting?

A.    Yes.

Q.    Do you know what it's called?  Is it called the credentialing department?

A.    I believe it is called the credentialing department.

Q.    Do you know who the head of that department is?

A.    I do not know.

Q.    Do you recognize the name Peter Henke?

A.    I do recognize the name.  I'm not sure if he's currently over that division or not, but I am familiar with that name.

Q.    Do you know if he's ever been affiliated with that division?

A.    I don't know.

Q.    Okay.  Do you know anybody who's -- who's -- who works within that credentialing department?

A.    No, not currently.

Q.    Okay.  So the credentialing department, they're responsible for those procedures and processes that you were talking about?

Coash Court Reporting & Video, LLC
staff@coashcrv.com
602-258-1440
www.CoashCourtReportingandVideo.com

APPENDIX 0421

Victor Manuel Ramirez Najera vs. Experian Information Solutions, Inc. -
30(b)(6) of Experian Informtion Solutions, Inc., by Teresa Iwanski

October 8, 2025
91

A.    Yes.

Q.    Have you ever seen the credentialing department's procedures for vetting and credentialing new data furnishers?

A.    No, I have not.

Q.    Do you know what those procedures are called?

A.    No.  I -- I don't remember at this time.

Q.    Okay.  But there are procedures that exist?

A.    To my understanding, there are procedures.  But what they're called, I'm not remembering off the top of my head right now.

Q.    But you know they exist because you've seen them before or because somebody has told you that they exist?

MR. MCCRAW:  Objection.  Form.

THE WITNESS:  I don't remember if specifically I've seen them.  It would've been prior to my employment back in early 2013, but I don't know specifically.  I don't have information as far as a person that has told me.  My previous knowledge was with my employment previously.

BY MR. HAMMOUD:

Q.    Okay.  So the knowledge about the -- you know, your testimony about the extensive credentialing and vetting process and all of that, that's based off of information you obtained back in 2013 and prior to that?

APPENDIX 0422

MR. MCCRAW:  Objection.  Form.

THE WITNESS:  It was prior to 2013.  And then recently, if there was any changes or things of that nature, I would have been notified.  I'm just not remembering specifically who was in that department right now.

BY MR. HAMMOUD:

Q.    Has anybody notified you at some point in time when you came back to Experian whether there have been changes in the credentialing procedures?

A.    I don't think there was any changes.  But I -- but I do remember reviewing something, I just can't remember exactly what it was, when I came back from being away for a few years.

Q.    Do you know when the current iterations of Experian's credentialing procedures were implemented?

A.    I do not.

Q.    Do you know if they were implemented, let's say, within the last five years or less, or more than five years?

A.    The vetting itself has been since the company started having a relationship with data furnishers.  When that started, how that started, I don't have that information.

Q.    Okay.  So the process in which data furnishers

are vetted and credentialed that you spoke about, that's been in place since way back when you first started with Experian, around that time period prior to 2013?

MR. MCCRAW:  Objection.  Form.

THE WITNESS:  It would have been some sort of form if it's changed over the process.  If it's changed over the years, I don't know specifically.  But the -- the information and how -- how Experian agrees to have a company report information to Experian, that has been the same.  There is a vetting process in place.

BY MR. HAMMOUD:

Q.   You said you're not sure if it's changed over time, but you indicated that if it had somebody would have notified you.  Is that correct?

A.   As a 30(b)(6), I would have been notified.  I just don't -- I don't believe that there's anything that has currently changed.

Q.   And you believe that because you can't recall that anybody has come to you and said, "Hey, Teresa, the credentialing or the vetting process or procedures have changed recently"?

A.   I have not received anything like that, no.

Q.   Okay.  Is there any part of the -- strike that.

Do you have any personal knowledge about the manner in which Experian's credentialing procedures

Victor Manuel Ramirez Najera vs. Experian Information Solutions, Inc. -
30(b)(6) of Experian Informtion Solutions, Inc., by Teresa Iwanski

October 8, 2025
94

operate other than the high level that you've shared with me?

A.    No, I do not.

Q.    Do you have any personal knowledge about what specific steps are taken in order to credential a new data furnisher?

A.    Again, on a higher level.  We do make sure that the facility is secure, that -- we do make sure that they have the security type of measures in place in order to report data to Experian.  Outside of that, I don't have specific information about it.

Q.    Okay.  So you don't have personal knowledge on the specific steps that are taken.  Is that correct?

A.    I have an overall understanding of it, but not specific steps.

Q.    Okay.  Do you have any personal knowledge about what documentation Experian collects and maintains concerning the credentialing process?

A.    No, I do not.

Q.    Do you know if Experian requires that new data furnishers produce their data accuracy policies and procedures documents to be reviewed by Experian?

A.    I don't know.

Q.    Okay.  Do you have any personal knowledge about what documents Experian collects and maintains concerning

the recredentialing process?

A.   I do not know.

Q.   Do you have any personal knowledge about what documentation Experian collects and maintains concerning the credentialing process?

A.   Specific steps, no.  I do not have knowledge of that.

Q.   Do you have personal knowledge about whether Rushmore went through the credentialing process when it was first onboarded as a data furnisher?

A.   In order for them to be reporting information to Experian, I believe that they would have.

Q.   So -- so you wouldn't have any personal knowledge about whether they went through the credential process, but you believe they did because it's your understanding that in order to be a data furnisher and furnish, you have to go through that process.  Is that fair?

MR. MCCRAW.  Objection.  Form.

THE WITNESS:  That's my understanding.

BY MR. HAMMOUD:

Q.   Okay.  But who visited Rushmore's location, what was reviewed, what documents were exchanged, you don't have any information about those specifics.  Is that correct?

A.   That's correct.

Q.    Okay.  Do you have any personal knowledge about how many times Rushmore has been recredentialed?

A.    I do not know.

Q.    You said that Experian would visit the location of the data furnishers.  Is that correct?

A.    Yes.

Q.    Do you know who's responsible for visiting the -- the data furnishers' locations?

A.    I do not know.

Q.    Do you know what -- what type of things they look at when they go onsite and they're reviewing their security associated with their -- with their systems?

MR. MCCRAW:  I'm going to lodge a general objection to this line of questioning.  It's outside the scope.

THE WITNESS:  When they get there, what they're looking at, what they're looking for, I don't have that particular knowledge.

BY MR. HAMMOUD:

Q.    Okay.  Have you ever seen the Salesforce account file that Experian maintains for Rushmore?

MR. MCCRAW:  Same objection.

THE WITNESS:  No.

BY MR. HAMMOUD:

Q.    Okay.  So is it fair to say that you have no

personal knowledge about what takes place during the credentialing or recredentialing processes?

MR. MCCRAW:  Same objection.

THE WITNESS:  Just my knowledge of the process is in place.  Outside of that, I do not have specific knowledge about the steps.

BY MR. HAMMOUD:

Q.  Okay.  And then this knowledge that you said -- this knowledge that you're referring to that you know it's in place, is this knowledge that you obtained from prior to 2013?  Is that correct?

A.  That's when I originally learned of it.  It's still part of -- of knowledge that I have today.  But yes, that's when I originally learned of it was back prior to 2013.  I just don't know when.

Q.  Do you know how you obtained it?  Did somebody tell you about the process?

A.  I don't remember.

Q.  Okay.  But this vetting and credentialing process --  Strike that.

Okay.  So would you say this vetting and credentialing process that Experian employs goes to -- is part of the reasonable procedures maintained to assure maximum possible accuracy as required by 1681e(b)?

MR. MCCRAW:  Same objection.

APPENDIX 0428

THE WITNESS:  That would be something Experian's attorneys would know.  I don't know.

BY MR. HAMMOUD:

Q.  Okay.  So standing here today, you're not able -- so strike that.

We had talked about what procedures Experian has in place to assure maximum possible accuracy as required by 1681e(b), correct?

A.  Correct.

Q.  Okay.  And then you talked about, you know, reviewing the data sent by the data furnisher, ensuring Metro 2 compliance, those types of things, correct?

A.  Correct.

Q.  Okay.  And you also mentioned that, you know, you can -- you believe the information to be accurate because there's agreements with data furnishers that are entered into before they can begin to supply information or furnish information to the CRAs, correct?

A.  Yes.  I don't know if that's verbatim, but that is a good summary of what were just talking about.

Q.  Okay.  And then these agreements that are entered into, as part of entering into the agreements, there are these vetting and credentialing processes that also must occur.  Is that correct?

A.  Yes, that's my understanding.

Q.   Okay.  So is it fair to say that this vetting and credentialing process is part of these procedures that Experian maintains to assure maximum possible accuracy under 1681e(b) or to comply with 1681e(b)?

MR. MCCRAW:  Objection.  Form.  And outside the scope.

THE WITNESS:  I'm just not sure of the -- the relationship part of it.  There's requirements on the data furnisher when they're reporting information to Experian.  That relationship itself, I'm just not familiar with it to -- to tell you that that's part of what is used.

BY MR. HAMMOUD:

Q.   Okay.  So there -- we can't -- you know, maybe we can't get a direct answer.  But, you know, the line of questioning prior where the agreements with the data furnishers -- where they say, "We're going to" -- you know, "We certify that the information we send over will be accurate," that's part of these procedures employed by Experian to assure maximum possible accuracy.  Is that correct?

MR. MCCRAW:  Objection.  Form.

THE WITNESS:  Yes.  Part of that agreement is then reporting accurate information and participating in the dispute process, correct.

BY MR. HAMMOUD:

Q.   Okay.  And then again, just to, you know, clarify, to enter into those agreements with data furnishers, the vetting and credentialing process must occur.  Is that correct?

A.   Yes, that's my understanding.

Q.   Okay.  I understand you've testified in prior cases that Experian performs some sort of data audit when Experian first begins to accept data from a new data furnisher.  Is that correct?

MR. MCCRAW:  Objection.  Outside the scope.

THE WITNESS:  Experian does look at the data prior to its original loading/onboarding of the data furnisher.

BY MR. HAMMOUD:

Q.   Okay.  Are there written procedures that detail how Experian -- how this happens?

MR. MCCRAW:  Same objection.

THE WITNESS:  I don't know.

BY MR. HAMMOUD:

Q.   Now, when you say that Experian reviews the information -- I mean, would you say, like, they're auditing the information that comes in from the furnishers prior to them accepting the information?

MR. MCCRAW:  Objection.

APPENDIX 0431

BY MR. HAMMOUD:

Q.   So I guess I'm just trying to --

A.   My under- --

Q.   I guess what I'm trying to understand is previously we talked about the information is transmitted by the data furnishers, and then Experian checks it to ensure it's complying with Metro 2, correct?

A.   Yes.

Q.   Okay.  You know, with respect to assuring compliance with Metro 2, is there any other type of, you know, audit that Experian does on the information when accepting from a new data furnisher?

A.   My understanding, there's an onboarding type of process where we're looking at the data to ensure that they are reporting the data that they said they were going to report.  The steps, procedures, I don't have knowledge of.  I do have knowledge of the onboarding process.

Q.   And when you say onboarding process, like, what does this entail?  What do you mean by that?

MR. MCCRAW:  Same objection.

THE WITNESS:  In general, just when the data furnisher first starts to report information to Experian, it is reviewed to make sure that that is the information they said they were going to report.  How that's done, processes in place, I do not know.

BY MR. HAMMOUD:

Q.    What do you mean by that, that we review to make sure that the data they said they're going to furnish, that is what they furnish.  Like, can you explain that further for me?

MR. MCCRAW:  Same objection.

THE WITNESS:  Yes.  So if they are a mortgage company and they are reporting only collection accounts, that information would be looked at, and we would stop that process and get in touch with the data furnisher.

So if they are reporting a kind of information, that information is looked at.  Beyond that, there may be steps involved that I just don't have knowledge of.

BY MR. HAMMOUD:

Q.    Okay.  Is there a specific department that -- that handles this data auditing or this onboarding process?

A.    It'd be a division of Experian, but I'm not sure which division that would be.

Q.    Do you know anybody who works in that division?

A.    No, I do not.

Q.    Do you know anybody who would have knowledge of somebody who works in that division or what that division

is called?

A.    My only understanding, the name itself is onboarding, the relationship and where they are associated with, I just don't know.

Q.    So could this be like a third party that Experian employs or is this internal with Experian?

A.    It is internal with Experian.

Q.    Okay.  Even the vetting and credentialing process, these are all Experian employees that are handling this.  Is that -- is that understand -- is my understanding correct?

A.    That's my understanding.

Q.    Okay.  So for the onboarding process, aside from, like, ensuring that they report the information they said they're going to report, what else does Experian do?

MR. MCCRAW:  Objection.

THE WITNESS:  Experian will also look at that formatting to make sure that they are complying with the Metro 2.  Outside of that, what other steps they have in place, I don't know.

BY MR. HAMMOUD:

Q.    Okay.  So just so we're clear, for the onboarding process, it would -- you know, one of the things -- one of the steps is to ensure that -- you know, if this data furnisher says they're a mortgage company and furnishing

mortgage accounts, that ultimately what information they're sending is related to mortgage accounts and not other things.  Is that correct?

MR. MCCRAW:  Objection --

THE WITNESS:  That's an example.

MR. MCCRAW:  -- outside the scope.

BY MR. HAMMOUD:

Q.   Okay.  And then the -- the other step is just ensuring that the data that is being transmitted is in compliance with the Metro 2 formatting standard.  Is that correct?

MR. MCCRAW:  Same objection.

THE WITNESS:  That's my understanding.

BY MR. HAMMOUD:

Q.   Okay.  Do you have any other information related to the onboarding process?

MR. MCCRAW:  Same objection.

THE WITNESS:  No, I do not.

BY MR. HAMMOUD:

Q.   Do you have any personal knowledge about what systems are used to perform the onboarding?

MR. MCCRAW:  Same objections.

THE WITNESS:  I do not.

BY MR. HAMMOUD:

Q.   So is it fair to say that you have no personal

APPENDIX 0435

Victor Manuel Ramirez Najera vs. Experian Information Solutions, Inc. -
30(b)(6) of Experian Informtion Solutions, Inc., by Teresa Iwanski

October 8, 2025
105

knowledge about what takes place during this onboarding process?

MR. MCCRAW:  Same objection.

THE WITNESS:  On a detailed level, I do not.

BY MR. HAMMOUD:

Q.  And when we -- and so you mean on a high level. And on a high level, it's just those two things that we talked about, ensuring the data they said they're going to -- the accounts they said they're going to be reporting on, those are the type of accounts, and then they're complying with Metro 2 format standard?

MR. MCCRAW:  Same objections.

THE WITNESS:  That's my understanding.

BY MR. HAMMOUD:

Q.  Okay.  Are you familiar with metric reports?

A.  Yes, I am.

Q.  What are metric reports?

A.  Metric reports are the -- it is a compile of information.  When the data furnishers report on a monthly basis to Experian, we are making sure that they are reporting under the Metro 2 guidelines, that the information's logical.  Experian will then send the information to the data furnisher if something is not logical or needs to be corrected or it won't -- will not be loaded to the database.  And that is part of the metric

reports that we send to data furnishers.

Q.   Okay.  So it's like a comprehensive summary of some sort that tells the data furnisher whether they're complying with the Metro 2 formatting standard when transmitting data to Experian.  Is that correct?

MR. MCCRAW:  Objection.  Form.  Outside the scope.

THE WITNESS:  Correct.  And as well as if there's anything illogical or accounts that they need to fix, Experian will convey that information on an account level basis.

BY MR. HAMMOUD:

Q.   Okay.  And when you say "illogical," what do you mean by that?

A.   Illogical could be just a collection company without an original delinquency date or just an update itself is not logical.

Q.   Okay.  That doesn't -- so for -- so just so I understand, the Metro 2 formatting requires that if a collection account is going to be reported, there has to be a date of first delinquency.  Is that correct?

A.   Yes.

Q.   Okay.  So if a collection account is being reported and there's no date of first delinquency, that would be classified as illogical and it can't report

APPENDIX 0437

because it doesn't have the necessary elements required by Metro 2.  Is that correct?

A.    Correct.

Q.    Okay.  Are these metric reports part of the onboarding process or the data audit process that Experian has?

MR. MCCRAW:  Objection.  Outside the scope.

THE WITNESS:  I don't know what that relationship would be with the onboarding.

BY MR. HAMMOUD:

Q.    Okay.  But these metric reports, they exist for all data furnishers that supply information to Experian?

MR. MCCRAW:  Same objection.

THE WITNESS:  I'm not sure every single data furnisher, but they are part of the data furnishers on some level.

BY MR. HAMMOUD:

Q.    Do you know if Rushmore has a -- if Experian carries a metric report or generates metric report for Rushmore?

MR. MCCRAW:  Same objection.

THE WITNESS:  I have not seen one, so I don't know specifically.

BY MR. HAMMOUD:

Q.    Okay.  And then again, this is kinda tying into

APPENDIX 0438

what we discussed from before, the metric report is about the Metro 2 formatting, but it doesn't provide, like, a measure of whether the data furnisher's data is actually correct, right?

MR. MCCRAW:  Same objection.

THE WITNESS:  Experian is not going to independently know each and every item, if it's -- if they're correct, meaning that they didn't make a mistake of some sort.  What Experian is -- is looking at is the format at that instance.  Experian has in place a dispute process for consumers to dispute information, and that is where the data furnishers would then certify to Experian if the information is accurate.

BY MR. HAMMOUD:

Q.   Okay.  For the agreements between Experian and the data furnisher, you indicated that these agreements -- they require the data furnisher to report accurate information.  Is that correct?

MR. MCCRAW:  Objection.  Outside the scope.

THE WITNESS:  Yes.

BY MR. HAMMOUD:

Q.   Okay.  Do you -- when is the last time you saw one of these agreements?

MR. MCCRAW:  Same objection.

THE WITNESS:  I'm not quite sure.  Maybe

months ago.  I'm not sure.

BY MR. HAMMOUD:

Q.   Do you know what contractual provisions are included in these agreements that you could share?

MR. MCCRAW:  Same objection.

THE WITNESS:  I do not know.

BY MR. HAMMOUD:

Q.   Okay.  So sitting here today, you can't tell me what, if anything, is included in these agreements?

MR. MCCRAW:  Same objection.

THE WITNESS:  I can tell you what I remember and have knowledge of, and that they participate in the dispute process and they are to report accurate information to Experian.

BY MR. HAMMOUD:

Q.   Okay.  So of all the information you have about what's included in these agreements, you can only state that you know that, one, they are agreeing to supply accurate information; and two, they have to participate in this ACDV process?

MR. MCCRAW:  Same objections.

THE WITNESS:  Correct.  And in the dispute process.

BY MR. HAMMOUD:

Q.   Okay.  But you don't know what exact language is

used on these two items.  Is that correct?

MR. MCCRAW:  Same objection.

THE WITNESS:  The verbiage from what I believe or remember, that those words are used.  And the language itself for the entire contract, I do not have knowledge of that.

BY MR. HAMMOUD:

Q.  Okay.  But the contract has other provisions and discusses other things other than these two things that we've touched upon, correct?  Which is participating in the dispute process and agreeing to furnish accurate information?

MR. MCCRAW:  Same objection.

THE WITNESS:  Yes.

BY MR. HAMMOUD:

Q.  Okay.  But you don't know what those other items are or what those other provisions are.  Is that correct?

THE WITNESS:  Yes.

MR. MCCRAW:  Same objection.

THE WITNESS:  Correct.  I'm not an attorney. I don't --

BY MR. HAMMOUD:

Q.  Okay.  And you've never looked at --

A.  I don't read contracts like that.

Q.  Okay.  Sorry for speaking over you.

Did you -- did you get that, Court Reporter, her response?

THE COURT REPORTER:  Can you repeat that, please?

MR. HAMMOUD:  I think he's talking to you, Teresa.

THE WITNESS:  Are you talking to me?

MR. HAMMOUD:  Yeah.  Yeah, if you could --

THE WITNESS:  Sure.  I have knowledge of the -- and I'm going to -- and I can't do that verbatim because I don't remember specifically what I said.  But I'm just going to answer the question.

I have knowledge of the pieces of information that -- that are part of my daily job to know about dispute process.  So the data furnishers within the agreement pledge to report accurate information to Experian as well as participate in the dispute process.

BY MR. HAMMOUD:

Q.  Okay.  And again, just for -- for clarification, you've never viewed the contract with Rushmore or Pennymac.  Is that correct?

MR. MCCRAW:  Same objection.

THE WITNESS:  No, I do not believe so.

BY MR. HAMMOUD:

Q.  So is it fair to say, without you looking at the

exact contract, you wouldn't be able to answer questions about it?

MR. MCCRAW: Same objection.

THE WITNESS: That's correct. Any questions about it, it would just be reading what it says.

BY MR. HAMMOUD:

Q. Okay. Do you have any personal knowledge about how Experian enforces the contractual provisions that relate to the requirement that data furnishers furnish accurate information to Experian?

MR. MCCRAW: Same objection.

THE WITNESS: I do not know.

BY MR. HAMMOUD:

Q. Okay. Have you ever heard of an instance where Experian terminated or suspended a data furnisher's access to furnished data based on a violation of these contractual provisions?

MR. MCCRAW: Same objection.

THE WITNESS: I have heard of data furnishers that we no longer accept data from. How and why, I don't specifically know or was told. But there are times when we no longer will allow companies to report information to Experian.

BY MR. HAMMOUD:

Q. How many instances do you know that this happened

Victor Manuel Ramirez Najera vs. Experian Information Solutions, Inc. -
30(b)(6) of Experian Informtion Solutions, Inc., by Teresa Iwanski

October 8, 2025
113

with?

MR. MCCRAW:  Same objection.

THE WITNESS:  I don't know.  Over the course -- I don't know, a hand -- a few.  I don't really remember.

BY MR. HAMMOUD:

Q.   So since you first began working with Experian to today, maybe you've heard about this happening a handful of times?

MR. MCCRAW:  Same objection.

THE WITNESS:  Maybe less than five.  I just don't remember specifics about them.  I don't really know. I don't -- I'm giving you an estimate based off of -- off of memory, and I would say less than five, but I'm not entirely sure.

BY MR. HAMMOUD:

Q.   Do you have any personal knowledge of any, like, breach of contract matter filed by Experian against the data furnisher for violation of one of the provisions in the agreements?

MR. MCCRAW:  Same objection.

THE WITNESS:  I do not know.

BY MR. HAMMOUD:

Q.   Okay.  What is the name of the department in which the dispute agents work?

A.    The department is -- the overall department is the National Consumer Assistance Center, and it's MC.

Q.    And you said "and it's MC"?

A.    Yeah, it's -- currently I think it's called MCE.

Q.    MCE?  But it's the National Consumer Assistance Center?

A.    The overall -- the National Consumer Assistance Center, the NCAC is the overall name.

Q.    Okay.  How many dispute agents does Experian employ?

A.    I don't know.

Q.    Can you give me your best estimate?

A.    I would be just guessing.  I really don't know.

Q.    Is it more than a thousand or less than a thousand?

A.    I don't know.

Q.    Is it more than a hundred or less than a hundred?

A.    I don't know.

Q.    Is it more than 10 or less than 10?

A.    More than 10, I would assume.  But again, that's just a guess.  But I believe it's definitely more than 10. But again, I'm just guessing at this point.

Q.    And these dispute agents, does Experian employ these dispute agents --  Strike that.

Are some of these dispute agents located in

Texas?

A.    Yes.

Q.    Okay.  Are some of these dispute agents located in Costa Rica?

A.    Yes.

Q.    How about in Chile?

A.    I'm not quite sure if there's dispute agents in Chile currently, but at one time there was.

Q.    How about in India?

A.    Yes.

Q.    Is there anywhere else, other than the locations I mentioned, that Experian employs dispute agents?

A.    No.  Those are the actual locations that the dispute agents would be working out of.

Q.    Okay.  But you don't know how many agents would be employed or you can't even give me an estimate?

A.    I just don't know.

Q.    Okay.  When you worked for Experian as a dispute agent, where did you work as a dispute agent from?

A.    In Allen, Texas.

Q.    Do you remember how many colleagues you had at the time?

A.    At the time, there might have been right around 150 in that one location.  I don't really remember specifically.

Q.   But do you think that since then Experian would have less employees or more employees?

A.   Possibly more.  But again, I'd be guessing on the amount.

Q.   Okay.  Who would be able to tell me how many dispute agents are employed by Experian?

A.   I -- I don't know.

Q.   Okay.

A.   I don't know specifically.

Q.   What is the official title for dispute agents?

A.   Currently, it's a customer service title, and they have either a customer service I, II or III, I believe.

Q.   Okay.  And the dispute agents, they solely handle responding to --  Strike that.

Do they -- do the dispute agents solely handle responding to consumer disputes or do they have other job duties?

A.   If they have other job duties, I do not have knowledge of that.

Q.   Okay.  But your understanding is that their sole responsibility is to handle responding to consumer disputes.  Is that correct?

A.   That's correct.  On some level -- yes, that's correct.

Q.   Do the dispute agents have standards in which they must comply, like a number of disputes they need to complete per day or per week?

A.   The dispute agents are trained to complete the file for as long as it takes.  If they -- if there's sometimes pages that are 300 pages and maybe one page, it really depends on how long it takes them to complete it.

Q.   But do they have, like, a standard, a quota, that they need to meet, like, per day or per week or per month?

A.   The agents would have goals that they would have, particular goals.  And they would create themselves, like, a yearly goal.  Specifically, it would be an average at the end of the month for the agents.

Q.   So every -- so when you say they would make goals, so every agent would just decide on a specific goal for themselves or is this a goal that's set up with Experian?

A.   So part of it is set up with Experian.  The incentive process is to incentivize the agents to complete mail properly and part of that is the quality.  So they would have to have good quality in order to meet certain kinds of standards to receive any kind of bonuses, things of that nature.

Q.   Okay.  So why don't you tell me about that?  How can -- how can a dispute agent receive a bonus?

Victor Manuel Ramirez Najera vs. Experian Information Solutions, Inc. -                October 8, 2025
30(b)(6) of Experian Informtion Solutions, Inc., by Teresa Iwanski                              118

A.    And it might be -- and I'm not sure if it's actually called a bonus or if it's part of their plan.

The agents would need to do a certain amount of processing, but their quality is part of that.  So if an agent is processing a lot of files, but their quality is bad, that is not viewed as somebody that -- that would be incentivized.  So the quality is part of that.  So I think -- and I apologize, I think it's sort of incentive -- it's -- the wording, I think, is incentive. It's not a bonus.

Q.    Okay.  So they would have to process a certain number of disputes or respond to a certain number of disputes and ensure that the quality of the disputes meet a certain level.  Is that correct?

A.    That's correct.  So basically, if some -- if an agent is processing one piece of mail for the entire day, it's not being productive.  So the agents are watched and viewed to make sure that they are being productive, that they are -- they have policies and procedures down, that they are accurately processing mail or telephone calls as well.

Q.    Okay.  Do you know what those -- you know, what the target is for the incentive?  So how many disputes do they have to process, plus what is the quality -- what kind of quality score do they have to achieve?

Victor Manuel Ramirez Najera vs. Experian Information Solutions, Inc. -
30(b)(6) of Experian Informtion Solutions, Inc., by Teresa Iwanski

October 8, 2025
119

A.   I don't know currently.

Q.   Okay.  So you just know that these incentives exist, this is how they're made up, but you don't know what the metrics are to meet these -- to satisfy the -- the requirements to get the incentive.  Is that correct?

A.   That's correct.  So when I was a dispute agent that is -- is how the process was set up.

Q.   Okay.  Do you know how much the dispute agents in Costa Rica get paid?

A.   I do not know.

Q.   Do you have an idea of an estimate of how much they get paid?

A.   No, I do not.

Q.   Do they get paid by the hour?

A.   I don't know.

Q.   How about -- how about the dispute agents in Chile, do you know if they're paid by the hour?

A.   I don't know.

Q.   How about the dispute agents in India?

A.   I don't know.

Q.   How about the dispute agents in Texas?

A.   I don't know.

Q.   When you were employed as a dispute agent in Texas, were you paid by the hour, or were you a salaried employee?

Coash Court Reporting & Video, LLC
staff@coashcrv.com
602-258-1440
www.CoashCourtReportingandVideo.com

APPENDIX 0450

A.   I was paid by the hour.

Q.   Okay.  The agents that are -- that work in Costa Rica, Chile, and India, are they employed by separate legal entities than the defendant in this case, meaning Experian Information Solutions, Incorporated?

A.   I believe in their own government or affiliation it might be different.  They are Experian agents, but they may have a different name associated with that particular company in that country.

Q.   So there's like -- are you saying, like, there's a special setup for how they're employed in these countries?

MR. MCCRAW:  Objection.

THE WITNESS:  I don't know what that is.  I don't know what that is.  I don't have knowledge -- specific knowledge about that.

BY MR. HAMMOUD:

Q.   But do they report to Experian?  And by Experian, I mean you, the defendant, Experian Information Solutions, Incorporated?

MR. MCCRAW:  Same objection.

THE WITNESS:  Yes.  On some level, they are part of Experian.  Since they're in a different country, I just don't know that kind of relationship.

BY MR. HAMMOUD:

Q.   Do you know if they have like a -- do they report to like a supervisor or a manager or director who's in the same location as them?

MR. MCCRAW:  Same objection.

THE WITNESS:  I don't know.  I don't know specifically.

BY MR. HAMMOUD:

Q.   And you've never seen any of, like, the employee contracts between Experian and these dispute agents located in -- outside of the country?

MR. MCCRAW:  Same objection.

THE WITNESS:  No, I've not.

BY MR. HAMMOUD:

Q.   Okay.  Now, the dispute agents that are -- that are employed by Experian in the other countries, they have the ability to change information in the consumer's credit file, correct?

A.   I'm not quite sure what you mean by "change information."

Q.   So when they receive a dispute from a consumer, this dispute agent can technically update information.  If they want, they can change certain information within a consumer's credit file.  Is that correct?

A.   Yes.  As long as the policy states that, yes.

Q.   Okay.  But whether -- so when you say "as long as the policy states that," you mean that you expect them to follow what the policies and procedures say when making any changes, correct?

A.   That's correct.

Q.   Okay.  But whether an employee decides to follow the policies and procedures or not, they can technically change information in a consumer's credit file.  Is that correct?

A.   To change information in a credit file, every agent is monitored on a security level that would be captured, and the employee would no longer be with Experian.

Q.   Sure.  That's not my -- I understand Experian has certain security measures in place.  But I'm saying that technically the dispute agents, they have the ability to change the information.  Now, Experian expects them to only change it in compliance with its policies and procedures, but nonetheless, the ability exists.  Is that correct?

A.   Yes, the ability exists.  And again, they are monitored.

Q.   Okay.

A.   If there was any -- any instances, they would no longer be with Experian.

Q.   Okay.  And the dispute agents employed by Experian in other countries are required to follow Experian's, the defendant, policies and procedures, correct?

A.   Correct.

Q.   And they're all trained using the same training.  Is that correct?

A.   Yes, that's correct.

Q.   So India, Chile, Costa Rica, they're trained the same way that the Texas employees are trained, the Texas dispute agents.  Is that correct?

A.   Yes, that's correct, the same manuals, same training.

Q.   So they're all trained using the same participant guides?

A.   Yes, sir.  For whatever --

Q.   Okay.

A.   -- specialty they have or -- or do not have.

Q.   Okay.  Do you know if, you know, the dispute agents in India handle a specific type of disputes versus the dispute agents in Costa Rica?

A.   I don't know.  It's whoever the next mail correspondence goes to.  It's in a queue, so it doesn't have a designation of location.

Q.   Okay.  So as far as you know, the dispute agents,

APPENDIX 0454

wherever they're located, handle all different types of disputes?

A.    Yes, that's my understanding.

Q.    Okay.  And you said that Experian, they perform employee monitoring on all of its dispute agents regardless of where they're located, correct?

A.    That's correct.

Q.    Okay.  Experian dispute agents, they access consumer credit information through a Salesforce interface called ACE, A-C-E.  Is that correct?

A.    Yes, that's correct.

Q.    Okay.  And Experian's dispute agents, they access consumer credit information through ACE regardless of which country the dispute agent is located in, correct?

A.    Yes, that's correct.

Q.    Okay.  And when a dispute agent performs a reinvestigation, the dispute agent is expected to follow Experian's policies and procedures regardless of which country the dispute agent is located in, correct?

A.    Yes, that's correct.

Q.    Okay.  And the dispute agent ultimately has the authority to decide which of Experian's policies or procedures is applicable to each dispute, correct?

MR. MCCRAW:  Objection.  Form.

THE WITNESS:  Correct.  Based on training,

that's correct.

BY MR. HAMMOUD:

    Q.    Okay.  In other words, there's no manager or director who signs off on every single reason code or response code by the dispute agent, correct?

                MR. MCCRAW:  Objection.  Form.

                THE WITNESS:  There are times when the supervisors are involved.  It's sporadic.  If the agents have questions, things of that nature.

BY MR. HAMMOUD:

    Q.    So if a specific dispute gets escalated, then maybe a supervisor is involved, fair?

                MR. MCCRAW:  Objection.  Form.

                THE WITNESS:  If the agent has questions, they can ask their supervisor.  And at that point, the supervisor can assist them in choosing the correct process.

BY MR. HAMMOUD:

    Q.    Other than questions or something being escalated, disputes being handled on a day-to-day basis, there's no manager or director who's signing off on every single reason code or response code that the dispute agents are inputting.  Is that correct?

                MR. MCCRAW:  Objection.  Form.

                THE WITNESS:  Only during their training

APPENDIX 0456

process.  Every single piece of mail is looked at before it is processed.

BY MR. HAMMOUD:

Q.   Okay.  So after their training process, and if they don't have any questions and they're not escalating a dispute, then the -- their -- the -- there is no manager or director who's signing off on every single one of their reason codes or response codes.  Is that correct?

A.   That's correct.  Outside of that would be the -- the quality, where the -- their work is checked on a monthly basis.

Q.   Okay.  And Experian has control over whether dispute agents in other countries have access to Experian's systems like ACE or e-OSCAR.  Is that correct?

A.   Yes.  It is only -- the access is only given to specific agents that need the access.

Q.   Okay.  And Experian can choose to terminate the access to those systems for dispute agents in other countries.  Is that correct?

A.   Yes.  It doesn't matter what country that they are in, we -- Experian security or human resource can stop their access.

Q.   Okay.  If Experian wanted to speak to an employee in Costa Rica, can Experian instruct that employee that -- that they must meet with somebody at Experian?

A.    I'm not quite sure what you mean.

Q.    So let's say -- let's say human -- you said, you know, human resources, for some reason, they can terminate access to those systems for somebody, let's say, located in Costa Rica.  Is that correct?

A.    That's correct.  It doesn't matter where they're located.  That is part of a process where they can -- human resource can request that access be stopped.

Q.    And this is human resources -- this is the human resource department within Experian Information Solutions, Incorporated, based in the United States?

A.    They may have the -- their own type of human resource in different countries.  I'm not entirely sure. I just have knowledge of the US human resource.

Q.    Okay.  So your knowledge is that -- that the US human resources has the ability to terminate a dispute agent's access, let's say, who's located in Costa Rica. Is that correct?

A.    Yes, that's my understanding.

Q.    Okay.  If the US-based human resources, let's say, wanted to have a meeting with a dispute agent in Costa Rica, is that something that they could do?

A.    I'm not specifically sure.  They do have an ability to communicate.  So how that would be set up would be determined by human resources, the agent's supervisor,

things of that nature, in order to set something like that up.

Q.    Okay.  So is it your understanding that if the US-based human resources wanted to meet with an employee, that employee would be obligated to have a meeting with them?

A.    I'm not quite sure what you mean by "obligated."

If there's any kind of meeting that a human resource department wants to have with any agent, that is something that they would set up themselves with supervisors.  Outside of that, I just don't have specific knowledge about what their process would be.

Q.    Yeah.  I guess I'm just trying to understand. Like, you know, you work for -- you know, you're located in US.  If human resources had an issue come up and they said, "Teresa, we need to talk to you about your employment with -- with Experian" -- okay? -- can you just say, "No, I'm not going to meet with you even though you're asking me to meet for continued employment"?  Or do you feel like you would be obligated to sit down and meet with human resources to see what's going on?

MR. MCCRAW:  Objection.  Form.  This is outside the scope.

THE WITNESS:  For me specifically, I would want to meet with human resource.  I would have no reason

APPENDIX 0459

to deny a conversation with human resource.  I guess I'm not understanding your question.

BY MR. HAMMOUD:

Q.   I'm just trying to say, do -- if human resources wanted to meet with an employee in Costa Rica or India, does that dispute agent have the ability to say, "No, I'm not going to meet with them," or would -- would Experian -- or is it Experian --  Strike that.

I'm trying to understand how much control, let's say, Experian has over these dispute agents.  So if there was a meeting and this dispute agent needed to be in that meeting related to their employment and carrying out their duties and obligations, is it Experian's expectation that they could instruct this dispute agent to show up and they would show up because Experian asked them to?

MR. MCCRAW:  Objection.  Form.  Outside the scope.

THE WITNESS:  My understanding, just like I would in my position, yes.  I -- I -- they would be expected to either show up, however it is.  Is it by email?  Teams?  Whatever.  It would be set up by HR and the supervisor.  Outside of that, it would depend on what the reason would be, if there's any recourse that would have to happen, if the agent said, "No, I do not want to come to this meeting," that would be up to human resource

APPENDIX 0460

to decide what the next steps would be.

BY MR. HAMMOUD:

Q.    Okay.  Like, next steps, like, potentially, like, if you're not going to listen to the instructions we're giving you to carry out your duties and obligations, then potentially we can terminate you?

MR. MCCRAW:  Same objections.

THE WITNESS:  I don't know what steps are in place, but the human resources would have an ability to follow those steps.

BY MR. HAMMOUD:

Q.    Okay.  Is it -- is it your understanding that the US-based human resources at Experian, the defendant in this lawsuit, has the ability to terminate a dispute agent located in, let's say, Costa Rica or India, if they decided to?

MR. MCCRAW:  Same objections.

THE WITNESS:  My understanding, yes.  It would be a formal process that -- that they would have to go through.  What that is and how that works, I just don't have knowledge of that.

BY MR. HAMMOUD:

Q.    Do you know if it's Experian, the defendant in this lawsuit, who pays those dispute agents?

MR. MCCRAW:  Same objection.

THE WITNESS:  I do not know the pay scale or how that works.

BY MR. HAMMOUD:

Q.   Not how much they get paid, but if it is Experian, the defendant in this lawsuit, that actually pays them?

MR. MCCRAW:  Same objection.

THE WITNESS:  So I work for Experian Information Solutions, Inc.  I'm here to testify about that part of the company.  If there's another part of the company that -- that would be more of a payroll to another facility in a different country, I don't know.

BY MR. HAMMOUD:

Q.   Okay.  What are -- what are internal reason codes?

MR. MCCRAW:  Objection.  Form.

THE WITNESS:  I'm sorry, I didn't quite understand your question.

BY MR. HAMMOUD:

Q.   Isn't it true that Experian's dispute procedures account for some scenarios in which Experian will update a tradeline without the need to send an ACDV to a data furnisher?

A.   Yes, that is correct.

Q.   Okay.  And is this something that, you know,

would need to be under -- it would be identified as an internal reason code?

A.    Yes.  We do have internal reason codes to make updates.  That's correct.

Q.    Okay.  So my previous question is, what is an internal reason code or what are internal reason codes?

A.    Internal reason codes are specific to whatever the consumer's disputing.  Experian has policies to update information depending on what is being disputed, how the account looks, and what policies Experian is using in order to make the internal update or delete.

Q.    So essentially, internal reason codes are used by Experian dispute agents when a consumer either provides acceptable proof documentation or if the consumer's dispute meets the requirements of an external Experian policy?

A.    Of the internal Experian policy, correct.

Q.    Okay.  Do you know the full list of the different internal reason codes available to dispute agents?

A.    Generally, it would be any kind of bankruptcy dispute.  We have internal policy update --

Q.    Do you know the -- like, can you tell me the full list by memory?

A.    I can tell you the -- the list that -- that I have memory of.  I didn't come here today with every

internal reason code memorized.

Q.   So --

A.   But I can tell you, you know, specifics if you have questions about it.

Q.   So again, I'm just -- it's a simple yes or no, and then I just want to continue on, right?

Do you know the full list of the different internal reason codes available to dispute agents?

MR. MCCRAW:  Objection.  Asked and answered.  Outside the scope.  Form.

THE WITNESS:  I do have knowledge of the reason codes.  Specifically, I don't have all of them memorized.

BY MR. HAMMOUD:

Q.   So the answer is no, you don't have -- you don't know the full list of the internal reason codes --

MR. MCCRAW:  Same objection.

BY MR. HAMMOUD:

Q.   -- that are available to dispute agents.  Is that correct?

MR. MCCRAW:  Same objections.

THE WITNESS:  I do have knowledge of the reason codes.  If you want me to name them off, I -- is that -- I'm not quite sure what you're asking.

APPENDIX 0464

BY MR. HAMMOUD:

Q.    Yeah.  I'm asking for the -- if you know the full list of the different internal reason codes available to dispute agents?

A.    So we have internal policy change, internal policy delete, bankruptcy update, bankruptcy update for discharge, or depending on the public record, we have internal statements that Experian can add if the consumer requests it, internal delete for certain policy, internal policy --

Q.    Is that --

A.    -- account --

Q.    And I don't mean to cut you off, but what you're stating, these internal reason codes, are these verbatim the names of these codes from Experian's policies and procedures, or are these your best recollection of, like, kind of what they say?

            MR. MCCRAW:  Objection.  Outside the scope.

            THE WITNESS:  So what I'm doing is I'm remembering each and every reason code top to bottom, and there's a few different kinds of reason codes.  Even the bankruptcy has -- if they want to change the internal bankruptcy status date, if they want to use an internal reason code.  We have the internal reason codes for delete and update that are for a lot of different reason codes --

or reasons.  So it's not just one particular policy for each and every internal or delete.  It's just --

BY MR. HAMMOUD:

Q.    Is there not a -- but is there not like a drop-down with, like, a list of the different internal reason codes that Experian provides to its dispute agents?

MR. MCCRAW:  I'm going to object to form.

THE WITNESS:  Yes, that's what I'm explaining to you.

BY MR. HAMMOUD:

Q.    Okay.  And then what you're telling me, internal policy change, internal policy delete, these are what's contained within this drop-down; when a dispute agent clicks it, these are the words that they'll see?

MR. MCCRAW:  Same objection.

THE WITNESS:  Yes.  Sorry.

BY MR. HAMMOUD:

Q.    So word for word, the policies and procedures for internal reason codes available to dispute agents are what you're telling me, when they click that drop-down, they'll be seeing internal policy change and the other ones that you listed to me?

MR. MCCRAW:  Same objection.

THE WITNESS:  Yes.  It'd be internal policy change, internal delete, bankruptcy updates, CCC.  So

it'll be any kind of consumer statement, if they want to add it.  And then if you want me to -- to tell you what I -- what I have knowledge of.  I have knowledge of Experian's policies.  I didn't memorize the internal drop-down menu.  I can tell you if you have particular question.

BY MR. HAMMOUD:

Q.    That was -- that was my question to begin with. I said, "Do you know the full list of the different internal reason codes available to dispute agents?"  You said yes.  And I asked you to name them all.

So if -- if you don't know them all, that's fine, just say you don't have them committed to memory and then we can move on.  But, you know, we just spent a bunch of time going over this, and now you're telling me that you don't have them all committed to memory.

So the question is, do you have the internal -- the full list of the different internal codes committed to memory that are available to dispute agents?

MR. MCCRAW:  Same objections.

THE WITNESS:  I did not memorize all of the internal --

MR. HAMMOUD:  Okay.

THE WITNESS:  -- reason codes.  What I do have today is --

APPENDIX 0467

MR. HAMMOUD: Thank you. That -- that's -- that was the response to my question.

MR. MCCRAW: Youssef --

MR. HAMMOUD: -- and then we can --

MR. MCCRAW: -- let her finish her answer.

Teresa, finish your answer.

MR. HAMMOUD: She's -- she's -- she's supposed to --

MR. MCCRAW: Youssef --

MR. HAMMOUD: You're supposed to just place your objection. Don't talk anymore. You just place your objection.

MR. MCCRAW: No, Youssef. She's allowed to finish her answer.

Teresa --

MR. HAMMOUD: She's --

MR. MCCRAW: -- please finish your answer.

MR. HAMMOUD: She can answer the question that was before her.

Ms. Iwanski --

MR. MCCRAW: And she was. You have to let her answer the question.

MR. HAMMOUD: All right. Chance, you're frustrating my ability to conduct the deposition. So I'm asking you to stop. You place your objection and that's

the end of it.  We're not going to continue to talk further.

MR. MCCRAW:  Youssef, you can't harass the witness.  If she wants to finish her question -- finish her answer, she can finish her answer.

Teresa, you may finish your answer.

THE WITNESS:  I did not memorize all of the internal reason codes to prepare for this deposition.  I had the reason codes that applied to the disputes that were handled in this case.  So with that information, I am ready to answer questions that you may have about this case.

MR. HAMMOUD:  Okay.  Thank you for that.

And, Ms. Iwanski, I'm not trying to cut you off from answering the question.  But, you know, I'm asking you some of these questions, and some of these questions I'm asking I'm making clear this is a yes or no question.  You're not answering my question, and then you're mentioning other things.  I'm trying to keep us on track.  And I want to -- you know, I just want to -- I want to get to the end of this, right?  I'm sure you want to, you know, get off this deposition.  I want to get off.  So I'm just trying to get to the end of it.  And when you're not answering my questions directly and, you know, we're talking about other things, it's just wasting time.

APPENDIX 0469

So when I stopped you, it was because I'm asking a direct question, and I want to stay focused on that question. Okay?

BY MR. HAMMOUD:

Q.   So to confirm, there are policies and procedures that Experian has that list each and every internal reason code that are available to dispute agents, correct?

MR. MCCRAW:  Objection.  Outside the scope.

THE WITNESS:  The manuals will show the internal reason codes that are to be used when a policy applies.

BY MR. HAMMOUD:

Q.   Were -- are there any internal reason codes that were applied to plaintiff's dispute or should have been applied to plaintiff's disputes in this matter?

A.   Yes.

Q.   Okay.  So now I want to break that question up.

So was an internal reason code applied to plaintiff's disputes or was it not applied and it should have been applied?  Which is it?  Or both?

A.   It was not applied.

Q.   Okay.  So did Experian produce the manual related to the internal dispute codes for the specific -- or, I'm sorry -- the internal reason code for the one that should have been applied here?

APPENDIX 0470

MR. MCCRAW:  Objection.  Outside the scope.

THE WITNESS:  I don't believe so.

BY MR. HAMMOUD:

Q.  Okay.  But you -- you said that you're prepared to testify about the internal reason code that should have been applied.  Is that correct?

A.  Yes.

Q.  Okay.  And you're here to testify about that because you believe it is relevant because it should have been applied in response to one of plaintiff's disputes. Is that correct?

A.  Yes.

Q.  Okay.  But standing here today, it's your understanding that Experian did not produce this manual with the relevant internal reason code that should have been applied.  Is that correct?

MR. MCCRAW:  Same objection.

THE WITNESS:  Yes, not to my knowledge.

BY MR. HAMMOUD:

Q.  You said that's correct, not to your knowledge?

A.  That's correct.  It was not -- I'm sorry.  It was not produced.

Q.  Okay.  But we agree that it is relevant because it should have been applied.  Is that correct?

A.  It's a process that should have been applied.

APPENDIX 0471

MR. HAMMOUD:  Okay.  So I just want the record to reflect that these manuals that are relevant and should have been applied, they have not been produced by Experian.  So again, we're conducting a deposition with no manuals, no policies, and no procedures.  So we're unable to conduct a full examination of the deponent.

MR. MCCRAW:  And I will also put on the record then that the only reason that plaintiff does not have these is that they reneged on the confidentiality agreement.  If they agreed to uphold and abide by the confidentiality agreement, they would have had the confidential documents.  They have not agreed to keep these documents confidential.  Until they agree --

MR. HAMMOUD:  Chance.

MR. MCCRAW:  -- to keep these documents confidential, these documents are not going to be produced.  We've engaged in multiple discussions with plaintiff.  And plaintiff signed on a confidentiality agreement, and they said they would not abide by it --

MR. HAMMOUD:  Sure.  We don't need -- we don't need -- I don't need you to filibuster on the record, right?  But --

MR. MCCRAW:  I'm not filibustering.

MR. HAMMOUD:  -- I will note that we --

MR. MCCRAW:  I'm giving my response.

Coash Court Reporting & Video, LLC
staff@coashcrv.com                          602-258-1440
www.CoashCourtReportingandVideo.com

APPENDIX 0472

MR. HAMMOUD:  We repeatedly --

MR. MCCRAW:  You put yours on the record.  I put mine on the record.

MR. HAMMOUD:  This is my deposition, Chance. This is my deposition.  So please.  Okay?

We made clear to you before the deposition multiple times, you produce documents, we will treat them as confidential pending any motion practice with the court.  You decided to produce some documents that you marked confidential, but not all the documents.  So when you say that you weren't producing documents because we reneged on an agreement or because they're confidential, that holds no merit because you have produced documents that you did mark confidential.  And we repeatedly told you we will hold them in confidence until the motion practice is done.  So I'm going to continue on -- I'm going to continue on with my deposition.

MR. MCCRAW:  And I'm going to respond --

MR. HAMMOUD:  We're only here for a certain amount of time.

MR. MCCRAW:  I will respond.

MR. HAMMOUD:  You can respond when -- you can respond when --

MR. MCCRAW:  For the confidential documents that we produced --

APPENDIX 0473

MR. HAMMOUD:  You can --

MR. MCCRAW:  -- were specific to this claim. The policies and procedures we did not produce, and you will get those whenever you agree to keep them confidential according to the terms that the parties agreed upon.  You've not agreed to do that.  We're not going to produce those until you do that.  And we can continue to discuss that offline.

MR. HAMMOUD:  Okay.

BY MR. HAMMOUD:

Q.   Ms. Iwanski, can you tell me which internal reason code should have been applied here?

A.   If you could please pull up the DR log and the mail correspondence, I'll be able to tell you.

Q.   Okay.  So you won't be able -- so this is not something that you have committed to memory that you could tell me?

MR. MCCRAW:  Objection.  Form, harassing.

THE WITNESS:  I've asked for the DR logs multiple times now.  And if you want me to answer the specific questions, I do need to look at Experian's logs, as well as the mail correspondence that was received.

BY MR. HAMMOUD:

Q.   Okay.  So you can talk about the internal reason code and what should have been done without looking at the

manual, but you won't be able to tell me which internal reason code should have been applied without looking at the disclosure logs?

MR. MCCRAW:  Objection.  Form.

This is harassing, Youssef.  She's asked you for the DR log multiple times.

THE WITNESS:  I can answer the question if I have the information in front of me so that I can fully point to specific information, and those are only housed in the DR log, as well as the letter that Experian received.

BY MR. HAMMOUD:

Q.   Aside from the internal reason codes, there are also external reason codes.  Is that correct?

A.   Yes.

Q.   Okay.  And an external reason code is used when a consumer initiates a dispute that results in an ACDV being sent to a data furnisher, correct?

A.   That's correct.

Q.   Okay.  In some instances, a consumer's dispute relates to a dispute that the account doesn't belong to that consumer, correct?

A.   Yes, that's correct.

Q.   Okay.  And Experian refers to these as ownership disputes, right?

Coash Court Reporting & Video, LLC
staff@coashcrv.com                                    602-258-1440
                            www.CoashCourtReportingandVideo.com

A.   Yes, that's correct.

Q.   Okay.  Is one of the external reason codes "not mine"?

A.   Yes, it is.

Q.   And is another one "not mine, mixed file"?

A.   Yes, there is.

Q.   Okay.  And both the not mine and not mine-mixed file reason codes are ownership disputes, correct?

A.   Yes, they are.

Q.   Okay.  Is there a not mine or not mine-mixed file internal reason code?

A.   When a file is being analyzed as mixed, the process is a little bit different.  So it's an internal process, either the agent is deleting it or moving it to the proper consumer.

Q.   But there isn't, like, a not mine or not mine-mixed file, like, word-for-word internal reason code?

A.   No.  The deletion would be to move or to delete based off of the mixed file.

Q.   Okay.  And Experian's procedures, they provide a step-by-step instruction for how to investigate a not mine dispute, right?

A.   Yes.

Q.   Okay.  What are those step-by-step instructions?

A.   They are -- the agent is trained to review all of

the information contained in the file or the dispute mail and look for the actual reason for the dispute, capture the reason code, as well as attach any additional relevant information with the ACDV to the dispute so it can be looked at and viewed by the data furnisher.

Q.    Is that all the step-by-step instructions?

A.    Just in general, if we wanted to look at this particular case, I've asked to see the mail correspondence and the DR log, if you want a specific answer.

Q.    What I'm talking about is what's contained within the policies and procedures related to not mine disputes. So if we look at the DR log, those don't contain the procedures for how to handle not mine disputes.

So I'm asking you what are the step-by-step instructions for handling these types of disputes?

MR. MCCRAW:  Objection.  Form, asked and answered.  This is harassing.  She's asked you to show the DR log so that she can answer the question.

BY MR. HAMMOUD:

Q.    Ms. Iwanski, will the DR log include the step-by-step instructions that a dispute agent should take when handling a not mine dispute?

A.    It's going to show what -- what they selected in that process.  So the step-by-step is something that they have already been trained how to do.

Q.   Okay.  And I'm not asking what they selected. I'm asking what the step-by-step instructions are for the not mine dispute.  So I'm going to back it up a little bit.

Do you know how many steps there are for a not mine dispute?  Is it one?  Two?  Three?  Four?

A.   So part of that, again, is reading the correspondence.  When the agent is actually going in and selecting the reason code, the agent just has to select the not mine.  So they would look at the drop-down, look for "not mine," select that, attach the document.  So they're -- they're typing in a doc ID that's associating with that piece of mail to be sent as an attachment to the ACDV.  So they're typing in that doc ID.  They're selecting "draft" at that point.  And then once they're done with the disputes, they hit "submit."  And that is when the ACDVs are sent to the data furnisher.

Q.   Okay.  Now within the policies and procedures for the step-by-step instruction, is it provided in the same way that you just shared with me, or does it have step one, whatever action needs to be taken, and then so on and so forth?

MR. MCCRAW:  Objection.  Form.

THE WITNESS:  So within the manual itself is going to ask the agent is there documents to use?  If

there is, do this.  If there isn't, do that.  And so it's going to give the agents the processes that are -- are both for internal and external process of a piece of mail, and it depends on the reason code.  Each reason code then is sectioned out in the manual.  So if we're just looking at not mine ownership, there is a couple of pieces of information that they need to review.

So the agents are looking at the identification information, seeing if there's any kind of conflicts and if they need to transfer it to a mixed train agent.  Outside of that, they're just going to select the reason code, which is not mine, and follow the processes where they are putting it into a draft.  And then they're also going to submit any other disputes, that's going to be in the draft.  And then once they are done, then they'll submit the -- and hit finish at the end so that the ACDVs are sent to the data furnishers.

MR. HAMMOUD:  I think this is a good time.  Let's take a break.  Let's do another 10 minutes.  Okay?

MR. MCCRAW:  Teresa, what time do you need to take lunch?  Or do you need to take lunch?

THE WITNESS:  Depends on how long we're going.  I can push through.  Depending if we're going to be here, you know, until 7:00; then I need to take a lunch.

MR. HAMMOUD:  I'd say I'm about maybe halfway through.  So, you know, we still have some -- some -- we still have to get to, you know, some of the exhibits.  So if you want to take a lunch, you know, we could -- we could do that.

THE WITNESS:  Okay.  I'll go ahead and take a lunch.  I don't need more than half an hour.

MR. HAMMOUD:  Okay.  So 30 minutes.  We'll be back at, you know, 1:15 Pacific time.

THE WITNESS:  Okay.

MR. HAMMOUD:  All right.  Thank you.

THE COURT REPORTER:  We're off the record. Time is 12:46 p.m.

(A recess ensued.)

THE COURT REPORTER:  We're back on the record.  Time is 1:30 p.m.

BY MR. HAMMOUD:

Q.    Okay.  When a consumer makes a not mine dispute, the Experian policies and procedures detail how to determine if the dispute relates to a mixed file, correct?

A.    Yes, it does give the process to look for a transfer if that person is not mixed train.

Q.    Okay.  And what is a mixed file?

A.    A mixed file is when two consumers are on one PIN.

Q.   And by "PIN," you mean the unique personal identification number that Experian associates with each and every consumer it has a file on?

A.   Correct.  Experian's ultimate goal is for each person to have their own PIN.

Q.   Kinda like an Experian social security number for each person?

A.   Yeah, it's -- it's a special number assigned to each person's file.

Q.   Okay.  So in instances where Experian identifies that the consumer is potentially the victim of a mixed file, Experian -- would they send those disputes to specialized agents who handle those types of disputes?

MR. MCCRAW:  Objection.  Form.

THE WITNESS:  Yes, it is.  It is part of the process to transfer to a mixed train agent if that person that's reviewing the -- the correspondence is not mixed train.

BY MR. HAMMOUD:

Q.   Okay.  So is that group known as, like, the mixed files department?

A.   Yes.  It's a specialty group.

Q.   Okay.  And how do Experian's procedures instruct a dispute agent to determine whether a not mine dispute relates to a mixed file?

A.    So it's going to depend on what's given in the letter or the phone call.  It's going to relate to any kind of conflicts that we have on the file, different social security numbers and who associates with those social security numbers.  Each instance might be a little bit different depending on the reason and what's given and what's on file at the time.

Q.    So just so we're clear, so when a consumer were -- if a consumer tells Experian that an account belongs to his or her family member with a similar name, do the Experian procedures require the dispute agent to transfer those disputes to the mixed file department?

A.    Yes.

Q.    Okay.  So if a consumer said, "This is my dad's account," and the consumer and their dad were like a junior or senior, Experian's procedures require that the employees treat those types of disputes as mixed files, correct?

A.    Yes.  They are analyzed then as a mixed file. And if that person is not trained, they do transfer it to mixed file for them to analyze as if it's -- to see if it's mixed.

Q.    So we talked, you know, a bit ago about the training that dispute -- that dispute agents are given, right?

APPENDIX 0482

A.   Yes.

Q.   Okay.  So for -- let's say a dispute that's happening over the phone for a not mine dispute, if a consumer were to say, "This account is not mine," are dispute agents trained to ask for more information?

A.   Not necessarily.  The agents are then looking for the conflicts.  If there's any conflicts, they can ask additional questions.  Otherwise, it would be dependent on what is being said to the agent at that time.

Q.   So if a consumer just called in and said, "I want to dispute this account because it's not mine," what is the -- what is the dispute agent required to do?

A.   At that point, the agent would look to see if there's any conflicts and process the dispute as it's given by the consumer.

Q.   Okay.  They're not required -- the policies and procedures don't require the dispute agent to follow up with any questions, like, "Why are you indicating this is not mine?  Are you the victim of identity theft?  You know, do you have any additional information?"  Anything like that?

A.   Depending on what's being said at the time, if there's any indication where the consumer is saying that they didn't open this account, that they are a victim of identity theft, those would trigger the agent to then ask

APPENDIX 0483

those further questions.  Outside of that, we're just taking it at face value that the consumer is just saying that this account is not theirs.

Q.   Okay.  So if they say -- so let me get -- let me understand this correctly.

So if somebody was the victim of identity theft, the dispute would be coded as "not mine," correct?

A.   If somebody says that they are a victim of identity theft, there's a lot -- there's a couple more steps that need to take place, and those would be treated as not mine-fraud or not mine-police report or we block, depending on what Experian receives.

Q.   Okay.  But the overarching kind of dispute, the umbrella, is "not mine," and then there are these different things that can -- you know, different reasons, not mine, identity theft, or police report, things like that.  Is that correct?

A.   Yes.  It's very specific to -- to the reason that's given at that time.

Q.   Okay.  But they're all under the umbrella of not mine?

A.   No, they're not under the umbrella.  They're all treated different.

So in -- a not mine-fraud is different than not mine, and not mine-mixed is different than a not mine.

They are treated differently.

Q.   Then what is just a not mine?  If somebody just says "not mine"?

A.   Then the agent just processes the dispute as a not mine.  There are times when people just do not recognize the account number or information, and they say something is not theirs, and then Experian processes the dispute.

Q.   Wouldn't it be helpful for Experian to know why they're saying it's not theirs, like, if it's related to identity theft or anything else?

A.   As far as an ownership dispute, it would depend on the conversation, it would depend on what information Experian receives with the dispute to lead that conversation to see if the consumer is saying that they're a victim of identity theft.  Experian is reliant on what is being said over the telephone as well as what is being given over through the mail correspondence as well.

Q.   Okay.  So are dispute agents trained to ask if the consumer knows the identity of the correct accountholder?

A.   There are times when -- when additional questions are asked, depending on what's being said or what's given within the mail correspondence.

Q.   So how about over the phone for phone disputes?

APPENDIX 0485

A.   For phone disputes, if they say that "this account belongs to my father," then at that point the file will be transferred to a mixed train agent, or the agent themselves, if they're mixed train, they would analyze to see if it is a mixed file.

Q.   Okay.  Are -- are the dispute agents trained to inform the consumer when calling in that they have different types of, you know, not mines or there are, like, specific types of ownership account disputes that they could make?

A.   Not as far as the -- the agents do not reveal, like, a selection of disputes they can choose from.  It is more that the conversation, meaning the person that's calling in, is advising Experian what their dispute reason is.  Outside of that, it would be an additional conversation that the consumer can have that would lead Experian to either treat it as a fraud dispute or treat it as a mixed dispute.

Q.   What -- what do you mean, there are further conversations they could have outside of that?

A.   So if the consumer says "an account belongs to my father, we have a similar name," or "an account belongs to my brother or sister, we have the same or similar name," those are instances where those would be treated as a mixed file or transferred to a mixed train agent.

Q.   I guess I'm just trying to understand, right?

So if a consumer calls in, he's on the phone with Experian and he's lodging a dispute, right?  So if he's indicating, "I want to dispute these accounts because they are not mine," Experian is required to do a reasonable reinvestigation based upon this dispute that the consumer is initiating.  Is that correct?

A.   Correct.

Q.   Okay.  So my question is, for purposes of it -- of carrying out a reasonable reinvestigation, if a consumer were just to say, "I'm disputing these accounts because they're not mine," is it Experian's position that no follow-up questions would be made of any sort if he just said, "They're not mine"?  Like, that would suffice for the reasonable reinvestigation?

MR. MCCRAW:  Objection.  Form.

THE WITNESS:  It would depend on -- on the conversation itself, whether or not the person says, "This account is not mine.  It belongs to my father, or somebody that has a similar name, or they're social security numbers that do not belong to me," the agent would look to see if those social security numbers would be on file and transfer to a mixed train agent.  So it really depends on what's being sought at that time.

BY MR. HAMMOUD:

Q.   Okay.  So there's certain, let's say, buzzwords that agents are trained that if they hear or a consumer says, then there's certain things that they would do.  Is that correct?

A.   Right.  But it is reliant on what's being said by the consumer at that time.

Q.   Okay.  So it's fair to say that, you know, for certain procedures or policies to apply or certain action to be taken, the agent is on the phone listening to see if any of these buzzwords are mentioned.  Is that correct?

MR. MCCRAW:  Objection.  Form.

THE WITNESS:  I wouldn't call them buzzwords.  It's more of the extra information that the agents are trained to listen for and checking the file. So for instance, if there's a situation where somebody says the account is not theirs, "My dad opened it," or something like that, the agent would then take a look at the file, see if there's any conflicts, transfer it based off of -- off of the information that was given during that phone call.

BY MR. HAMMOUD:

Q.   So they mention that this is -- belongs to somebody else or a family member?

A.   Right.  Experian looks at its own records as

APPENDIX 0488

well, just look for conflicts as well to see if it needs to be transferred to a mixed train agent.

Q.   But a "not mine" alone without anything more from the consumer, it wouldn't result in the dispute agent -- or the policies and procedures don't tell the dispute agents to ask any follow-up questions on a just "These are not mine"?

A.   That's correct.  Unless there's more conversations that is going on, if they're providing more information, then at that point the agent can start asking more questions.  Outside of that, just a regular not mine, they can call in and -- and say something, "This does not belong to me," and Experian would start the reinvestigation process as an ownership dispute.

Q.   Okay.  So you -- so you indicated within, like, the not mine disputes there's different ones, right?  You said something about, like, not mine, maybe police report, or not mine-identity theft.  Do you recall having that conversation?

A.   Yes.

MR. MCCRAW:  Objection.  Form.

BY MR. HAMMOUD:

Q.   Okay.  How many, like, different not mine disputes are there?  Can you list them for me?

A.   There not mine-fraud, not mine-block, not

mine-belongs to ex-spouse, not mine-not liable, not mine-mixed file, potential mixed file.  I think -- I believe I've named them all.

Q.   Okay.  So how about the -- does -- is the not mine-fraud, is that the same as not mine-police report?

A.    There's -- there's not mine -- yeah.  Not mine-fraud, meaning -- meaning there's no police report. Not mine-police report means we received a police report. We do have a decline to block, or we are using the police report to block.

Q.   Okay.  So -- so maybe, like, six different not mine codes?

A.    There might be one or two that I'm not thinking of right this minute, but that's generally what we have.

Q.   Okay.  So between six and eight.  Is that correct?

A.    Roughly.

Q.   Give or take one or two.

Okay.  And even though there's like -- are all dispute agents -- are they trained to know that there's between, you know, six to eight not mine dispute reasons or dispute codes?

A.   Yes.  They are given the dispute code when they're in training.

Q.   Okay.  But if a consumer were to call in and just

say "not mine" without anything further, the agent is not trained -- even though they know that there are six to eight different or potential, you know, not mine dispute codes, they're not trained to ask any follow-up questions to try and identify which is the code that applies here or the specific scenario that applies?

MR. MCCRAW: Objection. Form.

THE WITNESS: It really depends. Depending on what's in the phone call. There are times that the agents will ask the consumer if they know who it belongs to, but that's part of that conversation that the agents would have with the consumer when they're talking about what belongs to them and what not -- you know, what's -- what they're actually disputing.

BY MR. HAMMOUD:

Q. Are dispute agents trained to encourage the consumer to provide supporting documentation during the phone call?

A. It depends if there's something specific. They're saying something's paid off, the agents can also let them know that they can send in letters to Experian. They can upload those letters to Experian. It really depends on what's being disputed at that time.

Q. So the agent -- the dispute agent is trained to listen for certain statements or -- I classify them as

buzzwords, right?  Certain things that are said by the consumer, and then they'll respond to those types of things.

MR. MCCRAW:  Objection --

BY MR. HAMMOUD:

Q.   Is that fair?

A.   Generally, yes.

The agents are trained to listen for certain key phrases that will lead them in a direction where they can ask for more information from the -- from the consumer or they can explain something else, if -- if an explanation needs to be given.

Q.   Do you know if Experian makes this information public, like, the consumers -- "Hey consumers, if you're disputing and you're alleging it's not mine, you know, there's different types of not mine disputes.  There's fraud, belongs to ex-spouse, not liable.  There's all these different types of potential not mine dispute codes."  Is this information that Experian makes public to consumers?

A.   When consumers go online to dispute, they do get the drop-down menu.  So there are some at that time that they can look at it.  Outside of that, I don't know specifically if there's something that -- that will educate consumers on -- on the correct way to dispute,

APPENDIX 0492

other than the fact that they're giving their dispute to Experian as it relates to the reason why something they believe is inaccurate.

Q.    And then for the online drop-down, does it include all of these not mine disputes listed?

A.    I believe that if they were to select things, like, belongs to -- there's certain kinds -- I'm sorry. Let me think about this for a second.

There are times when the consumer is disputing something, such as a fraud dispute, things of that nature, they would need to call in for those types of disputes.  So not all of the ownership type of disputes are given on the website.  So there are types of disputes where -- where the consumer would need to call -- call Experian to lodge those kinds of disputes, because we need to look at what we have on file and we need to have that conversation with that consumer.

Q.    Okay.  Do Experian's procedures identify any unique treatment for transferred accounts based on the type of account?

A.    I'm not -- I'm not -- sorry.  What was that again?  I didn't quite understand your question.

Q.    Like, in other words, isn't it true that Experian's procedures treat transferred accounts that relate to a mortgage loan differently than nonmortgage

transferred accounts?

MR. MCCRAW:  Objection.  Form.

THE WITNESS:  If the consumer is saying not mine, then they're just going to treat it as not mine.  It doesn't matter what the status would be.

BY MR. HAMMOUD:

Q.   Okay.  Unrelated to the not mine disputes, though.  I'm just saying, does Experian procedures treat transferred accounts that relate to mortgage loans differently than nonmortgage accounts?

A.   It would depend on how the consumer's disputing it.  There's not really a policy that says treat the transfer differently.  It's just a status of the account at that time.

Q.   So let me ask the question.

For -- for transferred accounts that do not relate to a mortgage, do you know what Experian's rules are for purging accounts with delinquencies prior to transfer?

MR. MCCRAW:  Objection.  Form.

THE WITNESS:  If it's a derogatory account, meaning it's charge-off or collection, it would be seven years from the original delinquency date.  The account itself would purge.  Outside of that, each 30-day delinquency would stay on the file for seven years.

BY MR. HAMMOUD:

Q.   Okay.  And this applies to both mortgage accounts and non -- so this applies --  Strike that.

This applies to transferred accounts whether they're mortgage-related or nonmortgage-related?

A.   That's correct.  It's the same retention time, the original delinquency date that led to that derogatory status or those 30-day late payments stay on there for no longer than seven years.

Q.   Okay.  Does Experian maintain dispute procedures that relate to not mine disputes where the account was opened before the consumer was 18 years old?

A.   Yes, we do.

Q.   And what are those procedures?

A.   Those are the minor disputes, when a consumer is under the age of 18 when an account was opened.

Q.   Okay.  And how does -- how does Experian's procedures treat that kind of dispute?

A.   So depending on what's received, Experian will -- if Experian receives proof, the policy is to delete the account.  If Experian receives proof of age and -- Experian will look at the open date.  So by the open date of the account and if Experian receives proof, Experian has policies to delete the account.

Q.   Okay.  So if a consumer makes a not mine dispute

relating to a tradeline opened before the consumer was 18 years old, Experian has a policy to delete those accounts using an internal reason code if they receive sufficient documentation?

A.   Yes.

Q.   Okay.  What document is required in order for Experian to delete the account using the internal reason code under those circumstances?

A.   So any kind of proof of age, driver's license would be sufficient.  Experian would then look at the open date and -- to see if the -- if the account was open prior to the consumer being 18.  Based off of that, Experian would be able to delete with that procedure policy.

Q.   Isn't it true that under these circumstances, if a consumer disputed "not mine" for an account that was open when they were under the age of 18 and they didn't provide the sufficient proof, Experian would send a letter requesting proof of their date of birth?

A.   There is a communication letter asking for proof of date of birth, yes.

Q.   Okay.  And then for the -- for the documents that Experian considers sufficient, I just want to kinda go through a list and you just tell me yes or no if it's -- if this is sufficient.  Okay?

A.   Okay.

Q.   So a driver's license?

A.   Yes.

Q.   Driver's permit?

A.   Yes.

Q.   Passport?

A.   Yes.

Q.   Birth certificate?

A.   Yes.

Q.   Is there anything else?

A.   Any kind of state-issued ID.

Q.   Okay.  Can Experian just verify the date of birth by looking at their own records?  So Experian reports the consumer's date of birth, correct?

MR. MCCRAW:  Objection.  Form.

THE WITNESS:  I didn't quite understand what you -- what the question was.

BY MR. HAMMOUD:

Q.   Yeah.  So you said if a consumer disputes a not mine dispute relating to a tradeline that was open before they were 18, Experian can delete using an internal reason code if they have sufficient documentation, correct?

A.   Yes.

Q.   And so Experian would look at the date that the account was opened and then look at the -- you know, the date of birth and say, "Yes, he was" -- or "She was

younger than 18," delete, correct?

A.   Using that policy, correct.

Q.   Okay.  So I'm asking if Experian looks at the date that it was open, but Experian is also reporting their date of birth, would Experian just go off of the information it already carries internally?

A.   So date of birth is not always given.  I'm sorry. I'm trying to think of the scenario.

The date of birth is not always given at the time of an account being opened, or at least reported to Experian.  The date of birth is something that is reported to Experian.  And if it is reported to Experian, it is logged in a particular spot where the consumers can dispute the date of birth if it's the wrong date of birth. Experian will then have a process to delete the date of birth.

Q.   Yeah.

A.   Outside of that, they're -- Experian is receiving the information but does not have particular independent knowledge of the age of the person that the account is being reported for.

Q.   Does -- does -- but does Experian -- there are consumers with Experian credit files in which Experian is reporting their date of birth or their year of birth, correct?

APPENDIX 0498

A.   That's correct.  It could be reported by any data furnisher, though.  And that just becomes a field that is populated.  It is not corrected or updated by other data furnishers when they report dates of birth.  So it is a field that once it's reported, it is part of the consumer's file, and the consumer can dispute that information.

Q.   Okay.  But if Experian was reporting a consumer's date of birth and it was an accurate date of birth, and the consumer disputed that "this is not mine because this account was open before I was 18," could Experian -- or do the policies and procedures allow a dispute agent to look at the date the account was opened and compare it to the date of birth Experian has on file for this consumer and make that determination that they -- that they were in fact less than 18?

A.   The -- since the date of birth is something that is -- is separate from a particular tradeline that is being reported, that information would not be used in determining independently if Experian can delete the account.  Experian would then ask for proof of age.

Q.   Okay.  So is it -- is it because that -- that information cannot be reasonably relied upon, the date of birth, and so that's why Experian will require documentation to prove the date of birth?

APPENDIX 0499

A.    The date of birth can come in through inquiry or an account or however it was originally given to Experian. If the date of birth is incorrect, the consumers can dispute it.  But it's not tied to particular accounts, so Experian does not have a date of birth for each and every account.  It is given as the data is given to Experian, and Experian would not have any independent knowledge if the date of birth is correct or not correct.  It -- it would be whatever is being relied on from the data furnisher.

Q.    So the first time that a data furnisher supplies the date of birth for a specific consumer and it gets associated with their credit file, it can never be updated or changed unless there's a -- like, a dispute from the consumer indicating that is the wrong date of birth?

MR. MCCRAW:  Objection.  Form.

THE WITNESS:  They can independently update or change information outside the reporting cycle.  So the data furnishers themselves can update that kind of information if they need to make a correction either through their monthly update or through an AUD.

BY MR. HAMMOUD:

Q.    What if there are multiple furnishers reporting different dates of birth?  How does Experian deal with a situation like that?

APPENDIX 0500

So, for example, if -- if, you know, the very first data furnisher sent information over and indicated that the date of birth was January 1, 2000, but then years later another data furnisher started supplying information about this consumer indicating that their date of birth was February 10, 2005, how is that handled within Experian's system?

A.   So my knowledge is the date of birth is -- is what is called a sticky field.  So it's going to -- once it's reported to Experian, the date of birth is associated with the person's file.  Each and every company then would report a date of birth independent of the date of birth that -- that -- what is actually on the file -- every date of birth, we would believe the information to be accurate.  So each and every field, the -- sorry -- the dates of birth are not associated with each and every account on the account level part.  The date of birth is something separate.  So on a consumer disclosure, the date of birth is actually separate from the trade level account.

Q.   How many dates of birth does Experian report on consumers?  Is there more than one that could appear on a consumer -- Experian consumer credit file?

A.   I do not know if there's dates of birth that kind of sit in the background.  I really don't know as far as what that process would be.

APPENDIX 0501

Q.   So is it -- is it possible that Experian can publish a credit report about a consumer to, like, let's say, a lender or a third party, and under the dates of birth section include multiple dates of birth, or will there always be just one date of birth that's reported?

A.   It would be one date of birth that's reported.

Q.   Okay.  So -- you know, I want to go back to my question.

If Experian is receiving differing dates of birth from data furnishers about a specific consumer, how does Experian reconcile which date of birth will trump the other when they're publishing this credit file on the consumer?  Does that make sense?

A.   Yeah, I understand your question.  I believe it's -- it's the first time that Experian receives a date of birth.  Outside of that, it's something that -- within Experian's system, and I don't know particular system logic to tell you more than that.

Q.   Okay.  So the first data furnisher to report the date of birth, that's the one that kinda sticks on the credit file?

A.   That's my understanding.  If there's a system process that's in place outside of that, I just don't have that knowledge.

Q.   Okay.  Now, if that same data furnisher who made

APPENDIX 0502

it to -- you know, who made it first to report the date of birth, if they change the date of birth and then furnish that information, would it now update on Experian's end?

MR. MCCRAW:  Form.

THE WITNESS:  I don't know.

BY MR. HAMMOUD:

Q.  Okay.  But because of -- so it sounds like because -- I think your words were the date of birth is like a sticking point because, you know, data furnishers can report different dates of birth.  When it comes to, like, this dispute where we said less than 18, Experian requires proof of the date of birth because the date of birth information from furnishers is not entirely reliable.  Is that fair?

MR. MCCRAW:  Objection.  Form.

THE WITNESS:  I wouldn't say it was entirely unreliable, but it is something that -- that can be incorrect, a human being typing in a date of birth, typos, things of that nature.  So the information, when Experian's asking for proof of -- of birth -- or actually date of birth, it's just something that Experian does not rely on independently to make that determination.

BY MR. HAMMOUD:

Q.  Okay.  And then you said if Experian were to receive multiple dates of birth from different data

Victor Manuel Ramirez Najera vs. Experian Information Solutions, Inc. -
30(b)(6) of Experian Informtion Solutions, Inc., by Teresa Iwanski

October 8, 2025
173

furnishers, Experian would view each of those dates of birth as accurate.  Is that correct?

A.    Experian believes the information that's reported to Experian is accurate.  Outside of that, it would depend on what is being disputed and what is coming from the data furnisher itself.  Not all companies report with the date of birth.

Q.    Does Experian policies and procedures list all the documents that Experian considers sufficient to prove a consumer's date of birth?

A.    Yes.  I'm -- I'm sorry.  Yes.  We do have a policy in place that -- that Experian does communicate to consumers when -- when we ask for proving date of birth.

Q.    Okay.  And then in these circumstances where we're describing, like, a consumer disputes "not mine because it was opened before I was 18," are dispute agents trained to look at the open date in comparison with the consumer's age, or does the consumer need to explicitly state that the tradeline was open before they were 18 or that they were a minor?

A.    It would be something that -- that the -- is being communicated at that time.  So the consumer would need to explain to Experian or say to Experian, "This was opened before I was 18," or provide their driver's license and see this is the wrong -- "I didn't open it.  This is

the wrong year," or something to lead that agent to look at the proof information, meaning if there's a driver's license, compare it to the open date to apply that policy.

Q. Okay. When a -- when a consumer calls in to dispute, is there a verification process that they go through on the phone? So before they get an agent on the line, do they have to verify their identity?

A. When they have a report number, meaning, they've already gotten a report number either online, by mail, there is a little bit of verification that goes on, and that's done through an automated process, and then they are sent to the queue for the next available phone agent.

Q. And what if there isn't a report number? What if they're just calling the Experian, you know, customer service number to dispute?

A. There are times when consumers can bypass that kind of process, and there is an authentication process that -- that is asked of the consumer, specifically information about the report, things that they would know that another person would not.

Q. What do you mean, there are times they could bypass? So not all -- so not -- Strike that.

I guess I'm trying to understand. It sounds like there's only certain types of disputes that could be made over the phone if you don't have, like, a report

number.  Am I understanding that correctly?

A.    It depends if you -- if the agent -- I'm sorry.

If the consumers have a report number, they go through the automated system.  They are verified through the automated system, and then they are sent to the next available person.  If they do not have a copy of their report, there is an avenue for consumers to go through on the telephone in order to speak to a person. But in order to speak to that person, they need to be authenticated first.

Q.    And how do they get authenticated?

A.    The authentication process is asking questions about their report, information on the report, information that they would only know.

Q.    Okay.  Does it ask for their social security number to verify it?

A.    It does.  I'm not quite sure if it's just recently changed -- not recently -- but I'm not quite sure if it's the full social at this time or just the last four, but it is part of that verification process.

Q.    How about date of birth?

A.    Yes.  I believe the date of birth is also asked for as well.

Q.    Okay.  What I'm going to put in front of you is -- give me a second.  Let me close some of these

windows.

Let me know when you can see my screen.

A.   Okay.  I can see the screen.  If you want to make it just a little bit bigger.

Q.   Sure.  I will in a moment.

(Deposition Exhibit 2 was marked for identification.)

BY MR. HAMMOUD:

Q.   You know, for the record, this is being labeled as Exhibit 2.  It is Bates stamped EXPERIAN 209 through EXPERIAN 218.  Do you see that?

A.   Yes.

Q.   Okay.  And if I refer to these documents by its Bates stamp, are you going to know what I'm talking about?

A.   Yes.

Q.   Okay.  Are you familiar with -- with this document?

A.   Yes, I am.

Q.   Okay.  And is this something that you reviewed prior to today?

A.   Yes, I have.

Q.   Okay.  And this is plaintiff's disclosure log.  Is that correct?

A.   Yes, it is.

Q.   Okay.  What kind of information is contained in a

disclosure log?

A.   The information that's contained would be the identification information that was used to access the consumer's report.  It's going to contain name, social security number, address, date of birth, if given, as well as the report number that's generated at that time.  It's also known as a capid.  It would also house any kind of communication that is sent to the consumer as well.

Q.   Okay.  And so the -- so then the disclosure log, it would also identify on which -- on which dates the consumer initiated disputes with Experian?

A.   Yes, it would house the dispute -- the date that it was accessed by that agent, correct.

Q.   Okay.  So I'm going to scroll us down to top of -- bottom of EXPERIAN 217, top of EXPERIAN 218.

Do you see here where there's a reference to a phone dispute that occurred on February 12, 2024?

A.   Yes, I do.

Q.   Okay.  So does this mean that the plaintiff made a dispute over the phone on February 12, 2024?

A.   It looks like an access.  I'm not quite sure if it was an actual dispute or not.  If we can scroll down just a little bit, please -- or scroll up, just want to see if that's 2-12 -- 2-12 -- if you go back down just a little bit, please.  Okay.  Right there.  Sorry, right

there.

So it looks like on that same date there was an Internet access, so that generated the capid, which is also report number 2392744285. And if you scroll back up to 2-12 -- underneath where we see the PII, I don't see CDF, where it says "No CDF." So it doesn't look like this was an actual dispute.

Q. Okay. So -- so this -- so right here -- can you see where I'm highlighting?

A. Yes.

Q. Okay. So you're saying this -- this here, it doesn't indicate that a -- that a phone dispute had occurred on February 12, 2024?

A. Not with this particular -- sorry. One second.

So what you're -- what you're highlighting is the report number, agent ID, stamp date, phone dispute report type. Below it is going to tell us whether or not there was a dispute that was lodged.

Access to the consumer's file has a default of phone, and the access itself doesn't necessarily mean that there was a dispute that was lodged at that time. It might be related to the -- I'm not sure if that's a reseller or just an Internet access for that same date.

Q. Okay. Do you know what this means, the report type "Up Top LLC"?

A.   I'm not sure if it's a reseller or if it's a part -- it's part of Experian's access.  The eccharger -- agentId, eccharger [sic] is internet, Experian's internet. The Up Top LLC, I'm not sure if that's -- if that's a reseller or not, though.

Q.   Okay.  So if we wanted to see if there was a dispute made on February 12, 2024, where would we look?

A.   On the DR log.

Q.   All right.  I'm going to jump ahead and pull up the DR log.  But I'm going to label it as Exhibit 5, so I don't have to switch all the exhibit numbers on my end. Okay?

And then we'll come back and we'll fill in Exhibit 3 and 4.  Okay?

(Deposition Exhibit 5 was marked for identification.)

BY MR. HAMMOUD:

Q.   So what I'm putting in front of you now is Exhibit 5.  This is labeled as EXPERIAN 219 through 222. Have you seen this document before?

A.   Yes, I have.

Q.   Okay.  And then in this context, the DR stands for dispute response.  Is that correct?

A.   Yes, it is.

Q.   Okay.  And then the dispute response log is a

Coash Court Reporting & Video, LLC
staff@coashcrv.com
602-258-1440
www.CoashCourtReportingandVideo.com
APPENDIX 0510

document that Experian can generate which shows all disputes that a consumer has made within seven years from the date of the report and the results of those disputes?

A.   Yes.  Typically, that's the retention time.

Q.   Okay.  And then here at the top, the PIN, this is the PIN that we had talked about earlier that's associated with each consumer.  So this would be the PIN associated with the plaintiff in this matter, Mr. Ramirez Najera.  Is that correct?

A.   Yes.  That was the PIN at that time.

Q.   Okay.  Has that PIN changed?

A.   I don't believe so.

Q.   Okay.  And then this report -- this DR log report was generated on June 3, 2025.  Is that correct?

A.   Yes, it was.

Q.   Okay.  Did you generate this DR log report on June 3?

A.   No, I did not.

Q.   Okay.  And then this report was generated on June 3, which is around -- maybe like a month after this lawsuit was filed.  Is that your understanding?

A.   I'm not quite sure how long it was when we pulled the documents, but it would have been around that time when Experian was notified to pull documents based off of the request of counsel.

APPENDIX 0511

Q.    Okay.  But by the date of the report, June 3, is it fair to say that this report would not include any information that occurred after June 3, 2025?

A.    That's correct.

Q.    Okay.  So now let's jump down here to 2-20.  You see that there are two disputes here dated February 12, 2024.  Is that correct?

A.    Yes.

Q.    And these were handled by the agent identified as c92919b?

A.    That's correct.

Q.    Do you know the identity of this agent with this ID number?

A.    I do not.

Q.    Do you know if this individual is still employed by Experian?

A.    I do not know.

Q.    Do you know if this agent is located in Texas, Chile, Costa Rica, or India?

A.    I do not know.

Q.    Now, looking at these two disputes, can you determine whether these were made over the phone or online or through some other mode of communication?

A.    Yes.  It appears to be by telephone on 2/12/2024, which was created with the report number 3466487041.

APPENDIX 0512

Q.   Okay.  And how can you tell that it is -- that this was -- this was a phone dispute?

A.   Based off of the fact that the stamp date and the dispute date is the same.

Q.   Okay.  So only phone disputes would have the same stamp date and the same dispute date?

A.   Yes.  Experian has five days to work mail. Typically, it is not processed within the same day.

Q.   Okay.  And how about online disputes?

A.   Online disputes would have a different agent ID.

Q.   Okay.  So going back to Exhibit 2, do we know if this -- now this February 2 entry refers to a dispute that was made over the phone?

A.   If you could capture that report number one more time, I can tell you which portion of the disclosure log it pertains to.

Q.   Okay.  So --

A.   So the -- yes, that one.

Q.   Looks like they're different?

A.   The easiest way to do it is a fine string.  It might be just a little bit lower or a little bit higher.

Q.   Okay.  So here it is on EXPERIAN 217, a little bit higher, we see it?

A.   Yes.

Q.   Okay.  And you're aware that Experian produced

the dispute phone call recording in this case, right?

A.    Yes.

Q.    Did you listen to that call recording?

A.    Yes, I did.

Q.    Does Experian record all calls that it has with consumers?

A.    Yes.  Experian records the calls, and those are retained for two years.

Q.    Okay.  24 months.  And then they're deleted?

A.    Unless they're otherwise requested to -- to not be deleted.

Q.    Okay.  Are they permanently deleted or are they, you know, I guess, scrubbed in a way, but, you know, the data is still there should Experian need to come back after two years and pull that recording?

A.    My understanding, it's deleted after two years.

Q.    Okay.

A.    And that is all I have knowledge of as far as that goes.

Q.    Okay.  Is there any way to tell from the agent ID number where this individual is located?

A.    No.  All agents have a similar format for the agent ID.

Q.    Okay.  And then in preparation for today's deposition, you would have reviewed these documents, and

APPENDIX 0514

you would have, you know, at least read or noticed the -- you would have determined that on the -- on this day, February 12, 2024, there was a phone dispute, correct?

A.    Yes.

Q.    Okay.  Did you reach out to speak to this agent or see if they were still employed by Experian?

A.    No, I did not.

Q.    Okay.  So what I'm going to put in front of us now is being labeled as Exhibit 3.

(Deposition Exhibit 3 was marked for identification.)

BY MR. HAMMOUD:

Q.    This is the phone call recording that was produced by Experian in this matter.  I'm going to open it and start it.  The volume should come through.  So I'll let it play a little bit, make sure that you -- and then pause it, make sure that you could hear the volume.  And once you confirm, then I'll continue on.  Okay?

A.    Okay.

(Audio recording was played.)

BY MR. HAMMOUD:

Q.    Did you hear that?

A.    Yes, I did.

Q.    Okay.  Now I'm going to start it.

(Audio recording was played.)

APPENDIX 0515

BY MR. HAMMOUD:

Q.    Okay.  During that portion of the recording, do you agree that the plaintiff identified himself?

A.    Yes, he did.

Q.    Okay.  And before he would have got on this call, he would have had to go through the verification process at the outset?

A.    Yes, he would.

Q.    Okay.  And he stated clearly that he wanted to dispute something on his credit report, correct?

A.    Correct.

Q.    And then he proceeded to identify both the Pennymac and the Rushmore tradelines.  Is that correct?

A.    That is correct.

Q.    Okay.

        (Audio recording was played.)

BY MR. HAMMOUD:

Q.    Okay.  So during that portion of the audio we just listened to, you agree that the dispute agent asked plaintiff what was the reason for his dispute, correct?

A.    Yes.

Q.    And you would agree that plaintiff clearly said -- made a not mine dispute, right?

A.    Yes.

Q.    Okay.  In response, did the dispute agent ask any

questions about plaintiff's not mine dispute?

A.   No.  There was no additional discussion about it.

Q.   Okay.  Did the dispute agent ask plaintiff if he was the victim of identity theft?

A.   No.  That was not given from the plaintiff at that time.

Q.   Did the dispute agent ask the plaintiff if he knew the identity of the true accountholder?

A.   No.  It was not discussed in this phone call.

Q.   Okay.  Did the dispute agent encourage or tell plaintiff to provide supporting documentation?

A.   No.  There was nothing, no conversation or supplemental information that was being requested.

Q.   Okay.  Did the dispute agent ask plaintiff anything in response to his not mine dispute?

A.   The Experian agent just processed the dispute as it was given by the consumer at that time.

Q.   Okay.  So Experian's dispute agent understood plaintiff's not mine dispute and told him that the furnisher would have up to 30 days to respond, correct?

A.   That's correct.

Q.   Okay.

(Audio recording was played.)

BY MR. HAMMOUD:

Q.   Okay.  And that's the end of the recording.  Do

you agree?

A.   Yes.

Q.   Okay.  During this final portion of the call, you agree that the dispute agent asked plaintiff for his email address, correct?

A.   Yes.

Q.   Did the dispute agent ask plaintiff for any other information that would be helpful in resolving his dispute?

A.   No.  There was not any discussions other than the fact that the consumer was saying, "This is not mine."

Q.   Is this dispute agent's conduct consistent with -- with what Experian expects from its dispute agents?

A.   In this kind of situation, it would've been best if the agent asked additional questions, asking if the consumer knows who this belongs to or otherwise engaging in this kind of a dispute.  The -- without that kind of a discussion, this is treated just a regular not mine, and then the ACDV is then sent to the data furnisher.

Q.   Okay.  So you agree that it would have been more helpful to ask Mr. Ramirez Najera some additional follow-up questions?

MR. MCCRAW:  Objection.  Form.

THE WITNESS:  Yes.  So during training,

Victor Manuel Ramirez Najera vs. Experian Information Solutions, Inc. -
30(b)(6) of Experian Informtion Solutions, Inc., by Teresa Iwanski

October 8, 2025
188

depending on the dispute reason and what's on file, the agents are also trained to ask if they know who it belongs to. So in this instance that -- that did not happen. It was then sent as a regular not mine to the data furnisher.

BY MR. HAMMOUD:

Q. So would you say that the dispute agent didn't follow the policy and procedures or the training that Experian expects of them?

A. Correct. So Experian asks that they engage in at least a follow-up, "Do you know who this belongs to?" Outside of that, it is -- the dispute reason is just coming in from the consumer and the agents are processing those disputes.

Q. Okay. So just so I understand what you're saying, it's Experian's position that this dispute agent did not handle this phone call dispute in the way that Experian's policies and procedures or training would expect from the agent?

A. That's correct. It would have been best if the agent would have asked if -- if the consumer knew who this belonged to.

Q. Okay. And I just -- I want to clarify something. Because previously, before we got into the exhibit, you mentioned there was a mistake that occurred, but you had mentioned that was related to the mail correspondence. So

that was -- this is a different mistake that we're talking about now.  Is that correct?

A.   Yes, that's correct.

Q.   Okay.  All right.  What I'm going to share now is being labeled as Exhibit 4.

(Deposition Exhibit 4 was marked for identification.)

BY MR. HAMMOUD:

Q.   Have you seen this document before?

A.   Yes, I have.

Q.   Okay.  And this is plaintiff's Experian, February 12, 2024, credit report.  Is that correct?

A.   It says credit report, but it's known as a consumer disclosure.  So this is a consumer disclosure that was generated on February 12, 2024, with report number 2392-7442-85, I believe.

Q.   Okay.  And this is, like I said, Exhibit 4.  It's Bates labeled EXPERIAN 1 through EXPERIAN 10.  Would you agree?

A.   Yes.

Q.   Okay.  And then these credit disclosures are captured or generated by Experian whenever a consumer initiates a dispute?

A.   No.  These are a -- this cap -- this is done when the consumer is asking for a consumer disclosure --

Victor Manuel Ramirez Najera vs. Experian Information Solutions, Inc. -
30(b)(6) of Experian Informtion Solutions, Inc., by Teresa Iwanski

October 8, 2025
190

Q.   Okay.

A.   -- or one is being generated based off of that contact.

Q.   Okay.  Do you know how the plaintiff would have requested or when he would have requested the -- this consumer disclosure?

A.   So I would have to look at the report number and tie it back to what was on the disclosure.  So looking at 2392 on that date, I can tell you how it was requested.

Q.   Okay.  I'll go on.  I don't think it's really important right now.

So I'm going to turn to Experian 3.  Do you see that there are two mortgage accounts being reported on the plaintiff's Experian credit disclosure of February 12, 2024, the Pennymac and the Rushmore account?  Do you see that?

A.   Yes.

Q.   Okay.  Do you agree that these are the only two mortgage accounts reporting on this credit disclosure?

A.   Yes.  There was only two.

Q.   Okay.  And do you agree that the Pennymac mortgage reflects that it was transferred to another lender in February 2019 -- in or around February of 2019?

A.   Yes, it does.

Q.   And do you agree that the mortgage with Pennymac

was transferred from Pennymac to Rushmore in or around May of 2019?

A.    Yes, that's my understanding.

Q.    Okay.  So it's your understanding these two accounts, the Pennymac and Rushmore, are dealing with the same mortgage.  Is that correct?

A.    One does have the terms 21 years, and one has 30.  The original amount looks a little bit different.  The debt itself appears to be the same, but it was transferred and so possibly the terms have changed.

Q.    But it's your understanding, other than that, your belief is that these are related to the same mortgage.  Is that correct?

A.    That's my understanding based off of the fact that the original amount looks to be the same.

Q.    That it was opened on the same date, it's associated with the same address ID.  Is that correct?

A.    Yes.

Q.    Okay.  And that there's no, like, overlapping payment histories.  Is that fair?

A.    Yes, it is.  That's fair.

Q.    All right.  So I'm turning back to Exhibit 5.  We're at Experian 220.  I know we touched upon this, but I just want to confirm, looking at the DR log, the agent who handled the February 12 phone dispute, that is the agent

Coash Court Reporting & Video, LLC
staff@coashcrv.com    602-258-1440
www.CoashCourtReportingandVideo.com

APPENDIX 0522

that we just heard on the call recording.  Is that correct?

A.   Yes, it is.

Q.   Okay.  And you do not know the identity of this agent?

A.   I do not.

Q.   Okay.  And then the -- then the dispute agent listed --  Strike that.

The dispute agent selected as the external dispute code, the "not mine, provide complete ID."  Do you agree?

A.   Yes, I do.

Q.   Okay.  And she had done this for both of the accounts?

A.   Correct.

Q.   Okay.  Now what I'm going to put in front of you is labeled as Exhibit 6.

(Deposition Exhibit 6 was marked for
identification.)

BY MR. HAMMOUD:

Q.   This is the Pennymac ACDV response, Bates labeled Experian 147.  Have you seen this document before?

A.   Yes, I have.

Q.   Okay.  Is it fair to say you're familiar with it and how to read it?

A.   Yes, I am.

Q.   Okay.  And this is the ACDV response that Experian received from Pennymac, correct?

A.   Yes, it is.

Q.   Okay.  And just so we've got it for the record, an ACDV response consists of information that Experian provides to the data furnisher based on what Experian has on file for that consumer at the time, correct?

A.   Yes.

Q.   Okay.  And then you can see that I've drawn some colored boxes here around some of these responses.  Do you see that?

A.   Yes, I do.

Q.   Okay.  And then the portion inside the red boxes, would you agree that's the information that Experian has on file for -- for the plaintiff?

A.   Yes.  So when Experian accessed the consumer's report, the consumer identification information is populated on the ACDV.  So the identification and the profile is basically a snapshot of what was given that day.

Q.   Okay.  A snapshot of what was given on that day from within Experian's system on that specific consumer?

A.   That's correct.

So for the consumer identification, that was

APPENDIX 0524

the consumer disclosure that was generated with the 3466 number, which includes the Victor Ramirez social security number, date of birth, and address.

Q.   Okay.  So I -- I just, you know -- and I understand that.  I just want to make it clear that this consumer identification section, it doesn't contain what Pennymac reported upon this person -- like, Pennymac's the person identifying information about the plaintiff -- but rather it contains the information that consumer had on file for the plaintiff.  Is that correct?

A.   That's correct.  That's the identifying information that was gathered when Experian accessed the report and processed the dispute.

Q.   Okay.  And then here we see the dispute reason, which is code 1, "not his/hers, provide complete ID."  Is that correct?

A.   Yes, it is.

Q.   And then on the right-hand side, we see the response they -- so Pennymac responded to this on February 15, 2024.  Is that correct?

A.   Yes, they did.

Q.   Okay.  And Pennymac also responded with a code 23.  Do you see that?

A.   Yes, I do.

Q.   Okay.  And is it your understanding that code 23

means that the disputed information is verified as accurate, but there's some other information that's being updated unrelated to the dispute. Is that correct?

A. Yes. Yes, that's what it means.

Q. Okay. But you can see here that the social security number and date of birth that came back with the response from Pennymac was different than the social security number and date of birth that Experian had on file, correct?

A. Yes, that's correct. So the Experian agent -- once we received the ACDV, the Experian agent deleted the account.

Q. Okay. So I understand that Experian has ACDV procedures that contain instructions for how its dispute agents are supposed to handle ACDV responses from data furnishers. Is that correct?

A. Yes, that is correct.

Q. Okay. And do those ACDV procedures specify how Experian is supposed to treat not mine dispute responses?

A. Yes, it does.

Q. So what -- what does Experian's ACDV procedure say that dispute agents are supposed to do if the return name matches but the returned social security is totally different?

A. So the agent will look on file to see what social

security number is on file.  And because we got returned a different social, different date of birth, the policy is to delete the account.

Q.    Are they supposed to notify a supervisor, or are they supposed to just proceed and delete on their own?

A.    The policy is just to delete based off of the data furnisher's response.

Q.    So if the return name matches but the social security number is totally different, the dispute agent is not supposed to notify a supervisor to determine if there's a possible mixed file?

A.    No.  At this point, the agent is processing the ACDV, and based off of the information it received from the data furnisher, Experian's policy is to delete the account.

Q.    What -- what would be the reason for the -- for the deletion, though?

A.    It would be the -- the age of the individual, as well as the social security number was -- was completely different.

Q.    Okay.  So when they -- when they're placing the -- so over here, they would -- they would place an internal response code and delete it on Experian's end?

A.    Yes.  They delete it on Experian's file.

Q.    Okay.  Is there a way to see how this was coded,

what internal response code was used by this agent?

A.    It was in the DR log.

Q.    Okay.  Would it be here on this page?

A.    Yes, on the second page at the top.

I'm sorry, the third page.

Q.    Yeah.  Just so the record's clear, we're back on Exhibit 5, and we're looking at Experian 221.

Are you referring to this response: "Reason= Delete-No Reason for Delete Given"?

A.    Correct.

Q.    Did this agent handle this correctly?

A.    Yes, they did.

Q.    Okay.  So even though the name matched, but it came back with a completely different social and date of birth, the agent, according to Experian's policies and procedures, should just proceed to dispute without looking further to determine if there's a mixed file.  Is that correct?

A.    There is no indication of it being a mixed file at this point.  There was no indication of the reason code being a mixed file.  So at this point, the agents are processing the deletion based on what was received from the data furnisher.

Q.    Okay.  What -- what do Experian's ACDV procedures say that dispute agents are supposed to do when the return

date of birth is more than -- is off by more than five years?

A.   It's to delete the account.

Q.   And just to delete it without investigating to determine if there's a possible mixed file?

A.   If there was some sort of indication on the file, if there was conflicts.  There are times when the agent that's processing the ACDV may escalate that.  In this kind of situation, I don't believe that there was a social security number present with the Pennymac.  I'd have to look at the admin to confirm that.

Q.   Okay.  So when you say like without, like, more information on the file, you mean at the front end when the dispute was being initiated?  Like, there was no mention of -- of a potential mixed file or a -- or a possible mixed file?

A.   So that -- yes, that is correct.  So -- and the process of it being a -- just a regular not mine, we're still going to look at the identification information even though it's not -- they're not saying it's mixed.

Q.   Okay.

A.   So once we receive the response back, we're looking at that date of birth and that social security number and to see if we're going to keep it.  There are times when the agents can look for conflicts on the

consumer's report. If there's any conflicts, that could be escalated. But I would have to look at the admin to confirm whether or not that account was reporting with a social security number or not.

MR. HAMMOUD: Okay. Let's take, like, a short five-minute break. It's 2:45. Go off the record. We'll come back at 2:50.

THE WITNESS: Okay.

THE COURT REPORTER: We're off the record. Time is 2:46 p.m.

(A recess ensued.)

THE COURT REPORTER: Okay. We are on the record. Time is 3:01 p.m.

BY MR. HAMMOUD:

Q. Ms. Iwanski, during any of the breaks that we took today, did you review any documents?

A. No, I did not.

Q. Okay. Did you go onto your computer and access any policies and procedures housed within Experian's system?

A. No, I did not.

Q. Okay. Let's see, where did I leave off?

Okay. I think I was here. So before we took the break, we were talking about the -- the way that the dispute agent handled the response from Pennymac. Is

that right?

A.   Yes, that's correct.

Q.   Okay.  Now what I have in front of you is Exhibit 6.  This is the -- the Pennymac ACDV response, correct?

A.   Yes, it is.

Q.   Okay.  Would you agree that the social security number that Experian had on file for the plaintiff and the social security number that Pennymac reported was completely different?

A.   So the social security number is what was used to generate that -- that disclosure.  So that social security number and the response social security number is completely different, yes.

Q.   Okay.  And you indicated that in a situation like this where the name matches and the social security number is completely different, the policies and procedures tell the agent to just proceed to delete the account.  Is that correct?

A.   That is correct.  We have ownership disputes, the date of birth is always -- is also looked at.  But when we have ownership disputes, and it comes back in this manner, the process is to delete the account.

Q.   Okay.  But you -- you stated that even with the social security number being completely different, the

dispute agent would not initiate a mixed file

investigation.  Is that correct?

    A.   On the return of the ACDV, if there was any kind

of not mine, meaning -- or verbiage within that not mine

that said possible mixed file, it is treated with a

possible mixed file kind of procedure.  Outside of that,

it really depends on what -- what is on file at that time.

I'm not quite sure if Pennymac was reporting a social

security number at that time.  But the response back was a

completely different social and a completely different

date of birth, so the policy is to delete the account.

    Q.   Okay.  The policy is to delete, but do not do an

investigation to determine whether this is a potential

mixed file, correct?

    A.   Correct.  Not at this point.

    Q.   Okay.

    A.   The agent is processing according to how the --

how the dispute was initiated and with the differences and

the return of the social security number and date of

birth, the process is to just delete the account.

    Q.   Okay.  And then over here, we could see that the

date of birth that was returned from Pennymac is off by

more than five years.  Would you agree?

    A.   Yes, it is.

    Q.   It's off by, you know, approximately 25 years.

APPENDIX 0532

Victor Manuel Ramirez Najera vs. Experian Information Solutions, Inc. -
30(b)(6) of Experian Informtion Solutions, Inc., by Teresa Iwanski

October 8, 2025
202

Would you agree?

A.    Approximately, yes.

Q.    Okay.  And then in a situation like this, again, the dispute agent -- the policy and procedure would tell them to just move to delete, but not to initiate an investigation to determine if this is a mixed file.  Is that correct?

A.    That's correct.  It's not always a mixed file. Sometimes there's other reasons for them having a different social security number.  Experian does not independently have that knowledge.  But based off of the response, the agent is -- is -- the policy is to delete the account.

Q.    Okay.  So is it your position that this agent handled the ACDV response from Pennymac in a manner consistent with Experian policies and procedures and training?

A.    Yes.

Q.    Okay.  And then look at -- looking at Exhibit 5. This is the -- Experian's DR log.  We see that the agent who handled the ACDV response from Pennymac was identified as m01067a.  Is that correct?

A.    Yes, it is.

Q.    Do you know the identity of this person?

A.    I do not.

Q.   Did you speak to this person?

A.   I did not.

Q.   When reviewing these documents in preparation for today's deposition, did you look up to see if this person was still employed by Experian?

A.   No, I did not.

Q.   Do you know where this person is located, whether it's Texas, Chile, Costa Rica, or India?

A.   I do not.

Q.   Okay.  All right.  What I'm going to put in front of you now is being labeled as Exhibit 7.

         (Deposition Exhibit 7 was marked for
         identification.)

BY MR. HAMMOUD:

Q.   This is labeled as EXPERIAN 146.  Have you seen this document before?

A.   Yes, I have.

Q.   Okay.  And this is the ACDV response from Rushmore/Nationstar, correct?

A.   Correct.

Q.   And this is the response to the AC- -- to the dispute from February 12, 2024, correct?

A.   That is correct.

Q.   Okay.  And this dispute code was also given the "code 1, not his/hers, provide complete ID."  Is that

correct?

A.   Yes, that's correct.

Q.   And then in response to this ACDV, Rushmore responded with a "code 1, account information accurate as of date reported, no changes," correct?

A.   That is correct.

Q.   Okay.  And this response was given on February 28, 2024, correct?

A.   That's correct.

Q.   Okay.  So I see here on the bottom of -- we're back on Exhibit 5, EXPERIAN 220.  We see here that it indicates a response reason "remains, auto ACDV processing," with "Agent ID= AR 00001."  Do you see that?

A.   Yes, I do.

Q.   Okay.  Does that mean that Rushmore's ACDV response was handled automatically and no live human reviewed the response?

A.   That's correct.  Based off the fact that they gave a full match of ID, date of birth, and that matched back to what was given on the ACDV as far as what we were contacted with, the account remained unchanged, and that was processed through automation.

Q.   Okay.  So in instances where the ACDV response is a code 1, no changes are made.  Those are handled by Experian's algorithm and automatically processed?

A.   Not always.  If there is a difference in the identification information and ownership, the agents will then look at what was being -- what was different to see if the account will be deleted.

Q.   Yeah, but I'm talking in, like, a code 1 where they indicate that "it's accurate, we're not making any changes."  It would just -- the algorithm would automatically just process it itself?

A.   No.  So this is an ownership dispute.  So the identification information is also looked at.  It's not just the fact that they are not wanting changes; if there was a difference, like the one we had looked at before where they had given a different social security number, different date of birth, then at that point, the agent would look at that and then delete it based off of their -- if it was different and matched based what we were just looking at in the other ACDV.

Q.   Okay.  Understood.

And then looking at this DR log, we see that the response date here was March 7, 2024.  Is that correct?

A.   No.  That was the other ACDV.  So the previous ACDV is March 7.  The one we're looking at right now is March 28.

Q.   You mean -- you mean February 28, right?

A.    I'm sorry.  I apologize.  February 28.

Q.    Okay.  So turning back to the Pennymac ACDV, we see that Pennymac responded to Experian on February 15, 2024, correct?

A.    Yes.

Q.    And the DR log reflects that on March 7, 2024 is when the response was given by Experian to the plaintiff. Is that correct?

A.    Yes.  So it was handled through the agent receiving it.  So the ACDV was returned on -- I'm sorry, I missed that date -- on 2-15, and then -- was then worked by the agent on 3-7.

Q.    Okay.  So between February 15 and March 7 of 2024, it's approximately 26 days.  Would you agree?

A.    I would -- I think it is.  I'm not quite sure, but it is around that date.

Q.    Maybe my math is a little bit off, depends if it was -- if it was a leap year, right?  15, 28, 14, and 7, about 21 days.  I'm sorry.  Like I said earlier, lawyers are not good at math.  So approximately 21 days or so. Would you agree?

A.    Right around there.

Q.    Okay.  So what was happening between February 15, 2024 and March 7, 2024?  Do you know?

A.    The agents were processing other ACDVs as they

were coming in, and this one was processed in line when Experian received it, in the order it was received.

Q. Okay. But wouldn't Experian have received this Pennymac response before they received the Nationstar response? Because I understand that the -- Pennymac responded on February 15. Nationstar responded on February 28, but the Nationstar was -- Strike that.

So do -- do -- are there any notes that we could look at to see what was being done between February 15 and March 7 on this account related to the Pennymac one?

A. No. It was just the volume of ACDVs that the agents are trying to work through. So these were handled by live agents, and there are times when volume is a little bit higher than other times. So it varies from month to month.

Q. Okay. So you indicated that for ownership disputes, if a furnisher responds with a code 1, it is not always the case that the response would be -- would be handled through the automated system. Is that correct?

A. That's correct. The difference, then, would be through the reason code. And if the reason code was ownership, the identification information, if there's anything different, a live agent would need to look at that difference.

APPENDIX 0538

Victor Manuel Ramirez Najera vs. Experian Information Solutions, Inc. -
30(b)(6) of Experian Informtion Solutions, Inc., by Teresa Iwanski

October 8, 2025
208

Q.   Okay.  By "anything different," we mean if the name is different.  Is that one example?

A.    If the social security number, date of birth is different, then the agent would need to look at that information.

Q.   Okay.  But not if the name is different?

A.    It depends.  So if the name itself -- meaning it's -- it doesn't have a middle name, doesn't necessarily mean it's a completely different name itself.

What we're looking for is the -- the same.  And I can't see it very well on this ACDV right now, but there's boxes -- sorry, yes -- there's boxes to the right under response date.  We have the different flags.  So we have a name flag, that's SSN and the date of birth flag, in addition to the names.  But -- but the full name, even though there's not a middle name, doesn't mean it's a different name.  It's just -- it's letting us know that there's the same first name, last name, and all the other flags were showing the same.

Q.   Okay.  So essentially if the social security number or the date of birth was different on an ownership dispute like this -- which is a not his/not hers -- then it would require a live human to take a look at it before the ACDV response is, let's say, processed by Experian, fair?

Victor Manuel Ramirez Najera vs. Experian Information Solutions, Inc. -
30(b)(6) of Experian Informtion Solutions, Inc., by Teresa Iwanski

October 8, 2025
209

A.   Yes.   So the agent would need to look at it, just like the agent was looking at the other ACDV.   And if there's the same responses, meaning the different social security number, different date of birth, the account would have been deleted.

(Deposition Exhibit 8 was marked for identification.)

BY MR. HAMMOUD:

Q.   Okay.   Now, what I'm going to put in front of you is being labeled as Exhibit 8.   This is Experian Bates stamp 115 [sic] through 118.   Would you agree with that?

A.   Yes.

Q.   Okay.   Have you seen this document before?

A.   Yes, I have.

Q.   Okay.   And these are the dispute results that Experian sent to the plaintiff dated March 7, 2024.   Is that correct?

A.   Yes, it is.

Q.   These would be the dispute results in response to plaintiff's February 12, 2024 dispute of the Pennymac and Rushmore accounts.   Is that correct?

A.   Yes, they are.

Q.   Okay.   And we can see at the bottom of EXPERIAN 15, Experian provides the results of the plaintiff's dispute.   Is that correct?

A.   That's correct.

Q.   Okay.  And we can see that with respect to the Pennymac account, Experian indicated that it was deleted and removed from its credit report.  Is that correct?

A.   Yes, it was.

Q.   Okay.  And Experian, with respect to the Rushmore account, indicates that it's going to remain because Rushmore reported -- because Rushmore certified to Experian that the information was accurate.  Is that correct?

A.   Yes.  Based off of the ACDV, the identification information matched, and the account remained on file.

(Deposition Exhibit 9 was marked for identification.)

BY MR. HAMMOUD:

Q.   Okay.  I'm going to turn to Exhibit 9.  This is a document Bates labeled EXPERIAN 171 through 208.  Is that correct?

A.   Yes.

Q.   Have you seen this document before?

A.   Yes, I have.

Q.   Okay.  And you're familiar with it?

A.   Yes, I am.

Q.   Okay.  And this is the plaintiff's Experian admin report.  Is that correct?

A.    Yes, it is.

Q.    Okay.  And what is an admin report?

A.    The admin report is going to be a snapshot of what the full account looks like for a particular PIN, and it's going to house the names, the addresses, trade accounts, inquiries that are displayable to the consumer or that are also just not displayable but within Experian's records.

Q.    And this -- on the top left on the first page of EXPERIAN 171, it refers to TCA1.  Does this refer to your personal login code for the FileOne system?

A.    No, that is not mine.  It's whoever was pulling the documents at that time.  So on 6-3-2025, it was not me.

Q.    So do you know who this ID is for, who TCA1 is?

A.    I believe that's Sylvia.  I don't remember her last name.

Q.    What is the process for pulling an admin report?

A.    When Experian is named in a lawsuit and Experian's attorneys are asking for documents, this is one of the documents that's pulled.  It's going to give a snapshot of what the account looked like once we received the lawsuit complaint, and this is part of production --

Q.    So to pull this --

A.    -- process as well.

Q.   So to pull this admin report, somebody in Experian would have to log in to the A system?

A.   No.  It's a different platform to pull this information directly from Experian's computer system.

Q.   What -- what platform is this information housed on?

A.   I believe it's just J access.  I can't remember specifically.

Q.   J, as in jaguar, access?

A.   Yes, I believe so.

Q.   Okay.  How long does it take to pull an admin report?

A.   It depends how long the -- whether or not we have the identifying information.  If we have all the identifying information, it would just take as long as it takes for the person to log in, type that information in the top area up there where you see the TCA and the string that's ending in 1995 with that information.  And then once it pulls the admin, then retaining that admin after that, there's not a particular time frame.  It can be minutes.

Q.   Okay.  So it doesn't take much effort to pull an admin report?

A.   I don't know what you mean by effort.  There has to be a reason to pull an admin report.

APPENDIX 0543

Q.   Well, I mean, if Experian had to go pull an admin report, it's not something that would take, like, a whole day to go pull it.  It sounds like maybe you'd have to log in, type in some information, and within a couple minutes you could have an admin report generated.  Is that fair?

A.   Generally, depending on the ID information.  If we have sufficient ID to access the file, if we have a reason to access the file.

Q.   Okay.  And then this at the top, the TCA1 SV6 7999750***, can -- can you explain what all this means at the top?

A.   That is the identifying information that is being used to access the consumer's report.  So based off of the direction of counsel, that is the identification information Experian received to pull this particular admin.

Q.   So I -- I can see here where I'm highlighting, this is the plaintiff's full name, social security number, and it looks like an address with the year of his birth, correct?

A.   Yes, that's correct.

Q.   Okay.  What does this CA stand for next to the 3924, right before it?

A.   That's the consumer's address.

Q.   Okay.  And then how about these numbers at the

beginning, the TCA1 SV6 7999750***?

A.    That goes back to the person that's pulling the information.

Q.    Okay.  So this would be related to the identification of -- the employee identification of the person pulling the information.  Is that correct?

A.    Yes.  Yes.

Q.    So all this from -- beginning from T and ending at star, this would all be related to Sylvia's identifying employee information.  Is that correct?

A.    It's all part of their information in order to access the -- the admin.  So that's correct.

Q.    Okay.  And Experian, they maintain something called a long admin report.  Is that correct?

A.    A long admin is not retained.  It is pulled when requested.

Q.    Okay.  What's the difference between a long admin report and an admin report?

A.    So long admin is going to house every time a company reported information to Experian on each and every account in trade and how Experian builds that information.  It's going to house information about bankruptcies, things of that nature.  Outside of that is going to be the same thing that the regular admin would have.

Q.    So the long admin report would contain more

APPENDIX 0545

information than the admin report, correct?

A.   As it relates to the accounts, the dates that they were reported, the trade level.  So if you pass the names and addresses, once you start looking at the trades, it would show all the dates that the company reported information to Experian.

Q.   So fair to say that it would have more information, the long admin report, than an admin report?

A.   It would have more information regarding account payment history.

Q.   Okay.  And whatever information was furnished by a data furnisher to Experian?

A.   Relating to the trade level, correct.

Q.   Okay.  I understand that the difference between running or generating an admin report versus a long admin report is that in the search inquiry area, you just have to type the word "long" at the end.  Is that correct?

A.   As far as the access itself, yes, that's correct.

Q.   Okay.  Are there any other steps that differ between running an admin report versus running a long admin report?

A.   Just the approval in order to do so.  Experian does not pull long admins unless -- unless Experian receives the approval from counsel.

Q.   Okay.  But it's not like, let's say -- I don't

know how I could phrase this correctly.  It doesn't take an extensive amount of more time to run a long admin report than it does an admin report.  Is that correct?

A.   The time it takes is -- is similar.  Experian would need to have a reason to pull a long admin.  That does have proprietary information, how Experian keeps the account payment history grid, and that is typically not something that Experian would pull.

Q.   Okay.  What is FileOne?

A.   FileOne is Experian's computer system, houses the information as like we're seeing here on the PIN level for consumers.

Q.   Okay.  So FileOne would contain -- is the database that contains all of Experian's consumer credit information?

A.   Generally.  It doesn't sit in a file.  It is pieced out to match up to the PIN.  But that's generally how it works.

Q.   Okay.  And as I understand it, the data in FileOne is maintained in a series of tables separated by data type.  So one table for trade lines, one for inquiries, one for employment information, one for public records, and one for personal identifying information.  Is that correct?

A.   Yes, I believe so.

APPENDIX 0547

Q.    Okay.  And Experian has an algorithm, like a proprietary algorithm, called Find Consumer.  Is that correct?

A.    Yes.  There is a Find Consumer.

Q.    Do you have any personal knowledge about how Find Consumer operates?

A.    I'm not privy -- or I don't have specific information how it's assembled outside of the knowledge of the fact that, like you're saying, each table associates to a PIN.  And based off of the identifying information, like that's given here in this admin, is how the information would be returned.  So depending on what identification information is typed in, it could vary depending on if I didn't put a social in or didn't -- or transposed a social.  So it's very specific to the name that's being used and the address and the social security number being used at the time of the request.

Q.    Do you have any personal knowledge about how Find Consumer matches data to a particular PIN?

A.    Not on a system kind of level.  My understanding is what we're looking at now in the admin report.

Q.    Can you tell me all about your understanding about how Find Consumer matches data to a particular PIN?

A.    My understanding is it's based off of the inquiry, meaning the identifying information that's used

to access the report.  Like, we're looking at the admin
right now; based off of that, it's going to locate the
best matches.  And that's my understanding.

Q.   So when Experian receives new data from any
source, the Find Consumer algorithm would evaluate that
data and analyze personal identifying information
associated with that data.  Is that your understanding?

A.   That's my understanding.  I don't have the
algorithm or very specific information about how that's
assembled.

Q.   Okay.  And then based on Find Consumer's analysis
of this information, it would automatically search to
identify the best possible match with the PIN within
Experian's existing data and FileOne.  Is that correct?

A.   Yeah.

Q.   Okay.  My understanding is that Experian requires
some minimum information for acceptable data that it
receives from any source.  Is that correct?

A.   That is correct.

Q.   What is the minimum requirement for data that
Experian requires?

A.   Name and address.

Q.   Anything else?

A.   Not that I'm aware of.  I'm not sure if there is
anything specific outside of that, if it's anything in

addition to what I just said.  I'm not -- I really don't know.

Q.    Okay.  So Experian doesn't require a date of birth or social security number to accept data?

A.    There are some data furnishers that do not report with a social security number or date of birth.  To my knowledge, it's not a required field.

Q.    Okay.  And so when you talk about, you know, name as a minimum requirement, you mean first and last name, right?

A.    Experian requests the -- the -- all the information that -- that data furnisher has regarding that particular consumer.  And if they have just a first and last name and an address, then that's the information that they would provide.

Q.    Yeah, but we're talking about like the minimum data required by Experian the furnishers have to provide.

So when you say name, are we saying first and last name, or can a data furnisher just provide a first name, like John, with an address and that would be sufficient for Experian to match it to a PIN?

A.    It'd be a first name, last name, and an address.  Anything outside of that, as far as how the system takes that information and the exact requirements, I don't have particular knowledge of.

My knowledge is, I've seen information with just a name -- a first name, last name, and an address. So there are some -- some reporters that do not report with a social or date of birth.

Q.   Okay.  So in some instances, would you agree that Experian can match data to a PIN even if that data is not a perfect match?

A.   It depends on what's in the system at that time and what identification and what information's being received.  I don't know what that perfect match would be.

Q.   So in other words, if a first name was off by one letter, for instance, that wouldn't necessarily preclude data from being assigned to that consumer's PIN, correct?

A.   And it would depend on what's on that PIN.  So it varies.  If the -- if the information -- if the PIN has a DNC, it would not hit that PIN.  So there's just so many instances and it would depend on what's on that PIN to see if -- if that can be matched with a PIN.

Q.   So looking here on the first page of the admin report, EXPERIAN 171, we see here it says name, and then below that --  Strike that.

So over here, do you see the section that begins with the word "Name" that I'm highlighting?

A.   Yes, I do.

Q.   Okay.  And then below that, these -- these are

Coash Court Reporting & Video, LLC
staff@coashcrv.com    602-258-1440
www.CoashCourtReportingandVideo.com

APPENDIX 0551

called name identification numbers, right?  Are also known as NINs?

    A.   Yes, they are.

    Q.   Okay.  And then -- and then the name identification number is a -- is a value that contains a combination of a name and potentially also a social security number.  Is that correct?

    A.   Yes.  It will house, at that moment, what was -- what was given by that -- it looks like an inquiry at that time.

    Q.   Okay.  So, for example, this first one that we see, this NIN ending in 5919, it shows that the combination for this name identification number is Victor Manuel Ramirez Najera with the social security number.  Is that correct?

    A.   Yes, that does show that social security number associated with that name, and that's the NIN number associated with that.

    Q.   Okay.  Sometimes multiple social security numbers can appear.  Sometimes multiple social security numbers can appear in a consumer's file.  Is that correct?

    A.   That would be dependent on what was already on that PIN at the time.  It would depend on what was given along with the variation of a social security number. There are times when it -- when some information is

APPENDIX 0552

transposed and it does make it to a person's PIN.  But it really depends on what the -- what is on the PIN in the first place.

Q.   And we could see that multiple first names can potentially appear in a consumer's file.  Is that correct?

So, for example, we see that the first NIN ending in 5919 is associated with -- with the name of Victor Manuel Ramirez Najera, but we have the PIN ending in 6683, reflecting a name of just Victor Ramirez.

A.   So each name variation has a number associated with it.

Q.   A single consumer file can have different name variations.  Is that correct?

A.   Yes, depending on -- on what was given to Experian.

Q.   And if we look down towards the bottom of the page, EXPERIAN 171, we see the section that says "Address."  Do you see that?

A.   Yes, I do.

Q.   And we can see that there are multiple addresses associated with the plaintiff.  Is that correct?

A.   Yes, I do see addresses associated with the -- on the admin.

Q.   So we can agree that, you know, a consumer can have multiple addresses appear in their consumer credit

APPENDIX 0553

file.  Is that correct?

A.    Yes.  So each address will have a number that's associated with it, and if there's any kind of variation, it comes through and a new number is assigned to it.

Q.    Okay.  And then right on top of address, still at the bottom of 171, we see the date of birth.  Do you see that?

A.    Yes, I do.

Q.    Okay.  There's only a single date of birth field in this admin report.  Is that correct?

A.    Yes.

Q.    So unlike these other fields of name and addresses, does Experian only maintain a single date of birth with each PIN?

A.    I do not know what sits in the background of what we're looking at right now.  I only have knowledge of -- of the admin, how that looks.  To my knowledge there's only one date of birth.  If there's multiple dates of birth associated with -- with a particular PIN that -- that's not visible, then I just don't have that knowledge.

Q.    Where would it be visible, like in a long admin report, we could see that?

A.    No.  So if there's another date of birth that sits in the background or if it's been updated, I don't know if there's anything kept historically.

APPENDIX 0554

Q.   Are you aware of any report that would show if there's additional dates of birth associated with a specific consumer?

A.   No.  I would not be able to -- there's not a way to go back in time to see if that was changed or a different date of birth --

Q.   I guess --

A.   What we're showing is --

Q.   Sorry.  Didn't mean to cut you off.

I'm just trying to understand, because when I said is it only just, you know, one date of birth associated, you said you don't know if there's others kind of hidden in the background or were associated.

I guess what I'm trying to get at, is there any type of report that could be generated by Experian or anything that we could look at to make that determination if there is more than one date of birth associated with a specific consumer's PIN?

A.   I don't know.  I only had knowledge of the information we are looking at today.  I don't know.

Q.   Okay. Do you know why Experian would only -- Strike that.

And then going back just to clarify some things that we talked about from before, a date of birth gets associated with a specific PIN, once Experian

receives information from a furnisher about this consumer and they provide, like, a date of birth.  Is that correct?

A.   That's how I understand it, correct.

Q.   Okay.  And the first date of birth that kinda makes it to Experian's, you know, system, even if different dates of birth are reported with the same PIN, the first one is the one that sticks onto the file.  Is that correct?

A.   That's my understanding.

Q.   Okay.  So I see this field right here next to date of birth, YOBSRC.  Do you see that?

A.   Yes, I do.

Q.   Okay.  And does YOBSRC stand for year of birth source?

A.   Yes, it does.

Q.   Okay.  And then it says "AF" next to it.  Is that correct?

A.   Yes, it does.

Q.   And does that mean that this date of birth field was updated by -- so the AF code indicates that it was a -- like a monthly tradeline update?

A.   A data reporter, correct.

Q.   Okay.  So like a data reporter, you mean like a data furnisher?

A.   Yes.

Q.   Okay.  And then YOB -- YOBDT.  Do you see that?

A.   Yes.

Q.   And this -- this stands for year of birth date. Do you see that?

A.   Yes, I do.

Q.   And next to it, it says July 11, 2019.  Do you see that?

A.   Yes, I do.

Q.   So this indicates that the last time that this -- that the plaintiff's date of birth was updated was July 11, 2019.  Is that correct?

A.   Yes, that's correct.

Q.   Okay.  And so all read together, this means it was updated the last time July 11, 2019, via a monthly reporting cycle from a data furnisher.  Is that correct?

A.   That's correct.

Q.   Okay.  Is there anything within the admin report or the long admin report that would show what the date of birth value was prior to July 11, 2019?

A.   No.  It's not going to give any kind of historical information.  It's exactly what we're looking at right now.

Q.   Okay.  Now, I know you said with the date of birth, it's the furnisher who reports first, kind of that's how the date of birth gets inputted and it sticks.

Is that correct?

A.   That's my understanding.

Q.   Okay.  So would this year of birth date, July 11, 2019, would -- is it your understanding that this would mean the first time Experian received information about the plaintiff's birthday?

A.   It's showing the information being reported by a data furnisher on that date specifically.  I'm not quite sure if that's the first time, but it shows that was the last time that -- that year of birth was reported.

Q.   But that first data furnisher who supplies the information on the date of birth, if they were to change the date of birth within their system and then -- and then forward that information or furnish it to Experian, the date of birth would change within Experian's system.  Is my understanding correct?

A.   I don't know.

Q.   Okay.  And then next to it, it says "SP=Maria." Do you see that?

A.   Yes.

Q.   What does that mean?

A.   Spouse.

Q.   And then it says over here at the bottom "SSNRPTDCNT=11."  Do you see that?

A.   Yes.

Q.    Can you tell me what that means?

A.    The social security number has been reported 11 times, and there's 11 matches.

Q.    Okay.  So the zero -- and it is referring to the social security number ending in 0996.  Is that correct?

A.    Yes, it is.  That is the only social security number on file.

Q.    Okay.  I want to jump down to EXPERIAN 173. Here, towards like the -- on where it says page 3, right below it, we see the Rushmore Mortgage account.  Do you see that?

A.    Yes, I do.

Q.    Okay.  And as we sit here today, you understand that this tradeline, this Rushmore account, it does not belong to the plaintiff, correct?

A.    Yes.  That the -- that the account was not belonging to the plaintiff, correct.

Q.    Okay.  So you understand that reporting the account as belonging to the plaintiff is inaccurate, correct?

A.    Based on the information that Experian received, Experian, at the time, did not know that the information was inaccurate.  It's only been since Experian received this lawsuit complaint that Experian had more information to go on to have this knowledge.

Q.   What -- what information did the lawsuit provide that Experian did not already have for it to determine this was not his account?

A.   That the -- once Experian received the -- the lawsuit complaint, the file was analyzed to see if it's a mixed file.  At that time, based off of the direction of counsel, the -- the file then was unmixed, and a do not combine was placed on the consumer's file.

Q.   Okay.  But the information contained within the lawsuit, wasn't that information already provided to Experian by the plaintiff prior?

A.   It was, but it was not analyzed as a mixed file at that time.

Q.   Okay.  So the lawsuit made it to the legal department, and then they analyzed it as a mixed file.  Is that correct?

MR. MCCRAW:  Objection.  Form.

THE WITNESS:  Based off of the direction of counsel, Experian pulled documents, and then -- then worked the -- the file to see if it is -- or analyzed the file to see if it's a mixed file, and then unmixed it appropriately.

BY MR. HAMMOUD:

Q.   Okay.  But you would agree that prior to the lawsuit, the information provided by the plaintiff was

APPENDIX 0560

enough for Experian to recognize this was a mixed file, correct?

MR. MCCRAW:  Objection.  Form.

THE WITNESS:  Prior to the lawsuit complaint, Experian had not analyzed it yet as -- as a mixed file.  There were no conflicts on this particular consumer's report.  There was no different social security numbers.  And at that point, once Experian received the lawsuit complaint, then Experian analyzed it as a mixed file.

BY MR. HAMMOUD:

Q.    Okay.  But my question was, did Experian have sufficient information prior to the lawsuit or notice of the lawsuit that would have alerted it that this was a mixed file?

MR. MCCRAW:  Objection.  Form.

THE WITNESS:  Would be mail correspondence; if it was transferred to a mixed train agent at that time, it could have been analyzed.  But it was not analyzed as a mixed file until Experian received this lawsuit complaint.

BY MR. HAMMOUD:

Q.    Understood.

So was -- so let me ask it a different way.

Was the information provided to the plaintiff prior to Experian receiving this lawsuit

sufficient for Experian to determine that this was a mixed file?

MR. MCCRAW:  Objection.

THE WITNESS:  If the agent followed policy and transferred it to a mixed train agent, yes, it would.

BY MR. HAMMOUD:

Q.   When Experian received the lawsuit, did they go back and -- and look at the documents provided by the plaintiff in the previous disputes to help with the unmixing or to determine that this was a mixed file?

A.   I'm not the one that handled the file at that time.  I don't know specifically what they -- what the person was looking at at that time.

Q.   Do you know when plaintiff's file was unmixed?

A.   It was after litigation was filed, at direction of counsel.

Q.   When you say "direction of counsel," do you mean outside counsel or in-house counsel?

A.   It would be whoever was requesting the documents at that time, and it would be some -- it would be -- I'm not quite sure if Chase was handling the case at that time, but it would be somebody from Jones Day requesting the information and discussing the file at that time.

Q.   Do you know who at Experian unmixed the file?

A.   Yes, I do.

APPENDIX 0562

Victor Manuel Ramirez Najera vs. Experian Information Solutions, Inc. -
30(b)(6) of Experian Informtion Solutions, Inc., by Teresa Iwanski

October 8, 2025
232

Q.   Who?

A.   Christina Hamilton.

Q.   Who's Christina Hamilton?  What's her position?

A.   She's the same position as I do, 30(b)(6) witness.

Q.   Okay.  And how do you know it was Christina Hamilton that unmixed the file?

A.   It was a discussion -- or I saw it in -- in the file.  I can't remember exactly where I saw it.  But it was Christina Hamilton that unmixed the file.

Q.   You said it was a discussion.  Did you speak to Christina Hamilton about this case?

A.   No.

Q.   So it wasn't a discussion that you had?

A.   No.  And I'm sorry.  I don't know if it was a discussion.  I remember seeing it someplace.  I just don't remember where.

Q.   Where would that information typically be located, in the admin report, long admin report, you know, other types of notes housed within Experian's system, where would you have to look to determine that?

A.   It would be housed within Experian's system.

Q.   What system?

A.   It would be through ACE.

Q.   And would it be associated with a consumer?

Would it be notes that are just, you know, internal notes for -- for just Experian?  Like, internal communications?  How would it be housed?  Like, where would they be located?

A.   Anything post-litigation, so once -- once a lawsuit is filed, any kind of communications are done through Experian's counsel, any activities that the agents are doing is at direction of counsel, and that's housed within Experian's records.

Q.   All right.  So would it be, like, notated, like "unmixed file," and then it would say Christina Hamilton, or, you know, something like that?  Or if she did activity, it would just automatically indicate that certain activity happened on a file and it would register as Christina Hamilton because she used her login?

A.   It would be because she used her login to unmix the file.

Q.   Okay.  And then do you see this line that says "TATO= May 15, 2019"?  Do you see that?

A.   Yes.  Yes, I do.

Q.   Okay.  And TATO means the first date that this tradeline was posted to the FileOne system and associated with the plaintiff.  Is that correct?

A.   And it was the first time that the account was reported to Experian.

Victor Manuel Ramirez Najera vs. Experian Information Solutions, Inc. -
30(b)(6) of Experian Informtion Solutions, Inc., by Teresa Iwanski

October 8, 2025
234

Q.    First time it was reported to Experian and associated with the plaintiff?

A.    I don't have any historical information to know if it hit a different PIN or a fragment PIN.  I can tell you that that's the date that it was associated with -- or actually hit Experian's system.

Q.    Okay.  What would you have to look at to determine the historical information on when it was first associated with the plaintiff's PIN?

A.    I don't know if there is a document out there. I've never seen something like that.

Q.    How about the long admin report?

A.    No.  The long admin will just have the TATO as we're looking at now.  Anything related to how and when the company reported late payments is what you would see. Outside of that, it's going to give the same information.

Q.    So standing here today, it's your testimony that Experian does not know when this Rushmore account first appeared on the plaintiff's credit report or when it was first associated with this PIN?

A.    I personally do not know.  I can tell you that it was -- it hit the file in 2019.  If there was consumer disclosures on or around that time, I can tie it back to maybe a timeframe, if it hit just one PIN.  Outside of that, there's no historical information about the account

itself being associated with another PIN.  That's just my understanding, the -- the TATO is when it hits Experian's system.

Q.    When it hits Experian's system and it's associated with the PIN or just when it hits Experian's system before it's even associated with a PIN?

A.    So when it -- it is associated to a PIN, and that's the date that -- that is loaded into the database.

Q.    So if you had to say -- you know, if you had to give me your best estimate on when you think this first appeared or was first associated with plaintiff's PIN, would you say it was May 15, 2019?

A.    Since we're basing it off of this admin report, that's -- that's what I would base it off of.  Outside of that, I just don't have any kind of historical PIN information.

Q.    Okay.  And then here we see the n equals and then it's ending in 26591.  Is that correct?

A.    Yes, it is.

Q.    Okay.  So if we -- if we looked up plaintiff's NINs, look at the one ending in 26591, does this mean that what Rushmore sent over for the personal identifying information was just the name of Victor Manuel Ramirez?

A.    As far as the name wrote, yes.

Q.    Okay.  And Rushmore did not furnish a social

APPENDIX 0566

security number?

A.    No.

Q.    Okay.  So back to what you said, you said the minimum data is just a name and an address, no -- it's not necessary to have a social security number or date of birth.  Is that correct?

A.    That's my understanding.  There are some data reporters that only report with name and address and no social security number or date of birth.

Q.    Okay.  Is it your understanding that there are current data furnishers who only report with name and address?

A.    Yes.  There are some companies that just report with name and address.

Q.    Can you tell me who they are?  Like, what company can you think of off the top of your head?

A.    I don't know them all.  I don't -- I couldn't tell you.

Q.    Can you name one?

A.    Not sitting here today.

Q.    So looking at this information furnished by Rushmore, is it fair to say that they never reported a date of birth associated with this account?

A.    I don't know.

Q.    Is there anything you could look at to answer the

question?

A.    No.  What we're looking at is what's available on the admin, and it is not associated with a date of birth.

Q.    But we can confirm that they did not report a social security number, though?

A.    That is correct.

Q.    Okay.  Are you familiar with something called Data Accuracy Platform?

A.    No, I'm not.

Q.    Are you aware of Experian retaining backups of monthly Metro 2 data that furnishers transmit to Experian?

A.    I am not familiar with that exact information, no.

Q.    Do you know if Experian retains the historical monthly Metro 2 data that furnishers transmit to it?

A.    I believe there is a time frame.  I don't know how long it is when -- when information is sent to Experian.

Q.    And we see that in the long admin report?

A.    No.

Q.    Is there any type of report that Experian can generate that we could see this information?

A.    I do not know what it's called.  But as far as the historical raw data, it is only kept for a period of time, and I don't know that -- the name of that report.

Q. Okay. So going back to EXPERIAN 171, we can look at the name section to see the date ranges associated with each NIN, correct?

A. With each name row, yes, NIN.

Q. Okay. So for the -- and in order to see, like, when a PIN was created, isn't it true that the way you do so through the name section is finding the oldest date in the section?

A. I'm not entirely sure if that's -- if that would be an accurate reflection.

Q. Okay. So looking here at the plaintiff's admin report, we could see that the -- that the NIN ending in 26591, this is the one that Rushmore had furnished. Is that correct?

A. Yes.

Q. Okay. And we could see that this NIN has been associated with the plaintiff since at least August 3, 2008. Is that correct?

A. Yes.

Q. Okay. So is it fair to say that this PIN associated with the plaintiff has been in existence since at least August 3, 2008?

A. I don't know if it's been with that particular PIN the entire time. There are times when -- when the PINs merge, so I really don't know specifically. But that

is the first date associated with that name row.

Q.   Okay.  Now it says next to it, August 2 [sic], 2008 to May 15, 2019.  That's how long this specific NIN was -- the date range in which this NIN had been reported to Experian.  Is that correct?

A.   Yes, that's correct.

Q.   Okay.  And then it says the code AF, that's -- that tells us that this NIN was received by Experian through monthly furnishing cycles by a data furnisher.  Is that correct?

A.   Yes, it is.

Q.   Now we see a 0X next to it.  What does that mean?

A.   I'm not entirely sure what that 0X is -- is stating.  It might be relating to the duplication right below it.  I'm not quite sure.

Q.   Well, up here, we see 11X on the 5919.  Do you see that?

A.   Yes.

Q.   Okay.  Would this -- do you know what the 11X means?

A.   Yes.  So that actually is 11 times associated with some sort of trade.

Q.   So would the 0X mean that, you know, it's been associated zero times with this trade?

A.   At the time this admin was pulled, that's what it

Victor Manuel Ramirez Najera vs. Experian Information Solutions, Inc. -
30(b)(6) of Experian Informtion Solutions, Inc., by Teresa Iwanski

October 8, 2025
240

appears to be.

Q. Okay. So, for example, if this admin was pulled sometime in -- you know, between this date range and it was -- and Experian was receiving monthly furnishing cycles with this NIN, then maybe the number would not be zero and it would be like 1?

A. It would depend on what's being reported at that time.

Q. Okay. So is it fair to say that after May 15, 2019, this NIN of just Victor Manuel Ramirez has not been -- is not information that a data furnisher has been sending to Experian?

A. I would have to look at the -- do a fine string to see if there's any companies that were reporting it or that's the last time that we received data for that name row.

Q. Okay. So I want to jump down to EXPERIAN 174.

Do you see this Oportun/Progreso Finance account?

A. Yes, I do.

Q. And you see a TATO value of July 11, 2019. Do you see that?

A. Yes, I do. July 11, 2019, yes.

Q. Okay. So does that mean that this is when the tradeline posted to FileOne and was associated with the

plaintiff's PIN?

A.    According to the admin, yes.

Q.    Okay.  And now if we go back to EXPERIAN 171, we see the year of birth date as July 11, 2019.  Do you see that?

A.    Yes, I do.

Q.    So would that mean that it was the Progreso -- the Oportun/Progreso tradeline that caused this update in the date of birth field?

A.    That's what it appears to be, the name -- I'm sorry -- the date does match back to that data furnisher.

Q.    So would it mean that Oportun was the first data furnisher to ever report the plaintiff's date of birth?

A.    I don't know.

Q.    Do you have any understanding about how the Rushmore account was associated with the plaintiff's PIN?

MR. MCCRAW:  Objection.  Form.

THE WITNESS:  I am not familiar with the Experian's algorithm as far as the matching process.

BY MR. HAMMOUD:

Q.    So sitting here today, you can't tell me how this Rushmore account came to exist on plaintiff's consumer credit report or was associated with his PIN?

A.    My understanding would be the association would be the name and the address.  Outside of that, any kind of

APPENDIX 0572

matching algorithm, I just don't have knowledge of that information.

Q. Okay. So is it fair to say that Experian associated the account with plaintiff's PIN and that it wasn't Rushmore that told Experian to report it on plaintiff's PIN?

A. Rushmore does not have anything to do with a PIN, or any data furnishers. They are reporting the identification information, and that is what Experian is using in order to find the correct consumer. Outside of that, any kind of matching, I just don't have knowledge of that.

Q. So the mixing of the credit file that occurred here, where the Rushmore account that doesn't belong to plaintiff appeared on his report, this was something that happened on Experian's end. Is that correct?

A. Based off the information that Experian received from data furnishers, this is what -- the PIN that Experian believed belonged to this one person.

Q. Okay.

A. Instead of two.

THE WITNESS: Before another question, can I take a restroom break?

MR. HAMMOUD: Sure. It's 4:07, stop for a couple minutes. Okay.

THE WITNESS:  About five?

MR. HAMMOUD:  Sure.  However long you need.

THE WITNESS:  Thank you.

MR. HAMMOUD:  Yeah.

THE COURT REPORTER:  We're off the record.
Time is 4:08.

(A recess ensued.)

THE COURT REPORTER:  We're back on the
record.  Time is 4:20 p.m.

BY MR. HAMMOUD:

Q.   Okay.  So when we left off -- I'm putting back in
front of you Exhibit 9.  We were on Experian Bates stamp
173.  Do you see this document?

A.   Yes, I do.

Q.   Okay.  So towards the top of this page, we see
the Pennymac mortgage account.  Do you see that?

A.   Yes, I do.

Q.   Okay.  And this Pennymac account, this was also
associated with the plaintiff's PIN.  Is that correct?

A.   Yes.

Q.   Okay.  Now I see here that the NIN that Pennymac
was furnishing is the one ending in 184.  Is that correct?

A.   Yes.

Q.   Okay.  Now I'm going back up to EXPERIAN 171,
where the list of NINs is located.  Do you see my screen?

A.   Yes.

Q.   All right.  And I don't see the NIN that was associated with the Pennymac account on this list.  Do you?  It's the NIN ending in 184.

A.   I do not.

Q.   Do you know why it's not on this list?

A.   Unless there was a change on the name row level and the DR log.

Q.   Okay.  So if we look at the DR log over here, would we be able to see if there was a name row change?

Let me know if you need to -- if I need to go to a specific page.

A.   No, I don't see it.  If you can go back to the admin just one more time, please.  And if you go back to the account that we're looking at and the NIN 184.  If you can go back up, I just want to double-check it again one more time.  This is the first time I've seen this.  I don't know why it's not there.  I would --

Q.   Do you know if it's associated -- sorry.  Continue.

A.   I would see it either on -- if there was a change in the DR log; otherwise, it would be on the admin report.

Q.   Okay.  Do you know if it's -- if the NIN is associated with his dad, plaintiff's dad?

A.   I don't know if there was a -- since the account

Victor Manuel Ramirez Najera vs. Experian Information Solutions, Inc. -
30(b)(6) of Experian Informtion Solutions, Inc., by Teresa Iwanski

October 8, 2025
245

itself was there, I don't know if there was any kind of merging or -- or a split PIN or some other reason for it. I just don't know why it's not there.

Q.    Did you review the plaintiff's dad's admin report?

A.    I did not.

Q.    Did anybody at Experian, that you are aware of, review plaintiff's dad's admin report after the filing of this lawsuit?

A.    I don't know.

Q.    Do you know if these -- the Pennymac and Rushmore accounts are reporting on the dad's or associated with the dad's PIN and on his credit file?

A.    I just haven't seen it to tell you if that's the case.

Q.    Okay.  If -- if we -- let's say if I had -- if I ask you, "Hey, Teresa, can you go see if -- you know, pull the dad's admin report and see if these accounts are on there or had been associated with this PIN," how long would that take you?

A.    We would need permissible purpose from the consumer in order to do that.

Q.    And let's say you get that, how long would it take?

A.    However long it takes to communicate that

information and pull the information?  It just depends on how long it would take for Experian to receive the permissible purpose in order to access the father's file.

Q.   But generating the admin report, kinda like we talked about earlier, could just be like a matter of, like, minutes, right?

A.   It doesn't take much time.  But, again, without permissible purpose, it's something I cannot do.

Q.   Sure.  I'm jumping down to EXPERIAN 176.  Do you see this page and over here this section is titled "Inquiries."  Do you see that?

A.   Yes, I do.

Q.   Is it your understanding that this section of the admin report contains both hard inquiries and soft inquiries?

A.   Yes, it does.

Q.   Do you see the three-letter codes associated with each inquiry on the right-hand side?

A.   Yes, I do.

Q.   So, for example, on April 11, 2024, we see that this Amex inquiry is associated with an OPP code.  Do you see that?

A.   Yes, I do.

Q.   Okay.  And then these three letter codes are associated with a particular type of credit inquiry.  Is

that correct?

A.    Yes, they are.

Q.    Okay.  Do you know what OPP is?

A.    It is a -- it is a prequalification type of solicitation.

Q.    Would you be able to tell if this was a soft inquiry or a hard inquiry?

A.    I believe it'd be a soft inquiry.  I'm -- it is just getting a name and address to either send a pre-approved offer type of thing to consumers.

Q.    Okay.  Now I see next to the date -- the date means -- this date is associated with the time of the inquiry.  Is that correct?

A.    The date of the inquiry.

Q.    Okay.  And then this 1234990, what is this column?

A.    That is the sub code for the company that's pulling that inquiry.

Q.    Okay.  So this would be like the -- the identification number associated with each company?

A.    Each company has a subscriber number, yes.

Q.    Okay.  And what is the -- the column with BC?

A.    I believe it relates to the inquiry itself.  I'm not -- I don't know specifically what those codes are.

Q.    Okay.  And then I see here -- at the bottom, we

see the NIN number, and then it looks like an address number.  Is that correct?

A.    Yes.

Q.    And then next to it says "SEQ=1."  What does that mean?

A.    That it was -- it was for one sequence, one time.

Q.    Okay.  Do you know what FAM stands for?

A.    I am not sure.  I would have to look at the consumer disclosure to see if it had more information, if it was relating to housing or something of that nature. I -- just looking at it -- I would need to look at the consumer disclosure to find out more information.

Q.    Are you familiar with a document that Experian has called the admin handbook?

A.    Yes, I am.

Q.    Okay.  And would the admin handbook contain the meaning of all the codes that appear in this admin report?

A.    They would have most of them, yes.

Q.    So meaning if I had that admin handbook to show you, we could go through every single one of these inquiries to see what they mean.  Is that correct?

MR. MCCRAW:  Objection.  Outside the scope.

THE WITNESS:  It would generally give you a guidance as far as the meaning of the inquiry.  Not necessarily what the permissible purpose was.  That's more

of what is on the consumer's disclosures.

BY MR. HAMMOUD:

Q.    Okay.  But the admin handbook would help us kind of understand the -- the -- what these codes mean?

MR. MCCRAW:  Objection.  Form.

THE WITNESS:  Some of them.  Some of them. Again, it's just going to give you information about the inquiry, not the permissible purpose.

BY MR. HAMMOUD:

Q.    Okay.  And as we sit here today, do you know which of these inquiries would have resulted in a consumer report that contained the Rushmore tradeline?

A.    I don't know.  I would have to look at the consumer disclosures to see if it was on file at that time.

Q.    Okay.  Do you know what day Experian unmixed the file and removed the Rushmore tradeline from the plaintiff's credit file?

A.    It was post-litigation.  I do not know the date.

Q.    Okay.  Would it have been post the creation of this admin report and the DR log that was created on June 3, 2025?

A.    I believe so.

Q.    Okay.  So is it fair to say that any inquiries prior to June 11, 2025, there's a possibility that these

companies would have received the -- the -- they would have received a plaintiff's consumer -- consumer report, and it would have contained the Rushmore account?

A. If they are pulling a full credit report or a score report, it would be associated with that.

Q. Okay. Now looking at -- looking at this page here, EXPERIAN 176, are you able to tell whether they pulled a full report or not?

A. I would need to look at the last consumer disclosure that we provided, and I'd be able to tell you if the Alexander Forrest Investment or the one above it, and what it relates to. And if you could just go down. I believe the rest were just Experian or pre-qualifications.

Q. When you say pre-qualifications, do you mean like soft inquiries?

A. Yes.

Q. Do you know if tradeline information is provided to entities on a soft inquiry?

A. On a soft inquiry where there's a pre-qualification, it is just a name and address. Outside of that, it depends on the product or service, but it wouldn't be offering credit.

Q. Is it possible that on a soft inquiry, tradeline information like the Rushmore account could have been provided with -- along with plaintiff's credit

information?

A.    I'm not quite sure if it'd be part of a risk model or things of that nature.  I don't know.  I don't believe that it in itself would be something visible.

Q.    So it's possible that it could have been visible?

A.    If there was a collection inquiry, that would be visible.  But there would not be an offer of credit in a soft inquiry.

Q.    What I've put it in front of you is going to be labeled as Exhibit 10.

          (Deposition Exhibit 10 was marked for
          identification.)

BY MR. HAMMOUD:

Q.    This is labeled EXPERIAN 148 through 163.  Do you see that?

A.    Yes, I do.

Q.    Okay.  Have you seen this document before?

A.    Yes, I have.

Q.    Okay.  When is the last time you reviewed this document?

A.    Yesterday.

Q.    Okay.  And then this is -- this document before us, this is plaintiff's -- this is a dispute letter that the plaintiffs sent to Experian in or around July 10, 2024.  Is that your understanding?

A.    Yes.  I would need to look at the DR log to look at the date that Experian processed it, but it would be on or around that date.

Q.    Is it this?  Now I'm putting in front of you Exhibit 5.  We're looking at EXPERIAN 219 towards the bottom.  Is this what you need to see?

A.    Yes, I believe so.

Q.    Okay.  Does it say when Experian received this dispute from the consumer -- from the plaintiff?

A.    Looks like July 30, 2024.

Q.    Okay.  And so this is a dispute letter that the plaintiff sent via certified mail.  Is that correct?

A.    It does say "certified mail" on the first page we're looking at.

Q.    Okay.  And then here we see at the top of the page, plaintiff has his name, address, email address, and phone number.  Is that correct?

A.    Yes, I do see that.

Q.    And he has a subject here, it says dispute of inaccurate [sic] mortgage entry on credit report.  Do you see that?

A.    Yes, I do.

Q.    And then he begins and he says, "Dear Experian dispute department, I'm writing to formally dispute an incorrect entry on my credit report.  The report lists a

mortgage that does not belong to me.  I've never taken out a mortgage and the information being reported is inaccurate."  Do you see that?

A.    Yes, I do.

Q.    Okay.  And then he -- and then he provides the details of the incorrect mortgage, including the account name, number, the date it was opened, and it looks like the original balance.  Do you see that?

A.    Yes, I do.

Q.    And he indicates that to support his dispute, he's including certain documentation that clearly demonstrate the inaccuracy of the mortgage entry.  Do you see that?

A.    Yes, I do.

Q.    And he indicates that he -- one of the things that he's -- one of the documents he's providing is his birth certificate, which shows that -- his date of birth and verifies that he was only 13 years old at the time the mortgage was taken out in 2009, making it impossible for him to have entered into this agreement.  Do you see that?

A.    Yes.

Q.    Okay.  And then he indicates that he provides some school records to show further proof of his age and that he was a minor and student during the time this mortgage was reportedly opened.  Do you see that?

A.   Yes, I do.

Q.   And then he indicates that he's also providing house paperwork agreement to show that his social security number doesn't match the social security number on the paperwork.  Do you see that?

A.   Yes, I do.

Q.   Okay.  And then he asks you to conduct a thorough investigation and remove the inaccurate mortgage entry from his credit report.  Do you see that?

A.   Yes, I do.

Q.   And he tells you if you need any additional information, that you're welcome to contact him on his phone number or email address that is provided above.  Do you see that?

A.   Yes, I do.

Q.   Okay.  And we can confirm on the first page that his phone number and email address is included?

A.   Yes, I do see that.

Q.   Okay.  Now looking at EXPERIAN 150, it looks like we see a copy of a social security card.  Do you see that?

A.   Yes, I do.

Q.   Okay.  Is it your understanding that this is the plaintiff's social security card with his social security number on it?

A.   Yes, that's my understanding.

Q.    Is there any basis for you to dispute otherwise?

A.    No.  It -- it does say "valid for work."  That doesn't necessarily say this is a social security number, but it does associate with that consumer's name, and that's the number that was given.

Q.    Okay.  It should -- are you -- should I take your response to mean that this could potentially not be a social security number and it could be something else?

A.    No, sir.  I'm saying that this is the social security number that's valid for work, and that's the number that's given on the social security card, and that is the number -- or the name that's given, Victor M. Ramirez.

Q.    And this social security number ending in 0996, this is the social security number that Experian has on file for Experian -- on file for the plaintiff and associated with his PIN, correct?

A.    Yes.

Q.    Okay.  And you believe this to be plaintiff's accurate social security number, correct?

A.    Yes.

Q.    Okay.  Now we look at EXPERIAN 151.  Do you see this document?

A.    Yes, I do.

Q.    Okay.  And it -- and it looks like plaintiff --

he made some notes on this document.  Do you see that?

A.    Yes, I do.

Q.    Okay.  And it looks like, you know, the plaintiff is indicating that this is his father, Victor Manuel Ramirez.  Do you see that?

A.    Yes, I do.

Q.    And he's pointing out that his father is not a Najera.  Do you see that?

A.    Yes, I do.

Q.    Does Experian --  Strike that.

And then it indicates that his father's info here matches the house contract.  Do you understand what the plaintiff is talking about?

A.    That's what's stated -- or written there, correct.

Q.    Okay.  Do you understand what he's referring to based upon his dispute and all the supporting documentation he provided?

MR. MCCRAW:  Objection.  Form.

THE WITNESS:  Yes, I understand it.

BY MR. HAMMOUD:

Q.    Okay.  So we're going to turn to EXPERIAN 152.  Looks like this is another document that was provided by the plaintiff with his dispute.  Is that correct?

A.    Yes.

Q.   What is your understanding of what this document is?

A.   It looks like a borrower's agreement.

Q.   So something associated with --

A.   It's giving --

Q.   -- like a mortgage?

A.   Correct.

Q.   Okay.  And then we can see here it lists who the borrowers are.  Is that correct?

A.   Yes, it does.

Q.   Okay.  And it lists Victor Manuel Ramirez and his spouse Maria D. Ramirez.  Do you see that?

A.   Yes, I do.

Q.   So standing here today, what is your understanding of who these two individuals are, at least in relation to the plaintiff?

A.   As it relates to the plaintiff, post-litigation, we have found those to be the parents of plaintiff.

Q.   Okay.  So let's say, you know, not post-litigation, looking at this document, if you were just reviewing this document for the first time, would you understand that plaintiff was saying that these are his parents?

MR. MCCRAW:  Objection.  Form.

THE WITNESS:  Yes.  That's -- he's stating

APPENDIX 0588

that's mom and that's dad on the document.

BY MR. HAMMOUD:

Q.   And then he makes a note and he says on his dad's name that it's almost identical to his, but he does not have a Najera.  Do -- do you see that?

A.   Yes.

Q.   And do you understand that plaintiff is pointing out the difference in his name and his father's name?

A.   Yes.

Q.   Okay.  And then towards the bottom where the signature is, he has an arrow and it says, "[This is my] dad."  Do you see that?

A.   Yes.

Q.   Okay.  And then he has the arrow pointing up to Maria Ramirez, and he's saying that this is his mom.  Do you see that?

A.   Yes.

Q.   And he's also pointing to the date of this document, January 27, 2009.  Do you see that?

A.   Yes, I do.

Q.   And he says that he was 13 years old and that he couldn't have bought a house.  Do you see that?

A.   Yes, I do.

Q.   Do you agree with that statement that -- you know, him being 13 years old, he wouldn't have been able

Coash Court Reporting & Video, LLC
staff@coashcrv.com
602-258-1440
www.CoashCourtReportingandVideo.com

APPENDIX 0589

to buy a house?

A.   Yes, I understand that to be correct.

Q.   Okay.  Now I'm going to pull up EXPERIAN 153. This is another document that was provided by the plaintiff with this dispute.  Is that correct?

A.   Yes.

Q.   And would you agree that this is another -- it looks like a document from the mortgage application?

A.   I believe it is.

Q.   And then at the top he says these are the house documents that his father had signed.  Do you see that?

A.   Yes, I see the notation on the copy that's provided.

Q.   Okay.  So on top of what this document already says about it being a Uniform Residential Loan Application, the plaintiff is providing further clarification on what these documents are.  Would you agree with that?

A.   Yes.

Q.   Okay.  And then again, next to where his father's name is, he indicates that "my father [has the] same first name," but he's not a Najera.  Do you see that?

A.   Yes, I do.

Q.   And then he circles his dad's date of birth, and he says that this is his father's date of birth.  Do you

see that?

A.   Yes, I do.

Q.   Okay.  And the January 27, 1970, would you agree that -- that is not plaintiff's date of birth?

A.   Yes, I do.

Q.   Okay.  And we see that in the social security number field, we see the 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.  Do you see that?

A.   I just can't read it myself, but if that's what you see.

Q.   Okay.  I'm going to zoom in.

A.   Yes.

Q.   Is this -- is this enough for you to see?

A.   Yes.  That's what it states.

Q.   Okay.  So that is completely different than what the plaintiff's social security number is, correct?

A.   Yes.

Q.   And would you agree that this number ending in 5759 matches the information contained on EXPERIAN 151, where plaintiff indicated that this was his father's IRS individual taxpayer identification number?  Do you see that?

A.   Yes, I do.

Q.   Is it Experian's understanding that some people use their IRS individual taxpayer identification number in place of a social security number?

A.   Yes.

Q.   And is it Experian's -- does Experian also understand that all ITINs, or individual taxpayer identification numbers, begin with the digit 9?

A.   I believe so.

Q.   Okay.  So any number that's in a social security -- in a social security number field that begins with the digit 9, we can agree that is automatically an ITIN?  No social security number begins with the number 9.  Would you agree with that?

A.   Yes.

Q.   Okay.

A.   I'm thinking also of business numbers as well.  But it is part of the identification number associated with their IRS number.

Q.   But this -- but this information about consumers using ITIN in place of a social security number, this is information that Experian -- or knowledge that Experian has had prior to receiving the plaintiff's dispute.  Is that fair to say?

A.   Yes.

Q.   Would you say that Experian has had this knowledge for, I don't know, over 20 years, that people use ITINs in place of social security numbers at times?

A.   I don't know how long.

Q.   Okay.  But this is not new information that was provided to them.  This is information that they already -- this is knowledge that they already had?

A.   Yes.

Q.   Okay.  Now I'm going back down to EXPERIAN 154. It looks like this is another document from the mortgage application.  Would you agree?

A.   Another copy, correct.

Q.   Okay.  And it looks like now the plaintiff has an arrow to the date it was signed, and he's saying "January 27, 2009.  I was 13 years old."  Do you see that?

A.   Yes, I do.

Q.   And do you agree with plaintiff's statement that he was only 13 years old at this time?

A.   Yes, I do.

Q.   Okay.  Now it looks like -- on EXPERIAN 155, it looks like the plaintiff provided a copy of his passport. Would you agree?

A.   Yes, it appears to be.

Q.   Okay.  And then he put -- at the top he says, "This is me."  Do you see that?

A.   Yes.

Q.   Does Experian have any reason to dispute that this is not in fact the plaintiff?

A.   None at this time.

Q.    Okay.  And then again, he points here to his last name Najera, and he says, "My father is not a Najera. That's from my mom's side."  Do you see that?

A.    Yes, I do.

Q.    Okay.  Do you understand -- does Experian understand that in Hispanic tradition children have two surnames?

A.    Yes.  Experian is aware of that.  Experian is also aware that there are times when consumers use multiple last names.

Q.    Okay.  So does Experian understand that Ramirez Najera is different than Ramirez, that those are two different last names?

A.    It depends on the information, how it's being supplied to Experian.  It could be a variation.  It could be a whatever is -- is being reported.  The -- both last names are not always used or always reported.

Q.    So to confirm, Experian is aware of Spanish naming customs in which Hispanic culture uses two surnames, correct?

A.    Yes.  Experian has that knowledge, as well as the fact that consumers also use two last names at times as well.

Q.    Okay.  And Experian is aware that this double surname is the norm in Hispanic tradition?

APPENDIX 0594

          MR. MCCRAW:  Objection.  Form.

          THE WITNESS:  Experian is aware of it in --
just in general, whether if it's in Hispanic or people
using two last names when they are married.  Experian does
not decipher it being related to only Hispanic culture.
BY MR. HAMMOUD:

    Q.   Okay.  But Experian understands that in the
Hispanic culture the two surnames is a custom that's very
prevalent.  Is that fair?

          MR. MCCRAW:  Objection.  Form.

          THE WITNESS:  Experian does not decipher
whether or not something is Hispanic or not.  Experian
provides the fact that there are -- at times people use
two last names.
BY MR. HAMMOUD:

    Q.   Okay.  And then the plaintiff here is pointing to
his date of birth, and he's indicating that his dad's date
of birth is in 1970.  Do you see that?

    A.   Yes, I do.

    Q.   Okay.  So I just want to make clear that from
plaintiff's dispute, he's indicating that his last name is
Ramirez Najera, but his dad is only Ramirez.  Does that
strike Experian as unusual, or does -- or is this
something that Experian has seen and they understand that
this can happen within families?

MR. MCCRAW:  Objection.  Form.

THE WITNESS:  Experian has knowledge of this -- this happening.  Experian has received proof of -- of names in that format.  Outside of that, is -- there's a lot of people that use more than one last name.

BY MR. HAMMOUD:

Q.  Okay.  Now I'm going to EXPERIAN 156.  This is another document that was provided by the plaintiff with his dispute?

A.  I'm sorry.  Was that a question?

Q.  Yeah.  Was this -- do you agree that this is another document that the plaintiff had provided with this dispute?

A.  Yes, it is.

Q.  Okay.  And this looks like it's a -- it looks like a temporary permit for the plaintiff.  Do you see that?

A.  Yes, I do.

Q.  Okay.  And this is related to, like, a permit for -- for driving.  Do you -- do you agree with that?

A.  Yes.

Q.  Okay.  And then the plaintiff, again, he points to his date of birth on this permit, and he indicates that his dad's date of birth is in 1970.  Do you see that?

A.  Yes, I do.

Coash Court Reporting & Video, LLC
staff@coashcrv.com    602-258-1440
www.CoashCourtReportingandVideo.com

APPENDIX 0596

Q.   And then he has an asterisk next to the address, the 3924 Orcas Street.  Do you see that?

A.   Yes.

Q.   And he indicates that he has the same address with his parents because that's his dad.  Do you see that?

A.   Yes, I do.

Q.   Okay.  Now I'm going to EXPERIAN 157.  Looks like plaintiff provided this document along with his dispute. Do you agree?

A.   Yes, this was included.

Q.   Okay.  And plaintiff is -- his notes are on the side and it says this is "my birth certificate."  Do you see that?

A.   Yes, I do.

Q.   Okay.  Does Experian dispute that this is not a birth certificate?

A.   No.  It appears to be a copy of a birth certificate.

Q.   Okay.  Does Experian have a dispute agent who can read Spanish?

A.   Yes, we do.

Q.   Okay.  So if this document was received, this birth certificate, it's all in the Spanish language, Experian would have no issue reading what's contained within this document.  Is that fair?

APPENDIX 0597

A.    That's fair.

Q.    Okay.  And again, the plaintiff -- he's pointing to his date of birth, and he's indicating that his date of birth is December 14, 1995.  Do you see that?

A.    Yes, I do.

Q.    And he's also -- he's circling his second surname "Najera."  Do you see that?

A.    Yes.

Q.    Okay.  Would you agree that the --  Strike that.

We -- we discussed earlier that Experian has a procedure where when a consumer's dispute indicates that the disputed tradeline was opened before they were 18 or when he was a minor, Experian's procedures would allow the dispute agent to delete the account on their own using an internal reason code.  Is that correct?

A.    Yes, that's correct.

Q.    Okay.  And we indicated that they could -- the dispute agent could do that if there were certain documentation verifying the date of birth provided with the dispute.  Is that correct?

A.    Yes, that's correct.

Q.    Okay.  And we indicated that a passport was one of those documents, correct?

A.    That's correct.

Q.    We indicated that, like, a driver's license or a

APPENDIX 0598

driver's permit was one of those documents, correct?

A.   That's correct.

Q.   We indicated that a birth certificate was one of those documents.  Is that correct?

16:54:44  A.   Yes, that's correct.

Q.   Would you agree that plaintiff provided all four of those documents?

A.   Yes, that's correct.

Q.   Okay.  So would you agree that plaintiff provided

16:54:55  more than sufficient documentation for Experian to delete this account from his credit report?

A.   If there -- if the reason code -- the internal reason code or policy for the -- for the minor was being applied, correct.

16:55:15  Q.   Okay.  Should that have been applied?

A.   This should have been transferred to a mixed train agent, and at that point be analyzed as a mixed and the account should have been moved from the consumer's report.

16:55:30  Q.   Okay.  If this was analyzed as a mixed, it would have been removed.  Is that correct?

A.   Yes.

Q.   If this was analyzed as a minor, would the account also have been removed?

16:55:44  A.   Yes.  But the process would be to be sending it

Victor Manuel Ramirez Najera vs. Experian Information Solutions, Inc. -
30(b)(6) of Experian Informtion Solutions, Inc., by Teresa Iwanski

October 8, 2025
269

to a mixed train agent in order to put in the procedures of the do not combine and making sure there's no other additional conflicts.

Q.    So if this was processed either as a, you know, minor dispute or a mixed file dispute, both would have resulted in the removal of this account.  Is that correct?

A.    Yes.  The procedure, though, would be transferring to a mixed train agent.

Q.    Is there anything that the plaintiff should have provided in addition to everything that he did provide?

A.    No.  He provided sufficient information, and it should have been transferred to a mixed train agent.

Q.    So would you agree that the plaintiff's dispute met and surpassed the requirements to delete this account than what's even stated within Experian policies and procedures?

A.    Yes.  It's sufficient information for Experian to -- for the agent to have transferred it to a mixed train agent.  The mixed train agent then would apply mix policies, and it would have moved the accounts from the file.

Q.    Right.  So you would agree that Mr. Ramirez Najera did everything he was supposed to to get Experian to delete this account.  Is that fair?

MR. MCCRAW:  Objection.  Form.

THE WITNESS:  He supplied sufficient information for Experian to follow the policy and procedures that are outlined and trained to the agents, and the agent made a mistake.

BY MR. HAMMOUD:

Q.    So there's nothing further that Experian would have required of Mr. Ramirez Najera to do other than what he did do.  Is that fair?

A.    Yes, that's fair.

Q.    Okay.  I just want to make that clear, because, you know, I see a lot of disputes sent by consumers, and this is one of the disputes that I see where a consumer actually went above and beyond in their dispute.  So I just want to, you know, be -- I want to understand Experian's position and clear -- and make clear that there is nothing further that Experian would need or request from Mr. Ramirez Najera to have deleted this account other than what he had provided them?

A.    That is correct.  The agent made a mistake.

Q.    Okay.  So if we had to grade, let's say, Mr. Najera's dispute in informing Experian of the reason for the inaccuracy, one being you're missing a lot of key information to provide us, and five being you gave us all the information we need to delete this account, what grade would you give Mr. Najera's dispute?

A.   Not quite sure what you mean by -- by grading it. I believe he supplied sufficient information for Experian to process and send to a mixed file train agent.  If there's a letter grade, I don't -- I don't know what -- if you're asking for a letter grade.  But all -- all of the information sufficient for Experian to process as a mixed file was given, and the agent made a mistake in handling this dispute.

Q.   Yeah.  Well, what I'm asking is, on a scale of one to five, five being that the plaintiff gave Experian everything they need to process this dispute and delete the account, and one being, you know, there's a lot of missing information and we can't really process this dispute with what was provided, what would you grade from one to five Mr. Najera's dispute and supporting documentation?

A.   As far as the information -- as far as the information that was provided, I would -- I would say that the information was -- was a five.  The information itself was usable.  The agent, even though the agent went through training and was taught how to use Experian's policies and procedures, did not transfer this to a mixed train agent.

Q.   So the agent -- so the agent -- it's Experian's position that the agent made a mistake here, correct?

A.   Yes, sir.

APPENDIX 0602

Q.   Would this type of mistake be grounds for termination?

A.   It would be up to the supervisor or HR.  I really don't know.

Q.   So you don't know if like an Experian -- if a dispute agent made this type of mistake, if they would be terminated or if there have been instances where this type of mistake was made and then the dispute agent was terminated as a result?

A.   It would depend on the severity or the historical information about that agent.  I just don't have knowledge of that to tell you whether or not it's -- that would be the terminate type of a situation.  It would be the supervisor and HR either coming up with a plan or at that point dissolving the relationship with the agent.

Q.   Okay.  I understand that when Experian receives dispute mail from consumers that the mail comes into Experian's mailroom in Allen, Texas.  Is that correct?

A.   Yes, it does.

Q.   And then Experian's mailroom procedures involve an initial review of each dispute letter to try to identify if the mail came from the consumer or from some third party, correct?

MR. MCCRAW:  Objection.  Form.  Scope, it's outside the scope.

Coash Court Reporting & Video, LLC
staff@coashcrv.com                          602-258-1440
www.CoashCourtReportingandVideo.com

APPENDIX 0603

THE WITNESS:  That is correct.

BY MR. HAMMOUD:

Q.   Okay.  Experian maintains no records about which mailroom employee handles the initial review of any incoming mail.  Is that correct?

MR. MCCRAW:  Same objection.

THE WITNESS:  I don't know.

BY MR. HAMMOUD:

Q.   Okay.  And Experian maintains no records about what mailroom employees actually do in reviewing any incoming mail.  Is that correct?

MR. MCCRAW:  Same objection.

THE WITNESS:  They follow Experian's policy that's set up to look for indications of receiving third-party mail.

BY MR. HAMMOUD:

Q.   As we sit here today, do you have any personal knowledge on whether any mailroom employee ever actually opened up plaintiff's dispute letter?

A.   It would have -- Experian would have had to open the dispute mail in order to scan it for it to be worked.

Q.   Okay.  Do you have any personal knowledge whether any mailroom employee ever read plaintiff's dispute letter?

MR. MCCRAW:  Objection.

THE WITNESS:  It would be the agent -- sorry -- it would be the agent that processed the piece of mail.

BY MR. HAMMOUD:

Q.   Okay.  But you don't know if anybody with -- like, the mailroom employee actually read it?

A.   I don't know.

Q.   Okay.  So once the dispute letter passes Experian's initial review, the next step in the process is to scan the dispute letter into Experian's system.  Is that correct?

A.   Yes.

Q.   And the dispute letters are scanned into Experian's document storage system, which is called ILINX.  Is that correct?

A.   Yes.

Q.   And once the dispute -- how do you pronounce that acronym?  Is it ILINX?  ILINX?

A.   It's -- ILINX is the pronunciation.

Q.   Okay.  And once a dispute letter is scanned into ILINX, at that point, the consumer's personal information is reviewed and then a search is performed in Experian's A system, meaning Salesforce, to identify the correct consumer for the dispute.  Is that correct?

A.   No.  There's an agent involved that's doing the

reading and reviewing to process the disputes.

Q.   Okay.  So at that point, there would be a live human who's reviewing that dispute letter and matching it to the specific consumer?

A.   They are accessing the report to see what is on file, to see what's being disputed, and that would be an agent doing that.

Q.   Okay.  But once the documents are scanned into the system, how are they -- how does Experian determine where this -- or who will handle this specific dispute?

A.   It is sent to a queue to be worked by the agents, so it would be the next available agent that is in the queue.

Q.   Okay.  Are you familiar with a document maintained by Experian called the EPC sorting procedure?

A.   Yes, I am.

Q.   Have you been deposed about this document in the past?

MR. MCCRAW:  Objection.  Outside of scope.

THE WITNESS:  Yes, I have.

BY MR. HAMMOUD:

Q.   Do you have the contents of the EPC sorting procedure committed to memory?

MR. MCCRAW:  Same objection.

THE WITNESS:  Generally, yes.

BY MR. HAMMOUD:

Q.   So if I wanted to ask you specific questions about specific aspects of this procedure, you'd be able to answer them even without this document in front of you?

A.   I believe so.

Q.   Okay.  In the EPC sorting procedure, it's a document that contains information about how dispute agents are instructed to sort/scan documents for purposes of processing disputes.  Is that correct?

MR. MCCRAW:  Objection.  Form.

THE WITNESS:  Generally, yes.

BY MR. HAMMOUD:

Q.   And then the EPC sorting procedure also includes examples for sample verbiage that employees are supposed to look for in order to classify the type of dispute.  Is that correct?

A.   Yes, that stands through the sorting process.

Q.   And the disputes can be classified as just standard disputes or in some cases a mixed file dispute. Is that correct?

MR. MCCRAW:  Objection.  Form.

THE WITNESS:  Yes.

BY MR. HAMMOUD:

Q.   Okay.  And what do these -- what do the EPC sorting procedures instruct employees to do in terms of

APPENDIX 0607

classifying disputes as mixed file disputes?

MR. MCCRAW:  Objection.  Form.  Outside the scope.

THE WITNESS:  If there's some verbiage that they are able to see in the sort process, then they can send it to the mixed queue; otherwise, it is sent to the general queue for the agents to work it.  And then if it is mixed, to send it to a mixed train agent.

BY MR. HAMMOUD:

Q.   Do you know if the EPC sorting procedure here flagged plaintiff's dispute as a mixed file dispute?

A.   I don't believe so.

Q.   Okay.  So would you say that it should have been flagged as a mixed file dispute in the sorting process?

A.   Based on the information that I was able to read, yes.  Depending on what the agents in the sorting process had visibility to, there were several pages, and it would depend on what they were reading and what page they landed on in order to sort that piece of mail.

Q.   So they would not have reviewed the entire document and its materials to determine how to sort it?

A.   I don't believe that they read the entire document.

Q.   Okay.  How far into plaintiff's dispute that we just reviewed would you say that you need to read for you

to understand that this should be classified as a mixed file dispute?

And I can pull the document back up for you if you need it.

A.   So when the agents are scanning the documents, they are being scanned and then they're visible on the screen for the agents to see.  They're looking to make sure that it is coming through clearly and there's not a flipped page, things of that nature.  And then through the sorting process, they would be sorting then to gauge whether or not there's information that should be sent to fraud or mixed based off of key verbiage -- identity theft, mixed, things of that nature.  Outside of that is going to be the agent that's working the piece of mail to send it to the proper queue if it was not done initially.

Q.   Okay.  But standing here today, it's your position that according to the sorting procedures, this dispute should have been marked as a mixed file dispute. Is that correct?

A.   Yes, it would have been best for it to have gone directly to the mixed queue.

Q.   Would you say that according to Experian's policies and procedures, it should have went to the mixed file queue?

A.   Since there's a backup in place, meaning the

APPENDIX 0609

agents that are working it are trained to look at that information and send it to the proper queue if it's not caught initially through the sorting process. So it is -- it is on the agent's training to better put the -- transfer the files where they should go if it meets specialty, either fraud or mixed.

Q. So just so I understand what you're saying, if a document, through the sorting procedure, is misclassified, Experian trains its agents to be able to identify and ensure that -- that dispute gets classified correctly if it was misclassified on the initial sorting phase. Is that correct?

A. Correct. Or if it wasn't classified at all for whatever reason.

Q. Okay.

A. The agents are trained to look for that information and transfer it to the mixed queue.

Q. So would you -- would you agree that it was also a mistake for the sorting agent to not identify this as a mixed file dispute during the sorting process?

A. I don't know what the agent was looking at at the time or which page they were looking at at the time.

Ultimately, it is up to the agent that's reviewing the piece of mail to make any kind of transfers for it to go to the appropriate queue.

APPENDIX 0610

Victor Manuel Ramirez Najera vs. Experian Information Solutions, Inc. -
30(b)(6) of Experian Informtion Solutions, Inc., by Teresa Iwanski

October 8, 2025
280

Q.   But the correct procedure for how this should have been sorted was to be sorted as a mixed file dispute, correct?

A.   Correct.  That would have been the best -- that would have been the ultimate goal is to have it sent to the mixed queue.

Q.   Is it fair to say that this was an error on the employee sorting this dispute?

MR. MCCRAW:  Objection.  Form.

THE WITNESS:  I would not say it's an error because Experian's agent who is handling the piece of mail is ultimately responsible for where that piece of mail is to be worked, either themselves or transferred to another department.

BY MR. HAMMOUD:

Q.   Okay.  But that never happened in this case when it went to the dispute agent.  Is that correct?

A.   That is correct.  The agent made a mistake.

Q.   Okay.  Do you know the identity of the employee who was responsible for -- for sorting plaintiff's dispute after it was scanned into ILINX?

A.   I do not.

Q.   Okay.  Do you see my screen?

What I'm putting in front of you is -- we're going to go back to Exhibit 5.  Do you see that?

A.    Yes, I do.

Q.    Okay.  At the bottom of EXPERIAN 219, we see a stamp date here of July 30, 2024, correct?

A.    Yes.

Q.    And this is when Experian received plaintiff's dispute letter.  Is that correct?

A.    Yes.

Q.    And then the dispute date of August 1, 2024. This means that this is when Experian created the dispute within its records.  Is that correct?

A.    Yes.

Q.    Okay.  And then the agent here is c92484b.  Do you see that?

A.    Yes, I do.

Q.    And this would be the agent who viewed the dispute documents that were uploaded from the ILINX system.  Is that correct?

A.    Yes, it is.

Q.    Do you know who this agent is that's associated with this ID number?

A.    No, I do not.

Q.    Do you know if this agent is still employed by Experian?

A.    I do not know.

Q.    Did you try and find out prior to this

deposition?

A.   No, I did not.

Q.   Do you think it would have been helpful to just talk to this agent to see what they would have did and why they made the decisions that they made in handling the dispute?

A.   Typically, the agents don't remember specifics about a dispute.  I can gauge what they did -- what policy they should have used based off of my Experian's and knowledge of the policies and procedures.  There was -- there was no reason to ask the agent why they chose that particular reason code.

Q.   Okay.  So based off the documents, the dispute, and ultimately what happened, you can testify as to what should have happened, but you can't testify as to what actually occurred.  And by that, I mean what the dispute agent did when they received the dispute and the steps that they took to resolve it.  Is that fair?

MR. MCCRAW:  Objection.  Form.

THE WITNESS:  I can tell you what's in the DR log, what steps they did take.  I can tell you that they did make a mistake, and that should have been transferred to a mixed train agent and not handled as just an inaccurate reason code.  This agent made a mistake, and their outcome, what they chose, is in the DR log.

BY MR. HAMMOUD:

Q.    But you can't tell me like why he made this or she made this mistake, correct?  You could just tell me that a mistake was made.  Is that fair?

MR. MCCRAW:  Objection.  Form.

THE WITNESS:  Yes, that's correct.

BY MR. HAMMOUD:

Q.    You can't tell me what their thought process was. Is that fair?

A.    That's fair.  I can tell you that they are trained in the policies that they were trained on.  What is in their mind at the very moment, I do not have knowledge of.

Q.    Okay.  You can't even tell me if they believe they were doing what their training wanted them to do.  Is that fair?

A.    The training is extensive, tests are given.  So the policies and procedures would be very clear on how to handle that piece of mail.

Q.    But you don't -- but you can't testify as to this specific agent's understanding of the policies and procedures?  Is that fair?

A.    Again, in order for them to work pieces of mail, they would have to pass certain tests for them to understand Experian's policies and procedures.

So in that -- in this instance, those policies were taught, understood, because they passed the tests.  Outside of that, I don't know.  I'm not -- I wasn't in the mind of that person when they processed a piece of mail.

Q.   And then over here we see the DocID and the image request says "yes," and image sent says "successful."  Do you see that?

A.   Yes, I do.

Q.   Okay.  And this means that the documents that Experian received from the plaintiff, including his dispute letter and all supporting documents, were forwarded to Rushmore?

A.   Yes, they were.

Q.   Okay.  And we see that the dispute reason here, it was an external reason code that was used for this dispute, a "not mine, provide complete ID."  Is that correct?

A.   Yes, it was.

Q.   All right.  So this was a not mine dispute, correct?  Similar to the one -- similar -- this was the same external reason code used for the February 12, 2024 phone disputes.  Is that correct?

A.   Yes, it was.

Q.   Okay.  What I'm putting in front of you now is

being labeled as Exhibit 11.

       (Deposition Exhibit 11 was marked for identification.)

BY MR. HAMMOUD:

Q.   This is the ACDV response by Rushmore, dated August 19, 2024, and it's Bates stamped EXPERIAN 145.

       Have you seen this document before?

A.   I'm sorry.  What was -- what was the date again?

Q.   August 19, 2024 was the response date here.

A.   Oh, yes.

Q.   Okay.  And is my representation that this is the ACDV response from Rushmore to that July/August 2024 dispute from the plaintiff correct?

A.   That is correct.

Q.   Okay.  And then we see here that this time, in response to the ACDV, Rushmore didn't enter a social security number associated with the subscriber consumer ID.  Is that correct?

A.   That's correct.  And if you could -- I'm sorry.

      The response date on this ACDV is what again?

Q.   8-19-2024.

A.   If you can go back to the DR log one more time, please.

      Okay.  Sorry.  Yes.  I just wanted -- you

were looking at the one above it, and it was -- it was June.  And I wasn't sure if you were looking at the June or August dispute.

Q.   Oh, okay.  Sorry.  I apologize.

So Rushmore responded with a code 23, indicating that the information is accurate but they updated other information.  Is that correct?

A.   Yes, it is.  And I just --

Q.   Okay.  And it looks like --

A.   -- want to --

Q.   Go ahead.

A.   Sorry.  And if you go back to the response date one more time.

Okay.  8-19.  Okay.  Thank you.

Q.   Yep.

And then we can agree that this time when they responded, they confirmed the date of birth, but they removed the social -- well, they left the social security number blank.  Do you see that?

A.   Yes, I do.

Q.   Okay.  So what do Experian's ACDV procedures require in circumstances where the returned social security number field is left blank?

A.   Depending on the reason -- dispute reason code, this was inaccurate.  And so that is being sent --

APPENDIX 0617

Victor Manuel Ramirez Najera vs. Experian Information Solutions, Inc. -
30(b)(6) of Experian Informtion Solutions, Inc., by Teresa Iwanski

October 8, 2025
287

we're -- asking for the identification information as well as the status of the account, minus the social security number, would not cause a deletion of the account. Only if there was a do not combine on the file. At that point, a social security number is required.

Q. Okay. And then here we see the dispute reason code that was attached to this dispute is the code 112. Is that correct?

A. Yes, it is.

Q. Okay. So the dispute agents -- you know, he coded this as dispute 112, "Claims inaccurate information. Did not provide specific dispute. Provide complete ID and verify account information." Is that correct?

A. Correct.

Q. And you would agree that this was an incorrect way to code this dispute?

A. Based off of the mail correspondence that we received, yes.

It should have been transferred to a mixed train agent, and an ACDV would not have been sent. Experian agents would be trained to move the account to -- to -- outside of the consumer's PIN.

Q. Okay. Did the fact that Rushmore suddenly didn't know what the social security number was cause Experian to question the accuracy of this ACDV response?

A.    No.    The missing social security number is not something that -- that Experian would use to cause a deletion.

Q.    Okay.  So I'm going to put in front of you -- this is Exhibit 12.

(Deposition Exhibit 12 was marked for identification.)

BY MR. HAMMOUD:

Q.    These are plaintiff's -- Experian dispute results dated August 19, 2024.  Is that correct?

A.    Yes, it is.

Q.    And these are Bates labeled EXPERIAN 73 through EXPERIAN 76.  Is that correct?

A.    Yes, it is.

Q.    Okay.  And you're familiar with this document?  You've seen it before?

A.    Yes, I have.

Q.    Okay.  And then this -- these dispute results from Experian indicate that the Rushmore account that the plaintiff disputed was verified and updated.  Is that correct?

A.    Yes, that's correct.

Q.    Okay.  In other words, Experian communicated that it verified that the account belonged to the plaintiff, but it updated some other account details.  Is that

correct?

A.    That's correct.  It had ID match and it remained on file.

(Deposition Exhibit 13 was marked for identification.)

BY MR. HAMMOUD:

Q.    So I'm putting Exhibit 13 in front of you.  This is a document Bates labeled EXPERIAN 115 through 122.  Is that correct?

A.    I -- sorry.  115, yes, I do see that.

Q.    Through 122?

A.    Yes, I do see that.

Q.    Okay.  And this is plaintiff's Experian credit report dated May 28, 2025.  Do you see that?

A.    Yes, I do.

Q.    Okay.  And have you seen this document before?

A.    Yes, I have.

Q.    Okay.  And you agree that as of this day, on May 28, 2025, the Rushmore account was still reporting on plaintiff's credit file?

A.    Yes, it was.

Q.    Okay.  And just so the record's clear, we're on EXPERIAN 116, where the Rushmore account was reflected.  Is that correct?

A.    Yes, that is correct.

Q.   Okay.  I'm going to go down to EXPERIAN 119.
This is the hard inquiry section.  Do you see that?

A.   Yes, I do.

Q.   Okay.  And would you agree that a hard inquiry is when a consumer applies for credit, rental property, utility service, or a loan of some sort?

A.   Yes.  It's a firm offer of credit.

Q.   Okay.  And when a -- when a creditor pulls a consumer's credit report using a hard inquiry, the creditor receives the consumer's full Experian credit report.  Is that correct?

A.   If that's what they're choosing to receive, or they can receive a score report.

Q.   Okay.  Is it fair to say that the Xactus inquiry that occurred on April 27, 2025, they would have received plaintiff's credit information and it would include the Rushmore account at issue?

MR. MCCRAW:  Objection.  Form.

THE WITNESS:  Based on this document, yes, it would.

BY MR. HAMMOUD:

Q.   Is it fair to say that each of these hard inquiries that occurred would have resulted in Experian providing these creditors with plaintiff's credit information, which would have included the Rushmore

Victor Manuel Ramirez Najera vs. Experian Information Solutions, Inc. -
30(b)(6) of Experian Informtion Solutions, Inc., by Teresa Iwanski

October 8, 2025
291

account?

A.   Yes.  Based off of this document, the dates would align prior to it being deleted.

Q.   Okay.  And we -- we've -- I guess for clarity, we've agreed that the Rushmore account -- it was an inaccurate account to be reported on plaintiff's credit report.  Would you agree with that?

MR. MCCRAW:  Objection.  Form.

THE WITNESS:  Based on the identification information that was supplied to Experian, it was associated with the PIN that merged with two people.  Based off of that, it was incorrectly reporting on the wrong PIN.

BY MR. HAMMOUD:

Q.   So that was, like, a lot of words.  I want to unpack it.  I mean, boiled down, it sounds like you said -- and I don't want to put words in your mouth, so you'll tell me if that's correct or not -- but it sounds like you agreed that the Rushmore account was inaccurately reporting on plaintiff's credit report.  Do we agree on that?

MR. MCCRAW:  Objection.  Form.

THE WITNESS:  Yes.  After Experian received the notice of litigation, Experian analyzed the file to be a mixed file and processed accordingly.

BY MR. HAMMOUD:

Q.    Okay.  I'm putting Exhibit 14 in front of you.
This is Bates label EXPERIAN 164 through 165.

(Deposition Exhibit 14 was marked for
identification.)

BY MR. HAMMOUD:

Q.    Have you seen this document before?

A.    Yes, I have.

Q.    This -- this document reflects a dispute that was
made through Experian's website.  Is that correct?

A.    It is through a reseller process.

Q.    Do you know what reseller submitted this dispute
or from what reseller it came from?

A.    It would be the -- on the disclosure log, that
would have the reseller name.

Q.    Is it on this log, Exhibit 5?

A.    Not on the DR.  Not on the DR log.  It would be
on the disclosure log.

Q.    Hold on. Let me see.  Oh, there it is.

Okay.  So we're going back to Exhibit 2.  Do
you know what page?

A.    No.  I would have to look at the date.  And if
you could make it just a little bit bigger so I can -- if
you can just scroll down.  Hold on one second.  Sorry.

So I believe the report number associated

with it was 94- -- if you could stop right there -- 943396680.  Yes, so it's --

Q.    That's correct.

A.    It's associating -- yeah -- with the reseller dispute.  And I'm not sure this is the avenue for the reseller.  It doesn't really give me a name other than the -- the caps --

Q.    ID?

A.    Yeah.  It's not giving me a name of the actual reseller, but it is a reseller dispute.

Q.    So just so the record's clear, we're on Exhibit 2, EXPERIAN 210, and this is the capid.  This would be the ID associated with that reseller.  Is that correct?

A.    Yes, that's correct.

Q.    So Experian could search their --

A.    I'm sorry.  I'm sorry.  I'm sorry.  I just want to back up a little bit.  Sorry.

That is the report number that was generated with the identification information by the reseller, but that report number does not tie back to a particular reseller.  It's just that's the report number that was created based off of the reseller contact.

Q.    So there's -- so Experian has no documents or no way to tell who submitted this -- what is called a

APPENDIX 0624

reseller dispute?

A.   Yes, it is a reseller dispute.  If you look right above it on the same date, it shows there was an access through -- if you can go up just a little bit more -- one second.  One second.  Sorry.

Okay.  Yeah, it's not giving me a particular name.

Q.   Do you know if Experian could figure it out if you went back and searched your system?  Is that something you think you could locate?

A.   Me personally, I don't know.  The process would be for resellers to process disputes using the reseller portal that's set up for them, or the website that's set up with them.  If for some reason they can't process the dispute, they would send it in like they are now. Typically, I would see a name or something associated with just the reseller, but I do not see anything outside of just reseller dispute.

Q.   Okay.  So on -- back to Exhibit 14.  On EXPERIAN 164, it indicates that there's some uploaded file names with this dispute.  Do you see that?

A.   Yes, I do.

Q.   Are the documents that were uploaded just 164 -- EXPERIAN 164 and 165, or are there other documents in Experian's possession related to this reseller dispute?

A.  So this -- so there's a cover page, which is what we're looking at now.  And the second page is what's included in the Experian reseller dispute form.

Q.  So are you talking about this second page, this EXPERIAN 165?

A.  Yes.

Q.  Okay.  Was there an ACDV that was generated as a result of this reseller dispute?

A.  Yes, there was.

Q.  Okay.  And we could see that on the -- on the DR log?

A.  Yes.

Q.  Okay.  So it would be here -- back to Exhibit 5 -- which is EXPERIAN 219, towards the top where it begins "Agent ID c82441b."  Are you following?

A.  Yes.

Q.  Is this the -- is this the dispute associated with that reseller dispute that we just looked at?

A.  Yes, it is.

Q.  Okay.  And do you know if -- so you said that an ACDV was generated and sent to Rushmore here?

A.  It was sent, yes.

Q.  Do you know if it was produced in this case?

A.  I believe post-litigation the cycle was stopped, and then the mixed file procedures were applied.

Q.    So did -- did Experian get a response to the ACDV from Rushmore?

A.    No.  Experian stopped this -- the ACDV cycle to process internally.

Q.    Okay.  So an ACDV was sent out.  Before the results came back, Experian terminated that cycle and then they handled it on -- you know, themselves internally and processed it as a mixed file dispute.  Is that correct?

A.    That is correct.

Q.    Okay.  So is there a copy of the ACDV that was generated?

A.    No.  There would not be a copy that would be generated, it's just whatever is in our DR log.  Experian stopped that cycle from -- from a response coming back.

Q.    But the ACDV would've been generated to be -- to have been sent out to Rushmore, correct?

A.    Yes.

Q.    Okay.  So post-litigation, Experian -- Experian sent out an ACDV to Rushmore related to this reseller dispute.  Is that correct?

A.    No.  This was not -- the June 2 is not something that Experian did.  It is a reseller dispute.

Experian -- once Experian received the documents, meaning we're going in and we're pulling documents based off of the request of the data -- I'm

Coash Court Reporting & Video, LLC
staff@coashcrv.com                          602-258-1440
www.CoashCourtReportingandVideo.com

APPENDIX 0627

sorry -- request of counsel, at that point Experian stopped the cycle and then processed as a mixed file.

Q.   But would it have been the reseller that sent the ACDV to Rushmore, or would it have been Experian that sent the ACDV to Rushmore?

A.   It would be Experian sending it on behalf of the reseller on 6-2-2025.

Q.   With this dispute reason external code "Not mine. Provide complete ID," correct?

A.   Correct, based off of that reseller information.

Q.   Okay.  When Ms. Hamilton -- you testified earlier that Ms. Christina Hamilton was the person who performed the unmixing, correct?

A.   Yes, I believe so.

Q.   Okay.  And when she unmixed plaintiff's credit file, would the results of that unmixing be contained within a DR log dated after the date that the unmixing took place?

A.   Any of the logs would be part of Experian privileged documents.  So anything post-litigation would be something at direction of counsel.

Q.   So Experian provided this -- these documents, the DR log, the admin report as of June 3, because Experian's position is that after June 3, the unmixing is privileged communication?

MR. MCCRAW:  Objection.  Form.

THE WITNESS:  No.  No.  So the documents are pulled, the analyzation happens on or around that time. The documents being pulled has nothing to do with what -- what next steps Experian is taking.  Those next steps is at direction of counsel.

BY MR. HAMMOUD:

Q.   Okay.  So do you know why -- why a DR log report or an admin report dated after the additional actions that took place with respect to the plaintiff's file were not disclosed?

MR. MCCRAW:  Objection.  Form.  Outside the scope.

THE WITNESS:  If Experian pulled the information on 6/3/2025, at that time Experian had not received a response back from the data furnisher.

MR. HAMMOUD:  Okay.  All right.  Let's take a -- where did that go?  Let's take a short break.  I think I'm, like, almost wrapped up.  I just want to review my notes.  Okay?  So let's say, like, five minutes.

THE WITNESS:  Okay.

MR. MCCRAW:  Okay.

THE COURT REPORTER:  We're off the record. Time is 5:38 p.m.

(A recess ensued.)

THE COURT REPORTER:  Okay.  We are back on the record.  Time is 5:53 p.m.

BY MR. HAMMOUD:

Q.    Okay.  What I'm putting in front of you now is being labeled as Exhibit 15.

(Deposition Exhibit 15 was marked for identification.)

BY MR. HAMMOUD:

Q.    This is Experian Bates labeled 166 through 169.  Is that correct?

A.    Yes.

Q.    Okay.  And are you familiar with this document?  Have you seen it before?

A.    Yes, I am.

Q.    And this is plaintiff's dispute results, dated June 11, 2025.  Is that correct?

A.    Yes, it is.

Q.    Okay.  And these dispute results indicate that the Rushmore account was deleted from plaintiff's credit report.  Is that correct?

A.    Yes, it does.

Q.    Okay.  And this was the -- this dispute result was in response to the notice of litigation of this case.  Is that correct?

A.    That's correct.  It was at the point where

Experian analyzed the file as a mixed file and processed accordingly. And those are the name rows and information that was updated as well.

Q. Okay. I want to go to Exhibit 9. This is Experian's -- the admin report. Bates label that starts at 171. Do you see this?

A. Yes, I do.

Q. Okay. And this is an admin report that was pulled on June 3, 2025. Is that correct?

A. Yes, it is.

Q. And we can agree that as of this date, June 3, 2025, the Rushmore account was still on plaintiff's credit report. Is that correct?

A. Yes, that's correct.

Q. Okay. Isn't it true that when Experian is sued and the file is mixed, the litigation support department standard practice is to save a copy of the admin and/or long admin report before the file is unmixed?

A. If it is captured, that is something that -- that counsel may request.

Q. But it's not a standard practice?

A. I'm not sure of it being a standard practice. But if it's requested by the -- by counsel, then Experian would then pull the admin after the mix.

Q. After the mix or before the mix?

A.    I'm sorry.  After the unmix.  After the unmix.
I'm sorry.  Unmix.  After the unmix.

Q.    Okay.  So it's -- so just to confirm, it's not
standard practice to capture the information before the
mix and then capture the information after the mix.  Is
that correct?

A.    If it's requested by counsel.

Q.    Okay.  So whatever -- so whether -- whether the
information is captured before the mix or after the mix
just depends on what counsel advised Experian to do.  Is
that correct?

A.    If -- if they're asking Experian to pull another
document, that would be at the request of -- of counsel.

Q.    Okay.  Do you know if --  Strike that.

Have you seen an admin report that was
pulled for the plaintiff on or after June 11, after
Experian unmixed the file?

A.    It was not part of the information that was given
to prepare for this testimony.  I don't know if one was
pulled.

Q.    Do you know if a long admin -- if a long admin
report was pulled or generated after the mixing?

A.    I don't believe so.

Q.    Okay.  Experian is a credit reporting agency,
correct?

A.    Yes, it is.

Q.    Okay.  And would you agree that the plaintiff is a consumer?

A.    Yes.

Q.    Okay.  Would you agree that the plaintiff disputed the Pennymac and Rushmore account in February of 2024?

A.    Yes.

Q.    Okay.  And you agree that the dispute agent made a mistake in handling the phone dispute with the plaintiff, correct?

A.    Actually, the phone dispute itself, I may have interpreted -- thinking that it already had a DNC on file. So at the point of the phone call, it was not necessary for the agent to send it to mixed.  I apologize.

Q.    Okay.  I think you had said that in that situation, Experian would have wanted the dispute agent to ask additional follow-up questions.  Are you now changing your testimony and saying that is not Experian's position?

A.    When it's analyzing as a mixed file, the -- the Experian agents are trained to ask those additional questions.  When I answered the question, I -- I may have been thinking it already had a DNC on file.  I don't remember specifically.  I just remember thinking about that when you -- when you just asked.  I don't remember

Victor Manuel Ramirez Najera vs. Experian Information Solutions, Inc. -
30(b)(6) of Experian Informtion Solutions, Inc., by Teresa Iwanski

October 8, 2025
303

specifically. But outside of the fact that I was thinking it already had a DNC on file.

Q. Did you speak to anybody during the break?

A. Yes, I did.

Q. Who did you speak to?

A. Experian's counsel.

Q. Is that Mr. McCraw?

A. Yes.

Q. And what did you guys talk about?

MR. MCCRAW: That's attorney-client privilege.

MR. HAMMOUD: No, it's not, Chance. When I took a break with my client when you were taking his deposition, you asked him what you spoke about, and you made clear that communications during a deposition on the breaks are not privileged. And you asked him what I -- what we had spoken about.

So again, I'm going to instruct you, Ms. Iwanski, what did Mr. McCraw tell you during the break?

MR. MCCRAW: [Inaudible.]

MR. HAMMOUD: You are required to answer the question.

MR. MCCRAW: Youssef, I asked him, and he answered. You didn't object. I have objected.

Victor Manuel Ramirez Najera vs. Experian Information Solutions, Inc. -
30(b)(6) of Experian Informtion Solutions, Inc., by Teresa Iwanski

October 8, 2025
304

Ms. Iwanski, I'm going to instruct you not to answer the question.

MR. HAMMOUD:  You do know that communications during a deposition on breaks are not privileged communications.

MR. MCCRAW:  Who are you saying that to?

MR. HAMMOUD:  I'm saying that to you.

MR. MCCRAW:  What's your -- do you have any basis for that?

MR. HAMMOUD:  The basis is -- I mean, I don't have time right now with the deposition to pull up the case law.  If we want to pause and then, you know, deal with that issue, I'm happy to do that.  So we can -- we can go off the record while we can, you know, square this away.

MR. MCCRAW:  We can go off the record if you want.  I'm fine, yeah, with doing that.

MR. HAMMOUD:  Yeah.  We can go off the record.  And then if you're asking for us to provide you case law on this issue, we're happy to do that.  We could look it up and we could provide it to you.

MR. MCCRAW:  Okay.  Do that.  I'd rather handle it that way.

THE COURT REPORTER:  We're off the record.  Time is 6:01 p.m.

(A recess ensued.)

THE COURT REPORTER:  We're on the record. Time is 6:14 p.m.

BY MR. HAMMOUD:

Q.   Ms. Iwanski, before the break, I asked you if you had spoken to anybody during the break, and you indicated that you had spoken to your attorney, Mr. Chance McCraw. Is that correct?

A.   Yes.

Q.   Okay.  Can you tell me what you guys spoke about?

A.   Yes.  I called Chance to let him know that I wanted to clean up my testimony regarding the phone call. I was thinking that there was a DNC or it had already been treated as a mixed file, and so I just wanted to clarify that.  And that's what I asked him, if I could do that.

Q.   So you called him and you told him that you wanted to change the testimony that you had given earlier in your deposition.  Is that correct?

MR. MCCRAW:  Objection.  Form.

THE WITNESS:  I misspoke and I wanted to clear that up in my testimony.

BY MR. HAMMOUD:

Q.   Did you speak to anybody else during any of the breaks?

A.   No, I did not.

APPENDIX 0636

Q.   Okay.  So earlier today I asked you whether the dispute agent on the February 12, 2024 phone call made a mistake, correct?

A.   That's correct.

Q.   And you indicated at the time -- your testimony was that -- that individual did make a mistake in handling the phone call?

A.   At that time, yes.  I was thinking that the file had already been mixed or that it had already been treated as mixed and to be transferred.  But as a regular not mine, unless there's a DNC on file, the agent does not have to transfer it to a mixed train agent without any additional information being discussed by the consumer that would lead that to that direction.

Q.   Okay.  And our conversation was not about whether they transferred it to a mixed file, but whether the dispute agent should have asked any follow-up questions.  And your testimony was that you would -- Experian would have wanted, in a situation like that, the dispute agent to have asked some follow-up questions.  Is that not your testimony anymore?

A.   It's -- as far as the policy itself, it's not policy for the agents to ask additional questions.  It would have been great if the agent did.  However, hindsight, what we know now.  Back then, as far as the

policy itself, the agent did not make an error.

Q.   Okay.  But it's your position that it would have been more helpful or beneficial had the agent asked additional follow-up questions to plaintiff's assertion that the account was just simply not his.  Is that correct?

A.   Yes.  It would have been -- it would have been helpful knowing what we know now.  But at the time, the agent did not make an error.

Q.   Okay.  Now, the February 2024 dispute, will Experian agree that those disputes by plaintiff were neither frivolous nor irrelevant?

MR. MCCRAW:  Objection.  Form.

THE WITNESS:  Correct.

BY MR. HAMMOUD:

Q.   Okay.  And then plaintiff again disputed in July of 2024.  I believe Experian received that dispute in August, the written correspondence.  Is that correct?

A.   Yes.

Q.   Okay.  And is it still your testimony that the dispute agent made a mistake in handling the dispute?

A.   Yes.

Q.   And is it still your testimony that according to the sorting procedures employed by Experian, that the dispute should have been sorted as a mixed file dispute?

A.   It is the goal to have the sorting process to go into the correct queue, but ultimately is up to the agent. So there's not an error made on that stance.  It's more of what the agent is reviewing and their ultimate decision to transfer it.

Q.   Okay.  But in reviewing the dispute and what we saw, according to the sorting procedures and your understanding of the dispute, it should have been classified as a mixed file dispute and went to that queue. Is that correct?

A.   It's -- it's -- it would've been great if they did.  However, it did not get sorted to the queue, instead, it was left to the agent, which is the process for the agent to then transfer if necessary.

Q.   And the July 2024 dispute, that was neither a frivolous nor an irrelevant dispute.  Is that correct?

A.   That's correct.

Q.   Okay.  And Experian has policies and procedures related to its handling of disputes to ensure that a reasonable reinvestigation is being conducted by the dispute agent, correct?

A.   That is correct.

Q.   Okay.  So if the dispute agent doesn't follow these procedures, would you agree that the reinvestigation was not reasonable?

MR. MCCRAW:  Objection.  Form.

THE WITNESS:  I believe that they -- the -- Experian having reasonable policies and procedures, and that's what the agents are trained with.  If they make a mistake, it would not cause them to be unreasonable.  It means that -- that agent made a mistake.

BY MR. HAMMOUD:

Q.    Okay.  So -- so it's Experian's testimony that even if a dispute agent doesn't follow the policies and procedures, Experian still believes that it would be considered a reasonable reinvestigation?

MR. MCCRAW:  Objection.  Form.

THE WITNESS:  Yes.  Yes.  Experian has policies and procedures and training and monitoring to ensure that the agents are following policies and procedures.  And in this instance, that was a mistake.

MR. HAMMOUD:  No further questions.

MR. MCCRAW:  I have a few questions for Ms. Iwanski.


EXAMINATION

BY MR. MCCRAW:

Q.    So, Teresa, I just want to go to the very end of this.  So looking at plaintiff's credit score here at the very end after the Rushmore account is taken off, what

happened to plaintiff's credit score?

A.   The plaintiff's credit score went down five points.

Q.   Okay.  And so before that, we saw that the Rushmore account was on there and the plaintiff's credit score was higher.  So then is it true that the Rushmore account increased plaintiff's credit score?

A.   Yes, by looking at the scoring model, it was -- it was increased by five points.

Q.   Okay.  And then would you be able to provide any more testimony about the policies and procedures if they were in front of you today?

A.   No.  I would have all the -- I have knowledge of the policies and procedures, and it would not be different.

Q.   So would your testimony today be any different than if the policies and procedures from Experian were in front of you?

A.   No.

MR. MCCRAW:  All right.

MR. HAMMOUD:  I have some rebuttal questions.

(Next page, please.)

Victor Manuel Ramirez Najera vs. Experian Information Solutions, Inc. -
30(b)(6) of Experian Informtion Solutions, Inc., by Teresa Iwanski

October 8, 2025
311

FURTHER EXAMINATION

BY MR. HAMMOUD:

Q.    Are you a credit score expert, Ms. Iwanski?

A.    No, I'm not.  I'm basing this information off of the FICO score that was part of the disclosure that was created.

Q.    So you just saw that when the Rushmore account was there, once it was taken off, the score went down by five points?

A.    Yes.

Q.    Okay.  Did you -- did you comb through plaintiff's credit report to see if any other items in his credit report had changed, whether balances had gone up and down or anything like that?

A.    The information I viewed was the FICO score and the percentages and how they were calculated, and the only change was the -- I think the length of history was decreased.

Q.    So would the answer to that question be no, you did not comb through the plaintiff's credit report line by line to determine if any tradeline information had changed?

A.    No, I did not.

Q.    Okay.  And then with respect to the FCRA, do you know if the standard under the FCRA is accuracy or whether

the information makes your credit score go up or down?

A.   Experian's ultimate goal is to -- is to have the maximum possible accuracy, and that is what Experian's goal is, to comply with the FCRA.

Q.   So I understand that's Experian's goal.  But the law, which is enshrined in the Fair Credit Reporting Act, the standard set out by the law, is whether the information is accurate.  Is that correct?

MR. MCCRAW:  Objection.  Form.

THE WITNESS:  That's my understanding.

MR. HAMMOUD:  Okay.  No further questions from me.

MR. RISTVEDT:  And, Daniel, I think before we go off the record, as usual you probably know my order already.  We'll take e-tran only, do not need exhibits.  I will have Sean circulate the exhibits probably tomorrow morning.  I think he's already offline.

MR. HAMMOUD:  You don't -- James, no -- no PDF version?  No condensed version?

MR. MCCRAW:  We just do the e-tran only.  We can do the condensed, too, if you want, but --

MR. HAMMOUD:  Yeah, let's do a -- let's do a condensed PDF as well.

MR. MCCRAW:  Daniel, can we go ahead and mark this confidential, just the transcript in general,

because we were discussing confidential information.

MR. HAMMOUD:  This should not be designated as -- you can't just mass designate the entire transcript as confidential.  Under what basis?  There's no protective order in place.  There's no agreement between the parties.

MR. MCCRAW:  We have a confidentiality agreement.

MR. HAMMOUD:  So, again --

MR. MCCRAW:  -- and it's --

MR. HAMMOUD:  Chance, if you believe -- it's not going to be marked confidential.  Because if you believe that there is a confidentiality agreement, you would've disclosed all the confidential information that Experian is withholding.  There is no confidentiality agreement, and you can't just mass designate the entire transcript as confidential.  That's not going to happen.  You can move for a protective order with the Court, but other than that, you can't just mass designate unilaterally.

MR. MCCRAW:  Youssef, how it generally works in every other case is it would be designated, and then we can go through and if you want to use certain parts of it, we can discuss that whenever you're moving for summary judgment or something like that, and we can decide whether things need to be redacted.  That's just the usual case,

and I don't see any reason to --

MR. RISTVEDT:  I've taken dozens of Experian depositions, that's not been my Experian's as the usual case with Experian.  What's your basis for this?

MR. MCCRAW:  Well, we were discussing confidential documents, and so we need to designate it confidential.  And then we can go through and that gives us time to go through, normally you get 30 days, and you can pick out which sections and stuff like that.  And we can go back and forth for 30 days deciding which sections, you know, are confidential and which aren't.

MR. HAMMOUD:  Okay.  And you made clear on the record that Experian withheld documents on the basis of the fact that those documents are confidential and there is no confidentiality agreement.  So you can't come now and say, you know, we talked about confidential documents when you produced no confidential documents here.  So you can't --

MR. MCCRAW:  That's not true.

MR. HAMMOUD:  -- pick and choose what you believe to be confidential.

Again, if you believe the transcript is confidential, the proper method, as the court set out, is you could seek a protective order to designate it as confidential.  Until and unless there is a court order

Coash Court Reporting & Video, LLC
staff@coashcrv.com
602-258-1440
www.CoashCourtReportingandVideo.com

Victor Manuel Ramirez Najera vs. Experian Information Solutions, Inc. -
30(b)(6) of Experian Informtion Solutions, Inc., by Teresa Iwanski

October 8, 2025
315

designating the deposition transcript is confidential, it's not confidential.

MR. RISTVEDT:  I will note as well -- I don't want to be the voice of reason.  I hate being the voice of reason -- but, Ms. Iwanski, you likely do not need to stick around for this.  I know it's into the evening, and you probably want to go about your night.

THE WITNESS:  I just wanted to make sure that Daniel didn't need any corrections or --

THE COURT REPORTER:  I do actually.

One quick spelling.  Early in the day, you mentioned a woman by the name of Sarah.  I think it was Levell.  Could you specify or spell her last name for me?

THE WITNESS:  I believe it's L-e-v-e-l-l, and Sarah with an H.

THE COURT REPORTER:  Sarah with an H.  Got it.  That's the only one I needed from you.  Thank you very much.

THE WITNESS:  Thank you.

MR. HAMMOUD:  Thank you, Ms. Iwanski.  Enjoy the rest of your night, and I appreciate your time today.

THE WITNESS:  Okay.

THE COURT REPORTER:  And, Ms. Iwanski, do you want to read and sign or want a copy?

MR. MCCRAW:  Please.  Yes.

THE COURT REPORTER:  Electronic fine?

MR. MCCRAW:  Yeah, electronic is fine.

MR. RISTVEDT:  Daniel, are we still on the record, by the way?

THE COURT REPORTER:  We are actually.

MR. RISTVEDT:  All right.  That's what I thought.

MR. HAMMOUD:  Do you want to just go off the record?  I mean, it doesn't sound like we're going to come to an agreement on this, Chance.  So, you know, I -- it's been a long day.

MR. MCCRAW:  Right.

MR. HAMMOUD:  I'd like to go downstairs and be with my family.  You know our position.  So we don't believe the deposition transcript -- you can't just mass designate it as confidential.  We're having this issue. We've already filed a motion to compel.  And so, you know, if -- if you believe that you can just mark things confidential because there's an agreement in place, then what's the reason for you withholding documents that we talked about that Ms. Iwanski indicated was relevant?  You have no basis to withhold documents.

So ultimately, if you want the deposition transcript to be designated as confidential, you can file a motion for protective order and ask the court to do

that.

MR. MCCRAW:  Okay.  That wasn't the procedures that the court laid out for us.  He said the parties either agree to enter into a confidentiality agreement, which we did -- and you've since said that you're not going to abide by it -- and that's why we haven't produced, you know, policies and procedures.

We produced some other documents related specifically to plaintiff of policies and procedures.  We think that those are trade secrets, proprietary information.  Some of that was discussed here today.  So we do assert the confidentiality provision and it should apply to the transcript and especially those provisions.  And so we're just asking that we have time to go through and identify those sections that are deemed confidential.  And then, you know, we can litigate this.  You know, I understand that that's your choice.  You want to go through motions practice with the court, and we can go through that.  And that's totally fine.  It's your option.

MR. HAMMOUD:  I mean, I can't -- look, ultimately, I can't stop you from going through the transcript and informing the court reporter that you believe this line of questioning is -- is confidential.

Ultimately, our position is, if you want to designate them as confidential properly, you will have to

seek a motion for protective order, so --

MR. MCCRAW:  And I'm saying that I'm asking Daniel to go ahead and designate it confidential so that we have time to go through.  Normally, you're given 30 days.  That's typically, you know, how it works.  And --

MR. RISTVEDT:  But that's if there is a protective order in place, which there's not.

MR. MCCRAW:  Because this court doesn't do protective orders, James.

MR. RISTVEDT:  I'm aware.

MR. MCCRAW:  Yeah.

MR. RISTVEDT:  And, frankly, I think that's the better practice.  And ultimately, like we've been discussing, we -- we proposed language that we're willing to agree to, Experian's unwilling to agree to it, we're at an impasse.  The proper course of action is for Experian to abide by the federal rules and the court's interpreting the federal rules and move for confidentiality designations as it's able to -- truthfully, I don't understand what is stopping Experian from moving for a protective order like it is obligated to do when it seeks confidentiality when there's no -- like, moving document by document is in fact what courts did before blanket protective orders were so widespread.  But it's not like this is an atypical or unusual thing.  Experian has the

ability to do it.  I'm flabbergasted that it's just refusing steadfastly to file a PO to seek confidentiality designations.  I don't understand it.

MR. MCCRAW:  James, you only made this an issue Wednesday, and so it's not like we've had a lot of time to move for a PO to begin with.  We also had this deposition.  So I think, you know, there's other things that are going on.  And I've never had to move for a protective order in any case I've ever been involved in. It's typically just your law firm that these things come up like this.  And so understandably, you know, this isn't something that is normal, and it's not normal practice. In fact, the court did not say moving for a protective order is normal practice.  But I understand.  I already said their position.  I think that's done.  I'm going to head out.  You all can have a good night.

MR. RISTVEDT:  Thanks.

MR. HAMMOUD:  Okay.  Off the record.

THE COURT REPORTER:  We're off the record. Time is 6:32 p.m.

(The deposition was concluded at 6:32 p.m.)

_____
TERESA IWANSKI

STATE OF ARIZONA    )

COUNTY OF MARICOPA )

          BE IT KNOWN the foregoing proceedings were taken before me at the time and place herein set forth; that I was then and there a Certified Electronic Reporter and Notary Public in and for the County of Maricopa, State of Arizona; that the questions propounded by counsel and the answers of the witness thereto were taken by me electronically and thereafter reduced into typewritten form under my direction; that the foregoing pages are a full, true, and accurate transcript of all proceedings and testimony, all to the best of my skill and ability.

          I FURTHER CERTIFY that I am in no way related to nor employed by any parties hereto nor am I in any way interested in the outcome hereof.

          DATED at Phoenix, Arizona, this 17th day of October, 2025.


_____
Daniel Rohan, CER
Certified Electronic Reporter #4137
and Notary Public
My Commission Expires: June 28, 2027

Victor Manuel Ramirez Najera vs. Experian Information Solutions, Inc. -
30(b)(6) of Experian Informtion Solutions, Inc., by Teresa Iwanski

October 8, 2025
Index: (b)..2025

**Exhibits**

**Iwanski Exhibit 001**
2:10 11:3,4

**Iwanski Exhibit 002**
2:12 176:6,10 182:11
292:20 293:12

**Iwanski Exhibit 003**
2:14 179:14 184:9,10

**Iwanski Exhibit 004**
2:15 189:5,6,17

**Iwanski Exhibit 005**
2:17 179:10,15,19 191:22
197:7 202:19 204:11
252:5 280:25 292:16
295:14

**Iwanski Exhibit 006**
2:19 192:17,18 200:4

**Iwanski Exhibit 007**
2:20 203:11,12

**Iwanski Exhibit 008**
2:22 209:6,10

**Iwanski Exhibit 009**
2:23 210:13,16 243:12
300:4

**Iwanski Exhibit 010** 3:1
251:10,11

**Iwanski Exhibit 011** 3:3
285:1,2

**Iwanski Exhibit 012** 3:4
288:5,6

**Iwanski Exhibit 013** 3:6
289:4,7

**Iwanski Exhibit 014** 3:8
292:2,4 294:19

**Iwanski Exhibit 015** 3:9
299:5,6

---

**(**

**(b)** 49:2,8,13

---

**0**

**00001** 204:13

**0996** 228:5 255:14

**0X** 239:12,13,23

---

**1**

**1** 11:3,4 12:16 170:3
189:18 194:15 203:25
204:4,24 205:5 207:18
240:6 281:8

**10** 28:4 114:19,20,21
148:19 170:6 189:18
251:10,11,24

**10-minute** 46:24 86:20

**100** 53:19,22 79:3

**10:08** 46:24 47:4

**10:18** 46:24

**10:19** 47:7

**11** 30:24 226:6,11,14,19
227:3 228:2,3 239:21
240:21,23 241:4 246:20
249:25 285:1,2 299:16
301:16

**112** 287:7,11

**115** 209:11 289:8,10

**116** 289:23

**118** 209:11

**119** 290:1

**11:13** 86:23

**11:26** 87:1

**11X** 239:16,19

**12** 177:17,20 178:13 179:7
181:6 184:3 189:12,15
190:14 191:25 203:22
209:20 284:22 288:5,6
306:2

**122** 289:8,11

**1234990** 247:15

**12:46** 149:13

**13** 253:18 258:21,25
262:11,14 289:4,7

**14** 206:18 267:4 292:2,4
294:19

**145** 285:6

**146** 203:15

**147** 192:22

**148** 251:14

**15** 17:16 18:14 194:20
206:3,13,18,23 207:6,10
209:24 233:19 235:12
239:3 240:9 299:5,6

**150** 115:24 254:19

**151** 255:22 260:18

**152** 256:22

**153** 259:3

**154** 262:5

**155** 262:16

**156** 265:7

**157** 266:7

**163** 251:14

**164** 292:3 294:20,23,24

**165** 292:3 294:24 295:5

**166** 299:9

**1681** 18:14 49:7

**1681e** 49:2,8,13

**1681e(b)** 17:16 80:19
87:8 97:24 98:8 99:4

**1681i** 50:12

**169** 299:9

**171** 210:17 211:10 220:20
222:17 223:6 238:1 241:3
243:24 300:6

**173** 228:8 243:13

**174** 240:17

**176** 246:9 250:7

**18** 17:7,9 164:12,16 165:1,
12,16 166:20 167:1
168:11,16 172:11 173:16,
19,24 267:12

**184** 243:22 244:4,15

**19** 17:9 285:6,9 288:10

**1970** 260:3 264:18 265:24

**1995** 212:18 267:4

**1:15** 149:9

**1:30** 149:16

---

**2**

**2** 12:24 13:7 81:23,25
83:2,4,9,14,24 84:5,13
85:1,4,8 89:3 98:12 101:7,
10 103:19 104:10 105:11,
21 106:4,19 107:2 108:2
176:6,10 182:11,12
237:11,15 239:2 292:20
293:12 296:21

**2-12** 177:24 178:5

**2-15** 206:11

**2-20** 181:5

**2/12/2024** 181:24

**20** 17:9 261:23

**2000** 170:3

**2003** 26:23 29:5

**2005** 170:6

**2006** 30:1,4

**2008** 238:18,22 239:3

**2009** 253:19 258:19
262:11

**2013** 30:4,8,18 44:21
45:15 91:17,25 92:2 93:3
97:11,15

**2019** 190:23 191:2 226:6,
11,14,19 227:4 233:19
234:22 235:12 239:3
240:10,21,23 241:4

**2021** 30:8,17

**2024** 72:25 73:21 74:10,
21,25 75:8 177:17,20
178:13 179:7 181:7 184:3
189:12,15 190:15 194:20
203:22 204:8 205:20
206:4,6,14,24 209:16,20
246:20 251:25 252:10
281:3,8 284:22 285:6,9,12
288:10 302:7 306:2
307:10,17 308:15

**2025** 5:4 180:14 181:3
249:22,25 289:14,19
290:15 299:16 300:9,12

Victor Manuel Ramirez Najera vs. Experian Information Solutions, Inc. -
30(b)(6) of Experian Informtion Solutions, Inc., by Teresa Iwanski

October 8, 2025
Index: 208..accounts

**208** 210:17

**209** 176:10

**21** 191:7 206:19,20

**210** 293:12

**217** 177:15 182:22

**218** 176:11 177:15

**219** 179:19 252:5 281:2
295:14

**22** 18:6

**220** 67:17 191:23 204:11

**221** 197:7

**222** 179:19

**23** 194:23,25 286:5

**2392** 190:9

**2392-7442-85** 189:16

**2392744285** 178:4

**24** 183:9

**25** 18:9,13 201:25

**26** 14:22 18:17 206:14

**26591** 235:18,21 238:13

**27** 18:24 258:19 260:3
262:11 290:15

**28** 204:8 205:24,25 206:1,
18 207:7 289:14,19

**2:45** 199:6

**2:46** 199:10

**2:50** 199:7

---

**3**

**3** 13:25 14:18 179:14
180:14,17,20 181:1,3
184:9,10 190:12 228:9
238:17,22 249:22 297:23,
24 300:9,11

**3-7** 206:12

**30** 149:8 186:20 191:7
252:10 281:3 314:8,10
318:4

**30(b)(6)** 22:21,23 31:4
93:15 232:4

**30-day** 163:24 164:8

**300** 117:6

**31** 19:4

**32** 19:5

**33** 19:8

**34** 19:9,12,13

**3466** 194:1

**3466487041** 181:25

**35** 19:20 20:2

**36** 19:21

**37** 19:23 65:9,21 66:6
67:22 68:2,7

**38** 20:1

**39** 20:1

**3924** 213:23 266:2

**3:01** 199:13

---

**4**

**4** 15:2 179:14 189:5,6,17

**4:07** 242:24

**4:08** 243:6

**4:20** 243:9

---

**5**

**5** 15:9 179:10,15,19
191:22 197:7 202:19
204:11 252:5 280:25
292:16 295:14

**50** 67:16

**50-50** 28:19

**5759** 260:18

**5919** 221:12 222:7 239:16

**5:38** 298:24

**5:53** 299:2

---

**6**

**6** 16:2 192:17,18 200:4

**6-2-2025** 297:7

**6-3-2025** 211:13

**6/3/2025** 298:15

**6683** 222:9

**6:01** 304:25

**6:14** 305:3

**6:32** 319:20,21

---

**7**

**7** 16:17 37:15 203:11,12
205:20,23 206:6,13,18,24
207:10 209:16

**70** 7:2 9:7

**73** 288:12

**76** 288:13

**7999750** 213:10 214:1

**7:00** 148:24

---

**8**

**8** 5:4 209:6,10

**8-19** 286:14

**8-19-2024** 285:22

---

**9**

**9** 210:13,16 243:12 261:4,
8,9 300:4

**90** 28:3 67:11

**94-** 293:1

**943396680** 293:2

**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** 260:7

**9:12** 5:4

---

**A**

**A-C-E** 124:10

**a.m.** 5:4 47:4,7 87:1

**abide** 141:10,19 317:6
318:17

**ability** 8:22 121:17
122:16,19,21 127:16,24
129:6 130:9,14 137:24
319:1

**AC-** 203:21

**accept** 100:9 112:20
219:4

**acceptable** 132:14
218:17

**accepting** 100:24 101:12

**access** 62:19 84:22 87:22
112:15 124:8,12 126:13,
15,16,18,22 127:4,8,17
177:3,21 178:3,19,20,23
179:2 199:18 212:7,9
213:7,8,13 214:12 215:18
218:1 246:3 294:3

**accessed** 177:13 193:17
194:12

**accessing** 275:5

**account** 48:16,19,20
50:22 83:1,20 84:6 85:11,
21 87:20 96:20 106:10,20,
23 131:21 132:10 134:12
144:21 151:9,15 152:4,11,
24 153:3 154:6 155:2,9,
21,22 156:19 157:17
162:20 163:13,21,23
164:11,16,21,23,24 165:7,
11,15 166:24 167:10,20
168:11,13,21 169:2,6
170:16,17,19 190:15
195:12 196:3,15 198:3
199:3 200:18,23 201:11,
20 202:13 204:4,21 205:4
207:10 209:4 210:3,7,12
211:4,22 214:21 215:9
216:7 228:10,14,16,19
229:3 233:24 234:18,25
236:23 240:19 241:16,22
242:4,14 243:16,18 244:3,
15,25 250:3,24 253:6
267:14 268:11,18,24
269:6,14,24 270:17,24
271:12 287:2,3,13,21
288:19,24,25 289:19,23
290:17 291:1,5,6,19
299:19 300:12 302:6
307:5 309:25 310:5,7
311:7

**accountholder** 154:21
186:8

**accounts** 37:13 87:19
102:9 104:1,2 105:9,10
106:9 156:4,11 162:19,24

Victor Manuel Ramirez Najera vs. Experian Information Solutions, Inc. -
30(b)(6) of Experian Informtion Solutions, Inc., by Teresa Iwanski

October 8, 2025
Index: accuracy..agreement

163:1,9,10,16,18 164:2,4
165:2 169:4 190:13,19
191:5 192:14 209:21
211:6 215:2 245:12,18
269:20

**accuracy** 49:16 50:21
61:19 80:13 81:2,9 82:10
85:25 87:8 94:21 97:24
98:7 99:3,20 237:8 287:25
311:25 312:3

**accurate** 51:7 62:22 84:4,
12,16 85:17,20 86:3,8,11
87:12,15,16,18,24 88:3
98:15 99:19,24 108:13,17
109:13,19 110:11 111:16
112:10 168:9 170:14
173:2,4 195:2 204:4 205:6
210:9 238:10 255:20
286:6 312:8

**accurately** 8:19 82:14
118:20

**ACDV** 28:13 51:4,20,21
52:10,19 53:16 60:16
61:11,17,22 62:5,12,16,
20,23 63:1,9 67:7 82:14
88:1 109:20 131:22
144:17 146:4 147:14
187:20 192:21 193:2,6,19
195:11,13,15,18,21
196:13 197:24 198:8
200:4 201:3 202:15,21
203:18 204:3,12,15,20,23
205:17,22,23 206:2,10
208:11,24 209:2 210:11
285:5,12,16,20 286:21
287:20,25 295:7,21 296:1,
3,5,10,15,19 297:4,5

**ACDVS** 27:10 62:7
147:17 148:17 206:25
207:12

**ACE** 124:10,13 126:14
232:24

**achieve** 118:25

**acronym** 274:18

**Act** 33:6 312:6

**action** 147:21 157:9
318:16

**actions** 79:20 298:9

**actively** 57:14

**activities** 233:7

**activity** 233:13,14

**actual** 43:24 115:13
146:2 177:22 178:7 293:9

**add** 44:1 134:8 136:2

**addition** 53:24 208:15
219:1 269:10

**additional** 44:1 53:14
61:9,16 67:6,15 146:3
152:8,20 154:22 155:15
186:2 187:16,22 224:2
254:11 269:3 298:9
302:18,21 306:13,23
307:4

**address** 9:4 177:5 187:5
191:17 194:3 213:19,24
217:16 218:22 219:14,20,
22 220:2 222:18 223:2,5
236:4,8,12,14 241:25
247:9 248:1 250:20
252:16 254:13,17 266:1,4

**addresses** 211:5 215:4
222:20,22,25 223:13

**admin** 198:11 199:2
210:24 211:2,3,18 212:1,
11,19,23,25 213:1,5,16
214:12,14,15,17,18,19,24,
25 215:1,8,15,20,21
216:2,3,5 217:11,21 218:1
220:19 222:23 223:10,17,
21 226:17,18 232:19
234:12,13 235:13 237:3,
19 238:11 239:25 240:2
241:2 244:14,22 245:4,8,
18 246:4,14 248:14,16,17,
19 249:3,21 297:23 298:9
300:5,8,17,18,24 301:15,
21

**admins** 215:23

**advised** 301:10

**advisement** 39:5

**advising** 155:14

**advisory** 38:23 41:7,8

**AF** 225:16,20 239:7

**affidavits** 26:7

**affiliated** 90:17

**affiliation** 120:6

**affirm** 5:7

**affirmative** 13:7

**age** 164:16,21 165:9,16
167:20 168:21 173:18
196:18 253:23

**agencies** 83:11,16

**agency** 32:5 49:14,24
81:1 301:24

**agent** 27:2 29:11,14 31:8
62:6,8,13 64:7 67:7 69:13,
22 70:5,16 71:8,9 72:14,
17 76:13 77:12,14,21
79:18,20 115:19 117:15,
25 118:5,16 119:6,23
121:22 122:11 124:14,16,
17,19,21 125:5,14 127:21
128:9 129:6,11,14,24
130:14 135:13 145:14,25
146:21 147:8,9,25 148:11
150:16,24 151:11 152:9,
12,13,17,25 154:4 155:3,
25 156:21,23 157:10,18
158:2,4,10 160:1,24
168:12 174:1,6,12 175:2
177:13 178:16 181:9,12,
18 182:10 183:20,23
184:5 185:19,25 186:3,7,
10,14,16,18 187:4,7,16
188:6,15,18,20 191:24,25
192:5,7,9 195:10,11,25
196:9,12 197:1,11,15
198:7 199:25 200:18
201:1,17 202:4,12,14,20
204:13 205:14 206:9,12
207:24 208:4 209:1,2
230:18 231:4,5 266:19
267:14,18 268:17 269:1,8,
12,18,19 270:4,19 271:3,
7,20,22,23,24 272:6,8,11,
15 274:1,2,25 275:7,12
277:8 278:14 279:19,21,
23 280:11,17,18 281:12,
15,19,22 282:4,11,17,23,
24 287:20 295:15 302:9,
15,17 306:2,11,12,17,19,
24 307:1,3,9,21 308:2,4,
13,14,21,23 309:6,9

**agent's** 127:17,25 187:12
279:4 283:21

**affiliated** 90:17

**agentid** 179:3

**agents** 19:2,10 20:4,6
29:20 46:16 60:9,10,12,
17,23,24 61:5 64:16 65:3
66:13,19 68:22 69:1,14
70:13,23,25 71:21 72:13,
15 73:5,7 77:4 78:24
113:25 114:9,23,24,25
115:3,7,12,14,15 116:6,
10,14,16 117:1,4,10,13,19
118:3,17 119:8,16,19,21
120:2,7 121:10,15 122:16
123:1,11,20,21,25 124:5,
8,12 125:8,23 126:13,16,
18 129:10 130:24 132:13,
19 133:8,19 134:4 135:6,
19 136:10,19 139:7 148:2,
8 150:13 151:24 152:5,6
154:19 155:6,11 157:3,15
158:6 159:20 160:10,11,
16,20 161:8 173:16
183:22 187:14 188:2,12
195:15,22 197:21,25
198:25 205:2 206:25
207:13,14 233:7 270:3
275:11 276:8 277:7,16
278:5,7 279:1,9,16 282:7
287:10,21 302:21 306:23
309:4,15

**agree** 140:23 141:13
143:4 185:3,19,22 187:1,
4,21 189:19 190:18,21,25
192:11 193:15 200:7
201:23 202:1 206:14,21
209:11 220:5 222:24
229:24 258:24 259:7,18
260:3,17 261:8,10 262:7,
13,18 265:11,20 266:9
267:9 268:6,9 269:13,22
279:18 286:16 287:15
289:18 290:4 291:7,20
300:11 302:2,5,9 307:11
308:24 317:4 318:15

**agreed** 141:10,12 143:6
291:5,19

**agreeing** 109:18 110:11

**agreement** 84:3 87:23,25
88:11,13,16,19 99:23
111:16 141:10,11,19
142:12 253:20 254:3
257:3 313:5,7,12,15
314:15 316:10,19 317:5

Victor Manuel Ramirez Najera vs. Experian Information Solutions, Inc. -
30(b)(6) of Experian Informtion Solutions, Inc., by Teresa Iwanski

October 8, 2025
Index: agreements..backup

**agreements** 19:7 82:11 84:11 88:4 98:16,21,22 99:16 100:3 108:15,16,23 109:4,9,17 113:20

**agrees** 93:8

**ahead** 149:6 179:9 286:11 312:24 318:3

**alcohol** 8:21

**alerted** 230:14

**Alexander** 250:11

**algorithm** 204:25 205:7 217:1,2 218:5,9 241:19 242:1

**align** 291:3

**allegations** 6:15 12:17, 22 49:4 50:19

**alleged** 13:19 47:25 49:1 50:6,16 72:6

**alleging** 161:15

**Allen** 115:20 272:18

**allowed** 14:6 52:6 137:13

**Amex** 246:21

**amount** 53:17 67:21 116:4 118:3 142:20 191:8, 15 216:2

**analogs** 18:10,18

**analysis** 218:11

**analyst** 30:5,21 31:13

**analyzation** 298:3

**analyze** 151:21 155:4 218:6

**analyzed** 145:12 151:19 229:5,12,15,20 230:5,9,19 268:17,20,23 291:24 300:1

**analyzing** 302:20

**and/or** 67:4 300:17

**Ann** 33:4

**Anna** 22:18,19

**answering** 14:14 42:22 138:15,18,24

**answers** 9:16 13:23 75:19

**anymore** 137:11 306:21

**apologize** 118:8 206:1 286:4 302:15

**appeared** 234:19 235:11 242:15

**appearing** 11:19

**appears** 181:24 191:9 240:1 241:10 262:19 266:17

**applicable** 18:18 78:15 124:23

**application** 26:4 259:8, 16 262:7

**applied** 138:9 139:14,15, 18,19,20,21,25 140:6,10, 16,24,25 141:3 143:12 144:2 268:14,15 295:25

**applies** 49:24 62:23 80:23 84:14 139:11 160:5, 6 164:2,3,4 290:5

**apply** 28:14 60:13,25 63:4 81:8 157:9 174:3 269:19 317:13

**applying** 84:22 85:10

**appropriately** 229:22

**approval** 58:5 215:22,24

**approximately** 6:25 29:10,14 201:25 202:2 206:14,20

**approximation** 10:6,13

**April** 246:20 290:15

**AR** 204:13

**area** 212:17 215:16

**arrow** 258:11,14 262:10

**asks** 188:9 254:7

**aspects** 276:3

**assembled** 217:8 218:10

**assert** 317:12

**asserted** 13:13,18

**assertion** 307:4

**assigned** 150:8 220:13 223:4

**assist** 40:3 41:1 125:16

**Assistance** 114:2,5,7

**assistant** 30:12,13

**assisted** 40:20

**associate** 29:17 31:9 255:4

**associates** 150:2 151:4 217:9

**associating** 147:12 293:4

**association** 241:24

**assume** 45:16 114:20

**assure** 49:15 80:13 81:2, 9 82:9 97:23 98:7 99:3,20

**assuring** 87:7 101:9

**asterisk** 266:1

**attach** 52:6,10,14,18,23 53:4 146:3 147:11

**attached** 287:7

**attaching** 52:15

**attachment** 52:17 62:9 147:13

**attempt** 57:22

**attend** 31:4,5

**attention** 24:20,23

**attorney** 9:24 13:3,8,14 15:15,17,21,24 20:25 22:12 24:12,15 25:7,21 110:20 305:7

**attorney-client** 303:10

**attorneys** 31:2 35:5 55:2 98:2 211:20

**atypical** 318:25

**AUD** 169:21

**audio** 26:12 184:20,25 185:16,18 186:23

**audit** 100:8 101:11 107:5

**auditing** 100:23 102:18

**August** 238:17,22 239:2 281:8 285:6,9 286:3 288:10 307:18

**authenticated** 175:10,11

**authentication** 174:17 175:12

**authority** 124:22

**auto** 204:12

**automated** 37:12 174:11 175:4,5 207:20

**automatically** 61:22 204:16,25 205:8 218:12 233:13 261:8

**automation** 204:22

**availability** 21:8,25 22:11,13,14

**avenue** 175:7 293:5

**average** 117:12

**aware** 21:12 48:9,11 58:16 59:24 182:25 218:24 224:1 237:10 245:7 263:8,9,18,24 264:2 318:10

**B**

**back** 10:25 29:5 30:18 37:10 46:8,25 51:6,21 61:18 85:15 86:25 91:17, 25 92:9,13 93:2 97:14 147:3 149:9,15 171:7 177:24 178:4 179:13 182:11 183:14 190:8 191:22 195:6 197:6,14 198:22 199:7 200:22 201:9 204:11,20 206:2 214:2 224:5,23 231:8 234:23 236:3 238:1 241:3, 11 243:8,11,24 244:13,14, 16 262:5 278:3 280:25 285:23 286:12 292:20 293:18,21 294:9,19 295:13 296:6,14 298:16 299:1 306:25 314:10

**background** 170:24 223:15,24 224:13

**backup** 278:25

APPENDIX 0655

Victor Manuel Ramirez Najera vs. Experian Information Solutions, Inc. -
30(b)(6) of Experian Informtion Solutions, Inc., by Teresa Iwanski

October 8, 2025
Index: backups..case

**backups** 237:10

**bad** 118:6

**balance** 253:8

**balances** 311:13

**bank** 84:23

**bankruptcies** 37:15
214:22

**bankruptcy** 37:14
132:20 134:6,22,23
135:25

**base** 35:25 36:1 37:19
57:6 235:14

**based** 16:6 27:15,21
36:10 37:16 38:16 62:22
91:24 112:16 113:13
124:25 127:11 145:19
156:6 157:19 162:19
165:12 180:24 182:3
190:2 191:14 193:7 196:6,
13 197:22 202:11 204:18
205:15,16 210:11 213:13
217:10,24 218:2,11
228:21 229:6,18 242:17
256:17 277:15 278:12
282:9,13 287:17 290:19
291:2,9,12 293:23 296:25
297:10

**basically** 118:15 193:20

**basing** 235:13 311:4

**basis** 10:5,12 12:17
13:12,17 19:5 90:3 105:20
106:11 125:20 126:11
255:1 304:9,10 313:4
314:4,13 316:22

**Bates** 176:10,14 189:18
192:21 209:10 210:17
243:12 285:6 288:12
289:8 292:3 299:9 300:5

**BC** 247:22

**began** 26:22 113:7

**begin** 98:17 136:8 261:4
319:6

**beginning** 214:1,8

**begins** 100:9 220:23
252:23 261:7,9 295:15

**behalf** 6:11 7:10,24 11:19
21:1,19 23:3 31:4,5 297:6

**belief** 35:25 36:1 37:19
191:12

**believed** 242:19

**believes** 72:25 87:11,14
173:3 309:10

**belong** 48:4 144:21
156:21 158:13 228:15
242:14 253:1

**belonged** 188:21 242:19
288:24

**belonging** 228:17,19

**belongs** 151:10 155:2,21,
22 156:19 157:23 160:10,
13 161:17 162:7 187:17
188:2,10

**benchmark** 46:8

**beneficial** 307:3

**bigger** 16:16 176:4
292:23

**bind** 8:3

**birth** 165:18,20 166:7,11,
13,25 167:5,7,9,11,14,16,
24 168:4,9,14,17,24,25
169:1,3,5,8,12,15,24
170:3,6,8,10,12,14,16,17,
18,20,23 171:4,5,6,10,11,
16,20 172:2,8,10,12,13,
18,20,21,25 173:2,7,10,13
175:21,22 177:5 194:3
195:6,8 196:2 197:15
198:1,23 200:21 201:11,
20,22 204:19 205:14
208:3,14,21 209:4 213:19
219:4,6 220:4 223:6,9,14,
18,19,23 224:2,6,11,17,24
225:2,4,6,11,13,19 226:3,
10,19,24,25 227:3,10,12,
13,15 236:6,9,23 237:3
241:4,9,13 253:17 259:24,
25 260:4 264:17,18
265:23,24 266:12,16,17,
23 267:3,4,19 268:3
286:17

**birthday** 227:6

**bit** 16:16 18:24 28:24 29:7
47:18 51:1 61:4,14 63:16,

19,23 145:13 147:4 151:6,
23 174:10 176:4 177:23,
25 182:21,23 184:16
191:8 206:17 207:15
292:23 293:18 294:4

**blank** 286:19,23

**blanket** 318:23

**block** 153:11 159:9,10

**boiled** 291:16

**bonus** 117:25 118:2,10

**bonuses** 117:22

**borrower's** 257:3

**borrowers** 257:9

**bottom** 134:20 177:15
204:10 209:23 222:16
223:6 227:23 247:25
252:6 258:10 281:2

**bought** 258:22

**boxes** 193:11,14 208:12

**breach** 113:18

**break** 10:19 46:24 86:17,
20 139:17 148:19 199:6,
24 242:23 298:18 303:3,
13,20 305:5,6

**breaks** 10:16 87:4 199:15
303:16 304:4 305:24

**brings** 30:1

**brother** 155:23

**brought** 11:21

**builds** 71:16 214:21

**built** 62:7 71:22

**bunch** 136:14

**Bureau** 38:24

**business** 261:13

**buy** 259:1

**buzzwords** 157:2,11,14
161:1

**bypass** 174:16,22

## C

**c82441b** 295:15

**c92484b** 281:12

**c92919b** 181:10

**CA** 213:22

**calculated** 311:16

**California** 17:14

**call** 23:23 25:22,23,25
51:14,16 151:2 157:13,21
158:12 159:25 160:9,18
162:11,14 183:1,3 184:13
185:5 186:9 187:3 188:16
192:1 302:14 305:12
306:2,7

**called** 9:1 39:10,12 46:12
90:7,9 91:6,10 103:1
114:4 118:2 124:10
152:10 170:9 214:14
217:2 221:1 237:7,23
248:14 274:14 275:15
293:25 305:11,16

**calling** 155:7,14 174:14

**calls** 60:13 118:20 156:2
174:4 183:5,7

**cap** 189:24

**capacity** 6:10,16 7:9
23:4,8,10

**capid** 177:7 178:3 293:12

**caps** 293:7

**capture** 63:21 146:2
182:14 301:4,5

**captured** 122:12 189:22
300:19 301:9

**card** 254:20,23 255:11

**carries** 107:19 167:6

**carry** 56:24 130:5

**carrying** 129:12 156:10

**case** 7:12 13:22 15:1,7
17:23 23:16,22 24:1,4
34:25 35:4,10,19 36:4
37:2,7,18,20,21 38:2,11,
14,16 64:23 67:20 120:4
138:10,12 146:8 183:1

APPENDIX 0656

Victor Manuel Ramirez Najera vs. Experian Information Solutions, Inc. -
30(b)(6) of Experian Informtion Solutions, Inc., by Teresa Iwanski

October 8, 2025
Index: cases..completeness

207:19 231:21 232:12 245:15 280:16 295:23 299:23 304:12,20 313:21, 25 314:4 319:9

**cases** 18:7 27:13 31:4 37:2 39:25 100:8 276:19

**categorize** 63:21

**caught** 279:3

**caused** 241:8

**Cave** 21:16,17 23:6,11 32:12 56:2

**caveat** 10:17

**CCC** 135:25

**CDF** 178:6

**Center** 114:2,6,8

**centered** 29:19

**certificate** 166:7 253:17 266:12,16,18,23 268:3

**certified** 5:17 62:15 210:8 252:12,13

**certify** 61:19 84:11 99:18 108:12

**certifying** 51:6 62:20,21 82:13 87:15 88:2

**CFPB** 38:23 39:2,3,6,12, 14,21,25 40:2,4,6,10,18, 20,24 41:8,20,24 42:4,11, 22 45:1,18 46:20

**Chance** 8:8 14:3 20:25 22:6 43:3 44:1 137:23 141:14 142:4 303:12 305:7,11 313:10 316:10

**change** 36:3,5 38:16 121:17,19,23 122:8,10,17, 18 134:5,22 135:12,21,25 169:18 172:2 227:12,15 244:7,10,21 305:17 311:17

**changed** 16:19 30:5,6 45:5 93:6,12,17,21 169:14 175:18 180:11 191:10 224:5 311:13,22

**changing** 38:15,20 302:18

**Chapter** 37:15

**characterized** 8:11

**characters** 53:17,19,22

**charge-off** 163:22

**Chase** 231:21

**check** 89:12

**checked** 126:10

**checking** 157:15

**checks** 101:6

**children** 263:6

**Chile** 115:6,8 119:17 120:3 123:9 181:19 203:8

**choice** 317:17

**choose** 53:20 126:17 155:12 314:20

**choosing** 125:16 290:12

**chose** 282:11,25

**Christina** 22:18,19 232:2, 3,6,10,12 233:11,15 297:12

**circles** 259:24

**circling** 267:6

**circulate** 312:16

**circumstances** 165:8,14 173:14 286:22

**Civil** 17:14

**claim** 6:14,18 7:13 143:2

**claims** 6:8,17 13:18 31:3, 5 47:24 66:16 67:4 287:11

**clarification** 111:19 259:17

**clarify** 100:3 188:22 224:23 305:14

**clarity** 291:4

**classified** 106:25 276:18 278:1 279:10,13 308:9

**classify** 53:21 160:25 276:15

**classifying** 277:1

**clean** 305:12

**clear** 8:13 103:22 138:17 142:6 151:8 194:5 197:6 264:20 270:10,15 283:18 289:22 293:11 303:15 305:21 314:12

**click** 135:20

**clicks** 61:20 135:14

**client** 20:14 303:13

**clock** 24:20,23

**close** 26:3 175:25

**code** 17:14 62:25 83:21 125:4,5,22 132:2,6 133:1 134:20,24 139:7,18,24 140:5,15 143:12,25 144:2, 16 145:11,17 146:3 147:9 148:4,12 159:23 160:5 165:3,8 166:21 192:10 194:15,22,25 196:23 197:1,20 203:24,25 204:4, 24 205:5 207:18,22 211:11 225:20 239:7 246:21 247:17 267:15 268:12,13 282:12,24 284:16,22 286:5,24 287:7, 16 297:8

**coded** 83:20 153:7 196:25 287:11

**codes** 19:24 61:15 126:8 131:15 132:3,6,7,12,19 133:8,12,16,23 134:3,14, 15,21,24,25 135:6,19 136:10,18,24 138:8,9 139:10,13,23 144:13,14 145:2,8 159:12,22 160:4 161:19 246:17,24 247:24 248:17 249:4

**colleagues** 115:21

**collection** 30:13 84:6 85:11,21 102:8 106:15,20, 23 163:22 251:6

**collects** 94:17,25 95:4

**colored** 193:11

**column** 247:16,22

**comb** 311:11,20

**combination** 221:6,13

**combine** 229:8 269:2 287:4

**combined** 30:24

**committed** 68:8 78:16 136:13,16,19 143:16 275:23

**communicate** 34:9,12 82:1 127:24 173:12 245:25

**communicated** 39:25 173:22 288:23

**communicating** 41:15

**communication** 39:14, 22 41:13,19,24 42:2 72:22 165:19 177:8 181:23 297:25

**communications** 42:7 233:2,6 303:15 304:4,5

**companies** 112:22 173:6 236:13 240:14 250:1

**company** 30:13 51:5 61:19 92:21 93:9 102:8 103:25 106:15 120:9 131:10,11 170:11 214:20 215:5 234:15 236:15 247:17,20,21

**compare** 168:13 174:3

**compared** 28:12,13

**comparison** 173:17

**compel** 316:17

**compile** 105:18

**complaint** 12:17,22 13:20,21 40:7,14 49:4 50:8,18 211:23 228:24 229:5 230:5,9,20

**complaints** 40:14,15,18, 21,24 41:1,2,23 42:3,4,7 45:12,13,17 46:16,17,20

**complete** 10:19 117:3,4, 7,19 192:10 194:15 203:25 284:17 287:12 297:9

**completed** 27:13 70:14

**completely** 196:19 197:14 200:10,14,17,25 201:10 208:9 260:14

**completeness** 50:22

Victor Manuel Ramirez Najera vs. Experian Information Solutions, Inc. -
30(b)(6) of Experian Informtion Solutions, Inc., by Teresa Iwanski

October 8, 2025
Index: compliance..correct

**compliance** 32:15 87:8 98:12 101:10 104:10 122:18

**compliant** 89:3

**complies** 47:13 85:3

**comply** 17:20,25 18:16 35:12 36:6 50:3 57:12 71:17 84:5 99:4 117:2 312:4

**complying** 69:2 70:7 71:19 77:6 81:23,25 85:1 87:25 101:7 103:18 105:11 106:4

**comprehensive** 106:2

**computer** 10:8,11 81:18 199:18 212:4 216:10

**concluded** 319:21

**condensed** 312:19,21,23

**conduct** 54:15 137:24 141:6 187:12 254:7

**conducted** 55:10 308:20

**conducting** 55:5 57:19 58:14 141:4

**conferred** 20:14

**confidence** 142:15

**confidential** 141:12,13, 16 142:8,10,12,14,24 143:5 312:25 313:1,4,11, 13,16 314:6,7,11,14,16, 17,21,23,25 315:1,2 316:16,19,24 317:15,23, 25 318:3

**confidentiality** 141:9,11, 18 313:6,12,14 314:15 317:4,12 318:18,22 319:2

**confirm** 139:5 184:18 191:24 198:11 199:3 237:4 254:16 263:18 301:3

**confirmed** 286:17

**conflicts** 148:10 151:3 152:7,14 157:19 158:1 198:7,25 199:1 230:6 269:3

**confusing** 18:24

**considered** 309:11

**considers** 165:22 173:9

**consistent** 187:12 202:16

**consists** 193:6

**constant** 39:14,22 41:13, 19,24 42:2

**constitute** 71:11

**consumer** 27:5,15,16,21 28:23 32:5 38:23 48:5 49:14 50:21 52:12,22 53:10 61:6,7,20 62:1 63:13,18 64:3 70:18 80:13,14,25 81:3,10 83:16 114:2,5,7 116:17,22 121:21 124:9,13 132:13 134:8 136:1 144:17,22 145:15 149:18 150:3,11 151:8,9,14,15 152:4,10, 15,23 153:2 154:15,20 155:7,16,21 156:2,7,11 157:3,7 158:4 159:25 160:10,12,17 161:2,10 162:9,14,17 163:3 164:12, 15,25 165:1,12,15 166:18 168:6,10,14 169:12,15 170:5,18,22 171:2,10,13 173:15,18,22 174:4,18 177:8,11 180:2,7 186:17 187:11,17 188:12,20 189:14,22,25 190:6 193:8, 18,23,25 194:1,6,9 211:6 216:14 217:2,4,6,19,23 218:5 219:13 222:12,24, 25 224:3 225:1 232:25 234:22 241:22 242:10 245:22 248:9,12 249:11, 14 250:2,9 252:9 270:12 272:22 274:24 275:4 285:17 290:5 302:3 306:13

**consumer's** 54:6,16,22 63:20,23 121:17,24 122:8 132:8,14 144:20 163:11 166:13 168:6,8 173:10,18 177:4 178:19 193:17 199:1 213:13,24 218:11 220:13 221:21 222:5 224:18 229:8 230:7 249:1 255:4 267:11 268:18 274:21 287:22 290:9,10

**consumer-friendly** 36:4

**consumers** 15:10 16:3 52:5,8 54:10 108:11 149:24 161:14,20,21,25 167:13,23 169:3 170:21 173:13 174:16 175:3,7 183:6 216:12 247:10 261:16 263:9,22 270:11 272:17

**contact** 39:3 50:25 63:8 77:9 190:3 254:12 293:23

**contacted** 204:21

**contacting** 22:12 63:18

**contacts** 23:22 54:11

**contained** 65:10 80:2 135:13 146:1,10 176:25 177:2 229:9 249:12 250:3 260:18 266:24 297:16

**contents** 14:21 275:22

**context** 179:22

**continue** 14:14 18:4 43:14,22 133:6 138:1 142:16,17 143:8 184:18 244:20

**continued** 128:19

**continuing** 89:24

**contract** 110:5,8 111:20 112:1 113:18 256:12

**contracts** 110:24 121:10

**contractual** 109:3 112:8, 17

**control** 29:16 31:9 126:12 129:9

**conversation** 129:1 154:13,15 155:13,16 156:18 158:19 160:11 162:17 186:12 306:15

**conversations** 59:24 155:20 158:9

**convey** 106:10

**copy** 175:6 254:20 259:12 262:8,17 266:17 296:10, 12 300:17 315:24

**correct** 7:17,25 11:22 26:24 27:5,8,11,16 29:10,

17 30:3,9,10,14 31:6 32:6, 9 34:20 41:4,20 48:13,20 52:3 54:1 61:23,24 64:3 66:12 73:14 75:9 76:16 77:17,19 80:23,24 81:4,11 82:3,17,21 83:7,12,17,22, 25 84:1,17,18 85:4,17 87:8,12 93:14 94:13 95:24,25 96:5 97:11 98:8, 9,12,13,18,24 99:21,25 100:5,10 101:7 103:11 104:3,11 106:5,8,21 107:2,3 108:4,8,18 109:22 110:1,10,17,20 111:21 112:4 116:23,24,25 118:14,15 119:5,6 121:18, 24 122:4,5,9,20 123:4,5,7, 8,11,12 124:6,7,10,11,14, 15,19,20,23,25 125:1,5, 16,23 126:8,9,14,19 127:5,6,18 131:24 132:4, 17 133:20 139:7 140:6,11, 16,20,21,24 144:14,18,19, 22,23 145:1,8 149:20 150:4 151:18 153:7,17 154:20 156:7,8 157:5,11 158:8 159:16 161:25 164:6 166:13,21 167:1,2, 25 168:1 169:8 173:2 176:23 177:13 179:23 180:9,14 181:4,7,11 184:3 185:10,11,13,14,20 186:20,21 187:5 188:9,19 189:2,3,12 191:6,13,17 192:2,15 193:3,8,24 194:10,11,16,20 195:3,9, 10,16,17 197:10,18 198:17 200:2,5,19,20 201:2,14,15 202:7,8,22 203:19,20,22,23 204:1,2, 5,6,8,9,18 205:21 206:4,8 207:20,21 209:17,21,25 210:1,4,10,18,25 213:20, 21 214:6,10,12,14 215:1, 13,17,18 216:3,24 217:3 218:14,18,19 220:13 221:7,15,21 222:5,13,21 223:1,10 225:2,3,8,17,22 226:11,12,15,16 227:1,16 228:5,15,17,20 229:16 230:2 233:23 235:18 236:6 237:6 238:3,14,18 239:5,6,10 242:10,16 243:19,22 247:1,13 248:2, 21 252:12,17 255:17,20

APPENDIX 0658

Victor Manuel Ramirez Najera vs. Experian Information Solutions, Inc. -
30(b)(6) of Experian Informtion Solutions, Inc., by Teresa Iwanski

October 8, 2025
Index: corrected..date

256:15,24 257:7,9 259:2,5 260:15 262:8 263:20 267:15,16,20,21,23,24 268:1,2,4,5,8,14,21 269:6 270:19 271:24 272:18,23 273:1,5,11 274:11,15,23, 24 276:9,16,20 278:19 279:12,13 280:1,3,4,17,18 281:3,6,10,17 283:3,6 284:18,21,23 285:13,14, 18,19 286:7 287:8,13,14 288:10,13,21,22 289:1,2, 9,24,25 290:11 291:18 292:10 293:3,14,15 296:8, 9,16,20 297:9,10,13 299:10,16,20,24,25 300:9, 13,14 301:6,11,25 302:11 305:8,18 306:3,4 307:6, 14,18 308:2,10,16,17,21, 22 312:8

**corrected** 105:24 168:3

**correction** 169:20

**corrections** 315:9

**correctly** 8:10 72:25 73:6 85:23 153:5 175:1 197:11 216:1 279:10

**correspondence** 72:20 73:25 76:9,13 77:20 78:25 79:21 80:10 123:23 143:14,22 146:8 147:8 150:17 154:18,24 188:25 230:17 287:17 307:18

**Costa** 115:4 119:9 120:2 123:9,21 126:24 127:5,17, 22 129:5 130:15 181:19 203:8

**cough** 10:21

**counsel** 15:25 22:20 23:15 33:1 180:25 213:14 215:24 229:7,19 231:16, 17,18 233:7,8 297:1,21 298:6 300:20,23 301:7,10, 13 303:6

**count** 7:1

**countries** 120:12 121:16 123:2 126:13,19 127:13

**country** 120:9,23 121:11 124:14,19 126:20 131:12

**couple** 10:24 34:17 46:7 148:6 153:9 213:4 242:25

**court** 5:3,12 6:3,6,8,17 9:15 31:3 36:11,22 38:6,8 44:5,7 47:3,6 86:18,22,25 111:1,3 142:9 149:12,15 199:9,12 243:5,8 298:23 299:1 304:24 305:2 313:17 314:23,25 315:10, 16,23 316:1,5,25 317:3, 18,22 318:8 319:13,19

**court's** 318:17

**courtesy** 9:21

**courtroom** 7:21

**courts** 318:23

**cover** 295:1

**Covid** 44:15,16,18

**CRA** 32:6

**craft** 56:8,23 59:6

**crafted** 59:14

**crafts** 57:22

**CRAS** 98:18

**create** 33:16 55:3 57:12 60:9 117:11

**created** 17:19 35:11 37:16 40:6 54:23 59:25 72:1 75:23 181:25 238:6 249:21 281:9 293:23 311:6

**creates** 18:20 58:21

**creating** 37:11 40:1 52:13 58:4,13

**creation** 249:20

**credential** 94:5 95:14

**credentialed** 93:1

**credentialing** 90:5,8,9, 21,23 91:2,3,23 92:10,16 93:20,25 94:18 95:5,9 97:2,19,22 98:23 99:2 100:4 103:8

**credit** 6:19 7:13 16:18 19:15 33:6 49:24 80:15 83:11,16 84:14,22 121:17, 24 122:8,10 124:9,13

167:23 169:13 170:22 171:2,12,21 185:10 189:12,13,21 190:14,19 210:4 216:14 222:25 234:19 241:23 242:13 245:13 246:25 249:18 250:4,22,25 251:7 252:20, 25 254:9 268:11 289:13, 20 290:5,7,9,10,16,24 291:6,20 297:15 299:19 300:12 301:24 309:24 310:1,2,5,7 311:3,12,13, 20 312:1,6

**creditor** 290:8,10

**creditors** 290:24

**culture** 263:19 264:5,8

**current** 30:22,23 31:1 92:15 236:11

**custom** 264:8

**customer** 116:11,12 174:14

**customs** 263:19

**cut** 134:13 138:14 224:9

**cutting** 69:19

**cycle** 169:18 226:15 295:24 296:3,6,14 297:2

**cycles** 239:9 240:5

---

**D**

**dad** 151:15 157:17 244:24 258:1,12 264:22 266:5

**dad's** 151:14 245:4,8,12, 13,18 258:3 259:24 264:17 265:24

**daily** 39:4,24 41:23 111:14

**Daniel** 312:13,24 315:9 316:3 318:3

**data** 27:11 51:20 53:15 54:11 61:11,17 62:16,20, 24,25 81:21,22 82:1,5,11, 17,20 83:1,3,6,10,15,19 84:1,2,11,16,22,25 85:3, 10,16,17 86:6,7,11 87:19, 22 88:5,20,25 89:1 91:3 92:22,25 94:5,10,20,21

95:10,16 96:5,8 98:11,16 99:9,16 100:3,8,9,12,13 101:6,12,14,15,21 102:3, 10,18 103:24 104:9 105:8, 19,23 106:1,3,5 107:5,12, 14,15 108:3,12,16,17 111:15 112:9,15,16,19,20 113:19 131:22 144:18 146:5 147:17 148:17 168:1,3 169:6,9,11,19 170:2,4 171:10,19,25 172:9,25 173:5 183:14 187:20 188:4 193:7 195:15 196:7,14 197:23 215:12 216:19,21 217:19, 23 218:4,6,7,14,17,20 219:4,5,12,17,19 220:6,13 225:22,23,24 226:15 227:8,11 236:4,7,11 237:8,11,15,24 239:9 240:11,15 241:11,12 242:8,18 296:25 298:16

**database** 81:15 82:2,6 83:5,8 84:8 85:13,23 105:25 216:14 235:8

**date** 33:5,7,10,18 34:21, 24 35:10,18 37:19 38:22 74:4,16,22 75:10 76:1 84:7 85:11,22 106:16,21, 24 134:23 163:23 164:7, 22 165:11,18,20 166:11, 13,23,25 167:4,5,7,9,11, 14,15,24 168:9,13,14,17, 23,25 169:1,3,5,8,12,15 170:3,5,8,10,12,13,17,18 171:5,6,11,15,20 172:1,2, 8,12,18,21 173:6,10,13,17 174:3 175:21,22 177:5,12 178:2,16,23 180:3 181:1 182:3,4,6 190:9 191:16 194:3 195:6,8 196:2 197:14 198:1,23 200:21 201:11,19,22 204:5,19 205:14,20 206:11,16 208:3,13,14,21 209:4 219:3,6 220:4 223:6,9,13, 18,23 224:6,11,17,24 225:2,4,11,19 226:3,10, 18,23,25 227:3,8,12,13,15 233:21 234:5 235:8 236:5, 9,23 237:3 238:2,7 239:1, 4 240:3 241:4,9,11,13 247:11,12,14 249:19 252:2,3 253:7,17 258:18

APPENDIX 0659

Victor Manuel Ramirez Najera vs. Experian Information Solutions, Inc. -
30(b)(6) of Experian Informtion Solutions, Inc., by Teresa Iwanski

October 8, 2025
Index: dated..discharge

259:24,25 260:4 262:10 264:17 265:23,24 267:3, 19 281:3,8 285:8,9,20 286:12,17 292:22 294:3 297:17 300:11

**dated**  181:6 209:16 285:5 288:10 289:14 297:17 298:9 299:15

**dates**  75:19 168:4 169:24 170:15,20,23 171:3,4,9 172:10,25 173:1 177:10 215:2,5 223:18 224:2 225:6 291:2

**day**  117:3,9 118:16 182:8 184:2 193:21,22 213:3 231:22 249:16 289:18 315:11 316:11

**day-to-day**  36:7 89:20 90:3 125:20

**days**  182:7 186:20 206:14,19,20 314:8,10 318:5

**deal**  169:24 304:13

**dealing**  41:2 191:5

**deals**  83:24 90:5

**Dear**  252:23

**debt**  191:9

**December**  267:4

**decide**  117:15 124:22 130:1 313:24

**decided**  70:17 130:16 142:9

**decides**  122:6

**deciding**  314:10

**decipher**  264:5,11

**decision**  21:6,10,18 22:4 36:9,11 37:7 38:7,9 308:4

**decisions**  36:22 282:5

**declarations**  26:7

**decline**  159:9

**decreased**  311:18

**dedicated**  39:6

**deemed**  317:15

**default**  178:19

**defendant**  7:25 120:4,19 123:3 130:13,23 131:5

**defenses**  13:7,13,18 66:17 67:4

**define**  54:25 56:15 59:6, 20 60:19

**defines**  57:21 58:20

**defining**  55:8,13,22

**definition**  47:23 56:23 58:11 59:13

**delete**  132:11 134:6,9,24 135:2,12,25 145:18 164:20,24 165:2,7,13 166:20 167:1,15 168:20 196:3,5,6,14,23,24 197:9 198:3,4 200:18,23 201:11, 12,20 202:5,12 205:15 267:14 268:10 269:14,24 270:24 271:11

**Delete-no**  197:9

**deleted**  183:9,11,12,16 195:11 205:4 209:5 210:3 270:17 291:3 299:19

**deleting**  145:14

**deletion**  145:18 196:17 197:22 287:3 288:3

**delinquencies**  163:18

**delinquency**  84:7 85:11, 22 106:16,21,24 163:23, 25 164:7

**demonstrate**  253:12

**deny**  129:1

**department**  32:9,11,15, 17,19,22,25 33:3 34:4,7, 15,21 35:9 39:6,8,10,11 45:1 55:6,7,12,19 57:13, 21 58:2,6 90:4,8,10,11,21, 23 92:5 102:17 113:24 114:1 127:10 128:9 150:21 151:12 229:15 252:24 280:14 300:16

**department's**  91:2

**depend**  51:10 129:22 151:1 154:12,13 156:17 163:11 173:4 220:14,17

221:23 240:7 272:10 277:18

**dependent**  152:8 221:22

**depending**  19:23 62:25 63:1,17,19,20,23 132:9 134:7 148:23 151:6 152:22 153:12 154:23 160:8 164:19 188:1 213:6 217:12,14 222:14 277:16 286:24

**depends**  28:22 117:7 148:4,22 156:23 160:8,19, 23 175:2 201:7 206:17 208:7 212:13 220:8 222:2 246:1 250:21 263:14 301:10

**deponent**  141:6

**deposed**  275:17

**deposition**  6:22 7:5,9 9:2 11:4,18,19 12:3 15:15,19, 20,22 20:20,24 21:7,9,11, 18,22 22:1,14 23:14,20,24 24:13,16 25:7,10 26:17 43:8,12,20 74:2 137:24 138:8,22 141:4 142:4,5,6, 17 176:6 179:15 183:25 184:10 189:6 192:18 203:4,12 209:6 210:13 251:11 282:1 285:2 288:6 289:4 292:4 299:6 303:14, 15 304:4,11 305:18 315:1 316:15,23 319:7,21

**depositions**  9:7 22:25 23:2,12 31:4 314:3

**derogatory**  163:21 164:7

**describe**  6:13

**describing**  173:15

**design**  13:9

**designate**  313:3,15,18 314:6,24 316:16 317:25 318:3

**designated**  12:4,6 15:16 21:1,21 22:23 43:16 313:2,21 316:24

**designates**  21:4

**designating**  315:1

**designation**  123:24

**designations**  318:19 319:3

**desk**  10:8

**detail**  20:12 64:1 100:16 149:19

**detailed**  105:4

**details**  253:6 288:25

**determination**  56:7,23 168:15 172:22 224:16

**determine**  84:16 149:20 150:24 181:22 196:10 197:17 198:5 201:13 202:6 229:2 231:1,10 232:21 234:8 275:9 277:21 311:21

**determined**  127:25 184:2

**determines**  58:11

**determining**  55:22 168:20

**developed**  40:2 42:16,20

**developing**  40:22

**differ**  215:19

**difference**  10:14 51:18 205:1,12 207:21,25 214:17 215:14 258:8

**differences**  201:18

**differently**  61:3 154:1 162:25 163:10,13

**differing**  171:9

**digit**  261:4,8

**dining**  10:11

**direct**  99:15 139:1

**direction**  161:9 213:14 229:6,18 231:15,17 233:8 297:21 298:6 306:14

**directly**  34:23 79:12 138:24 212:4 278:21

**director**  121:3 125:4,21 126:7

**discharge**  134:7

APPENDIX 0660

Victor Manuel Ramirez Najera vs. Experian Information Solutions, Inc. -
30(b)(6) of Experian Informtion Solutions, Inc., by Teresa Iwanski

October 8, 2025
Index: discharged..duties

**discharged** 37:14

**disclosed** 298:11 313:13

**disclosure** 144:3 170:18 176:22 177:1,9 182:15 189:14,25 190:6,8,14,19 194:1 200:12 248:9,12 250:10 292:14,18 311:5

**disclosures** 14:22,23 189:21 234:23 249:1,14

**discovery** 15:3

**discuss** 20:3,15 65:13 74:8 78:9 143:8 313:23

**discussed** 13:1 80:20 108:1 186:9 267:10 306:13 317:11

**discusses** 110:9

**discussing** 35:2 60:3 231:23 313:1 314:5 318:14

**discussion** 186:2 187:19 232:8,11,14,16

**discussions** 141:17 187:10

**display** 84:6

**displayable** 211:6,7

**dispute** 20:3 27:1 28:25 29:9,11,13,20 31:8 40:7 51:11,24 52:1,6,7,13,23 53:1,3,5,7,21,25 54:6,10, 16,22 61:9,21 62:1,12,13 63:13,22 64:7,8 67:5,9,12, 23 68:1,7 69:21 70:13,16, 18 71:7,8 72:7,24 73:21 74:10,11,20,24 75:3,9,11, 15,16 76:7,13 77:12 80:15 81:10 82:12,13 99:25 108:10,11 109:13,22 110:11 111:15,17 113:25 114:9,23,24,25 115:3,7, 12,14,18,19 116:6,10,14, 16 117:1,4,25 119:6,8,16, 19,21,23 121:10,15,21,22 122:16 123:1,11,19,21,25 124:5,8,12,14,16,17,19, 21,23 125:5,11,22 126:6, 13,18 127:16,21 129:6,10, 11,14 130:14,24 131:20 132:13,15,19,21 133:8,19

134:4 135:6,13,19 136:10, 19 139:7,14,23 144:17,20, 21 145:22 146:1,2,4,21,22 147:3,6 149:18,20 150:24 151:11,24 152:2,3,5,11, 12,14,17 153:7,13 154:4, 8,12,14,19 155:6,14,17,18 156:3,4,6 158:4,5,14 159:20,21,22,23 160:3,16, 24 161:18,21,25 162:1,10 164:10,18,25 166:19 167:14 168:6,12 169:4,14 172:11 173:16 174:5,15 177:12,17,20,22 178:7,12, 16,18,21 179:7,23,25 182:2,4,6,12 183:1 184:3 185:10,19,20,23,25 186:1, 3,7,10,14,15,16,18,19 187:4,7,9,12,13,18 188:1, 6,11,15,16 189:23 191:25 192:7,9,10 194:13,14 195:3,14,19,22 196:9 197:16,25 198:14 199:25 201:1,18 202:4 203:22,24 205:9 208:22 209:15,19, 20,25 251:23 252:9,11,19, 24 253:10 255:1 256:17, 24 259:5 261:19 262:23 264:21 265:9,13 266:8,15, 19 267:11,14,18,20 269:5, 13 270:13,21,25 271:8,11, 14,15 272:6,8,17,21 273:19,21,23 274:8,10,13, 17,20,24 275:3,10 276:7, 15,19 277:11,14,24 278:2, 18 279:10,20 280:2,8,17, 20 281:6,8,9,16 282:6,8, 13,16,17 284:12,15,17,20 285:13 286:3,24 287:6,7, 10,11,12,16 288:9,18 292:9,12 293:5,10 294:1, 2,15,18,21,25 295:3,8,17, 18 296:8,20,22 297:8 299:15,18,22 302:9,10,12, 17 306:2,17,19 307:10,17, 21,25 308:6,8,9,15,16,21, 23 309:9

**disputed** 27:15 48:9 132:9 160:23 165:15 168:10 173:5 195:1 267:12 275:6 288:20 302:6 307:16

**disputes** 12:8,9 13:4,11 14:20 18:14 19:2 27:5,7

40:11 50:21 53:10 60:25 61:1,3 63:5 64:3,13 65:1,5 66:11 68:19 69:9,23,24 72:11 73:13 80:15 116:17, 23 117:2 118:12,13,23 123:20 124:2 125:20 138:9 139:15,19 140:10 144:25 145:8 146:11,13, 15 147:16 148:14 150:12, 13 151:12,17 154:25 155:1,9,12 158:16,24 161:16 162:5,12,13,15 163:7 164:11,15 166:18 173:15 174:24 177:11 180:2,3 181:6,21 182:5,9, 10 188:13 200:20,22 207:18 231:9 270:11,12 275:1 276:9,18,19 277:1 284:23 294:12 307:11 308:19

**disputing** 53:12 63:20,23 132:8 156:11 160:14 161:15 162:10 163:11

**disregard** 70:17

**disregarded** 68:18 69:8, 22

**Disregarding** 71:9

**dissolving** 272:15

**division** 90:15,18 102:20, 21,22,25

**DNC** 220:16 302:13,23 303:2 305:13 306:11

**doc** 52:15 147:12,14

**Docid** 284:6

**document** 11:14,17,18, 24 51:16 52:9,14,15,18,22 53:3,4 65:9,21 79:13 80:7 147:11 165:6 176:17 179:20 180:1 189:9 192:22 203:16 209:13 210:17,20 234:10 243:13 248:13 251:17,20,22 255:23 256:1,23 257:1,20, 21 258:1,19 259:4,8,14 262:6 265:8,12 266:8,22, 25 274:14 275:14,17 276:4,7 277:21,23 278:3 279:8 285:7 288:15 289:8, 16 290:19 291:2 292:7,9 299:12 301:13 318:22,23

**documentation** 14:25 51:25 52:2 94:17 95:4 132:14 160:17 165:4 166:21 168:25 186:11 253:11 256:18 267:19 268:10 271:16

**documents** 13:24 15:1,7 19:18,25 23:16,17,19,21 24:1,3,6,9 26:19 27:15,21 28:22,23 31:3 51:3,4,17 52:6,7 53:25 54:11 62:13 74:1 94:22,25 95:22 141:12,13,15,16 142:7,9, 10,11,13,24 147:25 165:21 173:9 176:13 180:23,24 183:25 199:16 203:3 211:13,20,21 229:19 231:8,19 253:16 259:11,17 267:23 268:1,4, 7 275:8 276:8 278:5 281:16 282:13 284:10,12 293:24 294:23,24 296:24, 25 297:20,22 298:2,4 314:6,13,14,17 316:20,22 317:8

**dog** 89:12,14

**double** 263:24

**double-check** 244:16

**downstairs** 316:13

**dozens** 314:2

**draft** 147:15 148:13,15

**drafting** 55:9 58:13

**drawn** 193:10

**driver's** 165:9 166:1,3 173:24 174:2 267:25 268:1

**driving** 265:20

**drop-down** 53:21 61:21 135:5,13,20 136:5 147:10 161:22 162:4

**drugs** 8:21

**duly** 5:16

**duplication** 239:14

**duties** 47:21 116:18,19 129:13 130:5

APPENDIX 0661

Victor Manuel Ramirez Najera vs. Experian Information Solutions, Inc. -
30(b)(6) of Experian Informtion Solutions, Inc., by Teresa Iwanski

October 8, 2025
Index: e-oscar..Experian

**E**

**e-oscar** 126:14

**e-tran** 312:15,20

**ear** 26:4

**earlier** 15:5 180:6 206:19 246:5 267:10 297:11 305:17 306:1

**early** 91:17 315:11

**easiest** 182:20

**eccharger** 179:2,3

**ECOA** 83:21

**educate** 161:25

**educated** 60:10

**effect** 56:21

**effort** 212:22,24

**electronic** 83:10,14 316:1,2

**elements** 107:1

**email** 129:21 187:4 252:16 254:13,17

**employ** 114:10,23

**employed** 22:22 34:1 99:19 115:16 116:6 119:23 120:3,11 121:16 123:1 181:15 184:6 203:5 281:22 307:24

**employee** 6:10 68:17 69:7 71:24 77:3 119:25 121:9 122:6,12 124:5 126:23,24 128:4,5 129:5 214:5,10 273:4,18,23 274:6 280:8,19

**employee's** 20:10

**employees** 17:12 64:2 71:18 103:9 116:2 123:10 151:17 273:10 276:14,25

**employer** 7:24

**employment** 91:17,20 128:17,19 129:12 216:22

**employs** 97:22 103:6 115:12

**encourage** 160:16 186:10

**end** 12:10 88:19 117:13 138:1,21,23 148:16 172:3 179:11 186:25 196:23 198:13 215:17 242:16 309:23,25

**ending** 212:18 214:8 221:12 222:7,8 228:5 235:18,21 238:12 243:22 244:4 255:14 260:17

**enforces** 112:8

**engage** 188:9

**engaged** 141:17

**engaging** 187:17

**Enjoy** 315:20

**enshrined** 312:6

**ensued** 47:5 86:24 149:14 199:11 243:7 298:25 305:1

**ensure** 9:8 55:9 57:22,23 86:8 89:24 101:7,14 103:24 118:13 279:10 308:19 309:15

**ensuring** 84:5 85:2 86:3 98:11 103:14 104:9 105:8

**entail** 82:24 101:19

**enter** 100:3 285:16 317:4

**entered** 98:16,21 253:20

**entering** 98:22

**entire** 110:5 118:16 238:24 277:20,22 313:3, 15

**entirety** 11:25

**entities** 120:4 250:18

**entitled** 10:4

**entry** 182:12 252:20,25 253:12 254:8

**EPC** 275:15,22 276:6,13, 24 277:10

**equals** 235:17

**error** 71:24 73:6 280:7,10 307:1,9 308:3

**escalate** 198:8

**escalated** 125:11,20 199:2

**escalating** 126:5

**essentially** 132:12 208:20

**estimate** 10:4,5,10,13 113:13 114:12 115:16 119:11 235:10

**evaluate** 218:5

**evening** 315:7

**events** 26:7,13

**ex-spouse** 159:1 161:17

**exact** 6:15 67:16 74:22 109:25 112:1 219:24 237:12

**examination** 5:19 141:6 309:21 311:1

**examined** 5:17

**examples** 276:14

**exchange** 42:3

**exchanged** 95:22

**exclude** 37:12

**exhibit** 11:3,4 176:6,10 179:10,11,14,15,19 182:11 184:9,10 188:23 189:5,6,17 191:22 192:17, 18 197:7 200:4 202:19 203:11,12 204:11 209:6, 10 210:13,16 243:12 251:10,11 252:5 280:25 285:1,2 288:5,6 289:4,7 292:2,4,16,20 293:12 294:19 295:14 299:5,6 300:4

**exhibits** 11:10 76:3 149:4 312:15,16

**exist** 91:8,12,13 107:11 119:3 241:22

**existence** 238:21

**existing** 218:14

**exists** 122:19,21

**expect** 122:2 188:18

**expectation** 129:13

**expected** 124:17 129:20

**expects** 122:17 187:13 188:8

**Experian** 6:11,16,18 7:10,13,24 8:3,14 11:20 12:9,18 13:4,8,9,10,13,18 15:7,9,25 16:6 17:25 18:21 21:2,3,5,19 22:12, 20,23 23:3,21 24:1 26:23 28:25 29:11 30:9,17 32:5, 14,24 33:1,5,7,10,15 34:24 35:9,18 36:1,5,6,10 37:6,15,19 38:9,20,22 39:1,5,25 40:1,10,15,25 41:6,19,22,24 42:11,17,22 45:11,12 47:13,21 48:1,24 49:25 50:6,11,16,20,22 51:1,4,7,16,19,21 52:9,18, 20,21,22 53:4,11 54:4,8, 11,14,20,23,25 55:4 56:15 57:11,23 58:3 59:20 60:18 62:7,18,20,21,22 63:9,17, 18,25 64:23,25 65:3 68:17,22,25 69:7 70:2,4,6, 12,22 71:16,17,18 72:6, 10,13,25 73:3,12 74:11,20 75:12,16,19 76:25 77:3,5 78:18 79:17 80:12,14,23 81:1,22,25 82:4,8,11,16, 19 83:5,7,12,17 84:7,10, 18,24 85:2,12 86:3,6,7,10 87:11,14,16,17,21,23,24 88:2,5,10,18,19,22 89:1,2, 5,8 90:1,5 92:9 93:3,8,9 94:10,17,20,22,25 95:4,12 96:4,21 97:22 98:6 99:3, 10,20 100:8,9,12,17,21 101:6,11,22 102:20 103:5, 6,7,9,15,17 105:20,22 106:5,10 107:5,12,18 108:6,9,10,12,15 109:14 111:17 112:8,10,15,23 113:7,18 114:9,23 115:12, 18 116:1,6 117:17,18 120:5,7,18,19,23 121:10, 16 122:13,14,17,25 123:2 124:4,8 126:12,17,21,23, 24,25 127:10 128:17 129:8,10,15 130:13,23 131:5,8,21 132:8,10,13, 15,17 134:8 135:6 139:6, 22 140:14 141:4 144:10, 24 149:19 150:2,6,10,12

Victor Manuel Ramirez Najera vs. Experian Information Solutions, Inc. -
30(b)(6) of Experian Informtion Solutions, Inc., by Teresa Iwanski

October 8, 2025
Index: Experian's..file

151:9,11 153:12 154:7,9, 14,16 155:14,17 156:3,5 157:25 158:13 160:21,22 161:13,19 162:2,15 163:8 164:10,19,20,21,22,23 165:2,7,10,12,17,22 166:11,12,20,23 167:3,4, 5,11,12,15,18,22,23 168:8,11,14,20,21,24 169:2,5,6,7,24 170:10,20, 22 171:1,9,11,15 172:11, 21,24 173:1,3,4,8,9,12,23 174:14 176:10,11 177:11, 15 179:19 180:1,24 181:16 182:7,22,25 183:5, 7,14 184:6,14 186:16 187:13 188:8,9 189:11,18, 22 190:12,14 191:23 192:22 193:3,6,7,15,17 194:12 195:8,10,11,13,19 197:7 200:8 202:10,16 203:5,15 204:11 206:3,7 207:2,3 208:24 209:10,16, 24 210:3,6,9,17,24 211:10,19 212:2 213:1,15 214:13,20,21 215:6,12,22, 23 216:4,6,8 217:1 218:4, 16,21 219:3,11,17,21 220:6,20 222:15,17 223:13 224:15,21,25 227:5,14 228:8,21,22,23, 24 229:2,4,11,19 230:1,5, 8,9,12,20,25 231:1,7,24 233:2,25 234:1,18 237:10, 11,14,18,21 238:1 239:5,8 240:4,12,17 241:3 242:3, 5,9,17,19 243:12,24 245:7 246:2,9 248:13 249:16 250:7,13 251:14,24 252:2, 5,8,23 254:19 255:15,16, 22 256:10,22 259:3 260:18 261:2,18,22 262:5, 16,23 263:5,8,11,15,18, 21,24 264:2,4,7,11,12,23, 24 265:2,3,7 266:7,15,19, 24 267:10 268:10 269:15, 17,23 270:2,6,16,21 271:2,6,10 272:5,16 273:3,9,20 275:9,15 279:9 281:2,5,9,23 284:11 285:6 287:21,24 288:2,9,12,13, 19,23 289:8,13,23 290:1, 10,23 291:10,23,24 292:3 293:12,16,24 294:8,20,24 295:3,5,14 296:1,3,6,13,

18,22,23 297:1,4,6,19,22 298:5,14,15 299:9 300:1, 15,23 301:10,12,17,24 302:17,21 306:18 307:11, 17,24 308:18 309:3,10,13 310:17 313:14 314:2,4,13 318:16,20,25

**Experian's** 13:24 14:19, 22,25 15:2 17:10,19 18:2, 16 19:18,24 20:25 23:23 25:21 29:21 31:2,4,5,10, 14,24 32:2 33:12 35:11 36:23 38:14 41:12 47:9 50:1 51:9 53:7 54:9 55:2, 16 64:1,16 66:13,15 68:18,23 69:2,8,22 70:7, 10,25 71:19 72:23 73:24 75:2,20 76:22 77:16 87:7 92:16 93:25 98:2 123:3 124:12,18,22 126:14 129:13 131:20 134:15 136:4 143:21 145:20 150:4,23 151:16 156:12 162:18,24 163:17 164:17 170:7 171:17 172:3,20 179:2,3 186:18 188:15,17 193:23 195:21 196:14,23, 24 197:15,24 199:19 202:20 204:25 211:8,20 212:4 216:10,14 218:14 225:5 227:15 232:20,22 233:7,9 234:6 235:2,4,5 241:19 242:16 260:23 261:2 267:13 270:15 271:21,23 272:18,20 273:13 274:9,10,14,22 278:22 280:11 282:9 283:25 286:21 292:10 294:25 297:23 300:5 302:19 303:6 309:8 312:2, 3,5 314:3 318:15

**expert** 23:12 311:3

**explain** 64:13 102:4 161:11 173:23 213:10

**explaining** 135:9

**explanation** 161:12

**explicitly** 173:18

**extensive** 89:7 91:23 216:2 283:17

**external** 132:15 144:14, 16 145:2 148:3 192:9

284:16,22 297:8

**extra** 157:14

_____

**F**

**face** 153:2

**facility** 94:8 131:12

**fact** 20:8 28:21 31:17 36:1 38:14,17 71:4 77:2 162:1 168:16 182:3 187:11 191:14 204:18 205:11 217:9 262:24 263:22 264:13 287:23 303:1 314:14 318:23 319:13

**facts** 13:22

**factual** 12:17 13:12,17

**failed** 72:6 76:21

**fair** 31:10,13,16 32:3 33:6 45:21 56:25 64:18 65:12 70:14 84:1 95:17 96:25 99:1 104:25 111:25 125:12 157:8 161:6 172:14 181:2 191:20,21 192:24 208:25 213:5 215:7 236:22 238:20 240:9 242:3 249:24 261:20 264:9 266:25 267:1 269:24 270:8,9 280:7 282:18 283:4,9,10, 16,22 290:14,22 312:6

**FAM** 248:7

**familiar** 9:6 17:17,18,24 18:10 31:9,14,23 32:2 49:8 50:12 57:13 89:9,10, 17,19,21 90:15 99:10 105:15 176:16 192:24 210:22 237:7,12 241:18 248:13 275:14 288:15 299:12

**families** 264:25

**family** 151:10 157:24 316:14

**fast** 17:2

**father** 155:2,22 156:19 256:4,7 259:11,21 263:2

**father's** 246:3 256:11 258:8 259:20,25 260:19

**FCRA** 33:6,11,19 34:22, 25 35:10,12,19 36:24 37:20 38:24 47:10,13,16, 20 48:23 49:21,24 50:3,7, 13,17 57:13 71:17 80:20 87:25 311:24,25 312:4

**FCRA's** 49:2

**February** 72:24 73:21 74:10,20,25 170:6 177:17, 20 178:13 179:7 181:6 182:12 184:3 189:12,15 190:14,23 191:25 194:20 203:22 204:8 205:25 206:1,3,13,23 207:6,7,10 209:20 284:22 302:6 306:2 307:10

**federal** 17:8 31:3 33:15 318:17,18

**feel** 128:20

**FICO** 311:5,15

**field** 168:2,5 170:9,15 219:7 223:9 225:10,19 241:9 260:7 261:7 286:23

**fields** 223:12

**figure** 294:8

**file** 19:16 50:23 85:24 96:21 117:5 121:18,24 122:8,10 145:5,8,10,12, 17,19 146:1 149:20,23,24 150:3,9,12,25 151:3,7,12, 19,21 155:2,5,25 156:22 157:15,19 159:2 162:16 163:25 168:6,14 169:13 170:11,13,22 171:12,21 178:19 188:1 193:8,16 194:10 195:9,25 196:1,11, 24 197:17,19,21 198:5,6, 13,15,16 200:8 201:1,5,6, 7,14 202:6,8 210:12 213:7,8 216:16 221:21 222:5,12 223:1 225:7 228:7 229:5,6,7,8,12,15, 20,21 230:1,6,10,15,20 231:2,10,11,14,23,24 232:7,9,10 233:11,14,17 234:22 242:13 245:13 246:3 249:14,17,18 255:16 269:5,21 271:3,7 275:6 276:19 277:1,11,14 278:2,18,24 279:20 280:2 287:4 289:3,20 291:24,25

APPENDIX 0663

Victor Manuel Ramirez Najera vs. Experian Information Solutions, Inc. -
30(b)(6) of Experian Informtion Solutions, Inc., by Teresa Iwanski

October 8, 2025
Index: filed..giving

294:20 295:25 296:8 297:2,16 298:10 300:1,16, 18 301:17 302:13,20,23 303:2 305:14 306:8,11,16 307:25 308:9 316:24 319:2

**filed** 48:24 113:18 180:21 231:15 233:6 316:17

**Fileone** 211:11 216:9,10, 13,20 218:14 233:22 240:25

**files** 118:5 150:21 151:17 167:23 279:5

**filibuster** 141:21

**filibustering** 141:23

**filing** 245:8

**fill** 179:13

**final** 187:3

**finally** 10:16

**Finance** 240:18

**Financial** 38:23

**find** 217:2,4,5,18,23 218:5,11 242:10 248:12 281:25

**finding** 238:7

**fine** 86:17 136:13 182:20 240:13 304:17 316:1,2 317:19

**finish** 137:5,6,14,17 138:4,5,6 148:16

**firm** 30:12 290:7 319:10

**five-minute** 199:6

**fix** 106:10

**flabbergasted** 319:1

**flag** 208:14

**flagged** 277:11,14

**flags** 208:13,19

**flipped** 278:9

**focused** 139:2

**follow** 47:22 49:15 50:2 58:3 60:9,11,17 66:13 69:14 70:13 72:15,17 73:7

76:14,21 77:5,16 80:16 122:3,6 123:2 124:17 130:10 148:12 152:17 188:7 270:2 273:13 308:23 309:9

**follow-up** 156:13 158:6 160:4 187:23 188:10 302:18 306:17,20 307:4

**forget** 79:10

**form** 8:14 14:4,13 22:7 27:22 28:17 43:11,17 48:2 50:24 51:10,12 54:7 61:21 62:3 63:15 64:20 65:2,24 66:3,18 67:25 68:10,21 69:11 71:14 73:2 74:12 75:4 76:15,24 78:3,10 79:4,15 80:4 81:5,12 85:5, 18 91:14 92:1 93:4,6 95:18 99:5,22 106:6 124:24 125:6,13,24 128:22 129:16 131:16 133:10 135:7 143:18 144:4 146:16 147:23 150:14 156:16 157:12 158:21 160:7 163:2,20 166:14 169:16 172:4,15 187:24 229:17 230:3,16 241:17 249:5 256:19 257:24 264:1,10 265:1 269:25 272:24 276:10,21 277:2 280:9 282:19 283:5 290:18 291:8,22 295:3 298:1,12 305:19 307:13 309:1,12 312:9

**formal** 130:19

**formally** 252:24

**format** 83:10,15 84:13,14 85:2,6 105:11 108:10 183:22 265:4

**formatting** 83:25 85:4,16 103:18 104:10 106:4,19 108:2

**Forrest** 250:11

**forward** 43:18 227:14

**forwarded** 284:13

**found** 257:18

**fragment** 234:4

**frame** 19:1 40:21 212:20

237:16

**frankly** 318:12

**fraud** 155:17 161:17 162:10 278:12 279:6

**free** 61:21

**freeform** 53:8,11

**frivolous** 307:12 308:16

**front** 11:2 16:7,8 26:19 65:13,17 68:6 74:5,15 80:1,7 144:8 175:24 179:18 184:8 192:16 198:13 200:3 203:10 209:9 243:12 251:9 252:4 276:4 280:24 284:25 288:4 289:7 292:2 299:4 310:12,18

**frustrate** 43:8,20

**frustrating** 137:24

**full** 132:18,22 133:7,16 134:2 136:9,18 141:6 175:19 204:19 208:15 211:4 213:18 250:4,8 290:10

**fully** 144:8

**furnish** 95:16 98:18 102:3,4 110:11 112:9 172:2 227:14 235:25

**furnished** 112:16 215:11 236:21 238:13

**furnisher** 51:20 53:16 61:12,18,23 62:2,12,16, 17,20 63:5 81:21 82:1 83:3 84:25 85:10 86:12 88:20 94:6 95:10,16 98:11 99:9 100:10,14 101:12,22 102:11 103:25 105:23 106:3 107:15 108:16,17 113:19 131:23 144:18 146:5 147:17 168:2 169:10,11 170:2,4 171:19, 25 173:6 186:20 187:20 188:4 193:7 196:14 197:23 207:18 215:12 219:12,19 225:1,24 226:15,24 227:8,11 239:9 240:11 241:11,13 298:16

**furnisher's** 84:23 108:3 112:15 196:7

**furnishers** 27:11 54:11 82:11,20 83:6,10,15 84:2, 11 87:12,19,22 88:5 91:4 92:22,25 94:21 96:5 98:16 99:17 100:4,23 101:6 105:19 106:1 107:12,15 108:12 111:15 112:9,20 148:17 168:4 169:19,23 171:10 172:9,13 173:1 195:16 219:5,17 236:11 237:11,15 242:8,18

**furnishers'** 96:8

**furnishing** 103:25 239:9 240:4 243:22

---

**G**

**game** 9:11

**gathered** 194:12

**gauge** 278:10 282:8

**gave** 33:24 38:5 204:19 270:23 271:10

**general** 19:5 64:18 96:13 101:21 146:7 264:3 277:7 312:25

**generally** 16:17 20:5 42:14 73:11 89:6 132:20 159:14 161:7 213:6 216:16,17 248:23 275:25 276:11 313:20

**generate** 180:1,16 200:12 237:22

**generated** 61:22 177:6 178:3 180:14,19 189:15, 22 190:2 194:1 213:5 224:15 293:19 295:7,21 296:11,13,15 301:22

**generates** 107:19

**generating** 215:15 246:4

**give** 5:8 10:9,13 28:2 77:21 114:12 115:16 148:2 149:21 159:18 175:25 211:21 226:20 234:16 235:10 248:23 249:7 270:25 293:6

**giving** 7:24 9:20 85:21 113:13 130:5 141:25 162:1 257:5 293:9 294:6

Victor Manuel Ramirez Najera vs. Experian Information Solutions, Inc. -
30(b)(6) of Experian Informtion Solutions, Inc., by Teresa Iwanski

October 8, 2025
Index: goal..housed

**goal** 50:1 54:9 55:16 117:12,15,16 150:4 280:5 308:1 312:2,4,5

**goals** 20:6 117:10,11,15

**good** 20:18 98:20 117:21 148:18 206:20 319:16

**govern** 84:15

**government** 120:6

**governs** 83:19

**grade** 270:20,24 271:4,5, 14

**grading** 271:1

**great** 9:14 306:24 308:11

**grid** 83:21 216:7

**ground** 9:5

**grounds** 272:1

**group** 39:2 90:2,4 150:20, 22

**guess** 8:13 20:11 73:19 101:2,4 114:21 128:13 129:1 156:1 174:23 183:13 224:7,14 291:4

**guessing** 9:10 10:10 114:13,22 116:3

**guidance** 248:24

**guidelines** 50:2 105:21

**guides** 123:15

**guys** 25:19 34:12 303:9 305:10

---

**H**

**half** 149:7

**halfway** 149:2

**Hamilton** 22:18,19,24 232:2,3,7,10,12 233:11,15 297:11,12

**Hammoud** 5:13,20 8:8, 12,17 11:6 12:23 13:5 14:3,7,16 15:8 16:13 22:2, 6,15 27:19 28:1 29:1 35:7, 23 36:16 37:4,17 38:4,18 39:7,18 40:8,23 41:5,17 42:1,9,18 43:3,19,21,25

44:6,14,22 45:7,14,20 46:3,18,23 47:2,8,14 48:6 51:8,23 54:13,19 55:20 56:1,5,14 57:4,15 58:8,17 59:4,11,18 60:5 62:10 63:24 64:24 65:6,18 66:1, 9,21 68:4,16 69:4,15 70:9 71:6 72:2,18 73:9,18 74:18 75:7 76:19 77:10,23 78:6,13 79:8,23 80:11 81:7,16 85:14 86:4,16,19 87:2 91:21 92:7 93:11 95:20 96:19,24 97:7 98:3 99:13 100:1,15,20 101:1 102:1,16 103:21 104:7,14, 19,24 105:5,14 106:12 107:10,17,24 108:14,21 109:2,7,15,24 110:7,15,22 111:5,8,18,24 112:6,13,24 113:6,16,23 120:17 121:1, 8,14 125:2,10,18 126:3 129:3 130:2,11,22 131:3, 13,19 133:14,18 134:1 135:3,10,17 136:7,23 137:1,4,7,10,16,18,23 138:13 139:4,12 140:3,19 141:1,14,20,24 142:1,4, 19,22 143:1,9,10,23 144:12 146:19 148:18 149:1,8,11,17 150:19 157:1,22 158:22 160:15 161:5 163:6 164:1 166:17 169:22 172:6,23 176:8 179:17 184:12,21 185:1, 17 186:24 188:5 189:8 192:20 199:5,14 203:14 209:8 210:15 229:23 230:11,21 231:6 241:20 242:24 243:2,4,10 249:2,9 251:13 256:21 258:2 264:6,15 265:6 270:5 273:2,8,16 274:4 275:21 276:1,12,23 277:9 280:15 283:1,7 285:4 288:8 289:6 290:21 291:14 292:1,6 298:7,17 299:3,8 303:12, 22 304:3,7,10,18 305:4,22 307:15 309:7,17 310:21 311:2 312:11,18,22 313:2, 8,10 314:12,20 315:20 316:8,13 317:20 319:18

**hand** 5:6 113:4

**handbook** 248:14,16,19 249:3

**handful** 113:8

**handle** 46:15 56:22 64:2 66:11 116:14,17,22 123:20 124:1 146:13 150:13 188:16 195:15 197:11 275:10 283:19 304:23

**handled** 12:9 13:11 14:20 27:7 61:3 67:8 72:4,25 76:13 125:20 138:10 170:6 181:9 191:25 199:25 202:15,21 204:16, 24 206:9 207:13,20 231:11 282:23 296:7

**handles** 16:6 102:18 273:4

**handling** 13:4 46:17 57:18 70:18 76:7 103:10 146:15,22 231:21 271:7 280:11 282:5 302:10 306:6 307:21 308:19

**happen** 28:11 52:16 78:21 129:24 188:3 264:25 313:16

**happened** 28:10,15 37:21 73:14 78:2 112:25 233:14 242:16 280:16 282:14,15 310:1

**happening** 43:1 44:10 52:19 113:8 152:3 206:23 265:3

**happy** 304:13,20

**harass** 138:3

**harassing** 143:18 144:5 146:17

**hard** 63:20 246:14 247:7 290:2,4,9,22

**hate** 315:4

**head** 32:11,17 33:2 90:11 91:11 236:16 319:16

**hear** 9:10 49:18 82:18 157:3 184:17,22

**heard** 112:14,19 113:8 192:1

**hearings** 31:5

**heart** 64:6

**held** 29:23 30:17

**helped** 40:16

**helpful** 77:24 78:8 79:25 154:9 187:8,22 282:3 307:3,8

**Henke** 90:13

**Hey** 38:6 39:21 58:19 59:20 93:19 161:14 245:17

**hidden** 224:13

**high** 20:8 89:10,19,21 90:1 94:1 105:6,7

**higher** 94:7 182:21,23 207:15 310:6

**highlighting** 178:9,15 213:17 220:23

**hindsight** 306:25

**his/hers** 194:15 203:25

**his/not** 208:22

**Hispanic** 263:6,19,25 264:3,5,8,12

**historical** 226:21 234:3, 8,25 235:15 237:14,24 272:10

**historically** 223:25

**histories** 84:23 191:20

**history** 83:21 215:10 216:7 311:17

**hit** 147:16 148:16 220:16 234:4,6,22,24

**hits** 235:2,4,5

**hold** 142:15 292:19,24

**holds** 142:13

**hour** 119:14,17,24 120:1 149:7

**hours** 24:19,21,22,24 25:2,3

**house** 177:7,12 211:5 214:19,22 221:8 254:3 256:12 258:22 259:1,10

**housed** 144:9 199:19 212:5 232:20,22 233:3,8

Coash Court Reporting & Video, LLC
staff@coashcrv.com

602-258-1440
www.CoashCourtReportingandVideo.com

APPENDIX 0665

Victor Manuel Ramirez Najera vs. Experian Information Solutions, Inc. -
30(b)(6) of Experian Informtion Solutions, Inc., by Teresa Iwanski

October 8, 2025
Index: household..information's

**household** 10:24

**houses** 216:10

**housing** 248:10

**HR** 129:21 272:3,14

**human** 61:25 71:24 73:6
126:21 127:2,3,8,9,12,14,
16,20,25 128:4,8,15,21,25
129:1,4,25 130:9,13
172:18 204:16 208:23
275:3

**hundred** 114:17

**hundreds** 78:22

**hypothetical** 63:21
69:21 74:15

**hypothetically** 70:17

**hypotheticals** 75:18

---

**I**

**I-W-A-N-S-K-I** 6:2

**ID** 147:12,14 166:10
178:16 181:13 182:10
183:20,23 191:17 192:10
194:15 203:25 204:13,19
211:15 213:6,7 281:20
284:17 285:18 287:12
289:2 293:8,13 295:15
297:9

**idea** 10:9 27:23,24 44:25
119:11

**identical** 258:4

**identification** 11:5 148:9
150:2 176:7 177:3 179:16
184:11 189:7 192:19
193:18,19,25 194:6
198:19 203:13 205:2,10
207:23 209:7 210:11,14
213:14 214:5 217:13
220:9 221:1,5,13 242:9
247:20 251:12 260:20,24
261:4,14 285:3 287:1
288:7 289:5 291:9 292:5
293:20 299:7

**identified** 132:1 181:9
185:3 202:21

**identifies** 150:10

**identify** 160:5 162:18
177:10 185:12 218:13
272:22 274:23 279:9,19
317:15

**identifying** 194:8,11
212:14,15 213:12 214:9
216:23 217:10,25 218:6
235:22

**identity** 152:19,25 153:6,
9,16 154:11,16,20 174:7
181:12 186:4,8 192:4
202:24 278:12 280:19

**ignore** 17:14,15

**II** 116:12

**III** 116:12

**ILINX** 274:14,18,19,21
280:21 281:16

**illogical** 81:24 83:3
106:9,13,15,25

**image** 284:6,7

**immediately** 61:11

**impacted** 36:23 38:11

**impair** 8:22

**impasse** 318:16

**implemented** 92:16,18

**important** 190:11

**impossible** 79:2 253:19

**in-house** 15:25 22:20
231:18

**inaccuracy** 253:12
270:22

**inaccurate** 162:3 228:19,
23 252:20 253:3 254:8
282:24 286:25 287:11
291:6

**inaccurately** 291:19

**Inaudible** 303:21

**incentive** 117:19 118:9,
23 119:5

**incentives** 119:2

**incentivize** 117:19

**incentivized** 118:7

**include** 37:12 53:22
146:20 162:5 171:4 181:2
290:16

**included** 51:17 109:4,9,
17 254:17 266:10 290:25
295:3

**includes** 194:2 276:13

**including** 253:6,11
284:11

**incoming** 273:5,11

**Incorporated** 120:5,20
127:11

**incorrect** 169:3 172:18
252:25 253:6 287:15

**incorrectly** 291:12

**increased** 310:7,9

**independent** 84:20
167:19 169:7 170:12

**independently** 108:7
168:20 169:17 172:22
202:11

**India** 115:9 119:19 120:3
123:9,20 129:5 130:15
181:19 203:8

**indicating** 152:18 156:4
169:15 170:5 256:4
264:17,21 267:3 286:6

**indication** 152:23
197:19,20 198:6

**indications** 273:14

**individual** 32:21 49:17
181:15 183:21 196:18
260:20,24 261:3 306:6

**individuals** 19:15 22:22
34:10 257:15

**influence** 58:3

**info** 256:11

**inform** 155:7

**information** 15:10 16:3,
6,18 19:4 44:1 49:6,16
51:5,6,22 53:14 54:10
61:10,16 62:19,21,22
67:6,15 71:8 77:21 80:14
81:3,14,21 82:1,3,14,19
83:3,5,7,11,16,25 84:3,4,

8,12,15,25 85:7,12 86:2,8,
10,11 87:11,14,15,18,20,
21,23,24 88:1,2,15,18,22
89:2,8,22,25 91:18,25
92:24 93:8,9 94:11 95:11,
23 98:15,17,18 99:9,18,24
100:22,23,24 101:5,11,22,
23 102:9,13 103:14 104:1,
15 105:19,23 106:10
107:12 108:11,13,18
109:14,16,19 110:12
111:14,16 112:10,23
120:5,19 121:17,20,22,23
122:8,10,17 124:9,13
127:10 131:9 132:9
138:10 144:8,9 146:1,4
148:7,9 152:5,20 154:6,13
157:14,20 158:10 161:10,
13,19 167:6,19 168:7,19,
23 169:18,20 170:2,5,14
172:3,13,19 173:3 174:2,
19 175:13 176:25 177:2,3
181:3 186:13 187:8 193:6,
15,18 194:8,9,12 195:1,2
196:13 198:13,19 204:4
205:2,10 207:23 208:5
210:9,12 212:4,5,14,15,
16,18 213:4,6,12,15
214:3,6,10,11,20,21,22
215:1,6,8,9,11 216:6,11,
15,22,23 217:8,10,12,13,
25 218:6,9,12,17 219:12,
14,24 220:1,15 221:25
224:20 225:1 226:21
227:5,7,12,14 228:21,22,
24 229:1,9,10,25 230:13,
24 231:23 232:18 234:3,8,
16,25 235:16,23 236:21
237:12,17,22 240:11
242:2,9,17 246:1 248:9,12
249:7 250:17,24 251:1
253:2 254:12 260:18
261:16,18 262:1,2 263:14
269:11,17 270:2,23,24
271:2,6,13,17,18,19
272:11 274:21 276:7
277:15 278:11 279:2,17
286:6,7 287:1,11,13
290:16,25 291:10 293:20
297:10 298:15 300:2
301:4,5,9,18 306:13
311:4,15,21 312:1,8
313:1,13 317:11

**information's** 105:22
220:9

APPENDIX 0666

Victor Manuel Ramirez Najera vs. Experian Information Solutions, Inc. -
30(b)(6) of Experian Informtion Solutions, Inc., by Teresa Iwanski

October 8, 2025
Index: informing..knowledge

**informing** 270:21 317:22

**initial** 14:22 52:13 272:21 273:4 274:9 279:11

**initially** 278:15 279:3

**initiate** 201:1 202:5

**initiated** 27:10 177:11 198:14 201:18

**initiates** 144:17 189:23

**initiating** 156:7

**input** 53:18 58:2

**inputted** 226:25

**inputting** 125:23

**inquiries** 211:6 216:22 246:11,14,15 248:21 249:11,24 250:15 290:23

**inquiry** 169:1 215:16 217:25 221:9 246:18,21, 25 247:7,8,13,14,18,23 248:24 249:8 250:18,19, 23 251:6,8 290:2,4,9,14

**inside** 193:14

**instance** 52:16 69:17 70:24 71:10 72:14,16,19 73:13 76:5,20 108:10 112:14 151:5 157:16 188:3 220:12 284:1 309:16

**instances** 61:13 81:24 83:2 112:25 122:24 144:20 150:10 155:24 204:23 220:5,17 272:7

**instruct** 126:24 129:14 150:23 276:25 303:18 304:1

**instructed** 276:8

**instruction** 145:21 147:19

**instructions** 130:4 145:24 146:6,15,21 147:2 195:14

**instructs** 10:1

**intended** 80:12 81:9

**intentional** 61:2 68:25 70:4

**intentionally** 68:17 69:8, 22

**interface** 124:9

**internal** 28:14 32:24 33:1 103:6,7 131:14 132:2,3,6, 7,11,12,17,19,21 133:1,8, 16 134:3,5,8,9,14,22,23, 24 135:2,5,11,12,19,21, 24,25 136:4,10,18,22 138:8 139:6,10,13,18,23, 24 140:5,15 143:11,24 144:1,13 145:11,13,17 148:3 165:3,7 166:20 196:23 197:1 233:1,2 267:15 268:12

**internally** 60:15 167:6 296:4,7

**internet** 51:15 63:9 178:3,23 179:3

**interpretation** 18:20 35:12

**interpreted** 302:13

**interpreting** 34:25 35:10, 19 37:20 318:17

**interrupt** 9:19,21

**interruptions** 14:15

**investigate** 74:11 145:21

**investigating** 198:4

**investigation** 58:12 76:22 201:2,13 202:6 254:8

**investigator** 29:9

**investigators** 29:12

**Investment** 250:11

**involve** 272:20

**involved** 39:1 40:1 43:1 44:11 45:15 62:8 89:5,11 102:14 125:8,12 274:25 319:9

**involvement** 19:15

**irrelevant** 307:12 308:16

**IRS** 260:19,24 261:15

**issue** 6:14 66:17 67:4 128:15 266:24 290:17

304:13,20 316:16 319:5

**item** 108:7

**items** 110:1,16 311:12

**iterations** 92:15

**ITIN** 261:9,17

**ITINS** 261:3,24

**Iwanski** 5:5,15,23 9:1 14:17 43:22 137:20 138:14 143:11 146:20 199:15 303:19 304:1 305:5 309:19 311:3 315:5, 20,23 316:21 319:23

---

### J

**jaguar** 212:9

**James** 312:18 318:9 319:4

**January** 170:3 258:19 260:3 262:11

**job** 9:14 39:24 111:14 116:18,19

**John** 219:20

**Jones** 231:22

**judge** 6:3,7 7:22 37:10

**judgment** 313:24

**July** 73:21 75:8 226:6,11, 14,19 227:3 240:21,23 241:4 251:24 252:10 281:3 307:16 308:15

**July/august** 285:12

**jump** 179:9 181:5 228:8 240:17

**jumping** 246:9

**June** 180:14,17,20 181:1, 3 249:22,25 286:2 296:21 297:23,24 299:16 300:9, 11 301:16

**junior** 151:16

**jury** 6:4,7 7:22

---

### K

**key** 161:9 270:22 278:12

**Kim** 21:16,17 23:11 32:12 56:2

**Kimberly** 23:6 32:12

**kind** 16:4 19:7 23:7 33:7 37:25 39:4 42:7 45:3 58:4 60:1 62:19 63:22 68:24 84:8 85:12 102:12 117:22 118:25 120:24 128:8 132:20 134:17 136:1 148:9 151:3 153:13 164:18 165:9 166:10 169:19 170:23 174:17 176:25 177:7 187:15,18 198:9 201:3,6 217:20 223:3 224:12 226:20,24 233:6 235:15 241:25 242:11 245:1 249:3 279:24

**kinda** 44:15 107:25 150:6 165:22 171:20 225:4 246:4

**kinds** 46:16,17 59:24 117:22 134:21 162:7,15

**knew** 36:9 186:8 188:20

**knowing** 66:4,5 307:8

**knowledge** 16:20,21 17:20 18:6 19:21 20:7 21:20 24:11 31:18,19,20 33:13,22,25 34:5 35:5,8, 14 37:2,3,21,25 38:3,6,16 39:3,17,19 41:8,16 43:7 57:6,10 58:24 59:7 60:21 69:13 78:11,23 79:16 80:7 84:20 91:19,22 93:24 94:4,12,16,24 95:3,6,8,13 96:1,18 97:1,4,6,8,9,10,13 101:16,17 102:15,24 104:20 105:1 109:12 110:6 111:9,13 112:7 113:17 116:20 120:15,16 127:14,15 128:12 130:21 133:11,22 136:3 140:18, 20 167:20 169:7 170:8 171:24 183:18 202:11 217:5,8,18 219:7,25 220:1 223:16,17,20 224:19 228:25 242:1,11 261:18, 23 262:3 263:21 265:2 272:11 273:18,22 282:10 283:13 310:13

APPENDIX 0667

Victor Manuel Ramirez Najera vs. Experian Information Solutions, Inc. -
30(b)(6) of Experian Informtion Solutions, Inc., by Teresa Iwanski

October 8, 2025
Index: L-E-V-E-L-L..mail

## L

**L-E-V-E-L-L** 315:14

**label** 83:20 179:10 292:3 300:5

**labeled** 11:2 176:9 179:19 184:9 189:5,18 192:17,21 203:11,15 209:10 210:17 251:10,14 285:1 288:12 289:8 299:5, 9

**laid** 317:3

**landed** 277:18

**language** 17:21 18:24 109:25 110:5 266:23 318:14

**largely** 29:19

**late** 164:8 234:15

**law** 8:6,9 17:10,15 30:12 34:25 35:4,10,19 36:4 37:20 38:2,11,14,16 304:12,20 312:6,7 319:10

**laws** 17:8

**lawsuit** 24:10 130:14,24 131:5 180:21 211:19,23 228:24 229:1,5,10,14,25 230:4,9,13,14,20,25 231:7 233:6 245:9

**lawyers** 206:19

**lead** 154:14 155:16 161:9 174:1 306:14

**leap** 206:18

**learn** 20:19 31:21

**learned** 31:21 37:6 97:12, 14

**leave** 199:22

**led** 164:7

**left** 10:24 87:6 211:9 243:11 286:18,23 308:13

**legal** 30:12,13 32:24 33:2, 12,17 34:10,15,21 35:9 39:8 55:6,7,12,18 56:7,22 57:21 58:2,6,11,20 59:5, 13 120:4 229:14

**lender** 171:3 190:23

**length** 311:17

**letter** 144:10 151:2 165:17,19 220:12 246:24 251:23 252:11 271:4,5 272:21 273:19,24 274:8, 10,20 275:3 281:6 284:12

**letters** 23:23 160:21,22 274:13

**letting** 208:17

**level** 20:8 35:13 89:10,19, 21 90:1 94:1,7 105:4,6,7 106:11 107:16 116:24 118:14 120:22 122:11 170:17,19 215:3,13 216:11 217:20 244:7

**Levell** 22:25 315:13

**levels** 88:24

**liable** 159:1 161:17

**license** 165:9 166:1 173:24 174:3 267:25

**limit** 14:4 53:17

**limited** 23:25

**lines** 6:21 216:21

**list** 132:18,23,24 133:7,16 134:3 135:5 136:9,18 139:6 158:24 165:23 173:8 243:25 244:3,6

**listed** 12:3 135:22 162:5 192:8

**listen** 130:4 157:15 160:25 161:8 183:3

**listened** 185:19

**listening** 157:10

**lists** 252:25 257:8,11

**litigate** 317:16

**litigation** 26:8,13,14 30:5,20 31:13 32:8 231:15 291:24 299:23 300:16

**live** 61:25 204:16 207:14, 24 208:23 275:2

**LLC** 178:25 179:4

**load** 84:8 85:12,22

**loaded** 11:10 81:14 82:5 105:25 235:8

**loading** 82:2 83:4,8

**loading/onboarding** 100:13

**loan** 87:21 162:25 259:15 290:6

**loans** 163:9

**locate** 218:2 294:10

**located** 68:7 114:25 115:3 121:11 124:1,6,14, 19 127:4,7,17 128:14 130:15 181:18 183:21 203:7 232:19 233:4 243:25

**location** 88:23 95:21 96:4 115:24 121:4 123:24

**locations** 96:8 115:11,13

**lodge** 96:13 162:15

**lodged** 178:18,21

**lodging** 156:3

**log** 74:7 77:20 79:22 80:9 143:13 144:6,10 146:9,12, 18,20 176:22 177:1,9 179:8,10,25 180:13,16 182:15 191:24 197:2 202:20 205:19 206:6 212:2,16 213:3 244:8,9,22 249:21 252:1 282:21,25 285:23 292:14,16,17,18 295:11 296:13 297:17,23 298:8

**logged** 167:13

**logic** 171:18

**logical** 105:22,24 106:17

**login** 211:11 233:15,16

**logs** 23:23 72:21 73:24 74:5,14,16,23 75:6,20 76:1,11,18 77:8,13 143:19,21 144:3 297:19

**long** 6:9 10:5,7,11,24 19:2 24:18 25:19,21 28:20 67:9 117:5,7 121:25 122:1 148:22 180:22 212:11,13, 15 214:14,15,17,19,25 215:8,15,17,20,23 216:2,5

223:21 226:18 232:19 234:12,13 237:17,19 239:3 243:2 245:19,23,25 246:2 261:25 300:18 301:21 316:11

**longer** 112:20,22 122:12, 25 164:9

**looked** 102:9,13 110:23 126:1 146:5 200:21 205:10,12 211:22 235:20 295:18

**lot** 69:1 71:17 88:20 89:5 118:5 134:25 153:9 265:5 270:11,22 271:12 291:15 319:5

**lower** 182:21

**lozenge** 10:22

**lunch** 148:21,25 149:4,7

## M

**M-A-Y** 6:2

**m01067a** 202:22

**made** 21:5 26:12 27:7 36:10 51:11 52:2 62:1 72:3,15 74:20,25 75:12 76:6,21 77:11 119:3 142:6 156:13 171:25 172:1 174:25 177:19 179:7 180:2 181:22 182:13 185:23 204:24 229:14 256:1 270:4,19 271:7,24 272:6,8 280:18 282:5,24 283:2,3,4 292:10 302:9 303:15 306:2 307:21 308:3 309:6 314:12 319:4

**mail** 27:8 28:7 29:7 51:1, 15,17,25 52:24 60:12,24 61:5 63:4,6,9,13 72:20 73:21,24 75:9,12 76:8,9, 13 77:20 78:25 79:19,21 80:9 117:20 118:16,20 123:22 126:1 143:14,22 146:1,8 147:13 148:3 154:18,24 174:9 182:7 188:25 230:17 252:12,13 272:17,22 273:5,11,15,21 274:3 277:19 278:14 279:24 280:11,12 283:19, 23 284:5 287:17

Coash Court Reporting & Video, LLC
staff@coashcrv.com

602-258-1440
www.CoashCourtReportingandVideo.com

APPENDIX 0668

Victor Manuel Ramirez Najera vs. Experian Information Solutions, Inc. -
30(b)(6) of Experian Informtion Solutions, Inc., by Teresa Iwanski

October 8, 2025
Index: mailroom..Metro

**mailroom** 272:18,20 273:4,10,18,23 274:6

**maintain** 15:10 80:12 81:1 164:10 214:13 223:13

**maintained** 97:23 216:20 275:15

**maintains** 94:17,25 95:4 96:21 99:3 273:3,9

**make** 6:18 8:13 11:12 16:16 29:20 36:3,5 43:14 52:12 56:7,22 68:25 69:1 70:6,23,25 71:3,19 73:5 77:6 84:25 88:23 89:3 94:7,8 101:23 102:2 103:18 108:8 117:14 118:18 132:3,11 155:10 168:15 169:20 171:13 172:22 176:3 184:16,17 194:5 222:1 224:16 264:20 270:10,15 278:7 279:24 282:22 292:23 306:6 307:1,9 309:4 315:8

**makes** 21:10,18 22:4 33:8 38:9 71:24 149:18 161:13, 19 164:25 225:5 258:3 312:1

**making** 7:13 52:7 69:13 81:23 82:25 105:20 122:3 138:17 205:6 253:19 269:2

**manager** 121:3 125:3,21 126:6

**manner** 93:25 200:22 202:15

**manual** 46:15 64:14 65:17 66:4 67:5,6,9,15,23 68:1,7,8 139:22 140:14 144:1 147:24 148:5

**manuals** 67:21 123:12 139:9 141:2,5

**Manuel** 221:14 222:8 235:23 240:10 256:4 257:11

**marathon** 10:17

**March** 205:20,23,24 206:6,13,24 207:10 209:16

**Maria** 257:12 258:15

**mark** 142:14 312:25 316:18

**marked** 11:4 142:10 176:6 179:15 184:10 189:6 192:18 203:12 209:6 210:13 251:11 278:18 285:2 288:6 289:4 292:4 299:6 313:11

**married** 264:4

**Mary** 23:2,11 25:13,14,17

**mass** 313:3,15,18 316:15

**match** 204:19 216:17 218:13 219:21 220:6,7,10 241:11 254:4 289:2

**matched** 197:13 204:19 205:16 210:12 220:18

**matches** 195:23 196:8 200:16 217:19,23 218:3 228:3 256:12 260:18

**matching** 241:19 242:1, 11 275:3

**materials** 19:22 277:21

**math** 206:17,20

**matter** 7:25 21:7 66:12,23 113:18 126:20 127:6 139:15 163:5 180:8 184:14 246:5

**maximum** 49:15 80:13 81:2,9 82:9 87:7 97:24 98:7 99:3,20 312:3

**MC** 114:2,3

**Mccraw** 8:6,9 9:24 12:19, 25 14:1,5 15:4,18,19,22 16:10 20:25 21:23 22:5,9 27:17,22 28:17 35:1,20 36:12,25 37:8,23 38:12,25 39:15,23 40:19 41:3,10,21 42:5,13 43:2,13,23 44:12, 19 45:2,10,19 46:1,13,21 47:11 48:2 50:24 51:12 54:7,17 55:15,24 56:3,11 57:2,9,25 58:15,23 59:9, 16,22 62:3 63:15 64:20 65:2,15,24 66:3,18 67:25 68:10,21 69:11 70:1,20 71:14 72:12 73:2,15 74:12

75:4 76:15,24 77:18 78:3, 10 79:4,15 80:4 81:5,12 85:5,18 91:14 92:1 93:4 95:18 96:13,22 97:3,25 99:5,22 100:11,18,25 101:20 102:6 103:16 104:4,6,12,17,22 105:3,12 106:6 107:7,13,21 108:5, 19,24 109:5,10,21 110:2, 13,19 111:22 112:3,11,18 113:2,10,21 120:13,21 121:5,12 124:24 125:6,13, 24 128:22 129:16 130:7, 17,25 131:7,16 133:9,17, 21 134:18 135:7,15,23 136:20 137:3,5,9,13,17,21 138:3 139:8 140:1,17 141:7,15,23,25 142:2,18, 21,24 143:2,18 144:4 146:16 147:23 148:20 150:14 156:16 157:12 158:21 160:7 161:4 163:2, 20 166:14 169:16 172:4, 15 187:24 229:17 230:3, 16 231:3 241:17 248:22 249:5 256:19 257:24 264:1,10 265:1 269:25 272:24 273:6,12,25 275:19,24 276:10,21 277:2 280:9 282:19 283:5 290:18 291:8,22 298:1,12, 22 303:7,10,19,21,24 304:6,8,16,22 305:7,19 307:13 309:1,12,18,22 310:20 312:9,20,24 313:6, 9,20 314:5,19 315:25 316:2,12 317:2 318:2,8,11 319:4

**MCE** 114:4,5

**meaning** 47:19 51:19 61:15 108:8 120:4 155:13 159:7 163:22 174:2,8 201:4 208:7 209:3 217:25 248:17,19,24 274:23 278:25 296:24

**means** 7:20 57:21 81:8 159:8 178:24 195:1,4 213:10 226:13 228:1 233:21 239:20 247:12 281:9 284:10 309:6

**measure** 108:3

**measures** 89:25 94:9 122:15

**medication** 8:24

**meet** 15:18 24:15 25:6 83:4 117:9,21 118:13 119:4 126:25 128:4,18,19, 20,25 129:5,7

**meeting** 24:18 26:1,2 83:1 85:7 127:21 128:5,8 129:11,12,25

**meets** 84:5 132:15 279:5

**member** 151:10 157:24

**memorialized** 58:10

**memorize** 17:2 48:25 49:5 74:3 78:22 136:4,21 138:7

**memorized** 17:22 68:12 133:1,13

**memory** 28:7 29:3 49:11, 20 60:3 68:8 78:16 79:3, 14 80:2 113:14 132:23,25 136:13,16,19 143:16 275:23

**mention** 79:11 157:23 198:15

**mentioned** 61:1 76:5 98:14 115:12 157:11 188:24,25 315:12

**mentioning** 138:19

**menu** 136:5 161:22

**merge** 238:25

**merged** 291:11

**merging** 245:2

**merit** 142:13

**met** 20:14 24:12 269:14

**method** 51:10 314:23

**Methvin** 23:2,11 25:13, 14,17

**metric** 105:15,17,18,25 107:4,11,19 108:1

**metrics** 119:4

**Metro** 81:23,25 83:2,4,9, 14,24 84:5,13 85:1,4,7 89:3 98:12 101:7,10 103:19 104:10 105:11,21 106:4,19 107:2 108:2

APPENDIX 0669

Victor Manuel Ramirez Najera vs. Experian Information Solutions, Inc. -
30(b)(6) of Experian Informtion Solutions, Inc., by Teresa Iwanski

October 8, 2025
Index: middle..number

237:11,15

**middle** 6:1 10:18 208:8, 16

**mind** 44:3 283:12 284:4

**mine** 47:19 142:3 145:3,5, 7,10,16,21 146:11,13,22 147:3,6,10,11 148:6,12 149:18 150:24 152:3,4,11, 19 153:7,14,16,21,25 154:2,3,5 156:5,12,14,19 158:3,7,11,16,17,23 159:6,12,21 160:1,3 161:15,16,18 162:5 163:4, 7 164:11,25 165:15 166:19 168:10 173:15 185:23 186:1,15,19 187:11,19 188:4 192:10 195:19 198:18 201:4 211:12 284:17,20 297:8 306:11

**mine-belongs** 159:1

**mine-block** 158:25

**mine-fraud** 153:11,24 158:25 159:5,7

**mine-identity** 158:18

**mine-mixed** 145:7,10,17 153:25 159:2

**mine-not** 159:1

**mine-police** 153:11 159:5,8

**mines** 155:8

**minimum** 218:17,20 219:9,16 236:4

**minor** 164:15 173:20 253:24 267:13 268:13,23 269:5

**minus** 287:2

**minute** 159:14

**minutes** 86:19 148:19 149:8 212:21 213:4 242:25 246:6 298:20

**misclassified** 279:8,11

**missed** 206:11

**missing** 270:22 271:13 288:1

**misspoke** 305:20

**mistake** 68:25 69:13 70:3,25 71:3,24 72:3,15 75:23 76:6,7,12,22 77:2, 11,15 108:8 188:24 189:1 270:4,19 271:7,24 272:1, 6,8 279:19 280:18 282:22, 24 283:3,4 302:10 306:3,6 307:21 309:5,6,16

**mix** 269:19 300:24,25 301:5,9

**mixed** 145:5,12,19 148:10 149:20,22,23,24 150:11,16,17,20,25 151:12,17,19,21,22 155:3, 4,5,18,25 156:23 158:2 159:2 196:11 197:17,19, 21 198:5,15,16,20 201:1, 5,6,14 202:6,8 229:6,12, 15,21 230:1,6,9,15,18,20 231:1,5,10 268:16,17,20 269:1,5,8,12,18,19 271:3, 6,22 276:19 277:1,6,8,11, 14 278:1,12,13,18,21,23 279:6,17,20 280:2,6 282:23 287:19 291:25 295:25 296:8 297:2 300:1, 16 302:15,20 305:14 306:9,10,12,16 307:25 308:9

**mixing** 242:13 301:22

**mode** 181:23

**model** 251:3 310:8

**mom** 258:1,15

**mom's** 263:3

**moment** 44:5 176:5 221:8 283:12

**monitored** 60:11 71:2 122:11,22

**monitoring** 69:1 70:6,22 73:4 77:6 124:5 309:14

**monitors** 71:18

**month** 7:1,2 117:9,13 180:20 207:16

**monthly** 105:19 126:11 169:21 225:21 226:14 237:11,15 239:9 240:4

**months** 34:17 109:1 183:9

**morning** 312:17

**mortgage** 48:4,7,13,16, 19 102:8 103:25 104:1,2 162:25 163:9,17 164:2 190:13,19,22,25 191:6,13 228:10 243:16 252:20 253:1,2,6,12,19,25 254:8 257:6 259:8 262:6

**mortgage-related** 164:5

**mortgages** 48:8,10,12

**motion** 43:17 142:8,15 316:17,25 318:1

**motions** 317:18

**mouth** 291:17

**move** 14:10 136:14 145:18 202:5 287:21 313:17 318:18 319:6,8

**moved** 268:18 269:20

**moving** 145:14 313:23 318:20,22 319:13

**multiple** 80:17 82:4 141:17 142:7 143:20 144:6 169:23 171:4 172:25 221:19,20 222:4, 20,25 223:18 263:10

---

**N**

**Najera** 13:19 47:25 48:23 50:6,11,16 72:6 180:8 187:22 221:14 222:8 256:8 258:5 259:22 263:2, 12 264:22 267:7 269:23 270:7,17

**Najera's** 270:21,25 271:15

**named** 159:3 211:19

**names** 19:9,17 134:15 208:15 211:5 215:4 222:4 263:10,13,17,22 264:4,14 265:4 294:21

**naming** 263:19

**National** 114:2,5,7

**Nationstar** 48:13 207:4,

6,7

**nature** 38:1 42:8 55:4 60:2 92:4 117:23 125:9 128:1 162:11 172:19 214:23 248:10 251:3 278:9,13

**NCAC** 114:8

**necessarily** 13:9 152:6 178:20 208:8 220:12 248:25 255:3

**needed** 62:9 129:11 315:17

**night** 315:7,21 319:16

**NIN** 221:12,17 222:6 238:3,4,12,16 239:3,4,8 240:5,10 243:21 244:2,4, 15,23 248:1

**NINS** 221:2 235:21 243:25

**nonetheless** 122:19

**nonmortgage** 162:25 163:10

**nonmortgage-related** 164:5

**norm** 263:25

**normal** 25:1,3 319:12,14

**notated** 233:10

**notation** 259:12

**note** 12:3 141:24 258:3 315:3

**notes** 26:16 207:8 232:20 233:1 256:1 266:11 298:20

**notice** 43:12 230:13 291:24 299:23

**noticed** 43:24 184:1

**notification** 83:6

**notified** 92:4,8 93:14,15 180:24

**notify** 83:7 196:4,10

**number** 7:3 12:16 13:7, 25 14:18 15:2,9 16:17 59:2 67:14,16 79:17 117:2 118:12 150:2,6,8 154:6

APPENDIX 0670

Victor Manuel Ramirez Najera vs. Experian Information Solutions, Inc. -
30(b)(6) of Experian Informtion Solutions, Inc., by Teresa Iwanski

October 8, 2025
Index: numbers..part

174:8,9,13,15 175:1,3,16 177:5,6 178:4,16 181:13, 25 182:14 183:21 189:16 190:7 194:2,3 195:6,8 196:1,9,19 198:10,24 199:4 200:8,9,11,13,16,25 201:9,19 202:10 205:13 208:3,21 209:4 213:18 217:17 219:4,6 221:5,7, 13,14,16,17,24 222:10 223:2,4 228:2,5,7 236:1,5, 9 237:5 240:5 247:20,21 248:1,2 252:17 253:7 254:4,13,17,24 255:3,5,8, 10,11,12,14,15,20 260:7, 15,17,20,24,25 261:6,7,9, 14,15,17 281:20 285:17 286:19,23 287:3,5,24 288:1 292:25 293:19,21, 22

**numbers** 68:12 151:4,5 156:21,22 179:11 213:25 221:1,19,20 230:8 261:4, 13,24

**O**

**oath** 7:17

**object** 15:4 16:10 72:12 135:7 303:25

**objected** 303:25

**objection** 8:6,9,15,16 9:25 12:19,25 14:1,13 15:4 21:23 22:5 27:17,22 28:17 35:1,20 36:12,25 37:8,23 38:12 39:15,23 40:19 41:3,21 42:5,13 43:2,4,5,7,12,13,18,19 44:2,12,19 45:2,10,19 46:1,13,21 47:11 48:2 50:24 51:12 54:7,17 55:15,24 56:3,11 57:2,9, 25 58:15,23 59:9,16,22 62:3 63:15 64:20 65:2,15, 24 66:3,18 67:25 68:10,21 69:11 71:14 73:2,15 74:12 75:4 76:15,24 77:18 78:3, 10 79:4,15 80:4 81:5,12 85:5,18 91:14 92:1 93:4 95:18 96:14,22 97:3,25 99:5,22 100:11,18,25 101:20 102:6 103:16 104:4,12,17 105:3 106:6

107:7,13,21 108:5,19,24 109:5,10 110:2,13,19 111:22 112:3,11,18 113:2, 10,21 120:13,21 121:5,12 124:24 125:6,13,24 128:22 129:16 130:25 131:7,16 133:9,17 134:18 135:15,23 137:11,12,25 139:8 140:1,17 143:18 144:4 146:16 147:23 150:14 156:16 157:12 158:21 160:7 161:4 163:2, 20 166:14 169:16 172:15 187:24 229:17 230:3,16 231:3 241:17 248:22 249:5 256:19 257:24 264:1,10 265:1 269:25 272:24 273:6,12,25 275:19,24 276:10,21 277:2 280:9 282:19 283:5 290:18 291:8,22 298:1,12 305:19 307:13 309:1,12 312:9

**objections** 8:15 12:20 14:4,13 16:11 22:7,8,10 38:25 41:10 43:11 70:1,20 104:22 105:12 109:21 130:7,17 133:21 136:20

**obligated** 54:15 128:5,7, 20 318:21

**obligation** 51:13

**obligations** 18:13 47:21 50:21 51:9 129:13 130:5

**observations** 39:4

**obtain** 16:3 39:19

**obtained** 91:25 97:10,16

**obtains** 15:9 41:7

**occur** 73:7 98:24 100:5

**occurred** 72:24 177:17 178:13 181:3 188:24 242:13 282:16 290:15,23

**October** 5:4

**offer** 247:10 251:7 290:7

**offering** 250:22

**official** 116:10

**offline** 143:8 312:17

**oldest** 238:7

**omission** 61:2

**on-site** 89:11

**on-time** 87:20

**onboarded** 95:10

**onboarding** 101:13,17, 18 102:18 103:3,13,22 104:16,21 105:1 107:5,9

**online** 52:5,7,11,12,14, 19,23,25 53:4,7,10 61:1,3, 7,20 62:12 63:4,6,7,14 161:21 162:4 174:9 181:22 182:9,10

**onset** 40:1 42:21 43:1 44:10

**onsite** 96:11

**open** 43:16 152:24 164:22 165:10,11,16 166:19 167:4 168:11 173:17,19,25 174:3 184:14 273:20

**opened** 157:17 164:12,16 165:1 166:24 167:10 168:13 173:16,24 191:16 253:7,25 267:12 273:19

**operate** 94:1

**operates** 217:6

**operating** 45:16

**opinions** 38:23 39:4 41:7,8

**Oportun** 241:12

**Oportun/progreso** 240:18 241:8

**OPP** 246:21 247:3

**option** 317:19

**Orcas** 266:2

**order** 17:3 51:3 64:12 73:5,23 74:4,13,17,22 75:5,17,25 76:10,11,16 77:20 79:22 85:23 88:15, 17,21 89:7,25 94:5,9 95:11,16 117:21 128:1 132:11 165:6 175:8,9 207:2 214:11 215:22 238:5 242:10 245:22

246:3 269:1 273:21 276:15 277:19 283:23 312:14 313:5,17 314:24, 25 316:25 318:1,7,21 319:9,14

**orders** 318:9,24

**original** 84:7 85:11,22 87:21 100:13 106:16 163:23 164:7 191:8,15 253:8

**originally** 97:12,14 169:2

**outcome** 282:25

**outlined** 270:3

**outset** 8:13 185:7

**overarching** 153:13

**overlapping** 191:19

**oversight** 17:15

**ownership** 144:24 145:8 148:6 154:12 155:9 158:14 162:12 200:20,22 205:2,9 207:17,23 208:21

**P**

**p.m.** 149:13,16 199:10,13 243:9 298:24 299:2 304:25 305:3 319:20,21

**Pacific** 149:9

**pages** 67:9,11,14,17,21 78:22 117:6 277:17

**paid** 119:9,12,14,17,24 120:1 131:4 160:20

**paper** 29:7

**paperwork** 254:3,5

**parents** 257:18,23 266:5

**part** 18:13 39:24 40:3,16 55:19,21 60:23 63:3 66:20 68:8 84:3 87:24 90:2 93:23 97:13,23 98:22 99:2,8,11,19,23 105:25 107:4,15 111:14 117:18, 20 118:2,4,7 120:23 127:7 131:10 147:7 150:15 160:11 168:5 170:17 175:20 179:2 211:23 214:11 251:2 261:14

Victor Manuel Ramirez Najera vs. Experian Information Solutions, Inc. -
30(b)(6) of Experian Informtion Solutions, Inc., by Teresa Iwanski

October 8, 2025
Index: participant..policies

297:19 301:18 311:5

**participant** 123:14

**participate** 82:12 109:12, 19 111:17

**participating** 99:24 110:10

**parties** 143:5 313:5 317:4

**parts** 65:8,14,20 313:22

**party** 103:5 171:3 272:23

**pass** 215:3 283:24

**passed** 284:2

**passes** 274:8

**passport** 166:5 262:17 267:22

**past** 85:24 275:18

**pause** 184:17 304:12

**pay** 131:1

**paying** 24:20,23

**payment** 83:20 191:20 215:10 216:7

**payments** 87:21 164:8 234:15

**payroll** 20:10 131:11

**pays** 130:24 131:6

**PDF** 312:19,23

**penalty** 5:10

**pending** 142:8

**Pennymac** 48:20 111:21 185:13 190:15,21,25 191:1,5 192:21 193:3 194:7,19,22 195:7 198:10 199:25 200:4,9 201:8,22 202:15,21 206:2,3 207:4, 5,11 209:20 210:3 243:16, 18,21 244:3 245:11 302:6

**Pennymac's** 194:7

**people** 154:5 260:23 261:23 264:3,13 265:5 291:11

**percent** 28:3,4 79:3

**percentages** 311:16

**perfect** 79:3 220:7,10

**perform** 54:5 104:21 124:4

**performed** 27:4 274:22 297:12

**performs** 100:8 124:16

**period** 30:11 93:3 237:24

**perjury** 5:10

**permanently** 183:12

**permissible** 245:21 246:3,8 248:25 249:8

**permit** 166:3 265:16,19, 23 268:1

**person** 21:10 59:1 84:21 91:18 149:22 150:5,7,16 151:20 155:13 156:18 167:20 174:20 175:6,8,9 194:7,8 202:24 203:1,4,7 212:16 214:2,6 231:13 242:19 284:4 297:12

**person's** 150:9 170:11 222:1

**personal** 26:16 37:21 43:6 93:24 94:4,12,16,24 95:3,8,13 96:1 97:1 104:20,25 112:7 113:17 150:1 211:11 216:23 217:5,18 218:6 235:22 273:17,22 274:21

**personally** 32:2 234:21 294:11

**pertains** 67:20 182:16

**Peter** 90:13

**phase** 279:11

**phone** 23:23 25:4 26:3 27:8 51:14,15 52:2 60:13, 25 63:4,9,13 151:2 152:3 154:25 155:1 156:2 157:10,21 160:9,18 174:6, 12,25 177:17,20 178:12, 16,20 181:22 182:2,5,13 183:1 184:3,13 186:9 188:16 191:25 252:17 254:13,17 284:23 302:10, 12,14 305:12 306:2,7

**phrase** 216:1

**phrases** 161:9

**pick** 314:9,20

**piece** 28:6 61:5 79:19 86:10 118:16 126:1 147:13 148:3 274:2 277:19 278:14 279:24 280:11,12 283:19 284:5

**pieced** 216:17

**pieces** 85:19 86:2 111:13 148:6 283:23

**PII** 178:5

**PIN** 149:25 150:1,5 180:5, 6,7,10,11 211:4 216:11,17 217:10,19,23 218:13 219:21 220:6,13,14,15,16, 17,18 221:23 222:1,2,8 223:14,19 224:18,25 225:6 234:4,9,20,24 235:1,5,6,7,11,15 238:6, 20,24 241:1,16,23 242:4, 6,7,18 243:19 245:2,13,19 255:17 287:22 291:11,13

**PINS** 238:25

**place** 5:8 8:14 9:25 44:1 54:10 57:11 60:16 70:3,23 71:1,5 73:4 75:24 77:1,4 81:14 82:5 88:21 89:22,25 93:2,10 94:9 97:1,5,10 98:7 101:25 103:20 105:1 108:10 122:15 130:9 137:10,11,25 153:10 171:23 173:12 196:22 222:3 260:25 261:17,24 278:25 297:18 298:10 313:5 316:19 318:7

**placing** 9:22 43:4 196:21

**plaintiff** 15:10 16:3 24:4 47:25 74:20,25 75:12 76:8 141:8,18 177:19 180:8 185:3,20,22 186:3,5,7,11, 14 187:4,7 190:4 193:16 194:8,10 200:8 206:7 209:16 222:21 228:15,17, 19 229:11,25 230:25 231:9 233:23 234:2 238:17,21 242:15 252:9, 12,16 255:16,25 256:3,13, 24 257:16,17,18,22 258:7 259:5,16 260:19 262:9,17, 24 264:16 265:8,12,16,22

266:8,11 267:2 268:6,9 269:9 271:10 284:11 285:13 288:20,24 301:16 302:2,5,11 307:11,16 317:9

**plaintiff's** 15:3 18:14 19:15 65:1 66:11 72:11 73:12 139:14,15,19 140:10 176:22 186:1,19 189:11 190:14 209:20,25 210:24 213:18 226:10 227:6 231:14 234:9,19 235:11,20 238:11 241:1, 13,16,22 242:4,6 243:19 244:24 245:4,8 249:18 250:2,25 251:23 254:23 255:19 260:4,15 261:19 262:13 264:21 269:13 273:19,23 277:11,24 280:20 281:5 288:9 289:13,20 290:16,24 291:6,20 297:15 298:10 299:15,19 300:12 307:4 309:24 310:1,2,5,7 311:12,20

**plaintiffs** 251:24

**plan** 118:2 272:14

**platform** 212:3,5 237:8

**play** 184:16

**played** 184:20,25 185:16 186:23

**pledge** 111:16

**PO** 319:2,6

**point** 36:8 61:10 86:6,8,9 92:8 114:22 125:15 144:9 147:15 152:13 155:2 158:10 172:9 196:12 197:20,21 201:15 205:14 230:8 268:17 272:15 274:21 275:2 287:4 297:1 299:25 302:14

**pointing** 256:7 258:7,14, 18 264:16 267:2

**points** 263:1 265:22 310:3,9 311:9

**police** 153:16 158:17 159:7,8,9

**policies** 17:11,19 18:2,

Victor Manuel Ramirez Najera vs. Experian Information Solutions, Inc. -
30(b)(6) of Experian Informtion Solutions, Inc., by Teresa Iwanski

October 8, 2025
Index: policy..processes

16,20,22 29:21 31:10,14,
24 32:2 35:11 38:16
45:22,25 46:5,11,19 51:2
54:23 55:3,4,9,18 56:8,24
57:12,22 58:4,13,22 59:6,
15,25 60:9,10,11,13,18,25
62:6,23 64:1,5,11,22,25
65:4 66:10,14,16,22 67:3,
18 68:5,13,18,23 69:2,8,
14,22 70:2,5,7,10,12,17,
24,25 71:4,12,16,19,22,
23,25 72:16 73:4,8 75:22,
24 76:14,21 77:1,5,7,16,
25 78:5,7,12,14,15,24
79:12,17,25 80:5 94:21
118:19 122:3,7,18 123:3
124:18,22 132:8,10
134:15 135:18 136:4
139:5 141:5 143:3 146:11
147:18 149:19 152:16
157:9 158:5 164:24
168:12 173:8 188:17
197:15 199:19 200:17
202:16 269:15,20 271:21
278:23 282:10 283:11,18,
21,25 284:2 308:18 309:3,
9,14,15 310:11,14,17
317:7,9

**policy** 28:14 33:16 36:3
38:15,20 60:2,4 65:13
66:8 68:14 72:17 77:16
79:18 121:25 122:2
132:16,17,21 134:5,6,9,10
135:1,12,21,24 139:10
163:12 164:20 165:2,13
167:2 173:12 174:3 188:7
196:2,6,14 201:11,12
202:4,12 231:4 268:13
270:2 273:13 282:8
306:22,23 307:1

**populated** 168:3 193:19

**portal** 40:2,6,9,10,25
45:13 294:13

**portion** 48:25 182:15
185:2,18 187:3 193:14

**position** 27:1 31:1,20
58:25 66:15 72:24 75:3
76:22 78:7 129:19 156:12
188:15 202:14 232:3,4
270:15 271:24 278:17
297:24 302:19 307:2
316:14 317:24 319:15

**possession** 294:25

**possibilities** 36:2

**possibility** 249:25

**possibly** 67:6,19 116:3
191:10

**post** 46:10 249:20

**post-2013** 44:25

**post-bankruptcy** 36:19

**post-covid** 46:9

**post-litigation** 233:5
249:19 257:17,20 295:24
296:18 297:20

**posted** 233:22 240:25

**potential** 159:2 160:3
161:18 198:15 201:13

**potentially** 130:3,6
150:11 221:6 222:5 255:7

**practice** 142:8,16 300:17,
21,22 301:4 317:18
318:13 319:12,14

**pre-approved** 247:10

**pre-covid** 46:8

**pre-qualification** 250:20

**pre-qualifications**
250:13,14

**preclude** 220:12

**prefer** 9:1

**preparation** 26:16
183:24 203:3

**prepare** 17:22 23:13,20,
24 24:13,16 25:7,9 138:8
301:19

**prepared** 12:14 13:17
14:8,12,23 16:9,25 23:15
140:4

**prepares** 49:14

**prequalification** 247:4

**prescription** 8:24

**present** 198:10

**prevalent** 264:9

**previous** 91:19 132:5

205:22 231:9

**previously** 16:12 91:20
101:5 188:23

**primarily** 31:2

**prior** 31:22 35:2 62:1
91:16,25 92:2 93:3 97:10,
14 99:16 100:7,13,24
163:18 165:11 176:20
226:19 229:11,24 230:4,
13,25 249:25 261:19
281:25 291:3

**privilege** 303:11

**privileged** 297:20,24
303:16 304:5

**privy** 35:13 217:7

**procedure** 63:3 65:8,13,
21 67:19 68:14 71:7 72:17
165:13 195:21 201:6
202:4 267:11 269:7
275:15,23 276:3,6,13
277:10 279:8 280:1

**procedures** 17:11,19,24
18:3,16,21,22 29:21
31:10,15,24 32:3 35:11
40:17 41:7 46:12,20 49:15
50:2,3 51:2,25 54:9,24
55:3,5,9,18 56:8,24 57:12,
18,22 58:4,13,22 59:7,15,
25 60:9,10,11,14,16,18,25
62:7,23 64:1,5,11,19,22,
25 65:4,14 66:11,14,16,23
67:3,18 68:6,13,18,24
69:3,9,14,23 70:3,5,7,11,
13,18,24 71:1,5,12,16,20,
22,23 72:1,16 73:4,8
75:22,24 76:14,21 77:1,4,
5,7,17,25 78:5,8,12,14,16,
24 79:12,25 80:6,12 81:2,
8 82:8 87:7 90:24 91:3,6,
8,9 92:10,16 93:20,25
94:22 97:23 98:6 99:2,19
100:16 101:16 118:19
122:3,7,19 123:3 124:18,
23 131:20 134:16 135:18
139:5 141:5 143:3 145:20
146:11,13 147:18 149:19
150:23 151:11,16 152:17
157:9 158:5 162:18,24
163:8 164:10,14,18
168:12 173:8 188:7,17
195:14,18 197:16,24

199:19 200:17 202:16
267:13 269:1,16 270:3
271:22 272:20 276:25
278:17,23 282:10 283:18,
22,25 286:21 295:25
307:24 308:7,18,24 309:3,
10,14,16 310:11,14,17
317:3,7,9

**proceed** 5:13 196:5
197:16 200:18

**proceeded** 185:12

**PROCEEDINGS** 5:1

**process** 19:2 33:16,23
37:11,12,16 39:17 40:7
42:15,19 45:5,16,22 51:19
52:9 55:19,21 56:9 57:7,
11,18 58:1,3,5,9,19 59:2
60:12,13,24 61:4,14,17
63:4 64:13,16,17 66:20
68:23 71:21 72:14 78:25
81:13,17,20 82:12,13
88:23 89:6,7,9,11,18,23
91:24 92:25 93:6,10,20
94:18 95:1,5,9,14,17 97:5,
17,20,22 99:2,25 100:4
101:14,17,18 102:10,19
103:9,13,23 104:16 105:2
107:5 108:11 109:13,20,
23 110:11 111:15,17
117:19 118:11,24 119:7
125:17 126:1,4 127:7
128:12 130:19 140:25
145:13,14 146:24 148:3
149:21 150:16 152:14
158:14 167:15 170:25
171:23 174:5,11,17
175:12,20 185:6 198:18
200:23 201:20 205:8
211:18,25 241:19 268:25
271:3,6,11,13 274:9 275:1
276:17 277:5,14,16
278:10 279:3,20 283:8
292:11 294:11,12,14
296:4 308:1,13

**processed** 126:2 182:8
186:16 194:13 204:22,25
207:1 208:24 252:2 269:4
274:2 284:4 291:25 296:8
297:2 300:1

**processes** 40:2 82:4,9
88:21 89:5,20,22 90:24
97:2 98:23 101:25 148:2,

Victor Manuel Ramirez Najera vs. Experian Information Solutions, Inc. -
30(b)(6) of Experian Informtion Solutions, Inc., by Teresa Iwanski

October 8, 2025
Index: processing..reason

12 154:4,7

**processing** 53:1 65:4
73:5 118:4,5,16,20 188:12
196:12 197:22 198:8
201:17 204:13 206:25
276:9

**produce** 94:21 139:22
140:14 142:7,9 143:3,7

**produced** 15:1,7 19:1,6
23:16,22 24:1,3,6,10
66:23,25 140:22 141:3,17
142:13,25 182:25 184:14
295:23 314:17 317:7,8

**producing** 142:11

**product** 250:21

**production** 211:23

**productive** 118:17,18

**productivity** 20:3,15

**profile** 193:20

**program** 62:8

**Progreso** 241:7

**pronounce** 274:17

**pronunciation** 274:19

**proof** 132:14 164:20,21,
23 165:9,17,18,19 168:21
172:12,20 174:2 253:23
265:3

**proper** 43:5,12,13 145:15
278:15 279:2 314:23
318:16

**properly** 117:20 317:25

**property** 290:5

**proposed** 318:14

**proprietary** 216:6 217:2
317:10

**Protection** 38:24

**protective** 313:4,17
314:24 316:25 318:1,7,9,
21,24 319:9,13

**prove** 168:25 173:9

**provide** 108:2 145:20
160:17 165:17 173:24
186:11 192:10 194:15

203:25 219:15,17,19
225:2 229:1 269:10
270:23 284:17 287:12
297:9 304:19,21 310:10

**provided** 16:12 52:2
147:19 229:10,25 230:24
231:8 250:10,17,25
254:13 256:18,23 259:4,
13 262:2,17 265:8,12
266:8 267:19 268:6,9
269:10,11 270:18 271:14,
18 297:22

**providing** 158:9 253:16
254:2 259:16 290:24

**proving** 173:13

**provision** 49:21,24 50:5,
7 80:19,23 317:12

**provisions** 109:3 110:8,
17 112:8,17 113:19
317:13

**public** 134:7 161:14,19
216:22

**publish** 171:2

**publishing** 171:12

**pull** 74:7 143:13 179:9
180:24 183:15 211:24
212:1,3,11,22,25 213:1,3,
15 215:23 216:5,8 245:17
246:1 259:3 278:3 300:24
301:12 304:11

**pulled** 180:22 211:21
214:15 229:19 239:25
240:2 250:8 298:3,4,14
300:9 301:16,20,22

**pulling** 211:12,18 214:2,6
247:18 250:4 296:24

**pulls** 212:19 290:8

**purge** 85:23 163:24

**purging** 163:18

**purpose** 245:21 246:3,8
248:25 249:8

**purposely** 69:13

**purposes** 74:9 156:9
276:8

**push** 148:23

**put** 11:2 16:7 31:18 70:12
89:13 141:7 142:2,3
175:24 184:8 192:16
203:10 209:9 217:14
251:9 262:20 269:1 279:4
288:4 291:17

**putting** 148:13 179:18
243:11 252:4 280:24
284:25 289:7 292:2 299:4

**Q**

**qualify** 68:19 69:10,24
70:19

**quality** 29:16 31:9,20
117:20,21 118:4,5,7,13,
24,25 126:10

**question** 9:11,22 10:18
15:12 16:4,5 22:3 29:4
44:4,9 56:13 68:14 69:6,7
73:10,11 74:4,14,15,17,23
75:6,25 76:11 79:7,22
80:16 86:15 89:16 111:12
129:2 131:18 132:5 136:6,
8,17 137:2,18,22 138:4,
15,18 139:2,17 144:7
146:18 156:9 162:22
163:15 166:16 171:8,14
230:12 237:1 242:22
265:10 287:25 302:22
303:23 304:2 311:19

**questioning** 10:19 20:17
73:20 74:9 96:14 99:16
317:23

**questions** 9:17 10:2
13:23 15:13 42:8,11,16,
22,23 60:2 65:7,20 73:23
74:7 75:17,20 76:10 77:8
80:10,17 112:1,4 125:9,
14,19 126:5 133:4 138:11,
16,17,24 143:21 152:8,18
153:1 154:22 156:13
158:6,11 160:4 175:12
186:1 187:16,23 276:2
302:18,22 306:17,20,23
307:4 309:17,18 310:22
312:11

**queue** 123:23 174:12
275:11,13 277:6,7 278:15,
21,24 279:2,17,25 280:6
308:2,9,12

**quick** 86:15 315:11

**quota** 117:8

**quotas** 20:3,6,15

**R**

**raise** 5:6

**Ramirez** 13:19 47:25
48:23 50:6,11,16 72:5
180:8 187:22 194:2
221:14 222:8,9 235:23
240:10 255:13 256:5
257:11,12 258:15 263:11,
12 264:22 269:22 270:7,
17

**range** 239:4 240:3

**ranges** 238:2

**raw** 237:24

**reach** 184:5

**read** 13:21 18:13,18 44:7
50:5 110:24 184:1 192:25
226:13 260:8 266:20
273:23 274:6 277:15,22,
25 315:24

**reading** 17:2,3 61:5
79:12,19 112:5 147:7
266:24 275:1 277:18

**ready** 138:11

**real** 86:15

**reason** 8:18 61:8,15,21
62:25 125:4,22 126:8
127:3 128:25 129:23
131:14 132:2,3,6,7,12,19
133:1,8,12,16,23 134:3,
14,20,21,24,25 135:6,19
136:10,24 138:8,9 139:6,
10,13,18,24 140:5,15
141:8 143:12,24 144:2,13,
14,16 145:2,8,11,17
146:2,3 147:9 148:4,12
151:6 153:18 155:14
162:2 165:3,7 166:20
185:20 188:1,11 194:14
196:16 197:9,20 204:12
207:22 212:25 213:8
216:5 245:2 262:23
267:15 268:12,13 270:21
279:14 282:11,12,24
284:15,16,22 286:24

Coash Court Reporting & Video, LLC
staff@coashcrv.com

602-258-1440
www.CoashCourtReportingandVideo.com

APPENDIX 0674

Victor Manuel Ramirez Najera vs. Experian Information Solutions, Inc. -
30(b)(6) of Experian Informtion Solutions, Inc., by Teresa Iwanski

October 8, 2025
Index: reasonable..report

287:6 294:14 297:8 314:1 315:4,5 316:20

**reasonable** 49:15 50:2 54:5,9,15,21,24 55:1,8,10, 13,17,22 56:16,24 57:19, 23 58:11,14,21 59:14,21 60:7,8,19 68:20 69:10,25 70:8,14,19 71:3,11,23,25 73:1 75:23 76:23 77:1,4 81:1 97:23 156:6,10,15 308:20,25 309:3,11

**reasons** 135:1 153:15 159:22 202:9

**rebuttal** 310:21

**recall** 80:19 93:18 158:18

**receipt** 62:11

**receive** 54:21 117:22,25 121:21 165:3 172:25 198:22 246:2 290:12,13

**received** 28:6 51:24 63:19 72:21 93:22 143:22 144:11 159:8 164:19 193:3 195:11 196:13 197:22 207:2,3,4 211:22 213:15 220:10 227:5 228:21,23 229:4 230:8,20 231:7 239:8 240:15 242:17 250:1,2 252:8 265:3 266:22 281:5 282:17 284:11 287:18 290:15 291:23 296:23 298:16 307:17

**receives** 52:20,21 153:12 154:14 164:20,21,23 171:15 215:24 218:4,18 225:1 272:16 290:10

**receiving** 41:22 51:16 52:10 63:5 64:7 167:18 171:9 206:10 230:25 240:4 261:19 273:14

**recently** 92:3 93:21 175:18

**recess** 47:5 86:24 149:14 199:11 243:7 298:25 305:1

**recite** 49:10 64:6,10,12 78:16,18,20

**reciting** 56:20

**recognize** 90:13,14 154:6 230:1

**recollection** 134:16

**reconcile** 171:11

**record** 5:4,22,25 9:25 44:7 47:3,6 86:18,22 87:1 134:7 141:2,8,22 142:2,3 149:12,16 176:9 183:5 193:5 199:6,9,13 243:5,9 298:23 299:2 304:14,16, 19,24 305:2 312:14 314:13 316:4,9 319:18,19

**record's** 197:6 289:22 293:11

**recording** 183:1,3,15 184:13,20,25 185:2,16 186:23,25 192:1

**recordings** 26:13

**records** 14:19 16:22 19:11 51:21 62:17 157:25 166:12 183:7 211:8 216:23 233:9 253:23 273:3,9 281:10

**recourse** 129:23

**recredentialed** 96:2

**recredentialing** 95:1 97:2

**red** 193:14

**redacted** 313:25

**refer** 48:15 176:13 211:10

**reference** 177:16

**referring** 15:17 41:20 48:17 97:9 197:8 228:4 256:16

**refers** 144:24 182:12 211:10

**reflect** 141:2

**reflected** 289:23

**reflecting** 222:9

**reflection** 238:10

**reflects** 190:22 206:6 292:9

**refresh** 29:3 49:11,20

**refusing** 319:2

**register** 233:14

**regular** 158:11 187:19 188:4 198:18 214:24 306:10

**regulated** 47:10,16,18,20

**regulatory** 32:14

**reinvestigate** 72:7,10 75:16

**reinvestigated** 73:12 75:3

**reinvestigating** 68:19 69:9,24

**reinvestigation** 52:11 54:6,15,21 55:1,8,10,14, 22 56:16 57:19,24 58:21 59:14,21 60:7,8,19 68:20 69:10,25 70:19 71:4,11 72:4 73:1,8 124:17 156:6, 10,15 158:14 308:20,24 309:11

**reinvestigations** 27:5, 14 54:24 55:5,17 56:25 58:14 70:14 71:25 77:2

**relate** 112:9 151:2 162:25 163:9,17 164:11

**related** 6:13 12:10,18 17:9 40:17 41:8 42:12 58:13,22 104:2,15 129:12 139:22 146:11 154:10 178:22 188:25 191:12 207:10 214:4,9 234:14 264:5 265:19 294:25 296:19 308:19 317:8

**relates** 13:10 17:18 18:2 49:17 144:21 149:20 150:25 162:2 215:2 247:23 250:12 257:17

**relating** 12:8 42:7 66:7 165:1 166:19 215:13 239:14 248:10

**relation** 257:16

**relationship** 92:22 99:8, 10 103:3 107:9 120:24 272:15

**relay** 40:11

**relevant** 53:14 61:10,16 66:16 67:3 140:9,15,23 141:2 146:3 316:21

**reliable** 172:14

**reliant** 154:16 157:6

**relied** 168:23 169:9

**rely** 172:22

**remain** 210:7

**remained** 204:21 210:12 289:2

**remains** 204:12

**remember** 6:15 24:25 26:9 28:12,20,21 29:5 34:2,6,8,19 42:21,23 44:13,24 46:6 56:16 59:1 74:22 77:13 91:7,15 92:12,13 97:18 109:11 110:4 111:11 113:5,12 115:21,24 211:16 212:7 232:9,16,17 282:7 302:24, 25

**remembering** 91:10 92:5 134:20

**removal** 269:6

**remove** 254:8

**removed** 210:4 249:17 268:21,24 286:18

**reneged** 141:9 142:12

**rental** 290:5

**repeat** 9:11 13:6 83:13 89:16 111:3

**repeatedly** 142:1,14

**repeating** 44:3

**rephrase** 80:17

**report** 21:13,15 48:5 49:14,17 51:21 61:8 87:24 88:15,17,21 89:8,22,25 93:9 94:10 101:16,22,24 103:14,15 105:19 106:25 107:19 108:1,17 109:13 111:16 112:22 120:18 121:2 153:11,16 158:17 159:5,7,8,10 168:4 170:12,20 171:2,19 172:1, 10 173:6 174:8,9,13,19,25

Victor Manuel Ramirez Najera vs. Experian Information Solutions, Inc. -
30(b)(6) of Experian Informtion Solutions, Inc., by Teresa Iwanski

October 8, 2025
Index: reported..RISTVEDT

175:3,7,13 177:4,6 178:4,
16,17,24 180:3,13,16,19
181:1,2,25 182:14 185:10
189:12,13,15 190:7
193:18 194:13 199:1
210:4,25 211:2,3,18
212:1,12,23,25 213:2,5,13
214:14,18,25 215:1,8,15,
16,20,21 216:3 217:21
218:1 219:5 220:3,20
223:10,22 224:1,15
226:17,18 230:7 232:19
234:12,19 235:13 236:8,
11,13 237:4,19,21,25
238:12 241:13,23 242:5,
15 244:22 245:5,8,18
246:4,14 248:17 249:12,
21 250:2,4,5,8 252:20,25
254:9 268:11,19 275:5
289:14 290:9,11,13 291:7,
20 292:25 293:19,21,22
297:23 298:8,9 299:20
300:5,8,13,18 301:15,22
311:12,13,20

**reported** 86:11 106:20,24
167:10,11,12,21 168:1,5,
19 170:10 171:5,6 173:3
190:13 194:7 200:9 204:5
210:8 214:20 215:3,5
225:6 227:7,10 228:2
233:25 234:1,15 236:22
239:4 240:7 253:2 263:16,
17 291:6

**reportedly** 253:25

**reporter** 5:3,12,17 9:15
44:5,7 47:3,6 86:18,22,25
111:1,3 149:12,15 199:9,
12 225:22,23 243:5,8
298:23 299:1 304:24
305:2 315:10,16,23 316:1,
5 317:22 319:19

**reporters** 220:3 236:8

**reporting** 6:19 7:13 32:5
33:6 36:20 48:20 49:14,24
51:5 80:15 81:1 82:15
83:11,16 89:4 95:11 99:9,
24 101:15 102:8,12 105:9,
21 167:4,24 168:8 169:18,
23 190:19 199:3 201:8
226:15 228:18 240:14
242:8 245:12 289:19
291:12,20 301:24 312:6

**reports** 80:14 81:3
105:15,17,18 106:1 107:4,
11 166:12 226:24

**represent** 74:24

**representation** 75:1,2
285:11

**representative** 6:16 7:10

**request** 11:18 88:18
127:8 180:25 217:17
270:16 284:7 296:25
297:1 300:20 301:13

**requested** 183:10 186:13
190:5,9 214:16 300:23
301:7

**requesting** 62:5 165:18
231:19,22

**requests** 15:3 134:9
219:11

**require** 108:17 151:11,16
152:17 168:24 208:23
219:3 286:22

**required** 10:1 47:21 54:5
97:24 98:8 107:1 123:2
152:12,16 156:5 165:6
219:7,17 270:7 287:5
303:22

**requirement** 112:9
218:20 219:9

**requirements** 33:5,11,
14,15,19 34:22 99:8 119:5
132:15 219:24 269:14

**requires** 80:25 94:20
106:19 172:12 218:16,21

**reseller** 178:23 179:1,5
292:11,12,13,15 293:4,6,
10,13,20,22,23 294:1,2,
12,17,18,25 295:3,8,18
296:19,22 297:3,7,10

**resellers** 294:12

**reserve** 43:18

**Residential** 259:15

**resolve** 282:18

**resolving** 187:8

**resource** 126:21 127:8,
10,13,14 128:9,25 129:1,

25

**resources** 127:3,9,16,20,
25 128:4,15,21 129:4
130:9,13

**respect** 17:13,16 50:10
56:6 59:5 74:10 75:15
84:13 101:9 210:2,6
298:10 311:24

**respond** 41:1 51:6 64:2
65:1 72:3 118:12 142:18,
21,22,23 161:2 186:20

**responded** 194:19,22
204:4 206:3 207:6 286:5,
17

**responding** 41:2,23
45:12 51:25 69:23 116:15,
17,22

**responds** 207:18

**response** 40:15,17 54:6,
16 56:7,19 57:1,6,7 60:22,
24 61:18 62:11,14,19
63:1,5,10 82:14 111:2
125:5,22 126:8 137:2
140:10 141:25 179:23,25
185:25 186:15 192:21
193:2,6 194:19 195:7
196:7,23 197:1,8 198:22
199:25 200:4,13 201:9
202:12,15,21 203:18,21
204:3,7,12,16,17,23
205:20 206:7 207:4,5,19
208:13,24 209:19 255:7
285:5,9,12,16,20 286:12
287:25 296:1,14 298:16
299:23

**responses** 15:3 40:4
42:3 67:7 193:11 195:15,
19 209:3

**responsibility** 116:22

**responsible** 55:7,13
58:12 90:24 96:7 280:12,
20

**rest** 250:13 315:21

**restart** 81:19

**restroom** 86:15 242:23

**result** 37:22 38:8 158:4
272:9 295:8 299:22

**resulted** 249:11 269:6
290:23

**results** 144:17 180:3
209:15,19,24 288:9,18
296:6 297:16 299:15,18

**resumed** 30:16

**retained** 183:8 214:15

**retaining** 212:19 237:10

**retains** 237:14

**retention** 164:6 180:4

**retrieve** 31:3

**return** 195:22 196:8
197:25 201:3,19

**returned** 195:23 196:1
201:22 206:10 217:12
286:22

**reveal** 155:11

**review** 23:17,25 24:3,6
74:1,23 82:23,25 86:7
102:2 145:25 148:7
199:16 245:4,8 272:21
273:4 274:9 298:19

**reviewed** 11:24 12:2
23:20 24:9 45:24 46:4
88:10 94:22 95:22 101:23
176:19 183:25 204:17
251:19 274:22 277:20,25

**reviewing** 29:20 62:6
81:20 92:12 96:11 98:11
150:17 203:3 257:21
273:10 275:1,3 279:24
308:4,6

**reviews** 41:7 62:1,14
82:16,19 84:24 100:21

**Rica** 115:4 119:9 120:3
123:9,21 126:24 127:5,17,
22 129:5 130:15 181:19
203:8

**right-hand** 194:18
246:18

**ringing** 26:4

**risk** 251:2

**RISTVEDT** 312:13 314:2
315:3 316:3,6 318:6,10,12
319:17

APPENDIX 0676

Victor Manuel Ramirez Najera vs. Experian Information Solutions, Inc. -
30(b)(6) of Experian Informtion Solutions, Inc., by Teresa Iwanski

October 8, 2025
Index: rogs..simultaneous

**rogs** 26:10

**Rohan** 44:3

**role** 27:4 29:10,14,19,24 30:7,17,23,25 31:12

**room** 10:11

**roughly** 67:20 159:17

**row** 238:4 239:1 240:16 244:7,10

**rows** 300:2

**rude** 69:18

**Rule** 14:22

**rules** 9:6 163:17 318:17, 18

**run** 86:15 216:2

**running** 215:15,20

**Rushmore** 48:13,16 88:11,12 95:9 96:2,21 107:18,20 111:20 185:13 190:15 191:1,5 204:3 209:21 210:6,8 228:10,14 234:18 235:22,25 236:22 238:13 241:16,22 242:5,7, 14 245:11 249:12,17 250:3,24 284:13 285:5,12, 16 286:5 287:23 288:19 289:19,23 290:17,25 291:5,19 295:21 296:2,16, 19 297:4,5 299:19 300:12 302:6 309:25 310:5,6 311:7

**Rushmore's** 95:21 204:15

**Rushmore/nationstar** 203:19

**S**

**safe** 32:1

**salaried** 119:24

**salary** 20:8

**Salesforce** 96:20 124:9 274:23

**sample** 276:14

**Sarah** 22:25 315:12,15,16

**sat** 9:7

**satisfy** 119:4

**save** 300:17

**scale** 131:1 271:9

**scan** 273:21 274:10

**scanned** 274:13,20 275:8 278:6 280:21

**scanning** 278:5

**scenario** 160:6 167:8

**scenarios** 131:21

**school** 253:23

**scope** 12:20 13:1 14:2,5, 6 35:1 36:13 41:11 43:5, 11 96:15 99:6 100:11 104:6 106:7 107:7 108:19 128:23 129:17 133:10 134:18 139:8 140:1 248:22 272:24,25 275:19 277:3 298:13

**score** 16:20 118:25 250:5 290:13 309:24 310:1,2,6,7 311:3,5,8,15 312:1

**scores** 16:18

**scoring** 310:8

**screen** 11:1,7 176:2,3 243:25 278:7 280:23

**scroll** 16:14 17:5,6 177:14,22,23 178:4 292:24

**scrub** 37:11,16

**scrubbed** 183:13

**Sean** 312:16

**search** 215:16 218:12 274:22 293:16

**searched** 294:9

**secrets** 317:10

**section** 18:14 49:2,21 50:10,12,16 53:13,15 61:16 80:19 171:4 194:6 220:22 222:17 238:2,7,8 246:10,13 290:2

**sectioned** 148:5

**sections** 48:23 314:9,10 317:15

**secure** 94:8

**security** 88:24 89:24 94:9 96:12 122:11,15 126:21 150:6 151:4,5 156:20,22 175:15 177:5 194:2 195:6, 8,23 196:1,9,19 198:10,23 199:4 200:7,9,11,12,13, 16,25 201:9,19 202:10 205:13 208:3,20 209:4 213:18 217:16 219:4,6 221:7,14,16,19,20,24 228:2,5,6 230:7 236:1,5,9 237:5 254:3,4,20,23 255:3,8,10,11,14,15,20 260:6,15,25 261:7,9,17,24 285:17 286:18,23 287:2,5, 24 288:1

**seek** 314:24 318:1 319:2

**seeks** 318:21

**select** 147:9,11 148:11 162:6

**selected** 146:23 147:1 192:9

**selecting** 61:8 147:9,15

**selection** 155:12

**send** 51:4,19 52:24 60:16 83:5 99:18 105:22 106:1 131:22 150:12 160:21 165:17 247:9 271:3 277:6, 8 278:15 279:2 294:15 302:15

**sending** 104:2 240:12 268:25 297:6

**sends** 62:7 88:19

**senior** 30:5,20 31:13 151:16

**sense** 171:13

**separate** 57:16 73:20 120:3 168:18 170:18,19

**separated** 216:20

**September** 26:23

**SEQ=1** 248:4

**sequence** 248:6

**series** 216:20

**service** 116:11,12 174:15 250:21 290:6

**set** 40:10,17 50:3 58:2 83:2 85:4 117:16,18 119:7 127:24 128:1,10 129:21 273:14 294:13 312:7 314:23

**sets** 47:20

**setup** 120:11

**severity** 272:10

**share** 11:1 109:4 189:4

**shared** 34:4 94:1 147:20

**short** 40:21 199:6 298:18

**show** 9:21 11:9 16:22 72:21 129:14,15,20 139:9 146:17,23 215:5 221:16 224:1 226:18 248:19 253:23 254:3

**showing** 208:19 224:8 227:7

**shows** 180:1 221:12 227:9 253:17 294:3

**sic** 179:3 209:11 239:2 252:20

**side** 62:17 194:18 246:18 263:3 266:12

**sign** 315:24

**signal** 14:10

**signature** 258:11

**signed** 26:6 141:18 259:11 262:10

**signing** 26:10 125:21 126:7

**signs** 125:4

**similar** 45:17 151:10 155:22,23 156:20 183:22 216:4 284:21

**Simmons** 22:18,19,24

**simple** 133:5

**simply** 307:5

**simultaneous** 53:2

Victor Manuel Ramirez Najera vs. Experian Information Solutions, Inc. -
30(b)(6) of Experian Informtion Solutions, Inc., by Teresa Iwanski

October 8, 2025
Index: simultaneously..step

**simultaneously** 53:2

**single** 32:21 86:7 107:14 125:4,22 126:1,7 222:12 223:9,13 248:20

**sir** 7:18 8:20,23,25 11:23 26:25 27:3 29:18 30:15 31:7 48:14 57:3 80:5 123:16 255:9 271:25

**sister** 155:23

**sit** 21:8,18,22,25 23:2 128:20 170:24 216:16 228:13 249:10 273:17

**sits** 21:11 22:25 223:15, 24

**sitting** 20:20,24 21:6 67:24 109:8 236:20 241:21

**situation** 85:9,25 157:16 169:25 187:15 198:9 200:15 202:3 272:13 302:17 306:19

**small** 6:8,17 10:18 31:3,5

**snapshot** 193:20,22 211:3,22

**social** 150:6 151:4,5 156:20,22 175:15,19 177:4 194:2 195:5,7,23,25 196:2,8,19 197:14 198:9, 23 199:4 200:7,9,11,12, 13,16,25 201:8,10,19 202:10 205:13 208:3,20 209:3 213:18 217:14,15, 16 219:4,6 220:4 221:6, 14,16,19,20,24 228:2,5,6 230:7 235:25 236:5,9 237:5 254:3,4,20,23 255:3,8,9,11,14,15,20 260:6,15,25 261:6,7,9,17, 24 285:16 286:18,22 287:2,5,24 288:1

**soft** 246:14 247:6,8 250:15,18,19,23 251:8

**sole** 116:21

**solely** 116:14,16

**solemnly** 5:7

**solicitation** 247:5

**Solutions** 120:5,19 127:10 131:9

**someplace** 232:16

**something's** 160:20

**sort** 93:5 100:8 106:3 108:9 118:8 156:13 198:6 239:22 277:5,19,21 290:6

**sort/scan** 276:8

**sorted** 280:2 307:25 308:12

**sorting** 275:15,22 276:6, 13,17,25 277:10,14,16 278:10,17 279:3,8,11,19, 20 280:8,20 307:24 308:1, 7

**sought** 156:24

**sound** 316:9

**sounds** 20:18 172:7 174:23 213:3 291:16,18

**source** 218:5,18 225:14

**SP=MARIA** 227:18

**Spanish** 263:18 266:20, 23

**speak** 8:7,10 12:9,21 13:15 14:19 15:1 16:18,21 17:8,10 18:21 19:5,10,17, 24 20:5,7 21:1 25:9,12,14, 17,19 39:20 87:3 126:23 175:8,9 184:5 203:1 232:11 303:3,5 305:23

**speaking** 8:15 22:8,9 25:20 110:25

**special** 120:11 150:8

**specialized** 150:13

**specialty** 123:18 150:22 279:6

**specific** 16:5,18 17:20,21 18:6 20:5 21:10 34:16 35:5 36:7,8,9 37:10 46:15, 19 48:15 49:21 50:5 59:24 60:3 65:7,8,9,14,20,23 66:7 74:16 75:18 78:1 80:23 94:5,11,13,15 95:6 97:6 102:17 117:15 120:16 123:20 125:11 126:16 128:11 132:7

**Solutions** 139:23 143:2,21 144:9 146:9 153:18 155:9 160:6, 19 169:12 171:10 193:23 217:7,15 218:9,25 224:3, 18,25 239:3 244:12 275:4, 10 276:2,3 283:21 287:12

**specifically** 13:3 16:19 26:10 29:6 34:8 35:14 38:1,15 40:10 41:14 44:13 55:18 58:6,18 59:1 74:3 75:10 77:14 78:23 79:20 91:16,18 92:5 93:7 107:23 111:11 112:21 115:25 116:9 117:12 121:7 127:23 128:24 133:12 161:24 174:18 212:8 227:8 231:12 238:25 247:24 302:24 303:1 317:9

**specifics** 6:20 18:19,25 42:15,23 45:4 90:2 95:23 113:12 133:3 282:7

**spell** 5:24 315:13

**spelling** 315:11

**spends** 68:25 71:17

**spent** 18:25 136:14

**split** 245:2

**spoke** 15:21 23:15 34:14 93:1 303:14 305:10

**spoken** 33:17 59:12 303:17 305:6,7

**sporadic** 125:8

**spot** 167:13

**spouse** 227:22 257:12

**square** 304:14

**SSN** 208:14

**SSNRPTDCNT=11** 227:24

**stamp** 176:14 178:16 182:3,6 209:11 243:12 281:3

**stamped** 176:10 285:6

**stance** 308:3

**stand** 213:22 225:13

**standard** 83:2 85:8 104:10 105:11 106:4 117:8 276:19 300:17,21, 22 301:4 311:25 312:7

**standardized** 83:9,14

**standards** 84:6 117:1,22

**standing** 84:21 98:4 140:13 234:17 257:14 278:16

**stands** 179:22 226:3 248:7 276:17

**star** 214:9

**start** 12:16 52:8 158:10, 13 184:15,24 215:4

**started** 40:6 52:11 92:22, 23 93:2 170:4

**starts** 12:11 101:22 300:5

**state** 5:21 12:22 17:8,15 18:9,18 33:14 75:10 109:17 173:19

**state-issued** 166:10

**state-particular** 17:10

**stated** 71:13 78:23 82:8 185:9 200:24 256:14 269:15

**statement** 136:1 258:24 262:13

**statements** 26:6 84:23 134:8 160:25

**states** 49:13 80:25 121:25 122:2 127:11 260:13

**stating** 57:17 88:24 134:14 239:14 257:25

**status** 134:23 163:5,13 164:8 287:2

**statute** 17:9,17,18 18:1

**statutes** 17:21,25

**stay** 33:10 139:2 163:25 164:8

**steadfastly** 319:2

**step** 64:6 78:21 79:11 104:8 147:20 274:9

Victor Manuel Ramirez Najera vs. Experian Information Solutions, Inc. -
30(b)(6) of Experian Informtion Solutions, Inc., by Teresa Iwanski

October 8, 2025
Index: step-by-step..testify

**step-by-step** 145:21,24 146:6,14,21,24 147:2,19

**steps** 46:16 53:9 57:11 64:12 78:1,18 79:10 94:5, 13,15 95:6 97:6 101:16 102:14 103:19,24 130:1,3, 8,10 147:5 153:10 215:19 282:17,21 298:5

**Sterling** 33:4

**stick** 14:13 315:6

**sticking** 172:9

**sticks** 171:20 225:7 226:25

**sticky** 170:9

**stop** 102:10 126:21 137:25 242:24 293:1 317:21

**stopped** 127:8 139:1 295:24 296:3,14 297:2

**stopping** 318:20

**storage** 274:14

**straight** 35:16

**Street** 266:2

**strike** 7:7 18:12,17 53:9 54:3 72:4,9 93:23 97:20 98:5 114:24 116:15 129:8 164:3 174:22 192:8 207:7 220:21 224:22 256:10 264:23 267:9 301:14

**string** 182:20 212:17 240:13

**structure** 20:8 45:4,9 84:4 86:2

**structured** 83:19

**student** 253:24

**stuff** 314:9

**subject** 12:20 16:11 252:19

**submit** 88:18 147:16 148:14,16

**submits** 80:15 83:3

**submitted** 27:15,21 81:10 292:12 293:25

**submitting** 52:6 53:3

**subscriber** 247:21 285:17

**subsection** 49:2,8,13

**successful** 284:7

**suddenly** 287:23

**sued** 300:15

**suffice** 156:14

**sufficient** 165:3,10,17, 22,24 166:21 173:9 213:7 219:21 230:13 231:1 268:10 269:11,17 270:1 271:2,6

**summary** 56:25 98:20 106:2 313:23

**supervisor** 59:19 121:3 125:12,15,16 127:25 129:22 196:4,10 272:3,14

**supervisors** 125:8 128:11

**supplemental** 14:23 186:13

**supplied** 82:17,20 263:15 270:1 271:2 291:10

**supplies** 84:25 169:11 227:11

**supply** 84:2,3,12 87:23 98:17 107:12 109:18

**supplying** 81:22 88:1 89:1,2 170:4

**support** 32:8 253:10 300:16

**supporting** 160:17 186:11 256:17 271:15 284:12

**supposed** 64:2,7 137:8, 10 195:15,19,22 196:4,5, 10 197:25 269:23 276:14

**surname** 263:25 267:6

**surnames** 263:7,20 264:8

**surpassed** 269:14

**suspended** 112:15

**SV6** 213:9 214:1

**swear** 5:7

**switch** 179:11

**sworn** 5:16

**Sylvia** 211:16

**Sylvia's** 214:9

**system** 62:18 170:7 171:17,22 175:4,5 193:23 199:20 207:20 211:11 212:2,4 216:10 217:20 219:23 220:8 225:5 227:13,15 232:20,22,23 233:22 234:6 235:3,4,6 274:10,14,23 275:9 281:17 294:9

**systems** 70:23 96:12 104:21 126:14,18 127:4

**T**

**T-E-R-E-S-A** 6:1

**table** 10:11,12 216:21 217:9

**tables** 216:20

**takes** 57:12 62:23 78:18 97:1 105:1 117:5,7 212:16 216:4 219:23 245:25

**taking** 153:2 298:5 303:13

**talk** 14:17 58:18 67:23 68:9 128:16 137:11 138:1 143:24 219:8 282:4 303:9

**talked** 15:24 98:6,10 101:5 105:8 151:23 180:6 224:24 246:5 314:16 316:21

**talking** 8:4 39:21 58:9 61:6 66:5 67:17 68:2 70:10 72:19 79:1,24 80:6 87:6 89:18 90:25 98:20 111:5,7 138:25 146:10 160:12 176:14 189:1 199:24 205:5 219:16 256:13 295:4

**talks** 14:21 78:1

**target** 118:23

**targets** 20:3,15

**TATO** 233:19,21 234:13 235:2 240:21

**taught** 71:2 271:21 284:2

**taxpayer** 260:20,24 261:3

**TCA** 212:17

**TCA1** 211:10,15 213:9 214:1

**team** 33:12,17 34:10 39:12,20 40:3,16 45:1 55:6 56:7,22 58:11,20 59:5,13

**Teams** 25:5,25 26:2 129:21

**technically** 121:22 122:7,16

**telephone** 63:6,7 118:20 154:17 175:8 181:24

**telling** 49:3 135:11,20 136:15

**tells** 106:3 151:9 239:8 254:11

**temporary** 265:16

**Ten** 86:19

**Teresa** 5:5,15,23 6:1 9:2 11:7 38:6 39:21 69:5 87:3 93:19 111:6 128:16 137:6, 15 138:6 148:20 245:17 309:23 319:23

**term** 18:11 57:21

**terminate** 126:17 127:3, 16 130:6,14 272:13

**terminated** 71:21 112:15 272:7,9 296:6

**termination** 272:2

**terms** 143:5 191:7,10 276:25

**testified** 5:17 6:3 63:25 70:12 100:7 297:11

**testify** 8:18,22 12:7,14 13:17 14:8,23 16:9,24,25 18:15 64:22 131:9 140:5,8 282:14,15 283:20

Victor Manuel Ramirez Najera vs. Experian Information Solutions, Inc. -
30(b)(6) of Experian Informtion Solutions, Inc., by Teresa Iwanski

October 8, 2025
Index: testifying..treatment

**testifying** 6:7 43:6

**testimony** 5:8 7:23 8:2 66:2 80:3 91:23 234:17 301:19 302:19 305:12,17, 21 306:5,18,21 307:20,23 309:8 310:11,16

**tests** 283:17,24 284:3

**Texas** 115:1,20 119:21,24 123:10 181:18 203:8 272:18

**text** 61:22

**texting** 53:8

**theft** 152:19,25 153:7,9, 16 154:11,16 158:18 186:4 278:13

**thing** 18:17 44:16 214:24 247:10 318:25

**things** 20:6 38:1 42:8 43:7 55:3 60:2 79:11 83:21 92:3 96:10 98:12 103:23 104:3 105:7 110:9 117:22 125:9 128:1 138:19,25 153:15,16 157:4 161:1,3 162:6,10 172:19 174:19 214:22 224:24 251:3 253:15 278:9,13 313:25 316:18 319:7,10

**thinking** 86:1 159:13 261:13 302:13,23,24 303:1 305:13 306:8

**third-party** 273:15

**thought** 283:8 316:7

**thousand** 114:14,15

**three-letter** 246:17

**tie** 190:8 234:23 293:21

**tied** 169:4

**time** 5:8 6:6 7:4 8:25 9:24 18:25 19:1 23:1 25:8,20 28:3,4,20,24 29:6 30:6,11 32:18,20 34:14,16 37:14 38:9,10 39:22 40:3,21 46:4 47:4,7 52:13,14,25 53:25 69:1 71:17 83:13 86:23 87:1 91:7 92:8 93:3, 13 108:22 115:8,22,23 136:15 138:25 142:20

148:18,20 149:9,13,16 151:7 152:9,22 153:19 156:24 157:7 160:23 161:22 163:14 164:6 167:10 169:11 171:15 173:22 175:19 177:6 178:21 180:4,10,23 182:15 186:6,17 193:8 199:10,13 201:7,9 211:13 212:20 214:19 216:2,4 217:17 220:8 221:10,23 224:5 226:9,14 227:5,9,10 228:22 229:6,13 230:18 231:12,13,20,22,23 233:24 234:1,23 237:16, 25 238:24 239:25 240:8, 15 243:6,9 244:14,17 246:7 247:12 248:6 249:15 251:19 253:18,24 257:21 262:14,25 279:22 285:15,23 286:13,16 298:3,15,24 299:2 304:11, 25 305:3 306:5,8 307:8 314:8 315:21 317:14 318:4 319:6,20

**timeframe** 40:5,6 42:25 44:9 234:24

**times** 6:25 25:6 27:24 28:7,13,16,22 43:10 62:24 73:6 96:2 112:22 113:9 125:7 142:7 143:20 144:6 154:5,22 160:9 162:9 174:16,21 198:7,25 207:14,15 221:25 228:3 238:24 239:21,24 261:24 263:9,22 264:13

**title** 30:4,6,20,22 116:10, 11

**titled** 246:10

**today** 5:4 7:16,23 8:4,19, 22 9:8,16,17 11:20,21 12:7,14 16:9 21:25 26:20 67:24 80:6 97:13 98:4 109:8 113:8 132:25 136:25 140:13 176:20 199:16 224:20 228:13 234:17 236:20 241:21 249:10 257:14 273:17 278:16 306:1 310:12,16 315:21 317:11

**today's** 9:2 21:6,22 23:13,20 24:13,16 25:7,10

26:13,14 183:24 203:4

**told** 20:23 33:22 34:21,23 37:25 43:10 59:2 91:13,19 112:21 142:14 186:19 242:5 305:16

**tomorrow** 312:16

**top** 91:10 134:20 177:14, 15 178:25 179:4 180:5 197:4 211:9 212:17 213:9, 11 223:5 236:16 243:15 252:15 259:10,14 262:20 295:14

**topic** 12:13,14,16,24 13:7,9,25 14:18 15:2,9 16:2,17 68:2

**topics** 12:2,4,6 14:8 15:15,16,19,20,22 16:9,23 17:3 35:2 43:16,24

**total** 30:23 67:17

**totally** 195:23 196:9 317:19

**touch** 102:10

**touched** 110:10 191:23

**track** 138:20

**trade** 81:24 170:19 211:5 214:21 215:3,13 216:21 239:22,24 317:10

**tradeline** 27:14,21 83:1 131:22 165:1 166:19 168:18 173:19 225:21 228:14 233:22 240:25 241:8 249:12,17 250:17, 23 267:12 311:21

**tradelines** 185:13

**trades** 67:6,12 215:4

**tradition** 263:6,25

**train** 148:10 149:22 150:16,18 155:3,4,25 156:23 158:2 230:18 231:5 268:17 269:1,8,12, 19 271:3,22 277:8 282:23 287:20 306:12

**trained** 17:11 60:11 64:16 65:4 66:13,20 68:23 69:14 70:5 71:2 72:15 73:7 77:4 78:24 117:4 123:6,9,10,14

145:25 146:25 151:20 152:5 154:19 155:6 157:3, 15 159:20 160:2,4,16,24 161:8 173:17 188:2 270:3 279:1,16 283:11 287:21 302:21 309:4

**training** 19:21 69:1 70:22 71:18 123:6,13 124:25 125:25 126:4 151:24 159:24 187:25 188:7,17 202:17 271:21 279:4 283:15,17 309:14

**trains** 279:9

**transactions** 84:23

**transcribe** 9:15

**transcript** 5:1 43:17 312:25 313:3,16 314:22 315:1 316:15,24 317:13, 22

**transfer** 148:10 149:22 150:16 151:12,20 156:23 157:19 163:13,19 271:22 279:5,17 306:12 308:5,14

**transferred** 155:3,25 158:2 162:19,24 163:1,9, 16 164:4 190:22 191:1,9 230:18 231:5 268:16 269:12,18 280:13 282:23 287:19 306:10,16

**transferring** 269:8

**transfers** 279:24

**transitioning** 31:12

**transmit** 237:11,15

**transmitted** 84:15 85:3 101:5 104:9

**transmitting** 83:11,15 85:16 106:5

**transposed** 217:15 222:1

**treat** 142:7 151:17 155:17 162:24 163:4,8,12 164:18 195:19

**treated** 153:10,23 154:1 155:24 187:19 201:5 305:14 306:9

**treatment** 162:19

APPENDIX 0680

Victor Manuel Ramirez Najera vs. Experian Information Solutions, Inc. -
30(b)(6) of Experian Informtion Solutions, Inc., by Teresa Iwanski

October 8, 2025
Index: trick..viewing

**trick** 26:5

**trigger** 152:25

**true** 131:20 162:23
165:14 186:8 238:6
300:15 310:6 314:19

**trump** 171:11

**trust** 49:4

**truth** 5:9 7:20,21

**truthfully** 8:19 318:19

**turn** 51:6 190:12 210:16
256:22

**turning** 191:22 206:2

**tying** 107:25

**type** 6:14 10:9 23:9,12
44:16 53:11,14 61:15,17
64:7 71:7,8 94:9 96:10
101:10,13 105:10 123:20
127:12 162:12,20 178:17,
25 212:16 213:4 215:17
216:21 224:15 237:21
246:25 247:4,10 272:1,6,
7,13 276:15

**typed** 217:13

**types** 37:13 83:20 98:12
124:1 146:15 150:13
151:17 155:8,9 161:2,16,
18 162:11,13 174:24
232:20

**typically** 37:13 180:4
182:8 216:7 232:18 282:7
294:16 318:5 319:10

**typing** 61:9 147:12,14
172:18

**typos** 172:18

**U**

**ultimate** 50:1 54:9 55:16
150:4 280:5 308:4 312:2

**ultimately** 104:1 124:21
279:23 280:12 282:14
308:2 316:23 317:21,24
318:13

**umbrella** 153:14,20,22

**unable** 8:18 141:5

**unchanged** 204:21

**under-** 101:3

**underneath** 178:5

**understand** 7:16 8:2,5
9:9 10:3,13 11:13 26:22
30:11 38:5 41:18 48:17
49:22 50:20 53:8 57:17
72:5,23 84:10 100:7 101:4
103:10 106:19 122:14
128:13 129:9 131:18
153:5 156:1 162:22
166:15 171:14 174:23
188:14 194:5 195:13
207:5 215:14 216:19
224:10 225:3 228:13,18
249:4 256:12,16,20
257:22 258:7 259:2 261:3
263:5,6,11 264:24 270:14
272:16 278:1 279:7
283:25 312:5 317:17
318:20 319:3,14

**understandably** 319:11

**understanding** 11:16
20:13 21:24 29:23 31:1,6,
17 36:23 37:5,9 47:9,12,
17,24 48:3,22 49:1,23
50:4,5,15 54:4,20 55:11
56:13 60:6,8 64:18,21
74:19 75:13 79:6 80:22
81:6 91:9 94:14 95:15,19
98:25 100:6 101:13 103:2,
11,12 104:13 105:13
116:21 124:3 127:19
128:3 129:2,18 130:12,18
140:14 171:22 175:1
180:21 183:16 191:3,4,11,
14 194:25 217:20,22,24
218:3,7,8,16 225:9 227:2,
4,16 235:2 236:7,10
241:15,24 246:13 251:25
254:22,25 257:1,15
260:23 283:21 308:8
312:10

**understands** 264:7

**understood** 38:21
186:18 205:18 230:22
284:2

**Uniform** 259:15

**unilaterally** 313:19

**unique** 150:1 162:19

**United** 127:11

**unlike** 223:12

**unmix** 233:16 301:1,2

**unmixed** 229:7,21
231:14,24 232:7,10
233:11 249:16 297:15
300:18 301:17

**unmixing** 231:10 297:13,
16,17,24

**unpack** 291:16

**unreasonable** 309:5

**unrelated** 163:7 195:3

**unreliable** 172:17

**unusual** 264:23 318:25

**unwilling** 318:15

**update** 27:14,20 54:12
60:15 106:16 121:22
131:21 132:8,11,21 134:6,
25 169:17,19,21 172:3
225:21 241:8

**updated** 168:3 169:13
195:3 223:24 225:20
226:10,14 286:7 288:20,
25 300:3

**updates** 132:4 135:25

**updating** 58:12

**uphold** 141:10

**upload** 52:7,9,17,22 53:3,
25 62:4 160:22

**uploaded** 61:11 281:16
294:20,23

**uploading** 52:15

**US-BASED** 127:20 128:4
130:13

**usable** 271:20

**USC** 17:16 18:14

**usual** 312:14 313:25
314:3

**utility** 290:6

**V**

**vague** 15:11 16:4

**valid** 22:10 255:2,10

**variation** 221:24 222:10
223:3 263:15

**variations** 222:13

**varies** 7:1 207:15 220:15

**vary** 217:13

**verbal** 9:16

**verbatim** 56:20 64:10,15
78:17,19,20 87:13 98:19
111:10 134:14

**verbiage** 110:3 201:4
276:14 277:4 278:12

**verification** 174:5,10
175:20 185:6

**verified** 175:4 195:1
288:20,24

**verifies** 253:18

**verify** 166:11 174:7
175:16 287:13

**verifying** 267:19

**version** 312:19

**versus** 123:20 215:15,20

**vetted** 93:1

**vetting** 88:22 89:7,9,11,
18,23 90:5 91:3,24 92:21
93:10,20 97:19,21 98:23
99:1 100:4 103:8

**victim** 150:11 152:19,24
153:6,8 154:16 186:4

**Victor** 194:2 221:13
222:8,9 235:23 240:10
255:12 256:4 257:11

**video** 26:12

**view** 38:7 47:15 173:1

**viewed** 37:15 111:20
118:6,18 146:5 281:15
311:15

**viewing** 41:14

Victor Manuel Ramirez Najera vs. Experian Information Solutions, Inc. -
30(b)(6) of Experian Informtion Solutions, Inc., by Teresa Iwanski

October 8, 2025
Index: violated..zoom

**violated** 50:6,11,16

**violation** 6:19 49:2 112:16 113:19

**violations** 7:14

**visibility** 277:17

**visible** 223:20,21 251:4,5, 7 278:6

**visit** 96:4

**visited** 95:21

**visiting** 96:7

**visits** 89:11,23

**voice** 315:4,5

**volume** 184:15,17 207:12,14

**W**

**wanted** 126:23 127:21 128:4 129:5 146:7 179:6 185:9 276:2 283:15 285:25 302:17 305:12,14, 17,20 306:19 315:8

**wanting** 205:11

**wasting** 138:25

**watched** 118:17

**ways** 63:12

**web-based** 62:8

**website** 162:13 292:10 294:13

**Wednesday** 319:5

**week** 7:6 117:3,9

**weeks** 10:24 20:22 34:17, 19

**White-hernandez** 36:18 37:7 38:3

**widespread** 318:24

**windows** 176:1

**withheld** 314:13

**withhold** 316:22

**withholding** 313:14 316:20

**witnesses** 22:21,23

**woman** 315:12

**word** 49:11 64:14 135:18 215:17 220:23

**word-for-word** 145:17

**wording** 18:9 49:9 78:20 118:9

**words** 64:10 73:16 110:4 125:3 135:14 162:23 172:8 220:11 288:23 291:15,17

**work** 25:2,3 29:20 30:9 31:2 32:8 34:9 113:25 115:19 120:2 126:10 128:14 131:8 182:7 207:13 255:2,10 277:7 283:23

**worked** 30:12 115:18 206:11 229:20 273:21 275:11 280:13

**working** 26:23 30:16 79:17 113:7 115:14 278:14 279:1

**works** 20:9 32:19,22 58:20 89:6 90:21 102:22, 25 130:20 131:2 216:18 313:20 318:5

**would've** 91:16 187:15 296:15 308:11 313:13

**wrapped** 298:19

**writes** 13:8

**writing** 23:12 58:10 252:24

**written** 26:6 64:1 100:16 256:14 307:18

**wrong** 167:14 169:15 173:25 174:1 291:13

**wrote** 235:24

**X**

**Xactus** 290:14

**Y**

**year** 20:6 29:10,14 167:24

174:1 206:18 213:19 225:13 226:3 227:3,10 241:4

**yearly** 89:23 117:12

**years** 6:9 29:24 30:24 46:7 59:3 79:17 85:24 92:14,19,20 93:7 163:23, 25 164:9,12 165:2 170:4 180:2 183:8,15,16 191:7 198:2 201:23,25 253:18 258:21,25 261:23 262:11, 14

**Yesterday** 24:17 25:18 251:21

**YOB** 226:1

**YOBDT** 226:1

**YOBSRC** 225:11,13

**younger** 167:1

**Youssef** 43:14 137:3,9, 13 138:3 144:5 303:24 313:20

**Z**

**zoom** 11:9 25:4 260:10

# EXHIBIT I

APPENDIX 0683

PO Box 9701
Allen, TX 75013



VICTOR RAMIREZ

FORT WORTH TX  76106



## Your Dispute Results

Report # 3466-4870-41 for **Mar 07, 2024**



# Hi, Victor. Welcome to your Dispute Results.

Our reinvestigation of the dispute(s) and/or other request(s) you recently submitted is now complete. If an item you disputed is not in the list of results below, it was either not appearing in your credit file or it already reflected the requested status at the time of our reinvestigation.

In response to your recent request, we are sending you this credit report. Before contacting us, please review this report carefully. If you disagree with an item, you may dispute it. We will process disputes generally by sending your dispute to the furnisher of the information or to the vendor who collected the information from a public record. If we were able to make changes to your credit report based on information you provided, or if you requested the addition of a statement, we have done so.  Otherwise, we have contacted the company reporting the information you disputed, supplied them all relevant information and any documents you gave us with your dispute, and instructed them to:  review all information we provide them about your dispute; verify the accuracy of the information; provide us a response to your dispute; and update their records and systems as necessary.

# How to Read Your Results

**Deleted** - This item was removed from your credit report.  **Remains** - The company that reported the information has certified to Experian that the information is accurate. This item was not changed as a result of our processing of your dispute.  **Updated**  (Your results will indicate which one of the following applies.) ─ a) The information you disputed has been updated. Please review your report for the details.  b) The item you disputed has been updated, which may include an update to the disputed information. Please review your report for the details. c) Information on this item has been updated. Please review your report for the details. **Verified and Updated** - The information you disputed has been verified as accurate, however, information unrelated to your dispute has been updated. Please review your report for the details. **Processed** - This item was either updated or deleted; Please review your report for the details.

## Here are your results

## Credit items

**PENNYMAC LOAN SERVICES L** 618100003.... **Outcome: Deleted - This item was removed from your credit report. Please review your report for the details.**
**RUSHMORE LOAN MGMT SERVI** 102760214.... **Outcome: Remains - The company that reported the information has certified to Experian that the information is accurate. This item was not changed as a result of our processing of your dispute. Please review your report for the details.**

APPENDIX 0684

EXPERIAN_NAJERA_0011

## Dispute Results (Continued)

### Before Dispute

---

**RUSHMORE LOAN MGMT SERVI** Partial Acct # 102760214....          **Status (Jan 2023)** Transferred,closed.
15480 LAGUNA CANYON RD STE 100 IRVINE CA 92618; (888) 504 6700

| | | | |
|---|---|---|---|
| **Date opened**<br>Jan 2009 | **Terms**<br>30 Years | **Recent balance**<br>Not reported | **Payment history: May 2019 - Jan 2023** |
| **Address ID #**<br>0701387387 | **Monthly payment**<br>Not reported | **Comment:**<br>**Transferred to another lender** | |
| **Type**<br>Mortgage | **Credit limit or original amount**<br>$109,370 | | |
| **Responsibility**<br>Individual | **High balance**<br>Not reported | | |

| | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2023 | CLS | | | | | | | | | | | |
| 2022 | 30 | OK | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 60 | 30 | 60 |
| 2021 | ND | ND | ND | ND | ND | 60 | 30 | 60 | 60 | 30 | 60 | OK |
| 2020 | OK | 30 | 60 | ND | ND | ND | ND | ND | OK | ND | ND | ND |
| 2019 | | | | | 30 | OK | OK | 30 | 30 | 30 | OK | 30 |

| | Dec22 | Nov22 | Oct22 | Sep22 | Aug22 | Jul22 | Jun22 | May22 | Apr22 | Mar22 | Feb22 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Account Balance | $95,397 | $94,967 | $95,915 | $95,483 | $95,739 | $95,944 | $96,150 | $96,434 | $96,717 | $96,999 | $96,310 |
| Date Payment Received | 10.31.22 | 10.31.22 | 08.27.22 | 08.27.22 | 08.05.22 | 06.18.22 | 05.31.22 | 04.18.22 | 04.02.22 | 01.29.22 | 01.29.22 |
| Scheduled Payment Amount | $1,248 | $1,248 | $1,248 | $1,248 | $1,248 | $1,198 | $1,198 | $1,196 | $1,196 | $1,196 | $1,196 |
| Actual Amount Paid | No Data | $2,496 | No Data | $1,248 | $1,198 | $1,196 | $1,196 | $1,196 | $1,196 | No Data | $2,457 |

*The original amount of this account was $109,370.*

If the reinvestigation does not resolve your dispute, you have the right to add a statement of up to 100 words to your file disputing the accuracy or completeness of the information.

If you provide a consumer statement that contains medical information related to service providers or medical procedures, then you expressly consent to Experian including this information in every credit report we issue about you. You may contact the company that reports the information to us and dispute it directly with them. If you wish to obtain documentation or written verification concerning your accounts, please contact your creditors directly. You may provide us additional information or documents about your dispute to help us resolve it by visiting www.experian.com/upload. You may also mail your information to Experian, P.O. Box 9701, Allen, Texas 75013.

You may file a complaint about Experian or the company reporting the item, with the Consumer Financial Protection Bureau or your State Attorney General's office. If there has been a change to your credit history resulting from our reinvestigation, or if you add a consumer statement. you may request that Experian send an updated report to those who received your report within the last two years for employment purposes, or within the last six months for any other purpose (the past 12 months for residents of Colorado, Maryland or New York), or within the last year for any non-employment purpose under the California Investigative Consumer Reporting Agencies Act. If you send a request to have your results sent to past recipients of your credit report, please designate the organization's name and address. In the event an organization is not specifically designated, we will generally default to sending only to companies that have requested your credit information as a result of an action you took, such as applying for credit, insurance, employment or apartment rental. If you request to have your results sent to past recipients of your investigative consumer report, you have the right to designate which entities you wish to receive the updated report and which entities you do not wish to receive the update. If interested, you may also request a description of how the reinvestigation was conducted along with the business name, address and telephone number (if reasonably available} of the furnisher of information. For frequently asked questions about your credit report, please visit experian.com/consumerfaqs.

Medical Information

By law, we cannot disclose certain medical information (relating to physical, mental, or behavioral health or condition). Although we do not generally collect such information, it could appear in the name of a data furnisher (i.e. "Cancer Center") that reports your payment history to us. If so, those names display on your report, but on reports to others, they display only as MEDICAL PAYMENT DATA. Consumer statements included on your report at your request that contain medical information are disclosed to others.

# Payment History Legend

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **OK** | Current / Terms met | **150** | Past due 150 Days | **VS** | Voluntarily surrendered | **D** | Defaulted on contract |
| **30** | Past due 30 Days | **180** | Past due 180 Days | **R** | Repossession | **C** | Collection |
| **60** | Past due 60 Days | **CRD** | Creditor received deed | **PBC** | Paid by creditor | **CO** | Charge off |
| **90** | Past due 90 Days | **FS** | Foreclosure proceedings started | **EC** | Insurance claim | **CLS** | Closed |
| **120** | Past due 120 Days | **F** | Foreclosure | **G** | Claim filed with government | **ND** | No data for this period |

# ⚠ Your Potentially Negative Account Activity

---

The most common items in this section are late payments, accounts that have been charged off or sent to collection, accounts settled for less than full value, and items that may need closer attention, such as transferred accounts.

APPENDIX 0685

EXPERIAN_NAJERA_0012

**Dispute Results** (Continued)
**Your Potentially Negative Account Activity (Continued)**

---

**RUSHMORE LOAN MGMT SERVI** Partial Acct # 102760214....    **Status (Jan 2023)** Transferred,closed.
15480 LAGUNA CANYON RD STE 100 IRVINE CA 92618; (888) 504 6700

| | | | |
|---|---|---|---|
| **Date opened** Jan 2009 | **Terms** 30 Years | **Recent balance** Not reported | **Payment history:** May 2019 - Jan 2023 |
| **Address ID #** 0701387387 | **Monthly payment** Not reported | **Comment:** Transferred to another lender | |
| **Type** Mortgage | **Credit limit or original amount** $109,370 | This item remained unchanged from our processing of your dispute in Feb 2024. | |
| **Responsibility** Individual | **High balance** Not reported | | |

Payment history:

| | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2023 | CLS | | | | | | | | | | | |
| 2022 | 30 | OK | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 60 | 30 | 60 |
| 2021 | ND | ND | ND | ND | ND | 60 | 30 | 60 | 60 | 30 | 60 | OK |
| 2020 | OK | 30 | 60 | ND | ND | ND | ND | ND | OK | ND | ND | ND |
| 2019 | | | | | 30 | OK | OK | 30 | 30 | 30 | OK | 30 |

| | Dec22 | Nov22 | Oct22 | Sep22 | Aug22 | Jul22 | Jun22 | May22 | Apr22 | Mar22 |
|---|---|---|---|---|---|---|---|---|---|---|
| Account Balance | $95,397 | $94,967 | $95,915 | $95,483 | $95,739 | $95,944 | $96,150 | $96,434 | $96,717 | $96,999 |
| Date Payment Received | 10.31.22 | 10.31.22 | 08.27.22 | 08.27.22 | 08.05.22 | 06.18.22 | 05.31.22 | 04.18.22 | 04.02.22 | 01.29.22 |
| Scheduled Payment Amount | $1,248 | $1,248 | $1,248 | $1,248 | $1,248 | $1,198 | $1,198 | $1,196 | $1,196 | $1,196 |
| Actual Amount Paid | No Data | $2,496 | No Data | $1,248 | $1,198 | $1,196 | $1,196 | $1,196 | $1,196 | No Data |

*The original amount of this account was $109,370*

# Who Has Viewed Your Consumer Information

## CONSUMER REPORT VIEWS / SOFT INQUIRIES

*Soft inquiries* are usually initiated by others, like companies making promotional offers of credit or your lender conducting periodic reviews of your existing credit accounts.

 Soft inquiries DO NOT impact your credit score.

**EXPERIAN CREDITMATCH** 475 ANTON BLVD # D4 COSTA MESA CA 92626 **No phone # available** **INQUIRY DATES:** 03.05.24 | 03.04.24 | 03.03.24 | 03.02.24 | 03.01.24 | 02.29.24 | 02.28.24 | 02.27.24 | 02.26.24 | 02.25.24 | 02.24.24 | 02.23.24 | 02.22.24 | 02.21.24 | 02.20.24 | 02.19.24 | 02.18.24 | 02.17.24 | 02.16.24 | 02.15.24 | 02.14.24 | 02.13.24 | 02.12.24 | 02.11.24 | 02.10.24 | 02.09.24 | 02.08.24 | 02.07.24 | 02.06.24 | 02.05.24 | 02.04.24 | 02.03.24 | 02.02.24 | 02.01.24 | 01.31.24 | 01.30.24 | 01.29.24 | 01.28.24 | 01.27.24 | 01.26.24 | 01.25.24 | 01.24.24 | 01.23.24 | 01.22.24 | 01.21.24 | 01.20.24 | 01.19.24 | 01.18.24 | 01.17.24 | 01.16.24 | 01.15.24 | 01.14.24 | 01.13.24 | 01.12.24 | 01.11.24 | 01.10.24 | 01.09.24 | 01.08.24 | 01.07.24 | 01.06.24 | 01.05.24 | 01.04.24 | 01.03.24 | 01.02.24 | 01.01.24 | 12.31.23 | 12.30.23 | 12.29.23 | 12.28.23 | 12.27.23 | 12.26.23 | 12.25.23 | 12.24.23 | 12.23.23 | 12.22.23 | 12.21.23 | 12.20.23 | 12.19.23 | 12.18.23 | 12.17.23 | 12.16.23 | 12.15.23 | 12.14.23 | 12.13.23 | 12.12.23 | 12.11.23 | 12.10.23 | 12.08.23 | 12.07.23 | 12.06.23 | 12.05.23 | 12.04.23 | 12.03.23 | 11.30.23 | 11.29.23 | 11.28.23 | 11.27.23 | 11.26.23 | 11.25.23 | 11.24.23 | 11.23.23 | 11.22.23 | 11.21.23 | 11.20.23 | 11.19.23 | 11.18.23 | 11.17.23 | 11.16.23 | 11.15.23 | 11.14.23 | 11.13.23 | 11.12.23 |

**CREDIT KARMA** 760 MARKET ST FL 2 SAN FRANCISCO CA 94102 (415) 510 5272 **INQUIRY DATES:** 03.04.24 | 03.03.24 | 03.01.24 | 02.28.24 | 02.27.24 | 02.25.24 | 02.24.24 | 02.20.24 | 02.19.24 | 02.13.24 | 02.11.24 | 02.02.24 | 02.01.24 | 01.24.24 | 01.23.24 | 01.21.24 | 01.20.24 | 01.15.24 | 01.11.24 |

**CREDIT KARMA** 760 MARKET ST FL 2 SAN FRANCISCO CA 94102 **No phone # available** **INQUIRY DATES:** 03.02.24 | 02.28.24 | 02.24.24 | 02.21.24 | 02.17.24 | 02.14.24 | 02.10.24 | 02.07.24 | 02.03.24 | 01.31.24 | 01.27.24 | 01.24.24 | 01.20.24 | 01.17.24 | 01.13.24 | 01.10.24 | 01.06.24 | 01.03.24 | 12.30.23 | 12.27.23 | 12.23.23 | 12.20.23 | 12.16.23 | 12.13.23 | 12.09.23 | 12.06.23 | 12.02.23 | 11.29.23 | 11.25.23 | 11.22.23 | 11.18.23 | 11.15.23 | 11.11.23 | 11.08.23 | 11.04.23 | 11.01.23 | 10.28.23 | 10.25.23 | 10.21.23 | 10.18.23 | 10.14.23 | 10.11.23 | 10.07.23 | 10.04.23 | 09.30.23 | 09.27.23 | 09.23.23 | 09.20.23 | 09.16.23 | 09.13.23 | 09.09.23 | 09.06.23 | 09.02.23 | 08.30.23 | 08.26.23 | 08.23.23 | 08.19.23 | 08.16.23 | 08.12.23 | 08.09.23 | 08.05.23 | 08.02.23 | 07.29.23 | 07.26.23 | 07.22.23 | 07.19.23 | 07.12.23 | 07.08.23 | 07.05.23 | 07.01.23 | 06.28.23 | 06.24.23 | 06.21.23 | 06.17.23 | 06.14.23 | 06.10.23 | 06.07.23 | 06.03.23 | 05.31.23 | 05.27.23 | 05.24.23 | 05.20.23 | 05.17.23 | 05.13.23 | 05.10.23 | 05.06.23 | 05.03.23 | 04.29.23 | 04.26.23 | 04.22.23 | 04.19.23 | 04.15.23 | 04.12.23 | 04.08.23 | 04.05.23 | 04.01.23 | 03.29.23 | 03.25.23 | 03.22.23 | 03.18.23 | 03.15.23 | 03.11.23 | 03.08.23 |

**JPMCB CJ** PO BOX 15298 WILMINGTON DE 19850 (888) 401 0550 **INQUIRY DATES:** 03.02.24 | 02.24.24 | 02.17.24 | 02.10.24 | 01.31.24 | 01.23.24 | 01.14.24 | 01.05.24 | 12.07.23 | 11.25.23 | 11.14.23 | 10.30.23 | 10.06.23 | 09.28.23 | 09.15.23 | 09.05.23 | 08.27.23 | 08.20.23 | 08.13.23 | 08.06.23 | 07.30.23 | 07.23.23 | 07.15.23 | 07.02.23 | 06.25.23 | 06.18.23 | 06.16.23 | 06.07.23 | 05.29.23 | 05.22.23 | 05.21.23 | 05.10.23 | 05.09.23 | 04.20.23 | 04.10.23 | 03.27.23 |

**EXPERIAN** 475 ANTON BLVD COSTA MESA CA 92626 (866) 431 3471 **INQUIRY DATES:** 03.01.24 | 02.23.24 | 02.23.24 | 02.16.24 | 02.12.24 | 02.09.24 | 02.02.24 | 01.26.24 | 01.19.24 | 01.12.24 | 01.05.24 | 12.29.23 | 12.22.23 | 12.15.23 | 12.08.23 | 12.01.23 | 11.24.23 | 11.17.23 | 11.10.23 | 11.03.23 | 10.27.23 | 10.20.23 | 10.13.23 | 10.06.23 | 09.29.23 | 09.22.23 | 09.15.23 | 09.08.23 | 09.01.23 | 08.25.23 | 08.18.23 | 08.11.23 | 08.04.23 | 07.28.23 | 07.21.23 | 07.14.23 | 07.07.23 | 06.30.23 | 06.23.23 | 06.16.23 | 06.09.23 | 06.02.23 | 05.26.23 | 05.19.23 | 05.12.23 | 05.05.23 | 04.28.23 | 04.24.23 | 04.21.23 | 04.14.23 | 04.07.23 | 03.31.23 | 03.24.23 | 03.17.23 | 03.10.23 |

**JPMCB** PO BOX 15298 WILMINGTON DE 19850 (800) 432 3117 **INQUIRY DATES:** 03.01.24 | 02.01.24 | 01.01.24 | 12.01.23 | 11.01.23 | 10.01.23 | 09.01.23 | 08.01.23 | 07.01.23 | 06.01.23 | 05.01.23 | 04.01.23 |

**AFFIRM** 650 CALIFORNIA ST FL 12 SAN FRANCISCO CA 94108 (855) 423 3729 **INQUIRY DATES:** 02.27.24 | 12.02.23 |

**EXPERIAN CREDITMATCH** 475 ANTON BLVD # D4 COSTA MESA CA 92626 **No phone # available** **INQUIRY DATES:** 02.23.24 | 02.12.24 | 06.04.23 | 05.19.23 | 04.24.23 |

**EXPERIAN** 475 ANTON BLVD COSTA MESA CA 92626 **No phone # available** **INQUIRY DATES:** 02.12.24 |

THIS PAGE INTENTIONALLY LEFT BLANK

APPENDIX 0687

EXPERIAN_NAJERA_0014

# EXHIBIT J

APPENDIX 0688

# 2023 Credit Reporting Resource Guide ®

CREDIT REPORTING RESOURCE GUIDE

*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 0689

# CONSUMER DATA INDUSTRY ASSOCIATION (CDIA)
# END USER LICENSE AGREEMENT
# TERMS AND CONDITIONS

1. **LICENSE GRANT.**  Conditioned on your continued compliance with the terms and conditions of this License Agreement, this License Agreement provides you, **as an individual**, with a **personal**, revocable, limited, non-exclusive, and nontransferable license to use the Credit Reporting Resource Guide® (CRRG®) for your informational and internal business purposes only.  The foregoing grant permits you to download a single electronic copy to a single computer or laptop and also print a single hard copy of the CRRG® from a single computer or laptop, provided that such copy contains all applicable proprietary notices.  Notwithstanding the foregoing, any rights granted hereby are licensed and not sold or otherwise transferred or assigned to you or any third party.

2. **LICENSE GRANT RESTRICTIONS.**  Except as provided above, you may not modify, alter, translate, create derivative work(s) of, distribute, display, broadcast, transmit, reproduce, publish, license, sub-license, sell, exploit, rent, lease, grant a security interest in, assign or transfer any right(s) in, or otherwise use in any manner not expressly permitted herein the CRRG® or any part thereof.  Specifically, you expressly agree that you are not using the CRRG® for competitive reasons (against Consumer Data Industry Association (CDIA)) or for the purpose of designing or developing similar materials.  In addition, you may not remove or alter any proprietary notice on the CRRG® **or use any portion of the CRRG® independently from the CRRG® as a whole**.  All rights not expressly granted to you herein are hereby reserved to CDIA.

3. **USER OBLIGATIONS.**  By installing, downloading, accessing, and/or using the CRRG®, you represent that you are of the legal age to create a binding agreement with CDIA and agree to abide by all applicable local, state, national, and international laws and regulations with respect to your use of the CRRG®.  You also agree to assume all responsibility concerning your use of the CRRG®, including meeting any requirements or obligations of your contracts with third parties.  CDIA assumes no responsibility or liability for any claims that may result directly or indirectly from the communications, agreements, or interactions you establish with third parties using the CRRG®.

4. **PROPRIETARY RIGHTS.**  CDIA or its licensors shall retain all ownership right, title, and interest, including, without limitation, all associated intellectual property or proprietary rights, in and to all text, graphics, methodologies, processes, procedures, content, products, information, and documentation associated with the CRRG® as well as its design, structure, "look and feel," and arrangement of any content contained on or available through the CRRG®.  The "Credit Reporting Resource Guide®" and its contents are © Consumer Data Industry Association and/or its licensors.  All rights reserved.  CREDIT REPORTING RESOURCE GUIDE®, CONSUMER DATA INDUSTRY ASSOCIATION, CDIA, and all other names, logos, and icons identifying CDIA and its products and services are proprietary trademarks of CDIA, and any use of such marks without the express written permission of CDIA is strictly prohibited.  Except as expressly provided herein, CDIA does not grant any express or implied right to you or any other person under any intellectual or proprietary rights.

APPENDIX 0690

5. **CONFIDENTIALITY.**  You acknowledge and agree that the certain parts of the CRRG® contain proprietary trade secrets and confidential information of CDIA (the "Confidential Information").  You agree to secure and protect the confidentiality of this Confidential Information of CDIA in a manner consistent with the maintenance of CDIA's rights therein, using at least as great a degree of care as you use to maintain the confidentiality of your own confidential information of a similar nature, but in no event using less than reasonable efforts.  You shall not, nor permit any third party to, sell, transfer, publish, disclose, or otherwise make available any portion of the Confidential Information to third parties, except as expressly authorized in this License Agreement.

6. **SUBMISSIONS.**  CDIA welcomes your feedback and suggestions about how to improve the CRRG®.  You agree that CDIA shall have the perpetual, royalty-free, and irrevocable right to use such feedback and suggestions in any manner it deems desirable without providing any consideration, attribution, or payment to you.

7. **DISCLAIMER.**  ALTHOUGH CDIA HAS USED COMMERCIALLY REASONABLE EFFORTS TO PROVIDE ACCURATE INFORMATION, NEITHER CDIA NOR THE CRRG® OFFERS ANY LEGAL OR OTHER PROFESSIONAL ADVICE.  CDIA ALSO MAKES NO REPRESENTATIONS OR WARRANTIES ABOUT THE SUITABILITY, COMPLETENESS, TIMELINESS, RELIABILITY, LEGALITY, OR ACCURACY OF THE CRRG® FOR ANY PURPOSE.  THE CRRG® IS PROVIDED "AS IS" WITHOUT WARRANTY OF ANY KIND, INCLUDING, WITHOUT LIMITATION, ALL IMPLIED WARRANTIES AND CONDITIONS OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE, AND NON-INFRINGEMENT AS WELL AS ANY WARRANTY RELATED TO THE USE, OR THE RESULTS OF THE USE, OF THE CRRG®.  THE ENTIRE RISK AS TO THE QUALITY OF AND RESULTS FROM THE USE OF THE CRRG® IS WITH YOU, AND YOU SHOULD NOT RELY ON ANY CONTENT IN THE CRRG® AS THE SOLE BASIS FOR ACTION OR ASSUME THAT ANY TACTICS DESCRIBED THEREIN WOULD, BY THEMSELVES, ACHIEVE A PARTICULAR RESULT.  IF ANY OF THE DISCLAIMERS OR EXCLUSIONS SET FORTH IN THIS SECTION ARE DETERMINED BY A COURT OF COMPETENT JURISDICTION TO BE UNENFORCEABLE, THEN ALL SUCH EXPRESS AND IMPLIED WARRANTIES AND CONDITIONS PERMITTED BY LAW SHALL BE LIMITED IN DURATION FOR A PERIOD OF 30 DAYS AFTER THE EFFECTIVE DATE OF THIS AGREEMENT AND NO WARRANTIES OR CONDITIONS SHALL APPLY AFTER THAT PERIOD.

8. **LIMITATION OF LIABILITY.**  YOU AGREE THAT IN NO EVENT SHALL CDIA BE LIABLE FOR ANY INDIRECT, PUNITIVE, INCIDENTAL, SPECIAL, OR CONSEQUENTIAL DAMAGES ARISING OUT OF OR IN ANY WAY CONNECTED WITH THE USE OF THE CRRG® BY YOU OR ANYONE ELSE, WHETHER BASED IN CONTRACT, TORT, STRICT LIABILITY, OR OTHERWISE, EVEN IF CDIA HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.  WITHOUT LIMITATION OF THE FOREGOING, THE TOTAL LIABILITY OF CDIA FOR ANY REASON WHATSOEVER RELATED TO USE OF THE CRRG®, INCLUDING FOR ANY INACCURACIES IN THE CRRG®, OR FOR ANY CLAIMS RELATING TO THIS LICENSE AGREEMENT SHALL NOT EXCEED $1,000 (USD).

9. **INDEMNITY.**  You agree to defend, indemnify, and hold harmless CDIA and its affiliates, employees, licensors, agents, directors, officers, partners, representatives, shareholders, attorneys, predecessors, successors, and assigns from and against any and all claims, proceedings, damages, injuries, liabilities, losses, costs, and expenses (including reasonable attorneys' fees and litigation expenses) relating to or arising from your use of the CRRG® and any breach by you of this License Agreement.

CREDIT REPORTING RESOURCE GUIDE®

*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 0691

10. **GOVERNING LAW.** This License Agreement has been made in and will be construed and enforced solely in accordance with the laws of the District of Columbia as applied to agreements entered into and completely performed in the District of Columbia. Any dispute, controversy, or claim between the parties arising out of or in connection with this License Agreement as to its conclusion, existence, validity, interpretation, performance, or non-performance, breach, termination, and the assessment of damages including claims in tort whether arising before or after the termination of the License Agreement shall be resolved in accordance with this License Agreement. You also agree that any action to enforce this License Agreement will be brought solely in the federal or state courts in the District of Columbia, and all parties to this License Agreement expressly agree to be subject to the jurisdiction of such courts.

11. **TERM AND TERMINATION.** This License Agreement and your right to use the CRRG® will take effect at the moment you click "I ACCEPT" or you install, download, access, or use the CRRG®, whichever occurs first, and is effective until terminated as set forth below. This License Agreement will terminate automatically if you click "I REJECT" or if you fail to comply with any of the terms and conditions described herein, including by exceeding the scope of the license. Termination or expiration of this License Agreement will be effective without notice. You may also terminate at any time by ceasing to use the CRRG®, but all applicable provisions of this License Agreement will survive termination, as outlined below. Upon termination or expiration, any right to use the CRRG® will immediately cease and you must return, destroy, or delete from your system all copies of the CRRG® (and any associated materials) in your possession. The miscellaneous provisions as well as the provisions concerning CDIA's proprietary rights, submissions, confidentiality, indemnity, disclaimers of warranty and liability, termination, and governing law, however, will survive the termination or expiration of this License Agreement for any reason.

12. **MISCELLANEOUS.** The parties agree that this License Agreement is for the benefit of the parties hereto. Failure to insist on strict performance of any of the terms and conditions of this License Agreement will not operate as a waiver of that or any subsequent default or failure of performance. A printed version of this License Agreement and of any related notice given in electronic form shall be admissible in judicial or administrative proceedings based upon or relating to this License Agreement to the same extent and subject to the same conditions as other business documents and records originally generated and maintained in printed form. No joint venture, partnership, employment, alliance, or agency relationship exists between you and CDIA as result of this License Agreement or your utilization of the CRRG®. Moreover, you may not bind CDIA in any way or otherwise make any representations or statements for or on behalf of CDIA without CDIA's separate, express, and written permission. This License Agreement represents the entire agreement between you and CDIA with respect to use of the CRRG® and it supersedes all prior or contemporaneous communications and proposals, whether electronic, oral, or written between you and CDIA with respect to the CRRG®. If any provision of this License Agreement is held by a court of competent jurisdiction to be contrary to law, such provision shall be changed and interpreted so as to best accomplish the objectives of the original provision to the fullest extent allowed by law and the remaining provisions of this License Agreement will remain in full force and effect. This License Agreement and any rights granted by CDIA may not be assigned or transferred by you without the prior express written consent of CDIA. If you have any questions regarding this License Agreement, the CRRG®, or other CDIA products or services, please contact CDIA at 1090 Vermont Avenue, NW, Suite 200, Washington, DC 20005, or www.cdiaonline.org.

# Table of Contents

| | |
|---|---|
| **RESPONSIBILITIES AND ROLES** | **1-1** |
| Responsibilities | 1-1 |
| Roles - CDIA, Consumer Reporting Agencies, Metro 2® Format Task Force, e-OSCAR® System Support Team, Data Furnisher, Consumer Financial Protection Bureau, Federal Trade Commission | 1-2 |
| | |
| **INDUSTRY STANDARDS** | |
| **AUTOMATED DATA REPORTING** | **2-1** |
| Features of the Metro 2® Format | 2-1 |
| Industry Reporting Standards | 2-2 |
| Industry Standard for Reporting Account Delinquency | 2-2 |
| Accuracy and Integrity Definitions | 2-3 |
| Maintaining Accuracy, Integrity and Consistency of Credit Information | 2-3 |
| | |
| **QUICK REFERENCE GUIDE TO INDUSTRY STANDARDS** | **2-5** |
| Banking/Savings & Loan/Credit Union Installment Loan & Line of Credit | 2-5 |
| Child Support Agencies | 2-6 |
| Credit Cards (non-Retail Cards) | 2-7 |
| Debt Buyers/Collection Agencies | 2-8 |
| Loan Finance Companies | 2-9 |
| Mortgage Lending | 2-10 |
| Point of Sale (POS) Accounts | 2-12 |
| Residential Rental Companies | 2-14 |
| Retail Accounts (store exclusive) | 2-15 |
| Sales Finance Companies | 2-16 |
| Student Loan Reporters – Federal Loans | 2-18 |
| Student Loan Reporters – Private Loans | 2-19 |
| Utility Companies | 2-20 |
| | |
| **METRO 2® FORMAT** | **3-1** |
| Business Requirements | 3-1 |
| Metro 2® Training | 3-2 |
| Programming Standards | 3-3 |
| Production Tips | 3-5 |

# Table of Contents

**RECORD LAYOUTS**                                                    **3-6**

Header Record — Character Format                                       3-7
426 Base Segment — Character Format                                    3-8
J1 Segment — Associated Consumer — Same Address                       3-10
J2 Segment — Associated Consumer — Different Address                  3-11
K1 Segment — Original Creditor Name                                   3-12
K2 Segment — Purchased From/Sold To                                   3-12
K3 Segment — Mortgage Information                                     3-13
K4 Segment — Specialized Payment Information                          3-13
L1 Segment — Account Number/Identification Number Change              3-14
N1 Segment — Employment                                               3-14
Trailer Record — Character Format                                     3-15
Header Record — Packed Format                                         3-17
366 Base Segment — Packed Format                                      3-18
Trailer Record — Packed Format                                        3-20


**FIELD DEFINITIONS**
**HEADER RECORD**                                                     **4-1**

Block Descriptor Word (BDW)                                           4-1
Record Descriptor Word (RDW)                                          4-1
Record Identifier                                                     4-1
Cycle Identifier                                                      4-2
Innovis Program Identifier                                           4-2
Equifax Program Identifier                                           4-2
Experian Program Identifier                                          4-2
TransUnion Program Identifier                                        4-2
Activity Date                                                         4-2
Date Created                                                          4-2
Program Date                                                          4-2
Program Revision Date                                                 4-3
Reporter Name                                                         4-3
Reporter Address                                                      4-3
Reporter Telephone Number                                            4-3
Software Vendor Name                                                  4-3
Software Version Number                                               4-3
MicroBilt/PRBC Program Identifier                                    4-3
Reserved                                                              4-3

CREDIT REPORTING RESOURCE GUIDE®
Copyright 2023 © Consumer Data Industry Association
APPENDIX 0694

# Table of Contents

| | |
|---|---|
| **BASE SEGMENT** | **4-4** |
| Block Descriptor Word (BDW) | 4-4 |
| Record Descriptor Word (RDW) | 4-4 |
| Processing Indicator | 4-4 |
| Time Stamp | 4-5 |
| Reserved | 4-5 |
| Identification Number | 4-5 |
| Cycle Identifier | 4-5 |
| Consumer Account Number | 4-5 |
| Portfolio Type | 4-6 |
| Account Type | 4-6 |
| Date Opened | 4-6 |
| Credit Limit | 4-7 |
| Highest Credit or Original Loan Amount | 4-7 |
| Terms Duration | 4-8 |
| Terms Frequency | 4-8 |
| Scheduled Monthly Payment Amount | 4-9 |
| Actual Payment Amount | 4-9 |
| Account Status | 4-10 |
| Payment Rating | 4-10 |
| Payment History Profile | 4-11 |
| Special Comment | 4-13 |
| Compliance Condition Code | 4-14 |
| Current Balance | 4-15 |
| Amount Past Due | 4-15 |
| Original Charge-off Amount | 4-15 |
| Date of Account Information | 4-16 |
| FCRA Compliance/Date of First Delinquency | 4-17 |
| Date Closed | 4-18 |
| Date of Last Payment | 4-18 |
| Interest Type Indicator | 4-18 |
| Reserved | 4-18 |
| Surname | 4-19 |
| First Name | 4-19 |
| Middle Name | 4-20 |
| Generation Code | 4-20 |

# Table of Contents

## BASE SEGMENT (CONTINUED)

| | |
|---|---|
| Social Security Number | 4-20 |
| Date of Birth | 4-21 |
| Telephone Number | 4-21 |
| ECOA Code | 4-21 |
| Consumer Information Indicator | 4-22 |
| Country Code | 4-22 |
| First Line of Address | 4-23 |
| Second Line of Address | 4-23 |
| City | 4-23 |
| State | 4-24 |
| Postal/Zip Code | 4-24 |
| Address Indicator | 4-24 |
| Residence Code | 4-24 |

## J1 SEGMENT
## ASSOCIATED CONSUMER – SAME ADDRESS    4-25

| | |
|---|---|
| Segment Identifier | 4-25 |
| Reserved | 4-25 |
| Surname | 4-25 |
| First Name | 4-26 |
| Middle Name | 4-26 |
| Generation Code | 4-26 |
| Social Security Number | 4-27 |
| Date of Birth | 4-27 |
| Telephone Number | 4-28 |
| ECOA Code | 4-28 |
| Consumer Information Indicator | 4-29 |
| Reserved | 4-29 |

CREDIT REPORTING RESOURCE GUIDE®
*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 0696

Case 4:25-cv-00443-P    Document 116    Filed 12/22/25    Page 663 of 1862    PageID 2512

# Table of Contents

**J2 SEGMENT**
**ASSOCIATED CONSUMER – DIFFERENT ADDRESS**                    **4-30**

| | |
|---|---|
| Segment Identifier | 4-30 |
| Reserved | 4-30 |
| Surname | 4-30 |
| First Name | 4-31 |
| Middle Name | 4-31 |
| Generation Code | 4-31 |
| Social Security Number | 4-32 |
| Date of Birth | 4-33 |
| Telephone Number | 4-34 |
| ECOA Code | 4-34 |
| Consumer Information Indicator | 4-35 |
| Country Code | 4-35 |
| First Line of Address | 4-36 |
| Second Line of Address | 4-36 |
| City | 4-36 |
| State | 4-37 |
| Postal/Zip Code | 4-37 |
| Address Indicator | 4-37 |
| Residence Code | 4-37 |
| Reserved | 4-37 |

**K1 SEGMENT**
**ORIGINAL CREDITOR NAME**                    **4-38**

| | |
|---|---|
| Segment Identifier | 4-38 |
| Original Creditor Name | 4-39 |
| Creditor Classification | 4-40 |

**K2 SEGMENT**
**PURCHASED FROM/SOLD TO**                    **4-41**

| | |
|---|---|
| Segment Identifier | 4-41 |
| Purchased From/Sold To Indicator | 4-41 |
| Purchased From or Sold To Name | 4-41 |
| Reserved | 4-41 |

# Table of Contents

**K3 SEGMENT**
**MORTGAGE INFORMATION**                                                 **4-42**

| | |
|---|---|
| Segment Identifier | 4-42 |
| Agency Identifier | 4-42 |
| Account Number | 4-42 |
| Mortgage Identification Number | 4-42 |

**K4 SEGMENT**
**SPECIALIZED PAYMENT INFORMATION**                                      **4-43**

| | |
|---|---|
| Segment Identifier | 4-43 |
| Specialized Payment Indicator | 4-43 |
| Deferred Payment Start Date | 4-43 |
| Balloon Payment Due Date | 4-43 |
| Balloon Payment Amount | 4-43 |
| Reserved | 4-43 |

**L1 SEGMENT**
**ACCOUNT NUMBER/IDENTIFICATION NUMBER CHANGE**                          **4-44**

| | |
|---|---|
| Segment Identifier | 4-44 |
| Change Indicator | 4-44 |
| New Consumer Account Number | 4-44 |
| New Identification Number | 4-45 |
| Reserved | 4-45 |

**N1 SEGMENT**
**EMPLOYMENT**                                                           **4-46**

| | |
|---|---|
| Segment Identifier | 4-46 |
| Employer Name | 4-46 |
| First Line of Employer Address | 4-46 |
| Second Line of Employer Address | 4-46 |
| Employer City | 4-46 |
| Employer State | 4-46 |
| Employer Postal/Zip Code | 4-46 |
| Occupation | 4-47 |
| Reserved | 4-47 |

Copyright 2023 © Consumer Data Industry Association

APPENDIX 0698

# Table of Contents

| | |
|---|---|
| **TRAILER RECORD** | **4-48** |
| Record Descriptor Word (RDW) | 4-48 |
| Record Identifier | 4-48 |
| Total Base Records | 4-48 |
| Reserved | 4-48 |
| Total of Status Code DF | 4-48 |
| Total Associated Consumer Segments (J1) | 4-48 |
| Total Associated Consumer Segments (J2) | 4-48 |
| Block Count | 4-48 |
| Total of Status Code DA | 4-48 |
| Total of Status Code 11 | 4-48 |
| Total of Status Code 13 | 4-49 |
| Total of Status Code 61 | 4-49 |
| Total of Status Code 62 | 4-49 |
| Total of Status Code 63 | 4-49 |
| Total of Status Code 64 | 4-49 |
| Total of Status Code 65 | 4-49 |
| Total of Status Code 71 | 4-49 |
| Total of Status Code 78 | 4-49 |
| Total of Status Code 80 | 4-49 |
| Total of Status Code 82 | 4-49 |
| Total of Status Code 83 | 4-49 |
| Total of Status Code 84 | 4-49 |
| Total of Status Code 88 | 4-49 |
| Total of Status Code 89 | 4-50 |
| Total of Status Code 93 | 4-50 |
| Total of Status Code 94 | 4-50 |
| Total of Status Code 95 | 4-50 |
| Total of Status Code 96 | 4-50 |
| Total of Status Code 97 | 4-50 |
| Total of ECOA Code Z (All Segments) | 4-50 |
| Total Employment Segments | 4-50 |
| Total Original Creditor Segments | 4-50 |
| Total Purchased From/Sold To Segments | 4-50 |

# Table of Contents

### TRAILER RECORD (CONTINUED)

| | |
|---|---|
| Total Mortgage Information Segments | 4-50 |
| Total Specialized Payment Information Segments | 4-50 |
| Total Change Segments | 4-50 |
| Total Social Security Numbers (All Segments) | 4-51 |
| Total Social Security Numbers (Base Segments) | 4-51 |
| Total Social Security Numbers (J1 Segments) | 4-51 |
| Total Social Security Numbers (J2 Segments) | 4-51 |
| Total Dates of Birth (All Segments) | 4-51 |
| Total Dates of Birth (Base Segments) | 4-51 |
| Total Dates of Birth (J1 Segments) | 4-51 |
| Total Dates of Birth (J2 Segments) | 4-51 |
| Total Telephone Numbers (All Segments) | 4-51 |
| Reserved | 4-51 |

CREDIT REPORTING RESOURCE GUIDE®

*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 0700

# Table of Contents

| **EXHIBITS** | **5-1** |
|---|---|
| Exhibit 1 — Account Type Codes by Industry | 5-1 |
| Exhibit 2 — Account Type Codes within Portfolio Type | 5-7 |
| Exhibit 3 — Terms/Payment Amount Conversion to Monthly | 5-13 |
| Exhibit 4 — Account Status Codes | 5-14 |
| Exhibit 5 — Examples of Reporting Payment History Profile | 5-16 |
| Exhibit 6 — Special Comment Codes — by Category within Portfolio | 5-18 |
|   Closed (Permanently or Temporarily) | 5-18 |
|   Leasing | 5-20 |
|   Legal Action | 5-22 |
|   Other | 5-22 |
|   Refinanced | 5-23 |
|   Removal of Comment | 5-24 |
|   Sold | 5-24 |
|   Special Payment Arrangements | 5-24 |
|   Transferred | 5-26 |
| Exhibit 7 — Special Comment Codes | 5-27 |
| Exhibit 8 — Compliance Condition Codes | 5-32 |
| Exhibit 9 — Explanation and Examples of FCRA Compliance/Date of First Delinquency | 5-36 |
| Exhibit 10 — ECOA Codes | 5-48 |
| Exhibit 11 — Consumer Information Indicators | 5-50 |
| Exhibit 12 — Country Codes | 5-53 |
| Exhibit 13 — General Rules for Addresses | 5-55 |
| Exhibit 14 — State Codes | 5-56 |
| Exhibit 15 — Data Conversion Checklist | 5-57 |
| Exhibit 16 — Examples of Record Layouts — Hexadecimal Representation | 5-60 |

# Table of Contents

| | |
|---|---|
| **FREQUENTLY ASKED QUESTIONS AND ANSWERS** | **6-1** |
| **Complete List of Questions** | 6-1 |
| Segments and Appendages | 6-6 |
| BDW / RDW | 6-8 |
| Delinquency Reporting | 6-8 |
| Cycle Reporting | 6-8 |
| Account Status, Payment Rating, Special Comment | 6-9 |
| ECOA Requirements | 6-10 |
| FCRA Requirements | 6-11 |
| Deleting Accounts/Borrowers | 6-12 |
| Consumer Information | 6-12 |
| Duplicate Tradelines | 6-14 |
| First Time Reporters | 6-15 |
| Accounts Included in Bankruptcy | 6-16 |
| Reporting Scenarios | 6-49 |
| | |
| **GLOSSARY OF TERMS** | **7-1** |
| | |
| **VALIDATION/IMPLEMENTATION CHECKLIST** | **8-1** |
| | |
| **INDUSTRY REPORTING GUIDELINES** | **9-1** |
| Child Support Reporting | 9-1 |
| Debt Buyer/Third Party Collection Agency Reporting | 10-1 |
| Mortgage Loan Modifications | 11-1 |
| Residential Rental Reporting | 12-1 |
| Student Loan Reporting | 13-1 |
| Federal Student Loan Guidelines | 13-2 |
| Lender/Servicer/Secondary Market | 13-3 |
| Post-Default Loans | 13-17 |
| Federal Student Loan Glossary of Terms | 13-22 |
| Private Student Loan Guidelines | 13-25 |
| Private Student Loan Glossary of Terms | 13-42 |
| Utility Company Reporting | 14-1 |

# Table of Contents

| | |
|---|---|
| **e-OSCAR**® | **15-1** |
| Consumer Dispute Process | 15-1 |
| Automated Consumer Dispute Verification (ACDV) | 15-2 |
| ACDV Workflow | 15-2 |
| Features of ACDV | 15-4 |
| The Update Process | 15-5 |
| Automated Universal Data Process via e-OSCAR® | 15-5 |
| Features of AUD | 15-6 |
| The Tradeline Block Rescission Request Process | 15-7 |
| Features of Block Rescission Request | 15-8 |

# Responsibilities and Roles

**RESPONSIBILITIES**

Credit reporting information is sensitive data. The issues of accuracy and completeness of information and fairness to consumers are not just a concern of the consumer reporting agencies; credit grantor participation is also required. Federal and state laws already regulate certain aspects of credit reporting. In order to protect your ability to conduct business without the further intervention of external forces, you must participate in the accuracy process.

Both credit grantors and consumers depend on consumer reporting agencies to acquire and maintain accurate credit histories. This can only be accomplished if the provider of consumer data understands the tools that are available and adheres to the standards for credit reporting.

The purpose of this guide is to document this very important process and includes:

- Industry Standards
- Metro 2® Format
- Metro 2® Validation/Implementation Checklist
- Automated Universal Data Process
- Automated Consumer Dispute Verification

The Metro 2® Format Task Force strongly encourages you to make the fullest use of the tools and procedures outlined in this guide, and to contact the consumer reporting agencies at any time for whatever assistance you may need.

# Responsibilities and Roles

**ROLES**

**Consumer Data Industry Association (CDIA)**
An international trade association representing the consumer credit, mortgage reporting, employment and tenant screening and collection service industries. Headquartered in Washington, DC, CDIA provides legislative assistance and a lobbying function to its members, and works with the consumer reporting agencies to establish standards for the consumer reporting industry.

For more information about CDIA, visit their website at www.cdiaonline.org.

**Consumer Reporting Agencies**
Individual companies that collect, store, maintain and distribute information on consumer credit history.

For more information about the agencies, visit their websites at:

www.equifax.com
www.experian.com
www.innovis.com
www.transunion.com

**Metro 2® Format Task Force**
Despite the competitive and organizational barriers within the credit industry, the consumer reporting agencies continue to work together to develop, maintain and enhance an industry-standard reporting format. The task force's mission is to provide a standardized method for the reporting of accurate, complete and timely data.

The Metro 2® Format Task Force is comprised of representatives from Equifax, Experian, Innovis and TransUnion and is supported by the CDIA.

For information specific to data reporting, click on the Metro 2® option at www.cdiaonline.org.

CREDIT REPORTING RESOURCE GUIDE®

*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 0705

Return to Table of Contents

# Responsibilities and Roles

---

**e-OSCAR® System Support Team**
This group maintains an industry-wide automated consumer dispute resolution system, which is required by the Fair Credit Reporting Act (FCRA) section 611 (a) (5) (D). This team includes representatives from Equifax, Experian, Innovis and TransUnion.

For information specific to consumer disputes, click on the e-OSCAR® option at www.cdiaonline.org.

**Data Furnisher**
Company who provides consumer credit accounts receivables to one or more consumer reporting agency.

Duties of furnishers are described in FCRA (section 623). See http://www.ftc.gov/os/statutes/fcra.pdf for additional information.

Return to Table of Contents

# Responsibilities and Roles

**Consumer Financial Protection Bureau (CFPB)**
The Consumer Financial Protection Act of 2010 (Title X of the Dodd-Frank Act) created the Consumer Financial Protection Bureau (CFPB) and granted to it supervisory, rule-making, and enforcement authority over consumer reporting agencies and it has powers to regulate the broader consumer reporting ecosystem. The CFPB oversees a number of rules promulgated under the FCRA.  These rules are found in the Code of Federal Regulations (CFR), Tit. 12, Ch. X, Part 1002, commonly called Reg. V.  Among its responsibilities, the CFPB writes rules under and enforces the FCRA, and takes consumer complaints related to the FCRA.  More information can be found on the internet at http:/www.consumerfinance.gov.

The CFPB has a dedicated webpage to consumer reporting: https://www.consumerfinance.gov/policy-compliance/guidance/other-applicable-requirements/fair-credit-reporting-act/.

**Federal Trade Commission (FTC)**
The federal Fair Credit Reporting Act (FCRA) was passed in 1970 and became effective in 1971.  The FCRA is the primary law that governs the consumer reporting ecosystem by imposing duties and prohibitions on consumer reporting agencies, data furnishers, and data users; and by empowering consumers with certain rights.  Since its initial passage, the FTC has played an important role in the implementation, oversight, enforcement, and interpretation of the FCRA.  The CFPB allowed the FTC to retain its enforcement role but it now shares that role in many respects with the CFPB.

The FTC has a dedicated webpage to consumer reporting: https://www.ftc.gov/tips-advice/business-center/privacy-and-security/credit-reporting.

CREDIT REPORTING RESOURCE GUIDE®
*Copyright 2023 © Consumer Data Industry Association*
APPENDIX 0707

Return to Table of Contents

# Automated Data Reporting

**FEATURES OF THE METRO 2® FORMAT**

- Accepted by all consumer reporting agencies, the Metro 2® Format enables the reporting of accurate, complete and timely credit information.

- Meets all requirements of the Fair Credit Billing Act (FCBA), the Fair Credit Reporting Act (FCRA), the Equal Credit Opportunity Act (ECOA) and all applicable state laws.

- Allows credit information to be added and mapped to the consumer's file with greater consistency.

- Allows complete identification information to be reported for each consumer (including co-debtor, co-signer, etc.) each month which improves the ability of the consumer reporting systems to match to the correct consumer.

- Accommodates cycle reporting of data, which allows more timely updating of the credit file.

- The Payment History Profile (up to 24 months) makes it possible for the credit grantor to supply automated updates/corrections for the file rather than costly manual updates/corrections, and reduces consumer disputes.

- Flexibility of the format provides for future enhancements.

Reporting in the Metro 2® Format greatly benefits the credit grantor, the consumer reporting agencies and your customer, the consumer.

Return to Table of Contents

# Automated Data Reporting

**INDUSTRY REPORTING STANDARDS**

An industry standard for reporting consumer accounts will ensure the integrity and consistency of the credit information being reported.

- All accounts with Account Status Codes 11, 71, 78, 80, 82-84, 88-89 and 93-97 must be reported a minimum of once per month.

- A final Account Status Code must be reported when the accounts are ultimately paid or closed with a zero balance.

- If reporting by cycles, all accounts must be reported at the close of each cycle.

- When reporting delinquent accounts, the "Industry Standard for Reporting Account Delinquency" must be followed.

**INDUSTRY STANDARD FOR REPORTING ACCOUNT DELINQUENCY**

The "clock" for a 30-day delinquency starts 30 days after the **due date**, as opposed to the billing date.

The following example tracks an account history for four months, specifying the Metro 2® Account Status Code that should be reported.  The Due Date for this example is the 15th of each month.

| Date of Acct. Info. | Jan 1 | Feb 1 | Mar 1 | Apr 1 |
|---|---|---|---|---|
| Bills Received | 1 | 2 | 3 | 4 |
| Payments Past Due | 0 | 1 | 2 | 3 |
| # Days Past Due Date | 0 | 17 | 45 | 76 |
| Metro 2® Status Code | 11 | 11 | 71 | 78 |

**Definitions:**

| Metro 2® Status Code 11 | 0-29 days past due date |
|---|---|
| Metro 2® Status Code 71 | 30-59 days past due date |
| Metro 2® Status Code 78 | 60-89 days past due date |

CREDIT REPORTING RESOURCE GUIDE®
*Copyright 2023 © Consumer Data Industry Association*
APPENDIX 0709

Return to Table of Contents

# Automated Data Reporting

---

**ACCURACY AND INTEGRITY DEFINITIONS**

The 2010 FACT Act Data Furnisher rules define the term "Accuracy" to mean that information that a furnisher provides to a consumer reporting agency about an account or other relationship with the consumer correctly:

- Reflects the terms of and liability for the account or other relationship;
- Reflects the consumer's performance and other conduct with respect to the account or other relationship; and
- Identifies the appropriate consumer.

The term "Integrity" means that information that a furnisher provides to a consumer reporting agency about an account or other relationship with the consumer:

- Is substantiated by the furnisher's records at the time it is furnished;
- Is furnished in a form and manner that is designed to minimize the likelihood that the information may be incorrectly reflected in a consumer report; and
- Includes the credit limit, if applicable and in the furnisher's possession.

**MAINTAINING ACCURACY, INTEGRITY AND CONSISTENCY OF CREDIT INFORMATION**

Once information is reported accurately, it is important that data furnishers not ask for a subsequent change in the history payment record unless the payment history is inaccurate.

- Consumer credit history information will be reported in a factual, precise and objective manner.

- Only inaccurately reported accounts should be deleted.  Paid derogatory accounts, such as collections or charge offs, should be reported as paid; they should not be deleted.

- Requests by consumers for re-verification of challenged information must be processed promptly.

- Unless an error is discovered, the consumer will be advised that the factual credit history will continue to be reported.

Case 4:25-cv-00443-P     Document 116     Filed 12/22/25     Page 677 of 1862     PageID 2526

CREDIT REPORTING RESOURCE GUIDE®

*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 0711

Return to Table of Contents

# Quick Reference Guides to Industry Standards

## Banking / Savings & Loan / Credit Union – Installment Loan & Line of Credit

While all applicable fields with the Metro 2® Format should be reported, these guidelines provide specific values that apply to Installment Loans and Lines of Credit.

**Important Note:** Refer to Credit Cards (non-Retail), Student Loans and Mortgages for guidelines specific to reporting those types of accounts.

| Field | Segment/ Field # | | |
|---|---|---|---|
| Portfolio Type | Base/8 | I (Installment) | C (Line of Credit) |
| Account Type | Base/9 | 00 – 06, 10, 11, 13, 17, 20, 90, 91, 95, 0A, 3A, 6A, 9A, 7B, 0F | 15, 43, 47, 7A, 9B |
| Credit Limit | Base/11 | Zero fill | Assigned credit limit |
| High Credit/Original Loan Amount | Base/12 | Original amount of the loan, excluding interest payments | Highest amount of credit utilized by the consumer |
| Terms Duration | Base/13 | Number of months of the loan | Constant of 'LOC' |
| Scheduled Monthly Payment Amount | Base/15 | Regular monthly payment | Minimum amount due based on the balance, not including any amounts past due |
| Account Status | Base/17A | 11, 13, 61 – 64, 71, 78, 80, 82 – 84, 93, 95 – 97, DA, DF | 11, 13, 62, 64, 71, 78, 80, 82 – 84, 93, 97, DA, DF |
| Special Comment | Base/19 | Closed accounts = I<br>Leasing = BB – BK, BS (Require Account Type Code 13 or 3A)<br>Legal Action = AM<br>Refinanced = AS<br>Sold = AH<br>Special Payment Arrangements = B, C, AB, AC, AI, AO, AU, AX, BN, BP, BT, CP<br>Transferred = H, O, AN, AT, BA<br>Other = S, V, AV, AW, AZ, CH, CM, CN, CO<br>Removal of comment = blank | Closed accounts = M, AP, CI, CJ, CL<br>Legal Action = AM<br>Refinanced = AS<br>Sold = AH<br>Special Payment Arrangements = B, C, AB, AC, AI, AU, AX, BP, BT, CP<br>Transferred = O, AN, AT, BA<br>Other = S, V, AV, AW, CH, CK, CM, CN, CO<br>Removal of comment = blank |
| Comp. Cond. Code | Base/20 | XB, XC, XF, XG, XH, XR | XA – XJ, XR |
| ECOA Code | Base/37 J1 & J2/10 | ECOA Code 3 (Authorized User) is not applicable. | 1 – 3, 5, 7, T, X, W, Z |

Case 4:25-cv-00443-P    Document 116    Filed 12/22/25    Page 678 of 1862    PageID 2527

# Child Support Agencies

While all applicable fields within the Metro 2® Format should be reported, these guidelines provide specific values that apply to Child Support Agencies' accounts.  Refer to the Child Support Reporting module for additional details.

| Field | Segment/ Field # | |
|---|---|---|
| Portfolio Type | Base/8 | O (Open) |
| Account Type | Base/9 | 50, 93 |
| Date Opened | Base/10 | Date the case was initiated with the state agency |
| Highest Credit/Original Loan Amount | Base/12 | Zero fill |
| Terms Duration | Base/13 | Constant of 001 |
| Current Balance | Base/21 | Total amount due from outstanding support payments.  This amount must equal, at a minimum, one scheduled monthly payment amount. |
| Scheduled Monthly Payment Amount | Base/15 | The monthly debt obligation |
| Account Status | Base/17A | Able to Age Account History: 11, 13, 62, 71, 78, 80, 82 – 84, 93, DA<br>Unable to Age Account History: 11, 13, 62, 93, DA |
| FCRA Compliance / Date of First Delinquency | Base/25 | Activity Date – because each month begins a new obligation.  Note: This date must freeze when the child or youngest child, in the case of multiple children, reaches the age of majority or emancipation, or the statute of limitations in that state has been reached. |
| Special Comment | Base/19 | Code 'CS' is used to overlay the Date of First Delinquency each month when reporting delinquent and collection account statuses because each month begins a new obligation.<br>Other applicable comments are:<br>Legal Action = AM<br>Special Payment Arrangements = B, AC, AI<br>Transferred = O<br>Other = S, V, AW<br>Removal of comment = blank |
| Compliance Condition Code | Base/20 | XB, XC, XH, XR |
| ECOA Code | Base/37 J1 & J2/10 | 1 (Individual) |
| Consumer Information Indicator | Base/38 J1 & J2/11 | T and U only (Note: Bankruptcy, Personal Receivership and Reaffirmation of Debt codes are not applicable.) |

Case 4:25-cv-00443-P   Document 116   Filed 12/22/25   Page 679 of 1862   PageID 2528

Return to Table of Contents

# Credit Cards (non-Retail Cards)

While all applicable fields within the Metro 2® Format should be reported, these guidelines provide specific values that apply to Credit Cards.

| Field | Segment/ Field # | | |
|---|---|---|---|
| Portfolio Type | Base/8 | R (Revolving) | O (Open) |
| Account Type | Base/9 | 18, 37, 2A, 8A, 0G | 18, 37, 2A, 8A |
| Credit Limit | Base/11 | Assigned credit limit | Assigned credit limit, if applicable. Otherwise, zero fill. |
| Highest Credit/Original Loan Amount | Base/12 | Highest amount of credit utilized by the consumer | Highest amount of credit utilized by the consumer |
| Terms Duration | Base/13 | 'REV' (for revolving payments) | '001' (for one payment due as scheduled) |
| Scheduled Monthly Payment Amount | Base/15 | Minimum amount due based on the balance, not including any amounts past due | Zero fill |
| Account Status | Base/17A | 11, 13, 62, 64, 71, 78, 80, 82 - 84, 93, 97, DA, DF<br>**Notes:** As per the status definitions in Exhibit 4, Account Status 13 (Paid or closed account/zero balance) is a final status. When reported for Revolving portfolio types, the account should no longer be available for use and the Balance Amount should be zero.<br><br>If the account has a zero balance but is still open for further use, report Account Status Code 11 (current). | 11, 13, 62, 64, 71, 78, 80, 82 - 84, 93, 97, DA, DF<br>**Notes:** As per the status definitions in Exhibit 4, Account Status 13 (Paid or closed account/zero balance) is a final status. When reported for Open portfolio types, the account should no longer be available for use and the Balance Amount should be zero.<br><br>If the account has a zero balance but is still open for further use, report Account Status Code 11 (current). |
| Special Comment | Base/19 | Closed accounts = M, AP, BL, CI<br>Legal Action = AM<br>Sold = AH<br>Special Payment Arrangements = B, C, AB, AC, AI, AU, AX, BP, BT, CP<br>Transferred = O, AN, AT, BA<br>Other = S, V, AV, AW, CH, CN, CO<br>Removal of comment = blank | Closed accounts = M, AP, BL, CI<br>Legal Action = AM<br>Sold = AH<br>Special Payment Arrangements = B, C, AB, AC, AI, AU, BP, CP<br>Transferred = O, AN, AT, BA<br>Other = S, V, AV, AW, CH, CN, CO<br>Removal of comment = blank |
| Date Closed | Base/26 | Date closed to further purchases | Date closed to further purchases |

*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 0714

Return to Table of Contents

Case 4:25-cv-00443-P　　Document 116　　Filed 12/22/25　　Page 680 of 1862　　PageID 2529

## Debt Buyers / Collection Agencies

While all applicable fields within the Metro 2® Format should be reported, these guidelines provide specific values that apply to Debt Buyer and Collection Agency accounts.  Refer to the Debt Buyer/Third Party Collection Agency Reporting module for additional details.

| Field | Segment/ Field # | Debt Buyer/Collection Agency | Returned Checks |
|---|---|---|---|
| Portfolio Type | Base/8 | O (Open) | O (Open) |
| Account Type | Base/9 | 48, 0C | 77 |
| Date Opened | Base/10 | Date the account was purchased by the debt buyer or placed/assigned to the third party collection agency | Date of the check |
| Highest Credit/Original Loan Amount | Base/12 | Original assigned amount as of the date purchased, placed or assigned | Original amount of the check, excluding fees and interest |
| Terms Frequency | Base/14 | Blank fill | Blank fill |
| Account Status | Base/17A | 62, 93, DA, DF (Note: Paid in full collection accounts must not be deleted.) | 62, 93, DA, DF (Note: Paid in full collection accounts must not be deleted.) |
| FCRA Compliance / Date of First Delinquency | Base/25 | Date of the first delinquency **with the original creditor** that led to the account being sold or placed for collection | Date the check was returned for non-sufficient funds.  If not available, the date of the check is acceptable. |
| Special Comment | Base/19 | Legal Action = AM Special Payment Arrangements =  B, C, AB, AC, AI, AU, BP Other = S, V, AW Removal of comment = blank | Legal Action = AM Special Payment Arrangements =  B, C, AB, AC, AI, AU, BP Other = S, V, AW Removal of comment = blank |
| Compliance Condition Code | Base/20 | XB, XC, XF, XG, XH, XR | XB, XC, XF, XG, XH, XR |
| ECOA Code | Base/37 J1 & J2/10 | ECOA Codes 3 and X are not applicable. | ECOA Codes 3, 5, 7 and X are not applicable. |
| K1 Segment | K1/2  K1/3 | Original credit grantor's name  Creditor Classification = 01–15 are required.  Note: 02 (Medical/Health Care) is used to identify an account as a medical collection debt in accordance with FCRA section 623. | Original Creditor = Name of the payee  Creditor Classification = 01–15 are required.  Note: 02 (Medical/Health Care) is used to identify an account as a medical collection debt in accordance with FCRA section 623. |

APPENDIX 0715

Return to Table of Contents

# Loan Finance Companies

While all applicable fields within the Metro 2® Format should be reported, these guidelines provide specific values that apply to Loan Finance companies' accounts.

**Important Note**: Refer to Credit Cards (non-Retail) and Student Loan Reporters for guidelines specific to reporting those types of accounts.

| Field | Segment/Field # | | |
|---|---|---|---|
| Portfolio Type | Base/8 | I (Installment) | C (Line of Credit) |
| Account Type | Base/9 | 00 – 05, 10, 11, 13, 17, 20, 90, 91, 95, 0A, 3A, 6A, 9A, 7B, 0F | 15, 43, 47, 7A, 9B |
| Credit Limit | Base/11 | Zero fill | Assigned credit limit |
| Highest Credit/Original Loan Amount | Base/12 | Original amount of the loan, excluding interest payments | Highest amount of credit utilized by the consumer |
| Terms Duration | Base/13 | Number of months of the loan | Constant of 'LOC' |
| Scheduled Monthly Payment Amount | Base/15 | Regular monthly payment | Minimum amount due based on the balance, not including any amounts past due |
| Account Status | Base/17A | 11, 13, 61 – 64, 71, 78, 80, 82 – 84, 93, 95 – 97, DA, DF | 11, 13, 62, 64, 71, 78, 80, 82 – 84, 93, 97, DA, DF |
| Special Comment | Base/19 | Closed accounts = I<br>Leasing = BB – BK, BS (Require Account Type Code 13 or 3A)<br>Legal Action = AM<br>Refinanced = AS<br>Sold = AH<br>Special Payment Arrangements = B, C, AB, AC, AI, AO, AU, AX, BN, BP, BT, CP<br>Transferred = H, O, AN, AT, BA<br>Other = S, V, AV, AW, AZ, CH, CM, CN, CO<br>Removal of comment = blank | Closed accounts = M, AP, CI, CJ, CL<br>Legal Action = AM<br>Refinanced = AS<br>Sold = AH<br>Special Payment Arrangements = B, C, AB, AC, AI, AU, AX, BP, BT, CP<br>Transferred = O, AN, AT, BA<br>Other = S, V, AV, AW, CH, CK, CM, CN, CO<br>Removal of comment = blank |
| Compliance Condition Code | Base/20 | XB, XC, XF, XG, XH, XR | XA – XJ, XR |
| ECOA Code | Base/37 J1 & J2/10 | ECOA Code 3 (Authorized User) is not applicable. | 1 – 3, 5, 7, T, X, W, Z |

Return to Table of Contents

Case 4:25-cv-00443-P    Document 116    Filed 12/22/25    Page 682 of 1862    PageID 2531

## Mortgage Lending

While all applicable fields within the Metro 2® Format should be reported, these guidelines provide specific values that apply to Mortgage lending.

| Field | # | M (Mortgage) | I (Installment) | C (Line of Credit) |
|---|---|---|---|---|
| Portfolio Type | 8 | M (Mortgage) | I (Installment) | C (Line of Credit) |
| Account Type | 9 | 19, 25, 26, 5A, 5B, 6B, 2C, 08 | 04, 05, 17, 0A, 9A, 6D, 0F | 89 |
| Credit Limit | 11 | Zero fill | Zero fill | Assigned credit limit |
| Highest Credit or Original Loan Amt. | 12 | Original amount of the loan, excluding interest payments | Original amount of the loan, excluding interest payments | Highest amount of credit utilized by the consumer |
| Terms Duration | 13 | Number of years of the loan | Number of months of the loan | Constant of 'LOC' |
| Scheduled Monthly Payment Amount | 15 | Regular monthly payment, including principal, interest & escrow | Regular monthly payment | Minimum amount due based on the balance, not including any amounts past due |
| Account Status | 17A | 11, 13, 65, 71, 78, 80, 82 – 84, 89, 94, DA, DF<br>• 88 (for HUD FHA Title 1 loans)<br>• 97 (Only report when the account does not go through the foreclosure process; but the remaining balance is charged off. If the remaining charged off balance is paid, report Account Status 64.)<br>**Note:** 97 should not be reported when deficiency balance is charged off. If the lien has been released, report the mortgage as paid. | 11, 13, 61 – 64, 71, 78, 80, 82 – 84, 93, 95 – 97, DA, DF<br><br>89 and 94 (only for Type 6D Home Equity loans that go through the deed in lieu or foreclosure process) | 11, 13, 62, 64, 65, 71, 78, 80, 82 – 84, 89, 93, 94, 97, DA, DF |

*Mortgage Lending (continued on next page)*

*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 0717

Return to Table of Contents

Case 4:25-cv-00443-P    Document 116    Filed 12/22/25    Page 683 of 1862    PageID 2532

# Mortgage Lending

*Continued from previous page*

| Field | # | M (Mortgage) | I (Installment) | C (Line of Credit) |
|---|---|---|---|---|
| Portfolio Type | 8 | M (Mortgage) | I (Installment) | C (Line of Credit) |
| Special Comment | 19 | Legal Action = AM<br>Refinanced = AS<br>Sold = AH<br>Special Payment Arrangements = B, C, AB, AC, AI, AU, BP, BT, CP<br>Transfer = H, O, AN, AT, BA<br>Other = S, V, AV, AW, BO, CH, CM, CN, CO<br>Removal of comment = blank | Legal Action = AM<br>Refinanced = AS<br>Sold = AH<br>Special Payment Arrangements = B, C, AB, AC, AI, AU, AX, BN, BP, BT, CP<br>Transfer = H, O, AN, AT, BA<br>Other = S, V, AV, AW, CH, CM, CN, CO<br>Removal of comment = blank | Closed = M, AP, CJ, CL<br>Legal Action = AM<br>Refinanced = AS<br>Sold = AH<br>Special Payment Arrangements = B, C, AB, AC, AI, AU, BP, BT, CP<br>Transfer = O, AN, AT, BA<br>Other = S, V, AV, AW, BO, CH, CK, CM, CN, CO<br>Removal of comment = blank |
| Compliance Condition Code | 20 | XB, XC, XF, XG, XH, XR | XB, XC, XF, XG, XH, XR | XA – XJ, XR |
| Interest Type Indicator | 28 | F (Fixed) or<br>V (Variable/Adjustable) | If applicable, F (Fixed) or<br>V (Variable/Adjustable) | If applicable, F (Fixed) or<br>V (Variable/Adjustable) |
| ECOA Code | 37<br>J1/J2<br>-10 | ECOA Code 3 (Authorized User) is not applicable. | ECOA Code 3 (Authorized User) is not applicable. | ECOA Code 3 (Authorized User) is not applicable. |
| K3 Segment Mortgage Information | 2<br><br>3<br>4 | Agency Identifier = 01 (Fannie Mae) & 02 (Freddie Mac)<br>Secondary Agency Account No.<br>Mortgage Identification Number | Segment not applicable | Segment not applicable |
| K4 Segment (when loan has a balloon payment) | 2<br><br>4<br>5 | Specialized Payment Indicator = 01<br>Balloon Payment Due Date<br>Balloon Payment Amount | Specialized Payment Indicator = 01<br>Balloon Payment Due Date<br>Balloon Payment Amount | Specialized Payment Indicator = 01<br>Balloon Payment Due Date<br>Balloon Payment Amount |
| K4 Segment (when loan is in deferment) | 2<br><br>3 | Specialized Payment Indicator = 02<br>Deferred Payment Start Date | Specialized Payment Indicator = 02<br>Deferred Payment Start Date | Specialized Payment Indicator = 02<br>Deferred Payment Start Date |

Copyright 2023 © Consumer Data Industry Association

APPENDIX 0718

Return to Table of Contents

Case 4:25-cv-00443-P    Document 116    Filed 12/22/25    Page 684 of 1862    PageID 2533

## Point of Sale (POS) Accounts

While all applicable fields within the Metro 2® Format should be reported, these guidelines provide specific values that apply to POS accounts.

| Field | Segment/ Field # | | |
|---|---|---|---|
| Portfolio Type | Base/8 | I (Installment) | C (Line of Credit) |
| Account Type | Base/9 | 06 (Installment Sales Contract) | 15 (Line of Credit) |
| Credit Limit | Base/11 | Zero fill | Assigned credit limit |
| Highest Credit/Original Loan Amount | Base/12 | Original amount of the loan, which should include the initial down payment amount if that is how the loan is structured. Otherwise, do not include the initial down payment in the Original Loan Amount. | Highest amount of credit utilized by the consumer |
| Terms Duration | Base/13 | Number of months of the loan (Exhibit 3 provides the calculations necessary to convert Terms Duration to monthly values. Round up if the result of the calculation is in between two values; e.g., 6 week obligation, report Terms Duration 002.) | Constant of 'LOC' |
| Terms Frequency | Base/14 | Frequency for payments due (Exhibit 3 provides definitions of the Terms Frequency codes.) | Frequency for payments due (Exhibit 3 provides definitions of the Terms Frequency codes.) |
| Scheduled Monthly Payment Amount | Base/15 | Regular monthly payment **Note:** Report the dollar amount of the scheduled monthly payment due for this reporting period. If multiple payments are due during the reporting period, the total amount due should be reported. | Minimum amount due based on the balance, not including any amounts past due |
| Actual Payment Amount | Base/16 | Total dollar amount actually received for this reporting period. When initial POS occurs, if down payment was required and part of the original loan amount, include within Actual Payment Amount. If there was no down payment, zero fill. | Total dollar amount actually received for this reporting period |

*Point of Sale Accounts (continued on next page)*

APPENDIX 0719

Return to Table of Contents

Case 4:25-cv-00443-P    Document 116    Filed 12/22/25    Page 685 of 1862    PageID 2534

# Point of Sale (POS) Accounts

*Continued from previous page*

| Field | Segment/ Field # | I (Installment) | C (Line of Credit) |
|---|---|---|---|
| Portfolio Type | Base/8 | I (Installment) | C (Line of Credit) |
| Account Status | Base/17A | 11, 13, 61 – 64, 71, 78, 80, 82 – 84, 93, 95 – 97, DA, DF<br>**Note:** If the consumer has returned the entire purchase and is no longer obligated to pay, report Account Status DA to delete the account. | 11, 13, 61 – 64, 71, 78, 80, 82 – 84, 93, 95 – 97, DA, DF<br>**Note:** If the consumer has returned the entire purchase and is no longer obligated to pay, however the line of credit is still available for use, do not delete the account and continue reporting normally going forward. |
| Special Comment | Base/19 | Sold = AH<br>Special Payment Arrangements = B, AC, AI, AU<br>Transferred = AT, BA<br>Other = V, AV, AW<br>Removal of comment = blank | Closed accounts = M, AP, CI<br>Sold = AH<br>Special Payment Arrangements = B, AC, AI, AU<br>Transferred = AT, BA<br>Other = V, AV, AW<br>Removal of comment = blank |
| Compliance Condition Code | Base/20 | XB, XC, XF, XG, XH, XR | XA – XJ, XR |
| ECOA Code | Base/37 J1 & J2/10 | 1, 2, 5, 7, T, X, Z | 1, 2, 5, 7, T, X, Z |

Return to Table of Contents

Case 4:25-cv-00443-P    Document 116    Filed 12/22/25    Page 686 of 1862    PageID 2535

## Residential Rental

While all applicable fields within the Metro 2® Format should be reported, these guidelines provide specific values that apply to reporters of Residential Rental accounts. Refer to the Residential Rental Reporting module for additional details.

| Field | Segment/ Field # | |
|---|---|---|
| Portfolio Type | Base/8 | O (Open) |
| Account Type | Base/9 | 29 |
| Date Opened | Base/10 | Lease start date<br><br>**Note:** If the lease start date is unavailable, report the date the renter/lessee takes possession of the property. |
| Credit Limit | Base/11 | Zero fill |
| Highest Credit/Original Loan Amount | Base/12 | Monthly rental obligation amount; i.e., amount of rent due each month |
| Terms Duration | Base/13 | Constant of 001 |
| Scheduled Monthly Payment Amount | Base/15 | Amount of the scheduled monthly payment due for the current reporting period, which should include:<br>• the monthly rental obligation amount, and<br>• utilities and other fees, if included in the rental agreement |
| Account Status | Base/17A | 11, 13, 62, 64, 71, 78, 80, 82 – 84, 93, 97, DA, DF |
| Special Comment | Base/19 | Legal Action = AM<br>Special Payment Arrangements = AC, AI, AU<br>Transferred = O, AT, BA<br>Sold = AH<br>Other = AW<br>Removal of comment = blank |
| Current Balance | Base/21 | Outstanding balance amount including any late charges and fees.<br>**Note:** Do **not** include one-time fees or damage fees. |
| ECOA Code | Base/37<br>J1 & J2/10 | ECOA Code 3 (Authorized User) is not applicable. |

Return to Table of Contents

Case 4:25-cv-00443-P    Document 116    Filed 12/22/25    Page 687 of 1862    PageID 2536

## Retail Accounts (store exclusive)

While all applicable fields within the Metro 2® Format should be reported, these guidelines provide specific values that apply to Retail accounts.

| Field | Segment/ Field # | | |
|---|---|---|---|
| Portfolio Type | Base/8 | R (Revolving) | I (Installment) |
| Account Type | Base/9 | 07 | 06 |
| Credit Limit | Base/11 | Assigned credit limit | Zero fill |
| Highest Credit/Original Loan Amount | Base/12 | Highest amount of credit utilized by the consumer | Original amount of the loan, excluding interest payments |
| Terms Duration | Base/13 | Constant of 'REV' | Number of months of the loan |
| Scheduled Monthly Payment Amount | Base/15 | Minimum amount due based on the balance, not including any amounts past due | Regular monthly payment |
| Account Status | Base/17A | 11, 13, 62, 64, 71, 78, 80, 82–84, 93, 97, DA, DF<br>**Notes:** As per the status definitions in Exhibit 4, Account Status 13 (Paid or closed account/zero balance) is a final status.  When reported for Revolving portfolio types, the account should no longer be available for use and the Balance Amount should be zero.<br><br>If the account has a zero balance but is still open for further use, report Account Status Code 11 (current). | 11, 13, 61 – 64, 71, 78, 80, 82 – 84, 93, 95 – 97, DA, DF |
| Special Comment | Base/19 | Closed accounts = M, AP, BL, CI<br>Legal Action = AM<br>Sold = AH<br>Special Payment Arrangements = B, C, AB, AC, AI, AO, AU, AX, BP, BT, CP<br>Transferred = O, AN, AT, BA<br>Other = S, V, AV, AW, AZ, CH<br>Removal of comment = blank | Closed accounts = I<br>Legal Action = AM<br>Refinanced = AS<br>Sold = AH<br>Special Payment Arrangements = B, C, AB, AC, AI, AO, AU, AX, BP, BT, CP<br>Transferred = O, AT, BA<br>Other = S, V, AV, AW, AZ, CH<br>Removal of comment = blank |
| Comp. Cond. Code | Base/20 | XA – XJ, XR | XB, XC, XF, XG, XH, XR |
| Date Closed | Base/26 | Date closed to further purchases | Date paid in full |
| ECOA Code | Base/37 J1 & J2/10 | ECOA Codes 5 and 7 are not applicable. | ECOA Code 3 is not applicable. |

*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 0722

Return to Table of Contents

## Sales Finance Companies

While all applicable fields within the Metro 2® Format should be reported, these guidelines provide specific values that apply to Sales Finance companies' accounts.

| Field | Segment/ Field # | | |
|---|---|---|---|
| Portfolio Type | Base/8 | I (Installment Loan) | R (Revolving) |
| Account Type | Base/9 | 00 – 03, 06, 11, 13, 17, 3A, 7B | 07 |
| Credit Limit | Base/11 | Zero fill | Assigned Credit Limit |
| Highest Credit/ Original Loan Amt. | Base/12 | Original amount of the loan, excluding interest payments | Highest amount of credit utilized by the consumer |
| Terms Duration | Base/13 | Number of months of the loan | 'REV' (for revolving payments) |
| Scheduled Monthly Payment Amount | Base/15 | Regular monthly payment | Minimum amount due based on the balance, not including any amounts past due |
| Account Status | Base/17A | 11, 13, 61 – 64, 71, 78, 80, 82 – 84, 93, 95 – 97, DA, DF | 11, 13, 62, 64, 71, 78, 80, 82 – 84, 93, 97, DA, DF **Notes:** As per the status definitions in Exhibit 4, Account Status 13 (Paid or closed account/zero balance) is a final status. When reported for Revolving portfolio types, the account should no longer be available for use and the Balance Amount should be zero.<br><br>If the account has a zero balance but is still open for further use, report Account Status Code 11 (current). |
| Special Comment | Base/19 | Closed accounts = I<br>Leasing = BB – BK, BS (Require Account Type Code 13 or 3A)<br>Legal Action = AM<br>Refinanced = AS<br>Sold = AH<br>Special Payment Arrangements = B, C, AB, AC, AI, AO, AU, AX, BN, BP, BT, CP<br>Transferred = O, AT, BA<br>Other = S, V, AV, AW, AZ, CH, CN, CO<br>Removal of comment = blank | Closed accounts = M, AP, BL, CI<br>Legal Action = AM<br>Sold = AH<br>Special Payment Arrangements = B, C, AB, AC, AI, AO, AU, AX, BP, BT, CP<br>Transferred = O, AT, BA<br>Other = S, V, AV, AW, AZ, CH, CN, CO<br>Removal of comment = blank |

*Sales Finance Companies (continued on next page)*

Return to Table of Contents

Case 4:25-cv-00443-P   Document 116   Filed 12/22/25   Page 689 of 1862   PageID 2538

## Sales Finance Companies

*Continued from previous page*

| Field | Segment/ Field # | | |
|---|---|---|---|
| Portfolio Type | Base/8 | I (Installment Loan) | R (Revolving) |
| Compliance Condition Code | Base/20 | XB, XC, XF, XG, XH, XR | XA – XJ, XR |
| Date Closed | Base/26 | Date paid in full | Date closed to further purchases |
| ECOA Code | Base/37 J1 & J2/10 | ECOA Code 3 is not applicable. | ECOA Codes 5 and 7 are not applicable. |

APPENDIX 0724

Return to Table of Contents

Case 4:25-cv-00443-P    Document 116    Filed 12/22/25    Page 690 of 1862    PageID 2539

## Student Loan Reporters – Federal Loans

While all applicable fields within the Metro 2® Format should be reported, these guidelines provide specific values that apply to Federal Student Loans.  Refer to the Federal Loans section of the Student Loan Reporting module for additional details.

| Field | Segment/ Field # | Lender/Servicer/Secondary Market | Post-Default Loans |
|---|---|---|---|
| Portfolio Type | Base/8 | I (Installment Loan) | O (Open) |
| Account Type | Base/9 | 12 (Education) | 12 (Education) |
| Date Opened | Base/10 | Date the account was originally opened | Date the defaulted claim was paid to the lender |
| Highest Credit / Orig. Loan Amt. | Base/12 | Original amount of the loan, excluding interest payments | Claim amount that was paid to the lender |
| Terms Duration | Base/13 | • Maximum number of months allowed for repayment of the loan<br>• When payments are not required (initial in-school, grace, deferment, forbearance), report Blank.<br>• When loans no longer guaranteed and in collections, report '001'. | '001' (for one payment due as scheduled) |
| Terms Freq. | Base/14 | M (monthly) or D (deferred), as applicable | Blank fill |
| Scheduled Monthly Payment Amt. | Base/15 | • Monthly payment amount for repayment plan in which borrower is enrolled during current reporting period<br>• For loans in IDR plan, amount the consumer is required to pay for each month in the IDR plan, which can be as low as $0 | Zero fill |
| Account Status | Base/17A | • 11, 13, 78, 80, 82 – 84, DA, DF<br>• For loans no longer guaranteed: 62, 64, 93, 97 | 62, 93, DA, DF |
| Special Comment | Base/19 | Sold = AH<br>Special Payment Arrangements = AU<br>Transferred = O, AT<br>Other = AW<br>Removal of comment = blank | Legal Action = AM<br>Special Payment Arrangements = B, C, AC, AI, AU<br>Other = S, V, AW<br>Removal of comment = blank |
| Compliance Cond. Code | Base/20 | XB, XC, XH, XR | XB, XC, XH, XR |
| ECOA Code | Base/37 J1/J2/10 | ECOA Code 3 is not applicable. | ECOA Code 3 is not applicable. |
| K1 Segment | K1/2 K1/3 | Segment not applicable | Complete name of the lender to whom the claim was paid & Creditor Classification = 07 |
| K4 Segment (deferment or forbearance) | K4/2 K4/3 | Specialized Payment Indicator = 02<br>Deferred Payment Start Date = date the first payment is due.  If not available, date on which the deferred/forbearance period will end. | Segment not applicable |

Return to Table of Contents

## Student Loan Reporters – Private Loans

While all applicable fields within the Metro 2® Format should be reported, these guidelines provide specific values that apply to Private Student Loans.  Refer to the Private Loans section of the Student Loan Reporting module for additional details.

| Field | Segment/ Field # | Installment | Line of Credit |
|---|---|---|---|
| Portfolio Type | Base/8 | I (Installment Loan) | C (Line of Credit) |
| Account Type | Base/9 | 12 (Education) | 15 (Line of Credit) |
| Credit Limit | Base/11 | Zero fill | Assigned credit limit |
| Highest Credit / Orig. Loan Amt. | Base/12 | Original amount of the loan, excluding interest payments | Highest amount of credit utilized by the consumer |
| Terms Duration | Base/13 | Number of months of the loan | Constant of 'LOC' |
| Terms Freq. | Base/14 | M (monthly) or D (deferred) | M (monthly) or D (deferred) |
| Scheduled Monthly Payment Amt. | Base/15 | Regular monthly payment | Minimum amount due based on the balance, not including any amounts past due |
| Account Status | Base/17A | 11, 13, 62, 64, 71, 78, 80, 82 – 84, 93, 97, DA, DF | 11, 13, 62, 64, 71, 78, 80, 82 – 84, 93, 97, DA, DF |
| Special Comment | Base/19 | Legal Action = AM; Refinanced = AS<br>Sold = AH<br>Special Payment Arrangements = AC, AU, BT<br>Transferred = O, AT<br>Other = AW, CH, CO<br>Removal of comment = blank | Closed = M, AP, CJ; Legal Action = AM<br>Sold = AH<br>Special Payment Arrangements = AC, AU, BT<br>Transferred = O, AT<br>Other = AW, CH, CO<br>Removal of comment = blank |
| Compliance Cond. Code | Base/20 | XB, XC, XH, XR | XA – XE, XH, XR |
| ECOA Code | Base/37 J1/J2/10 | ECOA Code 3 is not applicable. | ECOA Code 3 is not applicable. |
| K4 Segment (deferment or forbearance) | K4/2 K4/3 | Specialized Payment Indicator = 02<br>Deferred Payment Start Date = date the first payment is due.  If not available, date on which the deferred/forbearance period will end. | Specialized Payment Indicator = 02<br>Deferred Payment Start Date = date the first payment is due.  If not available, date on which the deferred/forbearance period will end. |

Copyright 2023 © Consumer Data Industry Association

APPENDIX 0726

Return to Table of Contents

Case 4:25-cv-00443-P    Document 116    Filed 12/22/25    Page 692 of 1862    PageID 2541

## Utility Companies

While all applicable fields within the Metro 2® Format should be reported, these guidelines provide specific values that apply to Utility Companies' accounts.  Refer to the Utility Company Reporting module for additional details.

| Field | Segment/ Field # | | |
|---|---|---|---|
| Portfolio Type | Base/8 | I (Installment) | O (Open) |
| Account Type | Base/9 | 06 | 92, 4D |
| Highest Credit/Original Loan Amount | Base/12 | Original amount of the loan, excluding interest payments | Highest amount of credit utilized by the consumer |
| Terms Duration | Base/13 | Number of months of the loan | '001' (for one payment due as scheduled) |
| Scheduled Monthly Payment Amount | Base/15 | Regular monthly payment | Zero fill |
| Account Status | Base/17A | 11, 13, 61 – 64, 71, 78, 80, 82 – 84, 93, 95 – 97, DA, DF | 11, 13, 62, 64, 71, 78, 80, 82 – 84, 93, 97, DA, DF |
| Special Comment | Base/19 | Legal Action = AM<br>Refinanced = AS<br>Sold = AH<br>Special Payment Arrangements = B, C, AB, AC, AI, AO, AU, AX, BN, BP, BT, CP<br>Transferred = O, AT, BA<br>Other = S, V, AV, AW, AZ, CH<br>Removal of comment = blank | Closed = M<br>Legal Action = AM<br>Sold = AH<br>Special Payment Arrangements = B, C, AB, AC, AI, AU, BP, CP<br>Transferred = O, AT, BA<br>Other = S, V, AV, AW, CH<br>Removal of comment = blank |
| Compliance Condition Code | Base/20 | XB, XC, XF, XG, XH, XR | XA – XJ, XR |
| ECOA Code | Base/37 J1 & J2/10 | ECOA Code 3 is not applicable. | ECOA Code 3 is not applicable. |

*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 0727

Return to Table of Contents

Case 4:25-cv-00443-P    Document 116    Filed 12/22/25    Page 693 of 1862    PageID 2542

# Business Requirements

**METRO 2® FORMAT**

The Metro 2® Format was developed as a standard for the credit reporting industry and accomplishes the following:

- Provides one standard computer layout to be used for reporting accurate, complete and timely consumer credit information.

- Meets all requirements of the Fair Credit Reporting Act (FCRA), the Fair Credit Billing Act (FCBA), the Equal Credit Opportunity Act (ECOA) and all applicable state laws.

- Allows for reporting information at both the account and consumer levels.

- Allows for reporting the full four-digit year.

The Metro 2® Format was designed to allow reporting of the most accurate and complete information on consumers' credit history. It is imperative that all accounts are reported a minimum of once per month and that they are reported with a final Account Status Code when they are ultimately paid or closed.

For data furnishers or processors who report data by cycles, all accounts should be reported at the close of each cycle.

The FCRA places significant responsibility on **both** the data furnishers and Consumer Reporting Agencies.  For more details, refer to the FCRA (sections 621 and 623), which can be found at www.cdiaonline.org.

The following fields within the Metro 2® Format will assist you in complying with federal and state legislation:

- Compliance Condition Code
- Date of First Delinquency
- Account Type
- Consumer Information Indicator
- ECOA Code
- Associated borrower information (J1/J2 Segments)
- Original Creditor Name and Creditor Classification (K1 Segment)

Work closely with your compliance officers and programmers to ensure that these and all fields are reported accurately and are logical in relationship to each other.

# Business Requirements

**RETURN ON INVESTMENT**

The correct use of the Metro 2® Format helps to ensure:

- Better credit granting decisions
- Reduced manual corrections
- Compliance with legislative requirements
- Reduced need for new legislation
- Reduced legal expenses
- Reduced consumer inquiries
- Reduced consumer disputes

**METRO 2® TRAINING**

Training on the Metro 2® Format is available through the CDIA in three convenient formats: 1) in-person workshops or virtual event series, 2) a self-directed e-Learning course, and 3) topic-based webinars.  The CDIA's Metro 2® training programs are the only training options developed by the Metro 2® Format Task Force, comprised of members from Equifax, Experian, Innovis, and TransUnion.  Registration for any of these training programs is available through the CDIA's website at www.cdiaonline.org.

- **Metro 2® Workshops/Virtual Event Series:** Depending on circumstances, we offer two-day workshops or live, virtual event series for advanced and fundamental learning.  Both events provide in-depth training on the standard reporting of consumer credit information to the consumer reporting agencies and focus on the regular automated reporting of new accounts and updates to previously-reported accounts in Metro 2®.

- **Metro 2® e-Learning Course:** This comprehensive e-Learning resource offers detailed guidance on the use of Metro 2® for both veterans and those new to the format.  Access is available for a full year and includes interactive guidance on reporting as well as examples of real-world reporting scenarios.  Flexible pricing options are available to allow data furnishers to provide training for individuals or large groups of employees.

- **Metro 2® Webinars:** These webinars are conducted by the Metro 2® Format Task Force to provide guidance on specific topics and are available for download after the event date.  The webinars are updated periodically and as such may not be available at all times.

For additional information, please contact CDIA Education Services at (202) 408-7408 or by email at cdia_training@cdiaonline.org.

CREDIT REPORTING RESOURCE GUIDE®
*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 0729

Return to Table of Contents

# Programming Standards

**CHARACTER VS. PACKED FORMAT**

The Consumer Data Record consists of the Base Segment and additional segments that may be appended, as appropriate. The Header Record, Base Segment and Trailer Record are available in both unpacked and packed formats.  All appendages are unpacked.

Each submission of data should contain only one occurrence of each account number.

Two formats are available: character and packed.  The only differences between these two formats are some of the field positions, caused by differences in recording techniques.

### Character Format (preferred)

| | |
|---|---|
| Record Size | 426 alphanumeric characters (or bytes) |
| Format | Fixed or variable blocked |

### Packed Format

| | |
|---|---|
| Record Size | 366 bytes, packed and unpacked data |
| Format | Variable blocked |

### Record Layout

426 or 366 Base Segment followed by Appendages in alphabetic sequence.  For example:
Base + J1 + J2 + L1

### Electronic Transmission

| | |
|---|---|
| File Name | No spaces or special characters can be included in the File Name. |

### Notes:

The Character Format is preferred.

Refer to Exhibit 16 for Examples of Record Layouts – Hexadecimal Representation.

# Programming Standards

**Reporting Standards**
- Every alphanumeric field is left-justified and blank filled.
- Every alpha field should be upper case letters.
- Every numeric field is right-justified and zero filled.
- If a descriptive field is not available, it should be blank filled.
- If a numeric field is not available, it should be zero filled.
- Monetary fields are reported in whole dollars only. Cents should be truncated.
- If a monetary field is not applicable, it should be zero filled. Do not 9-fill these fields. A monetary field should be 9-filled when the amount is in excess of $1 billion.
- If fixed-length records are being reported and a record does not require the information for the appendage segment, the Segment Identifier (e.g., J1) must be reported and the remainder of the segment must be blank filled.

> **Any deviation from these standards jeopardizes the integrity of the data.**

**Note:** Contact each consumer reporting agency *prior* to reporting for information on:

- electronic transmission
- data encryption
- account number scrambling
- pre-production testing

CREDIT REPORTING RESOURCE GUIDE®
*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 0731

Return to Table of Contents

# Production Tips

The following tips will ensure accurate processing of your data with the consumer reporting agencies' systems:

- Use the assigned Program Identifiers in the Header Record to ensure your information is identified correctly by the consumer reporting agencies.

- Always retain a back-up copy of the data you provide. This copy could be used to replace a transmission that was unreadable.

- Use address/zip code/social security number editing logic in your New Accounts and Customer Service systems to detect keying errors.  The accuracy of consumer identification information is critical.

- Do not report derogatory accounts beyond the allowable retention periods specified by federal and state laws.

- Report data at the close of the cycles if you bill by cycles.

- Do not report business accounts when companies are solely responsible for payments.  Business accounts should be reported only when there are also consumers who are personally liable for payments.

Contact your consumer reporting agencies' representatives prior to:

- changing formats
- changing transmission method
- implementing internal system changes that may affect the reporting of the data
- reporting account or portfolio acquisitions
- reporting account number changes
- changing data processing centers
- changing the frequency of reporting (i.e., accounts reported more than once per month)

**Refer to Exhibit 15 – Data Conversion Checklist for a useful guide to use in the conversion process.**

Return to Table of Contents

# Record Layouts

| Record/Segment | Description |
|---|---|
| Header Record | Identifies the reporter and reporting period. |
| Base Segment | Contains account information, which applies to all consumers associated to the account.  Also contains information specific to the primary consumer.  For joint accounts where two or more consumers are contractually responsible, the consumer reported in the Base Segment will be considered primary for reporting purposes. |
| J1 Segment Associated Consumer – Same Address | Contains information specific to an associated consumer who lives at the same address as the consumer reported in the Base Segment.  All account information reported in the Base Segment will be applied to this consumer. |
| J2 Segment Associated Consumer – Different Address | Contains information specific to an associated consumer who lives at a different address than the consumer reported in the Base Segment.  All account information reported in the Base Segment will be applied to this consumer. |
| K1 Segment Original Creditor Name | Contains the name of the original credit grantor, including any partnering affinity name, and the creditor's classification.  Reported by collection agencies, debt buyers, check guarantee companies, student loan guaranty agencies, the U.S. Department of Education and the U.S. Treasury. |
| K2 Segment Purchased From/Sold To | Contains the name of the company from which an account was purchased or the name of the company to which an account was sold. |
| K3 Segment Mortgage Information | Contains the Fannie Mae or Freddie Mac loan number associated to a mortgage account and/or the Mortgage Identification Number assigned by MERS. |
| K4 Segment Specialized Payment Information | Contains additional account information on deferred payments or balloon payments. |
| L1 Segment Account Number / Identification Number Change | Used to report a new Account Number and/or new Identification Number. |
| N1 Segment Employment | Contains employment information for the primary consumer reported in the Base Segment. |
| Trailer Record | Contains various totals of information reported on the file. |

**Note:** Refer to Field Definitions for detailed reporting guidelines.

CREDIT REPORTING RESOURCE GUIDE®
*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 0733

Return to Table of Contents

# Record Layouts

## Header Record — Character Format

| FIELD | FIELD NAME | REQUIRED[1] | LENGTH | POSITION | RECORDING TECHNIQUE[2] | DESCRIPTION PAGE NUMBER[3] |
|---|---|---|---|---|---|---|
| 0 | Block Descriptor Word (BDW) | A | 4 | 1-4 | N | 4-1 |
| 1 | Record Descriptor Word (RDW) | Y | 4 | 1-4 | N | 4-1 |
| 2 | Record Identifier | Y | 6 | 5-10 | AN | 4-1 |
| 3 | Cycle Identifier | A | 2 | 11-12 | AN | 4-2 |
| 4 | Innovis Program Identifier | A | 10 | 13-22 | AN | 4-2 |
| 5 | Equifax Program Identifier | A | 10 | 23-32 | AN | 4-2 |
| 6 | Experian Program Identifier | A | 5 | 33-37 | AN | 4-2 |
| 7 | TransUnion Program Identifier | A | 10 | 38-47 | AN | 4-2 |
| 8 | Activity Date | Y | 8 | 48-55 | N | 4-2 |
| 9 | Date Created | Y | 8 | 56-63 | N | 4-2 |
| 10 | Program Date | | 8 | 64-71 | N | 4-2 |
| 11 | Program Revision Date | | 8 | 72-79 | N | 4-3 |
| 12 | Reporter Name | Y | 40 | 80-119 | AN | 4-3 |
| 13 | Reporter Address | Y | 96 | 120-215 | AN | 4-3 |
| 14 | Reporter Telephone Number | | 10 | 216-225 | N | 4-3 |
| 15 | Software Vendor Name | A | 40 | 226-265 | AN | 4-3 |
| 16 | Software Version Number | A | 5 | 266-270 | AN | 4-3 |
| 17 | MicroBilt/PRBC Program Identifier | A | 10 | 271-280 | AN | 4-3 |
| 18 | Reserved | | 146 | 281-426 | AN | 4-3 |

Total
426

---

[1] Required Fields: Y = Yes, Field is always required; A = Field is required when applicable to the file being reported.
[2] Recording Technique: AN = Alphanumeric; N = Numeric
[3] Refer to definitions for field descriptions.

# Record Layouts

## 426 Base Segment — Character Format

| FIELD | FIELD NAME | REQUIRED[1] | LENGTH | POSITION | RECORDING TECHNIQUE[2] | DESCRIPTION PAGE NUMBER[3] |
|---|---|---|---|---|---|---|
| 0 | Block Descriptor Word (BDW) | A | 4 | 1-4 | N | 4-4 |
| 1 | Record Descriptor Word (RDW) | Y | 4 | 1-4 | N | 4-4 |
| 2 | Processing Indicator | | 1 | 5 | N | 4-4 |
| 3 | Time Stamp | | 14 | 6-19 | N | 4-5 |
| 4 | Reserved | | 1 | 20 | N | 4-5 |
| 5 | Identification Number | Y | 20 | 21-40 | AN | 4-5 |
| 6 | Cycle Identifier | A | 2 | 41-42 | AN | 4-5 |
| 7 | Consumer Account Number | Y | 30 | 43-72 | AN | 4-5 |
| 8 | Portfolio Type | Y | 1 | 73 | AN | 4-6 |
| 9 | Account Type | Y | 2 | 74-75 | AN | 4-6 |
| 10 | Date Opened | Y | 8 | 76-83 | N | 4-6 |
| 11 | Credit Limit | A | 9 | 84-92 | N | 4-7 |
| 12 | Highest Credit or Original Loan Amount | Y | 9 | 93-101 | N | 4-7 |
| 13 | Terms Duration | Y | 3 | 102-104 | AN | 4-8 |
| 14 | Terms Frequency | A | 1 | 105 | AN | 4-8 |
| 15 | Scheduled Monthly Payment Amount | A | 9 | 106-114 | N | 4-9 |
| 16 | Actual Payment Amount | A | 9 | 115-123 | N | 4-9 |
| 17A | Account Status | Y | 2 | 124-125 | AN | 4-10 |
| 17B | Payment Rating | A | 1 | 126 | AN | 4-10 |
| 18 | Payment History Profile | Y | 24 | 127-150 | AN | 4-11 |
| 19 | Special Comment | A | 2 | 151-152 | AN | 4-12 |
| 20 | Compliance Condition Code | A | 2 | 153-154 | AN | 4-13 |
| 21 | Current Balance | Y | 9 | 155-163 | N | 4-14 |
| 22 | Amount Past Due | A | 9 | 164-172 | N | 4-14 |
| 23 | Original Charge-off Amount | A | 9 | 173-181 | N | 4-14 |

_____

[1] Required fields: Y = Yes, Field is always required; A = Field is required when applicable to the account being reported.
[2] Recording Technique: AN = Alphanumeric; N = Numeric
[3] Refer to definitions for field descriptions.

CREDIT REPORTING RESOURCE GUIDE®
Copyright 2023 © Consumer Data Industry Association

APPENDIX 0735

Return to Table of Contents

# Record Layouts

## 426 Base Segment — Character Format

| FIELD | FIELD NAME | REQUIRED[1] | LENGTH | POSITION | RECORDING TECHNIQUE[2] | DESCRIPTION PAGE NUMBER[3] |
|---|---|---|---|---|---|---|
| 24 | Date of Account Information | Y | 8 | 182-189 | N | 4-15 |
| 25 | FCRA Compliance/ Date of First Delinquency | A | 8 | 190-197 | N | 4-16 |
| 26 | Date Closed | A | 8 | 198-205 | N | 4-17 |
| 27 | Date of Last Payment | A | 8 | 206-213 | N | 4-17 |
| 28 | Interest Type Indicator | | 1 | 214 | AN | 4-17 |
| 29 | Reserved | | 17 | 215-231 | AN | 4-17 |
| 30 | Surname | Y | 25 | 232-256 | AN | 4-18 |
| 31 | First Name | Y | 20 | 257-276 | AN | 4-18 |
| 32 | Middle Name | A | 20 | 277-296 | AN | 4-19 |
| 33 | Generation Code | A | 1 | 297 | AN | 4-19 |
| 34 | Social Security Number | Y | 9 | 298-306 | N | 4-19 |
| 35 | Date of Birth | Y | 8 | 307-314 | N | 4-20 |
| 36 | Telephone Number | | 10 | 315-324 | N | 4-20 |
| 37 | ECOA Code | Y | 1 | 325 | AN | 4-20 |
| 38 | Consumer Information Indicator | A | 2 | 326-327 | AN | 4-21 |
| 39 | Country Code | | 2 | 328-329 | AN | 4-21 |
| 40 | First Line of Address | Y | 32 | 330-361 | AN | 4-22 |
| 41 | Second Line of Address | A | 32 | 362-393 | AN | 4-22 |
| 42 | City | Y | 20 | 394-413 | AN | 4-22 |
| 43 | State | Y | 2 | 414-415 | AN | 4-23 |
| 44 | Postal/Zip Code | Y | 9 | 416-424 | AN | 4-23 |
| 45 | Address Indicator | | 1 | 425 | AN | 4-23 |
| 46 | Residence Code | | 1 | 426 | AN | 4-23 |

Total
426

---

[1] Required fields: Y = Yes, Field is always required; A = Field is required when applicable to the account being reported.
[2] Recording Technique: AN = Alphanumeric; N = Numeric
[3] Refer to definitions for field descriptions.

Return to Table of Contents

# Record Layouts

## J1 Segment
## Associated Consumer — Same Address

| FIELD | FIELD NAME | REQUIRED[1] | LENGTH | POSITION | RECORDING TECHNIQUE[2] | DESCRIPTION PAGE NUMBER[3] |
|---|---|---|---|---|---|---|
| 1 | Segment Identifier | Y | 2 | 1-2 | AN | 4-24 |
| 2 | Reserved | | 1 | 3 | AN | 4-24 |
| 3 | Surname | Y | 25 | 4-28 | AN | 4-24 |
| 4 | First Name | Y | 20 | 29-48 | AN | 4-25 |
| 5 | Middle Name | A | 20 | 49-68 | AN | 4-25 |
| 6 | Generation Code | A | 1 | 69 | AN | 4-25 |
| 7 | Social Security Number | Y | 9 | 70-78 | N | 4-26 |
| 8 | Date of Birth | Y | 8 | 79-86 | N | 4-26 |
| 9 | Telephone Number | | 10 | 87-96 | N | 4-27 |
| 10 | ECOA Code | Y | 1 | 97 | AN | 4-27 |
| 11 | Consumer Information Indicator | A | 2 | 98-99 | AN | 4-28 |
| 12 | Reserved | | 1 | 100 | AN | 4-28 |

Total
100

[1] Required fields: Y = Yes, Field is always required; A = Field is required when applicable to the account being reported.
[2] Recording Technique: AN = Alphanumeric; N = Numeric
[3] Refer to definitions for field descriptions.

CREDIT REPORTING RESOURCE GUIDE®
*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 0737

Return to Table of Contents

# Record Layouts

## J2 Segment
## Associated Consumer — Different Address

| FIELD | FIELD NAME | REQUIRED[1] | LENGTH | POSITION | RECORDING TECHNIQUE[2] | DESCRIPTION PAGE NUMBER[3] |
|---|---|---|---|---|---|---|
| 1 | Segment Identifier | Y | 2 | 1-2 | AN | 4-29 |
| 2 | Reserved | | 1 | 3 | AN | 4-29 |
| 3 | Surname | Y | 25 | 4-28 | AN | 4-29 |
| 4 | First Name | Y | 20 | 29-48 | AN | 4-30 |
| 5 | Middle Name | A | 20 | 49-68 | AN | 4-30 |
| 6 | Generation Code | A | 1 | 69 | AN | 4-30 |
| 7 | Social Security Number | Y | 9 | 70-78 | N | 4-31 |
| 8 | Date of Birth | Y | 8 | 79-86 | N | 4-32 |
| 9 | Telephone Number | | 10 | 87-96 | N | 4-33 |
| 10 | ECOA Code | Y | 1 | 97 | AN | 4-33 |
| 11 | Consumer Information Indicator | A | 2 | 98-99 | AN | 4-34 |
| 12 | Country Code | | 2 | 100-101 | AN | 4-34 |
| 13 | First Line of Address | Y | 32 | 102-133 | AN | 4-35 |
| 14 | Second Line of Address | A | 32 | 134-165 | AN | 4-35 |
| 15 | City | Y | 20 | 166-185 | AN | 4-35 |
| 16 | State | Y | 2 | 186-187 | AN | 4-36 |
| 17 | Postal/Zip Code | Y | 9 | 188-196 | AN | 4-36 |
| 18 | Address Indicator | | 1 | 197 | AN | 4-36 |
| 19 | Residence Code | | 1 | 198 | AN | 4-36 |
| 20 | Reserved | | 2 | 199-200 | AN | 4-36 |

Total
200

---

[1] Required fields: Y = Yes, Field is always required; A = Field is required when applicable to the account being reported.
[2] Recording Technique: AN = Alphanumeric; N = Numeric
[3] Refer to definitions for field descriptions.

Return to Table of Contents

# Record Layouts

## K1 Segment
## Original Creditor Name

| FIELD | FIELD NAME | REQUIRED[1] | LENGTH | POSITION | RECORDING TECHNIQUE[2] | DESCRIPTION PAGE NUMBER[3] |
|---|---|---|---|---|---|---|
| 1 | Segment Identifier | Y | 2 | 1-2 | AN | 4-37 |
| 2 | Original Creditor Name | Y | 30 | 3-32 | AN | 4-38 |
| 3 | Creditor Classification | Y | 2 | 33-34 | N | 4-39 |

Total
34

## K2 Segment
## Purchased From/Sold To

| FIELD | FIELD NAME | REQUIRED[1] | LENGTH | POSITION | RECORDING TECHNIQUE[2] | DESCRIPTION PAGE NUMBER[3] |
|---|---|---|---|---|---|---|
| 1 | Segment Identifier | Y | 2 | 1-2 | AN | 4-40 |
| 2 | Purchased From/Sold To Indicator | Y | 1 | 3 | N | 4-40 |
| 3 | Purchased From or Sold To Name | Y | 30 | 4-33 | AN | 4-40 |
| 4 | Reserved | | 1 | 34 | AN | 4-40 |

Total
34

---

[1] Required fields: Y = Yes, Field is always required.
[2] Recording Technique: AN = Alphanumeric; N = Numeric
[3] Refer to definitions for field descriptions.

*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 0739

Return to Table of Contents

# Record Layouts

## K3 Segment
## Mortgage Information

| FIELD | FIELD NAME | REQUIRED[1] | LENGTH | POSITION | RECORDING TECHNIQUE[2] | DESCRIPTION PAGE NUMBER[3] |
|---|---|---|---|---|---|---|
| 1 | Segment Identifier | Y | 2 | 1-2 | AN | 4-41 |
| 2 | Agency Identifier | A | 2 | 3-4 | N | 4-41 |
| 3 | Account Number | A | 18 | 5-22 | AN | 4-41 |
| 4 | Mortgage Identification Number | | 18 | 23-40 | AN | 4-41 |

Total 40

## K4 Segment
## Specialized Payment Information

| FIELD | FIELD NAME | REQUIRED[1] | LENGTH | POSITION | RECORDING TECHNIQUE[2] | DESCRIPTION PAGE NUMBER[3] |
|---|---|---|---|---|---|---|
| 1 | Segment Identifier | Y | 2 | 1-2 | AN | 4-42 |
| 2 | Specialized Payment Indicator | Y | 2 | 3-4 | N | 4-42 |
| 3 | Deferred Payment Start Date | A | 8 | 5-12 | N | 4-42 |
| 4 | Balloon Payment Due Date | A | 8 | 13-20 | N | 4-42 |
| 5 | Balloon Payment Amount | A | 9 | 21-29 | N | 4-42 |
| 6 | Reserved | | 1 | 30 | AN | 4-42 |

Total 30

---

[1] Required fields: Y = Yes, Field is always required; A = Field is required when applicable to the account being reported.
[2] Recording Technique: AN = Alphanumeric; N = Numeric
[3] Refer to definitions for field descriptions.

Return to Table of Contents

# Record Layouts

## L1 Segment
## Account Number/Identification Number Change

| FIELD | FIELD NAME | REQUIRED[1] | LENGTH | POSITION | RECORDING TECHNIQUE[2] | DESCRIPTION PAGE NUMBER[3] |
|---|---|---|---|---|---|---|
| 1 | Segment Identifier | Y | 2 | 1-2 | AN | 4-43 |
| 2 | Change Indicator | Y | 1 | 3 | N | 4-43 |
| 3 | New Consumer Account Number | A | 30 | 4-33 | AN | 4-43 |
| 4 | New Identification Number | A | 20 | 34-53 | AN | 4-44 |
| 5 | Reserved | | 1 | 54 | AN | 4-44 |

Total
54

## N1 Segment
## Employment

| FIELD | FIELD NAME | REQUIRED[1] | LENGTH | POSITION | RECORDING TECHNIQUE[2] | DESCRIPTION PAGE NUMBER[3] |
|---|---|---|---|---|---|---|
| 1 | Segment Identifier | Y | 2 | 1-2 | AN | 4-45 |
| 2 | Employer Name | Y | 30 | 3-32 | AN | 4-45 |
| 3 | First Line of Employer Address | | 32 | 33-64 | AN | 4-45 |
| 4 | Second Line of Employer Address | | 32 | 65-96 | AN | 4-45 |
| 5 | Employer City | | 20 | 97-116 | AN | 4-45 |
| 6 | Employer State | | 2 | 117-118 | AN | 4-45 |
| 7 | Employer Postal/Zip Code | | 9 | 119-127 | AN | 4-45 |
| 8 | Occupation | A | 18 | 128-145 | AN | 4-46 |
| 9 | Reserved | | 1 | 146 | AN | 4-46 |

Total
146

---

[1] Required fields: Y = Yes, Field is always required; A = Field is required when applicable to the account being reported.
[2] Recording Technique: AN = Alphanumeric; N = Numeric
[3] Refer to definitions for field descriptions.

APPENDIX 0741

Return to Table of Contents

# Record Layouts

## Trailer Record — Character Format

| FIELD | FIELD NAME | REQUIRED[1] | LENGTH | POSITION | RECORDING TECHNIQUE[2] | DESCRIPTION PAGE NUMBER[3] |
|---|---|---|---|---|---|---|
| 1 | Record Descriptor Word (RDW) | Y | 4 | 1-4 | N | 4-47 |
| 2 | Record Identifier | Y | 7 | 5-11 | AN | 4-47 |
| 3 | Total Base Records | Y | 9 | 12-20 | N | 4-47 |
| 4 | Reserved | | 9 | 21-29 | AN | 4-47 |
| 5 | Total of Status Code DF | | 9 | 30-38 | N | 4-47 |
| 6 | Total Associated Consumer Segments (J1) | A | 9 | 39-47 | N | 4-47 |
| 7 | Total Associated Consumer Segments (J2) | A | 9 | 48-56 | N | 4-47 |
| 8 | Block Count | Y | 9 | 57-65 | N | 4-47 |
| 9 | Total of Status Code DA | | 9 | 66-74 | N | 4-47 |
| 10 | Reserved | | 9 | 75-83 | AN | 4-47 |
| 11 | Total of Status Code 11 | | 9 | 84-92 | N | 4-47 |
| 12 | Total of Status Code 13 | | 9 | 93-101 | N | 4-48 |
| 13 | Total of Status Code 61 | | 9 | 102-110 | N | 4-48 |
| 14 | Total of Status Code 62 | | 9 | 111-119 | N | 4-48 |
| 15 | Total of Status Code 63 | | 9 | 120-128 | N | 4-48 |
| 16 | Total of Status Code 64 | | 9 | 129-137 | N | 4-48 |
| 17 | Total of Status Code 65 | | 9 | 138-146 | N | 4-48 |
| 18 | Total of Status Code 71 | | 9 | 147-155 | N | 4-48 |
| 19 | Total of Status Code 78 | | 9 | 156-164 | N | 4-48 |
| 20 | Total of Status Code 80 | | 9 | 165-173 | N | 4-48 |
| 21 | Total of Status Code 82 | | 9 | 174-182 | N | 4-48 |
| 22 | Total of Status Code 83 | | 9 | 183-191 | N | 4-48 |
| 23 | Total of Status Code 84 | | 9 | 192-200 | N | 4-48 |
| 24 | Total of Status Code 88 | | 9 | 201-209 | N | 4-48 |
| 25 | Total of Status Code 89 | | 9 | 210-218 | N | 4-49 |
| 26 | Total of Status Code 93 | | 9 | 219-227 | N | 4-49 |
| 27 | Total of Status Code 94 | | 9 | 228-236 | N | 4-49 |
| 28 | Total of Status Code 95 | | 9 | 237-245 | N | 4-49 |

[1] Required fields: Y = Yes, Field is always required; A = Field is required when applicable to the file being reported.
[2] Recording Technique: AN = Alphanumeric; N = Numeric
[3] Refer to definitions for field descriptions.

Return to Table of Contents

# Record Layouts

## Trailer Record — Character Format

| FIELD | FIELD NAME | REQUIRED[1] | LENGTH | POSITION | RECORDING TECHNIQUE[2] | DESCRIPTION PAGE NUMBER[3] |
|---|---|---|---|---|---|---|
| 29 | Total of Status Code 96 | | 9 | 246-254 | N | 4-49 |
| 30 | Total of Status Code 97 | | 9 | 255-263 | N | 4-49 |
| 31 | Total of ECOA Code Z (All Segments) | | 9 | 264-272 | N | 4-49 |
| 32 | Total Employment Segments | | 9 | 273-281 | N | 4-49 |
| 33 | Total Original Creditor Segments | | 9 | 282-290 | N | 4-49 |
| 34 | Total Purchased From/Sold To Segments | | 9 | 291-299 | N | 4-49 |
| 35 | Total Mortgage Information Segments | | 9 | 300-308 | N | 4-49 |
| 36 | Total Specialized Payment Information Segments | | 9 | 309-317 | N | 4-49 |
| 37 | Total Change Segments | | 9 | 318-326 | N | 4-49 |
| 38 | Total Social Security Numbers (All Segments) | | 9 | 327-335 | N | 4-50 |
| 39 | Total Social Security Numbers (Base Segments) | | 9 | 336-344 | N | 4-50 |
| 40 | Total Social Security Numbers (J1 Segments) | | 9 | 345-353 | N | 4-50 |
| 41 | Total Social Security Numbers (J2 Segments) | | 9 | 354-362 | N | 4-50 |
| 42 | Total Dates of Birth (All Segments) | | 9 | 363-371 | N | 4-50 |
| 43 | Total Dates of Birth (Base Segments) | | 9 | 372-380 | N | 4-50 |
| 44 | Total Dates of Birth (J1 Segments) | | 9 | 381-389 | N | 4-50 |
| 45 | Total Dates of Birth (J2 Segments) | | 9 | 390-398 | N | 4-50 |
| 46 | Total Telephone Numbers (All Segments) | | 9 | 399-407 | N | 4-50 |
| 47 | Reserved | | 19 | 408-426 | AN | 4-50 |

Total
426

---

[1] Required fields: Y = Yes, Field is always required; A = Field is required when applicable to the file being reported.
[2] Recording Technique: AN = Alphanumeric; N = Numeric
[3] Refer to definitions for field descriptions.

Return to Table of Contents

# Record Layouts

## Header Record — Packed Format

| FIELD | FIELD  NAME | REQUIRED[1] | LENGTH | POSITION | RECORDING TECHNIQUE[2] | DESCRIPTION PAGE NUMBER[3] |
|---|---|---|---|---|---|---|
| 0 | Block Descriptor Word (BDW) | Y | 4 | 1-4 | B | 4-1 |
| 1 | Record Descriptor Word (RDW) | Y | 4 | 1-4 | B | 4-1 |
| 2 | Record Identifier | Y | 6 | 5-10 | AN | 4-1 |
| 3 | Cycle Identifier | A | 2 | 11-12 | AN | 4-2 |
| 4 | Innovis Program Identifier | A | 10 | 13-22 | AN | 4-2 |
| 5 | Equifax Program Identifier | A | 10 | 23-32 | AN | 4-2 |
| 6 | Experian Program Identifier | A | 5 | 33-37 | AN | 4-2 |
| 7 | TransUnion Program Identifier | A | 10 | 38-47 | AN | 4-2 |
| 8 | Activity Date | Y | 8 | 48-55 | N | 4-2 |
| 9 | Date Created | Y | 8 | 56-63 | N | 4-2 |
| 10 | Program Date | | 8 | 64-71 | N | 4-2 |
| 11 | Program Revision Date | | 8 | 72-79 | N | 4-3 |
| 12 | Reporter Name | Y | 40 | 80-119 | AN | 4-3 |
| 13 | Reporter Address | Y | 96 | 120-215 | AN | 4-3 |
| 14 | Reporter Telephone Number | | 10 | 216-225 | N | 4-3 |
| 15 | Software Vendor Name | A | 40 | 226-265 | AN | 4-3 |
| 16 | Software Version Number | A | 5 | 266-270 | AN | 4-3 |
| 17 | MicroBilt/PRBC Program Identifier | A | 10 | 271-280 | AN | 4-3 |
| 18 | Reserved | | 86 | 281-366 | AN | 4-3 |

Total
366

[1] Required Fields: Y = Yes, Field is always required; A = Field is required when applicable to the file being reported.
[2] Recording Technique: AN = Alphanumeric; B = Binary; N = Numeric
[3] Refer to definitions for field descriptions.

# Record Layouts

## 366 Base Segment — Packed Format

| FIELD | FIELD NAME | REQUIRED[1] | LENGTH | POSITION | RECORDING TECHNIQUE[2] | DESCRIPTION PAGE NUMBER[3] |
|---|---|---|---|---|---|---|
| 0 | Block Descriptor Word (BDW) | Y | 4 | 1-4 | B | 4-4 |
| 1 | Record Descriptor Word (RDW) | Y | 4 | 1-4 | B | 4-4 |
| 2 | Processing Indicator | | 1 | 5 | N | 4-4 |
| 3 | Time Stamp | | 8 | 6-13 | P | 4-5 |
| 4 | Reserved | | 1 | 14 | N | 4-5 |
| 5 | Identification Number | Y | 20 | 15-34 | AN | 4-5 |
| 6 | Cycle Identifier | A | 2 | 35-36 | AN | 4-5 |
| 7 | Consumer Account Number | Y | 30 | 37-66 | AN | 4-5 |
| 8 | Portfolio Type | Y | 1 | 67 | AN | 4-6 |
| 9 | Account Type | Y | 2 | 68-69 | AN | 4-6 |
| 10 | Date Opened | Y | 5 | 70-74 | P | 4-6 |
| 11 | Credit Limit | A | 5 | 75-79 | P | 4-7 |
| 12 | Highest Credit or Original Loan Amount | Y | 5 | 80-84 | P | 4-7 |
| 13 | Terms Duration | Y | 3 | 85-87 | AN | 4-8 |
| 14 | Terms Frequency | A | 1 | 88 | AN | 4-8 |
| 15 | Scheduled Monthly Payment Amount | A | 5 | 89-93 | P | 4-9 |
| 16 | Actual Payment Amount | A | 5 | 94-98 | P | 4-9 |
| 17A | Account Status | Y | 2 | 99-100 | AN | 4-10 |
| 17B | Payment Rating | A | 1 | 101 | AN | 4-10 |
| 18 | Payment History Profile | Y | 24 | 102-125 | AN | 4-11 |
| 19 | Special Comment | A | 2 | 126-127 | AN | 4-12 |
| 20 | Compliance Condition Code | A | 2 | 128-129 | AN | 4-13 |
| 21 | Current Balance | Y | 5 | 130-134 | P | 4-14 |
| 22 | Amount Past Due | A | 5 | 135-139 | P | 4-14 |

---

[1] Required Fields: Y = Yes, Field is always required; A = Field is required when applicable to the account being reported.
[2] Recording Technique: AN = Alphanumeric; B = Binary; N = Numeric; P = Packed
[3] Refer to definitions for field descriptions.

CREDIT REPORTING RESOURCE GUIDE®

*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 0745

Return to Table of Contents

# Record Layouts

## 366 Base Segment — Packed Format

| FIELD | FIELD NAME | REQUIRED[1] | LENGTH | POSITION | RECORDING TECHNIQUE[2] | DESCRIPTION PAGE NUMBER[3] |
|---|---|---|---|---|---|---|
| 23 | Original Charge-off Amount | A | 5 | 140-144 | P | 4-14 |
| 24 | Date of Account Information | Y | 5 | 145-149 | P | 4-15 |
| 25 | FCRA Compliance/Date of First Delinquency | A | 5 | 150-154 | P | 4-16 |
| 26 | Date Closed | A | 5 | 155-159 | P | 4-17 |
| 27 | Date of Last Payment | A | 5 | 160-164 | P | 4-17 |
| 28 | Interest Type Indicator | | 1 | 165 | AN | 4-17 |
| 29 | Reserved | | 17 | 166-182 | AN | 4-17 |
| 30 | Surname | Y | 25 | 183-207 | AN | 4-18 |
| 31 | First Name | Y | 20 | 208-227 | AN | 4-18 |
| 32 | Middle Name | A | 20 | 228-247 | AN | 4-19 |
| 33 | Generation Code | A | 1 | 248 | AN | 4-19 |
| 34 | Social Security Number | Y | 5 | 249-253 | P | 4-19 |
| 35 | Date of Birth | Y | 5 | 254-258 | P | 4-20 |
| 36 | Telephone Number | | 6 | 259-264 | P | 4-20 |
| 37 | ECOA Code | Y | 1 | 265 | AN | 4-20 |
| 38 | Consumer Information Indicator | A | 2 | 266-267 | AN | 4-21 |
| 39 | Country Code | | 2 | 268-269 | AN | 4-21 |
| 40 | First Line of Address | Y | 32 | 270-301 | AN | 4-22 |
| 41 | Second Line of Address | A | 32 | 302-333 | AN | 4-22 |
| 42 | City | Y | 20 | 334-353 | AN | 4-22 |
| 43 | State | Y | 2 | 354-355 | AN | 4-23 |
| 44 | Postal/Zip Code | Y | 9 | 356-364 | AN | 4-23 |
| 45 | Address Indicator | | 1 | 365 | AN | 4-23 |
| 46 | Residence Code | | 1 | 366 | AN | 4-23 |

Total
366

_____

[1] Required Fields: Y = Yes, Field is always required; A = Field is required when applicable to the account being reported.

[2] Recording Technique: AN = Alphanumeric; P = Packed

[3] Refer to definitions for field descriptions.

Return to Table of Contents

# Record Layouts

## Trailer Record — Packed Format

| FIELD | FIELD NAME | REQUIRED[1] | LENGTH | POSITION | RECORDING TECHNIQUE[2] | DESCRIPTION PAGE NUMBER[3] |
|---|---|---|---|---|---|---|
| 1 | Record Descriptor Word (RDW) | Y | 4 | 1-4 | B | 4-47 |
| 2 | Record Identifier | Y | 7 | 5-11 | AN | 4-47 |
| 3 | Total Base Records | Y | 5 | 12-16 | P | 4-47 |
| 4 | Reserved | | 5 | 17-21 | AN | 4-47 |
| 5 | Total of Status Code DF | | 5 | 22-26 | P | 4-47 |
| 6 | Total Associated Consumer Segments (J1) | A | 5 | 27-31 | P | 4-47 |
| 7 | Total Associated Consumer Segments (J2) | A | 5 | 32-36 | P | 4-47 |
| 8 | Block Count | Y | 5 | 37-41 | P | 4-47 |
| 9 | Total of Status Code DA | | 5 | 42-46 | P | 4-47 |
| 10 | Reserved | | 5 | 47-51 | AN | 4-47 |
| 11 | Total of Status Code 11 | | 5 | 52-56 | P | 4-47 |
| 12 | Total of Status Code 13 | | 5 | 57-61 | P | 4-48 |
| 13 | Total of Status Code 61 | | 5 | 62-66 | P | 4-48 |
| 14 | Total of Status Code 62 | | 5 | 67-71 | P | 4-48 |
| 15 | Total of Status Code 63 | | 5 | 72-76 | P | 4-48 |
| 16 | Total of Status Code 64 | | 5 | 77-81 | P | 4-48 |
| 17 | Total of Status Code 65 | | 5 | 82-86 | P | 4-48 |
| 18 | Total of Status Code 71 | | 5 | 87-91 | P | 4-48 |
| 19 | Total of Status Code 78 | | 5 | 92-96 | P | 4-48 |
| 20 | Total of Status Code 80 | | 5 | 97-101 | P | 4-48 |
| 21 | Total of Status Code 82 | | 5 | 102-106 | P | 4-48 |
| 22 | Total of Status Code 83 | | 5 | 107-111 | P | 4-48 |
| 23 | Total of Status Code 84 | | 5 | 112-116 | P | 4-48 |
| 24 | Total of Status Code 88 | | 5 | 117-121 | P | 4-48 |
| 25 | Total of Status Code 89 | | 5 | 122-126 | P | 4-49 |
| 26 | Total of Status Code 93 | | 5 | 127-131 | P | 4-49 |
| 27 | Total of Status Code 94 | | 5 | 132-136 | P | 4-49 |

---

[1] Required fields: Y = Yes, Field is always required; A = Field is required when applicable to the file being reported.
[2] Recording Technique: AN = Alphanumeric; B = Binary; P = Packed
[3] Refer to definitions for field descriptions.

*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 0747

Return to Table of Contents

# Record Layouts

## Trailer Record — Packed Format

| FIELD | FIELD NAME | REQUIRED[1] | LENGTH | POSITION | RECORDING TECHNIQUE[2] | DESCRIPTION PAGE NUMBER[3] |
|---|---|---|---|---|---|---|
| 28 | Total of Status Code 95 | | 5 | 137-141 | P | 4-49 |
| 29 | Total of Status Code 96 | | 5 | 142-146 | P | 4-49 |
| 30 | Total of Status Code 97 | | 5 | 147-151 | P | 4-49 |
| 31 | Total of ECOA Code Z (All Segments) | | 5 | 152-156 | P | 4-49 |
| 32 | Total Employment Segments | | 5 | 157-161 | P | 4-49 |
| 33 | Total Original Creditor Segments | | 5 | 162-166 | P | 4-49 |
| 34 | Total Purchased From/Sold To Segments | | 5 | 167-171 | P | 4-49 |
| 35 | Total Mortgage Information Segments | | 5 | 172-176 | P | 4-49 |
| 36 | Total Specialized Payment Information Segments | | 5 | 177-181 | P | 4-49 |
| 37 | Total Change Segments | | 5 | 182-186 | P | 4-49 |
| 38 | Total Social Security Numbers (All Segments) | | 5 | 187-191 | P | 4-50 |
| 39 | Total Social Security Numbers (Base Segments) | | 5 | 192-196 | P | 4-50 |
| 40 | Total Social Security Numbers (J1 Segments) | | 5 | 197-201 | P | 4-50 |
| 41 | Total Social Security Numbers (J2 Segments) | | 5 | 202-206 | P | 4-50 |
| 42 | Total Dates of Birth (All Segments) | | 5 | 207-211 | P | 4-50 |
| 43 | Total Dates of Birth (Base Segments) | | 5 | 212-216 | P | 4-50 |
| 44 | Total Dates of Birth (J1 Segments) | | 5 | 217-221 | P | 4-50 |
| 45 | Total Dates of Birth (J2 Segments) | | 5 | 222-226 | P | 4-50 |
| 46 | Total Telephone Numbers (All Segments) | | 5 | 227-231 | P | 4-50 |
| 47 | Reserved | | 135 | 232-366 | AN | 4-50 |

Total
366

---

[1] Required fields: Y = Yes, Field is always required; A = Field is required when applicable to the file being reported.
[2] Recording Technique: AN = Alphanumeric; P = Packed
[3] Refer to definitions for field descriptions.

Return to Table of Contents

# Field Definitions

## Header Record

The Header Record must be the first record provided and includes information necessary to identify the reporter.

| FIELD | FIELD NAME & DESCRIPTION | 426 Character Format[1] | | |
|---|---|---|---|---|
| | | Length | Position | Recording Technique |
| 0 | **Block Descriptor Word (BDW)**<br>Contains a value equal to the length of the block of data and must be reported when using the packed format or when reporting variable length records.  This value includes the four bytes reserved for this field.  Report the standard IBM variable record length conventions.<br><br>*This field is not required when reporting fixed length, fixed block records. | 4 | 1-4 of each block of data* | N |
| 1 | **Record Descriptor Word (RDW)**<br>Contains a value equal to the length of the physical record. This value includes the four bytes reserved for this field.<br><br>The recording technique is Numeric for the 426 format and Binary for the 366 format.<br><br>*    Numeric: The entire four bytes are used. Example: F0F4F2F6.<br>*    Binary: The hexadecimal value should be in the first two bytes of the field and the last two bytes should contain binary zeros. Example: 016E0000.<br><br>If fixed-length records are being reported, the Header Record should be the same length as all the data records.  The Header Record should be padded with blanks to fill the needed number of positions. | 4 | 1-4 of each physical record | N |
| 2 | **Record Identifier**<br>Contains a constant of **HEADER,** which is used to identify this record. | 6 | 5-10 | AN |

---

[1] For 366 Packed Format specifications, refer to the Record Layouts section of the Metro 2® Format module.

Return to Table of Contents

# Field Definitions

## Header Record

| FIELD | FIELD NAME & DESCRIPTION | 426 Character Format | | |
| --- | --- | --- | --- | --- |
| | | Length | Position | Recording Technique |
| 3 | **Cycle Identifier**<br>Contains the cycle identifier for the information being reported, if reporting by cycles.  If data contains more than one cycle, report the first cycle identifier found on the data. | 2 | 11-12 | AN |
| 4 | **Innovis Program Identifier**<br>Contains a unique identification number assigned by this consumer reporting agency. | 10 | 13-22 | AN |
| 5 | **Equifax Program Identifier**<br>Contains a unique identification number assigned by this consumer reporting agency. | 10 | 23-32 | AN |
| 6 | **Experian Program Identifier**<br>Contains a unique identification number assigned by this consumer reporting agency. | 5 | 33-37 | AN |
| 7 | **TransUnion Program Identifier**<br>Contains a unique identification number assigned by this consumer reporting agency. | 10 | 38-47 | AN |
| 8 | **Activity Date**<br>Signifies date of most recent update to accounts.  If accounts are updated on different dates, use most recent.  A future date should not be reported.  Format is MMDDYYYY. | 8 | 48-55 | N |
| 9 | **Date Created**<br>Contains the date the Metro 2® file was generated.  A future date should not be reported.  Format is MMDDYYYY. | 8 | 56-63 | N |
| 10 | **Program Date**<br>Contains the date your reporting format was developed.  Format is MMDDYYYY.  If the day is not available, use 01. | 8 | 64-71 | N |

CREDIT REPORTING RESOURCE GUIDE®
*Copyright 2023 © Consumer Data Industry Association*    APPENDIX 0750

Return to Table of Contents

# Field Definitions

## Header Record

| FIELD | FIELD NAME & DESCRIPTION | 426 Character Format | | |
|---|---|---|---|---|
| | | Length | Position | Recording Technique |
| 11 | **Program Revision Date** Contains the last date your reporting format was revised. Format is MMDDYYYY.  If the day is not available, use 01. | 8 | 72-79 | N |
| 12 | **Reporter Name** Contains the name of the processing company sending the data; i.e., data furnisher or processor. If multiple Header Records are provided, the Reporter Name on the second and subsequent Headers may be repeated or blank filled. | 40 | 80-119 | AN |
| 13 | **Reporter Address** Contains the complete mailing address of the processing company; i.e., street address, city, state and zip code. | 96 | 120-215 | AN |
| 14 | **Reporter Telephone Number** Contains the telephone number (Area Code + number) of the company sending the data; i.e., data furnisher or processor. | 10 | 216-225 | N |
| 15 | **Software Vendor Name** Contains the name of the software vendor that provided the Metro 2® Format software. | 40 | 226-265 | AN |
| 16 | **Software Version Number** Contains the version number of the Metro 2® Format software. | 5 | 266-270 | AN |
| 17 | **MicroBilt/PRBC Program Identifier** Contains a unique identification number assigned by this consumer reporting agency. | 10 | 271-280 | AN |
| 18 | **Reserved** Blank fill. | 146 | 281-426 | AN |

# Field Definitions

## Base Segment

This section describes each data element in the Base Segment, which is used to report the primary consumer's identification information and the account transactional information.

| FIELD | FIELD NAME & DESCRIPTION | 426 Character Format[1] | | |
|---|---|---|---|---|
| | | Length | Position | Recording Technique |
| 0 | **Block Descriptor Word (BDW)**<br>Contains a value equal to the length of the block of data and must be reported when using the packed format or when reporting variable length records.  This value includes the four bytes reserved for this field.  Report the standard IBM variable record length conventions.<br><br>*This field is not required when reporting fixed length, fixed block records. | 4 | 1-4 of each block of data* | N |
| 1 | **Record Descriptor Word (RDW)**<br>Contains a value equal to the length of the physical record.  This value includes the four bytes reserved for this field.  The length of each segment should be included in the RDW.<br><br>For example:<br>Base Segment=   426<br>J2 Segment   =   200<br>K1 Segment   =    34<br>RDW          = 0660<br><br>For fixed block, the RDW will remain the same for each record.<br><br>For variable block, the RDW will change depending on the size of each record. | 4 | 1-4 of each physical record | N |
| 2 | **Processing Indicator**<br>Report a constant of **1**. | 1 | 5 | N |

---

[1] For 366 Packed Format specifications, refer to the Record Layouts section of the Metro 2® Format module.

CREDIT REPORTING RESOURCE GUIDE®

*Copyright 2023 © Consumer Data Industry Association*    APPENDIX 0752

Return to Table of Contents

# Field Definitions

## Base Segment

| FIELD | FIELD NAME & DESCRIPTION | 426 Character Format | | |
|---|---|---|---|---|
| | | Length | Position | Recording Technique |
| 3 | **Time Stamp** Contains date and time of actual account information update.  Format for packed date is 0MMDDYYYYHHMMSSs — where s is the sign.  Format is MMDDYYYYHHMMSS for character date. | 14 | 6-19 | N |
| 4 | **Reserved** Zero fill.  Field formerly used for Correction Indicator. | 1 | 20 | N |
| 5 | **Identification Number** Used to uniquely identify a data furnisher. Report your internal code to identify each branch, office, and/or credit central where information is verified.  For accounts reported by servicers, the Identification Number should refer to the current holder of the note.  This number must be unique, at least 5 digits long, and should not include embedded blanks or special characters.  Entire field should *never* be zero, blank or 9 filled.  **This field must be consistent on a month-to-month basis to avoid duplication of information.  Notify consumer reporting agencies before adding, deleting, or changing the identifiers in this field.** | 20 | 21-40 | AN |
| 6 | **Cycle Identifier** Report the internal cycle code for this account. Field is required if reporting by cycles; otherwise blank fill. | 2 | 41-42 | AN |
| 7 | **Consumer Account Number** Report the individual's complete and unique account number as extracted from your file.  Do not include embedded blanks or special characters.  **Do not report the Social Security Number, in whole or in part, within the Consumer Account Number.**  Account numbers must be unique.  Previously-reported account numbers should not be used again for credit reporting purposes.  Account number scrambling and encryption methods for security purposes are permitted. Contact the consumer reporting agencies for information regarding the Metro 2® scrambling techniques. | 30 | 43-72 | AN |

# Field Definitions

## Base Segment

| FIELD | FIELD NAME & DESCRIPTION | 426 Character Format | | |
|---|---|---|---|---|
| | | Length | Position | Recording Technique |
| 8 | **Portfolio Type**<br><br>Contains the one-character abbreviation for type of portfolio, which should remain the same as long as the account is reported.  Values available:<br><br>C = Line of Credit<br>I = Installment<br>M = Mortgage<br>O = Open<br>R = Revolving<br><br>Refer to the Glossary of Terms for definitions of each Portfolio Type. | 1 | 73 | AN |
| 9 | **Account Type**<br><br>Report the specific code that identifies the account classification.<br><br>Exhibit 1 provides a numeric listing of type codes that specify industry usage, and Exhibit 2 provides an alphabetic listing of type codes within their corresponding Portfolio Types. | 2 | 74-75 | AN |
| 10 | **Date Opened**<br><br>Report the date the account was originally opened. Retain the original Date Opened regardless of future activity, such as transfer, refinance, lost or stolen card, etc.<br><br>Valid Dates Opened must be reported – field cannot be zero or blank filled, nor contain a date in the future.<br><br>For companies who report returned checks, such as collection agencies, report the date of the check.<br><br>Format for character date is MMDDYYYY.  Format for packed date is 0MMDDYYYYs — where s is the sign.  If the day is not available, use 01. | 8 | 76-83 | N |

CREDIT REPORTING RESOURCE GUIDE®

*Copyright 2023 © Consumer Data Industry Association*    APPENDIX 0754

Return to Table of Contents

# Field Definitions

## Base Segment

| FIELD | FIELD NAME & DESCRIPTION | 426 Character Format | | |
|---|---|---|---|---|
| | | Length | Position | Recording Technique |
| 11 | **Credit Limit**<br><br>Report the following values in whole dollars only:<br><br>Line of Credit = Assigned credit limit*<br>Installment = Zero fill<br>Mortgage = Zero fill<br>Open = Assigned credit limit*, if applicable; otherwise, zero fill<br>Revolving = Assigned credit limit*<br><br>* For closed accounts, continue to report the last assigned credit limit. | 9 | 84-92 | N |
| 12 | **Highest Credit or Original Loan Amount**<br><br>Report the following values in whole dollars only:<br><br>Line of Credit = Highest amount of credit utilized by the consumer<br>Installment = Original amount of the loan excluding interest payments<br>Mortgage = Original amount of the loan excluding interest payments<br>Open = Highest amount of credit utilized by the consumer, if applicable<br>Revolving = Highest amount of credit utilized by the consumer<br><br>For companies who report returned checks, such as collection agencies, report the original amount of the check, excluding fees and interest. | 9 | 93-101 | N |

# Field Definitions

## Base Segment

| FIELD | FIELD NAME & DESCRIPTION | 426 Character Format | | |
| --- | --- | --- | --- | --- |
| | | Length | Position | Recording Technique |
| 13 | **Terms Duration**<br>Contains the duration of credit extended.<br><br>Line of Credit = Constant of **LOC**<br><br>Installment = Number of months<br>*If an extension of the terms results in a change to the contract, report the new number of months. If the contract is not changed, continue to report the original number of months.*<br><br>Mortgage = Number of years<br><br>Open = Constant of **001**<br>*One payment as scheduled*<br><br>Revolving = Constant of **REV**<br><br>Exhibit 3 provides the calculations necessary to convert Terms Duration to monthly. | 3 | 102-104 | AN |
| 14 | **Terms Frequency**<br>Report the frequency for payments due.  Values available:<br><br>D = Deferred (Refer to Note)<br>P = Single Payment Loan<br>W = Weekly<br>B = Biweekly<br>E = Semimonthly<br>M = Monthly<br>L = Bimonthly<br>Q = Quarterly<br>T = Triannually<br>S = Semiannually<br>Y = Annually<br><br>Exhibit 3 provides definitions of the Terms Frequency Codes.<br><br>**Note: When reporting Deferred accounts, report the Deferred Payment Start Date in the K4 Segment.** | 1 | 105 | AN |

CREDIT REPORTING RESOURCE GUIDE®

*Copyright 2023 © Consumer Data Industry Association*    APPENDIX 0756

Return to Table of Contents

# Field Definitions

## Base Segment

| FIELD | FIELD NAME & DESCRIPTION | 426 Character Format | | |
|---|---|---|---|---|
| | | Length | Position | Recording Technique |
| 15 | **Scheduled Monthly Payment Amount**<br><br>Report the dollar amount of the scheduled monthly payment due for this reporting period, whether principal, interest only or a combination of the two.  When a balloon payment is also due during the reporting period, the balloon payment amount should be included to represent the entire monthly payment amount due.<br><br>Report in whole dollars only.  When the account is paid in full, the Scheduled Monthly Payment Amount should be zero filled.<br><br>Line of Credit = Minimum amount due based on balance, not including any amounts past due<br>Installment = Regular monthly payment<br>Mortgage = Regular monthly payment, including the principal, interest, and escrow due this month<br>Open = Zero fill<br>Revolving = Minimum amount due based on balance, not including any amounts past due<br><br>Exhibit 3 provides the calculations necessary to convert payment amounts to monthly. | 9 | 106-114 | N |
| 16 | **Actual Payment Amount**<br><br>Report the dollar amount of the monthly payment actually received for this reporting period in whole dollars only.<br><br>If multiple payments are made during the reporting period, the total amount should be reported. | 9 | 115-123 | N |

Return to Table of Contents

# Field Definitions

## Base Segment

| FIELD | FIELD NAME & DESCRIPTION | 426 Character Format | | |
| --- | --- | --- | --- | --- |
| | | Length | Position | Recording Technique |
| 17A | **Account Status**<br><br>Contains the status code that properly identifies the current condition of the account as of the Date of Account Information (Field 24).<br><br>Exhibit 4 provides a description of these codes.<br><br>The Payment Rating (Field 17B) must also be reported when the Account Status Code is 13, 65, 88, 89, 94, or 95.<br><br>Special Comments (Field 19) may be used in conjunction with the Account Status to further define the account.<br><br>For examples of how Account Statuses, Payment Ratings and Special Comments interact, refer to Frequently Asked Question 12. | 2 | 124-125 | AN |
| 17B | **Payment Rating**<br>When the Account Status (Field 17A) contains 13, 65, 88, 89, 94 or 95, this field must also be reported.  The Payment Rating must be blank filled for all other Account Status Codes.<br><br>The Payment Rating contains a code that properly identifies whether the account was current, past due, in collections or charged off ***prior to the status and within the current month's reporting period.***<br><br>Values available:<br><br>0   =   Current account (0–29 days past the due date)<br>1   =   30-59 days past the due date<br>2   =   60-89 days past the due date<br>3   =   90-119 days past the due date<br>4   =   120-149 days past the due date<br>5   =   150-179 days past the due date<br>6   =   180 or more days past the due date<br>G   =   Collection<br>L   =   Charge-off<br><br>For example, if the account was paid on March 22, 2023, but the consumer was 30 days past the due date on March 10, 2023 prior to paying the account, report Account Status Code = 13 and Payment Rating = 1. | 1 | 126 | AN |

CREDIT REPORTING RESOURCE GUIDE®
*Copyright 2023 © Consumer Data Industry Association*     APPENDIX 0758

Return to Table of Contents

# Field Definitions

## Base Segment

| FIELD | FIELD NAME & DESCRIPTION | 426 Character Format | | |
| --- | --- | --- | --- | --- |
| | | Length | Position | Recording Technique |
| 18 | **Payment History Profile** | 24 | 127-150 | AN |

Contains up to 24 months of consecutive payment activity for the previous 24 monthly reporting periods prior to the Date of Account Information (Field 24) being reported.

Report one month's payment history in each position from the left to right in most recent to least recent order.  The first position should represent the Account Status Code reported in the previous month's reporting period.  Note that reporting monthly data does not always refer to a "calendar month".

For example:

| Date of Account Information | Account Status | Payment History Profile |
| --- | --- | --- |
| 03/15/2023 (Monthly reporting period = 02/16/2023 through 03/15/2023) | 78 (60-89 days past the due date) | 100000000000 000000000000 (1st position based on Account Status 71 reported 02/15/2023) |
| 04/15/2023 (Monthly reporting period = 03/16/2023 through 04/15/2023) | 80 (90-119 days past the due date) | 210000000000 000000000000 (1st position based on Account Status 78 reported 03/15/2023) |
| 05/15/2023 (Monthly reporting period = 04/16/2023 through 05/15/2023) | 11 (0-29 days past the due date) | 321000000000 000000000000 (1st position based on Account Status 80 reported 04/15/2023) |

Refer to Exhibit 5 for examples of reporting payment history, which includes examples for month-end reporters, as well as examples for reporters who submit data on other days of the month (e.g., 1st, 15th, etc.).

***Payment History Profile field description continued on next page***

# Field Definitions

## Base Segment

| FIELD | FIELD NAME & DESCRIPTION | 426 Character Format | | |
|---|---|---|---|---|
| | | Length | Position | Recording Technique |
| 18 | **Payment History Profile** | 24 | 127-150 | AN |

*** Field description continued from previous page**

Values available:

```
0  =  0 – 29 days past due date (current account)
1  =  30 - 59 days past due date
2  =  60 - 89 days past due date
3  =  90 - 119 days past due date
4  =  120 - 149 days past due date
5  =  150 - 179 days past due date
6  =  180 or more days past due date
```

B = No payment history available prior to this time – either because the account was not open or because the payment history cannot be furnished.  A "B" may not be embedded within other values.

D = No payment history reported/available this month.   "D" may be embedded in the payment history profile.
   **Note:** Code "D" should ***not*** be used as a default value or reported to remove accurately-reported history.

E = Zero balance ***and*** Account Status 11 – Current (0-29 days past the due date) (Applies to Credit Cards and Lines of Credit)

```
G  =  Collection
H  =  Foreclosure Completed
J  =  Voluntary Surrender
K  =  Repossession
L  =  Charge-off
```

**No other values are acceptable in this field.**

If a full 24 months of history are not available for reporting, the ending positions of this field should be B-filled.

The Payment History Profile is intended to be used to report ***monthly*** history, regardless of the Terms Frequency.

Reporting of the Payment History Profile provides a method for automated correction of erroneously reported history.

**For important information:**

- Paid accounts – refer to Frequently Asked Question 41.

- First-time reporters – refer to Frequently Asked Question 22.

- Reporting accounts with Payment History Profiles more than one time during a given monthly reporting period – refer to Frequently Asked Question 61.

CREDIT REPORTING RESOURCE GUIDE®
*Copyright 2023 © Consumer Data Industry Association*    APPENDIX 0760

Return to Table of Contents

# Field Definitions

## Base Segment

| FIELD | FIELD NAME & DESCRIPTION | 426 Character Format | | |
|---|---|---|---|---|
| 19 | **Special Comment**<br>Used in conjunction with Account Status (Field 17A) and Payment Rating (Field 17B) to further define the account (e.g., closed accounts or adjustments pending).  The Special Comment Code must be reported each month as long as the condition applies.<br><br>If more than one Special Comment applies to an account, it is the data furnisher's decision to report the comment that is deemed most important from a business perspective for the current reporting period.<br><br>If no Special Comment is applicable, blank fill.<br><br>Exhibit 6 provides a list of available comments by category within Portfolio Type and Exhibit 7 provides a list of codes in alphabetical sequence.  Both exhibits include definitions and usage guidelines.<br><br>For examples of how Account Statuses, Payment Ratings and Special Comments interact, refer to Frequently Asked Question 12. | 2 | 151-152 | AN |

# Field Definitions

## Base Segment

| FIELD | FIELD NAME & DESCRIPTION | 426 Character Format | | |
| --- | --- | --- | --- | --- |
| | | Length | Position | Recording Technique |
| 20 | **Compliance Condition Code**<br>Allows the reporting of a condition that is required for legal compliance.<br><br>Compliance Condition Codes are used to reflect accounts closed at consumer's request, and consumer disputes under the Fair Credit Billing Act (FCBA), the Fair Debt Collection Practices Act (FDCPA), or the direct dispute provisions of the Fair Credit Reporting Act (FCRA) and its implementing rules.<br><br>The code should be reported each month as long as the condition applies.  As an option, the code may be reported one time and will remain on file until another Compliance Condition Code or the **XR** (Removal code) is reported.  **Regardless of the method of reporting, the code will be deleted** *only* **when another Compliance Condition Code or the XR (Removal code) is reported.**<br><br>Exhibit 8 provides a list of Compliance Condition Codes and examples that demonstrate how to report these codes.<br><br>For questions about the use of Compliance Condition Codes or how long to report them, data furnishers should refer to their internal policies and procedures. | 2 | 153-154 | AN |

Copyright 2023 © Consumer Data Industry Association  APPENDIX 0762

Return to Table of Contents

# Field Definitions

## Base Segment

| FIELD | FIELD NAME & DESCRIPTION | 426 Character Format | | |
|---|---|---|---|---|
| | | Length | Position | Recording Technique |
| 21 | **Current Balance**<br>Report the outstanding current balance on the account as of the Date of Account Information.<br><br>The Current Balance should contain the principal balance including Balloon Payment Amounts (when applicable), as well as applicable interest, late charges, fees, insurance payments and escrow that are due during the current reporting period. The Current Balance may exceed the Highest Credit, Original Loan Amount or Credit Limit.<br><br>The Current Balance should *not* include <u>future</u> interest, escrow, fees or insurance payments.<br><br>This amount, which should be reported in whole dollars only, may increase or decline from month to month.  Credit balances (negative balances) should be reported as zero. | 9 | 155-163 | N |
| 22 | **Amount Past Due**<br>Report the total amount of payments that are 30 days or more past due in whole dollars only. This field should include late charges and fees, if applicable.  **Do not include current amount due in this field.**<br><br>**Notes: If the Account Status is 11 (current), this field should be zero.**<br><br>**If the Account Status is 93 (account assigned to internal or external collections) or 97 (unpaid balance reported as a loss – charge-off), this field may equal the Current Balance.** | 9 | 164-172 | N |
| 23 | **Original Charge-off Amount**<br>For Status Codes 64 and 97 (all portfolio types), report the original amount charged to loss, regardless of the declining balance.  Report whole dollars only.<br><br>If payments are received from the consumer, report the outstanding balance in the Current Balance and Amount Past Due fields. | 9 | 173-181 | N |

# Field Definitions

## Base Segment

| FIELD | FIELD NAME & DESCRIPTION | 426 Character Format | | |
| --- | --- | --- | --- | --- |
| | | Length | Position | Recording Technique |
| 24 | **Date of Account Information** | 8 | 182-189 | N |

Date that represents the current month's reporting period.  All account information, such as Account Status and Current Balance, must be reported *as of* the date in this field.  Refer to the Glossary of Terms for a description and examples of "monthly reporting periods".

For Account Status Codes 11, 71, 78, 80, 82-84, 88, 89, 93-97, DA and DF, report a date within the *current month's reporting period*, as noted below:

- **Cycle Reporters –** Report the date of the current month's billing cycle; i.e., reporting cycle.  ***This method is preferred to facilitate accurate and timely reporting of account information.***

- **Monthly Reporters –** Report the date within the current month's reporting period that represents the most recent update to the account, such as mid-month (03/15/2023) or end of month (03/31/2023).  The Date of Account Information may represent the consumer's billing date as long as the date is within the <u>current month's reporting period</u>.  A historic or future date should not be reported.

For Account Status Codes 13 and 61–65 (paid statuses), report a date within the *current month's reporting period*, as noted below:

- **Portfolio Types I (Installment) and M (Mortgage)** – Report the date paid.

- **Portfolio Types C (Line of Credit) and R (Revolving)** – Report the date the account was closed to further charges ***and has a zero balance.***  If the account was closed due to inactivity, then report the date within the current reporting period when the account was closed to further charges.

- **Portfolio Type O (Open)** – For Collection Agencies, Child Support Agencies, Debt Buyers, Residential Rental Companies, Student Loan Guarantors, the U.S. Department of Education (post-default loans), and Utility Companies, report the date paid.  For credit card reporters, when the full balance amount is due each month, follow the guidance above for Portfolio Types C and R.

Format for character date is MMDDYYYY.  Format for packed date is 0MMDDYYYYs – where s is the sign.

**Notes: This date must not reflect a future date.**

**For accounts reported with bankruptcy Consumer Information Indicators, refer to Frequently Asked Questions 27 and 28 for guidelines on reporting the Date of Account Information.**

**For guidelines on reporting paid, closed or inactive accounts, refer to FAQs 39, 40 and 41.**

**For guidelines on reporting transferred or sold accounts, refer to FAQs 46, 47 & 48.**

**For guidelines on reporting accounts more than one time during a given monthly reporting period, refer to FAQ 61.**

*Copyright 2023 © Consumer Data Industry Association*    APPENDIX 0764

**Return to Table of Contents**

# Field Definitions

## Base Segment

| FIELD | FIELD NAME & DESCRIPTION | 426 Character Format | | |
| --- | --- | --- | --- | --- |
| | | Length | Position | Recording Technique |
| 25 | **FCRA Compliance/Date of First Delinquency** | 8 | 190-197 | N |

This date is used to ensure compliance with the Fair Credit Reporting Act.

The date in the Date of First Delinquency field must be determined each reporting period based on the following hierarchy:

1. For Account Status Codes 61-65, 71, 78, 80, 82-84, 88-89 and 93-97, report the date of the first 30-day delinquency that led to the status being reported. This date should be 30 days after the Due Date. If a delinquent account becomes current, the Date of First Delinquency should be zero filled. Then if the account goes delinquent again, the Date of First Delinquency starts over with the new first delinquency date.

2. For Account Status Codes 05 and 13, if the Payment Rating is 1, 2, 3, 4, 5, 6, G or L, report the date of the first 30-day delinquency that led to the Payment Rating being reported. This date should be 30 days after the Due Date.

3. For Consumer Information Indicators A-H and Z (Bankruptcies), 1A (Personal Receivership) and V-Y (Reaffirmation of Debt Rescinded with Bankruptcy Chapters), if the account is current (Account Status Code 11 or Account Status Code 05 or 13 with Payment Rating 0), report the date of the bankruptcy/personal receivership petition or notification. Even though the account is not delinquent, this date is required for purging purposes.

If none of the conditions listed in the above hierarchy apply, the Date of First Delinquency should be zero filled.

**Note: Consumer Information Indicators W, X and Y are obsolete for reporting as of September 2010, Consumer Information Indicator Z is obsolete for reporting as of April 2021, and Account Status Code 05 is obsolete for reporting as of April 2022. These codes may no longer be reported.**

The Date of First Delinquency is used by the consumer reporting agencies for purging purposes. Format for character date is MMDDYYYY. Format for packed date is 0MMDDYYYYs — where s is the sign.

**Notes:**

- **Refer to Exhibit 9 for detailed reporting instructions, examples and excerpts from the Fair Credit Reporting Act.**

- **First-time reporters should refer to Frequently Asked Question 22 for important information.**

# Field Definitions

## Base Segment

| FIELD | FIELD NAME & DESCRIPTION | 426 Character Format | | |
|---|---|---|---|---|
| | | Length | Position | Recording Technique |
| 26 | **Date Closed**<br>For all portfolio types, contains the date the account was closed to further purchases, paid in full, transferred or sold.  For Line of Credit, Open or Revolving accounts, there may be a balance due.<br><br>Format for character date is MMDDYYYY.  Format for packed date is 0MMDDYYYYs — where s is the sign.  If not applicable, zero fill. | 8 | 198-205 | N |
| 27 | **Date of Last Payment**<br>Report the date the most recent payment was received, whether full or partial payment is made.  If a payment has never been received, zero fill.<br><br>Format for character date is MMDDYYYY.  Format for packed date is 0MMDDYYYYs — where s is the sign.  If the day is not available, use 01. | 8 | 206-213 | N |
| 28 | **Interest Type Indicator**<br>Contains one of the following values that designates the interest type:<br><br>F = Fixed<br>V = Variable/Adjustable<br><br>If indicator not available or unknown, blank fill.<br><br>**Note: Report indicator 'V' for loans where the interest rate will be variable at some point, even if the interest rate starts as fixed.** | 1 | 214 | AN |
| 29 | **Reserved**<br>Blank fill.<br><br>Last position of field formerly used for Consumer Transaction Type. | 17 | 215-231 | AN |

CREDIT REPORTING RESOURCE GUIDE®

*Copyright 2023 © Consumer Data Industry Association*    APPENDIX 0766

Return to Table of Contents

# Field Definitions

## Base Segment

**Note:  Fields 30 through 46 contain identification information for the primary consumer.  For joint accounts where two or more consumers are contractually responsible, the consumer reported in this Base Segment will be considered primary for reporting purposes.**

| FIELD | FIELD NAME & DESCRIPTION | 426 Character Format | | |
|---|---|---|---|---|
| | | Length | Position | Recording Technique |
| 30 | **Surname**<br>Report the last name of the primary consumer.  Titles and prefixes should not be reported.<br><br>If the surname contains multiple names, such as Paternal Name-Maternal Name, hyphenate the surnames.  For example, "SMITH-JONES" or "MARTINEZ-REYES" requires the hyphen.<br><br>If the surname contains separate words, the hyphen is not required.  For example, report "VAN DYKE" or "DE LA CRUZ" with a space between each word.<br><br>Other than the hyphen, do not report special characters in any of the Consumer Name fields.<br><br>The Generation Code should be reported in Field 33.<br><br>**Notes: Do not report minors.  The name fields should not contain messages, such as "Parent of", "Baby", "Daughter", "Child", etc.**<br><br>**Do not report trustee or estate accounts.  In cases where the debt is included in a revocable trust and <u>the consumer retains contractual responsibility</u>, report the consumer's Full Name, Address, Social Security Number, and Date of Birth within the Base Segment fields.  Do not report the name of the trust.** | 25 | 232-256 | AN |
| 31 | **First Name**<br>Report the full first name of the primary consumer.  Names should not be abbreviated.  Examples: Report first name "JUNIOR" (not "JR"); report "ROBERT" (not "ROBT").<br><br>If reporting multiple first names, hyphenate the first names.<br><br>**Note: If a consumer uses only initials for first and middle names (e.g., A.J.), the first name initial should be reported in the First Name field (e.g., A) and the middle initial should be reported in the Middle Name field (e.g., J).** | 20 | 257-276 | AN |

# Field Definitions

## Base Segment

| FIELD | FIELD NAME & DESCRIPTION | 426 Character Format | | |
| --- | --- | --- | --- | --- |
| | | Length | Position | Recording Technique |
| 32 | **Middle Name**<br><br>Report the middle name or middle initial of the primary consumer, if available.<br><br>If reporting multiple middle names, hyphenate the middle names. | 20 | 277-296 | AN |
| 33 | **Generation Code**<br><br>Used to distinguish Jr., Sr., II, III, etc.  If not applicable, blank fill.  Values available:<br><br>J = Junior   3 = III   6 = VI   9 = IX<br>S = Senior   4 = IV   7 = VII<br>2 = II       5 = V    8 = VIII | 1 | 297 | AN |
| 34 | **Social Security Number**<br><br>Report the Social Security Number (SSN) of the primary consumer.  Report only valid U.S.-issued SSNs.<br><br>Reporting of this information is required as the Social Security Number greatly enhances accuracy in matching to the correct consumer.<br><br>If the consumer does not have a SSN or one is not available for reporting, zero- or 9-fill all positions.<br><br>**Notes:**<br><br>**If the Social Security Number is not reported, the Date of Birth is required to be reported.**<br><br>**Do not report Individual Tax Identification Numbers (ITINs) in this field.  ITINs do not prove identity outside the tax system and should not be offered or accepted as identification for non-tax purposes, per the Social Security Administration.**<br><br>**Do not report Credit Profile Numbers (CPNs) in this field.  The CPN should not be used for credit reporting purposes and does not replace the Social Security Number.** | 9 | 298-306 | N |

*Copyright 2023 © Consumer Data Industry Association*
APPENDIX 0768

Return to Table of Contents

# Field Definitions

## Base Segment

| FIELD | FIELD NAME & DESCRIPTION | 426 Character Format | | |
|---|---|---|---|---|
| | | Length | Position | Recording Technique |
| 35 | **Date of Birth**<br>Report the full Date of Birth of the primary consumer, including the month, day and year.<br><br>Reporting of this information is required as the Date of Birth greatly enhances accuracy in matching to the correct consumer.<br><br>Format for character date is MMDDYYYY.  Format for packed date is 0MMDDYYYYs — where s is the sign.<br><br>**Notes: If the Date of Birth is not reported, the Social Security Number is required to be reported.**<br><br>**When reporting Authorized Users (ECOA Code 3), the full Date of Birth (MMDDYYYY) must be reported for all newly-added Authorized Users on all pre-existing and newly-opened accounts, even if the Social Security Number is reported.**<br><br>**Do not report accounts of consumers who are too young to enter into a binding contract.** | 8 | 307-314 | N |
| 36 | **Telephone Number**<br>Contains the telephone number of the primary consumer (Area Code + 7 digits). | 10 | 315-324 | N |
| 37 | **ECOA Code**<br>Defines the relationship of the primary consumer to the account and designates the account as joint, individual, etc., in compliance with the Equal Credit Opportunity Act.<br><br>Exhibit 10 provides a list of ECOA Codes, their definitions and usage.<br><br>For important information:<br>• Guidelines on reporting consumers who are personally liable for business accounts – refer to Frequently Asked Question 20.<br><br>• Usage guidelines on ECOA Codes T (Terminated) and Z (Delete Consumer) – refer to Frequently Asked Question 14(b).<br><br>**Note: Codes 0 (Undesignated), 4 (Joint) and 6 (On-Behalf-Of) are obsolete as of September 2003 and may no longer be reported.** | 1 | 325 | AN |

# Field Definitions

## Base Segment

| FIELD | FIELD NAME & DESCRIPTION | 426 Character Format | | |
|---|---|---|---|---|
| | | Length | Position | Recording Technique |
| 38 | **Consumer Information Indicator**<br>Contains a value that indicates a special condition of the account that applies to the primary consumer.<br><br>This special condition may be that a bankruptcy was filed, discharged, dismissed or withdrawn; a debt was reaffirmed; or the consumer cannot be located or is now located.<br><br>The indicator should be reported each month as long as the condition applies.  As an option, the indicator may be reported one time and will remain on file until another Consumer Information Indicator or a Removal value is reported.<br><br>**Regardless of the method of reporting, the indicator will be deleted *only* when another Consumer Information Indicator or a Removal value (Q, S, U) is reported.**<br><br>Exhibit 11 provides a list of Consumer Information Indicators and examples that demonstrate how to report these codes.<br><br>For reporting guidelines, refer to Frequently Asked Questions 23 through 32 (bankruptcy) and 33 (personal receivership). | 2 | 326-327 | AN |
| 39 | **Country Code**<br>Contains the standard two-character country abbreviation.<br><br>Exhibit 12 provides a list of the Country Codes. | 2 | 328-329 | AN |

CREDIT REPORTING RESOURCE GUIDE®<br>*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 0770

Return to Table of Contents

# Field Definitions

## Base Segment

| FIELD | FIELD NAME & DESCRIPTION | 426 Character Format | | |
|---|---|---|---|---|
| | | Length | Position | Recording Technique |
| 40 | **First Line of Address**<br>Contains billing/mailing address for the primary consumer.  If the consumer has a U.S. address and a foreign address, report the U.S. address.  If the consumer has never used the U.S. address as a billing/mailing address (e.g., a property address), report the foreign address.<br><br>If the billing/mailing address does not belong specifically to the consumer, such as a financial counseling site or bill paying service, report the consumer's home address.<br><br>The First Line of Address usually includes street number, direction, street name, and type of thoroughfare.<br><br>If the billing/mailing address is a PO Box or Rural Route, include Box or Route followed by the number (e.g., PO Box 100).  Do not report both a street address and a PO Box.<br><br>If the billing/mailing address is a private mailbox (PMB), the street address should be reported in the First Line of Address (e.g., 5678 Main Street).  The PMB number should be reported in the Second Line of Address (e.g., PMB 1234).  As an alternative, the entire address can be reported in the First Line of Address; for example, 5678 Main Street PMB 1234.<br><br>Eliminate internal messages such as: "Do not mail", "Attorney", "Charge-off", "Chapter 13", "Fraud", "Trustee", "Estate of", "Care of", "M/R" (Mail Returned), etc.<br><br>Exhibit 13 provides general rules for address reporting.  Do not enter data furnisher's address in this field. | 32 | 330-361 | AN |
| 41 | **Second Line of Address**<br>Contains second line of address, if needed, such as apartment or unit number, or private mailbox number (PMB).<br><br>Eliminate internal messages such as: "Do not mail", "Attorney", "Charge-off", "Chapter 13", "Fraud", "Trustee", or "Estate of", "Care of", "M/R" (Mail Returned), etc. | 32 | 362-393 | AN |
| 42 | **City**<br>Contains city name for address of primary consumer. Truncate rightmost positions if city name is greater than 20 characters or use standard 13-character U.S. Postal Service city abbreviations. | 20 | 394-413 | AN |

Return to Table of Contents

# Field Definitions

## Base Segment

| FIELD | FIELD NAME & DESCRIPTION | 426 Character Format | | |
| --- | --- | --- | --- | --- |
| | | Length | Position | Recording Technique |
| 43 | **State**<br><br>Contains the standard U.S. Postal Service state abbreviation for the address of the primary consumer.<br><br>Exhibit 14 provides a list of State Codes. | 2 | 414-415 | AN |
| 44 | **Postal/Zip Code**<br><br>Report the Zip Code of the primary consumer's address. Use entire field if reporting 9-digit zip codes. Otherwise, left-justify and blank fill. | 9 | 416-424 | AN |
| 45 | **Address Indicator**<br><br>Contains one of the following values for the address reported in fields 40-44:<br><br>C = Confirmed/Verified address<br>**Note: Value 'C' enables reporting a confirmed or verified address after receiving an address discrepancy notification from a consumer reporting agency. Report 'C' one time after the address is confirmed.**<br>Y = Known to be address of primary consumer<br>N = Not confirmed address<br>M = Military address<br>S = Secondary Address<br>B = Business address — not consumer's residence<br>U = Non-deliverable address/Returned mail<br>D = Data reporter's default address<br>P = Bill Payer Service — not consumer's residence<br><br>If indicator not available or unknown, blank fill. | 1 | 425 | AN |
| 46 | **Residence Code**<br><br>Contains the one-character residence code of the address reported in fields 40-44.<br><br>Values available:<br>O = Owns<br>R = Rents<br><br>If not available or unknown, blank fill. | 1 | 426 | AN |

CREDIT REPORTING RESOURCE GUIDE®
*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 0772

# Field Definitions

## J1 Segment
## Associated Consumer—Same Address

The J1 Segment is designed to accommodate the requirements of ECOA and applies when the associated consumer resides at the same address as the individual reported in the Base Segment. This segment must be present each time the account is reported.

Multiple occurrences of the J1 Segment can be appended to the Base Segment.

| FIELD | FIELD NAME & DESCRIPTION | 426 and 366 FORMATS | | |
|---|---|---|---|---|
| | | Length | Position | Recording Technique |
| 1 | **Segment Identifier**<br>Contains a constant of **J1**. | 2 | 1-2 | AN |
| 2 | **Reserved**<br>Blank fill.<br><br>Field formerly used for Consumer Transaction Type. | 1 | 3 | AN |
| 3 | **Surname**<br>Report the last name of the associated consumer.  Titles and prefixes should not be reported.<br><br>If the surname contains multiple names, such as Paternal Name-Maternal Name, hyphenate the surnames.  For example, "SMITH-JONES" or "MARTINEZ-REYES" requires the hyphen.<br><br>If the surname contains separate words, the hyphen is not required.  For example, report "VAN DYKE" or "DE LA CRUZ" with a space between each word.<br><br>Other than the hyphen, do not report special characters in any of the Consumer Name fields.<br><br>The Generation Code should be reported in Field 6.<br><br>**Notes: Do not report minors.  The name fields should not contain messages, such as "Parent of", "Baby", "Daughter", "Child", etc.**<br><br>**Do not report trustee or estate accounts.  In cases where the debt is included in a revocable trust and <u>the consumer retains contractual responsibility</u>, report the consumer's Full Name, Address, Social Security Number, and Date of Birth within the J1 Segment fields.  Do not report the name of the trust.** | 25 | 4-28 | AN |

# Field Definitions

## J1 Segment
## Associated Consumer—Same Address

| FIELD | FIELD NAME & DESCRIPTION | 426 and 366 FORMATS | | |
|---|---|---|---|---|
| | | Length | Position | Recording Technique |
| 4 | **First Name**<br>Report the full first name of the associated consumer. Names should not be abbreviated.  Examples: Report first name "JUNIOR" (not "JR"); report "ROBERT" (not "ROBT").<br><br>If reporting multiple first names, hyphenate the first names.<br><br>**Note: If a consumer uses only initials for first and middle names (e.g., A.J.), the first name initial should be reported in the First Name field (e.g., A) and the middle initial should be reported in the Middle Name field (e.g., J).** | 20 | 29-48 | AN |
| 5 | **Middle Name**<br>Report the middle name or middle initial of the associated consumer, if available.<br><br>If reporting multiple middle names, hyphenate the middle names. | 20 | 49-68 | AN |
| 6 | **Generation Code**<br>Used to distinguish Junior, Senior, II, III, IV, etc.  If not applicable, blank fill.  Values available:<br><br>J = Junior    3 = III    6 = VI    9 = IX<br>S = Senior    4 = IV    7 = VII<br>2 = II        5 = V     8 = VIII | 1 | 69 | AN |

CREDIT REPORTING RESOURCE GUIDE®
*Copyright 2023 © Consumer Data Industry Association*    APPENDIX 0774

Return to Table of Contents

# Field Definitions

## J1 Segment
## Associated Consumer—Same Address

| FIELD | FIELD NAME & DESCRIPTION | 426 and 366 FORMATS | | |
|---|---|---|---|---|
| | | Length | Position | Recording Technique |
| 7 | **Social Security Number** Report the Social Security Number (SSN) of the associated consumer. Report only valid U.S.-issued SSNs. Reporting of this information is required as the Social Security Number greatly enhances accuracy in matching to the correct consumer. If the consumer does not have a SSN or one is not available for reporting, zero- or 9-fill all positions. **Notes:** **If the Social Security Number is not reported, the Date of Birth is required to be reported.** **Do not report Individual Tax Identification Numbers (ITINs) in this field. ITINs do not prove identity outside the tax system and should not be offered or accepted as identification for non-tax purposes, per the Social Security Administration.** **Do not report Credit Profile Numbers (CPNs) in this field. The CPN should not be used for credit reporting purposes and does not replace the Social Security Number.** | 9 | 70-78 | N |
| 8 | **Date of Birth** Report the full Date of Birth of the associated consumer, including the month, day and year. Reporting of this information is required as the Date of Birth greatly enhances accuracy in matching to the correct consumer. Format is MMDDYYYY. **Notes:** **If the Date of Birth is not reported, the Social Security Number is required to be reported.** **When reporting Authorized Users (ECOA Code 3), the full Date of Birth (MMDDYYYY) must be reported for all newly-added Authorized Users on all pre-existing and newly-opened accounts, even if the Social Security Number is reported.** **Do not report accounts of consumers who are too young to enter into a binding contract.** | 8 | 79-86 | N |

# Field Definitions

## J1 Segment
## Associated Consumer—Same Address

| FIELD | FIELD NAME & DESCRIPTION | 426 and 366 FORMATS | | |
|---|---|---|---|---|
| | | Length | Position | Recording Technique |
| 9 | **Telephone Number** <br> Contains the telephone number of the associated consumer (Area Code + 7 digits). | 10 | 87-96 | N |
| 10 | **ECOA Code** <br> Defines the relationship of the associated consumer to the account and designates the account as joint, individual, etc., in compliance with the Equal Credit Opportunity Act. <br><br> Exhibit 10 provides a list of ECOA Codes, their definitions and usage. <br><br> For important information: <br><br> • Guidelines on reporting consumers who are personally liable for business accounts – refer to Frequently Asked Question 20. <br><br> • Usage guidelines on ECOA Codes T (Terminated) and Z (Delete Consumer) – refer to Frequently Asked Question 14(b). <br><br> **Note:  Codes 0 (Undesignated), 4 (Joint) and 6 (On-Behalf-Of) are obsolete as of September 2003 and may no longer be reported.** | 1 | 97 | AN |

CREDIT REPORTING RESOURCE GUIDE®

*Copyright 2023 © Consumer Data Industry Association*    APPENDIX 0776

Return to Table of Contents

# Field Definitions

## J1 Segment
## Associated Consumer—Same Address

| FIELD | FIELD NAME & DESCRIPTION | 426 and 366 FORMATS | | |
|---|---|---|---|---|
| | | Length | Position | Recording Technique |
| 11 | **Consumer Information Indicator**<br>Contains a value that indicates a special condition of the account that applies to the associated consumer.<br><br>This special condition may be that a bankruptcy was filed, discharged, dismissed or withdrawn; a debt was reaffirmed; or the consumer cannot be located or is now located.<br><br>The indicator should be reported each month as long as the condition applies.  As an option, the indicator may be reported one time and will remain on file until another Consumer Information Indicator or a Removal value is reported.<br><br>**Regardless of the method of reporting, the indicator will be deleted *only* when another Consumer Information Indicator or a Removal value (Q, S, U) is reported.**<br><br>Exhibit 11 provides a list of Consumer Information Indicators and examples that demonstrate how to report these codes.<br><br>For reporting guidelines, refer to Frequently Asked Questions 23 through 32 (bankruptcy) and 33 (personal receivership). | 2 | 98-99 | AN |
| 12 | **Reserved**<br>Blank fill. | 1 | 100 | AN |

**Note:  For additional reporting guidelines specific to the J1 Segment, refer to Frequently Asked Questions 6, 7 and 17 through 19.**

# Field Definitions

## J2 Segment
## Associated Consumer—Different Address

The J2 Segment is designed to accommodate the requirements of ECOA and applies when the associated consumer resides at a different address than the individual reported in the Base Segment.  The J2 Segment must always contain an address, even if the address is the same as the one reported in the Base Segment.  This segment must be present each time the account is reported.

Multiple occurrences of the J2 Segment can be appended to the Base Segment.

| FIELD | FIELD NAME & DESCRIPTION | 426 and 366 FORMATS | | |
|---|---|---|---|---|
| | | Length | Position | Recording Technique |
| 1 | **Segment Identifier**<br>Contains a constant of **J2**. | 2 | 1-2 | AN |
| 2 | **Reserved**<br>Blank fill.<br><br>Field formerly used for Consumer Transaction Type. | 1 | 3 | AN |
| 3 | **Surname**<br>Report the last name of the associated consumer.  Titles and prefixes should not be reported.<br><br>If the surname contains multiple names, such as Paternal-Name-Maternal Name, hyphenate the surnames.  For example, "SMITH-JONES" or "MARTINEZ-REYES" requires the hyphen.<br><br>If the surname contains separate words, the hyphen is not required.  For example, report "VAN DYKE" or "DE LA CRUZ" with a space between each word.<br><br>Other than the hyphen, do not report special characters in any of the Consumer Name fields.<br><br>The Generation Code should be reported in Field 6.<br><br>**Notes:  Do not report minors.  The name fields should not contain messages, such as "Parent of", "Baby", "Daughter", "Child", etc.**<br><br>**Do not report trustee or estate accounts.  In cases where the debt is included in a revocable trust and <u>the consumer retains contractual responsibility</u>, report the consumer's Full Name, Address, Social Security Number, and Date of Birth within the J2 Segment fields.  Do not report the name of the trust.** | 25 | 4-28 | AN |

*Copyright 2023 © Consumer Data Industry Association*    APPENDIX 0778

Return to Table of Contents

# Field Definitions

## J2 Segment
## Associated Consumer—Different Address

| FIELD | FIELD NAME & DESCRIPTION | 426 and 366 FORMATS | | |
|---|---|---|---|---|
| | | Length | Position | Recording Technique |
| 4 | **First Name**<br>Report the full first name of the associated consumer. Names should not be abbreviated.  Examples: Report first name "JUNIOR" (not "JR"); report "ROBERT" (not "ROBT").<br><br>If reporting multiple first names, hyphenate the first names.<br><br>**Note: If a consumer uses only initials for first and middle names (e.g., A.J.), the first name initial should be reported in the First Name field (e.g., A) and the middle initial should be reported in the Middle Name field (e.g., J).** | 20 | 29-48 | AN |
| 5 | **Middle Name**<br>Report the middle name or middle initial of the associated consumer, if available.<br><br>If reporting multiple middle names, hyphenate the middle names. | 20 | 49-68 | AN |
| 6 | **Generation Code**<br>Used to distinguish Junior, Senior, II, III, IV, etc.  If not applicable, blank fill.  Values available:<br><br>J = Junior    3 = III    6 = VI     9 = IX<br>S = Senior    4 = IV    7 = VII<br>2 = II        5 = V     8 = VIII | 1 | 69 | AN |

# Field Definitions

## J2 Segment
## Associated Consumer—Different Address

| FIELD | FIELD NAME & DESCRIPTION | 426 and 366 FORMATS | | |
| --- | --- | --- | --- | --- |
| | | Length | Position | Recording Technique |
| 7 | **Social Security Number** Report the Social Security Number (SSN) of the associated consumer.  Report only valid U.S.-issued SSNs.<br><br>Reporting of this information is required as the Social Security Number greatly enhances the accuracy in matching to the correct consumer.<br><br>If the consumer does not have a SSN or if one is not available for reporting, zero- or 9-fill all positions.<br><br>**Notes: If the Social Security Number is not reported, the Date of Birth is required to be reported.**<br><br>**Do not report Individual Tax Identification Numbers (ITINs) in this field.  ITINs do not prove identity outside the tax system and should not be offered or accepted as identification for non-tax purposes, per the Social Security Administration.**<br><br>**Do not report Credit Profile Numbers (CPNs) in this field.  The CPN should not be used for credit reporting purposes and does not replace the Social Security Number.** | 9 | 70-78 | N |

CREDIT REPORTING RESOURCE GUIDE®
*Copyright 2023 © Consumer Data Industry Association*    APPENDIX 0780

Return to Table of Contents

# Field Definitions

## J2 Segment
## Associated Consumer—Different Address

| FIELD | FIELD NAME & DESCRIPTION | 426 and 366 FORMATS | | |
|---|---|---|---|---|
| | | Length | Position | Recording Technique |
| 8 | **Date of Birth**<br>Report the Date of Birth of the associated consumer, including the month, day and year.<br><br>Reporting of this information is required as the Date of Birth greatly enhances accuracy in matching to the correct consumer.<br><br>Format is MMDDYYYY.<br><br>**Notes: If the Date of Birth is not reported, the Social Security Number is required to be reported.**<br><br>**When reporting Authorized Users (ECOA Code 3), the full Date of Birth (MMDDYYYY) must be reported for all newly-added Authorized Users on all pre-existing and newly-opened accounts, even if the Social Security Number is reported.**<br><br>**Do not report accounts of consumers who are too young to enter into a binding contract.** | 8 | 79-86 | N |

# Field Definitions

## J2 Segment
## Associated Consumer—Different Address

| FIELD | FIELD NAME & DESCRIPTION | 426 and 366 FORMATS | | |
|---|---|---|---|---|
| | | Length | Position | Recording Technique |
| 9 | **Telephone Number**<br>Contains the telephone number of the associated consumer (Area Code + 7 digits). | 10 | 87-96 | N |
| 10 | **ECOA Code**<br>Defines the relationship of the associated consumer to the account and designates the account as joint, individual, etc., in compliance with the Equal Credit Opportunity Act.<br><br>Exhibit 10 provides a list of ECOA Codes, their definitions and usage.<br><br>For important information:<br>• Guidelines on reporting consumers who are personally liable for business accounts – refer to Frequently Asked Question 20.<br><br>• Usage guidelines on ECOA Codes T (Terminated) and Z (Delete Consumer) – refer to Frequently Asked Question 14(b).<br><br>**Note: Codes 0 (Undesignated), 4 (Joint) and 6 (On-Behalf-Of) are obsolete as of September 2003 and may no longer be reported.** | 1 | 97 | AN |

CREDIT REPORTING RESOURCE GUIDE®

*Copyright 2023 © Consumer Data Industry Association*    APPENDIX 0782

Return to Table of Contents

# Field Definitions

## J2 Segment
## Associated Consumer—Different Address

| FIELD | FIELD NAME & DESCRIPTION | 426 and 366 FORMATS | | |
|---|---|---|---|---|
| | | Length | Position | Recording Technique |
| 11 | **Consumer Information Indicator**<br>Contains a value that indicates a special condition of the account that applies to the associated consumer.<br><br>This special condition may be that a bankruptcy was filed, discharged, dismissed or withdrawn; a debt was reaffirmed; or the consumer cannot be located or is now located.<br><br>The indicator should be reported each month as long as the condition applies.  As an option, the indicator may be reported one time and will remain on file until another Consumer Information Indicator or a Removal value is reported.<br><br>**Regardless of the method of reporting, the indicator will be deleted *only* when another Consumer Information Indicator or a Removal value (Q, S, U) is reported.**<br><br>Exhibit 11 provides a list of Consumer Information Indicators and examples that demonstrate how to report these codes.<br><br>For reporting guidelines, refer to Frequently Asked questions 23 through 32 (bankruptcy) and 33 (personal receivership). | 2 | 98-99 | AN |
| 12 | **Country Code**<br>Contains the standard two-character country abbreviation.<br><br>Exhibit 12 provides a list of the Country Codes. | 2 | 100-101 | AN |

# Field Definitions

## J2 Segment
## Associated Consumer—Different Address

| FIELD | FIELD NAME & DESCRIPTION | 426 and 366 FORMATS | | |
|---|---|---|---|---|
| | | Length | Position | Recording Technique |
| 13 | **First Line of Address**<br>Contains billing/mailing address for the associated consumer. If the consumer has a U.S. address and a foreign address, report the U.S. address.  If the consumer has never used the U.S. address as a billing/mailing address (e.g., a property address), report the foreign address.<br><br>If the billing/mailing address does not belong specifically to the consumer, such as a financial counseling site or bill paying service, report the consumer's home address.<br><br>The First Line of Address usually includes street number, direction, street name, and type of thoroughfare.<br><br>If the billing/mailing address is a PO Box or Rural Route, include Box or Route followed by the number (e.g., PO Box 100).  Do not report both a street address and a PO Box.<br><br>If the billing/mailing address is a private mailbox (PMB), the street address should be reported in the First Line of Address (e.g., 5678 Main Street).  The PMB number should be reported in the Second Line of Address (e.g., PMB 1234).  As an alternative, the entire address can be reported in the First Line of Address; for example, 5678 Main Street PMB 1234.<br><br>Eliminate internal messages such as: "Do not mail", "Attorney", "Charge-off", "Chapter 13", "Fraud", "Trustee", "Estate of", "Care of", "M/R" (Mail Returned), etc.<br><br>Exhibit 13 provides general rules for address reporting.<br><br>Do not enter data furnisher's address in this field. | 32 | 102-133 | AN |
| 14 | **Second Line of Address**<br>Contains second line of address, if needed, such as apartment or unit number, or private mailbox number (PMB).<br><br>Eliminate internal messages such as: "Do not mail", "Attorney", "Charge-off", "Chapter 13", "Fraud", "Trustee", "Estate of", "Care of", "M/R" (Mail Returned), etc. | 32 | 134-165 | AN |
| 15 | **City**<br>Contains city name for address of associated consumer. Truncate rightmost positions if city name is greater than 20 characters or use standard 13-character U.S. Postal Service city abbreviations. | 20 | 166-185 | AN |

CREDIT REPORTING RESOURCE GUIDE®

*Copyright 2023 © Consumer Data Industry Association*    APPENDIX 0784

Return to Table of Contents

# Field Definitions

## J2 Segment
## Associated Consumer—Different Address

| FIELD | FIELD NAME & DESCRIPTION | 426 and 366 FORMATS | | |
|---|---|---|---|---|
| | | Length | Position | Recording Technique |
| 16 | **State**<br>Contains the standard U.S. Postal Service state abbreviation for the address of the associated consumer.<br><br>Exhibit 14 provides a list of State Codes. | 2 | 186-187 | AN |
| 17 | **Postal/Zip Code**<br>Report the Zip Code of the associated consumer's address. Use entire field if reporting 9-digit zip codes. Otherwise, left-justify and blank fill. | 9 | 188-196 | AN |
| 18 | **Address Indicator**<br>Contains one of the following values for the address reported in fields 13-17:<br><br>C = Confirmed/Verified address<br>**Note: Value 'C' enables reporting a confirmed or verified address after receiving an address discrepancy notification from a consumer reporting agency. Report 'C' one time after the address is confirmed.**<br>Y = Known to be address of associated consumer<br>N = Not confirmed address<br>M = Military address<br>S = Secondary address<br>B = Business address — not consumer's residence<br>U = Non-deliverable address/Returned mail<br>D = Data reporter's default address<br>P = Bill Payer Service — not consumer's residence<br><br>If indicator not available or unknown, blank fill. | 1 | 197 | AN |
| 19 | **Residence Code**<br>Contains the one-character residence code of the address reported in fields 13-17. Values available:<br><br>O = Owns<br>R = Rents<br><br>If not available or unknown, blank fill. | 1 | 198 | AN |
| 20 | **Reserved**<br>Blank fill. | 2 | 199-200 | AN |

**Note: For additional reporting guidelines specific to the J2 Segment, refer to Frequently Asked Questions 6, 7 and 17 through 20.**

# Field Definitions

## K1 Segment
## Original Creditor Name

The K1 Segment is used by certain reporters to report the name of the original creditor. The segment is required for collection agencies, debt buyers, student loan guaranty agencies, and check guarantee companies.  The segment should also be reported by the U.S. Department of Education (post-default loans when not the original creditor) and the U.S. Treasury.  When applicable, this segment may be reported by other data furnishers when they are not the original creditor of the account.

The K1 Segment must be present each time the account is reported.  Only one occurrence of the K1 Segment can be appended to the Base Segment.  If not applicable, do not report the K1 Segment.

**The purpose of reporting the original creditor name is to help consumers identify the source of accounts when they appear on credit reports.**  Without the original creditor names, consumers may not know what the accounts represent.

Some state laws and CDIA policy stipulate that the original client/creditor must be identified. Federal law stipulates that the name of the payee must be identified when reporting returned checks.

| FIELD | FIELD NAME & DESCRIPTION | 426 and 366 FORMATS | | |
| --- | --- | --- | --- | --- |
| | | Length | Position | Recording Technique |
| 1 | **Segment Identifier**<br>Contains a constant of **K1**. | 2 | 1-2 | AN |

(continued)

CREDIT REPORTING RESOURCE GUIDE®
*Copyright 2023 © Consumer Data Industry Association*    APPENDIX 0786

Return to Table of Contents

# Field Definitions

## K1 Segment
## Original Creditor Name

| FIELD | FIELD NAME & DESCRIPTION | 426 and 366 FORMATS | | |
|---|---|---|---|---|
| | | Length | Position | Recording Technique |
| 2 | **Original Creditor Name** <br> This field is required and the content is dependent on the type of reporter. <br><br> Collection Agencies: Report the name of the company/creditor, including any partnering affinity name[1], that originally opened the account for the consumer, even if the account had been turned over to multiple collection agencies. <br><br> Debt Buyers: Report the name of the company/creditor, including any partnering affinity name[1], that originally opened the account for the consumer, even if the account had been sold multiple times to different debt buyers. Refer to the K2 Segment for "purchased from" information. <br><br> Companies Reporting Returned Checks: Report the name of the payee; i.e., name of company to which the check was written. Refer to Frequently Asked Question 15 for additional guidelines on reporting returned checks. <br><br> Student Loan Guarantors/U.S. Department of Education: Report the name of the original student loan lender. <br><br> U.S. Treasury: Report the name of the government agency that is the original creditor. <br><br> One of the following three options should be used when reporting a creditor's name that would reveal sensitive information about the consumer. <br><br> 1. Report the name of the institution, but do not include reference to the type of service. For example, use the hospital name without identifying that it was the psychiatric unit that provided care. If a hospital's name reveals sensitive information, abbreviate the name. <br><br> 2. Use the corporate name if it is different from the commercial name of a mental institution or drug rehabilitation center. <br><br> 3. Do not report the account if either of the above two options would not sufficiently protect the consumer's privacy. <br><br> **Note: Encoded information is not acceptable in this field.** | 30 | 3-32 | AN |

(continued)

---

[1] The Affinity Name further identifies or provides linkage detail for the relationship of the original creditor to any connecting or supporting entities (e.g., ABC BANK THE HOME STORE).

# Field Definitions

## K1 Segment
## Original Creditor Name

| FIELD | FIELD NAME & DESCRIPTION | 426 and 366 FORMATS | | |
|---|---|---|---|---|
| | | Length | Position | Recording Technique |
| 3 | **Creditor Classification**<br>Contains a code which must be reported to indicate the general type of business for the Original Creditor Name.<br><br>Values available:<br><br>01 = Retail<br>02 = Medical/Health Care<br>*Required when reporting medical debts and returned checks from providers of medical services, products or devices*<br>03 = Oil Company<br>04 = Government<br>05 = Personal Services<br>06 = Insurance<br>07 = Educational<br>08 = Banking<br>09 = Rental/Leasing<br>10 = Utilities<br>11 = Cable/Cellular<br>12 = Financial<br>(other non-banking financial institutions)<br>13 = Credit Union<br>14 = Automotive<br>15 = Check Guarantee | 2 | 33-34 | N |

**Note: To assist with compliance of the Fair Credit Reporting Act, companies who report medical debts or returned checks for medical purposes must report Creditor Classification '02' to indicate 'Medical/Health Care'. The actual name of the original creditor should continue to be reported in the Original Creditor Name (Field 2).**

Return to Table of Contents

# Field Definitions

## K2 Segment
## Purchased From/Sold To

The K2 Segment may be used to report the name of the company from which the account was purchased or the name of the company to which the account was sold.  The K2 Segment should be reported only one time per record to affect the change.

Only one occurrence of the K2 Segment can be appended to the Base Segment.  If not applicable, do not report the K2 Segment.

| FIELD | FIELD NAME & DESCRIPTION | 426 and 366 FORMATS | | |
|---|---|---|---|---|
| | | Length | Position | Recording Technique |
| 1 | **Segment Identifier**<br>Contains a constant of **K2**. | 2 | 1-2 | AN |
| 2 | **Purchased From/Sold To Indicator**<br>Contains a code representing the type of information being reported.  Values available:<br><br>1 = Purchased From Name<br>2 = Sold To Name<br>9 = Remove Previously Reported K2 Segment Information | 1 | 3 | N |
| 3 | **Purchased From or Sold To Name**<br>Contains the name of the company from which the account was purchased or to which the account was sold.<br><br>If field 2 = 9, this field should be blank filled. | 30 | 4-33 | AN |
| 4 | **Reserved**<br>Blank fill. | 1 | 34 | AN |

**Notes:  For reporting guidelines for accounts sold to another company or accounts purchased from another company, refer to Frequently Asked Questions 47 & 48.**

**The K2 segment should *not* be reported by collection agencies, check guarantee companies, student loan guaranty agencies and the U.S. Department of Education.**

**The K2 Segment may be reported by debt buyers when the name of the company from which the account was purchased is different from the original creditor's name, which is reported in the K1 Segment.  If the original creditor and the company from which the account was purchased are the same, the K2 Segment should not be reported.**

# Field Definitions

## K3 Segment
## Mortgage Information

The K3 Segment is used for two purposes:

1. To indicate a secondary marketing agency's interest in a loan by providing the applicable account number as assigned by the secondary marketing agency.

2. To report the Mortgage Identification Number (MIN), when available.

This segment must be present each time the account is reported.  Only one occurrence of the K3 Segment can be appended to the Base Segment.  If not applicable, do not report the K3 Segment.

| FIELD | FIELD NAME & DESCRIPTION | 426 and 366 FORMATS | | |
|---|---|---|---|---|
| | | Length | Position | Recording Technique |
| 1 | **Segment Identifier**<br>Contains a constant of **K3**. | 2 | 1-2 | AN |
| 2 | **Agency Identifier**<br>Contains a code indicating which secondary marketing agency has interest in this loan.  Values available:<br><br>00 = Agency Identifier not applicable<br>    (Used when reporting MIN only)<br>01 = Fannie Mae<br>02 = Freddie Mac | 2 | 3-4 | N |
| 3 | **Account Number**<br>Contains the account number as assigned by the secondary marketing agency.  **Do not include embedded blanks or special characters.**<br><br>If field 2 = 00, this field should be blank filled. | 18 | 5-22 | AN |
| 4 | **Mortgage Identification Number (MIN)**<br>Contains the Mortgage Identification Number assigned to a mortgage loan. **Do not include embedded blanks or special characters.**<br><br>The MIN indicates that the loan is registered with the Mortgage Electronic Registration Systems, Inc. (MERS), the electronic registry for tracking the ownership of mortgage rights.  For more information, see http://www.mersinc.org. | 18 | 23-40 | AN |

# Field Definitions

## K4 Segment
## Specialized Payment Information

The K4 Segment should be used to report information on specialized payment schedules for any type of loan for either deferred payments or balloon payments, which may include principal forbearance. This segment must be present each time the account is reported if a deferred or balloon payment applies to the account.

If an account has both deferred and balloon payments, report the Deferred Payment Start Date as long as payments are deferred. When the account is in repayment, report the Balloon Payment Due Date and Amount.

If an account has multiple balloon payments, only one can be reported at a time. When one balloon payment has been paid, the next one due can be reported.

Do not report the K4 Segment if:
- Account does not have a deferred or balloon payment
- The deferred payment start date is not known
- The balloon payment due date is not known

Only one occurrence of the K4 Segment can be appended to the Base Segment.

| FIELD | FIELD NAME & DESCRIPTION | 426 and 366 FORMATS | | |
|---|---|---|---|---|
| | | Length | Position | Recording Technique |
| 1 | **Segment Identifier**<br>Contains a constant of **K4**. | 2 | 1-2 | AN |
| 2 | **Specialized Payment Indicator**<br>Contains a code describing the specialized payment arrangements.  Values available:<br><br>01 = Balloon Payment<br>02 = Deferred Payment | 2 | 3-4 | N |
| 3 | **Deferred Payment Start Date**<br>Report the date the first payment is due for deferred accounts. Format is MMDDYYYY.  If the day is not available, use 01.<br><br>This date should be reported when the Terms Frequency (Base Segment, Field 14) indicates Deferred.<br><br>Refer to Frequently Asked Question 44 for guidelines on reporting deferred accounts. | 8 | 5-12 | N |
| 4 | **Balloon Payment Due Date**<br>Report the date the balloon payment is due, if applicable. Format is MMDDYYYY.  If the day is not available, use 01. | 8 | 13-20 | N |
| 5 | **Balloon Payment Amount**<br>Report the amount of the balloon payment in whole dollars only. | 9 | 21-29 | N |
| 6 | **Reserved**<br>Blank fill. | 1 | 30 | AN |

**Note:  All other account information should be reported in the Base Segment.**

# Field Definitions

## L1 Segment
## Account Number/Identification Number Change

The L1 Segment provides an automated method for changing the Consumer Account Number and/or Identification Number and should be reported only one time per record to affect the change.

The L1 Segment contains the new Consumer Account Number and/or the new Identification Number and the Base Segment contains the old Consumer Account Number (Field 7) and/or old Identification Number (field 5) exactly as reported previously.  In any subsequent reporting period, the Base Segment should contain the new Consumer Account Number and/or new Identification Number, and the L1 Segment should not be reported.

If the L1 Segment is being reported for the first time, or if L1 Segments are to be used for portfolio acquisition or a mass Consumer Account Number and/or Identification Number change, contact your consumer reporting agencies.

Only one occurrence of the L1 Segment can be appended to the Base Segment.

| FIELD | FIELD NAME & DESCRIPTION | 426 and 366 FORMATS | | |
|---|---|---|---|---|
| | | Length | Position | Recording Technique |
| 1 | **Segment Identifier**<br>Contains a constant of **L1**. | 2 | 1-2 | AN |
| 2 | **Change Indicator**<br>Contains a code representing the change being reported.<br>Values available:<br><br>1 = Consumer Account Number Change ONLY<br>2 = Identification Number Change ONLY<br>3 = Consumer Account Number AND Identification Number Change | 1 | 3 | N |
| 3 | **New Consumer Account Number**<br>Contains the new Account Number assigned to this account.<br>**Do not include embedded blanks or special characters.**<br><br>If field 2 = 2, this field should be blank filled. | 30 | 4-33 | AN |

(continued)

CREDIT REPORTING RESOURCE GUIDE®
*Copyright 2023 © Consumer Data Industry Association*     APPENDIX 0792

Return to Table of Contents

# Field Definitions

## L1 Segment
## Account Number/Identification Number Change

| FIELD | FIELD NAME & DESCRIPTION | 426 and 366 FORMATS | | |
|---|---|---|---|---|
| | | Length | Position | Recording Technique |
| 4 | **New Identification Number**<br>Contains the new Identification Number assigned to this account.  **Do not include embedded blanks or special characters.**<br><br>If field 2 = 1, this field should be blank filled. | 20 | 34-53 | AN |
| 5 | **Reserved**<br>Blank fill. | 1 | 54 | AN |

**Notes:** **For additional reporting guidelines specific to the L1 Segment, refer to Frequently Asked Question and Answer 5.**

**If fixed-length records are being reported and a record does not require a Consumer Account Number or Identification Number change, the Segment Identifier of *L1* must be reported and the remainder of the segment must be blank filled.**

# Field Definitions

## N1 Segment
## Employment

The N1 Segment may be used to report employment information for the consumer reported in the Base Segment.

Only one occurrence of the N1 Segment can be appended to the Base Segment.  If employment is not available, do not report the N1 Segment.

| FIELD | FIELD NAME & DESCRIPTION | 426 and 366 FORMATS | | |
|---|---|---|---|---|
| | | Length | Position | Recording Technique |
| 1 | **Segment Identifier**<br>Contains a constant of **N1**. | 2 | 1-2 | AN |
| 2 | **Employer Name**<br>Report the name of the employer for the consumer reported in the Base Segment. | 30 | 3-32 | AN |
| 3 | **First Line of Employer Address**<br>Contains the mailing address for the employer in Field 2 and usually includes street number, direction, street name and type of thoroughfare. | 32 | 33-64 | AN |
| 4 | **Second Line of Employer Address**<br>Contains second line of employer's address, if needed. | 32 | 65-96 | AN |
| 5 | **Employer City**<br>Contains city name for employer's address.  Truncate rightmost positions if city name is greater than 20 characters or use standard 13-character U.S. Postal Service city abbreviations. | 20 | 97-116 | AN |
| 6 | **Employer State**<br>Contains the standard U.S. Postal Service state abbreviation for the address of the employer.<br><br>Exhibit 14 provides a list of State Codes. | 2 | 117-118 | AN |
| 7 | **Employer Postal/Zip Code**<br>Report the zip code of the employer's address. Use entire field if reporting 9-digit zip codes.  Otherwise, left-justify and blank fill. | 9 | 119-127 | AN |

(continued)

CREDIT REPORTING RESOURCE GUIDE®

*Copyright 2023 © Consumer Data Industry Association*    APPENDIX 0794

Return to Table of Contents

# Field Definitions

## N1 Segment
## Employment

| FIELD | FIELD NAME & DESCRIPTION | 426 and 366 FORMATS | | |
|---|---|---|---|---|
| | | Length | Position | Recording Technique |
| 8 | **Occupation**<br>Report title or position for consumer reported in the Base Segment (the employee). | 18 | 128-145 | AN |
| 9 | **Reserved**<br>Blank fill. | 1 | 146 | AN |

# Field Definitions

## Trailer Record

The Trailer Record must be the last record provided on the file.  It includes cumulative totals that are used to verify that all records received have been processed.

| FIELD | FIELD NAME & DESCRIPTION | 426 Character Format[1] | | |
|---|---|---|---|---|
| | | Length | Position | Recording Technique |
| 1 | **Record Descriptor Word (RDW)**<br>Contains a value equal to the length of the physical record.  This value includes the four bytes reserved for this field.<br>If fixed-length records are being reported, the Trailer Record should be the same length as all the data records. The Trailer Record should be padded with blanks to fill the needed number of positions. | 4 | 1-4 | N |
| 2 | **Record Identifier**<br>Contains a constant of **TRAILER** which is used to identify this record. | 7 | 5-11 | AN |
| 3 | **Total Base Records**<br>Contains the total number of Base Segments being reported. | 9 | 12-20 | N |
| 4 | **Reserved**<br>Blank fill. | 9 | 21-29 | AN |
| 5 | **Total of Status Code DF**<br>Contains the total number of Base Segments with Status Code DF in Field 17A. | 9 | 30-38 | N |
| 6 | **Total Associated Consumer Segments (J1)**<br>Contains the total number of J1 Segments being reported.  Do not count blank- or 9-filled segments. | 9 | 39-47 | N |
| 7 | **Total Associated Consumer Segments (J2)**<br>Contains the total number of J2 Segments being reported.  Do not count blank- or 9-filled segments. | 9 | 48-56 | N |
| 8 | **Block Count**<br>Contains the number of blocks on the file, if applicable. | 9 | 57-65 | N |
| 9 | **Total of Status Code DA**<br>Contains the total number of Base Segments with Status Code DA in Field 17A. | 9 | 66-74 | N |
| 10 | **Reserved**<br>Blank fill. | 9 | 75-83 | AN |
| 11 | **Total of Status Code 11**<br>Contains the total number of Base Segments with Status Code 11 in Field 17A. | 9 | 84-92 | N |

---

[1] For 366 Packed Format specifications, refer to the Record Layouts section of the Metro 2® Format module.

CREDIT REPORTING RESOURCE GUIDE®

*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 0796

Return to Table of Contents

# Field Definitions

## Trailer Record

| FIELD | FIELD NAME & DESCRIPTION | 426 Character Format | | |
|---|---|---|---|---|
| | | Length | Position | Recording Technique |
| 12 | **Total of Status Code 13**<br>Contains the total number of Base Segments with Status Code 13 in Field 17A. | 9 | 93-101 | N |
| 13 | **Total of Status Code 61**<br>Contains the total number of Base Segments with Status Code 61 in Field 17A. | 9 | 102-110 | N |
| 14 | **Total of Status Code 62**<br>Contains the total number of Base Segments with Status Code 62 in Field 17A. | 9 | 111-119 | N |
| 15 | **Total of Status Code 63**<br>Contains the total number of Base Segments with Status Code 63 in Field 17A. | 9 | 120-128 | N |
| 16 | **Total of Status Code 64**<br>Contains the total number of Base Segments with Status Code 64 in Field 17A. | 9 | 129-137 | N |
| 17 | **Total of Status Code 65**<br>Contains the total number of Base Segments with Status Code 65 in Field 17A. | 9 | 138-146 | N |
| 18 | **Total of Status Code 71**<br>Contains the total number of Base Segments with Status Code 71 in Field 17A. | 9 | 147-155 | N |
| 19 | **Total of Status Code 78**<br>Contains the total number of Base Segments with Status Code 78 in Field 17A. | 9 | 156-164 | N |
| 20 | **Total of Status Code 80**<br>Contains the total number of Base Segments with Status Code 80 in Field 17A. | 9 | 165-173 | N |
| 21 | **Total of Status Code 82**<br>Contains the total number of Base Segments with Status Code 82 in Field 17A. | 9 | 174-182 | N |
| 22 | **Total of Status Code 83**<br>Contains the total number of Base Segments with Status Code 83 in Field 17A. | 9 | 183-191 | N |
| 23 | **Total of Status Code 84**<br>Contains the total number of Base Segments with Status Code 84 in Field 17A. | 9 | 192-200 | N |
| 24 | **Total of Status Code 88**<br>Contains the total number of Base Segments with Status Code 88 in Field 17A. | 9 | 201-209 | N |

# Field Definitions

## Trailer Record

| FIELD | FIELD NAME & DESCRIPTION | 426 Character Format | | |
|---|---|---|---|---|
| | | Length | Position | Recording Technique |
| 25 | **Total of Status Code 89**<br>Contains the total number of Base Segments with Status Code 89 in Field 17A. | 9 | 210-218 | N |
| 26 | **Total of Status Code 93**<br>Contains the total number of Base Segments with Status Code 93 in Field 17A. | 9 | 219-227 | N |
| 27 | **Total of Status Code 94**<br>Contains the total number of Base Segments with Status Code 94 in Field 17A. | 9 | 228-236 | N |
| 28 | **Total of Status Code 95**<br>Contains the total number of Base Segments with Status Code 95 in Field 17A. | 9 | 237-245 | N |
| 29 | **Total of Status Code 96**<br>Contains the total number of Base Segments with Status Code 96 in Field 17A. | 9 | 246-254 | N |
| 30 | **Total of Status Code 97**<br>Contains the total number of Base Segments with Status Code 97 in Field 17A. | 9 | 255-263 | N |
| 31 | **Total of ECOA Code Z (All Segments)**<br>Contains the total number of records with ECOA Code Z being reported in the Base Segment (Field 37), in the J1 Segment (Field 10) and in the J2 Segment (Field 10). | 9 | 264-272 | N |
| 32 | **Total Employment Segments**<br>Contains the total number of records with employment being reported in the N1 Segment. | 9 | 273-281 | N |
| 33 | **Total Original Creditor Segments**<br>Contains the total number of records with Original Creditors being reported in the K1 Segment. | 9 | 282-290 | N |
| 34 | **Total Purchased From/Sold To Segments**<br>Contains the total number of records with Purchased From/Sold To being reported in the K2 Segment. | 9 | 291-299 | N |
| 35 | **Total Mortgage Information Segments**<br>Contains the total number of records with Mortgage Information being reported in the K3 Segment. | 9 | 300-308 | N |
| 36 | **Total Specialized Payment Information Segments**<br>Contains the total number of records with Specialized Payment Information being reported in the K4 Segment. | 9 | 309-317 | N |
| 37 | **Total Change Segments**<br>Contains the total number of Consumer Account Number and/or Identification Number changes being reported in the L1 Segment. | 9 | 318-326 | N |

CREDIT REPORTING RESOURCE GUIDE®
*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 0798

Return to Table of Contents

# Field Definitions

## Trailer Record

| FIELD | FIELD NAME & DESCRIPTION | 426 Character Format | | |
|---|---|---|---|---|
| | | Length | Position | Recording Technique |
| 38 | **Total Social Security Numbers (All Segments)** Contains the total number of valid Social Security Numbers reported in the Base Segment (Field 34), in the J1 Segment (Field 7) and in the J2 Segment (Field 7). Do not count zero- or 9-filled SSNs. | 9 | 327-335 | N |
| 39 | **Total Social Security Numbers (Base Segments)** Contains the total number of valid Social Security Numbers reported in the Base Segment (Field 34). Do not count zero- or 9-filled SSNs. | 9 | 336-344 | N |
| 40 | **Total Social Security Numbers (J1 Segments)** Contains the total number of valid Social Security Numbers reported in the J1 Segment (Field 7). Do not count zero- or 9-filled SSNs. | 9 | 345-353 | N |
| 41 | **Total Social Security Numbers (J2 Segments)** Contains the total number of valid Social Security Numbers reported in the J2 Segment (Field 7). Do not count zero- or 9-filled SSNs. | 9 | 354-362 | N |
| 42 | **Total Dates of Birth (All Segments)** Contains the total number of valid Dates of Birth reported in the Base Segment (Field 35), in the J1 Segment (Field 8) and in the J2 Segment (Field 8). Do not count zero-filled Dates of Birth. | 9 | 363-371 | N |
| 43 | **Total Dates of Birth (Base Segments)** Contains the total number of valid Dates of Birth reported in the Base Segment (Field 35). Do not count zero-filled Dates of Birth. | 9 | 372-380 | N |
| 44 | **Total Dates of Birth (J1 Segments)** Contains the total number of valid Dates of Birth reported in the J1 Segment (Field 8). Do not count zero-filled Dates of Birth. | 9 | 381-389 | N |
| 45 | **Total Dates of Birth (J2 Segments)** Contains the total number of valid Dates of Birth reported in the J2 Segment (Field 8). Do not count zero-filled Dates of Birth. | 9 | 390-398 | N |
| 46 | **Total Telephone Numbers (All Segments)** Contains the total number of valid Telephone Numbers reported in the Base Segment (Field 36), in the J1 Segment (Field 9) and in the J2 Segment (Field 9). Do not count zero-filled Telephone Numbers. | 9 | 399-407 | N |
| 47 | **Reserved** Blank fill. | 19 | 408-426 | AN |

# Exhibit 1

## Account Type Codes by Industry

The following table describes the account type codes that are reported in Field 9.

| Code | Description | Bank/ Svgs & Loan | Child Support Agency | Credit Card Issuer | Credit Union | Debt Buyer/ Coll. Agency | Govt. Agency | Loan Finance | Mtg. Lender | Rental Com-panies | Retail Store | Sales Finance | Student Loan Lender | Utility |
|------|-------------|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 00 | Auto | X | | | X | | | X | | | | X | | |
| 01 | Unsecured | X | | | X | | | X | | | | X | | |
| 02 | Secured[1] | X | | | X | | | X | | | | X | | |
| 03 | Partially Secured | X | | | X | | | X | | | | X | | |
| 04 | Home Improvement | X | | | X | | | X | X | | | | | |
| 05 | FHA Home Improvement | X | | | X | | | X | X | | | | | |
| 06 | Installment Sales Contract | X | | | | | | | | | X | X | | X |
| 07 | Charge Account[1] | | | | | | | | | | X | X | | |
| 08 | Real estate, specific type unknown (Terms Duration in years) Report specific real estate type codes, when known.  Refer to codes 19, 25, 26, 6B, 2C. | X | | | X | | | | X | | | | | |
| 10 | Business Loan | X | | | X | | | X | | | | | | |
| 11 | Recreational Merchandise | X | | | X | | | X | | | | X | | |

(continued)

---

[1] Refer to Exhibit 2 for definitions and/or reporting guidelines.

Copyright 2023 © Consumer Data Industry Association

APPENDIX 0800

Return to Table of Contents

# Exhibit 1

## Account Type Codes by Industry

| Code | Description | Bank/ Svgs & Loan | Child Support Agency | Credit Card Issuer | Credit Union | Debt Buyer/ Coll. Agency | Govt. Agency | Loan Finance | Mtg. Lender | Rental Com- panies | Retail Store | Sales Finance | Student Loan Lender | Utility |
|------|-------------|------|------|------|------|------|------|------|------|------|------|------|------|------|
| 12 | Education | X | | | X | | X | X | | | | | X | |
| 13 | Lease[1] | X | | | X | | | X | | | | X | | |
| 15 | Line of Credit[1] | X | | | X | | | X | | | | | X | |
| 17 | Manufactured Housing | X | | | X | | | X | X | | | X | | |
| 18 | Credit Card | X | | X | X | | | X | | | | | | |
| 19 | FHA Real Estate Mortgage (Terms Duration in years) | X | | | X | | | | X | | | | | |
| 20 | Note Loan | X | | | X | | | X | | | | | | |
| 25 | VA Real Estate Mortgage (Terms Duration in years) | X | | | X | | | | X | | | | | |
| 26 | Conventional Real Estate Mortgage — including Purchase Money First[1] (Terms Duration in years) | X | | | X | | | | X | | | | | |
| 29 | Rental Agreement | | | | | | | | | X | | | | |
| 37 | Combined Credit Plan[1] | X | | X | X | | | | | | | | | |

(continued)

---

[1] Refer to Exhibit 2 for definitions and/or reporting guidelines.

5-2      CREDIT REPORTING RESOURCE GUIDE®

*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 0801

Return to Table of Contents

# Exhibit 1

## Account Type Codes by Industry

| Code | Description | Bank/ Svgs & Loan | Child Support Agency | Credit Card Issuer | Credit Union | Debt Buyer/ Coll. Agency | Govt. Agency | Loan Finance | Mtg. Lender | Rental Com-panies | Retail Store | Sales Finance | Student Loan Lender | Utility |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 43 | Debit Card[1] | X | | | X | | | X | | | | | | |
| 47 | Credit Line Secured | X | | | X | | | X | | | | | | |
| 48 | Collection Agency/Attorney | | | | | X | | | | | | | | |
| 50 | Family Support | | X | | | | | | | | | | | |
| 65 | Government Unsecured Guaranteed Loan | | | | | | X | | | | | | | |
| 66 | Government Secured Guaranteed Loan | | | | | | X | | | | | | | |
| 67 | Government Unsecured Direct Loan | | | | | | X | | | | | | | |
| 68 | Government Secured Direct Loan | | | | | | X | | | | | | | |
| 69 | Government Grant | | | | | | X | | | | | | | |
| 70 | Government Overpayment | | | | | | X | | | | | | | |
| 71 | Government Fine | | | | | | X | | | | | | | |
| 72 | Government Fee for Services | | | | | | X | | | | | | | |

(continued)

---

[1] Refer to Exhibit 2 for definitions and/or reporting guidelines.

APPENDIX 0802

Return to Table of Contents

# Exhibit 1

## Account Type Codes by Industry

| Code | Description | Bank/ Svgs & Loan | Child Support Agency | Credit Card Issuer | Credit Union | Debt Buyer/ Coll. Agency | Govt. Agency | Loan Finance | Mtg. Lender | Rental Com- panies | Retail Store | Sales Finance | Student Loan Lender | Utility |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 73 | Government Employee Advance | | | | | | X | | | | | | | |
| 74 | Government Misc. Debt | | | | | | X | | | | | | | |
| 75 | Government Benefit | | | | | | X | | | | | | | |
| 77 | Returned Check[1] | | | | | X | | | | | | | | |
| 89 | Home Equity Line of Credit | X | | | X | | | | X | | | | | |
| 90 | Medical Debt | X | | | X | | | X | | | | | | |
| 91 | Debt Consolidation[1] | X | | | X | | | X | | | | | | |
| 92 | Utility Company | | | | | | | | | | | | | X |
| 93 | Child Support | | X | | | | | | | | | | | |
| 95 | Attorney Fees[1] | X | | | X | | | | | | | | | |
| 0A | Time Share Loan[1] | X | | | X | | | X | X | | | | | |
| 2A | Secured Credit Card[1] | X | | X | X | | | | | | | | | |
| 3A | Auto Lease[1] | X | | | X | | | X | | | | X | | |

(continued)

---

[1] Refer to Exhibit 2 for definitions and/or reporting guidelines.

5-4      CREDIT REPORTING RESOURCE GUIDE®

*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 0803

Return to Table of Contents

# Exhibit 1

# Account Type Codes by Industry

| Code | Description | Bank/ Svgs & Loan | Child Support Agency | Credit Card Issuer | Credit Union | Debt Buyer/ Coll. Agency | Govt. Agency | Loan Finance | Mtg. Lender | Rental Com-panies | Retail Store | Sales Finance | Student Loan Lender | Utility |
|------|-------------|------|------|------|------|------|------|------|------|------|------|------|------|------|
| 5A | Real Estate — Junior Liens and Non-Purchase Money First[1] (Terms Duration in years) | X | | | X | | | | X | | | | | |
| 6A | Commercial Installment Loan[1] | X | | | X | | | X | | | | | | |
| 7A | Commercial Line of Credit[1] | X | | | X | | | X | | | | | | |
| 8A | Business Credit Card[1] | X | | X | X | | | | | | | | | |
| 9A | Secured Home Improvement | X | | | X | | | X | X | | | | | |
| 5B | Second Mortgage (Terms Duration in years) | X | | | X | | | | X | | | | | |
| 6B | Commercial Mortgage Loan[1] (Terms Duration in years) | X | | | X | | | | X | | | | | |
| 7B | Agricultural | X | | | X | | | X | | | | | X | |
| 8B | Deposit Account with Overdraft Protection[1] | X | | | X | | | | | | | | | |
| 9B | Business Line Personally Guaranteed | X | | | X | | | X | | | | | | |
| 0C | Debt Buyer | | | | | X | | | | | | | | |

(continued)

---

[1] Refer to Exhibit 2 for definitions and/or reporting guidelines.

*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 0804

Return to Table of Contents

Case 4:25-cv-00443-P    Document 116    Filed 12/22/25    Page 770 of 1862    PageID 2619

# Exhibit 1

## Account Type Codes by Industry

| Code | Description | Bank/ Svgs & Loan | Child Support Agency | Credit Card Issuer | Credit Union | Debt Buyer/ Coll. Agency | Govt. Agency | Loan Finance | Mtg. Lender | Rental Com-panies | Retail Store | Sales Finance | Student Loan Lender | Utility |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2C | U.S. Department of Agriculture (USDA) Real Estate Mortgage Loan (Terms Duration in years) | X | | | X | | | | X | | | | | |
| 4D | Telecommunications/Cellular | | | | | | | | | | | | | X |
| 6D | Home Equity[1] | X | | | X | | | | X | | | | | |
| 0F | Construction Loan | X | | | X | | | X | X | | | | | |
| 0G | Flexible Spending Credit Card[1] | X | | X | X | | | | | | | | | |

**Note:** **Account Type Codes 22 (Secured by Household Goods), 23 (Secured by Household Goods & Other Collateral) and 1C (Household Goods) are obsolete as of September 2011 and may no longer be reported.**

[1] Refer to Exhibit 2 for definitions and/or reporting guidelines.

CREDIT REPORTING RESOURCE GUIDE®

*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 0805

Return to Table of Contents

Case 4:25-cv-00443-P    Document 116    Filed 12/22/25    Page 771 of 1862    PageID 2620

# Exhibit 2

## Account Type Codes within Portfolio Type

The following table contains an alphabetic listing of the Account Type Codes and their corresponding Portfolio Types.

| Code | Description | Line of Credit | Installment | Mortgage | Open | Revolving |
|------|-------------|----------------|-------------|----------|------|-----------|
| 7B | Agricultural | | X | | | |
| 95 | Attorney Fees<br>*To be used to report an unsecured loan for the purpose of paying attorney fees.* | | X | | | |
| 00 | Auto | | X | | | |
| 3A | Auto Lease<br>*Refer to Frequently Asked Question 36 for guidelines specific to terminated leases and Frequently Asked Question 37 for guidelines specific to prepaid auto leases and auto leases paid in full in advance of termination.* | | X | | | |
| 8A | Business Credit Card<br>*Individual is personally liable.* | | | | X | X |
| 9B | Business Line Personally Guaranteed | X | | | | |
| 10 | Business Loan | | X | | | |
| 07 | Charge Account<br>*Used by the Retail Store industry.* | | | | | X |
| 93 | Child Support | | | | X | |
| 48 | Collection Agency/Attorney | | | | X | |
| 37 | Combined Credit Plan<br>*Represents two credit plans being reported as one account. Example: Visa and MasterCard on one bill.* | | | | X | X |

(continued)

APPENDIX 0806

Return to Table of Contents

# Exhibit 2

## Account Type Codes within Portfolio Type

| Code | Description | Line of Credit | Installment | Mortgage | Open | Revolving |
|------|-------------|----------------|-------------|----------|------|-----------|
| 6A | Commercial Installment Loan<br>*Individual is personally liable; company is guarantor.* | | X | | | |
| 7A | Commercial Line of Credit<br>*Individual is personally liable; company is guarantor.* | X | | | | |
| 6B | Commercial Mortgage Loan<br>*Terms Duration in years. Individual is personally liable; company is guarantor.* | | | X | | |
| 0F | Construction Loan | | X | | | |
| 26 | Conventional Real Estate Mortgage - including Purchase Money First<br>*Terms Duration in years. Purchase Money First means that the proceeds of the loan are used to buy the property. This is a mortgage account that is not guaranteed by a government agency.* | | | X | | |
| 18 | Credit Card | | | | X | X |
| 47 | Credit Line Secured | X | | | | |
| 43 | Debit Card<br>*To be used when debit card is backed by a line of credit or overdraft protection. Refer to Frequently Asked Question 68 for guidelines specific to debit cards.* | X | | | X | X |
| 0C | Debt Buyer | | | | X | |

(continued)

CREDIT REPORTING RESOURCE GUIDE®

*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 0807

Return to Table of Contents

# Exhibit 2

# Account Type Codes within Portfolio Type

| Code | Description | Line of Credit | Installment | Mortgage | Open | Revolving |
|---|---|---|---|---|---|---|
| 91 | Debt Consolidation<br>*Represents multiple loans which have been consolidated into one loan.* | | X | | | |
| 8B | Deposit Account with Overdraft Protection<br>*Overdrawn account. Refer to Frequently Asked Question 69 for reporting guidelines.* | | | | X | |
| 12 | Education | | X | | X | |
| 50 | Family Support | | | | X | |
| 05 | Federal Housing Administration (FHA) Home Improvement Loan | | X | | | |
| 19 | Federal Housing Administration (FHA) Real Estate Mortgage Loan<br>*Terms Duration in years.* | | | X | | |
| 0G | Flexible Spending Credit Card<br>*Credit card with no preset spending limit. The credit card has a Credit Limit, but the terms of the card allow the consumer to exceed that amount. Refer to Frequently Asked Question 67 for reporting guidelines.* | | | | | X |
| 75 | Government Benefit | | X | | X | |
| 73 | Government Employee Advance | | X | | X | |
| 72 | Government Fee for Services | | X | | X | |
| 71 | Government Fine | | X | | X | |

(continued)

Return to Table of Contents

# Exhibit 2

## Account Type Codes within Portfolio Type

| Code | Description | Line of Credit | Installment | Mortgage | Open | Revolving |
|---|---|---|---|---|---|---|
| 69 | Government Grant | | X | | X | |
| 74 | Government Miscellaneous Debt | | X | | X | |
| 70 | Government Overpayment | | X | | X | |
| 68 | Government Secured Direct Loan | | X | | X | |
| 66 | Government Secured Guaranteed Loan | | X | | X | |
| 67 | Government Unsecured Direct Loan | | X | | X | |
| 65 | Government Unsecured Guaranteed Loan | | X | | X | |
| 6D | Home Equity<br>*Installment payments.* | | X | | | |
| 89 | Home Equity Line of Credit | X | | | | |
| 04 | Home Improvement | | X | | | |
| 06 | Installment Sales Contract | | X | | | |
| 13 | Lease<br>*Non-auto.* | | X | | | |
| 15 | Line of Credit<br>*Personal line of credit – not secured by collateral. Includes Check Credit.* | X | | | | |
| 17 | Manufactured Housing | | X | | | |

(continued)

*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 0809

Return to Table of Contents

# Exhibit 2

# Account Type Codes within Portfolio Type

| Code | Description | Line of Credit | Installment | Mortgage | Open | Revolving |
|---|---|---|---|---|---|---|
| 90 | Medical Debt | | X | | X | |
| 20 | Note Loan | | X | | | |
| 03 | Partially Secured | | X | | | |
| 5A | Real Estate - Junior Liens and Non-Purchase Money First *Terms Duration in years. Junior Liens means that a person has a mortgage on property already and needs more money without paying off existing loan; second mortgage, third or more. Non-Purchase Money First means that the proceeds of the loan are not used directly for the property. This is a real estate account type.* | | | X | | |
| 08 | Real estate, specific type unknown *Terms Duration in years. Report specific real estate type codes, when known. Refer to codes 19, 25, 26, 6B, 2C.* | | | X | | |
| 11 | Recreational Merchandise | | X | | | |
| 29 | Rental Agreement *Used by rental companies and for reporting residential rental agreements* | | X | | X | |
| 77 | Returned Check *Reported by Collection Agencies, Debt Buyers and Check Guarantee companies when a check was returned to the payee for non-payment usually due to insufficient funds. Refer to Frequently Asked Question 15 for reporting requirements.* | | | | X | |

(continued)

Return to Table of Contents

# Exhibit 2

## Account Type Codes within Portfolio Type

| Code | Description | Line of Credit | Installment | Mortgage | Open | Revolving |
|---|---|---|---|---|---|---|
| 5B | Second Mortgage<br>*Terms Duration in years.* | | | X | | |
| 02 | Secured<br>*Used for Installment Contracts.* | | X | | | |
| 2A | Secured Credit Card<br>*Deposited funds are available in the event of default.* | | | | X | X |
| 9A | Secured Home Improvement | | X | | | |
| 4D | Telecommunications/Cellular | | | | X | |
| 0A | Time Share Loan<br>*A purchased time share.  Refer to Frequently Asked Question 51 for reporting guidelines.* | | X | X | | |
| 01 | Unsecured | | X | | | |
| 2C | U.S. Department of Agriculture (USDA) Real Estate Mortgage Loan<br>*Terms Duration in years.* | | | X | | |
| 92 | Utility Company | | | | X | |
| 25 | Veteran's Administration (VA) Real Estate Mortgage Loan<br>*Terms Duration in years.* | | | X | | |

**Note: Account Type Codes 22 (Secured by Household Goods), 23 (Secured by Household Goods & Other Collateral) and 1C (Household Goods) are obsolete as of September 2011 and may no longer be reported.**

CREDIT REPORTING RESOURCE GUIDE®

*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 0811

Return to Table of Contents

## Exhibit 3

# Terms/Payment Amount Conversion to Monthly

The following table contains the calculations to be used to convert the Terms Duration (number of payment intervals) and Scheduled Monthly Payment Amount to monthly values.

| Terms Frequency Field 14 | Terms Duration Field 13 | Scheduled Monthly Payment Amount Field 15 |
|---|---|---|
| D = Deferred | Blank fill | Zero fill |
| P = Single Payment Loan | 001 | Zero fill |
| W = Weekly (Due every week) | Divide by 4.33 | Multiply by 4.33 |
| B = Biweekly (Due every 2 weeks) | Divide by 2.16 | Multiply by 2.16 |
| E = Semimonthly (Due twice a month) | Divide by 2 | Multiply by 2 |
| M = Monthly (Due every month) | As given | As given |
| L = Bimonthly (Due every 2 months) | Multiply by 2 | Divide by 2 |
| Q = Quarterly (Due every 3 months) | Multiply by 3 | Divide by 3 |
| T = Triannually (Due every 4 months) | Multiply by 4 | Divide by 4 |
| S = Semiannually (Due twice a year) | Multiply by 6 | Divide by 6 |
| Y = Annually (Due every year) | Multiply by 12 | Divide by 12 |

**Note: Report whole dollars only in the Scheduled Monthly Payment Amount field.**

# Exhibit 4

## Account Status Codes

Enter the Account Status Code (Field 17A) that properly identifies the current condition of the account as of the Date of Account Information (Field 24).

| Code | Description |
|------|-------------|
| 11 | Current account (0-29 days past the due date)<br><br>*For Installment and Mortgage loans, the account should be current and have a non-zero Balance Amount.  For Credit Line, Open and Revolving portfolio types, the account should be current and available for use. If the account is closed, but there is a balance due, Special Comment Code M or Compliance Condition Code XA should also be reported to indicate the account is no longer available for use.* |
| 13[1 & 2] | Paid or closed account/zero balance<br><br>*For Installment and Mortgage loans, the account should be paid with a zero Balance Amount. For Credit Line, Open and Revolving portfolio types, the account should no longer be available for use, and the Balance Amount should be zero. A Special Comment Code M or Compliance Condition Code XA may also be reported to indicate the account is closed.* |
| 61[1] | Account paid in full, was a voluntary surrender<br><br>*Requires Current Balance and Amount Past Due = zero.*<br><br>*Refer to Frequently Asked Question & Answer 63 for reporting guidelines.* |
| 62[1] | Account paid in full, was a collection account<br><br>*Requires Current Balance and Amount Past Due = zero.* |
| 63[1] | Account paid in full, was a repossession<br><br>*Requires Current Balance and Amount Past Due = zero.*<br><br>*Refer to Frequently Asked Question & Answer 62 for reporting guidelines.* |
| 64[1] | Account paid in full, was a charge-off<br><br>*Requires Current Balance and Amount Past Due = zero.*<br><br>*Refer to Frequently Asked Question & Answer 34(b) for reporting guidelines.* |
| 65[1 & 2] | Account paid in full. A foreclosure was started.<br><br>*Requires Current Balance and Amount Past Due = zero.*<br><br>*Refer to Frequently Asked Question & Answer 52 for reporting guidelines.* |
| 71[3] | Account 30-59 days past the due date |
| 78[3] | Account 60-89 days past the due date |
| 80[3] | Account 90-119 days past the due date |
| 82[3] | Account 120-149 days past the due date |
| 83[3] | Account 150-179 days past the due date |
| 84[3] | Account 180 days or more past the due date |

(continued)

---

[1] This Account Status Code is considered to be a final status, which does not require further updating.
[2] Field 17B (Payment Rating) is also required when reporting this Account Status Code.
[3] For Credit Line, Open and Revolving portfolio types, if the account is closed, Special Comment M or Compliance Condition Code XA should also be reported to indicate the account is no longer available for use.

CREDIT REPORTING RESOURCE GUIDE®

*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 0813

Return to Table of Contents

# Exhibit 4

# Account Status Codes

| Code | Description |
|---|---|
| 88[1] | Claim filed with government for insured portion of balance on a defaulted loan |
| 89[1] | Deed received in lieu of foreclosure on a defaulted mortgage; there may be a balance due<br><br>*Refer to Frequently Asked Question & Answer 53 for reporting guidelines.*<br>*Note: For credit reporting purposes, do not report Account Status Code 97 (Charge-off) after Account Status 89 has been reported.* |
| 93 | Account assigned to internal or external collections |
| 94[1] | Foreclosure completed; there may be a balance due<br><br>*Refer to Frequently Asked Question & Answer 52 for reporting guidelines.*<br><br>*Note: For credit reporting purposes, do not report Account Status Code 97 (Charge-off) after Account Status 94 has been reported.* |
| 95[1] | Voluntary surrender; there may be a balance due<br><br>*Refer to Frequently Asked Question & Answer 63 for reporting guidelines.*<br><br>*Note: Do not report Status Code 95 for early termination of leases.  Refer to the Leasing category within Exhibit 6 for applicable Special Comments.* |
| 96 | Merchandise was repossessed; there may be a balance due<br><br>*Refer to Frequently Asked Question & Answer 62 for reporting guidelines.* |
| 97 | Unpaid balance reported as a loss (charge-off)<br><br>*Refer to Frequently Asked Question & Answer 34(a) for reporting guidelines.* |
| DA | Delete entire account (for reasons other than fraud)<br><br>**Note: In order to maintain the integrity of credit information, it is important that data furnishers not ask for a subsequent deletion of account history unless an actual error was reported.  Paid derogatory accounts, such as collections, should be reported as paid; they should not be deleted.** |
| DF | Delete entire account due to confirmed fraud (fraud investigation completed) |

**Note: Account Status Code 05 (Account Transferred) is obsolete for reporting as of April 2022 and may no longer be reported.**

---

[1] Field 17B (Payment Rating) is also required when reporting this Account Status Code.

APPENDIX 0814

[ Return to Table of Contents ]

# Exhibit 5

# Examples of Reporting Payment History Profile (Field 18)

The Account Status, which is reported in field 17A of the Base Segment, contains the status of the account as of the Date of Account Information.  The Payment History Profile contains up to 24 months of consecutive payment activity for the previous 24 reporting periods prior to the Date of Account Information.

Examples of Account Status and Payment History Profile (PHP):

A.  Data furnisher reports data on the last day of each month:

- Account Status Code = 11
- Date of Account Information = 03/31/2023 (represents the monthly reporting period of 03/01/2023 through 03/31/2023)
- PHP = 000011000000EEEE0000BBBB (leftmost position represents Account Status reported with Date of Account Information = 02/28/2023)

In the above example, the Payment History Profile represents, from left to right, 02/28/2023 back through 03/31/2021.

The E's indicate that the account was current with a zero balance in 02/2022, 01/2022, 12/2021 and 11/2021.  The B's indicate that no payment history was available prior to 07/2021, which was most likely the date account was opened.

B.  Data furnisher reports data on the 15th of each month:

- Account Status Code = 80
- Date of Account Information = 03/15/2023 (represents the monthly reporting period of 02/16/2023 through 03/15/2023)
- Date of First Delinquency = 10/11/2022
- PHP = 2211100000DD000101000000 (leftmost position represents Account Status reported with Date of Account Information = 02/15/2023)

In the above example, the Payment History Profile represents, from left to right, data that was reported in the mid-month reporting periods of 02/15/2023 back through 03/15/2021.  For example, the first position, which is 2 (60-89 days past the due date) represents that the account was 60 days delinquent in the 01/16/2023 through 02/15/2023 reporting period.

The D's indicate that no payment history was available for 04/2022 or 03/2022.

**Note:** The Date of First Delinquency (10/11/2022) represents the date of the first 30-day delinquency that led to the status being reported.

(continued)

CREDIT REPORTING RESOURCE GUIDE®
*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 0815

Return to Table of Contents

## Exhibit 5

# Examples of Reporting Payment History Profile (Field 18)

C. Data furnisher reports data on the 1st of each month:

- Account Status Code = 11
- Date of Account Information = 03/01/2023 (represents the monthly reporting period of 02/02/2023 through 03/01/2023)
- PHP = 0EEEEEEEE000EEEE00000000 (leftmost position represents Account Status reported with Date of Account Information = 02/01/2023)

   In the above example, the Payment History Profile represents, from left to right, 02/01/2023 back through 03/01/2021.  For example, the first position, which is 0 (0-29 days past the due date), represents that the account was current in the 01/2/2023 through 02/01/2023 reporting period.

   The E's indicate that the account was current with a zero balance from 01/01/2023 back through 06/01/2022 and from 02/01/2022 back through 11/01/2021.  The account was current (and active) during the other months.

D. Data furnisher reports data on the last day of each month; example of derogatory account history:

- Account Status Code = 97
- Date of Account Information = 03/31/2023 (represents the monthly reporting period of 03/01/2023 through 03/31/2023)
- Date of First Delinquency = 08/30/2021
- PHP = LLGGGGGGGG66654332100010 (leftmost position represents Account Status reported with Date of Account Information 02/28/2023)

   In the above example, the Payment  History Profile represents, from left to right, 02/28/2023 back through 03/31/2021.  The L's indicate that the account was a charge-off in 02/2023 and 01/2023, and the G's indicate that the account was a collection from 12/2022 back through 05/2022.

   **Note:** The Date of First Delinquency (08/30/2021) represents the date of the first 30-day delinquency that led to the charge off being reported.

Return to Table of Contents

# Exhibit 6

# Special Comment Codes – By Category within Portfolio

The Special Comment Code (Field 19) must be reported each month as long as the condition applies.  If more than one Special Comment applies to an account, it is the data furnisher's decision to report the comment that is deemed most important from a business perspective for the current reporting period.

| Category | Description | Line of Credit | Install-ment | Mortgage | Open | Revolving |
|---|---|---|---|---|---|---|
| Closed (Permanently or Temporarily) | **Election of Remedy** <br> *Definition: A car or other item is repossessed, but the value is less than the balance due.  The credit grantor must consider the account paid and cannot collect the difference in amounts.* | - | I | - | - | I |
| | **Account Closed at Credit Grantor's Request** <br> (Requires Date Closed to identify the date the account was closed to further purchases/use.) | M | - | - | M | M |
| | **Credit Line Suspended** <br> (Continue to report the last assigned Credit Limit.  Account Status Code should **not** be 13 or 61-65.  Does not require Date Closed to be reported since credit line is temporarily suspended*.*) <br> *Definition: The credit line is temporarily unavailable for use.* | AP | - | - | AP | AP |
| | **Account Closed Due to Refinance** <br> (Refer to Frequently Asked Question 59 for reporting guidelines.) | AS | AS | AS | - | - |
| | **Account Closed Due to Transfer** <br> (Refer to Frequently Asked Question 46 for reporting guidelines.) <br> *Note: Used for internal transfers.* | AT | AT | AT | AT | AT |
| | **Credit Card Lost or Stolen** <br> (Refer to Frequently Asked Question 65 for reporting guidelines.) | - | - | - | BL | BL |

(continued)

CREDIT REPORTING RESOURCE GUIDE®
*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 0817

Return to Table of Contents

# Exhibit 6

## Special Comment Codes – By Category within Portfolio

| Category | Description | Line of Credit | Install- ment | Mortgage | Open | Revolving |
|---|---|---|---|---|---|---|
| Closed (Permanently or Temporarily) (continued) | **Account Closed Due to Inactivity**<br><br>(Requires Date Closed to identify the date the account was closed to further purchases/use.) | CI | - | - | CI | CI |
| | **Credit Line No Longer Available – In Repayment Phase**<br><br>(Continue to report the last assigned Credit Limit.  Account Status Code should **not** be 13 or 61-65 and Current Balance should **not** be zero.  Requires Date Closed to identify the date the account was closed to further purchases/use.)<br><br>*Definition: To be used for line of credit accounts that have two phases: the borrowing phase and the repayment phase.  The repayment phase is a natural progression for the account when the consumer is responsible for payment of the outstanding balance and the credit line is no longer available for use.* | CJ | - | - | - | - |
| | **Credit Line Suspended due to Collateral Depreciation**<br><br>(Continue to report last assigned Credit Limit.  Account Status Code should **not** be 13 or 61-65.  Does not require Date Closed to be reported since credit line is temporarily suspended.)<br><br>*Definition: To be used for Home Equity and other secured line of credit accounts when the credit line is temporarily unavailable for use.* | CL | - | - | - | - |

(continued)

Return to Table of Contents

# Exhibit 6

## Special Comment Codes – By Category within Portfolio

| Category | Description | Line of Credit | Install-ment | Mortgage | Open | Revolving |
|---|---|---|---|---|---|---|
| Leasing | **Full Termination/Status Pending**<br>(Requires Account Type 3A or 13.  Account Status should **not** be 13 or 61-65.) | - | BB | - | - | - |
| | **Full Termination/Obligation Satisfied**<br>(Requires Account Type 3A or 13, Account Status Code 13 and Current Balance = 0) | - | BC | - | - | - |
| | **Full Termination/Balance Owing**<br>(Requires Account Type 3A or 13.  Account Status should **not** be 13 or 61-65.)<br>Refer to Frequently Asked Question 36 for reporting guidelines. | - | BD | - | - | - |
| | **Early Termination/Status Pending**<br>(Requires Account Type 3A or 13.  Account Status should **not** be 13 or 61-65.)<br>Refer to Frequently Asked Question 36 for reporting guidelines. | - | BE | - | - | - |
| | **Early Termination/Obligation Satisfied**<br>(Requires Account Type 3A or 13, Account Status Code 13 and Current Balance = 0) | - | BF | - | - | - |
| | **Early Termination/Balance Owing**<br>(Requires Account Type 3A or 13.  Account Status should **not** be 13 or 61-65.)<br>Refer to Frequently Asked Question 36 for reporting guidelines. | - | BG | - | - | - |

(continued)

CREDIT REPORTING RESOURCE GUIDE®

*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 0819

Return to Table of Contents

# Exhibit 6

## Special Comment Codes - By Category within Portfolio

| Category | Description | Line of Credit | Install-ment | Mortgage | Open | Revolving |
|---|---|---|---|---|---|---|
| Leasing (continued) | **Early Termination/Insurance Loss**<br>(Requires Account Type 3A or 13)<br>*Notes: If there is a deficiency balance that the consumer is obligated to pay, report the applicable Account Status Code, which should **not** be 13 or 61-65.*<br>*If the insurance payment pays the account in full, report Account Status Code 13 and Current Balance and Amount Past Due = 0.* | - | BH | - | - | - |
| | **Involuntary Repossession**<br>(Requires Account Type 3A or 13)<br>*Note: This Special Comment is not applicable for non-lease account types. Accounts with non-lease type codes should be reported with Account Status 63 (Paid, was a repossession) or 96 (Repossession), as applicable.* | - | BI | - | - | - |
| | **Involuntary Repossession/Obligation Satisfied**<br>(Requires Account Type 3A or 13)<br>*Note: This Special Comment is not applicable for non-lease account types. Accounts with non-lease type codes should be reported with Account Status 63 (Paid, was a repossession).* | - | BJ | - | - | - |
| | **Involuntary Repossession/Balance Owing**<br>(Requires Account Type 3A or 13)<br>*Note: This Special Comment is not applicable for non-lease account types. Accounts with non-lease type codes should be reported with Account Status 96 (Repossession).* | - | BK | - | - | - |

(continued)

# Exhibit 6

## Special Comment Codes – By Category within Portfolio

| Category | Description | Line of Credit | Install-ment | Mortgage | Open | Revolving |
|---|---|---|---|---|---|---|
| Leasing (continued) | Prepaid Lease (Requires Account Type 3A or 13) Refer to Frequently Asked Question 37 for reporting guidelines.) *Definition: Consumer paid lease in advance.  No monthly payments are due.* | - | BS | - | - | - |
| Legal Action | Account Payments Assured by Wage Garnishment | AM | AM | AM | AM | AM |
| Other | Special Handling - Contact Credit Grantor for Additional Information | S | S | S | S | S |
| | Adjustment Pending *Definition: Account adjustment, such as returned merchandise and refund due.* | V | V | V | V | V |
| | First Payment Never Received *Note: May indicate fraudulent activity* | AV | AV | AV | AV | AV |
| | Affected by Natural or Declared Disaster (Refer to Frequently Asked Question 58 for reporting guidelines.) | AW | AW | AW | AW | AW |
| | Redeemed or Reinstated Repossession | - | AZ | - | - | AZ |
| | Foreclosure Proceedings Started (Refer to Frequently Asked Question 52 for reporting guidelines.) | BO | - | BO | - | - |
| | Guaranteed/Insured | CH | CH | CH | CH | CH |

(continued)

CREDIT REPORTING RESOURCE GUIDE®
*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 0821

Return to Table of Contents

# Exhibit 6

# Special Comment Codes - By Category within Portfolio

| Category | Description | Line of Credit | Install-ment | Mortgage | Open | Revolving |
|---|---|---|---|---|---|---|
| Other (continued) | Credit Line Reduced due to Collateral Depreciation<br><br>*Definition: To be used for Home Equity or other secured line of credit accounts.* | CK | - | - | - | - |
| | Collateral Released by Creditor / Balance Owing<br><br>(Account Status Code should **not** be 13 or 61-65 and Current Balance should **not** be zero.)<br><br>*Definition: To be used for Mortgages, Home Equity or other secured accounts when the collateral is released, but the consumer still has an outstanding balance to repay.* | CM | CM | CM | - | CM |
| | Loan Modified under a Federal Government Plan | CN | CN | CN | CN | CN |
| | Loan Modified<br><br>*Definition: To be used when reporting loans that are modified, but not under a Federal Government Plan.* | CO | CO | CO | CO | CO |
| | Used by **Child Support Agencies only** when reporting delinquent or collection accounts  (No actual comment displays) | - | - | - | CS | - |
| | Debt Extinguished Under State Law<br><br>(Account Status Code should **not** be 13 or 61-65 and Current Balance and Amount Due = 0.<br>Refer to Frequently Asked Question 70 for reporting guidelines.)<br><br>*Definition: To be used when debts are extinguished under state law.* | DE | DE | DE | DE | DE |
| Refinanced | Account Closed Due to Refinance<br>(Refer to Frequently Asked Question 59 for reporting guidelines.) | AS | AS | AS | - | - |

(continued)

Return to Table of Contents

# Exhibit 6

# Special Comment Codes – By Category within Portfolio

| Category | Description | Line of Credit | Install-ment | Mortgage | Open | Revolving |
|---|---|---|---|---|---|---|
| Removal of Comment | Removes Any Previously Reported Special Comment Code, or no Special Comment applies for this reporting period | BLANK | BLANK | BLANK | BLANK | BLANK |
| Sold | Purchased by Another Company<br>(Refer to Frequently Asked Question 48 for reporting guidelines.) | AH | AH | AH | AH | AH |
| Special Payment Arrangements | Account Payments Managed by Financial Counseling Program<br>*Note: Used for external financial counseling programs* | B | B | B | B | B |
| | Paid by Co-Maker or Guarantor<br>(Requires Account Status Code 13 or 61-65 and Current Balance = 0) | C | C | C | C | C |
| | Debt Being Paid Through Insurance<br>(Account Status Code should **not** be 13 or 61-65) | AB | AB | AB | AB | AB |
| | Paying Under a Partial Payment Agreement<br>(Account Status Code should **not** be 13 or 61-65)<br>*Definition: An agreed-upon repayment plan with account payments that are **less than** the original contract's account payments.* | AC | AC | AC | AC | AC |
| | Recalled to Active Military Duty<br>*Definition: To be used for reservists; not to be used to identify full time military personnel.*<br>*Note: A code is not available to report full time military personnel.* | AI | AI | AI | AI | AI |
| | Voluntarily Surrendered, then Redeemed or Reinstated | - | AO | - | - | AO |

(continued)

CREDIT REPORTING RESOURCE GUIDE®

*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 0823

Return to Table of Contents

# Exhibit 6

# Special Comment Codes - By Category within Portfolio

| Category | Description | Line of Credit | Install-ment | Mortgage | Open | Revolving |
|---|---|---|---|---|---|---|
| Special Payment Arrangements (continued) | **Account Paid in Full for Less than the Full Balance**<br>(Requires Account Status Code 13 or 61-65 and Current Balance = 0. Refer to Frequently Asked Questions 38 and 53 for reporting guidelines.)<br>*Definition: To be used when the furnisher accepts payment in full for less than the full balance.  Includes short sales.* | AU | AU | AU | AU | AU |
| | **Account Paid from Collateral**<br>(Requires Account Status Code 13 or 61-65 and Current Balance = 0) | AX | AX | - | - | AX |
| | **Paid by Company which Originally Sold the Merchandise**<br>(Requires Account Status Code 13 or 61-65 and Current Balance = 0) | - | BN | - | - | - |
| | **Paid through Insurance**<br>(Requires Account Status Code 13 or 61-65 and Current Balance = 0) | BP | BP | BP | BP | BP |
| | **Principal Deferred/Interest Payment Only** | BT | BT | BT | - | BT |
| | **Account in Forbearance**<br>(Account Status Code should **not** be 13 or 61-65 and Current Balance should **not** be zero.) | CP | CP | CP | CP | CP |

(continued)

Return to Table of Contents

# Exhibit 6

## Special Comment Codes – By Category within Portfolio

| Category | Description | Line of Credit | Install-ment | Mortgage | Open | Revolving |
|---|---|---|---|---|---|---|
| Transferred | **Account Closed Due to Transfer**<br>(Refer to Frequently Asked Question 46 for reporting guidelines.)<br>*Note: Used for internal transfers* | AT | AT | AT | AT | AT |
| | **Loan Assumed by Another Party**<br>(Requires ECOA Code T — Terminated.<br>Refer to Frequently Asked Question 55 for reporting guidelines.) | - | H | H | - | - |
| | **Account Transferred to Another Company/Servicer**<br>(Refer to Frequently Asked Question 46 for reporting guidelines.) | O | O | O | O | O |
| | **Account Acquired by FDIC/NCUA**<br>*Definition: Federal Deposit Insurance Corp./National Credit Union Administration* | AN | AN | AN | AN | AN |
| | **Transferred to Recovery**<br>(Requires Account Status Code 71-97)<br>*Note: Used for internal transfers* | BA | BA | BA | BA | BA |

**Note: Special Comment Codes AG (Simple Interest Loan) and AJ (Payroll Deduction) became obsolete for reporting as of September 2011.  Special Comment Code AL (Student Loan Assigned to Government) became obsolete for reporting as of April 2020.**

CREDIT REPORTING RESOURCE GUIDE®

*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 0825

Return to Table of Contents

# Exhibit 7

# Special Comment Codes

The Special Comment Code (Field 19) must be reported each month as long as the condition applies.

If more than one Special Comment applies to an account, it is the data furnisher's decision to report the comment that is deemed most important from a business perspective for the current reporting period.

| Code | Description |
|---|---|
| Blank | Removes any previously reported Special Comment Code, or no Special Comment applies for this reporting period. |
| B | Account payments managed by financial counseling program.<br>*Note: Used for external financial counseling programs.* |
| C | Paid by Co-maker or Guarantor.<br>*Requires Account Status Code 13 or 61-65 and Current Balance = 0.* |
| H | Loan assumed by another party.<br>*Requires ECOA Code T (Terminated).*<br>*Refer to Frequently Asked Question 55 for reporting guidelines.* |
| I | Election of remedy.<br>*Definition: A car or other item is repossessed, but the value is less than the balance due. The credit grantor must consider the account paid and cannot collect the difference in the amounts.* |
| M | Account closed at credit grantor's request.<br>*Requires Date Closed to identify the date the account was closed to further purchases/use.* |
| O | Account transferred to another company/servicer.<br>*Refer to Frequently Asked Question 46 for reporting guidelines.* |
| S | Special handling. Contact credit grantor for additional information. |
| V | Adjustment pending.<br>*Definition: Account adjustment, such as returned merchandise and refund due.* |
| AB | Debt being paid through insurance.<br>*Account Status Code should **not** be 13 or 61-65.* |
| AC | Paying under a partial payment agreement.<br>*Account Status Code should **not** be 13 or 61-65.*<br>*Definition: An agreed-upon repayment plan with account payments that are **less than** the original contract's account payments.* |
| AH | Purchased by another company.<br>*Refer to Frequently Asked Question 48 for reporting guidelines.* |

(continued)

Return to Table of Contents

# Exhibit 7

# Special Comment Codes

| Code | Description |
|------|-------------|
| AI | Recalled to active military duty.<br>*Definition: To be used for reservists; not to be used to identify full time military personnel.*<br>*Note: A code is not available to report full time military personnel.* |
| AM | Account payments assured by wage garnishment. |
| AN | Account acquired by FDIC/NCUA.<br>*Definition: Federal Deposit Insurance Corp./National Credit Union Administration.* |
| AO | Voluntarily surrendered - then redeemed or reinstated. |
| AP | Credit Line suspended.<br>*Continue to report the last assigned Credit Limit.  Account Status Code should **not** be 13 or 61-65.  Does not require Date Closed to be reported since credit line is temporarily suspended.*<br>*Definition: The credit line is temporarily unavailable for use.* |
| AS | Account closed due to refinance.<br>*Refer to Frequently Asked Question 59 for reporting guidelines.* |
| AT | Account closed due to transfer.<br>*Note: Used for internal transfers.*<br>*Refer to Frequently Asked Question 46 for reporting guidelines.* |
| AU | Account paid in full for less than the full balance.<br>*Requires Account Status Code 13 or 61-65 and Current Balance = 0.*<br>*Refer to Frequently Asked Questions 38 and 53 for reporting guidelines.*<br>*Definition: To be used when the furnisher accepts payment in full for less than the full balance.  Includes short sales.* |
| AV | First payment never received.<br>*Comment: May indicate fraudulent activity.* |
| AW | Affected by natural or declared disaster.<br>*Refer to Frequently Asked Question 58 for reporting guidelines.* |
| AX | Account paid from collateral.<br>*Requires Account Status Code 13 or 61-65 and Current Balance = 0.* |
| AZ | Redeemed or reinstated repossession. |
| BA | Transferred to Recovery.<br>*Requires Account Status Code 71 - 97.*<br>*Note: Used for internal transfers* |

(continued)

CREDIT REPORTING RESOURCE GUIDE®
*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 0827

Return to Table of Contents

## Exhibit 7

# Special Comment Codes

| Code | Description |
|------|-------------|
| BB | Full termination/status pending. <br> *Requires Account Type 3A (Auto Lease) or 13 (Lease).* <br> *Account Status should **not** be 13 or 61-65.* |
| BC | Full termination/obligation satisfied. <br> *Requires Account Type 3A (Auto Lease) or 13 (Lease), Account Status Code 13 and Current Balance = 0.* |
| BD | Full termination/balance owing. <br> *Requires Account Type 3A (Auto Lease) or 13 (Lease).* <br> *Account Status should **not** be 13 or 61-65.* <br> Refer to Frequently Asked Question 36 for reporting guidelines. |
| BE | Early termination/status pending. <br> *Requires Account Type 3A (Auto Lease) or 13 (Lease).* <br> *Account Status should **not** be 13 or 61-65.* <br> Refer to Frequently Asked Question 36 for reporting guidelines. |
| BF | Early termination/obligation satisfied. <br> *Requires Account Type 3A (Auto Lease) or 13 (Lease), Account Status Code 13 and Current Balance = 0.* |
| BG | Early termination/balance owing. <br> *Requires Account Type 3A (Auto Lease) or 13 (Lease).* <br> *Account Status should **not** be 13 or 61-65.* <br> Refer to Frequently Asked Question 36 for reporting guidelines. |
| BH | Early termination/insurance loss. <br> *Requires Account Type 3A (Auto Lease) or 13 (Lease).* <br> *Notes: If there is a deficiency balance that the consumer is obligated to pay, report the applicable Account Status Code, which should **not** be 13 or 61-65.* <br> *If the insurance payment pays the account in full, report Account Status Code 13 and Current Balance and Amount Past Due = 0.* |
| BI | Involuntary repossession. <br> *Requires Account Type 3A (Auto Lease) or 13 (Lease).* <br> *Note: This Special Comment is not applicable for non-lease account types. Accounts with non-lease type codes should be reported with Account Status 63 (Paid, was a repossession) or 96 (Repossession), as applicable.* |

(continued)

APPENDIX 0828

Return to Table of Contents

# Exhibit 7

# Special Comment Codes

| Code | Description |
|---|---|
| BJ | Involuntary repossession/obligation satisfied.<br>*Requires Account Type 3A (Auto Lease) or 13 (Lease).*<br>*Note: This Special Comment is not applicable for non-lease account types. Accounts with non-lease type codes should be reported with Account Status 63 (Paid, was a repossession).* |
| BK | Involuntary repossession/balance owing.<br>*Requires Account Type 3A (Auto Lease) or 13 (Lease).*<br>*Note: This Special Comment is not applicable for non-lease account types. Accounts with non-lease type codes should be reported with Account Status 96 (Repossession).* |
| BL | Credit card lost or stolen.<br>*Refer to Frequently Asked Question 65 for reporting guidelines.* |
| BN | Paid by company which originally sold the merchandise.<br>*Requires Account Status Code 13 or 61-65 and Current Balance = 0.* |
| BO | Foreclosure proceedings started.<br>*Refer to Frequently Asked Question 52 for reporting guidelines.* |
| BP | Paid through insurance.<br>*Requires Account Status Code 13 or 61-65 and Current Balance = 0.* |
| BS | Prepaid lease.<br>*Requires Account Type 3A (Auto Lease) or 13 (Lease).*<br>*Definition: Consumer paid lease in advance. No monthly payments are due.*<br>*Refer to Frequently Asked Question 37 for reporting guidelines.* |
| BT | Principal deferred/Interest payment only. |
| CH | Guaranteed/Insured. |
| CI | Account closed due to inactivity.<br>*Requires Date Closed to identify the date the account was closed to further purchases/use.* |
| CJ | Credit line no longer available – in repayment phase.<br>*Continue to report the last assigned Credit Limit. Account Status Code should **not** be 13 or 61-65 and the Current Balance should **not** be zero. Requires Date Closed to identify the date the account was closed to further purchases/use.*<br>*Definition: To be used for line of credit accounts that have two phases: the borrowing phase and the repayment phase. The repayment phase is a natural progression for the account when the consumer is responsible for payment of the outstanding balance and the credit line is no longer available for use.* |

(continued)

**CREDIT REPORTING RESOURCE GUIDE®**

*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 0829

Return to Table of Contents

# Exhibit 7

# Special Comment Codes

| Code | Description |
|------|-------------|
| CK | Credit line reduced due to collateral depreciation.<br>*Definition: To be used for Home Equity or other secured line of credit accounts.* |
| CL | Credit line suspended due to collateral depreciation.<br>*Continue to report last assigned Credit Limit.  Account Status Code should **not** be 13 or 61-65. Does not require Date Closed to be reported since credit line is temporarily suspended.*<br>*Definition: To be used for Home Equity or other secured line of credit accounts when the credit line is temporarily unavailable for use.* |
| CM | Collateral released by creditor / Balance owing.<br>*Account Status Code should **not** be 13 or 61-65 and the Current Balance should **not** be zero.*<br>*Definition: To be used for Mortgages, Home Equity or other secured accounts when the collateral is released, but the consumer still has an outstanding balance to repay.* |
| CN | Loan modified under a federal government plan. |
| CO | Loan modified.<br>*Definition: To be used when reporting loans that are modified, but <u>not</u> under a federal government plan.* |
| CP | Account in forbearance.<br>*Account Status should **not** be 13 or 61-65 and the Current Balance should **not** be zero.* |
| CS | Used by **Child Support Agencies only** when reporting delinquent or collection accounts.  (No actual comment displays.) |
| DE | Debt extinguished under state law.<br>*Account Status should **not** be 13 or 61-65 and the Current Balance and Amount Past Due = 0.*<br>*Refer to Frequently Asked Question 70 for reporting guidelines.*<br>*Definition: To be used when debts are extinguished under state law.* |

**Notes:  For comments specific to disputes and accounts closed at consumer's request, refer to the Compliance Condition Code (Field 20 and Exhibit 8).**

**Special Comment Codes AG (Simple Interest Loan) and AJ (Payroll Deduction) became obsolete for reporting as of September 2011. Special Comment Code AL (Student Loan Assigned to Government) became obsolete for reporting as of April 2020.**

# Exhibit 8

# Compliance Condition Codes

The Compliance Condition Code (CCC), which is reported in Field 20 of the Base Segment, allows the reporting of a condition that is required for legal compliance.

Compliance Condition Codes are used to reflect accounts closed at consumer's request, and consumer disputes under the Fair Credit Billing Act (FCBA), the Fair Debt Collection Practices Act (FDCPA), or the direct dispute provisions of the Fair Credit Reporting Act (FCRA) and its implementing rules.

The Compliance Condition Codes should <u>not</u> be reported in response to a consumer dispute investigation request from the consumer reporting agencies, except where a data furnisher uses a Compliance Condition Code to satisfy its FDCPA obligation to communicate that a debt is disputed.

Report the following codes:

| Code | Description |
|---|---|
| Blank | Retains previously reported code, or no new Compliance Condition Code applies for this reporting period |
| XA | Account closed at consumer's request<br><br>*Definition: Reported when a consumer requested an account be closed.*<br><br>**Important Note:  Report the Date Closed as the date the account was closed to further purchases.** |
| XB | Account information has been disputed by the consumer directly to the data furnisher under the Fair Credit Reporting Act (FCRA); the data furnisher is conducting its investigation.<br><br>*Definition: Reported when the completeness or accuracy of the account information is disputed directly to the data furnisher by the consumer under the FCRA and investigation of the dispute is in progress by the data furnisher.*<br><br>*Code XB should be reported for FDCPA disputes.*<br><br>**Important Note: Code XB should no longer be reported after the investigation is completed; the XB should be removed by reporting the removal code or changed to another code.** |
| XC | FCRA direct dispute investigation completed — consumer disagrees with the results of the data furnisher's investigation.<br><br>*Definition: Reported when the investigation of an FCRA dispute made by the consumer directly to the data furnisher has been completed by the data furnisher; however, the consumer disagrees with the outcome of the investigation.* |

(continued)

CREDIT REPORTING RESOURCE GUIDE®

*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 0831

Return to Table of Contents

# Exhibit 8

# Compliance Condition Codes

| Code | Description |
|---|---|
| XD | Account closed at consumer's request; and account information disputed by the consumer directly to the data furnisher under the FCRA; the data furnisher is conducting its investigation.<br><br>*Definition: Combination code reported when two conditions (XA and XB) apply to the account.  A consumer requested an account be closed and the completeness or accuracy of the account information is disputed directly to the data furnisher by the consumer under the FCRA and investigation of the dispute is in progress by the data furnisher.*<br><br>**Important Notes: Report the Date Closed as the date the account was closed to further purchases.**<br><br>**Code XD should no longer be reported after the investigation is completed; the XD should be changed to another code, such as XA or XE, if applicable.** |
| XE | Account closed at consumer's request; and data furnisher has completed its investigation; consumer disagrees with the results of the investigation. (To be used for direct disputes under the FCRA or FCBA disputes)<br><br>*Definition: Combination code reported when two conditions (XA and XC or XG) apply to the account.  A consumer requested an account be closed and the investigation of the dispute has been completed by the data furnisher; however, the consumer disagrees with the outcome of the investigation.*<br><br>**Important Note: Report the Date Closed as the date the account was closed to further purchases.** |
| XF | Account in dispute under Fair Credit Billing Act (FCBA); the data furnisher is conducting its investigation.<br><br>*Definition: Reported when information is disputed by the consumer under the FCBA and investigation of the dispute is in progress by the data furnisher.*<br><br>**Important Note: Code XF should no longer be reported after the investigation is completed; the XF should be removed by reporting the removal code or changed to another code.** |
| XG | FCBA dispute investigation completed — consumer disagrees with the results of the data furnisher's investigation.<br><br>*Definition: Reported when the investigation of an FCBA dispute has been completed by the data furnisher; however, the consumer disagrees with the outcome of the investigation.* |

(continued)

Return to Table of Contents

# Exhibit 8

# Compliance Condition Codes

| Code | Description |
|---|---|
| XH | Account previously in dispute; the data furnisher has completed its investigation. (To be used for direct disputes under the FCRA, FDCPA disputes or FCBA disputes)<br><br>*Definition: Reported when the investigation of a dispute by the data furnisher was completed.* |
| XJ | Account closed at consumer's request; and account information disputed by the consumer under FCBA; the data furnisher is conducting its investigation.<br><br>*Definition: Combination code reported when two conditions (XA and XF) apply to the account.  A consumer requested an account be closed and information is disputed by the consumer under the FCBA and investigation of the dispute is in progress by the data furnisher.*<br><br>**Important Notes: Report the Date Closed as the date the account was closed to further purchases.**<br><br>**Code XJ should no longer be reported after the investigation is completed; the XJ should be changed to another code, such as XA or XE, if applicable.** |
| XR | Removes the most recently reported Compliance Condition Code<br><br>**Important Note: Do not use XR as a default code.  If no Compliance Condition Code applies in the current reporting period, blank fill this field.** |

**Important Note:**

**When a dispute investigation is completed, it is important to delete the previously-reported Compliance Condition Code or to update the Compliance Condition Code to show that the investigation has been completed.  Your internal policies and procedures should indicate which option your company prefers to use; and if you choose to report a code indicating that the investigation has been completed, how long to retain the code on the consumer's file.**

(continued)

CREDIT REPORTING RESOURCE GUIDE®
*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 0833

Return to Table of Contents

## Exhibit 8

# Compliance Condition Codes

The code should be reported each month as long as the condition applies.

| Date of Account Information | CCC | Action |
|---|---|---|
| 09/15/2022 | XA | XA is added to file. |
| 10/15/2022 | XA | XA is retained. |
| 11/15/2022 | XA | XA is retained. |
| 12/15/2022 | Blank | XA is retained. |
| 01/15/2023 | XD | XA is replaced with XD. |
| 02/15/2023 | XD | XD is retained. |
| 03/15/2023 | XA | XD is replaced with XA. |

As an option, the code should be reported one time and will be deleted only when another Compliance Condition Code or the **XR** (Removal code) is reported.  Example:

| Date of Account Information | CCC | Action |
|---|---|---|
| 09/15/2022 | XA | XA is added to file. |
| 10/15/2022 | Blank | XA is retained. |
| 11/15/2022 | Blank | XA is retained. |
| 12/15/2022 | Blank | XA is retained. |
| 01/15/2023 | XD | XA is replaced with XD. |
| 02/15/2023 | Blank | XD is retained. |
| 03/15/2023 | XA | XD is replaced with XA. |

**Note: Regardless of the method of reporting, the code will be deleted *only* when another Compliance Condition Code or the XR (Removal code) is reported.**

Return to Table of Contents

# Exhibit 9

# Explanation and Examples of FCRA Compliance/ Date of First Delinquency

**This date is used to ensure compliance with the Fair Credit Reporting Act.**

**HOW TO REPORT:** The date in the Date of First Delinquency field must be determined each reporting period based on the following hierarchy:

1. For Account Status Codes 61-65, 71, 78, 80, 82-84, 88-89 and 93-97, report the date of the first 30-day delinquency that led to the status being reported. This date should be 30 days after the due date.  If a delinquent account becomes current, the Date of First Delinquency should be zero filled.  Then if the account goes delinquent again, the Date of First Delinquency starts over with the new first delinquency date.

2. For Account Status Codes 05 and 13, if the Payment Rating is 1-6, G or L, report the date of the first 30-day delinquency that led to the Payment Rating being reported.  This date should be 30 days after the due date.

3. For Consumer Information Indicators A-H and Z (Bankruptcies), 1A (Personal Receivership) and V-Y (Reaffirmation of Debt Rescinded with Bankruptcy Chapters), if the account is current (Account Status Code 11 or Account Status Code 05 or 13 with Payment Rating 0), report the date of the bankruptcy/personal receivership petition or notification.  Even though the account is not delinquent, this date is required for purging purposes.

If none of the conditions listed in the above hierarchy apply, the Date of First Delinquency should be zero filled.

**Note: Consumer Information Indicators W, X and Y are obsolete for reporting as of September 2010, Consumer Information Indicator Z is obsolete for reporting as of April 2021, and Account Status Code 05 is obsolete for reporting as of April 2022.  These codes may no longer be reported.**

The following pages contain a flowchart view of the Date of First Delinquency hierarchy, plus several step-by-step examples demonstrating how to report the FCRA Compliance/Date of First Delinquency.

CREDIT REPORTING RESOURCE GUIDE®
*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 0835

Return to Table of Contents

# Exhibit 9

## Explanation and Examples of FCRA Compliance/ Date of First Delinquency (Field 25)



*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 0836

Return to Table of Contents

# Exhibit 9

## Explanation and Examples of FCRA Compliance/
## Date of First Delinquency (Field 25)

**Example 1:** Displays an account that goes delinquent to current and then goes delinquent again.

| Date of Account Information (Field 24) | Due Date (Not reported) | Number of Days Past Due Date (Not reported) | Account Status & Definition (Field 17A) | Date of First Delinquency (Field 25) |
|---|---|---|---|---|
| 03/12/2022 | 03/20/2022 | 0 | 11 Current Account 0–29 days past the due date | Zero fill |
| 04/12/2022 | 03/20/2022 | 23 | 11 Current Account 0–29 days past the due date | Zero fill |
| 05/12/2022 | 03/20/2022 | 53 | 71 30–59 days past the due date | 04/19/2022 (First Delinquency) |
| 06/12/2022 | 03/20/2022 | 84 | 78 60-89 days past the due date | 04/19/2022 |
| 07/12/2022 | 06/20/2022 | 22 | 11 Current Account 0-29 days past the due date | Zero fill |
| 08/12/2022 | 06/20/2022 | 53 | 71 30-59 days past the due date | 07/20/2022 (First Delinquency) |
| 09/12/2022 | 06/20/2022 | 84 | 78 60-89 days past the due date | 07/20/2022 |
| 10/12/2022 | 06/20/2022 | 114 | 80 90-119 days past the due date | 07/20/2022 |
| 11/12/2022 | 06/20/2022 | 145 | 93 (Collection) | 07/20/2022 |

**Note: The Date of First Delinquency is used by the consumer reporting agencies for purging purposes.**

(continued)

CREDIT REPORTING RESOURCE GUIDE®
*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 0837

Return to Table of Contents

# Exhibit 9

## Explanation and Examples of FCRA Compliance/ Date of First Delinquency (Field 25)

**Example 2:** Displays an account that goes delinquent and never returns to a current status.

| Date of Account Information (Field 24) | Due Date (Not reported) | Number of Days Past Due Date (Not reported) | Account Status & Definition (Field 17A) | Date of First Delinquency (Field 25) |
|---|---|---|---|---|
| 02/28/2022 | 03/01/2022 | 0 | 11<br>Current Account<br>0-29 days past the due date | Zero fill |
| 03/31/2022 | 03/01/2022 | 30 | 71<br>30–59 days past the due date | 03/31/2022<br>(First Delinquency) |
| 04/30/2022 | 03/01/2022 | 60 | 78<br>60–89 days past the due date | 03/31/2022 |
| 05/31/2022 | 03/01/2022 | 91 | 80<br>90-119 days past the due date | 03/31/2022 |
| 06/30/2022 | 03/01/2022 | 121 | 82<br>120–149 days past the due date | 03/31/2022 |
| 07/31/2022 | 03/01/2022 | 152 | 83<br>150-179 days past the due date | 03/31/2022 |
| 08/31/2022 | 03/01/2022 | 183 | 97<br>Charge-off | 03/31/2022 |
| 09/30/2022 | All payments made | N/A | 64<br>Paid Charge-off | 03/31/2022 |

**Note:  The Date of First Delinquency is used by the consumer reporting agencies for purging purposes.**

(continued)

APPENDIX 0838

Return to Table of Contents

# Exhibit 9

## Explanation and Examples of FCRA Compliance/ Date of First Delinquency (Field 25)

**Example 3:** Displays an account that has rolling delinquencies.

| Date of Account Information (Field 24) | Due Date (Not reported) | Number of Days Past Due Date (Not reported) | Account Status & Definition (Field 17A) | Date of First Delinquency (Field 25) |
|---|---|---|---|---|
| 04/12/2022 | 03/20/2022 | 23 | 11<br>Current Account<br>0-29 days past the due date | Zero fill |
| 05/12/2022 | 03/20/2022 | 53 | 71<br>30-59 days past the due date | 04/19/2022<br>(First delinquency) |
| 06/12/2022 | 04/20/2022 | 53 | 71<br>30–59 days past the due date | 04/19/2022 |
| 07/12/2022 | 04/20/2022 | 83 | 78<br>60–89 days past the due date | 04/19/2022 |
| 08/12/2022 | 04/20/2022 | 114 | 80<br>90-119 days past the due date | 04/19/2022 |
| 09/12/2022 | 07/20/2022 | 54 | 71<br>30-59 days past the due date | 04/19/2022 |
| 10/12/2022 | 08/20/2022 | 53 | 71<br>30-59 days past the due date | 04/19/2022 |
| 11/12/2022 | 08/20/2022 | 84 | 78<br>60-89 days past the due date | 04/19/2022 |

**Note: The Date of First Delinquency is used by the consumer reporting agencies for purging purposes.**

(continued)

CREDIT REPORTING RESOURCE GUIDE®

*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 0839

Return to Table of Contents

# Exhibit 9

## Explanation and Examples of FCRA Compliance/
## Date of First Delinquency (Field 25)

**Example 4:** Displays an account that has been paid; the Payment Rating is delinquent.

| Date of Account Information (Field 24) | Due Date (Not reported) | Number of Days Past Due Date (Not reported) | Account Status & Definition (Field 17A) | Date of First Delinquency (Field 25) |
|---|---|---|---|---|
| 03/18/2022 | 03/15/2022 | 3 | 11 Current Account 0-29 days past the due date | Zero fill |
| 04/18/2022 | 04/15/2022 | 3 | 11 Current Account 0-29 days past the due date | Zero fill |
| 05/18/2022 | 04/15/2022 | 33 | 71 30–59 days past the due date | 05/15/2022 (First Delinquency) |
| 06/18/2022 | 04/15/2022 | 64 | 78 60–89 days past the due date | 05/15/2022 |
| 07/18/2022 | 05/15/2022 | 64 | 78 60-89 days past the due date | 05/15/2022 |
| 08/18/2022 | 05/15/2022 | 95 | 80 90-119 days past the due date | 05/15/2022 |
| 09/18/2022 | 05/15/2022 | 126 | 82 120-149 days past the due date | 05/15/2022 |
| 10/15/2022 | 05/15/2022 Paid in full on 10/15/2022 | 153 prior to being paid in full | 13 Paid Account Payment Rating = 5 150-179 days past the due date | 05/15/2022 |

**Note: The Date of First Delinquency is used by the consumer reporting agencies for purging purposes.**

(continued)

APPENDIX 0840

Return to Table of Contents

# Exhibit 9

## Explanation and Examples of FCRA Compliance/
## Date of First Delinquency (Field 25)

**Example 5:** Displays an account that was current when included in a Chapter 7 Bankruptcy. Data furnisher only reports Consumer Information Indicator one time to take effect.

| Date of Account Information (Field 24) | Due Date (Not reported) | Number of Days Past Due Date (Not reported) | Account Status & Definitions (Field 17A) | Date of First Delinquency (Field 25) |
|---|---|---|---|---|
| 03/18/2022 | 03/15/2022 | 3 | 11 Current | Zero fill |
| 04/18/2022 | 04/15/2022 | 3 | 11 Current | Zero fill |
| 05/18/2022 | 05/15/2022 | 3 | 11 Current Consumer Information Indicator = A Petition for Chapter 7 Bankruptcy | 05/07/2022 (Bankruptcy Petition Date) |
| 06/18/2022 | 06/15/2022 | 3 | 11 Current Consumer Information Indicator = Blank | Zero fill |

**Note: The Date of First Delinquency is used by the consumer reporting agencies for purging purposes.**

(continued)

CREDIT REPORTING RESOURCE GUIDE®
*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 0841

Return to Table of Contents

# Exhibit 9

## Explanation and Examples of FCRA Compliance/ Date of First Delinquency (Field 25)

**Example 6:** Displays an account that was current when included in a Chapter 7 Bankruptcy. Data furnisher reports Consumer Information Indicator every month as long as it applies.

| Date of Account Information (Field 24) | Due Date (Not reported) | Number of Days Past Due Date (Not reported) | Account Status & Definitions (Field 17A) | Date of First Delinquency (Field 25) |
|---|---|---|---|---|
| 03/18/2022 | 03/15/2022 | 3 | 11<br>Current | Zero fill |
| 04/18/2022 | 04/15/2022 | 3 | 11<br>Current | Zero fill |
| 05/18/2022 | 05/15/2022 | 3 | 11<br>Current<br>Consumer Information Indicator = A<br>Petition for Chapter 7 Bankruptcy | 05/07/2022<br>(Bankruptcy Petition Date) |
| 06/18/2022 | 06/15/2022 | 3 | 11<br>Current<br>Consumer Information Indicator = A<br>Petition for Chapter 7 Bankruptcy | 05/07/2022<br>(Bankruptcy Petition Date) |

**Note: The Date of First Delinquency is used by the consumer reporting agencies for purging purposes.**

(continued)

APPENDIX 0842

Return to Table of Contents

Case 4:25-cv-00443-P   Document 116   Filed 12/22/25   Page 808 of 1862   PageID 2657

# Exhibit 9

## Explanation and Examples of FCRA Compliance/
## Date of First Delinquency (Field 25)

**Example 7:** Displays an account that was delinquent before it was included in a Chapter 7 Bankruptcy.

| Date of Account Information (Field 24) | Due Date (Not reported) | Number of Days Past Due Date (Not reported) | Account Status & Definition (Field 17A) | Date of First Delinquency (Field 25) |
|---|---|---|---|---|
| 03/18/2022 | 03/15/2022 | 3 | 11<br>Current<br>0-29 days past the due date | Zero fill |
| 04/18/2022 | 04/15/2022 | 3 | 11<br>Current<br>0-29 days past the due date | Zero fill |
| 05/18/2022 | 04/15/2022 | 33 | 71<br>30–59 days past the due date | 05/15/2022<br>(First Delinquency) |
| 06/18/2022 | 04/15/2022 | 64 | 78<br>60–89 days past the due date | 05/15/2022 |
| 07/18/2022 | 05/15/2022 | 64 | 78<br>60-89 days past the due date | 05/15/2022 |
| 08/18/2022 | 05/15/2022 | 95 | 80<br>90-119 days past the due date<br>Consumer Information Indicator = A<br>Petition for Chapter 7 Bankruptcy | 05/15/2022 |

**Note: The Date of First Delinquency is used by the consumer reporting agencies for purging purposes.**

(continued)

CREDIT REPORTING RESOURCE GUIDE®

*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 0843

Return to Table of Contents

# Exhibit 9

## Explanation and Examples of FCRA Compliance/ Date of First Delinquency (Field 25)

**Example 8:** Displays an account in a Chapter 7 Bankruptcy that is current at the time of filing and the non-filer becomes delinquent after the petition is reported. Data furnisher reports Consumer Information Indicator every month as long as it applies.

| Date of Account Information (Field 24) | Due Date (Not reported) | Number of Days Past Due Date (Not reported) | Account Status & Definition (Field 17A) | Date of First Delinquency (Field 25) |
|---|---|---|---|---|
| 03/18/2022 | 03/15/2022 | 3 | 11<br>Current<br>0-29 days past the due date | Zero fill |
| 04/18/2022 | 04/15/2022 | 3 | 11<br>Current<br>Consumer Information Indicator = A (Filer)<br>Petition for Chapter 7 Bankruptcy<br>Consumer Information Indicator = Blank (Non-filer) | 04/10/2022<br>(Bankruptcy Notification Date – for the Filer only)<br>Hierarchy Rule #3 |
| 05/18/2022 | 05/15/2022 | 3 | 11<br>Current<br>Consumer Information Indicator = A (Filer)<br>Petition for Chapter 7 Bankruptcy<br>Consumer Information Indicator = Blank (Non-filer) | 04/10/2022<br>(Bankruptcy Notification Date – for the Filer only)<br>Hierarchy Rule #3 |
| 06/18/2022 | 05/15/2022 | 34 | 71<br>30–59 days past the due date<br>Consumer Information Indicator = A (Filer)<br>Petition for Chapter 7 Bankruptcy<br>Consumer Information Indicator = Blank (Non-filer) | 06/14/2022<br>(For the Non-filer only)<br>Hierarchy Rule #1 |
| 07/18/2022 | 05/15/2022 | 64 | 78<br>60-89 days past the due date<br>Consumer Information Indicator = A (Filer)<br>Petition for Chapter 7 Bankruptcy<br>Consumer Information Indicator = Blank (Non-filer) | 06/14/2022<br>(For the Non-filer only)<br>Hierarchy Rule #1 |

**Note: The Date of First Delinquency is used by the consumer reporting agencies for purging purposes.**

(continued)

APPENDIX 0844

Return to Table of Contents

Case 4:25-cv-00443-P   Document 116   Filed 12/22/25   Page 810 of 1862   PageID 2659

## Exhibit 9

# Explanation and Examples of FCRA Compliance/ Date of First Delinquency (Field 25)

**Fair Credit Reporting Act Excerpts**

**FCRA Section 605(c) [15 U.S.C. § 1681c(c)], Running of Reporting Period:**

(1) In general: The 7-year period referred to in paragraphs (4) and (6) of subsection (a) shall begin, with respect to any delinquent account that is placed for collection (internally or by referral to a third party, whichever is earlier), charged to profit and loss, or subjected to any similar action, upon the expiration of the 180-day period beginning on the date of the commencement of the delinquency which immediately preceded the collection activity, charge to profit and loss, or similar action.

**FCRA Section 605(a) [15 U.S.C. § 1681c(a)], Information Excluded From Consumer Reports:**

(4) Accounts placed for collection or charged to profit and loss which antedate the report by more than seven years.

(5) Any other adverse item of information, other than records of convictions or crimes which antedates the report by more than seven years.

(continued)

CREDIT REPORTING RESOURCE GUIDE®

*Copyright 2023 © Consumer Data Industry Association*    APPENDIX 0845

Return to Table of Contents

## Exhibit 9

# Explanation and Examples of FCRA Compliance/ Date of First Delinquency (Field 25)

**Fair Credit Reporting Act Excerpts**

**FCRA Section 623 [15 U.S.C. § 1681s-2], Responsibilities of Furnishers of Information to Consumer Reporting Agencies:**

(5) Duty to provide notice of delinquency of accounts.

> (A) In general. - A person who furnishes information to a consumer reporting agency regarding a delinquent account being placed for collection, charged to profit or loss, or subjected to any similar action, shall, not later than 90 days after furnishing the information, notify the agency of the date of delinquency on the account, which shall be the month and year of the commencement of the delinquency on the account that immediately preceded the action.

> (B) Rule of construction.-For purposes of this paragraph only, and provided that the consumer does not dispute the information, a person that furnishes information on a delinquent account that is placed for collection, charged for profit or loss, or subjected to any similar action, complies with this paragraph, if-

>> (i) the person reports the same date of delinquency as that provided by the creditor to which the account was owed at the time at which the commencement of the delinquency occurred, if the creditor previously reported that date of delinquency to a consumer reporting agency;

>> (ii) the creditor did not previously report the date of delinquency to a consumer reporting agency, and the person establishes and follows reasonable procedures to obtain the date of delinquency from the creditor or another reliable source and reports that date to a consumer reporting agency as the date of delinquency; or

>> (iii) the creditor did not previously report the date of delinquency to a consumer reporting agency and the date of delinquency cannot be reasonably obtained as provided in clause (ii), the person establishes and follows reasonable procedures to ensure the date reported as the date of delinquency precedes the date on which the account is placed for collection, charged to profit or loss, or subjected to any similar action, and reports such date to the credit reporting agency.

# Exhibit 10

## ECOA Codes

The ECOA Code defines the relationship of the consumer to the account in compliance with the Equal Credit Opportunity Act. This code is reported in Field 37 of the Base Segment and Field 10 of the J1 and J2 Segments. Values available:

| Code | Description | Definition | Logical Usage |
|------|-------------|------------|---------------|
| 1 | Individual | This consumer has contractual responsibility for this account and is primarily responsible for its payment. | • Most commonly reported in Base Segment<br>• May be reported in J1 or J2 Segment when Base Segment consumer is reported with T, X or Z |
| 2 | Joint Contractual Liability | This consumer has contractual responsibility for this joint account. | • Base, J1 or J2 Segment |
| 3 | Authorized User | This consumer is an authorized user of this account; another consumer has contractual responsibility.<br><br>**Note: The full Date of Birth (MMDDYYYY) must be reported for all newly-added authorized users on all pre-existing and newly-opened accounts.** | • J1 or J2 Segment |
| 5 | Co-maker or Guarantor | This consumer is the co-maker or guarantor for this account, who becomes liable if the maker defaults. | • J1 or J2 Segment<br>• May be reported in Base Segment when business is reported in J2 Segment |
| 7 | Maker | This consumer is the maker who is liable for the account, but a co-maker or guarantor is liable if the maker defaults. | • Most commonly reported in Base Segment<br>• May be reported in J1 or J2 Segment if more than one maker on account |

(continued)

5-48 <span style="font-variant:small-caps">Credit Reporting Resource Guide</span>®

*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 0847

Return to Table of Contents

# Exhibit 10

## ECOA Codes

| Code | Description | Definition | Logical Usage |
|---|---|---|---|
| T | Terminated | The association with the account has been terminated by this consumer.<br><br>**Note: Refer to Frequently Asked Question 14(b) for reporting guidelines on ECOA Code T.** | • Base, J1 or J2 Segment |
| X | Deceased | This consumer is deceased.<br><br>**Notes: Do not report ECOA Code X until you have received a legally-sufficient death notice; e.g., death certificate. Data furnishers should consult with internal Legal counsel or Compliance area regarding what constitutes a legally-sufficient death notice.**<br><br>**Refer to Frequently Asked Question 19 for guidelines on reporting deceased consumers.** | • Base, J1 or J2 Segment |
| W | Business/ Commercial | This code is used to identify that the company reported in the Name field is contractually liable for this account.<br><br>**Note: Refer to Frequently Asked Question 20 for guidelines on reporting consumers who are personally liable for business accounts.** | • J2 Segment |
| Z | Delete Consumer | This code is used to delete this consumer from the account.<br><br>**Notes: Refer to Frequently Asked Question 14(b) for reporting guidelines on ECOA Code Z.**<br><br>**Only inaccurately reported consumers should be deleted. Additionally, as per Frequently Asked Questions & Answers 27 and 28, authorized users should be deleted from accounts included in bankruptcy since authorized users are not contractually responsible for payments.** | • Base, J1 or J2 Segment |

**Note: ECOA Codes 0 (Undesignated), 4 (Joint) and 6 (On-Behalf-Of) are obsolete as of September 2003 and may no longer be reported.**

APPENDIX 0848

Return to Table of Contents

## Exhibit 11

# Consumer Information Indicators

The Consumer Information Indicator (CII), which is reported in Field 38 of the Base Segment, Field 11 of the J1 Segment, and Field 11 of the J2 Segment, contains a value that indicates a special condition that applies to the specific consumer.  The Consumer Information Indicator must be reported only on the consumer to whom the information applies.  Report the following values:

| Code | Description |
|------|-------------|
| BLANK | Retains previously reported value, or no new Consumer Information Indicator applies for this reporting period |
|  |  |
| A | Petition for Chapter 7 Bankruptcy |
| B | Petition for Chapter 11 Bankruptcy |
| C | Petition for Chapter 12 Bankruptcy |
| D | Petition for Chapter 13 Bankruptcy |
|  |  |
| E | Discharged through Bankruptcy Chapter 7 |
| F | Discharged through Bankruptcy Chapter 11 |
| G | Discharged through Bankruptcy Chapter 12 |
| H | Discharged/Completed through Bankruptcy Chapter 13 |
|  |  |
| 1A | Personal Receivership |
| Q | Removes previously reported Bankruptcy Indicator (A through H) or Personal Receivership Indicator (1A).  Also used to report Bankruptcies that have been closed, terminated, dismissed or withdrawn, without being discharged.<br><br>**Note: Do not report Q as a default value.  If no new CII applies in the current reporting period, blank fill this field.** |

(continued)

CREDIT REPORTING RESOURCE GUIDE®

*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 0849

Return to Table of Contents

## Exhibit 11

# Consumer Information Indicators

| Code | Description |
|------|-------------|
|  |  |
| R | Chapter 7 Reaffirmation of Debt |
| V | Chapter 7 Reaffirmation of Debt Rescinded |
| 2A | Lease Assumption |
| S | Removes previously reported Reaffirmation of Debt, Reaffirmation of Debt Rescinded and Lease Assumption Indicators (R, V, 2A, and obsolete values W, X, Y)<br><br>**Note: Do not report S as a default value.  If no new CII applies in the current reporting period, blank fill this field.** |
|  |  |
| T | Credit Grantor Cannot Locate Consumer |
| U | Consumer Now Located (Removes previously reported T Indicator)<br><br>**Note: Do not report U as a default value.  If no new CII applies in the current reporting period, blank fill this field.** |

**Notes**:   **Codes W (Chapter 11 Reaffirmation of Debt Rescinded), X (Chapter 12 Reaffirmation of Debt Rescinded) and Y (Chapter 13 Reaffirmation of Debt Rescinded) are obsolete as of September 2010 and may no longer be reported.**

  **Codes I – L (Bankruptcy Dismissed for Chapters 7, 11, 12 and 13), M – P (Bankruptcy Withdrawn for Chapters 7, 11, 12, and 13) and Z (Bankruptcy - Undesignated Chapter) are obsolete for reporting as of April 2021 and may no longer be reported.**

(continued)

Return to Table of Contents

# Exhibit 11

## Consumer Information Indicators

**Examples of reporting Consumer Information Indicators:**

The Consumer Information Indicator should be reported each month as long as the condition applies.

| Date of Account Information | CII | Action |
|---|---|---|
| 01/15/2023 | A | A is added to file. |
| 02/15/2023 | A | A is retained. |
| 03/15/2023 | A | A is retained. |
| 04/15/2023 | E | A is replaced by E. |

As an option, the indicator should be reported one time and will be deleted only when another Consumer Information Indicator or a Removal value is reported.

| Date of Account Information | CII | Action |
|---|---|---|
| 01/15/2023 | A | A is added to file. |
| 02/15/2023 | Blank | A is retained. |
| 03/15/2023 | Blank | A is retained. |
| 04/15/2023 | E | A is replaced by E. |

**Regardless of the method of reporting (each month or one time), the Consumer Information Indicator will be deleted only when another Consumer Information Indicator or a Removal value is reported.**

| Date of Account Information | CII | Action |
|---|---|---|
| 11/15/2022 | D | D is added to file. |
| 12/15/2022 | D | D is retained. |
| 01/15/2023 | D | D is retained. |
| 02/15/2023 | D | D is retained. |
| 03/15/2023 | Q | D is removed. |
| **Note:** The removal value **Q** is used to remove the **D**, which in this example, was reported in error. | | |

# Exhibit 12

# Country Codes

These Country Codes, which are unique to Metro 2®, are used for credit reporting purposes and may differ from codes used by other industries.

| COUNTRY | CODE | COUNTRY | CODE | COUNTRY | CODE |
|---|---|---|---|---|---|
| Afghanistan | AF | Cayman Islands | CI | Gibraltar | GI |
| Albania | AN | Central African | | Grenada | GD |
| Algeria | DZ | Republic | CF | Greece | GR |
| Andorra | AD | Chad | CD | Greenland | GE |
| Angola | AO | Chile | CL | Guadeloupe | GP |
| Anguilla | AI | China (Peking) | CP | Guatemala | GT |
| Antigua & Barbuda | AG | Colombia | CB | Guernsey | GG |
| Argentina | AT | Comoros | CJ | Guinea | GN |
| Armenia | RM | Congo | CG | Guinea-Bissau | GW |
| Aruba | AW | Corsica | CC | Guyana | GY |
| Ascension | AS | Costa Rica | CR | Haiti | HA |
| Australia | AU | Croatia | HX | Honduras | HN |
| Austria | DF | Cuba | HR | Hungary | HU |
| Azerbaijan | AJ | Cyprus | CY | Iceland | IS |
| Azores | AX | Czech Republic | CZ | India | IB |
| Bahamas | BS | Democratic Republic | | Indonesia | IF |
| Bahrain | BH | of Congo | ZR | Iran | IR |
| Bangladesh | BD | Denmark | DK | Iraq | IQ |
| Barbados | BB | Djibouti | DJ | Ireland | IE |
| Belarus | BL | Dominica | DM | Israel | IG |
| Belgium | BE | Dominican | | Italy | IT |
| Belize | BZ | Republic | DO | Ivory Coast | IC |
| Benin | BJ | East Timor | EM | Jamaica | JM |
| Bermuda | BU | Ecuador | EC | Japan | JP |
| Bhutan | BM | Egypt | EG | Jersey | JE |
| Bolivia | BO | El Salvador | SV | Jordan | JO |
| Bosnia & | | Equatorial Guinea | GQ | Kazakhstan | KZ |
| Herzegovina | BX | Eritrea | ER | Kenya | KE |
| Botswana | BW | Estonia | SU | Kiribati | KI |
| Brazil | BR | Ethiopia | ET | Korea (North) | KX |
| British Virgin | | Falkland Islands | FA | Korea (South) | KR |
| Islands | VG | Faroe Islands | FE | Kuwait | KW |
| Brunei | BN | Fiji | FJ | Kyrgyzstan | KG |
| Bulgaria | BG | Finland | FI | Laos | LO |
| Burkina Faso | BF | France | FR | Latvia | LX |
| Burundi | BI | French Guiana | GF | Lebanon | LB |
| Cambodia | KA | French Polynesia | FP | | |
| Cameroon | CM | Gabon | GB | (continued) | |
| Canada | CN | Gambia | GM | | |
| Cape Verde | CV | Germany | DW | | |
| Carriacou | CU | Ghana | GH | | |

Return to Table of Contents

# Exhibit 12

# Country Codes

| COUNTRY | CODE | COUNTRY | CODE | COUNTRY | CODE |
|---|---|---|---|---|---|
| Leeward Islands | LE | Paraguay | PY | Taiwan | TW |
| Lesotho | LS | Peru | PU | Tanzania | TZ |
| Liberia | LR | Philippines | PH | Thailand | TH |
| Libya | LV | Pitcairn Islands | PS | Togo | TG |
| Liechtenstein | CH | Poland | PL | Tonga | TA |
| Lithuania | LT | Portugal | PT | Trinidad & Tobago | TT |
| Luxembourg | LU | Qatar | QA | Tristan da Cunha | TD |
| Macao | MJ | Republic of | | Tunisia | TU |
| Macedonia | MH | Georgia | GX | Turkey | TR |
| Madagascar | MG | Reunion Island | RE | Turkmenistan | TM |
| Madeira | MB | Romania | RO | Turks & Caicos | |
| Malawi | MW | Russia | RU | Islands | TC |
| Malaysia | MY | Rwanda | RW | Tuvalu | TV |
| Maldives | MV | Saint Helena | SH | Uganda | UG |
| Mali | ML | Saint Kitts & Nevis | KN | Ukraine | UA |
| Malta | MF | Saint Lucia | LC | Union of Myanmar | |
| Martinique | MQ | Saint Pierre & | | (Burma) | BK |
| Mauritania | MR | Miquelon | SP | United Arab | |
| Mauritius | MU | Saint Vincent & the | | Emirates | UM |
| Mexico | MX | Grenadines | SF | United Kingdom | UK |
| Moldova | LD | San Marino | SM | United States | US |
| Monaco | AC | Santa Cruz Islands | ST | Uruguay | UY |
| Mongolia | MC | Sao Tome & | | Uzbekistan | UZ |
| Montenegro | MM | Principe | MP | Vanuatu | VU |
| Montserrat | MK | Saudi Arabia | SA | Vatican City State | VC |
| Morocco | RC | Senegal | SN | Venezuela | VE |
| Mozambique | MZ | Serbia | SX | Vietnam | VN |
| Namibia | NB | Seychelles | YC | Wallis/Futuna | |
| Nauru | NA | Sierra Leone | SL | Island | WT |
| Nepal | NP | Singapore | SG | Western Samoa | WS |
| Netherlands | | Slovakia | VK | Yemen | YE |
| Antilles | NN | Slovenia | XN | Zambia | ZM |
| Netherlands | NL | Solomon Islands | SI | Zimbabwe | ZW |
| New Caledonia | NW | Somalia | SO | | |
| New Zealand | NZ | South Africa | ZA | | |
| Nicaragua | NI | Spain | ES | | |
| Niger | NR | Sri Lanka | LK | | |
| Nigeria | NG | Sudan | SB | | |
| Norway | NO | Suriname | SR | | |
| Oman | OM | Swaziland | SZ | | |
| Pakistan | PK | Sweden | SE | | |
| Panama | PM | Switzerland | SW | | |
| Papua New | | Syria | SY | | |
| Guinea | PG | Tajikistan | TK | | |

CREDIT REPORTING RESOURCE GUIDE®
*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 0853

Return to Table of Contents

# Exhibit 13

# General Rules for Addresses

Most addresses consist of a street address, containing a street number, street name, street type, city name (spelled out), state code and postal/zip code. Include the complete address on all records; the absence of an address may cause a record to be bypassed.

Do not report non-address information in the Address fields.

Examples:   Do not report a spouse name in the Address field.
Do not report account description terminology, such as Fraud, Bankrupt, Charge-off, etc. in the Address field.

Slashes, dashes and periods are acceptable in the First Line of Address, Second Line of Address and City fields.

Use the standard postal abbreviations for state names, such as MS for Mississippi. Refer to Exhibit 14 for a complete list of State Codes.

**Notes:  If the consumer has a U.S. address and a foreign address, report the U.S. address.  If the consumer has never used the U.S. address as a billing/mailing address (e.g., a property address), report the foreign address.**

**The Address Indicator (Field 45 in the Base Segment and Field 18 in the J2 Segment) should be used to designate what address is being reported.**

**Military Addresses**

The standard format for Military Addresses (APO/FPO Addresses) is:

PSC (CMR or UNIT) NNNNN
BOX NNNN or SHIP'S NAME
CITY (APO/FPO), STATE (AE, AP OR AA), ZIP CODE

Currently, the largest unit number is 5 digits long.

The U.S. Postal Service designates the state code for military addresses as follows:

- AE – Armed Forces in Europe, Africa, Middle East and Canada
- AA – Armed Forces in the Americas, excluding Canada
- AP – Armed Forces in the Pacific

All domestic military mail must have the conventional street style addresses.

# Exhibit 14

## State Codes

| STATE | CODE | STATE | CODE |
|---|---|---|---|
| Alabama | AL | New Jersey | NJ |
| Alaska | AK | New Mexico | NM |
| American Samoa | AS | New York | NY |
| Arizona | AZ | North Carolina | NC |
| Arkansas | AR | North Dakota | ND |
| California | CA | Northern Mariana Islands | MP |
| Colorado | CO | Ohio | OH |
| Connecticut | CT | Oklahoma | OK |
| Delaware | DE | Oregon | OR |
| District of Columbia | DC | Palau | PW |
| Federated States of Micronesia | FM | Pennsylvania | PA |
|  |  | Puerto Rico | PR |
| Florida | FL | Rhode Island | RI |
| Georgia | GA | South Carolina | SC |
| Guam | GU | South Dakota | SD |
| Hawaii | HI | Tennessee | TN |
| Idaho | ID | Texas | TX |
| Illinois | IL | Utah | UT |
| Indiana | IN | Vermont | VT |
| Iowa | IA | Virginia | VA |
| Kansas | KS | Virgin Islands | VI |
| Kentucky | KY | Washington | WA |
| Louisiana | LA | West Virginia | WV |
| Maine | ME | Wisconsin | WI |
| Marshall Islands | MH | Wyoming | WY |
| Maryland | MD |  |  |
| Massachusetts | MA |  |  |
| Michigan | MI | Military in the Americas other than Canada | AA |
| Minnesota | MN |  |  |
| Mississippi | MS |  |  |
| Missouri | MO | Military in Europe, Middle East, Africa, Canada | AE |
| Montana | MT |  |  |
| Nebraska | NE |  |  |
| Nevada | NV | Military in the Pacific Theater | AP |
| New Hampshire | NH |  |  |

CREDIT REPORTING RESOURCE GUIDE®
*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 0855

Return to Table of Contents

# Exhibit 15

# Data Conversion Checklist

The purpose of the Data Conversion Checklist is to guide data furnishers through one of the following processes by focusing on the critical steps and questions that must be answered.

- Change to a new data processor
- Core system change or conversion (internal in-house system)
- Mergers & Acquisitions
- Coordination of reporting between seller & purchaser of accounts

If your conversion involves another data furnisher, consult with the other furnisher throughout the project regarding information reported in their Metro 2® program.

Data furnishers should contact your data representatives at the consumer reporting agencies early in the process to facilitate a smooth conversion.

**Note:**
- **External Data Furnisher = Data reported by 3rd Party Data Processor**
- **Internal Data Furnisher = Data reported directly by in-house system**

| STEP | TASK DESCRIPTION | CRRG® REFERENCE | ANSWERS/COMMENTS |
|---|---|---|---|
| **1** | **Conversion Questions** | | |
| | Identify external or internal data furnisher involved. | | |
| | Will new external or internal data furnisher send the data file to same CRAs to which my current processor sends data? | | |
| | Will all portfolios be transferring?  If answer is no, which ones will be transferring? | | |
| | Will all accounts be transferring; specifically will paid, transferred and derogatory accounts be transferring? | | |
| | What is the expected date of conversion? | | |
| | What is the approximate number of accounts that are transferring? | | |

(continued)

Return to Table of Contents

## Exhibit 15

# Data Conversion Checklist

| STEP | TASK DESCRIPTION | CRRG® REFERENCE | ANSWERS/COMMENTS |
|---|---|---|---|
| | What Identification Number is currently reported? | Page 4-5 | |
| | What is the Identification Number used by new external or internal data furnisher? | Page 4-5 | |
| | Will format of the account numbers change?  If so, provide specifics (e.g.; append or prepend any digits/characters to the Account Number). | Page 4-5 | |
| | If Identification Number or Account Number is changing, will the L1 Change Segment be reported? | Pages 4-43 & 4-44; See FAQ 5 | |
| | Will the Portfolio Types remain the same? | Page 4-6 | |
| | Will the Account Types remain the same? | Page 4-6; See Exhibits 1 & 2 | |
| | Will the Dates Opened remain the same? | Page 4-6 | |
| | Will the Credit Limits remain the same? | Page 4-7 | |
| | Will the Highest Credit or Original Loan Amounts remain the same? | Page 4-7 | |

(continued)

CREDIT REPORTING RESOURCE GUIDE®
*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 0857

Return to Table of Contents

# Exhibit 15

# Data Conversion Checklist

| STEP | TASK DESCRIPTION | CRRG® REFERENCE | ANSWERS/COMMENTS |
|------|------------------|-----------------|------------------|
| | Will new external or internal data furnisher report the Payment History Profile (up to 24 months)? | Page 4-11; See FAQ 22 and Exhibit 5 | |
| | Will previously-reported history be included with the first submission or will payment history only be reported going forward? | Page 4-11; See FAQ 22 and Exhibit 5 | |
| | Ensure that the FCRA Compliance/Date of First Delinquency is accurate & consistent with prior reporting. | See FAQ 22 and Exhibit 9 | |
| | | | |
| **2** | ***Contact your data rep at each CRA in advance to notify them about the conversion.*** | | |
| | Provide to the CRAs the technical contact's email address & phone number for new external or internal data furnisher. | | |
| | Provide this checklist with answers to your data representative at each CRA. | | |

*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 0858

Return to Table of Contents

# Exhibit 16

## Examples of Record Layouts — Hexadecimal Representation

The following examples represent Hexadecimal output of the Metro 2® Format 366 and 426 records. They are included here to illustrate how each field should be programmed according to the format specifications.

For each format, there is an example of the Header Record, the Data Record (Base Segment and J1 through N1 Segments) and the Trailer Record. The 366 packed format is shown as variable-length. The 426 unpacked format is shown as fixed-length.

### 366 FORMAT - HEADER RECORD (VARIABLE BLOCKED)

**Note: The Block Descriptor Word shifts the first record of each block over 4 positions.**

```
CHAR            HEADER01IN HDR ID EQ HDR ID X HDRTU HDR ID MMDDYYYYMMDDYYYYMMDDYYYYMMDDYYYYREPORTER NAME
ZONE  07000600CCCCCDFFCD4CCD4CC4CD4CCD4CC4E4CCDEE4CCD4CC4DDCCEEEEDDCCEEEEDDCCEEEEDDCCEEEEDCDDDECD4DCDC4444
NUMR  12001E0085145901950849094058084909407084934084909404444888844448888444488884444888895769359051450000
      01...5...10...15...20...25...30...35...40...45...50...55...60...65...70...75...80...85...90...95.....
CHAR                    REPORTER ADDRESS
ZONE  44444444444444444444444DCDDDECD4CCCDCEE44444444444444444444444444444444444444444444444444444444444444
NUMR  00000000000000000000000957693590144952200000000000000000000000000000000000000000000000000000000000000
      101...5...10...15...20...25...30...35...40...45...50...55...60...65...70...75...80...85...90...95.....
CHAR                9995551234SOFTWARE VENDOR NAME                      VERNO
ZONE  44444444444444444444FFFFFFFFFFFEDCEEECDC4ECDCDD4DCDC44444444444444444444444ECDDD4444444444444444444444444
NUMR  00000000000000000009995551234266361950555469051450000000000000000000559560000000000000000000000000000
      201...5...10...15...20...25...30...35...40...45...50...55...60...65...70...75...80...85...90...95.....
CHAR
ZONE  44444444444444444444444444444444444444444444444444444444444444444444444444444444
NUMR  00000000000000000000000000000000000000000000000000000000000000000000000000000000
      301...5...10...15...20...25...30...35...40...45...50...55...60...65...70
```

POS.   1-  4 = Block Descriptor Word
POS.   5-  8 = Record Descriptor Word
POS.   9- 14 = Record Identifier
POS.  15- 16 = Cycle Identifier
POS.  17- 26 = Innovis Program ID
POS.  27- 36 = Equifax Program ID
POS.  37- 41 = Experian Program ID
POS.  42- 51 = TransUnion Program ID
POS.  52- 59 = Activity Date
POS.  60- 67 = Date Created
POS.  68- 75 = Program Date
POS.  76- 83 = Program Revision Date
POS.  84-123 = Reporter Name
POS. 124-219 = Reporter Address
POS. 220-229 = Reporter Phone #
POS. 230-269 = Software Vendor Name
POS. 270-274 = Software Version #
POS. 275-284 = MicroBilt/PRBC Program ID
POS. 285-370 = Reserved

(continued)

Return to Table of Contents

APPENDIX 0859

# 366 FORMAT - DATA RECORD (VARIABLE BLOCKED)

**Note:** The Block Descriptor Word shifts the first record of each block over 4 positions.

```
CHAR         -    * ID NUMBER           01ACCOUNT NUMBER              R18         054980000000070DCE400000000
ZONE  0B000B00F062994754CC4DEDCCD44444444444FFCCCDEDE4DEDCCD4444444444444444DFF054980000000070DCE400000000
NUMR  480044000001910000940544259000000000000001133645305442590000000000000000918001 9C0010C0005C95500005C000
    01...5...10...15...20...25...30...35...40...45...50...55...60...65...70...75...80...85...90...95.....
CHAR    1102200000BBBBBBBBBBBBBBBBBB                                                       SURNAME
ZONE  10FFFFFFFFFFCCCCCCCCCCCCCCCCCC444400020000000000000119900000000000119944444444444444444444EEDDCDC4444444
NUMR  0C110220000022222222222222220000000000C0000C0000C0019C0000C0000C0019C00000000000000000000024951450000000
   101...5...10...15...20...25...30...35...40...45...50...55...60...65...70...75...80...85...90...95.....
CHAR         1ST NAME          MIDDLE NAME       2        <2  US1ST LINE OF ADDRESS
ZONE  44444444444FEE4DCDC444444444444DCCCDC4DCDC444444444F1357901199095524F44EEFEE4DCDC4DC4CCCDCEE44444444
NUMR  0000000000012305145000000000000494435051450000000000022468C0014C99513C20042123039550660144952200000000
   201...5...10...15...20...25...30...35...40...45...50...55...60...65...70...75...80...85...90...95.....
CHAR      2ND LINE OF ADDRESS        CITY         ST123451234Y J1 SURNAME            1S
ZONE  44444FDC4DCDC4DC4CCCDCEE4444444444444CCEE4444444444444444EEFFFFFFFFFE4DF4EEDDCDC4444444444444444444FE
NUMR  0000025403955066014495220000000000003938000000000000000023123451234801102495145000000000000000000012
   301...5...10...15...20...25...30...35...40...45...50...55...60...65...70...75...80...85...90...95.....
CHAR  T NAME          MIDDLE NAME       123456789MMDDYYYY999555512342    J2 SURNAME           1S
ZONE  E4DCDC444444444444DCCCDC4DCDC4444444444FFFFFFFFFDDCCEEEEFFFFFFFFFFFF444DF4EEDDCDC4444444444444444444FE
NUMR  3051450000000000004944350514500000000001234567894444888899955512342000120249514500000000000000000012
   401...5...10...15...20...25...30...35...40...45...50...55...60...65...70...75...80...85...90...95.....
CHAR  T NAME          MIDDLE NAME       123456789MMDDYYYY999555512342  US1ST LINE OF ADDRESS
ZONE  E4DCDC444444444444DCCCDC4DCDC4444444444FFFFFFFFFDDCCEEEEFFFFFFFFFFFF44EEFEE4DCDC4DC4CCCDCEE4444444444
NUMR  3051450000000000004944350514500000000001234567894444888899955512342004212303955066014495220000000000
   501...5...10...15...20...25...30...35...40...45...50...55...60...65...70...75...80...85...90...95.....
CHAR      2ND LINE OF ADDRESS        CITY         ST123451234   J2 SURNAME            1S
ZONE  444FDC4DCDC4DC4CCCDCEE4444444444444CCEE4444444444444444EEFFFFFFFFFE4DF4EEDDCDC4444444444444444444FE
NUMR  0002540395506601449522000000000000393800000000000000000231234512340000120249514500000000000000000012
   601...5...10...15...20...25...30...35...40...45...50...55...60...65...70...75...80...85...90...95.....
CHAR  T NAME          MIDDLE NAME       123456789MMDDYYYY999555512342  US1ST LINE OF ADDRESS
ZONE  E4DCDC444444444444DCCCDC4DCDC4444444444FFFFFFFFFDDCCEEEEFFFFFFFFFFFF44EEFEE4DCDC4DC4CCCDCEE4444444444

NUMR  3051450000000000004944350514500000000001234567894444888899955512342004212303955066014495220000000000
   701...5...10...15...20...25...30...35...40...45...50...55...60...65...70...75...80...85...90...95.....
CHAR      LINE OF ADDRESS 2         CITY         ST123451234   K1ORIGINAL CREDITOR NAME
ZONE  444DCDC4DC4CCCDCEE4F4444444444444444CCEE4444444444444444EEFFFFFFFFFE4444DFDDCCCDCD4CDCCCEDD4DCDC444444
NUMR  0003955066014495220200000000000000003938000000000000000231234512340000216997951303954936905145000000
   801...5...10...15...20...25...30...35...40...45...50...55...60...65...70...75...80...85...90...95.....
CHAR    00K20PURCHASED PORFOLIO/SOLD NAME   K300ACCOUNT NUMBER    MORT ID NUMBER   K400MMDDYYYYMMDDYYYY00
ZONE  44FFDFFDEDCCCECC4DDDCDDCD6EDDC4DCDC444DFFFCCCDEDE4DEDCCD4444DDDE4CC4DEDCCD4444DFFFDDCCEEEEDDCCEEEEFF
NUMR  0000220749381254076966396126340514500023001336453054425900004693094054425900002400444488884444888800
   901...5...10...15...20...25...30...35...40...45...50...55...60...65...70...75...80...85...90...95.....
CHAR  0000000 L13NEW ACCOUNT NUMBER       NEW ID NUMBER     N1EMPLOYER NAME           1ST LI
ZONE  FFFFFFF4DFFDCE4CCCDEDE4DEDCCD444444444444DCE4CC4DEDCCD44444444DFCDDDDECD4DCDC4444444444444444444FEE4DC
NUMR  0000000031355601336453054425900000000000556094054425900000000051547368590514500000000000000000123039
   1001...5...10...15...20...25...30...35...40...45...50...55...60...65...70...75...80...85...90...95.....
CHAR  NE OF EMPLOYER ADDRESS    2ND LINE OF EMPLOYER ADDRESS    EMPLOYER CITY      ST123451234OCCUPATION
ZONE  DC4DC4CDDDDECD4CCCDCEE4444FDC4DCDC4DC4CDDDDECD4CCCDCEE4444CDDDDECD4CCEE4444444EEFFFFFFFFFDDCCEDECDD4
NUMR  5506605473685901449522000025403955066054736859014495220000547368590393800000002312345123463347139650
   1101...5...10...15...20...25...30...35...40...45...50...55...60...65...70...75...80...85...90...95.....
CHAR
ZONE  44444444
NUMR  00000000
   1201...5...
```

(continued)

Right-column legend:

| POS. | | Description |
|---|---|---|
| 1- | 4 | = Block Descriptor Word |
| 5- | 8 | = Record Descriptor Word |
| | 9 | = Processing Indicator |
| 10- | 17 | = Time Stamp |
| | 18 | = Reserved |
| 19- | 38 | = Identification Number |
| 39- | 40 | = Cycle Identifier |
| 41- | 70 | = Account Number |
| | 71 | = Portfolio Type |
| 72- | 73 | = Account Type |
| 74- | 78 | = Date Opened |
| 79- | 83 | = Credit Limit |
| 84- | 88 | = Highest Credit |
| 89- | 91 | = Terms Duration |
| | 92 | = Terms Frequency |
| 93- | 97 | = Scheduled Monthly Payment |
| 98- | 102 | = Actual Payment Amount |
| 103- | 104 | = Account Status |
| | 105 | = Payment Rating |
| 106- | 129 | = Payment History Profile |
| 130- | 131 | = Special Comment |
| 132- | 133 | = Compliance Condition Code |
| 134- | 138 | = Current Balance |
| 139- | 143 | = Amount Past Due |
| 144- | 148 | = Original Charge-Off Amount |
| 149- | 153 | = Date of Account Information |
| 154- | 158 | = Date Of 1st Delinquency |
| 159- | 163 | = Date Closed |
| 164- | 168 | = Date Of Last Payment |
| 169 | | = Interest Type Indicator |
| 170- | 186 | = Reserved |
| 187- | 211 | = Surname |
| 212- | 231 | = First Name |
| 232- | 251 | = Middle Name |
| | 252 | = Generation Code |
| 253- | 257 | = SSN |
| 258- | 262 | = Date of Birth |
| 263- | 268 | = Telephone Number |
| | 269 | = ECOA Code |
| 270- | 271 | = Consumer Info Indicator |
| 272- | 273 | = Country Code |
| 274- | 305 | = Address - Line 1 |
| 306- | 337 | = Address - Line 2 |
| 338- | 357 | = City |
| 358- | 359 | = State |
| 360- | 368 | = Postal/Zip Code |
| | 369 | = Address Indicator |
| | 370 | = Residence Code |

Return to Table of Contents

# 366 FORMAT - TRAILER RECORD (Variable Blocked)

```
CHAR        <TRAILER
ZONE   07000600EDCCDCD0000100001000000001000020000300000000000000000000000000000000000000000000000000
NUMR   12001E0039193590000C0000C0000C0000C0000C0000C0000C0000C0000C0000C0000C0000C0000C0000C0000C0000C
       01...5...10...15...20...25...30...35...40...45...50...55...60...65...70...75...80...85...90...95.....
CHAR
ZONE   000000000000000000000000000000000000000000000000000000000000000010000100001000010000100001000400001
NUMR   0000C0000C0000C0000C0000C0000C0000C0000C0000C0000C0000C0000C0000C0000C0000C0000C0000C0000C0000C0000C
       101...5...10...15...20...25...30...35...40...45...50...55...60...65...70...75...80...85...90...95.....
CHAR
ZONE   0000100002000000000000000000000000004444444444444444444444444444444444444444444444444444444444444444
NUMR   0000C0000C0000C0000C0000C0000C0000C0000000000000000000000000000000000000000000000000000000000000000000
       201...5...10...15...20...25...30...35...40...45...50...55...60...65...70...75...80...85...90...95.....
CHAR
ZONE   444444444444444444444444444444444444444444444444444444444444444444444
NUMR   00000000000000000000000000000000000000000000000000000000000000000000
       301...5...10...15...20...25...30...35...40...45...50...55...60...65...70
```

Note:  The Block Descriptor Word shifts the first record of each block over 4 positions.

```
POS.   1-  4 = Block Descriptor Word
POS.   5-  8 = Record Descriptor Word
POS.   9- 15 = Record Identifier
POS.  16- 20 = Total Base Records
POS.  21- 25 = Reserved
POS.  26- 30 = Total Status DF
POS.  31- 35 = Total J1 Segments
POS.  36- 40 = Total J2 Segments
POS.  41- 45 = Block Count
POS.  46- 50 = Total Status DA
POS.  51- 55 = Reserved
POS.  56- 60 = Total Status 11
POS.  61- 65 = Total Status 13
POS.  66- 70 = Total Status 61
POS.  71- 75 = Total Status 62
POS.  76- 80 = Total Status 63
POS.  81- 85 = Total Status 64
POS.  86- 90 = Total Status 65
POS.  91- 95 = Total Status 71
POS.  96-100 = Total Status 78
POS. 101-105 = Total Status 80
POS. 106-110 = Total Status 82
POS. 111-115 = Total Status 83
POS. 116-120 = Total Status 84
POS. 121-125 = Total Status 88
POS. 126-130 = Total Status 89
POS. 131-135 = Total Status 93
POS. 136-140 = Total Status 94
POS. 141-145 = Total Status 95
POS. 146-150 = Total Status 96
POS. 151-155 = Total Status 97
POS. 156-160 = Total ECOA Z
POS. 161-165 = Total Employment Segments
POS. 166-170 = Total Orig Creditor Segs
POS. 171-175 = Total Purch/Sold Segments
POS. 176-180 = Total Mort Info Segments
POS. 181-185 = Total Special Payment Segs
POS. 186-190 = Total Change Segments
POS. 191-195 = Total SSN All
POS. 196-200 = Total SSN Base
POS. 201-205 = Total SSN J1
POS. 206-210 = Total SSN J2
POS. 211-215 = Total Dates of Birth All
POS. 216-220 = Total Dates of Birth Base
POS. 221-225 = Total Dates of Birth J1
POS. 226-230 = Total Dates of Birth J2
POS. 231-235 = Total Phone # All
POS. 236-370 = Reserved
```

CREDIT REPORTING RESOURCE GUIDE®

*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 0861

Return to Table of Contents

# 426 FORMAT - HEADER RECORD (FIXED LENGTH)

```
CHAR  1364HEADER  IN HDR     EQ HDR ID X HDRTU HDR ID MMDDYYYYMMDDYYYYMMDDYYYYMMDDYYYYREPORTER NAME
ZONE  FFFFCCCCCD44CD4CCD4444CD4CCD4CC4E4CCDEE4CCD4CC4DDCCEEEEDDCCEEEEDDCCEEEEDDCCEEEEDCDDDECD4DCDC44444444
NUMR  13648514590095084900005808490940708493408490940444488884444888844448888444488889576935905145000000000
        01...5...10...15...20...25...30...35...40...45...50...55...60...65...70...75...80...85...90...95.....
CHAR                      REPORTER ADDRESS
ZONE  444444444444444444DCDDDECD4CCCDCEE444444444444444444444444444444444444444444444444444444444444444
NUMR  00000000000000000009576935901449522000000000000000000000000000000000000000000000000000000000000000
        101...5...10...15...20...25...30...35...40...45...50...55...60...65...70...75...80...85...90...95.....
CHAR                 9995551234SOFTWARE VENDOR NAME                          VERNO
ZONE  444444444444444FFFFFFFFFFFEDCEECDC4ECDCDD4DCDC444444444444444444444ECDDD4444444444444444444444444444
NUMR  000000000000000999555123426636195055546905145000000000000000000000055956000000000000000000000000000
        201...5...10...15...20...25...30...35...40...45...50...55...60...65...70...75...80...85...90...95.....
CHAR
ZONE  44444444444444444444444444444444444444444444444444444444444444444444444444444444444444444444444444444
NUMR  00000000000000000000000000000000000000000000000000000000000000000000000000000000000000000000000000000
        301...5...10...15...20...25...30...35...40...45...50...55...60...65...70...75...80...85...90...95.....
CHAR
ZONE  44444444444444444444444444444444444444444444444444444444444444444444444444444444444444444444444444444
NUMR  00000000000000000000000000000000000000000000000000000000000000000000000000000000000000000000000000000
        401...5...10...15...20...25...30...35...40...45...50...55...60...65...70...75...80...85...90...95.....
```

**...continue to blank-fill out to 1364 characters...**

```
CHAR
ZONE  44444444444444444444444444444444444444444444444444444444444444444444444444444444444444444444444444444
NUMR  00000000000000000000000000000000000000000000000000000000000000000000000000000000000000000000000000000
       1101...5...10...15...20...25...30...35...40...45...50...55...60...65...70...75...80...85...90...95.....
CHAR
ZONE  44444444444444444444444444444444444444444444444444444444444444444444444444444444444444444444444444444
NUMR  00000000000000000000000000000000000000000000000000000000000000000000000000000000000000000000000000000
       1201...5...10...15...20...25...30...35...40...45...50...55...60...65...70...75...80...85...90...95.....
CHAR
ZONE  4444444444444444444444444444444444444444444444444444444444444444
NUMR  0000000000000000000000000000000000000000000000000000000000000000
       1301...5...10...15...20...25...30...35...40...45...50...55...60...6
```

(continued)

POS.    1-  4 = Record Descriptor Word
POS.    5- 10 = Record Identifier
POS.   11- 12 = Cycle Identifier
POS.   13- 22 = Innovis Program ID
POS.   23- 32 = Equifax Program ID
POS.   33- 37 = Experian Program ID
POS.   38- 47 = TransUnion Program ID
POS.   48- 55 = Activity Date
POS.   56- 63 = Date Created
POS.   64- 71 = Program Date
POS.   72- 79 = Program Revision Date
POS.   80-119 = Reporter Name
POS. 120-215 = Reporter Address
POS. 216-225 = Reporter Phone #
POS. 226-265 = Software Vendor Name
POS. 266-270 = Software Version #
POS. 271-280 = MicroBilt/PRBC Prog. ID
POS. 281-426 = Reserved
POS.427-1364 = Blank Fill

Return to Table of Contents

# 426 FORMAT - DATA RECORD (FIXED LENGTH)

```
CHAR  13641MMDDYYYYHHMMSS ID NUMBER            ACCOUNT NUMBER              R18MMDDYYYY00000500000000200     POS.   1-  4 = Record Descriptor Word
ZONE  FFFFFDDCCEEEECCDDEE4CC4DEDCCD4444444444444CCCDEDE4DEDCCD444444444444444DFFDDCCEEEEFFFFFFFFFFFFFFFFFF   POS.       5 = Processing Indicator
NUMR  1364144448888844220940544259000000000000133645305442590000000000000000918444488800005000000000200   POS.   6- 19 = Time Stamp
     01...5...10...15...20...25...30...35...40...45...50...55...60...65...70...75...80...85...90...95....     POS.      20 = Reserved
CHAR  0REV 000000020000000000110211000BBBBBBBBBBBBBBBBBBB  00000000000000000000000000MMDDYYYYMMDDYYYYMMD    POS.  21- 40 = Identification #
ZONE  FDCE4FFFFFFFFFFFFFFFFFFFFFFFFFFFFCCCCCCCCCCCCCCCCCCC4444FFFFFFFFFFFFFFFFFFFFFFFFFFFDDCCEEEEDDCCEEEEDDC   POS.  41- 42 = Cycle Identifier
NUMR  095500000000200000000001102110002222222222222222200000000000000000000000000000004444888844448888444   POS.  43- 72 = Account Number
    101...5...10...15...20...25...30...35...40...45...50...55...60...65...70...75...80...85...90...95.....   POS.      73 = Portfolio Type
CHAR  DYYYYMMDDYYYY          1SURNAME            FIRST NAME       MIDDLE NAME         2123                   POS.  74- 75 = Account Type
ZONE  CEEEEDDCCEEEE4444444444444444FEEDDCDC4444444444444444CCDEE4DCDC4444444444DCCCDC4DCDC4444444444FFFF    POS.  76- 83 = Date Opened
NUMR  48888844448888000000000000000012495145000000000000069923051450000000000494435051450000000002123      POS.  84- 92 = Credit Limit
    201...5...10...15...20...25...30...35...40...45...50...55...60...65...70...75...80...85...90...95.....   POS.  93-101 = Highest Credit
CHAR  456789MMDDYYYY99955512341  US1ST LINE OF ADDRESS        2ND LINE OF ADDRESS         CITY             POS. 102-104 = Terms Duration
ZONE  FFFFFFDDCCEEEEFFFFFFFFFFFF44EEFEE4DCDC4DC4CCCDCEE4444444444444FDC4DCDC4DC4CCCDCEE444444444444CCEE444   POS.     105 = Terms Frequency
NUMR  45678944448888999555123410042123039550660144952200000000000002540395506601449522000000000003938000   POS. 106-114 = Sched Monthly Payment
    301...5...10...15...20...25...30...35...40...45...50...55...60...65...70...75...80...85...90...95.....   POS. 115-123 = Actual Payment Amount
CHAR        ST123451234  J1 SURNAME            1ST NAME          MIDDLE NAME        12345                   POS. 124-125 = Account Status
ZONE  444444444444EEFFFFFFFFF44DF4EEDDCDC44444444444444444FEE4DCDC4444444444DCCCDC4DCDC44444444444FFFFF     POS.     126 = Payment Rating
NUMR  000000000000231234512340011024951450000000000000000123051450000000000494435051450000000000012345     POS. 127-150 = Payment History Profile
    401...5...10...15...20...25...30...35...40...45...50...55...60...65...70...75...80...85...90...95.....   POS. 151-152 = Special Comment
CHAR  6789MMDDYYYY99955512342   J1                                                                         POS. 153-154 = Compliance Cond Code
ZONE  FFFFDDCCEEEEFFFFFFFFFFFF444DF4444444444444444444444444444444444444444444444444444444444444444444     POS. 155-163 = Current Balance
NUMR  6789444488889995551234200011000000000000000000000000000000000000000000000000000000000000000000000    POS. 164-172 = Amount Past Due
    501...5...10...15...20...25...30...35...40...45...50...55...60...65...70...75...80...85...90...95.....   POS. 173-181 = Orig. Charge-Off Amt.
CHAR                J2 SURNAME            1ST NAME         MIDDLE NAME        112345                        POS. 182-189 = Date of Account Info.
ZONE  444444444444444444444444DF4EEDDCDC44444444444444444FEE4DCDC4444444444DCCCDC4DCDC44444444FFFFFF        POS. 190-197 = Date Of 1st Delinquency
NUMR  000000000000000000000000120249514500000000000000000123051450000000000494435051450000000112345        POS. 198-205 = Date Closed
    601...5...10...15...20...25...30...35...40...45...50...55...60...65...70...75...80...85...90...95.....   POS. 206-213 = Date of Last Payment
                                                                                                           POS. 214    = Interest Type Indicator
CHAR  6789MMDDYYYY99955512342  US1ST LINE OF ADDRESS        2ND LINE OF ADDRESS         CITY               POS. 215-231 = Reserved
ZONE  FFFFDDCCEEEEFFFFFFFFFFFF44EEFEE4DCDC4DC4CCCDCEE4444444444444FDC4DCDC4DC4CCCDCEE444444444444CCEE44444   POS. 232-256 = Surname
NUMR  67894444888899955512342004212303955066014495220000000000000025403955066014495220000000000003938000   POS. 257-276 = First Name
    701...5...10...15...20...25...30...35...40...45...50...55...60...65...70...75...80...85...90...95.....   POS. 277-296 = Middle Name
CHAR        ST123451234   J2                                                                               POS.     297 = Generation Code
ZONE  444444444444EEFFFFFFFFF444DF4444444444444444444444444444444444444444444444444444444444444444444      POS. 298-306 = SSN
NUMR  000000000002312345123400001200000000000000000000000000000000000000000000000000000000000000000000     POS. 307-314 = Date of Birth
    801...5...10...15...20...25...30...35...40...45...50...55...60...65...70...75...80...85...90...95.....   POS. 315-324 = Telephone Number
CHAR                                                                                                       POS.     325 = ECOA Code
ZONE  44444444444444444444444444444444444444444444444444444444444444444444444444444444444444444444444      POS. 326-327 = Consumer Info Ind.
NUMR  00000000000000000000000000000000000000000000000000000000000000000000000000000000000000000000000      POS. 328-329 = Country Code
    901...5...10...15...20...25...30...35...40...45...50...55...60...65...70...75...80...85...90...95.....   POS. 330-361 = Address - Line 1
CHAR                    K1ORIGINAL CREDITOR NAME     00K20PURCHASED PORFOLIO/SOLD NAME   K300AC             POS. 362-393 = Address - Line 2
ZONE  44444444444444444444444444DFDDCCCDCD4CDCCCEDD4DCDC44444444FFDFFFDEDCCCECC4DDDCDDCD6EDDC4DCDC444DFFFCC POS. 394-413 = City
NUMR  0000000000000000000000000216997951303954936905145000000000022074938125407696639612634051450002300130 POS. 414-415 = State
    1001...5...10...15...20...25...30...35...40...45...50...55...60...65...70...75...80...85...90...95.....  POS. 416-424 = Postal/Zip Code
CHAR  COUNT NUMBER   MORT ID NUMBER   K400MMDDYYYY000000000 L13NEW ACCOUNT NUMBER            NEW            POS.     425 = Address Indicator
ZONE  CDEDE4DEDCCD4444DDDE4CC4DEDCCD4444DFFFDDCCEEEEDDCCEEEEFFFFFFFF4DFFDCE4CCCDEDE4DEDCCD444444444444DCE    POS.     426 = Residence Code
NUMR  36453054425900004693094054425900002400444488884444888800000000000313556013364530544259000000000556
    1101...5...10...15...20...25...30...35...40...45...50...55...60...65...70...75...80...85...90...95.....
```

(continued)

*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 0863

Return to Table of Contents

## 426 FORMAT - DATA RECORD (FIXED LENGTH) CONTINUED

```
CHAR   ID NUMBER        N1EMPLOYER NAME              1ST LINE OF EMPLOYER ADDRESS    2ND LINE OF EMPLOY        See Attachment for Segment
ZONE   4CC4DEDCCD44444444DFCDDDDECD4DCDC4444444444444444FEE4DCDC4DC4CDDDDECD4CCCDCEE4444FDC4DCDC4DC4CDDDDE     definitions.
NUMR   0940544259000000005154736859051450000000000000000123039550660547368590144952200025403955066054 7368
    1201...5...10...15...20...25...30...35...40...45...50...55...60...65...70...75...80...85...90...95.....
CHAR   ER ADDRESS     EMPLOYER CITY       ST123451234OCCUPATION
ZONE   CD4CCCDCEE4444CDDDDECD4CCEE4444444EEFFFFFFFFFFDCCEDCECDD444444444
NUMR   5901449522000054736859039380000000023123451234633471396500000 0000
    1301...5...10...15...20...25...30...35...40...45...50...55...60...6
```

(continued)

Case 4:25-cv-00443-P    Document 116    Filed 12/22/25    Page 830 of 1862    PageID 2679

APPENDIX 0864

# 426 FORMAT - TRAILER RECORD (FIXED LENGTH)

```
CHAR  1364TRAILER0000000010000000010000000000000000000000000000000000000000000000000000000000000
ZONE  FFFFEDCCDCDFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFF
NUMR  1364391935900000000100000000010000000000000000000000000000000000000000000000000000000000000
        01...5...10...15...20...25...30...35...40...45...50...55...60...65...70...75...80...85...90...95.....
CHAR  00000000000000000000000000000000000000000000000000000000000000000000000000000000000000000000
ZONE  FFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFF
NUMR  00000000000000000000000000000000000000000000000000000000000000000000000000000000000000000000
       101...5...10...15...20...25...30...35...40...45...50...55...60...65...70...75...80...85...90...95.....
CHAR  00000000000000000000000000000000000000000000000000000000000000000000000000000000000000000000
ZONE  FFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFF
NUMR  00000000000000000000000000000000000000000000000000000000000000000000000000000000000000000000
       201...5...10...15...20...25...30...35...40...45...50...55...60...65...70...75...80...85...90...95.....
CHAR  00000000000000000000000000000000000000000000000000000000000000000000000000000000000000000000
ZONE  FFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFFF
NUMR  00000000000000000000000000000000000000000000000000000000000000000000000000000000000000000000
       301...5...10...15...20...25...30...35...40...45...50...55...60...65...70...75...80...85...90...95.....
CHAR  0000000
ZONE  FFFFFFF4444444444444444444444444444444444444444444444444444444444444444444444444444444444444
NUMR  00000000000000000000000000000000000000000000000000000000000000000000000000000000000000000000
       401...5...10...15...20...25...30...35...40...45...50...55...60...65...70...75...80...85...90...95.....
CHAR
ZONE  444444444444444444444444444444444444444444444444444444444444444444444444444444444444444444444
NUMR  00000000000000000000000000000000000000000000000000000000000000000000000000000000000000000000
       501...5...10...15...20...25...30...35...40...45...50...55...60...65...70...75...80...85...90...95.....
CHAR
ZONE  444444444444444444444444444444444444444444444444444444444444444444444444444444444444444444444
NUMR  00000000000000000000000000000000000000000000000000000000000000000000000000000000000000000000
       601...5...10...15...20...25...30...35...40...45...50...55...60...65...70...75...80...85...90...95.....
CHAR
ZONE  444444444444444444444444444444444444444444444444444444444444444444444444444444444444444444444
NUMR  00000000000000000000000000000000000000000000000000000000000000000000000000000000000000000000
       701...5...10...15...20...25...30...35...40...45...50...55...60...65...70...75...80...85...90...95.....
```

**...continue to blank-fill out to 1364 characters...**

```
CHAR
ZONE  444444444444444444444444444444444444444444444444444444444444444444444444444444444444444444444
NUMR  00000000000000000000000000000000000000000000000000000000000000000000000000000000000000000000
      1001...5...10...15...20...25...30...35...40...45...50...55...60...65...70...75...80...85...90...95.....
CHAR
ZONE  444444444444444444444444444444444444444444444444444444444444444444444444444444444444444444444
NUMR  00000000000000000000000000000000000000000000000000000000000000000000000000000000000000000000
      1101...5...10...15...20...25...30...35...40...45...50...55...60...65...70...75...80...85...90...95.....
CHAR
ZONE  444444444444444444444444444444444444444444444444444444444444444444444444444444444444444444444
NUMR  00000000000000000000000000000000000000000000000000000000000000000000000000000000000000000000
      1201...5...10...15...20...25...30...35...40...45...50...55...60...65...70...75...80...85...90...95.....
CHAR
ZONE  4444444444444444444444444444444444444444444444444444444444444444
NUMR  00000000000000000000000000000000000000000000000000000000000000000
      1301...5...10...15...20...25...30...35...40...45...50...55...60...6
```

(continued)

| POS. | | |
|---|---|---|
| 1- 4 | = Record Descriptor Word |
| 5- 11 | = Record Identifier |
| 12- 20 | = Total Base Records |
| 21- 29 | = Reserved |
| 30- 38 | = Total Status DF |
| 39- 47 | = Total J1 Segments |
| 48- 56 | = Total J2 Segments |
| 57- 65 | = Block Count |
| 66- 74 | = Total Status DA |
| 75- 83 | = Reserved |
| 84- 92 | = Total Status 11 |
| 93-101 | = Total Status 13 |
| 102-110 | = Total Status 61 |
| 111-119 | = Total Status 62 |
| 120-128 | = Total Status 63 |
| 129-137 | = Total Status 64 |
| 138-146 | = Total Status 65 |
| 147-155 | = Total Status 71 |
| 156-164 | = Total Status 78 |
| 165-173 | = Total Status 80 |
| 174-182 | = Total Status 82 |
| 183-191 | = Total Status 83 |
| 192-200 | = Total Status 84 |
| 201-209 | = Total Status 88 |
| 210-218 | = Total Status 89 |
| 219-227 | = Total Status 93 |
| 228-236 | = Total Status 94 |
| 237-245 | = Total Status 95 |
| 246-254 | = Total Status 96 |
| 255-263 | = Total Status 97 |
| 264-272 | = Total ECOA Z |
| 273-281 | = Total Employment Segments |
| 282-290 | = Total Original Creditor Segments |
| 291-299 | = Total Purchased/Sold Segments |
| 300-308 | = Total Mortgage Info Segments |
| 309-317 | = Total Special Payment Segments |
| 318-326 | = Total Change Segments |
| 327-335 | = Total SSN All |
| 336-344 | = Total SSN Base |
| 345-353 | = Total SSN J1 |
| 354-362 | = Total SSN J2 |
| 363-371 | = Total Dates of Birth All |
| 372-380 | = Total Dates of Birth Base |
| 381-389 | = Total Dates of Birth J1 |
| 390-398 | = Total Dates of Birth J2 |
| 399-407 | = Total Telephone #s All |
| 408-426 | = Reserved |
| 427-1364 | = Blank Fill |

CREDIT REPORTING RESOURCE GUIDE®
*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 0865

Return to Table of Contents

# ATTACHMENT - SEGMENT DEFINITIONS

```
J1 Segment                                            K3 Segment
      Pos.    1- 2 = Segment Identifier                     Pos.    1- 2 = Segment Identifier
      Pos.       3 = Reserved                               Pos.    3- 4 = Agency Identifier
      Pos.    4- 28 = Surname                               Pos.    5-22 = Account Number
      Pos.   29- 48 = First Name                            Pos.   23-40 = Mortgage Identification Number
      Pos.   49- 68 = Middle Name
      Pos.      69 = Generation Code
      Pos.   70- 78 = Social Security Number
      Pos.   79- 86 = Date of Birth
      Pos.   87- 96 = Telephone Number              K4 Segment
      Pos.      97 = ECOA Code                             Pos.    1- 2 = Segment Identifier
      Pos.   98- 99 = Consumer Information Indicator        Pos.    3- 4 = Specialized Payment Indicator
      Pos.     100 = Reserved                              Pos.    5-12 = Deferred Payment Start Date
                                                           Pos.   13-20 = Balloon Payment Due Date
                                                           Pos.   21-29 = Balloon Payment Amount
                                                           Pos.      30 = Reserved
J2 Segment
      Pos.    1- 2 = Segment Identifier
      Pos.       3 = Reserved
      Pos.    4- 28 = Surname                        L1 Segment
      Pos.   29- 48 = First Name                            Pos.    1- 2 = Segment Identifier
      Pos.   49- 68 = Middle Name                           Pos.       3 = Change Indicator
      Pos.      69 = Generation Code                        Pos.    4-33 = New Account Number
      Pos.   70- 78 = Social Security Number               Pos.   34-53 = New Identification Number
      Pos.   79- 86 = Date of Birth                        Pos.      54 = Reserved
      Pos.   87- 96 = Telephone Number
      Pos.      97 = ECOA Code
      Pos.   98- 99 = Consumer Information Indicator
      Pos.  100-101 = Country Code
      Pos.  102-133 = First Line of Address          N1 Segment
      Pos.  134-165 = Second Line of Address                Pos.    1- 2 = Segment Identifier
      Pos.  166-185 = City                                  Pos.    3- 32 = Employer Name
      Pos.  186-187 = State                                 Pos.   33- 64 = First Line of Employer Address
      Pos.  188-196 = Postal/Zip Code                       Pos.   65- 96 = Second Line of Employer Address
      Pos.     197 = Address Indicator                      Pos.   97-116 = Employer City
      Pos.     198 = Residence Code                         Pos.  117-118 = Employer State
      Pos.  199-200 = Reserved                              Pos.  119-127 = Employer Postal/Zip Code
                                                            Pos.  128-145 = Occupation
                                                            Pos.     146 = Reserved
K1 Segment
      Pos.    1- 2 = Segment Identifier
      Pos.    3-32 = Original Creditor Name
      Pos.   33-34 = Creditor Classification


K2 Segment
      Pos.    1- 2 = Segment Identifier
      Pos.       3 = Purchased From/Sold To Indicator
      Pos.    4-33 = Purchased From or Sold To Name
      Pos.      34 = Reserved
```

APPENDIX 0866

Return to Table of Contents

# Frequently Asked Questions and Answers

Please note that within these reporting guidelines, certain fields are mentioned that provide specific guidance for the situations described.  For all other Metro 2® fields, the standard guidelines described within the Field Definitions module should be followed.

## Segments and Appendages (6-6)

1. How is the Base Segment used?
2. What if we don't currently capture data for a specific field in our system?
3. How are the J1 and J2 Segments used?
4. When reporting fixed-length records, can the J2 segment be reported for all consumers, whether they live at the same or different address as the primary borrower?  If the address is the same, can the address fields be blank?
5. How is the L1 Segment used?
6. How are fixed-length records reported if no appendage (e.g., J1, J2) information is available?
7. How are variable-length records reported if no appendage (e.g., J1, J2) information is available?

## BDW / RDW (6-8)

8. What is the BDW and how is it used?
9. What is the RDW and how is it used?

## Delinquency Reporting (6-8)

10. How are delinquencies calculated?

## Cycle Reporting (6-8)

11. When is cycle reporting appropriate, versus month-end reporting?

## Account Status, Payment Rating, Special Comment (6-9)

12. How do Account Statuses, Payment Ratings and Special Comments interact?

## ECOA Requirements (6-10)

13. How do I comply with ECOA?
14. ECOA Codes:
    (a) How is an ECOA change reported?
    (b) What is the difference between ECOA Codes T (Association with Account Terminated) and Z (Delete Consumer)?

(continued)

*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 0867

Return to Table of Contents

# Frequently Asked Questions and Answers

## FCRA Requirements (6-11)

15. The Fair Credit Reporting Act requires certain information to be reported with regard to returned checks.  What are those requirements?

## Deleting Accounts/Borrowers (6-12)

16. How should an account, or a specific borrower, be deleted from the consumer reporting agencies' files?

## Consumer Information (6-12)

17. How should a new borrower be added to an existing account?
18. How should a consumer's association with an existing account be terminated?
19. How should deceased borrowers be reported?
20. How should a business account be reported when a consumer is personally liable?

## Duplicate Tradelines (6-14)

21. What causes duplicate tradelines?

## First Time Reporters (6-15)

22. Are there any special reporting requirements for a first time reporter when sending data to the consumer reporting agencies?

## Accounts Included in Bankruptcy (6-16)

23. How should an account be reported when the consumer files bankruptcy, but the account is not included in the bankruptcy?
24. How should an account included in bankruptcy be reported if a "Relief from Stay" is granted to the creditor?
25. How should an account that has been included in Bankruptcy be reported when a consumer is making payments or has paid the account in full, even though the account has not been reaffirmed?
26. Is there a preferred method of reporting when accounts are partially reaffirmed in bankruptcy?

(continued)

CREDIT REPORTING RESOURCE GUIDE®
*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 0868

Return to Table of Contents

# Frequently Asked Questions and Answers

## Accounts Included in Bankruptcy (6-18)

27. Accounts included in Bankruptcy Chapter 7 or 11:
    *Original reporting guidance (to be retired in May 2025):*
    (a) How should an account be reported when all borrowers associated to the account filed Bankruptcy Chapter 7 or 11?
    (b) How should an account be reported when one borrower filed Bankruptcy Chapter 7 or 11 and the other borrower did not?
    *Alternate simplified reporting guidance:*
    (c) How should an account be reported when all borrowers associated to the account filed Bankruptcy Chapter 7 or 11?
    (d) How should an account be reported when one borrower filed Bankruptcy Chapter 7 or 11 and the other borrower did not?
28. Accounts included in Bankruptcy Chapter 12 or 13:
    *Original reporting guidance (to be retired in May 2025):*
    (a) How should an account be reported when all borrowers associated to the account filed Bankruptcy Chapter 12 or 13?
    (b) How should an account be reported when one borrower filed Bankruptcy Chapter 12 or 13 and the other borrower did not?
    *Alternate simplified reporting guidance:*
    (c) How should an account be reported when all borrowers associated to the account filed Bankruptcy Chapter 12 or 13?
    (d) How should an account be reported when one borrower filed Bankruptcy Chapter 12 or 13 and the other borrower did not?
29. How should a secured debt (e.g., mortgage account) be reported when a consumer completes the required payments through a Bankruptcy Chapter 12 or 13 plan, but the account is still open and the consumer is continuing to make payments?
30. How should multiple bankruptcies (i.e., the same or different chapters) be reported for the different associated borrowers on an account?
31. How should bankruptcies be reported when the consumer voluntarily surrenders the merchandise or redeems the merchandise?
32. How should an account be reported when a Bankruptcy case has been closed or terminated without being discharged or dismissed?

## Reporting Scenarios (6-49)

33. How should an account be reported when it is included in a Personal Receivership plan (Wisconsin Chapter 128)?
34. Charge-offs:
    (a) How should charged off accounts be reported?
    (b) How should paid charge-off accounts be reported?
35. How should an account be reported when the creditor files an IRS Form 1099-C?

(continued)

APPENDIX 0869

Return to Table of Contents

# Frequently Asked Questions and Answers

## Reporting Scenarios (6-52)

36. How should an account be reported when an auto lease is terminated (full or early), yet there may be post-lease charges on the account; i.e., over mileage charges, excess wear and tear charges, or other outstanding charges?

37. Prepaid leases and leases paid in full in advance of termination:
(a) How should an account be reported when an auto lease is prepaid – where entire lease payment is paid at the time of opening?
(b) How should an account be reported when an auto lease is paid in full in advance of termination?

38. How should accounts that are paid in full for less than the full balance (i.e., settled) be reported?

39. How should a paid in full, closed account be reported?

40. How should a closed account be reported that has an outstanding balance?

41. How long should paid accounts (Account Status Code 13, 61-65) continue to be reported?

42. How should prepaid credit cards/gift cards be reported?

43. What are the available options for reporting an account that has regular payments temporarily postponed?

44. How should deferred accounts be reported?

45. How should accounts in forbearance be reported?

46. How should accounts that have been transferred be reported?

47. How should accounts that have been sold to another company be reported by the seller and the purchaser *when the purchaser will convert the seller's previous account history to their system*?

48. How should accounts that have been sold to another company be reported by the seller and the purchaser *when the purchaser will NOT convert the seller's previous account history to their system*?

49. How are "payment reversal" transactions handled when reporting Date of Last Payment, Date of First Delinquency, Payment History Profile and Actual Payment Amount?

50. Consumer loans may have multiple payment schedules, which may each have different payment frequencies (e.g., principal amount due annually and interest amount due monthly).  How should these loans be reported?

51. How should timeshare mortgages and timeshare loans be reported?

52. How should the different stages of foreclosure be reported?

53. How should alternatives to foreclosure (i.e., Deed in Lieu and Short Sale) be reported?

54. How should a secured account (i.e., mortgage, home equity or other secured account) be reported when the collateral is released but there is an outstanding balance due?

55. How should full loan assumptions be reported?

56. How should simple loan assumptions be reported?

57. How should reverse mortgages be reported?

(continued)

# Frequently Asked Questions and Answers

## Reporting Scenarios (6-75)

58. What are the available options for reporting an account affected by a natural or declared disaster?
59. How should a renegotiated/refinanced loan be reported?
60. How should a modified loan be reported?
61. How should an account be reported when it is updated more than one time during a given monthly reporting period; e.g., an account that is moved to recovery?
62. How should an account be reported when merchandise has been repossessed?
63. How should an account be reported when the consumer has voluntarily surrendered the merchandise?
64. How should a replacement credit card be reported (i.e., credit card replaced with a new account number)?
65. Lost or stolen credit cards:
    (a) How should a lost or stolen credit card be reported when the consumer will retain the account, but will get a new Account Number?
    (b) How should a lost or stolen credit card be reported when the consumer does not want a replacement card and will pay off the existing account?
66. If a credit card or account is in dispute or temporarily unavailable for use because the credit grantor is conducting an investigation (due to a request from the consumer, such as potential identity theft or other reason), how should the account be reported?
67. How should credit cards with no preset spending limits be reported that have terms allowing consumers to exceed the credit limits (i.e., Flexible Spending Credit Cards)?
68. When and how should Debit Cards be reported?
69. How should deposit accounts, with overdraft protection, be reported that have been overdrawn?
70. How should a debt extinguished under state law be reported?

Return to Table of Contents

# Frequently Asked Questions and Answers

Please note that within these reporting guidelines, certain fields are mentioned that provide specific guidance for the situations described.  For all other Metro 2® fields, the standard guidelines described within the Field Definitions module should be followed.

## SEGMENTS AND APPENDAGES

1.   **Question: How is the Base Segment used?**

   Answer: The Base Segment of the Metro 2® Format is used to report the identification information for the primary borrower, as well as all of the pertinent account information, such as Date Opened, High Credit, Current Balance and Account Status.

2.   **Question: What if we don't currently capture data for a specific field in our system?**

   Answer: Refer to Record Layouts within the Metro 2® Format section for designated Required Fields.

   If you have a question about a specific field that is not on your system, contact all the consumer reporting agencies to determine if that field is required.  Some fields must be reported to comply with legislative requirements, while others are used to make the reported data complete and accurate.

3.   **Question: How are the J1 and J2 Segments used?**

   Answer: In general, appendages in the Metro 2® Format are designed to allow the data furnisher to report additional information about the account by adding the appropriate appendages to the end of the Base Segment.  Two segments: J1 and J2 are used in reporting the names and addresses (if different from the primary borrower) of individuals who are associated with the account.

   • The J1 Segment is used to report a consumer who is associated with the account who lives at the same address as the individual reported in the Base Segment.

   • The J2 Segment is used to report a consumer who is associated with the account and who lives at the same or different address from the individual reported in the Base Segment.

APPENDIX 0872

Return to Table of Contents

# Frequently Asked Questions and Answers

**4.** **Question: When reporting fixed-length records, can the J2 Segment be reported for all consumers, whether they live at the same or different address as the primary borrower?  If the address is the same, can the address fields be blank?**

Answer: If you are reporting fixed-length records, you may choose to report only J2 Segments for all associated consumers.  In that case, the J2 Segments must always contain addresses, even if the addresses are the same as those reported in the Base Segments.

**5.** **Question: How is the L1 Segment used?**

Answer: The L1 Segment is used to report a new Account Number or a new Identification Number in situations when one or both of these numbers has changed since the last reporting period.  The Change Indicator field in the L1 Segment specifies whether the change is to the Account Number, the Identification Number or both.

The old Account Number is reported in the Consumer Account Number field of the Base Segment and the new Account Number is reported in the New Consumer Account Number field of the L1 Segment.  The old Identification Number is reported in the Identification Number field of the Base Segment and the new Identification Number is reported in the New Identification Number field of the L1 Segment.

The L1 Segment should be reported at the time of the Account Number/Identification Number change and should be reported only once.  The following month, the new numbers should appear in the Base Segment.

**6.** **Question: How are fixed-length records reported if no appendage (e.g., J1, J2) information is available?**

Answer: If no information is available for the appendages, provide the Segment Identifier (e.g., J1, J2) and blank fill the remainder of the segment.

**7.** **Question: How are variable-length records reported if no appendage (e.g., J1, J2) information is available?**

Answer: Do not report the appendage.

Return to Table of Contents

# Frequently Asked Questions and Answers

## BDW / RDW

**8.    Question: What is the BDW and how is it used?**

Answer: For variable-length blocks, the Block Descriptor Word (BDW) is typically systems-generated and contains a value equal to the length of each block of data.  The BDW must be reported when using the packed format or when reporting variable length records.  The BDW is used internally by each consumer reporting agency's system to determine the number of bytes in each block.

**9.    Question: What is the RDW and how is it used?**

Answer: The Record Descriptor Word (RDW) contains a value equal to the number of bytes in each record.  A data record includes the Base Segment and any appendages (e.g., J1, K1, N1).

The RDW is a required field and may be systems-generated by the data furnisher's system.  If not, it must be hard-coded in the program.

The RDW is used internally by each consumer reporting agency's system to determine the number of bytes in each data record.

## DELINQUENCY REPORTING

**10.    Question: How are delinquencies calculated?**

Answer: Delinquencies should be calculated from the due date.  For consumer reporting purposes, an account is not deemed to be delinquent until it is at least 30 days (Account Status Code 71) past the due date.

## CYCLE REPORTING

**11.    Question: When is cycle reporting appropriate, versus month-end reporting?**

Answer: Cycle reporting is generally appropriate when the data furnisher has multiple billing cycles.  Reporting would take place at the end of each billing cycle, resulting in more accurate and current reporting of account statuses.

CREDIT REPORTING RESOURCE GUIDE®

*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 0874

Return to Table of Contents

# Frequently Asked Questions and Answers

## ACCOUNT STATUS, PAYMENT RATING, SPECIAL COMMENT

12. **Question: How do Account Statuses, Payment Ratings and Special Comments interact?**

Answer: The Account Status (Field 17A) is used to report the current condition of the accounts, such as current or 30 days past the due date. The Payment Rating (Field 17B), which is required for certain Account Statuses, is used to report whether the account is current, past due, in collections or charged off within the current month's reporting period. The Special Comment (Field 19) is used to provide additional information about the account. These codes are used together to provide a complete picture of the account.

Examples:

- An account is reported with Account Status Code 80 (90 days past the due date) and Special Comment M (Account closed at credit grantor's request). Since both codes are reported, credit grantors know the current condition of the account, and that the account is closed to further charges, at the credit grantor's request.

- An account is reported with Account Status Code 13 (Paid), Payment Rating 3 (90 days past the due date) and Special Comment AU (Account paid in full for less than the full balance). This combination of codes provides complete information for credit grantors: the account is paid, the consumer was 90 days past the due date during the final month and the account was settled for less than the full balance.

Return to Table of Contents

# Frequently Asked Questions and Answers

## ECOA REQUIREMENTS

**13. Question: How do I comply with ECOA?**

Answer: While ECOA requires only the reporting of spouse information, industry practices encourage the reporting of all consumers associated with an account.  The correct ECOA Code should be reported in the Base, J1 and J2 Segments.

**14. Questions: ECOA Codes:**
**(a) How is an ECOA Code change reported?**

Answer: Change the ECOA Code to the new value in the segment that has changed.  Refer to field descriptions for each segment (Base, J1 and J2) for lists of applicable ECOA codes.

**(b) What is the difference between ECOA Codes T (Association with Account Terminated) and Z (Delete Consumer)?**

Answer: ECOA Code 'T' should be reported when a consumer is no longer associated with an account.  In subsequent reporting periods, this consumer should not be reported.  The account, including payment history reported prior to the termination will be retained, but future updates will not be applied to the account for this consumer.

ECOA Code 'Z' should be reported when a consumer was reported in error and the account, including payment history, should be deleted from this consumer's file.  It is imperative that ECOA Code 'Z' is reported only on the consumer who was inaccurately reported.  In subsequent reporting periods, this consumer should not be reported.

**Note:** Only inaccurately reported consumers should be deleted.  Additionally, as per Frequently Asked Questions & Answers 27 and 28, authorized users should be deleted from accounts included in bankruptcy since authorized users are not contractually responsible for payments.

Return to Table of Contents

# Frequently Asked Questions and Answers

## FCRA REQUIREMENTS

**15. Question: The Fair Credit Reporting Act requires certain information to be reported with regard to returned checks.  What are those requirements?**

Answer: For companies who report returned checks, such as collection agencies, debt buyers or check guarantee companies, there are four reporting guidelines:

- The Date Opened (Base Segment Field 10) should contain the date of the check.
- The Highest Credit or Original Loan Amount (Base Segment Field 12) should contain the original amount of the check, excluding fees and interest.
- The Original Creditor Name (K1 Segment Field 2) should contain the name of the payee; i.e., the name of the company to which the check was written.  Report the Creditor Classification (K1 Segment Field 3) to identify the original creditor's type of business.  Note that code 02 (Medical/Health Care) is used to identify an account as a medical collection debt in accordance with FCRA section 623.
- The FCRA Compliance/Date of First Delinquency (Base Segment Field 25) should contain the date the check was returned for nonsufficient funds.  If not available, report the date of the check.

APPENDIX 0877

Return to Table of Contents

# Frequently Asked Questions and Answers

## DELETING ACCOUNTS/BORROWERS

16. **Question: How should an account, or a specific borrower, be deleted from the consumer reporting agencies' files?**

    Answer: It is imperative that only inaccurate accounts be deleted from the consumer reporting agencies' files.  In order to maintain the accuracy and integrity of consumer files, historical consumer credit information must be reported in a factual and objective manner.  Paid derogatory accounts, such as collections, should be reported as paid; they should not be deleted.

    To delete an entire account, **_for reasons other than fraud_**, report Account Status Code **DA** (Field 17A).  All borrowers will be deleted along with the account history.

    To delete an entire account, **_due to confirmed fraud_**, report Account Status Code **DF** (Field 17A).  All borrowers will be deleted along with the account history.

    To delete a specific borrower, report **Z** in the ECOA Code field of the segment containing the consumer to be deleted.

## CONSUMER INFORMATION

17. **Question: How should a new borrower be added to an existing account?**

    Answer: Append a J1 or J2 Segment for the new borrower to the Base Segment.

    - A J1 Segment should be used to add a new borrower living at the same address as the consumer reported in the Base Segment.
    - A J2 segment should be used to add a new borrower living at a different address from the consumer reported in the Base Segment.

18. **Question: How should a consumer's association with an existing account be terminated?**

    Answer: Report **T** in the ECOA Code field (Base Segment Field 37, J1/J2 Segment Field 10) in the segment containing the consumer for whom the association is to be terminated.  All payment history for this account will be retained.  Do not report this consumer in subsequent reporting periods.

*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 0878

Return to Table of Contents

# Frequently Asked Questions and Answers

**19. Question: How should deceased borrowers be reported?**

Answer: Deceased borrowers should be reported through use of ECOA Code **X** in the appropriate Base Segment Field 37 or J1/J2 Segment Field 10.  An ECOA Code **X** should be reported *only* for the deceased consumer; not all consumers associated with the account.

If only one borrower is associated with the account and the borrower is reported as deceased, discontinue reporting the entire account after the ECOA Code **X** is reported.  Do not report the account with a trustee or estate name.

If there are multiple associated borrowers and one borrower is reported as deceased, continue reporting the account, but discontinue reporting the deceased borrower after the ECOA Code **X** is reported.  If the deceased borrower had been reported in the Base Segment, another borrower must be moved into the Base Segment for subsequent reporting.

**Important:** Do not report ECOA Code **X** until you have received a legally-sufficient death notice; e.g., death certificate.  Data furnishers should consult with internal Legal counsel or Compliance area regarding what constitutes a legally-sufficient death notice.

Reporting a consumer as deceased provides valuable information on the credit report.  If another consumer tries to use the identity of a deceased consumer, the "deceased" information will appear on the credit report, helping to deter the fraudulent activity.

**Note:** Debt Buyers and Third Party Collection Agencies should refer to the Debt Buyer/Collection Agency Reporting module for guidance on reporting deceased borrowers.

APPENDIX 0879

Return to Table of Contents

# Frequently Asked Questions and Answers

**20. Question: How should a business account be reported when a consumer is personally liable?**

Answer:
- Report the consumer's information in the Base Segment with ECOA Code **2** (Joint/Contractual Liability) or **5** (Co-maker or Guarantor) in Field 37, as applicable.
- Report the business name in the J2 Segment starting in the Surname field (Field 3).  The business name may continue into the First and Middle Name fields if needed.
- Report ECOA Code **W** (Business/Commercial) in Field 10 of the J2 Segment.

    **Note:** The business name will not be added to the consumer credit databases.

## DUPLICATE TRADELINES

**21. Question: What causes duplicate tradelines?**

Answer: Any change in Account Number, Identification Number, Portfolio Type and/or Date Opened may cause duplication if the consumer reporting agencies are not notified prior to the change.

CREDIT REPORTING RESOURCE GUIDE®
*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 0880

Return to Table of Contents

# Frequently Asked Questions and Answers

## FIRST TIME REPORTERS

22. **Question: Are there any special reporting requirements for a first time reporter when sending data to the consumer reporting agencies?**

    Answer: It is very important to ensure that the FCRA Compliance/Date of First Delinquency is reported accurately.

    When historical credit information is reported in the Payment History Profile (Field 18), the Date of First Delinquency must reflect the date of the first delinquency that led to the earliest delinquency reported in the Payment History Profile. ***In this situation, the Date of First Delinquency must be reported, regardless of the Account Status Code being reported.***

    Examples:

    Account Status = 93 (Collection)
    Payment History Profile = GGGGGGGGGGGG666654321100
    Date of Account Information = 03/30/2023
    Date of First Delinquency = 05/24/2021

    In the above example, 05/24/2021 represents the date of the earliest 30-day delinquency represented in the Payment History Profile that led to the Collection (Code G) being reported.

    Account Status = 11 (Current)
    Payment History Profile = 000000GGGGGGGGGGGGGGGGGGGG
    Date of Account Information = 03/30/2023
    Date of First Delinquency = 08/12/2020

    In the above example, 08/12/2020 represents the date of the earliest 30-day delinquency that led to the Collection (Code G) reported in the Payment History Profile. In this scenario, the 30-day delinquency was outside the time period represented in the Payment History Profile.

# Frequently Asked Questions and Answers

## ACCOUNTS INCLUDED IN BANKRUPTCY

Please note that within these reporting guidelines, certain fields are mentioned that provide specific guidance for the situations described.  For all other Metro 2® fields, the standard guidelines described within the Field Definitions module should be followed.

**23.  Question: How should an account be reported when the consumer files bankruptcy, but the account is not included in the bankruptcy?**

Answer: For accounts that are <u>not</u> discharged in the bankruptcy, follow these guidelines:

- When notified of the petition, report the applicable Consumer Information Indicator.

  **Note:** The consumer may be protected by the automatic stay until the bankruptcy is discharged or, for Chapter 12 or 13, the repayment plan is completed.

- Follow the guidance in FAQ 27 or 28, as applicable, for the months between petition and final resolution.
- For Chapter 7 or 11, when the bankruptcy is discharged, report Consumer Information Indicator **Q** to remove the petition indicator and continue reporting the account normally going forward.
- For Chapter 12 or 13, when the repayment plan is completed, report Consumer Information Indicator **Q** to remove the petition indicator and continue reporting the account normally going forward.  If an associated borrower who was not included in the bankruptcy filing had been terminated from the account, re-report this borrower with the applicable ECOA Code (not T).

**24.  Question: How should an account included in bankruptcy be reported if a "Relief from Stay" is granted to the creditor?**

Answer: Report the appropriate Consumer Information Indicator for the borrower who included the account in bankruptcy (filer).

**Note:** Even though the creditor can pursue collection of collateral, the account is still included in bankruptcy.  The reporting of the Consumer Information Indicator has no impact on the creditor's ability to collect.

APPENDIX 0882

Return to Table of Contents

# Frequently Asked Questions and Answers

**25. Question: How should an account that has been included in Bankruptcy be reported when a consumer is making payments or has paid the account in full, even though the account has not been reaffirmed?**

Answer: For all Bankruptcy chapters, with the exception of an account included in Bankruptcy Chapter 7 that has been reaffirmed through the Bankruptcy Court, the account is included in Bankruptcy. For credit reporting purposes, the appropriate Bankruptcy Consumer Information Indicator must be reported.

Refer to Frequently Asked Questions & Answers 27 and 28 for detailed reporting guidelines.

**26. Question: Is there a preferred method of reporting when accounts are partially reaffirmed in bankruptcy?**

Answer: For accounts that are partially reaffirmed in bankruptcy, report a separate tradeline with a new Account Number for the portion of the account that is in repayment. For this new tradeline, report Consumer Information Indicator **R** for each affected consumer, which states "Chapter 7 Reaffirmation of Debt", plus the appropriate Account Status. For that portion of the original tradeline which is still included in bankruptcy, report the appropriate Account Status (Field 17A), the appropriate Consumer Information Indicator (Base Segment Field 38 and J1/J2 Segment Field 11), and adjust the Current Balance (Field 21) accordingly.

If the partial reaffirmation of debt is subsequently rescinded, report the new account with Account Status Code **DA** to delete the account. The original account, which was reported with the appropriate bankruptcy Consumer Information Indicator, will reflect that the account is included in bankruptcy.

Refer to Frequently Asked Question & Answer 27 for detailed reporting guidelines on accounts that are completely reaffirmed in bankruptcy.

Return to Table of Contents

# Frequently Asked Questions and Answers

27. **Questions: Accounts included in Bankruptcy Chapter 7 or 11:**

   **Note: Letters (a) and (b) contain the original reporting guidance for accounts included in Bankruptcy Chapters 7 and 11, <u>which will be retired in May 2025</u>.  Letters (c) and (d) offer alternate simplified bankruptcy guidance, which replaces the original reporting guidance.**

   **(a) How should an account be reported when all borrowers associated to the account filed Bankruptcy Chapter 7 or 11?**

   Answer: Report the account according to the following guidelines:

| | **All Borrowers Filed Bankruptcy Chapter 7 or 11** |
|---|---|
| Month BK Filed | • CII = A or B (Petition for Chapter 7 or 11 Bankruptcy)<br>• Account Status = status at time of petition<br>• Payment History = first character based on previous month's status plus prior history<br>• Current Balance = outstanding balance amount<br>• Scheduled Monthly Payment Amount = amount of the scheduled monthly payment due<br>• Amount Past Due = amount past due at the time of petition<br>• Date of Account Information = current month's date<br><br>**Note: Authorized Users (ECOA Code 3) on accounts included in a bankruptcy petition should be deleted (ECOA Code Z) from the account because they are not contractually liable for payments.** |
| Months Between Petition Filed & BK Resolution | • CII = Blank (previous petition value reported is retained) or CII = A or B<br>• Account Status = status at time of petition<br>• Payment History = increment first position with value 'D' (plus history reported prior to bankruptcy filing)<br>• Current Balance = outstanding balance amount<br>• Scheduled Monthly Payment Amount = amount of the scheduled monthly payment due<br>• Amount Past Due = amount past due at the time of petition<br>• Date of Account Information = current month's date |
| Reaffirmation of Debt or Lease Assumption | • CII = R (Chapter 7 Reaffirmation of Debt) or 2A (Lease Assumption)<br>• All other Metro 2® account level information should be reported as of the Date of Account Information<br><br>**Note: If the bankruptcy is subsequently discharged, but the Reaffirmation of Debt remains in effect, do not report the discharged CII.  Continue reporting the account as reaffirmed.** |

*FAQ 27(a) continued on next page*

6-18                     CREDIT REPORTING RESOURCE GUIDE®

*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 0884

Return to Table of Contents

# Frequently Asked Questions and Answers

**FAQ 27(a)** (continued)

|  | **All Borrowers Filed Bankruptcy Chapter 7 or 11** |
|---|---|
| BK Discharged | • CII = E or F (Discharged through BK Chapter 7 or 11)<br>• Account Status = status at time of petition<br>• Payment History = increment first position with value 'D' (plus prior months' history)<br>• Current Balance = outstanding balance amount<br>• Scheduled Monthly Payment Amount = amount of the scheduled monthly payment due<br>• Amount Past Due = amount past due at the time of petition<br>• Date of Account Information = current month's date<br><br>**Notes: After reporting the discharge CII E or F for all Filers, discontinue reporting the account.**<br><br>**Do not report the discharged CII if a Reaffirmation of Debt remains in effect.** |
| Reaffirmation of Debt Rescinded | • CII = V (Chapter 7 Reaffirmation of Debt Rescinded)<br>• Account Status = status at time of petition<br>• Payment History = increment first position based on previous month's Account Status, plus prior history<br>• Current Balance = outstanding balance amount<br>• Scheduled Monthly Payment Amount = amount of the scheduled monthly payment due<br>• Amount Past Due = amount past due at the time of petition<br>• Date of Account Information = current month's date<br><br>**Notes:**<br>**After reporting CII 'V' for all Filers, in the following monthly reporting period:**<br>• **If the bankruptcy has been discharged, report the applicable discharge CII (CII = E or F), then discontinue reporting the account going forward.**<br>• **If the bankruptcy has not yet been discharged, continue reporting the account and Filers with the applicable CIIs (CII = A or B).**<br><br>**If the bankruptcy is discharged in the same monthly reporting period that the Reaffirmation of Debt is rescinded, report the applicable discharge CII (CII = E or F).  Do not report CII 'V'.** |

*FAQ 27(a) continued on next page*

Return to Table of Contents

# Frequently Asked Questions and Answers

**FAQ 27(a)** (continued)

|  | **All Borrowers Filed Bankruptcy Chapter 7 or 11** |
|---|---|
| BK Dismissed or Withdrawn | • CII = Q (Removal value)<br>• All other Metro 2® account level field information should be reported as of the Date of Account Information<br><br>**Note: The "D's" reported in the Payment History Profile from the time the petition was filed until the dismissal (or petition withdrawn) should not be removed, as the consumer was protected by a stay during those months.** |

CREDIT REPORTING RESOURCE GUIDE®

*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 0886

Return to Table of Contents

# Frequently Asked Questions and Answers

**27(b) How should an account be reported when one borrower filed Bankruptcy Chapter 7 or 11 and the other borrower did not?**

Answer: Report the account according to the following guidelines:

| | **Filer(s) and Non-Filer(s)** |
|---|---|
| Month BK Filed | • CII for Non-Filer(s) = Blank<br>• CII for Filer(s) = A or B (Petition for BK Chapter 7 or 11)<br>• Account Status = applicable status for consumer(s) who did <u>not</u> file Bankruptcy<br>• Payment History = first character based on previous month's status plus prior history<br>• Current Balance = outstanding balance amount<br>• Scheduled Monthly Payment Amount = amount of the scheduled monthly payment due<br>• Amount Past Due = total amount that is 30 days or more past the due date<br><br>**Note: Authorized Users (ECOA Code 3) on accounts included in a bankruptcy petition should be deleted (ECOA Code Z) from the account because they are not contractually liable for payments.** |
| Months Between Petition Filed & BK Resolution | • CII for Non-Filer(s) = Blank<br>• CII for Filer(s) = Blank (previous petition value reported is retained) or CII = A or B<br>• Account Status = applicable status for consumer(s) who did <u>not</u> file Bankruptcy<br>• All other Metro 2® account level field information should be reported as of the Date of Account Information for the Non-Filer(s) |
| Reaffirmation of Debt or Lease Assumption | • CII for Non-Filer(s) = Blank<br>• CII for Filer(s) = R (Chapter 7 Reaffirmation of Debt) or 2A (Lease Assumption)<br>• All other Metro 2® account level field information should be reported as of the Date of Account Information<br><br>**Note: If the bankruptcy is subsequently discharged, but the Reaffirmation of Debt remains in effect, do not report the discharged CII.  Continue reporting the account as reaffirmed.** |

***FAQ 27(b) continued on next page***

*Copyright 2023 © Consumer Data Industry Association*
APPENDIX 0887

Return to Table of Contents

# Frequently Asked Questions and Answers

**FAQ 27(b)** (continued)

| | Filer(s) and Non-Filer(s) |
|---|---|
| BK Discharged | • CII for Non-Filer(s) = Blank<br>• CII for Filer(s) = E or F (Discharged through BK Chapter 7 or 11)<br><br>**Note: Do not report the discharged CII if the Reaffirmation of Debt remains in effect.**<br><br>• All other Metro 2® account level field information should be reported as of the Date of Account Information for the Non-Filer(s)<br><br>**Note: After reporting the discharge CII for the Filer(s), discontinue reporting the Filer(s).** |
| Reaffirmation of Debt Rescinded | • CII for Non-Filer(s) = Blank<br>• CII for Filer(s) = V (Chapter 7 Reaffirmation of Debt Rescinded)<br>• All other Metro 2® account level field information should be reported as of the Date of Account Information for the Non-Filer(s)<br><br>**Notes:**<br>**After reporting CII 'V' for the Filer(s), in the following monthly reporting period:**<br>• **If the bankruptcy has been discharged, report the applicable discharge CII (CII = E or F). In subsequent reporting periods, discontinue reporting the Filer(s) associated to the account.**<br>• **If the bankruptcy has not yet been discharged, continue reporting the account and Filer(s) with the applicable CIIs (CII = A or B).**<br><br>**If the bankruptcy is discharged in the same monthly reporting period that the Reaffirmation of Debt is rescinded, report the applicable discharge CII (CII = E or F) for the Filer(s). Do not report CII 'V'.** |
| BK Dismissed or Withdrawn | • CII for Non-Filer(s) = Blank<br>• CII for Filer(s) = Q (Removal value)<br>• All other Metro 2® account level field information should be reported as of the Date of Account Information |

**Note: The Consumer Information Indicator is required for reporting when applicable for the filing consumer(s).**

CREDIT REPORTING RESOURCE GUIDE®
*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 0888

Return to Table of Contents

# Frequently Asked Questions and Answers

**27(c) How should an account be reported when all associated borrowers filed Bankruptcy Chapter 7 or 11?**

Answer: Report the account according to the following guidelines:

| | **All Borrowers Filed Bankruptcy Chapter 7 or 11** |
|---|---|
| Month BK Filed | • CII = A or B (Petition for Chapter 7 or 11 Bankruptcy)<br>• Account Status = status as of the Date of Account Information<br>• Payment History = first character based on previous month's status plus prior history<br>• Current Balance = balance as of the Date of Account Information<br>• Scheduled Monthly Payment Amount = amount of the scheduled monthly payment due<br>• Amount Past Due = amount as of the Date of Account Information<br>• Date of Account Information = current month's date<br><br>**Note: Authorized Users (ECOA Code 3) on accounts included in a bankruptcy petition should be deleted (ECOA Code Z) from the account because they are not contractually liable for payments.** |
| Months Between Petition Filed & BK Resolution | • CII = A or B or Blank (previous petition value reported is retained)<br>• Account Status = status as of the Date of Account Information<br>• Payment History = first character based on previous month's status plus prior history<br>• Current Balance = balance as of the Date of Account Information<br>• Scheduled Monthly Payment Amount = amount of the scheduled monthly payment due<br>• Amount Past Due = amount as of the Date of Account Information<br>• Date of Account Information = current month's date |
| Reaffirmation of Debt or Lease Assumption | • CII = R (Chapter 7 Reaffirmation of Debt) or 2A (Lease Assumption)<br>• All other Metro 2® account level field information should be reported as of the Date of Account Information<br><br>**Note: If the bankruptcy is subsequently discharged, but the Reaffirmation of Debt remains in effect, do not report the discharged CII.  Continue reporting the account as reaffirmed.** |

*FAQ 27(c) continued on next page*

# Frequently Asked Questions and Answers

**FAQ 27(c)** (continued)

| | **All Borrowers Filed Bankruptcy Chapter 7 or 11** |
|---|---|
| BK Discharged | • CII = E or F (Discharged through BK Chapter 7 or 11)<br>• Account Status = status as of the Date of Account Information<br>• Payment History = first character based on previous month's status plus prior history<br>• Current Balance = balance as of the Date of Account Information<br>• Scheduled Monthly Payment Amount = amount of the scheduled monthly payment due<br>• Amount Past Due = amount as of the Date of Account Information<br>• Date of Account Information = current month's date<br><br>**Notes: After reporting the discharge CII E or F for all Filers, discontinue reporting the account.**<br><br>**Do not report the discharged CII if a Reaffirmation of Debt remains in effect.** |
| Reaffirmation of Debt Rescinded | • CII = V (Chapter 7 Reaffirmation of Debt Rescinded)<br>• Account Status = status as of the Date of Account Information<br>• Payment History = first character based on previous month's status plus prior history<br>• Current Balance = balance as of the Date of Account Information<br>• Scheduled Monthly Payment Amount = amount of the scheduled monthly payment due<br>• Amount Past Due = amount as of the Date of Account Information<br>• Date of Account Information = current month's date<br><br>**Notes:**<br>**After reporting CII 'V' for all Filers, in the following monthly reporting period:**<br>• **If the bankruptcy has been discharged, report the applicable discharge CII (CII = E or F), then discontinue reporting the account going forward.**<br>• **If the bankruptcy has not yet been discharged, continue reporting the account and Filers with the applicable CIIs (CII = A or B).**<br><br>**If the bankruptcy is discharged in the same monthly reporting period that the Reaffirmation of Debt is rescinded, report the applicable discharge CII (CII = E or F). Do not report CII 'V'.** |

*FAQ 27(c) continued on next page*

CREDIT REPORTING RESOURCE GUIDE®
*Copyright 2023 © Consumer Data Industry Association*
APPENDIX 0890

Return to Table of Contents

# Frequently Asked Questions and Answers

**FAQ 27(c)** (continued)

| BK Dismissed or Withdrawn | <ul><li>CII = Q (Removal value)</li><li>All other Metro 2® account level field information should be reported as of the Date of Account Information</li></ul> |
|---|---|

APPENDIX 0891

Return to Table of Contents

# Frequently Asked Questions and Answers

**27(d) How should an account be reported when one borrower filed Bankruptcy Chapter 7 or 11 and the other borrower did not?**

Answer: Report the account according to the following guidelines:

|  | **Filer(s) and Non-Filer(s)** |
|---|---|
| Month BK Filed | • CII for Non-Filer(s) = Blank<br>• CII for Filer(s) = A or B (Petition for BK Chapter 7 or 11)<br>• Account Status = status as of the Date of Account Information<br>• Payment History = first character based on previous month's status plus prior history<br>• Current Balance = outstanding balance amount<br>• Scheduled Monthly Payment Amount = amount of the scheduled monthly payment due<br>• Amount Past Due = total amount that is 30 days or more past the due date<br><br>**Note: Authorized Users (ECOA Code 3) on accounts included in a bankruptcy petition should be deleted (ECOA Code Z) from the account because they are not contractually liable for payments.** |
| Months Between Petition Filed & BK Resolution | • CII for Non-Filer(s) = Blank<br>• CII for Filer(s) = A or B or Blank (previous petition value reported is retained)<br>• Account Status = status as of the Date of Account Information<br>• All other Metro 2® account level field information should be reported as of the Date of Account Information |
| Reaffirmation of Debt or Lease Assumption | • CII for Non-Filer(s) = Blank<br>• CII for Filer(s) = R (Chapter 7 Reaffirmation of Debt) or 2A (Lease Assumption)<br>• All other Metro 2® account level field information should be reported as of the Date of Account Information<br><br>**Note: If the filer's bankruptcy is subsequently discharged, but the Reaffirmation of Debt remains in effect, do not report the discharged CII.  Continue reporting the account as reaffirmed.** |

***FAQ 27(d) continued on next page***

CREDIT REPORTING RESOURCE GUIDE®
*Copyright 2023 © Consumer Data Industry Association*
APPENDIX 0892

Return to Table of Contents

# Frequently Asked Questions and Answers

**FAQ 27(d)** (continued)

| | Filer(s) and Non-Filer(s) |
|---|---|
| BK Discharged | • CII for Non-Filer(s) = Blank<br>• CII for Filer(s) = E or F (Discharged through BK Chapter 7 or 11)<br><br>**Note: Do not report the discharged CII if a Reaffirmation of Debt remains in effect.**<br><br>• All other Metro 2® account level field information should be reported as of the Date of Account Information<br><br>**Note: After reporting the discharge CII E or F, discontinue reporting the Filer(s) associated to the account.** |
| Reaffirmation of Debt Rescinded | • CII for Non-Filer(s) = Blank<br>• CII for Filer(s) = V (Chapter 7 Reaffirmation of Debt Rescinded)<br>• All other Metro 2® account level field information should be reported as of the Date of Account Information<br><br>**Notes:**<br>**After reporting CII 'V' for the Filer(s), in the following monthly reporting period:**<br>• **If the bankruptcy has been discharged, report the applicable discharge CII (CII = E or F). In subsequent reporting periods, discontinue reporting the Filer(s) associated to the account.**<br>• **If the bankruptcy has not yet been discharged, continue reporting the account and Filer(s) with the applicable CIIs (CII = A or B).**<br><br>**If the bankruptcy is discharged in the same monthly reporting period that the Reaffirmation of Debt is rescinded, report the applicable discharge CII (CII = E or F) for the Filer(s). Do not report CII 'V'.** |
| BK Dismissed or Withdrawn | • CII for Non-Filer(s) = Blank<br>• CII for Filer(s) = Q (removal value)<br>• All other Metro 2® account level field information should be reported as of the Date of Account Information |

**Note: The Consumer Information Indicator is required for reporting when applicable for the filing consumer(s).**

Return to Table of Contents

# Frequently Asked Questions and Answers

**28. Questions: Accounts included in Bankruptcy Chapter 12 or 13:**

**Note: Letters (a) and (b) contain the original reporting guidance for accounts included in Bankruptcy Chapters 12 and 13, <u>which will be retired in May 2025</u>. Letters (c) and (d) offer alternate simplified bankruptcy guidance, which replaces the original reporting guidance.**

**(a) How should an account be reported when all borrowers associated to the account filed Bankruptcy Chapter 12 or 13?**

Answer: Report the account according to the following guidelines:

|  | **All Borrowers Filed Bankruptcy Chapter 12 or 13** |
|---|---|
| Month BK Filed | • CII = C or D (Petition for Chapter 12 or 13 Bankruptcy)<br>• Account Status = status at time of petition<br>• Payment History = first character based on previous month's Account Status, plus prior history<br>• Current Balance = outstanding balance amount<br>• Scheduled Monthly Payment Amount = amount of the scheduled monthly payment due<br>• Amount Past Due = amount past due at the time of petition<br>• Date of Account Information = current month's date<br><br>**Note: Authorized Users (ECOA Code 3) on accounts included in a bankruptcy petition should be deleted (ECOA Code Z) from the account because they are not contractually liable for payments.** |
| Months Between Petition Filed & BK Resolution | • CII = Blank (previous value reported is retained) or CII = C or D<br>• Account Status = status at time of petition<br>• Payment History = increment first position with value 'D' (plus history reported prior to BK filing)<br>• Current Balance = outstanding balance amount<br>• Scheduled Monthly Payment Amount = amount of the scheduled monthly payment due<br>• Amount Past Due = amount past due at the time of petition<br>• Date of Account Information = current month's date |

*FAQ 28(a) continued on next page*

Return to Table of Contents

# Frequently Asked Questions and Answers

**FAQ 28(a)** (continued)

| | **All Borrowers Filed Bankruptcy Chapter 12 or 13** |
|---|---|
| BK Chapter 12 or 13 Converted to BK Chapter 7 | • CII = A (Petition for Chapter 7 Bankruptcy) or E (Discharged through Bankruptcy Chapter 7), as applicable<br>• Date of First Delinquency = If the Account Status is 11, continue reporting the original Chapter 12 or 13 bankruptcy petition or notification date.<br><br>**Notes:**<br>**The "D's" reported in the Payment History Profile from the time the petition was filed until the bankruptcy converted to Chapter 7 should not be removed, as the consumer was protected by a stay during those months.**<br><br>**With the reporting of the BK Chapter 7 indicator, continue updating the account by following FAQ 27(a).** |
| Plan Confirmed | • CII = Blank (previous value reported is retained) or CII = C or D<br>• Account Status = status at time of petition<br>• Payment History = increment with value 'D' (plus prior months' history)<br>• Current Balance = Chapter 12 or 13 plan balance[1], which should decline as payments are made<br>• Amount Past Due = Zero<br>• Terms Duration & Terms Frequency = report changed values, if applicable<br>• Scheduled Monthly Payment Amount = Chapter 12 or 13 plan payment amount<br>• Date of Account Information = current month's date |
| Plan Completed – All payments made according to plan – no further obligation | • CII = G or H (Discharged/completed through BK Chapter 12 or 13)<br>• Account Status = status at time of petition<br>• Payment History = increment first position with value 'D' (plus prior months' history)<br>• Current Balance = Zero<br>• Scheduled Monthly Payment Amount = Zero<br>• Amount Past Due = Zero<br>• Date of Account Information = current month's date<br><br>**Note: After reporting CII 'G' or 'H' for all Filers, discontinue reporting the account.** |

*FAQ 28(a) continued on next page*

---

[1] If the Chapter 12 or 13 plan balance amount is not clearly communicated to the lender, the lender should consult with internal Legal to determine what amount to report in the Current Balance field. If the lender (e.g., unsecured creditor) does not receive a confirmed amount from the Bankruptcy court, report the outstanding balance.

Return to Table of Contents

# Frequently Asked Questions and Answers

**FAQ 28(a)** (continued)

|  | **All Borrowers Filed Bankruptcy Chapter 12 or 13** |
|---|---|
| Plan Completed – All payments made according to plan – consumer continues to make payments (example: mortgage account) | • CII = Q (Removal value)<br>• Account Status = status as of the Date of Account Information<br>• Payment History = first month, increment first position with value 'D'; in subsequent months, increment based on prior month's status<br>• Date of Account Information = current month's date<br>• All other Metro 2® account level field information should be reported as of the Date of Account Information |
| BK Dismissed or Withdrawn | • CII = Q (Removal value)<br>• All other Metro 2® account level field information should be reported as of the Date of Account Information<br><br>**Note: The "D's" reported in the Payment History Profile from the time the petition was filed until the dismissal (or petition withdrawn) should not be removed, as the consumer was protected by a stay during those months.** |

CREDIT REPORTING RESOURCE GUIDE®
*Copyright 2023 © Consumer Data Industry Association*
APPENDIX 0896

Return to Table of Contents

# Frequently Asked Questions and Answers

**28(b) How should an account be reported when one borrower filed Bankruptcy Chapter 12 or 13 and the other borrower did not?**

Answer: When a Bankruptcy Chapter 12 or 13 is filed by one borrower and there is also a Non-Filer associated to the account, both may be protected by an automatic stay.  The Non-Filer may be protected through the completion of the plan.   Therefore, the Non-Filer should be terminated from the account until the plan is completed.

| | **Filer(s)** | **Non-Filer(s) – Protected by Stay through plan completion** |
|---|---|---|
| Month BK Filed | • CII = C or D (Petition for Chapter 12 or 13 Bankruptcy)<br>• Account Status = status at time of petition<br>• Payment History = first character based on previous month's status, plus prior history<br>• Current Balance = outstanding balance amount<br>• Scheduled Monthly Payment Amount = amount of the scheduled monthly payment due<br>• Amount Past Due = amount past due at the time of petition<br>• Date of Account Information = current month's date | • CII = Blank<br>• ECOA Code = T (Terminated)<br><br>**Note: Authorized Users (ECOA Code 3) on accounts included in a bankruptcy petition should be deleted (ECOA Code Z) from the account because they are not contractually liable for payments.** |
| Months Between Petition Filed & BK Resolution | • CII = Blank (previous petition value reported is retained) or CII = C or D<br>• Account Status = status at time of petition<br>• Payment History = increment first position with value 'D' (plus history reported prior to BK filing)<br>• Current Balance = outstanding balance amount<br>• Scheduled Monthly Payment Amount = amount of the scheduled monthly payment due<br>• Amount Past Due = amount past due at the time of petition<br>• Date of Account Information = current month's date | Do not report Non-Filer(s). |

***FAQ 28(b) continued on next page***

*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 0897

Return to Table of Contents

# Frequently Asked Questions and Answers

**FAQ 28(b)** (continued)

| | **Filer(s)** | **Non-Filer(s) – Protected by Stay through plan completion** |
|---|---|---|
| BK Chapter 12 or 13 Converted to BK Chapter 7 | • CII = A (Petition for Chapter 7 Bankruptcy) or E (Discharged through Bankruptcy Chapter 7), as applicable<br>• Date of First Delinquency = If the Account Status is 11, continue reporting the original Chapter 12 or 13 bankruptcy petition or notification date.<br><br>**Notes:**<br>**The "D's reported in the Payment History Profile from the time the petition was filed until the bankruptcy converted to Chapter 7 should not be removed, as the consumer was protected by a stay during those months.**<br><br>**With the reporting of the BK Chapter 7 indicator, continue updating the account by following FAQ 27(b).** | • ECOA = original value that defines the consumer's relationship to the account (not T)<br>• CII = Blank<br><br>**Note: At this point, continue updating the account by following FAQ 27(b).** |
| Plan Confirmed | • CII = Blank (previous petition value reported is retained) or CII = C or D<br>• Account Status = status at time of petition<br>• Payment History = increment with value 'D' (plus prior months' history)<br>• Current Balance = Chapter 12 or 13 plan balance[1], which should decline as payments are made<br>• Amount Past Due = Zero<br>• Terms Duration & Terms Frequency = report changed values, if applicable<br>• Scheduled Monthly Payment Amount = Chapter 12 or 13 plan payment amount<br>• Date of Account Information = current month's date | Do not report Non-Filer(s). |

*FAQ 28(b) continued on next page*

---

[1] If the Chapter 12 or 13 plan balance amount is not clearly communicated to the lender, the lender should consult with internal Legal to determine what amount to report in the Current Balance field.  If the lender (e.g., unsecured creditor) does not receive a confirmed amount from the Bankruptcy court, report the outstanding balance.

CREDIT REPORTING RESOURCE GUIDE®

*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 0898

Return to Table of Contents

# Frequently Asked Questions and Answers

**FAQ 28(b)** (continued)

|  | **Filer(s)** | **Non-Filer(s) – Protected by Stay through plan completion** |
|---|---|---|
| Plan Completed – All payments made according to plan – no further obligation by Filer | • CII = G or H (Discharged/completed through BK Chapter 12 or 13)<br>• Account Status = status at time of petition<br>• Payment History = increment first position with value 'D' (plus prior months' history)<br>• Current Balance = Zero<br>• Scheduled Monthly Payment Amount = Zero<br>• Amount Past Due = Zero<br>• Date of Account Information = current month's date<br><br>**Note: After reporting CII 'G' or 'H', discontinue reporting the Filer(s).** | If creditor intends to collect additional monies from Non-Filer after all plan payments are completed, Non-Filer should be reported <u>no earlier than one month after</u> the CII 'G' or 'H' is reported for the Filer.<br><br>First month:<br>• ECOA = applicable value, such as 1 or 2 (not T)<br>• Account Status = status as of the Date of Account Information<br>• Payment History Profile = Report value 'D' in the monthly reporting periods representing the duration of the Filer's bankruptcy (i.e., petition through discharge/completion).<br>• Current Balance = outstanding balance amount<br>• Scheduled Monthly Payment Amount = original or updated amount of the monthly payment due for the Non-Filer(s) going forward<br>• Amount Past Due = total amount that is 30 days or more past the due date<br>**Note: If the Account Status is current (Status Code 11), this field should be zero.**<br><br>In subsequent months, all other Metro 2® account level field information should be reported as of the Date of Account Information for the Non-Filer(s). |

*FAQ 28(b) continued on next page*

*Copyright 2023 © Consumer Data Industry Association*
APPENDIX 0899

Return to Table of Contents

# Frequently Asked Questions and Answers

**FAQ 28(b)** (continued)

| | **Filer(s)** | **Non-Filer(s) – Protected by Stay through plan completion** |
|---|---|---|
| Plan Completed – All payments made according to plan – consumer continues to make payments (example: mortgage account) | <ul><li>CII = Q (Removal Value)</li><li>Account Status = status as of the Date of Account Information</li><li>Payment History = first month, increment first position with value 'D'; in subsequent months, increment based on prior month's status</li><li>Date of Account Information = current month's date</li><li>All other Metro 2® account level field information should be reported as of the Date of Account Information</li></ul> | Non-Filer can be re-reported in the same month CII Q is reported for the filer.<br><br><ul><li>CII = Blank</li><li>ECOA = applicable value, such as 2 (not T)</li></ul> |
| BK Dismissed or Withdrawn | <ul><li>CII = Q (Removal value)</li><li>All other Metro 2® account level field information should be reported as of the Date of Account Information</li></ul>**Note: The "D's" reported in the Payment History Profile from the time the petition was filed until the dismissal (or petition withdrawn) should not be removed, as the consumer was protected by a stay during those months.** | Re-report Non-Filer(s).<br><ul><li>CII = Blank</li><li>ECOA = applicable value, such as 2 (not T)</li></ul> |

**Note: The Consumer Information Indicator is required for reporting when applicable for the filing consumer(s).**

Return to Table of Contents

# Frequently Asked Questions and Answers

**28(c) How should an account be reported when all borrowers associated to the account filed Bankruptcy Chapter 12 or 13?**

Answer: Report the account according to the following guidelines:

|  | **All Borrowers Filed Bankruptcy Chapter 12 or 13** |
|---|---|
| Month BK Filed | • CII = C or D (Petition for Chapter 12 or 13 Bankruptcy)<br>• Account Status = status as of the Date of Account Information<br>• Payment History = first character based on previous month's status, plus prior history<br>• Current Balance = balance as of the Date of Account Information<br>• Scheduled Monthly Payment Amount = amount of the scheduled monthly payment due<br>• Amount Past Due = amount as of the Date of Account Information<br>• Date of Account Information = current month's date<br><br>**Note: Authorized Users (ECOA Code 3) on accounts included in a bankruptcy petition should be deleted (ECOA Code Z) from the account because they are not contractually liable for payments.** |
| Months Between Petition Filed & BK Resolution<br><br>**Note: This guidance should also be followed for confirmed plans.** | • CII = C or D or Blank (previous value reported is retained)<br>• Account Status = status as of the Date of Account Information<br>• Payment History = increment first position with value 'D' (plus history reported prior to BK filing)<br>• Current Balance = balance as of the Date of Account Information<br>• Scheduled Monthly Payment Amount = amount of the scheduled monthly payment due<br>• Amount Past Due = amount as of the Date of Account Information<br>• Date of Account Information = current month's date |

*FAQ 28(c) continued on next page*

Return to Table of Contents

# Frequently Asked Questions and Answers

**FAQ 28(c)** (continued)

| | All Borrowers Filed Bankruptcy Chapter 12 or 13 |
|---|---|
| BK Chapter 12 or 13 Converted to BK Chapter 7 | • CII = A (Petition for Chapter 7 Bankruptcy) or E (Discharged through Bankruptcy Chapter 7), as applicable<br>• Date of First Delinquency = If the Account Status is 11, continue reporting the original Chapter 12 or 13 bankruptcy petition or notification date.<br><br>**Notes:**<br>**The "D's reported in the Payment History Profile from the time the petition was filed until the bankruptcy converted to Chapter 7 should not be removed, as the consumer was protected by a stay during those months.**<br><br>**With the reporting of the BK Chapter 7 indicator, continue updating the account by following FAQ 27 (c).** |
| Plan Completed – All payments made according to plan – no further obligation | • CII = G or H (Discharged/completed through BK Chapter 12 or 13)<br>• Account Status = status as of the Date of Account Information<br>• Payment History = increment first position with value 'D' (plus prior months' history)<br>• Current Balance = Zero<br>• Scheduled Monthly Payment Amount = Zero<br>• Amount Past Due = Zero<br>• Date of Account Information = current month's date<br><br>**Note: After reporting CII 'G' or 'H' for all Filers, discontinue reporting the account.** |
| Plan Completed – All payments made according to plan – consumer continues to make payments (example: mortgage account) | • CII = Q (Removal value)<br>• Account Status = status as of the Date of Account Information<br>• Payment History = first month, increment first position with value 'D'; in subsequent months, increment based on prior month's status<br>• Date of Account Information = current month's date<br>• All other Metro 2® account level field information should be reported as of the Date of Account Information |
| BK Dismissed or Withdrawn | • CII = Q (removal code)<br>• All other Metro 2® account level field information should be reported as of the Date of Account Information<br><br>**Note: The "D's" reported in the Payment History Profile from the time the petition was filed until the dismissal (or petition withdrawn) should not be removed, as the consumer was protected by a stay during those months.** |

CREDIT REPORTING RESOURCE GUIDE®
*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 0902

Return to Table of Contents

# Frequently Asked Questions and Answers

**28(d) How should an account be reported when one borrower filed Bankruptcy Chapter 12 or 13 and the other borrower did not?**

Answer: When a Bankruptcy Chapter 12 or 13 is filed by one borrower and there is also a Non-Filer associated to the account, both may be protected by an automatic stay.  The Non-Filer may be protected through the completion of the plan.  Therefore, the Non-Filer should be terminated from the account until the plan is completed.

|  | **Filer(s)** | **Non-Filer(s) – Protected by Stay through plan completion** |
|---|---|---|
| Month BK Filed | <ul><li>CII = C or D (Petition for Chapter 12 or 13 Bankruptcy)</li><li>Account Status = status as of the Date of Account Information</li><li>Payment History = first character based on previous month's status, plus prior history</li><li>Current Balance = balance as of the Date of Account Information</li><li>Scheduled Monthly Payment Amount = amount of the scheduled monthly payment due</li><li>Amount Past Due = amount as of the Date of Account Information</li><li>Date of Account Information = current month's date</li></ul> | <ul><li>CII = Blank</li><li>ECOA Code = T (Terminated)</li></ul>**Note: Authorized Users (ECOA Code 3) on accounts included in a bankruptcy petition should be deleted (ECOA Code Z) from the account because they are not contractually liable for payments.** |
| Months Between Petition Filed & BK Resolution<br><br>**Note: This guidance should also be followed for confirmed plans.** | <ul><li>CII = C or D or Blank (previous petition value reported is retained)</li><li>Account Status = status as of the Date of Account Information</li><li>Payment History = increment first position with value 'D' (plus history reported prior to BK filing)</li><li>Current Balance = balance as of the Date of Account Information</li><li>Scheduled Monthly Payment Amount = amount of the scheduled monthly payment due</li><li>Amount Past Due = amount as of the Date of Account Information</li><li>Date of Account Information = current month's date</li></ul> | Do not report Non-Filer(s). |

*FAQ 28(d) continued on next page*

Return to Table of Contents

# Frequently Asked Questions and Answers

**FAQ 28(d)** (continued)

| | **Filer(s)** | **Non-Filer(s) – Protected by Stay through plan completion** |
|---|---|---|
| BK Chapter 12 or 13 Converted to BK Chapter 7 | • CII = A (Petition for Chapter 7 Bankruptcy) or E (Discharged through Bankruptcy Chapter 7), as applicable<br>• Date of First Delinquency = If the Account Status is 11, continue reporting the original Chapter 12 or 13 bankruptcy petition or notification date.<br><br>**Notes:**<br>**The "D's reported in the Payment History Profile from the time the petition was filed until the bankruptcy converted to Chapter 7 should not be removed, as the consumer was protected by a stay during those months.**<br><br>**With the reporting of the BK Chapter 7 indicator, continue updating the account by following FAQ 27(d).** | • ECOA = original value that defines the consumer's relationship to the account (not T)<br>• CII = Blank<br><br>**Note: At this point, continue updating the account by following FAQ 27(d).** |

*FAQ 28(d) continued on next page*

CREDIT REPORTING RESOURCE GUIDE®

*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 0904

Return to Table of Contents

# Frequently Asked Questions and Answers

**FAQ 28(d)** (continued)

| | **Filer(s)** | **Non-Filer(s) – Protected by Stay through plan completion** |
|---|---|---|
| Plan Completed – All payments made according to plan – no further obligation by Filer | • CII = G or H (Discharged/completed through BK Chapter 12 or 13)<br>• Account Status = status as of the Date of Account Information<br>• Payment History = increment first position with value 'D' (plus prior months' history)<br>• Current Balance = Zero<br>• Scheduled Monthly Payment Amount = Zero<br>• Amount Past Due = Zero<br>• Date of Account Information = current month's date<br><br>**Note: After reporting CII 'G' or 'H', discontinue reporting the Filer(s).** | If creditor intends to collect additional monies from Non-Filer after all plan payments are completed, Non-Filer should be reported <u>no earlier than one month after</u> the CII 'G' or 'H' is reported for the Filer.<br><br>First month:<br>• ECOA = applicable value, such as 1 or 2 (not T)<br>• Account Status = status as of the Date of Account Information<br>• Payment History Profile = Report value 'D' in the monthly reporting periods representing the duration of the Filer's bankruptcy (i.e., petition through discharge/completion).<br>• Current Balance = outstanding balance amount<br>• Scheduled Monthly Payment Amount = original or updated amount of the monthly payment due for the Non-Filer(s) going forward<br>• Amount Past Due = total amount that is 30 days or more past the due date<br>**Note: If the Account Status is current (Status Code 11), this field should be zero.**<br><br>In subsequent months, all other Metro 2® account level field information should be reported as of the Date of Account Information for the Non-Filer(s). |

*FAQ 28(d) continued on next page*

# Frequently Asked Questions and Answers

**FAQ 28(d)** (continued)

|  | **Filer(s)** | **Non-Filer(s) – Protected by Stay through plan completion** |
|---|---|---|
| Plan Completed – All payments made according to plan – consumer continues to make payments (example: mortgage account) | • CII = Q (Removal value)<br>• Account Status = status as of the Date of Account Information<br>• Payment History = first month, increment first position with value 'D'; in subsequent months, increment based on prior month's status<br>• Date of Account Information = current month's date<br>• All other Metro 2® account level field information should be reported as of the Date of Account Information | Non-Filer can be re-reported in the same month CII Q is reported for the filer.<br><br>• CII = Blank<br>• ECOA = applicable value (not T) |
| BK Dismissed or Withdrawn | • CII = Q (removal value)<br>• All other Metro 2® account level field information should be reported as of the Date of Account Information<br><br>**Note: The "D's" reported in the Payment History Profile from the time the petition was filed until the dismissal (or petition withdrawn) should not be removed, as the consumer was protected by a stay during those months.** | Re-report Non-Filer(s).<br>• CII = Blank<br>• ECOA = applicable value (not T) |

**Note: The Consumer Information Indicator is required for reporting when applicable for the filing consumer(s).**

CREDIT REPORTING RESOURCE GUIDE®
*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 0906

Return to Table of Contents

# Frequently Asked Questions and Answers

29. **Question: How should a secured debt (e.g., mortgage account) be reported when a consumer completes the required payments through a Bankruptcy Chapter 12 or 13 plan, but the account is still open and the consumer is continuing to make payments?**

    Answer: While the consumer is making payments through the plan, Consumer Information Indicator **C** (Petition for Chapter 12 Bankruptcy) or **D** (Petition for Chapter 13 Bankruptcy) should be reported.  If the account is still open when the plan payments have been completed, report Consumer Information Indicator **Q** to remove the petition indicator so that ongoing payments made by the consumer can be reported.

# Frequently Asked Questions and Answers

**30. Question: How should multiple bankruptcies (i.e., the same or different chapters) be reported for the different associated borrowers on an account?**

Answer: Report the account according to the following guidelines:

| | | |
|---|---|---|
| **A** | Both borrowers file Bankruptcy Chapter 7 in the same reporting period. | Follow FAQ 27(c). |
| **B** | Borrower 1 files Bankruptcy Chapter 7 – Borrower 2 is a Non-Filer.  At a later time, Borrower 2 files Bankruptcy Chapter 7. | When Borrower 1 files BK Chapter 7, follow FAQ 27(d) because at this time, there is also a Non-Filer on this account. Therefore, for the account level fields, report account information for the consumer who did <u>not</u> file the bankruptcy.<br><br>When Borrower 2 files BK Chapter 7 at a later date, begin following FAQ 27(c) since all borrowers are now filers.<br><br>• Reaffirmation of Debt – If Borrower 1 reaffirms the debt, report CII = R.  As per FAQ 27(c), all other Metro 2® account level field information should be reported as of the Date of Account Information.<br>• Discharged – If the bankruptcy for Borrower 1 is discharged, report CII = E.  Discontinue reporting Borrower 1 on subsequent updates.  Continue reporting for Borrower 2 according to FAQ 27(c).<br>• Dismissed = If the bankruptcy for Borrower 1 is dismissed, report CII = Q (to remove the petition indicator).  Continue reporting the account according to FAQ 27(d) since Borrower 1 is now a Non-Filer. |
| **C** | Both borrowers file Bankruptcy Chapter 13 in the same reporting period. | Follow FAQ 28(c). |

*FAQ 30 continued on next page*

CREDIT REPORTING RESOURCE GUIDE®
*Copyright 2023 © Consumer Data Industry Association*
APPENDIX 0908

Return to Table of Contents

# Frequently Asked Questions and Answers

**FAQ 30** (continued)

| D | Borrower 1 files Bankruptcy Chapter 13 – Borrower 2 is a Non-Filer.  At a later time, Borrower 2 files Bankruptcy Chapter 13. | When Borrower 1 files BK Chapter 13, follow FAQ 28(d) because at this time, there is also a Non-Filer on this account.  As per the FAQ, the Non-Filer should be terminated from the account using ECOA Code T.

When Borrower 2 files BK Chapter 13, re-report this borrower as follows:

• Consumer Information Indicator = D
• ECOA Code = applicable value such as 2 (not T)

Continue reporting the account following FAQ 28(c).

When Borrower 1 completes the BK Chapter 13 plan, report CII = H for Borrower 1.  Discontinue reporting Borrower 1 on subsequent updates.

When Borrower 2 completes the BK Chapter 13 plan, report CII = H for Borrower 2.  If all payments have been completed according to the plan and there is no further obligation, discontinue reporting the account on subsequent updates.  However, if all payments have been completed according to the plans and the account is still open, both borrowers may be reported with CII = Q to remove the BK indicators so that ongoing payments made by the consumers may be reported.

**Important Note:** If the asset (e.g., mortgage) is included in only one of the borrower's bankruptcy plans, CII D should be reported ***only*** for the borrower whose bankruptcy plan includes the account.  The other borrower should be terminated from the account since the asset is not included in this borrower's bankruptcy plan.

***Scenario D continued on next page*** |

Return to Table of Contents

# Frequently Asked Questions and Answers

**FAQ 30** (continued)

| D | *Continued from previous page*<br><br>Borrower 1 files Bankruptcy Chapter 13 – Borrower 2 is a Non-Filer.  At a later time, Borrower 2 files Bankruptcy Chapter 13. | **Notes regarding bankruptcy plan dismissals:**<br><br>• If the bankruptcy for Borrower 1 is dismissed <u>prior</u> to Borrower 2 filing bankruptcy, report Consumer Information Indicator Q (to remove the petition indicator), report the account information as it applies going forward, and re-report the Non-Filer with the applicable ECOA Code (not T).  In this scenario, when Borrower 2 later files Bankruptcy Chapter 13, follow FAQ 28(d).<br><br>• If the bankruptcy for Borrower 1 is dismissed <u>after</u> Borrower 2 files bankruptcy, report Consumer Information Indicator Q (to remove the petition indicator) and ECOA Code T for Borrower 1, who may now be protected by Borrower 2's bankruptcy.<br><br>Continue updating this account by following FAQ 28(d).<br><br>• If the bankruptcy for Borrower 2 is dismissed and the bankruptcy for Borrower 1 is still active, report Consumer Information Indicator Q and ECOA Code T for Borrower 2.  Continue updating the account according to FAQ 28(d).<br><br>• If the bankruptcy for Borrower 2 is dismissed and the bankruptcy for Borrower 1 was previously dismissed, report Borrower 1 with the applicable ECOA Code (not T).   As this account no longer has any borrowers in an active bankruptcy, report the account normally going forward. |

*FAQ 30 continued on next page*

CREDIT REPORTING RESOURCE GUIDE®
*Copyright 2023 © Consumer Data Industry Association*
APPENDIX 0910

Return to Table of Contents

# Frequently Asked Questions and Answers

**FAQ 30** (continued)

| E | Borrower 1 files Bankruptcy Chapter 7 and Borrower 2 files Bankruptcy Chapter 13 in the same reporting period. | In the month the BK's were filed, Borrower 1 should be reported with CII = A, and Borrower 2 should be reported with CII = D.  (Each borrower may be protected by an automatic stay based on his or her bankruptcy filing.)<br><br>• Account Status = status as of the Date of Account Information<br>• Payment History = first character based on previous month's Account Status, plus prior history<br>• Current Balance = balance as of the Date of Account Information<br>• Scheduled Monthly Payment Amount = amount of the scheduled monthly payment due<br>• Amount Past Due = amount as of the Date of Account Information<br>• Date of Account Information = current month's date<br><br>Months between petition filed and BK resolution:<br><br>• CII = A for Borrower 1 and CII = D for Borrower 2,  or Blank (previous values reported are retained)<br>• Account Status = status as of the Date of Account Information<br>• Payment History = increment first position with value 'D' (plus history reported prior to bankruptcy)<br>• Current Balance = balance as of the Date of Account Information<br>• Scheduled Monthly Payment Amount = amount of the scheduled monthly payment due<br>• Amount Past Due = amount as of the Date of Account Information<br>• Date of Account Information = current month's date<br><br>***Scenario E continued on next page*** |

*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 0911

Return to Table of Contents

# Frequently Asked Questions and Answers

**FAQ 30** (continued)

| E | *Continued from previous page*<br><br>Borrower 1 files Bankruptcy Chapter 7 and Borrower 2 files Bankruptcy Chapter 13 in the same reporting period. | In subsequent months:<br><br>**Borrower 1:**<br>Debt is Discharged:<br>• CII = E (Discharged through BK Chapter 7)<br>• Discontinue reporting Borrower 1 on subsequent updates.<br><br>**Note:** In this case, begin to follow FAQ 28(c) because at this point, Borrower 2 is the only borrower remaining on the account.<br><br>**Borrower 1:**<br>BK is Dismissed:<br>• CII = Q (to remove petition indicator)<br>• ECOA Code = T (Terminated) if the BK Chapter 13 for Borrower 2 is still in petition or confirmed state.<br>Note that Borrower 1 may now be protected by the automatic stay of Borrower 2's BK Chapter 13.<br><br>Continue to follow FAQ 28(d) because at this point, there is a filer and Non-Filer on the account.<br><br>**Borrower 2:**<br>BK Dismissed:<br>• CII = Q (to remove the petition indicator)<br><br>Continue reporting and follow FAQ 27(d) if the BK for Borrower 1 is still a Chapter 7 petition or discharge. |

*FAQ 30 continued on next page*

CREDIT REPORTING RESOURCE GUIDE®

*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 0912

Return to Table of Contents

# Frequently Asked Questions and Answers

**FAQ 30** (continued)

| | | |
|---|---|---|
| **F** | Borrower 1 files Bankruptcy Chapter 7 – Borrower 2 is a Non-Filer.  At a later time, Borrower 2 files Bankruptcy Chapter 13. | When Borrower 1 files BK Chapter 7, follow FAQ 27(d) because at this point, there is also a Non-Filer on the account.<br><br>If the BK Chapter 7 for Borrower 1 is discharged, when Borrower 2 files BK Chapter 13 at a later date, follow FAQ 28(c) because Borrower 1 is no longer reported after the BK Chapter 7 discharge.<br><br>If the BK Chapter 7 for Borrower 1 is dismissed, report CII = Q (to remove the petition indicator) and ECOA Code T to terminate this borrower from the account.  At this point, Borrower 1 may be protected by the automatic stay of Borrower 2's BK Chapter 13.  Continue to follow the guidance in FAQ 28(d). |
| **G** | Borrower 1 files Bankruptcy Chapter 13 – Borrower 2 is a Non-Filer.  At a later time, Borrower 2 files Bankruptcy Chapter 7. | When Borrower 1 files BK Chapter 13, follow FAQ 28(d) because at this point, there is also a Non-Filer on this account.  As per the FAQ, the Non-Filer (Borrower 2) should be terminated from the account using ECOA Code T.<br><br>When Borrower 2 files BK Chapter 7, re-report this borrower with the original ECOA Code (not T) and CII = A (Petition for Chapter 7 BK).  Follow the guidance in FAQ 28(c).<br><br>If Borrower 2's BK is discharged, report CII = E (Chapter 7 BK Discharged).  Discontinue reporting this consumer on subsequent updates and continue reporting the account and Borrower 1 following FAQ 28(c).<br><br>If Borrower 2's BK is dismissed, report CII = Q (to remove the petition indicator) and ECOA Code T (Terminated) since this borrower may be protected by Borrower 1's Chapter 13 BK. |

*Copyright 2023 © Consumer Data Industry Association*
APPENDIX 0913

Return to Table of Contents

# Frequently Asked Questions and Answers

**31. Question: How should bankruptcies be reported when the consumer voluntarily surrenders the merchandise or redeems the merchandise?**

Answer: When a bankruptcy is filed, the consumer can voluntarily surrender the merchandise to the creditor.  In this situation, report Account Status Code **95** (Voluntary Surrender) and the appropriate Consumer Information Indicator.

The consumer also has the option to pay fair market value, thereby redeeming the merchandise.  In this situation, report Account Status Code **13** (Paid/closed account), Special Comment Code **AU** (Account paid in full for less than the full balance), and the appropriate Consumer Information Indicator.

**32. Question: How should an account be reported when a Bankruptcy case has been closed or terminated without being discharged or dismissed?**

Answer: Report Consumer Information Indicator **Q** to remove the previously-reported Bankruptcy Petition indicator.  If the case is re-opened, report the Consumer Information Indicator for the appropriate disposition; e.g., petition, discharged or dismissed.

**Note:** A bankruptcy case may be closed or terminated when the consumer does not pay the applicable court fees or does not attend the required financial management class.

CREDIT REPORTING RESOURCE GUIDE®

*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 0914

Return to Table of Contents

# Frequently Asked Questions and Answers

## REPORTING SCENARIOS

Please note that within these reporting guidelines, certain fields are mentioned that provide specific guidance for the situations described.  For all other Metro 2® fields, the standard guidelines described within the Field Definitions module should be followed.

**33.  Question: How should an account be reported when it is included in a Personal Receivership plan (Wisconsin Chapter 128)?**

Answer: Report the account per existing Metro 2® guidelines.  If the Terms Duration and Scheduled Monthly Payment Amount were modified by the plan, report the new values.  Include Consumer Information Indicator **1A** (Personal Receivership) for the consumer who filed the plan.

When the plan is completed or has been dismissed, report Consumer Information Indicator **Q** to remove the Personal Receivership indicator.

**34.  Questions: Charge-offs:**

**(a) How should charged off accounts be reported?**

Answer: Report the following Base Segment fields:

- Scheduled Monthly Payment Amount = zero
- Account Status = 97 (Unpaid balance reported as a loss – charge-off)
- Original Charge-off Amount = the original amount charged to loss, regardless of the declining balance.  This field should not be changed.
- FCRA Compliance/Date of First Delinquency = the date of the first 30-day delinquency that led to the account being charged off
- Date Closed = For Installment and Mortgage accounts (Portfolio Types I and M), zero fill.  For Revolving, Open and Line of Credit accounts (Portfolio Types R, O and C), if the account is closed, report the date the account was closed to further purchases.  Otherwise, zero fill.
- Date of Last Payment = date the most recent payment was received

**Note:** If a small deficiency balance is being charged off for accounting and general ledger purposes only and the consumer is not being held responsible for this amount, ***do not report*** the account as a charge off.  Deduct the charged off amount from the Current Balance of the ongoing account.

*FAQ 34 continued on next page*

# Frequently Asked Questions and Answers

**34(b) How should paid charge-off accounts be reported?**

Answer: Report the following Base Segment fields:

- Scheduled Monthly Payment Amount = zero
- Account Status = 64 (Account paid in full, was a charge-off)
- Special Comment Code = If the account is settled for less than the full balance, include **AU**.
- Current Balance and Amount Past Due = zero
- Original Charge-off Amount = the original amount charged to loss
- Date of Account Information = date paid
- FCRA Compliance/Date of First Delinquency = the date of the first 30-day delinquency that led to the account being charged off
- Date Closed = For Installment and Mortgage accounts (Portfolio Types I and M), report the date the account was paid in full.  For Revolving, Open and Line of Credit accounts (Portfolio Types R, O and C), report the date the account was closed to further purchases.
- Date of Last Payment = date the most recent payment was received

CREDIT REPORTING RESOURCE GUIDE®
*Copyright 2023 © Consumer Data Industry Association*
APPENDIX 0916

Return to Table of Contents

# Frequently Asked Questions and Answers

**35. Question: How should an account be reported when the creditor files an IRS Form 1099-C?**

Answer: The account should be reported as charged off, or if a settlement agreement was made with the consumer, the account should be reported as settled.  Account balances should be reflective of those decisions or actions at the time they occur; e.g., charged off, settled.  There is no special comment that specifically states that the creditor has filed form 1099-C.

If the account is reported as a charge off, report the following Base Segment fields:

- Account Status Code = 97 (Unpaid balance reported as a loss – charge-off)
- Current Balance and Amount Past Due:
  - If the consumer is no longer obligated to pay the balance, report both fields as zero.  In subsequent reporting periods, discontinue reporting the account.
  - If the account has received only a partial adjustment and the consumer remains obligated to repay the residual amount, report the residual amount in the Current Balance and Amount Past Due fields.  If payments are made by the consumer, report the declining balance in these two fields.
- Original Charge-off Amount = the original amount charged to loss
- FCRA Compliance/Date of First Delinquency = the date of the first 30-day delinquency that led to the account being charged off
- Date Closed = For Installment and Mortgage accounts (Portfolio Types I and M), zero fill.  For Revolving, Open and Line of Credit accounts (Portfolio Types R, O and C), if the account is closed, report the date the account was closed to further purchases.  Otherwise, zero fill.

If the account is reported as settled, refer to FAQ 38 for reporting guidance.

# Frequently Asked Questions and Answers

**36.  Question: How should an account be reported when an auto lease is terminated (full or early), yet there may be post-lease charges on the account; i.e., over mileage charges, excess wear & tear charges, or other outstanding charges?**

Answer: Report the following Base Segment fields:

- Original Loan Amount = Continue to report the original amount of the loan, which should *not* be changed to include the additional charges.
- Account Status Code = 11, 71, 78, 80, 82, 83, 84 or 93, as applicable

    **Note:** Even though the lease contract is terminated, the account should *not* be reported as paid (Account Status 13 or 61-65) because there may be other outstanding charges.

- Special Comment Code = Report the applicable code to represent the lease termination:
    - o  BB = Full termination/status pending
    - o  BD = Full termination/balance owing
    - o  BE = Early termination/status pending
    - o  BG = Early termination/balance owing
- Current Balance = Report the outstanding current balance as of the Date of Account Information, which should include the additional outstanding charges on the account.
- Amount Past Due = Report the total amount of payments that are 30 days or more past due.

When the account has been paid in full, including any applicable post-lease charges, report Account Status Code **13** or **62** and remove or change the reported Special Comment Code as applicable.

If the fees are not paid and the outstanding amount is charged off, report Account Status Code **97** (Unpaid balance reported as a loss – charge-off).  In subsequent reporting periods, follow FAQ 34.

CREDIT REPORTING RESOURCE GUIDE®
*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 0918

Return to Table of Contents

# Frequently Asked Questions and Answers

37. **Questions: Prepaid leases and leases paid in full in advance of termination:**

    **(a) How should an account be reported when an auto lease is prepaid – where entire lease payment is paid at the time of opening?**

    Answer: Report the following Base Segment fields:

    - Account Type = 3A (Auto Lease)
    - Terms Duration = 001
    - Terms Frequency = P (Single Payment Loan)
    - Scheduled Monthly Payment Amount = zero
    - Account Status = 11

        **Note:** Even though the account has been prepaid, do ***not*** report the Account Status as paid (Account Status Codes 13 or 61-65) since the potential exists for lease end charges to be due on termination.
    - Special Comment Code = BS (Prepaid Lease)
    - Current Balance = zero

    Upon termination, if no lease end charges apply, report Account Status Code **13** (paid).

    If lease end charges apply, refer to FAQ 36 for reporting guidance.

    **(b) How should an account be reported when an auto lease is paid in full in advance of termination?**

    Answer: Report the following Base Segment fields:

    - Scheduled Monthly Payment Amount = zero
    - Account Status = 11

        **Note:** Even though the account has been paid in full in advance of termination, do ***not*** report the Account Status as paid (Account Status Codes 13 or 61-65) since the potential exists for lease end charges to be due on termination.
    - Special Comment Code = BS (Prepaid Lease)
    - Current Balance = zero

    **Notes:** Do ***not*** change the original Terms Duration or Terms Frequency.

    Upon termination, if no lease end charges apply, report Account Status Code **13** (paid).

    If lease end charges apply, refer to FAQ 36 for reporting guidance.

Return to Table of Contents

# Frequently Asked Questions and Answers

**38.  Question: How should accounts that are paid in full for less than the full balance (i.e., settled) be reported?**

Answer: Report the following Base Segment fields as specified:

- Scheduled Monthly Payment Amount = zero
- Account Status Code = 13 or 61-65, as applicable
- Payment Rating = required when the Account Status Code is 13 or 65. Blank fill for Account Status Codes 61-64.
- Special Comment = AU (Account paid in full for less than the full balance)
- Current Balance and Amount Past Due = zero
- Date of Account Information = the date the account was paid in full for less than the full balance
- Date Closed = For Installment and Mortgage accounts (Portfolio Types I and M), report the date the account was paid in full for less than the full balance.  For Revolving and Line of Credit accounts (Portfolio Types R and C), report the date the account was closed to further charges.  For Open accounts (Portfolio Type O), report the date the account was closed to further charges or paid in full, as applicable.

CREDIT REPORTING RESOURCE GUIDE®

*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 0920

Return to Table of Contents

# Frequently Asked Questions and Answers

**39. Question: How should a paid in full, closed account be reported?**

Answer: Report the following Base Segment fields as specified:

- Scheduled Monthly Payment Amount = zero
- Actual Payment Amount = the amount actually received for this reporting period
- Credit Limit = For Revolving, Open and Line of Credit accounts, report the last assigned credit limit.
- Account Status Code = 13 or 61-65, as applicable
- Payment Rating = required when the Account Status Code is 13 or 65. Blank fill for Account Status Codes 61-64.
- Special Comment Code = M or CI may be reported if applicable for Revolving, Open and Line of Credit accounts
- *OR* Compliance Condition Code = XA may be reported if applicable for Revolving, Open and Line of Credit accounts.

**Important Note:** Do not report an account as closed by credit grantor *and* closed at consumer's request.  Only one closed code can apply.

- Current Balance and Amount Past Due = zero
- Date of Account Information = Report the date the account was paid in full. For inactive accounts, report a date within the current reporting period when the account was closed to further use.

**Important Note:** Payoffs should not be backdated for credit reporting purposes.  For example:

- Account reported as Account Status 11 (current) with Date of Account Information = 03/31/2023
- Account marked as paid on 04/08/2023, but the paid effective date is 03/22/2023
- Report account as Account Status 13 (paid) with Date of Account Information = 04/08/2023

- Date Closed = For Installment and Mortgage accounts (Portfolio Types I and M), report the date the account was paid in full.  For Revolving and Line of Credit accounts (Portfolio Types R and C), report the date the account was closed to further charges.  For Open accounts (Portfolio Type O), report the date the account was closed to further charges or paid in full, as applicable.

Return to Table of Contents

# Frequently Asked Questions and Answers

40. **Question: How should a closed account be reported that has an outstanding balance?**

    Answer: For Revolving, Open and Line of Credit accounts *only*, report the following Base Segment fields as specified:

    - Portfolio Type = R (Revolving), O (Open) or C (Line of Credit) depending on the terms
    - Credit Limit = report last assigned credit limit
    - Account Status Code = 11, 71, 78, 80, 82-84, 93 or 97, as applicable
    - Special Comment Code = M, if account closed by credit grantor
    - *OR* Compliance Condition Code = if account closed at consumer's request, report the appropriate code XA, XD, XE or XJ

      **Important Note:** Do not report an account as closed by credit grantor *and* closed at consumer's request.  Only one closed code can apply.

    - Current Balance = the outstanding balance amount as of the Date of Account Information
    - Amount Past Due = the total amount that is 30 days or more past the due date
    - Date Closed = the date the account was closed

41. **Question: How long should paid accounts (Account Status Codes 13, 61-65) continue to be reported?**

    Answer: Use the following guidelines if paid accounts are re-reported:

    - Freeze the Account Status, Payment Rating, Payment History Profile and Date of Account Information as of the date the account was paid.
    - Do not re-report paid accounts for more than three months.

42. **Question: How should prepaid credit cards/gift cards be reported?**

    Answer: Do not report prepaid credit cards/gift cards because the consumer has no credit obligation.

Return to Table of Contents

# Frequently Asked Questions and Answers

**43. Question: What are the available options for reporting an account that has regular payments temporarily postponed?**

Answer: While all applicable fields within the Metro 2® Format should be reported, these guidelines provide specific values that apply to the options available when a lender (creditor) agrees to temporarily postpone regular payments on an account.  Based on the type of temporary relief payment plan, the consumer may be making reduced payments, interest-only payments or no payments.

"Temporary" for this Metro 2® credit reporting purpose is defined as a short-term schedule change to regular monthly payments that has an identified end date and is not permanent.

When the temporary relief payment plan concludes, for subsequent reporting, the standard guidelines described within the Field Definitions module should be followed for all Metro 2® fields.

Your business policies/procedures as identified by your legal/compliance department should:

- Determine which reporting option is most applicable to follow when a consumer enters into a temporary relief payment plan
- Identify the duration of how long applicable temporary relief payment plan options will last in compliance with federal and state guidance pertaining to a consumer's willingness to repay the obligation
- Include provisions for when a consumer does not fulfill the required obligation(s) of the temporary relief payment plan (including working out a payment plan) after being given an opportunity to comply.  These provisions should also clearly state when standard delinquency reporting/progression, including Date of First Delinquency calculations as described in Exhibit 9, can resume for the account.

**Important Note:** Do not update the entries in the Payment History Profile for the month's representative of the temporary relief payment plan, after the plan period has ended.  If the account becomes paid while in the payment plan, refer to FAQ 39 for standard reporting guidance for paid in full accounts.

*FAQ 43 continued on next page*

# Frequently Asked Questions and Answers

**FAQ 43** (continued)

### Option 1 – Report the account in a Payment Holiday/Skip-a-Pay

Report the following Base Segment fields as specified:

- Terms Frequency = frequency for payments due
  (***Not*** value D for deferred)
- Scheduled Monthly Payment Amount = new payment due
  (If no payments are due during this time period, zero fill.)
- Account Status = appropriate code that specifies the status of the account
  for each month the account is in the Payment Holiday/Skip-a-Pay (e.g.,
  Current, 30 days delinquent, 60 days delinquent)
  (If no payments are due during this time period, report Account Status
  **11**.)
- Payment History Profile = appropriate code that specifies the previous
  month's Account Status for each month the account is in the Payment
  Holiday/Skip-a-Pay time period, plus prior history.
  (Increment the Payment History Profile with value **D** if no payments are
  due during this time period.)

**Important Note:** Additionally, if the consumer was delinquent going into the
Payment Holiday/Skip-a-Pay, the two fields below must be considered when
the consumer comes out of this time period and begins repayment:

- Account Status Code = appropriate code that specifies the status of the
  account when the account comes out of the Payment Holiday/Skip-a-Pay
- Date of First Delinquency = if the Account Status is delinquent, the
  original date that led to the Account Status being reported prior to the
  Payment Holiday/Skip-a-Pay

### Option 2 – Report the account as Deferred

Refer to FAQ 44 for complete reporting guidance for Deferred Accounts.

### Option 3 – Report the account in Forbearance

Refer to FAQ 45 for complete reporting guidance for accounts in Forbearance.

CREDIT REPORTING RESOURCE GUIDE®
*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 0924

Return to Table of Contents

# Frequently Asked Questions and Answers

**44.  Question: How should deferred accounts be reported?**

Answer: Report the following Base Segment fields as specified:

- Terms Duration = blank
- Terms Frequency = D (Deferred)
- Highest Credit or Original Loan Amount = the total amount borrowed, excluding interest
- Scheduled Monthly Payment Amount = zero
- Account Status Code = 11 (Current account)
- Payment History Profile = Use Character **B** to indicate accounts which have never been in repayment.  Use Character **D** to indicate accounts that were previously in repayment but are now deferred.

    **Note:** When an account goes into deferment, do not change the previously-reported account history in the Payment History Profile.

- Current Balance = outstanding balance amount
- Amount Past Due = zero

In the K4 Segment, report the Specialized Payment Indicator **02** for Deferred Payment.  Also, report the Deferred Payment Start Date as the date the first payment will be due.  If the deferred payment start date is not known, do not report the K4 Segment.

**Important Notes:** When the account goes into repayment, stop reporting the K4 Segment and begin reporting monthly payment information.  Report valid values as per the repayment agreement in the following fields:

- Terms Duration
- Terms Frequency (other than **D**)
- Scheduled Monthly Payment Amount

Additionally, if the consumer was delinquent going into the deferment period, the two fields below must be considered when the consumer comes out of deferment and begins repayment.

- Account Status Code = appropriate code that specifies the status of the account when the account comes out of deferment
- Date of First Delinquency = if the Account Status is delinquent, the original date that led to the Account Status being reported prior to deferment

*Copyright 2023 © Consumer Data Industry Association*
APPENDIX 0925

Return to Table of Contents

# Frequently Asked Questions and Answers

**45.  Question: How should accounts in forbearance be reported?**

Answer: Forbearance is a period of time during repayment in which a borrower is permitted to temporarily postpone making regular monthly payments.  The debt is not forgiven, but regular payments are suspended until a later time.  A forbearance agreement is most commonly applied to mortgages and student loans.  However, forbearance is applicable to any type of loan.  As an example, forbearance may be granted if a borrower is experiencing temporary financial difficulty.  The consumer may be making reduced payments, interest-only payments or no payments.

If the account is in forbearance, report:

- Terms Duration = terms of the loan, which can be changed if the terms of the loan are contractually extended
  (If no payments are due during the forbearance period, blank fill.)
- Terms Frequency = frequency for payments due
  (If no payments are due during the forbearance period, report code **D** for deferred.)
- Scheduled Monthly Payment Amount = new payment due
  (If no payments are due during the forbearance period, zero fill.)
- Account Status = appropriate code that specifies the status of the account for each month the account is in forbearance (e.g., Current, 30 days delinquent, 60 days delinquent)
  (If no payments are due during the forbearance period, report Account Status **11**.)
- Payment History Profile = appropriate code that specifies the previous month's Account Status for each month the account is in forbearance, plus prior history.
  (Increment the Payment History Profile with value **D** if no payments are due during the forbearance period.)
- Special Comment Code = **CP** (Account in forbearance)
- Current Balance = outstanding balance amount, reflecting any payments made
- Amount Past Due = total amount that is 30 days or more past the due date, if the account is delinquent during the forbearance period
- K4 Specialized Payment Indicator = **02** and Deferred Payment Start Date when payments are deferred during the forbearance period

**Important Note:** Additionally, if the consumer was delinquent going into the forbearance period and no payments were required during forbearance, the two fields below must be considered when the consumer comes out of forbearance and begins repayment.

- Account Status Code = appropriate code that specifies the status of the account when the account comes out of forbearance
- Date of First Delinquency = if the Account Status is delinquent, the original date that led to the Account Status being reported, prior to forbearance

    CREDIT REPORTING RESOURCE GUIDE®
*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 0926

Return to Table of Contents

# Frequently Asked Questions and Answers

**46. Question: How should accounts that have been transferred be reported?**

Answer: There are two options for reporting accounts that are being transferred internally or to a servicer:

1. **Preferred Option if account history can be verified by the new department or servicer:** Report the L1 Segment to change the Identification Number and/or the Consumer Account Number.  Use of the L1 Segment allows the consumer reporting agencies to retain all prior account history.

   **Note:** For full L1 Segment reporting details, refer to the L1 Segment field description in the Field Definitions module.

2. The second option results in two tradelines on a consumer's file: the first as transferred and the second for the ongoing account.

   The original department or servicer should report the following Base Segment fields as specified for the transferred account:

   - Scheduled Monthly Payment Amount = zero
   - Account Status Code = the appropriate code that specifies the status of the account at the time of transfer
   - Payment Rating = if applicable to the Account Status Code being reported
   - Special Comment = For internal transfers, report Special Comment AT (Account closed due to transfer), *or* for transfers to another company or servicer, report Special Comment O (Account transferred to another company/servicer).
   - Current Balance and Amount Past Due = zero
   - Date of Account Information = date the account was transferred
     **Note:** Reporting the account as transferred is considered a final disposition for credit reporting purposes.  However, if the account is reported in subsequent reporting periods, freeze the Date of Account Information as of the date the account was transferred.
   - FCRA Compliance/Date of First Delinquency = If the account is delinquent or derogatory at the time of transfer, report the date of the first 30-day delinquency that led to the status being reported.  If the account being transferred is current and included in bankruptcy, report the date of the bankruptcy petition or notification.
   - Date Closed = date the account was transferred.  If the account was closed prior to being transferred, report the original date the account was closed.
   - Consumer Information Indicator = report bankruptcy indicator when applicable to the consumer(s)

   Additionally, if the account is delinquent or derogatory, it is imperative that you provide the date of the first delinquency that led to the account being transferred to the internal department or servicer that will be reporting the ongoing account.

*FAQ 46 continued on next page*

Return to Table of Contents

# Frequently Asked Questions and Answers

**FAQ 46** (Option 2 continued)

In the following month's reporting period, the new department or servicer should report the following Base Segment fields as specified for the new account:

- Identification Number = number that identifies the new department or servicer reporting the account
- Consumer Account Number = new account number for the ongoing account
- Date Opened = date opened with the original department or servicer
- Account Status Code = appropriate code that specifies the status of the account as of the Date of Account Information
- Payment Rating = if applicable to the Account Status Code being reported
- Payment History Profile = report character 'B' for months the account was reported by the original department or servicer; do **not** report payment history that occurred prior to the transfer.
- FCRA Compliance/Date of First Delinquency = If the account is delinquent or derogatory at the time of transfer, report the date of the first 30-day delinquency **with the original department or servicer** that led to the status being reported.  If the account being transferred is current and included in bankruptcy, report the date of the bankruptcy petition or notification.

    If the new department or servicer is unable to obtain the **Date of First Delinquency with the original department or servicer**, do not report the account.

- Consumer Information Indicator = report bankruptcy indicator when applicable to the consumer(s)

**Note:** If accounts are being transferred from one data processor to another, contact the data representative at each consumer reporting agency to facilitate transfer of the accounts.

CREDIT REPORTING RESOURCE GUIDE®
*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 0928

Return to Table of Contents

# Frequently Asked Questions and Answers

**47.    Question: How should accounts that have been sold to another company be reported by the seller and the purchaser _when the purchaser will convert the seller's previous account history to their system_?**

Answer: Prior to reporting accounts that have been sold to another company, it is imperative that the seller and purchaser work together with the data representatives at the consumer reporting agencies to discuss the various options for reporting and to facilitate a smooth transition.  In addition, refer to Exhibit 15 – Data Conversion Checklist, which helps data furnishers focus on the critical steps and questions that must be answered prior to reporting the purchased accounts.

**SELLER:**

If the company that purchased the accounts is converting the account history to their system and will report the prior history, the seller should **not** report the accounts as sold.  Discontinue reporting the accounts.

After the final reporting of the account by the seller, reporting by the purchaser should begin in the following month's reporting period.

**PURCHASER:**

When the seller's account history is being converted to the purchaser's system and the account history can be verified, report the following Base Segment, K2 Segment and L1 Segment fields as specified:

- Base Segment Identification Number = Identification Number reported by the seller
- Base Segment Consumer Account Number = Account Number reported by the seller
- Date Opened = date opened with the seller
- Account Status Code = appropriate code that specifies the status of the account as of the Date of Account Information

   **Note:** To minimize consumer disputes, do not report accounts as sold that were previously reported as paid in full.

- Payment Rating = if applicable to the Account Status Code being reported
- Payment History Profile = report payment history provided by the seller
- Date of Account Information = follow the standard guidelines documented in Field 24

   **Note:** After the final reporting of the account by the seller, reporting by the purchaser should begin in the following month's reporting period.

*FAQ 47 continued on next page*

Return to Table of Contents

# Frequently Asked Questions and Answers

**FAQ 47** (Purchaser's guidance continued)

- FCRA Compliance/Date of First Delinquency = If the account is delinquent or derogatory at the time of purchase, report the date of the first 30-day delinquency **with the seller** that led to the status being reported.  If the account is current and included in a bankruptcy petition, report the date of the bankruptcy petition or notification.

    **Note:** If the purchaser is unable to obtain the ***Date of First Delinquency with the seller***, do not report the account.

- Consumer Information Indicator = report bankruptcy indicator when applicable to the consumer(s)

    **Note:** Do not report purchased accounts that were included in discharged/completed Bankruptcies.

- K2 Segment Purchased From/Sold To Indicator = **1** and Purchased From Name = name of the company from which the account was purchased

- L1 Segment Change Indicator = **3**, New Consumer Account Number = new account number assigned by the purchaser, and New Identification Number = internal code that specifies where information will be verified by the purchaser

    For full L1 Segment reporting details, refer to the L1 Segment field description in the Field Definitions module.

    In subsequent reporting periods, the purchaser's Identification Number and Consumer Account Number should be reported in the Base Segment.

CREDIT REPORTING RESOURCE GUIDE®
*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 0930

Return to Table of Contents

# Frequently Asked Questions and Answers

**48. Question: How should accounts that have been sold to another company be reported by the seller and the purchaser _when the purchaser will NOT convert the seller's previous account history to their system_?**

Answer: For this situation, the seller will report the accounts as sold and the purchaser will report the accounts from the point of purchase going forward.  Prior to reporting, it is imperative that the seller and purchaser work together with the data representatives at the consumer reporting agencies to facilitate a smooth transition.  In addition, refer to Exhibit 15 – Data Conversion Checklist, which helps data furnishers focus on the critical steps and questions that must be answered prior to reporting the purchased accounts.

**SELLER:**

If the company that purchased the accounts will _**not**_ report the prior history, the seller must report the accounts as sold to retain the account history and reflect the final disposition of the account.

Report the following Base Segment and K2 Segment fields as specified:

* Scheduled Monthly Payment Amount = zero
* Account Status Code = the appropriate code that specifies the status of the account at the time of the sale

    **Note:** To minimize consumer disputes, do not report accounts as sold that were previously reported as paid in full.

* Payment Rating = if applicable to the Account Status Code being reported
* Special Comment = AH (Purchased by another company)
* Current Balance and Amount Past Due = zero
* Date of Account Information = date the account was sold

    **Note:** Reporting the account as sold is considered a final disposition for credit reporting purposes.  In subsequent reporting periods, discontinue reporting the account.

* FCRA Compliance/Date of First Delinquency = If the account is delinquent or derogatory at the time of sale, report the date of the first 30-day delinquency that led to the status being reported.  If the account being sold is current and included in a bankruptcy petition, report the date of the bankruptcy petition or notification.
* Date Closed = date the account was sold to the other company.  If the account was closed prior to being sold, report the original date the account was closed.
* Consumer Information Indicator = report bankruptcy indicator when applicable to the consumer(s)
* K2 Segment Purchased From/Sold To Indicator = **2** and Sold To Name = name of company to which the account was sold

**Note:** If the account is delinquent or derogatory, it is imperative that you provide the date of the first delinquency that led to the account being sold _**to the purchaser**_.

_**FAQ 48 continued on next page**_

Return to Table of Contents

# Frequently Asked Questions and Answers

**FAQ 48** (continued)

   **PURCHASER:**

If the seller reported the accounts as "purchased by another company", report the following Base and K2 Segment fields as specified:

- Consumer Account Number = newly assigned account number
- Date Opened = date opened with the seller *(preferred)*

   **Note:** If the date opened with the seller is not known, the date the account was purchased may be reported.

- Account Status Code = appropriate code that specifies the status of the account as of the Date of Account Information

   **Note:** To minimize consumer disputes, do not report accounts that were previously reported as paid in full by the seller.

- Payment Rating = if applicable to the Account Status Code being reported
- Payment History Profile = report character **B** for months when account was owned by the seller

   **Important Note:** Payment history that occurred with the seller, which is already on the consumer's file, must not be reported by the purchaser.

- Date of Account Information = follow the standard guidelines documented in Field 24

   **Note:** Reporting by the purchaser should begin in the following month's reporting period – *after* the seller reported the accounts as sold.

- FCRA Compliance/Date of First Delinquency = If the account is delinquent or derogatory at the time of purchase, report the date of the first 30-day delinquency *with the seller* that led to the status being reported.  If the account is current and included in a bankruptcy petition, report the date of the bankruptcy petition or notification.

   **Note:** If the purchaser is unable to obtain the *Date of First Delinquency with the seller*, do not report the account.

- Consumer Information Indicator = report bankruptcy indicator when applicable to the consumer(s)

   **Note:** Do not report purchased accounts that were included in discharged/completed Bankruptcies.

- K2 Segment Purchased From/Sold To Indicator = **1** and Purchased From Name = name of the company from which the account was purchased

Return to Table of Contents

# Frequently Asked Questions and Answers

**49.  Question: How are "payment reversal" transactions handled when reporting Date of Last Payment, Date of First Delinquency, Payment History Profile and Actual Payment Amount?**

Answer: A "payment reversal" transaction usually occurs when a check is returned for non-payment to the credit grantor.  If the change is made in the following month's reporting cycle, the following adjustments should be made:

- The Date of Last Payment should be adjusted to indicate the date of the last payment made that was not reversed.
- The FCRA Compliance/Date of First Delinquency (DOFD) should reflect the first time the consumer was 30 days past the due date that led to the status being reported.  The DOFD would change to the month of the returned check if that had been the first time the consumer was 30 days past the due date.
- The Payment History Profile should reflect the appropriate delinquency in the first position, which reflects the previous month's payment activity (e.g., **1** if the returned check resulted in the account being 30-59 days past the due date that month).
- The Actual Payment Amount reflects the payment received for this reporting period.  If no payment was received for this reporting period, this amount should be zero.

**50.  Question: Consumer loans may have multiple payment schedules, which may each have different payment frequencies (e.g., principal amount due annually and interest amount due monthly).  How should these loans be reported?**

Answer: Report only one tradeline.

- The Terms Frequency should reflect the most frequent payment schedule. For example, if the principal is due annually and the interest amount is due monthly, report Terms Frequency **M** (Monthly).
- The Scheduled Monthly Payment Amount should reflect the minimum amount due each month and may change when the principal amount is also due.

In months where only the interest payment is due, report Special Comment Code **BT** (Principal deferred/interest payment only).  In months where both principal and interest payments are due, the Special Comment Code **BT** should not be reported.

Return to Table of Contents

# Frequently Asked Questions and Answers

**51. Question: How should timeshare mortgages and timeshare loans be reported?**

Answer: <u>If the timeshare account is a mortgage</u>, report the account according to the Mortgage Portfolio Type guidelines.  Report the following Base Segment fields as specified:

- Portfolio Type = M (Mortgage)
- Account Type Code = 26 (Conventional Mortgage) or 08 (Real Estate, specific type unknown), as applicable
- Terms Duration = number of years of the loan
- Account Status Code = 11, 13, 65, 71, 78, 80, 82-84, 89, 94, DA or DF, as applicable
- Payment Rating = applicable code when Account Status Code = 13, 65, 89 or 94
- Special Comment = <u>Refer to Exhibit 6</u>, Mortgage column, for applicable comments.
- Interest Type Indicator = F (fixed) or V (variable/adjustable)

<u>If the timeshare account is a loan</u>, report the account according to the Installment Portfolio Type guidelines.  Report the following Base Segment fields as specified:

- Portfolio Type = I (Installment)
- Account Type Code = 0A (Timeshare)
- Terms Duration = number of months of the loan
- Account Status Code = 11, 13, 61-64, 71, 78, 80, 82-84, 93, 95-97, DA or DF, as applicable
- Payment Rating = applicable code when Account Status Code = 13 or 95
- Special Comment = <u>Refer to Exhibit 6</u>, Installment column, for applicable comments.

CREDIT REPORTING RESOURCE GUIDE®
*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 0934

Return to Table of Contents

# Frequently Asked Questions and Answers

**52. Question: How should the different stages of foreclosure be reported?**

Answer: Use the following guidelines:

**Potential Foreclosure** – No specific code is available with this designation. Continue reporting the correct Account Status Code that defines the current condition of the account.  For example, Account Status Code 82 represents 120 – 149 days past the due date or Account Status Code 84 represents 180 days or more past the due date.

**Foreclosure Started** – Special Comment Code **BO** should be reported, which specifically says "Foreclosure proceedings started".  This special comment should be reported each month as long as the comment applies.  The appropriate Account Status Code should be reported in conjunction with this special comment, such as Account Status Code 82 for 120 – 149 days past the due date.

**Foreclosure Cancelled** – No specific code is available for this situation. Therefore, if Special Comment Code BO had been reported, stop reporting the comment (i.e., blank out the Special Comment Code field) and the comment will be deleted from the consumer reporting agencies' files.

**Foreclosure Started / Now Paid** – Account Status Code **65** should be reported when foreclosure proceedings had been started, but the consumer subsequently paid the account balance in full.  Account Status 65 specifies "Account paid in full.  A foreclosure was started".  The appropriate Payment Rating should be reported in conjunction with this Account Status.  Discontinue reporting Special Comment Code **BO** (Foreclosure proceedings started) at this point.

*FAQ 52 continued on next page*

# Frequently Asked Questions and Answers

**FAQ 52** (continued)

**<u>Foreclosure Completed</u>** – Account Status Code **94** should be reported, which specifies "Foreclosure completed; there may be a balance due".  The appropriate Payment Rating should be reported in conjunction with this Account Status.  Discontinue reporting Special Comment Code **BO** (Foreclosure proceedings started) at this point.

<u>If the consumer is not responsible</u> for the remaining balance on the account or there is no deficiency balance, report Account Status **94** and a Scheduled Monthly Payment Amount, Current Balance and Amount Past Due of zero.  Report the Date Closed as the date the foreclosure was completed.

<u>If the consumer is held responsible</u> for the remaining balance on the account, continue reporting Account Status **94**.  In each subsequent reporting period, increment the first position of the Payment History Profile with value **H** (Foreclosure completed).  Report the remaining balance in the Current Balance and Amount Past Due fields, and as payments are made by the consumer, report a declining balance in both fields.  When the Current Balance reaches zero, report the Date Closed as the date the account was paid in full.

For credit reporting purposes, do ***not*** report Account Status Code 97 (Charge-off) after Account Status 94 has been reported.

**<u>Redeemed Foreclosure</u>** – Account Status 65 should be reported, which specifies "Account paid in full.  A foreclosure was started".  The appropriate Payment Rating should be reported in conjunction with this Account Status, along with a Current Balance and Amount Past Due = zero.

**Note:** Each state has a rescission period that allows the consumer to redeem the property during or after foreclosure.

CREDIT REPORTING RESOURCE GUIDE®
*Copyright 2023 © Consumer Data Industry Association*
APPENDIX 0936

Return to Table of Contents

# Frequently Asked Questions and Answers

**53. Question: How should alternatives to foreclosure (i.e., Deed in Lieu and Short Sale) be reported?**

Answer: Use the following guidelines:

<u>**Deed in Lieu**</u> – Account Status Code **89** should be reported, which specifies "Deed received in lieu of foreclosure on a defaulted mortgage; there may be a balance due".  The appropriate Payment Rating should be reported in conjunction with this Account Status.

<u>If the consumer is not responsible</u> for the remaining balance on the account or there is no deficiency balance, report Account Status Code **89** and a Scheduled Monthly Payment Amount, Current Balance and Amount Past Due of zero.  Report the Date Closed as the date the deed was received in lieu of foreclosure.

<u>If the consumer is held responsible</u> for the remaining balance on the account, continue reporting Account Status **89**.  Report the remaining balance in the Current Balance and Amount Past Due fields, and as payments are made by the consumer, report a declining balance in both fields.  When the Current Balance reaches zero, report the Date Closed as the date the account was paid in full. Note that the Payment History Profile field should contain 24 months of history the first time Account Status Code 89 is reported.  In subsequent months, when Account Status 89 is reported, the entire Payment History Profile should be blank filled.

For credit reporting purposes, do **_not_** report Account Status Code 97 (Charge-off) after Account Status 89 has been reported.

<u>**Short Sale**</u> – A short sale occurs when the proceeds from the sale of real estate fall short of the balance owed on the loan.  In a short sale, the lender agrees to discount the loan balance typically due to an economic or financial hardship on the part of the consumer.

Report the following Base Segment fields as specified:

- Scheduled Monthly Payment Amount = zero
- Actual Payment Amount = the amount actually received for this reporting period
- Account Status Code = 13 (Paid or closed account/zero balance) or 65 (Account paid in full, a foreclosure was started), as applicable
- Payment Rating = applicable code that identifies whether the account is current or past due within the current month's reporting period
- Special Comment = AU (Account paid in full for less than the full balance)
- Current Balance and Amount Past Due = zero
- Date of Account Information = the date the account was paid in full for less than the full balance
- Date Closed = the date the account was paid in full for less than the full balance

Return to Table of Contents

# Frequently Asked Questions and Answers

**54. Question: How should a secured account (i.e., mortgage, home equity or other secured account) be reported when the collateral is released but there is an outstanding balance due?**

Answer: Continue to report the existing account with the following Base Segment fields as specified:

- Portfolio Type & Account Type = remain the same as previously reported
- Date Opened = the date the account was originally opened
- Original Loan Amount = the original amount of the loan
- Terms Duration = terms of the loan, which can be changed if the terms of the loan are contractually extended
- Scheduled Monthly Payment Amount = new scheduled payment due
- Account Status Code = the applicable code that specifies how the consumer is paying the deficiency balance, such as current or delinquent
- Special Comment = CM (Collateral released by creditor/balance owing)
- Current Balance = outstanding balance amount, which may decline as payments are made
- Amount Past Due = total amount that is 30 days or more past the due date, if the account is delinquent

**Note:** When the consumer pays the outstanding balance in full, report the applicable "paid" Account Status Code, as well as the Payment Rating, if required.  Discontinue reporting Special Comment CM.  The Current Balance and Amount Past Due should be zero.

CREDIT REPORTING RESOURCE GUIDE®
*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 0938

Return to Table of Contents

# Frequently Asked Questions and Answers

**55. Question: How should full loan assumptions be reported?**

Answer: A Full Loan Assumption occurs when a new borrower (who has never been associated with the account) assumes responsibility for the loan. The original borrower is terminated from the loan and is no longer responsible for payments.

**Note:** Do not follow this FAQ when an existing borrower(s) is being terminated from an account, such as in a divorce situation. Instead, refer to FAQ 18 for reporting guidance.

There are two options for reporting.

1. If the Consumer Account Number remains the same for the consumer who is assuming the loan, the ***consumers must be reported in separate reporting periods***.

   • The first month, report the original consumer(s) with ECOA Code **T** (Terminated) and Special Comment Code **H** (Loan assumed by another party). Report the Current Balance as zero.

   • The following month, report the new consumer(s). The Date Opened should be the date the loan was assumed by the new consumer(s). Other account information should be changed, if appropriate. For example, Terms Duration, Scheduled Monthly Payment, Current Balance or other fields may be different for the new consumer(s). Do ***not*** report the original consumer's account history in the Payment History Profile (Field 18).

2. If the consumer who is assuming the loan is given a new Consumer Account Number, follow these guidelines:

   • Report the original consumer(s) with ECOA Code **T** (Terminated) and Special Comment Code **H** (loan assumed by another party). Report the Current Balance as zero.

   • Report the new consumer(s) during the same month with the new Consumer Account Number, the Date Opened as the date the loan was assumed, and other appropriate account information. Do ***not*** report the original consumer's account history in the Payment History Profile (Field 18).

# Frequently Asked Questions and Answers

**56. Question: How should simple loan assumptions be reported?**

Answer: A simple loan assumption is one in which the original borrower remains responsible for the loan in the event that the new borrower defaults.

<u>Report the original loan for the original borrower</u> with the following Base Segment fields as specified:

- Scheduled Monthly Payment Amount = zero
- Account Status Code = applicable code that specifies the status of the account prior to the assumption
- Special Comment Code = AT (Account closed due to transfer)
- Current Balance and Amount Past Due = zero
- FCRA Compliance/Date of First Delinquency = if the account is delinquent at the time of the assumption, report the date of the first delinquency
- Date Closed = date the assumption process was completed

<u>Report the assumed loan for the original and new borrower(s)</u> with the following Base, J1 or J2 Segment fields as specified:

- Consumer Account Number = new or modified Account Number
  **Note:** If the Account Number for the assumed loan remains the same, it must be modified for credit reporting purposes in order to be unique.  For example, add a digit or character to the end of the original number.
- Date Opened = date the loan was assumed
- Highest Credit or Original Loan Amount = the amount that was assumed by the new borrower(s)
- Terms Duration/Terms Frequency/Scheduled Monthly Payment Amount = as applicable for the assumed loan
- Account Status Code = 11 (Current Account) for the first reporting period after the assumption.  In subsequent reporting periods, the applicable code that specifies the status of the account as of the Date of Account Information.
- Payment History Profile = 'B' filled for the first reporting period after the assumption.
  **Note:** Payment history that occurred prior to the assumption must not be reported on the assumed loan.
- ECOA Code for new borrower(s) = 7 (Maker)
- ECOA Code for original borrower = 5 (Guarantor)

**57. Question: How should reverse mortgages be reported?**

Answer: Do not report reverse mortgages because the consumer has no credit obligation.

CREDIT REPORTING RESOURCE GUIDE®
*Copyright 2023 © Consumer Data Industry Association*
APPENDIX 0940

Return to Table of Contents

# Frequently Asked Questions and Answers

**58.  Question: What are the available options for reporting an account affected by a natural or declared disaster?**

Answer: Use the following reporting guidelines after it is confirmed that an account is impacted by a natural or declared disaster (e.g., hurricane, wildfire, flood), based on your internal policies and procedures.

**Notes:** Reporting an account with Special Comment **AW** (Affected by natural or declared disaster) is **_optional_** and is intended to be reported temporarily for narrative purposes only.

Reporting an account as affected by a natural or declared disaster should not be reported as a default, replacement or cover for temporary relief payment plan reporting.

Refer to FAQ 43 (What are the available options for reporting an account that has regular payments temporarily postponed?) for detailed guidance options for reporting an account in a temporary relief payment plan.

- **Open accounts** – defined as Account Status Code 11 (Current account) or 71, 78, 80, 82, 83 or 84 (Delinquent accounts) – and **Closed Accounts with Balances Owing** - reported with the same open Account Status Codes.

  Report the Account Status that applies to the account (credit grantor's decision).  Report Special Comment **AW** (Affected by natural or declared disaster).

- **Derogatory Accounts** – defined as Account Status Codes 88 (Government Claim), 89 (Deed in Lieu), 93 (Collection), 94 (Foreclosure Completed), 95 (Voluntary Surrender), 96 (Repossession), and 97 (Charge-off).

  Continue reporting these statuses and add Special Comment **AW** (Affected by natural or declared disaster).

- **Debt Buyers and Collection Agencies**

  Continue reporting Account Status Code 93 (Collection) and add Special Comment **AW** (Affected by natural or declared disaster).

  If accounts are sold to another company or given back to the original creditor, report Account Status Code **DA** to delete the accounts.

# Frequently Asked Questions and Answers

**59.  Question: How should a renegotiated/refinanced loan be reported?**

Answer: The guidelines described below are used for renegotiated or refinanced loans that are *not* associated with one of the federal loan modification programs.  There are three options for reporting:

1.  If the original Account Number and Date Opened are retained, modify the amounts and terms as per the refinanced agreement.  Fields that may be changed include Original Loan Amount, Terms Duration, Terms Frequency, Scheduled Monthly Payment Amount and Current Balance.

    Note that the Terms Duration should reflect the terms for the life of the account.  Therefore, for a loan modification, set the Terms Duration from the original Date Opened to the new maturity date.

    **Optional:** Special Comment Code **CO** (Loan modified) may be reported.  Note that this code is used when reporting accounts that are modified, but not under a federal government plan.

    Special Comment **CO** may be reported as long as deemed appropriate by the data furnisher, or until another Special Comment becomes more critical.  For the length of time the Special Comment should be reported, consult with your internal Legal or Compliance department.

2.  If the original Account Number changes and the Date Opened remains the same, follow the above reporting guideline, and include an L1 Segment with the new Account Number.  Refer to the L1 Segment specifications within the Field Definitions for reporting guidelines.

3.  If the original Account Number and Date Opened change, report the original loan as specified:

    - Account Status Code = 13 (Paid)
    - Payment Rating = the appropriate code that identifies the status of the account within the current month's reporting period
    - Special Comment = AS (Account closed due to refinance)
    - Current Balance and Amount Past Due = zero

    Report the newly refinanced/renewed loan with the new Account Number, new Date Opened and all other applicable fields.  Payment history that occurred prior to the new Date Opened should not be reported with this account.

**Note:** For reporting guidelines specific to the federal loan modification programs, such as Making Home Affordable, Hope for Homeowners and the Fannie Mae/Freddie Mac Mortgage Loan Modification Program, refer to the module called "Mortgage Loan Modifications".

CREDIT REPORTING RESOURCE GUIDE®
*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 0942

Return to Table of Contents

# Frequently Asked Questions and Answers

**60. Question: How should a modified loan be reported?**

Answer: The guidelines described below are used for modified loans that are **not** associated with one of the federal loan modification programs.

**Trial Period:**

If there is a trial period prior to a loan being modified, report as follows during the trial period:

- Current, but eligible for loan modification:

  If the consumer was current on his/her payments prior to the trial period, and makes each month's trial period payment on time, report the consumer as current (Account Status 11) during the trial period. If the consumer is at least 30 days past due during the trial period, report the Account Status Code that reflects the appropriate level of delinquency.

  Report the trial period payment in the Scheduled Monthly Payment Amount field. Special Comment Code 'AC' (Paying under a partial payment agreement) should also be reported.

  **Note:** As per the definition in Exhibits 6 and 7, Special Comment Code 'AC' is an agreed-upon repayment plan with account payments that are **less than** the original contract's account payments.

- Delinquent

  If the consumer was delinquent (at least 30 days past the due date) prior to the trial period and the reduced payments do not bring the account current, report the Account Status Code that reflects the appropriate level of delinquency.

  Report the trial period payment in the Scheduled Monthly Payment Amount field. Special Comment Code 'AC' (Paying under a partial payment agreement) should also be reported.

  **Note:** As per the definition in Exhibits 6 and 7, Special Comment Code 'AC' is an agreed-upon repayment plan with account payments that are **less than** the original contract's account payments.

**If the loan is *not* modified, report the account as per the original contractual agreement.**

*FAQ 60 continued on next page*

Return to Table of Contents

# Frequently Asked Questions and Answers

**FAQ 60 (continued)**

### If the loan is modified, there are three options for reporting:

1. If the original Account Number and Date Opened are retained, report the amounts and terms as per the modified agreement.  Fields that may be changed include Original Loan Amount, Terms Duration, Terms Frequency, Scheduled Monthly Payment Amount and Current Balance.

   Note that the Terms Duration should reflect the terms for the life of the account.  Therefore, for a loan modification, set the Terms Duration from the original Date Opened to the new maturity date.

   **Optional:** Special Comment Code **CO** (Loan modified) may be reported.  Note that this code is used when reporting accounts that are modified, but <u>not</u> under a federal government plan.

   Special Comment **CO** may be reported as long as deemed appropriate by the data furnisher, or until another Special Comment becomes more critical.  For the length of time the Special Comment should be reported, consult with your internal Legal or Compliance department.

2. If the original Account Number changes and the Date Opened remains the same, follow the above reporting guideline, and include an L1 Segment with the new Account Number.  Refer to the L1 Segment specifications within the Field Definitions for reporting guidelines.

3. If the original Account Number and Date Opened change, report the original loan as specified:

   - Account Status Code = 13 (Paid)
   - Payment Rating = the appropriate code that identifies the status of the account within the current month's reporting period
   - Special Comment = AS (Account closed due to refinance)
   - Current Balance and Amount Past Due = zero

   Report the newly modified loan with the new Account Number, new Date Opened and all other applicable fields.  Payment history that occurred prior to the new Date Opened should not be reported with this account.

   **Note:** For reporting guidelines specific to the federal loan modification programs, such as Making Home Affordable, Hope for Homeowners and the Fannie Mae/Freddie Mac Mortgage Loan Modification Program, refer to the module called "Mortgage Loan Modifications".

CREDIT REPORTING RESOURCE GUIDE®
*Copyright 2023 © Consumer Data Industry Association*
APPENDIX 0944

Return to Table of Contents

# Frequently Asked Questions and Answers

**61. Question: How should an account be reported when it is updated more than one time during a given monthly reporting period; e.g., an account that is moved to recovery?**

Answer: Use the following guidelines to report accounts that are updated by the data furnisher more than one time during a given monthly reporting period:

- Date of Account Information = most recent date of update
- Account Status Code = new code that applies to the most recent update
- Payment History Profile = When the account is updated ahead of the next regular reporting period, freeze the PHP as it was reported in the previous regular reporting period.  In subsequent reporting periods, the PHP should be updated/incremented normally.

**Example:**

Regular Monthly Reporting Period:

- Date of Account Information = 03/05/2023
- Account Status = 82 (120-159 days past due date)
- Payment History Profile = 321000000110000210010000

Account moved to recovery and updated ahead of next regular reporting period, which would have been on 04/05/2023.  Recovery system reports at end of each month:

- Date of Account Information = 03/31/2023
- Account Status = 97 (Charge-off)
- Payment History Profile = 321000000110000210010000
  **Note:** In order to accurately maintain the PHP, the field contents are the same as reported on 03/05/2023.

Next recovery system update:

- Date of Account Information = 04/30/2023
- Account Status = 97 (Charge-off)
- Payment History Profile = L3210000011000021001000
  **Note:** The PHP is updated/incremented normally at this point.

**Note:** For guidance on reporting paid accounts, refer to FAQ 39.

# Frequently Asked Questions and Answers

**62.  Question: How should an account be reported when merchandise has been repossessed?**

Answer: Use the following guidelines:

Account Status Code **96** should be reported, which specifies "Merchandise was repossessed; there may be a balance due".  Report the outstanding balance amount in the Current Balance field and the amount deemed to be past due by the creditor in the Amount Past Due field.  Continue reporting Account Status 96 until one of the following situations apply:

- **If the consumer reinstates the loan** by bringing account payments current, report Account Status 11 (current) and continue reporting the account normally going forward.  Special Comment Code **AZ** (Redeemed or reinstated repossession) may also be reported.

- **If the consumer redeems the merchandise** by paying the account balance in full, report Account Status 63 (Account paid in full, was a repossession) and a Current Balance and Amount Past Due = zero.  Special Comment Code **AZ** (Redeemed or reinstated repossession) may also be reported.

- **If the consumer is not responsible** for the remaining balance on the account after the sale of the merchandise <u>or</u> there is no deficiency balance, report Account Status 96 with a Current Balance and Amount Past Due of zero.  Report the Date Closed as the date the merchandise was repossessed.

- **If the consumer is held responsible** for the remaining balance on the account after the sale of the merchandise, continue reporting Account Status **96**.  Report the remaining balance in the Current Balance and Amount Past Due fields, and as payments are made by the consumer, report a declining balance in both fields.  In subsequent reporting periods, the Payment History Profile should be incremented with value '**K**' to indicate repossession.  When the consumer pays the outstanding balance in full, report Account Status Code **63**, which specifies "Account paid in full, was a repossession".  The Current Balance and Amount Past Due should be zero and the Date Closed should be the date the account was paid in full.

   **Notes:** If a repayment plan is created for this remaining balance, report the new Scheduled Monthly Payment Amount (SMPA).  Otherwise, report SMPA = zero.

   If the remaining balance is not paid and is subsequently charged off, report Account Status Code **97** (Unpaid balance reported as a loss – charge-off).  In subsequent reporting periods, follow FAQ 34.  For credit reporting purposes, Account Status 97 should not be reported until after the sale of the merchandise and the consumer has been given an opportunity to make payments on the remaining balance.

CREDIT REPORTING RESOURCE GUIDE®

*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 0946

Return to Table of Contents

# Frequently Asked Questions and Answers

**63.  Question: How should an account be reported when the consumer has voluntarily surrendered the merchandise?**

Answer: Use the following guidelines:

Account Status Code **95** should be reported, which specifies "Voluntary Surrender; there may be a balance due", along with the applicable Payment Rating.  Report the outstanding balance amount in the Current Balance field and the amount deemed to be past due by the creditor in the Amount Past Due field.  If the consumer was current at the time of the voluntary surrender, the Amount Past Due should be zero and the FCRA Compliance/Date of First Delinquency should be the date the merchandise was voluntarily surrendered.

Continue reporting Account Status 95 until one of the following situations apply:

- **If the consumer reinstates the loan** by bringing account payments current, report Account Status **11** (current) and continue reporting the account normally going forward.  Special Comment Code **AO** (Voluntarily surrendered – then redeemed or reinstated) may also be reported.

- **If the consumer redeems the merchandise** by paying the account balance in full, report Account Status **61** (Account paid in full, was a voluntary surrender) and a Current Balance and Amount Past Due = zero.  Special Comment Code **AO** (Voluntarily surrendered – then redeemed or reinstated) may also be reported.

- **If the consumer is not responsible** for the remaining balance on the account after the sale of the merchandise <u>or</u> there is no deficiency balance, report Account Status **95** with a Current Balance and Amount Past Due of zero.  Report the Date Closed as the date the consumer voluntarily surrendered the merchandise.

*FAQ 63 continued on next page*

Return to Table of Contents

# Frequently Asked Questions and Answers

**FAQ 63 (continued)**

- **<u>If the consumer is held responsible</u>** for the remaining balance on the account after the sale of the merchandise, continue reporting Account Status **95**. Report the remaining balance in the Current Balance and Amount Past Due fields, and as payments are made by the consumer, report a declining balance in both fields. In subsequent reporting periods, the Payment History Profile should be incremented with value '**J**' to indicate voluntary surrender.

   **Notes:** If the consumer was current at the time the merchandise was voluntarily surrendered, the Amount Past Due would be zero. In subsequent months, if payments become delinquent, the Amount Past Due would be incremented based on the number of payments past due.

   If a repayment plan is created for the remaining balance, report the new Scheduled Monthly Payment Amount (SMPA). Otherwise, report SMPA = zero.

   When the consumer pays the outstanding balance in full, report Account Status Code **61**, which specifies "Account paid in full, was a voluntary surrender". The Current Balance and Amount Past Due should be zero and the Date Closed should be the date the account was paid in full.

   If the remaining balance is not paid and is subsequently charged off, report Account Status Code **97** (Unpaid balance reported as a loss – charge-off). In subsequent reporting periods, follow FAQ 34. For credit reporting purposes, Account Status 97 should not be reported until after the sale of the merchandise and the consumer has been given an opportunity to make payments on the remaining balance.

CREDIT REPORTING RESOURCE GUIDE®

*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 0948

Return to Table of Contents

# Frequently Asked Questions and Answers

**64. Question: How should a replacement credit card be reported (i.e., credit card replaced with a new account number)?**

Answer: There are two options for reporting replacement credit cards:

1. **Preferred Option:** Report the L1 Segment to change the Consumer Account Number.  Use of the L1 Segment allows the consumer reporting agencies to retain all prior account history and maintain one account.

2. The second option results in two tradelines on a consumer's file: the first as transferred and the second for the ongoing account.

   Report the following Base Segment fields as specified for the transferred account:

   - Scheduled Monthly Payment Amount = zero
   - Account Status Code = the appropriate code that specifies the status of the account at the time of transfer
   - Special Comment = AT (Account closed due to transfer)
   - Current Balance and Amount Past Due = zero
   - FCRA Compliance/Date of First Delinquency = If the account is delinquent or derogatory at the time of transfer, report the date of the first 30-day delinquency that led to the status being reported.
   - Date Closed = date the account was transferred

   In the following month's reporting period, report the new account with the new account number.  Report the following Base Segment fields as specified for the new account with the new account number:

   - Date Opened = date the original account was opened
   - Account Status Code = the status of the account for the current month
   - Payment History Profile = Report character **B** for months the account was reported with the original account number; do ***not*** report payment history that occurred prior to the replacement card being issued.
   - FCRA Compliance/Date of First Delinquency = If the account is delinquent or derogatory at the time the card is replaced, report the date of the first 30-day delinquency that led to the status being reported.

# Frequently Asked Questions and Answers

**65. Questions: Lost or stolen credit cards:**

**(a) How should a lost or stolen credit card be reported when the consumer will retain the account, but will get a new Account Number?**

Answer: There are two options for reporting:

1.  **Preferred Option:** Report the L1 Segment to change the Account Number.  Use of the L1 Segment allows the consumer reporting agencies to retain all prior account history.  Continue to report the original Date Opened.

    If the payment history is invalid due to the credit card being lost or stolen, use the Payment History Profile (Field 18) to correct the history.  If accurate payment history is not known during the time frame when the credit card was lost or stolen, report value **D** for months that are unknown in the Payment History Profile.  For example:

    Date of Account Information = 03/15/2023
    Account History = Always current
    Unknown Months of History = January and February 2023
    Payment History Profile = DD000000000000000000000

2.  Report Special Comment Code **BL** (Credit card lost or stolen), the appropriate Account Status Code (*not* DA or DF) and Current Balance of zero.  Do not report this account on subsequent updates.

    If the payment history is invalid due to the credit card being lost or stolen, use the Payment History Profile (Field 18) to correct the history.  If accurate payment history is not known during the time frame when the credit card was lost or stolen, report value **D** for months that are unknown in the Payment History Profile.  For example:

    Date of Account Information = 03/15/2023
    Account History = Always current
    Unknown Months of History = January and February 2023
    Payment History Profile = DD000000000000000000000

    In the following month's reporting period, report the new credit card as a separate account with a new Account Number, the same Date Opened as the lost/stolen account, and the appropriate Account Status Code and Current Balance.

    **Note:** Payment history that occurred prior to the credit card being lost or stolen should *not* be reported under the new Account Number.

    *FAQ 65 continued on next page*

# Frequently Asked Questions and Answers

**FAQ 65** (continued)

**(b) How should a lost or stolen credit card be reported when the consumer does not want a replacement card and will pay off the existing account?**

Answer: Continue reporting the account normally.  Do ***not*** report Special Comment BL.  Report Compliance Condition Code **XA** to denote 'Account closed at consumer's request'.  When the Current Balance Amount reaches zero, report Account Status Code **13** and the applicable Payment Rating, along with Compliance Condition Code **XA**.

If the payment history is invalid due to the credit card being lost or stolen, use the Payment History Profile (Field 18) to correct the history.  If accurate payment history is not known during the time frame when the credit card was lost or stolen, report value **D** for months that are unknown in the Payment History Profile.  For example:

Date of Account Information = 03/15/2023
Account History = Always current
Unknown Months of History = January and February 2023
Payment History Profile = DD0000000000000000000000

# Frequently Asked Questions and Answers

66. **Question: If a credit card or account is in dispute or temporarily unavailable for use because the credit grantor is conducting an investigation (due to a request from the consumer, such as potential identity theft or other reason), how should the account be reported?**

    Answer: Continue to report the account as usual, but include Compliance Condition Code **XB**, which specifies "Account information has been disputed by the consumer directly to the data furnisher under the Fair Credit Reporting Act; the data furnisher is conducting its investigation".

    When the investigation is complete, if the account is valid for this consumer (i.e., not fraudulent), continue to report the account as usual.  If any months of the payment history are invalid, use the Payment History Profile (Base Segment Field 18) to correct the history for those months.  In addition, report Compliance Condition Code **XR** to remove the previously-reported **XB** or report Compliance Condition Code **XH**, which specifies "Account previously in dispute – the data furnisher has completed its investigation".

    When the investigation is complete, if it is discovered that the account was opened or used fraudulently, report Account Status Code **DF** to delete the account.

    **Note:**  If the consumer has submitted an identity theft report to you, certain obligations occur.  Refer to the Fair Credit Reporting Act section 623(a)(6).

CREDIT REPORTING RESOURCE GUIDE®
*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 0952

Return to Table of Contents

# Frequently Asked Questions and Answers

67. **Question: How should credit cards with no preset spending limits be reported that have terms allowing consumers to exceed the credit limits (i.e., Flexible Spending Credit Cards)?**

    Answer: Report the following Base Segment fields as specified:

    - Account Type Code = 0G (Flexible Spending Credit Card)
    - Portfolio Type = R (Revolving)
    - Credit Limit = the valid credit limit for the revolving portion of the account
    - Highest Credit or Original Loan Amount = the highest amount of credit utilized by the consumer
    - Terms Duration = REV
    - Scheduled Monthly Payment Amount = the minimum amount due based on the revolving balance, plus the total flexible amount if due in full, OR the minimum due based on the total outstanding balance
    - Current Balance = outstanding balance amount, including revolving and flexible amounts
    - Amount Past Due = the portion of the Scheduled Monthly Payment Amount based on the revolving and flexible amounts that is 30 days or more past the due date.  (Do not include the current month's amount due in this field.)

    Example 1 -
    Flexible Spending Credit Cards with both Revolving and Open Terms:

    A consumer has a credit card on which a $10,000 credit limit is considered revolving, with a minimum due calculated as a small percentage of the revolving balance.  Additionally, the consumer has no preset spending limit and the balance amount over $10,000 must be paid in full each month.  The current balance is $12,000.  The minimum due is 3% of $10,000 plus the balance over the revolving amount ($2,000).  The Scheduled Monthly Payment Amount is $2,300.

    Example 2 -
    Flexible Spending Credit Cards with only Revolving Terms:

    A consumer has a credit card with a $10,000 credit limit.  Additionally, the consumer has no preset spending limit and can exceed the credit limit with no penalties or added fees.  The minimum amount due is calculated as a percentage of the total balance amount.  The current balance is $12,000 and the percentage due is 3%.  The Scheduled Monthly Payment Amount is $360.

APPENDIX 0953

Return to Table of Contents

# Frequently Asked Questions and Answers

**68.  Question: When and how should Debit Cards be reported?**

Answer: Debit Cards should be reported only when backed by a line of credit or overdraft protection.

Report the following Base Segment fields as specified:

- Account Type Code = 43 (Debit Card)
- Portfolio Type = C (Line of Credit), O (Open) or R (Revolving) depending on the terms
- Credit Limit = assigned Credit Limit
- Highest Credit or Original Loan Amount = highest amount of credit utilized by the consumer when the overdraft protection was used

**69.  Question: How should deposit accounts, with overdraft protection, be reported that have been overdrawn?**

Answer: These deposit accounts should only be reported when they are charged off or in collection activity.  Report the following Base Segment fields as specified.

- Portfolio Type = O (Open)
- Account Type Code = 8B (Deposit Account with Overdraft Protection)
- Date Opened = date account opened
- Credit Limit = assigned overdraft limit
- Highest Credit/Original Loan Amount = highest overdrawn amount
- Terms Duration = 001
- Scheduled Monthly Payment Amount = zero fill
- Account Status Code = 93 (Account assigned to internal or external collections), 97 (Unpaid balance reported as a loss – charge-off), 62 (Account paid in full, was a collection), or 64 (Account paid in full, was a charge-off)
- Current Balance = outstanding balance amount
- Amount Past Due = total amount that is 30 days or more past the due date
- Date of First Delinquency = date account was first overdrawn
- Date Closed = date the account was closed

CREDIT REPORTING RESOURCE GUIDE®
*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 0954

Return to Table of Contents

# Frequently Asked Questions and Answers

**70.  Question: How should a debt extinguished under state law be reported?**

Answer: Report the following Base Segment fields as specified:

*   Scheduled Monthly Payment Amount = zero
*   Account Status Code = status at time of debt extinguishment
    **Note:** The Account Status should not be 13 or 61-65.
*   Special Comment Code = DE (Debt Extinguished Under State Law)
*   Current Balance = zero
*   Amount Past Due = zero

**Note:** After reporting Special Comment Code DE, discontinue reporting the account.

# Glossary of Terms

| | |
|---|---|
| **Account Number Scrambling** | A security feature that allows a data furnisher to report a scrambled version of the account numbers. Three methods of scrambling are available based on CDIA guidelines. The consumer reporting agencies will unscramble the account numbers for display purposes. |
| **Affinity Name** | An additional name that can be reported by Third Party Collection Agencies and Debt Buyers within the Original Creditor Name field in the K1 Segment.  The Affinity Name further identifies or provides linkage detail for the relationship of the original creditor to any connecting or supporting entities (e.g., ABC BANK THE HOME STORE). |
| **Alphanumeric** | Describes a character set that includes both letters and numbers. |
| **ASCII** | An acronym for American Standard Code for Information Interchange. A code used by certain types of computers. |
| **Authorized User** | Person permitted by a credit card holder to charge goods and services on the cardholder's account. Authorized users are not legally responsible for payment of the charges incurred. |
| **Automatic Stay** | The filing of a bankruptcy, under any chapter of the Bankruptcy Code, stops most actions by any creditor against the debtor or the debtor's property.  In Chapter 13, the stay even protects co-debtors (non-filers) who are liable with the debtor on consumer debts.  The automatic stay gives the debtor protection from his creditors until the rights of all concerned can be balanced in bankruptcy court. |
| **Bankruptcy Closed** | A bankruptcy case may be closed or terminated when the consumer does not pay the applicable court fees or does not attend the required financial management class. |
| **Bankruptcy Discharged** | The judgment of the court that a person who has filed a Chapter 7, 11 or 12 petition be granted a bankruptcy.  A Chapter 13 debtor is entitled to a discharge upon completion of all payments under the Chapter 13 plan. |
| **Bankruptcy Dismissed** | A Chapter 7, 11, 12 or 13 petition is terminated without the granting of a discharge by the U.S. Bankruptcy Court. |

# Glossary of Terms

| | |
|---|---|
| **Bankruptcy Petition (Chapter 7)** | An application made to the U.S. Bankruptcy Court requesting release from financial obligations due to a debtor's inability to pay his debts. |
| **Bankruptcy Petition (Chapter 11)** | An application made to the U.S. Bankruptcy Court requesting financial reorganization. |
| **Bankruptcy Petition (Chapter 12)** | An application made to the U.S. Bankruptcy Court requesting release from financial obligations due to the inability of a family farm to pay their debts. |
| **Bankruptcy Petition (Chapter 13)** | An application made to the U.S. Bankruptcy Court requesting adjustment for personal debts and the establishment of a repayment plan. |
| **Bankruptcy Withdrawn** | The petitioner has decided not to file bankruptcy and has taken back the petition. |
| **Blocking** | Combining two or more records into a block to increase the efficiency of computer input and output operations. |
| **Byte** | One alphanumeric character. |
| **Chapter 128** | See Personal Receivership. |
| **Consumer** | One who buys goods or services. |
| **Consumer Data Industry Association (CDIA)** | CDIA is an international trade association representing the consumer credit, mortgage reporting, employment and tenant screening, and collection service industries. Headquartered in Washington, DC, CDIA provides legislative assistance and a lobbying function to its members, and establishes standards for the consumer credit reporting industry. |
| **Cycle Reporting** | A method by which data furnishers can divide their files for reporting purposes, usually in alphabetical order by surname or by billing date.  Reporting takes place at the end of each billing cycle, resulting in more accurate and timely reporting of account statuses. |
| **Debt Buyer** | A company or individual who purchases accounts (generally non-performing debts) with the intent of collecting debts owed. |
| **EBCDIC** | An acronym for Extended Binary Coded Decimal Interchange Code. A code used by certain types of computers. |

# Glossary of Terms

| | |
|---|---|
| **ECOA (Equal Credit Opportunity Act)** | A federal law that prohibits creditors from discriminating against applicants on the basis of sex or marital status in any aspect of a credit transaction. |
| **ECOA Code** | An alpha or numeric code used to describe a borrower's association with an account, according to the Equal Credit Opportunity Act (ECOA). |
| **Factoring Company** | See Debt Buyer. |
| **FCBA (Fair Credit Billing Act)** | A federal law stipulating procedures to help consumers resolve credit billing disputes with the credit grantor promptly and fairly. Disputes must be reported. The FCBA applies to open-end credit accounts, such as credit cards and revolving charge accounts. |
| **FCRA (Fair Credit Reporting Act)** | The FCRA states that companies which furnish data to the consumer reporting agencies have a responsibility to provide accurate information, to update and correct information and to respond to notices of dispute.  It also states that consumers have the right to know what is in credit records; to challenge the accuracy of information; and to have it re-verified, updated or removed. It also limits the time derogatory information can be retained on a credit record and assures that a consumer's privacy will be protected at all times. |
| **FDCPA (Fair Debt Collection Practices Act)** | The FDCPA regulates the activities of debt collectors concerning their communications with consumers, prohibiting harassment or abuse, false or misleading representations, and unfair practices. |
| **Fixed Length Record** | A record that always contains the same number of characters.<br><br>For example, you may report a 426-byte Base Segment, a 100-byte J1 Segment, and a 30-byte K4 Segment for every record. The fixed record length would be 556.  If there is no associated consumer on the account, report the Base Segment, report the J1 Segment Identifier, blank fill the remainder of the J1 Segment, and report the K4 Segment information. |
| **Fixed Rate Loan** | A loan in which the interest rate does not change during the entire term of the loan. |

# Glossary of Terms

| | |
|---|---|
| **Flexible Spending Credit Card** | Credit card with no preset spending limit.  The credit card has a Credit Limit, but the terms of the card allow the consumer to exceed that amount.  Refer to Frequently Asked Question 67 for reporting guidelines. |
| **Forbearance** | A period of time during repayment in which a borrower is permitted to temporarily postpone making regular monthly payments.  The debt is not forgiven, but payments are suspended until a later time.  As an example, forbearance may be granted if a borrower is experiencing temporary financial difficulty.  A forbearance agreement is most commonly applied to mortgages and student loans.  However, forbearance is applicable to any type of loan.  Refer to Frequently Asked Question 45 for reporting guidelines. |
| **Installment (Portfolio Type)** | A loan repayable in installments, usually in set monthly amounts. |
| **Lease Assumption** | The debtor's assumption of personal liability for leases of personal property that would otherwise be discharged in bankruptcy.  When a lease is assumed, the consumer is assuming use of the personal property, such as an auto, as well as payment on the account. |
| **Line of Credit (Portfolio Type)** | An agreement between an institution and a consumer where the institution agrees to lend a consumer funds up to an agreed upon credit limit.  The consumer may borrow as much of the line as needed and pays interest on the borrowed portion only. Payment amounts are revolving, based on the outstanding balance amount. |
| **Loan Assumption** | Full Loan Assumption – A new borrower assumes responsibility for a loan.  The original borrower is terminated from the loan and is no longer responsible for payments.  Refer to Frequently Asked Question 55 for reporting guidelines.<br><br>Simple Loan Assumption – A new borrower assumes responsibility for a loan.  The original borrower remains responsible in the event that the new borrower defaults.  Refer to Frequently Asked Question 56 for reporting guidelines. |

# Glossary of Terms

| | |
|---|---|
| **Monthly Reporting Period** | Data furnishers report accounts a minimum of once per month.  Note that reporting monthly data does not always refer to a "calendar month".  A Date of Account Information of 02/15/2023 represents a monthly reporting period of 01/16/2023 through 02/15/2023. |
| | The Date of Account Information, which is the "as of" date for the information being reported represents the "monthly reporting period", which may be any day within the reporting period and should be consistent from month to month. |
| | For cycle reporters, each cycle represents a reporting period, such as accounts that cycle on the 5th of every month and would be reported on the 5th of every month.  As an example, a Date of Account Information = 02/05/2023 represents the monthly reporting period of 01/06/2023 through 02/05/2023. |
| | For monthly reporters, as examples, data reported at month-end should always be reported at month end, such as 01/31, 02/28, etc.  Data reported mid-month should always be reported at mid-month, such as 01/15, 02/15, etc. |
| **Mortgage (Portfolio Type)** | A written conveyance of title (i.e., contract or deed) to real estate property.  The creditor has actual title to the property, but the property remains with the use and occupancy of the borrower as long as the conditions of the mortgage are met. |

# Glossary of Terms

| | |
|---|---|
| **Open (Portfolio Type)** | Accounts where the entire balance is due upon demand or that have one payment due as scheduled (i.e., Terms Duration = 001).  This Portfolio Type is used by credit card reporters when the full balance amount is due each month (i.e., no revolving terms).  This Portfolio Type is also used by Collection Agencies, Child Support Agencies, Debt Buyers, Student Loan Guarantors, the U.S. Department of Education (as guarantor) and Utility Services' payment plans. |
| **Personal Receivership** | A voluntary debt repayment plan filed in Wisconsin (Chapter 128) that is an alternative to Bankruptcy. The consumer may include debts they want managed by the court. The plan is administered by a court-appointed trustee and lasts for a period of time no more than three years.  Refer to Frequently Asked Question 33 for reporting guidelines. |
| **Reaffirmation of Debt (Bankruptcy Chapter 7)** | An agreement by a debtor to continue paying a dischargeable debt after the bankruptcy, usually for the purpose of keeping collateral or mortgaged property that would otherwise be subject to repossession.  This agreement is done through the U.S. Bankruptcy Court. |
| **Reaffirmation of Debt Rescinded (Bankruptcy Chapter 7)** | The consumer may rescind a reaffirmation agreement prior to the bankruptcy discharge or within 60 days after the reaffirm agreement is filed with the court, whichever occurs later.  A consumer files a "rescind of debt" (requires judge's signature) for one or more of the debts in the reaffirm.  This means that the reaffirm is canceled (taken back) and the debts are again included in or discharged through bankruptcy. |
| **Redeemed** | When merchandise is repossessed or foreclosure is started on property, the consumer can "redeem" the merchandise or property by paying the debt in full. |
| **Redemptions (due to Bankruptcy)** | In a Bankruptcy filing, the consumer can choose to redeem merchandise from a creditor by paying fair market value.  Refer to Frequently Asked Question 31 for reporting guidelines. |
| **Reinstated** | When merchandise is repossessed or to avoid foreclosure, the consumer can "reinstate" the loan by bringing account payments current; i.e., making up all late payments, including applicable fees and late charges. |

CREDIT REPORTING RESOURCE GUIDE®

*Copyright 2023 © Consumer Data Industry Association*    APPENDIX 0961

Return to Table of Contents

# Glossary of Terms

| | |
|---|---|
| **Relief from Stay** | A bankruptcy judge grants a secured creditor the right to collect a debt that has been included in bankruptcy, to the extent that the order permits. |
| **Reporting Period** | See Monthly Reporting Period. |
| **Revolving (Portfolio Type)** | An account that establishes a maximum credit limit for a consumer, such as a credit card or charge account. Payment amounts are revolving based on the outstanding balance amount. |
| **Short Sale** | The sale of real estate in which the proceeds from the sale fall short of the balance owed on the loan, which is secured by the property sold.  In a short sale, the lender agrees to discount the loan balance, typically due to an economic or financial hardship on the part of the consumer. |
| **Sold Accounts** | Assets/portfolios/accounts are purchased by another company.  The new company takes ownership of the accounts/notes. |
| **Standard** | The term "standard" appears in the Credit Reporting Resource Guide® (CRRG®) and other training materials associated with the Metro 2® Format.  When used in the CRRG® or other Metro 2® training materials, the term "standard" refers to the formatting instructions that guide furnishers to report information to the consumer reporting agencies that accept data in the Metro 2® Format.  The term also refers to the information fields and codes that are intended to promote consistent reporting of information about consumers to the consumer reporting agencies that accept data in the Metro 2® Format.

Entities furnishing data in the Metro 2® Format are responsible for furnishing data that they believe will satisfy their obligations in compliance with relevant laws.  Neither the Metro 2® Task Force nor CDIA is responsible for determining whether a particular furnisher has satisfied its obligations to accurately report information. |

# Glossary of Terms

| | |
|---|---|
| **Third Party Collection Agency** | A company or individual who specializes in collecting outstanding debts for other businesses or individuals. |
| **Transferred Accounts** | Ownership of the accounts/notes are ***not*** affected.  For example, a lender/creditor is moving the processing of accounts internally from one department to another department; or from one servicer to another servicer. |
| **Variable/Adjustable Rate Loan** | A loan in which the interest rate is periodically adjusted based on a variety of indices, usually in response to changes in the Treasury Bill rate or the prime rate. |
| **Variable Length Records** | Records which may be different lengths within predetermined minimums and maximums. Variable length records allow a data furnisher to report only the size of record required for a transaction, thus allowing more data to be placed on the Metro 2® file.<br><br>For example, the J1 and J2 Segments would be reported only when additional borrowers are associated with an account. Some records may include these appendages, while others may not. |

# Validation/Implementation Checklist

**CHECKLIST USES**

This valuable checklist may be used for many purposes, including:

- Self-auditing tool to ensure accuracy and integrity of your data
- Validating that your Metro 2® output is still accurate when changes are made to your internal systems
- Upgrading your existing Metro 2® Format program
- Developing new Metro 2® software

The 2010 FACT Act Data Furnisher rules state that "each furnisher must review its policies and procedures periodically and update them as necessary to ensure their continued effectiveness". The checklist can help you with this validation process.

**IMPLEMENTATION OF THE METRO 2® FORMAT**

When used to implement a new Metro 2® program or to change from Metro™ to Metro 2®, this checklist will guide you step by step through the process.

Prior to reporting in Metro 2® for the first time, you must complete testing with each of the consumer reporting agencies to which you report.

Whether reporting through a purchased software package, a third-party data processor or an internally developed program, the data furnisher is ultimately responsible for compliance issues.

When reporting information through a third-party processor, there are certain steps that need to be taken to ensure that information is reported according to industry standard guidelines. The steps are:

- Confirm that the processor is supplying all account information in the Metro 2® Format to all consumer reporting agencies.

- Use the Metro 2® Validation/Implementation Checklist to review in detail what the processor will be reporting to ensure that your portfolio information is reported accurately.

# Validation/Implementation Checklist

| STEP | TASK DESCRIPTION | REFERENCE | AVAILABLE YES OR NO? | COMMENTS |
|---|---|---|---|---|
| 1 | Obtain a copy of the Metro 2® Format.<br><br>*Electronically:*<br>https://www.cdiaonline.org/resources/furnishers-of-data-overview/metro2-information/<br><br>*Hard copy:*<br>https://www.cdiaonline.org/publications/ | | | |
| 2 | Obtain a Program Identifier (for the Header Record) from each consumer reporting agency. | | | |
| 3 | Compare Metro 2® Field Definitions to available data on your system.  The following data should be reported according to the specified definitions in order to process your credit information correctly: | *Credit Reporting Resource Guide®: Metro 2®* | | |
| | **Header Record - Identification of Reporter:** | | | |
| | Block Descriptor Word (BDW) | Page 4-1 | | See FAQ 8. |
| | Record Descriptor Word (RDW) | Page 4-1 | | See FAQ 9. |
| | Record Identifier - HEADER | Page 4-1 | Hard code | |
| | Cycle Identifier | Page 4-2 | | See FAQ 11. |
| | Innovis Program Identifier | Page 4-2 | Hard code | |
| | Equifax Program Identifier | Page 4-2 | Hard code | |
| | Experian Program Identifier | Page 4-2 | Hard code | |
| | TransUnion Program Identifier | Page 4-2 | Hard code | |
| | Activity Date | Page 4-2 | | |
| | Date Created | Page 4-2 | | |
| | Program Date | Page 4-2 | | |

**Note: References to FAQ numbers can be found in the Frequently Asked Questions and Answers section.**

CREDIT REPORTING RESOURCE GUIDE®
*Copyright 2023 © Consumer Data Industry Association*    APPENDIX 0965

Return to Table of Contents

# Validation/Implementation Checklist

| STEP | TASK DESCRIPTION | REFERENCE | AVAILABLE YES OR NO? | COMMENTS |
|---|---|---|---|---|
| | Program Revision Date | Page 4-3 | | |
| | Reporter Name | Page 4-3 | | |
| | Reporter Address | Page 4-3 | | |
| | Reporter Telephone Number | Page 4-3 | | |
| | Software Vendor Name | Page 4-3 | Hard coded by Vendor | |
| | Software Version Number | Page 4-3 | Hard coded by Vendor | |
| | **Base Segment - Processing Information:** | | | See FAQ 1. |
| | Block Descriptor Word (BDW) | Page 4-4 | | See FAQ 8. |
| | Record Descriptor Word (RDW) | Page 4-4 | | See FAQ 9. |
| | Processing Indicator | Page 4-4 | Hard code | |
| | Time Stamp | Page 4-5 | | |
| | **Base Segment - Account Information:** | | | |
| | Identification Number | Page 4-5 | | |
| | Cycle Identifier | Page 4-5 | | See FAQ 11. |
| | Consumer Account Number | Page 4-5 | | |
| | Portfolio Type | Page 4-6 | | |
| | Account Type | Page 4-6 | | See Exhibits 1 & 2. |
| | Date Opened | Page 4-6 | | |
| | Credit Limit | Page 4-7 | | |
| | Highest Credit or Original Loan Amount | Page 4-7 | | |
| | Terms Duration | Page 4-8 | | See Exhibit 3. |
| | Terms Frequency | Page 4-8 | | See Exhibit 3. |
| | Scheduled Monthly Payment Amount | Page 4-9 | | See Exhibit 3. |
| | Actual Payment Amount | Page 4-9 | | |
| | Account Status | Page 4-10 | | See FAQs 12 & 41 and Exhibit 4. |
| | Payment Rating | Page 4-10 | | See FAQ 12. |

Return to Table of Contents

# Validation/Implementation Checklist

| STEP | TASK DESCRIPTION | REFERENCE | AVAILABLE YES OR NO? | COMMENTS |
|------|------------------|-----------|----------------------|----------|
| | Payment History Profile (up to 24 months) | Page 4-11 | | See FAQs 22 & 41 and Exhibit 5. |
| | Special Comment | Page 4-13 | | See FAQ 12 and Exhibits 6 & 7. |
| | Compliance Condition Code | Page 4-14 | | See Exhibit 8. |
| | Current Balance | Page 4-15 | | |
| | Amount Past Due | Page 4-15 | | |
| | Original Charge-off Amount | Page 4-15 | | |
| | Date of Account Information | Page 4-16 | | |
| | FCRA Compliance/Date of First Delinquency | Page 4-17 | | See FAQ 22 and Exhibit 9. |
| | Date Closed | Page 4-18 | | |
| | Date of Last Payment | Page 4-18 | | |
| | Interest Type Indicator | Page 4-18 | | |
| | ***Base Segment - Primary Borrower Information:*** | | | |
| | Surname | Page 4-19 | | Include edits to remove internal messages. |
| | First Name | Page 4-19 | | |
| | Middle Name | Page 4-20 | | |
| | Generation Code | Page 4-20 | | |
| | Social Security Number | Page 4-20 | | |
| | Date of Birth | Page 4-21 | | |
| | Telephone Number | Page 4-21 | | |
| | ECOA Code | Page 4-21 | | See FAQs 13, 14, 16 & 18 through 20 and Exhibit 10. |
| | Consumer Information Indicator | Page 4-22 | | See FAQs 23 through 33 and Exhibit 11. |

CREDIT REPORTING RESOURCE GUIDE®

*Copyright 2023 © Consumer Data Industry Association*    APPENDIX 0967

Return to Table of Contents

# Validation/Implementation Checklist

| STEP | TASK DESCRIPTION | REFERENCE | AVAILABLE YES OR NO? | COMMENTS |
|---|---|---|---|---|
| | Country Code | Page 4-22 | | See Exhibit 12. |
| | First Line of Address | Page 4-23 | | See Exhibit 13. Include edits to remove internal messages. |
| | Second Line of Address | Page 4-23 | | |
| | City | Page 4-23 | | |
| | State | Page 4-24 | | See Exhibit 14. |
| | Postal/Zip Code | Page 4-24 | | |
| | Address Indicator | Page 4-24 | | |
| | Residence Code | Page 4-24 | | |
| **4** | Can you report all borrowers associated with the account? | | | |
| | For an associated borrower who lives at the same address as the primary borrower, report the J1 Segment.  Fields available: | | | See FAQs 3, 6, 7 & 17. |
| | Segment Identifier - J1 | Page 4-25 | Hard code | |
| | Surname | Page 4-25 | | Include edits to remove internal messages. |
| | First Name | Page 4-26 | | |
| | Middle Name | Page 4-26 | | |
| | Generation Code | Page 4-26 | | |
| | Social Security Number | Page 4-27 | | |
| | Date of Birth | Page 4-27 | | |
| | Telephone Number | Page 4-28 | | |
| | ECOA Code | Page 4-28 | | See FAQs 13, 14, 16, 18 & 19 and Exhibit 10. |
| | Consumer Information Indicator | Page 4-29 | | See FAQs 23 through 33 and Exhibit 11. |

Return to Table of Contents

# Validation/Implementation Checklist

| STEP | TASK DESCRIPTION | REFERENCE | AVAILABLE YES OR NO? | COMMENTS |
|---|---|---|---|---|
| | For an associated borrower who lives at a different address than the primary borrower, report the J2 Segment.  Fields available: | | | See FAQs 3, 6, 7 & 17. |
| | Segment Identifier - J2 | Page 4-30 | Hard code | |
| | Surname | Page 4-30 | | Include edits to remove internal messages. |
| | First Name | Page 4-31 | | |
| | Middle Name | Page 4-31 | | |
| | Generation Code | Page 4-31 | | |
| | Social Security Number | Page 4-32 | | |
| | Date of Birth | Page 4-33 | | |
| | Telephone Number | Page 4-34 | | |
| | ECOA Code | Page 4-34 | | See FAQs 13, 14, 16 & 18 through 20 and Exhibit 10. |
| | Consumer Information Indicator | Page 4-35 | | See FAQs 23 through 33 and Exhibit 11. |
| | Country Code | Page 4-35 | | See Exhibit 12. |
| | First Line of Address | Page 4-36 | | See Exhibit 13. Include edits to remove internal messages. |
| | Second Line of Address | Page 4-36 | | |
| | City | Page 4-36 | | |
| | State | Page 4-37 | | See Exhibit 14. |
| | Postal/Zip Code | Page 4-37 | | |
| | Address Indicator | Page 4-37 | | |
| | Residence Code | Page 4-37 | | |

CREDIT REPORTING RESOURCE GUIDE®

*Copyright 2023 © Consumer Data Industry Association*    APPENDIX 0969

Return to Table of Contents

# Validation/Implementation Checklist

| STEP | TASK DESCRIPTION | REFERENCE | AVAILABLE YES OR NO? | COMMENTS |
|---|---|---|---|---|
| **5** | For Collection Agencies, Debt Buyers, Check Guarantee Companies, Student Loan Guaranty Agencies, and U.S. Department of Education, a K1 Segment is needed.  Fields available: | | | The K1 Segment is required for these companies. |
| | Segment Identifier - K1 | Page 4-38 | Hard code | |
| | Original Creditor Name | Page 4-39 | | |
| | Creditor Classification | Page 4-40 | | |
| **6** | If you've purchased or sold an account, a K2 Segment can be reported.  Fields available: | | | See FAQs 47 & 48. |
| | Segment Identifier - K2 | Page 4-41 | Hard code | |
| | Purchased From/Sold To Indicator | Page 4-41 | | |
| | Purchased From or Sold To Name | Page 4-41 | | |
| **7** | If you provide mortgage information, a K3 Segment can be reported.  Fields available: | | | |
| | Segment Identifier - K3 | Page 4-42 | Hard code | |
| | Agency Identifier | Page 4-42 | | |
| | Account Number (of secondary marketing agency) | Page 4-42 | | |
| | Mortgage Identification Number | Page 4-42 | | |
| **8** | Specialized payment information, for balloon or deferred payments, can be reported in the K4 Segment.  Fields available: | | | |
| | Segment Identifier - K4 | Page 4-43 | Hard code | |
| | Specialized Payment Indicator | Page 4-43 | | |
| | Deferred Payment Start Date | Page 4-43 | | See FAQ 44. |
| | Balloon Payment Due Date | Page 4-43 | | |
| | Balloon Payment Amount | Page 4-43 | | |

Return to Table of Contents

# Validation/Implementation Checklist

| STEP | TASK DESCRIPTION | REFERENCE | AVAILABLE YES OR NO? | COMMENTS |
|---|---|---|---|---|
| **9** | Account Number and/or Identification Number changes can be reported in the L1 Segment.  Fields available: | | | See FAQ 5. |
| | Segment Identifier - L1 | Page 4-44 | Hard code | |
| | Change Indicator | Page 4-44 | | |
| | New Consumer Account Number | Page 4-44 | | |
| | New Identification Number | Page 4-45 | | |
| **10** | Can employment information for the primary borrower be provided in the N1 Segment?  Fields available: | | | |
| | Segment Identifier - N1 | Page 4-46 | Hard code | |
| | Employer Name | Page 4-46 | | |
| | First Line of Employer Address | Page 4-46 | | |
| | Second Line of Employer Address | Page 4-46 | | |
| | Employer City | Page 4-46 | | |
| | Employer State | Page 4-46 | | |
| | Employer Postal/Zip Code | Page 4-46 | | |
| | Occupation | Page 4-47 | | |
| **11** | Can totals be provided in the Trailer Record?  Fields available: | | | |
| | Record Descriptor Word (RDW) | Page 4-48 | | See FAQ 9. |
| | Record Identifier - TRAILER | Page 4-48 | Hard code | |
| | Total Base Records | Page 4-48 | | |
| | Total of Status Code DF (Delete due to fraud) | Page 4-48 | | |
| | Total Associated Consumer Segments (J1) | Page 4-48 | | |
| | Total Associated Consumer Segments (J2) | Page 4-48 | | |
| | Block Count | Page 4-48 | | |
| | Total of Status Code DA (Delete – other than fraud) | Page 4-48 | | |
| | Total of each Status Code individually | Pages 4-48 through 4-50 | | |
| | Total of ECOA Code Z (Delete borrower) | Page 4-50 | | |
| | Total Employment Segments | Page 4-50 | | |
| | Total Original Creditor Segments | Page 4-50 | | |

*Copyright 2023 © Consumer Data Industry Association*    APPENDIX 0971

Return to Table of Contents

# Validation/Implementation Checklist

| STEP | TASK DESCRIPTION | REFERENCE | AVAILABLE YES OR NO? | COMMENTS |
|---|---|---|---|---|
| | Total Purchased From/Sold To Segments | Page 4-50 | | |
| | Total Mortgage Information Segments | Page 4-50 | | |
| | Total Specialized Payment Information Segments | Page 4-50 | | |
| | Total Change Segments | Page 4-50 | | |
| | Total SSNs (All Segments) | Page 4-51 | | |
| | Total SSNs (Base Segments) | Page 4-51 | | |
| | Total SSNs (J1 Segments) | Page 4-51 | | |
| | Total SSNs (J2 Segments) | Page 4-51 | | |
| | Total Dates of Birth (All Segments) | Page 4-51 | | |
| | Total Dates of Birth (Base Segments) | Page 4-51 | | |
| | Total Dates of Birth (J1 Segments) | Page 4-51 | | |
| | Total Dates of Birth (J2 Segments) | Page 4-51 | | |
| | Total Telephone Numbers (All Segments) | Page 4-51 | | |
| **12** | ***Review the following reporting situations:*** | | | |
| | How should returned checks be reported to comply with the Fair Credit Reporting Act? | | | See FAQ 15. |
| | How can an account, or specific borrower, be deleted from the file? | | | See FAQ 16. |
| | What causes duplicate tradelines? | | | See FAQ 21. |
| | If you are a first time reporter of credit data, there are special reporting requirements. | | | See FAQ 22. |
| | How should an account be reported when the consumer files bankruptcy, but the account is not included in the bankruptcy? | | | See FAQ 23. |
| | How should an account included in bankruptcy be reported if a "Relief from Stay" is granted to the creditor? | | | See FAQ 24. |
| | How should an account that has been included in Bankruptcy be reported when a consumer is making payments or has paid the account in full, even though the account has not been reaffirmed? | | | See FAQ 25. |

*Copyright 2023 © Consumer Data Industry Association*

Return to Table of Contents

# Validation/Implementation Checklist

| STEP | TASK DESCRIPTION | REFERENCE | AVAILABLE YES OR NO? | COMMENTS |
|---|---|---|---|---|
| | Is there a preferred method of reporting when accounts are partially reaffirmed in bankruptcy? | | | See FAQ 26. |
| | How should an account be reported when one or more borrowers filed Bankruptcy Chapter 7 or 11? | | | See FAQs 27(c) and 27(d). |
| | How should an account be reported when one or more borrowers filed Bankruptcy Chapter 12 or 13? | | | See FAQs 28(c) and 28(d). |
| | How should a secured debt (e.g., mortgage account) be reported when a consumer completes the required payments through a Bankruptcy Chapter 12 or 13 plan, but the account is still open and the consumer is continuing to make payments? | | | See FAQ 29. |
| | How should multiple bankruptcies (i.e., the same or different chapters) be reported for the different associated borrowers on an account? | | | See FAQ 30. |
| | How should Bankruptcies be reported when the consumer voluntarily surrenders or redeems the merchandise? | | | See FAQ 31. |
| | How should an account be reported when a Bankruptcy case has been closed or terminated without being discharged or dismissed? | | | See FAQ 32. |
| | How should an account be reported when it is included in a Personal Receivership plan (Wisconsin Chapter 128)? | | | See FAQ 33. |
| | How should charge-offs and paid charge-offs be reported? | | | See FAQs 34(a) & 34(b). |
| | How should an account be reported when the creditor files an IRS Form 1099-C? | | | See FAQ 35. |
| | How should an account be reported when an auto lease is terminated (full or early), yet there may be post-lease charges on the account; i.e., over mileage charges, excess wear and tear charges, or other outstanding charges? | | | See FAQ 36. |

Return to Table of Contents

# Validation/Implementation Checklist

| STEP | TASK DESCRIPTION | REFERENCE | AVAILABLE YES OR NO? | COMMENTS |
|---|---|---|---|---|
| | How should an account be reported when an auto lease is prepaid – where entire lease payment is paid at the time of opening; and how should an account be reported when an auto lease in paid in full in advance of termination? | | | See FAQs 37(a) and 37(b). |
| | How should accounts that are paid in full for less than the full balance (i.e., settled) be reported? | | | See FAQ 38. |
| | How should paid in full, closed accounts be reported? | | | See FAQ 39. |
| | How should a closed account be reported that has an outstanding balance? | | | See FAQ 40. |
| | How long should paid accounts (Account Status Codes 13, 61-65) continue to be reported? | | | See FAQ 41. |
| | How should prepaid credit cards/gift cards be reported? | | | See FAQ 42. |
| | What are the available options for reporting an account that has regular payments temporarily postponed? | | | See FAQ 43. |
| | How should deferred accounts be reported? | | | See FAQ 44. |
| | How should accounts in forbearance be reported? | | | See FAQ 45. |
| | How should accounts that have been transferred be reported? | | | See FAQ 46. |
| | How should accounts that have been sold to another company be reported by the seller and the purchaser _when the purchaser will convert the seller's previous account history to their system_? | | | See FAQ 47. |
| | How should accounts that have been sold to another company be reported by the seller and the purchaser _when the purchaser will NOT convert the seller's previous account history to their system_? | | | See FAQ 48. |
| | How are "payment reversal" transactions handled? | | | See FAQ 49. |
| | How do you report loans with multiple payment schedules? | | | See FAQ 50. |
| | How should timeshare mortgages and timeshare loans be reported? | | | See FAQ 51. |

# Validation/Implementation Checklist

| STEP | TASK DESCRIPTION | REFERENCE | AVAILABLE YES OR NO? | COMMENTS |
|---|---|---|---|---|
| | How should the different stages of foreclosure be reported? | | | See FAQ 52. |
| | How should alternatives to foreclosure (i.e., Deed in Lieu and Short Sale) be reported? | | | See FAQ 53. |
| | How should a secured account (i.e., mortgage, home equity or other secured account) be reported when the collateral is released but there is an outstanding balance due? | | | See FAQ 54. |
| | How should full loan assumptions be reported? | | | See FAQ 55. |
| | How should simple loan assumptions be reported? | | | See FAQ 56. |
| | How should reverse mortgages be rptd? | | | See FAQ 57. |
| | How should an account be reported when the consumer is affected by a natural or declared disaster? | | | See FAQ 58. |
| | How should a renegotiated/refinanced loan be reported? | | | See FAQ 59. |
| | How should a modified loan be reported? | | | See FAQ 60. |
| | How should an account be reported when it is updated more than one time during a given monthly reporting period; e.g., an account that is moved to recovery? | | | See FAQ 61. |
| | How should an account be reported when merchandise has been repossessed? | | | See FAQ 62. |
| | How should an account be reported when the consumer has voluntarily surrendered the merchandise? | | | See FAQ 63. |
| | How should a replacement credit card be reported (i.e., credit card replaced with a new account number)? | | | See FAQ 64. |
| | How should lost or stolen credit cards be reported? | | | See FAQs 65(a) and 65(b). |
| | If a credit card is temporarily unavailable for use because the credit grantor is conducting an investigation, how should the account be reported? | | | See FAQ 66. |

## Validation/Implementation Checklist

| STEP | TASK DESCRIPTION | REFERENCE | AVAILABLE YES OR NO? | COMMENTS |
|------|------------------|-----------|---------------------|----------|
|  | How should credit cards with no preset spending limits be reported that have terms allowing consumers to exceed the credit limits (i.e., Flexible Spending Credit Cards)? |  |  | See FAQ 67. |
|  | When and how should Debit Cards be reported? |  |  | See FAQ 68. |
|  | How should a debt extinguished under state law be reported? |  |  | See FAQ 70. |

*Copyright 2023 © Consumer Data Industry Association* APPENDIX 0976

Return to Table of Contents

# Validation/Implementation Checklist

| STEP | TASK DESCRIPTION | REFERENCE | COMMENTS |
|---|---|---|---|
| **13** | *Include the following cross-field edits:* | | |
| | Portfolio Type / Account Type | See Exhibit 2. | |
| | Portfolio Type / Credit Limit | See Base Segment Field 11. | |
| | Portfolio Type / Highest Credit or Original Loan Amount | See Base Segment Field 12. | |
| | Portfolio Type / Account Type / Terms Duration | See Base Segment Field 13 & Exhibit 2. | |
| | Terms Duration / Terms Frequency / Scheduled Monthly Payment Amount | See Exhibit 3. | |
| | Date Opened / Payment History Profile | | Amount of history reported should not be older than the Date Opened. |
| | Date of Account Information / Account Status | | Account Status is reported "as of" the Date of Account Information. |
| | Date of Account Information/Payment History Profile (PHP) | | First position of PHP represents reporting period prior to Date of Account Information. |
| | Account Status / Payment Rating | See Base Segment Fields 17A & 17B. | |
| | Account Status / Current Balance / Amount Past Due | | Monetary fields should be validated based on the status reported.  Examples:<br>• Account Status 11 (Current) requires Amount Past Due = 0.<br>• Account Status 13 (Paid account) requires Current Balance and Amount Past Due = 0. |
| | Date of First Delinquency / Account Status / Payment Rating / Consumer Information Indicator | See Base Segment Field 25 or Exhibit 9. | |
| | Charge-off and Paid Charge-off Account Status / Original Charge-off Amount | | Original Charge-off Amount is required for Account Statuses 97 and 64. |
| | Paid or Sold Account / Current Balance/ Date Closed | See FAQs 38, 39, 47 & 48. | Date Closed is required and Current Balance = 0. |
| | Closed Special Comments or Compliance Condition Codes/ Date Closed | | Date Closed is required. |
| | ECOA Codes when Multiple Borrowers | See Exhibit 10. | |

CREDIT REPORTING RESOURCE GUIDE®

*Copyright 2023 © Consumer Data Industry Association*   APPENDIX 0977

Return to Table of Contents

# Validation/Implementation Checklist

| STEP | TASK DESCRIPTION | REFERENCE | AVAILABLE YES OR NO? | COMMENTS |
|---|---|---|---|---|
| | **Project Phases:** | | | |
| **14** | Review the Metro 2® Format and any conversion questions with your consumer reporting agency representative. | Exhibit 15: Data Conversion Checklist | | |
| **15** | Determine whether data will be reported in the Character or Packed Format. | | | Character Format is preferred. |
| **16** | Develop internal software, and perform internal conversion tests. | | | |
| **17** | To set-up for electronic transmissions, which is the preferred method of reporting, contact all consumer reporting agencies. | | | |
| **18** | Advise all consumer reporting agencies of the expected date they will receive the Metro 2® test file. | | | |
| **19** | Send test transmission, record layout, and documentation to ALL consumer reporting agencies. | | | |
| **20** | Make corrections to your credit reporting format and data, as required. | | | |
| **21** | Send transmission to all consumer reporting agencies. | | | |

# Child Support Reporting

## GENERAL REPORTING GUIDELINES

The Child Support Enforcement Program was established in 1975 under Title IV-D of the Social Security Act, to help state and local agencies locate absent parents and to collect child support from parents legally obligated to pay.

Child support obligations are renewable from month to month. Although each monthly payment satisfies that month's obligation, the next month immediately begins a new obligation, to be satisfied by the next payment. The entire support obligation is not considered satisfied until the child reaches the age of majority or emancipation, or the statute of limitations for that state has been reached.

- Report data in the standard Metro 2® Format, including the Header Record.

- Report full file on a monthly basis.

- Report the complete name, social security number, date of birth, and address of the obligor.

- Report the telephone number, when available.

- An acceptable reason for deleting accounts is when Child Support cases are withdrawn by the courts.

- In the Identification Number field, report the internal code that identifies the child support agency where the information is verified.

- All parties reporting credit information must comply with the Fair Credit Reporting Act and any applicable state laws.

- All parties reporting credit information must respond to consumer inquiries.

**Note: The guidelines contained in this document are specific to your industry and should be used in conjunction with the specifications in the Metro 2® Format. Refer to the Metro 2® Format for detailed information on segments and field information.**

## CHILD SUPPORT REPORTING GUIDELINES

1.  State agencies ***that are able to age the accounts*** should report the following Account Status Codes (Base Segment, Field 17A):

    **Status 11**
    Reported for all open, current accounts, and for cases that have been brought current. Use this status when the child, or youngest child (in the case of multiple children), has ***not*** yet reached the age of majority or emancipation, or the statute of limitations for judgments in that state has not been reached.

    **Status 13**[1]
    Reported when the Office of Child Support Enforcement rates this case "satisfied." Use this status when the child, or youngest child (in the case of multiple children), ***has*** reached the age of majority or emancipation, or the statute of limitations for judgments in that state has been reached.

    **Status 62**
    Reported when the Office of Child Support Enforcement rates this case as "satisfied" and the account was previously a collection. Use this status when the child, or youngest child (in the case of multiple children), ***has*** reached the age of majority or emancipation, or the statute of limitations for judgments in that state has been reached.

    **Statuses 71, 78, 80, 82–84**[2]
    Reported to reflect the appropriate stage of delinquency (30 days to 180 or more days past the due date).

    **Status 93**[2]
    Reported when the Office of Child Support Enforcement rates this case as in collections.

    **Status DA**
    Reported when a Child Support case is withdrawn by the courts. The action taken by the consumer reporting agencies is to delete the account from their files.

    **Note: When the child support case is transferred to another state because of the relocation of the obligor, follow the standard guidelines in Frequently Asked Question and Answer 46 (option 2 with Special Comment O – transferred to another company/servicer). This transfer usually occurs with a URESA (Uniform Reciprocal Enforcement Support Act) account. The state agency is responsible for notifying another agency when the account is being transferred to their jurisdiction.**

    **Report the Payment History Profile, which provides up to 24 months of payment history, in order for the agency to control and maintain the payment history.**

---

[1] When the Account Status is 13, the Payment Rating must also be reported.

[2] When Status 71, 78, 80, 82-84 or 93 is reported, the account should be reported with a Special Comment "CS" each month in order to overlay the date of first delinquency. Special Comment "CS" is reported only until the child or youngest child reaches the age of majority or emancipation, or the statute of limitations for judgments in that state has been reached.

*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 0980

Return to Table of Contents

## CHILD SUPPORT REPORTING GUIDELINES

State agencies *that are unable to age the accounts* should report the following Account Status Codes (Base Segment, Field 17A):

**Status 11**
Reported for all open, current accounts, and for cases that have been brought current. Use this status when the child, or youngest child (in the case of multiple children), has *not* yet reached the age of majority or emancipation, or the statute of limitations for judgments in that state has not been reached.

**Status 13**[1]
Reported when the Office of Child Support Enforcement rates this case "satisfied" and the account was previously reported as current. Use this status when the child, or youngest child (in the case of multiple children), *has* reached the age of majority or emancipation, or the statute of limitations for judgments in that state has been reached.

**Status 62**
Reported when the Office of Child Support Enforcement rates this case "satisfied" and the account was previously a collection. Use this status when the child, or youngest child (in the case of multiple children), *has* reached the age of majority or emancipation, or the statute of limitations for judgments in that state has been reached.

**Status 93**
Reported when the Office of Child Support Enforcement rates this case as in collections. If a Status 93 is reported, the account should be reported with a Special Comment "CS" each month in order to overlay the date of first delinquency. Special Comment "CS" is reported only until the child or youngest child reaches the age of majority or emancipation, or the statute of limitations for judgments in that state has been reached.

**Status DA**
Reported when a Child Support case is withdrawn by the courts. The action taken by the consumer reporting agencies is to delete the account from their files.

**Note: When the child support case is transferred to another state because of the relocation of the obligor, follow Frequently Asked Question and Answer 46 (option 2 with Special Comment O – transferred to another company/servicer). This transfer usually occurs with a URESA (Uniform Reciprocal Enforcement Support Act) account. The state agency is responsible for notifying another agency when the account is being transferred to their jurisdiction.**

---

[1] When the Account Status is 13, the Payment Rating must also be reported.

APPENDIX 0981

Return to Table of Contents

## CHILD SUPPORT REPORTING GUIDELINES

2.    Portfolio Type (Base Segment, Field 8) — O (Open)

3.    Account Type Codes (Base Segment, Field 9)

- 50 – Family Support
- 93 – Child Support

4.    Date Opened (Base Segment, Field 10) — the date the case was initiated with the state agency

5.    Highest Credit or Original Loan Amount (Base Segment, Field 12) — zero

6.    Terms Duration (Base Segment, Field 13) — 001

7.    Scheduled Monthly Payment Amount (Base Segment, Field 15) — the monthly debt obligation of the obligor

8.    Special Comment Codes (Base Segment, Field 19) — Any Special Comment Code can be reported on accounts that do not require Special Comment Code CS or O.

       Refer to Exhibits 6 and 7 in the Metro 2® Format for descriptions of Special Comment Codes.

9.    Compliance Condition Codes (Base Segment, Field 20) — Report Compliance Condition Codes in conjunction with Account Status Codes and Payment Ratings when comments are required for legal compliance.

       Refer to Exhibit 8 in the Metro 2® Format for descriptions of Compliance Condition Codes.

10.   Current Balance (Base Segment, Field 21) — the total amount due from outstanding support payments. This amount must equal, at a minimum, one Scheduled Monthly Payment Amount.

11.   Amount Past Due (Base Segment, Field 22) — the total amount in arrears

12.   FCRA Compliance/Date of First Delinquency (Base Segment, Field 25) — the activity date

       The FCRA Compliance/Date of First Delinquency must freeze when the child, or youngest child (in the case of multiple children), reaches the age of majority or emancipation, or the statute of limitations for judgments in that state has been reached.

13.   ECOA Code (Base Segment, Field 37) — 1 (individual) on all records

14.   Consumer Information Indicator (Base Segment, Field 38) – Report code T (Credit Grantor Cannot Locate Consumer) and code U (Consumer Now Located) when appropriate.

       **Note: Refer to FAQ 23 for guidelines on reporting an account when a consumer files bankruptcy, but the child support obligation is not included in the bankruptcy.**

9-4                     CREDIT REPORTING RESOURCE GUIDE®
                *Copyright 2023 © Consumer Data Industry Association*
                                                       APPENDIX 0982

Return to Table of Contents

# Debt Buyer/Third Party Collection Agency Reporting

## GENERAL REPORTING GUIDELINES

A Debt Buyer is a company or individual who purchases accounts (generally non-performing debts) with the intent of collecting debts owed.  A Third Party Collection Agency is a company or individual who specializes in collecting outstanding debts for other businesses or individuals.

Do not report an account before communicating with the consumer(s) about the debt.

- Report data in the standard Metro 2® Format, including the Header Record.

- Report the complete name, address, social security number and date of birth for the legally liable consumer(s).

- Report all accounts on a monthly basis, including open collection accounts, collection accounts paid in full, and accounts requiring deletion or correction.

- Report paid in full collection accounts before purging the accounts from your internal collection system.  Do not re-report paid accounts for more than 3 months.

- Debts should only be reported based on a consumer signing a contract or agreement to pay with the original creditor.  Examples of debts that should **not** be reported include certain fines, tickets and other assessments, such as library fines, parking tickets, etc.

- Do not report Medical Debt collection accounts (as defined by Creditor Classification Code 02) until they are at least 365 days past the Date of First Delinquency that led to the account being sold or placed for collection.

- Do not report Medical Debt collection accounts (as defined by Creditor Classification Code 02) with a Highest Credit/Original Loan Amount **less than** $500.

(continued)

APPENDIX 0983

Return to Table of Contents

## DEBT BUYER/THIRD PARTY COLLECTION AGENCY REPORTING GUIDELINES

- **Do not delete paid in full collection accounts.**

| Accounts must be deleted for the following reasons: | Debt Buyers | Third Party Collection Agencies |
|---|:---:|:---:|
| Accounts which have been forwarded or sold to another entity | X | |
| Accounts which have been canceled and returned to creditor | | X |
| Accounts reported in error | X | X |
| Accounts which have been confirmed as fraudulent | X | X |
| Accounts for consumers who are deceased if no other associated consumers remain responsible for the accounts | X | X |
| Accounts that are being paid by insurance or were paid in full through insurance (not by the consumer) | X | X |
| Accounts of consumers who have filed petitions for bankruptcy | | X |

- All parties reporting credit information must comply with the Fair Credit Reporting Act (FCRA), Fair Debt Collection Practices Act (FDCPA), any applicable state laws and regulatory authorities.

- The Date of First Delinquency is used to comply with FCRA sections 605 and 623 (obsolescence period). See page 10-4 of this document for detailed reporting requirements.

- The Creditor Classification must be reported in the K1 Segment to identify the original creditor's type of business.  Note that code 02 (Medical/Health Care) is used to identify an account as a medical collection debt in accordance with FCRA section 623.

- In the Identification Number field, report the internal code that identifies the debt buyer or third party collection agency where information is verified.

- All parties reporting credit information must respond to consumer inquiries.

**Note: The guidelines in this document are specific to your industry and should be used in conjunction with the specifications in the Metro 2® Format. Refer to the Metro 2® Format for detailed information on segments and field information.**

CREDIT REPORTING RESOURCE GUIDE®
*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 0984

Return to Table of Contents

## DEBT BUYER/THIRD PARTY COLLECTION AGENCY REPORTING GUIDELINES

1.    Consumer Account Number (Base Segment, Field 7)

  - Report the individual's complete and unique account number as extracted from your file.
  - If the account number changes, report the L1 Segment. See field definitions in the Metro 2® Format.
    **Note: Notify your consumer reporting agencies the first time L1 Segments are reported.**

2.    Portfolio Type (Base Segment, Field 8) — O (Open)

3.    Account Type Codes (Base Segment, Field 9)

  - 0C — Debt Buyer
  - 48 — Collection Agency/Attorney
  - 77 — Returned Check

4.    Date Opened (Base Segment, Field 10) — the date the account was purchased by the debt buyer or placed/assigned to the third party collection agency.  When reporting returned checks, provide the date the check was written.

5.    Highest Credit or Original Loan Amount (Base Segment, Field 12) — original assigned amount as of the date purchased, placed or assigned.  When reporting returned checks, report the original amount of the check, excluding fees and interest.

6.    Terms Duration (Base Segment, Field 13) — 001

7.    Account Status Codes (Base Segment, Field 17A) — report **only** the following:

  93 — Account assigned to internal or external collections
  62 — Paid in full, was a collection account
  DF — Delete entire account due to confirmed fraud
  DA — Delete entire account (for reasons other than fraud – see below)

  - Accounts reported in error
  - Consumer is deceased. (if no other associated consumer remains responsible for the account)
  - Accounts that are being paid by insurance or were paid in full through insurance (not by the consumer)
  - Debt Buyers must also delete accounts that have been forwarded or sold to another entity.
  - Third Party Collection Agencies must also delete accounts for the following reasons:
    − Accounts that have been canceled and returned to the creditor
    − Accounts of consumers who have filed petitions for Bankruptcy

  ***Do not delete paid in full collection accounts.***

Return to Table of Contents

## DEBT BUYER/THIRD PARTY COLLECTION AGENCY REPORTING GUIDELINES

8.  FCRA Compliance/Date of First Delinquency (Base Segment, Field 25) — the date of the first delinquency **with the original creditor** that led to the account being sold or placed for collection.

    Example:
    ***Original Credit Grantor Reports:***

| Date of Account Information | Account Status Code | Definition | Date of First Delinquency |
|---|---|---|---|
| 05/31/2022 | 11 | Current (0-29 days past the due date) | Zero fill |
| 06/30/2022 | 71 | 30-59 days past the due date | 06/20/2022 |
| 07/31/2022 | 78 | 60-89 days past the due date | 06/20/2022 |
| 08/31/2022 | 80 | 90-119 days past the due date | 06/20/2022 |
| 09/30/2022 | 82 | 120-149 days past the due date | 06/20/2022 |
| 10/31/2022 | 83 | 150-189 days past the due date | 06/20/2022 |

Account is sold to debt buyer or assigned to collection agency.

***Debt Buyer/Collection Agency Reports:***

| Date of Account Information | Account Status Code | Definition | Date of First Delinquency |
|---|---|---|---|
| 12/31/2022 | 93 | Collection | 06/20/2022 |
| 01/31/2023 | 93 | Collection<br>*Consumer agrees to a repayment plan. First payment is received by debt buyer, collection agency or credit grantor's internal collection department.* | 06/20/2022 |
| 02/28/2023 | 93 | Collection<br>*Consumer continues to make payments. Current Balance is reported as decreasing.* | 06/20/2022 |
| 03/31/2023 | 62 | Paid collection account<br>*Current Balance is reported as zero.* | 06/20/2022 |

**Notes: The FCRA Compliance/Date of First Delinquency does not change due to subsequent repayment agreements.**

**When reporting returned checks, report the date the check was returned for insufficient funds. If not available, report the date of the check.**

*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 0986

Return to Table of Contents

## DEBT BUYER/THIRD PARTY COLLECTION AGENCY REPORTING GUIDELINES

FCRA Compliance/Date of First Delinquency (continued)

Effective March 31, 2004, the FCRA[1] states that "provided that the consumer does not dispute the information, a person that furnishes information on a delinquent account that is placed for collection, charged for profit and loss, or subjected to any similar action, complies with this paragraph, if –

(i) the person reports the same date of delinquency as that provided by the creditor to which the account was owed at the time at which the commencement of the delinquency occurred, if the creditor previously reported that date of delinquency to a consumer reporting agency;

(ii) the creditor did not previously report the date of delinquency to a consumer reporting agency, and the person establishes and follows reasonable procedures to obtain the date of delinquency from the creditor or another reliable source and reports that date to a consumer reporting agency as the date of delinquency; or

(iii) the creditor did not previously report the date of delinquency to a consumer reporting agency and the date of delinquency cannot be reasonably obtained as provided in clause (ii), the person establishes and follows reasonable procedures to ensure the date reported as the date of delinquency precedes the date on which the account is placed for collection, charged to profit or loss, or subjected to any similar action, and reports such date to the credit reporting agency."

9.  Report Special Comments (Base Segment, Field 19) in conjunction with Account Status Codes to further define the accounts.  As an example, Special Comment AU (Account paid in full for less than the full balance) could be reported with Account Status Code 62.

---

[1] Fair Credit Reporting Act Section 623(a)(5) [15 U.S.C. § 1681s-2]

Return to Table of Contents

## DEBT BUYER/THIRD PARTY COLLECTION AGENCY REPORTING GUIDELINES

10.  Compliance Condition Codes (Base Segment, Field 20) – report the following codes, which are applicable to disputes under the Fair Debt Collection Practices Act (FDCPA) and to direct disputes under the Fair Credit Reporting Act (FCRA).

XB – Account information has been disputed by the consumer directly to the data furnisher under the FCRA; the data furnisher is conducting its investigation. *Code XB should be reported for FDCPA disputes.*

**Important Note: Code XB should no longer be reported after the investigation is completed; the XB should be removed by reporting the removal code or changed to another code.**

XC – FCRA direct dispute investigation completed – consumer disagrees with the results of the data furnisher's investigation.

XH – Account previously in dispute; the data furnisher has completed its investigation. (To be used for disputes under the FDCPA and for direct disputes under the FCRA)

XR – Removes the most recently reported Compliance Condition Code

11.  Current Balance (Base Segment, Field 21) and Amount Past Due (Base Segment, Field 22) — may include fees and interest, depending on state and federal laws. If payments are made, the Current Balance and Amount Past Due should decrease accordingly.

12.  Date of Last Payment (Base Segment, Field 27) – the date the most recent payment was received by the debt buyer or third party collection agency.

13.  Address (Base Segment, Fields 39 – 45; J2 Segment, Fields 12 – 18) – report the consumer's full address as provided by the original creditor or a newer known address.  If the consumer's current address is unknown, report the consumer's last known address and Address Indicator 'N' (not confirmed address).

**Note: An address found through skip tracing processes should be reported only when confirmed to be the address of the consumer you are reporting.**

CREDIT REPORTING RESOURCE GUIDE®
*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 0988

Return to Table of Contents

## DEBT BUYER/THIRD PARTY COLLECTION AGENCY REPORTING GUIDELINES

14. ECOA Code (Base Segment, Field 37; J1 and J2 Segment, Field 10) — used to designate an account as joint, individual, etc. in compliance with the Equal Credit Opportunity Act (ECOA).  Refer to Exhibit 10 in the Metro 2® Format for a list of available codes.

    **Notes: Authorized users (ECOA Code 3) should not be reported because they are not contractually liable.**

    **For accounts with more than one associated borrower, if one borrower becomes deceased, report ECOA Code Z (Delete Consumer) for that borrower.  In subsequent reporting periods, only the remaining consumer should be reported.**

15. Report the K1 Segment, which contains the name of the original creditor, including any partnering affinity name, and the creditor's classification.  The Affinity Name further identifies or provides linkage detail for the relationship of the original creditor to any connecting or supporting entities (e.g., ABC BANK THE HOME STORE).

    When reporting returned checks, report the name of the payee in the Original Creditor Name field.  Note that code 02 (Medical/Health Care) is used to identify an account as a medical collection debt in accordance with FCRA section 623.

    **Notes**: **Refer to the guidelines for the K1 Segment in the Metro 2® Format.**

    **Both the Original Creditor Name and Creditor Classification are required and must be reported.  The purpose of reporting the original creditor name is to help consumers identify the source of accounts that appear on their credit reports.   Without the original creditor names, consumers may not know what the accounts represent.**

    **Federal law stipulates that the name of the payee must be identified when reporting returned checks.  It also stipulates that medical debts must be identified.**

## DEBT BUYER/THIRD PARTY COLLECTION AGENCY REPORTING GUIDELINES

16.  The following Base Segment fields are not applicable:

- Cycle Identifier (Field 6) – blank fill
- Credit Limit (Field 11) – zero fill
- Terms Frequency (Field 14) – blank fill
- Scheduled Monthly Payment Amount (Field 15) – zero fill
- Payment Rating (Field 17B) – blank fill
- Payment History Profile (Field 18) – blank fill
- Original Charge-off Amount (Field 23) – zero fill

17.  **Debt Buyers *only* –** An optional segment that may be reported is the K2 Segment, which contains the name of the company from which the account was purchased.  If the original creditor name, which is reported in the K1 Segment, and the name of the company from which the account was purchased, are the same, the K2 Segment should not be reported.

Consumer Information Indicator (Base Segment, Field 38; J1 and J2 Segment, Field 11) — used to specify that a consumer has filed bankruptcy or a consumer cannot be located.  Refer to Exhibit 11 in the Metro 2® Format for a list of available indicators.

**Note: Debt Buyers should not report accounts that were included in discharged/completed bankruptcies prior to purchasing.**

CREDIT REPORTING RESOURCE GUIDE®
*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 0990

Return to Table of Contents

# Mortgage Loan Modifications

## GENERAL REPORTING GUIDELINES

Report accounts in the standard Metro 2® Format.  Refer to the Field Definitions module for detailed reporting guidelines.

| | |
|---|---|
| Making Home Affordable Program (HAMP)<br>• First Liens<br>• Second Liens | Page 11-2<br>Page 11-5 |
| Home Affordable Foreclosure Alternatives℠ (HAFA) | Page 11-6 |
| Hardest Hit Fund (Unemployment Assistance) | Page 11-7 |
| Other Unemployment Programs | Page 11-8 |
| Hope for Homeowners Program | Page 11-9 |
| Mortgage Loan Modification Program –<br>Freddie Mac and Fannie Mae | Page 11-10 |
| Home Affordable Refinance Program (HARP) | Page 11-11 |
| General Guidelines for Renegotiated/Refinanced Accounts | Page 11-11 |

## MAKING HOME AFFORDABLE PROGRAM

### First Liens

### Program Description

The consumer must first make three reduced payments during the 3-month trial period before the loan modification becomes effective.

If the three payments are made, the loan will be modified for the purpose of creating an affordable payment plan for the consumer.  Commonly, Terms Duration may be extended and Scheduled Monthly Payment Amounts may be changed.  A portion of the principal loan amount may be set aside, but must be paid upon transfer, payoff, sale, or at maturity.

### Reporting Guidelines for Trial Period:

The guidelines below should be followed when reporting payments during the trial period:

1.  Current, but facing imminent default or Current, but eligible for loan modification

    If the consumer was current on his/her payments prior to the trial period, and makes each month's trial period payment on time, report the consumer as current (Account Status 11) during the trial period.  If the consumer is at least 30 days past due during the trial period, report the Account Status Code that reflects the appropriate level of delinquency.

    Report the trial period payment in the Scheduled Monthly Payment Amount field.  Special Comment Code 'AC' (Paying under a partial payment agreement) should also be reported.

    **Note: As per the definition in Exhibits 6 and 7, Special Comment Code 'AC' is an agreed-upon repayment plan with account payments that are *less than* the original contract's account payments.**

2.  Delinquent

    If the consumer was delinquent (at least 30 days past the due date) prior to the trial period and the reduced payments do not bring the account current, report the Account Status Code that reflects the appropriate level of delinquency.

    Report the trial period payment in the Scheduled Monthly Payment Amount field.  Special Comment Code 'AC' (Paying under a partial payment agreement) should also be reported.

    **Note: As per the definition in Exhibits 6 and 7, Special Comment Code 'AC' is an agreed-upon repayment plan with account payments that are *less than* the original contract's account payments.**

    (continued)

CREDIT REPORTING RESOURCE GUIDE®
*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 0992

Return to Table of Contents

## MAKING HOME AFFORDABLE PROGRAM

**First Liens (continued)**

**After the trial period:**

If the loan is <u>not</u> modified, report the account as per the original contractual agreement.

If the loan is modified, the guidelines below for modified loans should be followed. Report the appropriate Account Status Code for each reporting period based on the new terms of the loan.  Prior payment history reported on the account will be retained.

**Reporting Guidelines for Modified Loans**

Continue to report one tradeline under the original Account Number.

- Date Opened = the date the account was originally opened

- Original Loan Amount = the original amount of the loan, including the Balloon Payment Amount, if applicable

- Terms Duration = the modified terms

   **Note: Terms Duration should reflect the terms for the life of the account. For a loan modification, set the Terms Duration from the original Date Opened to the new maturity date.**

- Scheduled Monthly Payment Amount = new scheduled monthly payment amount as per the modified agreement

- Current Balance = the principal balance (including the Balloon Payment Amount if applicable), plus late charges, fees, interest and escrow that are due during the current reporting period

   **Note: If a portion of the loan is forgiven, the forgiven amount should be deducted from the Current Balance owed.**

- Account Status Code = the appropriate code based on the new terms of the loan

- Special Comment Code = CN (Loan modified under a federal government plan)

   **Note: Special Comment Code CN should be reported as long as deemed appropriate by the data furnisher (such as, for 5 years until the interest rate is lowered), or until another special comment becomes more critical.  For the length of time the special comment should be reported, consult with your internal Legal or Compliance department.**

(continued)

## MAKING HOME AFFORDABLE PROGRAM

**First Liens (continued)**

- K4 Segment = used to report the Balloon Payment or principal forbearance information, if applicable:

    - Specialized Payment Indicator = 01 (Balloon Payment)

    - Balloon Payment Due Date = the date the balloon payment is due which is equal to maturity of the amortizing portion of the loan.

       **Note: The payoff date can be used in this field.**

    - Balloon Payment Amount = the amount of the balloon payment in whole dollars only

**Note: If your system requires you to change the Account Number, report the L1 Segment with the new Account Number, following reporting guidelines for the L1 Segment.**

CREDIT REPORTING RESOURCE GUIDE®
*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 0994

Return to Table of Contents

## MAKING HOME AFFORDABLE PROGRAM

### Second Lien Modification Program (2MP)

Under 2MP, when a borrower's first lien is modified under HAMP (Home Affordable Modification Program) and the servicer of the second lien is a 2MP participant, that servicer must offer either to modify the borrower's second lien according to a defined protocol or to accept a lump sum payment from Treasury in exchange for full extinguishment of the second lien.

### Reporting Guidelines for Modified Second Liens and Partially Extinguished Second Liens

Follow the reporting guidelines for modified first liens (including the trial period and the modified loan) as described on pages 11-2 through 11-4.

For partially extinguished second liens, the forgiven portion of the loan should be deducted from the Current Balance owed.

**IMPORTANT NOTE:  When a borrower is current on the existing second lien and the current contractual payment amount is equal to or greater than the monthly payment that will be due following the 2MP modification, a trial period may not be required.  The servicer and borrower may execute a modification of the second lien immediately following modification of the HAMP-modified first lien.**

### Reporting Guidelines for Extinguished Second Liens

Second liens that are fully extinguished under 2MP are forgiven and as such, are considered to be paid.  Report all forgiven accounts as specified below:

- Account Status Code = 13 (Paid)
- Payment Rating = the appropriate code that identifies the status of the account within the current month's reporting period
- Special Comment Code = AU (Account paid in full for less than the full balance)
- Current Balance and Amount Past Due = zero
- Date Closed = date the account was forgiven and considered to be paid

Note that payment history for the forgiven accounts will be retained.

# HOME AFFORDABLE FORECLOSURE ALTERNATIVES<sup>SM</sup> (HAFA)

HAFA provides two options for consumers: a Short Sale or a Deed-in-Lieu (DIL) of foreclosure.

In a short sale, the mortgage company allows the sale of the consumer's house for an amount that falls short of the amount still owed. Unlike conventional short sales, a HAFA short sale completely releases the consumer from the mortgage debt after selling the property. The consumer will no longer be responsible for the amount that falls short of the amount owed. The deficiency is guaranteed to be waived by the servicer.

In a Deed in Lieu, the mortgage company allows the consumer to give the title back, transferring ownership back to the mortgage company.

## Reporting Guidelines

Follow the reporting guidelines in Frequently Asked Question & Answer 53 for Alternatives to Foreclosure: Deed in Lieu and Short Sale.

CREDIT REPORTING RESOURCE GUIDE®
*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 0996

Return to Table of Contents

## HARDEST HIT FUND (UNEMPLOYMENT ASSISTANCE)

**Program Description**

Treasury announced the Hardest Hit Fund program early in 2010 providing targeted aid to 18 states and the District of Columbia. The objective of the Housing Finance Agency's (HFAs) Hardest-Hit Fund is to allow HFAs to develop creative, effective approaches that consider local conditions. Treasury has outlined below many of the possible types of transactions that would meet the requirements of the Emergency Economic Stabilization Act of 2008.

a. **Mortgage Modifications** – Programs may provide for mortgage modification of loans held by HFAs or other financial institutions or provide incentives for servicers / investors to modify loans.

b. **Mortgage Modifications with Principal Forbearance** – Programs may provide for paying down all or a portion of an overleveraged loan and taking back a note from the borrower for that amount in order to facilitate additional modifications.

c. **Short Sales / Deeds-In-Lieu of Foreclosure** – Programs may provide for assistance with short sales and deeds in lieu of foreclosure in order to prevent avoidable foreclosures.

d. **Principal Reduction Programs for Borrowers with Severe Negative Equity** – Programs may provide incentives for financial institutions to write-down a portion of unpaid principal balance for homeowners with severe negative equity.

e. **Unemployment Programs** – Programs may provide assistance to unemployed borrowers to help them avoid preventable foreclosures.

f. **Second Lien Reductions** – Programs may provide incentives to reduce or modify second liens.

**Reporting Guidelines**

For reporting guidelines on the various types of transactions described above, refer to other sections within this module and to various Frequently Asked Questions & Answers.

Return to Table of Contents

## OTHER UNEMPLOYMENT PROGRAMS

### Home Affordable Unemployment Program

For consumers who are unemployed, depending on their situation, MHA's **Home Affordable Unemployment Program (UP)** may reduce the consumer's mortgage payments to 31 percent of their income or suspend payments altogether for 12 months or more.  UP is not currently available for homeowners with mortgages held by Fannie Mae and Freddie Mac.

### Fannie Mae's Unemployment Forbearance Program

Servicers have the flexibility to assist consumers who have a financial hardship due to unemployment.  This program allows the consumer to receive a reduction or suspension of the monthly mortgage payment for a specific period of time.  If during the final month of the initial Unemployment Forbearance period, the consumer remains unemployed, the servicer must determine if the consumer is eligible for an extension of Unemployment Forbearance of no more than six additional months.

### Freddie Mac's Unemployment Forbearance Program

Freddie Mac's forbearance requirements provide a "short-term unemployment forbearance" relief option to assist consumers who are unable to make their mortgage payments due to unemployment.  In addition, Freddie Mac offers an "extended unemployment forbearance" relief option to provide an extension of the forbearance period if the consumers have not regained employment after the short-term forbearance period has ended.  These additional relief options give unemployed borrowers an opportunity to retain homeownership by providing mortgage payment relief while they seek re-employment.

Servicers have delegated authority to approve an eligible consumer for a short-term unemployment forbearance period of six months during which time the monthly mortgage payment is either suspended or reduced.  If the consumer remains unemployed at the end of the short-term unemployment forbearance period, the Servicer must consider the consumer for extended unemployment forbearance.  If the consumer meets the eligibility criteria for extended unemployment forbearance, the Servicer must obtain Freddie Mac's written approval before entering into an extended unemployment forbearance plan with the consumer.

### Reporting Guidelines

Follow the reporting guidelines documented in Frequently Asked Question & Answer 45 for Accounts in Forbearance for the programs described above.

CREDIT REPORTING RESOURCE GUIDE®
*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 0998

Return to Table of Contents

## HOPE FOR HOMEOWNERS PROGRAM

The HOPE for Homeowners Act of 2008 created a new program within FHA to back FHA-insured mortgages to distressed borrowers.  The new mortgages offered by FHA-approved lenders will refinance loans at a significant discount for homeowners facing difficulty meeting their mortgage payments.

**Reporting Guidelines:**

1.  The original mortgage loan is considered to be closed due to refinance and a new loan is opened.

    Report the original mortgage loan as specified below:

    - Account Status Code = 13 (Paid)
    - Payment Rating = the appropriate code that identifies the status of the account within the current month's reporting period
    - Special Comment Code = AS (Account closed due to refinance)
    - Current Balance and Amount Past Due = zero
    - Date Closed = date the account was closed due to refinance

    Note that payment history for the original mortgage loan will be retained.

    Report the newly refinanced loan with the new Account Number, new Date Opened, Special Comment Code CN (Loan modified under a federal government plan) and all other applicable fields.

    Note that payment history that occurred prior to the new Date Opened should ***not*** be reported with this account.

2.  All subordinate liens on the property must be extinguished.  Any such liens (i.e., loans or lines of credit) are forgiven and are considered to be paid.

    Report all forgiven accounts as specified below:

    - Account Status Code = 13 (Paid)
    - Payment Rating = the appropriate code that identifies the status of the account within the current month's reporting period
    - Special Comment Code = AU (Account paid in full for less than the full balance)
    - Current Balance and Amount Past Due = zero
    - Date Closed = date the account was forgiven and considered to be paid

    Note that payment history for the forgiven accounts will be retained.

Return to Table of Contents

## MORTGAGE LOAN MODIFICATION PROGRAM – FREDDIE MAC AND FANNIE MAE

Freddie Mac & Fannie Mae began offering a streamlined modification program starting 12/15/2008 for a targeted group of borrowers with certain loan criteria.  As it relates to credit reporting, all eligible loans under this program must be at least 3 payments delinquent.

The consumer must first make three reduced payments during the 3-month trial period before the loan modification becomes effective.  During that time, the data furnisher should report the true Account Status Code, which is delinquent, and Special Comment Code AC (Paying under a partial payment agreement).

If the three payments are made, the loan will be modified for the purpose of creating an affordable payment plan for the consumer.  Terms Duration may be extended and Scheduled Monthly Payment Amounts may be changed.  A portion of the principal loan amount may be set aside, but must be paid upon transfer, payoff, sale, or at maturity.  This set-aside amount would be considered the balloon payment.

**Reporting Guidelines:**

Continue to report one tradeline under the original Account Number.

- Date Opened = the date the account was originally opened
- Original Loan Amount = the original amount of the loan, including the Balloon Payment Amount
- Terms Duration = the modified terms

   **Note: Terms Duration should reflect the terms for the life of the account.  For a loan modification, set the Terms Duration from the original Date Opened to the new maturity date.**

- Scheduled Monthly Payment Amount = the new scheduled monthly payment amount as per the modified agreement
- Current Balance = the principal balance (including the Balloon Payment Amount if applicable), plus late charges, fees, interest and escrow that are due during the current reporting period
- Account Status Code = the appropriate code based on the new terms of the loan
- Special Comment Code = CN (Loan modified under a federal government plan)

   **Note: Special Comment Code CN should be reported as long as deemed appropriate by the data furnisher, or until another special comment becomes more critical.  For the length of time the special comment should be reported, consult with your internal Legal or Compliance department.**

- K4 Segment = used to report Balloon Payment or principal forbearance information:
  - Specialized Payment Indicator = 01 (Balloon Payment)
  - Balloon Payment Due Date = the date the balloon payment is due which is equal to maturity of the amortizing portion of the loan
    **Note: The payoff date may be used in this field.**
  - Balloon Payment Amount = amount of the balloon payment in whole dollars only

CREDIT REPORTING RESOURCE GUIDE®
*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 1000

Return to Table of Contents

## HOME AFFORDABLE REFINANCE PROGRAM (HARP)

The guidelines documented in Frequently Asked Question & Answer 59 (General Guidelines for Renegotiated or Refinanced Loans) may be used when reporting loans refinanced under HARP.

## GENERAL GUIDELINES FOR RENEGOTIATED/REFINANCED MORTGAGE ACCOUNTS

Refer to Frequently Asked Question and Answer 59 for general guidelines on reporting renegotiated or refinanced mortgage accounts (i.e., mortgage loans that are not modified through one of the federal government programs).

# Residential Rental Reporting

## GENERAL REPORTING GUIDELINES

Reporters of residential rental information include property management companies and 3rd party aggregators.

The following reporting guidelines refer to all reporters of residential rental information:

- Report data in the standard Metro 2® Format, including the Header Record.

- Report transferred, sold and paid accounts in the monthly reporting period in which they occur.

- Report the complete name, address, social security number and date of birth of the consumer.

- In the Identification Number field, report the internal code that identifies the property management company or 3rd party aggregator where information is verified.  For accounts reported by aggregators, the Identification Number should refer to the current holder of the property.

- All data furnishers must comply with the Fair Credit Reporting Act and any applicable state laws.

- All data furnishers must respond to consumer disputes in order to comply with one of the requirements of the Fair Credit Reporting Act.

**Note: The guidelines in this document are specific to your industry and should be used in conjunction with specifications in the Metro 2® Format.  Refer to the Field Definitions module for detailed information on segments and field information.**

## RESIDENTIAL RENTAL REPORTING GUIDELINES

**All fields within the Metro 2® Format are required to be reported for each account.  The information below describes fields that require specific values.**

| | |
|---|---|
| Portfolio Type<br>Base Segment, Field 8 | O (Open) |
| Account Type Code<br>Base Segment, Field 9 | 29 (Rental Agreement) |
| Date Opened<br>Base Segment, Field 10 | Report the lease start date.<br><br>**Note: If the lease start date is unavailable, report the date the renter/lessee takes possession of the property.** |
| Credit Limit<br>Base Segment, Field 11 | Field not applicable.  Zero fill. |
| Highest Credit/Original Loan Amount<br>Base Segment, Field 12 | Report the monthly rental obligation amount; i.e., the amount of rent due each month.<br><br>If included in the rental agreement, add recurring fees to the monthly rental obligation amount that apply for the current month's reporting period.  Examples include pet fees, parking fees and utility payments. |
| Terms Duration<br>Base Segment, Field 13 | Report a constant of 001. |
| Scheduled Monthly Payment Amount, Base Segment, Field 15 | Report the amount of the scheduled monthly payment due for the current reporting period, which should include:<br>• the monthly rental obligation amount, and<br>• utilities and other fees, if included in the rental agreement |
| Account Status<br>Base Segment, Field 17A | Report the following codes:<br><br>• Current Account Status: 11<br>• Paid Account Status: 13<br>• Delinquent Account Statuses: 71, 78, 80, 82, 83, 84<br>• Derogatory Account Statuses: 93, 97<br>• Paid, was derogatory Account Statuses: 62, 64<br>• Delete Account Statuses: DA, DF<br><br>**Note: Refer to Exhibit 4 for complete definitions and reporting guidance for each Account Status Code.** |

*Copyright 2023 © Consumer Data Industry Association*
APPENDIX 1003

Return to Table of Contents

## RESIDENTIAL RENTAL REPORTING GUIDELINES

| | |
|---|---|
| Payment Rating<br>Base Segment, Field 17B | For Account Status 13, report applicable value:<br><br>0, 1, 2, 3, 4, 5, 6<br>(Refer to field 17B for complete definitions and an example.)<br><br>For all other Account Status Codes, blank fill. |
| Special Comment<br>Base Segment, Field 19 | Report **only** the following values:<br><br>Legal Action:<br>• AM = Account payments assured by wage garnishment<br><br>Special Payment Arrangements:<br>• AC = Paying under a partial payment agreement<br>• AI = Recalled to active military duty<br>• AU = Account paid in full for less than the full balance<br><br>Transferred:<br>• BA = Transferred to recovery<br>• AT = Account closed due to transfer<br>• O = Account transferred to another company/servicer<br><br>Sold:<br>• AH = Purchased by another company<br><br>Other:<br>• AW = Affected by natural or declared disaster<br><br>To remove a previously-reported Special Comment, blank fill.<br><br>**Note: Refer to Exhibits 6 and 7 for definitions and usage guidelines for Special Comments.** |
| Compliance Condition Codes<br>Base Segment, Field 20 | Report Compliance Condition Codes in conjunction with Account Statuses when comments are required for legal compliance.<br><br>**Note: Refer to Exhibit 8 for descriptions of Compliance Condition Codes and usage guidelines.** |
| Current Balance<br>Base Segment, Field 21 | Report the outstanding balance amount including any late charges and fees.  Do not include one-time fees or damage fees.<br><br>If no outstanding balance amount remains, zero fill this field. |

Return to Table of Contents

## RESIDENTIAL RENTAL REPORTING GUIDELINES

| ECOA Code<br>Base Segment, Field 37<br>J1 Segment, Field 10<br>J2 Segment, Field 10 | Refer to Exhibit 10 for a list of ECOA Codes, their definitions and reporting guidelines.<br><br>**Note: ECOA Code 3 (Authorized User) is not applicable and should *not* be reported.** |
|---|---|
| Consumer's Address<br>Base Segment, Fields 39-44<br>J2 Segment, Fields 12-17 | Report the billing/mailing address for the primary consumer in the Base Segment Address fields.  Note that the address reported in the Base Segment is also used for the consumer reported in the J1 Segment.<br><br>Report the billing/mailing address for the associated consumer in the J2 Segment Address fields.<br><br>**Note: Refer to the Field Definitions module for detailed guidance on reporting consumer addresses.** |

## RESIDENTIAL RENTAL REPORTING GUIDELINES

| Multiple Tenant Situations |
|---|

Reporting of multiple tenant situations depends on the consumer(s) included on the rental agreement/lease.

- If each tenant has a separate lease agreement for a portion of the rental obligation, each tenant should be reported in a separate account, each with a unique Consumer Account Number. ECOA Code 1 (Individual) should be reported on both accounts.

- If the lease agreement is a joint agreement with multiple tenants financially liable, a single account should be reported. One tenant should be reported in the Base Segment and the other should be reported in a J1 or J2 Segment. ECOA Code 2 (Joint with Contractual Liability) should be reported for each tenant.

| Regular Fees |
|---|

If a rental agreement includes utilities, parking or other fees in the regular monthly payment owed by the consumer, include these fees in the Highest Credit/Original Loan Amount, Scheduled Monthly Payment Amount and Current Balance fields.

| One-time Fees or Security Deposits |
|---|

One-time fees and one-time security deposits, where a partial or full amount may be recouped by the consumer, should not be reported in any of the amount fields.

## RESIDENTIAL RENTAL REPORTING GUIDELINES

### Vouchers, Subsidies, Rent Credits, Concessions

For any situation that reduces the monies owed by the consumer, i.e., vouchers, subsidies, rent credits or concessions, ensure that the account data reported represents the consumer's specific obligation to repay; **not** the full amount(s) for the rental unit.  Deduct the applicable amount from the Original Loan Amount and Scheduled Monthly Payment Amount to identify the amount the lessee is expected to pay; i.e., amount reduced from "market" amount.

Example 1:

- Market rental amount = $1,200 per month for 12 months ($14,400/year)
- Lessee is given a concession of one month's rent that is prorated over the year.
- Total lease amount = $13,200 ($14,400 - $1,200)
- Highest Credit/Original Loan Amount = $1,100
- Scheduled Monthly Payment Amount = $1,100

Example 2:

- Market rental amount = $1,200 per month for 12 months ($14,400/year)
- Lessee is given a concession of one month's rent that occurs in the sixth month.
- Months 1 through 5: Highest Credit/Original Loan Amount and Scheduled Monthly Payment Amount = $1,200
- Month 6: Highest Credit/Original Loan Amount and Scheduled Monthly Payment Amount = $0
- Months 7 through 12: Highest Credit/Original Loan Amount and Scheduled Monthly Payment Amount = $1,200

### Tenant withholds rent as permitted by local law

Refer to Frequently Asked Question & Answer 43 for available options for reporting an account that has regular payments temporarily postponed.

### Temporary relief payment plan negotiated between tenant and lessor

Refer to Frequently Asked Question & Answer 43 for available options for reporting an account that has regular payments temporarily postponed.

## RESIDENTIAL RENTAL REPORTING GUIDELINES

### Lease Renewals

If the consumer's lease is renewed, there are three options for reporting.  The first two options ensure that the consumer's rental tradeline continues to be reported as a single account with the original Date Opened.

1. If the original Account Number and Date Opened are retained, report the amounts as per the renewed agreement.  Fields that may be changed include the Highest Credit/Original Loan Amount, Terms Frequency, Scheduled Monthly Payment Amount and Current Balance.

2. If the original Account Number changes and the Date Opened remains the same, follow the above reporting guideline, and include an L1 Segment with the new Account Number.

   Refer to the L1 Segment specifications within the Field Definitions module for reporting guidelines.

3. If the original Account Number and Date Opened change, report the original account as specified:

   - Account Status Code = 13 (Paid)
   - Payment Rating = the appropriate code that identifies whether the account was current or past due ***prior to the status and within the current month's reporting period***
   - Current Balance and Amount Past Due = zero

   Report the lease renewal account as a new account with the new Account Number, new Date Opened and all other applicable fields.  Payment history that occurred prior to the new Date Opened should not be reported with this account.

### Transferred Accounts

Refer to Frequently Asked Question & Answer 46 for reporting guidelines for transferred accounts.

**Note:  Ownership of the accounts is *not* affected.  For example, accounts are being transferred from one aggregator to another aggregator for processing and credit reporting.**

### Sold/Purchased Accounts

Refer to Frequently Asked Questions & Answers 47 and 48 for reporting guidelines for accounts sold to or purchased by another company.

Return to Table of Contents

## RESIDENTIAL RENTAL REPORTING GUIDELINES

| Accounts with Post-lease Outstanding Balances |
|---|

When the lease is terminated, but the consumer still has an outstanding balance to repay, report the following Base Segment fields as specified:

- Highest Credit/Original Loan Amount = zero
- Scheduled Monthly Payment Amount = zero
- Account Status Code = 11, 71, 78, 80, 82, 83, 84, 93, or 97, as applicable

    **Note: Even though the lease is terminated, the account should not be reported as paid since there is an outstanding balance.**

- Current Balance = Report the outstanding current balance as of the Date of Account Information, which should include any additional charges on the account; such as damages.
- Amount Past Due = Report the total amount that is 30 days or more past due.
- Date Closed  = zero fill

When the account has been paid in full, report Account Status Code 13, 62 or 64, as applicable.  Also report Current Balance and Amount Past Due = zero and Date Closed = the date the account was paid in full.

If the outstanding balance is not paid and is charged off, report Account Status Code 97 (Unpaid balance reported as a loss – charge-off).  In subsequent reporting periods, follow Frequently Asked Question 34.

# Student Loan Reporting

This module contains the reporting guidelines for both Federal and Private Student Loans.  The contents of the two separate sections are detailed below.

## Student Loan Reporting – Federal Loans

| | |
|---|---|
| General Reporting Guidelines | Page 13-2 |
| | |
| Federal Loans – Lender/Servicer/Secondary Market | Page 13-3 |
| • Single, Multiple and Consolidated Loans, Deferment or Forbearance, Loan Defaults and Transfers | Page 13-9 |
| • Loan Forgiveness and Discharge | Page 13-12 |
| • Total and Permanent Disability (TPD) Discharge Procedures for Non-defaulted Loans (Standard and VA) | Page 13-14 |
| • Total and Permanent Disability (TPD) Discharge Procedures (Federal Perkins Loan Program) | Page 13-15 |
| • Rehabilitated Student Loans and Recalled and Repurchased Student Loans | Page 13-16 |
| | |
| Federal Loans – Reporting Guidelines for Post-Default Loans | Page 13-17 |
| • Special Situations | Page 13-20 |
| • Total and Permanent Disability (TPD) Discharge Procedures for Non-defaulted FFELP Loans (Standard and VA) | Page 13-21 |
| • Total and Permanent Disability (TPD) Discharge Procedures for Defaulted Loans (Standard and VA) | Page 13-21 |
| | |
| Federal Student Loan Glossary of Terms | Page 13-22 |

## Student Loan Reporting – Private Loans

| | |
|---|---|
| General Reporting Guidelines | Page 13-25 |
| | |
| Private Loans – Lender/Servicer/Secondary Market | Page 13-26 |
| • Single, Multiple and Refinanced Loans, Deferment or Forbearance, Loan Sales and Transfers, Co-Signer Release, Loan Defaults | Page 13-33 |
| • Write-off of Private Student Loan Balances due to Death or Disability: For private student loans, write-off reporting requirements apply following approval by the loan holder. | Page 13-36 |
| • Rehabilitated Private Student Loans | Page 13-38 |
| | |
| Private Student Loan Glossary of Terms | Page 13-42 |

# Student Loan Reporting – Federal Loans

## GENERAL REPORTING GUIDELINES

Reporters of federal student loan information include lenders, servicers, secondary markets, collection agencies and the U.S. Department of Education ("ED").

The following reporting guidelines refer to all reporters of federal student loan information:

- Report data in the standard Metro 2® Format, including the Header Record.

- Report all open accounts on a monthly basis.

- Report transferred, paid, and government claim accounts in the reporting period in which they are finalized.

- Do not report accounts prior to the first disbursement.

- Report the complete name, address, social security number and date of birth of the consumer.

- In the Identification Number field, report the internal code that identifies the lender, secondary market, or guarantor where information is verified.  For servicers, the Identification Number should refer to the current loan owner/holder; e.g., Servicer Name/Dept. of Ed.

- All parties reporting credit information must respond to consumer inquiries.

**Note: The guidelines in this document are specific to your industry and should be used in conjunction with specifications in the Metro 2® Format.  Refer to the Metro 2® Format for detailed information on segments and field information.**

CREDIT REPORTING RESOURCE GUIDE®
*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 1011

Return to Table of Contents

## FEDERAL LOANS – LENDER/SERVICER/SECONDARY MARKET

**All fields within the Metro 2® Format are required to be reported for each account.  The information below describes fields that require specific values.**

**Do not report a loan until a disbursement has been made.**

| | |
|---|---|
| Identification Number Base Segment, Field 5 | For loans reported by a servicer, the Identification Number should refer to the current loan owner/holder or servicer and loan owner/holder; e.g., Servicer Name/Dept. of Ed.<br><br>**Note:** Verification of accounts will be done with the servicer. |
| Account Type Code Base Segment, Field 9 | 12 (Education) for installment accounts |
| Highest Credit or Original Loan Amount Base Segment, Field 12 | The Original Loan Amount should be increased for subsequent disbursements of a loan, and reduced for disbursements that are canceled or returned.<br><br>Do not increase the Original Loan Amount as a result of interest capitalization or fees incurred post-disbursement. |
| Terms Duration Base Segment, Field 13 | Report the maximum number of months allowed for repayment of the loan.<br><br>For loans in an Income Driven Repayment (IDR) plan, the Terms Duration should reflect the maximum number of months allowed for repayment of the loan, which is the number of months between the start of repayment and when the loan could be forgiven if not repaid by the borrower, or the fixed number of months for the IDR plan.  For example, a loan being repaid under the Pay as You Earn Repayment Plan should always have Terms Duration = 240 months.<br><br>While payments are being made toward the Public Service Loan Forgiveness Program, report Terms Duration based on the actual repayment plan (i.e., standard, extended or IDR).<br><br>When the loan is in a period during which payments are not required (i.e., initial in-school, grace, deferment, and forbearance periods), report Terms Duration as blank.<br><br>For loans that are no longer guaranteed and are reported as in collections (Account Status 93 or 62), report a constant of 001. |
| Scheduled Monthly Payment Amount, Base Segment, Field 15 | Report the monthly payment amount for the repayment plan in which the borrower is enrolled during the current reporting period.<br><br>For loans in an Income Driven Repayment (IDR) plan, report the amount the consumer is required to pay for each month in the IDR plan, which can be as low as $0. |

Return to Table of Contents

## FEDERAL LOANS – LENDER/SERVICER/SECONDARY MARKET

| Account Status Code Base Segment, Field 17A | • 11 = Open account in good standing<br><br>For ED-owned loans, Account Status 11 should be reported until the loan is 90 days or more past the due date as of the Date of Account Information.<br><br>For all other federal student loans, Account Status 11 should be reported until the loan is at least 60 or 90 days past the due date as of the Date of Account Information, based on loan holder requirements.<br><br>• 11 for Income Driven Repayment (IDR) plans when the Scheduled Monthly Payment Amount = $0<br><br>• 11 with Terms Frequency D and Payment History Profile Character B — Open account/payments deferred/account was never in repayment<br><br>• 11 with Terms Frequency D and Payment History Profile Character D — Open account/payments deferred/account was previously in repayment<br><br>**Note**: Terms Frequency Code D should be used with Account Status Code 11 and Amount Past Due = 0 when payments are not currently required (e.g., deferment, grace period, forbearance), but there is a future payment obligation, even if the loan has an unresolved delinquency prior to or during the deferred period.<br><br>• 78, 80, 82–84 = the appropriate stage of delinquency (60 days to 180 or more days past the due date).  Refer to Account Status 11 above for exceptions due to delayed delinquency reporting.<br><br>• 13 = Paid/zero balance account (requires Payment Rating)<br><br>**Note**: For paid in full accounts, report the Date Closed. Also, report both the Current Balance and the Amount Past Due as zero.  Refer to Frequently Asked Question and Answer 39 for additional guidance on reporting accounts that are paid in full.<br><br>• DA = Delete entire account<br>• DF = Delete entire account due to confirmed fraud<br><br>**Note:** Refer to guidance throughout this module for specific situations on deleting accounts.<br><br>(continued) |
|---|---|

CREDIT REPORTING RESOURCE GUIDE®
*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 1013

Return to Table of Contents

## FEDERAL LOANS – LENDER SERVICER/SECONDARY MARKET

| | |
|---|---|
| Account Status Code Base Segment, Field 17A (continued) | **For federally-guaranteed student loans that are <u>no longer guaranteed</u>**, the following additional Account Status Codes may be reported for loans that are defaulted, in collections, or charged off:<br><br>• 93 = Account assigned to internal or external collections<br>• 97 = Unpaid balance reported as a loss (charge-off)<br>• 62 = Account paid in full, was a collection account<br>• 64 = Account paid in full, was a charge-off |
| Payment History Profile Base Segment, Field 18 | Refer to the Field Definitions module for standard guidelines on reporting up to 24 months of payment history.<br><br>The Payment History Profile will reflect accounts going from current to 60 or 90 days delinquent due to delayed delinquency reporting (refer to Account Status 11 above).<br><br>**Examples:**<br><br>• 332000000000220000000000 (first reported delinquent at 60 days)<br>• 004333000000300030000000 (first reported delinquent at 90 days)<br><br>For months during which payments were not required (i.e., initial in-school, grace, deferment and forbearance periods):<br><br>• Report value **D** for loans that were previously in repayment.<br><br>• Report value **B** for loans that have never been in repayment.<br><br>  **Note**: If payment history was reported in error (i.e., account mistakenly reported as in repayment), report value **D**.<br><br>When adjusting the initial in-school or grace period status of a loan that covers one or more months previously reported in the Payment History Profile, the applicable months should be updated to reflect character D (no payment history available this month). |

Return to Table of Contents

## FEDERAL LOANS – LENDER/SERVICER/SECONDARY MARKET

| Special Comment Base Segment, Field 19 | The Special Comments that apply to Federal Student Loans are listed below.  No other codes may be reported.<br><br>• **O** – when reporting a transfer to another servicer or guaranty agency that is not due to a loan sale, with the exception of internal transfers; i.e., ED-owned loans or defaults reported by a FFELP servicer<br>• **AH** – when a loan is purchased by another company<br>• **AT** – when reporting an internal transfer of an ED-owned loan or a default by a FFELP servicer<br>• **AU** – when a loan is paid in full for less than the full balance<br>• **AW** – when the borrower is affected by a natural or declared disaster.  Follow guidance in FAQ 58.<br><br>**Notes:**<br><br>Special Comment Code **AL** (Student Loan assigned to government) became obsolete for reporting as of April 2020.<br><br>Special Comment Code **CP** (Forbearance) should not be used for federal student loans.  Forbearance should be reported similarly to deferment, as per FAQ 44. |
|---|---|

*CREDIT REPORTING RESOURCE GUIDE®*
*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 1015

Return to Table of Contents

## FEDERAL LOANS – LENDER /SERVICER/SECONDARY MARKET

| | |
|---|---|
| FCRA Compliance/Date of First Delinquency (DOFD) Base Segment, Field 25 | Refer to the Field Definitions module and Exhibit 9 (Explanation and Examples of FCRA Compliance/Date of First Delinquency) for standard guidelines on reporting DOFD according to hierarchy rules. |

Regarding hierarchy rules 1 and 2: Report the date of the first 30-day delinquency that led to the Account Status or Payment Rating being reported even though reporting of delinquency is delayed until the loan is 60 or 90 days past the due date. When the Account Status is 11 (Current), report Date of First Delinquency = 0. However, when reporting delinquent statuses, do not change/update the Date of First Delinquency unless the borrower has brought the account back to less than 30 days past the due date. A borrower may be less than 60 or 90 days past the due date (i.e., Account Status 11) without triggering a change to the Date of First Delinquency.

**Example:**

Refer to table below for example of DOFD reporting for loans that may not be reported as delinquent until 90 days past the due date.

| Date of Account Information (Field 24) | Next Payment Due Date (not reported) | # of Days Past Due Date (not rptd.) | Account Status and Definition (Field 17A) | Date of First Delinquency (Field 25) |
|---|---|---|---|---|
| 03/31/2022 | 04/15/2022 | 0 | 11 (Current) | Zero fill |
| 04/30/2022 | 04/15/2022 | 15 | 11 | Zero fill |
| 05/31/2022 | 04/15/2022 | 46 | 11 | Zero fill |
| 06/30/2022 | 04/15/2022 | 76 | 11 | Zero fill |
| 07/31/2022 | 04/15/2022 | 107 | 80 (90-119 days past due) | 05/15/2022 (30 days after 04/15/2022 due date) |
| 08/31/2022 | 06/15/2022 | 77 | 11 | Zero fill |
| 09/30/2022 | 06/15/2022 | 107 | 80 | 05/15/2022 (DOFD does not reset; borrower never less than 30 days delinquent) |
| 10/31/2022 | 08/15/2022 | 77 | 11 | Zero fill |
| 11/30/2022 | 10/15/2022 | 46 | 11 | Zero fill |
| 12/31/2022 | 12/15/2022 | 16 | 11 | Zero fill (Borrower less than 30 days delinquent; DOFD will reset if future delinquency) |
| 01/31/2023 | 12/15/2022 | 47 | 11 | Zero fill |
| 02/28/2023 | 12/15/2022 | 75 | 11 | Zero fill |
| 03/31/2023 | 12/15/2022 | 106 | 80 | 01/14/2023 (30 days after 12/15/2022 due date) |

Return to Table of Contents

## FEDERAL LOANS – LENDER/SERVICER/SECONDARY MARKET

| | |
|---|---|
| Date of Last Payment Base Segment, Field 27 | Report the date the most recent payment was received whether a partial or full payment was made.<br><br>For loans in an Income Driven Repayment (IDR) plan, when the Scheduled Monthly Payment Amount = **0** and the Actual Payment Amount = **0**, report the payment due date within the current reporting period as the Date of Last Payment. |
| Consumer Information Indicator Base Segment Field 38 J1 and J2 Segments – Field 11 | Used to specify that a consumer's student loan has been included in bankruptcy or a consumer cannot be located.  Refer to Exhibit 11 for a list of available indicators.<br><br>**Note:** Refer to FAQ 23 for guidelines on reporting an account when a consumer files bankruptcy, but the student loan is not included in the bankruptcy discharge. |
| K4 Segment Deferred Payment information | Report for deferred loans:<br>• Specialized Payment Indicator = 02 (Deferred payment)<br>• Deferred Payment Start Date = date the first payment is due.  If not available, report the date on which the deferred period will end.<br><br>**Note:** If neither date is available, do not report the K4 Segment. |
| L1 Segment Consumer Account Number Change | When account history can be verified, report one time when account numbers change due to an account acquisition or internal account number change.<br><br>Refer to FAQ 46 for guidelines on reporting when account history cannot be verified by the new servicer. |

CREDIT REPORTING RESOURCE GUIDE®
*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 1017

Return to Table of Contents

## FEDERAL LOANS – LENDER/SERVICER/SECONDARY MARKET

| Single, Multiple and Consolidated Loans, Deferment or Forbearance, Loan Defaults and Transfers | |
|---|---|
| **Multiple disbursements of a single loan** | When a loan has multiple disbursements, report the loan as one account.<br><br>• Retain and do not change the original Consumer Account Number when additional disbursements are reported.<br><br>• Retain and do not change the original Date Opened after the loan is reported.<br><br>• Update the Original Loan Amount, Current Balance, and Scheduled Monthly Payment Amount (when in repayment) as applicable, to include totals for all disbursements.  Reduce these amount fields as applicable, due to the amount of any canceled or returned disbursements.<br><br> **Example**: If the loan is for $10,000 and the first disbursement is for $2,000, report the Original Loan Amount field as $2,000. If an additional disbursement is made for $8,000, increase the Original Loan Amount to $10,000.  If the $2,000 disbursement is subsequently canceled, reduce the Original Loan Amount to $8,000.<br><br>• If all disbursements are canceled or returned, report Account Status DA to delete the account. |
| **Multiple loans** | Multiple loans must be reported as separate accounts. |
| **Consolidated loans** | When a loan is paid in full through consolidation, report the loan with Account Status Code 13 and the appropriate Payment Rating.<br><br>The new consolidation loan, which paid the underlying loans in full, must be reported as a new account. |

(continued)

Return to Table of Contents

## FEDERAL LOANS – LENDER/SERVICER/SECONDARY MARKET

| | |
|---|---|
| **Loans in deferment or forbearance** | Report federal student loans in deferment or forbearance as deferred.  Refer to Frequently Asked Question and Answer 44 for specific reporting guidance. |
| **Loans transferred <u>to</u> another servicer or lender** | Follow the standard guidelines in Frequently Asked Question and Answer 46 for servicing transfers.<br><br>• Report Special Comment Code **AT** for ED-owned loans.<br>• Report Special Comment Code **O** or **AT** (as applicable) for guaranteed loans.<br><br>Follow the standard guidelines in Frequently Asked Questions and Answers 47 and 48 for transfers as a result of a loan sale. |
| **Loans transferred in <u>from</u> another servicer or lender** | Follow the standard guidelines in FAQ 46 for servicing transfers and FAQs 47 and 48 for transfers in as a result of a loan purchase. |
| **ED-owned loans transferred to ED due to default or ineligible borrower** | Follow the standard guidelines in Frequently Asked Question and Answer 46 for servicing transfers.  Report Special Comment Code **AT** to denote an internal transfer. |
| **Guaranteed loans transferred to Guaranty Agency due to default/claim payment or bankruptcy** | Follow the standard guidelines in Frequently Asked Question and Answer 46 for servicing transfers.  Report Special Comment Code **O** or **AT**, as applicable. |

(continued)

CREDIT REPORTING RESOURCE GUIDE®
*Copyright 2023 © Consumer Data Industry Association*
                                                                    APPENDIX 1019

Return to Table of Contents

## FEDERAL LOANS – LENDER/SERVICER/SECONDARY MARKET

| | |
|---|---|
| **Federally guaranteed loans that are no longer guaranteed (i.e., unreinsured loans) that default/charge off and transfer from the servicer to another entity at the time of default/charge off** | Follow the standard guidelines in Frequently Asked Question and Answer 46 for servicing transfers.  Report Special Comment Code **O** or **AT**, as applicable.<br><br>Report Account Status Code **97** with the applicable Special Comment Code if the loan was charged off at the time of transfer, or Account Status Code **93** if in collections at the time of transfer. |
| **Defaulted federal loans that are no longer guaranteed (i.e., unreinsured loans) and are not transferred at the time of default/charge-off** | If the loans have been charged off, follow the standard guidelines in Frequently Asked Questions and Answers 34 or 35, as applicable.<br><br>Loans that have defaulted and are in collections should be reported with Account Status **93** and the Current Balance and Amount Past Due = outstanding balance amount.  Account Status **62** must be reported when the loan is paid in full.<br><br>As an option, loans that have defaulted and are in collections may be reported with the applicable level of delinquency rather than Account Status 93.  When using this option, Account Status Code 13 should be reported when the account is paid in full.<br><br>In all situations, if the account is settled for less than the outstanding balance, follow the guidance in Frequently Asked Question and Answer 38, which requires reporting Special Comment Code AU along with the applicable paid status. |

*Copyright 2023 © Consumer Data Industry Association*
APPENDIX 1020

Return to Table of Contents

## FEDERAL LOANS – LENDER/SERVICER/SECONDARY MARKET

| Loan Forgiveness and Discharge<br><br>For guaranteed federal loans, the forgiveness or discharge reporting requirements apply following approval and payment of the claim by the guarantor. | |
|---|---|
| **Loans forgiven due to Borrower Defense to Repayment** | If the account is partially forgiven, reduce the Current Balance to reflect the amount remaining after the partial forgiveness and update the Payment History Profile with character **D** for months prior to approval of the partial forgiveness.  Continue reporting the account normally in subsequent reporting periods.<br><br>If the loan is completely forgiven, report Account Status Code **DA** to delete the account. |
| **Loans forgiven due to Teacher Loan Forgiveness** | If the loan is partially forgiven, reduce the Current Balance to reflect the amount remaining after the partial forgiveness.<br><br>If the loan is completely forgiven and had been in repayment prior to being forgiven, report Account Status Code **13**, Payment Rating **0**, Current Balance **0** and Amount Past Due **0** to indicate a paid/closed account, along with the appropriate Date Closed.<br><br>If the loan is completely forgiven, but had never been in repayment, report Account Status Code **DA** to delete the account. |
| **Loans forgiven due to Public Service Loan Forgiveness** | Report Account Status Code **13**, Payment Rating **0**, Current Balance **0** and Amount Past Due **0** to indicate a paid/closed account, along with the appropriate Date Closed. |
| **Loans forgiven or paid in full upon completion of an income-driven repayment (IDR) plan** | Report Account Status Code **13**, Payment Rating **0**, Current Balance **0** and Amount Past Due **0** to indicate a paid/closed account, along with the appropriate Date Closed. |
| **Loans discharged due to school closure** | Report Account Status Code **DA** to delete the account. |
| **Loans discharged due to False Certification or, prior to discharge, when the loan is determined to be the result of identity theft** | Report Account Status Code **DF** to delete the account. |
| **Loans discharged due to Unpaid Refund** | Report Account Status Code **DA** to delete the account. |

(continued)

*C*REDIT *R*EPORTING *R*ESOURCE *G*UIDE®
*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 1021

Return to Table of Contents

## FEDERAL LOANS – LENDER/SERVICER/SECONDARY MARKET

| | |
|---|---|
| **Loans discharged due to the death of a student who is not a party to the loan (e.g., Parent PLUS Loan or Consolidated Loan that includes a Parent PLUS Loan)** | If the loan had been in repayment prior to the student's death, report Account Status Code **13**, Payment Rating **0**, Current Balance **0**, and Amount Past Due **0** to indicate a paid/closed account, along with the appropriate Date Closed. The Payment History Profile should be updated to reflect value **D** for months between the date of death and the reporting period in which the loan is reported with Account Status Code 13. <br><br> If the loan had never been in repayment, report Account Status Code **DA** to delete the account. <br><br> ECOA Code **X** should not be reported because the student that is deceased is not a party to the loan.  ECOA Code X must be reported only when a party to the loan is deceased. Refer to Frequently Asked Question and Answer 19 for reporting when a party to the loan is deceased. |
| **Loans discharged due to the death of a party to the loan** | If the loan had been in repayment prior to the death of a party to the loan, report Account Status Code **13**, Payment Rating **0**, Current Balance **0**, and Amount Past Due **0** to indicate a paid/closed account, along with the appropriate Date Closed.  Report ECOA Code **X** in the applicable Base or J1/J2 Segment for the deceased party as described in Frequently Asked Question and Answer 19. <br><br> If the loan had never been in repayment, report Account Status Code **DA** to delete the account. |

*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 1022

Return to Table of Contents

## FEDERAL LOANS – LENDER/SERVICER/SECONDARY MARKET

| Total and Permanent Disability (TPD) Discharge Procedures for Non-defaulted Loans (Standard and VA) | |
|---|---|
| **Initial indication of interest in TPD discharge by borrower** | When notice is received from ED that the borrower has indicated interest in a TPD discharge and collection activities are suspended for 120 days, report the account as deferred. Refer to Frequently Asked Question and Answer 44 for specific reporting guidelines.  Do not report Special Comment CP. |
| **Initial TPD application filed by borrower** | When notice is received from ED that the borrower has applied for a TPD discharge and collection activities are suspended, report the account as deferred.  Refer to Frequently Asked Question and Answer 44 for specific reporting guidelines.  Since the Deferred Payment Start Date will not be known, do not report the K4 Segment.  Do not report Special Comment CP. |
| **TPD discharge not approved** | If the discharge is not approved, stop reporting the account as deferred and resume reporting the account normally going forward.<br><br>The "D's" reported in the Payment History Profile during the deferral time period should not be removed. |
| **TPD discharge approved** | Report the account with the following Base Segment fields:<br><br>• Account Status Code = 13 (Paid)<br><br>  **Note:** If the TPD effective date is prior to the date the loan entered repayment, or is prior to the date that the lender or servicer began reporting the loan, report Account Status **DA** to delete the account.<br><br>• Payment Rating = 0 (Current; since no payments were due within this reporting period)<br><br>• Payment History Profile = Report value D (no payment history available this month) in the positions representing the months going back to the TPD effective date.  Adjustments to months earlier than the previous 24 months prior to the Date of Account Information must be corrected by submitting an AUD through e-OSCAR®.<br><br>  **Note:** Any delinquencies that occurred prior to the TPD effective date should remain on the file and should not be deleted.<br><br>(continued) |

CREDIT REPORTING RESOURCE GUIDE®
*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 1023

Return to Table of Contents

## FEDERAL LOANS – LENDER/SERVICER/SECONDARY MARKET

| TPD discharge approved (continued) | • Current Balance and Amount Past Due = 0<br><br>• Date of Account Information = Report a date within the current month's reporting period even if the paid effective date was in a prior month.  Refer to Frequently Asked Question and Answer 39.<br><br>• Date Closed = Date the TPD discharge was approved by ED.<br><br>**Notes:**<br>If notified by a subsequent servicer that the TPD effective date was during the period that a prior servicer was responsible for reporting the account, the prior servicer should also follow the reporting guidelines outlined above.<br><br>If a loan discharged under Standard TPD is reinstated within 3 years, a new account will have to be reported by the current servicer because the discharged account was reported as paid.  The new account should be reported with Account Status 11 (current). |
|---|---|

| Total and Permanent Disability (TPD) Discharge Procedures (Federal Perkins Loan Program) | |
|---|---|
| **Non-defaulted loans** | • Follow the standard guidelines in Frequently Asked Question and Answer 46; option 2 to report the account as transferred.<br><br>• Any credit history already established by the borrower will be retained for historical credit reporting purposes.<br><br>• No further reporting by the school is required. ED will be responsible for reporting the loan after assignment. |
| **Defaulted loan**<br><br>**(previously reported by the school as Account Status 93 (collection)** | • Follow the standard guidelines in Frequently Asked Question and Answer 46; option 2 to report the account as transferred.<br><br>• All collection history already reported will be retained for historical credit reporting purposes.<br><br>• No further reporting by the school is required. ED will be responsible for reporting the loan after assignment. |

## FEDERAL LOANS – LENDER/SERVICER/SECONDARY MARKET

| Rehabilitated Student Loans and Recalled and Repurchased Student Loans |
|---|
| Section 428F(a)(1)(A) of the Higher Education Act of 1965 was amended by the Higher Education Opportunity Act of 2008 to require that, upon the rehabilitation of a defaulted loan, the holder of the loan must request any consumer reporting agency to which the guaranty agency or holder had reported the default of the loan to remove the record of default from the borrower's credit history.<br><br>Recall and repurchase occurs for federal student loans after a loan is reported as defaulted and an event occurs that restores the loan to its prior status.  In this case, the credit report must be updated in the same manner as a rehabilitated student loan.<br><br>Since defaulted federal student loans are reported as transferred, there is no clear "notice of default" to remove from the reported account.<br><br>If the student loan is rehabilitated, the new or previous lender should report the loan as a new account going forward.  Payment history reported prior to the default should not be included with the new account.<br><br>**IMPORTANT NOTE: Contact your data representatives at the consumer reporting agencies to ensure that previously-reported "defaults" have been removed.** |

Return to Table of Contents

## FEDERAL LOANS – REPORTING GUIDELINES FOR POST-DEFAULT LOANS

**The following guidance is specific to reporting by the guarantor or its servicer/agent.  All fields within the Metro 2® Format are required to be reported for each account.  The information below describes fields that require specific values.**

- Do not report the account during the review period.
- Do not report the account if it is returned to the lender.
- Do not report the account if it was transferred to the guarantor due to a claim payment for any reason other than default for non-payment.
- Guaranty agencies should follow the reporting guidelines for Lender/Servicer/Secondary Market when reporting loans that are not guaranteed by the federal government.

| | |
|---|---|
| Consumer Account Number<br>Base Segment, Field 7 | Report the new number as assigned by the guaranty agency.<br><br>**Note:** Do not report the consumer's Social Security Number in whole or in part within the Consumer Account Number. |
| Portfolio Type<br>Base Segment, Field 8 | O (Open) |
| Date Opened<br>Base Segment, Field 10 | Report the date the defaulted claim was paid to the lender. |
| Highest Credit/Original Loan Amount<br>Base Segment, Field 12 | Report the claim amount that was paid to the lender. |
| Terms Duration<br>Base Segment, Field 13 | 001 (one payment as scheduled) |
| Terms Frequency<br>Base Segment, Field 14 | Blank |
| Account Status Code<br>Base Segment, Field 17A | Report *only* the following:<br><br>- 93 = Account assigned to internal or external collections. (Account Status 93 should be reported immediately after the review period if the account is retained.)<br>- 62 = Account paid in full/was a collection account.<br><br>**Notes**:<br>If a consumer is making payments, continue to report the account with Account Status Code 93, but report the declining balance.<br><br>If accounts are turned over to a Collection Agency and the Collection Agency reports the accounts to the credit reporting agencies, the guaranty agency should report the accounts as Status **DA** to delete them. These accounts cannot be reported by both agencies, causing duplication. The FCRA Compliance/Date of First Delinquency should contain the date of the first delinquency with the original lender that led to the default. The K1 Segment should contain the complete name of the original lender/servicer/secondary market to whom the claim was paid, as well as Creditor Classification Code 07. |

Return to Table of Contents

## FEDERAL LOANS – REPORTING GUIDELINES FOR POST-DEFAULT LOANS

| FCRA Compliance/Date of First Delinquency (DOFD) Base Segment, Field 25 | Report the date of the first delinquency **with the original lender** that led to the loan being transferred to the guaranty agency.  If multiple defaults are reported as one loan (compressed), the Date of First Delinquency must be the date of the first delinquency that led to the earliest default.

**Note:**
Effective March 31, 2004, the FCRA[1] states that "provided that the consumer does not dispute the information, a person that furnishes information on a delinquent account that is placed for collection, charged for profit and loss, or subjected to any similar action, complies with this paragraph, if –

(i) the person reports the same date of delinquency as that provided by the creditor to which the account was owed at the time at which the commencement of the delinquency occurred, the creditor previously reported that date of delinquency to a consumer reporting agency;

(ii) the creditor did not previously report the date of delinquency to a consumer reporting agency, and the person establishes and follows reasonable procedures to obtain the date of delinquency from the creditor or another reliable source and reports that date to a consumer reporting agency as the date of delinquency; or

(iii) the creditor did not previously report the date of delinquency to a consumer reporting agency and the date of delinquency cannot be reasonably obtained as provided in clause (ii), the person establishes and follows reasonable procedures to ensure the date reported as the date of delinquency precedes the date on which the account is placed for collection, charged to profit or loss, or subjected to any similar action, and reports such date to the credit reporting agency." |

---

[1] Fair Credit Reporting Act Section 623 (a) (5)

Return to Table of Contents

## FEDERAL LOANS –REPORTING GUIDELINES FOR POST-DEFAULT LOANS

| | |
|---|---|
| Consumer Information Indicator Base Segment, Field 38; J1/J2 Segment, Field 11 | Used to specify that a consumer's student loan has been included in bankruptcy or a consumer cannot be located. Refer to Exhibit 11 in the Metro 2® Format for a list of available indicators.<br><br>When a defaulted loan is included in a bankruptcy filing, the guaranty agency should report the account with Account Status 93 and the applicable bankruptcy CII.<br><br>If the account is reported by the guaranty agency during the bankruptcy and is repurchased by the lender at the conclusion of the bankruptcy, the guaranty agency should report Account Status **DA** to delete the account.<br><br>**Notes:** Refer to FAQ 23 for guidelines on reporting an account when a consumer files bankruptcy, but the student loan is not included in the bankruptcy discharge.<br><br>Non-defaulted loans that were claim paid by the guaranty agency due to a bankruptcy should not be reported by the guaranty agency. |
| K1 Segment | Report the complete name of the lender to whom the claim was paid in the Original Creditor Name field.  Also, report Creditor Classification Code 07 to indicate Educational.<br><br>**Note: The K1 Segment is required for all accounts reported, regardless of Account Status Code.** |

Return to Table of Contents

## FEDERAL LOANS – REPORTING GUIDELINES FOR POST-DEFAULT LOANS

| Special Situations | |
|---|---|
| **Rehabilitated loans** | Report Account Status Code **DA** to delete the account when it is transferred to a lender.<br><br>**Note:** The transferred account reported by the original lender will remain on file until purged according to FCRA guidelines. |
| **Accounts sent to ED (Guaranty agencies only) (See row below for exception)** | Report Account Status Code **DA** to delete the account. |
| **Loans that have been Consolidated and Transferred to ED** | Report Account Status Code **62**. |
| **Accounts with a Balance and Consumer who is responsible for payments is deceased** | Report Account Status Code **62** (paid account/was a collection account) and ECOA Code **X**.<br><br>If date of death of the consumer who is responsible for payments is prior to the first reporting by the guaranty agency, do not report the account. |
| **Accounts where student is deceased and the parent is responsible for payments** | Report Account Status Code **DA** to delete the account. |
| **Guaranty Agencies dissolving or undergoing bankruptcy** | Contact the Consumer Data Industry Association (CDIA) to determine the appropriate steps in the reporting process that would be unique to the agency's specific situation. |
| **Loans discharged due to school closure** | Report Account Status Code **DA** to delete the account. |
| **Loans discharged due to identify theft or, prior to discharge, when it is determined that the loan is the result of identity theft** | Report Account Status **DF** to delete the account. |
| **Loans that have an unpaid tuition refund** | Report Account Status 62 and Special Comment AU.  Note that the student paid the percentage of tuition owed and the remainder of the tuition was forgiven. |

CREDIT REPORTING RESOURCE GUIDE®

*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 1029

Return to Table of Contents

## FEDERAL LOANS – REPORTING GUIDELINES FOR POST-DEFAULT LOANS

| Total and Permanent Disability (TPD) Discharge Procedures for Non-defaulted FFELP Loans (Standard and VA) | |
|---|---|
| Do not report the account when a TPD claim is filed on a non-defaulted loan. | |

| Total and Permanent Disability (TPD) Discharge Procedures for Defaulted Loans (Standard and VA) | |
|---|---|
| **Initial indication of interest in TPD discharge by borrower** | When notice is received from ED that the borrower has indicated interest in a TPD discharge, continue to report the account as in collections (Account Status Code 93). |
| **Initial TPD application filed by borrower** | When notice is received from ED that the borrower has applied for a TPD discharge, continue to report the account as in collections (Account Status Code 93). |
| **TPD discharge not approved** | If the discharge is not approved, continue reporting the account normally going forward. |
| **TPD discharge approved** | Report the account with the following Base Segment fields:<br><br>• Account Status Code = 62 (Paid in full/was a collection account)<br>**Note:** If the TPD effective date is prior to the date the guaranty agency or ED began reporting the loan, report Account Status **DA** to delete the account.<br><br>• Current Balance and Amount Past Due = 0<br>• Date of Account Information = Even though the Account Status is 62, report a date within the current month's reporting period.<br>• Date Closed = Date the TPD discharge was approved by ED.<br><br>**Notes:**<br>If notified by the guaranty agency or ED that the TPD effective date was prior to default and during the period that a prior servicer was responsible for reporting the account, the prior servicer should follow the reporting guidelines outlined above in the Lender/Servicer/Secondary Market Reporting Guidelines.<br><br>If a loan discharged under Standard TPD is reinstated within 3 years, a new account will have to be reported because the discharged account was reported as paid in full.  If Account Status 93 is reported on the new account, the ***original*** Date of First Delinquency must be reported. |

Return to Table of Contents

## FEDERAL STUDENT LOAN GLOSSARY OF TERMS

**Borrower Defense to Repayment**
Loan forgiveness for borrowers who took out federal student loans to attend a school if that school misled the borrower, or engaged in other misconduct in violation of certain state laws. The borrower must demonstrate that the school, through an act or omission, violated state law directly related to the borrower's federal student loan or to the educational services for which the loan was provided.  In order for a student loan to be forgiven, the borrower must have approval from the U.S. Department of Education or a state court.

**Closed School Loan Discharge**
Relief for borrowers who could not complete their program because the school closed while they were enrolled or borrowers who withdrew not more than 120 days before the school closed.  In order for a student loan to be discharged, the student must have approval from the U.S. Department of Education.

**False Certification**
Relief for borrowers for whom the school falsified the borrower's name on either the loan application or disbursement authorization, unless the student received the proceeds of the loan.

**Grace Period**
The period of time between the end of the initial in-school period and the date repayment of the student loan is expected to begin.

**Guaranty Agency**
A state or private nonprofit organization that has an agreement with the Secretary of the U.S. Department of Education, under which the organization will administer a student loan guarantee program under the Federal Family Education Loan Program (FFELP).  The guaranty agency pays a claim to the original lender when a student defaults on a FFELP loan.

**Income Driven Repayment (IDR) Plans**
Federal student loans may be repaid under one of several repayment plans which sets the borrower's monthly student loan payment at an amount that is intended to be affordable based on the borrower's income and family size.

**Initial In-School Period**
The period of time immediately following the loan disbursement when the borrower is attending school and repayment is not required.

**Lender**
A bank, credit union, savings and loan association, insurance company, or other lending institution, which makes or holds loans under the Federal Family Education Loan Program (FFELP) and is subject to examination and supervision by an agency of the United States.

*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 1031

Return to Table of Contents

## FEDERAL STUDENT LOAN GLOSSARY OF TERMS

### Public Service Loan Forgiveness
Borrowers may be eligible for forgiveness of their Direct Loans if they make 120 monthly payments on the loans after Oct. 1, 2007, under certain repayment plans, while the borrower is employed full-time in a qualifying public service job. The borrower must not be in default and may not apply for forgiveness until after all of the required 120 qualifying monthly payments have been made.

### Rehabilitated Loans
Federal student loans that were previously in collections with a guarantor or the U.S. Department of Education.  The rehabilitation process requires that the student agree, in writing, to make nine voluntary, reasonable, and affordable monthly payments (as determined by the loan holder) within 20 days of the due date; and must make all nine payments during a period of 10 consecutive months.  At that time, the loan can then be resold to a new lender or the original lender.  When loans are rehabilitated, the original lender and guarantor are required to remove the record of default from the consumer's credit history.  However, the credit history will still reflect late payments that were reported by the loan holder before the loan went into default.

### Secondary Market
An entity which purchases student loan obligations from participating lenders in a secondary market and pays lenders par, premium or discount on the original principal balance of the note.  A secondary market may also service the loans that it purchases.

### Servicer
An organization that services (i.e., processes) a student loan debt following origination, to ensure due diligence of the debt with respect to enforcement of the terms of the promissory note as defined under Federal regulations.  A servicer collects payments, responds to customer service inquiries, and performs other administrative tasks associated with maintaining a federal student loan on behalf of a lender.

### Teacher Loan Forgiveness
A portion of the Federal Family Education Loan (FFEL) program whereby the Secretary of the U.S. Department of Education repays portions of student loans.  To qualify, the student must meet certain criteria, such as teaching, nursing, or volunteering through the Peace Corps.

## FEDERAL STUDENT LOAN GLOSSARY OF TERMS

**Total and Permanent Disability Discharge**
Relief for borrowers who provide one or more of the following types of documentation: 1) Documentation from the U.S. Department of Veterans Affairs (VA) showing that the VA has determined that the borrower is unemployable due to a service-connected disability; 2) Social Security Administration (SSA) notice of award for Social Security Disability Insurance (SSDI) or Supplemental Security Income (SSI) benefits stating that the borrower's next scheduled disability review will be within five to seven years from the date of the borrower's most recent SSA disability determination; or 3) Certification from a physician that the borrower is totally and permanently disabled. The physician must certify that the borrower is unable to engage in any substantial gainful activity because of a medically determinable physical or mental impairment that can be expected to result in death, has lasted for a continuous period of not less than 60 months, or can be expected to last for a continuous period of not less than 60 months. In order for a student loan to be discharged, the borrower must have approval from the U.S. Department of Education.

*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 1033

Return to Table of Contents

# Student Loan Reporting – Private Loans

## GENERAL REPORTING GUIDELINES

Reporters of private student loan information include lenders, servicers and secondary markets.

The following reporting guidelines refer to all reporters of private student loan information:

- Report data in the standard Metro 2® Format, including the Header Record.

- Report all open accounts on a monthly basis.

- Report sold, transferred and paid accounts in the reporting period in which they are finalized.

- Do not report accounts prior to the first disbursement.

- Report the complete name, address, social security number and date of birth of the consumer.

- In the Identification Number field, report the internal code that identifies the lender or secondary market where information is verified.  For servicers, the Identification Number should refer to the current loan owner/holder; e.g., Servicer Name/Loan Owner Name.

- All parties reporting credit information must respond to consumer inquiries.

**Note: The guidelines in this document are specific to your industry and should be used in conjunction with specifications in the Metro 2® Format.  Refer to the Metro 2® Format for detailed information on segments and field information.**

## PRIVATE STUDENT LOANS – LENDER/SERVICER/SECONDARY MARKET

**All fields within the Metro 2® Format are required to be reported for each account.  The information below describes fields that require specific values.**

**Do not report a loan until a disbursement has been made.**

| | |
|---|---|
| Identification Number Base Segment, Field 5 | For loans reported by a servicer, the Identification Number should refer to the current loan owner/holder or servicer and loan owner/holder; e.g., Servicer Name/Loan Owner Name.<br><br>**Note:** Verification of accounts will be done with the servicer. |
| Account Type Code Base Segment, Field 9 | • 12 (Education) for installment accounts with Portfolio Type I (Installment)<br>• 15 (Line of Credit) for education line of credit accounts with Portfolio Type C (Line of Credit) |
| Highest Credit or Original Loan Amount Base Segment, Field 12 | The Highest Credit or Original Loan Amount should be increased for subsequent disbursements of a loan, and reduced for disbursements that are canceled or returned.<br><br>Do not increase this amount as a result of interest capitalization or fees incurred post-disbursement.<br><br>**Note:** Accounts with Account Type 12 report the original amount of the loan.  Accounts with Account Type 15 report the Highest Credit Amount. |
| Terms Duration Base Segment, Field 13 | For installment loans, report the maximum number of months allowed for repayment of the loan.<br><br>For line of credit accounts, report a constant of LOC.<br><br>When the loan is in a period during which payments are not required (i.e., initial in-school, grace, deferment, and forbearance periods), report Terms Duration as blank.<br><br>For loans that are reported as in collections (Account Status 93 or 62) or charged off (Account Status 97 or 64), continue to report Terms Duration normally.  Do not report a constant of 001. |

*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 1035

Return to Table of Contents

## PRIVATE STUDENT LOANS – LENDER/SERVICER/SECONDARY MARKET

| Account Status Code Base Segment, Field 17A | • 11 = Open account in good standing<br><br>For those private student loans that are subject to delayed delinquency reporting based on loan holder requirements, Account Status 11 should be reported until the loan is 60 days past the due date as of the Date of Account Information.<br><br>• 11 with Terms Frequency D and Payment History Profile Character B = Open account/payments deferred/account was never in repayment<br><br>• 11 with Terms Frequency D and Payment History Profile Character D = Open account/payments deferred/account was previously in repayment or was previously reported as in repayment<br><br>**Note**: Terms Frequency Code D should be used with Account Status Code 11 and Amount Past Due = 0 when payments are not currently required (e.g., deferment, grace period, forbearance), but there is a future payment obligation.<br><br>• 71, 78, 80, 82–84 = the appropriate stage of delinquency (30 days to 180 or more days past the due date).  Refer to Account Status 11 above for exceptions due to delayed delinquency reporting.<br><br>• 13 = Paid/zero balance account (requires Payment Rating)<br><br>**Note**: For paid in full accounts, report the Date Closed. Also, report both the Current Balance and the Amount Past Due as zero.  Refer to Frequently Asked Question and Answer 39 for additional guidance on reporting accounts that are paid in full.<br><br>• 93 = Account assigned to internal or external collections<br><br>• 97 = Unpaid balance reported as a loss (charge-off)<br><br>• 62 = Account paid in full, was a collection account<br><br>• 64 = Account paid in full, was a charge-off<br><br>• DA = Delete entire account<br>• DF = Delete entire account due to confirmed fraud<br><br>**Note:** Refer to guidance throughout this module for specific situations on deleting accounts. |
|---|---|

## PRIVATE STUDENT LOANS – LENDER SERVICER/SECONDARY MARKET

| | |
|---|---|
| Payment History Profile<br>Base Segment, Field 18 | Refer to the Field Definitions module for standard guidelines on reporting up to 24 months of payment history.<br><br>The Payment History Profile will reflect accounts going from current to 30 days delinquent or from current to 60 days delinquent due to delayed delinquency reporting (refer to Account Status 11 above).<br><br>**Examples:**<br><br>• 332100000001221000000000 (first reported delinquent at 30 days)<br>• 332000000002200000000000 (first reported delinquent at 60 days)<br><br>For months during which payments were not required (i.e., initial in-school, grace, deferment and forbearance periods):<br><br>• Report value **D** for loans that were previously in repayment.<br><br>• Report value **B** for loans that have never been in repayment.<br><br>   **Note**: If payment history was reported in error (i.e., account mistakenly reported as in repayment), report value **D**.<br><br>When adjusting the initial in-school or grace period status of a loan that covers one or more months previously reported in the Payment History Profile, the applicable months should be updated to reflect character D (no payment history available this month). |

CREDIT REPORTING RESOURCE GUIDE®<br>*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 1037

Return to Table of Contents

## PRIVATE STUDENT LOANS – LENDER/SERVICER/SECONDARY MARKET

| Special Comment Base Segment, Field 19 | The Special Comments that apply to private student loans are listed below.  No other codes may be reported.

- **O** – when reporting a transfer to another servicer that is not due to a loan sale.  Refer to Frequently Asked Question and Answer 46 for additional reporting guidance.
- **AC** – when a partial payment agreement is in effect and the borrower is making payments that are *less than* the original contract's account payments
- **AH** – when a loan is purchased by another company.  Refer to Frequently Asked Questions and Answers 47 and 48 for additional reporting guidance.
- **AM** – when account payments are assured by wage garnishment (used when payments are being made through wage garnishment on an account that has been charged off or is in collections)
- **AS** – when the account is closed due to an internal refinancing.  Refer to Frequently Asked Question and Answer 59 (option 3) for additional reporting guidance.
- **AT** – when reporting an internal transfer that results in a new tradeline.  Refer to Frequently Asked Question and Answer 46 for additional reporting guidance.
- **AU** – when a loan is paid in full for less than the full balance.  Refer to Frequently Asked Question and Answer 38 for additional reporting guidance.
- **AW** – when the borrower is affected by a natural or declared disaster.  Refer to Frequently Asked Question and Answer 58 for additional reporting guidance.
- **BT** – when the borrower is required to make interest-only payments under the terms of the promissory note (e.g., a requirement to make interest-only payments during the initial in-school period).
- **CH** – when loan payments have been guaranteed or insured
- **CO** – when the loan has been permanently modified

Additionally, the following Special Comments may be reported for Lines of Credit accounts (Account Type 15):

- **M** – when the account is closed at credit grantor's request
- **AP** – when the credit line is suspended
- **CJ** – when the credit line is no longer available – account is in the repayment phase. Refer to Exhibit 6 or 7 for reporting guidance.

**Note:**

Special Comment Code **CP** (Forbearance) should not be used for private student loans.  Forbearance should be reported similarly to deferment, as per FAQ 44. |

Return to Table of Contents

## PRIVATE STUDENT LOANS – LENDER /SERVICER/SECONDARY MARKET

| FCRA Compliance/Date of First Delinquency (DOFD) Base Segment, Field 25 | Refer to the Field Definitions module and Exhibit 9 (Explanation and Examples of FCRA Compliance/Date of First Delinquency) for standard guidelines on reporting DOFD according to hierarchy rules.<br><br>Regarding hierarchy rules 1 and 2: Report the date of the first 30-day delinquency that led to the Account Status or Payment Rating being reported even though reporting of delinquency may be delayed until the loan is 60 days past the due date because the loan is subject to delayed delinquency reporting. When the Account Status is 11 (Current), zero fill the Date of First Delinquency.  However, when reporting delinquent statuses, do not change/update the Date of First Delinquency unless the borrower has brought the account back to less than 30 days past the due date.  A borrower may be less than 60 days past the due date (i.e., Account Status 11) without triggering a change to the Date of First Delinquency.<br><br>(Example on next page) |

(continued)

CREDIT REPORTING RESOURCE GUIDE®

*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 1039

Return to Table of Contents

## PRIVATE STUDENT LOANS – LENDER/SERVICER/SECONDARY MARKET

| FCRA Compliance/Date of First Delinquency (DOFD) Base Segment, Field 25 (continued) | **Example:**<br><br>Refer to table below for example of DOFD reporting for loans that may not be reported as delinquent until 60 days past the due date. | | | |
|---|---|---|---|---|
| **Date of Account Information (Field 24)** | **Next Payment Due Date (not reported)** | **# of Days Past Due Date (not rptd.)** | **Account Status and Definition (Field 17A)** | **Date of First Delinquency (Field 25)** |
| 03/31/2022 | 04/15/2022 | 0 | 11 (Current) | Zero fill |
| 04/30/2022 | 04/15/2022 | 15 | 11 | Zero fill |
| 05/31/2022 | 04/15/2022 | 46 | 11 | Zero fill |
| 06/30/2022 | 04/15/2022 | 76 | 78 (60-89 days past due date) | 05/15/2022 (30 days after 04/15/2022 due date) |
| 07/31/2022 | 06/15/2022 | 46 | 11 | Zero fill |
| 08/31/2022 | 06/15/2022 | 77 | 78 | 05/15/2022 (DOFD does not reset; borrower never less than 30 days delinquent) |
| 09/30/2022 | 08/15/2022 | 47 | 11 | Zero fill |
| 10/31/2022 | 09/15/2022 | 46 | 11 | Zero fill |
| 11/30/2022 | 10/15/2022 | 46 | 11 | Zero fill |
| 12/31/2022 | 12/15/2022 | 16 | 11 | Zero fill (Borrower less than 30 days delinquent; DOFD will reset if future delinquency) |
| 01/31/2023 | 12/15/2022 | 47 | 11 | Zero fill |
| 02/28/2023 | 12/15/2022 | 75 | 78 | 01/14/2023 (30 days after 12/15/2022 due date) |

Return to Table of Contents

## PRIVATE STUDENT LOANS – LENDER/SERVICER/SECONDARY MARKET

| | |
|---|---|
| Consumer Information Indicator<br>Base Segment Field 38<br>J1 and J2 Segments – Field 11 | Used to specify that a consumer's student loan has been included in bankruptcy or a consumer cannot be located.  Refer to Exhibit 11 for a list of available indicators.<br><br>**Note:** Refer to FAQ 23 for guidelines on reporting an account when a consumer files bankruptcy, but the student loan is not included in the bankruptcy discharge. |
| K4 Segment<br>Deferred Payment information | Report for deferred loans:<br>• Specialized Payment Indicator = 02 (Deferred payment)<br>• Deferred Payment Start Date = date the first payment is due.  If not available, report the date on which the deferred period will end.<br><br>**Note:** If neither date is available, do not report the K4 Segment. |
| L1 Segment<br>Consumer Account Number Change | When account history can be verified, report one time when account numbers change due to an account acquisition or internal account number change.<br><br>Refer to FAQ 46 (option 2) for guidelines on reporting when account history cannot be verified by the new servicer. |

CREDIT REPORTING RESOURCE GUIDE®
*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 1041

Return to Table of Contents

## PRIVATE STUDENT LOANS – LENDER/SERVICER/SECONDARY MARKET

| Single, Multiple and Refinanced Loans, Deferment or Forbearance, Loan Sales and Transfers, Co-Signer Release, Loan Defaults | |
|---|---|
| **Multiple disbursements of a single loan** | When a loan has multiple disbursements, report the loan as one account.<br><br>• Retain and do not change the original Consumer Account Number when additional disbursements are reported.<br><br>• Retain and do not change the original Date Opened after the loan is reported.<br><br>• Update the Original Loan Amount, Current Balance, and Scheduled Monthly Payment Amount (when in repayment) as applicable, to include totals for all disbursements.  Reduce these amount fields as applicable, due to the amount of any canceled or returned disbursements.<br><br>  **Example**: If the loan is for $10,000 and the first disbursement is for $2,000, report the Original Loan Amount field as $2,000. If an additional disbursement is made for $8,000, increase the Original Loan Amount to $10,000.  If the $2,000 disbursement is subsequently canceled, reduce the Original Loan Amount to $8,000.<br><br>• If all disbursements are canceled or returned, report Account Status DA to delete the account. |
| **Multiple loans** | Multiple loans must be reported as separate accounts. |
| **Refinanced loans** | Internal Refinancing: Refer to Frequently Asked Question and Answer 59 for reporting guidance.<br><br>External Refinancing: When a loan is paid in full through refinancing, the original lender should report the loan with Account Status Code 13 and the appropriate Payment Rating.<br><br>The new refinanced loan, which paid the underlying loans in full, must be reported as a new account. |
| **Loans in deferment or forbearance when no payments are due** | Report private student loans in deferment or forbearance as deferred.  Refer to Frequently Asked Question and Answer 44 for specific reporting guidance. |

(continued)

Return to Table of Contents

## PRIVATE STUDENT LOANS – LENDER/SERVICER/SECONDARY MARKET

| | |
|---|---|
| **Loans sold <u>to</u> another company** | Follow the standard guidelines in <u>Frequently Asked Questions and Answers 47 and 48</u> for loans sold to another company.<br><br>Report Special Comment Code **AH**. |
| **Loans transferred <u>to</u> another servicer or lender** | Follow the standard guidelines in <u>Frequently Asked Question and Answer 46</u> for servicing transfers.<br><br>If FAQ 46 option 2 is followed, report Special Comment Code **O** (Account transferred to another company/servicer). |
| **Loans purchased <u>from</u> another servicer or lender** | Follow the standard guidelines in <u>Frequently Asked Questions and Answers 47 or 48</u> for transfers in as a result of a loan purchase. |
| **Loans transferred in <u>from</u> another servicer or lender** | Follow the standard guidelines in <u>Frequently Asked Question and Answer 46</u> for servicing transfers.  Do not change the Date Opened; report the date opened with the original servicer. |
| **Release of Co-Signer** | If the co-signer of the private student loan is released from further liability on the loan, report ECOA Code **T** (Terminated) for the co-signer and discontinue reporting the co-signer going forward. |

(continued)

CREDIT REPORTING RESOURCE GUIDE®
*Copyright 2023 © Consumer Data Industry Association*
APPENDIX 1043

Return to Table of Contents

## PRIVATE STUDENT LOANS – LENDER/SERVICER/SECONDARY MARKET

| | |
|---|---|
| **Private student loans that are transferred back to the lender by the servicer at the lender's request at the time of default[1]** | Follow the standard guidelines in Frequently Asked Question and Answer 46 for servicing transfers.  If option 2 is followed, report Special Comment Code **O** (Account transferred to another company/servicer). <br><br> Options available to the servicer transferring the loan to the loan holder: <br> • Report Account Status Code **97** with the applicable Special Comment Code if the loan was charged off at the time of transfer. <br> • Report Account Status Code **93** if in collections at the time of transfer. <br><br> The loan holder receiving the loan from the servicer should report the account as a new tradeline. <br><br> Options available for the loan holder receiving the loan from the servicer: <br> • Report Account Status Code **97** if the loan is a charge off. <br> • Report Account Status Code **93** if the account is in collections. |
| **Private student loans that are not transferred to the lender by the servicer at the time of default[1]** | If the loans have been charged off, follow the standard guidelines in Frequently Asked Questions and Answers 34 or 35, as applicable. <br><br> Loans that are in collections should be reported with Account Status **93** and the Current Balance and Amount Past Due = outstanding balance amount.  Account Status **62** should be reported when the loan is paid in full. <br><br> In both situations, if the account is settled for less than the outstanding balance, follow the guidance in Frequently Asked Question and Answer 38, which requires reporting Special Comment Code **AU** along with the applicable paid status. |

---

[1] Refer to the Private Student Loan Glossary of Terms at the end of this section for the standard definition of "default" as it applies to private student loans.

Return to Table of Contents

## PRIVATE STUDENT LOANS – LENDER/SERVICER/SECONDARY MARKET

| | |
|---|---|
| **Write-off of Private Student Loan Balances due to Death or Disability: For private student loans, write-off reporting requirements apply following approval by the loan holder.  Practices among private loan lenders vary as to write-off options.** | |
| **Write-off of loan due to the death of a student who is not a party to the loan (e.g., private student loan that is made to a parent)** | If the loan had been in repayment prior to the student's death, report Account Status Code **13**, Payment Rating **0**, Current Balance **0**, and Amount Past Due **0** to indicate a paid/closed account, along with the appropriate Date Closed. The Payment History Profile should be updated to reflect value **D** for months between the date of death and the reporting period in which the loan is reported with Account Status Code 13.<br><br>If the loan was in collections or charged off at the time of the student's death, report Account Status Code **62** or **64** as appropriate, plus Current Balance **0** and Amount Past Due **0** to indicate a paid/closed account, along with the appropriate Date Closed.<br><br>If payments on the loan were not yet required, the tradeline should be deleted.  Report Account Status Code **DA** to delete the account.<br><br>ECOA Code **X** should not be reported because the student who is deceased is not a party to the loan.  ECOA Code X must be reported only when a party to the loan is deceased. Refer to Frequently Asked Question and Answer 19 for reporting when a party to the loan is deceased. |
| **Write-off of loan due to the death of a party to the loan** | If the loan had been in repayment prior to the death of a party to the loan, report Account Status Code **13**, Payment Rating **0**, Current Balance **0**, and Amount Past Due **0** to indicate a paid/closed account, along with the appropriate Date Closed.  Report ECOA Code **X** in the applicable Base or J1/J2 Segment for the deceased party as described in Frequently Asked Question and Answer 19.<br><br>If the loan was in collections or charged off at the time of the party's death, report Account Status Code **62** or **64** as appropriate, plus Current Balance **0** and Amount Past Due **0** to indicate a paid/closed account, along with the appropriate Date Closed.<br><br>If payments on the loan were not yet required, the tradeline should be deleted.  Report Account Status Code **DA** to delete the account.<br><br>**Note:** When there are multiple parties to the loan (e.g., borrower and co-signer), the death of the co-signer may not cause the loan to be written off and the borrower may continue to be obligated.  In that instance, report ECOA Code X for the co-signer and continue to report the account for the borrower. |

CREDIT REPORTING RESOURCE GUIDE®

*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 1045

Return to Table of Contents

## PRIVATE STUDENT LOANS – LENDER/SERVICER/SECONDARY MARKET

| | |
|---|---|
| **Write-off of loan due to disability of the borrower** | If a write-off due to disability is granted by the lender, report the account as follows:<br><br>• If the effective date of the disability is prior to the date the loan entered repayment, or is prior to the date that the lender or servicer began reporting the loan, report Account Status **DA** to delete the account.<br><br>• If the loan had been in repayment prior to the effective date of the borrower's disability, report Account Status Code **13**, Payment Rating **0**, Current Balance **0** and Amount Past Due **0** to indicate a paid/closed account, along with the appropriate Date Closed.<br><br>The Payment History Profile should be updated to reflect value **D** (no payment history available this month) for months between the effective date of the disability and the reporting period in which the loan is reported with Account Status 13.  Adjustments to months earlier than the previous 24 months prior to the Date of Account Information must be corrected by submitting an AUD through e-OSCAR®.<br><br>**Note**: The effective date of the disability write-off will vary according to lender policy.  Common triggers include the date of the doctor's certification, the date the lender receives the disability request, or the date the lender approves the disability request.  Any delinquencies that occurred prior to the effective date of the disability should remain on the file and should not be deleted.<br><br>Date of Account Information = Report a date within the current month's reporting period even if the paid effective date was in a prior month.  Refer to Frequently Asked Question and Answer 39.<br><br>Date Closed = Date the disability write-off was approved by the lender.<br><br>• If the loan was in collections or charged off at the time of the effective date of the borrower's disability, report Account Status Code **62** or **64** as appropriate, plus Current Balance **0** and Amount Past Due **0** to indicate a paid/closed account, along with the appropriate Date Closed. |

# PRIVATE STUDENT LOANS – LENDER/SERVICER/SECONDARY MARKET

| Rehabilitated Private Student Loans |
| --- |
| Section 623(a)(1) of the Fair Credit Reporting Act [15 U.S.C. 1681s-2(a)(1)] was amended by the Economic Growth, Regulatory Relief, and Consumer Protection Act (EGRRCPA) to provide that, a consumer may request a lender to remove from a consumer report a reported "default" regarding a private student loan, and such information shall not be considered inaccurate, if the lender chooses to offer a private student loan rehabilitation program that meets the requirements of section 623(a)(1). The term "default" as used in EGRRCPA is not a defined term for purposes of private student loans, but the student loan industry generally regards loans that are either in collections (Account Status Code 93) or charged off (Account Status Code 97) as being in default.<br><br>**Note:** Refer to the Private Student Loan Glossary of Terms at the end of this section for the standard definition of "default" as it applies to private student loans.<br><br>*Reporting guidance on following pages.* |

APPENDIX 1047

Return to Table of Contents

## PRIVATE STUDENT LOANS – LENDER/SERVICER/SECONDARY MARKET

| Rehabilitated private student loan that had been transferred back to the lender at the lender's request at time of default and returns to the same servicer post-rehabilitation | Servicer reporting:<br><br>If the servicer's Account Number is changed from the original number, report an L1 Segment.<br><br>Follow the guidance below depending on the Account Status Code previously reported:<br>• If the servicer had previously reported a loan as charged-off using Account Status Code 97, the servicer must remove the Account Status Code 97 and the Payment History Profile code L if the loan is later rehabilitated.  Begin reporting Account Status Code **11** once the loan is rehabilitated.<br>• If the servicer had previously reported a loan as being in collections using Account Status Code 93, the servicer must remove the Account Status Code 93 and the Payment History Profile code G if the loan is later rehabilitated.  Begin reporting Account Status Code **11** once the loan is rehabilitated.<br><br>Payment History Profile = In both situations described above, report value **D** (no payment history available this month) in the positions representing the months going back to the effective date of the rehabilitation.  Adjustments to months earlier than the previous 24 months prior to the Date of Account Information must be corrected by submitting an AUD through e-OSCAR®.<br><br>**Note:** If the servicer had only reported the account as delinquent, using the Account Status Code applicable to the level of delinquency, and has not reported the loan as in collections (Account Status Code 93) or as a charge-off (Account Status  Code 97), no changes to prior reporting are needed if the loan is later rehabilitated.  Begin reporting Account Status Code **11** once the loan is rehabilitated.<br><br>Lender reporting:<br><br>If the lender reported either Account Status Code 93 (in collections) or Account Status Code 97 (charge-off) during the period that it held the loan, the tradeline should be deleted when the loan is successfully rehabilitated by reporting Account Status Code **DA**. |
| --- | --- |

(continued)

Return to Table of Contents

## PRIVATE STUDENT LOANS – LENDER/SERVICER/SECONDARY MARKET

| Rehabilitated private student loan that had been transferred back to the lender at the lender's request at the time of default and is assigned to a different servicer post-rehabilitation | Former Servicer reporting:<br><br>• If the servicer had previously reported a loan as charged-off using Account Status Code 97, the servicer must remove the Account Status Code 97 and the Payment History Profile code L if the loan is later rehabilitated.<br>• If the servicer had previously reported a loan as being in collections using Account Status Code 93, the servicer must remove the Account Status Code 93 and the Payment History Profile code G if the loan is later rehabilitated.<br><br>Payment History Profile = In both situations described above, report value **D** (no payment history available this month) in the positions representing the months going back to the effective date of the rehabilitation.  Adjustments to months earlier than the previous 24 months prior to the Date of Account Information must be corrected by submitting an AUD through e-OSCAR®.<br><br>**Note:** If the servicer had only reported the account as delinquent, using the Account Status Code applicable to the level of delinquency, and had not reported the loan as in collections (Account Status Code 93) or as a charge-off (Account Status Code 97), no changes to prior reporting are needed if the loan is later rehabilitated.<br><br>New Servicer reporting:<br><br>If the private student loan is rehabilitated, the new lender/servicer should report the loan as a new account going forward.  Payment history reported prior to the default should not be included with the new account.<br><br>Lender reporting:<br><br>If the lender reported either Account Status Code 93 (in collections) or Account Status Code 97 (charge-off) during the period that it held the loan, the tradeline should be deleted when the loan is successfully rehabilitated by reporting Account Status Code **DA**. |

(continued)

Return to Table of Contents

## PRIVATE STUDENT LOANS – LENDER/SERVICER/SECONDARY MARKET

| | |
|---|---|
| **Rehabilitated private student loan that continued to be held by the servicer and was not transferred back to the lender at the lender's request at time of default** | Servicer reporting:<br><br>If the servicer's Account Number is changed from the original number, report an L1 Segment.<br><br>Follow the guidance below depending on the Account Status Code previously reported:<br>• If the servicer had reported a loan as charged-off using Account Status Code 97, the servicer must remove the Account Status Code 97 and the Payment History Profile code L if the loan is later rehabilitated. Begin reporting Account Status Code **11** once the loan is rehabilitated.<br>• If the servicer had reported a loan as being in collections using Account Status Code 93, the servicer must remove the Account Status Code 93 and the Payment History Profile code G if the loan is later rehabilitated. Begin reporting Account Status Code **11** once the loan is rehabilitated.<br><br>Payment History Profile = In both situations described above, report value **D** (no payment history available this month) in the positions representing the months going back to the effective date of the rehabilitation. Adjustments to months earlier than the previous 24 months prior to the Date of Account Information must be corrected by submitting an AUD through e-OSCAR®.<br><br>**Note:** If the servicer had only reported the account as delinquent, using the Account Status Code applicable to the level of delinquency, and had not reported the loan as in collections (Account Status Code 93) or as a charge-off (Account Status Code 97), no changes to prior reporting are needed if the loan is later rehabilitated. Begin reporting Account Status Code **11** once the loan is rehabilitated. |

## PRIVATE STUDENT LOAN GLOSSARY OF TERMS

**Charge-off**
Private student loan lenders employ various criteria as to when they may consider a loan charged off.  The period of time from delinquency to charge off varies from 60 days to 221 days, with 120 days delinquent being a common period used by private student loan lenders.

**Default**
The term "default" is not a defined term for purposes of private student loans as it is for federal student loans, but it is used as the trigger for private loan rehabilitation in the Economic Growth, Regulatory Relief, and Consumer Protection Act (EGRRCPA), which amends section 623(a)(1) of the Fair Credit Reporting Act (FCRA).  The student loan industry and the consumer reporting industry have agreed on the following standard definition of default as it applies to private student loans.  A private student loan is considered to be "defaulted" when (1) it is placed in collections (Account Status Code 93) or (2) when it is charged off (Account Status Code 97).

**Disability Write-off (Reduction/elimination of the outstanding loan balance)**
Some lenders may offer relief for borrowers who provide documentation of disability; the lender may write off or forgive the loan.  These programs may be modelled on the Department of Education's criteria for total and permanent disability (TPD) discharge, or the lender may employ its own criteria.  The effective date of the write-off may vary as well; some lenders employ the date that a doctor provided a certificate of disability, while others use the date that the lender approved the disability write-off.

**Grace Period**
For some private student loans, the period of time between the end of the initial in-school period and the date repayment of the student loan is expected to begin.

**Initial In-School Period**
For some private student loans, the period of time immediately following the loan disbursement when the borrower is attending school and repayment is not required.

**Lender**
A bank, credit union, savings and loan association, insurance company, state agency, non-profit organization, or other lending institution, which makes or holds private student loans.

**Rehabilitated Loans**
Section 623(a)(1) of the Fair Credit Reporting Act [15 U.S.C. 1681s-2(a)(1)] was amended by the Economic Growth, Regulatory Relief, and Consumer Protection Act (EGRRCPA) to provide that, a consumer may request a lender to remove from a consumer report a reported "default" regarding a private student loan, and such information shall not be considered inaccurate, if the lender chooses to offer a private student loan rehabilitation program that meets the requirements of section 623(a)(1). The term "default" as used in EGRRCPA is not a defined term for purposes of private student loans, but the student loan industry generally regards loans that are either in collections (Account Status Code 93) or charged off (Account Status Code 97) as being in default.

Return to Table of Contents

## PRIVATE STUDENT LOAN GLOSSARY OF TERMS

**Secondary Market**
An entity which purchases student loan obligations from participating lenders in a secondary market and pays lenders par, premium or discount on the original principal balance of the note.  A secondary market may also service the loans that it purchases.

**Servicer**
An organization that services (i.e., processes) a student loan debt following origination, to ensure due diligence of the debt with respect to enforcement of the terms of the promissory note as defined under Federal regulations.  A servicer collects payments, responds to customer service inquiries, and performs other administrative tasks associated with maintaining a federal or private student loan on behalf of a lender.

**Write-off**
Some lenders may write off the outstanding balance of a private student loan under certain circumstances such as the death or disability of the borrower.  Policies vary from lender to lender.  This document uses the term "write-off" for consistency's sake but be aware that different lenders may use various terms such as write-off or forgiveness or discharge to describe the process.  Forgiveness or discharge of private student loans should not be confused with forgiveness and discharge in the federal student loan programs.  And write-off is not the same as charge-off; it is merely the reduction/elimination of the outstanding loan balance on the lender's books.

# Utility Company Reporting

## GENERAL REPORTING GUIDELINES

Reporters of utility company data include Energy companies (e.g., coal and wood dealers, electric light and power, fuel oil distributors, gas companies — natural and bottled, etc.), Communications companies (e.g., telephone, cable, etc.) and Service companies (e.g., water, garbage, rubbish and other disposal companies, etc.).

The following reporting guidelines apply to all reporters of utility company data:

- Report data in the standard Metro 2® Format, including the Header Record.

- Report all current and delinquent open accounts on a monthly basis.

- Report closed accounts at the end of the month in which they occur.

- Report the complete name, address, social security number, and date of birth of the legally liable consumer(s).

- Report the telephone number, when available.

- Report the ECOA Code to designate the account as joint, individual, etc. in compliance with the Equal Credit Opportunity Act (ECOA).

- Report the Payment History Profile, which provides up to 24 months of payment history, in order to control and maintain the payment history.

- In the Identification Number field, report the internal code that identifies the utility company where information is verified.

- All parties reporting credit information must respond to consumer inquiries.

- All parties reporting credit information must comply with the Fair Credit Reporting Act and any applicable state laws.

**Note: The guidelines in this document are specific to your industry and should be used in conjunction with the specifications in the Metro 2® Format. Refer to the Metro 2® Format for detailed information on segments and field information.**

Return to Table of Contents

## UTILITY COMPANY REPORTING GUIDELINES

1.   Consumer Account Number (Base Segment, Field 7)

   - Report the individual's complete and unique account number as extracted from your file.

   - If a consumer has multiple accounts, the account numbers must be unique.  If necessary, append a unique identifier to the original account number for each account.

   - If the account number changes, report the L1 Segment.  See field definitions in the Metro 2® Format.

      **Note**: **Notify your local consumer reporting agencies the first time L1 Segments are reported.**

2.   Portfolio Type (Base Segment, Field 8)

   - O (Open) - for all utility services' payment plans

   - I (Installment) - for merchandise (e.g., appliances, etc.)

3.   Account Type Codes (Base Segment, Field 9)

   - 92 (Utility Company) - for all utility services' payment plans

   - 06 (Installment Sales Contract) - for merchandise (e.g., appliances, etc.)

   - 4D (Telecommunications/Cellular) - for telecommunications companies, as appropriate

4.   Highest Credit or Original Loan Amount (Base Segment, Field 12)

   - For utility services' accounts, report the highest amount of credit utilized by the consumer.

   - For Installment accounts, report the amount of the contract.

5.   Terms Duration (Base Segment, Field 13)

   - For utility services' accounts, report Terms Duration as 001.

   - For Installment accounts, report the number of months of the contract.

6.   Terms Frequency (Base Segment, Field 14)

   - For utility services' accounts, blank fill.

   - For Installment accounts, report the frequency for payments due.

CREDIT REPORTING RESOURCE GUIDE®
*Copyright 2023 © Consumer Data Industry Association*
APPENDIX 1054

Return to Table of Contents

## UTILITY COMPANY REPORTING GUIDELINES

7.  Scheduled Monthly Payment Amount (Base Segment, Field 15)

    - For utility services' accounts, zero fill.

    - For Installment accounts, report the regularly scheduled monthly payment amount.

8.  Account Status Codes (Base Segment, Field 17A) and Payment Ratings (Base Segment, Field 17B)

    - Report full file information, including open/current accounts (Status Code 11), all stages of delinquency (Status Codes 71, 78, 80, 82–84), derogatory accounts (Status Codes 93, 95–97) and closed or paid accounts (Status Codes 13, 61–64). When the Account Status Code is 13 or 95, the Payment Rating must also be reported.

    - Refer to Exhibit 4 for specific definitions of Account Status Codes.

9.  Report Special Comments (Base Segment, Field 19) in conjunction with Account Status Codes to further define the accounts.  Refer to Exhibits 6 and 7 for specific code definitions.

    When a utility service is terminated due to nonpayment, Special Comment M (Account Closed at Credit Grantor's Request) should be reported with the appropriate Status Code.

    If the account is subsequently reinstated, remove the Special Comment M by blank filling the field.

10. Report Compliance Condition Codes (Base Segment, Field 20) when required for legal compliance.  Refer to Exhibit 8 for specific code definitions.

    **Example:** Compliance Condition Code XB (Account information has been disputed by the consumer directly to the data furnisher under the FCRA; the data furnisher is conducting its investigation.)

    **Important Note: Code XB should no longer be reported after the investigation is completed; the XB should be removed by reporting the removal code or changed to another code.**

11. Current Balance (Base Segment, Field 21)

    For all accounts, report the outstanding balance amount.

12. Amount Past Due (Base Segment, Field 22)

    For delinquent or derogatory accounts, report the dollar amount past due.

# e-OSCAR®

**ABOUT
e-OSCAR®**

Access to e-OSCAR®, the **O**nline **S**olution for **C**omplete and **A**ccurate **R**eporting, is through a secure website.  Each data furnisher has a unique registration and all users have their own user id and password.  For more information on e-OSCAR®, visit http://www.e-OSCAR.org.

**CONSUMER
DISPUTE PROCESS**

The Fair Credit Reporting Act (FCRA) guarantees consumers the right to dispute information that has been previously reported to consumer reporting agencies.  See sections 611 and 623.

The consumer may initiate his or her dispute directly with a consumer reporting agency, a reseller of consumer reports or directly with the data furnisher.  ***Regardless of the source at which the dispute originates, the data furnisher must respond.*** (See Federal Trade Commission interpretation letter of July 1999 http://www.ftc.gov/os/1999/08/faresletterfinal.htm).

The law also describes these duties of data furnishers specific to the consumer dispute process:

- Conduct an investigation with respect to the disputed information.
- Review all relevant information provided by the consumer and the consumer reporting agency.
- Report the results of the investigation to the consumer reporting agency.
- If the investigation finds that the information is incomplete or inaccurate, report those results to all other consumer reporting agencies to which the data provider furnished the information.

**NOTE:** After completion of a dispute investigation, it is imperative that data furnishers update their internal records to avoid re-reporting incorrect information.

The law also mandates a deadline for the completion of the investigation, review, and reporting of the investigation results.  Per the FCRA, the consumer's dispute investigation must be completed within 30 days (45 days for FACT Act report).  The time ***begins when the consumer contacts the consumer reporting agency***.  See sections 623 (b) (2) and 611 (a) (1).

Return to Table of Contents

# e-OSCAR® Consumer Dispute Process

**AUTOMATED CONSUMER DISPUTE VERIFICATION (ACDV)**

In compliance with FCRA section 611 (a) (5) (D), the consumer credit reporting industry maintains an automated dispute resolution system. This system, called e-OSCAR®, is available for use by all data furnishers.

**ACDV WORKFLOW**

- Each consumer reporting agency and data furnisher has its own access to e-OSCAR®.

- When a consumer contacts a consumer reporting agency with a dispute, the agency transmits the disputed information and, if applicable, one or more images of relevant, consumer-provided documentation through e-OSCAR®.  The data furnisher accesses e-OSCAR® and retrieves the disputed data and any associated document image(s).  A possible exception to this process is when a consumer reporting agency updates the disputed item based on the information provided by the consumer (i.e., a valid police report).  In this case, a dispute may not be transmitted via an ACDV.

- The data furnisher researches the disputed account and transmits a response back to the originating consumer reporting agency via e-OSCAR®. If the information is verified as correctly reported, the response goes only to the originating consumer reporting agency.  If the information is modified or deleted, e-OSCAR® automatically sends a response to the originating consumer reporting agency and sends carbon copies to any other consumer reporting agencies with which the data furnisher's registration is active in e-OSCAR®.

  **Note: Responding to disputes varies from automated data reporting because when replying to a dispute, a data furnisher may be required to update historical account information.  Dates and other account fields may need to be adjusted.  For that reason, in some cases, data furnishers may not be able to follow the guidance published in the Credit Reporting Resource Guide®, which is intended for regular monthly updates to previously-reported accounts.**

CREDIT REPORTING RESOURCE GUIDE®
*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 1057

Return to Table of Contents

# e-OSCAR® Consumer Dispute Process

- The consumer reporting agencies receive responses, update the credit files accordingly and respond back to the consumers.

- The originating consumer reporting agency also notifies the data furnisher via e-OSCAR® of any account modifications or deletions as a result of the dispute reinvestigation.  These notifications may include, if applicable, one or more images of relevant, consumer-provided documentation.

- **To complete the process, when a change has been made, data furnishers must also update their internal records to avoid re-reporting incorrect information.**

# e-OSCAR® Consumer Dispute Process

**FEATURES OF ACDV**

- **Automatic Carbon Copies** – If a data furnisher modified or deleted an account in response to a consumer reporting agency-generated consumer dispute, e-OSCAR® will send copies of the dispute and response to each of the consumer reporting agencies with which the data furnisher's registration is active in e-OSCAR®.  These copies help to pre-empt future disputes, thus reducing the data furnisher's costs.  Consumer credit data may be modified at all the agencies with which the data furnisher's registration is active in e-OSCAR®, which will help to improve consumer satisfaction.

- **Automatic Notification –** The Fair Credit Reporting Act requires the originating consumer reporting agency to notify the data furnisher of any modifications or deletions as a result of the dispute reinvestigation.  e-OSCAR® provides the capability to meet this requirement.  See section 623 (b) (1) (D).

- **No Illogical Conditions** — Information within a dispute response must be complete and logical.  The e-OSCAR® system has built-in edits to prevent illogical responses.

- Other benefits include easy tracking of consumer disputes in progress or completed and easy access to a broad range of user reports.

*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 1059

Return to Table of Contents

# e-OSCAR®

**THE UPDATE PROCESS**

From time to time, data furnishers will find it necessary to update account information they have reported to the consumer reporting agencies. The need to modify existing account information may come about as a result of consumer contact or through internal processes.

The Automated Universal Data Process (AUD) is used for interim maintenance requests to report updates to an account or to delete an account.  AUD transactions are submitted through e-OSCAR®.

**Reporting inaccuracies must be corrected promptly in order to comply with the Fair Credit Reporting Act.  See section 623 (a) (2) (B).**

**AUTOMATED UNIVERSAL DATA PROCESS VIA e-OSCAR®**

- The intent of the e-OSCAR® AUD process is to provide the consumer reporting agencies with a request to correct or delete a consumer's account.  e-OSCAR® may not be used to add/create an account or to provide updates to a consumer's Personally Identifiable Information.

- When a consumer contacts a data furnisher and requests a change of information that has been previously reported, the data furnisher researches the account.  If the data furnisher verifies that the account information in question needs to be modified, the company will use the e-OSCAR® system to complete an AUD.

Return to Table of Contents

# e-OSCAR® Update Process

- The AUD process allows data furnishers to modify existing account information, or to delete the entire account from a consumer's credit report. A data furnisher may update a consumer's account information by submitting an Automated Universal Data (AUD) record. The data furnisher uses the system's web-based interactive interface to create the AUD record. The record is routed to one or more consumer reporting agencies, based on the reporting relationships indicated by the data furnisher within e-OSCAR® and based on the subscriber codes specified in the AUD record.

- The consumer reporting agencies receive their AUDs from e-OSCAR® and update the consumers' files as appropriate per their internal business processes.

- The originating consumer reporting agency notifies the data furnisher via e-OSCAR® of the outcome of each submitted AUD.

- **To complete the process, when a change has been made, data furnishers must also update their internal records to avoid re-reporting incorrect information.**

**FEATURES OF AUD**

- **Ability to send to multiple CRAs** – Each data furnisher indicates an affiliation with one or more of the consumer reporting agencies at the time of registration. This affiliation can be updated at any time. If the data furnisher modifies or deletes an account using the AUD process, e-OSCAR® sends the update to the consumer reporting agencies that the data furnisher designates when it submits the AUD. The data furnisher has the choice because it may not need to update an account on each of the consumer reporting agencies' databases. See section 623 (a) (2) (B) for information on the data furnisher's duty to correct and update information.

- **No Illogical Conditions** – Information within an update must be complete and logical. The e-OSCAR® system has built-in edits to prevent illogical conditions.

- **Time Service –** Information on the consumer's file is corrected more quickly – no mail time.

15-6        CREDIT REPORTING RESOURCE GUIDE®

*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 1061

Return to Table of Contents

# e-OSCAR®

---

**THE TRADELINE BLOCK RESCISSION REQUEST PROCESS**

Data furnishers may find it necessary to request a Tradeline Block Rescission Request as permitted under section 605B (c) (1) of the Fair Credit Reporting Act. The Tradeline Block Rescission Request Process (BRR) is used to request an account be returned to the file. BRR transactions are submitted through e-OSCAR®.

**BLOCK RESCISSION REQUEST PROCESS VIA e-OSCAR®**

The intent of the e-OSCAR® BRR process allows data furnishers to request one or more consumer reporting agencies return a consumer's account to the file. This can be in response to a Tradeline Block Notification that originated from one or more consumer reporting agency.

- When a Consumer Reporting Agency blocks tradeline information in a consumer's file that the consumer identifies as alleged identity theft, a Tradeline Block Notification is sent to the data furnisher via e-OSCAR®. If the data furnisher verifies that the account in question is not related to identity theft, they will use the e-OSCAR® system to request a BRR.

- The consumer reporting agencies receive their BRRs from e-OSCAR® and update the consumers' files as appropriate per their internal business processes.

- The consumer reporting agencies notify the data furnisher via e-OSCAR® in the event that they reinsert the tradeline information as a result of the submitted BRR.

Return to Table of Contents

# e-OSCAR® Tradeline Block Rescission Process

**FEATURES OF BRR**

- **Ability to send to multiple CRAs** – Each data furnisher indicates an affiliation with one or more of the consumer reporting agencies at the time of registration.  This affiliation can be updated at any time.  If the data furnisher requests a Tradeline Block Rescission Request using the BRR process, e-OSCAR® sends the request to the consumer reporting agencies that the data furnisher designates when it submits the BRR.  The data furnisher has the choice because it may not need to update an account on each of the consumer reporting agencies' databases.

- **No Illogical Conditions** – Information within a rescission request must be complete and logical.  The e-OSCAR® system has built-in edits to prevent illogical conditions.

- **Time Service –** Accounts are reinserted to a consumer's file more quickly – no mail time.

CREDIT REPORTING RESOURCE GUIDE®

*Copyright 2023 © Consumer Data Industry Association*

APPENDIX 1063

Return to Table of Contents

# EXHIBIT K

APPENDIX 1064

Case 4:25-cv-00443-P    Document 116    Filed 12/22/25    Page 1031 of 1862    PageID 2880

| PROGRAM: | CAPRESPA | EXPERIAN-CONSUMER ASSISTANCE - CAPS | PAGE: 1 | |
|---|---|---|---|---|
| RUN DATE: | 07/02/2025 | ACDV Response: | DOCUMENT VIEWED: Y | 0690845524001 |
| RUN TIME: | 08:41:23 | Auto Response: | | |
| SUBCODE: | 1937638 | ACCOUNT# ████ 296 SUBSCRIBER: Nationstar Mortgage LLC | | |

| | | Office: | 1 |
|---|---|---|---|
| DISPUTE REASON: | 112 - Claims inaccurate information. Did not provide specific dispute. Provide complete ID and verify account information. | Date Sent: | 08/01/2024 |
| | | Date Due: | 08/22/2024 |
| REMARKS: | | Resp Date: | 08/19/2024 |

| CONSUMER IDENTIFICATION | | SUBSCRIBER CONSUMER ID | | | | DNR Date: | 08/22/2024 |
|---|---|---|---|---|---|---|---|
| Name: | VICTOR RAMIREZ | | VICTOR M RAMIREZ | | | Name Flag: | S  X  S |
| SSN: | DOB: ████ 996 | ████ 995 | | | ████ 995 | Second Name: | |
| Curr Address: | | | | | | Curr Addr Flag: | Same |
| | FORT WORTH TX | | FORT WORTH TX | | | Prev Addr Flag: | |
| ZIP: | 76106 | | 76106 | | | SSN Flag: | Unknown |
| Prev Addr 1: | | | | | | DOB Flag: | Same |
| Prev Addr 2: | | | | | | Authorized Verifier: | Lucas Musfelt |
| Account Name: | | | | | | Phone: | (308) 641-9746 |
| RESPONSE: | 23 - Disputed information accurate. Updated account information unrelated to the dispute. | | | | | DF Contact Phone #: | |

| TRADE INFORMATION | | SUBSCRIBER RESPONSE | | ON PROFILE | | CONSUMER CLAIMS |
|---|---|---|---|---|---|---|
| Acct Condition/Cumm Status: | | | | TRANSFERRED/ DEL 60-4+ | | |
| Act Status/Rating: | | 11 | | | | |
| Payment Rating: | | | | | | |
| CII: | ECOA: | 1 | | | 1 | |
| Balance: | Balance Date: | 0 | 01/05/2023 | 0 | 01/05/2023 | |
| Amt Past Due: | | 0 | | | | |
| Orig Delinq Date: | | | | | | |
| Credit Limit/Orig Amt: | | | | | | |
| High Credit Balance: | | 109,370 | | 109,370 | | |
| Charge Off Amt: | | | | | | |
| Sch Monthly Pay: | Act Pay: | 0 | 0 | | | |
| Portfolio Name: | | | | | | |
| Date Last Pay: | | 12/30/2022 | | 12/30/2022 | | |
| Open Date: | Closed Date: | | 01/05/2023 | 01/27/2009 | | |
| Spec Comm Code: | | 0 | | 0 | | |
| Cons Compl Code: | | | | | | |
| Type: | Terms: | Freq: | 26 | 26 | 030 | M |
| Original Creditor: | | | | | | |
| Special Payment/Date/Amt: | | | | | | |

**Response History Grid:**

| Year | Dec | Nov | Oct | Sep | Aug | Jul | Jun | May | Apr | Mar | Feb | Jan |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2025 | | | | | | | | | | | | |
| 2024 | | | | | | D | D | D | D | D | D | D |
| 2023 | D | D | D | D | D | D | D | D | D | D | D | D |
| 2022 | 2 | 1 | 2 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 0 | 1 |
| 2021 | 0 | 2 | 1 | 2 | 2 | 1 | 2 | D | D | D | D | D |
| 2020 | D | D | D | 0 | D | D | D | D | D | 2 | 1 | 0 |
| 2019 | 1 | 0 | 1 | 1 | 1 | 0 | 0 | 1 | | | | |
| 2018 | | | | | | | | | | | | |

**On File History Grid:**

| Year | Dec | Nov | Oct | Sep | Aug | Jul | Jun | May | Apr | Mar | Feb | Jan |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2025 | | | | | | | | | | | | |
| 2024 | | | | | | | | | | | | |
| 2023 | | | | | | | | | | | | |
| 2022 | | | | | | | | | | | | |
| 2021 | | | | | | | | 2 | 1 | 2 | 1 | 1 |
| 2020 | 1 | 1 | 1 | 1 | 1 | 0 | 1 | 0 | 2 | 1 | 2 | 2 |
| 2019 | 1 | 2 | D | D | D | D | D | D | D | D | 0 | D |
| 2018 | D | D | D | D | 2 | 1 | 0 | 1 | 0 | 1 | 1 | 1 |

APPENDIX 1065

EXPERIAN_NAJERA_0145

# EXHIBIT L

APPENDIX 1066

PO Box 9701
Allen, TX 75013



VICTOR RAMIREZ
3924 ORCAS STREET
FORT WORTH TX 76106

## Your Dispute Results

Report # **0690-8455-24** for **Aug 19, 2024**



# Hi, Victor. Welcome to your Dispute Results.

Our reinvestigation of the dispute(s) and/or other request(s) you recently submitted is now complete. If an item you disputed is not in the list of results below, it was either not appearing in your credit file or it already reflected the requested status at the time of our reinvestigation.

In response to your recent request, we are sending your dispute results. Before contacting us, please review this report carefully. If you disagree with an item, you may dispute it. We will process disputes generally by sending your dispute to the furnisher of the information or to the vendor who collected the information from a public record. If we were able to make changes to your credit report based on information you provided, or if you requested the addition of a statement, we have done so. Otherwise, we have contacted the company reporting the information you disputed, supplied them all relevant information and any documents you gave us with your dispute, and instructed them to: review all information we provide them about your dispute; verify the accuracy of the information; provide us a response to your dispute; and update their records and systems as necessary.

# How to Read Your Results

**Deleted** - This item was removed from your credit report. **Remains** - The company that reported the information has certified to Experian that the information is accurate. This item was not changed as a result of our processing of your dispute. **Updated** (Your results will indicate which one of the following applies.) - a) The information you disputed has been updated. Please review your report for the details. b) The item you disputed has been updated, which may include an update to the disputed information. Please review your report for the details. c) Information on this item has been updated. Please review your report for the details. **Processed** - This item was either updated or deleted; Please review your report for the details. **Verified and Updated** - The information you disputed has been verified as accurate, however, information unrelated to your dispute has been updated. Please review your report for the details.

## Here are your results

## Credit items

**RUSHMORE LOAN MGMT SER** 102760214.... **Outcome: Verified and Updated - The information you disputed has been verified as accurate; however, information unrelated to your dispute has been updated. Please review your report for the details.**

**Before Dispute**

APPENDIX 1067

EXPERIAN_NAJERA_0073

## Dispute Results (Continued)

### RUSHMORE LOAN MGMT SERVI Partial Acct # 102760214....

**Status (Jan 2023)** Transferred,closed.

15480 LAGUNA CANYON RD STE 100 IRVINE CA 92618; (888) 504 6700

| | | | |
|---|---|---|---|
| **Date opened** Jan 2009 | **Terms** 30 Years | **Recent Balance** Not reported This item remained unchanged from our processing of your dispute in Feb 2024. | **Payment history:** May 2019 - Jan 2023 |
| **Address ID #** 0701387387 | **Monthly payment** Not reported | | |
| **Type** Mortgage | **Credit limit or original amount** $109,370 | | |
| **Responsibility** Individual | **High Balance** Not reported | | |

Payment history:

| | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2023 | CLS | | | | | | | | | | | |
| 2022 | 30 | OK | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 60 | 30 | 60 |
| 2021 | ND | ND | ND | ND | ND | 60 | 30 | 60 | 60 | 30 | 60 | OK |
| 2020 | OK | 30 | 60 | ND | ND | ND | ND | ND | OK | ND | ND | ND |
| 2019 | | | 30 | OK | OK | 30 | 30 | 30 | 30 | OK | 30 | |

| | Dec22 | Nov22 | Oct22 | Sep22 | Aug22 |
|---|---|---|---|---|---|
| **Account Balance** | $95,397 | $94,967 | $95,915 | $95,483 | $95,739 |
| **Date Payment Received** | 10.31.22 | 10.31.22 | 08.27.22 | 08.27.22 | 08.05.22 |
| **Scheduled Payment Amount** | $1,248 | $1,248 | $1,248 | $1,248 | $1,248 |
| **Actual Amount Paid** | No Data | $2,496 | No Data | $1,248 | $1,198 |

*The original amount of this account was $109,370*

### After Dispute

### RUSHMORE LOAN MGMT SERVI Partial Acct # 102760214....

**Status (Jan 2023)** Transferred,closed.

15480 LAGUNA CANYON RD STE 100 IRVINE CA 92618; (888) 504 6700

| | | | |
|---|---|---|---|
| **Date opened** Jan 2009 | **Terms** 30 Years | **Recent Balance** Not reported **Comment: Transferred to another lender** This item was updated from our processing of your dispute in Aug 2024. | **Payment history:** May 2019 - Jan 2023 |
| **Address ID #** 0701387387 | **Monthly payment** Not reported | | |
| **Type** Mortgage | **Credit limit or original amount** $109,370 | | |
| **Responsibility** Individual | **High Balance** Not reported | | |

| | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2023 | CLS | | | | | | | | | | | |
| 2022 | 30 | OK | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 60 | 30 | 60 |
| 2021 | ND | ND | ND | ND | ND | 60 | 30 | 60 | 60 | 30 | 60 | OK |
| 2020 | OK | 30 | 60 | ND | ND | ND | ND | ND | OK | ND | ND | ND |
| 2019 | | | 30 | OK | OK | 30 | 30 | 30 | 30 | OK | 30 | |

| | Dec22 | Nov22 | Oct22 | Sep22 | Aug22 |
|---|---|---|---|---|---|
| **Account Balance** | $95,397 | $94,967 | $95,915 | $95,483 | $95,739 |
| **Date Payment Received** | 10.31.22 | 10.31.22 | 08.27.22 | 08.27.22 | 08.05.22 |
| **Scheduled Payment Amount** | $1,248 | $1,248 | $1,248 | $1,248 | $1,248 |
| **Actual Amount Paid** | No Data | $2,496 | No Data | $1,248 | $1,198 |

*The original amount of this account was $109,370*

If the reinvestigation does not resolve your dispute, you have the right to add a statement of up to 100 words to your file disputing the accuracy or completeness of the information.

If you provide a consumer statement that contains medical information related to service providers or medical procedures, then you expressly consent to Experian including this information in every credit report we issue about you. You may contact the company that reports the information to us and dispute it directly with them. If you wish to obtain documentation or written verification concerning your accounts, please contact your creditors directly. You may provide us additional information or documents about your dispute to help us resolve it by visiting www.experian.com/upload. You may also mail your information to Experian, P.O. Box 9701, Allen, Texas 75013.

APPENDIX 1068

EXPERIAN_NAJERA_0074

**Dispute Results** (Continued)

You may file a complaint about Experian or the company reporting the item, with the Consumer Financial Protection Bureau or your State Attorney General's office. If there has been a change to your credit history resulting from our reinvestigation, or if you add a consumer statement. you may request that Experian send an updated report to those who received your report within the last two years for employment purposes, or within the last six months for any other purpose (the past 12 months for residents of Colorado, Maryland or New York), or within the last year for any non-employment purpose under the California Investigative Consumer Reporting Agencies Act. If you send a request to have your results sent to past recipients of your credit report, please designate the organization's name and address. In the event an organization is not specifically designated, we will generally default to sending only to companies that have requested your credit information as a result of an action you took, such as applying for credit, insurance, employment or apartment rental. If you request to have your results sent to past recipients of your investigative consumer report, you have the right to designate which entities you wish to receive the updated report and which entities you do not wish to receive the update. If interested, you may also request a description of how the reinvestigation was conducted along with the business name, address and telephone number (if reasonably available} of the furnisher of information. For frequently asked questions about your credit report, please visit experian.com/consumerfaqs.

Medical Information

By law, we cannot disclose certain medical information (relating to physical, mental, or behavioral health or condition). Although we do not generally collect such information, it could appear in the name of a data furnisher (i.e., "Cancer Center") that reports your payment history to us. If so, those names display on your report, but on reports to others they display only as "MEDICAL PAYMENT DATA." Consumer statements included on your report at your request that contain medical information are disclosed to others.

# Payment History Legend



| | | | | | | |
|---|---|---|---|---|---|---|
| OK | Current / Terms met | 150 | Past due 150 Days | VS | Voluntarily surrendered | D | Defaulted on contract |
| 30 | Past due 30 Days | 180 | Past due 180 Days | R | Repossession | C | Collection |
| 60 | Past due 60 Days | CRD | Creditor received deed | PBC | Paid by creditor | CO | Charge off |
| 90 | Past due 90 Days | FS | Foreclosure proceedings started | EC | Insurance claim | CLS | Closed |
| 120 | Past due 120 Days | F | Foreclosure | G | Claim filed with government | ND | No data for this period |

# ⚠️ Your Potentially Negative Account Activity

The most common items in this section are late payments, accounts that have been charged off or sent to collection, accounts settled for less than full value, and items that may need closer attention, such as transferred accounts.

**RUSHMORE LOAN MGMT SERVI** Partial Acct # 102760214....    **Status (Jan 2023)** Transferred,closed.
15480 LAGUNA CANYON RD STE 100 IRVINE CA 92618; (888) 504 6700

**Date opened**
Jan 2009

**Address ID #**
0701387387

**Type**
Mortgage

**Responsibility**
Individual

**Terms**
30 Years

**Monthly payment**
Not reported

**Credit limit or original amount**
$109,370

**High Balance**
Not reported

**Recent Balance**
Not reported

**Comment:**
Transferred to another lender

This item was updated from our processing of your dispute in Aug 2024.

**Payment history:** May 2019 - Jan 2023

| | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2023 | CLS | | | | | | | | | | | |
| 2022 | 30 | OK | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 60 | 30 | 60 |
| 2021 | ND | ND | ND | ND | ND | 60 | 30 | 60 | 60 | 30 | 60 | OK |
| 2020 | OK | 30 | 60 | ND | ND | ND | ND | ND | OK | ND | ND | ND |
| 2019 | | | | | 30 | OK | OK | 30 | 30 | 30 | OK | 30 |

| | Dec22 | Nov22 | Oct22 | Sep22 | Aug22 |
|---|---|---|---|---|---|
| **Account Balance** | $95,397 | $94,967 | $95,915 | $95,483 | $95,739 |
| **Date Payment Received** | 10.31.22 | 10.31.22 | 08.27.22 | 08.27.22 | 08.05.22 |
| **Scheduled Payment Amount** | $1,248 | $1,248 | $1,248 | $1,248 | $1,248 |
| **Actual Amount Paid** | No Data | $2,496 | No Data | $1,248 | $1,198 |

*The original amount of this account was $109,370*

APPENDIX 1069

EXPERIAN_NAJERA_0075

**Dispute Results** (Continued)

**Notification of Rights for Texas Consumers**

The Texas Business and Commerce Code requires that Texas consumers be given notice of their rights with written disclosure. You have the right to obtain a copy of your personal credit report from Experian online at www.experian.com/consumer, by calling 1 888 EXPERIAN (1 888 397 3742), or by writing to us at P.O. Box 2002, Allen, TX 75013. If you write to us, always include your full name including middle initial (and generation such as JR, SR, II, III); current mailing address; date of birth (month/date/year); and previous addresses for the past two years. Include one copy of a government issued identification card, such as a driver's license, state ID card, etc.; and one copy of a utility bill, bank or insurance statement, etc. Make sure that each copy is legible (enlarge if necessary), displays your name and current mailing address, and the date of issue (statement dates must be recent). We are unable to accept credit card statements, voided checks, lease agreements, magazine subscriptions, or postal service forwarding orders as proof of your address and identity. To protect your personal information, Experian does not return correspondence sent to us. Send copies of any documents you wish to provide to us and always retain your original documents. The fee for a credit report is $12.45 (includes tax).

You have the right to dispute information in your credit report that you believe is inaccurate. You may dispute online at www.experian.com/disputes, or by calling the toll-free number or writing to us at the address on your credit report. The account name and number and a specific reason why you believe the information is inaccurate should be included. Experian will verify disputed information with the source, which may take up to 30 days, or 45 days for information in an annual free credit report, and then notify the consumer of the results of the investigation.

You have a right to place a fraud security alert statement on your credit report that alerts anyone who reviews your credit information that your identity may have been used without your consent and requests that the reviewer verifies your identity before issuing credit. If an alert is added, approvals of credit, rental housing, insurance, employment, etc. requested by you may be delayed or rejected. You may request a security alert online at www.experian.com/fraud or by calling 1 888 EXPERIAN (1 888 397 3742). Consumers who add a one-year security alert may request a complimentary copy of their report by visiting www.experian.com/initialfraudreport or by calling 1 (800) 360-7540. To remove a security alert, the consumer must submit the request in writing.

Texas consumers have a right to file action in court to enforce an obligation of a consumer reporting agency. Or, if agreed to by both parties, after the consumer has followed the normal dispute procedures and received their notice of the results of the investigation, the matter may be submitted to binding arbitration in the manner provided by the rules of the American Arbitration Association.

APPENDIX 1070

EXPERIAN_NAJERA_0076

# EXHIBIT M

# In the Matter of:

*Najera*

*vs*

**Experian Information Solutions**

*Christina Hamilton*

*December 9, 2025*



GRIFFIN GROUP INTERNATIONAL

3200 East Camelback Road, Suite 177
Phoenix, Arizona 85018

APPENDIX 1072

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

VICTOR MANUEL RAMIREZ ) Case No.: 4:25-cv-443
NAJERA, )
                        )
        Plaintiff,      )
                        )
            vs.         )
                        )
EXPERIAN INFORMATION SOLUTIONS,)
INC.; APPFOLIO, INC.; and     )
NATIONSTAR MORTGAGE LLC d/b/a )
RUSHMORE SERVICING,           )
                        )
        Defendants.     )
_____)

ZOOM RECORDED VIDEOCONFERENCE DEPOSITION

OF CHRISTINA HAMILTON

Rockwell, Texas
December 9, 2025
9:32 a.m.

REPORTED BY:
JENNIFER HANSSEN, RPR
Certified Reporter
Certificate No. 50165

PREPARED FOR:
ASCII/CONDENSED

(Certified Copy)



**Griffin Group International**
**888.529.9990 | 602.264.2230**

APPENDIX 1073

**Najera vs**
**Experian Information Solutions**

**Christina Hamilton**

2

INDEX

WITNESS                                                    PAGE

CHRISTINA HAMILTON

            Examination by Mr. Ristvedt          4


                    E X H I B I T S

Deposition
Exhibits:        Description                       Page

1    D/R Log Report (6 pages)                      11
     EXPERIAN_NAJERA_0392-0397

2    Admin Report (38 pages)                       26
     EXPERIAN_0171-0208

3    Dispute letter dated 7-10-24 (16 pages)       21
     EXPERIAN_0148-1063

4    LAR (59 pages) EXPERIAN_NAJERA_0398-0456      26

**Griffin Group International**
**888.529.9990 | 602.264.2230**

3

                    ZOOM RECORDED VIDEOCONFERENCE DEPOSITION

OF CHRISTINA HAMILTON was taken on December 9, 2025,

commencing at 9:32 a.m., Rockwell, Texas,

before JENNIFER HANSSEN, RPR, a Certified Reporter in

the State of Arizona, appearing via videoconference.


COUNSEL APPEARING (via videoconference):

              For the Plaintiff:
              CONSUMER JUSTICE LAW FIRM, PLC
              By:  James Ristvedt
              8095 North 85th Way
              Scottsdale, Arizona  85258

              THE CREDIT ATTORNEY, INC.
              By:  Youssef H. Hammoud
              601 North Parkcenter Drive, Suite 202
              Santa Ana, California  92705

              For the Defendant Experian Information
              Solutions, Inc.:
              JONES DAY
              By:  Camden Douglas
              2727 North Harwood Street, Suite 500
              Dallas, Texas  75201

ALSO PRESENT (via videoconference):

              Shaun Pambid



**Griffin Group International**
**888.529.9990 | 602.264.2230**

APPENDIX 1075

4

                        CHRISTINA HAMILTON,


called as a witness herein, having been first duly

sworn, was examined and testified as follows:


                        EXAMINATION

BY MR. RISTVEDT:

   Q.    Okay.  Good morning, Miss Hamilton.  How are

you today?

   **A.    I am good.  How are you?**

   Q.    Very well.  Thank you.

              I understand you are here today not as a

30(b)(6) witness testifying on behalf of Experian, but

rather as a fact witness testifying about actions you

performed with respect to Mr. Ramirez Najera's credit

file.  Is that your understanding as well?

   **A.    Yes, it is.**

   Q.    You have had your deposition taken on a number

of occasions; correct?

   **A.    Yes, that's correct.**

   Q.    In fact, I think I took your depo, like, two

weeks ago or something like that.  Does that sound about

right to you?

   **A.    Yes, I believe so.**

   Q.    You're familiar with all the typical

5

admonishments:  Don't interrupt each other, don't answer my questions if you don't understand it, things to that effect; yes?

A.    Yes, I do.

Q.    I just have a couple of quick questions I want to make sure I get on the record that I always do.  Is there any reason you'd be unable to provide me with truthful or accurate testimony today?

A.    No, there's not.

Q.    Have you consumed any drugs or alcohol in the last 24 hours that would impair your ability to testify truthfully or accurately?

A.    No, I have not.

Q.    Are you taking any prescription medications that would impair your ability to testify truthfully or accurately?

A.    No.

Q.    Are you familiar generally with the facts of this case, Victor Ramirez Najera v Experian?

A.    Yes, I am.

Q.    Can you tell me just high level, what do you understand the facts of this case to be?

A.    I understand that there was a mortgage appearing on his credit file that he states belonged to his -- belongs to his father with a similar name.



**Griffin Group International**
**888.529.9990 | 602.264.2230**

APPENDIX 1077

6

Q.    You're aware that Mr. Ramirez Najera made a phone call dispute to Experian resulting in a couple of ACDVs being generated to PennyMac and Rushmore respectively; correct?

A.    **I don't recall a phone call.**

Q.    Okay.  But do you recall a written dispute that Mr. Ramirez Najera sent in with some documents?

A.    **Yes, I do.**

Q.    And is it your understanding that in response to Mr. Ramirez Najera's written dispute, Experian did not correct, update or delete the Rushmore tradeline appearing in Mr. Ramirez Najera's credit file?

A.    **Yes, that's my understanding, correct.**

Q.    I understand that you work within Experian's litigation support department; correct?

A.    **Yes, that's correct.**

Q.    Among your job duties, is it true to say that you assist Experian's internal and external attorneys with understanding aspects of consumer credit files after a consumer has initiated litigation against Experian?

A.    **Yes, I would agree with that.**

Q.    Does part of your job consist of reviewing instances where a consumer has filed suit against Experian alleging that their Experian credit file was



7

either mixed or merged?

A.    Yes, I have seen those cases.

Q.    And within the scope of those cases, is it true to say that you look into or otherwise investigate the nature of whether those consumers actually are the subject of a mixed or merged file?

A.    Yes, a review would be completed of the file and how it appears and what actions had occurred in the past.

Q.    And can you walk me through what that process looks like.  I assume it begins with some Experian attorney, whether internally or externally, asking you to sort of look into a consumer's credit file.  Is that how the process would typically begin?

A.    Yes.  They would reach out to litigation support to notify of a case that has been brought forth.

Q.    In an instance of a mixed file, are you told at that time, "Hey, this consumer is alleging their file was mixed.  We need to look into this," something like that?

A.    Yes, in most cases if the plaintiff has provided that allegation, then yes.

Q.    When you do that, what is the first step in your process in order to investigate the consumer's allegation?



8

**A.    Once the pertinent documents are pulled, a review would be made of those documents as well as the consumer's credit file as it appears and review the personal identifying information that is listed there.**

Q.    When you say the pertinent documents that are pulled, what are those pertinent documents in this context?

MS. DOUGLAS:  Objection, form.

**A.    Those would be the disclosure log, D/R log, admin, post-lit CDI, as well as any correspondence that may have been sent, ACDVs that may have been sent and returned.**

Q.    BY MR. RISTVEDT:  Okay.  So I want to make sure I have that universe of documents.  Basically, when you get notified, "Hey, this person is suing us, they're saying it's a mixed file," you would pull their post-litigation disclosure log, dispute response log, their admin report and any documents the consumer sent, any communications, as well as any ACDVs responses that Experian received from furnishers with respect to the consumer's dispute.  Did I catch all that correctly?

**A.    Yes, that's correct.**

Q.    And I understand when you talk about reviewing the consumer's credit file, you're making reference to reviewing that consumer's admin report; true?



**Griffin Group International**
**888.529.9990  |  602.264.2230**

APPENDIX 1080

9

**A.**     Yes, that is one of the things that we look at.

Q.     So you'd be looking at the admin report and then trying to determine based on sort of the allegations in the complaint does it look like this person's file is mixed.  Is that the next step in the process?

**A.     Yes, I would agree with that.**

Q.     What specific information are you looking at in order to carry out that aspect of your investigation?

**A.     We would be looking for any differing Social Security number, a differing name or variation, what those differing pieces of information are tied to on the credit report.**

Q.     In some instances, a consumer might be mixed with somebody who has a similar name.  Is that true?

MS. DOUGLAS:  Objection, form.

**A.     Yes, that's correct.**

Q.     BY MR. RISTVEDT:  In some instances, a consumer might be mixed with somebody even if there isn't a second or third Social Security number appearing in the consumer's credit file.  Is that also true?

MS. DOUGLAS:  Objection, form.

**A.     Yes, that's correct.**

Q.     BY MR. RISTVEDT:  So in those instances where there's nothing that's sort of glaring like, "Hey, we



APPENDIX 1081

10

have a different Social or we have a different name," how would you identify based on the admin report, "Oh, it looks like this person is mixed"?

          MS. DOUGLAS:  Same objection.

   A.    **Without those differing instances and no other proof documentation, we would have to send an ACDV out because we wouldn't be visibly able to determine that it for sure belongs to someone else.**

   Q.    BY MR. RISTVEDT:  Got it.  So there's not something that's -- that makes it visually apparent within the scope of the admin report and if you don't have proof documents that would substantiate a mix, in those instances you're saying you have to kind of go to the next step and request additional information from the data furnisher.  Have I understood your testimony correctly?

          MS. DOUGLAS:  Objection, form.

   A.    **Yes, that's correct.**

   Q.    BY MR. RISTVEDT:  Now I want to touch on the proof documents portion because you mentioned that's one part of that investigation; correct?

   A.    **Yes, correct.**

   Q.    When you say "proof documents," that's Experian speak for documents that the consumer has sent in along with the dispute to substantiate their claim of a



Q.   dispute; is that accurate?

A.   **Yes, that's correct.**

Q.   So in the case of Mr. Ramirez, you're aware he sent in that written dispute that had a letter, some documentation about his driver's license, birth certificate, passport, some photos of him on his football team in eighth grade and some mortgage documents for the underlying mortgage that was the subject of the mixed account.  You're aware all of that was included in his dispute letter; correct?

A.   **Yes, that's correct.**

Q.   And given that those dispute documents were received by Experian well before the lawsuit was filed, those would be documents Experian refers to as proof documents that you would use in order to investigate whether a mix occurred in a circumstance like that; true?

MS. DOUGLAS:  Objection, form.

A.   **Yes, we would utilize those documents during our evaluation, yes.**

Q.   BY MR. RISTVEDT:  I'm going to pull up my first exhibit.  I will designate this as Plaintiff's 1.

Have you seen this document before, Miss Hamilton?

A.   **Yes, I have.**



12

Q.    What do you understand this document to be?

A.    **This is a D/R log or a dispute -- dispute response log.**

Q.    And to put a finer point on it, this is the dispute response log for Mr. Ramirez Najera that was printed on October 8th, 2025; true?

A.    **Yes, that's correct.**

Q.    Now looking through this document, I'm going to jump down to EXPERIAN_NAJERA 394 at the bottom.  Do you see this section beginning with Agent ID=c15160a?

A.    **Yes, I do.**

Q.    Do you know the identity of that particular agent?

A.    **I'm fairly certain I know who it is.  I would just have to double-check that it's who I'm thinking it is.**

Q.    Who do you believe it to be?

A.    **I believe it is Sylvia Vargas.**

Q.    And is Miss Vargas an employee working in Experian's ECA division?

A.    **She is part of litigation support.**

Q.    Ah, okay.  So she works within your department. Is she also a litigation support specialist or does she have a different title?

A.    **I don't know her title off the top of my head.**



**Griffin Group International**
**888.529.9990  |  602.264.2230**

APPENDIX 1084

Q.   This report has a date of June 3rd, 2025, and it has the urgent remark, "Litigation activity - handled by ECA - federal lawsuit June 2025 - forward to ECA litigation team."

        Have I read that correctly?

**A.    Yes, correct.**

Q.   So this note is essentially saying, "Hey, we're being sued.  ECA, we need you to look into this as soon as possible"; correct?

**A.    No, not exactly.**

Q.   Okay.  What is it communicating?

**A.    That remark is added when litigation has been filed, so if a consumer is to call or send mail correspondence, that always initially goes to a regular so to speak agent.  When they pull up the file, they would see this remark and know that they need to transfer that file or phone call over to the ECA division.**

Q.   Ah, I see.  So this is more like a flag saying, "Hey, if we get another dispute or another phone call, this person is actively in litigation with us so don't handle it like every other dispute, send it on to ECA litigation team."  Have I understood your testimony?

**A.    Yes, that's correct.**

Q.   What about the "internal remark=internet



block," what's the significance of that remark?

A. That is also something that is added during litigation that will prevent reinvestigations being initiated online by a consumer or someone acting on their behalf so that we are fully aware of what interactions are occurring on the file.

Q. Got it. So this internet block is kind of similar to this other urgent remark essentially making it so that if the consumer were to dispute online, it would be processed differently and presumably forwarded to ECAs litigation team; true?

A. Yes, correct. It would stop them from online access for disputing only and then they would be forced to call where they would reach the ECA team -- ECA litigation team.

Q. I understand within the scope of the D/R log, these little greater than or less than symbols which I have highlighted in red, those denote the breakup between distinct records; true?

A. Yes, that's correct, a separation of each action --

Q. So above --

A. -- (inaudible).

Q. My apologies.

A. Sorry.



Q.    Quite alright.

So below that relates more to the, "Hey, if new disputes come in, don't process it in the normal way, handle it in a special way because of lawsuits," and then above that relates to the process of unmixing Mr. Ramirez Najera's file.  Is that all correct?

MS. DOUGLAS:  Objection, form.

**A.    Yes.  The above is the next action that took place on a file on that different date.**

Q.    BY MR. RISTVEDT:  I note as I go through and scroll up through EXPERIAN_NAJERA 393 and continuing into 392, I don't see those greater than or less than record breakers until the very top of EXPERIAN_NAJERA 392.  Would you agree with me?

**A.    Yes, I do.**

Q.    So everything between these two red sets of greater than, less than record breakers, they all relate to this process of unmixing Mr. Ramirez Najera's file.  Is that all right?

MS. DOUGLAS:  Objection, form.

**A.    That is correct, yes.**

Q.    BY MR. RISTVEDT:  As I go through this section, I see there's a different agent ID.  This one is ca914pc.  Do you agree?

**A.    Yes.**



16

Q.    Do you have any knowledge as to the identity of that agent?

**A.    Yes.**

Q.    And who is that?

**A.    That is me.**

Q.    Okay.  So all the records ca914pc, those all relate to actions that you personally took within Mr. Ramirez Najera's credit file; correct?

**A.    Yes, that's correct.**

Q.    Going down again to EXPERIAN_NAJERA 394, this first record with your agent ID, that would have been sort of the first record you looked at within Mr. Ramirez Najera's file.  Am I understanding that correctly?

**A.    First record, can you clarify that?  I'm sorry.**

Q.    Sure.  Really what I want to make certain I understand is, I know that this document goes in reverse chronological order, meaning the newest records and actions at the very top, oldest records and actions at the very bottom.  Is that true?

**A.    For each specific date, yes, that is true.**

Q.    Okay.  So within a record like this one where there are several different actions, is there any way for me to know whether each of those actions was performed in the same reverse chronological order or



could it be any order?

**A.    The way it's printed in the D/R log, it could be any order.   It's not specific to the actual order that it's done.**

Q.    Okay.   So in other words, while the unmixing would have occurred after this other action of the internet block and the litigation identification record that we looked at before, other than the fact that this unmixing process took place after, there's no way for me to know the order of steps of unmixing.   Is that your testimony?

**A.    Yes, that's correct, not by looking at a D/R log.**

Q.    Is there any record within Experian's system that would allow me to know the exact order of the unmixing process?

**A.    No, there's not an exact record, no.**

Q.    I want to look at this first item.   The dispute date of June 11, 2025, that connotes when you would have begun processing this process of unmixing Mr. Ramirez Najera's file; is that correct?

**A.    Yes, that's correct.**

Q.    I see the very first record here says Original Data, then it has Mr. Ramirez Najera's PIN and it lists spouse name Maria, year of birth, date of birth



18

December 14, 1995.  Do you agree?

A.    Yes, I do.

Q.    Based on the fact that this original data value appears here, is there anything that I can understand with respect to this first portion of the unmixing record?

A.    The first line in itself is just how information had displayed when I went into that field to add the DNC to the file.

Q.    When you say "DNC," you're referring to the do not combine flag; correct?

A.    Yes, correct.

Q.    For posterity, the do not combine flag is a unique designation used by Experian whereby it essentially alerts Experian's internal algorithm and processes that a more strict matching requirement is needed as it relates to this consumer's file.  Is that correct?

MS. DOUGLAS:  Objection, form.

A.    Yes, that is correct.  There's a stricter criteria for information that would then come into the file to be loaded.

Q.    BY MR. RISTVEDT:  And I can tell this do not combine or DNC flag was applied by virtue of the "update data= do not combine Y"; true?



**Griffin Group International**
**888.529.9990 | 602.264.2230**

APPENDIX 1090

19

A.    Yes, that's correct.

Q.    With respect to this first portion which I've just drawn a red box around, is there anything else that I would be able to tell took place as it relates to that portion of the action?

A.    No, there -- I don't see anything else that was missed that you hadn't stated.  That is the action that took place there.

Q.    The next portion relates to this original data Rushmore Loan Management Services that's identified at the top of EXPERIAN_NAJERA 392; correct?

A.    Yes, correct.

Q.    And I understand in this case, the original data is just making reference to that tradeline, the Rushmore loan account at issue in this lawsuit.  Is that your understanding as well?

A.    Yes, that's how it appeared at the time of this processing at the time of June 11, 2025.

Q.    Under the Dispute Reason, it says, "Internal change item moved to another consumer."  Did I read that correctly?

A.    Yes.

Q.    Is there anything I can understand about that action other than this is a notation that this particular tradeline is being disassociated with



20

Mr. Ramirez Najera and reassociated with a separate consumer?

A.    **Yes, that's the understanding of that action.**

Q.    When it says, "Update data, Victor Manuel Ramirez, 1970, 3924 Orca Street, Forth Worth, Texas 76106, soft delete," what do I understand based on that line?

A.    **So this line is instructing the system where I'm asking this tradeline to be moved to the plaintiff or the personal identifying information of the consumer it should be moved to.**

Q.    Where it says "soft delete," does that also mean that action is resulting in deleting the account from Mr. Ramirez Najera's PIN?

A.    **Yes, that's correct.**

Q.    So in other words, this record here relates to taking the Rushmore account from the plaintiff's credit file and then reassociating it with the PIN assigned to Mr. Ramirez Najera's father Victor Ramirez.  Is that accurate?

A.    **Yes, that's correct.**

Q.    Do you remember -- I guess this is about six months or so ago after this lawsuit was filed.  Do you remember reviewing these documents updating Mr. Ramirez Najera's credit file?



APPENDIX 1092

21

A.    Yes, I do.

Q.    And do you remember what documents you looked at in order to make the changes that were needed in the case of Mr. Ramirez Najera?

A.    Yes, I do.

Q.    What documents were those?

A.    **The correspondence that had previously been sent in.**

Q.    And to put a finer point on it, I'm actually going to -- Miss Hanssen, I apologize in advance, I'm going to be skipping an exhibit for the time being.  But I'm going to place on the screen what I'll designate as Plaintiff's 3.

Miss Hamilton, you've seen this document before?

A.    Yes, I have.

Q.    And I'll represent to you this is a 16-pager.  It goes from EXPERIAN 148 through EXPERIAN 163 and contains both the letter Mr. Ramirez Najera sent in and the dispute documents he sent in evidencing and substantiating his dispute.  Is that your understanding as well?

A.    Yes, that's correct.

Q.    When you refer to the correspondence that was previously sent, is this the document to which you're



referring?

A.    This is one of two that were sent in.  This was the most impactful with proof documentation that I was able to reference.

Q.    When you mention one of two, what is the second that you're referring to?

A.    There was a second correspondence sent by a reseller simply disputing the Rushmore account is not his.

Q.    Got it.  So there was the mail dispute that Mr. Ramirez Najera sent in along with documents and then there was this other reseller dispute that kind of generally said, "Hey, this account is not his," is that what you're referring to?

A.    Yes, that's correct.

Q.    Am I correct in understanding from your testimony the reseller dispute would have been less helpful during this process?

MS. DOUGLAS:  Objection, form.

A.    Yes.  This piece here was the most impactful.

Q.    BY MR. RISTVEDT:  Is that because the reseller dispute didn't have documents to substantiate the contentions made in that dispute?

MS. DOUGLAS:  Objection, form.

A.    Correct, it did not have proof documentation or



23

specified belief of belonging to a person with a same or similar name.

Q.    BY MR. RISTVEDT:  Understood.  So if I'm following your testimony correctly, you're saying that the letter and documents Mr. Ramirez Najera sent were the documents upon which you relied because, Number 1, they made clear that the account actually belongs to Mr. Ramirez Najera's father, and, Number 2, because they provided documentation, for instance, things about Mr. Ramirez Najera's birth date.  Have I understood you correctly?

MS. DOUGLAS:  Objection, mischaracterizes testimony.

A.    Basically, yes, that this was the biggest piece of correspondence that made the most impact.  It did outline it belonged to his father with similar name, it did outline the tradeline that was in question and his date of birth was clearly called out.

Q.    BY MR. RISTVEDT:  So let me ask a different way.  Let's say for a moment that the reseller dispute does not exist, it never happened.  You just had this 16-page document, Mr. Ramirez Najera's dispute and the dispute documents.  Would this have been sufficient for you to come to the same conclusion?

A.    Yes, it would.



24

Q.   So in other words, the reseller dispute didn't really add a whole lot to this process; is that fair?

MS. DOUGLAS:  Objection, form.

A.   Yes, that's fair to say.

Q.   BY MR. RISTVEDT:  Other than this 16-page document and then the reseller dispute that sort of generally said, "Hey, this isn't my account," was there any other documentation upon which you relied in order to conclude that the Rushmore account did not belong to the plaintiff?

A.   No, there wasn't.

Q.   Was there any information that you obtained as a result of, say, the complaint that Mr. Ramirez Najera filed or information that you learned as a consequence of the litigation itself that played some role?

A.   No, just reviewing the correspondence and reviewing the file itself and making that determination.

Q.   I'm going to go back to Exhibit 1 for a moment. I want to take a look at EXPERIAN_NAJERA 393.  Do you see here at the bottom there's a section on this name identification number ending in 26591?

A.   Yes, I see that there.

Q.   The name identification numbers that Experian receives, those are coded pieces of information that can contain a consumer's full name and potentially a



25

Social Security number as well; is that true?

A.    Yes, it reflects the name that was provided, whether it's a middle initial, middle name without -- or with or without a Social Security number, so the name and Social if it's there that's been reported.

Q.    This particular name, 26591, it says that the information received was just Victor Manuel Ramirez, meaning first, middle, last.  Would you agree?

A.    Yes, I agree.

Q.    And it also identifies that this would have come from Rushmore Loan Management Service and has an AF code meaning that this was a monthly tradeline Metro 2 update; is that true?

A.    That it's a, yes, a reliable source.  The Rushmore notation there is referencing the last subscriber to report that name route which in this case is Rushmore.

Q.    Is there anything I could ascertain from this record that demonstrates, say, the date of birth associated with that name identification number?

A.    No, there's not.

Q.    What about the Social Security number associated with that name identification number?

A.    There wasn't one provided, so no.

Q.    And when you say there wasn't one provided, is



26

that omission identified by the absence of a Social Security number following the last name Ramirez here?

A.    Yes, that's correct.

Q.    In other words, if I look at the item above, the pathword "NA/Oportun," in this one it says Victor Manuel Ramirez and then is immediately followed by a Social Security number ending in 0996; right?

A.    Yes, correct.

Q.    So in other words, when a Social is provided with a name identification number, it would appear immediately following the last name and that's how you know there was no Social from this Rushmore tradeline; true?

A.    Yes, that's correct.

Q.    I want to go to what I'm now going to designate as Plaintiff's 2.  Have you seen this document before?

A.    Yes, I have.

Q.    And what do you understand this one to be?

A.    **This is the admin report for the plaintiff.**

Q.    And before I get into questions on this one, I'm also going to put on the screen what I will designate as Plaintiff's 4.

Have you seen this one as well?

A.    Yes, I have.



27

Q.    What do you understand this one to be?

**A.    This is another admin report.  It looks like it's a long admin.**

Q.    And to clarify, when you say "long admin," you can understand that this is a long admin by virtue of the key word "long" here at the top of the inquiry; yes?

**A.    Yes, correct.**

Q.    I'm going to take a look -- you see this long admin report is dated October 8th, 2025, so two months ago from today; yes?

**A.    Yes, correct.**

Q.    And if I return to Exhibit 2, that one is dated June 3 of 2025.  You agree?

**A.    Yes, I agree.**

Q.    Based on the timeline we saw in the D/R log, I understand that the sort of litigation block that we looked at earlier, those records were dated June 3, 2025; right?

**A.    Yes, correct.**

Q.    And then you ultimately didn't unmix the file until about a week and some days later, I think on June 11th.  Is that timeline correct?

**A.    Yes, that's correct.**

Q.    When Experian receives a lawsuit alleging a mixed file, is it a true statement that the litigation



support department will pull an admin report before going through the process of unmixing the file?

        MS. DOUGLAS:  Objection, form.

    A.    Yes, that's correct.

    Q.    BY MR. RISTVEDT:  And is that so that you kind of have a snapshot of here's what it looked like before we started going to work on the file?

    A.    Yes, that's correct.

    Q.    So then a week or so later when you go in and unmix on June 11th, you're basically taking the data from this document Exhibit 2 and updating it, and the results of any changes would eventually be displayed in Exhibit 4 which is dated four months or so later.  Is that fair?

        MS. DOUGLAS:  Objection, form.

    A.    **Yes, the update would have occurred on June 11th.  It would have been effective as of that date.  The October date was just the date a new admin was pulled, a long admin.**

    Q.    BY MR. RISTVEDT:  So just to clarify, when you made changes on June 11th, those would be applied to the file and I would be able to look at the results of those changes within the October long admin report; fair?

    A.    Yes, that's correct.

    Q.    So I want to look at the name identification



29

number we looked at a few minutes ago in Exhibit 1. This first one, 26591, you would agree that as of June 3rd, there was no Social Security number associated with that name identification number; right?

A.   Yes, I agree.

Q.   And if we look at Exhibit 2 here on EXPERIAN 171, that same name identification number, 26591, it, in fact, does not have a Social Security number, just the first, middle, last of Victor Manuel Ramirez; correct?

A.   Yes, that's correct.

Q.   Now if I turn to the October long admin and look at that same number, 26591, do you see that now it's got an associated Social ending in 0996 which is the Social belonging to Mr. Ramirez Najera; you agree?

A.   Yes, I agree.

Q.   Why is it that this Social now appears associated with this name identification number when Experian never received that Social associated with that name identification number?

         MS. DOUGLAS:  Objection, form.

A.   With the mix processing on name rows, we are changing that name row to reflect the consumer's actual information, so this one now shows with his full last name and his Social Security number.



30

Q.   BY MR. RISTVEDT:  Are there instances where the unmixing process as you noted would simply result in removal of that name identification number from the consumer's file?

**A.   Not part of mixed processing, no.  It changes the data.**

Q.   So when you go in and unmix a file post-litigation, you take the name identification numbers that appear either incomplete or potentially inaccurate and those get corrected to reflect the actual information belonging to the plaintiff.  Have I understood your testimony correctly?

**A.   Yes, that's correct.**

Q.   Are there any instances in which you would simply remove a name identification number from being associated with the plaintiff's file?

**A.   No, not that I can think of.**

Q.   So the standard process is always if there are inaccuracies or incomplete information associated with a particular name identification number, the unmixing process involves updating that name identification number to the correct and complete name and the correct Social Security number.  Is that all right?

MS. DOUGLAS:  Objection, mischaracterizes the testimony.



31

A.    Yes, I would say that's correct.  The mix processing changes those name rows to reflect the consumer's correct information, whatever is missing or incomplete.

Q.    BY MR. RISTVEDT:  So if I look at the next name identification number, 20731, this one again is Victor Manuel Ramirez, but this one does have a Social ending in 0996; true?

A.    Yes, correct.

Q.    And in Exhibit 2, I see that exact same information because that's where the data in the D/R log would have been pulled from; correct?

A.    From the admin, yes, that's where it came from. That's how it showed at the time.

Q.    Go to now Exhibit 4 here on EXPERIAN_NAJERA 398.  I see that same name identification number, but the last name has been updated to Ramirez-Najera.  Do you agree?

A.    Yes, I agree.

Q.    And this is consistent with that same process you mentioned before of updating the name value to contain the complete name identified for that consumer; is that accurate?

A.    Yes, that's correct.

Q.    I want to ask you about -- I see here at the



32

top of EXPERIAN_NAJERA 392, there's an account -- excuse me -- an employment record for Integrated Interiors in Fort Worth, Texas.  Do you see that?

A.    Yes, I do.

Q.    As I understand it, the idea here is that this employer is wrong and so it needs to be removed from this consumer's credit file; is that correct?

**A.    I wouldn't necessarily say it's wrong, but it is requested to be removed from the file.**

Q.    Is there anything within the letter that Mr. Ramirez Najera provided that you base that termination on?

**A.    No, there wasn't anything in the correspondence.  That's part of our mix procedures.**

Q.    So when you talk about this employer, EXPERIAN_NAJERA 392, the record of Integrated Interiors, how did you come to the determination that this was an employer that should no longer be associated with Mr. Ramirez Najera's file?

**A.    For mix processing, if the employment is not confirmed by that consumer as accurate, it is removed from the file.**

Q.    Oh, okay.  So you're saying if during this unmixing process if there's information in certain areas that isn't specifically confirmed by the consumer, those



33

will just get kind of deleted as a precautionary

measure.  Have I understood you correctly?

MS. DOUGLAS:  Objection, form.

A.    **Yes, that's correct.**

Q.    BY MR. RISTVEDT:  Are there other pieces of

data that have this similar quality of if it's not

confirmed, then we remove it as a precautionary measure?

A.    **Yes.**

Q.    What are those other pieces of data?

A.    **The other piece is phone numbers.**

Q.    And that's these phone number records here on

EXPERIAN_NAJERA 392, the phone numbers ending in 4637,

2581 and 7891 respectively; correct?

A.    **Yes, that's correct.**

Q.    So for phone numbers and employers, if it's not

explicitly confirmed by the consumer as belonging to

them, Experian just blocks that from the file; correct?

A.    **Yes, that's correct.**

Q.    When you say if it's confirmed by the consumer,

how would a consumer confirm that?  Is it in their

letter, is it in the lawsuit or somewhere else entirely?

A.    **When working the correspondence, it would be in**

**that correspondence.  If it was provided during the**

**litigation, that would be another reference.**

Q.    So in other words, if the consumer's letter,



34

for instance, had one of these phone numbers, you're saying that would be sufficient to keep it in the file. Have I understood you right?

A.    **Yes, at the time the agent is processing it, yes.**

Q.    And similarly, presumably, if they said, you know, "Hey, by the way, I work for Integrated Interiors," would that have been sufficient to say this belongs to that consumer so we're going to leave it in?

A.    **Yes.**

Q.    Are there any other pieces of information within a consumer's credit file that would be subject to this if-it's-not-confirmed-block-it kind of rule?

A.    **Those are the two that are coming to mind.  I don't believe there's others.**

Q.    What about address information?

A.    **Address information, no, it's not automatically deleted.  If it only belongs to the other consumer, then it is removed from the file, but if it still links to our consumer or is not referenced as not theirs, then it's left on file.**

Q.    What about spouse information?

A.    **Spouse field references spouse or co-applicant so we're able to look at the credit report to see if there's someone that's listed as a co-applicant with the**



35

consumer's actual items, and if we do see that, then that is left.

Q.   Where would the record of co-applicants be listed within a consumer's admin report?

A.   I would need to see the admin report again. I'm not recalling offhand if it's there or not.  It is on their disclosures.

Q.   Sure.  So looking at the -- this is the June 2025 admin report here on EXPERIAN 171.  You can see there's a spouse listed of Maria; yes?

A.   Yes, there is.

Q.   Looking through, if I go through, say, the tradelines here at the bottom of EXPERIAN 172, how would I go about determining whether Maria was a co-applicant on any of these tradelines?

A.   I would probably use a "find" search to see if I find "Maria."  If I don't see it on any tradelines, I would double-check a disclosure because I'm not certain that it appears with -- or on the admin with the tradelines.

Q.   And when you say you would just do a find, is that, like, you're talking about just a Control F kind of thing?

A.   Yes.

Q.   Okay.  So I'll represent to you at least my



**Griffin Group International**
**888.529.9990 | 602.264.2230**

APPENDIX 1107

36

Control F is picking up this first "Maria" and then not a second one.  So based on that, I'm not going to waste everyone's time going through every piece of information, but would you accept my representation Maria is not referenced by name in any of these tradelines, at least in the admin report?

    A.    I can accept that, yes.

    Q.    So it sounds like you're saying you'd be able to look then at a disclosure and then determine based on the information in the disclosure whether Maria is listed as a co-applicant on any of those tradelines. Have I understood your testimony correctly?

            MS. DOUGLAS:  Objection, form.

    A.    Yes, that's correct.

    Q.    BY MR. RISTVEDT:  I lastly want to ask you a couple of questions about Experian's procedure at issue in this case.  You would agree with me that a person under the age of 18 can't take out a mortgage loan; yes? We're agreed on that?

    A.    I would agree with that, yes.

    ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████



37

████████████████████████████████

████████████████████████

████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████

Q.   BY MR. RISTVEDT:  I knew what you were getting at.

A.   **Sorry.**

Q.   Quite alright.

And in this case, you would agree with me that any of the proof documents Mr. Ramirez Najera gave, either his driver's license, his birth certificate, his passport, each of those independently would be sufficient to qualify as proof documents for his date of birth; is that right?

A.   **Yes, that's correct.**

Q.   When a consumer calls Experian on the phone, they're subject to out-of-wallet questions; is that right?

A.   **Yes, I believe they could be for passing authentication of who they are.**

Q.   And that's what I want to make certain I understand.  When a consumer calls Experian -- you used to do dispute phone calls and dispute review of

38

documents in a prior role with Experian; true?

A.    I did, yes.

Q.    Prior to connecting with a dispute agent, does the consumer have to go through some sort of authentication to prove that they know their Social Security number, prove they know their date of birth, things like that?

A.    Yes.  The system will ask them various questions to authenticate through the automation of the phone tree to verify their information.

Q.    Is date of birth one of those?

A.    I believe it is, yes.

Q.    I understand -- it sounds like you may not have reviewed the phone call at issue in this case.  You did take dispute phone calls for many years with Experian; true?

A.    I did for about four years.

Q.    If a consumer called in and said, like, "Hey, this account is not mine," did you receive training to ask additional information like, "What do you mean?  Is it someone else's?  Why are you saying it's not mine"?  Were you trained to follow up with additional questions?

A.    Yes.

MS. DOUGLAS:  Objection, form.

A.    Yes, I was.



Najera vs
Experian Information Solutions

Christina Hamilton

39

Q.    BY MR. RISTVEDT:  So if a consumer were to call in and say, "I'm disputing this account," and you said, "Well, why are you disputing," and they said, "It's not mine," are there circumstances in which you would just take that information only and go, "Okay, good enough for me, I'll move on with the dispute," or would you ask for additional information about why they were making that claim?

MS. DOUGLAS:  Objection, form.

A.    I was trained to ask additional, if they perhaps knew who it belonged to, if they believed they were a victim of fraud, those additional questions.

Q.    BY MR. RISTVEDT:  Is that based on the talk tracks that Experian maintains?

A.    Yes, at the time it was based on those, yes.

Q.    Okay.  I don't have anything further.

MR. RISTVEDT:  Camden, I'll pass the witness.

MS. DOUGLAS:  Experian doesn't have any redirect.

MR. RISTVEDT:  Okay.

Miss Hanssen, we will take an Etran only, a copy, please.  I do not need exhibits, but I will get the exhibits provided for you.

THE REPORTER:  Okay.  And Ms. Douglas?

**Najera vs**
**Experian Information Solutions**                                  **Christina Hamilton**

40

MS. DOUGLAS:  Yes, the same, please.

THE REPORTER:  No exhibits?

MS. DOUGLAS:  No exhibits.

MR. RISTVEDT:  Okay.  Great.

Miss Hamilton, thank you very much for your time, as always.

Camden, I will probably be in touch with you and/or Rebecca today.

MS. DOUGLAS:  Great.  Thank you so much. Thanks, everyone.

(10:24 a.m.)

_____
                              CHRISTINA HAMILTON

41

CERTIFICATE OF CERTIFIED REPORTER

BE IT KNOWN that the foregoing proceedings were taken before me; that the witness before testifying was duly sworn by me to testify to the whole truth; that the foregoing pages are a full, true and accurate record of the proceedings, all done to the best of my skill and ability; that the proceedings were taken down by me in shorthand and thereafter reduced to print under my direction.

I CERTIFY that I am in no way related to any of the parties hereto nor am I in any way interested in the outcome hereof.

[] Review and signature was requested; any changes made by the witness will be attached to the original transcript.

[x] Review and signature was waived/not required.

I CERTIFY that I have complied with the ethical obligations set forth in ACJA 7-206(F)(3) and ACJA 7-206 J(1)(g)(1) and (2). Dated at Phoenix, Arizona, this 12th of December, 2025.

                    /s/ Jennifer Hanssen
                    Jennifer Hanssen, RPR
                    Certified Reporter
                    Arizona CR No. 50165

                 *          *          *          *

I CERTIFY that GRIFFIN GROUP INTERNATIONAL has complied with the ethical obligations set forth in ACJA 7-206 (J)(1)(g)(1) through (6).

                    /s/ Pamela A. Griffin
                    _____
                    GRIFFIN GROUP INTERNATIONAL
                    Registered Reporting Firm
                    Arizona RRF No. R1005



**Griffin Group International**
**888.529.9990 | 602.264.2230**

APPENDIX 1113

**Exhibits**

**HamiltonC 120925 Exh 1**
24:18 29:1

**HamiltonC 120925 Exh 2**
27:12 28:11 29:6 31:10

**HamiltonC 120925 Exh 3**
27:12 28:11 29:6 31:10

**HamiltonC 120925 Exh 4**
28:13 31:15

**0**

**0996**
26:8 29:14 31:8

**1**

**1**
11:22 23:6 24:18 29:1

**10:24**
40:11

**11**
17:19 19:18

**11th**
27:22 28:10,17,21

**14**
18:1

**148**
21:18

**16-page**
23:22 24:5

**16-pager**
21:17

**163**
21:18

**171**
29:7 35:9

**172**
35:13

**18**

36:18,23

**1970**
20:5

**1995**
18:1

**2**

**2**
23:8 25:13 26:17 27:12 28:11 29:6 31:10

**2025**
12:6 13:1,3 17:19 19:18 27:9,13,18 35:9

**20731**
31:6

**24**
5:11

**2581**
33:13

**26591**
24:21 25:6 29:2,8, 13

**3**

**3**
21:13 27:13,18

**30(b)(6)**
4:13

**392**
15:12,14 19:11 32:1,16 33:12

**3924**
20:5

**393**
15:11 24:19

**394**
12:9 16:10

**398**
31:16

**3rd**
13:1 29:3

**4**

**4**
26:23 28:13 31:15

**4637**
33:12

**7**

**76106**
20:6

**7891**
33:13

**8**

**8th**
12:6 27:9

**A**

**a.m.**
40:11

**ability**
5:11,15

**absence**
26:1

**accept**
36:4,7

**access**
14:13

**account**
11:9 19:15 20:13, 17 22:8,13 23:7 24:7,9 32:1 36:23 38:19 39:2

**accounts**
36:24

**accurate**
5:8 11:1 20:20 31:23 32:21

**accurately**
5:12,16

**ACDV**
10:6 36:25

**ACDVS**
6:3 8:11,19

**acting**
14:4

**action**
14:21 15:8 17:6 19:5,7,24 20:3,13

**actions**
4:14 7:8 16:7,19, 23,24

**actively**
13:21

**activity**
13:2

**actual**
17:3 29:23 30:10 35:1

**add**
18:9 24:2

**added**
13:12 14:2

**additional**
10:14 38:20,22 39:7,10,12

**address**
34:16,17

**admin**
8:10,18,25 9:2 10:2,11 26:20 27:2,3,4,5,9 28:1, 18,19,23 29:12 31:13 35:4,5,9,19 36:6

**admonishments**
5:1

**advance**
21:10

**AF**
25:12

**age**
36:18,23

**agent**
12:10,13 13:15 15:23 16:2,11 34:4 38:3

**agree**
6:22 9:7 15:14,24 18:1 25:8,9 27:13, 14 29:2,5,15,16

31:18,19 36:17,20, 25 37:11

**agreed**
36:19

**alcohol**
5:10

**alerts**
18:15

**algorithm**
18:15

**allegation**
7:22,25

**allegations**
9:4

**alleging**
6:25 7:18 27:24

**alright**
15:1 37:10

**and/or**
40:8

**apologies**
14:24

**apologize**
21:10

**apparent**
10:10

**appeared**
19:17

**appearing**
5:24 6:12 9:20

**appears**
7:8 8:3 18:4 29:17 35:19

**applied**
18:24 28:21

**areas**
32:24

**ascertain**
25:18

**aspect**
9:9

**aspects**
6:19

**assigned**
20:18

**assist**



6:18

**assume**
7:11

**attorney**
7:12

**attorneys**
6:18

**authenticate**
38:9

**authentication**
37:22 38:5

**automatically**
34:17

**automation**
38:9

**aware**
6:1 11:3,9 14:5

---

**B**

---

**back**
24:18

**base**
32:11

**based**
9:3 10:2 18:3 20:6
27:15 36:2,9
39:13,15

**basically**
8:14 23:14 28:10

**begin**
7:14

**beginning**
12:10

**begins**
7:11

**begun**
17:20

**behalf**
4:13 14:5

**belief**
23:1

**believed**
39:11

**belong**
24:9

**belonged**
5:24 23:16 39:11

**belonging**
23:1 29:15 30:11
33:16

**belongs**
5:25 10:8 23:7
34:9,18

**biggest**
23:14

**birth**
11:5 17:25 23:10,
18 25:19 37:4,5,
13,16 38:7,11

**block**
14:1,7 17:7 27:16

**blocks**
33:17

**bottom**
12:9 16:20 24:20
35:13

**box**
19:3

**breakers**
15:13,17

**breakup**
14:18

**brought**
7:16

---

**C**

---

**ca914pc**
15:24 16:6

**call**
6:2,5 13:13,17,20
14:14 38:14 39:1

**called**
4:3 23:18 38:18

**calls**
37:18,24,25 38:15

**Camden**
39:17 40:7

**carry**
9:9

**case**
5:19,22 7:16 11:3

19:13 21:4 25:16
36:17 37:11 38:14

**cases**
7:2,3,21

**catch**
8:21

**CDI**
8:10

**certificate**
11:6 37:13

**change**
19:20

**changing**
29:23

**CHRISTINA**
4:1 40:15

**chronological**
16:18,25

**circumstance**
11:16

**circumstances**
39:4

**claim**
10:25 39:8

**clarify**
16:15 27:4 28:20

**clear**
23:7

**co-applicant**
34:23,25 35:14
36:11

**co-applicants**
35:3

**code**
25:12

**coded**
24:24

**combine**
18:11,13,24,25

**communicating**
13:11

**communications**
8:19

**complaint**
9:4 24:13

**complete**

30:22 31:22

**completed**
7:7

**conclude**
24:9

**conclusion**
23:24

**confirm**
33:20

**confirmed**
32:21,25 33:7,16,
19

**connecting**
38:3

**connotes**
17:19

**consequence**
24:14

**consist**
6:23

**consistent**
31:20

**consumed**
5:10

**consumer**
6:19,20,24 7:18
8:18 9:14,18 10:24
13:13 14:4,9 19:20
20:2,10 31:22
32:21,25 33:16,19,
20 34:9,18,20
37:18,24 38:4,18
39:1

**consumer's**
7:13,24 8:3,21,24,
25 9:21 18:17
24:25 29:23 30:4
31:3 32:7 33:25
34:12 35:1,4

**consumers**
7:5 36:22

**contentions**
22:23

**context**
8:7

**continue**
37:3

**continuing**
15:11

**Control**
35:22 36:1

**copy**
39:23

**correct**
4:19,20 6:4,11,13,
15,16 8:22 9:17,23
10:18,21,22 11:2,
10,11 12:7 13:6,9,
24 14:12,20 15:6,
21 16:8,9 17:12,
21,22 18:11,12,18,
20 19:1,11,12
20:15,21 21:23
22:15,16,25 26:4,
9,15 27:7,11,19,
22,23 28:4,8,24
29:10,11 30:13,22
31:1,3,9,12,24
32:7 33:4,13,14,
17,18 36:14 37:17

**corrected**
30:10

**correctly**
8:21 10:16 13:5
16:14 19:21 23:4,
11 30:12 33:2
36:12

**correspondence**
8:10 13:14 21:7,24
22:7 23:15 24:16
32:14 33:22,23

**couple**
5:5 6:2 36:16

**created**
36:23

**credit**
4:15 5:24 6:12,19,
25 7:13 8:3,24
9:13,21 16:8
20:17,25 32:7
34:12,24 36:23

**criteria**
18:21



Najera vs
Experian Information Solutions

Christina Hamilton

**D**

**D/r**
8:9 12:2 14:16
17:2,12 27:15
31:11
**data**
10:15 17:24 18:3,
25 19:9,14 20:4
28:10 30:6 31:11
33:6,9
**date**
13:1 15:9 16:21
17:19,25 23:10,18
25:19 28:18 37:4,
5,15 38:6,11
**dated**
27:9,12,17 28:13
**days**
27:21
**December**
18:1
**delete**
6:11 20:6,12 36:24
37:6
**deleted**
33:1 34:18
**deleting**
20:13
**demonstrates**
25:19
**denote**
14:18
**department**
6:15 12:22 28:1
**depo**
4:21
**deposition**
4:18
**designate**
11:22 21:12 26:16,
23
**designation**
18:14
**determination**
24:17 32:17

**determine**
9:3 10:7 36:9
**determining**
35:14
**differently**
14:10
**differing**
9:10,11,12 10:5
**disassociated**
19:25
**disclosure**
8:9,17 35:18 36:9,
10
**disclosures**
35:7
**displayed**
18:8 28:12
**dispute**
6:2,6,10 8:17,21
10:25 11:1,4,10,12
12:2,5 13:20,22
14:9 17:18 19:19
21:20,21 22:10,12,
17,22,23 23:20,22,
23 24:1,6 37:25
38:3,15 39:6
**disputes**
15:3 36:22
**disputing**
14:13 22:8 39:2,3
**distinct**
14:19
**division**
12:20 13:18
**DNC**
18:9,10,24
**document**
11:23 12:1,8 16:17
21:14,25 23:22
24:6 26:17 28:11
**documentation**
10:6 11:5 22:3,25
23:9 24:8
**documents**
6:7 8:1,2,5,6,14,18
10:12,20,23,24
11:8,12,14,15,19

20:24 21:2,6,20
22:11,22 23:5,6,23
37:12,15 38:1
**double-check**
12:15 35:18
**Douglas**
8:8 9:16,22 10:4,
17 11:18 15:7,20
18:19 22:19,24
23:12 24:3 28:3,15
29:21 30:24 33:3
36:13 37:1,3 38:24
39:9,19,25 40:1,3,
9
**drawn**
19:3
**driver's**
11:5 37:13
**drugs**
5:10
**duly**
4:3
**duties**
6:17

**E**

**earlier**
27:17
**ECA**
12:20 13:3,8,17,22
14:14
**ECAS**
14:11
**effect**
5:3
**effective**
28:17
**eighth**
11:7
**else's**
38:21
**employee**
12:19
**employer**
32:6,15,18
**employers**

33:15
**employment**
32:2,20
**ending**
24:21 26:8 29:14
31:7 33:12
**essentially**
13:7 14:8 18:15
**Etran**
39:22
**evaluation**
11:20
**eventually**
28:12
**everyone's**
36:3
**evidencing**
21:20
**exact**
17:15,17 31:10
**EXAMINATION**
4:6
**examined**
4:4
**excuse**
32:1
**exhibit**
11:22 21:11 24:18
27:12 28:11,13
29:1,6 31:10,15
**exhibits**
39:23,24 40:2,3
**exist**
23:21
**Experian**
4:13 5:19 6:2,10,
21,25 7:11 8:20
10:23 11:13,14
18:14 21:18 24:23
27:24 29:7,19
33:17 35:9,13
36:21,24 37:18,24
38:1,15 39:14,19
**Experian's**
6:14,18 12:20
17:14 18:15 36:16

**EXPERIAN_
NAJERA**
12:9 15:11,13
16:10 19:11 24:19
31:16 32:1,16
33:12
**explicitly**
33:16
**external**
6:18
**externally**
7:12

**F**

**fact**
4:14,21 17:8 18:3
29:8 36:21
**facts**
5:18,22
**fair**
24:2,4 28:14,23
**fairly**
12:14
**familiar**
4:25 5:18
**father**
5:25 20:19 23:8,16
**federal**
13:3
**field**
18:8 34:23
**file**
4:16 5:24 6:12,25
7:6,7,13,17,18 8:3,
16,24 9:5,21
13:15,17 14:6
15:6,9,18 16:8,13
17:21 18:9,17,22
20:18,25 24:17
27:20,25 28:2,7,22
30:4,7,16 32:7,9,
19,22 33:17 34:2,
12,19,21
**filed**
6:24 11:13 13:13
20:23 24:14



**files**
6:19

**find**
35:16,17,21

**finer**
12:4 21:9

**flag**
13:19 18:11,13,24

**follow**
38:22

**football**
11:7

**forced**
14:13

**form**
8:8 9:16,22 10:17
11:18 15:7,20
18:19 22:19,24
24:3 28:3,15 29:21
33:3 36:13 37:1
38:24 39:9

**Fort**
32:3

**forward**
13:3

**forwarded**
14:10

**fraud**
39:12

**full**
24:25 29:24

**fully**
14:5

**furnisher**
10:15

**furnishers**
8:20

---

**G**

---

**gave**
37:12

**generally**
5:18 22:13 24:7

**generated**
6:3

**glaring**
9:25

**good**
4:8,10 39:5

**grade**
11:7

**Great**
40:4,9

**greater**
14:17 15:12,17

**guess**
20:22

---

**H**

---

**Hamilton**
4:1,8 11:24 21:14
40:5,15

**handle**
13:22 15:4

**handled**
13:2

**Hanssen**
21:10 39:22

**happened**
23:21

**head**
12:25

**helpful**
22:18

**Hey**
7:18 8:15 9:25
13:7,20 15:2 22:13
24:7 34:7 38:18

**high**
5:21

**highlighted**
14:18

**hours**
5:11

---

**I**

---

**ID**
15:23 16:11

**ID=C15160A**
12:10

**idea**
32:5

**identification**
17:7 24:21,23
25:20,23 26:11
28:25 29:4,7,18,20
30:3,8,15,20,21
31:6,17

**identified**
19:10 26:1 31:22

**identifies**
25:10

**identify**
10:2

**identifying**
8:4 20:10

**identity**
12:12 16:1

**if-it's-not-
confirmed-block-it**
34:13

**immediately**
26:7,12

**impact**
23:15

**impactful**
22:3,20

**impair**
5:11,15

**inaccuracies**
30:19

**inaccurate**
30:10

**inaudible**
14:23

**included**
11:10

**incomplete**
30:9,19 31:4

**independently**
37:14

**information**
8:4 9:8,12 10:14
18:8,21 20:10
24:12,14,24 25:7
29:24 30:11,19
31:3,11 32:24

34:11,16,17,22
36:4,10 38:10,20
39:5,7

**initial**
25:3

**initially**
13:14

**initiate**
36:22

**initiated**
6:20 14:4

**initiating**
36:25

**inquiry**
27:6

**instance**
7:17 23:9 34:1

**instances**
6:24 9:14,18,24
10:5,13 30:1,14

**instructing**
20:8

**Integrated**
32:2,16 34:7

**interactions**
14:6

**Interiors**
32:2,16 34:8

**internal**
6:18 13:25 18:15
19:19

**internally**
7:12 37:6

**internet**
14:7 17:7

**interrupt**
5:1

**investigate**
7:4,24 11:15

**investigation**
9:9 10:21

**involves**
30:21

**issue**
19:15 36:16 38:14

**item**

17:18 19:20 26:5

**items**
35:1

---

**J**

---

**job**
6:17,23

**jump**
12:9

**June**
13:1,3 17:19 19:18
27:13,18,22 28:10,
17,21 29:3 35:8

---

**K**

---

**key**
27:6

**kind**
10:13 14:7 22:12
28:5 33:1 34:13
35:22

**knew**
37:7 39:11

**knowledge**
16:1

---

**L**

---

**lastly**
36:15

**lawsuit**
11:13 13:3 19:15
20:23 27:24 33:21

**lawsuits**
15:4

**learned**
24:14

**leave**
34:9

**left**
34:21 35:2

**letter**
11:4,10 21:19 23:5
32:10 33:21,25

**level**



5:21

**license**
11:5 37:13

**links**
34:19

**listed**
8:4 34:25 35:4,10
36:11

**lists**
17:24

**litigation**
6:15,20 7:15
12:21,23 13:2,4,
12,21,23 14:3,11,
15 17:7 24:15
27:16,25 33:24

**loaded**
18:22

**loan**
19:10,15 25:11
36:18

**log**
8:9,17 12:2,3,5
14:16 17:2,13
27:15 31:11

**long**
27:3,4,5,6,8 28:19,
23 29:12

**longer**
32:18

**looked**
16:12 17:8 21:2
27:17 28:6 29:1

**lot**
24:2

**M**

**made**
6:1 8:2 22:23 23:7,
15 28:21

**mail**
13:13 22:10

**maintains**
39:14

**make**
5:6 8:13 16:16

21:3 37:23

**makes**
10:10

**making**
8:24 14:8 19:14
24:17 39:7

**Management**
19:10 25:11

**Manuel**
20:4 25:7 26:7
29:9 31:7

**Maria**
17:25 35:10,14,17
36:1,5,10

**matching**
18:16

**meaning**
16:18 25:8,12

**measure**
33:2,7

**medications**
5:14

**mention**
22:5

**mentioned**
10:20 31:21

**merged**
7:1,6

**Metro**
25:13

**middle**
25:3,8 29:9

**mind**
34:14

**mine**
38:19,21 39:4

**minutes**
29:1

**mischaracterizes**
23:12 30:24

**missed**
19:7

**missing**
31:3

**mix**
10:12 11:16 29:22

31:1 32:14,20

**mixed**
7:1,6,17,19 8:16
9:5,14,19 10:3
11:9 27:25 30:5

**moment**
23:20 24:18

**monthly**
25:12

**months**
20:23 27:9 28:13

**morning**
4:8

**mortgage**
5:23 11:7,8 36:18

**move**
39:6

**moved**
19:20 20:9,11

**N**

**NA/OPORTUN**
26:6

**Najera**
5:19 6:1,7 12:5
20:1 21:4,19 22:11
23:5 24:13 29:15
32:11 37:12

**Najera's**
4:15 6:10,12 15:6,
18 16:8,13 17:21,
24 20:14,19,25
23:8,10,22 32:19

**nature**
7:5

**necessarily**
32:8

**needed**
18:17 21:3

**newest**
16:18

**normal**
15:3

**notation**
19:24 25:15

**note**
13:7 15:10

**noted**
30:2

**notified**
8:15

**notify**
7:16

**number**
4:18 9:11,20 23:6,
8 24:21 25:1,4,20,
22,23 26:2,8,11
29:1,3,4,7,9,13,18,
20,25 30:3,15,20,
22,23 31:6,17
33:11 38:6

**numbers**
24:23 30:9 33:10,
12,15 34:1

**O**

**objection**
8:8 9:16,22 10:4,
17 11:18 15:7,20
18:19 22:19,24
23:12 24:3 28:3,15
29:21 30:24 33:3
36:13 37:1 38:24
39:9

**obtained**
24:12

**occasions**
4:19

**occurred**
7:8 11:16 17:6
28:16

**occurring**
14:6

**October**
12:6 27:9 28:18,23
29:12

**offhand**
35:6

**oldest**
16:19

**omission**
26:1

**online**
14:4,9,12

**Orca**
20:5

**order**
7:24 9:9 11:15
16:18,25 17:1,3,
10,15 21:3 24:8

**original**
17:23 18:3 19:9,13

**out-of-wallet**
37:19

**outline**
23:16,17

**P**

**part**
6:23 10:21 12:21
30:5 32:14

**pass**
39:17

**passing**
37:21

**passport**
11:6 37:14

**past**
7:9

**pathword**
26:6

**Pennymac**
6:3

**performed**
4:15 16:25

**person**
8:15 10:3 13:21
23:1 36:17

**person's**
9:5

**personal**
8:4 20:10

**personally**
16:7

**pertinent**
8:1,5,6

**phone**
6:2,5 13:17,20



33:10,11,12,15
34:1 37:18,25
38:10,14,15
**photos**
11:6
**picking**
36:1
**piece**
22:20 23:14 33:10
36:3
**pieces**
9:12 24:24 33:5,9
34:11
**PIN**
17:24 20:14,18
**place**
15:9 17:9 19:4,8
21:12
**plaintiff**
7:21 20:9 24:10
26:20 30:11
**plaintiff's**
11:22 20:17 21:13
26:17,23 30:16
**played**
24:15
**point**
12:4 21:9
**policy**
36:21 37:6
**portion**
10:20 18:5 19:2,5,
9
**post-lit**
8:10
**post-litigation**
8:17 30:8
**posterity**
18:13
**potentially**
24:25 30:9
**precautionary**
33:1,7
**prescription**
5:14
**prevent**
14:3

**previously**
21:7,25
**printed**
12:6 17:2
**prior**
38:1,3
**procedure**
36:16,24
**procedures**
32:14
**process**
7:10,14,24 9:6
15:3,5,18 17:9,16,
20 22:18 24:2 28:2
30:2,18,21 31:20
32:24
**processed**
14:10
**processes**
18:16
**processing**
17:20 19:18 29:22
30:5 31:2 32:20
34:4
**proof**
10:6,12,20,23
11:14 22:3,25
37:4,5,12,15
**prove**
38:5,6
**provide**
5:7
**provided**
7:22 23:9 25:2,24,
25 26:10 32:11
33:23 37:2,4,5
39:24
**pull**
8:16 11:21 13:15
28:1
**pulled**
8:1,6 28:19 31:12
**put**
12:4 21:9 26:22

### Q

**qualify**
37:15
**quality**
33:6
**question**
23:17
**questions**
5:2,5 26:21 36:16
37:19 38:9,22
39:12
**quick**
5:5

### R

**Ramirez**
4:15 5:19 6:1,7,10,
12 11:3 12:5 15:6,
18 16:8,13 17:20,
24 20:1,5,14,19,24
21:4,19 22:11
23:5,8,10,22 24:13
25:7 26:2,7 29:10,
15 31:7 32:11,19
37:12
**Ramirez-najera**
31:18
**reach**
7:15 14:14
**read**
13:5 19:20
**reason**
5:7 19:19
**reassociated**
20:1
**reassociating**
20:18
**Rebecca**
40:8
**recall**
6:5,6
**recalling**
35:6
**receive**
38:19

**received**
8:20 11:13 25:7
29:19
**receives**
24:24 27:24
**record**
5:6 15:13,17
16:11,12,15,22
17:7,14,17,23 18:6
20:16 25:19 32:2,
16 35:3
**records**
14:19 16:6,18,19
27:17 33:11
**red**
14:18 15:16 19:3
**redirect**
39:20
**refer**
21:24
**reference**
8:24 19:14 22:4
33:24
**referenced**
34:20 36:5
**references**
34:23
**referencing**
25:15
**referring**
18:10 22:1,6,14
**refers**
11:14
**reflect**
29:23 30:10 31:2
**reflects**
25:2
**regular**
13:14
**reinvestigations**
14:3
**relate**
15:17 16:7
**relates**
15:2,5 18:17 19:4,
9 20:16

**reliable**
25:14
**relied**
23:6 24:8
**remark**
13:2,12,16 14:1,8
**remark=internet**
13:25
**remember**
20:22,24 21:2
**removal**
30:3
**remove**
30:15 33:7
**removed**
32:6,9,21 34:19
**report**
8:18,25 9:2,13
10:2,11 13:1 25:16
26:20 27:2,9 28:1,
23 34:24 35:4,5,9
36:6
**reported**
25:5
**REPORTER**
39:25 40:2
**represent**
21:17 35:25
**representation**
36:4
**request**
10:14
**requested**
32:9
**requirement**
18:16
**reseller**
22:8,12,17,21
23:20 24:1,6
**respect**
4:15 8:20 18:5
19:2
**response**
6:9 8:17 12:3,5
**responses**
8:19



**Najera vs**
**Experian Information Solutions**

**Christina Hamilton**

**result**
24:13 30:2

**resulting**
6:2 20:13

**results**
28:12,22

**return**
27:12

**returned**
8:12

**reverse**
16:17,25

**review**
7:7 8:2,3 37:25

**reviewed**
38:14

**reviewing**
6:23 8:23,25 20:24
24:16,17

**RISTVEDT**
4:7 8:13 9:18,24
10:9,19 11:21
15:10,22 18:23
22:21 23:3,19 24:5
28:5,20 30:1 31:5
33:5 36:15 37:7
39:1,13,17,21 40:4

**role**
24:15 38:1

**route**
25:16

**row**
29:23

**rows**
29:22 31:2

**rule**
34:13

**Rushmore**
6:3,11 19:10,15
20:17 22:8 24:9
25:11,15,17 26:13

—— **S** ——

**scope**
7:3 10:11 14:16

**screen**

21:12 26:22

**scroll**
15:11

**search**
35:16

**section**
12:10 15:22 24:20

**Security**
9:11,20 25:1,4,22
26:2,8 29:3,8,25
30:23 38:6

**send**
10:6 13:13,22

**separate**
20:1

**separation**
14:20

**Service**
25:11

**Services**
19:10

**sets**
15:16

**showed**
31:14

**shows**
29:24

**significance**
14:1

**similar**
5:25 9:15 14:8
23:2,16 33:6

**similarly**
34:6

**simply**
22:8 30:2,15

**skipping**
21:11

**snapshot**
28:6

**Social**
9:11,20 10:1 25:1,
4,5,22 26:2,8,10,
13 29:3,8,14,15,
17,19,25 30:23
31:7 38:6

**soft**
20:6,12

**sort**
7:13 9:3,25 16:12
24:6 27:16 38:4

**sound**
4:22

**sounds**
36:8 38:13

**source**
25:14

**speak**
10:24 13:15

**special**
15:4

**specialist**
12:23

**specific**
9:8 16:21 17:3

**specifically**
32:25

**spouse**
17:25 34:22,23
35:10

**standard**
30:18

**started**
28:7

**stated**
19:7

**statement**
27:25

**states**
5:24

**step**
7:23 9:5 10:14

**steps**
17:10

**stop**
14:12

**Street**
20:5

**strict**
18:16

**stricter**
18:20

**subject**
7:6 11:9 34:12
37:19

**subscriber**
25:16

**substantiate**
10:12,25 22:22

**substantiating**
21:21

**sued**
13:8

**sufficient**
23:23 34:2,8 37:15

**suing**
8:15

**suit**
6:24

**support**
6:15 7:16 12:21,23
28:1

**sworn**
4:4

**Sylvia**
12:18

**symbols**
14:17

**system**
17:14 20:8 38:8

—— **T** ——

**taking**
5:14 20:17 28:10

**talk**
8:23 32:15 39:13

**talking**
35:22

**team**
11:7 13:4,23
14:11,14,15

**termination**
32:12

**testified**
4:4

**testify**
5:11,15

**testifying**
4:13,14

**testimony**
5:8 10:15 13:23
17:11 22:17 23:4,
13 30:12,25 36:12

**Texas**
20:5 32:3

**thing**
35:23

**things**
5:2 9:1 23:9 38:7

**thinking**
12:15

**tied**
9:12

**time**
7:18 19:17,18
21:11 31:14 34:4
36:3 39:15 40:6

**timeline**
27:15,22

**title**
12:24,25

**today**
4:9,12 5:8 27:10
40:8

**told**
7:17

**top**
12:25 15:13 16:19
19:11 27:6 32:1

**touch**
10:19 40:7

**tracks**
39:14

**tradeline**
6:11 19:14,25 20:9
23:17 25:12 26:13

**tradelines**
35:13,15,17,20
36:6,11

**trained**
38:22 39:10

**training**
38:19



**Griffin Group International**
**888.529.9990 | 602.264.2230**

Index: result..training

**Najera vs**
**Experian Information Solutions**

**Christina Hamilton**

**transfer**
13:17

**tree**
38:10

**true**
6:17 7:3 8:25 9:15,
21 11:17 12:6
14:11,19 16:20,21
18:25 25:1,13
26:14 27:25 31:8
38:1,16

**truthful**
5:8

**truthfully**
5:12,15

**turn**
29:12

**typical**
4:25

**typically**
7:14

———————

**U**

———————

**ultimately**
27:20

**unable**
5:7

**underlying**
11:8

**understand**
4:12 5:2,22,23
6:14 8:23 12:1
14:16 16:17 18:4
19:13,23 20:6
26:19 27:1,5,16
32:5 37:24 38:13

**understanding**
4:16 6:9,13,19
16:13 19:16 20:3
21:21 22:16

**understood**
10:15 13:23 23:3,
10 30:12 33:2 34:3
36:12

**unique**
18:14

**universe**
8:14

**unmix**
27:20 28:10 30:7

**unmixing**
15:5,18 17:5,9,10,
16,20 18:5 28:2
30:2,20 32:24

**update**
6:11 18:24 20:4
25:13 28:16

**updated**
31:18

**updating**
20:24 28:11 30:21
31:21

**urgent**
13:2 14:8

**utilize**
11:19

———————

**V**

———————

**Vargas**
12:18,19

**variation**
9:11

**verify**
38:10

**victim**
39:12

**Victor**
5:19 20:4,19 25:7
26:6 29:9 31:6

**virtue**
18:24 27:5

**visibly**
10:7

**visually**
10:10

———————

**W**

———————

**walk**
7:10

**waste**
36:2

**week**
27:21 28:9

**weeks**
4:22

**word**
27:6

**words**
17:5 20:16 24:1
26:5,10 33:25

**work**
6:14 28:7 34:7

**working**
12:19 33:22

**works**
12:22

**Worth**
20:5 32:3

**written**
6:6,10 11:4

**wrong**
32:6,8

———————

**Y**

———————

**year**
17:25

**years**
38:15,17



**Griffin Group International**
**888.529.9990 | 602.264.2230**

# EXHIBIT N

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| VICTOR MANUEL RAMIREZ NAJERA, | Case No.: 4:25-cv-443 |
| Plaintiff, | |
| v. | **DECLARATION OF PAOLA ESPINOZA** |
| EXPERIAN INFORMATION SOLUTIONS, INC.; APPFOLIO, INC.; and NATIONSTAR MORTGAGE LLC d/b/a RUSHMORE SERVICING. | |
| Defendant. | |

I, Paola Espinoza, declare as follows:

1.  I have personal knowledge of the facts stated in this declaration and, if called to testify, could and would competently testify thereto.

2.  I am the fiancée of Victor Manuel Ramirez Najera.

3.  In June 2023, I gave birth to our first child. Around that time, Victor and I were trying to move into a place of our own so that we could have our own space as a family.

4.  In or around mid-2023, Victor applied for an apartment at Hartford House Apartments. His application was denied. My understanding at the time was that the denial was related to an issue with Victor's credit.

5.  Because we were unable to obtain approval to live at Hartford House Apartments, Victor, our son Mateo, and I moved into a studio apartment above a garage in or around August 2023. The studio was owned by a family friend. We ultimately paid more in rent for the studio than we would have paid for the apartment at Hartford House.

1

6. While we were living in the garage studio, sometime in late 2023 and/or early 2024, Victor and I became aware that a mortgage belonging to Victor's parents was appearing on Victor's credit report.

7. I recall that Victor was extremely confused and anxious about how his parents' mortgage could be reporting on his credit report. Prior to this issue, Victor typically spent his time after work with me and our son. During this period, however, when Victor came home from work, he would often go directly to his computer to try to understand how the mortgage appeared on his credit report and what he could do to fix the issue.

8. During this time, I observed that Victor was noticeably stressed and worried. This was unusual, as Victor is generally calm and not prone to stress or anxiety in this manner.

9. I also observed changes in Victor's sleep during this period. On multiple occasions, I observed Victor grinding his teeth while sleeping, something I had never observed before he learned of the mortgage on his credit report. I also observed that he had difficulty sleeping, including tossing and turning and waking up during the night. I was frequently awake during the night feeding and caring for our infant son, which allowed me to observe these changes.

10. This behavior continued for several months. In or around March 2024, Victor went to the emergency room because he was experiencing ongoing chest pain and believed he might be having a heart attack. After that visit, Victor told me that he needed to try to stay calm and not let the credit reporting issue affect his health. He also told me that he planned to wait until we returned to Texas to submit a dispute and provide documentation showing that the mortgage was not his.

- 2 -

11. In or around June 2024, Victor, our son, and I moved from Tennessee to Texas. We drove from Tennessee to Texas in one trip. When we arrived at Victor's parents' home after a long day of driving, Victor immediately began gathering and organizing documents related to the mortgage, including documents showing that he was a young teenager at the time the mortgage was taken out. I found this unusual because, instead of resting after the drive or spending time with his family, Victor focused on collecting documents.

12. After Victor compiled the documents and submitted a dispute letter to Experian, I observed a noticeable change in his behavior. He appeared calmer and more like himself. It seemed that the stress had eased because he felt confident that the documents he submitted would show that the mortgage did not belong to him.

13. That changed after Victor received the dispute results indicating that the mortgage would remain on his credit report. I remember this clearly. Victor was at work when the mail arrived. We were staying at his parents' home, and his mother gave me Victor's mail. I noticed a letter from Experian and waited for Victor to return home so he could open it.

14. When Victor came home, I sat next to him as he opened the letter. After reading it, Victor became visibly upset and raised his voice, saying that it was not possible for Experian to leave the mortgage on his credit report. This behavior was unusual for Victor, as he is not someone who typically displays anger. He expressed frustration and repeatedly said that he did not know what else he could do to prove that the mortgage was not his.

15. After receiving the dispute results, I observed that Victor once again became withdrawn and spent much of his time after work on his computer researching whether there was anything else he could do to remove the mortgage from his credit report.

- 3 -

- 4 -

I swear under penalty of perjury that the foregoing is true and correct to the best of my knowledge and recollection.

Dated: 22/12/25 _____

_____
Paola Espinoza Moreno (Dec 22, 2025 12:04:14 CST)

Paola Espinoza

# EXHIBIT O

# FILED UNDER SEAL

(Appendix 1127-1147)

# EXHIBIT P

**In the Matter Of:**

NAJERA V. EXPERIAN

4:25-CV-00443-P

**PAOLA ESPINOZA**

*November 14, 2025*



800.211.DEPO (3376)
*EsquireSolutions.com*

APPENDIX 1149

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

VICTOR MANUEL RAMIREZ NAJERA, §
                               §
      PLAINTIFF,               §
                               §
VS.                            §    CASE NO.
                               §    4:25-CV-00443-P
EXPERIAN INFORMATION SOLUTIONS, §
INC.; APPFOLIO, INC.; AND       §
NATIONSTAR MORTGAGE LLC d/b/a   §
RUSHMORE SERVICING,            §
                               §
      DEFENDANTS.              §

*************************************************

ORAL AND VIDEOTAPED DEPOSITION OF

PAOLA ESPINOZA

NOVEMBER 14, 2025

*************************************************

ORAL DEPOSITION OF PAOLA ESPINOZA, produced as a witness at the instance of the DEFENDANTS, and duly sworn, was taken in the above-styled and numbered cause on the 14th day of November, 2025, from 2:00 p.m. to 4:18 p.m., before Angelica Robledo, CSR in and for the State of Texas, reported remotely by machine shorthand, via Zoom videoconference, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.



800.211.DEPO (3376)
EsquireSolutions.com

APPENDIX 1150

A P P E A R A N C E S

FOR THE PLAINTIFF:

    MR. YOUSSEF HAMMOUD (APPEARED REMOTELY)
THE CREDIT ATTORNEY
601 North Parkcenter Drive, Suite 202
Santa Ana, CA 92705
(949)301-9692
yhammoud@thecreditattorney.com

FOR THE DEFENDANT EXPERIAN INFORMATION SOLUTIONS, INC.:

    MR. TIMOTHY J. O'DONNELL III (APPEARED REMOTELY)
MS. REBECCA W. ANTHONY (APPEARED REMOTELY)
JONES DAY
2727 North Harwood Street, 5th Floor
Dallas, Texas 75201
(214)969-5104
joeyodonnell@jonesday.com
ranthony@jonesday.com



APPENDIX 1151

```
                              INDEX

                                                    PAGE

Appearances.................................    2

PAOLA ESPINOZA
      Examination by Mr. O'Donnell..........    5


Changes and Signature.......................   74

Reporter's Certificate......................   76



                            EXHIBITS

NO. DESCRIPTION                                    PAGE

01. Medical Record/Doctor's Notes...........   41

02. Credit Report...........................   48

03. Plaintiff's Complaint...................   58

04. Dispute Report Document.................   62

05. Letter..................................   66

06. Mailed in Dispute Document..............   68
```



800.211.DEPO (3376)
EsquireSolutions.com

P R O C E E D I N G S

(Proceedings began at 2:00 p.m.)

THE REPORTER:  We are on the record. Today's date is Friday, November 14th, 2025.  The time is now 2:00 p.m.  This is the oral deposition of Paola Espinoza.

My name is Angelica Robledo, Texas CSR No. 8002.  I am administering the oath and reporting the deposition remotely by stenographic writing from Dallas County, Texas.

The witness is located in Fort Worth, Texas, and identity has been attested to by counsel prior to going on the record.

Counsel, please state your appearances for the record, after which I will swear in the witness.

MR. HAMMOUD:  Youssef Hammoud on behalf of the witness, Ms. Paola Espinoza, and also counsel for the Plaintiff in this matter, Mr. Ramirez Najera.

MR. O'DONNELL:  Joey O'Donnell for the Defendant, Experian Information Solutions, Incorporated, the Defendant in this case.  And to be joined later by my colleague, Ms. Rebecca Anthony, also to represent Experian Information Solutions, Incorporated.

THE REPORTER:  Ms. Espinoza, will you please raise your right hand.



800.211.DEPO (3376)
EsquireSolutions.com

APPENDIX 1153

(The witness was sworn.)

PAOLA ESPINOZA,

having been first duly sworn, testified as follows:

EXAMINATION

BY MR. O'DONNELL:

Q    Can you please state and spell your name for the record?

A    Yes.  Paola, P-A-O-L-A, Espinoza, E-S-P-I-N-O-Z-A.

Q    Good afternoon, Ms. Espinoza.  And is it all right if I call you Ms. Espinoza?  Is that fine?  Or would you prefer anything else?

A    Yes.  Yes.

Q    And what is your current address?

A    ███████████████████████ -- I'm sorry, it's just I don't know the address all the way.

Q    That's okay.  As much as you --

A    I think it's ████████████████.

Q    And is that in Forest Hill, Texas?

A    Forest Hill, Texas.

Q    And just as a preliminary matter, if I use Experian, will you understand that I'm referring to Experian Information Solutions, Incorporated, the Defendant in this case?

A    Yes.  Yes.  Yes.



Q   Okay.  Great.  Have you ever testified under oath before?

A   No.

Q   Have you ever been deposed before?

A   No.

Q   Okay.  I'm just going to walk through a little bit -- a few basics about how a deposition works, how this is going to go.

Do you understand that you're fully under oath today and required to respond to my questions truthfully just as if you were before a judge and a jury?

A   Yes.

Q   Do you understand that your testimony today can be used just as if it were testimony in court?

A   Yes.

Q   So our questions and answers today will be recorded by a court reporter.  Because of that, it's important that we both don't speak at the same time.  So I ask that you do your best to wait for me to finish my question before you respond, and in turn, I'll do my best to wait for you to finish your answer before I ask anything else.  Does that sound fair?

A   Yes.

Q   And, of course, opposing counsel is entitled to make objections after I finish my questions to you.  In



the event that he does pose an objection, you should still answer the question unless he specifically instructs you not to respond.  Do you understand that?

A    Yes.

Q    Similarly, because the court -- the court reporter is transcribing what we are saying here today, I'll ask that you keep your responses audible.  So yeses and nos rather than shaking your head or nodding.  Does that sound fair?

A    Yes.

Q    If at any point you don't understand something that I'm saying or you want me to rephrase the question, just please let me know, and I would be more than happy to do that.  If you don't stop me, I'll assume that you understood the question when you answer.  Does that sound fair?

A    Yes.

Q    Also, if you want to take a break, please just let me know.  I just ask that, if there's a question pending, you would answer that question first before we take the break.  Do you understand that?

A    Okay.  Yes.

Q    Sometimes you may give an answer as completely as you can in the moment.  And then some time later on -- maybe it's five minutes, maybe it's two hours -- you



remember some additional information that changes or modifies your answer a little bit.  I'd ask that, if that happens to you, just please tell me that you'd like to add something to that earlier answer and we can do that right then.  Okay?

A    Okay.

Q    And then a few more just preliminary questions. Is there any reason that you can't give your best testimony today?

A    No.

Q    Are you taking any medications that might make it difficult for you to understand and answer my questions today?

A    No.

Q    Have you consumed any alcohol today?

A    No.

Q    Any drugs?

A    No.

Q    Got to check it off, you know.  Not that I suspect you of that.

Are you at all sick today?

A    No.

Q    Is there any reason you could not answer truthfully and accurately today?

A    No.



Q    What have you done to prepare for this deposition?

A    I joined Youssef yesterday for a call.

Q    Okay.  Is that the only time you've talked with him or have you talked with him previously?

A    We talked the day before.  That's when he let me know that this was going to happen.

Q    Okay.  Are you represented by counsel today?

A    Yes.

Q    By Mr. Hammoud?

A    Yes.

Q    So you said you talked yesterday?

A    Yes.

Q    For how long did you talk?

A    It was around an hour.

Q    Did you discuss the substance of the case with Mr. Hammoud?

A    Yes.

        MR. HAMMOUD:  Objection.  Hold on, Paola.

        Mr. O'Donnell, you're welcome to ask her if she met with me and talked, but you can't inquire into any communications or anything that we had -- we talked about amongst one another.

        MR. O'DONNELL:  I'm sorry.  Just to clarify, I'm not asking about the details of those



conversations, just that you talk about the case.

MR. HAMMOUD:  You can -- you can ask that -- that we -- we met to discuss, you know, this deposition, and that's about it.

Q   (BY MR. O'DONNELL)  Okay.  So you met to discuss this deposition?

A   Correct.

Q   Have you reviewed any documents in preparation for today's deposition?

A   No.

Q   Have you watched a recording of any other deposition?

A   No.

Q   Did you take any notes during your meeting yesterday with Mr. Hammoud?

A   No.

Q   Were you provided with any notes?

A   No.

Q   Have you talked with anyone else about this case?

A   No, not really.

Q   Have you done anything else to prepare?

A   No.

Q   And, then, do you have any documents or notes with you today?



A    No.

Q    Okay.  So I'm just going to go into a little bit of biographical information and learn a little bit about you.

A    Okay.

Q    So, to start with, how old are you, Ms. Espinoza?

A    I'm 21.

Q    21.  And can you give me your date of birth?

A    Yes.  It's 01/29/2004.

Q    And I already asked for you name, but could you give me your full name?

A    Yes.  Paola Espinoza Moreno.

Q    Are you married, Ms. Espinoza?

A    No.

Q    Are you engaged?

A    Yes.

Q    What's your fiancé's name?

A    Victor Ramirez.

Q    And he's the Plaintiff in this case, right?

A    Correct.

Q    What name does he go by?

A    Victor Ramirez.

Q    Does he have any nicknames?

A    His parents and his family call him Vio.



Q    And if I refer to him intermittently throughout this deposition as Mr. Ramirez, will that be clear -- would it be easier for me to --

A    Yes.

Q    Okay.  Would it be easier for me to refer to him by any other name?

A    Victor.

Q    Victor?  I'll do that.

How long have you and Victor been together?

A    It would be, like, three years.

Q    When did you meet?

A    We met in 2022.

Q    And is that when you began dating, in 2022?

A    Yes.

Q    When did you get engaged?

A    This past December.

Q    So would that be December of 2024?

A    Yes.

Q    Well, congratulations, first off.

A    Thank you.

Q    Where did the -- where did the two of you meet?

A    In Nashville, Tennessee.

Q    Are you originally from Tennessee?

A    Yes.

Q    Do you live in -- but you live in Texas now?



A    Yes.

Q    What brought you to Texas?

A    Victor and his family.

Q    So y'all moved together?

A    Yes.

Q    Do you have any children?

A    Yes.  I have a son.

Q    One son.  With Mr. Ramirez?  Or Victor?

A    Yes, correct.

Q    What's your son's name?

A    Mateo.

Q    Okay.  And how old is Mateo?

A    He's two.

Q    Do you currently live with Victor?

A    Yes.

Q    When did you start living together?

A    We started living together when -- maybe a month before Mateo was born.

Q    And when was Mateo born?

A    He was born in June of 2023.

Q    So fair to say you started living together around May of 2023?

A    Sure.

Q    And is your current address the Dorsey address that you gave earlier --



A    Yes.

Q    -- in Forest, Texas -- or, sorry, Forest Hill, Texas?

A    Correct.

Q    How long have you lived at this current address?

A    I'd say around four months.

Q    Fair to say that you moved in sometime around June 2025?

A    Yes.

Q    Do -- let me rephrase that.

Who do you live with at your current address?

A    I live with Victor, my fiancé; my son; and part-time with my stepdaughter.

Q    When you say "part-time," how often is your stepdaughter living with you?

A    She's with us two weeks per month.  But it's every other week.

Q    And what's the name of your stepdaughter?

MR. HAMMOUD:  Objection, form.

A    Sofia (phonetic).

Q    (BY MR. O'DONNELL)  Did you say "Sofia"?

A    Correct.

Q    And for clarity, would you mind spelling Mateo, your son's name, for me as well?



A    It's M-A-T-E-O.  Is it?  I don't know.

Q    And your current address on Dorsey Street, do you own or rent that property?

A    Victor owns it.

Q    So Victor, your fiancé, owns it?

A    Yes.

Q    Do you know which bank the mortgage is with?

A    No.

Q    Okay.  Where did you live prior to your current address?

A    We lived at his parents' house.

Q    Do you recall the street address of Victor's parents' house?

A    Yes.  It's ███████████████.

Q    And that's in Fort Worth, Texas, correct?

A    Fort Worth, Texas, correct.

Q    How long did you live at that address?

A    About a year.

Q    Do you remember the date range?

A    No.

Q    Was it somewhere, roughly, from June 2024 to June 2025?

A    I would say so, probably.

Q    Okay.  Did you own or rent that property?

A    No.  It's his parents' house.



Q    So Victor's parents own the property?

A    Yes.

Q    Okay.  And do you know which bank or mortgage it was through for his parents' house?

A    No.

Q    And who lived with you at -- at this address?

A    His parents and Victor, my stepdaughter, my son, and I.

Q    And so both Victor's parents, his mom and his dad?

A    Correct.

Q    I think I forgot to ask this earlier.  What -- how old is your stepdaughter?

A    She is eight this year.

Q    She's eight.

Okay.  And I hope this isn't getting a little too repetitive, but where were you living before that?

A    Before his parents' house?

Q    Yes.

A    We were living at my parents' house.

Q    Your parents' house?  And could you give me the street address for your parents' house?

A    My parents' house is ███████████

Q    And how long did you live at that address?



A    Before we moved, I would say it was around three months.

Q    So you moved from your parents' house to Victor's parents' house sometime around June 2024?

A    Yes.  It was before my son's birthday.

Q    And then you were at your parents' house for a total of three months, so that would bring it back to around March of 2024; is that correct?

A    Possibly.  I don't recall entirely.

Q    And then -- well, let's get this.  Who lived with you at this address?

A    My parents, my youngest brother, Victor, and my son and I.

Q    What's your younger brother's name?

A    Alberto.

Q    And how old was Alberto while you were living there?

A    If this was last year, he was 9 or 10.

Q    And then do your parents own that property?

A    Yes.

Q    Did you, I don't know, pay any sort of rent to your parents or anything like that?

A    No.  We just bought food.

Q    Got you.  And how would you describe your time there in general?



A    It was nice to have my parents, like, support us during that time.

Q    How did you feel the help was appreciated?

MR. HAMMOUD:  Objection, form.

A    Well, at -- at that point, my son was very young.  So, you know, my parents would, like, help us watch him, and it was just everyone was very hands-on with him.

Q    (BY MR. O'DONNELL)  I guess to phrase my question in a slightly different way, what support did you feel like you needed?

A    Well, support that you would use after having a child, postpartum, new parents, you know.  Emotional support, I guess.

Q    Okay.  One more time.  Where are you at prior to living with your parents at the ███████ address?

A    Prior to that, we were living at a small studio, I guess.  Studio apartment.

Q    And was that in Tennessee?

A    Yes.

Q    Do you recall the address of that?

A    I don't.

Q    How long were you at this address?

A    I don't recall.

Q    Was it a year?



A    No, it was less than a year.

Q    Less than a year?

A    Uh-huh.

Q    And I think Victor, at some point in his deposition, mentioned a unit that was sort of above a garage.  Was this the --

A    Yes, this is the studio apartment we're talking about.

Q    And so in -- in March of 2023, you either would have been at this address or at your parents' house?

A    Correct.

        MR. HAMMOUD:  Objection, form.  Do you mean -- do you mean 2024, Mr. O'Donnell?  You said March 2023.

        MR. O'DONNELL:  Sorry.  I -- I did mean 2024.  Thank you for correcting me.

        THE WITNESS:  Okay.

        MR. HAMMOUD:  So you can strike my objection, then.

Q    (BY MR. O'DONNELL)  And who lived with you at this address?

A    It was just Victor, my son, and I.

Q    And do you recall how old your son, Mateo, was while living here?

A    Yes.  Maybe around six months.  Four,



six months.

Q   And did you rent or own this property?

A   We rented.

Q   And do you remember how much rent was?

A   No.

Q   Do you remember a ballpark estimate?

A   It was, like, above -- a little above a thousand.

Q   Okay.  So around this time frame, around March of 2024, where was Mr. -- where was Mr. Ramirez working?

A   2024, he was working -- I don't recall the name of the company, but he was working for a construction company.

Q   Okay.  How much was he making?

A   I don't know.  He was making pretty good money, though.

Q   Can you give a ballpark estimate?

A   I don't know.  I just remember he was getting a lot of, like, raises at his job.  It was a really nice job.

Q   How frequent were the raises?

A   I would say every other month.

Q   How much a month generally -- strike that.

Do you recall how much in a single paycheck Victor was typically making?



APPENDIX 1169

A    I don't.  I remember at one point it had to be, per hour, about $28.  And it kept going up from there.

Q    So if he was getting raises, he was probably doing pretty good work.  Was he working a lot, would you say?

A    No.  It was regular hours.  That's why it was a good job.

Q    What do you mean by "regular hours"?

A    Regular, like, he would get off pretty early unless he was doing overtime.  Get off around, like, 2:00 p.m., overtime maybe 6:00.

Q    And when would he typically start?

A    He would start Mondays at around 5:00.

Q    5:00 a.m.?

A    Yes, 5:00 a.m.  5:00 or 6:00.

Q    And what weekdays would he typically work?

A    Monday through Friday.

Q    Did he feel like he was overworked?

A    No.  Like, the job -- the company was really good, and it was a really nice company.  They would take care of their workers.  So he would love, like, going to work.

Q    Did he ever -- ever complain about work?

A    No.  He complains about, like, past jobs compared to that one.



Q   No trouble with coworkers, anything like that?

A   No.  He had really good coworkers.

Q   At the time, was he working on any big projects?  Anything with a deadline coming up?

A   I think all construction projects are that way, so, I guess.

Q   Did he express to you that he was stressed out about any of these deadlines?

A   No.  He -- he loves his job.  He loved, especially, that job.  And he was -- he took pride in being really efficient.  So he never was stressed out about it.

Q   So you might have mentioned, but how old was Mateo at this time, around March of 2024?

A   He was maybe eight months.

Q   Eight months?

A   Eight months.  I couldn't tell you exactly.  I'd have to think on it.

Q   Did he have a consistent sleep schedule or was it somewhat erratic?

A   No.  He was -- he would go to sleep very early, actually.

Q   What do you mean by "very early"?

A   7:00 p.m.

Q   And would he typically sleep through the night



or would he ever wake up in the middle of the night?

A    He was exclusively nursing.  He would wake up to eat.

Q    How frequently would he wake up?

A    I don't recall.  We would co-sleep.

Q    Could you give me a --

A    We barely notice.

Q    Are we talking three times a night?  More? Less?

A    Maybe twice, and then sometimes it would be more often.

Q    And would Victor also wake up, help, get you what you needed, and help soothe Mateo?

A    No.  I was exclusively nursing, so he wouldn't need to wake up.

Q    He would never wake up?

A    No.

Q    There was never a time when maybe Mateo got a little fussy, started crying?

A    He never really did.  I would just nurse him and he would just go back to sleep.

Q    Did you feel like you were getting enough sleep at the time?

A    Yes.  I think the co-sleeping really helped.  I wouldn't have to get up at night.



Q    Did you have trouble sleeping earlier on when Mateo was a little bit younger?

A    Probably when he was a newborn.

Q    When did that stop being a problem?

A    Past the newborn stage.  I would say maybe around three months.

Q    Around three months?

A    Probably so.

Q    So from three months to eight months, he would sleep through the night.  No problem other than, like you said, waking up a little bit for some feedings, but never crying, never waking anyone else up?

A    No.

Q    Did Mateo have any medical concerns?  Any issues?  Or was it smooth sailing as far as health went from birth to about eight months?

A    Yeah, it was pretty smooth.  He had eczema, but...

Q    Did he receive --

MR. HAMMOUD:  Sorry.  Sorry.  Just I didn't here what Ms. Espinoza said.  Did you say "eczema"?

THE WITNESS:  Yes.

MR. HAMMOUD:  Okay.

Q    (BY MR. O'DONNELL)  Did Mateo receive treatment for eczema?



800.211.DEPO (3376)
EsquireSolutions.com

APPENDIX 1173

A    No.  We just -- I would make like shea butter things and it just went away with that.

Q    And was that pretty much an effective treatment?

A    Yes.

Q    Well, I'm -- I'm glad to hear that.

A    Yeah.

Q    Did you have, during that time, any lingering complications from pregnancy or birth?

A    No.

Q    How would you describe Victor as a father?

A    He's a really good dad.  He's really patient.

Q    Would it be fair to say that he wants to provide the best for both you and for Mateo?

A    Yes, for his two kids and I.

Q    Fair to say he's concerned for your wellbeing?

A    Yes.

Q    Fair to say that it might distress him if he felt like he couldn't totally provide for you?

A    I wouldn't know.

Q    But you think he wants to provide the best life for you that he can, right?

A    Correct.

Q    So if for whatever reason he couldn't do that as much as he wanted to, do you think that would weigh on him or cause him any negative feelings?



A    Yes, of course.

Q    So March 2024 time period, how would you describe your family's financial situation?  You -- and to describe your family, I guess in particular I mean you, Victor, and Mateo.

A    Uh-huh.  I don't recall.  I think maybe around that time -- you said when?

Q    Around --

A    2024?

Q    -- March of 2024?

A    If that was when we were at my parents' house, everything was well.  I mean, financially, since he moved back to Tennessee from Texas and he got that job, everything was well financially.  And he really liked his job.

Q    What about when you weren't at your parents' house but just previous to that, when you were at the studio apartment?

A    It was fine, too.  I mean, the -- it was manageable, like, all the bills and everything considering he had a good job and it paid well.

Q    And by "manageable," do you mean everything getting paid on time?

A    Yes.

Q    What prompted you to go from the studio



apartment to moving in with your parents?

A   It was so we could save the money that we were spending on the rent, so we could move back to Texas.

Q   So when you say that you were saving the money to move back to -- to move back to Texas, what exactly do you mean by that?

A   That if we didn't pay rent, we could put the money aside to pay the moving cost.

Q   Was it exclusively for moving costs or for anything else?

A   It was just moving costs, really.  And just to have, like, you know, savings.

Q   So you said finances were manageable in terms of being able to pay bills and everything.  What about were there things that you wanted to buy that you felt like you couldn't?

A   Not really, no.

Q   Were there any clothes or maybe toys for Mateo that you wanted to buy but didn't feel like you were in a good enough financial spot to do that?

A   No.  We always would, like, buy him clothes and shoes, toys.

Q   And Victor has -- you mentioned he has another child, correct?

A   Yes, correct.



Q    Who was born before Mateo was?

A    Yes.  Correct.

Q    Do you know the name of that child?

A    Yes.  Sofia.

MR. HAMMOUD:  Asked and answered.

Q    (BY MR. O'DONNELL)  Oh.  That's -- that's Sofia?

A    Uh-huh.

Q    Got it.  I apologize.  I was confused earlier when -- but I -- I under -- I understand now. That's Sofia.  Okay.

A    Yes.

Q    How old was Sofia around -- around March 2024?

A    She was -- this was last year.  She's eight now. She has -- had to be seven or six.  Possibly six, yeah.

Q    And was Victor supporting Sofia financially at that time?

A    Yes.

Q    Do you recall how much -- how many dollars a month, typically, he would spend supporting her?

A    It was around 150 a week.

Q    $150 a week?

A    Yes.

Q    And -- excuse me -- even though you and Victor and Mateo were in Tennessee, Sofia was in Texas at that time, right?



A    Yes.  Correct.

Q    How often would Victor get to visit with Sofia?

A    It would be around every month or so.

Q    And did he go back to see her?  Did she come to Tennessee?

A    He would fly here to Texas.  And she went to Tennessee one time when Mateo was born.

Q    And he would visit about once a month; is that right?

A    Yes.

Q    Did he express ever wanting to visit more often?

A    No.  But it was the reason that we moved back, to be able to spend more time with her.

Q    So did it cause him any distress or any negative emotions that he only got to see her about once -- once a month?

A    He was sometimes upset, but we knew we were, you know, making plans to move back.  So it was not really weighing heavy on him.

Q    But he was concerned about getting to see her more often?

A    Probably so.

Q    That was a priority of -- of yours?

A    Yeah, I would say.  Maybe.

Q    And do you know what Victor's relationship is --



is like with -- with Sofia's mom?  Are they cordial?  Are they friendly?  Are they on good terms?

A    They're on good terms, yeah.

Q    How much did they interact?

A    During what time?

Q    Sorry.  Around that same time period, March 2024?

A    I mean, they would text back and forth.  He would call so he could talk to Sofia; so...

Q    Did they seem to get along well enough given the circumstances?

A    Yeah, they did.

Q    You know, did -- did they ever fight?  Did they ever have any disagreements?

A    No, not really.

Q    Nothing?

A    Maybe when something would, like, come up and she needed maybe, like, help getting her picked up from school.  And she would call him to, like, arrange the pickup.  Maybe call his mom to pick her up.  Something like that.

Q    Did he ever -- when she was expressing criticism maybe that he help more or help facilitate rides to school, did he talk to you about that?

              MR. HAMMOUD:  Objection.  Assuming facts



not in evidence.

A    Yes.

Q    (BY MR. O'DONNELL)  Did he seem frustrated?

A    No.  He would just call for help.  Call his mom for help, and his mom would handle it.

Q    Did it seem to weigh on him at all?

A    No.  It wasn't really, like, a big problem.

Q    Even, you know, little things can add up.  So that, having to call his parents and arrange that, it didn't really add to his mental strain or anything like that?

A    I don't think so. His mom, like, she tries to help out a lot.  So a lot of the times, like, he wouldn't even, like, worry about that too much.

Q    Does he feel comfortable asking for help?

A    His mom, yes.

Q    He feels comfortable asking his mom for help?

A    Yes.

Q    He doesn't think he's imposing a burden or anything like that?  Maybe feel a little uncomfortable, but does it out of necessity?

A    No.  Not with his mom, no.

Q    And during that time frame, you were in the studio apartment.  You moved to -- excuse me -- your parents' house.  How would you say Victor's relationship



with your parents was?

A    Really good.

Q    Really good.  Was it -- has it always been good?
Was it ever not good?

A    Yes.  Yes, since they meet him.

Q    It's always been good since they met him?

A    Yes.

Q    Never argued?

A    No.  Neither sides are, like, the type to argue;
so...

Q    Never, you know, complained about his future
in-laws, nothing like that?

A    No.

MR. HAMMOUD:  Lucky him.

Q    (BY MR. O'DONNELL)  So they -- did they -- so
they totally approved of your relationship, liked Victor,
all was well?

A    Yes.  I mean, he kind of did everything right in
their eyes.  So they never complained.

Q    What were the things he did, you think, that --
that made them think positive?

A    Well, he treats me really well.  So that's, I
guess, the thing that matters to them the most.

Q    Was it at all stressful?  I know it can be a
bit -- you know, you get a lot of people living together.


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

So at one point in your parents' house, it was your parents, your brother, you, Victor, and Mateo.  Stressful having a lot of people in the house?  Feel a little cramped?

A    Maybe for me, but not for everyone else.  Everyone else seemed to be fine.

Q    What makes you say that?

A    Well, things are hard postpartum.  You know, you can come down from a lot of things, so.  But, yeah.  Everyone else seemed to be fine.

Q    Do you think it was hard for Victor if you felt cramped?  If you felt uncomfortable with postpartum?

A    No, I don't think so.  We had -- I think it helped him feel at ease, the fact that I felt really comfortable getting my mom's help and advice during that time.

Q    So that was enough to offset whatever negative feelings you might have felt for it being cramped?

A    Sure.  Well, I never really felt cramped.

Q    Okay.

A    It was just overstimulating at times.

Q    What was Victor's relationship with his parents like at that time, around March 2024?

A    It was really good.

Q    He had lived with them previously, right?



A    Yes.

Q    And then he would go on to -- you both would live with them after this, right?

A    Yes.

Q    So fair to say he was close with his parents?

A    Yes.

Q    And do you know where Victor's father currently lives?

A    No.

Q    Does he live at the -- the Fort Worth address where you lived with him?

A    No.

MR. HAMMOUD:  Objection, form.

Q    (BY MR. O'DONNELL)  No.  So you don't know where he is today?

A    I don't.

Q    You don't know where he lives currently?

A    I don't know where he lives currently.

MR. HAMMOUD: Objection. Relevance. Asked and answered.  This was already asked of Mr. Ramirez Najera in his deposition and he answered the -- where his father is currently located.

Q    (BY MR. O'DONNELL)  So do you know if he was a citizen or a legal resident?

MR. HAMMOUD:  Objection.  She's not going



to answer with respect to the immigration status whether Victor's dad was a citizen or not a citizen.  It's not relevant to the claims here.

MR. O'DONNELL:  Youssef, I've -- I would ask that you -- that you limit the speaking objections. And I -- I think this does bear on -- this does bear on relevance.  It --

MR. HAMMOUD:  It -- it doesn't -- it doesn't -- it doesn't bear on relevance.  Whether Ms. Espinoza knows the immigration status of somebody or not, has nothing to do with her testimony here today.

MR. O'DONNELL:  It speaks to --

(Simultaneous speaking.)

MR. O'DONNELL:  It speaks to --

MR. HAMMOUD:  Mr. McCraw -- Mr. McCraw already asked a whole bunch of questions geared at this. We're not going to reopen this and get into everybody's immigration status.  Especially knowing that immigration status today, in light of the political climate of things, is -- is -- there's a lot of turmoil involved.  At the time that all of this stuff was happening, with respect to the credit reporting and even the ER visit, there were no issues related to immigration status.

MR. O'DONNELL:  We can -- we can take this -- we can -- we can take this off the record.  I



don't think this is appropriate for you to be --

MR. HAMMOUD:  Sure.  I'm happy to chat off the record if you want to chat off the record.  But she's not going to talk about the immigration status of -- you know, specific immigration status of anybody.

MR. O'DONNELL:  Okay.  Then I'll -- I'll pipe this off.  But I would ask that you refrain from making speaking objections going forward.

MR. HAMMOUD:  I -- I've been letting you ask the questions that you want to ask.  But if you're going to get into immigration status, I'm going to, you know, place the objection --

MR. O'DONNELL:  Okay.  Well, let's --

MR. HAMMOUD:  -- and instruct the witness not to answer.

MR. O'DONNELL:  Well, we'll move on.

THE WITNESS:  I'm sorry.  Could I take a break, a restroom break?

MR. O'DONNELL:  Yeah.  Absolutely.

(Break from 2:50 p.m. to 2:53 p.m.)

Q   (BY MR. O'DONNELL)  Okay.  Ms. Espinoza, where did you go to high school?

A   I went to Whites Creek High School in Nashville, Tennessee.

Q   What years were you attending Whites Creek in



Nashville?

A    Well, I graduated in 2022, so four years before that.

Q    So 2018 to 2022?

A    Yes.

Q    Did you attend a university after high school?

A    Yes.  I attended Belmont University.

Q    What years did you attend Belmont?

A    It was from 2022 to 2023.

Q    What did you study at Belmont?

A    Architecture and interior design.

Q    What prompted you to -- to study that?  Sounds interesting.

A    I just love design.  Art wasn't really, like, my thing that I wanted to do.  It seemed like I wouldn't get any money from it, I guess.  So interior design was the next best thing to do and architecture.

Q    Have you -- have you taken that to heart in your -- in your new home?  Have you designed it?

A    Yes.  I've been moving things around.

Q    I'm sure -- I'm sure Victor appreciates the aesthetic.

A    Yeah.

Q    Did you finish your degree when you were studying at Belmont?



A    No.  I dropped out a few months before my son was born.

Q    And Belmont is -- it's a private university, right?

A    Correct.

Q    Did you take out any -- any loans to attend?

A    No.  I had a full academic scholarship?

Q    Well, that's amazing.  Congratulations.

A    Thank you.

Q    Did you attend anywhere else for college or any college after Mateo was born?

A    No.

Q    And, then, do you have any other education or special training?

A    No.

Q    Are you currently employed?

A    No.

Q    Are you the full-time caregiver for -- for Mateo?

A    Yes.

Q    So have you been at home with Mateo pretty much since he was born to the present day?

A    Yes.

Q    So you, yourself, don't have an income at the moment?



A    I don't.

Q    And Victor, I know we talked about what he was doing.  What's he currently doing for work?

A    The same thing.

Q    Still in construction?

A    Yes.

Q    Do you know what his annual income is now?

A    I wouldn't know, honestly.

Q    Ballpark estimate for yearly pay?

A    I don't know.  I don't know.

Q    Ballpark for monthly pay?

A    I honestly don't even know how much he gets paid hourly; so...

Q    Does -- does he handle the finances -- the finances?

A    Mostly, yes.

Q    Do you and Victor have any other sources of income?

A    No.

Q    No rental properties?

A    No.

Q    No investment income?

A    No.

Q    No businesses?

A    No.



Q    Any financial support from anyone else?

A    No.

Q    Okay.  Prior to staying home with Mateo, were you employed at any point?

A    No.

Q    Do either you or Victor have any military experience?

A    No.

Q    Okay.  So I want to talk just a little bit about the current lawsuit.  Why is Victor suing Experian, to your knowledge?

A    I believe it's because Experian failed to fix a mistake.

Q    Do you know what that mistake was?

A    Yes.  Taking his parents' mortgage off his history, something like that.

Q    And you understand that he's been damaged by Experian's reporting of his credit?

A    Yes, correct.

Q    How?

A    Emotionally.  Physically, even.

Q    Is that it?

A    I would say mainly, yes.

Q    Mainly, but anything else you can think of?

A    I think everything would fall into emotionally



and physically.

MR. O'DONNELL: Now, Ms. Angelica, I -- if I'm to introduce a document, what's the best way for me to go about doing that here?

(Conversation held between reporter and counsels.)

MR. O'DONNELL: Is that visible?

THE REPORTER: I can see it, yes.

THE WITNESS: Yes.

MR. HAMMOUD: And then, Paola, because he's showing this to you and you're the witness, if you need him to zoom anywhere or you need to see more of the page, just let Mr. O'Donnell know whatever you need to be able to answer the question that he will pose to you. Okay?

THE WITNESS: Okay.

MR. O'DONNELL: Yes.

Q (BY MR. O'DONNELL) So I will represent that this is a -- these are doctor's notes from a March 2024 visit that Mr. Ramirez made to the ER. This is Ramirez -- Bates Number Ramirez 21.

Ms. Espinoza, do you recall a visit that Victor made to the ER in March of 2024?

(Exhibit 1 marked.)

A Yes.

Q (BY MR. O'DONNELL) What do you remember about



it?

A    I remember him telling me -- he called me after work telling me he was going to go to the ER because he felt like he was maybe going to have a heart attack.  And he was panicking.  At first, like, throughout the day, he -- he was telling me how he was feeling and he was asking me if he should go.  But I remember, like, the phone call of him telling me that he was on his way to the ER.

Q    Do you remember anything else?

A    I remember him sending me pictures of how they had him, like, hooked up and, yeah, him telling me that he was panicking.

Q    So he was sending you pictures during the visit?

A    Yes.

Q    Did you attend the visit with him?

A    No.  I was home with my son.

Q    Do you know why he went to the ER?

A    Yes.  I just said he felt like he was going to have a heart attack.

Q    Do you remember what the doctor's response was?

A    I think -- actually, I don't remember exactly.

Q    It's okay.  Have -- have you ever seen this document before?

A    No.  But I remember -- I don't remember exactly



what the document said.  I remember seeing his discharge, like, paperwork and stuff.  I remember the bill.

Q   So do you recall how much the -- the bill was for?

A   It was like a thousand something.  It had to be around there.  An ER bill is pretty, like, expensive.

Q   Did that cause any, you know, unexpected ER visit -- did that cause any -- was there any question about how you were going to pay that or?

A   No.  You can do payments on those things, so it was not really.

Q   Well, I -- I guess I just meant not so much the physically paying it, but the financial impact?

A   No.

Q   Okay.  So I'll direct you to it.  I got it pulled up here.  And this is page 1 of the document, where it says that Victor described chest pain that has been going on -- or, sorry, that has been ongoing and intermittent for three weeks.  Do you remember him having these symptoms?

A   Yes.

Q   Had he ever had them before, or was this the first time he'd ever had anything like this?

A   It was the first time he -- anything like this had happened.  That's why he was really worried.



Q   Particularly with feeling like he was going to have a heart attack?

A   Yes.  Chest pain.

Q   Did he have any other symptoms?

A   I don't think so, no.

Q   Does he still suffer from these symptoms or were they short term?

A   No, not now.  But I think they went away a few months ago.  Or maybe last year sometime.

Q   So they were still present up until around a month ago?

A   Present -- no.  They were present until we -- like a little after we moved to his mom's house, I would say.

Q   So they were present up until -- earlier you said that you moved to what I believe is his parents' address, the ███████ in Fort Worth address, around June of 2024?

A   Yes.

Q   So his symptoms persisted up until from around March of 2024 to about June of 2024?

A   I would say so.  But I'm -- I'm not completely sure.  He had, like, something -- something was wrong with him.

Q   And when you say his symptoms continued, do you



mean the chest pain or -- or all of it or?

A    The chest pain.  He had a lot of anxiety during that time.

Q    So would it be fair to say that they stopped around July of 2024?

A    It was less frequent around that time.

Q    Less frequent but still persisted?

A    Yes.

Q    Have -- but they have finally stopped, you would say, as of a month ago?

A    Yes.  A few months ago.

Q    Okay.  Prior to the ER visit, did you notice any changes in Victor's demeanor?

A    Yes.  He was really stressed out about us not being able to get an apartment.

Q    So did his demeanor change -- did this sort of start when he wasn't -- when you weren't approved for the apartment that you applied to?

A    Yes.  When we were looking into apartments and we wouldn't get accepted.

Q    How many apartments did you apply to and not get accepted?

A    I don't recall.

Q    Was it more than one?

A    It was at least one.



Q    At least one, but you're not sure if it was more than one?

A    I don't recall.

Q    So you -- you said he was -- he was stressed, he had chest pain.  Did he have any other symptoms?  Was he -- for example, was he losing sleep?  Was he irritable?

A    He was.  He was grinding his teeth at night.

Q    And those all onset at around the same time?

A    Yes.  Maybe late 2023.  Like -- around like the -- like, Thanksgiving of 2023 onto, like, 2024.

Q    Okay.  I'm going to scroll down a little bit.

Do you see here, which is on page 7?

A    Could you zoom in a little bit?

Q    Yes.  Let me know when it's visible.

MR. HAMMOUD:  And then, Mr. O'Donnell, just for the record to be clear, maybe we could indicate the Bates number of this exact page, that way it'll just be easier to refer to it.

MR. O'DONNELL:  Got it.  Yeah.  This is -- this is Bates Number Ramirez 28.

MR. HAMMOUD:  Okay.  Thank you.

MR. O'DONNELL:  Uh-huh.

Q    (BY MR. O'DONNELL)  And do you see under "Discharge/Care Plan"?

A    Yes.



Q    How it gives a couple of medications as a -- as a prescription?

A    Yes.

Q    Which I'm -- I'm glad the transcript won't be able to record that I might butcher the pronunciations of these, but that it prescribes famotidine and hydroxyzine pamoate.  Did Victor take this medication?

A    I don't remember if he took it.

Q    Don't remember.  Do you know if he picked up the prescription?

A    I believe he did, yes.

Q    But you don't recall if he -- if he took the prescription medication?

A    I don't recall.

Q    Do you see, same page, in the patient instructions how it describes Victor's condition as anxiety and depression?

A    Yes, I see it.

Q    Had Victor ever had any anxiety-related episodes before?

A    I don't think he had ever had anxiety before. That's why he was panicking.

Q    Never before?

A    Never before.

Q    Had he ever had a panic attack before?



A    No.

Q    Do you know if he ever received treatment for anxiety and depression before this ER visit?

A    No.  Like I said, he didn't even know what anxiety felt like up until this point.

Q    So he didn't know what anxiety felt like prior to March of 2024?

A    Yes.  That's why he thought he was having a heart attack.

Q    I'm going to share another document here.  Now, I'm not sure since this is digital, but -- so it'll be -- mark this as Exhibit 2, and this is Bates Number Experian_Najera_1.  Ms. Espinoza, have you ever seen this document before?

          (Exhibit 2 marked.)

A    I probably have.  I don't remember completely.

Q    (BY MR. O'DONNELL)  That's okay.  I will represent to you that this is Victor's credit report from February 12th of 2024.  So this would be, just for context, a month before the ER visit.

A    Okay.

Q    And I'm just going to scroll through it, let you see the report.  Tell me to go slower if you need.

A    Am I supposed to be able to read all of this or?

Q    You don't have to, like, memorize any line.  I



just wanted to scan through it just to give you a sense of the document.

A    Okay.

Q    So scrolling back up.

Do you know if Victor was concerned about any of the trade lines on this report?

MR. HAMMOUD:  Objection, form.

A    What are -- what is trade line?

Q    (BY MR. O'DONNELL)  A trade line meaning, like, an account that's being reported.  So, for example, here on Bates Experian Najera 2, this Capital One, this information?

A    All I remember from any credit report, anything, was his parents' mortgage being on there.

Q    And that was the only account that Victor was concerned about or expressed concern about?

A    Yes.  Because everything else was supposed to be there or expected to be there, I guess.

Q    So I'm going to scroll to Experian Najera 3.  Do you see this Southwest Credit Systems account?

A    Yes.  Yes, I see that.

Q    Do you see how that account has a "C" starting in June of 2022, it looks like?

MR. HAMMOUD:  Objection, form.

A    Yes.



Q    (BY MR. O'DONNELL)  So the "C" here means that the account is in collection.  Do you understand what an account being in collection means?

A    That means it wasn't paid.

Q    For a little bit of context, it means that it hasn't been paid, and the account's been sold to a collection agency who attempts to collect on the debt.

A    Hmmm.

MR. HAMMOUD:  Objection, form to the extent Mr. O'Donnell misrepresents what collection means.

Q    (BY MR. O'DONNELL)  Do you see how the amount owed is $233?

A    Yes.

Q    Did Mr. Ramirez -- did Victor ever get calls about this debt?

A    I don't know.

Q    Were you ever with him when he got a call that was from a creditor?

A    Probably, but I wouldn't know.

Q    Was Victor concerned at all about how he was going to pay off the $233?

A    No.

Q    Why not?  Sorry.  I didn't mean to cut you off.

A    It's okay.

Well, he had the means to pay $233.



Especially at that point.

Q    Do you know why he didn't?

A    No.  He probably wasn't even aware of that.

Q    So did the existence of this debt or owing this debt stress him out at all?

A    No.

MR. HAMMOUD:  Objection, form.

A    I don't think he even knew about it.

Q    (BY MR. O'DONNELL)  Okay.  I'm scrolling back up to Experian Najera 2.  Do you see this Oportun Progreso account?

A    Yes.

Q    Do you see how it is -- I'm going to scroll up to Experian Najera 1 -- under the banner broadly speaking of your potentially negative account activity?

A    Uh-huh.

Q    Now, here, this 60 and this 90 means that payments were at those dates reported as 60 days late and then 90 days late.

A    Okay.

Q    Do you know if -- if the existence of -- of this account on his report stressed him out?

A    No.  It didn't stress him out.

Q    Do you know why not?

A    Probably because had he paid it, it would have



just gotten fixed.  But he didn't -- yeah, I mean, he didn't really mention any of that.  Those weren't an issue.

Q    Well, even after it's paid off, if there were previous late payments, it can still have a negative affect on one's --

A    Right.

Q    -- credit score.

A    Right.  But to my understanding, I mean, you know, slowly, you can fix your credit.  So you can raise it back up.

Q    But even though this was negatively affecting his credit score, that wasn't -- that didn't cause him any stress?

        MR. HAMMOUD:  Objection, form.

A    No.  He -- the only thing I remember that was an issue when it came to his credit was his parents' mortgage being on there, because that was not his duty.

Q    (BY MR. O'DONNELL)  Why did that cause him distress when other negative accounts didn't?

A    Because I -- I would say that he -- he knew that, you know, the payments were late.  So he knew the consequences that that would bring.  But the parents' -- his parents' mortgage had no reason to be on his report.  So seeing it on there just, like, didn't make sense.  And



maybe, had that not been on there, his credit would be higher, probably.

Q   Do you think it was about the fact that, without his parents' mortgage, his credit score would have been higher or the lack of control?

A   I think it was that it could possibly be higher. But also I remember us talking about how -- to get a car, I mean, they -- they check if, you know, you are paying something else, like a mortgage.  And they tell you, like, well, how are you going to pay a mortgage and a car at the same time and pay an apartment, you know, like the rent to your apartment.  So you can't stretch money that far.

Q   Okay.  I am going to --

MR. O'DONNELL:  First, can we take a 10-minute break.  Go off the record and come back around 4- -- or sorry, 3:35.

THE WITNESS:  Okay.

(Break from 3:25 p.m. to 3:36 p.m.)

Q   (BY MR. O'DONNELL)  So, Ms. Espinoza, we started talking about it a little bit, but I just want to talk a little bit more about this lawsuit and kind of your understanding of it.

So, again, just to kind of start with some preliminary questions, have you ever been arrested, tried, convicted of any crime, or pled guilty of no contest -- or



no contest to any crime?

A   No.

Q   Have you ever been involved in a lawsuit before?

A   No.

Q   So Victor has filed a lawsuit related to allegations that Experian was reporting a mortgage on his credit report that was his parents'.  Does that sound correct?

A   Yes.

Q   And you understand that your deposition today is for that lawsuit, correct?

A   Yes.

Q   Did Victor ever discuss his credit score with you?

A   Yes.  We -- we discussed it, like, around the time we -- we had met.  About how we -- we should probably start, like -- well, to gain more knowledge on how credit works.  Because growing up, we're not really taught any of this in our household.

Q   And remind me, you-all met in 2022; is that right?

A   Yes, that's correct.

Q   So when you said you wanted to get more knowledge about credit scores and how they worked, what did you -- what did you do to go about gaining that



knowledge?

A    I think we briefly just, like, looked into, like, better ways to manage our credit and credit cards and things like that.

Q    And when you say "looked into," what exactly do you mean by that?

A    Like, Googled it.

Q    Did you talk to anybody or was it mostly independent research?

A    No, it was just between us two.

Q    You didn't, like, I don't know, consult with somebody?  This was just you wanted to find out more information, so you were researching it on your own?

A    Yes.  But it was not like a, you know, in depth thing.  It was just like a conversation that we had.

Q    Did he ever discuss anything specific on his credit report with you?

A    Not around the time that we met, no.

Q    What about at later points?

A    Yes.  When we were trying to look for apartments.

Q    What did he -- what did he talk to you about?

A    That he had to look into his credit score and all of that.

Q    And this was in connection to applying for an



apartment at the Hartford House Apartments?  Does that sound correct?

A    I don't remember the name.

Q    But an apartment complex when you were in Tennessee?

A    Yes.

Q    And is it correct that when you couldn't get -- you didn't get approved at the apartment complex you applied to, you, instead, moved to the garage studio apartment?

A    Yes.

Q    Okay.  So prior to applying for the apartment complex, Victor discussed his credit report with you.  Do you remember what you talked about?

A    We just talked about working on our credit scores so maybe we could be on the lease together.  And also just the knowledge thing.  And, like, getting more knowledge on how to use, like, our credit cards.

Q    Did you feel like you needed to improve your credit score?

A    Probably.  That's when I hadn't --

          MR. HAMMOUD:  Objection, form.  Sorry.  You can answer.

A    I hadn't looked into that kind of stuff.

Q    (BY MR. O'DONNELL)  And was this focused on



Victor's credit score or were you also trying to improve your credit score or?

A    I was trying to get, like, started.  Like, building my credit at that point.  But it was also, like, since he already had credit cards or a credit card -- I don't remember how many -- then it was to improve his credit.

Q    And when you had these discussions prior to applying for the apartment, were they -- what was the focus of how you were going to improve his credit score?

A    I don't think we even got to a focus.  It was just a generalized discussion that maybe we should start, like, looking into all -- you know, all the things that you would need to get an apartment.

Q    So you don't remember the name of the apartment complex, which is totally fine.  Do you remember when you applied for the apartment?

A    No.  I remember they were cute.  That's what I remember.

Q    But, like, general date range?

A    I remember, actually, it was -- we looked at some in 2022, and we applied for those.  But I think he ended up having to move back to Texas during that time too; so...

Q    I don't know if we briefly discussed, why did he



move back to Texas in 2022?

A    The job that he had had been cut short, like, the project.

Q    So he moved down to Texas for a bit and then moved back to Tennessee to be with you?

A    Yes.

Q    So were you involved in preparing the application to -- I'll represent to you that I believe it's the Hartford House Apartments, just so we can kind of refer to the name.

A    Okay.

Q    Were you involved in applying for the -- were you involved in drafting the application?

A    I was probably there.  I wouldn't say I was involved.  But I saw him, like, do all that stuff.

Q    And when you were applying for this apartment complex, where were you living at that time?

A    What was the date on the application?  Sorry.

Q    Well, this might be -- this might be easier. Just to give us some context, this is what I'll do.

         This will be Exhibit 3.  And this is Plaintiff's Complaint And Demand For Jury Trial.  Have you ever seen this document before, Ms. Espinoza?

         (Exhibit 3 marked.)

A    No.

 ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Q    (BY MR. O'DONNELL)  Well, I'll represent to you
this is the -- this is the complaint that's operative in
this case.  Let's scroll down to page 25.  It says that on
or about --

A    Can you zoom in?

Q    Yes.

A    I'm sorry.

Q    No.  Is this good?

A    Yes, that's better.

Q    It says:  On or about May 22nd, 2023, AppFolio
prepared a tenant screening report on Plaintiff, Victor,
and provided it to its client for its investment for a
studio at Hartford House Apartments.  Does that sound like
a timeline you're familiar with --

A    Yes.

Q    -- around May of 2023?

A    Yes.

Q    So where were you living in May of 2023 when you
applied for this apartment?

A    At my parents' house.

Q    Okay.  You were at your parents' house.  Do you
remember why you wanted to move?

A    We just wanted our own space.

Q    And you were -- you were denied.  You submitted
an application, but you were denied, correct?



A    Yes.

Q    What is your understanding as to why?

A    I think it has something to do with his credit. At that point we didn't know exactly what it was because the credit wasn't super low to where it would make sense that we would be denied.

Q    Have you or Victor ever been denied for -- ever been denied an apartment before?

A    I think this was the first time -- at this point in time was the first time that we actually went that far with an application.

Q    And have you or Victor ever been denied credit before?

A    I don't think so, no.  Like a credit card?

Q    Yeah.  An application for any kind of credit, like a credit card?

A    Oh, no.  At least not me.  I don't know Victor.

Q    Okay.  I'm going to scroll down a little bit to page 26.  And do you see how it talks about a Rushmore Loan Management Services Mortgage account?  Or --

A    Yes.

Q    We've been discussing this as -- as Victor's father's mortgage or what he alleges to be?

             (Ms. Anthony joins proceedings.)

A    Oh, yes.  That is his parents' loan mortgage.



Q    (BY MR. O'DONNELL)  So you've heard of this account before?

A    Yes.

Q    Can you tell me what you know about it?

A    I know it appeared in his credit report when we, like, looked at it.  And that was the thing that stood out to us the most when we saw it because it didn't make sense for it to be there.

Q    And the first time that you became aware of it was after this application to the Hartford House Apartments was denied?

A    That is correct.  I believe so.

Q    So in May of 2023?

A    Around that time, yes.

Q    That's when you became aware of it?

A    Yes.

Q    Did Victor do anything about the account right away?

A    I think on -- yes.  I -- if I'm not mistaken, on the credit thing, when you look into all those things, it tells you, like, you have the option to report something that you believe is not supposed to be there.  And that's what he did.  I think he made some calls, too.

Q    Do you remember if he did that immediately afterward?



A    It had to be, like, some day -- some -- a few days after that.  I don't remember exactly how many days.

Q    Okay.  I'm going to stop sharing here.  Put up this.  It will be Exhibit 4.  And this is Bates Experian Najera 15.  Ms. Espinoza, have you ever seen this document before?

(Exhibit 4 marked.)

A    I believe so, yes.

Q    (BY MR. O'DONNELL)  Do you know what it is?

A    It says Your Dispute Results.

Q    So I'll represent to you that this document is dispute results from a February 2024 dispute via phone call that Victor -- when he disputed two accounts with Experian, including the Rushmore mortgage account we just -- we just talked about.

A    Uh-huh.

Q    Do you see how this is from March 7th, 2024?

A    Yes.

Q    I'll represent to you that this is the first dispute from Victor that we have concerning the Rushmore account.  Do you know why he waited until 2024 to dispute the account if the Hartford House Apartments application was denied in around May of 2023?

A    You said this was --

MR. HAMMOUD:  Objection, form.



A     You said this was done through the phone?

Q     (BY MR. O'DONNELL)  Yes.

A     I wouldn't know, honestly.

Q     You don't know why he waited?

A     No.  Like, I don't know -- yeah, the dates kind of seem off.  Like, I don't -- not that they seem off or wrong, but I don't recall, like -- yeah.

Q     You can see -- sorry, let me scroll down a little bit -- where he disputed the Rushmore loan account. Do you remember anything from his call disputing this, which would have been in February of 2024?

A     I don't know if this was -- I don't -- I don't know which, like, credit bureau it was.  But I remember him before that making calls, a lot of calls.  And him not being able to reach someone.  I'm guessing it was the Rushmore people.

Q     Do you think he was trying to -- sorry to cut you off.

Do you think he was trying to contact the bank directly for the Rushmore loan or was he trying to contact the credit reporting agency?

MR. HAMMOUD:  Objection, form.

A     I don't remember exactly.  But I just remember that he -- something with the -- with the loan.  Maybe it was the loan bank.  That they switched, like, the -- they



switched something so he couldn't reach the mortgage anymore.  He had to find who the mortgage had moved to.  So he was trying to figure all that out.

Q    (BY MR. O'DONNELL)  But do you remember anything specifically, I guess, about this dispute?

A    No.

Q    Okay.  This will be Exhibit 5.  And this is Experian Najera 148.

A    I remembered something.  I remember the first time that he applied to those apartments --

Q    Uh-huh.

A    -- if I'm not mistaken, it was before our son was born.  So he was trying to find an apartment before he moved to Tennessee.  But at that point we hadn't really, like, started to look more in depth, like, at an apartment for us.  Like, you know, gone and looked at apartments.  He, like, applied for this while he was still in Texas.

Q    Okay.

A    Yes.

Q    A previous -- a previous apartment complex he -- he applied for?

A    This was -- the -- the one that you showed at first, if I'm not mistaken, is in May 2023, correct?

Q    Correct.

A    Yeah.  That was when he was still maybe over



here, in Texas.  Because I don't remember even looking at those apartments.  And we hadn't, like -- after our son was born, I was not -- we were not looking immediately for apartments.  So that's probably why he didn't, like, do any credit stuff at that point.  And he waited until 2024.  That's what would make the most sense.

Q    Sorry.  Could you specify a little bit there for me?  What do you mean by that was probably why he didn't do any credit related?

A    Because we -- we had no -- or, not we, but -- well, yeah, we didn't have any knowledge of his parents' mortgage being on there until later in 2023.  Because I remember it was cold outside.  It was, like, holiday season when all of this, like -- when we were, like, aware that the mortgage was on there.

Q    So you --

A    If that makes sense.

Q    You became aware of the mortgage being on his credit report at some point after being denied the apartment, but not immediately afterward?

A    At some point after Mateo was born.  When we were already living at, like, the garage studio.

Q    That's when you became aware that the mortgage was on his credit report?

A    That's what I remember.  Yes.  And that's when



he started looking into ways, like -- and calling and trying to report this.  And it went into 2024, early 2024.

Q   Okay.  So around the holiday season of 2023, you would say, that's when he first became aware of it?

A   Yes.

Q   Okay.

A   That's when I remember he was really worried about his health.  He was really stressed out, when we started look into this stuff.

Q   And what was causing him to be worried about his health?

A   Just not being able to fix, like, his parents' mortgage being on his credit report.

Q   Okay.  Well, thank you for bringing that up.  I appreciate you coming back to it once you've remembered a little bit more.

A   Of course.

Q   So turning back to the document, Exhibit 4, which again -- sorry, Exhibit 5.

A   Can you zoom in?

Q   Uh-huh.

Which is Experian Najera 148.  Ms. Espinoza, have you seen this document before?

(Exhibit 5 marked.)

A   I don't remember it super clearly.  But I see



some information on it that I have seen before.

Q   (BY MR. O'DONNELL)   What -- what information is familiar?

A   The original balance.  The credit mortgage entry on credit report.  All that.

Q   So do you see how it's marked here July 10, 2024?

A   Yes.

Q   Do you remember --

A   Okay.  I remember this.  I remember this, yes.

Q   What do you remember about it?

A   I remember this is -- Victor wrote this.  He drafted it.  I remember him sitting at his desk.  That's the first thing that he did.  It was -- or maybe not the first thing, but this is after he tried calling, after the calls were made.  And I remember him writing and giving -- like, I guess, explaining why his dad's -- well, his parents' mortgage is not his, and why it doesn't make sense.

Q   Did you help Victor to prepare this at all?

A   No, but I saw him do it.

Q   You saw him do it.  And when you -- when you say that, do you mean you watched him draft it up?

A   Yes.  I watched -- I watched him, like, type this up.



Q    Do you recall him doing anything else?

A    No.  Maybe -- I don't know if this was sent by mail.  If it was, then we probably went to, like -- no, I think this was an e-mail.  But I don't know.  I don't know if this was one that he mailed.

Q    Did victor talk to you about this dispute, specifically?

A    Yes.  I would ask him, like, how all that is going because I would see him, that he was really stressed out about it.  So, you know, I didn't want to stress him out more about it, obviously.  But I still wanted to know how he was doing when it came to that.  So I -- I would ask him, like, you know, like, what is that.  Like, is this, like, the next step.  What happened?  Like, did they not pick up.  Like, why do you have to do this?  All those kinds of questions.

Q    Anything else that he talked to you about?

A    No.  No.  I don't think so.

Q    Okay.  This will be Exhibit 6.  And this is Experian Najera 164.  I'm going to scroll through it -- it's just two pages -- to let you see the whole thing, Ms. Espinoza.

(Exhibit 6 marked.)

A    Uh-huh.

Q    (BY MR. O'DONNELL)  So I will -- well, first,



have you seen this document before, Ms. Espinoza?

    A    No.

    Q    I will represent to you that this is a dispute that was mailed to Experian in June of 2025, where it specifically disputes the Rushmore account that we've been talking about.  Do you remember anything about this dispute even if you haven't seen this before?

         MR. HAMMOUD:  Objection, form.  To the extent he misrepresents the record as to what this document is and how it was sent to Experian.

    Q    (BY MR. O'DONNELL)  You can answer.

    A    Can you say the question again?

    Q    Uh-huh.  Do you remember anything about this dispute?

    A    His -- I see his parents' mortgage.

    Q    Well, I guess I mean this subsequent -- so the last one we just talked about was in -- the last one that we discussed was in June 2024?

    A    Uh-huh.

    Q    And then this one is June 2025?

    A    Okay.

    Q    Do you remember anything about this particular dispute?

         MR. HAMMOUD:  I think -- Mr. O'Donnell, I think you mean July 2024 for the last one.  That was the



date on the dispute letter.

MR. O'DONNELL:  Thank you.  That's --
that's what I meant.  Thank you, Counsel.

A    Sorry.  I'm, like, confused now.

Q    (BY MR. O'DONNELL)  Sorry.  I probably added to
your confusion a little bit there.  I think I said the
wrong -- I think I said the wrong date.

The last one that we were just talking
about was a dispute from July of 2024.

A    Okay.

Q    And this one is from June of 2025.

A    Okay.

Q    And so I just wanted to know, we just talked
about that last dispute.  This one that was in June of
2025, do you remember anything about it?  Was anything
different from the last one?  Anything changed?

A    Maybe this was when we had already moved to
Texas, if I'm not mistaken.

Q    Uh-huh.

A    But, yeah.

Q    But substance was pretty much the same, as you
recall?

A    Yes.

MR. HAMMOUD:  Objection, form.

Q    (BY MR. O'DONNELL)  Now that we have brought in



a little more context, do you remember this dispute?

A    Yes.  This is a dispute Victor sent, correct?

Q    Well, that's what I'm -- I guess, I'm asking you?

A    Yeah.  Yes.

Q    Did you help Victor to prepare this dispute?

A    No.

Q    You didn't help him to prepare this one?

A    No.  But I -- actually, I probably didn't even see him do this one.

Q    Okay.  Did he talk to you about it at all?

A    Yes, he did.

Q    What did he -- what did he say?  Kind of the same thing he's been talking about?

A    He said he's -- he said he -- he's still, like, trying to send, like, to get it off, like, his credit.

Q    Anything else?

A    That he was really tired of still trying to do this.  He's stressed out, mostly.

MR. O'DONNELL:  Okay.  I'm going to request that we take another short break, and then I should be -- just want to check in a little bit.  And then might have a few more questions to ask, but we should largely be done.

MR. HAMMOUD:  Five minutes?

MR. O'DONNELL:  Five minutes should be



sufficient.

(Break from 4:07 p.m. to 4:12 p.m.)

MR. O'DONNELL: Maybe somewhat anticlimactically, I -- I think I actually have -- have no further questions. So, Ms. Espinoza, I would just like to thank you for your time. You know, being nine months pregnant, going out of your way, I appreciate you taking the time today.

THE WITNESS: Of course.

MR. HAMMOUD: Can we just -- just give me one minute. Let me just -- I thought you had some more questions, so I never kind of, like, reviewed to see if I wanted to ask anything. So just give me a minute. Let me just -- let me see just see if I need anything, okay? We can go off the record for a second. I just need, like, two minutes.

MR. O'DONNELL: Yeah.

(Off the record at 4:13 p.m.)

(On the record at 4:17 p.m.)

MR. HAMMOUD: I don't have any questions for Ms. Espinoza. Ms. Espinoza, thank you for your time. I will note that you do have an opportunity to review the transcript and to sign it to make sure everything is okay. If there's any changes, you know, it was -- Madam Court Reporter, I'm sure she did a great job, but if she



APPENDIX 1221

transcribed something that you didn't say or misstated something, you have an opportunity to fix it.

So we'll -- with that explanation, we'll ask for a read and sign.  You can send it to me and then I can forward it to the witness.  And then, you know, we'll do like a PDF copy of this.

THE REPORTER:  Okay.

MR. HAMMOUD:  And a condensed version.  And an E-tran copy because my cocounsel likes E-tran.  I don't like E-tran.  But, okay.

(End of proceedings at 4:18 p.m.)



CHANGES AND SIGNATURE

WITNESS NAME: PAOLA ESPINOZA DATE: NOVEMBER 14, 2025

PAGE      LINE              CHANGE      REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____



APPENDIX 1223

I, PAOLA ESPINOZA, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

_____
PAOLA ESPINOZA

THE STATE OF TEXAS)

COUNTY OF _____)

     Before me, _____, on this day personally appeared PAOLA ESPINOZA, known to me (or proved to me under oath or through _____) (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

     Given under my hand and seal of office this _____ day of _____, 2025.

_____
NOTARY PUBLIC IN AND FOR
THE STATE OF TEXAS
COMMISSION EXPIRES:_____



UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

VICTOR MANUEL RAMIREZ NAJERA,      §
                                   §
     PLAINTIFF,                    §
                                   §
VS.                                §    CASE NO.
                                   §    4:25-CV-00443-P
EXPERIAN INFORMATION SOLUTIONS,    §
INC.; APPFOLIO, INC.; AND          §
NATIONSTAR MORTGAGE LLC d/b/a      §
RUSHMORE SERVICING,                §
                                   §
     DEFENDANTS.                   §

*************************************************************

REPORTER'S CERTIFICATION
DEPOSITION OF
NOVEMBER 14, 2025

          I, Angelica Robledo, Certified Shorthand

Reporter in and for the State of Texas, hereby certify to

the following:

          That the witness, PAOLA ESPINOZA, was duly sworn

by the officer and that the transcript of the oral

deposition is a true record of the testimony given by the

witness;

          I further certify that pursuant to FRCP Rule

30(F)(1) that the signature of the deponent:

          _X_ was requested by the deponent or a party

before the completion of the deposition and that the

signature is to be before any notary public and returned



within 30 days from date of receipt of the transcript. If returned, the attached Changes and Signature Page contains any changes and the reasons therefor:

___ was not requested by the deponent or a party before the completion of the deposition.

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Certified to by me this 12th day of December, 2025.



_____
Angelica Robledo, CSR
Texas CSR 8002
Expiration Date: 04/2027
Firm Registration No. 11972
Script Deposition Services, LLC
P.O. Box 60
China Spring, Texas 76633
Telephone: (903)470-0098

## $

**$150**
28:21

**$233**
50:12,21,
25

**$28**
21:2

## 0

**01/29/2004**
11:10

## 1

**1**
41:23
43:16
51:14

**10**
17:18
67:6

**10-minute**
53:15

**12th**
48:19

**148**
64:8
66:22

**14th**
4:4

**15**
62:5

**150**
28:20

**164**
68:20

## 2

**2**
48:12,15
49:11
51:10

**20-**
5:15

**2018**
37:4

**2022**
12:12,13
37:2,4,9
49:23
54:20
57:22
58:1

**2023**
13:20,22
19:9,14
37:9
46:9,10
59:10,16,
18 61:13
62:23
64:23
65:12
66:3

**2024**
12:17
15:21
17:4,8
19:13,16
20:10,11
22:14
26:2,9,10
28:12
30:7
33:23
41:18,22
44:18,21
45:5
46:10

48:7,19
62:12,17,
21 63:11
65:5 66:2
67:7
69:18,25
70:9

**2025**
4:4 14:8
15:22
69:4,20
70:11,15

**21**
11:8,9
41:20

**22nd**
59:10

**25**
59:3

**26**
60:19

**28**
46:20

**2:00**
4:2,5
21:11

**2:50**
36:20

**2:53**
36:20

## 3

**3**
49:19
58:21,24

**3915**
16:24

**3924**
15:14

**3:25**
53:18

**3:35**
53:16

**3:36**
53:18

## 4

**4**
62:4,7
66:18

**4-**
53:16

**404821**
5:18

**4829**
5:15

**4:07**
72:2

**4:12**
72:2

**4:13**
72:18

**4:17**
72:19

**4:18**
73:11

## 5

**5**
64:7
66:19,24

**5:00**
21:13,14,
15

## 6

**6**
68:19,23

**60**
51:17,18

**6:00**
21:11,15

## 7

**7**
46:12

**7:00**
22:24

**7th**
62:17

## 8

**8002**
4:8

## 9

**9**
17:18

**90**
51:17,19

## A

**a.m.**
21:14,15

**Absolutely**
36:19

**academic**
38:7



PAOLA ESPINOZA
NAJERA V. EXPERIAN

**accepted**
  45:20,22

**account**
  49:10,15,
  20,22
  50:2,3
  51:11,15,
  22 60:20
  61:2,17
  62:14,21,
  22 63:9
  69:5

**account's**
  50:6

**accounts**
  52:20
  62:13

**accurately**
  8:24

**activity**
  51:15

**add**
  8:3 31:8,
  10

**added**
  70:5

**additional**
  8:1

**address**
  5:14,16
  13:24
  14:5,12
  15:2,10,
  12,17
  16:6,23,
  25 17:11
  18:16,21,
  23 19:10,
  21 34:10
  44:17

**administeri
ng**

  4:8

**advice**
  33:15

**aesthetic**
  37:22

**affect**
  52:6

**affecting**
  52:12

**afternoon**
  5:10

**afterward**
  61:25
  65:20

**agency**
  50:7
  63:21

**Alberto**
  17:15,16

**alcohol**
  8:15

**allegations**
  54:6

**alleges**
  60:23

**amazing**
  38:8

**amount**
  50:11

**Angelica**
  4:7 41:2

**annual**
  39:7

**answers**
  6:16

**Anthony**
  4:22
  60:24

**anticlimact
ically**

  72:4

**anxiety**
  45:2
  47:17,21
  48:3,5,6

**anxiety-
related**
  47:19

**anymore**
  64:2

**apartment**
  18:18
  19:7
  26:18
  27:1
  31:24
  45:15,18
  53:11,12
  56:1,4,8,
  10,12
  57:9,14,
  15,17
  58:16
  59:19
  60:8
  64:13,15,
  20 65:20

**apartments**
  45:19,21
  55:21
  56:1 58:9
  59:13
  61:11
  62:22
  64:10,16
  65:2,4

**apologize**
  28:8

**appearances**
  4:14

**appeared**

  61:5

**Appfolio**
  59:10

**application**
  58:8,13,
  18 59:25
  60:11,15
  61:10
  62:22

**applied**
  45:18
  56:9
  57:17,22
  59:19
  64:10,17,
  21

**apply**
  45:21

**applying**
  55:25
  56:12
  57:9
  58:12,16

**appreciated**
  18:3

**appreciates**
  37:21

**approved**
  32:16
  45:17
  56:8

**architectur
e**
  37:11,17

**argue**
  32:9

**argued**
  32:8

**arrange**
  30:19
  31:9

  **arrested**
  53:24

**Art**
  37:14

**assume**
  7:14

**Assuming**
  30:25

**attack**
  42:4,20
  44:2
  47:25
  48:9

**attempts**
  50:7

**attend**
  37:6,8
  38:6,10
  42:16

**attended**
  37:7

**attending**
  36:25

**attested**
  4:12

**audible**
  7:7

**aware**
  51:3
  61:9,15
  65:14,18,
  23 66:4

———————

**B**

———————

**back**
  17:7
  23:21
  26:13
  27:3,5
  29:4,12,



18 30:8 49:4 51:9 52:11 53:15 57:23 58:1,5 66:15,18

**balance** 67:4

**ballpark** 20:6,17 39:9,11

**bank** 15:7 16:3 63:20,25

**banner** 51:14

**barely** 23:7

**basics** 6:7

**Bates** 41:20 46:17,20 48:12 49:11 62:4

**Baxter** 16:24 18:16

**bear** 35:6,9

**began** 4:2 12:13

**behalf** 4:16

**Belmont** 37:7,8, 10,25 38:3

**big**

22:3 31:7

**bill** 43:2,3,6

**bills** 26:20 27:14

**biographica l** 11:3

**birth** 11:9 24:16 25:8

**birthday** 17:5

**bit** 6:7 8:2 11:2,3 24:2,11 32:25 40:9 46:11,13 50:5 53:20,21 58:4 60:18 63:9 65:7 66:16 70:6 71:22

**born** 13:18,19, 20 28:1 29:7 38:2,11, 22 64:13 65:3,21

**bought** 17:23

**break** 7:18,21 36:18,20 53:15,18

71:21 72:2

**briefly** 55:2 57:25

**bring** 17:7 52:23

**bringing** 66:14

**broadly** 51:14

**brother** 17:12 33:2

**brother's** 17:14

**brought** 13:2 70:25

**building** 57:4

**bunch** 35:16

**burden** 31:19

**bureau** 63:13

**businesses** 39:24

**butcher** 47:5

**butter** 25:1

**buy** 27:15,19, 21

—————————

**C**
—————————

**call** 5:11 9:3 11:25 30:9,19, 20 31:4,9 42:8 50:17 62:13 63:10

**called** 42:2

**calling** 66:1 67:15

**calls** 50:14 61:23 63:14 67:16

**Capital** 49:11

**car** 53:7,10

**card** 57:5 60:14,16

**cards** 55:3 56:18 57:5

**care** 21:21

**caregiver** 38:18

**case** 4:21 5:24 9:16 10:1,20 11:20

59:3

**causing** 66:10

**change** 45:16

**changed** 70:16

**chat** 36:2,3

**check** 8:19 53:8 71:22

**chest** 43:17 44:3 45:1,2 46:5

**child** 18:13 27:24 28:3

**children** 13:6

**circumstanc es** 30:11

**citizen** 34:24 35:2

**claims** 35:3

**clarify** 9:25

**clarity** 14:24

**clear** 12:2 46:16

**client** 59:12



**climate**
  35:19

**close**
  34:5

**clothes**
  27:18,21

**co-sleep**
  23:5

**co-sleeping**
  23:24

**cocounsel**
  73:9

**cold**
  65:13

**colleague**
  4:22

**collect**
  50:7

**collection**
  50:2,3,7,
  10

**college**
  38:10,11

**comfortable**
  31:15,17
  33:15

**communicati
ons**
  9:22

**company**
  20:12,13
  21:19,20

**compared**
  21:25

**complain**
  21:23

**complained**
  32:11,19

**complains**
  21:24

**complaint**
  58:22
  59:2

**completely**
  7:23
  44:22
  48:16

**complex**
  56:4,8,13
  57:16
  58:17
  64:20

**complicatio
ns**
  25:8

**concern**
  49:16

**concerned**
  25:15
  29:20
  49:5,16
  50:20

**concerns**
  24:14

**condensed**
  73:8

**condition**
  47:16

**confused**
  28:8 70:4

**confusion**
  70:6

**congratulat
ions**
  12:19
  38:8

**connection**
  55:25

**consequence
s**
  52:23

**consistent**
  22:19

**constructio
n**
  20:12
  22:5 39:5

**consult**
  55:11

**consumed**
  8:15

**contact**
  63:19,21

**contest**
  53:25
  54:1

**context**
  48:20
  50:5
  58:20
  71:1

**continued**
  44:25

**control**
  53:5

**conversatio
n**
  41:5
  55:15

**conversatio
ns**
  10:1

**convicted**
  53:25

**copy**
  73:6,9

**cordial**
  30:1

**correct**
  10:7
  11:21
  13:9
  14:4,23
  15:15,16
  16:11
  17:8
  19:11
  25:22
  27:24,25
  28:2 29:1
  38:5
  40:19
  54:8,11,
  22 56:2,7
  59:25
  61:12
  64:23,24
  71:2

**correcting**
  19:16

**cost**
  27:8

**costs**
  27:9,11

**counsel**
  4:12,14,
  17 6:24
  9:8 70:3

**counsels**
  41:6

**County**
  4:10

**couple**
  47:1

**court**
  6:14,17
  7:5 72:24

**coworkers**
  22:1,2

**cramped**

  33:4,12,
  18,19

**credit**
  35:22
  40:18
  48:18
  49:13,20
  52:8,10,
  13,17
  53:1,4
  54:7,13,
  17,24
  55:3,17,
  23 56:13,
  15,18,20
  57:1,2,4,
  5,7,10
  60:3,5,
  12,14,15,
  16 61:5,
  20 63:13,
  21 65:5,
  9,19,24
  66:13
  67:4,5
  71:16

**creditor**
  50:18

**Creek**
  36:23,25

**crime**
  53:25
  54:1

**criticism**
  30:22

**crying**
  23:19
  24:12

**CSR**
  4:7

**current**
  5:14
  13:24



14:5,11
15:2,9
40:10

**cut**
50:23
58:2
63:17

**cute**
57:18

_____

**D**
_____

**dad**
16:10
25:11
35:2

**dad's**
67:17

**Dallas**
4:9

**damaged**
40:17

**date**
4:4  11:9
15:19
57:20
58:18
70:1,7

**dates**
51:18
63:5

**dating**
12:13

**day**
9:6  38:22
42:5  62:1

**days**
51:18,19
62:2

**deadline**
22:4

**deadlines**
22:8

**debt**
50:7,15
51:4,5

**December**
12:16,17

**Defendant**
4:20,21
5:24

**degree**
37:24

**Demand**
58:22

**demeanor**
45:13,16

**denied**
59:24,25
60:6,7,8,
12  61:11
62:23
65:19

**deposed**
6:4

**deposition**
4:5,9  6:7
9:2  10:4,
6,9,12
12:2  19:5
34:21
54:10

**depression**
47:17
48:3

**depth**
55:14
64:15

**describe**
17:24
25:10
26:3,4

**describes**
47:16

**design**
37:11,14,
16

**designed**
37:19

**desk**
67:13

**details**
9:25

**difficult**
8:12

**digital**
48:11

**direct**
43:15

**directly**
63:20

**disagreemen
ts**
30:14

**discharge**
43:1

**Discharge/
care**
46:24

**discuss**
9:16
10:3,5
54:13
55:16

**discussed**
54:15
56:13
57:25
69:18

**discussing**
60:22

**discussion**

57:12

**discussions**
57:8

**dispute**
62:10,12,
20,21
64:5  68:6
69:3,7,
14,23
70:1,9,14
71:1,2,6

**disputed**
62:13
63:9

**disputes**
69:5

**disputing**
63:10

**distress**
25:17
29:14
52:20

**doctor's**
41:18
42:21

**document**
41:3
42:24
43:1,16
48:10,14
49:2
58:23
62:5,11
66:18,23
69:1,10

**documents**
10:8,24

**dollars**
28:18

**Dorsey**
5:15,18
13:24

15:2

**draft**
67:23

**drafted**
67:13

**drafting**
58:13

**dropped**
38:1

**drugs**
8:17

**duly**
5:3

**duty**
52:18

_____

**E**
_____

**e-mail**
68:4

**E-S-P-I-N-
O-Z-A**
5:9

**E-TRAN**
73:9,10

**earlier**
8:4  13:25
16:12
24:1  28:8
44:15

**early**
21:9
22:21,23
66:2

**ease**
33:14

**easier**
12:3,5
46:18
58:19



**eat**
23:3

**eczema**
24:17,21,
25

**education**
38:13

**effective**
25:3

**efficient**
22:11

**Emotional**
18:13

**emotionally**
40:21,25

**emotions**
29:15

**employed**
38:16
40:4

**end**
73:11

**ended**
57:23

**engaged**
11:16
12:15

**entitled**
6:24

**entry**
67:4

**episodes**
47:19

**ER**
35:22
41:19,22
42:3,9,18
43:6,7
45:12
48:3,20

**erratic**
22:20

**Espinoza**
4:6,17,24
5:2,8,10,
11 11:7,
13,14
24:21
35:10
36:21
41:21
48:13
53:19
58:23
62:5
66:23
68:22
69:1
72:5,21

**estimate**
20:6,17
39:9

**event**
7:1

**everybody's**
35:17

**evidence**
31:1

**exact**
46:17

**EXAMINATION**
5:4

**exclusively**
23:2,14
27:9

**excuse**
28:23
31:24

**exhibit**
41:23
48:12,15
58:21,24

62:4,7
64:7
66:18,19,
24 68:19,
23

**existence**
51:4,21

**expected**
49:18

**expensive**
43:6

**Experian**
4:20,22
5:22,23
40:10,12
49:11,19
51:10,14
54:6
62:4,14
64:8
66:22
68:20
69:4,10

**Experian's**
40:18

**Experian_
najera_1**
48:13

**experience**
40:7

**explaining**
67:17

**explanation**
73:3

**express**
22:7
29:11

**expressed**
49:16

**expressing**
30:22

**extent**
50:9 69:9

**eyes**
32:19

———————

F

———————

**facilitate**
30:23

**fact**
33:14
53:3

**facts**
30:25

**failed**
40:12

**fair**
6:22 7:9,
16 13:21
14:7
25:12,15,
17 34:5
45:4

**fall**
40:25

**familiar**
59:14
67:3

**family**
11:25
13:3 26:4

**family's**
26:3

**famotidine**
47:6

**father**
25:10
34:7,22

**father's**
60:23

**February**
48:19
62:12
63:11

**feedings**
24:11

**feel**
18:3,11
21:18
23:22
27:19
31:15,20
33:3,14
56:19

**feeling**
42:6 44:1

**feelings**
25:25
33:18

**feels**
31:17

**felt**
25:18
27:15
33:11,12,
14,18,19
42:4,19
48:5,6

**fiancé**
14:13
15:5

**fiancé's**
11:18

**fight**
30:13

**figure**
64:3

**filed**
54:5

**finally**
45:9



APPENDIX 1232

**finances**
27:13
39:14,15

**financial**
26:3
27:20
40:1
43:13

**financially**
26:12,14
28:15

**find**
55:12
64:2,13

**fine**
5:11
26:19
33:6,10
57:16

**finish**
6:19,21,
25 37:24

**fix**
40:12
52:10
66:12
73:2

**fixed**
52:1

**fly**
29:6

**focus**
57:10,11

**focused**
56:25

**food**
17:23

**Forest**
5:19,20
14:2

**forgot**

16:12

**form**
14:20
18:4
19:12
34:13
49:7,24
50:9 51:7
52:15
56:22
62:25
63:22
69:8
70:24

**Fort**
4:11
15:15,16
34:10
44:17

**forward**
36:8 73:5

**frame**
20:9
31:23

**frequent**
20:21
45:6,7

**frequently**
23:4

**Friday**
4:4 21:17

**friendly**
30:2

**frustrated**
31:3

**full**
11:12
38:7

**full-time**
38:18

**fully**

6:9

**fussy**
23:19

**future**
32:11

— G —

**gain**
54:17

**gaining**
54:25

**garage**
19:6 56:9
65:22

**gave**
13:25

**geared**
35:16

**general**
17:25
57:20

**generalized**
57:12

**generally**
20:23

**get along**
30:10

**give**
7:23 8:8
11:9,12
16:22
20:17
23:6 49:1
58:20
72:10,13

**giving**
67:16

**glad**
25:5 47:4

**good**
5:10
20:15
21:4,7,20
22:2
25:11
26:21
27:20
30:2,3
32:2,3,4,
6 33:24
59:8

**Googled**
55:7

**graduated**
37:2

**great**
6:1 72:25

**grinding**
46:7

**growing**
54:18

**guess**
18:9,14,
18 22:6
26:4
32:23
37:16
43:12
49:18
64:5
67:17
69:16
71:3

**guessing**
63:15

**guilty**
53:25

— H —

**Hammoud**

4:16
9:10,17,
19 10:2,
15 14:20
18:4
19:12,18
24:20,23
28:5
30:25
32:14
34:13,19,
25 35:8,
15 36:2,
9,14
41:10
46:15,21
49:7,24
50:9 51:7
52:15
56:22
62:25
63:22
69:8,24
70:24
71:24
72:10,20
73:8

**hand**
4:25

**handle**
31:5
39:14

**hands-on**
18:7

**happen**
9:7

**happened**
43:25
68:14

**happening**
35:21

**happy**
7:13 36:2



PAOLA ESPINOZA
NAJERA V. EXPERIAN

November 14, 2025
Index: hard..kids

**hard**
33:8,11

**Hartford**
56:1 58:9
59:13
61:10
62:22

**head**
7:8

**health**
24:15
66:8,11

**hear**
25:5

**heard**
61:1

**heart**
37:18
42:4,20
44:2 48:9

**heavy**
29:19

**held**
41:5

**helped**
23:24
33:14

**high**
36:22,23
37:6

**higher**
53:2,5,6

**Hill**
5:19,20
14:2

**history**
40:16

**Hmmm**
50:8

**Hold**

9:19

**holiday**
65:13
66:3

**home**
37:19
38:21
40:3
42:17

**honestly**
39:8,12
63:3

**hooked**
42:12

**hope**
16:16

**hour**
9:15 21:2

**hourly**
39:13

**hours**
7:25
21:6,8

**house**
15:11,13,
25 16:4,
19,21,22,
23,24
17:3,4,6
19:10
26:11,17
31:25
33:1,3
44:13
56:1 58:9
59:13,20,
21 61:10
62:22

**household**
54:19

**hydroxyzine**
47:6

—————

**I**

—————

**identity**
4:12

**immediately**
61:24
65:3,20

**immigration**
35:1,10,
18,23
36:4,5,11

**impact**
43:13

**important**
6:18

**imposing**
31:19

**improve**
56:19
57:1,6,10

**in-laws**
32:12

**including**
62:14

**income**
38:24
39:7,18,
22

**Incorporated**
4:20,23
5:23

**independent**
55:9

**information**
4:20,23
5:23 8:1
11:3
49:12
55:13

67:1,2

**inquire**
9:21

**instruct**
36:14

**instructions**
47:16

**instructs**
7:2

**interact**
30:4

**interesting**
37:13

**interior**
37:11,16

**intermittent**
43:19

**intermittently**
12:1

**introduce**
41:3

**investment**
39:22
59:12

**involved**
35:20
54:3
58:7,12,
13,15

**irritable**
46:6

**issue**
52:3,17

**issues**
24:15
35:23

—————

**J**

—————

**job**
20:19,20
21:7,19
22:9,10
26:13,15,
21 58:2
72:25

**jobs**
21:24

**Joey**
4:19

**joined**
4:21 9:3

**joins**
60:24

**judge**
6:11

**July**
45:5 67:6
69:25
70:9

**June**
13:20
14:8
15:21,22
17:4
44:18,21
49:23
69:4,18,
20 70:11,
14

**jury**
6:11
58:22

—————

**K**

—————

**kids**
25:14



800.211.DEPO (3376)
EsquireSolutions.com

**kind**
32:18
53:21,23
56:24
58:9
60:15
63:5
71:13
72:12

**kinds**
68:16

**knew**
29:17
51:8
52:21,22

**knowing**
35:18

**knowledge**
40:11
54:17,24
55:1
56:17,18
65:11

---

**L**

---

**lack**
53:5

**largely**
71:23

**late**
46:9
51:18,19
52:5,22

**lawsuit**
40:10
53:21
54:3,5,11

**learn**
11:3

**lease**
56:16

**legal**
34:24

**letter**
70:1

**letting**
36:9

**life**
25:20

**light**
35:19

**likes**
73:9

**limit**
35:5

**lines**
49:6

**lingering**
25:7

**live**
12:25
13:14
14:11,13
15:9,17
16:25
34:3,10

**lived**
14:5
15:11
16:6
17:10
19:20
33:25
34:11

**lives**
34:8,17,
18

**living**
13:16,17,
21 14:16
16:17,21
17:16

18:16,17
19:24
32:25
58:17
59:18
65:22

**loan**
60:20,25
63:9,20,
24,25

**loans**
38:6

**located**
4:11
34:22

**long**
9:14 12:9
14:5
15:17
16:25
18:23

**looked**
55:2,5
56:24
57:21
61:6
64:16

**losing**
46:6

**lot**
20:19
21:4
31:13
32:25
33:3,9
35:20
45:2
63:14

**love**
21:21
37:14

**loved**
22:9

**loves**
22:9

**low**
60:5

**Lucky**
32:14

---

**M**

---

**M-A-T-E-O**
15:1

**Madam**
72:24

**made**
32:21
41:19,22
61:23
67:16

**mail**
68:3

**mailed**
68:5 69:4

**make**
6:25 8:11
25:1
52:25
60:5 61:7
65:6
67:18
72:23

**makes**
33:7
65:17

**making**
20:14,15,
25 29:18
36:8
63:14

**manage**
55:3

**manageable**
26:20,22
27:13

**Management**
60:20

**March**
17:8
19:9,13
20:9
22:14
26:2,10
28:12
30:6
33:23
41:18,22
44:21
48:7
62:17

**mark**
48:12

**marked**
41:23
48:15
58:24
62:7
66:24
67:6
68:23

**married**
11:14

**Mateo**
13:11,12,
18,19
14:24
19:23
22:14
23:13,18
24:2,14,
24 25:13
26:5
27:18
28:1,24
29:7 33:2
38:11,19,



21 40:3
65:21

**matter**
4:18 5:21

**matters**
32:23

**Mccraw**
35:15

**meaning**
49:9

**means**
50:1,3,4,
5,10,25
51:17

**meant**
43:12
70:3

**medical**
24:14

**medication**
47:7,13

**medications**
8:11 47:1

**meet**
12:11,21
32:5

**meeting**
10:14

**memorize**
48:25

**mental**
31:10

**mention**
52:2

**mentioned**
19:5
22:13
27:23

**met**
9:21

10:3,5
12:12
32:6
54:16,20
55:18

**middle**
23:1

**military**
40:6

**mind**
14:24

**minute**
72:11,13

**minutes**
7:25
71:24,25
72:16

**misrepresen
ts**
50:10
69:9

**misstated**
73:1

**mistake**
40:13,14

**mistaken**
61:19
64:12,23
70:18

**modifies**
8:2

**mom**
16:9
30:1,20
31:4,5,
12,16,17,
22

**mom's**
33:15
44:13

**moment**

7:24
38:25

**Monday**
21:17

**Mondays**
21:13

**money**
20:15
27:2,4,8
37:16
53:12

**month**
13:17
14:17
20:22,23
28:19
29:3,8,16
44:11
45:10
48:20

**monthly**
39:11

**months**
14:6
17:2,7
19:25
20:1
22:15,16,
17 24:6,
7,9,16
38:1 44:9
45:11
72:6

**Moreno**
11:13

**mortgage**
15:7 16:3
40:15
49:14
52:17,24
53:4,9,10
54:6
60:20,23,

25 62:14
64:1,2
65:12,15,
18,23
66:13
67:4,18
69:15

**move**
27:3,5
29:18
36:16
57:23
58:1
59:22

**moved**
13:4 14:7
17:1,3
26:12
29:12
31:24
44:13,16
56:9
58:4,5
64:2,14
70:17

**moving**
27:1,8,9,
11 37:20

————————

**N**

————————

**Najera**
4:18
34:21
49:11,19
51:10,14
62:5 64:8
66:22
68:20

**Nashville**
12:22
36:23
37:1

**necessity**
31:21

**needed**
18:11
23:13
30:18
56:19

**negative**
25:25
29:14
33:17
51:15
52:5,20

**negatively**
52:12

**newborn**
24:3,5

**nice**
18:1
20:19
21:20

**nicknames**
11:24

**night**
22:25
23:1,8,25
24:10
46:7

**nodding**
7:8

**nos**
7:8

**note**
72:22

**notes**
10:14,17,
24 41:18

**notice**
23:7
45:12

**November**



APPENDIX 1236

4:4

**number**
41:20
46:17,20
48:12

**nurse**
23:20

**nursing**
23:2,14

---

**O**

---

**O'DONNELL**
4:19 5:5
9:20,24
10:5
14:22
18:9
19:13,15,
20 24:24
28:6 31:3
32:15
34:14,23
35:4,12,
14,24
36:6,13,
16,19,21
41:2,7,
13,16,17,
25 46:15,
19,22,23
48:17
49:9
50:1,10,
11 51:9
52:19
53:14,19
56:25
59:1 61:1
62:9 63:2
64:4 67:2
68:25
69:11,24
70:2,5,25

71:20,25
72:3,17

**oath**
4:8 6:2,
10

**objection**
7:1 9:19
14:20
18:4
19:12,19
30:25
34:13,19,
25 36:12
49:7,24
50:9 51:7
52:15
56:22
62:25
63:22
69:8
70:24

**objections**
6:25 35:5
36:8

**offset**
33:17

**one's**
52:6

**ongoing**
43:18

**onset**
46:8

**operative**
59:2

**Oportun**
51:10

**opportunity**
72:22
73:2

**opposing**
6:24

**option**
61:21

**oral**
4:5

**Orcas**
15:14
44:17

**original**
67:4

**originally**
12:23

**overstimula
ting**
33:21

**overtime**
21:10,11

**overworked**
21:18

**owed**
50:12

**owing**
51:4

**owns**
15:4,5

---

**P**

---

**P-A-O-L-A**
5:8

**p.m.**
4:2,5
21:11
22:24
36:20
53:18
72:2,18,
19 73:11

**pages**
68:21

**paid**

26:21,23
39:12
50:4,6
51:25
52:4

**pain**
43:17
44:3
45:1,2
46:5

**pamoate**
47:7

**panic**
47:25

**panicking**
42:5,13
47:22

**Paola**
4:5,17
5:2,8
9:19
11:13
41:10

**paperwork**
43:2

**parents**
11:25
16:1,7,9
17:12,19,
22 18:1,
6,13,16
27:1 31:9
32:1
33:2,22
34:5

**parents'**
15:11,13,
25 16:4,
19,21,22,
23,24
17:3,4,6
19:10
26:11,16

31:25
33:1
40:15
44:16
49:14
52:17,23,
24 53:4
54:7
59:20,21
60:25
65:11
66:12
67:18
69:15

**part-time**
14:14,15

**past**
12:16
21:24
24:5

**patient**
25:11
47:15

**pay**
17:21
27:7,8,14
39:9,11
43:9
50:21,25
53:10,11

**paycheck**
20:24

**paying**
43:13
53:8

**payments**
43:10
51:18
52:5,22

**PDF**
73:6

**pending**
7:20



APPENDIX 1237

**people**
32:25
33:3
63:16

**period**
26:2 30:6

**persisted**
44:20
45:7

**phone**
42:8
62:12
63:1

**phonetic**
14:21

**phrase**
18:9

**physically**
40:21
41:1
43:13

**pick**
30:20
68:15

**picked**
30:18
47:9

**pickup**
30:20

**pictures**
42:11,14

**pipe**
36:7

**place**
36:12

**Plaintiff**
4:18
11:20
59:11

**Plaintiff's**

58:22

**Plan**
46:24

**plans**
29:18

**pled**
53:25

**point**
7:11 18:5
19:4 21:1
33:1 40:4
48:5 51:1
57:4
60:4,9
64:14
65:5,19,
21

**points**
55:19

**political**
35:19

**pose**
7:1 41:14

**positive**
32:21

**possibly**
17:9
28:14
53:6

**postpartum**
18:13
33:8,12

**potentially**
51:15

**prefer**
5:12

**pregnancy**
25:8

**pregnant**
72:7

**preliminary**
5:21 8:7
53:24

**preparation**
10:8

**prepare**
9:1 10:22
67:20
71:6,8

**prepared**
59:11

**preparing**
58:7

**prescribes**
47:6

**prescriptio
n**
47:2,10,
13

**present**
38:22
44:10,12,
15

**pretty**
20:15
21:4,9
24:17
25:3
38:21
43:6
70:21

**previous**
26:17
52:5
64:20

**previously**
9:5 33:25

**pride**
22:10

**prior**
4:12 15:9

18:15,17
40:3
45:12
48:6
56:12
57:8

**priority**
29:23

**private**
38:3

**problem**
24:4,10
31:7

**proceedings**
4:2 60:24
73:11

**Progreso**
51:10

**project**
58:3

**projects**
22:3,5

**prompted**
26:25
37:12

**pronunciati
ons**
47:5

**properties**
39:20

**property**
15:3,24
16:1
17:19
20:2

**provide**
25:12,18,
20

**provided**
10:17
59:12

**pulled**
43:16

**put**
27:7 62:3

---

**Q**

**question**
6:20 7:2,
12,15,19,
20 18:10
41:14
43:8
69:12

**questions**
6:10,16,
25 8:7,12
35:16
36:10
53:24
68:16
71:23
72:5,12,
20

---

**R**

**raise**
4:25
52:10

**raises**
20:19,21
21:3

**Ramirez**
4:18
11:19,23
12:2 13:8
20:10
34:20
41:19,20
46:20
50:14



**range**
15:19
57:20

**reach**
63:15
64:1

**read**
48:24
73:4

**reason**
8:8,23
25:23
29:12
52:24

**Rebecca**
4:22

**recall**
15:12
17:9
18:21,24
19:23
20:11,24
23:5 26:6
28:18
41:21
43:3
45:23
46:3
47:12,14
63:7 68:1
70:22

**receive**
24:19,24

**received**
48:2

**record**
4:3,13,15
5:7 35:25
36:3
46:16
47:5
53:15
69:9

72:15,18,
19

**recorded**
6:17

**recording**
10:11

**refer**
12:1,5
46:18
58:10

**referring**
5:22

**refrain**
36:7

**regular**
21:6,8,9

**related**
35:23
54:5 65:9

**relationship**
29:25
31:25
32:16
33:22

**relevance**
34:19
35:7,9

**relevant**
35:3

**remember**
8:1 15:19
20:4,6,18
21:1
41:25
42:2,7,
10,11,21,
22,25
43:1,2,19
47:8,9
48:16
49:13

52:16
53:7
56:3,14
57:6,15,
16,18,19,
21 59:22
61:24
62:2
63:10,13,
23 64:4,9
65:1,13,
25 66:7,
25 67:9,
10,11,12,
13,16
69:6,13,
22 70:15
71:1

**remembered**
64:9
66:15

**remind**
54:20

**remotely**
4:9

**rent**
15:3,24
17:21
20:2,4
27:3,7
53:11

**rental**
39:20

**rented**
20:3

**reopen**
35:17

**repetitive**
16:17

**rephrase**
7:12
14:10

**report**
48:18,23
49:6,13
51:22
52:24
54:7
55:17
56:13
59:11
61:5,21
65:19,24
66:2,13
67:5

**reported**
49:10
51:18

**reporter**
4:3,24
6:17 7:6
41:5,8
72:25
73:7

**reporting**
4:8 35:22
40:18
54:6
63:21

**represent**
4:22
41:17
48:18
58:8 59:1
62:11,19
69:3

**represented**
9:8

**request**
71:20

**required**
6:10

**research**
55:9

**researching**
55:13

**resident**
34:24

**respect**
35:1,21

**respond**
6:10,20
7:3

**response**
42:21

**responses**
7:7

**restroom**
36:18

**results**
62:10,12

**review**
72:22

**reviewed**
10:8
72:12

**rides**
30:23

**Road**
16:24
18:16

**Robledo**
4:7

**roughly**
15:21

**Rushmore**
60:19
62:14,20
63:9,16,
20 69:5

---

**S**

---

**sailing**



24:15

**save**
27:2

**saving**
27:4

**savings**
27:12

**scan**
49:1

**schedule**
22:19

**scholarship**
38:7

**school**
30:19,24
36:22,23
37:6

**score**
52:8,13
53:4
54:13
55:23
56:20
57:1,2,10

**scores**
54:24
56:16

**screening**
59:11

**scroll**
46:11
48:22
49:19
51:13
59:3
60:18
63:8
68:20

**scrolling**
49:4 51:9

**season**

65:14
66:3

**send**
71:16
73:4

**sending**
42:11,14

**sense**
49:1
52:25
60:5 61:7
65:6,17
67:19

**Services**
60:20

**shaking**
7:8

**share**
48:10

**sharing**
62:3

**shea**
25:1

**shoes**
27:22

**short**
44:7 58:2
71:21

**showed**
64:22

**showing**
41:11

**sick**
8:21

**sides**
32:9

**sign**
72:23
73:4

**Similarly**
7:5

**simultaneous**
35:13

**single**
20:24

**sitting**
67:13

**situation**
26:3

**sleep**
22:19,21,
25 23:21,
22 24:10
46:6

**sleeping**
24:1

**slightly**
18:10

**slower**
48:23

**slowly**
52:10

**small**
18:17

**smooth**
24:15,17

**Sofia**
14:21,22
28:4,6,
10,12,15,
24 29:2
30:9

**Sofia's**
30:1

**sold**
50:6

**Solutions**
4:20,23

5:23

**son**
13:7,8
14:13
16:7
17:13
18:5
19:22,23
38:1
42:17
64:12
65:2

**son's**
13:10
14:25
17:5

**soothe**
23:13

**sort**
17:21
19:5
45:16

**sound**
6:22 7:9,
15 54:7
56:2
59:13

**Sounds**
37:12

**sources**
39:17

**Southwest**
49:20

**space**
59:23

**speak**
6:18

**speaking**
35:5,13
36:8
51:14

**speaks**
35:12,14

**special**
38:14

**specific**
36:5
55:16

**specifically**
7:2 64:5
68:7 69:5

**spell**
5:6

**spelling**
14:24

**spend**
28:19
29:13

**spending**
27:3

**spot**
27:20

**stage**
24:5

**start**
11:6
13:16
21:12,13
45:17
53:23
54:17
57:12

**started**
13:17,21
23:19
53:19
57:3
64:15
66:1,9

**starting**
49:22



**state**
4:14 5:6

**status**
35:1,10,
18,19,23
36:4,5,11

**staying**
40:3

**stenographic**
4:9

**step**
68:14

**stepdaughter**
14:14,16,
19 16:7,
13

**stood**
61:6

**stop**
7:14 24:4
62:3

**stopped**
45:4,9

**strain**
31:10

**street**
5:15,18
15:2,12,
14 16:23
44:17

**stress**
51:5,23
52:14
68:10

**stressed**
22:7,11
45:14
46:4
51:22

66:8 68:9
71:19

**stressful**
32:24
33:2

**stretch**
53:12

**strike**
19:18
20:23

**studio**
18:17,18
19:7
26:18,25
31:24
56:9
59:13
65:22

**study**
37:10,12

**studying**
37:25

**stuff**
35:21
43:2
56:24
58:15
65:5 66:9

**submitted**
59:24

**subsequent**
69:16

**substance**
9:16
70:21

**suffer**
44:6

**sufficient**
72:1

**suing**
40:10

**super**
60:5
66:25

**support**
18:1,10,
12,14
40:1

**supporting**
28:15,19

**supposed**
48:24
49:17
61:22

**suspect**
8:20

**swear**
4:15

**switched**
63:25
64:1

**sworn**
5:1,3

**symptoms**
43:20
44:4,6,
20,25
46:5

**Systems**
49:20

———————

**T**

———————

**taking**
8:11
40:15
72:7

**talk**
9:14 10:1
30:9,24
36:4 40:9
53:20

55:8,22
68:6
71:11

**talked**
9:4,5,6,
12,21,22
10:19
39:2
56:14,15
62:15
68:17
69:17
70:13

**talking**
19:7 23:8
53:7,20
69:6 70:8
71:14

**talks**
60:19

**taught**
54:18

**teeth**
46:7

**telling**
42:2,3,6,
8,12

**tells**
61:21

**tenant**
59:11

**Tennessee**
12:22,23
18:19
26:13
28:24
29:5,7
36:24
56:5 58:5
64:14

**term**
44:7

**terms**
27:13
30:2,3

**testified**
5:3 6:1

**testimony**
6:13,14
8:9 35:11

**Texas**
4:7,10,12
5:19,20
12:25
13:2
14:2,3
15:15,16
26:13
27:3,5
28:24
29:6
57:23
58:1,4
64:17
65:1
70:18

**text**
30:8

**Thanksgiving**
46:10

**thing**
32:23
37:15,17
39:4
52:16
55:15
56:17
61:6,20
67:14,15
68:21
71:14

**things**
25:2
27:15
31:8



32:20
33:8,9
35:19
37:20
43:10
55:4
57:13
61:20

**thought**
48:8
72:11

**thousand**
20:8 43:5

**time**
4:4 6:18
7:24 9:4
17:24
18:2,15
20:9
22:3,14
23:18,23
25:7
26:2,7,23
28:16,25
29:7,13
30:5,6
31:23
33:16,23
35:21
43:23,24
45:3,6
46:8
53:11
54:16
55:18
57:23
58:17
60:9,10
61:9,14
64:10
72:6,8,21

**timeline**
59:14

**times**

23:8
31:13
33:21

**tired**
71:18

**today**
6:10,13,
16 7:6
8:9,13,
15,21,24
9:8 10:25
34:15
35:11,19
54:10
72:8

**today's**
4:4 10:9

**total**
17:7

**totally**
25:18
32:16
57:16

**toys**
27:18,22

**trade**
49:6,8,9

**training**
38:14

**transcribed**
73:1

**transcribin
g**
7:6

**transcript**
47:4
72:23

**treatment**
24:24
25:3 48:2

**treats**

32:22

**Trial**
58:22

**trouble**
22:1 24:1

**truthfully**
6:11 8:24

**turmoil**
35:20

**turn**
6:20

**turning**
66:18

**type**
32:9
67:24

**typically**
20:25
21:12,16
22:25
28:19

———

**U**
———

**Uh-huh**
19:3 26:6
28:7
46:22
51:16
62:16
64:11
66:21
68:24
69:13,19
70:19

**uncomfortab
le**
31:20
33:12

**understand**
5:22 6:9,

13 7:3,
11,21
8:12 28:9
40:17
50:2
54:10

**understandi
ng**
52:9
53:22
60:2

**understood**
7:15

**unexpected**
43:7

**unit**
19:5

**university**
37:6,7
38:3

**upset**
29:17

———

**V**
———

**version**
73:8

**victor**
11:19,23
12:7,8,9
13:3,8,14
14:13
15:4,5
16:7
17:12
19:4,22
20:25
23:12
25:10
26:5
27:23
28:15,23
29:2

32:16
33:2,11
37:21
39:2,17
40:6,10
41:22
43:17
47:7,19
49:5,15
50:14,20
54:5,13
56:13
59:11
60:7,12,
17 61:17
62:13,20
67:12,20
68:6
71:2,6

**Victor's**
15:12
16:1,9
17:4
29:25
31:25
33:22
34:7 35:2
45:13
47:16
48:18
57:1
60:22

**Vio**
11:25

**visible**
41:7
46:14

**visit**
29:2,8,11
35:22
41:19,21
42:14,16
43:8
45:12
48:3,20



800.211.DEPO (3376)
EsquireSolutions.com

**W**

**wait**
6:19,21

**waited**
62:21
63:4 65:5

**wake**
23:1,2,4,
12,15,16

**waking**
24:11,12

**walk**
6:6

**wanted**
25:24
27:15,19
37:15
49:1
54:23
55:12
59:22,23
68:11
70:13
72:13

**wanting**
29:11

**watch**
18:7

**watched**
10:11
67:23,24

**ways**
55:3 66:1

**week**
14:18
28:20,21

**weekdays**
21:16

**weeks**
14:17
43:19

**weigh**
25:24
31:6

**weighing**
29:19

**wellbeing**
25:15

**Whites**
36:23,25

**work**
21:4,16,
22,23
39:3 42:3

**worked**
54:24

**workers**
21:21

**working**
20:10,11,
12 21:4
22:3
56:15

**works**
6:7 54:18

**worried**
43:25
66:7,10

**worry**
31:14

**Worth**
4:11
15:15,16
34:10
44:17

**writing**
4:9 67:16

**wrong**

44:23
63:7 70:7

**wrote**
67:12

**Y**

**y'all**
13:4

**year**
15:18
16:14
17:18
18:25
19:1,2
28:13
44:9

**yearly**
39:9

**years**
12:10
36:25
37:2,8

**yeses**
7:7

**yesterday**
9:3,12
10:15

**you-all**
54:20

**young**
18:6

**younger**
17:14
24:2

**youngest**
17:12

**Youssef**
4:16 9:3
35:4

**Z**

**zoom**
41:12
46:13
59:5
66:20



# EXHIBIT Q

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF TEXAS

VICTOR MANUEL RAMIREZ NAJERA, )
)
      Plaintiff, )
) Case No.:
v. ) 4:25-cv-00443-P
)
EXPERIAN INFORMATION SOLUTIONS, )
INC.; APPFOLIO, INC.; and )
NATIONSTAR MORTGAGE, LLC d/b/a )
RUSHMORE SERVICING, )
)
      Defendants. )
_____)


30(b)(1) VIDEOCONFERENCE DEPOSITION OF
EXPERIAN INFORMATION SOLUTIONS, INC.
BY TIMOTHY SUMIDA


Yorba Linda, California

November 18, 2025


Prepared by:

Daniel Rohan, CER
Certified Electronic Reporter
CER No. 4137

**CERTIFIED TRANSCRIPT**

I N D E X

THE WITNESS                                                              PAGE

 TIMOTHY SUMIDA

     Examination by Mr. Ristvedt                                           6


                        EXHIBITS MARKED

 EXHIBIT                    DESCRIPTION                                  PAGE

 Exhibit 1      Experian Patent, Systems and Methods      39
                for Large-Scale Credit Data
                Processing

 Exhibit 2      Ramirez Najera Admin Report               62
                (Pre-Unmixing)
                EXPERIAN_NAJERA_0171 - 0208
                CONFIDENTIAL

 Exhibit 3      SSN Examples                             117

 Exhibit 4      Name Examples                            152

 Exhibit 5      Hernandez Franco Examples                154

 Exhibit 6      Garcia Delgado LAR                       126
                EXP-Delagdo-000029 - 000040
                CONFIDENTIAL


                  INSTRUCTIONS NOT TO ANSWER

                     Page 93    Line 13

                    30(b)(1) VIDEOCONFERENCE DEPOSITION OF

               EXPERIAN INFORMATION SOLUTIONS, INC.

                         BY TIMOTHY SUMIDA

was taken on November 18, 2025, commencing at 9:02 a.m.,

with the witness appearing from Yorba Linda, California;

with all other participants appearing via videoconference

from their respective locations, before Michelle Clark, a

Certified Electronic Reporter and Notary in the State of

Arizona.


                              *    *    *

APPEARANCES:

     For the Plaintiff:
          CONSUMER JUSTICE LAW FIRM, PLC
          By:  James Ristvedt, Esq.
               Mehak Rizvi, Esq.
               McKenzie Czabaj, Esq.
               8095 North 85th Way
               Scottsdale, Arizona  85258
               480-626-1956
               jristvedt@consumerjustice.com
               mrizvi@consumerjustice.com
               mcazbaj@consumerjustice.com

          and

          THE CREDIT ATTORNEY, INC.
          By:  Youssef H. Hammoud, Esq.
               601 North Parkcenter Drive
               Suite 202
               Santa Ana, California  92705
               949-301-9692
               yhammoud@thecreditattorney.com

APPENDIX 1247

```
        For the Defendant:
          JONES DAY
          By:  Rebecca W. Anthony, Esq.
               2727 North Harwood Street
               Suite 500
               Dallas, Texas  75201
               214-220-3939
               ranthony@jonesday.com
```

TRANSCRIPT OF PROCEEDINGS


THE COURT REPORTER:  We're on the record. Today's date is November 18, 2025, and the time is 9:02 a.m. Pacific Standard Time.

Would counsel please state your appearances for the record, including the location from which you're appearing?

MR. RISTVEDT:  Yes.  This is attorney James Ristvedt.  I am located in, I guess, Scottsdale, Arizona. I'm joined today by my colleagues, Mehak Rizvi, McKenzie Czabaj, and Youseff Hammoud.

MS. ANTHONY:  This is Rebecca Anthony on behalf of the witness and Experian Information Solutions. I am in Dallas, Texas.

THE COURT REPORTER:  Will the witness please state and spell your full name for the record and provide the address from which you are appearing?

THE WITNESS:  Sure.  I'm Timothy Sumida, T-i-m-o-t-h-y, Sumida, S-u-m-i-d-a, and I'm in Yorba Linda, California.

THE COURT REPORTER:  Mr. Sumida, would you please raise your right hand to be sworn?

Do you solemnly swear or affirm that the testimony you're about to give at this time and place will

be the truth, the whole truth and nothing but the truth, under penalty of perjury?

THE WITNESS:  Yes, I do.

THE COURT REPORTER:  Thank you, sir.

Counsel, you may proceed.


TIMOTHY SUMIDA,

the witness herein, having been first duly sworn by the Certified Reporter, was examined and testified as follows:


EXAMINATION

BY MR. RISTVEDT:

Q.  Thank you.  Good morning, Mr. Sumida.  How are you today?

A.  Morning.  Please call me Tim.

Q.  Tim, fair enough.

Have you ever been deposed before, Tim?

A.  Once before, yes.

Q.  When was that?

A.  That was maybe 15 years ago or so.

Q.  Do you recall what the context was or what that case was about?

A.  Yeah, that was the BK-7 discharge case.  It was not a Find Consumer case.  Yeah.

Q.  Got it.  So in other words, it was related to

APPENDIX 1250

Experian's reporting of bankruptcy records as opposed to tradeline information. Am I understanding you correctly?

A. Yes. Roughly, yes.

Q. Within the context of that case, other than your deposition, did you provide any other testimony by way of, say, in-courtroom testimony, anything to that effect?

A. No, I did not.

Q. Okay. So I understand this may be a -- it's been a while since you've done this, and you've only done this once. I've got some -- what we call admonishments, really just rules of the road to hopefully get us on the same page so that we can, number one, be efficient with our time today, but hopefully, it is as painless for all of us as feasibly possible, as painless as a deposition can be.

Anyway, there are a few different questions I'd like to get on the record just so that we've got them for posterity. Some of them do sound a little silly, but it's important I ask them nonetheless.

Is there any reason that you would be unable to provide truthful or accurate testimony today?

A. No.

Q. Have you consumed any drugs or alcohol in the last 24 hours that would impair your ability to testify truthfully or accurately?

A. No.

Q.   Are you currently taking any prescription medications that affect your ability to testify truthfully or accurately?

A.   No.

Q.   So we are here for your deposition in which I get to ask questions.  You're obligated to answer those questions truthfully to the best of your ability, best of your recollection.  With that being said, it is not intended to be a trivia contest or Who Wants to Be a Millionaire, or anything remotely similar.  Hopefully, I will do my job well and ask you very clear questions so that it is obvious, number one, what I'm asking you, and number two, the different words that I am using.

But I, like most attorneys, have a tendency to at times ask questions where I begin the question thinking one thing and end the question thinking another, such that my question might become confusing to you.  If that occurs, what I'd like you to do is let me know either, "I didn't understand you.  I'm not sure what you're asking me.  Could you please rephrase?  I don't know what that term you used means," something to that effect.  But if you do answer my question, I will make two assumptions based on your answer, number one, you understood me; number two, you heard me.  Is that fair?

A.   Yes, it is.

Q.   Mr. Rohan, our court reporter, he's going to be transcribing everything I say, everything you say, everything Ms. Anthony says during the course of today's deposition.  So there will be times where there may be folks talking over one another, and my hope is that we can minimize the number of times that occurs so that we make our court reporter's, Mr. Rohan, life a little easier.

Therefore, what I'll ask is when I've asked you a question, I'd like you to wait just a moment until it's clear that I'm done asking my question before you begin your answer.  This has a couple different reasons. Number one, it means we're not going to talk over one another; number two, if Ms. Anthony needs to lodge an objection in response to one of the questions I asked you, she'll be able to do so, again, without stepping on your answer with her objection.  Does that all make sense?

A.   Yes, it does.

Q.   As it relates to objections, there will be times that Ms. Anthony objects to a question I've asked you, perhaps a series of questions I've asked you.  I'm sure you've seen courtroom TV shows and movies.  It's very dramatic.  The judge bangs the gavel and says "overruled" or "sustained" or something like that.  There's no judge here.  It's just us.  And so none of the objections today will be ruled upon.  What this means, practically

speaking, for you is that these objections are largely being preserved for what's called the record later on, meaning that later on a judge may be able to rule on some of these objections.  The practical impact for you as it relates to your testimony is that when Ms. Anthony does object to a question I ask you, what I'd like you to do is allow her to complete her objection, state it for the record, then go ahead and answer my question as though she never said anything at all.

The only exception to this would be if at some point she raises what's called a privilege objection and she says, "I'm objecting.  This calls for attorney-client privileged communications.  I'm instructing the witness not to answer the question."  In those instances, I expect you will follow your attorney's instructions and refrain from answering my question.

Does that all make sense to you?

A.    Yes, it does.

Q.    Now, you are not obligated to guess at the answers for anything today.  As I said, it is not intended to be a trivia contest, it's not a guessing game, anything like that.  However, I am entitled to what is called your best estimate.

The typical comparison that I make in order to explain this distinction between a guess, a pure shot

in the dark versus a best estimate with some basis is, if I were to ask you, for instance, "Tim, how many windows are there in New York City," well, I imagine unless you have very specific New York City-based interest, you have no way of answering my question.  You might not know how many buildings there are, how many windows per building, are we counting cars?  Are we counting subway cars?  All of those items.  You just have no basis at all, it would be a pure shot in the dark.  No basis of any kind?

On the other hand, if I said, "Hey, Tim, how long is the desk you're sitting at today," you might not have ever measured it with a tape measure, but you may know, "Okay.  My wing span is about six feet wide.  I can almost grab the entire table, so it's about six or seven feet."  You've got some framework, some basis to make that estimate.

Does this distinction I've provided you as -- with respect to a guess versus a best estimate, does that make sense to you?

A.   Yes, it does.  Thank you.

Q.   The last thing I'll note is that I typically suggest a break of five to ten minutes every hour or so.  However, time does fly when one is having fun.  And I have a very bad habit of ultimately running longer than an hour and being alerted that, "Hey, it's been more than an hour

since our last break."  I say this to let you know that, number one, I will endeavor to take those breaks every hour.  If I forget or if we go over the hour mark, your attorney may suggest a break.  But I also want you to be aware that if at any point you need a break, in other words, you need to stand up, stretch your legs, grab a drink of water, whatever the case may be, please simply ask me.  I am more than happy to oblige.  The only thing that I will ask you in return is if I have a pending question where I'm waiting for your answer still, or sometimes I might have kind of an interrelated series of questions where, "Hey, these questions are all kind of linked," I may say, "Tim, I've got just a few more questions that are connected.  Let's go ahead and answer these, and then we can break."  Is that fair?

A.    Yes, it is.

Q.    Who is your current employer?

A.    I'm not currently employed.

Q.    I understand until recently you were employed in some context by Experian, but potentially by a contractor or subcontractor of Experian.  Is my understanding correct?

A.    That is correct, on a part-time basis.

Q.    What was the name of the -- well, first, actually, was it a contractor or a subcontractor?

A.    It was a contracting firm.

Q.    What was the name of -- or what is the name of that contracting firm?

A.    It was Caspex.

Q.    And could you spell that, please?

A.    Yeah, C-a-s-p, as in Paul, -e-x, as in x-ray.

Q.    And is there any sort of, like, stylized, like a capital e-x or anything like that in the name?

A.    I don't think so.

Q.    Okay.  What type of company is Caspex?

A.    It's a consulting -- global consulting company.

Q.    Does it specialize in technological or programming kind of consulting?

A.    It does do that, yeah.

Q.    And that was the, I guess, role in which you were associated with Caspex.  Is that true?

A.    Yes.

Q.    I understand that you've been contracting for Experian for a number of years, presumably through Caspex during that entire time.  Is my understanding correct?

A.    So I started contracting through Caspex July of 2024.

Q.    Okay.  And who were you working for prior to July '24?

A.    Experian.

Q.   When you were employed by Experian, when did you start your employment with Experian?

A.   So I started with TRW/Experian.  TRW became Experian September of 1979.

Q.   And in July of '24, when you last worked directly for Experian, what was your title at that time?

A.   I was a senior director of software development.

Q.   So obviously you were employed by Experian nearly -- math and attorney -- I think roughly 45 years or so.  Does that sound about right?

A.   Yes.

Q.   And I have no interest in going through every -- I imagine you had a number of roles during that 45-year term.  Is that a fair assumption?

A.   Yes, it is.

Q.   Were they all more or less related to kind of technological, software, programming, engineering type roles, or did they vary in other areas?

A.   I'd say majority of the years were in software engineering/software development.

Q.   I take it you probably have a degree in some sort of computer science or data development, something to that effect.  Am I on the right track?

A.   No.  I have an associate's degree.

Q.   What was the area of focus for your associate's?

A.   It was general, general education.

Q.   When you began with Experian in '79, I would expect that its operations largely differed from the primarily technological database driven stuff that Experian does now.  Is that a fair guess on my part again?

A.   When I first started with Experian or TRW?

Q.   Sorry.  TRW as it was known.  And for the purposes of this deposition, I may refer to those as interchangeable.

A.   Sure.

Q.   I understand that in the '90s they made that transition from TRW to Experian.  For ease of discussion, I'll refer to that entity, TRW and Experian, both by the name of Experian.  Does that make sense?

A.   Yes.  Okay.

Q.   So in the late '70s, kind of early '80s, when you began with Experian, what types of roles did you have or what was the focus of your employment with Experian at that time?

A.   So when I first started, it was sort of an entry-level position in what they call the RJE room.  They had high speed printers, card readers.  And I supported that area for about a year.  That was my first job.

Q.   Approximately how many years in was it before you made sort of the transition into software, computer

science, that sort of area?

A.    I would say roughly in the mid '80s.

Q.    What type of training or education did you receive that you were able to sort of learn software development and coding, that type of thing?

A.    So when I was in college, I took some programming courses there.  I also received some training through the company.

Q.    And then I would assume between the '80s and the last 10, 15 years, presumably you received kind of ongoing training to learn about new or different types of programming codes and languages, things to that effect?

A.    That's correct.

Q.    So when you left your employ with Experian in July of '24, you were the senior director of software. Are my notes correct on that?

A.    That is correct.

Q.    How long were you in that role prior to your departure?

A.    Approximately, maybe 10 years.

Q.    And prior to that, was it kind of -- I should say, having deposed enough Experian employees, my experience is that usually when Experian employees are employed for lengthy periods of time, they sort of have a natural progression upward where their last or most recent

APPENDIX 1260

job is sort of a newer, better, more responsibilities version of a prior role that they held.  Was that your experience as well?

A.    Yeah.  I mean, I managed the team for quite a few years.  So I knew it was the same team that I was with.  You know, prior to that, I was in a different division.  But, yeah, I would say my role was -- did not change drastically.

Q.    When you mentioned you were in a different division, when you were employed as the senior director of software, is the department literally called the software department, or is there, like, a different official name for it?

A.    I believe the name now is FSD.

Q.    Do you know what FSD stands for?

A.    That's the business unit, Financial Services Division, I believe, yeah.

Q.    And my apologies.  I didn't mean to speak over you.

So the business unit would be the financial services division, you said?

A.    Yes.  I believe that's the name.

Q.    Is there like a software team that's like a subgroup of that business unit?

A.    Yes, there is.

Q.    What were the circumstances surrounding your departure in July of '24 and your transition to working for Caspex as a contractor to Experian?

A.    So I took a voluntary layoff.

Q.    And was that something that was requested by Experian, something that you approached them about, or how did that shake out?

A.    They were having some reductions, and so I just decided to take the voluntary layoff at that time.

Q.    When you began working for Caspex, was there a -- like a lag period between your voluntary layoff with Experian where there was a period of time before you worked with Caspex in conjunction with Experian again, or was it like voluntary layoff on Friday and then working for Caspex through Experian on Monday?

A.    That's what it was, yes, working with Experian on Friday and Caspex on Monday, yes.

Q.    Was the Caspex relationship, was that something you were aware of as a consequence of your role with Experian?

A.    I'm not sure I understand that.

Q.    Yeah.  It's not a very good question.  Let me try again.

       In other words, was the Caspex contractor relationship with Experian, did that exist prior to July

of 2024?

A.    No, it did not.

Q.    Okay.  So when you made that transition, you were essentially the link between Experian and Caspex.  Is that fair to say?

            MS. ANTHONY:  Object to form.

            THE WITNESS:  I'm sorry.  I missed what you said, Rebecca.  Sorry.

            MS. ANTHONY:  I just -- object to form.

            But you can go ahead and answer if you know it.  Apologies.

            THE WITNESS:  I'm sorry.  Would you mind repeating the question one more time, please?

BY MR. RISTVEDT:

Q.    Yeah.  No worries.

            My question is, the contractor relationship between experience and Caspex, it sounds to me like you're saying this started right as you made that transition. Have I understood your testimony thus far correctly?

A.    Yes.

Q.    So do you know if you specifically were the reason that Experian entered into that contracting relationship with Caspex?

A.    They already had a relationship with Caspex.

Q.    Okay.  So in other words, no, not you

specifically.  Is that fair?

A.   If you're asking did they go with Caspex specifically to hire me, no.  They already had a relationship with Caspex, if I'm understanding what you're asking.

Q.   Yes, that's correct.  Thank you.

A.   Okay.

Q.   So I understand you are located in California, Experian's kind of home offices are located in Allen, Texas.  Is my understanding correct?

A.   They have a campus in Costa Mesa, California, and that's where I was -- that's where my office was.

Q.   Understood.  So did you physically work in the Costa Mesa office at Experian?

A.   Well, I did until Covid, and then started working from home since then.

Q.   I think a lot of people would join you in that sequence of events.

So following 2020/2021, the pandemic, from then on, were you working entirely remote?  Was there ever a hybrid?  Like, sometimes remote, sometimes in office, or was it just fully remote after that?

A.   It was fully remote after that, yes.

Q.   And I understand Experian's system contains consumer credit information, proprietary information owned

Coash Court Reporting & Video, LLC
staff@coashcrv.com
602-258-1440
www.CoashCourtReportingandVideo.com

by Experian, and other sensitive trade information.  Is my understanding correct in that regard as well?

A.    Yes.

Q.    So I would expect that working remotely, you would have to have some sort of secure connection vis-à-vis a VPN link or something along those lines.  Is my expectation accurate?

A.    Yes.

Q.    Do you know what the name of the VPN that you used to connect to Experian's sort of home office is called?

A.    No, I don't.  Sorry.

Q.    When you access Experian's system remotely, other than the VPN, were there any other security measures you were required to maintain on your home computer so that Experian could be assured that you had a secure system?

MS. ANTHONY:  Object.

THE WITNESS:  So I use the Experian laptop. I did not use my home computer.

BY MR. RISTVEDT:

Q.    Got it.  And I assume they kind of load it up, firewall, antivirus, things like that on there?

A.    Uh-huh, yeah.

Q.    So I have some questions for you about your preparation for today.  Before I ask these questions, I do

want to make clear, number one, I understand you're being represented.  You have an attorney present today, Ms. Anthony.  Is that true?

A.    Yes.

Q.    Now, I know you're no longer employed by Experian, but am I correct in understanding that Experian arranged for you to have access to Ms. Anthony as your legal counsel?

A.    Yes.

Q.    Did you sign any sort of retainer agreement with Ms. Anthony or her firm?

A.    No, I did not.

Q.    And are you paying them anything?

A.    Am I paying them anything?

Q.    Correct, yes.

A.    I am not paying them anything, no.

Q.    Okay.  So I have some questions about sort of what you did to prepare for today.  Because you are represented by an attorney, before I ask these questions, I want to make absolutely clear to you, I have zero interest in any privileged communications.  In other words, the substance, what you discussed with Ms. Anthony.

Therefore, if any of my questions would require you to divulge information about what you actually talked about with Ms. Anthony, I'll ask you not to provide

me any of that type of testimony.  Does that make sense?

A.   We'll see.  I mean, I don't know what would be considered privileged or not necessarily, but yeah.

Q.   So generally speaking, the contents of any of those communications is information I have zero interest in.  The existence of those communications, say, if you spoke over Zoom, that type of information would not be subject to privilege.  However, if I were to ask you, "Hey, what did Rebecca tell you to say," that would be something that, number one, I wouldn't ask; but number two, Ms. Anthony would certainly object and instruct you not to answer.  Does that make sense?

A.   Yes.  Okay.

Q.   So generally speaking, what did you do to prepare for today?

A.   The only thing was a meeting that we had yesterday.

Q.   And when you say a meeting we had, I assume the "we" in that statement is you and Ms. Anthony.  Is that correct?

A.   Yeah.  And there were others as well.

Q.   Do you know the identity of the others?

A.   Yes, I do.

Q.   Who are the others?

A.   Adam Wiers and then Kim Cave joined for a period,

and I believe that was it.

Q.    Was that a meeting over Zoom or Microsoft Teams or something similar?

A.    That was a Zoom.

Q.    You said that took place yesterday.  Am I understanding that correct?

A.    Yesterday, correct.

Q.    When did you first learn that your deposition would be taken in connection with this case?

A.    I don't know the exact date, but it was earlier -- earlier this month maybe, perhaps even late October.  I don't recall the specific date.

Q.    Kind of like in the end of October, early November time frame?

A.    Something -- something around there, yeah.

Q.    What was the -- how did you learn initially that your deposition was being sought?

A.    I believe Mike Rozak reached out to me first.

Q.    And Mike Rozak, that's Experian's internal general counsel.  Is that right?

A.    Yes.

Q.    After learning your deposition testimony was being sought, I understand that one of your former colleagues, Ms. Cave, was present on the meeting you had yesterday.  Setting aside that meeting for a moment, were

there any other of your former colleagues at Experian with whom you've communicated since learning about this deposition?

A. Any other from Experian?  Not that I can recall.

Q. Did you review any documents to prepare for the deposition or upon learning that your deposition was being sought?

A. I did not review any documents.

Q. Have you made any written statements about the deposition testimony that was being sought from you or about the facts of any particular lawsuit?

A. Not that I recall, no.

Q. Did you make any notes to prepare for today?

A. Notes, no.

Q. I imagine in the context of your role for Experian you had the opportunity to become familiar with Experian's matching logic for matching consumer credit information to personal identification numbers, or PINs, within Experian's system.  Is my understanding and assumption correct?

A. Yes.

MS. ANTHONY:  Object.

THE WITNESS:  Sorry.

MR. RISTVEDT:  I promise you it happens, even with people who do this all day every day.

BY MR. RISTVEDT:

Q.    Are you familiar with Experian's rules surrounding creation of PINs?

A.    I'm familiar with it, yes.

Q.    Are you familiar with Experian's matching and sorting algorithm named Find Consumer?

A.    Yes.

Q.    I understand that Find Consumer is sort of a colloquial name.  In other words, it may not be the official name of the algorithm.  Is that true?

A.    That's the only name I've heard reference to it. I'm not aware of any other name.

Q.    Okay.  So in other words, Find Consumer is the only name you've ever referred to or used to refer to Experian's algorithm.  Am I understanding you correctly?

A.    Yes.

Q.    Does documentation exist that contains the technical specifications about how Find Consumer operates?

        MS. ANTHONY:  Object to form.

        THE WITNESS:  Yeah, there is documentation.
BY MR. RISTVEDT:

Q.    Is that documentation to which you had access during the course of your employment with Experian?

A.    Yes.

Q.    How would you go about -- well, actually, strike

that.

So my understanding from many depositions of other Experian employees is that there's some sort of server, kind of like SharePoint, potentially even now using SharePoint, that Experian uses to store its internal documents, policies, procedures, things of that nature. Is that your experience as well?

MS. ANTHONY:  Object to form.

THE WITNESS:  Yes, it is.

BY MR. RISTVEDT:

Q.   When you talk about the document containing technical specs for Find Consumer, would that type of documentation be contained within that server that I'm referencing?

A.   Yeah, I don't know the specific server or location.

Q.   Well, in other words, what I want to ascertain is during the course of your employment, if I said, like, "Hey, Tim, can you go track down the technical specs for Find Consumer and send them to me," where would you go to look for that documentation?

A.   So I would go to the -- the team that supports it.

Q.   When you say "the team that supports it," what is the "it" in that sentence?

A.   That supports the application, Find Consumer.

Q.   Got it.  So there's a Find Consumer team.  Is that right?

A.   Yes.

Q.   So presumably this Find Consumer team, they've got the documentation, and you would request it from, like, the manager of that team.  Is that right?

A.   Yes.

Q.   Have you seen the documentation containing those technical specs about Find Consumer before?

A.   Yes, I have.

Q.   Did you play any role in either drafting or in updating the documentation surrounding the technical specs of it?

A.   Yes, I did.

Q.   We've talked about this algorithm, Find Consumer, a bunch in a few depositions.  And I, like most lawyers -- this may surprise you -- am not overly tech savvy.  So when we talk about this algorithm, it's kind of a nebulous concept, I think, to several of us attorneys.

So when I say "the Find Consumer algorithm," what is it literally?  Like, what type of computer file is the Find Consumer algorithm?

MS. ANTHONY:  Object to form.

THE WITNESS:  Type of computer file?  Are

you asking what language is it written in?

BY MR. RISTVEDT:

Q.    Yeah, let's start there.  Like, is it C plus plus?  Is it Python?  Is it something else that's really cool?

A.    It's C.

Q.    So it's written in C.

What type of file or files does that ultimately result in?  In other words, I expect the algorithm is maybe not like a single file.  Is that assumption correct?

A.    Yes, it is.

Q.    Is it a handful of files?  Is it thousands of files?  Like, what's the universe we're talking about?

A.    It's not thousands, but there are several different functions.

Q.    And if I were to look at it, like on a computer, is there a certain operating system I need to be using in order to view those files?  Like, does it have to be Linux?  Can I view them in Windows?  Or is it something else entirely?

A.    Yeah, you'd have to -- the program would have to answer that.  I don't -- I no longer do any programming.

Q.    So at least the computer files themselves -- my -- and this is a very surface level understanding, is

that there are files that would have a file extension of,
like, dot C, or in some cases, dot O or dot S, things like
that.  Is my high level layman understanding correct?

A.    I believe so.

Q.    Let me take a step back.

The database that Experian maintains
containing consumer credit information is called the
FileOne database.  I expect you're familiar with FileOne.
Is that correct?

A.    Yes.

MS. ANTHONY:  Object to form.

BY MR. RISTVEDT:

Q.    What type of database is the FileOne database?

A.    It's a relational database.

Q.    What language is the FileOne database coded in?

A.    What language is the database coded in?

Q.    And this is the main problem with attorneys
asking technical questions is sometimes the questions
don't even make sense and people make that face.

So let me try this.  I'm familiar with
something called like a MySQL database?

A.    Okay.

Q.    Is FileOne a MySQL database?

A.    So it runs on Aurora, which is a BI SQL type
database, as well as really have Db2 on the mainframe.

Q.   Am I correct in understanding this Aurora, BI SQL and Db2, presumably these are standardized types of database infrastructure as opposed to, say, a proprietary Experian invention?  Am I correct in that understanding?

A.   I'm not sure I understand the question.

Q.   Well, in other words, I don't believe Experian, for instance, invented MySQL and presumably didn't invent this Aurora that you're referring to.  Is that true?

A.   That is true.

Q.   And the Db2 type of, I think, database that you're referring to, is that a proprietary Experian database type, or is that something that's used by, say, other companies, other users, things like that?

A.   Db2 is commercial.

Q.   When we talk about the Find Consumer algorithm, are the files containing Find Consumer backed up somewhere within Experian's storage systems?

A.   Yeah, I don't know.  I mean -- yeah.  As I said, I don't -- I don't handle the development, so -- yeah -- yeah, I don't -- I'm not certain.

Q.   Well, in other words -- and it sounds like you may not know, and if that's the case, that's -- this is the one test where "I don't know" is an acceptable answer.

But what I want to make certain I understand is -- so, for instance, like, the formula for Coke, if

every single Coca-Cola plant suddenly had a catastrophic failure, my understanding is they've got like fireproof safes that have the formula for Coca-Cola so that if something horrible ever happened, they could still recreate the classic beverage.

So my question is, do you have any knowledge about whether Experian would have the ability to, say, recreate Find Consumer from scratch if suddenly it had a catastrophic system failure?

MS. ANTHONY:  Object to form.

THE WITNESS:  Yeah, again, I don't -- I would not know the details for that.

BY MR. RISTVEDT:

Q.   Do you have any knowledge about whether Experian retains archived versions of the Find Consumer algorithm?

MS. ANTHONY:  Object to form.

THE WITNESS:  Yeah, I mean, I think that's a similar question.  Yeah, I would not be aware.  I'm not familiar with that.

BY MR. RISTVEDT:

Q.   My understanding of the operation of Find Consumer is that it is both rules-based and conflicts-based.  Is that correct?

A.   It is rules-based.  I'm not sure what you mean by conflict-based.

Q.   Well, a few months ago, we took a deposition of Ms. Cave, who provided some, I would say, very high level testimony about Find Consumer, its operation.  And she identified that some of the ways that Find Consumer operates in associating data to a particular PIN is through things like conflict.

So like if a social security number was 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, a second social security number of 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 would be a conflict such that the second could not be associated with the first.  Does that distinction of what a conflict is -- at least my understanding -- does that make sense?

A.   Yeah.  So I think what she's referring to -- so we have reject rules, which looks at conflicts.  But we also have select rules which looks at what's matching.

Q.   Okay.  So it sounds like, if I'm following you correctly, and I want to be certain I am, the conflicts I'm describing are really, like, negative rules.  They're rules for rejecting data versus what you called selective rules, which are rules for matching data.  Have I understood and followed your testimony correctly?

MS. ANTHONY:  Object to form.

THE WITNESS:  Yeah.  So the reject rules are rules for disqualifying based on conflicts.  The select rules are rules for determining whether we have -- whether

it passes the match threshold or the select rules.

BY MR. RISTVEDT:

Q.   So that you and I are using the same vernacular throughout today's deposition, if you were referring to what I call the conflict, like a mismatch in data, would you call that a disqualifying conflict, a conflict, a reject, or what word would you use?

A.   I would use rejects, reject tables.

Q.   And when I talk about matching data, it sounds like you would use a word more like "select" or something like that.  Have I followed you correctly?  Or is there a different word you would typically use for matching data?

A.   Well, matching is actually done before we pass to reject or select tables.  So matching is one of the first things we do.

Q.   So let me clarify.

When you say "matching is one of the first things we do," my, at least, sort of conception of matching is, we have a tradeline with certain information and we match it to a particular PIN.  But it sounds like you may be saying that there's a step before what I have understood as matching.  Have I understood your testimony correctly?

A.   Yes.  When we match, we don't match tradelines by consumer matches, consumer PII.  So before we can

determine what conflicts exist or what matches exist, we have to match, right?  Compare what's on the input to what we have on file for that PIN and build a match pattern.

Q.   When you say compare what's on the input to what's on the file, so that I can use more tangible terms, in this context, would input refer to, like, a tradeline monthly update furnished by a data furnisher?

A.   It could be trades that we receive from a data furnisher, or it could be an inquiry coming in.  It's used by both.

Q.   Sure.  And allow me to clarify.

In other words, when -- when you talk about input, you're talking about data received from a data source, whether that's a tradeline update or an inquiry or a public record, something like that, yes?

A.   Yes.

Q.   And then when you talk about what's on file, you're referring to what's literally in the FileOne database at the time that input is received.  Is that true?

A.   That's correct.

Q.   So the PINs that Experian maintains, those correlate to a particular combination of personal identifying information Experian has received potentially from a number of sources.  Is that correct?

Victor Manuel Ramirez Najera vs. Experian Information Solutions Inc. -
30(b)(1) Experian Information Solutions, Inc. - Timothy Sumida

November 18, 2025
36

A.   Yes.

Q.   And my understanding about the process of data ingestion is that when Experian receives new data from a data source, Find Consumer analyzes the data at ingestion and then sort of seeks out an existing PIN to try and determine if there's a PIN that already exists that has sufficiently similar PII within the FileOne database.  Is this understanding correct?

A.   Yes.

Q.   In circumstances where the new data payload is not sufficiently similar to an existing PIN, does FileOne and Find Consumer -- do they sort of understand this must be a new person and then a new PIN gets created?  Or what would that sequence of events look like?

MS. ANTHONY:  Object to form.

THE WITNESS:  Yeah, Find Consumer is a read only application, so it does not create or write PINs. It's up to the calling application to determine if a new PIN should be created.

BY MR. RISTVEDT:

Q.   When you say the calling application, is that something within the FileOne database, or is that a different piece of software entirely?

A.   It's within the FileOne set of applications, so it could be trade reporter update, it could be, you know,

APPENDIX 1280

Victor Manuel Ramirez Najera vs. Experian Information Solutions Inc. -
30(b)(1) Experian Information Solutions, Inc. - Timothy Sumida

November 18, 2025
37

inquiries that come in, yes.

Q.   So within the FileOne, I guess we'll call it neighborhood, there are different kind of subsets of processes from what it sounds like.  Am I understanding you correctly?

A.   Yeah.  There are different applications that use Find Consumer, whether it be to new trades, new public records, to service inquiries that come in, requesting credit reports, they all will call Find Consumer.

Q.   Understood.  So if I understand the relationship between these various processes, it sounds like at the point of data ingestion, Find Consumer is sort of the search engine, and then FileOne and its subset of processes do the actual work of either creating a PIN or creating new information within FileOne based on the data payload and Find Consumer's algorithm result.

Do I understand this relationship between the various processes correctly?

MS. ANTHONY:  Object to form.

THE WITNESS:  Yeah -- so, yeah.  Yeah.

So Find Consumer is the storage engine that's used by the various applications.  It's read only, so it'll return back the PIN and associated consumer and address data for that PIN.  And that's where Find Consumer's task ends.  They'll give it back to the caller.

BY MR. RISTVEDT:

Q.   Got it.  So in circumstances where the new data payload is analyzed by Find Consumer and it comes up and says, "No, there's no existing PIN that matches within those rules," in those instances, the result that Find Consumer returns to the calling application would basically be no records found.  Is that correct?

A.   Yes.

Q.   And then based on that no records found result, the calling application would make the determination, presumably based on its own rules, as to whether to outright reject the data or create a new PIN entirely.  Is that true?

A.   Yes, that's my understanding.

Q.   I take it, from the sound of it, you may be less familiar with the calling process than with Find Consumer.  Have I understood correctly?

A.   Yes, I'm more familiar with Find Consumer.

Q.   Do you have any knowledge as to whether --  Let me strike that.

Are you listed as the inventor on any patents held by Experian that relate in any way to Find Consumer?

A.   I believe I may be.  I know there were some patents issued.  I don't know if it's specific -- if it's

specific to Find Consumer.

Q.   I'm going to share my screen.  Throughout the course of the deposition, I have a number of exhibits I'd like to share with you and ask you some questions about. Unfortunately, we are not in person.  I can't just dupe you the exhibits and then have you rifle through them.  So we're left with me kind of as the host showing you the exhibits on the screen.

However, I do want to ensure that you can adequately read the documents, see them, all of that fun stuff.  So if you need me to scroll up, scroll in, scroll out, zoom, whatever, please let me know.  I'm happy to manipulate the document however you need.  Does that make sense?

A.   Yes.

        (Plaintiff Exhibit 1 was marked for
        identification.)

BY MR. RISTVEDT:

Q.   I'm going to share this first document with you. This is what I'm going to designate as Plaintiff's 1.

Have you ever seen this document before?

A.   I assume I would have seen this, yes.

Q.   And I imagine you're saying you assume you would've seen it because it's got your name listed as an inventor on the patent.  Is that the basis for your

assumption?

A.    Yeah.  Yes.

Q.    Now, you may not have seen this specific document before, but it does list you, Timothy Sumida, Yorba Linda, California, as one of the inventors on this patent, correct?

A.    Yes, it does.

Q.    And this says it was filed in July 2012.  Do you agree?

A.    Yes.

Q.    Do you recall at some point in 2012, or perhaps before then, contributing to a patent that Experian planned to obtain?

A.    Yes, I recall that.

Q.    Now, I understand that this particular patent is titled "Systems and Methods for Large-Scale Credit Data Processing."  Would you agree?

A.    Yes.

Q.    Now, based again on my layperson knowledge, my review of this patent and the information contained generally therein seems to be describing what we're talking about.  In other words, ingesting data from data sources, and then taking that data, analyzing it for certain characteristics, and determining what the result of that analysis is.

Coash Court Reporting & Video, LLC
staff@coashcrv.com
602-258-1440
www.CoashCourtReportingandVideo.com

Is my understanding about what this patent consists of more or less correct?

A.   Well, I can't tell by looking at the title.

Is there more to this document?

Q.   Yes, there is.  So I'm going to go down to -- this is the bottom half of page 1.  The abstract I've highlighted reads, "Systems and methods are provided for processing large volumes of credit-related data and other data, and generating products based on the processed data.  Data received from a number of different data sources may be processed in parallel and stored in memory.  Reporting rules may be defined in association with each of a number of different accounts.  Products, such as credit reports, may then be generated based on one or more rule sets."

Have I read the highlighted text correctly?

A.   Yes.

Q.   So my understanding of this abstract is that it's describing aspects of what Find Consumer does and then some other ancillary aspects of things like credit reporting that involve other Experian processes.  Is my understanding consistent with your understanding?

A.   Can you please scroll down a little bit?

Q.   Yes.

A.   Okay.  Yeah.

Q.   And are you referring to the figure at the bottom

of page 1?

A.   Yes, that's what I'm looking at right now, yeah.

Q.   Okay.  And actually, if I can scroll down, there's a much larger version of this figure here on page 5.

A.   Yeah.  Thank you.

Q.   Let me know when you've had a chance to review the figure on page 5.

A.   Yes, I reviewed it.

Q.   So my understanding is that at least aspects of this relate to Find Consumer and its operation.  But again, including other types of Experian processes, like generating credit reports to subscribers, generating consumer disclosures to consumers, things of that nature.

Is my understanding of Figure 1 on page 5 consistent with your understanding?

A.   The only -- wait a minute.  This -- I'm just having a little trouble interpreting the arrows.  Sorry.

Q.   That's quite all right.

And really, I want to ask you a few questions about -- my understanding is, on the right side of the screen where it says "Rules Data 140," that this information would contain certain rules that based on this arrow is applied to the data being ingested by the data supplier, which is then loaded into the information

Coash Court Reporting & Video, LLC
staff@coashcrv.com
602-258-1440
www.CoashCourtReportingandVideo.com

management system, meaning presumably FileOne or some derivation thereof.

Is my understanding of these sequence of events more or less correct?

A.   It's hard for me to determine that.  You know, rules data, product data, it's not clear to me if that's Find Consumer or not.  There's data rule modules, display rule module -- yeah, this is -- just looking at this, it's not clear to me that, you know, rules data is specifically Find Consumer.

Q.   Got it.  So there are a number of different patents Experian has that have your name on them.  Are you aware of that?

A.   Yes, I am.

Q.   And is it your understanding that Find Consumer, the algorithm, Experian's processes surrounding it, that they're referenced in one of those patents?

A.   Yeah, I'm not certain.

Q.   Well, in other words, what I want to make certain I understand is, at least as we sit here today, do you have any knowledge as to whether there's a patent out there with your name on it that relates to aspects of how Find Consumer operates?

MS. ANTHONY:  Object to the form.

THE WITNESS:  Yeah, I mean, I don't know

Coash Court Reporting & Video, LLC
staff@coashcrv.com
602-258-1440
www.CoashCourtReportingandVideo.com

APPENDIX 1287

specifically if there's a patent for Find Consumer that has my name on it.  I mean, there -- there may be, but I don't recall if there is one.

BY MR. RISTVEDT:

Q.    Did you receive any sort of bonus or compensation when you were -- when you participated in a patent that was ultimately registered by Experian?

A.    I believe so.

Q.    So I want to place on -- well, actually, before I get to that.

So we talked a little bit about the rules surrounding Find Consumer and also some of the documentation surrounding Find Consumer.  The documents that contain technical specification about Find Consumer, would those documents also contain a list of the rules to which you're referring?

A.    Yes, they would.

Q.    And are those rules enumerated in sort of a jargon-heavy code format or, like, are they readable to, say, lawyers?

MS. ANTHONY:  Object to the form.

THE WITNESS:  I don't know how easily interpreted it would be for someone not familiar with it, regardless if they're lawyers or not.  So yeah, I don't know how clear it would -- how easily understood it would

be.

BY MR. RISTVEDT:

Q. Well, so, for instance, I'm aware of, say, one rule where Experian has a minimum threshold that, for social security numbers, for instance, at least six out of nine digits must match in order for the data to not reject. Are you aware of that rule?

A. Yes, I am.

Q. So my question is, is there a document somewhere that says, you know, social security numbers, at least six digits must match, something to that effect, even if it's in maybe more of a technical vernacular than what I've just described?

A. Yes, that would be in the rules. Yes.

Q. And that documentation, when we talk about documentation, quote-unquote, I'm thinking of like a PDF, not like a 400-page, you know, line-by-line code.

Is there documentation, like in a PDF file like I'm describing, that contains these rules to which you're referring?

A. Yeah, there's -- there's documentation in a Word file.

Q. Do you know the name of that documentation?

A. I believe it's referred to as the Find Consumer DRDD.

Q.   You could probably bet my next question.

Do you know what DRDD stands for?

A.   Yes, it's detail requirements and design document.

Q.   That tracks.

So within the Find Consumer -- and I think I now understand why you use the acronym -- within the Find Consumer DRDD, it sounds like this contains these rules. Does that include all of the rules or only certain subsets of rules?

A.   That would be all of the rules.

Q.   Now, I understand we don't have, unfortunately, the benefit of looking at the DRDD today.  But I would expect, based on your lengthy history of employ with Experian and your role, presumably, at least, for instance, with this social security number rule, some of these rules I imagine you have committed to memory.  Is that assumption fair?

A.   Maybe a small portion.  I mean, I certainly remember the social rule because that's just one.  It's -- but I don't know that I would recall from memory other rules as well.

Q.   Okay.  Do you have an understanding of how these rules interact with one another?  In other words, if one rule is satisfied, whether other rules, say, become more

flexible, things like that?

A.   So when we look at -- when we consider the reject rule, if a reject rule is satisfied, the PIN is disqualified.  No further action is taken on the PIN -- or no further evaluation is performed on the PIN.  Is that your question?

Q.   I think it's part of it.

So I think if I'm understanding your answer correctly, you're saying for the reject rules, sort of these negative rules, if those are satisfied, then in that instance, the data from the data source is disqualified and there's no other rule that can kind of remedy it. Have I understood you correctly?

A.   That's correct, yes.

Q.   So my question is, are there -- are there some rules that are more flexible than this must have at least six digits rule with respect to the social security numbers?

MS. ANTHONY:  Object to form.

THE WITNESS:  I'm not sure I understand. What do you mean by more flexible with respect to the social security?

BY MR. RISTVEDT:

Q.   So my question is -- so, like, if I've got -- my name's James.  And if there were typically a rule that

says, "Hey, in most cases, we're not going to accept a data payload that has information where the first name is, say, Michael," are there rules that interact with one another that say, "Well, normally we wouldn't accept Michael, but the social matches, the date of birth matches, the address matches, everything else matches except for this first name.  So in this case, there's an exception to that rule."

Are there anything -- any rules like that, that have sort of exceptions based on other factors?

MS. ANTHONY:  Object to form.

THE WITNESS:  Well, the reject rules and select rules, they do consider other match outcomes.  As I said, the social conflict of four more digits, that's the only one that I can recall where that's the only check that's performed.

BY MR. RISTVEDT:

Q.   So it sounds like, for the other rules, setting aside this at least six digits rule, the other rules kind of interact with one another and consider other components.  Have I followed you correctly?

A.   They don't interact with other rules, but the rule itself could consider other fields, yes.

Q.   Okay.  So you're saying, like, a rule for the first name field could potentially consider data from the

date of birth field, for instance?

A.   Yeah, or other parts of the name.  Yes.

MR. RISTVEDT:  Okay.  Well, I note we've been going about an hour.

Rebecca, do you want to take five or so?  Do you want to take more?

Mr. Sumida, of course I'll defer to you as well if you'd like a little bit more time.  That's perfectly fine.

MS. ANTHONY:  Tim, I defer to you.  I'm happy to do five or ten.

THE WITNESS:  Yeah, that works for me as well.

MR. RISTVEDT:  Okay.  And, Daniel, do you want -- I know you're probably going to say either one, but five minutes, ten minutes?

THE COURT REPORTER:  Five is fine with me.

MR. RISTVEDT:  Okay.  Sounds good.  I've got 11:04 my time.  Let's just call it ten after the hour.

(Off-the-record discussed ensued.)

THE COURT REPORTER:  We're off the record. Time is 10:05 a.m.

(A recess ensued)

THE COURT REPORTER:  We're on the record. Time is 10:11 a.m.

BY MR. RISTVEDT:

Q.    Okay.  Tim, before we broke, we were talking about sort of the documentation Experian maintains surrounding Find Consumer, this detail requirements and design document.  Do you recall that?

A.    Yes, I do.

Q.    When Ms. Cave gave her deposition a few months ago, she talked about how when she is analyzing how a mixed file took place.  In many instances, she can sort of piece it together.  But when she can't, she refers those questions -- or referred -- those questions to you for sort of further investigation.

Has it been your experience that from time to time either Ms. Cave or other litigation support employees will reach out to you for analysis about how a particular mixed file occurred?

A.    Yes.  Kim Cave for sure, yes.

Q.    When those types of inquiries took place, was it your practice to review, say, a long admin report for the consumer, who is the victim of the mixed file?

A.    I do not usually look at admin reports, no.

Q.    What type of documentation would you utilize to conduct your inquiry?

MS. ANTHONY:  Object to the form.

THE WITNESS:  Well, it depends.  I may need

to review the document.  And depending upon when the mix occurred, I may have to request archived copies of the database so I can see what the database had on file at the time.  I'm also able to run a tool that would give me some diagnostics so I can interpret if I have a data available to me, the internals of Find Consumer.  So, I mean, there are a couple of methods that -- that I could use depending upon the research that I'm doing and what my needs are.

BY MR. RISTVEDT:

Q.    Okay.  So that was a very thorough, helpful answer.  Thank you.  I have questions about several of the items you mentioned.

Number one, you had mentioned this sort of temporal quality in terms of kind of depending on when the mix might have occurred, in those instances, I might need to request archival copy of data from the database.  Did I catch that portion correctly?

A.    Yes.

Q.    Now, my understanding is that Experian stores data it receives from data sources primarily in the FileOne database in a series of tables.

So, for instance, one table for tradelines, one for personal identifying information, one for inquiries, one for public records, and one for employment.  Is my understanding correct?

A.    Yes.   But the tables that I typically am concerned with are the tables that store the consumer name and address data.

Q.    Understood.   And that would be in the personal identifying information table.   Is that correct?

A.    That would be in the consumer table and the address tables, yes.

Q.    Understood.   So the consumer table and the address table are those which contain the PII that you're typically looking for?

A.    Correct.

Q.    Now, I understand that in addition to FileOne, Experian has a separate database that has been referred to as the Data Accuracy Platform or DAP.   Is that something with which you're familiar as well?

A.    I'm not quite sure what that refers to, yeah.

Q.    Okay.   And it's possible you may not be.   The testimony I'm familiar with has indicated that, to your point, there is this separate platform that retains kind of archive snapshots in time of data received from data sources.

It sounds like when you need that type of data, you need to request it from someone else.   Have I understood that portion of your testimony correctly?

MS. ANTHONY:   Object to form.

THE WITNESS:  Yes.  Sorry.  Yes.

BY MR. RISTVEDT:

Q.   So that may -- in other words, you wouldn't be requesting the archive data directly from whatever platform it's stored in, you make that request to another Experian employee or department.  Is that right?

MS. ANTHONY:  Object to the form.

THE WITNESS:  Yeah, what I would look at are the archive image copies, and those are supported by the DBAs.  So my request would be to the DBAs.

BY MR. RISTVEDT:

Q.   And who or what are the DBAs?

A.   Those are the database administrators.

Q.   So you would go to -- and this is -- maybe this is a stupid question, maybe it's not.

Are the database administrators, are those human beings, or are those, like, software?  What are they?

A.   Those are human beings.

Q.   Got it.  So there's a database administrator for the consumer table, and then there's a different database administrator, it sounds like, for the address table.  Have I -- have I followed you correctly?

A.   Typically, a DBA would have access to all of them.  So they're not -- the responsibilities are not

broken down by table.

Q.   Got it.   So a DBA sort of has access to each of those tables.  You would go to them and say, "Hey, I need data from the consumer table and the address table with respect to the following PIN."  Is that how the inquiry would go?

A.   Yes.  It is a formal request that goes -- first of all, it must be approved by the information custodian. Once it's approved, it'll go to the DBAs.

Q.   When you say "formal request," my experience in corporate America means you have to fill out some sort of form or send an email or something like that, that -- in other words, some sort of documentation.  Is that correct?

A.   That's correct.

Q.   Do you know the name of what that formal request is called?  In other words, is there a form that's specific to those kinds of requests?

A.   Well, I would call them a DBA request form.

Q.   Simple enough.  So you send the DBA request form first to somebody to approve of the existence of your request.  Is that right?

MS. ANTHONY:  Object to form.

THE WITNESS:  Yes.  So I will list -- or I think that there's an assigned information custodian, it automatically goes to them for approval.  I believe that's

how it is.

BY MR. RISTVEDT:

Q.   Okay.  So it goes to the information custodian, they approve it, and then it gets routed to the database administrator, who then kind of does the actual seeking out of the data that you're requesting.  Is that the sequence of events?

MS. ANTHONY:  Object to the form.

THE WITNESS:  That's the sequence, yes.

BY MR. RISTVEDT:

Q.   When the database administrator -- actually, let me take a step back.

So what would the request from someone like Ms. Cave typically look like?  In other words, she reaches out to you and says, "Tim, I cannot for the life of me figure out why this consumer's file got mixed.  Can you look into it?"  What type of information does she give you?  Is it just a PIN number?  Is it the consumer social security number?  Or what does she start you with?

MS. ANTHONY:  Object to the form.

And, Tim, just to the extent that -- I'm just going to instruct you to ensure that you're not revealing attorney-client privileged communications in responding to the question, if that makes sense.

THE WITNESS:  I'm not sure.

MS. ANTHONY:  Yeah, I'm not telling you not to answer the question.  To the extent you might discuss specific communications that are privileged in responding, I don't want you to discuss those.  But I think -- and maybe, James, you can even rephrase your question a bit.

MR. RISTVEDT:  Yeah, I'm fine with that.

BY MR. RISTVEDT:

Q.    So, Mr. Sumida, setting aside any specific instance or any specific request, particularly those involving any attorneys, what would typically be how Ms. Cave sends a request to you?  She says, "Mr. Sumida, I need help.  How was this file mixed?"  What information does she give you about the file?

A.    So it would include PII information that was used on, let's say, the input transaction.  And then I would need to know what existed on the database at the time for that -- for the PIN in question.

Q.    How do her and -- actually, let me strike that.

I understand Ms. Cave has made these kinds of requests to you.  It sounds like you may have at times received them from another litigation support employee, Ms. Methvin.  Is that correct?

A.    Mary Methvin.

Q.    Yes.  Have you received those same kinds of requests from her as well?

A.    I don't usually receive those types of requests from her, specific -- I mean, those types of requests. Yes, she does give me other requests, but not those types.

Q.    What other types of requests would Ms. Methvin give you?





BY MR. RISTVEDT:

     Q.   Approximately how long does it take?  Is it like a few seconds?  A few months?

     A.   I would say seconds, not months.

     Q.   So returning to the types of requests you would

typically get from Ms. Cave, sort of how did this mix happen type of request, when she sends those to you, is there some sort of interoffice memo?  Does she send you an email?  Or what is the medium for her request, typically?

A.   I think it's -- it's typically an email.

Q.   And then once you get that email, you make the formal request to the DBA -- it goes to the information custodian, and then to the DBA.  Is that the full sequence of events?

MS. ANTHONY:  Object to the form.

THE WITNESS:  If I need an archive image copy.

BY MR. RISTVEDT:

Q.   Yes, a very good point.

So in some instances, you're able to, on your own, sort of look at the information and identify exactly how the mix occurred without making this archive request.  Is that right?

A.   In some cases, yes.

Q.   When you look at the information that is actively in the databases, meaning setting aside these instances where you need to request an archived copy, when we talk about looking at the data in the databases, we're talking about the data within FileOne, yes.

A.   Yes.

Q.    When you access that data, am I correct in understanding that you're able to view --  Strike that.

Is there a particular piece of software that you use to access the data in the FileOne tables?

A.    For the archive image copy request?

Q.    No.

Setting aside the archive copy request for a moment.  When you, Tim Sumida, go, "Oh, this is active.  I don't need the archive stuff.  I can just do this one myself," is there a piece of software you use to pull up FileOne active data?

A.    Yes.  I can pull up the live table, data from the live table.

Q.    What is that software named that you use to access that information?

A.    Yeah, I don't recall the specific name.  It's a menu that I go to.

Q.    So it's a menu on -- so you're on your laptop, and you click in a menu somewhere?

A.    It's not on my laptop, no.

Q.    Oh, is this something you need to physically be onsite at Experian to do?

A.    No.  No.  And most of my queries are done on the mainframe.  So it's not -- it's a TSO section that I sign on to, and then I go into a menu and I'm able to submit my

Coash Court Reporting & Video, LLC
staff@coashcrv.com    602-258-1440
www.CoashCourtReportingandVideo.com

request there.

Q. Okay. So I want to make certain I understand.

When you say these inquiries are on the mainframe, what do you mean by that? I assume there has to be a computer terminal involved, yes?

A. Yeah, so I open up -- I use my laptop and establish a TSO session. So there's a sign-on process, and then use the tool.

Q. Is a TSO session, is that different than a -- like, a VPN connection like we discussed earlier?

A. Well, I'm on VPN. But there is a specific software that I pull up and it presents me with what they used to call a green screen, a TSO session, yeah.

Q. So when you say "green screen," is that like -- like, I worked at a telemarketing firm for a while, and they have really old computers that were literally like a green screen with black text, where it's, like, you hit Y and enter to go on to the second page of things. Is it something like that?

MS. ANTHONY: Object to form.

THE WITNESS: I mean, it's -- it presents you with different menus and you can make selections.

BY MR. RISTVEDT:

Q. So it sounds like this linkup with the mainframe, that's a separate thing from just your standard

run-of-the-mill VPN connection.  Is that right?

A.   It's in addition to, yeah.

Q.   Okay.  So when you're connecting to the mainframe, that's this kind of like added step, you access a menu, and then you have the ability to look through the tables that we discussed earlier for the actual data in FileOne.  Is that all correct?

A.   Yes.  It allows me to query the tables.

Q.   I'm going to share my screen once again.  I'm going to designate this as Plaintiff's 2.

(Plaintiff Exhibit 2 was marked for identification.)

BY MR. RISTVEDT:

Q.   I expect you've seen documents similar to this before, though, you may -- or probably may not -- have seen this particular document.  Is that all more or less correct?

A.   Yeah, sometimes Kim will send me something like this, yes.

Q.   I want to draw your attention for a moment to the bottom right corner.  Do you see where it says EXPERIAN_NAJERA_0171?

A.   Yes.

Q.   Do you have any knowledge about what that notation means?

Coash Court Reporting & Video, LLC
staff@coashcrv.com
602-258-1440
www.CoashCourtReportingandVideo.com
APPENDIX 1306

A.    No.

Q.    So I'll represent to you this is something that's called a Bates stamp.  Fortunately for you, you have no reason to know what it means.  It's a -- it's an identifier used within the context of litigation for the purposes of identifying a unique page on a unique document.  In other words, if at some point Rebecca or myself or the judge in this case were to say, "Look, here on EXPERIAN NAJERA 0171," we would all know we're referring to exactly this specific page from exactly this specific document.  Does that make sense?

A.    Yes.

Q.    So I tell you this only because throughout the course of some of these documents that contain these Bates stamps, you may hear me say -- and this is more for the benefit of the transcript later on -- "We're looking at EXPERIAN NAJERA 171."  If I make reference to a page number like that, based on what I've just represented to you, will you understand what I'm referring to?

A.    Yes.

Q.    Okay.  So I'll represent to you that this is an admin report that was produced by Experian in discovery in a lawsuit called Victor Ramirez Najera v. Experian.  It's in fact the case under which you were subpoenaed in connection with this case.  Does that make sense so far?

A.    Yes.

Q.    You mentioned that Ms. Cave will sometimes send you a document that looks like this.  Is that done typically in connection with the types of requests that I'm referring to, where she's asking you about how a particular mixed file occurred?

A.    Yeah, it would be in relation to that, yes.

Q.    Now, I understand -- it sounds like you used this type of document less in your day-to-day work.  Are you still familiar with the information that's contained within this document?

MS. ANTHONY:  Objection to form.

THE WITNESS:  I mean, I'm familiar with what's here, yes.  I mean, I see the names and various fields that relate to columns in the database, yeah.

BY MR. RISTVEDT:

Q.    One of the things I wanted to ask you about, I think you touched on a little while ago when you had spoken about the various different things you do when you get a request like the ones I'm describing from Ms. Cave.  One of them was that you have the ability to sort of run queries based on what the rules require and allow.

Did I catch that portion of your testimony correctly?

A.    I'm not sure I would describe it quite that way.

But -- so I do have a tool that allows me to run a query, and it will contain some diagnostics so I can see what's happening within Find Consumer when it's evaluating, let's say, if this is a PIN question, this PIN.

Q.   My understanding -- or at least I think Ms. Cave's understanding is she referred to this type of inquiry as a rules engine demo.  Is that what you're describing?

MS. ANTHONY:  Object to the form.

THE WITNESS:  Yeah, I don't know if that's her name for this, but for -- her name for the tool that I use, but --

BY MR. RISTVEDT:



Q.   So the first thing you do is you add a name and address to this inquiry and presumably you identify which PIN you are making an inquiry about.  Is that part of the process as well?

A.   Well, Kim will usually provide the PIN that I should be looking at, but it actually shows all PINs that were evaluated.

Q.   Okay.  So you put in the name and address information, and then based on that, this inquiry will tell you sort of, "Hey, here are the potentially matching PINs."  Am I understanding correctly?

A.   Yes.

Q.   Now, when you say the name value, I understand that within the universe of Experian's data, a name value is actually a combination of name plus -- in some, though not all instances -- a social security number.  Is that correct?

MS. ANTHONY:  Object to the form.

THE WITNESS:  So by name value -- what do you mean by name value?

BY MR. RISTVEDT:

Q.   Well, so, for instance, we're looking here at Exhibit 2, the admin report for Mr. Ramirez Najera.  And do you see here where it says "Name," identification number N equals 5919?

A.   Yes, I do.

Q.   What I've learned from prior Experian depositions is that this unique name value, 5919, in combination with this PIN equals Victor Manuel Ramirez Najera and the social security number that's highlighted.  Is that your understanding of what a name identification number connotes?

MS. ANTHONY:  Object to the form.

THE WITNESS:  Yes.

BY MR. RISTVEDT:

Q.   So in this context, at least when we talk about the name value, we're referring to Mr. Ramirez Najera's name and the added value of his social security number in tandem with one another, right?

MS. ANTHONY:  Object to the form.

THE WITNESS:  Yes.  So that's the social that was provided for this name.

BY MR. RISTVEDT:













APPENDIX 1318



Q. Understood. So for a new transaction, let's say if this was something that Experian had just received last week, that would be an instance where you can run the inquiry to see how would this currently query the database. Is that all correct?

MS. ANTHONY: Object to the form.

THE WITNESS: Yeah, I'm not sure I understand the question.

BY MR. RISTVEDT:

Q.   Well, in other words, what I want to make certain is clear, for an archived version like this, you're saying you couldn't perform the inquiry you're talking about because you would -- that system doesn't have access to the archived data you would need to request.  Is that right?

A.   Yes, that system does not go against the archives.

Q.   Okay.  So if you want to determine why a mix happened at some point in the past, do you have to, by definition, request an archived copy of the database?

MS. ANTHONY:  Object to the form.

THE WITNESS:  If I believe I need that, yes.

BY MR. RISTVEDT:

Q.   What -- what would be the circumstances where you wouldn't need that?

A.   If I'm able to understand what happened without it, then -- then maybe I wouldn't need to request it.  But usually it's helpful for me to know because it's important to know what came in and what was on the database at the time that transaction came in.

Q.   You mentioned something, I forget the exact term you used, but, like, the match results or something to that effect, a few minutes ago.  Do you recall that?

APPENDIX 1320

A.    Yeah, that's a term I probably would have used, yes.

Q.    When you run that -- the match details, my apologies.

A.    Okay.

Q.    Do you recall that?

A.    Yes.

Q.    The inquiry that you're talking about, it sounds like it gives you some sort of explanation for, "Hey, here's why this record matched to these qualified PINs." Did I understand that portion correctly?

MS. ANTHONY:  Object to the form.

THE WITNESS:  Yeah, you know, I don't know if -- it doesn't tell me why.  It just tells me what happened.  And then I review it and from, you know, what's -- from the diagnostics, I determined the why.

BY MR. RISTVEDT:

Q.    Okay.  So it doesn't say, like, this satisfied the following rules and tell you what rules were met sufficient for a match to take place?

A.    Well, it does post the rule, whether it be a reject rule or a select rule, it will post it as well.

Q.    Okay.  So it identifies the operative rule that resulted in either, to your point, a select or a reject, correct?

A.   Yes, it'll -- it'll include that in the report.

Q.   And knowing enough about Experian's systems, am I correct in assuming that is like some sort of code as opposed to saying, in plain language, here's what the rule was?

MS. ANTHONY:   Object to the form.

THE WITNESS:   It's been a while since I ran this, but I think it would look similar to how the rule is presented in the document.   But, you know, I . . .

BY MR. RISTVEDT:

Q.   And when you say "the document," you're talking about that Find Consumer DRDD?

A.   Yes.

Q.   Okay.   Does the DRDD contain sort of additional information about each code, in other words, provide kind of details just beyond the name of the code?

A.   It doesn't really refer to the name of the code. It -- it provides the requirements, and then the code is intended to match the requirement.   So this -- it doesn't contain code.

Q.   So match details -- if I were just looking at the match details result, to the extent I could understand what it refers to, it's in plain language as opposed to, like, a code or a number, something like that?

MS. ANTHONY:   Object the form.

THE WITNESS:  Yeah, I mean, it would be spelled out, right?  So if the threshold is conflict, you'll see the word "conflict."

BY MR. RISTVEDT:

Q.   If --  my apologies.  Go ahead.

A.   Sorry.  If that was your question, then yeah.

Q.   If it were a conflict for something like -- let's say it didn't satisfy the -- you ran an inquiry and only five digits of the social security number matched, meaning it violates the six digits or more rule.  Would it say conflict fewer than five -- or fewer than six digits of social security number, or would it just say conflict?

MS. ANTHONY:  Object to the form.

THE WITNESS:  It would post the actual batch type.  So if social, it could be four to six, seven to nine, two to three.  So it tells us the number of digits that matched or did not match.

BY MR. RISTVEDT:

Q.   And you threw out some numbers there that I'm not sure I follow, four to six, seven to nine.  Are you referring to the order of the digits in the social security number value or something else?

A.    It would be the number of digits in conflict.  So do we have four to six digits in conflict?  Did we have seven to nine digits in conflict?  Do we have two to three

Coash Court Reporting & Video, LLC
staff@coashcrv.com
602-258-1440
www.CoashCourtReportingandVideo.com

APPENDIX 1323

digits in conflict?  It refers to that.

Q.   Why would there be a different rule for four to six or seven to nine?  I guess my understanding was anything with four or more digits in conflict is always a conflict, period, end of sentence.  Is that not correct?

A.   That is correct.

Q.   So is there a reason for a distinction between socials that have four digits in conflict versus seven to nine in conflict?

A.   It only helps you determine where to set the threshold.

Q.   Okay.  So, like, if Experian wanted to change that rule at some point, it would be able to do so.  Is that right?

A.   Yeah.  So if you wanted to go from four to six or -- four to six, if you wanted to say, you know what, seven to nine, then we could do that.

Q.   Got it.  So forgive the crude analogy, but it sounds to me like this is like a faucet where right now it's set to four to six.  And if I wanted to, I could open the faucet all the way and say, actually, now we're going to let in any social where seven to nine digits conflict. Is that -- am I understanding what you're describing?

MS. ANTHONY:  Object to the form.

THE WITNESS:  Yeah.  So what's -- what

you'll see in the rule is the threshold, and then anything below that.  So if it's four to six, then seven to nine would be below that, would also be included.

BY MR. RISTVEDT:

Q.    Okay.  So the threshold in my faucet example would be like the location of the handle, where I set how much information can make it through.  Is that fair?

MS. ANTHONY:  Object to form.

THE WITNESS:  I don't know if it's a location, but it's, you know, do I want to open it up all the way?  Do I want to maybe go halfway?

BY MR. RISTVEDT:

Q.    Sure.

A.    If you want to stick with the faucet analogy.

Q.    Understood.  So in theory, with respect to this threshold you're describing, if I wanted to take the faucet and say I only want, like, a tiny drip coming through, I only want to let through socials that have one or fewer conflicts, you could adjust that threshold value, and that would effectuate what I'm describing.  Is that true?

MS. ANTHONY:  Object to the form.

THE WITNESS:  I mean, if we have a match type that's one, I don't recall.  If we just have a single digit in conflict or -- you know, yeah.  And, you know, is

there a one to two?  Is there a -- I believe there's a two to three.

BY MR. RISTVEDT:

Q.   Okay.  So you're saying as the system exists today, there may not be a single digit, but, for instance, you're aware of like a two- to three-digit threshold.  Am I understanding you correctly?

A.   Yeah, two to three, four to six, seven to nine transposition, yeah.

Q.   So for the water faucet social security number example I'm using in that scenario, we could take the faucet handle and set it to two to three, and that would result in only allowing matches for social when there's a conflict of three or fewer digits.  Is that true?

MS. ANTHONY:  Object to the form.

THE WITNESS:  If you're setting the threshold to two to three for the rejects, then if it's two or more digits in conflict, it will fail.

BY MR. RISTVEDT:

Q.   Okay.  So Experian creates these threshold levels, yes?

A.   Those thresholds are determined by Find Consumer.

Q.   Well, right.  But, like, Find Consumer isn't Skynet, right?  Like, it's not artificial intelligence, it's not operating on its own volition.  Some human being

at some point programmed in these thresholds, yes?

A.    Yeah, those thresholds are determined by a human. Yes.

Q.    Okay.  So a human could put in a threshold of one digit and then any social with two or more digits not matching would result in a conflict, yes?

A.    Yes, if you set the threshold to two to three, then two or more digits in conflict would fit.

Q.    And Experian owns and operates Find Consumer, Experian determines these threshold levels on its own, yes?

A.    Yes.

Q.    So if Experian wanted to -- well, then let me take a step back.

Experian also employs, like, software engineers and system architects and IP folks and people who understand how all this programming works, yes?

A.    Yes.

Q.    So if Experian wanted to, it could program it to have whatever threshold it wanted based on whatever it chooses, correct?

MS. ANTHONY:  Object to the form.

THE WITNESS:  So it provides some level of flexibility to where you can set the thresholds depending upon the rule.

BY MR. RISTVEDT:

Q.   And what do you mean by that, it provides a flexibility?  What does that mean?

A.   Well, it means, as we've discussed, you don't have to specify all the match types.  You specify the threshold for whatever field we're talking about.

Q.   When you refer to match types, you're talking about, I assume, like a transpositional error?  In other words, it doesn't have to be six sequential digits, it can just be any six digit.  Is that true?

A.   So transposition and six digits are kind of different.  But if we say four to six, then that would be four or more digits in conflict -- four to six digits in conflict, sorry.  That's that specific match type.  But there is a separate seven to nine, which would be included if you set the threshold at four to six.

Q.   Okay.  So the current threshold, if I followed you correctly, is the two to three threshold, because more than three digits results in a conflict, yes?

A.   That would be the four to six, four or more are in conflict.

Q.   Okay.  So maybe I've not followed you.

So the threshold you're describing of this range four to six, that means that if there are four digits or more in conflict, it results in a reject, yes?

A.   That's correct.

Q.   Okay.  All right.  So this six or more digits rule for the social security number, my understanding from Ms. Cave is that rule was updated in or around November of 2018.  Do you have any knowledge about the change that took place back in 2018?

MS. ANTHONY:  Object to the form.

THE WITNESS:  I don't recall the specific dates, but it's four or more, not six or more, right?

BY MR. RISTVEDT:

Q.   Oh, and my apologies.  I've been referring to it as six or more in terms of the number that need to match.

So my understanding from Ms. Cave is the typical way she's described it is at least six digits need to match or it will be a reject.  Does that make sense?

A.   Yes.

Q.   So this six or more matching digits rule, were you part of the conversation in 2018 to update this rule?

A.   Yes, I would have been involved in that discussion.

Q.   Do you recall the conversations, the discussions that were had during that time period about the changes to Find Consumer?

And actually, let me clarify.

Understanding that I expect you can't quote

me with perfect recall every conversation you've had in the last year, much less specific conversations you had in 2018.  Do you generally recall what was discussed concerning the changes being made to Find Consumer in 2018?

A.    With respect to whether we should or not?  I mean, what types of discussions are there?

Q.    Sure.  So do you recall any discussion about what types of changes Experian ought to make or why those changes ought to be made or what changes could be made to improve Experian's processes?

MS. ANTHONY:  Object to the form.

THE WITNESS:  Well, those are the kind of conversations we would -- we would have, yes.

BY MR. RISTVEDT:

Q.    And would those conversations typically have been back in 2018, so probably pre Zoom being very popular, would those have been like in-person meetings or conference calls or email discussions?

A.    Definitely not in-person meetings because we're located in different areas.  Possibly Zoom.  I don't know. I don't recall.

Q.    My understanding from Ms. Cave's prior testimony is that the reason Experian changed its procedures in 2018 was because of Experian's efforts to remediate problems

surrounding mixed files.

Do you have any knowledge about that being part of the discussion for changes to Find Consumer in 2018?

MS. ANTHONY:  Form.

THE WITNESS:  I would say generally speaking, if we're making an adjustment to the reject rule, that is to reduce false positive matches, yes.

BY MR. RISTVEDT:

Q.   And I understand you're a data scientist, so false positive for us lay people, you're talking about a mixed file where data from one consumer winds up falsely attributed to data from another consumer.  Is that true?

A.   Yeah, generally speaking, yes.

Q.   So the changes that Experian made, it sounds like would at least in some part be designed to address Experian's perceived problem with mixed files or, as you put it, false positives, true?

MS. ANTHONY:  Object to the form.

THE WITNESS:  I'm sorry.  Can you repeat that?

BY MR. RISTVEDT:

Q.   Sure.  So I think you had testified, and I mostly just want to confirm it's your testimony -- my understanding is that if Experian decided, "Hey, let's

make some changes to Find Consumer," the reason would be at least in part to try and address potential false positives, true?

A.    Yeah, that would be the purpose of -- of a reject roll change -- well, I mean, if it's -- if it's making it more restrictive, then yes.  We could also make it more forgiving, in which case it would do the opposite.

Q.    Have you ever been involved in any discussions to make Experian's rules more forgiving, as you put it?

A.    There may have been discussions with -- but that's less common than tightening the rules.

Q.    Were you ever asked to perform any statistical analysis or gather information about the prevalence of false positives in either 2018 or at any other time?

MS. ANTHONY:  Object to the form.

THE WITNESS:  I don't recall that, and I'm not sure I would be able to do that.

BY MR. RISTVEDT:

Q.    Fair enough.  Let me put it another way.

Have you ever seen any documentation containing any statistical analysis or studies concerning the efficacy of Find Consumer?

MS. ANTHONY:  Object to the form.

THE WITNESS:  I'm not sure what -- what type of report would provide that information.

Coash Court Reporting & Video, LLC
staff@coashcrv.com                                    602-258-1440
www.CoashCourtReportingandVideo.com

APPENDIX 1332

BY MR. RISTVEDT:

Q. Do you have any knowledge about what the impetus was for considering whether a change should be made in 2018?

A. I don't know that -- the specifics of why -- of what sort of inspired this change.

Q. Well, in other words, it's my general sense that a company doesn't go, like, "Hey, everything is working really great. Let's change things a bunch."

So my assumption is that there was some sort of analysis that said, "Hey, we could improve our processes if we potentially made a change."

So my question is, do you know whether or not there was some discussion around a particular issue that Experian was trying to address, and if so, what the basis for that issue was?

MS. ANTHONY: Object to the form.

THE WITNESS: Yeah. We may have -- there may have been discussions, but I don't recall the specifics of the discussions. But Kim sometimes does provide feedback on cases or examples where we might want to look at making an adjustment.

BY MR. RISTVEDT:

Q. When you say Kim might provide feedback on a particular example, presumably that feedback would come in

Coash Court Reporting & Video, LLC
staff@coashcrv.com                                                    602-258-1440
www.CoashCourtReportingandVideo.com

the form of, like, an email communication.  Is that a fair assumption?

A.    I mean, it could be an email.  It could be a meeting request where we get together and we discuss it. I mean, it's -- yeah.

Q.    And does that typically take the form of, say, Ms. Cave has identified a particular issue, she brings it to your attention and says, "Hey, Tim, this thing happened I've never seen before.  Maybe we should look at adjusting thresholds or something else in Find Consumer."  Is that more or less kind of how it goes?

MS. ANTHONY:  Object to form.

THE WITNESS:  Yeah, she would mostly request a meeting, and then we get together and have a discussion.

BY MR. RISTVEDT:

Q.    So I understand you may not have your calendar immediately handy.  Approximately how often would these types of meeting requests or inquiries surrounding potential changes to Find Consumer -- about how often would they happen?  Are we talking once a year?  Once every five years?  Once every couple of months?  What's the time frame?

A.    Yeah, not very often.  I -- I would say it would be more in the area of years rather than months.  That would be my best recollection.

Q.    So I understand these changes were made back in 2018, my understanding is late 2018.  Do you recall -- actually, let me strike that.

Between 2019 and today, approximately how many different discussions have you had with Ms. Cave about potential changes to Find Consumer?

MS. ANTHONY:  Object to the form.

THE WITNESS:  Yeah, I don't -- I'm not sure I can even venture a guess.  Because we can have a call and it may just be a question she has, and I'm answering the question.  It's not specific to a certain scenario like this.  She could request a PIN merge report.  I mean -- yeah.

BY MR. RISTVEDT:

Q.    So setting aside those kind of more, "Hey, what's the answer to this question," or, "Can you run this report," focusing specifically on what you described a few minutes ago in terms of, "Hey, we should meet to discuss potentially a change," has that occurred at some point since 2019?

A.    Yeah, there is one that's being discussed.

Q.    And you're saying it's being discussed presently?

A.    Yes.

Q.    And what does that discussion entail?

A.    That's based on a litigation that -- that she

Coash Court Reporting & Video, LLC
staff@coashcrv.com
602-258-1440
www.CoashCourtReportingandVideo.com

provided support for.

Q.    And to be clear and I want to make certain, I don't want any contents of any conversations you've had with an attorney.  You're saying these discussions were with Ms. Cave about potential changes to Find Consumer, correct?

A.    Yes.

Q.    What is the potential change being discussed?

MS. ANTHONY:  I'm going to object here based off of attorney-client privilege.  It sounds like what he's saying is that they're discussing a potential change related to litigation.

MR. RISTVEDT:  That's not privileged.  That's not even work product.  I can give -- I can give you the supreme court cite if you want, and we can motion the court.

MS. ANTHONY:  It's direct enough, Counsel, to investigate.  Kim works closely with in-house counsel constantly.  My understanding is that some of the work that they're doing is at the direction of counsel and that it's work product.

MR. RISTVEDT:  Yeah.  I mean, number one, not all conversations with attorneys are privileged.  But number two, Mr. Sumida's not describing any conversation with an attorney.  He's describing a conversation with

Ms. Cave. So you're free to make your objection. We'll move the court to the extent we need to because there's no -- literally no basis for it being privileged. And it's not me saying it, it's the Supreme Court.

BY MR. RISTVEDT:

Q. Mr. Sumida, I'll ask the question again, and your attorney's free to object.

The discussions that you've been having with Ms. Cave, what is the change or changes that are being considered with respect to Find Consumer?

MS. ANTHONY: And, Mr. Sumida, for now, I'll instruct you not to answer, and we can -- for now, I'll instruct you not to answer.

BY MR. RISTVEDT:

Q. And, Mr. Sumida, just so I've got it for posterity and for the record, are you taking your attorney's advice and refusing to answer this question?

A. Yes, I am.

MR. RISTVEDT: Understood. I note we've been going just over an hour. It feels like a natural stopping point. Mr. Sumida, is another five minutes okay? Do you wish for more?

THE WITNESS: Five minutes is fine, yes.

MR. RISTVEDT: Okay.

MS. ANTHONY: I'd appreciate ten if that's

okay with you all.

MR. RISTVEDT:  Yeah, absolutely.

I have no problem taking no breaks, so I'm not going to begrudge a longer one for those who need it.

And, Daniel, is ten minutes okay for your fingers?

THE COURT REPORTER:  Perfect.

MR. RISTVEDT:  Okay.  Lovely.

THE COURT REPORTER:  We're off the record. Time is 11:19.

(A recess ensued.)

THE COURT REPORTER:  We're on the record. Time is 11:29 a.m.

BY MR. RISTVEDT:

Q.   Okay.  Mr. Sumida, you understand you remain under oath, correct?

A.   Yes.

Q.   So we've been discussing the Find Consumer rules. I'd like to ask you about some rules, and specifically rules for reject about particular data points beginning with social security number.

I understand that you testified earlier the six or more digits matching social security number rule is a fixed rule that can never be broken, meaning if a social has five or fewer digits matching, it always results in a

reject without any other analysis, correct?

A.   Yes.

Q.   I suspect, based on that, I know the answer to this question, but are there any circumstances where a social security number could have five or fewer matching digits and still be associated with a PIN?

A.   I'm thinking because you -- we refer to it in the opposite way.  I think four more digits and conflict and you're thinking five or more matching or six or more matching.  So yeah, there would not be a condition where we have four more digits in conflict where it would qualify.

Q.   Okay.  You talked earlier about the transpositional issues.  If I have understood you correctly, it means that this four or more digits in conflict rule means that it's any four digits, it doesn't need to be sequential, that doesn't play a role in this analysis.  Have I understood you correctly?

A.   Yes, it's not positional.

Q.   In some instances, multiple social security numbers can satisfy this rule of six or more digits matching, correct?

A.   So you're saying there could be a security number?

Q.   Yes.

A.    Six or more could be matching.  Is that the question?

Q.    Correct.  There could be more than two numbers that satisfy that rule, yes?

A.    Yes.

Q.    Setting aside other rules, because I understand there are also reject rules that relate to things like name and address and date of birth, those other fields, right?

A.    Yes.

Q.    So setting aside all other rules and thinking only about this six or more must match rule for the social security number.  If a number matches six or more digits, it satisfies this rule, correct?

A.    If it matches six or more, it does not satisfy the rule.

Q.    My apologies.  I think because we're speaking in inverse, I've reversed the rule.  So let me go with the way you've defined it.

A.    Okay.

Q.    If a rule -- or excuse me.

If a number does not have four or more digits in conflict, it does not get rejected, right?

A.    It does not get rejected by that rule.

Q.    So theoretically, many numbers could result in

not being rejected by this specific rule, provided that they weren't rejected by some other rule, right?

A. Theoretically, yes.

Q. Is there any limit to the number of social security numbers that can potentially be associated with a single PIN?

A. Assuming it's matching six or more?

Q. Correct, yes.

A. There is no limit in terms of the number of rows we can associate with a given PIN, that I'm aware of. So I guess you can assume the max would be whatever numbers are possible for those combinations of numbers where we have a match of six or more.

Q. Now, I understand we've talked about select rules and reject rules. I also understand that there are instances where Experian might not receive any data in a particular field, which I believe Experian employees have referred to as omissions. Is that the correct vernacular to use in that circumstance?

A. It is. We refer to it as nulls.



not



BY MR. RISTVEDT:

Q.   But you would agree with me that -- well, actually, let me step back.

When a null value comes through in the social security number field, I've sometimes seen all zeros like what I'm describing.  Is that the way that a null presents within the system is a nine-digit number that's all zeros?

A.   On the actual database, I'm not sure if it's all zeros or just a null terminator.  I don't know specifically how it's represented.

Q.   Okay.  Experian could adjust its procedures to treat a null value as a conflict, correct?

MS. ANTHONY:  Object.

THE WITNESS:  It could.

BY MR. RISTVEDT:

Q.   I've also seen in some instances where a data furnisher might submit information with a truncated social security number, say the first five digits, give a null value with only the last four digits provided.  Have you ever seen something like that?

MS. ANTHONY:  Object.

THE WITNESS:  Are we talking about -- what type of input are we talking about?

BY MR. RISTVEDT:

Q.   So a data payload from a data furnisher, say, a monthly tradeline or a credit inquiry, something to that effect.

A.   I have not seen that on a data furnisher file, but then I don't -- that's not something I would necessarily be looking -- looking at or looking for.

Q.   So let me ask this way.

If a data furnisher's payload contained a partial null value, say, the first five digits just did not exist and only included the last four digits of the consumer's social security number, would Find Consumer

interpret that as the first five digits being in conflict or the first five digits being an omission?

MS. ANTHONY:  Object to the form.

THE WITNESS:  If it is -- so if it's past Find Consumer and not edited out, so if it's given, you know, five zeros and four numerics, then I believe Find Consumer would consider that a conflict.

BY MR. RISTVEDT:

Q.   And when you say "I believe," my perception of what you're saying is you think that to be the case, though, you may not know it with certainty.  Is my understanding correct?

A.   Yes.  If we're specific to coming into a data furnisher, yes.

Q.   And when you say you're not positive about what the outcome would be, if you reviewed that document that we referred to earlier, the DRDD, would that allow you to be more confident about the outcome in such a scenario?

A.   You know, in that case, I might consult the programmer.

Q.   Okay.  So in some instances, the DRDD itself might not even be sufficient.  You might need to actually ask whoever programmed Find Consumer?

A.   Yeah.  I mean, if I didn't see anything in the DRDD, in this case, I might confirm that with the

programmer.

Q.   When you say "the programmer," is there, like, a particular person, or are you just speaking kind of generally about some programmer somewhere employed by Experian?

A.   It would be a programmer who is -- who works with Find Consumer.

Q.   Do you have a particular sort of go-to programmer?

A.   I don't often reach out to the programmers, but there are programmers who support, as you might imagine, Find Consumer.

Q.   If you had an issue like today and you needed to reach out to one, who would you email?

A.   I would probably reach out to Andrea Bertino.

THE COURT REPORTER:  Can you spell that name for me?

THE WITNESS:  Yeah, A-n-d-r-e-a, Bertino, Ber- -- B as in boy, -e-r-t, as in Tom, -i-n, as in Nelly -- -o, Bertino.

BY MR. RISTVEDT:

Q.   When Experian receives monthly tradeline updates from a data furnisher, does it -- my understanding is those data transmissions take place via file transfer protocols also known as FPPs.  Is that true?

A.    That's outside my area.

Q.    Understood.  If Experian receives data from a data furnisher that satisfies all rules to be associated with a particular PIN but this four or more conflict rule results in a reject, is the data from that furnisher rejected entirely?  Is it assigned to a new PIN?  Or what takes place with the rejected data?

A.    It's -- again, it's up to the caller.  So I guess either can happen.  They can create a new PIN or -- I'm not sure if there are situations under which they would not.  I don't know.

Q.    When you say it's up to the caller, are you talking about an automated process within FileOne, correct?

A.    The applications that's calling Find Consumer. So if that's a data furnisher, it would be that application that updates trades.

Q.    So based on, I guess, the rules for that data application, there would be a determination made to either A, create a brand new PIN based on this data; or B, reject the data entirely, and it never gets into FileOne.  Is that right?

A.    Those would be the options.  I'm not sure if it's 100 percent one or the other, yeah.

Q.    I think you had testified earlier that's because

the sort of operations of FileOne and the storage kind of component on that side of the house, that's beyond your purview.  Is that right?

A.    Yeah.  So Find Consumer is read only.  It does not update.  And it's up to the calling application to determine whether a new PIN should be created or not.

Q.    I want to ask you -- we talked early in your deposition about your position as the senior director of software.  I think you said you've been in that role for a decade or so.  Am I recalling correctly?

MS. ANTHONY:  Object to the form.

THE WITNESS:  Yeah.

BY MR. RISTVEDT:

Q.    I don't need necessarily a laundry list of every -- everything that you do within that role.  But can you tell me at a high level, what are your duties or what were your duties as the senior director of software?

A.    To oversee the teams that I was managing to ensure that whatever projects are assigned to the group that were -- are completed on time, or if not, to understand what -- what the issues are.  In some cases, it could be hiring.  At the senior director level, I would be looking to hire managers, and the managers hire the employees.  But it also could be Find Consumer support, right?  Because sometimes I'm -- even as a senior

director, I will be called to request for assistance to help research Find Consumer.

Q.   You mentioned teams that report to you. Approximately how many teams did you have reporting to you?

A.   At the time I was laid off -- or took a voluntary layoff?

Q.   Yes.

A.   At that time, it was three.

Q.   And what were the -- and what were the names of those three teams?

A.   I may not have the names down. I just remember them -- so there's a team called the asset pinning that does the batch pinning. There's a team that handles an application called iSmart and Engage. And then there's -- there's another team, I forget now what applications they supported, but -- yeah.

Q.   And I think you said iSmart. Is that kind of like stylized like Apple, lower case i, capital S, iSmart?

A.   Yeah, I think it's lower case i, upper case S, and I think that's what it was, yeah.

Q.   And it sounds like -- did any of those teams have direct oversight of Find Consumer?

A.   Not for FileOne, no.

Q.   So I guess for different portions of Experian's

data?

A.    Different portions of the data.  Or in the case of iSmart, it's a -- it's a tool used by operations.  So they support the tool.

Q.    So how did it come to be that you became the Find Consumer guy if that's not within your team's sort of responsibilities?

MS. ANTHONY:  Object to the form.

THE WITNESS:  Well, when -- when I was an assistant engineer, I worked on the development of Find Consumer.

BY MR. RISTVEDT:

Q.    So was it kind of like you gained all the specialized knowledge of Find Consumer and how it operated and things like that, and then even after you got promoted, the people who had dealt with you kind of went "Well, I sort of prefer dealing with Tim, so I'm going to keep going to him even though it's not really his job anymore"?  Is that more or less it?

MS. ANTHONY:  Object to the form.

THE WITNESS:  Yeah, I mean, they always had the option of going to the developer.  I don't know how often they chose me versus some other resource.  But I did manage that team up until July of 2023.  And then there was a reorganization, and then that team that supports

Find Consumer for FileOne moved to a different manager.

BY MR. RISTVEDT:

Q.   What department did that team -- the FileOne team move to?

A.   I don't recall the name of that department.

Q.   Is it the data development department?

A.   No.  That's -- the data development that I'm aware of is an operations team.

Q.   Okay.  So at some point, July 2023, the Find Consumer team was removed from your purview and reassigned to another manager or another department.  Is that correct?

A.   That's correct, yes.



BY MR. RISTVEDT:

Q.    So in other words, this social security number values beginning with nine are not valid values, that's not a Find Consumer rule, that would be something before Find Consumer is part of the equation.  Is that true?

A.    That's correct.

Q.    What is before -- what is between the data payload from the data furnisher and Find Consumer?  What's in the middle?

A.    Well, that would be what I refer to as a calling application.  It could be credit reporting, if it's a inquiry request, it could be our update processes if it's coming from a data furnisher.  And, you know, there's a data prep piece as well that that could do some editing and validating, so . . .

Q.    In some instances, in response to, like, a consumer dispute or a lawsuit, Experian will unmix a file, meaning they might remove certain information from being associated with one PIN and then placed in association with a different PIN.

Are you familiar with that process generally?

A.    I know there is a process to do that, yes.

Q.    Do you -- the Find Consumer algorithm has no role in that process, true?

A.    For the final separation process, no.

Q.    Does Find Consumer's matching logic take into consideration any aspect of the data it expects to receive based on past transmissions from, say, a furnisher versus what it received in a new data payload?

MS. ANTHONY:  Object to the form.

THE WITNESS:  Yeah, I'm sorry.  I'm not sure I understand the question.

BY MR. RISTVEDT:

Q.    Sure.  Maybe -- maybe an example will help.

So say I've got a Wells Fargo mortgage, and my social security number is 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, and Wells Fargo, like clockwork, sends this every single month to Experian, "Hey, here's James' updated account information," and they do this for 20 years.  And then in year 21, they send a new piece of data that says, "Here's the James Ristvedt account, and the social with it is 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," would there be any aspect of Find Consumer that has some sort of predictive characteristic where it says, "Wait a minute. This is not what we expected to receive with the James Ristvedt file"?

MS. ANTHONY:  Object to the form.

THE WITNESS:  If I'm understanding your question correctly, it does not [inaudible] input might look like.

BY MR. RISTVEDT:

Q. And it gets a new data point, fair?

A. Yeah, every time we get input transaction, it will evaluate it based on what was provided on the input at the time.

Q. There are instances where a do not combine or DNC is applied to a particular consumer's PIN that then impacts the matching rules Find Consumer will apply with respect to that PIN, true?

A. True.

Q. When the DNC is applied, does Experian receive any sort of notification when a data source transmits data that Find Consumer would have matched to a particular PIN, but for the presence of that DNC?

A. I'm not sure I fully understand. Would you mind repeating that?

Q. Sure. So in a case of a DNC, to use the example I've just given, my social is 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. Once a DNC is applied, from that point forward, any social security number not consisting of exactly 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, will be subject to a reject, yes?

A. Any number not that social security number for that PIN?

Q. Correct, yes.

A. Yes, if it is not an exact match, it will be

rejected based on the do not combine rules.

Q.   So in instances where the data Experian receives would have matched to my PIN, say it was 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, three digits off, but has six matching digits, in a circumstance like that where it would have matched but for the DNC making it a disqualifying reject, is there any sort of notification that the system sends that says, "Hey, this data furnisher is off.  It didn't follow our DNC"?

MS. ANTHONY:  Object to the form.

THE WITNESS:  Yeah, I'm not certain on that. It would depend on whether Find Consumer has a specific return code that would indicate that.  And I don't know off the top if that's the case.





APPENDIX 1358

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████

Q.   Referring to the four digits or more in conflict results in a reject rule, does Experian maintain statistics about how often that reject rule is satisfied?

A.   I can't speak for Experian-wide.  I don't know if other groups do, but I don't -- I don't believe the Find Consumer team tracks that.  Not that I can recall.

Q.   It's my understanding that as part of the changes in 2018 concerning the threshold for social security numbers, Experian also updated Find Consumer to require a minimum of one, first and last name; and two, either a social security number or a date of birth.  Is my understanding correct?

MS. ANTHONY:  Object to the form.

THE WITNESS:  You know, first name -- names are -- first and last names are always required.  So I'm not quite sure what area you're referring to.

BY MR. RISTVEDT:

Q.   Sure.  So maybe let me clarify.

One of the things Ms. Cave testified about previously was the changes that took place in 2018, and specifically the change that -- again, my understanding is -- or may have been 2017 -- my understanding is that

there was a new requirement put in place where furnishers were required to send either a social security number or a date of birth in order for the information to be considered by Find Consumer.  Do you have any knowledge about that requirement?

MS. ANTHONY:  Object to the form.

THE WITNESS:  If it's specific to data furnishers, she may be referring to end cap.  Again, I'm not an expert in that area, but it could be around the -- the end cap.

BY MR. RISTVEDT:

Q.   Well, let me maybe ask this way.

Are you aware of the minimum threshold for required information in order for Find Consumer to consider data regardless of the data source?

A.   Yes, for Find Consumer, the minimum is a name and an address.

Q.   So for -- so Find Consumer, at least, does not require a social or a date of birth to perform its analysis.  Is that true?

A.   That's true, if there's a requirement, then that would be imposed by the caller.

Q.   Does Find Consumer have the ability to trigger notifications in other areas of Experian's systems?

MS. ANTHONY:  Objection to the form.

Coash Court Reporting & Video, LLC
staff@coashcrv.com
602-258-1440
www.CoashCourtReportingandVideo.com
APPENDIX 1360

THE WITNESS:  I'm not sure I understand.

BY MR. RISTVEDT:

Q.   Well, so, for instance, if Find Consumer ran its analysis and, as you say, it returned a result that said, "Find Consumer can't figure out which PIN this would apply to.  We need a social security number," is there any mechanism within Find Consumer to have that result trigger, say, an alert to a data furnisher directly to say, "You need to give us better data"?

A.   That would be up to the calling application.  So Find Consumer will issue that return code, and it's up to the caller as to what they want to do with that.

Q.   Okay.  I'm going to place on the screen what I will designate as Plaintiff's Exhibit 3.

(Plaintiff Exhibit 3 was marked for identification.)

BY MR. RISTVEDT:

Q.   I suspect that you have never seen this document before.  If you have, it would be very impressive since I made it yesterday.  And, in fact, I think I've made a mistake, so I'm going to quickly update that.

This is a demonstrative exhibit I've created about an SSN that would be in a consumer's file as compared with the SSN that Experian receives in a hypothetical data payload.  Does my explanation about what

APPENDIX 1361

this table entails makes sense to you?

A.   Yes.

MS. ANTHONY:  Object to the form.  And object to the demonstrative.

BY MR. RISTVEDT:

Q.   So based on my understanding -- and again, right now, we're not considering any of the other rules, name, date of birth, any of those things, but so long as at least six digits match, the social security number rule allows the data to potentially result in a candidate PIN for that particular consumer, true?

A.   Well, how well it matches to the -- what we have on file is not a function of determining candidate PINS. Candidate PINs are done first, and then we -- Find Consumer evaluates those candidate PINs.

Q.   Got it.  So from the group of candidate PINs, Find Consumer would evaluate the social on file versus the social received and then apply the four or more digits in conflict rule.  Is that true?

A.   Yes.

Q.   So just as it relates to this four or more rule, this first row 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, in the consumer's PIN, Find Consumer would not reject a social of 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 since only three digits are in conflict.  Is that true?

MS. ANTHONY:  Object to the form.

THE WITNESS:  It would not reject the PIN based on this conflict for that particular rule, yeah.

BY MR. RISTVEDT:

Q.    Understood.  And, again, setting -- keeping in mind only this rule for the time being.

A.    Okay.

Q.    The second row, 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, this rule would not require a reject for 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, because again, only three digits, those that I've highlighted in red and underlined, only three digits are in conflict, correct?

MS. ANTHONY:  Object to the form.

THE WITNESS:  Yeah, it's -- only three digits are in conflict.

BY MR. RISTVEDT:

Q.    And then the third row, 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, this rule would not trigger a reject for 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 because, again only three digits are in conflict.  Do you agree?

MS. ANTHONY:  Object to the form.

THE WITNESS:  Yes.

BY MR. RISTVEDT:

Q.    So in theory, with just a few mistakes, this social security number of 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, which is the polar opposite of the original social 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, that could theoretically be associated with a consumer's file and satisfy this specific rule.  Would you agree with me?

Case 4:25-cv-00443-P   Document 116   Filed 12/22/25   Page 1310 of 1862   PageID 3159

MS. ANTHONY:  Object to the form of the question.

THE WITNESS:  So are you referring to social 012 and 876 now?

BY MR. RISTVEDT:

Q.   So if we started with this first row, 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, these other socials in the right column, let's say those were received, the new social could be added to the consumer's file without violating the social rule, yes?

A.   No.

Q.   Why not?

A.   When Find Consumer compares the input social to the on file social, it will determine what it believes to be the best social for the PIN, and it will only compare it to that social.

Q.   Okay.  So Find Consumer makes a determination about all of the socials in a consumer's file and the three -- or excuse me -- the four or more in conflict equals reject rule, that's applied only to this best social you're talking about.  Have I understood you correctly?

A.   That is correct.

Q.   How does Find Consumer make the determination about which social is the best social?

A.    That's going to be based on the reported counts.

Q.    Oh, okay.  So if I go back to Mr. Ramirez Najera's admin report, when I see next to each of these name value fields, there's -- for instance, this first one says 11X, meaning 11 times, yes?

A.    I'm not sure.  I see a TR count, and that's closer to what I'm thinking about.  So I'm not sure if that 11X is a reflection of that or not, but --

Q.    Well, I -- my apologies.  Go ahead.

A.    Or no -- so -- so the TR count is what Find Consumer uses.  We'll have a trade reported count for each row, and it will look at all the rows that have socials and it will determine the best social based on the social that has the highest aggregate count.

Q.    Got it.  So I think that this answers some future questions for us.

These two items here that I'm going to highlight in -- we'll go cyan -- where it says SSN reported count equals 11, SSN max count equals 11.

Do you see those fields on EXPERIAN NAJERA 171?

A.    Yes, I do.

Q.    So in this instance, am I correct in understanding that this reported count has some relationship to what Find Consumer is then identifying as

what the best social is for this particular PIN?

A.   I'm not sure because I don't know how these counts are derived.  This might be something credit reporting does.  I don't know.

Q.   Where within the -- how would you determine what the, quote-unquote, best social is for a particular PIN?

A.   So each row will have its own reported count. And let's say there's four rows that have the same social, then it will take the reported counts for each one of those rows, add them up, and that will be the aggregate count for that social.  If there's a second social, let's say it's only on one row, and that count is one, then the best social will be the social that has the higher TR count.

Q.   Got it.  And at least on this document, you're saying this TR count that's associated with each of these rows.  Is that right?

A.   That's what it looks like --

MS. ANTHONY:  Object to the form.

THE WITNESS:  I'm sorry.  That's what it looks like to me.  Again, this is a credit report.  It looks like that's what it's referencing, but, you know, I would need that verified.

BY MR. RISTVEDT:

Q.   So the next -- or the next field I want to

discuss with you is the date of birth field.  I'm looking here at EXPERIAN NAJERA 171, and it refers to the date of birth associated with this PIN and some other information about the date of birth.  Do you see that?

MS. ANTHONY:  Object.

THE WITNESS:  Yes, I do.

BY MR. RISTVEDT:

Q.    Okay.  Now again, understanding that this is not the document that you would use in your day-to-day work, do you know how many date of births are associated with a particular PIN?

A.    Yes.

Q.    And what is the answer to that question?

A.    The answer is one.

Q.    And we talked about the social security number, and I think you had said sort of, you know, theoretically you could have as many socials as those that would fulfill that social security number rule of having fewer than four conflicts.  Do you recall that testimony?

A.    Yes, fewer than four to the best.

Q.    So in fact, you could theoretically have thousands of social security numbers in a single PIN, again, just based on that social security number field, yes?

A.    Yes, assuming there's no limit.  And I don't know

APPENDIX 1367

if there is or not.

Q.    Why is there only a single date of birth associated with a PIN?

A.    So that was the way FileOne was designed.  So we maintain one in the consumer op table.  And there are rules that determine its own best-ness logic, if you will. So it'll determine do we think that this date of birth is more reliable than the date of birth we have on file, right?  If they do, they will update it.  If they don't, then they'll leave it as is.

Q.    And that's a function of Find Consumer, if I'm understanding you correctly.  Is that right?

A.    No.  That's done by the update applications.

Q.    And the update applications, are those within FileOne itself?

A.    Yes.

Q.    So it sounds like even though at least this particular item is not within your area of oversight within Experian, you have knowledge, nonetheless, about the date of birth field in FileOne.  Is that true?

MS. ANTHONY:  Object to the form.

THE WITNESS:  Well, I have some knowledge on how that's updated.

BY MR. RISTVEDT:

Q.    And I think you had said there are similar rules

to the -- what we call the best social security number evaluation, but with respect to the date of birth field. Did I catch your testimony correctly?

A. Yeah, there are rules that determine when what we have on file can be updated by what's coming in.

Q. Do you know those rules?

A. No, I do not.

Q. Okay. Do you have any high level understanding of how those rules operate or what information would be sufficient to satisfy those rules?

MS. ANTHONY: Object to the form.

THE WITNESS: I have -- yeah, well, based on this -- how can I say this? There's something that could be used to determine what's better, yeah.

BY MR. RISTVEDT:

Q. And what would be the thing that could be used to determine what's better?

A. Well, what could potentially be used is the YOB source.

Q. You're referring to the field at the bottom of the EXPERIAN NAJERA 171, YOBSRC equals AF, yes?

A. Yes.

Q. And in my understanding, this means the source for the year of birth currently appearing associated with this PIN was AF, and in Experian's vernacular, AF

Coash Court Reporting & Video, LLC
staff@coashcrv.com
602-258-1440
www.CoashCourtReportingandVideo.com

translates to a monthly tradeline update.  Is that correct?

A.   Yes, that's my understanding as well.

Q.   When Ms. Cave reaches out to you to say, "Hey, Tim, this file was mixed.  I'm trying to figure out what happened here," does that ever include a question about a date of birth being associated with a particular PIN?

A.   It could, yes.

Q.   So if Ms. Cave came to you and said, "This person's date of birth is wrong.  That's not this person's real date of birth," what would you do to investigate an inquiry like that one?

            MS. ANTHONY:  Object to the form.

            THE WITNESS:  That's not something I would typically investigate.

            (Plaintiff Exhibit 6 was marked for identification.)

BY MR. RISTVEDT:

Q.   Okay.  So if she came to you and said -- let's do this.  I'm going to place on the screen what I will designate as Plaintiff's Exhibit 6.

            You can probably tell this is a similar document to the one we were just looking at, except this one, instead of being for Victor Ramirez Najera, this one is for Ronald Garcia Delgado.  Do you agree?

A.   Yes.

Q.   So I'm looking at Experian Delgado CONFIDENTIAL 30 at the very top of the page.  Do you see the date of birth field and the year of birth source that we just discussed in the other report?

A.   Yes, I do.

Q.   So this one has a date of birth listed in 1971.  Would you agree with me?

A.   Yes.

Q.   So if Ms. Cave reached out to you and said, "Hey, Tim, this person has sued us, and they're saying that the date of birth in their file is wrong.  They were actually born in the '90s," am I correct in understanding your testimony, you would not be the person to investigate such an issue?

A.   Yes.  To me, that would be more of a dispute.

Q.   So if Ms. Cave came to you and said, "I'm looking for information about this date of birth," you wouldn't be the one to handle those types of inquiries, at least within the file -- the Find Consumer processes?

MS. ANTHONY:  Object to the form.

THE WITNESS:  You know, it depends on what type of information she's looking for.

BY MR. RISTVEDT:

Q.   How do you mean?

A.   Well, if she's saying, "I don't believe this is the consumer's date of birth," there's nothing I would be able to do about that.

Now, if she said --

Q.   Oh, my apologies.  Go ahead.

A.   Now, if she's questioning -- if she wants to know what impact this might have had on the matching, then she might ask me that question.  But if she's saying, "I don't think this date of birth is this consumer's date of birth," I don't know what action she would expect of me.

Q.   Okay.  So you're saying she might ask you, "Hey, why did this particular date of birth get associated with this PIN?"  Am I understanding?

MS. ANTHONY:  Object to the form.

THE WITNESS:  That --

MR. RISTVEDT:  I'm sorry.  I think your audio -- I don't know if that was for everyone or just me.

THE COURT REPORTER:  He cut out.

MR. RISTVEDT:  I suspect, based on --

THE WITNESS:  -- it was added through a data furnisher -- can you hear me?  Can you hear me okay?

MR. RISTVEDT:  Yes, I think we can now.

THE WITNESS:  Okay.  Okay.

BY MR. RISTVEDT:

Q.   And my apologies.  I think my question was, if

Ms. Cave reached out to say, "Why did this date of birth get" -- "Why was this associated with this PIN," would that be something you'd be able to investigate or no?

MS. ANTHONY: Object to the form.

THE WITNESS: Why would it have -- why would it be associated with this PIN? Yeah, I don't know how I would investigate that.

BY MR. RISTVEDT:

Q. You testified earlier about the ability to look at archived versions of the tables within FileOne. Do you recall that?

A. Yes.

Q. If you looked at archived versions of the tables in FileOne, would that also give you the ability to look at the date of birth that was associated with a particular PIN at a particular moment in time?

A. Yes, if I requested the consumer op table, then that would contain the YOB information.

Q. So on this particular report, do you see at the top of Experian Delgado CONFIDENTIAL 30, where it says that the year of birth source was a tradeline update on April 12 -- March 12 of 2024?

A. I see it, but I don't know if it's the top of 30. I assume so because what's above it is 29.

Q. And just to --

A.    Okay, yes.

Q.    So I can surmise that this date of birth was updated on that date as a consequence of a tradeline update, fair?

A.    That's what I would surmise, yes.

Q.    So based on your testimony, I understand that you would have the ability to obtain an archived copy of the consumer table from, say, the week before March 5th, 2024, and you could look at whether there was a different date of birth at that point in time associated with this PIN, true?

A.    Yes.

Q.    So the practice of only keeping a single PIN in the consumer's -- or excuse me -- a single date of birth in the consumer's file, it sounds like that is a FileOne process and therefore not within your purview.  Is that true?

A.    Yeah.  It's something that would have been part of the initial design of FileOne.

Q.    So setting aside that inquiry, what rules exist for matching data within the date of birth field in Find Consumer specifically?

A.    Yeah, I don't know if I can recall the rule -- all the rules that relates to YOB.

Q.    I did want to check -- you mentioned -- you

mentioned YOB a few times, Y meaning year, as opposed to DOB, D meaning date.  Have I caught your testimony correctly?

A.    YOB versus what?  I'm sorry.

Q.    Versus DOB --

A.    Oh, DOB.

Q.    -- date of birth.

A.    Yes.

Q.    Is there a particular reason that you keep referring to the year of birth as opposed to date of birth?

A.    Yes.  I refer to year of birth because that's what Find Consumer matches on.

Q.    Okay.  So Find Consumer is concerned with whether the year matches, but it's matching logic would not throw a reject based on, say, a date in the same year as the date of birth on file.  Is that right?

A.    Yes.  It only looks at the YOB, not the MMDD.

Q.    I know you mentioned that you may not have committed to memory all of the rules surrounding Find Consumer's treatment and analysis of year of birth.

Do you know any of the rules beyond the it has to be in the same year rule?

A.    Not off the top -- and I don't know what you mean by it has to be in the same year.  What do you mean by

that?

Q.   Well, I think you just testified that Find Consumer makes some consideration about the year of birth. In other words, it looks at, "We have 1971 on file.  Does this data have 1971 on some date?"  That was what I understood your testimony to be.  Was that what you intended or no?

MS. ANTHONY:  Objection to form.

THE WITNESS:  Yeah.  So it will match the incoming YOB to the YOB that we have on file for the PIN.

BY MR. RISTVEDT:

Q.   And that's a Find Consumer function you're describing, yes?

A.   The matching is a Find Consumer function, yes.

Q.   So I understand that to be like a rule, kind of like the social security number rule we've been discussing.  In this instance, the rule is the year received has to match the year on file.  Would you call that a rule, or is that something else?

A.   I would not consider that a rule.  I would consider -- that would be a match type, right?  So what's the outcome when we match the input YOB to the on file YOB?  Is it an exact match?  Is it a plus or minus two -- plus a minus two?  Is it three to five digits off?  So it determines the match outcome.  That's what Find Consumer

APPENDIX 1376

determines.

Q.    Okay.  And you identified these other thresholds, two to three, that kind of thing, is that similar to the thresholds we talked about earlier in terms of the number of social security number digits that need to match?

A.    It's similar to that.

Q.    Do you know if there are any reject rules within Find Consumer processes that would reject a date of birth that is five or more years off from the date of birth on file?

A.    Again, I don't have them memorized, so I don't know.

Q.    If you had the -- excuse me -- the RDRR -- or excuse me, backwards -- DRDD, would that allow you to look at the rules for year of birth, date of birth to identify specifics about what Find Consumer does and does not allow?

A.    [Inaudible.]

Q.    I think --

MS. ANTHONY:  He cut out.  He's --

THE WITNESS:  Oh, sorry.  Can you hear me?

MS. ANTHONY:  Yes, we can now.

MR. RISTVEDT:  Yes.

BY MR. RISTVEDT:

Q.    I think you said, "That would be in the rules,

yes," but I want to confirm that.

A.    Yeah, so the rules would be in the DRDD.

Q.    And at least as we sit here today, you wouldn't be able to speak to what level of flexibility those rules allow for.  Is that fair?

A.    Yeah.  I wouldn't be able to, off the top of my head, tell you what those rules are.

So I know we've been going a little over an hour.  This looks like a good time for a break.  I think we've got about 45 minutes left.  Mr. Sumida, is another

five minutes okay?  Do you want more time?

Rebecca, how much do you want?

MS. ANTHONY:  That's fine with me.

THE WITNESS:  That's fine with me as well.

THE COURT REPORTER:  I'm good with that.

MR. RISTVEDT:  Okay.  I've got 1:33.  Let's call it 1:38.

THE WITNESS:  Okay.

THE COURT REPORTER:  We're off the record. Time is 12:33 p.m.

(A recess ensued.)

THE COURT REPORTER:  We're on the record. Time is 12:41 p.m.

BY MR. RISTVEDT:

Q.   All right.  And, Mr. Sumida, you understand you remain under oath, yes?

A.   Yes.

Q.   Okay.  We were talking about conflicts for data as understood by Find Consumer.

I'd like to ask you some information -- or some questions about the address information that Experian receives.

Find Consumer has rules in place to evaluate address information received from its data sources.  Is that true?

A.   So it does match on address, as well as the name, when qualifying.  Is that the question?

Q.   Yes.

A.   Okay.  Okay.

Q.   Now, I expect there are some rules that relate to how address matching operates within Find Consumer, like with the other fields.  Is that true?

A.   Yes.  So there are match types that Find Consumer will post for the fields that Find Consumer evaluates, yes.

Q.   For the address field, do you have any knowledge about what the rules are that Find Consumer applies when matching address information?

A.   When you say "rules," do you mean reject/select type rules or --

Q.   Yes.

A.   In terms of the reject/select, no.  I don't have those committed to memory.

Q.   Do you have any general understanding of how the reject or accept -- or excuse me reject or select process works with respect to addresses?

        MS. ANTHONY:  Object to the form.

        THE WITNESS:  General -- only that it does consider the address, and there may be rules around reject and select that are -- that are based on those fields and

however they matched.

BY MR. RISTVEDT:

Q.   I'm going to reshare.  We were looking at Exhibit 2 earlier.  This is the admin report for Mr. Ramirez Najera.

Do you recall looking at this earlier?

A.   Yes, I do.

Q.   So looking at EXPERIAN NAJERA 172, the top of that page, and the bottom of EXPERIAN NAJERA 171.  Do you see where the address information is included in this report?

A.   Yes, I do.

Q.   So I see that there are addresses associated with this particular PIN.  I would expect that if I just got a brand new address, there would be some sort of rule in place to determine is this information wrong or did this person potentially move?  Is my expectation correct?

MS. ANTHONY:  Object to the form.

THE WITNESS:  Yeah, I don't know what you mean by "wrong."  You know, Find Consumer doesn't know that this is -- this is the right address for that consumer, if that's your question.

BY MR. RISTVEDT:

Q.   Yeah, let me clarify.

I understand you -- so within the context of

Find Consumer's inquiry, I expect there is some sort of process for Find Consumer to determine whether or not an address, say, satisfies a reject rule versus perhaps the consumer has recently moved and that's why the address was never before associated with the consumer's PIN.

Are there those types of rules or processes to ensure that new addresses can be returned associated with a particular PIN?

MS. ANTHONY:  Object to the form.

THE WITNESS:  Find Consumer only knows what's on file.  So when it's matching, it'll match to the addresses that are linked to that PIN.

BY MR. RISTVEDT:

Q.   So if Find Consumer receives a brand new address, say, I just moved and I've got -- I was at 123 First Street, now I'm at 987 10th Street, if Experian receives new data from a furnisher saying James Ristvedt, with my correct social and all that information and a brand new address not currently associated with my PIN, how does Find Consumer treat those types of scenarios?

MS. ANTHONY:  Object to the form.

THE WITNESS:  So you're saying we have the address on file or we don't yet have it?

BY MR. RISTVEDT:

Q.   Do not.  This is -- this would be a brand new

address, I just moved.

MS. ANTHONY:  Object to the form.

THE WITNESS:  So the address is not associated with that PIN yet?

BY MR. RISTVEDT:

Q.   Correct.

A.   Okay.  So under that scenario, what is your question, then?

Q.   So my question is, how would Find Consumer treat just the address field in the circumstances I'm describing?

MS. ANTHONY:  Object to the form.

THE WITNESS:  So it would not have a match on address.

BY MR. RISTVEDT:

Q.   When Find Consumer performs its analysis, the inquiry is comparing input data to the data Experian already has on file.  That's true, yes?

A.   Yes.

Q.   Are there any sort of confidence thresholds that are returned within the Find Consumer process, or is each result is a yes/no?

A.   Are we talking specific to the address again -- still or --

Q.   Well, let me take a step back.

So if I've got a social that, you know, 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, like the fictitious social I've been describing today, if Experian received a perfect match, 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, versus receiving a match that does not result in a reject, but it's missing by a digit, say, 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, the last two digits are different, will Find Consumer apply some sort of confidence level to the latter as opposed to the exact match in the former?

MS. ANTHONY:  Object to the form.

THE WITNESS:  So Find Consumer will return -- the match for that -- for the SSN in that case would be the two to three digit conflict, and it would be subject to two rules that are relative to that.

BY MR. RISTVEDT:

Q.   Okay.  So it's based on whatever the threshold that's set is.  Have I understood that correctly?

A.   It's based on the match outcome, right?  So comparing input to on file, and then if there's any rules that consider that.

Q.   So for the address, it sounds like if the received address is not already on file, the address field will result in a -- I'm going to forget the term you used -- a match result of no, the address doesn't match. Is that right?

MS. ANTHONY:  Object to the form.

THE WITNESS:  Yes.  So the -- the address fields would be -- it would -- it would not have any matches.  I'd have to -- I'd have to refresh my memory on, you know, what does it actually post?  Does it post conflict?  Does it post some other values that tell us that we did not have an address match?

BY MR. RISTVEDT:

Q.   So at least as we sit here today, you wouldn't be able to say with certainty whether it's just a yes, no, this matches or, you know, there's a confidence score of 50 because we're unsure about the match.  You wouldn't be able to say either way.  Is that fair?

MS. ANTHONY:  Objection to the form.

THE WITNESS:  Well, I'm not clear on this confidence score.  I'm not familiar with a confidence score.  But --

BY MR. RISTVEDT:



Q.   Do you know whether -- do you see on the screen I've highlighted two addresses, 3109 Chippewa Trail and then 3109 Chippeira Trail?  Do you see that?

A.   Yes, I do.

Q.   Is the initial match within Find Consumer for addresses an exact match or is there some flexibility?

MS. ANTHONY:  Object to the form.

THE WITNESS:  There is some fuzzy matching that Find Consumer will perform on the fields, yes.

BY MR. RISTVEDT:

Q.   What does the fuzzy matching for the address field consist of?

A.   Yeah, I would have to refresh my memory on that.

You know, the match types and the type of matching we do is different depending upon the field that we're evaluating.  So, you know, we would come up with some match type for the street number or house number.  Primary street ID is what we refer to it as.  I don't know specifically which match types are possible for primary street ID, which match types are possible for street name.  Each one has a specific set of fuzzy matching it will perform.

Q.    If I've understood you correctly, in the example we've got on the screen, so, for instance, the street number is 3109.  That's the value to which you're referring, yes?

A.    Yes.

Q.    So there's some sort of fuzzy matching that is specific to the street number, yes?

A.    Yes.

Q.    And then --

A.    It's an exact match in this case.

Q.    And then separately there's also the second part of the address, which is the street name, in this case Chippewa Trail and Chippeira Trail.  Am I correct in that as well?

A.    Yes.

Q.    And you're saying there's a separate portion of

matching done on the street name and that too has its own

fuzzy matching component, correct?

    A.   Yeah, it has fuzzy matching functions that we

will apply to street name.

    Q.   And when you say that in order to state with

certainty about what those fuzzy matching rules consist

of, when you say you need to refresh your recollection,

are you again referring to the Find Consumer DRDD?

           MS. ANTHONY:  Object to the form.

           THE WITNESS:  Yeah.  So the Find Consumer

DRDD would reference what match type -- or what types of

matching we will do for each of these fields.

BY MR. RISTVEDT:

    Q.   So it would say -- it would have details about

how fuzzy matching worked for, say, the house number

versus the street name, fair?

    A.   Yes.

    Q.   Beyond knowing that these fuzzy matching

processes exist, as we sit here today, do you have any

other knowledge about what those fuzzy matching processes

entail or how the fuzzy matching logic operates?

    A.   Well, it depends on what type of fuzzy matching

we're doing.  I don't know specifically which -- which

algorithms we use for street number versus street name.

They're not always the same.  Numbers are often evaluated

in a different way.  So yeah, it depends on -- on the field.

Q.   Okay.  But in other words, as we sit here today, you wouldn't be able to tell me if, say, the street number matching logic required one or fewer digits to be in conflict, something like that.  Is that fair?

A.   Yeah, I don't know specifically what type of matching we perform on each of these fields.

Q.   I want to move on to names.

Experian receives data from data sources containing consumer names, meaning first name, middle name, and last name, yes?

A.   Yes.

Q.   And when Find Consumer performs its match logic, it evaluates the names Experian has received from a data source and compares it against the names Experian has on file at that time, true?

A.   Yes.

Q.   I suspect, like each of the other fields, there are rules and different types of, to your point, fuzzy matching that are performed with respect to the name fields.  Is my expectation correct?

A.   Yes.  There may be overlap, but there may be rules that are specific to a given field.

Q.   Do you know what level of flexibility is allowed

for, say, a typo in the first name field?  Like, here we've got Victor, V-i-c-t-o-r.  If somebody had typed V-i-c-t-o-r-r, would a typo like that throw a reject code or is there some consideration for simple mistakes like that?

MS. ANTHONY:  Object to the form.

THE WITNESS:  We don't determine a reject at this point, right?  It's just determining the level to which it matches.

BY MR. RISTVEDT:

Q.   And then based on that level to which it matches, there would be some rules applied by Find Consumer before it sends the result.  Is that correct?

MS. ANTHONY:  Object to the form.

THE WITNESS:  Yeah, so the rules, you know, it depends on if they're name only rules, name and address rules, select rules, it will look at all the match types for each of the fields.

BY MR. RISTVEDT:

Q.   And then it makes a determination based on the aggregate of those match types?





Q.   So with respect to the name rules, do you know those rules by memory, or is that like the address rules where you sort of know that there's some fuzzy logic, but you may not know the specific rules?

MS. ANTHONY:  Form.

THE WITNESS:  Again, it sounds like maybe you're mixing rules and match types.  So yeah, I don't recall all the types of matching that's performed on the individual fields, nor -- nor can I recall all the rules that are used to determine rejection or selection.

BY MR. RISTVEDT:

Q.   Does Find Consumer have any built-in considerations about name variations as a consequence of cultural issues, say, Hispanic cultures that have multiple surnames, or in some Asian cultures where the surname and first name are reversed?  Is there anything like that that's built in to Find Consumer?

MS. ANTHONY:  Object to the form.

THE WITNESS:  I mean, if you're referring to does Find Consumer have rules that are specific to ethnicity?  Is that what you're saying?

BY MR. RISTVEDT:

Q.   Not necessarily specific to ethnicity, but rather that account for certain cultures that have different naming conventions.  Are those things considered within Find Consumer's built-in processes?

MS. ANTHONY:  Object to the form.

THE WITNESS:  So Find Consumer matches to whatever we have on the database in those fields, right?  If we have a first name, middle name, last name, second surname, that's what it matches to.

BY MR. RISTVEDT:

Q.   How does Experian parse out first name, middle name, last name from the data that it received from data furnishers?

MS. ANTHONY:  Object to the form.

THE WITNESS:  There's a simple application that does the parsing of names.

BY MR. RISTVEDT:

Q.   And is that just based on the data payload that's received, or is there some internal logic within that application?

A.   So the application is the one that processes

Coash Court Reporting & Video, LLC
staff@coashcrv.com
602-258-1440
www.CoashCourtReportingandVideo.com

through the name.  You know, there are some options, right?  So is it -- is this in first, middle, last or last, first, middle?  So there is some indication as to what sequence the names are given, but the name plus application based on the format will parse through the names.

Q.  So we talked a little bit about the match types surrounding different data fields and then the resulting rules.  As we sit here today, do you have knowledge about what the various match types are for, say, first names?

MS. ANTHONY:  Object to the form.

THE WITNESS:  Yeah, I couldn't tell you all the match types that are used.  I don't recall all of them, no.

BY MR. RISTVEDT:

Q.  And presumably, as we've discussed a few times, in order to refresh your recollection, we would need to review the Find Consumer DRDD to look at the match types surrounding names.  Is that fair?

A.  That's what I would usually refer to, yes.

Q.  And then I understand that in addition to the match types, there are also rules that are applied dependent upon the match types.  Am I correct in assuming that you also would need to review the DRDD in order to recall the various rules applied to first names?

Coash Court Reporting & Video, LLC
staff@coashcrv.com
602-258-1440
www.CoashCourtReportingandVideo.com

APPENDIX 1395

Victor Manuel Ramirez Najera vs. Experian Information Solutions Inc. -
30(b)(1) Experian Information Solutions, Inc. - Timothy Sumida

November 18, 2025
152

MS. ANTHONY:  Object to the form.

THE WITNESS:  Again, they're not really applied to specific fields.  It's applied to the entire pattern.  So each field may have a threshold specified in the rule, but it will refer -- it will take a look at the entire pattern and look to see what all is matching, what all is in conflict with respect to the names in this case.

BY MR. RISTVEDT:

Q.  So at least without the benefit of the DRDD, you wouldn't be able to tell me, say, whether a particular name would be likely to result in a certain type of match type based on input data versus the data on file.  Is that true?

MS. ANTHONY:  Object to the form.

THE WITNESS:  I wouldn't be able to tell you all the match types that relate to, let's say, first name.

BY MR. RISTVEDT:

Q.  Is the same true for a middle name and last name?

A.  Yeah, I wouldn't be able to call -- recall with certainty what all the match types are.

Q.  I suspect I know the answer, but I'm going to ask some questions nonetheless.

(Plaintiff Exhibit 4 was marked for

identification.)

BY MR. RISTVEDT:

Q.    I'm placing on the screen what I'll designate as Plaintiff's 4.  I expect you've also not seen this document before.  Again, it is a demonstrative exhibit I've created containing some -- on the left-hand side, names on file versus names received in the right-hand side.  Do you understand the distinction between the data on the screen?

A.    Yes.

MS. ANTHONY:  Object to the form.  Object to the demonstrative as having made-up information.

BY MR. RISTVEDT:

Q.    So my assumption, based on your testimony, is that, at least as we sit here today, if I were to ask you, for instance, what match type would be returned between the name in the first row, the last name Ramirez Najera versus the received name Ramirez, I expect you would not be able to tell me about what match type would be returned.  Is that true?

MS. ANTHONY:  Object to the form.

THE WITNESS:  I mean, not with certainty, no.

BY MR. RISTVEDT:

Q.    Do you know whether there are match types that relate to data that contains an additional word or

Coash Court Reporting & Video, LLC
staff@coashcrv.com                                    602-258-1440
www.CoashCourtReportingandVideo.com

additional characters?

A.    Yeah, there are some match types that would recognize that.

(Plaintiff Exhibit 5 was marked for identification.)

BY MR. RISTVEDT:

Q.    Okay.  I'm going to place on the screen what I'm going to designate as Plaintiff's 5.

Once again, I expect that this is brand new to you.  Again, this is a demonstrative exhibit I've created containing some names from an Experian credit file.  Does my explanation of what this information consists of make sense to you?

A.    So you're saying these are on-file names?

Q.    That's correct, yes.

A.    Okay.  Yeah.

MS. ANTHONY:  Object to the form and object to the demonstrative as having made-up information.

BY MR. RISTVEDT:

Q.    Am I correct in understanding that if data ultimately is associated with a particular PIN that Find Consumer has evaluated, that data and that no rule has precluded that data from being sent back with a result to FileOne, is my understanding of that sequence of events correct?

Victor Manuel Ramirez Najera vs. Experian Information Solutions Inc. -                    November 18, 2025
30(b)(1) Experian Information Solutions, Inc. - Timothy Sumida                                         155

A.    I'm not sure I fully understood the question.

Q.    Sure.  So maybe if I --  I'm going to go back to Exhibit 2 ever so briefly.

This is the admin report for Mr. Ramirez Najera, you agree?

A.    It appears so, yes.

Q.    And there are a number of names, name value listed in his admin report.  Do you agree with that as well?

A.    Yes.

Q.    I believe -- please correct me if I'm wrong -- that by virtue of the fact that the data in this document has been associated with Mr. Ramirez Najera's PIN ending in 0565, that Find Consumer would have evaluated the input data and its determination would have been that no rules required a rejection of the data.  Is my understanding of that correct?

MS. ANTHONY:  Object to the form.

THE WITNESS:  If a new name variation was added to the PIN, then it would only do that if Find Consumer qualified the PIN.

BY MR. RISTVEDT:

Q.    Okay.  So returning to Exhibit 5, if -- I believe you just testified that if a name is added to a PIN, then Find Consumer would have had to qualify the PIN.  Did I

Coash Court Reporting & Video, LLC                                          602-258-1440
staff@coashcrv.com                              www.CoashCourtReportingandVideo.com

APPENDIX 1399

catch that correctly?

A.   For the incoming name, yes.

Q.   So by virtue of a name or name variation appearing in the PIN, I can conclude definitively that Find Consumer evaluated that, number one, and number two, it qualified the PIN for the consumer on whose file the data now appears.  All true?

MS. ANTHONY:  Object to the form.

THE WITNESS:  I'm just thinking through what you said.  So yeah -- it would only add a name variation if Find Consumer qualified the PIN.

BY MR. RISTVEDT:

Q.   So I want to ask you about one name variation in this list in particular.  Do you see the last name column here that -- on the far right?

A.   Yes.

Q.   Ms. Cave testified that there is some analysis performed in a left to right reading versus right to left. Do you understand what I mean by left to right versus right to left?

MS. ANTHONY:  Object.

THE WITNESS:  I understand what you mean.

MS. ANTHONY:  Go ahead.

BY MR. RISTVEDT:

Q.   So, for instance, in this, say, fourth row,

Hernandez Ramirez has Hernandez first, then Ramirez second, meaning we're reading from left to right, yes?

A.    Yes.

Q.    Is there any analysis that Find Consumer performs with respect to any match types that would consider, say, a right-to-left reading of a surname versus a left-to-right reading?

MS. ANTHONY:  Object to form.

THE WITNESS:  I don't recall any that would operate in that direction, but I'd have to confirm that.

BY MR. RISTVEDT:

██████████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████

███████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

███████████

████████████████

█████████████████████████████████████

████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████

███████████████  Find Consumer?



APPENDIX 1402



Q.   Am I correct in understanding your testimony today that actions performed by the FileOne database for

things like either merging a PIN or splitting a PIN, those are actions performed by FileOne processes separate from Find Consumer.  Is that true?

A.   With the determination of whether PINs are mergeable, in other words, an inquiry comes in, it qualifies two PINs, it's not DNC rejected, it passes cross PIN, Find Consumer will return those two PINs back to the caller, and the caller will decide, "Can this transaction trigger a PIN merge," right?  If the answer is yes, then a physical PIN merge will happen.  If the answer is no, then a PIN merge will not happen.

So the action is determined by the caller, but the determination that we have more than one PIN satisfy the request is determined by Find Consumer.

Q.   So Find Consumer is like the Google result, and then FileOne is the action of clicking on one of the links to actually select a web page.  Is that a fair analogy?

MS. ANTHONY:  Object to the form.

THE WITNESS:  I mean, I would stick with what I said.  Find Consumer can qualify multiple PINs, and if it does, then it's up to the calling application to either merge those PINs if the transaction has the -- the ability to do so, or not merge the PINs.

BY MR. RISTVEDT:



█████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████

Q.    So setting aside a consumer dispute or, say, a lawsuit in which there's kind of a manual, "Hey, we need to go in and split this," are you aware of any automated process within Experian which would trigger a PIN split?

A.    Yeah, there is a process that's handled by data management/data development, and I believe Kim participates in some of that, that can do an automated PIN split.

Q.    Do you know what that process is called?

A.    They -- well, sometimes they refer to it as Roomba.

Q.    Roomba, like the little robot vacuum that rides around my house?

A.    That is correct.

Q.    The Experian Roomba process, is that something that you have any knowledge of?

Actually, sorry, let me strike that.

Obviously I understand you clearly have some knowledge of its existence by virtue of the fact that you know its name.  Beyond knowing its name, do you have any

knowledge about how Roomba, in the Experian vernacular, operates?

A.   General knowledge.

Q.   What is that general knowledge?

A.   So if there is a specific pattern that Kim -- and I don't know if there's others who would come up with these -- that suggests that there could be a potential mix, then that database is evaluated to see what PINs may have that condition.

Q.   So you're saying that there's some determination that potentially a pattern has emerged suggesting a mix on a widespread scale, this Roomba protocol can be designed to try and address and remediate this problem and split those PINs into separate PINs.  Is that what your testimony is?

A.   That's my understanding.

Q.   And, again, I would assume that because this is within the FileOne database and outside of Find Consumer, you may not have personal knowledge about precisely how that operates.  Is that true?

A.   I have some knowledge, but, again, it's -- it's dated.  I don't have current knowledge.

Q.   When -- when did you obtain your Roomba knowledge?

A.   When it was initially developed, I participated

in some of those discussions.

Q.   And approximately what year was that?

A.   I'm terrible with dates, I don't know.  I don't recall the exact date.

Q.   All right.  More than a year ago?

A.   More than a year ago, yes.

Q.   More than 10 years ago?

A.   That's where it gets a little iffy for me.  I would say more than five years ago for sure.

Q.   Potentially somewhere around a five- to ten-year time frame, fair?

A.   Fair, yeah.  Perhaps longer.  I don't know.

Q.   During those conversations that you had in the --

MS. ANTHONY:  May I interrupt for a second?  I just want to know where we're at in terms of time?

MR. RISTVEDT:  I've got a minute.

MS. ANTHONY:  Okay, sorry.  Go ahead.

BY MR. RISTVEDT:

Q.   During those five- to ten-year ago discussions about Roomba, what was your role in those discussions?

A.   So that was a tool that the data management team was looking to develop, and I was asked to accompany them to the consumer assistance center to have discussions with them about what some of those rules might be.

Q.   And did Find Consumer play some role in that

discussion?

A.    No, not directly.  I mean, that discussion was around, you know, are there -- what are the cases in which we think that there may be a mixed file.

Q.    Understood.

Well, Mr. Sumida, I believe my time is up. I do have just one more question for you.  Have you spoken to anybody today since -- other than myself since your deposition began?

A.    About?

Q.    About anything.

A.    I had a brief call with Rebecca.

Q.    Were you told not to provide any testimony or told to provide any testimony?

A.    I think it was just an encouragement, her telling me that I was -- I was doing okay.

MR. RISTVEDT:  Okay.  I have nothing further.

And, Rebecca, I don't know if you've got any rebuttal.

MS. ANTHONY:  Let me just take a brief break, and then we'll -- I don't expect to, but I want to just take a brief break to make sure.

MR. RISTVEDT:  Okay.  Sounds good.

THE COURT REPORTER:  We're off the record.

Coash Court Reporting & Video, LLC
staff@coashcrv.com    602-258-1440
www.CoashCourtReportingandVideo.com

APPENDIX 1409

Time is 1:28 p.m.

(A recess ensued.)

THE COURT REPORTER:  We are on the record. Time is 1:31 p.m.

MS. ANTHONY:  I don't have any questions.  I would like a read and sign.

MR. RISTVEDT:  And, Daniel, before we go off the record, I will take an e-tran only.  I do not need exhibits.  I will have Shaun circulate the exhibits for you probably later today.

THE COURT REPORTER:  That'd be great.

Okay.  We are off the record.  Time is 1:32 p.m.

(The deposition was concluded at 1:32 p.m.)


_____
TIMOTHY SUMIDA

Victor Manuel Ramirez Najera vs. Experian Information Solutions Inc. -
30(b)(1) Experian Information Solutions, Inc. - Timothy Sumida

November 18, 2025
167

STATE OF ARIZONA )

COUNTY OF MARICOPA )

BE IT KNOWN the foregoing proceedings were taken before me at the time and place herein set forth; that I was then and there a Certified Electronic Reporter and Notary Public in and for the County of Maricopa, State of Arizona; that the questions propounded by counsel and the answers of the witness thereto were taken by me electronically and thereafter reduced into typewritten form under my direction; that the foregoing pages are a full, true, and accurate transcript of all proceedings and testimony, all to the best of my skill and ability.

I FURTHER CERTIFY that I am in no way related to nor employed by any parties hereto nor am I in any way interested in the outcome hereof.

DATED at Phoenix, Arizona, this 28th day of November, 2025.

_____
Daniel Rohan, CER
Certified Electronic Reporter #4137
and Notary Public
My Commission Expires: June 28, 2027

Victor Manuel Ramirez Najera vs. Experian Information Solutions Inc. - 30(b)(1) Experian Information Solutions, Inc. - Timothy Sumida

November 18, 2025
Index: -e-r-t..addresses

**-**

**-e-r-t** 102:19

**-e-x** 13:6

**-i-n** 102:19

**-o** 102:20

**0**

**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** 98:13

**012** 120:4

**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** 118:23 119:7

**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** 118:22 119:23 120:7

**0171** 63:9

**0565** 73:21 74:2,19 155:14

**1**

**1** 39:16,20 41:6 42:1,15

**10** 16:10,20 164:7

**100** 103:24

**10:05** 49:22

**10:11** 49:25

**10th** 138:16

**11** 121:5,19

**11:04** 49:19

**11:19** 94:10

**11:29** 94:13

**11X** 121:5,8

**12** 129:22

**123** 138:15

**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** 140:6

**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** 33:8 98:12 110:12 111:18,20 140:2,4

**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** 112:3

**12:33** 135:10

**12:41** 135:13

**140** 42:22

**15** 6:20 16:10

**171** 63:17 121:21 123:2 125:21 137:9

**172** 137:8

**18** 5:4

**1971** 127:7 132:4,5

**1979** 14:4

**1:28** 166:1

**1:31** 166:4

**1:32** 166:13,14

**1:33** 135:6

**1:38** 135:7

**2**

**2** 62:10,11 67:16 68:16 137:4 155:3

**20** 110:15

**2012** 40:8,11

**2017** 115:25

**2018** 85:5,6,18 86:3,5,17, 24 87:4 88:14 89:4 91:2 115:11,23

**2018-2019** 75:13

**2019** 91:4,20

**2020/2021** 20:19

**2023** 106:24 107:9

**2024** 13:22 19:1 129:22 130:8

**2025** 5:4

**21** 110:15

**24** 7:23 13:24 14:5 16:15 18:2

**29** 129:24

**3**

**3** 117:14,15

**30** 127:3 129:20,23

**3109** 142:14,15 143:12

**4**

**4** 152:23 153:3

**400-page** 45:17

**45** 14:9 134:25

**45-year** 14:13

**5**

**5** 42:5,8,15 154:4,8 155:23

**50** 141:11

**5919** 67:18,21 73:19

**5th** 130:8

**6**

**6** 126:16,21

**7**

**70s** 15:16

**79** 15:2

**8**

**80s** 15:16 16:2,9

**876** 120:4

**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** 119:8,15

**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** 119:16,22

**9**

**90s** 15:11 127:13

**987** 138:16

**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** 33:9 110:17

**9:02** 5:5

**A**

**A-N-D-R-E-A** 102:18

**a.m.** 5:5 49:22,25 94:13

**ability** 7:23 8:2,7 32:7 62:5 64:21 116:23 129:9, 14 130:7 160:23

**absolutely** 22:20 94:2

**abstract** 41:6,17

**accept** 48:1,4 136:20

**acceptable** 31:23

**access** 21:13 22:7 26:22 53:24 54:2 60:1,4,15 62:4 76:5

**accompany** 164:22

**account** 110:14,17 150:6 158:13

**accounts** 41:13

**Accuracy** 52:14

**accurate** 7:20 21:7

**accurately** 7:24 8:3

**acronym** 46:7

**action** 47:4 128:10 160:12,16 161:19

**actions** 159:25 160:2

**active** 60:8,11

**actively** 59:20

**actual** 37:14 55:5 62:6 72:18 79:14 99:23

**Adam** 23:25

**add** 65:23 66:2,19 122:10 156:10

**added** 62:4 68:6 120:9 128:20 155:20,24

**addition** 52:12 62:2 151:21

**additional** 78:14 153:25 154:1

**address** 5:18 37:24 48:6 52:3,7,9 53:22 54:4 66:8, 11,20 67:1 68:14,25 69:4, 5 73:25 87:16 88:2 89:15 96:8 116:17 135:21,24 136:1,6,11,13,24 137:10, 15,21 138:3,4,14,19,23 139:1,3,10,14,23 140:20, 21,23 141:1,6 142:23 143:21 146:16 148:4 149:2 159:19 163:13

**addresses** 75:3 136:21

Victor Manuel Ramirez Najera vs. Experian Information Solutions Inc. -
30(b)(1) Experian Information Solutions, Inc. - Timothy Sumida

November 18, 2025
Index: adequately..attention

137:13 138:7,12 142:14, 18

**adequately** 39:10

**adjust** 81:19 100:1

**adjusting** 90:9

**adjustment** 87:7 89:22

**admin** 50:19,21 63:22 67:16 121:3 137:4 155:4,8

**administrator** 53:20,22 55:5,11

**administrators** 53:13,16

**admonishments** 7:10

**advice** 93:17

**AF** 125:21,25

**affect** 8:2

**affirm** 5:24

**aggregate** 121:14 122:10 146:21,22

**agree** 40:9,17 99:16 119:17,25 126:25 127:8 155:5,8

**agreement** 22:10

**ahead** 10:8 12:14 19:10 75:5 79:5 113:25 121:9 128:5 156:23 164:17

**alcohol** 7:22

**alert** 117:8

**alerted** 11:25

**algorithm** 26:6,10,15 28:16,19,21,23 29:10 31:15 32:15 37:16 43:16 109:24

**algorithms** 144:24

**Allen** 20:9

**allowed** 145:25

**allowing** 82:13

**America** 54:11

**amidst** 147:5,23

**analogy** 80:18 81:14 160:17

**analysis** 40:25 50:15 88:13,21 89:11 95:1,18 108:10 116:20 117:4 131:21 139:16 147:22 156:17 157:4

**analyzed** 38:3

**analyzes** 36:4

**analyzing** 40:23 50:8

**ancillary** 41:19

**Andrea** 102:15

**answering** 10:16 11:5 91:10

**answers** 10:20 121:15 158:7,18

**Anthony** 5:13 9:3,13,19 10:5 19:6,9 21:17 22:3,7, 11,22,25 23:11,19 25:22 26:19 27:8 28:24 30:11 32:10,16 33:22 36:15 37:19 43:24 44:21 47:19 48:11 49:10 50:24 52:25 53:7 54:22 55:8,20 56:1 57:19 58:17 59:10 61:20 64:12 65:9 66:1 67:11 68:1,8,17 69:2 70:7,14,22 71:7,15,21 72:11 73:2,14 74:3 75:23 76:13 77:12 78:6,25 79:13 80:24 81:8, 22 82:15 83:22 85:7 86:12 87:5,19 88:15,23 89:17 90:12 91:7 92:9,17 93:11, 25 98:17 99:4,13 100:3,11 101:3 104:11 106:8,20 108:4,18 110:6,22 112:10 113:21 115:16 116:6,25 118:3,25 119:11,18 120:1 122:19 123:5 124:21 125:11 126:13 127:21 128:14 129:4 132:8 133:20,22 134:11,18 135:3 136:22 137:18 138:9,21 139:2,12 140:9, 25 141:13,22 142:19 144:9 146:6,14 147:8,14, 25 149:5,25 150:9,18 151:11 152:1,14 153:10, 20 154:17 155:18 156:8, 21,23 157:8,16 158:23 159:7 160:18 161:9 164:14,17 165:21 166:5

**antivirus** 21:22

**anymore** 106:19

**apologies** 17:18 19:11 66:9 72:3 75:5 77:4 79:5 85:11 96:17 99:7 121:9 128:5,25

**appearances** 5:6

**appearing** 5:8,18 125:24 156:4

**appears** 155:6 156:7

**Apple** 105:19

**applicable** 157:13

**application** 28:1 36:17, 18,21 38:6,10 58:13,18 72:20 103:17,19 104:5 105:15 107:21 108:20 109:11 117:10 150:19,24, 25 151:5 160:21 161:19

**applications** 36:24 37:6, 22 103:15 105:16 115:2 124:13,14 161:20,23,24

**applied** 42:24 71:14 111:7,11,19 120:20 142:9 146:12 148:8 151:22,25 152:3 157:25

**applies** 136:12

**apply** 98:4 111:8 117:5 118:18 140:7 144:4

**applying** 148:20 158:14

**approached** 18:6

**approval** 54:25

**approve** 54:20 55:4

**approved** 54:8,9

**approximately** 15:24 16:20 58:22 90:17 91:4 105:4 164:2

**April** 129:22

**architects** 83:16

**archival** 51:16

**archive** 52:20 53:4,9 59:11,17 60:5,7,9 75:8

**archived** 32:15 51:2 59:22 76:3,6,12 129:10,13

130:7

**archives** 76:9

**area** 14:25 15:23 16:1 90:24 103:1 115:19 116:9 124:18

**areas** 14:18 86:21 116:24

**Arizona** 5:10

**arranged** 22:7

**arrow** 42:24

**arrows** 42:18

**artificial** 82:24

**ascertain** 27:17 57:16 141:18

**Asian** 149:22

**aspect** 110:3,18

**aspects** 41:18,19 42:10 43:22

**asset** 105:13

**assigned** 54:24 73:11,12, 16 74:9,14 103:6 104:19

**assigning** 72:17

**assistance** 105:1 164:23

**assistant** 106:10

**assistants** 162:2

**associate** 97:10

**associate's** 14:24,25

**associating** 33:5

**association** 41:12 107:25 109:19

**assume** 16:9 21:21 23:18 39:22,23 61:4 84:8 97:11 129:24 163:17

**assuming** 78:3 97:7 123:25 151:23

**assumption** 14:14 25:20 29:11 40:1 46:18 89:10 90:2 153:13

**assumptions** 8:23

**assured** 21:16

**attention** 62:20 90:8

APPENDIX 1413

Victor Manuel Ramirez Najera vs. Experian Information Solutions Inc. -
30(b)(1) Experian Information Solutions, Inc. - Timothy Sumida

November 18, 2025
Index: attorney..change

**attorney** 5:9 12:4 14:9 22:2,19 92:4,25

**attorney's** 10:15 93:7,17

**attorney-client** 10:13 55:23 92:10

**attorneys** 8:14 28:20 30:17 56:10 92:23

**attributed** 87:13

**audio** 128:17

**Aurora** 30:24 31:1,8

**automated** 103:13 162:8, 12

**automatically** 54:25 113:18

**aware** 12:5 18:19 26:12 32:18 43:13 45:3,7 82:6 97:10 107:8 116:13 158:17 159:8 162:8

**awareness** 108:22

**B**

**back** 30:5 37:23,25 55:12 83:14 85:6 86:17 91:1 98:19 99:17 121:2 139:25 154:23 155:2 160:7

**backed** 31:16

**backwards** 133:14

**bad** 11:24

**bangs** 9:22

**bankruptcy** 7:1

**based** 8:23 33:24 37:15 38:9,11 40:19 41:9,14 42:23 46:14 48:10 63:18 64:22 65:17 67:2 71:13 83:20 91:25 92:9 95:3 98:2 103:18,20 110:4 111:4 112:1 118:6 119:2 121:1,13 123:23 125:12 128:19 130:6 131:16 136:25 140:15,17 142:4,8 146:11,20 147:3 150:22 151:5 152:12 153:13 158:20 161:13

**basically** 38:7 113:19

**basing** 75:11

**basis** 11:1,8,9,15 12:23 39:25 89:16 93:3

**batch** 79:14 105:14

**Bates** 63:3,14

**began** 15:2,17 18:10 165:9

**begin** 8:15 9:11 107:18

**beginning** 94:20 108:3 109:3

**begrudge** 94:4

**behalf** 5:14

**beings** 53:17,19 113:20

**believes** 120:14

**belong** 162:5

**belongs** 73:4

**benefit** 46:13 63:16 152:9

**Ber-** 102:19

**Bertino** 102:15,18,20

**best-ness** 124:6

**bet** 46:1

**beverage** 32:5

**BI** 30:24 31:1

**binary** 141:19

**birth** 48:5 49:1 96:8 114:21 115:14 116:3,19 118:8 123:1,3,4 124:2,7,8, 20 125:2,24 126:7,10,11 127:4,7,12,18 128:2,9,10, 12 129:1,15,21 130:2,10, 14,21 131:7,10,11,12,17, 21 132:3 133:8,9,15 134:9,15,16,20,21

**births** 123:10

**bit** 41:22 44:11 49:8 56:5 151:7 160:25

**BK-7** 6:23

**black** 61:17

**board** 97:23

**bonus** 44:5

**born** 127:13

**bottom** 41:6,25 62:21 125:20 137:9

**boy** 102:19

**brain** 98:13

**brand** 103:20 137:15 138:14,18,25 154:9

**break** 11:22 12:1,4,5,15 134:24 165:22,23

**breaks** 12:2 94:3

**briefly** 155:3

**bring** 70:3

**brings** 90:7

**broke** 50:2

**broken** 54:1 94:24

**build** 35:3 71:8

**building** 11:6

**buildings** 11:6

**built** 149:24

**built-in** 149:19 150:8

**bunch** 28:17 89:9

**business** 17:16,20,24

**C**

**C-A-S-P** 13:6

**calendar** 90:16

**California** 5:21 20:8,11 40:5

**call** 6:15 7:10 15:21 34:5, 6 37:2,9 49:19 54:18 61:13 91:9 125:1 132:18 135:7 152:19 165:12

**called** 10:2,11,22 17:11 21:11 30:7,21 33:19 54:16 63:3,23 105:1,13,15 162:14

**caller** 37:25 103:8,12 116:22 117:12 160:8,12

**calling** 36:18,21 38:6,10, 16 103:15 104:5 107:21 108:20 109:10 114:13

117:10 160:21 161:15,19

**calls** 10:12 86:19

**campus** 20:11

**candidate** 69:19,20,21 71:5,9,12 72:6 74:1,5 108:2 118:10,13,14,15,16

**cap** 116:8,10

**capital** 13:8 105:19

**card** 15:22

**care** 159:4,15

**cars** 11:7

**case** 6:22,23,24 7:4 12:7 24:9 31:22 48:7 63:8,24, 25 75:6 88:7 99:9 101:10, 19,25 105:19,20 106:2 111:17 112:14 140:11 143:19,21 152:7 161:17, 19

**cases** 30:2 48:1 59:19 89:21 104:21 165:3

**Caspex** 13:4,10,16,19,21 18:3,10,13,15,17,18,24 19:4,17,23,24 20:2,4

**catastrophic** 32:1,9

**catch** 51:17 64:23 69:18 125:3 156:1

**caught** 131:2

**Cave** 23:25 24:24 33:2 50:7,14,17 55:14 56:11,19 59:1 64:2,20 68:21 69:9, 17 74:17 85:4,13 90:7 91:5 92:5 93:1,9 115:22 126:4,9 127:10,17 129:1 156:17

**Cave's** 65:6 86:23

**caveman** 98:13

**center** 164:23

**certainty** 101:11 141:9 144:6 152:20 153:21

**Certified** 6:9

**chance** 42:7

**change** 17:7 80:12 85:5 88:5 89:3,6,9,12 91:19 92:8,11 93:9 115:24

Victor Manuel Ramirez Najera vs. Experian Information Solutions Inc. -
30(b)(1) Experian Information Solutions, Inc. - Timothy Sumida

November 18, 2025
Index: changed..consumer

**changed** 86:24

**characteristic** 110:19

**characteristics** 40:24

**characters** 154:1

**check** 48:15 113:8 130:25

**Chippeira** 142:15 143:22

**Chippewa** 142:14 143:22

**choose** 108:20,21

**chooses** 83:21

**chose** 106:23

**circulate** 166:9

**circumstance** 97:19,24 112:5

**circumstances** 18:1 36:10 38:2 76:16 95:4 139:10

**cite** 92:15

**City** 11:3

**City-based** 11:4

**clarify** 34:16 35:11 72:21 85:24 107:22 113:15 115:21 137:24 147:19 157:22

**classic** 32:5

**clear** 8:11 9:10 22:1,20 43:6,9 44:25 70:15 73:15 76:3 92:2 141:14 158:8

**click** 60:19

**clicking** 160:16

**clockwork** 110:13

**closely** 92:18

**closer** 121:7

**Coca-cola** 32:1,3

**code** 44:19 45:17 78:3,15, 16,17,18,20,24 112:13,19, 20 114:16,19 117:11 146:3

**coded** 30:15,16

**codes** 16:12 112:16,25 113:2,6 114:16

**coding** 16:5 58:15

**Coke** 31:25

**colleagues** 5:11 24:24 25:1

**college** 16:6

**collided** 74:15

**colloquial** 26:9

**column** 120:7 156:14

**columns** 64:15

**combination** 35:23 67:8, 21

**combinations** 97:12

**combine** 111:6 112:1 113:3

**combined** 57:12

**commercial** 31:14

**committed** 46:17 131:20 136:18

**common** 88:11

**communicated** 25:2

**communication** 90:1

**communications** 10:13 22:21 23:5,6 55:23 56:3

**companies** 31:13

**company** 13:10,11 16:8 89:8

**compare** 35:2,4 113:9,12 120:15

**compared** 75:3 117:24 142:7

**compares** 120:13 145:16

**comparing** 139:17 140:18 159:3

**comparison** 10:24 113:23 114:3

**compensation** 44:5

**complete** 10:7

**completed** 104:20

**complicated** 58:15

**component** 104:2 144:2

**components** 48:21

**computer** 14:22 15:25 21:15,19 28:22,25 29:17, 24 61:5

**computers** 61:16

**concept** 28:20

**conception** 34:18

**concerned** 52:2 131:14

**conclude** 156:4

**concluded** 166:14

**condition** 95:10 163:9

**conduct** 50:23

**conference** 86:19

**confidence** 139:20 140:7 141:10,15

**confident** 101:18

**CONFIDENTIAL** 127:2 129:20

**confirm** 87:24 101:25 134:1 157:10

**conflict** 33:6,9,11 34:5,6 48:14 79:2,3,7,11,12,23, 24,25 80:1,4,5,8,9,22 81:25 82:14,18 83:6,8 84:13,14,19,21,25 95:8, 11,16 96:23 98:14,19,22 99:1,11 100:2 101:1,7 103:4 114:9 115:4 118:19, 24 119:2,10,13,17 120:19 140:12 141:5 145:6 148:23 152:7

**conflict-based** 32:25

**conflicts** 33:14,17,24 35:1 81:19 113:10 123:19 135:18

**conflicts-based** 32:23

**confusing** 8:17

**conjunction** 18:13

**connect** 21:10

**connected** 12:14

**connecting** 62:3

**connection** 21:5 24:9 61:10 62:1 63:25 64:4

**connotes** 67:25

**consequence** 18:19 130:3 149:20

**consideration** 110:3 132:3 146:4

**considerations** 149:20

**considered** 23:3 93:10 98:2,22 116:4 150:7

**consist** 142:24 144:6

**consistent** 41:21 42:16

**consisting** 111:20

**consists** 41:2 154:13

**constantly** 92:19

**consult** 101:19

**consulting** 13:11,13

**consumed** 7:22

**consumer** 6:24 20:25 25:17 26:6,8,13,18 27:12, 20 28:1,2,5,10,16,21,23 30:7 31:15,16 32:8,15,22 33:3,4 34:25 36:4,12,16 37:7,9,12,21,23 38:3,6,16, 18,23 39:1 41:18 42:11,14 43:7,10,15,23 44:1,12,13, 14 45:24 46:6,8 50:4,20 51:6 52:2,6,8 53:21 54:4 55:18 65:3,17,21 70:5,12, 16 71:4,10,12 72:6,16,19, 22 73:4 78:12 82:22,23 83:9 85:23 86:4 87:3,12, 13 88:1,22 90:10,19 91:6 92:5 93:10 94:18 100:25 101:5,7,23 102:7,12 103:15 104:4,24 105:2,23 106:6,11,14 107:1,10,15, 20 108:1,8,10,12,14,22 109:4,5,8,17,24 110:18 111:8,13 112:12 113:11, 14 114:15 115:9,12 116:4, 14,16,18,23 117:3,5,7,11 118:11,15,17,23 120:13, 17,24 121:11,25 124:5,11 127:20 129:17 130:8,22 131:13,14 132:3,12,14,25 133:8,16 134:8 135:19,23 136:6,8,9,12 137:20,22 138:2,4,10,14,20 139:9, 16,21 140:7,10 142:17,21

APPENDIX 1415

Victor Manuel Ramirez Najera vs. Experian Information Solutions Inc. -
30(b)(1) Experian Information Solutions, Inc. - Timothy Sumida

November 18, 2025
Index: consumer's..decade

144:8,10 145:11,14 146:12 147:13,16,20,22 149:12,19,24 150:2,10 151:18 154:22 155:14,21, 25 156:5,6,11 157:4,12,25 158:16,19 159:2,4,15,20 160:3,7,14,15,20 161:5,8, 11,13,18,22,25 162:1,5,6 163:18 164:23,25

**consumer's** 37:16,25 55:16 68:15 69:10 100:25 110:2 111:7 117:23 118:22 119:24 120:9,18 128:2,9 130:14,15 131:21 138:1,5 150:8

**consumers** 42:14

**contained** 27:13 40:20 64:10 100:22

**contents** 23:4 92:3

**contest** 8:9 10:21

**context** 6:21 7:4 12:20 25:15 35:6 63:5 66:17 68:4 112:19 137:25

**continue** 66:9

**contracting** 13:1,3,18,21 19:22

**contractor** 12:20,25 18:3,24 19:16

**contributing** 40:12

**control** 66:18 68:13

**conventions** 150:7

**conversation** 85:18 86:1 92:24,25

**conversations** 85:21 86:2,14,16 92:3,23 164:13

**cool** 29:5

**copies** 51:2 53:9

**copy** 51:16 59:12,22 60:5, 7 75:9,16 76:12 130:7

**corner** 62:21

**corporate** 54:11

**correct** 12:22,23 13:20 16:13,16,17 20:6,10 21:2 22:6,15 23:20 24:6,7 25:20 29:11 30:3,9 31:1,4

32:23 35:21,25 36:8 38:7 40:6 41:2 43:4 47:14 51:25 52:5,11 54:13,14 56:22 60:1 62:7,17 67:10 71:6,25 73:13,21 74:2,22 75:22 77:25 78:3 80:5,6 83:21 85:1 92:6 94:16 95:1,22 96:3,14 97:8,18 98:3,7,9 100:2 101:12 103:14 107:12,13,19 109:6 111:24 115:15 119:10 120:23 121:23 126:2 127:13 137:17 138:18 139:6 143:22 144:2 145:22 146:13 151:23 154:15,20,25 155:11,17 159:24 161:16 162:19

**correctly** 7:2 19:19 26:15 33:17,21 34:11,23 37:5,18 38:17 41:15 47:9,13 48:21 51:17 52:24 53:23 64:24 65:19 67:4 69:1,18 72:10 74:10 77:11 82:7 84:18 95:15,18 104:10 110:24 120:22 124:12 125:3 131:3 140:16 142:11 143:10 147:7 148:13 156:1 161:4

**correlate** 35:23

**Costa** 20:11,14

**counsel** 5:6 6:5 22:8 24:20 92:17,18,20

**count** 121:6,10,11,14,19, 24 122:7,11,12,14,16

**counting** 11:7

**counts** 121:1 122:3,9

**couple** 9:11 51:7 90:21

**courses** 16:7

**court** 5:3,16,22 6:4 9:1,7 49:17,21,24 92:15,16 93:2,4 94:7,9,12 102:16 128:18 135:5,9,12 165:25 166:3,11

**courtroom** 9:21

**Covid** 20:15

**create** 36:17 38:12 103:9, 20 148:1

**created** 36:13,19 75:3 104:6 117:22 153:5 154:11

**creates** 82:20 162:4

**creating** 37:14,15

**creation** 26:3

**credit** 20:25 25:17 30:7 37:9 40:16 41:13,19 42:13 100:16 109:11 114:25 115:2 122:3,21 154:11 157:14,18 158:14 159:4, 17

**credit-related** 41:8

**cross** 113:4,5,7,8,18,22 114:1,2,5,6 160:6

**crude** 80:18

**cultural** 149:21

**cultures** 149:21,22 150:6

**curious** 69:15

**current** 12:17 84:17 163:22

**custodian** 54:8,24 55:3 59:8

**cut** 128:18 133:20

**cyan** 121:18

**Czabaj** 5:12

**D**

**Dallas** 5:15

**Daniel** 49:14 94:5 166:7

**DAP** 52:14

**dark** 11:1,9

**data** 14:22 33:5,19,20 34:5,9,12 35:7,8,13 36:2, 3,4,10 37:12,15,24 38:2, 12 40:16,22,23 41:8,9,10 42:22,24 43:6,7,9 45:6 47:11 48:2,25 51:5,16,20 52:3,14,20,23 53:4 54:4 55:6 59:23,24 60:1,4,11, 12 62:6 66:15 67:7 69:25 70:13,17 71:13,14,19 72:25 73:10 74:1 75:12 76:6 87:10,12,13 94:20

97:16,22 98:4,25 99:1,11, 12 100:6,15,18,22 101:13 102:23,24 103:2,3,5,7,16, 18,20,21 106:1,2 107:6,7 108:11,16,17 109:7,8,13, 14 110:3,5,16 111:2,12 112:2,8 113:16 114:20,23 116:7,15 117:8,9,25 118:10 128:20 130:21 132:5 135:18,24 138:17 139:17 142:7,8 145:10,15 148:14,15 150:16,22 151:8 152:12 153:7,25 154:20,22,23 155:12,15, 16 156:7 157:18,23 158:10,11,15,16,20,21 159:3,13,16,17,18 162:3, 4,10 164:21

**database** 15:4 30:6,8,13, 14,15,16,21,23,25 31:3, 10,12 35:19 36:7,22 51:3, 16,21 52:13 53:13,16,20, 21 55:4,11 56:16 64:15 69:5 72:18,20 73:11 74:16 75:10,16,22 76:12,21 99:23 150:11 159:25 163:8,18

**databases** 59:21,23

**date** 5:4 24:10,12 48:5 49:1 96:8 115:14 116:3,19 118:8 123:1,2,4,10 124:2, 7,8,20 125:2 126:7,10,11 127:3,7,12,18 128:2,9,12 129:1,15 130:2,3,9,14,21 131:2,7,10,16,17 132:5 133:8,9,15 134:9,15,16 164:4

**dated** 163:22

**dates** 85:9 164:3

**day** 25:25

**day-to-day** 64:9 123:9

**Db2** 30:25 31:2,10,14

**DBA** 53:24 54:2,18,19 59:7,8

**DBAS** 53:10,12 54:9

**dealing** 106:17

**dealt** 106:16

**decade** 104:10

Victor Manuel Ramirez Najera vs. Experian Information Solutions Inc. -
30(b)(1) Experian Information Solutions, Inc. - Timothy Sumida

November 18, 2025
Index: decide..easily

**decide** 160:8

**decided** 18:9 87:25

**defer** 49:7,10

**defined** 41:12 96:19

**definition** 76:12

**definitively** 156:4

**degree** 14:21,24

**Delgado** 126:25 127:2 129:20

**demo** 65:7

**demonstrative** 117:22 118:4 153:4,11 154:10,18

**department** 17:11,12 53:6 107:3,5,6,11

**departure** 16:19 18:2

**depend** 70:24 112:12

**dependent** 151:23

**depending** 51:1,7,14 83:24 112:25 143:2

**depends** 50:25 108:19 127:22 144:22 145:1 146:16

**deposed** 6:17 16:22

**deposition** 7:5,14 8:5 9:4 15:8 24:8,17,22 25:3,6,10 33:1 34:4 39:3 50:7 104:8 165:9 166:14

**depositions** 27:2 28:17 67:20

**derivation** 43:2

**derived** 122:3

**describe** 64:25

**describing** 33:18 40:21 41:18 45:19 64:20 65:8 73:24 80:23 81:16,20 84:23 92:24,25 99:20 132:13 139:11 140:3

**design** 46:3 50:5 130:19

**designate** 39:20 62:10 117:14 126:21 153:2 154:8

**designed** 87:16 124:4

163:12

**desk** 11:11

**detail** 46:3 50:4

**details** 32:12 74:24,25 77:3 78:16,21,22 112:17 144:14

**detected** 114:8

**determination** 38:10 72:25 103:19 120:17,24 146:20 155:15 160:4,13 161:16 163:10

**determine** 35:1 36:6,18 43:5 65:24 69:9 71:17 73:4 76:10 80:10 104:6 114:3,10,17 120:14 121:13 122:5 124:6,7 125:4,14,17 137:16 138:2 142:9 146:7 149:10 158:3 161:5

**determined** 77:16 82:22 83:2 114:13 142:2,4 160:12,14

**determines** 71:13 72:7 83:10 132:25 133:1

**determining** 33:25 40:24 118:13 146:8

**develop** 164:22

**developed** 163:25

**developer** 106:22

**development** 14:7,20,22 16:5 31:19 106:10 107:6,7 162:11

**diagnostic** 66:12

**diagnostics** 51:5 65:2 66:7 77:16

**differed** 15:3

**difference** 157:12

**digit** 81:25 82:5 83:5 84:10 140:5,12

**digits** 45:6,11 47:17 48:14,19 79:9,10,11,16, 21,23,24,25 80:1,4,8,22 82:14,18 83:5,8 84:9,11, 13,19,25 85:2,14,17 94:23,25 95:6,8,11,15,16,

21 96:13,23 98:13 100:8, 9,23,24 101:1,2 112:4 115:4 118:9,18,24 119:9, 10,13,17 132:24 133:5 140:6 145:5 148:23

**direct** 92:17 105:23

**direction** 92:20 157:10

**directly** 14:5 53:4 117:8 165:2

**director** 14:7 16:15 17:10 104:8,17,22 105:1

**discharge** 6:23

**disclosures** 42:14

**discovery** 63:22

**discriminate** 158:20

**discuss** 56:2,4 90:4 91:18 123:1

**discussed** 22:22 49:20 61:10 62:6 84:4 86:3 91:21,22 92:8 127:5 151:16 160:25

**discussing** 92:11 94:18 132:17 161:7

**discussion** 15:12 85:20 86:8 87:3 89:14 90:14 91:24 99:5 165:1,2

**discussions** 85:21 86:7, 19 88:8,10 89:19,20 91:5 92:4 93:8 164:1,19,20,23

**display** 43:7

**dispute** 109:17 127:16 161:25 162:6

**disqualification** 114:10

**disqualified** 47:4,11

**disqualifying** 33:24 34:6 112:6

**distinction** 10:25 11:17 33:10 80:7 153:7

**divested** 58:4

**division** 17:6,10,17,21

**divulge** 22:24

**DNC** 111:6,11,14,17,18 112:6,9 160:6

**DOB** 131:2,5,6

**document** 27:11 39:13, 19,21 40:3 41:4 45:9 46:4 50:5 51:1 62:16 63:7,11 64:3,9,11 78:9,11 101:16 117:18 122:15 123:9 126:23 153:4 155:12

**documentation** 26:17, 20,22 27:13,21 28:6,9,13 44:13 45:15,16,18,21,23 50:3,22 54:13 88:20

**documents** 25:5,8 27:6 39:10 44:13,15 62:14 63:14

**dot** 30:2

**drafting** 28:12

**dramatic** 9:22

**drastically** 17:8

**draw** 62:20

**DRDD** 45:25 46:2,8,13 78:12,14 101:17,21,25 133:14 134:2 144:8,11 151:18,24 152:9

**drink** 12:7

**drip** 81:17

**driven** 15:4

**drugs** 7:22

**duly** 6:8

**dupe** 39:5

**duties** 104:16,17

---

**E**

**e-tran** 166:8

**e-x** 13:8

**earlier** 24:11 61:10 62:6 94:22 95:13 101:17 103:25 112:17 129:9 133:4 137:4,6 161:1

**early** 15:16 24:13 104:7

**ease** 15:12

**easier** 9:7

**easily** 44:22,25

APPENDIX 1417

Victor Manuel Ramirez Najera vs. Experian Information Solutions Inc. -
30(b)(1) Experian Information Solutions, Inc. - Timothy Sumida

November 18, 2025
Index: edited..false

**edited** 101:5

**editing** 107:20 109:14

**education** 15:1 16:3

**effect** 7:6 8:22 14:23 16:12 45:11 76:25 100:17

**effectuate** 81:20

**efficacy** 88:22

**efficient** 7:12

**efforts** 86:25

**email** 54:12 59:4,5,6 86:19 90:1,3 102:14

**Emanuel** 68:24 73:19,24

**emerged** 163:11

**employ** 16:14 46:14

**employed** 12:18,19 14:1,8 16:24 17:10 22:5 102:4

**employee** 53:6 56:21

**employees** 16:22,23 27:3 50:15 97:17 104:24

**employer** 12:17

**employment** 14:2 15:18 26:23 27:18 51:24

**employs** 83:15

**encoded** 70:5,9

**encouragement** 165:15

**end** 8:16 24:13 70:20 80:5 116:8,10

**endeavor** 12:2

**ended** 70:21

**ending** 73:21 74:2,18 155:13

**ends** 37:25

**Engage** 105:15

**engine** 37:13,21 65:7

**engineer** 106:10

**engineering** 14:17

**engineering/software** 14:20

**engineers** 83:16

**ensued** 49:20,23 94:11 99:5 135:11 166:2

**ensure** 39:9 55:22 104:19 138:7

**entail** 75:1 91:24 144:21

**entails** 118:1

**enter** 61:18

**entered** 19:22

**entire** 11:14 13:20 152:3,6

**entitled** 10:22

**entity** 15:13

**entry-level** 15:21

**enumerated** 44:18

**equals** 67:18,22 120:20 121:19 125:21

**equation** 109:5

**error** 84:8

**essentially** 19:4 71:4

**establish** 61:7

**estimate** 10:23 11:1,16,18

**ethnicity** 150:3,5

**evaluate** 71:16 111:4 118:17 135:23 148:24

**evaluated** 65:21 66:25 71:10 144:25 154:22 155:14 156:5 163:8

**evaluates** 71:12 72:6 118:15 136:9 145:15 158:20

**evaluating** 65:3 143:3

**evaluation** 47:5 125:2 147:9

**evaluative** 147:5

**event** 57:21

**events** 20:18 36:14 43:4 55:7 59:9 66:6 154:24

**exact** 24:10 76:23 111:25 132:23 140:8 142:18 143:19 164:4

**EXAMINATION** 6:11

**examined** 6:9

**examples** 89:21

**exception** 10:10 48:8

**exceptions** 48:10

**excuse** 96:21 120:19 130:14 133:13,14 136:20

**exhibit** 39:16 62:11 67:16 68:16 117:14,15,22 126:16,21 137:4 152:23 153:4 154:4,10 155:3,23

**exhibits** 39:3,6,8 166:9

**exist** 18:25 26:17 35:1 100:24 130:20 144:19

**existed** 56:16 75:17

**existence** 23:6 54:20 162:24

**existing** 36:5,11 38:4

**exists** 36:6 82:4

**expect** 10:15 15:3 21:4 29:9 30:8 46:14 62:14 85:25 128:10 136:5 137:14 138:1 153:3,17 154:9 165:22

**expectation** 21:7 137:17 145:22

**expected** 110:20

**expects** 110:3

**Experian** 5:14 12:20,21 13:19,25 14:1,2,4,6,8 15:2,5,6,12,13,14,17,18 16:14,22,23 18:3,6,12,13, 15,16,20,25 19:4,22 20:14 21:1,16,18 22:6 25:1,4,16 26:23 27:3,5 30:6 31:4,6, 11 32:7,14 35:22,24 36:3 38:22 40:12 41:20 42:12 43:12 44:7 45:4 46:15 50:3 51:19 52:13 53:6 60:22 63:9,17,22,23 67:20 75:19 80:12 82:20 83:9, 10,13,15,19 86:9,24 87:15,25 89:15 97:16,17, 25 98:25 99:10 100:1 102:5,22 103:2 107:17 109:17 110:13 111:11

112:2 114:20,23 115:5,12 117:24 121:20 123:2 124:19 125:21 127:2 129:20 135:21 137:8,9 138:16 139:17 140:3 142:3 145:10,15,16 150:15 154:11 158:10 162:9,20 163:1

**Experian's** 7:1 20:9,24 21:10,13 24:19 25:17,19 26:2,5,15 31:17 43:16 67:7 78:2 86:11,25 87:17 88:9 105:25 107:24 116:24 125:25

**Experian-wide** 115:7

**EXPERIAN_NAJERA_ 0171** 62:22

**experience** 16:23 17:3 19:17 27:7 50:13 54:10

**expert** 116:9

**explain** 10:25

**explanation** 77:9 117:25 154:12

**extension** 30:1

**extent** 55:21 56:2 78:22 93:2

---

**F**

**face** 30:19

**fact** 63:24 75:12 117:20 123:21 155:12 162:24

**factors** 48:10

**facts** 25:11

**fail** 82:18

**fails** 114:7

**failure** 32:2,9 113:5,7,18 114:1,2,6

**fair** 6:16 8:24 12:15 14:14 15:5 19:5 20:1 46:18 58:9 81:7 88:19 90:1 99:2 111:2 130:4 134:5 141:12 144:16 145:6 151:19 160:17 164:11,12

**false** 87:8,11,18 88:2,14

Victor Manuel Ramirez Najera vs. Experian Information Solutions Inc. -
30(b)(1) Experian Information Solutions, Inc. - Timothy Sumida

November 18, 2025
Index: falsely..furnisher

**falsely** 87:12

**familiar** 25:16 26:2,4,5 30:8,20 32:19 38:16,18 44:23 52:15,18 64:10,13 109:21 141:15

**Fargo** 110:11,12 158:12, 13

**faucet** 80:19 81:5,14,17 82:10,12

**faucet all** 80:21

**feasibly** 7:14

**feedback** 89:21,24,25

**feels** 93:20

**feet** 11:13,15

**fewer** 79:11 81:19 82:14 94:25 95:5 123:18,20 145:5

**fictitious** 71:4 140:2

**field** 48:25 49:1 84:6 97:17,22 99:19 122:25 123:1,23 124:20 125:2,20 127:4 130:21 134:10,16 136:11 139:10 140:21 141:21,24 142:24 143:2 145:2,24 146:1 152:4

**fields** 48:23 64:15 96:8 121:4,20 134:13 136:7,9, 25 141:2 142:21 144:12 145:8,19,22 146:18 147:3, 6,21,23 149:9 150:11 151:8 152:3

**figure** 41:25 42:4,8,15 55:16 65:18 113:19 117:5 126:5

**figured** 99:9

**file** 28:22,25 29:8,10 30:1 35:3,5,17 45:18,22 50:9, 16,20 51:3 55:16 56:12,13 64:6 68:22 69:9 87:12 100:18 102:24 109:17 110:21 117:23 118:13,17 119:24 120:9,14,18 124:8 125:5 126:5 127:12,20 130:15 131:17 132:4,10, 18,22 133:10 138:11,23 139:18 140:18,21 142:5,7 145:17 152:12 153:6

154:12 156:6 159:3 162:1 165:4

**filed** 40:8

**Fileone** 30:8,13,15,23 35:18 36:7,11,22,24 37:2, 13,15 43:1 51:21 52:12 59:24 60:4,11 62:7 72:18, 24 73:11 74:8 103:13,21 104:1 105:24 107:1,3 124:4,15,20 129:10,14 130:15,19 147:12 148:17 154:24 159:25 160:2,16 163:18

**files** 29:8,13,14,19,24 30:1 31:16 87:1,17

**fill** 54:11

**filtered** 148:16

**final** 110:1 147:22 148:9, 14

**financial** 17:16,20

**Find** 6:24 26:6,8,13,18 27:12,20 28:1,2,5,10,16, 21,23 31:15,16 32:8,15,21 33:3,4 36:4,12,16 37:7,9, 12,16,21,24 38:3,5,16,18, 22 39:1 41:18 42:11 43:7, 10,15,23 44:1,12,13,14 45:24 46:6,7 50:4 51:6 65:3,17,20 70:5,12,16 71:4,10,12 72:6,16,19,22 78:12 82:22,23 83:9 85:23 86:4 87:3 88:1,22 90:10, 19 91:6 92:5 93:10 94:18 100:25 101:5,6,23 102:7, 12 103:15 104:4,24 105:2, 23 106:5,10,14 107:1,9, 15,20 108:1,8,12,14,22 109:4,5,8,24 110:2,18 111:8,13 112:12 113:14 114:15 115:8,12 116:4,14, 16,18,23 117:3,5,7,11 118:14,17,22 120:13,17, 24 121:10,25 124:11 127:20 130:21 131:13,14, 20 132:2,12,14,25 133:8, 16 134:8 135:19,23 136:6, 8,9,12 137:20 138:1,2,10, 14,20 139:9,16,21 140:6, 10 142:17,21 144:8,10 145:14 146:12 147:13,16, 20,21 149:12,19,24 150:2,

8,10 151:18 154:21 155:14,20,25 156:5,11 157:4,12,25 158:16,19 159:2,3,15,20 160:3,7,14, 15,20 161:5,8,10,13,18,21 163:18 164:25

**fine** 49:9,17 56:6 93:23 135:3,4

**finer** 68:21

**fingers** 94:6

**fireproof** 32:2

**firewall** 21:22

**firm** 13:1,3 22:11 61:15

**fit** 83:8

**five-** 164:10,19

**fixed** 94:24

**flexibility** 83:24 84:3 134:4 142:18 145:25

**flexible** 47:1,16,21

**fly** 11:23

**focus** 14:25 15:18 98:5

**focusing** 91:17

**folder** 114:24

**folks** 9:5 83:16

**follow** 10:15 66:3 79:20 112:8

**forget** 12:3 76:23 105:16 140:22

**forgive** 80:18

**forgiving** 88:7,9

**form** 19:6,9 26:19 27:8 28:24 30:11 32:10,16 33:22 36:15 37:19 43:24 44:21 47:19 48:11 50:24 52:25 53:7 54:12,16,18, 19,22 55:8,20 57:19 58:17 59:10 61:20 64:12 65:9,17 66:1 67:11 68:1,8,17 69:2 70:7,14,22 71:7,15,21 72:11 73:2,14 74:3 75:23 76:13 77:12 78:6,25 79:13 80:24 81:8,22 82:15 83:22 85:7 86:12 87:5,19 88:15, 23 89:17 90:1,6,12 91:7

98:17 99:4,13 101:3 104:11 106:8,20 108:4,18 110:6,22 112:10 113:21 115:16 116:6,25 118:3,25 119:11,18 120:1 122:19 124:21 125:11 126:13 127:21 128:14 129:4 132:8 134:11,18 136:22 137:18 138:9,21 139:2,12 140:9,25 141:13,22 142:19 144:9 146:6,14 147:8,14,25 149:5,25 150:9,18 151:11 152:1,14 153:10,20 154:17 155:18 156:8 157:8,16 158:23 159:7 160:18 161:9

**formal** 54:7,10,15 59:7

**format** 44:19 151:5

**formula** 31:25 32:3

**Fortunately** 63:3

**forward** 111:19

**found** 38:7,9 112:21 113:2 148:22

**fourth** 156:25

**FPPS** 102:25

**frame** 24:14 90:22 164:11

**framework** 11:15

**free** 93:1,7

**Friday** 18:14,17

**FSD** 17:14,15

**fulfill** 123:17

**full** 5:17 59:8

**fully** 20:22,23 111:15 155:1

**fun** 11:23 39:10

**function** 114:3,6 118:13 124:11 132:12,14

**functions** 29:16 144:3

**furnished** 35:7

**furnisher** 35:7,9 97:22 100:7,15,18 101:14 102:23 103:3,5,16 109:8, 13 110:4 112:8 117:8 128:21 138:17

Victor Manuel Ramirez Najera vs. Experian Information Solutions Inc. -
30(b)(1) Experian Information Solutions, Inc. - Timothy Sumida

November 18, 2025
Index: furnisher's..information

**furnisher's** 100:22

**furnishers** 116:1,8 150:17 157:18 159:17

**future** 121:15

**fuzzy** 142:20,23 143:8,15 144:2,3,6,15,18,20,21,22 145:20 149:3

**G**

**gained** 106:13

**game** 10:21

**Garcia** 126:25

**gather** 65:15 88:13

**gave** 50:7

**gavel** 9:22

**gen** 114:19

**general** 15:1 24:20 89:7 136:19,23 163:3,4

**generally** 23:4,14 40:21 86:3 87:6,14 102:4 109:22

**generated** 41:14

**generates** 58:14

**generating** 41:9 42:13

**give** 5:25 37:25 51:4 55:17 56:13 57:3,5 74:21 92:14 100:8 117:9 129:14

**glean** 65:15

**global** 13:11

**go-to** 102:8

**good** 6:13 18:22 49:18 59:14 134:24 135:5 165:24

**Google** 160:15

**grab** 11:14 12:6

**great** 89:9 166:11

**green** 61:13,14,17

**group** 104:19 118:16

**groups** 115:8

**guess** 5:10 10:19,25 11:18 13:15 15:5 37:2

80:3 91:9 97:11 98:10 103:8,18 105:25

**guessing** 10:21

**guidance** 161:18

**guy** 106:6

**H**

**habit** 11:24

**half** 41:6

**halfway** 81:11

**Hammoud** 5:12

**hand** 5:23 11:10

**handful** 29:13

**handle** 31:19 81:6 82:12 127:19 161:21

**handled** 162:10

**handles** 105:14 157:13

**handy** 90:17

**happen** 59:2 90:20 103:9 160:10,11

**happened** 32:4 57:12,21 76:11,18 77:15 90:8 126:6

**happening** 65:3

**happy** 12:8 39:12 49:11

**hard** 43:5 158:13

**head** 134:7

**heads** 114:22

**hear** 63:15 128:21 133:21

**heard** 8:24 26:11

**held** 17:2 38:22

**helpful** 51:10 76:20 158:6

**helps** 65:20 80:10

**Hernandez** 157:1

**Hey** 11:10,25 12:12 23:9 27:19 48:1 54:3 67:3 77:9 87:25 89:8,11 90:8 91:15, 18 108:11 110:14 112:8 114:21 126:4 127:10 128:11 162:7

**high** 15:22 30:3 33:2 104:16 125:8

**higher** 122:13

**highest** 121:14

**highlight** 121:18

**highlighted** 41:7,15 67:23 75:6 119:9 142:14

**hire** 20:3 104:23

**hiring** 104:22

**Hispanic** 149:21

**history** 46:14 57:6,7,9,10, 16 58:8,12

**hit** 58:14 61:17 112:20

**home** 20:9,16 21:10,15, 19

**hope** 9:5

**horrible** 32:4

**host** 39:7

**hour** 11:22,24,25 12:3 49:4,19 93:20 134:24

**hours** 7:23

**house** 74:9 104:2 143:4 144:15 162:18

**human** 53:17,19 82:25 83:2,4 113:13,20

**hybrid** 20:21

**hypothetical** 117:25

**I**

**ID** 143:5,7

**idea** 70:12

**identification** 25:18 39:17 62:12 67:17,24 107:18 117:16 126:17 152:24 154:5

**identified** 33:4 90:7 133:2

**identifier** 63:5

**identifies** 72:5,23 77:23

**identify** 59:16 66:20 70:20 71:5 73:9 74:1,8

114:21 133:15

**identifying** 35:24 51:23 52:5 63:6 72:5 121:25

**identity** 23:22

**iffy** 164:8

**image** 53:9 59:11 60:5 75:9,16

**imagine** 11:3 14:13 25:15 39:23 46:17 102:11

**immediately** 90:17

**impact** 10:4 128:7

**impacts** 111:8

**impair** 7:23

**impetus** 89:2

**important** 7:18 76:20

**imposed** 116:22

**impressive** 117:19

**improve** 86:11 89:11

**in-courtroom** 7:6

**in-house** 92:18

**in-person** 86:18,20

**inaudible** 110:24 133:18

**include** 46:9 56:14 75:2 78:1 126:6

**included** 58:5 81:3 84:15 100:24 137:10

**including** 5:7 42:12 74:2

**incoming** 132:10 156:2

**indication** 151:3 161:12

**individual** 107:17 148:3 149:9

**information** 5:14 7:2 20:25 21:1 22:24 23:5,7 25:18 30:7 34:19 35:24 37:15 40:20 42:23,25 48:2 51:23 52:5 54:8,24 55:3, 17 56:12,14 59:7,16,20 60:15 64:10 65:24 67:2 72:5 73:12 78:15 81:7 88:13,25 100:7 109:18 110:14 116:3,14 123:3 125:9 127:18,23 129:18

APPENDIX 1420

Victor Manuel Ramirez Najera vs. Experian Information Solutions Inc. -
30(b)(1) Experian Information Solutions, Inc. - Timothy Sumida

November 18, 2025
Index: infrastructure..level

135:20,21,24 136:13 137:10,16 138:18 149:16 153:11 154:12,18 157:14 158:12,13

**infrastructure** 31:3

**ingested** 42:24

**ingesting** 40:22

**ingestion** 36:3,4 37:12

**initial** 72:5 130:19 142:17

**initially** 24:16 163:25

**input** 35:2,4,6,13,19 56:15 65:23 66:8 68:19 69:6,8,13,23,24 70:25 71:13 73:5,10 74:1 100:13 110:24 111:3,4 113:16 120:13 132:22 139:17 140:18 142:5,7 152:12 155:14 158:15,24 159:2,3, 12,20

**inquiries** 37:1,8 50:18 51:24 61:3 70:12 90:18 127:19 157:19 159:18

**inquiry** 35:9,14 50:23 54:5 65:7,17,22 66:6,20, 21 67:2 68:12 69:12 70:20 71:3,5,19 72:5 73:8,23 74:7,21 75:21 76:4 77:8 79:8 100:16 108:1,2 109:12 126:12 130:20 138:1 139:17 157:14 158:14 159:4 160:5

**inspired** 89:6

**instance** 11:2 31:7,25 45:3,5 46:16 47:11 49:1 51:22 56:9 67:15 68:22,23 73:18 75:20 82:5 97:21 108:16 117:3 121:4,23 132:17 143:11 153:15 156:25 158:11

**instances** 10:15 38:5 50:9 51:15 57:13 58:3 59:15,21 67:9 69:24 72:15,22 95:20 97:16 100:6 101:21 109:16 111:6 112:2 113:17 114:12

**instruct** 23:11 55:22 93:12,13

**instructing** 10:14

**instructions** 10:16

**intelligence** 82:24

**intended** 8:9 10:20 78:19 132:7

**interact** 46:24 48:3,20,22

**interchangeable** 15:9

**interest** 11:4 14:12 22:21 23:5

**internal** 24:19 27:5 150:23

**internals** 51:6

**interoffice** 59:3

**interpret** 51:5 101:1

**interpreted** 44:23

**interpreting** 42:18

**interprets** 98:25 99:10

**interrelated** 12:11

**interrupt** 164:14

**invalid** 107:16

**invent** 31:7

**invented** 31:7

**invention** 31:4

**inventor** 38:21 39:25

**inventors** 40:5

**inverse** 58:2 96:18

**investigate** 92:18 126:11,15 127:14 129:3,7

**investigation** 50:12

**involve** 41:20

**involved** 57:11 61:5 85:19 88:8

**involving** 56:10

**IP** 83:16

**ismart** 105:15,18,19 106:3

**issue** 89:14,16 90:7 102:13 117:11 127:15

**issued** 38:25

**issues** 95:14 104:21 149:21

**item** 124:18

**items** 11:8 51:12 69:15 121:17

**ITIN** 108:2

**ITINS** 107:17,23

---

**J**

**James** 5:9 47:25 56:5 110:16,20 138:17

**James'** 110:14

**jargon-heavy** 44:19

**JCL** 66:10,12,17

**job** 8:11 15:23 17:1 66:18 68:13 69:14 106:18

**join** 20:17

**joined** 5:11 23:25

**judge** 9:22,23 10:3 63:8

**July** 13:21,23 14:5 16:15 18:2,25 40:8 106:24 107:9

---

**K**

**keeping** 119:4 130:13

**Kim** 23:25 50:17 62:18 66:23 89:20,24 92:18 162:11 163:5

**kind** 11:9 12:11,12 13:13 14:16 15:16 16:10,21 20:9 21:21 24:13 27:4 28:19 37:3 39:7 47:12 48:19 51:14 52:19 55:5 58:14 62:4 78:15 84:11 86:13 90:11 91:15 102:3 104:1 105:18 106:13,16 132:15 133:3 148:14 162:7

**kinds** 54:17 56:19,24

**knew** 17:5

**knowing** 78:2 144:18 162:25

**knowledge** 32:6,14 38:19 40:19 43:21 62:24 85:5 87:2 89:2 106:14

116:4 124:19,22 134:8 136:11 144:20 151:9 162:21,24 163:1,3,4,19, 21,22,24

---

**L**

**lack** 99:11

**lag** 18:11

**laid** 105:6

**language** 29:1 30:15,16 66:18 68:13 78:4,23

**languages** 16:12

**laptop** 21:18 60:18,20 61:6

**large** 41:8

**Large-scale** 40:16

**largely** 10:1 15:3

**larger** 42:4

**late** 15:16 24:11 91:2

**laundry** 104:14

**lawsuit** 25:11 63:23 109:17 162:7

**lawyers** 28:17 44:20,24

**lay** 87:11

**layman** 30:3

**layoff** 18:4,9,11,14 105:7

**layperson** 40:19 69:21

**learn** 16:4,11 24:8,16

**learned** 67:20

**learning** 24:22 25:2,6

**leave** 124:10

**left** 16:14 39:7 134:25 156:18,19,20 157:2

**left-hand** 153:5

**left-to-right** 157:7

**legal** 22:8

**legs** 12:6

**lengthy** 16:24 46:14

**level** 29:25 30:3 33:2

Victor Manuel Ramirez Najera vs. Experian Information Solutions Inc. -
30(b)(1) Experian Information Solutions, Inc. - Timothy Sumida

November 18, 2025
Index: levels..met

83:23 104:16,22 112:22 125:8 134:4 140:7 141:25 142:2,4 145:25 146:8,11

**levels** 82:21 83:10

**leveraged** 158:2

**life** 9:7 55:15 57:17

**limit** 97:4,9 123:25

**limiting** 98:5

**Linda** 5:21 40:4

**line-by-line** 45:17

**lines** 21:6

**link** 19:4 21:6

**linked** 12:13 138:12

**links** 160:16

**linkup** 61:24

**Linux** 29:20

**list** 40:4 44:15 54:23 104:14 156:14

**listed** 38:21 39:24 127:7 155:8

**lists** 75:12

**literally** 17:11 28:22 35:18 61:16 68:14 93:3

**litigation** 50:14 56:21 63:5 91:25 92:12

**live** 60:12,13

**load** 21:21

**loaded** 42:25

**located** 5:10 20:8,9 86:21

**location** 5:7 27:16 81:6, 10

**lodge** 9:13

**logic** 25:17 110:2 124:6 131:15 144:21 145:5,14 149:3 150:23

**long** 11:11 16:18 50:19 58:22 118:8

**longer** 11:24 22:5 29:23 94:4 164:12

**looked** 129:13

**lookup** 71:8,9

**lot** 20:17

**Lovely** 94:8

**lower** 105:19,20

---

**M**

**made** 15:11,25 19:3,18 25:9 56:19 86:4,10 87:15 89:3,12 91:1 103:19 117:20

**made-up** 153:11 154:18

**main** 30:17

**mainframe** 30:25 60:24 61:4,24 62:4 66:15

**maintain** 21:15 115:5 124:5

**maintains** 30:6 35:22 50:3

**majority** 14:19

**make** 8:22 9:6,16 10:17, 24 11:15,19 15:14 22:1,20 23:1,12 25:13 30:19 31:24 33:12 38:10 39:13 43:19 53:5 59:6 61:2,22 63:11, 17,25 65:14 72:24 74:11 76:2 81:7 85:15 86:9 88:1, 6,9 92:2 93:1 108:11 114:22 120:24 154:13 165:23

**makes** 55:24 113:12 118:1 120:17 132:3 146:20

**making** 59:17 66:21 87:7 88:5 89:22 112:6

**man** 98:11

**manage** 106:24

**managed** 17:4

**management** 43:1 164:21

**management/data** 162:11

**manager** 28:7 107:1,11

**managers** 104:23

**managing** 104:18

**manipulate** 39:13

**manual** 162:7

**Manuel** 67:22

**March** 129:22 130:8

**mark** 12:3

**marked** 39:16 62:11 117:15 126:16 152:23 154:4

**Mary** 56:23

**match** 34:1,20,24 35:2,3 45:6,11 48:13 69:22,25 71:9 74:24,25 75:2 76:24 77:3,20 78:19,21,22 79:17 81:23 84:5,7,14 85:12,15 96:12 97:13 111:25 112:17,20,23 113:1 114:4, 17 118:9 132:9,18,21,22, 23,25 133:5 136:1,8 138:11 139:13 140:3,4,8, 11,17,23 141:6,11,24,25 142:4,8,17,18 143:1,4,6,7, 19 144:11 145:14 146:17, 21,23,25 147:1,4,6,21,23 148:1,3,4,5 149:7,17,18 151:7,10,13,18,22,23 152:11,16,20 153:15,18, 24 154:2 157:5,13,24

**matched** 77:10 79:9,17 111:13 112:3,5 137:1

**matches** 34:25 35:1 38:4 48:5,6 82:13 87:8 96:13, 15 113:17 118:12 131:13, 15 141:3,10,20 146:9,11 150:10,13

**matching** 25:17 26:5 33:15,20 34:9,12,13,14, 17,19,22 67:3 83:6 85:17 94:23,25 95:5,9,10,22 96:1 97:7 110:2 111:8 112:4,17 114:11 128:7 130:21 131:15 132:14 136:6,13 138:11 142:8,20, 23 143:1,8,15 144:1,2,3,6, 12,15,18,20,21,22 145:5, 8,21 149:8,13,15 152:6

**math** 14:9

**matter** 159:5

**managing** 104:18

**max** 97:11 121:19

**Mckenzie** 5:11

**meaning** 10:3 43:1 59:21 79:9 94:24 97:23 107:17 109:18 121:5 131:1,2 145:11 157:2

**means** 8:21 9:12,25 54:11 62:25 63:4 84:4,24 95:15,16 125:23

**meant** 113:14

**measure** 11:12

**measured** 11:12

**measures** 21:14

**mechanism** 117:7

**medications** 8:2

**medium** 59:4

**meet** 91:18

**meeting** 23:16,18 24:2, 24,25 90:4,14,18

**meetings** 86:18,20

**Mehak** 5:11

**memo** 59:3

**memorized** 133:11

**memory** 41:11 46:17,21 131:20 136:18 141:3 142:25 149:2

**mentioned** 17:9 51:12,13 64:2 69:16 72:19 76:23 105:3 130:25 131:1,19

**menu** 60:17,18,19,25 62:5

**menus** 61:22

**merge** 57:6,9,10,11,16,20 58:2,6,8 91:12 160:9,10, 11,22,23,25 161:2,7

**mergeable** 160:5

**merges** 58:7

**merging** 160:1

**Mesa** 20:11,14

**message** 115:1

**met** 77:19

APPENDIX 1422

Victor Manuel Ramirez Najera vs. Experian Information Solutions Inc. -
30(b)(1) Experian Information Solutions, Inc. - Timothy Sumida

November 18, 2025
Index: methods..occurred

**methods** 40:16 41:7 51:7

**Methvin** 56:22,23 57:4

**Michael** 48:3,5

**Microsoft** 24:2

**mid** 16:2

**middle** 109:9 114:18 145:11 146:24 150:12,15 151:2,3 152:18

**Mike** 24:18,19

**Millionaire** 8:10

**mind** 19:12 111:15 119:5

**minimize** 9:6

**minimum** 45:4 115:13 116:13,16

**minus** 132:23,24

**minute** 42:17 110:19 164:16

**minutes** 11:22 49:16 76:25 91:18 93:21,23 94:5 134:25 135:1

**mismatch** 34:5

**missed** 19:7

**missing** 99:12 140:5

**mistake** 117:21

**mistakes** 119:21 146:4

**misunderstood** 72:3 147:18

**mix** 51:1,15 59:1,17 76:10 163:8,11

**mixed** 50:9,16,20 55:16 56:12 64:6 69:10 87:1,12, 17 126:5 162:1 165:4

**mixing** 149:7

**MMDD** 131:18

**module** 43:8

**modules** 43:7

**moment** 9:9 24:25 60:8 62:20 98:5 129:16

**moments** 159:11

**Monday** 18:15,17

**month** 24:11 110:13

**monthly** 35:7 100:16 102:22 126:1 157:15 158:12

**months** 33:1 50:7 58:23, 24 90:21,24

**morning** 6:13,15

**mortgage** 110:11 158:12

**motion** 92:15

**move** 93:2 107:4 137:17 145:9

**moved** 107:1 138:4,15 139:1

**movies** 9:21

**multiple** 57:13 70:1,3 71:19 72:17,23 95:20 113:1,2,17 149:21 160:20

**Mysql** 30:21,23 31:7

**N**

**Najera** 63:9,17,23 67:16, 22 68:24 73:19,25 121:21 123:2 125:21 126:24 137:5,8,9 153:16 155:5

**Najera's** 68:5 121:3 155:13

**name's** 47:25

**named** 26:6 60:14

**names** 64:14 75:3 105:10,12 115:17,18 145:9,11,15,16 148:2,3,25 149:13 150:20 151:4,6,10, 19,25 152:7 153:6 154:11, 14 155:7

**naming** 150:7

**natural** 16:25 93:20

**nature** 27:6 42:14

**nebulous** 28:19

**necessarily** 23:3 69:4 100:20 104:14 134:16 150:5

**needed** 102:13 114:17 161:13

**negative** 33:18 47:10

**neighborhood** 37:3

**Nelly** 102:20

**newer** 17:1

**nine-digit** 98:18 99:21

**nonetheless** 7:18 124:19 152:22

**notation** 62:25

**note** 11:21 49:3 93:19

**notes** 16:16 25:13,14

**notification** 111:12 112:7 114:22

**notifications** 116:24

**November** 5:4 24:14 85:4

**null** 97:23 98:2,6,15 99:18,21,24 100:2,8,23 134:9

**nulls** 97:20 98:1,18 99:14 134:13

**num** 74:15

**number** 7:12 8:12,13,23, 24 9:6,12,13 12:2 13:19 14:13 22:1 23:10 33:7,8 35:25 39:3 41:10,12 43:11 46:16 51:13 55:18,19 63:18 67:9,18,23,24 68:6 73:20 78:24 79:9,12,16, 22,23 82:10 85:3,12 92:22,24 94:21,23 95:5,24 96:13,22 97:4,9,22 98:6, 19 99:19,21 100:8,25 107:15,19 108:2,5 109:2 110:12 111:20,22 115:14 116:2 117:6 118:9 119:22 123:15,18,23 125:1 132:16 133:4,5 143:4,12, 16 144:15,24 145:4 155:7 156:5 158:10

**numbers** 25:18 45:5,10 47:18 79:19 95:21 96:3,25 97:5,11,12 107:18 115:12 123:22 144:25

**numerics** 101:6

**O**

**oath** 94:16 135:16

**object** 10:6 19:6,9 21:17 23:11 25:22 26:19 27:8 28:24 30:11 32:10,16 33:22 36:15 37:19 43:24 44:21 47:19 48:11 50:24 52:25 53:7 54:22 55:8,20 57:19 58:17 59:10 61:20 65:9 66:1 67:11 68:1,8,17 69:2 70:7,22 71:7,21 72:11 73:2,14 74:3 75:23 76:13 77:12 78:6,25 79:13 80:24 81:8,22 82:15 83:22 85:7 86:12 87:19 88:15,23 89:17 90:12 91:7 92:9 93:7 98:8,17 99:4,13 100:3,11 101:3 104:11 106:8,20 108:4,18 110:6, 22 112:10 113:21 115:16 116:6 118:3,4,25 119:11, 18 120:1 122:19 123:5 124:21 125:11 126:13 127:21 128:14 129:4 134:18 136:22 137:18 138:9,21 139:2,12 140:9, 25 141:22 142:19 144:9 146:6,14 147:8,14,25 149:25 150:9,18 151:11 152:1,14 153:10,20 154:17 155:18 156:8,21 157:8,16 158:23 159:7 160:18 161:9

**objecting** 10:12

**objection** 9:14,16 10:7, 11 64:12 70:14 93:1 116:25 132:8 134:11 141:13

**objections** 9:18,24 10:1, 4

**objects** 9:19

**obligated** 8:6 10:19

**oblige** 12:8

**obtain** 40:13 130:7 163:23

**obvious** 8:12

**occurred** 50:16 51:2,15 59:17 64:6 65:18,25 91:19

APPENDIX 1423

Victor Manuel Ramirez Najera vs. Experian Information Solutions Inc. -
30(b)(1) Experian Information Solutions, Inc. - Timothy Sumida

November 18, 2025
Index: occurs..plaintiff

**occurs** 8:18 9:6

**October** 24:12,13

**off-the-record** 49:20 99:5

**office** 20:12,14,21 21:10

**offices** 20:9

**official** 17:12 26:10

**omission** 98:16,20,25 99:14 101:2 134:13 146:24

**omissions** 97:18

**on-file** 154:14 158:25 159:12,13

**ongoing** 16:10

**onsite** 60:22

**op** 124:5 129:17

**open** 58:12 61:6 80:20 81:10

**operate** 125:9 157:10

**operated** 106:14

**operates** 26:18 33:5 43:23 65:17 83:9 136:6 144:21 163:2,20

**operating** 29:18 82:25

**operation** 32:21 33:3 42:11

**operations** 15:3 104:1 106:3 107:8

**operative** 77:23

**opportunity** 25:16

**opposed** 7:1 31:3 78:4, 23 131:1,10 140:8

**opposite** 88:7 95:8 119:23

**option** 106:22

**options** 103:23 151:1

**order** 10:24 29:19 45:6 65:24 71:3 79:21 116:3,14 144:5 151:17,24

**original** 57:17,23 98:20 119:23

**originally** 58:3

**outcome** 65:18,24 101:16,18 113:1 132:22, 25 140:17 142:5

**outcomes** 48:13

**outright** 38:12 114:13

**overlap** 145:23

**overly** 28:18

**overruled** 9:22

**oversee** 104:18

**oversight** 105:23 124:18

**owned** 20:25

**owns** 83:9

**P**

**p.m.** 135:10,13 166:1,4, 13,14

**Pacific** 5:5

**painless** 7:13,14

**pandemic** 20:19

**parallel** 41:11

**parse** 150:15 151:5

**parsing** 150:20

**part** 15:5 47:7 66:21 74:5 85:18 87:3,16 88:2 109:5 115:10 130:18 143:20 148:14 161:8

**part-time** 12:23

**partial** 100:23

**participated** 44:6 163:25

**participates** 162:12

**parts** 49:2

**pass** 34:13 148:21

**passed** 108:6,8,13,15,17 148:5,11

**passes** 34:1 160:6

**past** 76:11 101:4 110:4

**patent** 39:25 40:5,12,15, 20 41:1 43:21 44:1,6

**patents** 38:22,25 43:12, 17

**pattern** 35:3 75:2 146:23 147:1,5,23 148:2,5,8,11, 15,21 152:4,6 158:4 163:5,11

**Paul** 13:6

**paying** 22:13,14,16

**payload** 36:10 37:16 38:3 48:2 98:4 100:15,22 108:17 109:8 110:5 117:25 150:22

**PDF** 45:16,18

**penalty** 6:2

**pending** 12:9

**people** 20:17 25:25 30:19 83:16 87:11 106:16

**perceived** 87:17

**percent** 103:24

**perception** 101:9

**perfect** 86:1 94:7 140:3

**perfectly** 49:9

**perform** 65:22 70:2,4 73:8 76:4 88:12 116:19 142:21 143:9 145:8

**performed** 47:5 48:16 113:18 145:21 147:12,20 149:8 156:18 159:25 160:2

**performs** 139:16 145:14 157:4

**period** 18:11,12 23:25 80:5 85:22

**periods** 16:24

**perjury** 6:2

**person** 36:13 39:5 102:3 113:20 127:11,14 137:17

**person's** 126:10

**personal** 25:18 35:23 51:23 52:4 72:4 163:19

**phonetic** 149:13,15

**phonetics** 149:17

**physical** 160:10

**physically** 20:13 60:21

**piece** 36:23 50:10 60:3,10 72:4 109:14 110:16

**PII** 34:25 36:7 52:9 56:14 69:11,13 70:20,25 72:17

**PIN** 33:5 34:20 35:3 36:5, 6,11,13,19 37:14,23,24 38:4,12 47:3,4,5 54:5 55:18 56:17 57:6,7,9,10, 11,15,17,25 58:1,2,4,6,8, 12,13,19 65:4,21 66:21,23 67:22 69:10,17,21,25 70:25 71:13,16,23,25 72:2,8,12,13,16,25 73:4,9, 12,16,21 74:4,10,14,15, 16,18 75:15 91:12 95:6 97:6,10 103:4,6,9,20 104:6 107:24 108:2 109:19,20 111:7,9,13,23 112:3 113:4,5,7,8,9,18,22 114:1,2,3,5,6 117:5 118:10,22 119:1 120:15 122:1,6 123:3,11,22 124:3 125:25 126:7 128:13 129:2,6,16 130:10,13 132:10 137:14 138:5,8,12, 19 139:4 154:21 155:13, 20,21,24,25 156:4,6,11 160:1,7,9,10,11,13,25 161:3,5,7,11,12,13,17,21 162:2,4,9,12

**pinning** 105:13,14

**PINS** 25:18 26:3 35:22 36:17 57:12,13,14,15,17, 23 58:4 66:24 67:4 69:17, 19,20,22 70:1,3 71:6,9,13, 19 72:6,7,13,17,23 73:9, 12 74:2,5,22,23 77:10 113:9,10,17,19 114:9 118:13,14,15,16 160:4,6, 7,20,22,23 161:2 163:8,14

**place** 5:25 24:5 44:9 50:9, 18 77:20 85:6 102:24 103:7 115:23 116:1 117:13 126:20 135:23 137:16 154:7

**placing** 153:2

**plain** 78:4,23

**plaintiff** 39:16 62:11

Victor Manuel Ramirez Najera vs. Experian Information Solutions Inc. -
30(b)(1) Experian Information Solutions, Inc. - Timothy Sumida

November 18, 2025
Index: Plaintiff's..questions

117:15 126:16 152:23 154:4

**Plaintiff's** 39:20 62:10 117:14 126:21 153:3 154:8

**planned** 40:13

**plant** 32:1

**platform** 52:14,19 53:5

**play** 28:12 95:17 157:23 164:25

**point** 10:11 12:5 37:12 40:11 52:19 59:14 63:7 68:21 76:11 77:24 80:13 83:1 91:19 93:21 107:9 111:2,19 130:10 145:20 146:8 148:14,22

**points** 94:20 148:16

**polar** 119:22

**policies** 27:6

**popular** 86:17

**portion** 46:19 51:17 52:24 64:23 77:11 143:25 161:6

**portions** 105:25 106:2

**position** 15:21 104:8

**positional** 95:19

**positive** 87:8,11 101:15

**positives** 87:18 88:3,14

**Possibly** 86:21

**post** 77:21,22 79:14 136:9 141:4,5

**posterity** 7:17 93:16

**potential** 69:16 88:2 90:19 91:6 92:5,8,11 157:24 163:7

**potentially** 12:20 27:4 35:24 48:25 67:3 69:22,25 70:1,2 71:20,22 72:1,8 73:11 89:12 91:19 97:5 113:17 118:10 125:18 137:17 141:20 161:2,3 163:11 164:10

**practical** 10:4

**practically** 9:25

**practice** 50:19 130:13

**pre** 86:17

**pre-find** 108:10

**precisely** 163:19

**precluded** 154:23

**predictive** 110:19

**prefer** 106:17

**prep** 109:14

**preparation** 21:25

**prepare** 22:18 23:14 25:5,13

**prescription** 8:1

**presence** 111:14

**present** 22:2 24:24

**presented** 78:9

**presently** 91:22

**presents** 61:12,21 99:21

**preserved** 10:2

**prevalence** 88:13

**prevent** 107:25

**previously** 115:23

**primarily** 15:4 51:20

**primary** 143:4,6

**printers** 15:22

**prior** 13:23 16:18,21 17:2, 6 18:25 67:20 75:17 86:23

**privilege** 10:11 23:8 92:10

**privileged** 10:13 22:21 23:3 55:23 56:3 92:13,23 93:3

**problem** 30:17 87:17 94:3 163:13

**problems** 86:25

**procedures** 27:6 86:24 100:1

**proceed** 6:5

**PROCEEDINGS** 5:1

**process** 36:2 38:16 58:11 61:7 66:22 68:23 103:13 107:17 109:21,23,25 110:1 130:16 136:20 138:2 139:21 142:8 147:5, 12,15 148:10,15 161:7 162:2,9,10,14,20

**process's** 161:15

**processed** 41:9,11

**processes** 37:4,11,14,18 41:20 42:12 43:16 86:11 89:12 109:12 127:20 133:8 138:6 144:19,20 150:8,25 160:2

**processing** 40:17 41:8

**produce** 147:1 148:19,20

**produced** 63:22

**product** 43:6 92:14,21

**products** 41:9,13

**program** 29:22 83:19

**programmed** 83:1 101:23

**programmer** 101:20 102:1,2,4,6,9

**programmers** 102:10,11

**programming** 13:13 14:17 16:6,12 29:23 83:17

**progression** 16:25

**projects** 104:19

**promise** 25:24

**promoted** 106:16

**proprietary** 20:25 31:3, 11

**protocol** 72:24 114:14 163:12

**protocols** 102:25

**provide** 5:17 7:5,20 22:25 58:19 66:8,15,23 69:11 78:15 88:25 89:21,24 165:13,14

**provided** 11:17 33:2 41:7 68:10 69:12 70:25 73:5,25 92:1 97:1 98:21 100:9 111:4 114:23

**public** 35:15 37:7 51:24

**pull** 60:10,12 61:12

**pure** 10:25 11:9

**purpose** 70:19 73:7 88:4

**purposes** 15:8 63:6

**purview** 104:3 107:10 130:16

**put** 67:1 68:21 83:4 87:18 88:9,19 114:24 116:1

**Python** 29:4

---

**Q**

**qualified** 73:9 74:22,23 77:10 155:21 156:6,11

**qualifies** 71:17 72:15 160:6

**qualify** 70:25 71:19,22 72:1,12 95:12 113:9 155:25 160:20 161:11

**qualifying** 72:23 136:2

**quality** 51:14

**queries** 60:23 64:22

**query** 62:8 65:1 71:5 75:21

**question** 8:15,16,17,22 9:9,10,19 10:6,8,14,16 11:5 12:10 18:22 19:13,16 31:5 32:6,18 45:9 46:1 47:6,15,24 53:15 55:24 56:2,5,17 65:4 68:12,25 70:24 74:12 75:7,14,25 79:6 89:13 91:10,11,16 93:6,17 95:4 96:2 98:21 99:10 108:1 110:8,24 120:2 123:13 126:6 128:8, 25 136:2 137:22 139:8,9 155:1 157:17,22 158:7,8, 18 159:15,21 165:7

**questioning** 128:6

**questions** 7:15 8:6,7,11, 15 9:14,20 12:12,14 21:24,25 22:17,19,23 30:18 39:4 42:21 50:11 51:11 121:16 135:21 152:22 166:5

Victor Manuel Ramirez Najera vs. Experian Information Solutions Inc. -
30(b)(1) Experian Information Solutions, Inc. - Timothy Sumida

November 18, 2025
Index: quickly..request

**quickly** 117:21

**quote** 85:25

**quote-unquote** 45:16 122:6

---

**R**

**raise** 5:23

**raises** 10:11

**Ramirez** 63:23 67:16,22 68:5,24 73:19,24 121:2 126:24 137:5 153:16,17 155:4,13 157:1

**ran** 78:7 79:8 117:3

**range** 84:24

**RDRR** 133:13

**reach** 50:15 102:10,14,15

**reached** 24:18 127:10 129:1

**reaches** 55:14 126:4

**read** 36:16 37:22 39:10 41:15 104:4 166:6

**read-only** 72:19

**readable** 44:19

**readers** 15:22

**reading** 156:18 157:2,6,7

**reads** 41:7

**real** 126:11

**reason** 7:19 19:22 57:14 63:4 80:7 86:24 88:1 98:10,14 131:9 158:8

**reasons** 9:11

**reassigned** 107:10

**Rebecca** 5:13 19:8 23:9 49:5 63:7 135:2 165:12,19

**rebuttal** 165:20

**recall** 6:21 24:12 25:4,12 40:11,14 44:3 46:21 48:15 50:5 60:16 76:25 77:6 81:24 85:8,21 86:1,3,8,22 88:16 89:19 91:2 107:5 115:9 123:19 129:11 130:23 137:6 149:8,9

151:13,25 152:19 157:9 164:4

**recalling** 104:10 161:3

**receive** 16:4 35:8 44:5 57:1 97:16 110:3,20 111:11

**received** 16:7,10 35:13, 19,24 41:10 52:20 56:21, 24 75:13,19 110:5 118:18 120:8 132:18 135:24 140:3,21 145:15 150:16, 23 153:6,17 157:14

**receives** 36:3 51:20 102:22 103:2 112:2 117:24 135:22 138:14,16 145:10 158:10

**receiving** 58:1 140:4

**recent** 16:25

**recently** 12:19 138:4

**recess** 49:23 94:11 135:11 166:2

**recognize** 108:7 154:3

**recollection** 8:8 90:25 144:7 151:17

**record** 5:3,7,17 7:16 10:2, 8 35:15 49:21,24 77:10 93:16 94:9,12 112:21 113:2 135:9,12 165:25 166:3,8,12

**records** 7:1 37:8 38:7,9 51:24 57:20

**recreate** 32:5,8

**red** 119:9

**reduce** 87:8

**reductions** 18:8

**refer** 15:8,13 26:14 35:6 78:17 84:7 95:7 97:20 109:10 131:12 143:5 151:20 152:5 162:15

**reference** 26:11 63:17 144:11

**referenced** 43:17 112:17

**referencing** 27:14 122:22

**referred** 26:14 45:24 50:11 52:13 65:6 97:18 101:17

**referring** 31:8,11 33:13 34:4 35:18 41:25 44:16 45:20 63:10,19 64:5 68:5 79:21 85:11 115:4,19 116:8 120:3 125:20 131:10 143:13 144:8 147:15 150:1

**refers** 50:10 52:16 78:23 80:1 123:2

**reflection** 121:8

**refrain** 10:16

**refresh** 141:3 142:25 144:7 151:17

**refusing** 93:17

**regard** 21:2

**registered** 44:7

**reject** 33:14,23 34:7,8,14 38:12 45:7 47:2,3,9 48:12 77:22,24 84:25 85:15 87:7 88:4 94:20 95:1 96:7 97:15,25 98:2,6,15 103:5, 20 108:21 111:21 112:6 115:5,6 118:23 119:1,8,16 120:20 131:16 133:7,8 134:16 136:20,24 138:3 140:5 146:3,7 147:10

**reject/select** 136:14,17

**rejected** 96:23,24 97:1,2 98:8 103:6,7 112:1 148:23 160:6

**rejecting** 33:19

**rejection** 114:13 149:10 155:16

**rejects** 34:8 82:17 148:20,22

**relate** 38:22 42:11 64:15 96:7 136:5 152:16 153:25

**related** 6:25 14:16 92:12

**relates** 9:18 10:5 43:22 118:21 130:24

**relation** 64:7

**relational** 30:14

**relationship** 18:18,25 19:16,23,24 20:4 37:10,17 121:25

**relative** 140:13

**reliable** 124:8

**remain** 94:15 135:16

**remediate** 86:25 163:13

**remedy** 47:12

**remember** 46:20 105:12

**remote** 20:20,21,22,23

**remotely** 8:10 21:4,13

**remove** 109:18

**removed** 107:10

**removes** 162:3

**reorganization** 106:25

**repeat** 87:20

**repeating** 19:13 111:16

**rephrase** 8:20 56:5

**report** 50:19 57:10,16 58:2,5,6,8,12,14 63:22 67:16 78:1 88:25 91:12,17 105:3 115:1 121:3 122:21 127:5 129:19 137:4,11 155:4,8 161:1

**reported** 121:1,11,19,24 122:7,9

**reporter** 5:3,16,22 6:4,9 9:1 36:25 49:17,21,24 94:7,9,12 102:16 128:18 135:5,9,12 165:25 166:3, 11

**reporter's** 9:7

**reporting** 7:1 41:11,20 105:4 109:11 114:25 115:2 122:4

**reports** 37:9 41:13 42:13 50:21 57:6,8,9

**represent** 63:2,21

**representative** 158:4

**represented** 22:2,19 63:18 99:25

**request** 28:6 51:2,16

Victor Manuel Ramirez Najera vs. Experian Information Solutions Inc. -
30(b)(1) Experian Information Solutions, Inc. - Timothy Sumida

November 18, 2025
Index: requested..satisfies

52:23 53:5,10 54:7,10,15, 18,19,21 55:13 56:9,11 59:2,4,7,18,22 60:5,7 61:1 64:20 70:24 76:6,12,19 90:4,13 91:12 105:1 109:12 160:14

**requested** 18:5 129:17

**requesting** 37:8 53:4 55:6 72:24 148:9

**requests** 54:17 56:20,25 57:1,2,3,4,6 58:25 64:4 65:16 90:18

**require** 22:24 64:22 115:12 116:19 119:8 134:21

**required** 21:15 114:18,19 115:3,18 116:2,14 145:5 155:16

**requirement** 78:19 116:1,5,21

**requirements** 46:3 50:4 78:18

**research** 51:8 105:2

**reshare** 137:3

**resolve** 114:17

**resource** 106:23

**respect** 11:18 47:17,21 54:5 81:15 86:6 93:10 111:9 125:2 136:21 141:24 145:21 149:1 152:7 157:5 159:13

**responding** 55:24 56:3

**response** 9:14 98:12 109:16

**responsibilities** 17:1 53:25 106:7

**rest** 108:16

**restrictive** 88:6

**result** 29:9 37:16 38:5,9 40:24 72:8 78:22 82:13 83:6 96:25 112:23,24 114:9 117:4,7 118:10 139:22 140:4,22,23 142:9 146:13 147:13 148:9,17 152:11 154:23 160:15

**resulted** 77:24

**resulting** 151:8

**results** 76:24 84:19,25 94:25 103:5 115:5

**retainer** 22:10

**retains** 32:15 52:19

**return** 12:9 37:23 71:9 108:2 112:13,16,19,20,25 113:2 114:15,16 117:11 140:11 147:4 160:7

**returned** 97:21 113:5,6 117:4 138:7 139:21 141:20 147:13 148:17 153:15,19

**returning** 58:25 155:23

**returns** 38:6 148:9

**revealing** 55:23

**reversed** 96:18 149:23

**review** 25:5,8 40:20 42:7 50:19 51:1 77:15 151:18, 24

**reviewed** 42:9 101:16

**reviewing** 69:13

**rides** 162:17

**rifle** 39:6

**right-hand** 153:6

**right-to-left** 157:6

**Ristvedt** 5:9,10 6:12 19:14 21:20 25:24 26:1,21 27:10 29:2 30:12 32:13,20 34:2 36:20 38:1 39:18 44:4 45:2 47:23 48:17 49:3,14,18 50:1 51:9 53:2, 11 55:2,10 56:6,7 57:22 58:21 59:13 61:23 62:13 64:16 65:13 66:4 67:14 68:3,11,20 69:7 70:10,18 71:2,11,18,24 72:14 73:6, 17 74:6 76:1,15 77:17 78:10 79:4,18 81:4,12 82:3,19 84:1 85:10 86:15 87:9,22 88:18 89:1,23 90:15 91:14 92:13,22 93:5,14,19,24 94:2,8,14 98:24 99:6,15 100:5,14 101:8 102:21 104:13

106:12 107:2 108:9 109:1 110:9,16,21 111:1 112:15 113:24 115:20 116:11 117:2,17 118:5 119:3,14, 20 120:5 122:24 123:7 124:24 125:15 126:18 127:24 128:16,19,22,24 129:8 132:11 133:23,24 134:14,22 135:6,14 137:2, 23 138:13,17,24 139:5,15 140:14 141:7,17 142:1,22 144:13 146:10,19 147:11, 17 148:7 149:11 150:4,14, 21 151:15 152:8,17 153:1, 12,23 154:6,19 155:22 156:12,24 157:11,20 159:1,10 160:24 161:14 164:16,18 165:17,24 166:7

**Rizvi** 5:11

**RJE** 15:21

**road** 7:11

**robot** 162:17

**Rohan** 9:1,7

**role** 13:15 16:18 17:2,7 18:19 25:15 28:12 46:15 95:17 104:9,15 109:24 157:23 164:20,25

**roles** 14:13,18 15:17

**roll** 88:5

**Ronald** 126:25

**room** 15:21

**Roomba** 162:16,17,20 163:1,12,23 164:20

**roughly** 7:3 14:9 16:2

**routed** 55:4

**row** 118:22 119:7,15 120:6 121:12 122:7,12 153:16 156:25

**rows** 97:9 121:12 122:8, 10,17 158:1,3

**Rozak** 24:18,19

**rule** 10:3 41:14 43:7,8 45:4,7 46:16,20,25 47:3, 12,17,25 48:8,19,23,24 77:21,22,23 78:4,8 79:10

80:2,13 81:1 83:25 85:3,4, 17,18 87:8 94:23,24 95:16,21 96:4,12,14,16, 18,21,24 97:1,2 98:6,7,8 103:4 109:4 115:5,6 118:9,19,21 119:2,5,7,15, 25 120:10,20 123:18 130:23 131:23 132:15,16, 17,19,20 137:15 138:3 152:5 154:22 161:6

**ruled** 9:25

**rules** 7:11 26:2 33:14,15, 18,19,20,23,24,25 34:1 38:5,11 41:12 42:22,23 43:6,9 44:11,15,18 45:14, 19 46:8,9,10,11,17,22,24, 25 47:9,10,16 48:3,9,12, 13,18,19,22 64:22 65:7 70:5,9 73:23 77:19 88:9, 11 94:18,19,20 96:6,7,11 97:14,15 98:4 103:3,18 111:8 112:1 118:7 124:6, 25 125:4,6,9,10 130:20,24 131:20,22 133:7,15,25 134:2,4,7,20 135:23 136:5,12,14,15,24 138:6 140:13,18 142:5,9 144:6 145:20,24 146:12,15,16, 17 148:6,8,11,16,24 149:1,2,4,7,9 150:2 151:9, 22,25 155:15 157:13,18, 24 164:24

**rules-based** 32:22,24

**run** 51:4 64:21 65:1,16 66:7,11 68:12 69:14 70:11 73:23 74:21 75:20 77:3 91:16

**run-of-the-mill** 62:1

**running** 11:24 58:11

**runs** 30:24 71:4

---

**S**

**S-U-M-I-D-A** 5:20

**safes** 32:3

**satisfied** 46:25 47:3,10 77:18 115:6

**satisfies** 96:14 103:3 138:3 142:10

APPENDIX 1427

Victor Manuel Ramirez Najera vs. Experian Information Solutions Inc. -
30(b)(1) Experian Information Solutions, Inc. - Timothy Sumida

November 18, 2025
Index: satisfy..source

**satisfy** 79:8 95:21 96:4, 15 119:25 125:10 160:14

**savvy** 28:18

**scale** 163:12

**scans** 58:19

**scenario** 82:11 91:11 101:18 113:16 114:6 139:7

**scenarios** 138:20

**science** 14:22 16:1

**scientist** 87:10

**score** 141:10,15,16 158:4

**Scottsdale** 5:10

**scratch** 32:8

**screen** 39:2,8 42:22 61:13,14,17 62:9 73:21 117:13 126:20 142:13 143:11 153:2,8 154:7

**script** 66:14

**scroll** 39:11 41:22 42:3

**search** 37:13 58:14 66:16 148:17

**searches** 70:2,4

**seconds** 58:23,24

**section** 60:24

**secure** 21:5,16

**security** 21:14 33:7,8 45:5,10 46:16 47:17,22 55:19 67:9,23 68:6 73:20 79:9,12,22 82:10 85:3 94:21,23 95:5,20,23 96:13 97:5,22 98:5 99:19 100:8, 25 107:15 109:2 110:12 111:19,22 115:11,14 116:2 117:6 118:9 119:22 123:15,18,22,23 125:1 132:16 133:5

**seeking** 55:5

**seeks** 36:5

**select** 33:15,24 34:1,10, 14 48:13 77:22,24 97:14 136:20,25 146:17 147:10 160:17

**selection** 149:10

**selections** 61:22

**selective** 33:19

**send** 27:20 54:12,19 59:3 62:18 64:2 108:20 110:15 116:2 158:12,13

**sending** 57:25 158:17

**sends** 56:11 59:2 110:13 112:7 146:13

**senior** 14:7 16:15 17:10 104:8,17,22,25

**sense** 9:16 10:17 11:19 15:14 23:1,12 30:19 33:12 39:14 55:24 63:11,25 85:15 89:7 108:11 118:1 154:13 157:21

**sensitive** 21:1

**sentence** 27:25 80:5

**separate** 52:13,19 58:4 61:25 84:15 143:25 160:2 161:20,23 163:14

**separately** 143:20

**separation** 110:1

**September** 14:4

**sequence** 20:18 36:14 43:3 55:7,9 59:8 66:5 69:1 151:4 154:24

**sequential** 84:9 95:17

**series** 9:20 12:11 51:21

**server** 27:4,13,15

**service** 37:8

**services** 17:16,21

**session** 61:7,9,13

**set** 36:24 74:5 80:10,20 81:6 82:12 83:7,24 84:16 140:16 142:2 143:8

**sets** 41:14

**setting** 24:25 48:18 56:8 59:21 60:7 82:16 91:15 96:6,11 119:4 130:20 162:6

**shake** 18:7

**share** 39:2,4,19 62:9

**Sharepoint** 27:4,5

**Shaun** 166:9

**she'll** 9:15 69:11

**shot** 10:25 11:9

**show** 69:16

**showing** 39:7

**shows** 9:21 66:24

**sic** 74:15

**side** 42:21 68:19 74:8 104:2 153:5,7 158:25 159:2,12,13,20

**sign** 22:10 60:24 166:6

**sign-on** 61:7

**silly** 7:17

**similar** 8:10 24:3 32:18 36:7,11 62:14 78:8 124:25 126:22 133:3,6 146:24 161:6

**simple** 54:19 98:11 146:4 150:19

**simply** 12:7

**single** 29:10 32:1 69:25 81:24 82:5 97:6 110:13 123:22 124:2 130:13,14 161:3

**singular** 57:15

**sir** 6:4

**sit** 43:20 134:3 141:8 144:19 145:3 151:9 153:14

**sitting** 11:11

**situations** 103:10

**Skynet** 82:24

**small** 46:19

**snapshots** 52:20

**social** 33:7,8 45:5,10 46:16,20 47:17,22 48:5,14 55:18 67:9,23 68:6,9 73:19 79:9,12,15,21 80:22 82:10,13 83:5 85:3 94:21, 23,24 95:5,20 96:12 97:4,

22 98:2,5,6,12,23 99:19 100:7,25 107:14 108:7,8, 13,15,17,21,23,24 109:2 110:12,17 111:18,19,22 115:11,14 116:2,19 117:6 118:9,17,18,23 119:22,23 120:3,8,9,13,14,15,16,21, 25 121:13 122:1,6,8,11,13 123:15,18,22,23 125:1 132:16 133:5 138:18 140:1,2 148:4,22 158:2

**socials** 80:8 81:18 120:7, 18 121:12 123:17

**software** 14:7,17,19 15:25 16:4,15 17:11,23 36:23 53:17 60:3,10,14 61:12 83:15 104:9,17

**solemnly** 5:24

**Solutions** 5:14

**sort** 13:7 14:21 15:20,25 16:1,4,24 17:1 21:5,10 22:10,17 26:8 27:3 34:18 36:5,12 37:12 44:5,18 47:9 48:10 50:3,9,12 51:13 54:2,11,13 57:16 58:15 59:1,3,16 64:21 65:18 67:3 71:4 77:9 78:3, 14 89:6,10 102:8 104:1 106:6,17 110:18 111:12 112:7 123:16 137:15 138:1 139:20 140:7 143:15 147:4,22 149:3

**sorting** 26:6

**sought** 24:17,23 25:7,10

**sound** 7:17 14:10 38:15

**Sound-x** 149:13,17

**sounds** 19:17 31:21 33:16 34:9,20 37:4,11 46:8 48:18 49:18 52:22 53:22 56:20 61:24 64:8 77:8 80:19 87:15 92:10 105:22 124:17 130:15 140:20 149:6 165:24

**source** 35:14 36:4 47:11 111:12 114:23 116:15 125:19,23 127:4 129:21 145:16 149:15 157:23 158:11,20 159:14,16

Victor Manuel Ramirez Najera vs. Experian Information Solutions Inc. -
30(b)(1) Experian Information Solutions, Inc. - Timothy Sumida

November 18, 2025
Index: sources..task

**sources** 35:25 40:23 41:10 51:20 52:21 135:24 145:10

**span** 11:13

**speak** 17:18 115:7 134:4

**speaking** 10:1 23:4,14 87:7,14 96:17 102:3

**specialize** 13:12

**specialized** 106:14

**specific** 11:4 24:12 27:15 38:25 39:1 40:3 54:17 56:3,8,9 57:2 60:16 61:11 63:10,11 84:14 85:8 86:2 91:11 97:1 101:13 112:12 113:3,6 114:16 116:7 119:25 139:23 143:8,16 145:24 149:4 150:2,5 152:3 157:18 163:5

**specifically** 19:21 20:1,3 43:9 44:1 74:8 91:17 94:19 98:4 99:25 115:24 130:22 143:6 144:23 145:7

**specification** 44:14

**specifications** 26:18

**specifics** 89:5,20 133:16

**specs** 27:12,19 28:10,13

**speed** 15:22

**spell** 5:17 13:5 102:16

**spelled** 79:2

**split** 58:6 161:3,12,13,17, 21 162:2,8,9,13 163:13

**splits** 58:7

**splitting** 160:1

**spoke** 23:7

**spoken** 64:19 165:7

**SQL** 30:24 31:1

**SSN** 114:18 115:3 117:23, 24 121:18,19 140:11

**stamp** 63:3

**stamps** 63:15

**stand** 12:6

**standard** 5:5 61:25 149:17

**standardized** 31:2

**stands** 17:15 46:2 66:17

**start** 14:2 29:3 55:19

**started** 13:21 14:3 15:6, 20 19:18 20:15 120:6

**starts** 108:5,14

**state** 5:6,17 10:7 144:5

**statement** 23:19

**statements** 25:9

**statistical** 88:12,21

**statistics** 115:6

**step** 30:5 34:21 55:12 62:4 66:6 83:14 99:17 139:25

**stepping** 9:15

**stick** 81:14 160:19

**stopping** 93:21

**storage** 31:17 37:21 104:1

**store** 27:5 52:2

**stored** 41:11 53:5

**stores** 51:19

**street** 138:16 143:4,5,7, 11,16,21 144:1,4,16,24 145:4

**stretch** 12:6

**strike** 26:25 38:20 56:18 60:2 91:3 162:22

**studies** 88:21

**stuff** 15:4 39:11 60:9

**stupid** 53:15

**style** 149:13

**stylized** 13:7 105:19

**subcontractor** 12:21,25

**subgroup** 17:24

**subject** 23:8 111:21 140:13 148:24

**submit** 60:25 100:7 162:3

**subpoenaed** 63:24

**subscribers** 42:13

**subset** 37:13

**subsets** 37:3 46:9

**substance** 22:22

**subsumed** 58:8

**subtract** 65:23 66:3

**subway** 11:7

**suddenly** 32:1,8

**sued** 127:11

**sufficient** 77:20 101:22 114:9 125:10

**sufficiently** 36:7,11

**suggest** 11:22 12:4 113:11 161:11

**suggesting** 163:11

**suggests** 163:7

**Sumida** 5:19,20,22 6:7,13 40:4 49:7 56:8,11 60:8 93:6,11,15,21 94:15 134:25 135:15 165:6 166:16

**Sumida's** 92:24

**supplier** 42:25

**support** 50:14 56:21 92:1 102:11 104:24 106:4

**supported** 15:22 53:9 105:17

**supports** 27:22,24 28:1 106:25

**supreme** 92:15 93:4

**surface** 29:25

**surmise** 130:2,5

**surname** 149:22 150:13 157:6

**surnames** 149:22

**surprise** 28:18

**surrounding** 18:1 26:3 28:13 43:16 44:12,13 50:4 87:1 90:18 131:20 151:8,

19

**suspect** 95:3 117:18 128:19 145:19 152:21 158:7

**sustained** 9:23

**swear** 5:24

**sworn** 5:23 6:8

**system** 20:24 21:13,16 25:19 29:18 32:9 43:1 71:5 76:5,8 82:4 83:16 98:14 99:21 112:7

**systems** 31:17 40:16 41:7 78:2 107:25 116:24

---

**T**

**T-I-M-O-T-H-Y** 5:20

**table** 11:14 51:22 52:5,6, 8,9 53:21,22 54:1,4 60:12, 13 118:1 124:5 129:17 130:8

**tables** 34:8,14 51:21 52:1,2,7 54:3 58:20 60:4 62:6,8 129:10,13 147:2,9, 10

**tails** 114:22

**takes** 103:7

**taking** 8:1 40:23 72:16 93:16 94:3

**talk** 9:12 27:11 28:19 31:15 34:9 35:12,17 45:15 59:22 68:4

**talked** 22:25 28:16 44:11 50:8 95:13 97:14 104:7 123:15 133:4 151:7

**talking** 9:5 29:14 35:13 40:22 50:2 58:16 59:23 69:8 76:4 77:8 78:11 84:6, 7 87:11 90:20 100:12,13 103:13 120:21 135:18 139:23 158:24

**tandem** 68:7

**tangible** 35:5

**tape** 11:12

**task** 37:25

Victor Manuel Ramirez Najera vs. Experian Information Solutions Inc. -
30(b)(1) Experian Information Solutions, Inc. - Timothy Sumida

November 18, 2025
Index: taxpayer..type

**taxpayer** 107:18

**team** 17:4,5,23 27:22,24 28:2,5,7 105:13,14,16 106:24,25 107:3,8,10 115:9 164:21

**team's** 106:6

**teams** 24:2 104:18 105:3, 4,11,22

**tech** 28:18

**technical** 26:18 27:12,19 28:10,13 30:18 44:14 45:12

**technological** 13:12 14:17 15:4

**telemarketing** 61:15

**telling** 56:1 165:15

**tells** 57:11 77:14 79:16

**temporal** 51:14

**ten** 11:22 49:11,16,19 93:25 94:5

**ten-year** 164:10,19

**tendency** 8:14

**term** 8:21 14:14 76:23 77:1 98:20 140:22

**terminal** 61:5

**terminator** 99:24

**terms** 35:5 51:14 85:12 91:18 97:9 133:4 136:17 164:15

**terrible** 164:3

**test** 31:23 65:22 70:11

**testified** 6:9 87:23 94:22 103:25 115:22 129:9 132:2 155:24 156:17 161:1

**testify** 7:23 8:2

**testimony** 5:25 7:5,6,20 10:5 19:19 23:1 24:22 25:10 33:3,21 34:22 52:18,24 64:23 65:16,19 72:9 86:23 87:24 123:19 125:3 127:14 130:6 131:2 132:6 153:13 159:24 161:4 163:15 165:13,14

**Texas** 5:15 20:10

**text** 41:15 61:17

**That'd** 166:11

**theoretically** 96:25 97:3 119:24 123:16,21

**theory** 81:15 119:21

**thereof** 43:2

**thing** 8:16 11:21 12:8 16:5 23:16 61:25 66:19 90:8 125:16 133:3

**things** 16:12 21:22 27:6 30:2 31:13 33:6 34:15,18 41:19 42:14 47:1 61:18 64:17,19 89:9 96:7 106:15 113:12 115:22 118:8 150:7 160:1

**thinking** 8:16 45:16 95:7, 9 96:11 121:7 156:9

**thousands** 29:13,15 123:22

**three-digit** 82:6

**threshold** 34:1 45:4 79:2 80:11 81:1,5,16,19 82:6, 17,20 83:4,7,10,20 84:6, 16,17,18,23 115:11 116:13 140:15 142:2,10, 11 152:4

**thresholds** 82:22 83:1,2, 24 90:10 133:2,4 139:20 142:6

**threw** 79:19

**throw** 131:15 146:3

**tightening** 88:11

**Tim** 6:15,16,17 11:2,10 12:13 27:19 49:10 50:2 55:15,21 60:8 90:8 99:7 106:17 126:5 127:11

**time** 5:4,5,25 7:13 11:23 13:20 14:6 15:19 16:24 18:9,12 19:13 24:14 35:19 49:8,19,22,25 50:13,14 51:4 52:20 56:16 76:22 85:22 88:14 90:22 94:10, 13 104:20 105:6,9 111:3,5 119:5 129:16 130:10 134:24 135:1,10,13

145:17 164:11,15 165:6 166:1,4,12

**times** 8:15 9:4,6,18 56:20 121:5 131:1 151:16

**Timothy** 5:19 6:7 40:4 166:16

**tiny** 81:17

**title** 14:6 41:3

**titled** 40:16

**today** 5:11 6:14 7:13,20 9:24 10:20 11:11 21:25 22:2,18 23:15 25:13 43:20 46:13 82:5 91:4 102:13 134:3 140:3 141:8 144:19 145:3 151:9 153:14 159:25 165:8 166:10

**today's** 5:4 9:3 34:4

**told** 165:13,14

**Tom** 102:19

**tool** 51:4 61:8 65:1,11 66:7,13 106:3,4 164:21

**top** 112:14 127:3 129:20, 23 131:24 134:6,21 137:8

**touched** 64:18

**TR** 121:6,10 122:13,16

**track** 14:23 27:19

**tracks** 46:5 115:9

**trade** 21:1 36:25 121:11

**tradeline** 7:2 34:19 35:6, 14 100:16 102:22 126:1 129:21 130:3 157:15 159:5

**tradelines** 34:24 51:22

**trades** 35:8 37:7 103:17

**Trail** 142:14,15 143:22

**training** 16:3,7,11

**transaction** 56:15 75:9, 17,18 76:22 111:3 160:8, 22 162:3

**transcribing** 9:2

**transcript** 5:1 63:16

**transfer** 102:24

**transition** 15:12,25 18:2 19:3,18

**translates** 126:1

**transmissions** 102:24 110:4

**transmits** 111:12

**transposition** 82:9 84:11

**transpositional** 84:8 95:14

**treat** 70:12,16 100:2 107:15 134:12 138:20 139:9 159:5

**treated** 97:25

**treatment** 131:21 159:13

**treats** 134:9 159:19

**trigger** 116:23 117:8 119:16 134:16 160:9 162:9

**trivia** 8:9 10:21

**trouble** 42:18

**true** 13:16 22:3 26:10 31:8,9 35:20 38:13 70:6, 21 81:21 82:14 84:10 87:13,18 88:3 97:25 99:12 102:25 109:5,25 111:9,10 116:20,21 118:11,19,24 124:20 130:11,17 134:17 135:25 136:7 139:18 145:17 147:24 152:13,18 153:19 156:7 160:3 163:20

**truncated** 100:7

**truth** 6:1

**truthful** 7:20

**truthfully** 7:24 8:2,7

**TRW** 14:3 15:6,7,12,13

**TRW/EXPERIAN** 14:3

**TSO** 60:24 61:7,9,13

**TV** 9:21

**two-** 82:6

**type** 13:10 14:17 16:3,5 23:1,7 27:12 28:22,25 29:8 30:13,24 31:10,12

Victor Manuel Ramirez Najera vs. Experian Information Solutions Inc. -
30(b)(1) Experian Information Solutions, Inc. - Timothy Sumida

November 18, 2025
Index: typed..worries

50:22 52:22 55:17 58:8,13 59:2 64:9 65:6 68:23,25 69:3,5 73:24 79:15 81:24 84:14 88:24 100:13 127:23 132:21 136:15 143:1,4 144:11,22 145:7 146:25 147:4 152:11,12 153:15,18 157:23 158:11

**typed** 146:2

**types** 15:17 16:11 31:2 42:12 50:18 57:1,2,3,4 58:25 64:4 84:5,7 86:7,9 90:18 127:19 136:8 138:6, 20 143:1,6,7 144:11 145:20 146:17,21 147:6, 21,23 149:7,8 151:7,10, 13,18,22,23 152:16,20 153:24 154:2 157:5,13,24 158:15

**typical** 10:24 85:14

**typically** 11:21 34:12 47:25 52:1,10 53:24 55:14 56:10 57:6 59:1,4,5 64:4 86:16 90:6 108:6 126:15

**typing** 68:14,18

**typo** 146:1,3

### U

**Uh-huh** 21:23

**ultimately** 11:24 29:9 44:7 72:25 73:12,20 154:21

**unable** 7:19

**underlined** 119:10

**understand** 7:8 8:19 12:19 13:18 15:11 18:21 20:8,24 22:1 24:23 26:8 31:5,24 36:12 37:10,17 40:15 43:20 46:7,12 47:20 52:12 56:19 61:2 63:19 64:8 65:15,20 67:6 70:8 71:1,3 73:8,10 74:11,17 75:25 76:18 77:11 78:22 83:17 87:10 90:16 91:1 94:15,22 96:6 97:14,15 104:21 110:8 111:15 117:1 130:6 132:15 135:15 137:25 147:6 151:21 153:7 156:19,22

162:23

**understanding** 7:2 12:21 13:20 20:4,10 21:2 22:6 24:6 25:19 26:15 27:2 29:25 30:3 31:1,4 32:2,21 33:11 36:2,8 37:4 38:14 41:1,17,21 42:10, 15,16,21 43:3,15 46:23 47:8 51:19,25 60:2 65:5,6 67:4,24 69:1 70:19 80:3, 23 82:7 85:3,13,25 86:23 87:25 91:2 92:19 97:24 98:3 101:12 102:23 107:14,16,19,23 110:23 115:10,15,24,25 118:6 121:24 123:8 124:12 125:8,23 126:3 127:13 128:13 136:19 148:13 154:20,24 155:16 159:24 163:16

**understood** 8:24 19:19 20:13 33:21 34:22 37:10 38:17 44:25 47:13 52:4,8, 24 65:19 72:9 74:10 75:11,18 81:15 93:19 95:14,18 103:2 113:15 119:4 120:21 132:6 134:22 135:19 140:16 142:11 143:10 155:1 165:5

**unique** 63:6 67:21 112:25

**unit** 17:16,20,24

**universe** 29:14 67:7

**unmix** 109:17

**unsure** 141:11

**update** 35:7,14 36:25 66:10 72:20 85:18 104:5 109:12 117:21 124:9,13, 14 126:1 129:21 130:4 157:15 159:5 162:3

**updated** 85:4 110:14 115:12 124:23 125:5 130:3

**updates** 102:22 103:17

**updating** 28:13

**upper** 105:20

**upward** 16:25

**users** 31:13

**utilize** 50:22

**utilizes** 149:12

### V

**V-I-C-T-O-R** 146:2

**V-I-C-T-O-R-R** 146:3

**vacuum** 162:17

**valid** 108:7 109:3

**validating** 107:21 109:15

**values** 74:13 98:15 107:15 109:3 134:9 141:5

**variation** 155:19 156:3, 10,13

**variations** 149:20

**vary** 14:18

**venture** 91:9

**verified** 122:23 162:4

**vernacular** 34:3 45:12 97:18 125:25 163:1

**version** 17:2 42:4 76:3

**versions** 32:15 129:10,13

**versus** 11:1,18 33:19 80:8 106:23 110:4 118:17 131:4,5 138:3 140:4 144:16,24 152:12 153:6, 17 156:18,19 157:6,14,18 159:17

**victim** 50:20

**Victor** 63:23 67:22 68:24 73:19,24 126:24 146:2

**view** 29:19,20 60:2

**violates** 79:10

**violating** 120:9

**virtue** 155:12 156:3 162:24

**vis-à-vis** 21:6

**volition** 82:25

**volumes** 41:8

**voluntary** 18:4,9,11,14

105:6

**VPN** 21:6,9,14 61:10,11 62:1

### W

**wait** 9:9 42:17 110:19

**waiting** 12:10

**wanted** 64:17 80:12,15, 16,20 81:16 83:13,19,20 113:15

**water** 12:7 82:10

**ways** 33:4

**web** 160:17

**week** 75:20 130:8

**Wells** 110:11,12 158:11, 13

**wide** 11:13

**widespread** 163:12

**Wiers** 23:25

**windows** 11:2,6 29:20

**winds** 87:12

**wing** 11:13

**word** 34:7,10,12 45:21 79:3 153:25

**words** 6:25 8:13 12:6 18:24 19:25 22:22 26:9,13 27:17 29:9 31:6,21 35:12 40:22 43:19 46:24 53:3 54:13,16 55:14 57:12 63:7 65:14 66:5 70:11 76:2 78:15 84:9 89:7 109:2 113:1 132:4 145:3 158:19 159:16 160:5

**work** 20:13 37:14 64:9 92:14,19,21 123:9

**worked** 14:5 18:13 61:15 106:10 144:15

**working** 13:23 18:2,10, 14,16 20:15,20 21:4 89:8

**works** 49:12 71:14 83:17 92:18 102:6 136:21

**worries** 19:15

APPENDIX 1431

Victor Manuel Ramirez Najera vs. Experian Information Solutions Inc. -
30(b)(1) Experian Information Solutions, Inc. - Timothy Sumida

November 18, 2025
Index: would've..zoom

**would've** 39:24

**write** 36:17

**written** 25:9 29:1,7

**wrong** 126:10 127:12
137:16,20 155:11

**X**

**x-ray** 13:6

**Y**

**year** 15:23 86:2 90:20
110:15 114:21 125:24
127:4 129:21 131:1,10,12,
15,16,21,23,25 132:3,17,
18 133:15 134:9,20,21
164:2,5,6

**years** 6:20 13:19 14:9,19
15:24 16:10,20 17:5
90:21,24 110:15 133:9
164:7,9

**yes/no** 139:22

**yesterday** 23:17 24:5,7,
25 117:20

**YOB** 114:19 125:18
129:18 130:24 131:1,4,18
132:10,22,23 148:5

**YOBSRC** 125:21

**Yorba** 5:20 40:4

**York** 11:3,4

**Youseff** 5:12

**Z**

**zeros** 97:23 99:20,22,24
101:6

**zoom** 23:7 24:2,4 39:12
86:17,21

# EXHIBIT R

IN THE UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF VIRGINIA

DANVILLE DIVISION

```
                                    )
CHARLES MCCALL,                     )
                                    )
          Plaintiff,                )
                                    )   Case No.:
v.                                  )   4:24-cv-00011-TTC-CKM
                                    )
EXPERIAN INFORMATION                )
SOLUTIONS, INC., EQUIFAX            )
INFORMATION SERVICES, LLC,          )
TRANS UNION, LLC and                )
LEXISNEXIS RISK SOLUTIONS,          )
INC.,                               )
                                    )
          Defendants.               )
_____)
```

30(b)(6)and 30(b)(1) VIDEOCONFERENCE DEPOSITION OF
EXPERIAN INFORMATION SOLUTIONS, INC.
BY PETER HENKE

**CONFIDENTIAL – ATTORNEYS' EYES ONLY**

Cary, Illinois

October 3, 2025

Prepared by:

Daniel Rohan, CER
Certified Electronic Reporter
CER No.-4137

**CERTIFIED TRANSCRIPT**

I N D E X

WITNESS                                                          PAGE

PETER HENKE

    Examination by Mr. Ristvedt                                    6


                    EXHIBITS MARKED

EXHIBITS                    DESCRIPTION                          PAGE

 Exhibit 1    Plaintiff's 30(b)(6) and 30(b)(1)      22
              Notice of Deposition of Defendant
              Experian Information Solutions, Inc.
              Case No.: 4:24-cv-00011-TTC-CKM

 Exhibit 2    Credentialing Services, New Client     24
              Inspection Policy
              MCCALL_EXP_000635 - 000638
              CONFIDENTIAL - ATTORNEYS' EYES ONLY

 Exhibit 3    Credentialing Services, Due Diligence  45
              Procedure
              MCCALL_EXP_000581 - 000622
              CONFIDENTIAL - ATTORNEYS' EYES ONLY

 Exhibit 4    Credentialing Services, Data Reporting 120
              Policy
              MCCALL_EXP_000639 - 000645
              CONFIDENTIAL - ATTORNEYS' EYES ONLY

 Exhibit 5    Credentialing Services, Potential      126
              Subscriber Investigation Requirements
              Policy
              MCCALL_EXP_000630 - 000634
              CONFIDENTIAL - ATTORNEYS' EYES ONLY

 Exhibit 6    Credentialing Services, Industry Risk  128
              Policy - FCRA
              MCCALL_EXP_000646 - 000652
              CONFIDENTIAL - ATTORNEYS' EYES ONLY

 Exhibit 7    Credentialing Services Procedures,     130
              Recredentialing Procedure
              MCCALL_EXP_000543 - 000580
              CONFIDENTIAL - ATTORNEYS' EYES ONLY

Exhibit 8     Credentialing Services,                    150
              Recredentialing Policy
              MCCALL_EXP_000623 - 000629
              CONFIDENTIAL - ATTORNEYS' EYES ONLY


                         REQUESTS

                Page 39      Line 4
                Page 44      Line 16


              INSTRUCTIONS NOT ANSWER

                Page 41      Line 3
                Page 120     Line 14

30(b)(6)and 30(b)(1) VIDEOCONFERENCE DEPOSITION OF

EXPERIAN INFORMATION SOLUTIONS, INC.

BY PETER HENKE

was taken on October 3, 2025, commencing at 10:02 a.m.,

with the witness appearing from 472 Santa Fe Trail, Cary,

Illinois; with all other participants appearing via

videoconference from their respective locations, before

Daniel Rohan, a Certified Electronic Reporter and Notary

in the State of Arizona.

                    *    *    *

APPEARANCES:

     For the Plaintiff:
          CONSUMER JUSTICE LAW FIRM, PLC
          By:  James Ristvedt, Esq. (Pro Hac Vice)
               Mehak Rizvi, Esq.
               8095 North 85th Way
               Scottsdale, Arizona  85258
               480-626-1956
               jristvedt@consumerjustice.com
               mrizvi@consumerjustice.com

     For the Defendant Experian Information Solutions:
          JONES DAY
          By:  Ryan P. Mueller, Esq.
               325 John H. McConnell Boulevard
               Suite 600
               Columbus, Ohio  43215
               614-469-3939
               rmueller@jonesday.com

     Also present:  Michelle Clark

APPENDIX 1437

TRANSCRIPT OF PROCEEDINGS


THE COURT REPORTER:  We are on the record. The date is October 3, 2025, time is 10:02 a.m. Central, for the deposition of Peter Henke, 30(b)(6) representative of Experian Information Solutions.

THE WITNESS:  You mean my physical address?

THE COURT REPORTER:  Yes, sir.

THE COURT REPORTER:  Will you please raise your right hand to be sworn.

Do you solemnly swear that the testimony you're about to give today at this time and place will be the truth, the whole truth, and nothing but the truth, under penalty of perjury?

THE WITNESS:  I do.

THE COURT REPORTER:  Thank you, sir.

Will counsel please state their appearances for the record?

MR. RISTVEDT:  Yes.  This is attorney James Ristvedt on behalf of the plaintiff in this matter, Charles McCall.  I'm also joined today by my associate

Mehak Rizvi.

MR. MUELLER:  This is Ryan Mueller on behalf of defendant Experian Information Solutions, Incorporated.

THE COURT REPORTER:  Mr. Ristvedt, you may proceed.

MR. RISTVEDT:  Thank you.


PETER HENKE,

the witness herein, having been first duly sworn by the Certified Reporter, was examined and testified as follows:


EXAMINATION

BY MR. RISTVEDT:

Q.   Good morning, Mr. Henke.  How are you today?

A.   Doing well.  Thank you.

Q.   Could I have you please state your first and last name and spell each of them for the record?

A.   Sure.  It's Peter, P-e-t-e-r, Henke, H-e-n-k-e.

Q.   And have you ever had your deposition taken before, Mr. Henke?

A.   Yes.

Q.   On approximately how many occasions?

A.   Approximately five.

Q.   I don't expect you to remember the exact date of each of those, but can you tell me approximately sort of

the time frame in which those five depositions would have taken place?

A.    Is between 5 and 10, maybe 15 years ago.

Q.    And when you say between 5 and 10, 15 years ago, are you saying they were within the last 15 years or they were kind of about in that 15 to 10 to 5 years ago range?

A.    They were in that 15 to 5 years ago range. Nothing --

Q.    My apologies.  Go ahead.

A.    Nothing in the last five years.

Q.    So I'd like to begin just by going over some sort of rules of the road with you just to try and make sure you and I are on sort of the same page, that we use our time as efficiently as possible today.  I also have some what are called admonishments that sort of set some of these ground rules.  Some of them may sound a little silly, but it's important that I get them on the record for posterity.

To begin with, is there any reason that you would be unable to testify truthfully or accurately today?

A.    No.

Q.    Have you consumed any drugs or alcohol in the last 24 hours that would impair or inhibit your ability to testify truthfully or accurately today?

A.    No.

Q.    Are you currently taking any prescription medications that would affect or inhibit or impair your ability to testify truthfully or accurately?

A.    No.

Q.    So as I stated earlier, I've got some ground rules.

We are here today for Experian's deposition, in which I ask questions, you're obligated to answer those questions to the best of your knowledge and recollection. With that being said, it is by no means intended to be a game show or a guessing game, anything remotely similar to that.  I'm hopefully going to ask very clear questions in order to get very clear answers from you.  In other words, I don't want you sort of guessing at what I'm asking you or otherwise unclear what I am asking you.

Therefore, if at some point I ask you a question and you're unsure what I'm asking, perhaps my phrasing is confusing, maybe I use a term that you don't understand, whatever the case may be, if I hit a question mark and you don't know what I'm asking, I would ask that you simply tell me "I didn't understand your question," or ask me, "Could you rephrase that question?"  Something to that effect to let me know, and I'll do my best to rephrase.  However, if you answer my question, I'm going to make two assumptions.  Number one, you understood me;

number two, you heard me.  Is that fair?

A.   Yes.

Q.   You are not, as I mentioned, obligated to guess as to any answers.  However, I am entitled to what's called your best estimate.  The typical way that I explain to witnesses the distinction between a guess versus a best estimate would be if I ask you, for instance, how many windows are there in New York City?  Well, I imagine you have no frame of reference at all to guess what that number is.  It would be a complete shot in the dark.

On the other hand, if I were to ask you approximately how long is the desk or table that you're sitting at today?  You may not know down to the inch, but based on the fact that you know approximately how tall you are versus how long that table is, you would at least have some frame of reference to say, "Okay, it's about six feet long."

Does that distinction between a guess versus a best estimate make sense to you?

A.   Yes.  I think I understand.

Q.   There will almost certainly be times at which your attorney, Mr. Mueller, raises an objection to one or more of my questions.  Since we do not have a judge here today, there's no ability for a judge to weigh in.  I'm sure you've seen TV shows and movies.  It's very dramatic,

overruled or sustained, whatever the case may be.  The judge bangs the gavel.  None of that's happening here. It's much more boring.  And so these objections are just being what's called preserved for the record.

What that means is when Mr. Mueller raises an objection, I'll ask that you pause for a moment, allow him to state his objection for the record, and then when he's completed doing so, go ahead and answer my question. Nonetheless, the only exception to this would be if at some point Mr. Mueller raises an objection as to what's called attorney-client privilege and instructs you not to answer my question.  In those instances, I assume that you will follow your attorney's instructions and refrain from answering my question.  Does that all make sense as well?

A.   Yes.

Q.   Lastly, I typically try and take a break once every hour or so of 5 to 10 minutes.  And it's quite common that I may forget to suggest a break right at the hour mark, or that because of the way that my questions are progressing, it may not be an ideal time to take a break right at the exact one-hour mark.

With that being said, if at any point during today's examination you feel you need a break, whether that's to get up, stretch your legs, grab a drink of water, whatever the case may be, please simply ask me.

I'm happy to oblige those requests.

The only thing I would ask in return is if I do have a question, for instance, that is pending your response, I'll ask for you to answer that question before we break.  Does that all make sense?

A.   Yes.

Q.   I understand you are employed by Experian's Information Solutions, Inc.  Is that correct?

A.   Yes.

Q.   Approximately how long have you been employed by Experian?

A.   Approximately 23 years.

Q.   So since about 2002-ish, that kind of time frame?

A.   Correct.

Q.   Who were you employed by prior to 2002 when you started working for Experian's?

A.   Blockbuster.

Q.   And what type of entity is that?

A.   Entertainment.  Blockbuster Video.

Q.   Oh, okay.  Understood.

And what did you do for Blockbuster back in 2002?

A.   I managed stores for them.

Q.   And approximately how long did you do that?

A.   Approximately 12 years.

APPENDIX 1444

Q.   So beginning in 2002, when you started working for Experian, what was your first role or position with Experian?

A.   At the time, I believe the title was membership analyst.

Q.   Is a membership analyst part of the credentialing department within Experian's?

A.   Yes.  Membership was the previous name for credentialing.

Q.   Understood.

So if I'm following you correctly, back in 2002, it was called the membership department.  And then at some point, that name changed to now -- what it is now, which is the credentialing department.  Is that all correct?

A.   Yeah.

Q.   When you started as a membership analyst -- I don't need necessarily a, you know, laundry list, granular detail of every single task you performed.  But at a high level, can you tell me what were your sort of job functions or job duties as a membership analyst?

A.   My responsibility was to vet client requests to determine if the clients were eligible.

Q.   In this context, when you say "client requests," am I correct in understanding that would include potential

new subscribers to Experian and/or potential new data furnishers to Experian?

A.   Yes.

Q.   I want to make certain I understand.

When we talk about Experian's customers, am I correct in understanding there is a distinction between subscribers, meaning customers who purchase credit reports and information -- other information from Experian versus data furnishers, meaning entities that supply credit information about consumers to Experian?  Is that distinction something you understand to exist as well?

A.   Yes, but it can be both.  So I don't know that I would phrase it as a distinction between the two.

Q.   Very good.  And allow me to clarify.

So in other words, a single entity could be both a subscriber, meaning purchasing credit reports, credit information, and also a data furnisher, meaning supplying credit information.  Is that what you're saying?

A.   Yeah.

Q.   But mostly I wanted to make certain, when I talk about this distinction of terms, subscriber versus furnisher, does that distinction make sense in terms of how I'm differentiating between those two terms?

A.   I understand it, yes.

Q.   So you began in 2002 doing vetting of prospective

APPENDIX 1446

customers.  How long were you in that role of membership analyst?

    A.    Approximately a year.

    Q.    Within your year as a membership analyst, were you the actual -- or I should say, were you an employee of Experian who was performing the actual vetting functions, like evaluating a customer's sort of compliance with Experian's vetting and onboarding policies?

    A.    I was applying our, at the time, membership procedure for due diligence against clients that were requesting services, such as data furnishing, to determine if they were eligible.  Is that what you're asking?

    Q.    Yes.  Yeah, very good.

          So after that year as a membership analyst, what was your next role, beginning around 2003?

    A.    I don't remember the specific title, but it was something of assistant manager.

    Q.    Understood.

          And I assume, was this still in the, at the time, membership department?

    A.    Correct.

    Q.    So as an assistant manager, is it safe to assume you had some sort of managerial or oversight functions as it relates to membership analysts?

    A.    Yes.

Q.   Once you made that transition to assistant manager of the credentialing department, did you continue to have any role in the actual due diligence or was it primarily managing the folks who were -- who were completing those tasks?

A.   Let's see.  Both.  I continued to have a role.

Q.   Understood.

And then how long were you in the assistant manager to the membership department role?

A.   I want to say around maybe four years.

Q.   Okay.  So that takes us to approximately 2007, that kind of time frame?

A.   Yeah.

Q.   What was your job title after 2007?

A.   Manager of the department.

Q.   Got it.

So promotion from assistant manager to manager.  I expect your sort of managerial and oversight functions presumably expanded at that point.  Is that a safe assumption?

A.   Yes.

Q.   Once you transitioned to manager, did you continue to have any involvement in the actual day-to-day due diligence and credentialing tasks?

A.   Yes.

Q.   In what capacity did your involvement with those due diligence job functions change when you went from an actual analyst to assistant manager to manager?  Did they -- did you get sort of less involved in the diligence aspect?  Did you have different involvement?  Or can you tell me about what that transition looked like?

A.   Yes, it was -- I'm sorry, Ryan, did you say something?

MR. MUELLER:  No, I didn't.

Go ahead, Mr. Henke.

THE WITNESS:  It was more answering questions and reviewing work of the analysts.

BY MR. RISTVEDT:

Q.   Got it.

And when you say "answering questions," do you mean like if a membership analyst went, "Hey, I ran into X, what do I do with this?"  Things like that?

A.   Yes.

Q.   When you transitioned into a management role, did you continue to have any sort of interactions with prospective customers during the diligence process?

A.   Yeah.

Q.   And in what regard did that change when you transitioned from analyst to assistant manager to manager?

A.   It became less.  And probably I would also add

that it was -- again, only if there were questions that the analyst needed assist with -- assistance with.

Q.   Once you transitioned in 2007 to the membership department manager, how long were you in that role?

A.   Maybe seven years.

Q.   So that would take us to about 2014 time frame?

A.   Yes, around that time frame.

Q.   And then in 2014, what did your title change to?

A.   Director of the department.

Q.   So director of the membership department?

A.   Yes.  I don't remember exactly when the change happened from membership to credentialing, but somewhere in there.

Q.   When you changed to director of the membership department, is it safe to assume that's sort of another step up from the manager role that you were previously at?

A.   Yes.

Q.   When you took on the director of membership department role in 2014, how did your job duties change from the manager role?

A.   Sort of as you described, more managerial responsibilities, more oversight of the department responsibilities.

Q.   I would imagine as a director, your involvement in the day-to-day diligence and credentialing job

functions decreased further.  Is that assumption correct?

A.    Not much, no.

Q.    Okay.  So you still had some -- some role, presumably similar to when you were a manager, with kinda answering questions and then resolving issues that might need to be escalated.  Is that a safe assumption?

A.    Correct.

Q.    Within your role as director of the membership department, did you continue to have any direct interaction with prospective customers or clients of Experian?

A.    Yes.

Q.    Did that decrease when you became a director, similar to the way it decreased when you became manager?

A.    No.  It's about the same.

Q.    And so that was 2014.  Is that the role that you're in today?

A.    My current title is director of credentialing and fraud investigations.

Q.    Understood.

So at some point, the membership department changed, I understand, to the credentialing department, true?

A.    Yes.

Q.    And it sounds like your role expanded in some

capacity to also include fraud investigations.  Did I catch that correctly as well?

A.   Yes.

Q.   When did that transition occur from director of membership to your current role of director of credentialing and fraud investigation?

A.   It was approximately five years ago.

Q.   So around 2020?

A.   Yes.

Q.   How did the fraud investigations angle get sort of added to your role or -- or I guess let me take a step back.

I understand the -- my understanding of the credentialing and formerly the membership department is that it's primarily centered around evaluating current and/or prospective customers of Experian and, as you said earlier, applying Experian's credentialing policies to those prospective or current customers.  Is that generally correct?

A.   Yes.

Q.   And when I hear fraud investigation, I don't immediately think of sort of credentialing and onboarding. In other words, it sounds like a separate job duty.  Is that understanding correct as well?

A.   Yes.

Q.   What were the circumstances under which this fraud component was sort of absorbed?  Well, actually, let me take a step back from that.

Is the fraud component -- is that something that's now under the purview of the credentialing department or is that sort of specific to your role?

A.   It's separate from credentialing.  It's an additional responsibility I have.

Q.   Understood.

Can you tell me what the circumstances were under which this fraud component was added to your job functions?

MR. MUELLER:  Foundation grounds there.

THE WITNESS:  Can you clarify circumstances?

BY MR. RISTVEDT:

Q.   Yeah.  I'm just -- mostly, I'm just curious how sort of that got added or what the -- why that became part of your job function when your history has been sort of in the credentialing component only?

MR. MUELLER:  Same objection.  And I'll object as outside the scope of the notice.

THE WITNESS:  I believe I was doing a good job as a director, and they just wanted me to have more responsibility.

BY MR. RISTVEDT:

Q.   Understood.

So your present title is director of credentialing and fraud investigations.  I'm not particularly interested in the fraud investigation component for today's purposes.  But as it relates to your position as director of the credentialing department, do those job duties generally entail the same as it was when you were the director of the -- what was called the membership department at that time?

A.   Is the question is my responsibilities as director of credentialing consistent with when it was director of membership?

Q.   Yes, that's correct.

A.   Yes, it's the same.

Q.   Within your role as the director of the credentialing department, do you have personal knowledge of Experian's policies and procedures for credentialing subscribers and/or data furnishers?

A.   Did you say personal knowledge?

Q.   Yes.  In other words, do you have knowledge of what those policies and procedures entail?

A.   Yes, I have knowledge of our credentialing policies and procedures.

Q.   And it sounds like you've been working with these policies and procedures for, at this point, two-plus

decades.  Is that fair?

A.    Yes.

Q.    I'm going to place on the screen an exhibit I would like to share and examine with you.  Throughout the course of the day I'll be sharing exhibits on the screen.  Obviously, we're not in person, so I don't have the ability to just hand you anything.  But I do want to ensure that you can adequately read and understand the documents on the screen.

So if at any point you need me to zoom in, zoom out, scroll up, scroll down, whatever the case may be, please let me know.  I'm happy to manipulate the document however you need.  Okay?

A.    Yes.

(Deposition Exhibit 1 was marked for identification.)

BY MR. RISTVEDT:

Q.    So I'm going to share on the screen what I will designate as Plaintiff's 1.

Have you seen this document before today, Mr. Henke?

A.    I think so, yes.

Q.    I'll scroll through this document.  You can see that there are a number of topics that are identified between pages 2 and page 7.  Do you see those topics?

A.    Yes.

Q.    Prior to today, did you have an opportunity to review the topics that are identified on pages 2 through 7 of this exhibit?

A.    Yes.

Q.    I understand that Experian has provided some objections in response to these topics.  Subject to those objections, is it a true statement that you are the Experian employee who has been designated to provide testimony about these topics?

A.    Yes.

Q.    Again, subject to Experian's objections, did you prepare to answer questions about these topics today?

A.    Yes.

Q.    And once again, subject to those objections, are there any of these topics that you do not feel prepared to testify about today?

A.    I believe there were some specific about employee names or specific costs.

Q.    Understood.

And I think you're referring to here on Topic 1 (a) [sic] vii, there's a topic of "The cost for on-site physical inspections."  Is that one of the items that you're referring to?

A.    Yes.

Could you -- I'm sorry -- could you zoom in, please, though?

Q.   Yes.

A.   Maybe like -- I have pretty bad eyes, maybe like -- yeah, that's better.  Thank you.

Q.   When you made reference to there were some topics about the identity of employees, which of these topics were you referring to?

A.   I don't recall the specific numbers.

Q.   So I understand that you've testified that there are some topics about costs and then some topics about the identity of employees.  Are there any other topics that you don't feel prepared to discuss today?

A.   I think I'm prepared.

(Deposition Exhibit 2 was marked for identification.)

BY MR. RISTVEDT:

Q.   So I'd like to go into Plaintiff's Exhibit 2.

Have you seen this document before, Mr. Henke?

A.   Yes.

Q.   Are you familiar with this one?

A.   Yes.

Q.   What is this document?

A.   It's the Credentialing Services New Client

Inspection Policy.

Q.   So I have some questions about this policy document.  Before I get into those, I have some sort of overarching questions that I would like to sort of have a generalized understanding of what the purpose of these policies and procedures within the credentialing department are.  And in order to ask you some of these questions, I want to ask you first, do you have any knowledge about the facts or allegations of this lawsuit between Mr. McCall and Experian?

A.   Not very many, no.

Q.   Do you have any knowledge about why you're being deposed today or sort of what the scope of your deposition is?

A.   I believe it was what we outlined in that document.

Q.   Well, to put a finer point on it, what I'll represent to you is that Experian has made the contention in this lawsuit that part of its procedures for compliance with the FCRA involve credentialing of data furnishers who submit information to Experian in order to determine that those data furnishers are reliable and/or accurate sources of information.

Does my representation make sense to you in terms of Experian's contention?

MR. MUELLER:  I will -- I'll object to that to the extent it mischaracterizes the record.

Go ahead.

THE WITNESS:  I understand.

BY MR. RISTVEDT:

Q.   So a number of my questions today will be framed in regard to trying to understand how these policies and procedures relate to the accuracy of a data furnisher's data or a -- the reliability of a data furnisher's data. Does that make sense to you?

A.   I understand it, yes.

Q.   So I want to place back on the screen Exhibit 2. This is the New Client Inspection Policy.  I understand here at the top there's this big blue, bold letters of "Credentialing Services."  Do you see that?

A.   Yes.

Q.   And it's my understanding from my general familiarity with Experian's documents that this blue header sort of identifies the group within Experian that, for lack of a better word, owns this policy.  Is that understanding correct?

MR. MUELLER:  Form.

THE WITNESS:  Yeah, that's fair.

BY MR. RISTVEDT:

Q.   So in other words, this document is for the

credentialing services department, the department of which you're the director, fair?

A.   Correct.  I can't say for every other department, but for ours, that's correct.

Q.   And I did want to clarify.  I know we've mentioned a couple times -- I think I've referred to it as the credentialing department.  Is the official name the credentialing services department or is it credentialing department or something else?

A.   I don't know that there's an official name.  We typically just say "credentialing."

Q.   Okay.  But in other words, this new client inspection policy is -- is a policy that's maintained and implemented by the folks in your department.  Is that true?

A.   Yes.

Q.   I'm going to go down to page 3 of this document.

Before I ask some questions about it, I want to ask, do you see this notation here in the bottom right that reads MCCALL_EXP_000637?

A.   I see it, yes.

Q.   Do you have any knowledge as to what that notation signifies or connotes?

MR. MUELLER:  Objection.  Foundation.

THE WITNESS:  I'm assuming it's just a

document for this court case and that's the reference number.

BY MR. RISTVEDT:

Q.    Absolutely correct.

So it's what's called a Bates number.  And to your point, it's essentially a reference number for this unique page from this unique document.

In other words, if Mr. Mueller or myself or the court wanted to make reference to this particular page, they could do so by using this reference number of MCCALL_EXP_000637?

Because that is a bit of a mouthful, at times throughout the course of the day, you may hear me refer to a Bates number by an abbreviated form, like I might say, "We're here on McCall Experian 637."  If I say that and reference a Bates number in that regard, will it make sense to you what I'm referring to?

A.    Yes.

Q.    Okay.  So here on McCall Experian 637, there are a few different sections beginning with "Purpose" at the top.  Do you see that?

A.    Yes.

Q.    And it says that, "The purpose of the inspection policy is to define reasonable procedures regarding inspections to assist in ensuring Experian provides

sensitive consumer credit data and sensitive credit products and services only to legitimate business entities that have a permissible purpose, appropriate use, and/or a GLB exception."  Did I read that correctly?

A.   Yes.

Q.   So if I'm understanding correctly, this particular policy applies to entities who are requesting information from Experian?  In other words, that distinction we discussed earlier, subscribers, correct?

MR. MUELLER:  Objection to form.

THE WITNESS:  The policy applies to all of our clients, whether they're, as you say, subscribers pulling data or furnishing data.

BY MR. RISTVEDT:

Q.   How would I identify -- well, let me take a step back.

Do you see the next section, it has the heading "Scope"?

A.   Yes.

Q.   And I see there are a few different independent sections here.  The first one says, "This policy applies to any new client requesting consumer credit data regulated by the FCRA," correct?

A.   Yes.

Q.   So that would be a subscriber who's actually

requesting information as opposed to supplying it, true?

A.    Yes.

Q.    And then it says, "It also applies to consumer identification data regulated by the Gramm-Leach-Bliley Act (GLB)," correct?

A.    Yeah.

Q.    And that is limited solely to consumer identification data, so like a name, a date of birth, social security number, information like that, true?

A.    Yes.

Q.    So in other words, that wouldn't specifically refer to furnishers.  You would agree?

A.    That sentence does not specifically refer to furnishers.

Q.    And then the rest of this scope section says that an inspection has to be completed before either FCRA or consumer identification products or services can be delivered.

And then this last section says "and before any data can be loaded to FileOne or any GLB regulated database, with the exceptions noted below."  Did I read that portion correctly?

A.    Yes.

Q.    So is this last half of this last sentence, the "before any data can be loaded to FileOne," is that how I

would understand that this is also applied to furnishers supplying information to Experian?

A.    That specifically states it, yes.

Q.    Okay.  So this policy would apply to any data furnisher that is a new client.  Am I understanding that correctly?

A.    Yes.

Q.    The policy itself discusses that an inspection is required for every entity applying for the Experian credentialing process, and then it identifies some exceptions here in this bullet point list.  Do you see that?

A.    Yes.

Q.    And the exceptions list comprises publicly-traded entities, banks and credit unions, governmental agencies, and franchised auto dealers, true?

A.    Yes.

Q.    So for any entity that is publicly traded, the -- this policy is inapplicable.  Is that true?

A.    Yeah.

Q.    And similar for the other items in those lists, banks, credit unions, government agencies, franchise auto dealers, those are all excepted from the policy, meaning not subject to this policy, true?

MR. MUELLER:  Form, to the extent it

mischaracterizes the document.

BY MR. RISTVEDT:

Q.   And I'm sorry, Mr. Henke.  Your answer?

A.   Yes.  Those entities are exempt from inspections.

Q.   Does Experian maintain any sort of statistics in terms of what percentage of its customer base comprised these exception-type entities versus non-excepted entities?

MR. MUELLER:  Objection.  Foundation.

THE WITNESS:  Not that I'm aware of.

BY MR. RISTVEDT:

Q.   You've overseen the credentialing department for just over a decade, correct?

A.   Yes.

Q.   Do you know -- do you have any basis to provide a best estimate for the percentage of customers that fall under one of these exceptions?

A.   No, not without researching.

Q.   When there's an exception that's applied, is there some sort of notation within the customer's SalesForce file?

A.   No.

Q.   So I want to look at -- it talks at a high level about what this inspection process entails, and it says that it includes an evaluation of the physical premises,

yes?

A.    I'm sorry.  Which line are you referring to?

Q.    Right here, The inspection process includes an evaluation of the physical premises," correct?

A.    Yes.

Q.    And there's also an "overall assessment of the legitimacy of the business, which may include physical security," true?

A.    Yes.

Q.    Now, these items are detailed in greater detail within a separate policy document called the Experian Due Diligence Procedure document.  Are you familiar with that policy and procedure document?

A.    I'm familiar with that document.

Q.    In this document, you would agree there's no sort of substantive detail about what either of those items entail, rather, it just kind of references we do these things generally.  Would you agree with me?

A.    Which items specifically are you talking --

Q.    Yes, the evaluation of the physical premises and the overall assessment of the legitimacy of the business.

In other words, within this document, I wouldn't be able to figure out the details of what those things entail.  Is that fair?

A.    Yes.

Q.   I do want to ask -- do you see the line I've highlighted in green?  It says, "The inspector must utilize the appropriate Experian approved Inspection Checklist."  Do you see that line?

A.   Yes.

Q.   What is the inspection checklist?

A.   The checklist is a list of questions and directions that we provide to our inspector or inspection company that we ask them to fulfill based on their observations.

Q.   When you say "inspection company," who is that or what is that inspection company?

A.   There's a company that we hire that performs on-site inspections for us.  TrendSource is the company's name.  It's a service they provide.

Q.   Yes, I know TrendSource.

So TrendSource performs the physical inspections for Experian when a physical inspection is performed as part of the diligence process.  Is that true?

A.   Yes.

Q.   Are there any Experian employees who perform physical inspections, or are those entirely outsourced to TrendSource?

A.   Those are outsourced to TrendSource.

Q.   When it says, "The inspector must utilize the

appropriate Experian approved inspection checklist," from your testimony, it's my understanding that this is some document that Experian provides to TrendSource that TrendSource then needs to follow and complete when performing that physical inspection. Have I understood your testimony correctly?

A. Yes.

Q. Is that inspection checklist something to which you have access?

A. I could get one, yeah.

Q. And actually, I'd like to -- you're aware that this document and the other credentialing policy and procedure documents, they were produced by Experian to the plaintiff in connection with discovery for this case. You know that, right?

A. That's my understanding, yes.

Q. Were you the person within Experian who obtained these documents and provided them to Experian's attorney or was it somebody else?

A. It was me.

Q. Where did you go to obtain the policy and procedure documents within Experian's files?

MR. MUELLER: Objection, form. Vague.

BY MR. RISTVEDT:

Q. And actually, let me try that again. That's a

APPENDIX 1468

terrible question.  Sorry, Mr. Henke.

I assume you have access to Experian's system on, like, your computer or laptop.  Is that a fair assumption?

A.   Yes.

Q.   Is there a particular folder within Experian's file sharing system that contains the credentialing policies and procedures?

A.   There are, yeah, particular areas where our -- I don't know if -- yeah, there's particular areas on our -- our shared services or websites that contain these documents.

Q.   And are those sort of segregated in a way where you've got kind of just this section is only the credentialing documents or is it kind of commingled with other departments?

A.   No.

MR. MUELLER:  I object to that as outside the scope of the notice.

THE WITNESS:  It is organized separately from other departments.

BY MR. RISTVEDT:

Q.   Within that section that contains the credentialing policies and procedures documents, does that also contain other types of credentialing documents, like,

APPENDIX 1469

for instance, this inspection checklist?

A.   It does not contain this referenced inspection checklist, but it could contain other materials that we would use in our department like --

Q.   Understood.

A.   -- as an example.

Q.   This last sentence in this paragraph that says, "The inspector is required to provide any evidence of potentially suspicious activity," am I correct in understanding "inspector" in this sentence again refers to the TrendSource employee who would be performing a physical inspection?

A.   Yes.

Q.   When it makes reference to potentially suspicious activity, is there some communication within the inspection checklist that identifies to TrendSource what Experian would consider potentially suspicious?

A.   There is.

Q.   So without having the benefit of the inspection checklist before us, do you have any knowledge about what types of information is provided to TrendSource as indicative of potentially suspicious activity?

A.   Yes.

Q.   And what are -- what are those types of information?

APPENDIX 1470

A.   If the contact is overly anxious, if the contact is having difficulty describing the services that the company provides, if the entity is not located where they're supposed to be located.  And just, essentially, anything that, in their opinion, renders the -- you know, an observation suspicious.

Q.   So to a degree, it sounds like some of those are objective qualifications.

For instance, to your point, if we say our business is at 123 First Street and, in fact, it's at 987 10th Street, that would be an objective qualification that this is the wrong place, fair?

A.   Can you clarify what you mean by an "objective qualification"?

Q.   Well, in other words, in comparison, you mentioned that the other components are opinion based.

In other words, if a TrendSource employee, in their opinion, identifies something as potentially suspicious, right?

A.   Correct.

Q.   And an opinion like that would obviously be subjective on the part of that TrendSource employee, fair?

A.   Yes.

Q.   But, by contrast, there are other components, like, for instance, the location of the building, if we're

at the wrong place, it's not my opinion, we're just not at the right address, fair?

A.   Yes.

Q.   Would you be able to provide a copy of that inspection checklist to your attorney?

MR. MUELLER:  Objection, form, foundation.

THE WITNESS:  Of the Experian approved inspection checklist --

BY MR. RISTVEDT:

Q.   Correct.

A.   -- you're referring to?

Yes, I could find one and deliver it to our attorney.

Q.   This line here that says, "All third-party vendors must be approved by Credentialing Management and Compliance prior to performing any inspections," in this context, when it says "third-party vendors," it's referring to TrendSource and/or other companies like TrendSource.  Is that -- am I understanding what that means?

A.   Yes.

Q.   Are there other third-party vendors that Experian has used in the last decade other than TrendSource?

A.   Yes.

Q.   What other companies are you aware of that

Coash Court Reporting & Video, LLC
staff@coashcrv.com
602-258-1440
www.CoashCourtReportingandVideo.com

APPENDIX 1472

Experian has used?

A.    There's one other company that is hardly -- I'm just -- it may have been used, NCCI, I believe that stands for National Creditors Connection, Inc.

Q.    And are they -- it sounds like they're infrequently, if ever, utilized.  Am I understanding your testimony right?

A.    Yes.

Q.    Are they still technically a current third-party vendor, just they're not used, or are they no longer a vendor at all?

A.    They're technically a third-party vendor that's just not used.

Q.    Okay.  I'm going to go down to -- this is McCall Experian 638.  Do you see this section on Change Control?

A.    I do.

Q.    It's my understanding from my familiarity with Experian documents that these change control sections typically demonstrate any changes to the policy or procedure, identifying the date on which those changes are made, who made the change, and then sort of a high level description of what those changes were.  Is that your understanding of what this section entails?

A.    Yes.

Q.    Do you know -- well, when you produced this

APPENDIX 1473

document to your attorney, did you redact this information in the editor column?

MR. MUELLER: Objection, form. Objection, foundation.

THE WITNESS: No.

BY MR. RISTVEDT:

Q.   Do you have any knowledge about who performed the redactions in this document?

MR. MUELLER: Objection. And I'm going to object on grounds of attorney-client privilege.

To the extent your answer involves anything that you communicated between yourself and your attorneys, I'm going to instruct you not to answer.

THE WITNESS: All right. Yeah, I can't answer that.

BY MR. RISTVEDT:

Q.   Understood.

I see here in the July 2021 change, there was an update that says "Removed the word 'physical' and requirement for third parties to perform inspection. This accounts for the ability to perform virtual inspections." Did I read that correctly?

A.   Yes.

Q.   So having used TrendSource's services myself, my understanding is that in some instances, TrendSource does

not actually physically go to a location, but rather they do what's called a virtual inspection where through an app they're able to perform the inspection remotely.  Are you familiar with that service provided by TrendSource?

A.   Yes.

Q.   When this description of change references virtual inspections, is this also referring to that same type of remote inspection performed by TrendSource?

A.   Yes.

Q.   So in some instances, rather than a physical inspection, meaning a TrendSource employee actually visits the customer's business address, those inspections might be performed remotely without ever actually setting foot on the premises.  Is that fair?

A.   Yes.

Q.   Do Experian's policies and procedures detail when a physical inspection is required versus when that can be a remote or virtual inspection?

A.    This is the policy that dictates it.  And it's -- essentially we just use the term "inspection" now, meaning they're synonymous.  They can be either physical or virtual.

Q.   Do you have any knowledge about the frequency with which TrendSource performs virtual inspections versus physical inspections?

APPENDIX 1475

A.    There's very few virtual inspections done by TrendSource.

Q.    Got it.

So it sounds like the majority of inspections would be actual physical on-site inspections. Am I following you?

A.    We perform the physical inspections -- correct -- with TrendSource.

Q.    Well, my question's a little bit different.

If I'm understanding your testimony correctly -- and I want to ensure that I am -- it sounds like the majority of inspections are physical inspections rather than virtual.  Am I understanding you correctly?

A.    Not necessarily.  I don't -- I don't have the -- the numbers between the difference on physical versus virtual, but we won't use TrendSource necessarily for virtual inspections.

Q.    Oh, I see.  I think I've followed your testimony correctly now.

So if I'm understanding you, TrendSource performs the physical inspections, and then Experian performs the virtual inspections itself.  Is that correct?

A.    Well, technically, the client is performing the virtual inspections, because they're receiving the instructions and having to take the photo and submit it.

Q.   Understood.

So for the virtual inspections, that would be something where Experian transmits instructions to the customer and then the customer sort of completes them by taking photos of their physical location and answering questions.  Have I understood your testimony correctly?

A.   Yes.

Q.   Are those instructions that the customer would receive for a virtual inspection, are those similar to the information in the TrendSource inspection checklist?

A.   Similar, yes.

Q.   Do you have access to the instructions that are provided to customers performing the virtual inspection themselves?

A.   Yes.

Q.   And is that something you'd be able to provide to your attorney?

A.   Yes.

MR. RISTVEDT:  Okay.  I'm going to move on to the next exhibit, but I note that we've been going approximately an hour.  This seems like a natural break point.

Ryan, do you want to do five minutes?  Ten minutes?  What do you want?

MR. MUELLER:  If it's okay with Mr. Henke,

let's do five so we can keep this -- keep this thing rolling.

MR. RISTVEDT:  That sounds good.

Mr. Henke, is that sufficient with you?

THE WITNESS:  Yes, that's fine with me.

MR. RISTVEDT:  Perfect.  I've got 9:01. Let's call it 9:06.

THE COURT REPORTER:  We are off the record at 11:01 a.m.

(A recess ensued.)

THE COURT REPORTER:  Back on the record at 11:07 a.m.

BY MR. RISTVEDT:

Q.   Okay.  And, Mr. Henke, I understand I just asked you this question, but just now that we're officially back on the record, you understand you remain under oath, correct?

A.   Correct.

Q.   Understood.

I'm displaying on the screen now what I will designate as Plaintiff's Exhibit 3.

(Deposition Exhibit 3 was marked for identification.)

BY MR. RISTVEDT:

Q.   Have you seen this document before, Mr. Henke?

A.   Yes.

Q.   And are you familiar with this one as well?

A.   Yes.

Q.   What is this?

A.   The Credentialing Services Due Diligence Procedure.

Q.   I understand that is a 42-page document.  This one does provide more substantive details about what the due diligence process entails.  Would you agree with me?

A.   Yes.

Q.   Looking at McCall Experian 582 and 583, I see that there is a table of contents that details each of the sections in this document.  Do you see that?

A.   I do.

Could you zoom in, though, please?

Q.   Of course.

A.   Thank you.

Q.   At a high level -- well, actually, let me -- I'm going to go to page 4.  This is McCall Experian 584.

This first section, the introduction, identifies that this procedure details the steps that are taken to investigate new Experian subscribers, which includes accessing information regulated by the FCRA and the Gramm-Leach-Bliley Act.

Did I read that part correctly?

A.   Yes.

Q.   Now in this instance, this does not mention anything along the lines of like we saw in Exhibit 2 where it talks about data that is submitted to the FileOne system.  Would you agree?

A.   That sentence does not describe data furnishing, correct.

Q.   So what I want to make certain I understand is --

A.   Excuse me.

Q.   Oh, my apologies.  Go ahead.

A.   Can you rephrase it?

Q.   Yes, of course.

A.   All right.  So yeah, in that specific sentence, it talks about subscribers that are dealing with FCRA regulated data.  Specifically it says "accessing," so it doesn't specifically state furnishing data.

Q.   So I think I asked a similar question in regard to Exhibit 2.  But how would I understand from this document whether it also applies to data furnishers who are supplying Experian with information?

A.   So as we described, a subscriber can either access or furnish data.  Both activities are governed by the FCRA.  So as an analyst on our team, understanding that it's a subscriber dealing with FCRA data, you would understand that this is applicable to both types of

subscribers, as you said.

Q.   Okay.  So just to clarify something I wrote from earlier.  I made that distinction between subscriber who accesses Experian's data and furnisher who supplies Experian with data.  If I'm following your testimony correctly, you're saying that within the context of Experian's written documents, subscriber could refer to both of those concepts, subscriber and furnisher.  Is that what you're saying?

A.   Right.  That's what I was trying to describe earlier.  A subscriber is -- can be either or it can be both, and both are subject to FCRA when it comes to consumer credit information.

Q.   Okay.  Thank you for clarifying.

Then next section talks about the Leveling System.  And this is in reference to -- if I can return to the table of contents, there are different levels of diligence.  For instance, Level 1:  Fraud Check, Level 2: KYC, or know your customer, Level 3:  Baseline, et cetera, et cetera.

When we talk about the leveling system, that's what we're referring to, right?

A.   Yes.

Q.   And returning to Experian -- or McCall Experian 584, this leveling system explanation says that,

investigations are completed based on essentially what type of product is being requested, and no level gets completed without the previous level having already been completed.  Is that fair?

A.    That's correct.  You have to do the prior levels as well.

Q.    So basically Level 1:  Fraud Check, that's the start.  And then if they were getting a product that necessitated, for instance, Level 5, that would first require a Level 1, Level 2, Level 3, Level 4, and only then Level 5.  Is that all correct?

A.    It's correct that all five levels would need to be completed.  The order is not as significant.

Q.    Oh, okay.  So it just has to be all of them completed, but not necessarily in a sequential process. Is that what you're saying?

A.    Correct.  So, for example, if you did the telephone vetting before you did, say, the database search, that would be totally acceptable.

Q.    Okay.  So it's not so much what the order is, just it's a necessity that all of the levels are completed, if I'm following you correctly?

A.    Correct.  The timing is less important than the steps.

Q.    So this first level, fraud check, I understand is

performed regardless of the product being requested.  In other words, it is always performed in every instance, correct?

A.    For every client, yes.

Q.    If my understanding of this procedure document is correct, within each of these levels, there are numbered lists that detail the specific actions that are completed for each level.  Is my understanding correct?

A.    Can you clarify what you mean by numbered lists? Is that what you're referring to there, like, on the screen?

Q.    Yes.  So, for instance, in the Level 1 section, I see Number 1, Search for Duplicate Accounts; Number 2, Consolidated Alert List; Number 3, Owners & Beneficiaries, and so on and so forth.

My understanding is that each of these -- each of these numbers from this numbered list refer to discrete actions that are taken within this Level 1 fraud check section.  Is my understanding of this information correct?

A.    Yes, that's correct.

Q.    So the first step is to search for duplicate accounts.  And in this context, it refers to, essentially, do we already have an account for this customer?  Is that fair?

A.   Yes.

Q.   I see that it says, "Perform a SalesForce search to find any duplicate account under the same company name."  Do you see that?

A.   Yes.

Q.   Is it true that Experian maintains accounts for subscribers and the word data furnishers within Experian's SalesForce platform?

MR. MUELLER:  Objection, foundation.

THE WITNESS:  Yes.

BY MR. RISTVEDT:

Q.   So for instance, if I wanted to find information about ABC Company, a data furnisher who sends information to Experian, there would, by definition, be a SalesForce account for ABC Company that would contain certain information about that entity.  Is that true?

A.   Yes.  There should be an account for ABC Company in that instance.

Q.   The data furnisher that's at issue in this case is Capital One.  Are you aware of that?

A.   Yes.

Q.   Is it true that Capital One has a SalesForce account within Experian's system?

MR. MUELLER:  Objection, foundation. Objection, outside the scope of the notice.

THE WITNESS:  Yes.

BY MR. RISTVEDT:

Q.   What type of information is included within a SalesForce account for one of Experian's customers?

MR. MUELLER:  Same objections.

THE WITNESS:  There would be a lot of -- a variety of information.  It would -- SalesForce would contain the, as you said, the company name, addresses, phone numbers, contacts, products requested, contracts -- yeah, a variety.  It's our tool for managing the account, the information we would need to -- in order to manage that account, I guess.

BY MR. RISTVEDT:

Q.   Does it have things like account notes where you'd be able to note sort of, you know, "talked to John in accounting," for any issues, things like that?

MR. MUELLER:  Same objections.

THE WITNESS:  SalesForce has lots of notes areas depending on what the topic is, whether it's, as you described, financing, service issues, credentialing.

BY MR. RISTVEDT:

Q.   And it sounds like -- you had mentioned that, like, the contracts are in there as well.  So is it safe to assume that there's some sort of document storage component that makes up those account files?

MR. MUELLER:  Same objections.

THE WITNESS:  Yeah, there's a section for applicable documents, yes.

BY MR. RISTVEDT:

Q.   I understand, based on Experian's policy and procedure documents, that when the due diligence process is completed, there are documents that are retained that detail the results of the due diligence process.  Is that true?

MR. MUELLER:  Objection to form, vague.

THE WITNESS:  The documents -- yeah, can you clarify the question, please?

BY MR. RISTVEDT:

Q.   Certainly.

So Experian performs a bunch of different due diligence actions when onboarding a new subscriber, true?

A.   Yes.

Q.   And presumably, there's some record of the results of those actions.  In other words, if I'm a credentialing analyst and I perform this -- these different actions, I make some sort of record that they've been done so that we know they've been completed, fair?

A.   Yes.

Q.   My question is, are there documents that are

APPENDIX 1486

retained within the SalesForce account that detail the results of the due diligence process?

MR. MUELLER: Objection, vague.

THE WITNESS: So there are fields you would complete to document what you described. There could be additional documentation to support that, which could be captured in a PDF, but not everything is in a PDF. It's, as I described, fields within the system.

BY MR. RISTVEDT:

Q. Okay. So I think I've understood you, but I want to ensure that I do.

It sounds like there are some fields where the credentialing analyst can input the result, and then in other instances, if there's a record, say a PDF, that relates to some result, that can also be attached within the SalesForce file. Is that all -- am I understanding you correctly?

A. Yes.

Q. Would that include something like when TrendSource performs a physical inspection of a property and they complete that inspection checklist, would that be something that gets uploaded to the SalesForce account for that subscriber?

MR. MUELLER: Objection, vague.

THE WITNESS: Yes.

BY MR. RISTVEDT:

Q.   So in other words, if I -- to use the example I gave earlier, if I wanted to find all of the documents and all of the results of the due diligence for ABC Company, there would be, it sounds like, a spot within the SalesForce account for ABC Company that I could look at to identify that information.  Is that true?

MR. MUELLER:  Objection, form.  Vague.

THE WITNESS:  There would be a number of spots, I would say.

BY MR. RISTVEDT:

Q.   But in other words, you or your employees would know where in that SalesForce file to look for that type of information.  Is that true?

A.   Yes.

Q.   The second step refers to a consolidated alert list, and it references this path of credentialing, credentialing documentation, consolidated alert list, and then refers to this Excel file.  Do you see that?

A.   Yes.

Q.   What is the consolidated alert list in this context?

A.   That's a list of -- how do I describe it?  Like, hot lists.  The government's OFAC list, the SDN list, and a number of other lists of entities that we won't do

business with.

Q. Does that include a politically exposed persons or PEPs as well, or is that a separate list?

A. I believe PEPs are also included in the consolidated list.

Q. So essentially this is kind of like an ongoing Excel document that contains these high level alerts where if the entity was located on this list, or an officer or a director, for instance, of the entity, that would be a red flag where Experian would go, "We can't do business with them." Have I followed you correctly?

A. Yes, that would be a red flag.

Q. And I understand this next section says that, you know, we make sure the business is not on a list, but also any individuals that we've identified, either supplied by the client or gathered through our own searches, we make sure they're not on the list as well, right?

A. Correct.

Q. Are there remediation procedures in place where if someone were, say, located on the consolidated alert list, they could somehow remediate that by saying, "Well, here's my explanation," providing documentation, things like that, or is it just if you're on the list, we can't do it?

MR. MUELLER: Objection, outside the scope

of the notice.

THE WITNESS:  If we discovered a match, we would explore and validate that match is legitimate, which could entail discussing with the client as you described.

BY MR. RISTVEDT:

Q.   There's this other section here that says, "If there's a finding under the LexisNexis section of the consolidated alert list."  What does the LexisNexis section refer to?

A.   So as it's a consolidated list, one of the lists is provided to us by LexisNexis of entities that we cannot resell the Lexis products to.

Q.   Understood.

So am I correct, then, in understanding that the lift premium and risk view attributes products, those would presumably be Lexis products that you're referring to?

A.   They contain Lexis data.

Q.   Okay.  I see here there's this acronym of CPD BPI.  Do you know what that stands for?

A.   Yes.

Q.   What does that stand for?

A.   Consumer Profile Document Business Process Item.

Q.   And what does that mean or what is -- when it refers to this in the CPB BPI, is that a particular

document that Experian maintains or a system or what is that?

A.    It's a -- I would describe it as a set of fields that we use in SalesForce.

Q.    The next section refers to Owners & Beneficiaries and kind of says if they're located in or they've got some sort of business ties to certain entities, then it gets escalated to you for further review, correct?

A.    Yes.

Q.    I do want to ask you, when it refers to the credentialing application -- when I hear "application," I think of, like, you know, completing a credit card application.  I've gotta fill out information, my name, date of birth, social security number.  But in other words, I have to provide information to whoever I'm applying with.

Is this the same type of thing where a subscriber will complete a credentialing application that has information they provide to Experian?

A.    So, yes, a client that's applying for -- to be a subscriber of one of our services would complete a credentialing application.

Q.    I assume that there's like a blank sort of template that is provided to the subscribers to complete. Is that a safe assumption?

A.   Yes.

Q.   And then when the subscriber completes the credentialing application, is that saved within the subscriber's SalesForce account file?

MR. MUELLER:   Objection, form, vague.

BY MR. RISTVEDT:

Q.   My apologies, Mr. Henke.  Go ahead.

A.   Ultimately, yes.

Q.   So is there a -- well, actually, let me take a step back.

So for any new subscriber to Experian, they will have a credentialing application that they completed at some point when they became a new subscriber, correct?

A.   Sorry.  You said new subscriber twice.

So a new subscriber would complete a credentialing application, correct.  Is that what you're asking?

Q.   Yes.

So what about -- there are some entities that Experian has done business with for decades, true?

A.   Yes.

Q.   So, for instance, I assume some of the bigger banks, like Bank Of America and Chase and, say, larger credit cards like Capital One, presumably Experian has done business with entities like that for potentially

Case 4:25-cv-00443-P   Document 116   Filed 12/22/25   Page 1439 of 1862   PageID 3288

several decades.  Is that true?

A.   Yes.

Q.   For companies that have been doing business with Experian potentially before these policies even existed, do those entities have some similar credentialing application documentation or are they exempted from that?

A.   They should have a similar application type document, but it's not a requirement since they're not a new client.  Is that what you're asking?

Q.   Yes.  And I think I understood your answer, but I just want to ensure that I do.

So it sounds like even if, say, Capital One became a customer of Experian's 40 years ago or something like that, presumably, at that time, they would have completed some application, even if it's not the same application Experian uses today.  Have I followed you correctly?

A.   I would say even before we had a procedure requiring an application, we were still receiving some type of application from clients, yes.

Q.   Okay.  So for a company like Capital One, you'd be able to look at their SalesForce file and identify whatever application materials were submitted whenever they became a subscriber or customer of Experian, true?

A.   Yeah.  We would be able to look up their

paperwork.

Q.   And that's information to which you have access, correct?

A.   Yes.

Q.   The next section is the Conduct Internet Search. And it says there's an internet search that's performed on all company names, contact names, addresses, phone and fax numbers, and email addresses, to, quote, ensure that business is not involved in unacceptable behavior.

Have I read that correctly?

A.   Yes.

Q.   If I were a brand new compliance analyst, just got hired by Experian, I'm starting to, you know, do my first due diligence of a new subscriber, how would I know what is an unacceptable behavior under Number 4?

A.   Well, I think we described it to you as -- I think you can describe it is lower in the -- in the same procedure.  So we would describe to them what are, you know, initial unacceptable behaviors.  But again, it can be subjective if they see something that they feel is unacceptable.  So we would give, like, descriptions and the specifics from lower in the procedure, and then they would use that to process.

Q.   And you said -- I'm sorry -- it may be somewhere lower in the procedure?  Did I catch that?

A.   Yes.

Q.   Okay.  The next section, Findings, says, "Any list matches or indications that a client has engaged in illegal conduct must be escalated to Credentialing Leadership to ensure entities that do are not eligible, are not given access to Experian data."  Did I read that correctly?

A.   Yes.

Q.   Is there a list of illegal conduct that's provided to credentialing analysts in order to identify whether this criteria is met?

A.   I'm sorry.  A list of illegal conduct?

Q.   Well, for instance, I expect that, say, compliance analysts are not entirely made up of, say, trained attorneys.  Is that a safe assumption?

A.   Correct.

Q.   And I assume probably they're not all, you know, with a law enforcement background or something like that. Also true?

A.   Yes.

Q.   So if I were, again, a new -- you know, inbound compliance analyst and I don't necessarily know all of the laws of the United States or each state in which a company might operate, how would I know what comprises illegal conduct sufficient to satisfy the criteria in Number 5?

A.   So as an example, when you're doing the Internet search, if there's any information that comes back that provides that there's been litigation or judgment against that particular entity for illegal conduct, that would be something you would raise to our attention.

Q.   And I want to clarify.  When you say "illegal conduct," does this refer to criminal conduct only, or is it potentially violations of civil law?

A.   It could be either.

Q.   So, for instance, you understand that the Fair Credit Reporting Act is a federal law, and when a company violates it, they may not necessarily have committed a criminal act, but they could be subject to civil liability, right?

A.   That's correct.

Q.   So if a company, say Capital One, was sued in which a consumer said you violated the FCRA, would that be sufficient to satisfy this illegal conduct section?

MR. MUELLER:  Objection, form.  Misleading.  Mischaracterizes the document.

THE WITNESS:  Yeah.  They're not trying to satisfy a legal conduct requirement.  The analyst is trying to observe as another data point, if you will, if there is any illegal conduct that they're aware of during their search.

APPENDIX 1496

BY MR. RISTVEDT:

Q.   Well, that's what I want to be certain I understand, is in this instance, it says that if there's any indications that the subscriber has engaged in illegal conduct, it gets escalated to credentialing leadership, right?

A.   Yes.

Q.   So if a company was accused of violating the FCRA, would something like that be escalated to credentialing leadership or no?

A.   Yes.

Q.   Would that include accusations that a company, say, was subject to a CFPB investigation or something like that?

A.   It could, yes.

Q.   Number 6 says that the analyst establishes the company as an active business entity and then identifies a bunch of different potential acceptable documentation, correct?

A.   Yes.

Q.   And essentially this is saying we want to make sure that they're actually doing business and that they've got an active business license, something like that, right?

A.   Yes, something like that.

Q.   And so it says this could be done through, for instance, articles of incorporation, a business compliance Insights report, searching the EDGAR database for SEC information, or state and government agency websites, all of these kinds of things to identify information that establishes the company is currently doing business.  Is that all true?

A.   Yes, that it's currently an active legal business.

Q.   What is a business compliance insight report?

A.   That's an Experian product that identifies information about businesses such as registered with Secretary of State and so on.

Q.   Is that analogous -- well, are you familiar with a company called Dun & Bradstreet?

A.   Yes.

Q.   Is -- a BCI report, is that similar to like a Dun & Bradstreet report?

A.   It's better.

Q.   Fair enough.  Okay.  Similar, but better.  Am I following?

A.   Yes.

Q.   Understood.

Does Experian perform this BCI report on all prospective customers?

A.    We attempt to.

Q.    And I am understanding the attempt portion of that, sometimes there might not be a BCI for a particular business.  Is that what you're saying?

A.    Yes.

Q.    But if there is, that would be part of this just overall due diligence process?

A.    Correct.

Q.    Going down to Level 2, this is where we get into the -- well, actually, let me -- before I move on to Level 2.

We've been discussing this Level 1 Fraud Check, which is largely, you know, do they already have an account?  Are they actually a business?  Are they on any sort of lists that we should be aware of and not do business with them?  Things of that nature, that all kind of generally relate to potential fraud, fair?

A.    I wouldn't say that it's necessarily fraud, but it's most likely an entity that we don't want to do business with.

Q.    Understood.

But nothing in Level 1 would relate to whether or not a data furnisher is providing accurate information.  Would you agree with me?

A.    Not entirely.

Q.   And which section would relate to whether a data furnisher is providing Experian with accurate consumer credit information?

MR. MUELLER:  Objection, form.  Misleading.

THE WITNESS:  So I don't think any section is specific to the data that's being reported, but it does substantiate the entity that's reporting the data is legitimate.

So, for example, the last one that we went over, if it was not an active business, that would be more suspect of not having accurate data to report --

BY MR. RISTVEDT:

Q.   Well, I understand that --  my apologies.  Go ahead.  I didn't mean to cut you off.

A.   I'd say by the -- on the converse, by establishing that it is an active business, it supports that they do have data to report.

Q.   Well, I -- I understand that a number of these diligence items revolve around trying to ensure is this a legitimate company?  Are they going to pay us?  Things like that, right?

A.   Correct.

Q.   But you understand that there's a difference between a company being in existence and actually being a legitimate company versus whether that company's

information is accurate.  Those are not the same thing.
You agree?

A.    Yes.  There's a difference between is it a legitimate company and is the data accurate.

Q.    In other words, in theory, I could go out right now, rent a building, create a company, file all the appropriate documents, and deliberately send Experian inaccurate data, but I could still pass a credentialing check.  You would agree?

A.    It would be highly unlikely, but possible.

Q.    Well, I guess that's what I want to understand, is within this first fraud section, I understand to your point that this Level 1 -- these searches are designed to identify is this a legitimate company, right?

A.    This first section is -- yes, is it an actual legal entity, and is there a known history or an identified history of actions or activities that we would not do business with.

Q.    Understood.

But in other words, there's nothing in this first level that relates to is their credit information accurate?  Do you agree?

A.    Correct.

Q.    And there's nothing in this first section that relates to is their credit information reliable beyond the

fact that they're a business who's operating and has, you know, necessary paperwork, things like that, fair?

A.    Yes.

Q.    So moving on to Level 2, KYC.

KYC in this context relates to the acronym Know Your Customer, right?

A.    Yes.

Q.    And the first step is we want to identify are they potentially a financial risk, right?

A.    Correct.

Q.    And in this context, financial risk would relate to, you know, if they owe us money, if we've got an invoice outstanding, is there potentially a risk that they're not going to be able to pay us.  Is that fair?

A.    Yeah.

Q.    So, for instance, this first step, to your point earlier, is we pull a BCI report.  And I assume, having seen enough Dun & Bradstreet reports, there's some sort of risk indicator that says, you know, this is a high risk company or low risk or medium risk, something like that, fair?

A.    Yes.

Q.    Do you guys use the color system like Dun & Bradstreet does, where it's like high risk is red, low risk is green, medium risk, yellow?

Coash Court Reporting & Video, LLC
staff@coashcrv.com
602-258-1440
www.CoashCourtReportingandVideo.com

APPENDIX 1502

A.   Yes, there is a color system.

Q.   I figured.

So part of this is -- number one is essentially based on this BCI report, are there potentially concerns that this company might not pay their bills, true?

A.   I don't know that I'd say there's concerns.  This is just, again, another data point observation.  Does it look to have risk of not paying bills?

Q.   And then step 2 is an analysis of the company's website.  And in large part, this is similar to section 1, like are they a legitimate business?  Do they have a business website?  Does the information on that website seem to comport with what they've represented is their industry?  Is that all true?

A.   Yes.

Q.   I see here there's this acronym of EMS and EDQ.  Do you know what those acronyms stand for?

A.   Yes.

Q.   What do they stand for?

A.   Experian Marketing Services and Experian Data Quality.

Q.   So this is for requests to those specific Experian entities.  Have I understood that right?

A.   Yes, request for those specific Experian entities

or business units.

Q. Okay. Going down to McCall Experian 587, there's a section here that says, for EMS and EDQ, this is again, those other Experian entities. Is that right?

A. Correct.

Q. So not relevant to our discussion today. Is that fair?

A. Yes.

Q. When it says, "If the CE is purchasing the targeting prospecting list" -- first, what is CE? What does that stand for?

A. Covered entity.

Q. And does this -- okay. So I think this relates to something in the healthcare industry, correct?

A. Correct, the health business unit.

Q. Got it. Okay.

A. Or I should say the health legal entity.

Q. Understood.

Under Section C, it says, "Ensure . . . the company is not offering services or associated with businesses that would be deemed unacceptable under Experian guidelines."

Earlier when I had asked you about sort of unacceptable practices and how would I know what that was, is this what you were referring to when it was later in

the policy?

A.    Procedure, yes.

Q.    Procedure, yes.  Very good.

So this section has some tables that talk about prohibited clients or industries, different types of risks, so things like companies that involve convicted felons or credit repair agencies or residential clients, karate clubs, different things that Experian has identified as entities or businesses with which they don't want to do business.  Is that all true?

A.    They're entities that carry more risk, I would say, specifically to not do business with, that might be the prohibited section.

Q.    Understood.

So in other words, the prohibited section would indicate these are companies or industries we don't want to do business with, the other sections might be, to your point, an indication and one data point that potentially there's risk associated with that entity or industry that would be factored into Experian's overall credentialing decision.  Have I understood your testimony correctly?

A.    Yes.

Q.    So the rest of this section really just relates to if you've identified somebody's within this list and

Charles McCall vs. Experian Information Solutions, Inc. -
30(b)(6) and 30(b)(1) Experian Information Solutions, Inc. - Peter Henke

October 3, 2025
73

there are certain thresholds of risks, they may need to be escalated to credentialing leadership before they can be finalized for onboarding.  Is that fair?

A.    Yes.

Q.    The next section is Placement, and this relates to validating that the client is "located at the address indicated in the Credentialing Application," true?

A.    Yes.

Q.    So this also includes or subsumes the physical or virtual inspections we referred to earlier, right?

A.    I'm not sure what you mean by includes.

I would state that the physical or virtual inspections can be used to validate placement.  Is that what you're asking?

Q.    Yes.

Well, and really what I wanted to understand is, I see here Subsection A says validate the business is located at the address in the application, and you can do that through any of this -- any of these resources that are identified, right?

A.    Correct.

Q.    So like the BCI report or Google search or Zoom info or the lease agreement, Mapquest, any of those things can be used to validate, "Hey, they are where they say they are," right?

A.    Yes.

Q.    So my question is, the physical or virtual inspection that's identified in Subsection B, is that an alternative to those items listed in Subsection A, or is that in addition to Subsection A?

A.    It depends on the specific request, but it's -- it can be an alternative.

Q.    When you say that it depends on the specific request, what do you mean by that?  Or what does it depend upon?

A.    So, for example, when we described in the physical inspection policy that the inspection -- sorry, the inspection policy -- that the inspections are applicable to those FCRA and GLB regulated products, such as data furnishing or credit reports, then it's not really an alternative at that point.  Then the inspection is needed barring an exception.

Q.    Okay.  So --

A.    If you have an exception, such as a bank, you can use a -- I don't know what number X is -- but for banks and credit unions, you can use the address match as an alternative to an inspection because an inspection isn't required.

Q.    Understood.

So I think I'm following you, but I want to

ensure I am.  So letter A, sort of validating through some sort of remote search, that can potentially be the only portion of the placement search that's done if a company is subject to one of the exceptions we identified in Exhibit 2.  Is that what you're saying?

A.   Yes.

Q.   Okay.  So if I were a bank, it's possible that in order to determine is your business actually at that location, it might be as simple as just, "Well, we pulled the BCI report and the address matches up to the credentialing application, so all good," and then there's no -- there's no physical or virtual inspection needed. Is that true?

A.   Yes.

Q.   And at least as we sit here today, you don't know sort of what percentage of credentialing diligence processes have some sort of exception that's applied?  Is that true?

A.   Yes.

Q.   Do you have any ballpark in terms of are we talking 50 percent of applications might be subject to an exception?  5 percent?  99 percent?  Any sort of frame of reference for that?

A.   It would just be a guess at this point.

Q.   Okay.

A.    I could research it.  But right now, it would just be a guess.

Q.    What would you do to research it if you were going to do that?

A.    I don't know yet.  Probably start with some queries in SalesForce.

Q.    Is there like a field that would be ticked, like a checkbox, if there was an exception that was applied?

A.    An exception to the inspection?

Q.    Yeah.

A.    No, there's no box -- there's no tick mark or specific flag indicating it.

Q.    Okay.  But presumably, you'd have some sort of queries that you would run to kind of figure out, say, last month how many -- how many applications did we process and how many of them had a physical or virtual inspection?  Something like that?

A.    Something similar.  It would be more like how many did we process for bank and credit unions -- the public -- sorry -- the publicly traded becomes a little bit more difficult, so I'm not sure exactly how I'd do it to be honest with you.

Q.    When we talk about a physical or virtual inspection, I understand that there's a checklist that Experian uses.  What -- what is the function of the

physical or virtual inspection of a customer?

A.   I'm sorry.  What is the function of a virtual or physical inspection?  What do you mean by "function"?

Q.   Or what -- what is the purpose, rather?  Is it to confirm that, you know, they've got locks on the doors, that file cabinets are closed, things like that, or are there specific inquiries that are performed?

A.   The --

MR. MUELLER:  Wait just a second.

Objection, compound.  Vague.  Go ahead.

THE WITNESS:  The inspection is additional information or additional data points on the applicant that can be weighed into the decision as to whether or not that applicant is eligible to be a client or receive the services being requested.

BY MR. RISTVEDT:

Q.   What are the data points performed in the physical or virtual inspection that you're referring to?

A.   Well, I was referring to the inspection as a whole as an additional data point, meaning as we went through each of these steps, each -- each step is an additional data point.

Q.   Understood.

So limiting our focus only to the physical or virtual inspection of a customer's property, what

specifically is that physical or virtual inspection looking for?

    A.    So there's a number of items.  For example, we're looking for is the customer at the location that they claim to be at?  Does it appear to be an active business?  Are there employees there?  Is there a sign that represents that the business is at the location?  As you had mentioned, security measures.  We're looking for are there locks on the doors?  If they're pulling credit reports, are there ways, in other words, to secure the data that they might procure?  Do they appear to be in the type of business that they stated that they're in on the application and so on.

    Q.    So it sounds like there's a mix of what we discussed before, which is, is this a legitimate business, and then also, as you pointed out, a number of items that relate to potential security measures.  Have I understood you correctly?

    A.    Yes.

    Q.    I assume there is nothing like, you know, "Hey, we want to go over your books, and I want to confirm that James Ristvedt actually owes the $500 you say he owes." Nothing like that.  Is that fair?

    A.    The inspector would not be allowed to look at the actual consumer data.  That's what you're asking, right?

Q.    Correct, yeah.

In other words, he's not, like, rifling through account documents to make sure these people actually owe what they say they owe, right?

A.    Right.

Q.    Number 4 relates to zoning.  This is pretty straightforward, as best I can tell.  It's, you know, is the business operating in a commercial zone where they're supposed to be instead of, like, am I doing it out of my house, right?

A.    Correct.

Q.    I see Number 5 relates to this SalesForce Mainframe/D2P4 and Clarity Connect search.  Do you see that section?

A.    Yes.

Q.    And this really relates to checking for previous business relationships, like, have we done business with them in the past, right?

A.    Yes.

Q.    And then it's got a couple subsections.  Number i is poor payment history and/or charged off balances, right?

A.    Yes.

Q.    And then number ii says policy violations or compliance investigations due to these types of issues,

like the payment history and charged off balances, right?

A.   Not -- yes.  Yeah.

Q.   So essentially, this is -- this section is, "Have we done business with them in the past, and did they have some sort of issues where we couldn't collect a balance from them?"  Is that fair?

A.   Yes.

Q.   When it references Clarity Connect claims, what is Clarity Connect in this context?

A.   Clarity is, like, a different business unit, and Clarity Connect is the system that's used to deliver that Clarity data.

Q.   Okay.  So not related to Experian Information Solutions, if I'm understanding you correctly?

A.   Well, it's -- it's a different business unit.

Q.   Okay.

A.   It's not the consumer core credit, if that's what you're asking.

Q.   Yes, it is.

The next section is on McCall Experian 592, Identify 3rd Parties.  This part is saying essentially if you see references to other companies.

So, for instance, in the client's company documents or their application, if you see a reference to another entity, potentially we might need to do diligence

relating to that entity in addition to the customer themselves.  Is that true?

A.    Yes.

Q.    And specifically, there are references to, say, data hosting.  And I see there's this Hosted Solutions list saying certain entities might be on this restricted list for hosters.  Is that right?

A.    Yes.

Q.    I see that there's this other list of data processor and agents.  Do you know what's -- what's included within this data processor and agents list?

A.    Yes.

Q.    What is -- what type of information is included therein?

A.    It's, as it describes, a list of agents and data processors that have already gone through that vetting process.

Q.    Understood.

And then I know there's also sort of this reference to they can be affiliates, and those could also be subject to diligence as well.  Is that true?

A.    What you're pointing to is more specific to those business units.  But yes, that's true.

Q.    So you're saying this B subsection relates only to these other business units which do not include EIS,

right?

A. Correct. But it's true that affiliates or branches could receive additional due diligence.

Q. So that's the entirety of the Level 2 section. I asked similar questions under Level 1. I'm going to ask them now under Level 2.

You would agree that none of the items that we just discussed in Level 2 relates to whether a data furnisher's credit information is accurate, yes?

A. I'd have the same response, it does not pertain to the data itself, but it does pertain to the legitimacy of the entity providing the data.

Q. Right.

So in other words, this section, like section -- or level -- like Level 1 is largely centered around is this a legitimate business? Can we do business with them? And not is their data accurate, true?

A. Yes.

Q. And one more question about the physical or virtual inspections.

Some customers Experian has have numerous different locations, right? In other words, it's not just a single building. Is that true?

A. Yes.

Q. If a company has locations in, say, all 50

states, are all 50 of those locations subject to physical or virtual inspections or is it specific locations like the company's headquarters?

    A.    We would not be required to do inspections on all locations.  We would just do the inspection -- well, the inspection would only be required at the applying headquartered location, if you will.

    Q.    Okay.  So, in other words, my headquarters was located in Phoenix, Arizona, but I had branches all over the country.  Phoenix is where the physical or virtual inspection would take place.  Is that fair?

    A.    Most likely, yes.

            MR. RISTVEDT:  Okay.  I know we've been going about an hour, Ryan.  This seems like a good natural break point.  You want to do another five minutes here?

            MR. MUELLER:  Sure.  And I'll note -- yeah, we can go off the record now.

            THE COURT REPORTER:  We are off the record. Time is 12:05 p.m.

            (A recess ensued.)

            THE COURT REPORTER:  We are on the record. Time is 12:12 p.m.

BY MR. RISTVEDT:

    Q.    And, Mr. Henke, you understand you remain under oath, correct?

Charles McCall vs. Experian Information Solutions, Inc. -
30(b)(6) and 30(b)(1) Experian Information Solutions, Inc. - Peter Henke

October 3, 2025
84

A.   Yes.

Q.   All right.  I am going to place back on the screen the due diligence procedure we've been examining.  And do you see that on the screen okay?

A.   Yes.

Q.   So we were discussing Level 2 and Level 1.  We're now moving on to Level 3, Baseline.  Do you see that?

A.   I do, yes.

Could you click one more zoom, please?

Q.   Yes, of course.  Is that better?

A.   Yep.

Q.   Perfect.

So Baseline, as I understand it, largely relates to verifying that -- well, let's go through the section.

I see the first section here is Contact Authentication, meaning we want to verify the person who is signing the contract on Experian's behalf is actually an employee of Experian -- or excuse me -- of the customer, correct?

A.   In 1a, yes.

Q.   And then it adds some details about sort of what titles are acceptable, but essentially 1a is all about whoever is signing the contract, we want to make sure they are actually a person who works for that customer, yes?

A.   Yes.

Q.   If we go to 1b, this is the security designate, which am I correct in assuming this is the person -- the contact at the customer for security issues?

A.   No.

Q.   Okay.  And what is a security designate then?

A.   So the security designate is -- how would I describe it? -- more like the systems administrator.  So it's the individual that has the core credentials to access the Experian systems on the client side.

Q.   Okay.  That makes much more sense than what I was thinking.

So this is the person -- the tech person, essentially, who's going to be the primary point of contact for the customer.  Is that fair?

A.   Ideally, yeah.

Q.   And this section also relates to we want to make sure this person is actually an employee of the customer, correct?

A.   Yes.

Q.   If I move to letter (c), this is verify the business contact.  And again, the same sort of thing, we want to make sure whoever is the business contact for this customer, if it's different than those previous two people, we want to make sure they're an employee, right?

A.   Yes.

Q.   Moving on to Section (d).  This is confirming the commercial email address.  So, for instance, if you know my credentialing application said James@abccompany.com, we want to make sure that's actually a legitimate email address, correct?

A.   Yes.

Q.   Moving on to Number 2, there's a social security number verification section.  Do you see that?

A.   Yes.

Q.   If I'm understanding this correctly, in some instances, the client contact for the customer will provide their social security number within the credentialing application.  Is that accurate?

A.   I'm sorry.  Can you repeat that?

Q.   Yes.

Does the client contact for the customer provide their social security number in the credentialing application in all instances or just some?

A.   Just to clarify, the contact does not provide their social security.  It's the -- in the principal section, at times some principals will provide their social security number.

Q.   Oh, okay.  So within the credentialing application, there's a section that relates to principals

APPENDIX 1519

of the company.  And in some instances, the principal's social security number might be included in that section. Is that what you're saying?

A.   Yes.

Q.   So I take it that's not a required field in all instances, based on your testimony.  Am I understanding that correctly?

A.   Yes.

Q.   But if they do provide it in those instances, Experian will pull an SSN search via either Metronet or Authentication Solutions Level 1.  Is that true?

A.   Yes.

Q.   So basically, in these instances, we want to make sure it's a valid or legitimate social security number that we've been given, fair?

A.   We want to -- we use it to validate the individual so they're the person they say they are.

Q.   Understood.

So, again, kinda consistent with what we've been discussing, in terms of making sure the people we're doing business with are legitimate human beings and this is not, you know, identity theft or something else, fair?

A.   Yes.

Q.   Section Number 3 relates to authenticating the company's phone number, meaning we try and figure out does

this phone number they've given us have some sort of public link to the company, either in the BCI report or one of these other resources, true?

A.    Yes.

Q.    Okay.  And then Number 4, Experian will actually call that number and say -- you know, just to verify oh, ABC Company actually picked up the phone and it doesn't go to somebody completely different.  Is that right?

A.    Yes.

Q.    I do note there's this exception that says if you pulled a BCI report and there's a perfect match of what they gave us in the credentialing application, you do not need to call just to verify that they're answering, right?

A.    Yes.

Q.    But in that instance -- or even in that instance, collection agencies would be exempt from that.  In other words, if it were a collection agency, you'd still have to pick up the phone and call them to make sure they're answering the phone?

A.    No, collection agencies are exempt from having to call.

Q.    Oh, okay.  So exempt -- they're exempt from having to call, not exempt from the exception?

A.    Correct.

Q.    Okay.  I got thrown off by the sub (i) here.

A.    Yeah.

Q.    So that makes more sense.  Okay.

A.    Maybe it makes more sense to make that a B.

Q.    The next step, International Review.  This really just relates to certain countries that have restrictions.  Is that fair?

A.    Not countries that have restrictions, but restricted countries.

Q.    Okay.  Understood.

But in other words, that would not have any relation to what we're here today to discuss.  Is that fair?

A.    Yes, in my opinion.

Q.    I'm going to skip through the rest of Section 5.  That'll save us quite a bit of time.  And that is the end of Level 3.

So I asked you similar questions in Levels 1 and 2.  I'll ask you the same questions now in Level 3.

As I understand it, the tasks in Level 3 again relate to is the business that is applying and completing this credentialing application and are the people associated with this business legitimate businesses and legitimate people, correct?

A.    Yes.

Q.    But it does not have any relation to is a data

furnisher's credit information accurate.  Also true?

A.    It does not pertain to the data itself, correct.

Q.    Moving on to Level 4, this is Baseline (EPS).
What does "EPS" stand for in this context?

A.    Experian Partner Solutions.

Q.    What is Experian Partner Solutions?

A.    That's another business unit.

Q.    What type of business unit is EPS as compared
with Experian Information Solutions?

MR. MUELLER:  Foundation.

THE WITNESS:  It's a similar business unit
in that they sell credit -- consumer credit data.  But
their focus is more on, like, direct-to-consumer reselling
of consumer credit data.

BY MR. RISTVEDT:

Q.    So you're saying the EPS business unit is more
focused direct on consumers as opposed to business
entities that EIS would be focused on.  Is that what
you're saying?

MR. MUELLER:  Same objection.  Objection,
outside the scope of the notice.

THE WITNESS:  I'd say they're focused on
businesses that sell direct to the consumer.

BY MR. RISTVEDT:

Q.    Oh, okay.  So more resellers then.  Is that fair?

A.    Yes.

Q.    Okay.  So I don't think -- although, correct me if I'm wrong -- if I'm understanding correct, Level 4 applying only to this EPS business unit, that would not have any relation to Experian Information Solutions and its subscribers.  Is that true?

A.    No.  It's a lot of the subscribers for EIS have to also complete Level 4 because they have to go through Level 5.

Q.    Okay.  So this would potentially be -- or would actually then literally be applicable to EIS's customers as well?

A.    Yes.

Q.    Okay.  So the first step here is a CFPB and FTC search, correct?

A.    Yes.

Q.    And basically, we look through enforcement actions filed with the CFPB and/or the FTC over the last seven years, correct?

A.    Correct.

Q.    And this includes these categories identified in here of civil action, pending litigation, administrative proceeding, and post-order/post-judgment, correct?

A.    Yes.

Q.    And then the FTC has similar filters for consumer

protection and then actions of federal process enforcement and administrative.  Also true?

A.   Yes.

Q.   And the idea is if either of these searches have any matches, that gets escalated to leadership for some sort of additional evaluation.  Is my understanding right?

A.   Yes.

Q.   When it says "leadership," does that refer to you or to other individuals within credentialing?

A.   Both.

Q.   So potentially you and then, I assume, like the managers or assistant managers in the credentialing department?

A.   Yes, our leadership team.

Q.   Are there written policies that the leadership team has in terms of how it evaluates findings subject to these FTC and CFPB searches?

A.   No.

Q.   When findings are found and this does get escalated to you -- or to the leadership team rather -- how does the leadership team handle those escalated findings?

A.   Well, obviously, first, it's reviewed, and then a determination is, depending on the finding, it can be a variety of, you know, actions, the next step would

Charles McCall vs. Experian Information Solutions, Inc. -
30(b)(6) and 30(b)(1) Experian Information Solutions, Inc. - Peter Henke

October 3, 2025
93

probably be a determination of what level of escalation those findings would warrant.  And then in most cases, it's, you know, ultimately a decision on how to address the findings.

Q.   When those escalations occur and those decisions are made, what type of documentation is created or retained to detail those determinations?

A.   Again, there's not a set format.  Most likely it's communicated through email.  Is that what you're referring to, like, what our -- what the leadership decision is?

Q.   Well, yeah.  I want to make sure I understand.

So let's say my company, ABC Company, has a bunch of hits that flag on this civil action over the last seven years in the CFPB search, and credentialing agent John Smith forwards it to the leadership team and says, "Hey, ABC Company's civil action search is lit up.  Here are the results," what does the leadership team do to evaluate it, and then document whether or not Experian is going to ultimately move forward with that credentialing application?

A.   All right.  So like I said, a number of things could take place depending on what the specifics were of those enforcement actions identified.  The individual on the leadership team could decide it warrants a rejection

right there, and they could communicate via an email back to the analyst to reject that request.

They could deem that it maybe needs to be escalated to myself, in which case they might pull me in. I could do the same thing with a rejection. I could hypothetically -- you know, it could be something that's -- you know, maybe there's some remediation on the client's side, so I might email back a question, say, ask the client how they've addressed these issues identified by the FTC or the CFPB, and we would take into account the client's response. Have they already remediated the issue, and so on. Has the government shut them down, or are they continuing to allow them to operate? So there's a number of factors that could go into it.

Q.  So at least this initial escalation to leadership, it sounds like, takes place via email, and then it includes a screenshot of that -- of the results within the investigation file. Is that all true?

A.  Yes, it -- it could be a screenshot or a link.

Q.  When those escalations take place and those discussions are had via email, is there a copy of those email communications that's retained within the investigation file in SalesForce?

MR. MUELLER:  Objection, form.  Vague.

THE WITNESS:  Typically, yes.

BY MR. RISTVEDT:

Q.    So going back to my example, if, say, ABC Company had a bunch of enforcement actions, the leadership team looked at it and said, "Okay, it looks like they've kind of resolved these things.  They're good to proceed," there'd be some sort of record of that conversation that then gets saved to the ABC Company SalesForce file, true?

A.    Most likely, yes.

Q.    The next item within Level 4 is Validate Company Office Inspection Required, and says that there's a requirement that we need to verify the business office meets Experian requirements confirmed via physical/virtual inspection, correct?

A.    Yes.

Q.    And this is essentially going through what we discussed earlier, the physical or virtual inspection, the same thing as before, right?

A.    Can you be more specific, please?

Q.    Well, we looked at -- in Level 2, there was this description of a physical or virtual inspection that's required unless an exception applies, right?

A.    Correct.

Q.    And I understand that in order for Level 4 to occur, the lower levels, by definition, have to have already -- or have to occur as well, correct?

A.   Correct.

Q.   So what I want to make certain I understand is, is this in Section 4 -- or Level 4, rather -- is this referring to the same kind of physical or virtual inspection, or is this different from the one in Level 2?

A.   It's similar, and the difference being that in Level 2 it could apply to non-FCRA requests.  So some of those other business units that we described, for example, a commercial only report wouldn't have FCRA data in it, and so you wouldn't get to this level.  So the requirements of an inspection are not applicable at that point.  But when you get to this level, there are entities that are required to have inspections, and there are exceptions to those requirements.

Q.   As I understand it, the exceptions that are bulleted out here in Section C, these are the same exceptions that we discussed in Exhibit 2 and earlier in Exhibit 3, meaning publicly traded entities, banks and credit unions, government agencies, and franchised auto dealers, correct?

A.   That's correct.

Q.   Now, I see here on McCall Experian 606, it says we can level -- we can leverage Virtual Inspections for all kinds of business, correct?

A.   "For all KOB's," correct.

Q.   The virtual inspections checklist client, is that that document that we referred to earlier, that the customer uses to perform the sort of self-examination inspection?

A.   Yes.

Q.   And then it says if there are red flags as a consequence of those virtual inspections, then Experian can request a physical inspection, sort of to follow up on those red flags.  Is that right?

MR. MUELLER:  Objection.  Misstates the document.

THE WITNESS:  Yeah, so a physical inspection can always be ordered and required of a client if the analyst deems it necessary.

BY MR. RISTVEDT:

Q.   Okay.  So in other words, this Subsection ii, d(ii), is really just saying if there are red flags, you can send an email to leadership and confirm whether we should also do a physical inspection.  Am I following that right?

A.   Yes.

Q.   When it says this document that's referenced below, Physical Inspections How To, is that different from the inspection checklist we discussed earlier or is that a different name for the same thing?

A.    That's different.

Q.    What information is contained in the Physical Inspections How To document?

A.    For example, how to log in to the TrendSource website and how to physically request the inspection.

Q.    Got it.

So the Physical Inspections How To, that's more of a nuts and bolts of like go to this website, click this button, make this request, things like that?

A.    Yes.

Q.    Okay.  Number 3 is Obtain Permissible Purpose Supporting Documentation, only required for EPS baseline Full Vetting requests, right?

A.    Correct.

Q.    And this is really just we want documentation that shows that this direct-to-consumer reseller is properly getting consent from consumers.  Is that fair?

A.    Yes.

Q.    So now having completed Level 4, I've got the same questions as I did in the previous levels.  You would agree that Level 4 does not contain any steps that identify the accuracy of a data furnisher's data, correct?

A.    I have the same response that it validates the entity as a reputable business and has the ability to report accurate data, not that they look at the specific

data to determine the data's accuracy.

Q.   Well, I want to make certain I have a clear record.

Nothing in Level 4 relates to whether a data furnisher's data is accurate.  You agree?

MR. MUELLER:  Objection.  Vague.

THE WITNESS:  Correct.  It doesn't pertain to the actual data being accurate.

BY MR. RISTVEDT:

Q.   So going on to Level 5, this is the FCRA/GLB Due Diligence.  This would be -- this would concern data furnishers who submit credit information to Experian, correct?

A.   Correct.

Q.   Number 1 is DBA name validation.  In other words, if a company -- my company, ABC Company, also does business as James' Widgets, then there would be some sort of verification to confirm that that's actually associated with ABC Company.  Is that true?

A.   Yes.

Q.   The next is Obtain Permissible Purpose Supporting Documentation.  This is similar to the one we looked at in Level 4, where it's basically let's make sure that if you're requesting credit reports, you've got documents that support what you are requesting those credit reports

for.  Is that true?

A.   It's more specific to the permissible purpose as to why you're requesting the consumer credit data and receiving the documents that support that permissible purpose.

Q.   Understood.

And I think what you're referring to is Subsection D here, where it talks about "accepted supporting documentation for FCRA," and then it bullets out each different type of permissible purpose, right?

A.   Yes.

Q.   So, for instance, for account review inquiries, there are different documents that Experian might require for that, yes?

A.   Yes.

Q.   And then the same is true as we go through for collections, firm offers of credit, extensions of credit, legitimate business need, tenant screening, underwriting of insurance, employment purposes, written consent -- and looks like that's all of them.  But each of those have different documents that may be required in order for Experian to confirm that permissible purpose, yes?

A.   Yes.

Q.   There's also a section here for GLB requests and additional documentation for servicers.  Do you see that?

Charles McCall vs. Experian Information Solutions, Inc. -
30(b)(6) and 30(b)(1) Experian Information Solutions, Inc. - Peter Henke

October 3, 2025
101

A.   Yes.

Q.   And so, for instance, for servicers, if it's a servicer who has a lender or relationship with multiple lenders, they might need to provide documents that demonstrate and substantiate those relationships.  Is that true?

A.   Yes.

Q.   And then lastly, there's this section on government entities.  They need to provide -- or rather, the federal government does not need to provide supporting documents, but state and local governments would need to provide documents to support their permissible purposes, yes?

A.   Yes.

Q.   In Section 8, there's this reference to Mind Map and the Amazing Industry Guide.  What are those?

A.    Those are just helpful documents for an analyst that might be unfamiliar with a particular industry, like the government, as you saw, and just some experiences that other analysts may share with their experience on how to gather information pertaining to those more unique industries, if you will.

Q.   So if I'm understanding you correctly, those reference documents are sort of, sounds like, a collection of best practices and maybe other experiences from other

APPENDIX 1534

Experian employees that would detail some nuances of specific industries.  Have I understood your testimony correctly?

MR. MUELLER:  Objection, to the extent it mischaracterizes testimony.

THE WITNESS:  Yes, it's very similar to that.  It's previous experiences and how to, you know, achieve the due diligence supporting DAPP requirements in more difficult industries that might not be accounted for in some of the earlier bullet points.

BY MR. RISTVEDT:

Q.   So I'm going to pause here after Number 2.

We've gone through, in Level 5, the dba name validation and the obtain permissible purpose supporting documentation section.

You would agree, as we discussed in the other levels, nothing in either Number 1 or Number 2 relates to the accuracy of a data furnisher's data, correct?

A.   It's the same response.  Yeah, it validates the entity.  We don't validate the entity's data.

Q.   Well, and just so I've got a clear record, your answer is no, Number 1 and Number 2 do not relate to the accuracy of the data furnisher's data, correct?

MR. MUELLER:  Objection, mischaracterizes

Charles McCall vs. Experian Information Solutions, Inc. -
30(b)(6) and 30(b)(1) Experian Information Solutions, Inc. - Peter Henke

October 3, 2025
103

testimony.

THE WITNESS:  It does not relate to the entity's data.

BY MR. RISTVEDT:

Q.    Going down to McCall Experian 610.  This section, titled "Data Accuracy Furnisher Policy & Procedure," does relate in some capacity to a data furnisher's actual data, correct?

A.    This -- it pertains to their policies regarding -- regarding their data.

Q.    So this first sentence says, "All new data furnishers, including banks and credit unions and Rent Bureau, must provide a copy of the Data Accuracy Policies and Procedures."  Did I read that first sentence correctly?

A.    You did.

Can I -- can I put a hold for just a minute?

Q.    Oh, certainly.  Do we need to take a quick break?

A.    Just like one minute.

MR. MUELLER:  Sure.

THE WITNESS:  Is that okay?

MR. RISTVEDT:  Yeah, absolutely.

Daniel, we can just go off the record for a minute here.

THE COURT REPORTER:  We are off the record.

Time is 12:42 p.m.

                    (A recess ensued.)

                    THE COURT REPORTER:  We are on the record.

Time is 12:43 p.m.

BY MR. RISTVEDT:

    Q.    Okay.  So, Mr. Henke, we were looking at the

Subsection 3 of Level 5, the Data Accuracy Furnisher

Policy and Procedure, correct?

    A.    Correct.

    Q.    So the second sentence here says, "These

procedures should establish and implement reasonable

written policies concerning the accuracy and integrity of

the information it furnishes to consumer reporting

agencies."  Did I read that correctly as well?

    A.    Yes.

    Q.    And then it has a list that follows, spanning

from McCall Experian 610 into 611, where it says, "The

following 9 components must exist within the written FCRA

policies and procedures as follows:  Accuracy and

integrity of furnished information; Metro 2 compliance;

investigating disputes and ability to make updates;

periodic reviews of policies and procedures; quality

control; training; vendor management; FCRA compliance;

[and] resource planning (staffing)."  Did I read that list

correctly?

A.   Yes.

Q.   So Experian requires that customers provide Experian with written FCRA policies and procedures that contain, at minimum, that list of nine items.  Is that fair?

A.   Yes.

Q.   Now, I understand this relates to new data furnishers, meaning data furnishers that are being onboarded, you know, today, tomorrow, et cetera, correct?

A.   Yes.

Q.   With respect to data furnishers who have been furnishing data to Experian for decades, or since before these written policies existed, are those data furnishers subject to this requirement that they must provide Experian with copies of their written policies and procedures?

A.   No.

Q.   So they're kind of like grandfathered in from having to comply with this policy.  Is that fair?

A.   They're grandfathered in with regards to not having -- not being required to submit those documents to us.

Q.   So I want to pause for a moment and go down to the -- if I can find it -- the Change Control section here on McCall Experian 617.  Do you see that?

Charles McCall vs. Experian Information Solutions, Inc. -
30(b)(6) and 30(b)(1) Experian Information Solutions, Inc. - Peter Henke

October 3, 2025
106

A.   Yes.

Q.   And I see this document Version 1.0 was first drafted December 27 of 2022, correct?

A.   Yes.

Q.   So returning to what we were just discussing, the data accuracy policies and procedures, we talked about sort of furnishers can be grandfathered in.

Are data furnishers who furnished to Experian prior to December 2022, when this document was drafted, are they all grandfathered in or is it only some of them?

A.   All.

Q.   So anybody who furnished data to Experian prior to December does not or was never required to provide Experian with copies of their data accuracy policies and procedures, true?

A.   They were not initially required to provide us their data policies and procedures.

Q.   So for a company like Capital One, who's been furnishing to Experian since well before December of 2022, Capital One, for instance, would never have been subject to this requirement to produce its data accuracy policies and procedures to Experian.  Is that fair?

A.   I do not believe we required Capital One to provide their data accuracy policies and procedures.

Q.   And is the same true with respect to any data furnisher furnishing prior to December of 2022?

A.   No.  There's a possibility that there are some furnishers that were reporting prior to 2022 that we did require a copy of their policies and procedures.

Q.   For those data furnishers that may have been required to provide their data accuracy policies and procedures who were furnishing prior to December of 2022, what would be reasons that those data furnishers would be subject to this policy and not grandfathered in?

A.   An example would be they're going to report a new line of data that they hadn't ever prior reported before. Another example is maybe they've gone into the property management business now and are going to start reporting tenant screening data to our RentBureau business.  There's a number of, I guess, different types of interactions that could have occurred that would prompt us to ask them for the data accuracy policies and procedures.

Q.   So if I'm following you correctly, and I want to ensure that I am, it sounds like if a data furnisher was grandfathered in but has since started furnishing a new type of data -- so to your point, they're a creditor, but now they're reporting property management information to Rent Bureau -- that would be circumstances where those data furnishers, even though they were grandfathered in,

would now have to provide a copy of their data accuracy policies and procedures.  Have I understood you correctly?

MR. MUELLER:  Objection, to the extent it mischaracterizes testimony.

THE WITNESS:  That's a type of example that could warrant us requesting a copy of their data accuracy policies and procedures.

BY MR. RISTVEDT:

Q.   Is there a list somewhere that details the circumstances where an otherwise grandfathered in furnisher would be subject to providing a copy of their data accuracy policies and procedures?

A.   I am not aware of a list.

Q.   So this list of nine items, these things all need to be present in the written data accuracy policies and procedures when Experian goes through and obtains that for new data furnishers, true?

A.   Each of the nine components need to be addressed within their policies and procedures.  We don't dictate the language that they use.

Q.   Who is it that analyzes whether or not the policies and procedures provided by new data furnishers meet these nine components?

A.   It's the analysts that would review the furnisher's policies and procedures as compared to nine

components, and they're validating that they address each of the nine components.

Q.    So the compliance -- or excuse me.

The credentialing analyst who is overseeing the due diligence for that -- new customers -- would review the data accuracy and policies and procedures provided by the customer, and they would confirm that all nine of these components exist within those written policy and procedures.  Have I understood you right?

A.    Yes.

Q.    And it sounds like they don't have to have some specific verbiage.  In other words, the policy doesn't need to say the literal magic phrase "accuracy and integrity of furnished information" for instance.  Is that true?

A.    Yes.

Q.    So in other words, if they had a section that said, like, "accuracy," presumably that might satisfy Number 1.  Is that a safe assumption?

MR. MUELLER:  Incomplete hypothetical.

THE WITNESS:  It's possible.

BY MR. RISTVEDT:

Q.    When Experian receives those written policies and the credentialing analyst reviews them, is there any sort of inquiry to determine whether this policy is actually

followed by the data furnisher?

A.    Can you say that again?

Q.    Sure.  Well, let me -- let me put it a different way.

If a parent tells their kid, "Hey, go clean your room," and doesn't check if the room ever gets clean, the kid could lie and say, "Yeah, I cleaned my room.  It's clean," and never actually do it, right?

A.    Right.

Q.    So I could draft a data accuracy policy and procedure and not follow it.  That's a conceivable possibility, yes?

A.    Correct.

Q.    So my question is, when a data furnisher submits a credentialing application to Experian, and as part of that application submits their data accuracy policies and procedures, does Experian ever make any inquiry with the data furnisher as to whether the furnisher actually follows those policies and procedures?

MR. MUELLER:  Objection, foundation.

THE WITNESS:  The credentialing department would not audit the data furnishers to ensure that they're following policies and procedures that they provided.

BY MR. RISTVEDT:

Q.    And I assume the same answer is true for there's

no inquiry to determine whether or not that policy is actually effective as employed by the data furnisher.  Is that fair?

MR. MUELLER:  Objection, vague.

THE WITNESS:  Did you say there's no policy? We don't have a -- like an audit practice to compare -- to validate the data furnisher's policies and procedures are being followed.

BY MR. RISTVEDT:

Q.   My question was a slight bit different.

It was -- I understand that there's no policy to inquire, "Hey, are you actually following these procedures."  My follow-up question is, is there any policy on Experian's end to make any inquiry with the furnisher about whether the furnisher's policies and procedures are effective?

MR. MUELLER:  Objection, vague.

THE WITNESS:  Yeah, the credentialing department would have no way to validate if the data was accurate, since we don't see the data.

BY MR. RISTVEDT:

Q.   Understood.

So in other words, this requirement is the furnisher has to produce some sort of written policies and procedures, but beyond producing those written policies

and procedures, there's no inquiry from Experian about either the efficacy of those policies and procedures, whether the furnisher follows those policies and procedures, or whether the furnisher's data is actually accurate.  Is that all fair?

MR. MUELLER:  Objection, misstates prior testimony.

THE WITNESS:  Not within the credentialing group.

BY MR. RISTVEDT:

Q.   I think you may have answered in the negative, but my question was framed in the positive.  So let me just make sure I've understood.

My understanding of your answer is that the credentialing department does not do any of those things. In other words, does not verify the efficacy, does not verify whether they're followed, and does not verify whether the furnisher's data is actually accurate.  All correct?

A.   Correct.

Q.   There's also this reference of Data Furnisher Policy & Procedure Requirements document.  Do you see that?

A.   Yes.

Q.   As best I can tell, we were not produced a

document with this name, or if it has -- or if it was produced, it may have a slightly different name.

Do you know if this document, Data Furnisher Policy and Procedure Requirements, was produced in discovery in this case?

MR. MUELLER:  Objection, foundation.

THE WITNESS:  I don't believe it was.

BY MR. RISTVEDT:

Q.   And I assume that's something you have access to, correct?

A.   Yes.

Q.   What type of information is included in that document, the Data Furnisher Policy & Procedure Requirements?

A.   It's information regarding the client's policies and procedures for those nine components we just covered.

Q.   So it gets presumably more kind of granular detail about what each of those nine components would entail.  Is that a fair characterization?

A.   I would phrase it as it's additional information to help the analyst on looking for whether or not those nine components have been addressed.

Q.   So to my question earlier when -- do you recall I had asked you sort of this Number 1 if there was just a section that said "accuracy," would that fit?  And you had

kind of said it could or something to that effect?

A.    Yes.

Q.    So would this Data Furnisher Policy & Procedure Requirements document, would that have additional guidance to help a credentialing analyst understand whether particular components are satisfied?

A.    Whether -- yes, whether particular components are addressed.

Q.    Okay.  Okay.  I'm going to continue on.

The next level is Reseller.  Do you see that?

A.    Yes.

Q.    Well -- and actually, let me go back just to put a -- to make sure I've got a clean record.

We've just completed our evaluation of Level 5.  We looked at Sections 1 and 2 earlier, doing business as name validation, and obtain permissible purpose supporting documentation.  You agreed that neither of those relate to the data from furnishers.  You would agree with me that Section 3 of Level 5 does relate to the data accuracy policies maintained by furnishers, correct?

A.    Yes.

MR. MUELLER:  I'll object to the intro to that question to the extent it mischaracterizes prior testimony.

BY MR. RISTVEDT:

Q. But you would agree with me that Section Number 3, as you've testified, does not relate to the actual accuracy of a data furnisher's data, correct?

A. Number 3 relates to the data furnisher's policies and procedures. It does not take into account the actual data.

Q. Understood.

Moving on to Level 6. Level 6 relates to resellers, correct?

A. Yes.

Q. And as a consequence, this would not be, at least in most cases, for data furnishers submitting data to Experian. Is that true?

A. I'm -- I'm not sure what the percentage would be.

Q. Well, in other words, for a company like Capital One, Capital One is not a consumer reporting agency reseller, correct?

A. Correct, not a reseller.

Q. So in other words, this would not be applicable to, say, just a company that was doing only data furnishing or a subscriber to Experian, this level is specific to CRA resellers, yes.

A. Yes.

Q. Okay. Number 7 relates to Direct to Consumer

Resellers.  Same sort of question that relates only to the direct to consumer resellers and not companies solely engaged in data furnishing and obtaining credit reports, true?

A.  Correct.

Q.  Number 8, Prequalification Resellers.  Same deal, this is specific to this type of reseller, right?

A.  Yes.

Q.  That completes the eight levels that we've looked at.  Would you agree?

A.  It should be six levels.  I think the -- those numbers were part of Level 6.

Q.  Oh, yes.  My apologies.  I misread the subnumbers as different levels.

Okay.  So having completed the six levels, you would agree with me that none of the actions performed associated with any of those six levels relates to the actual accuracy of data furnished by data furnishers, as we've discussed, correct?

A.  It relates to the data furnisher, not to the actual data, correct.

Q.  And just so that I've got a clean record, I do want to ensure I've got your response clear.

You're saying these levels relate to aspects about the data furnisher itself, but do not in any way

relate to the accuracy of that data furnisher's data.
Would you agree?

A.    It does not relate to the data furnisher's actual
data.  It relates to the data furnisher and their ability
to report accurate data.

Q.    Well, and if it doesn't relate to their data, it
therefore does not relate to the accuracy of that data,
true?

MR. MUELLER:  Objection, vague.  Misleading.

THE WITNESS:  Yeah, I don't know that I
agree with that.

BY MR. RISTVEDT:

Q.    Well, I guess my question is, which of the six
levels relate in any way to the accuracy of the data
itself?

A.    It's -- well, somewhat the data policies and
procedures -- data furnisher policies and procedure
section.  But mostly it's all regarding the entity itself
being a legitimate entity with data that's eligible to be
reported.  But it does not pertain specifically to the
data itself, because we don't receive the actual reported
data in our team.

Q.    And that's what I want to make certain is
absolutely clear.

I understand that the data policies and

procedures section that we reviewed, that relates to whether a furnisher has policies, correct?

A.   Correct.

Q.   But it does not relate to the actual data itself, right?

A.   Again, I think it helps to validate that the source of the data has the ability to report properly with integrity and accurately.  So in my opinion, it doesn't entirely discount that.

So, for instance, if we found a fraudulent entity, we wouldn't allow them to report because we would suspect that their data would be inaccurate.  So based on the entity being legitimate and active and having proper data to report, I feel like it does help.

Q.   Well, I understand what you're saying.  You're saying that it's a legitimate company, and that's what these inquiries are designed to determine.  Is this an actual company?  Are they operational?  And are they actually a legitimate business?  Yes?

A.   Yes.

Q.   But to the example I used earlier, you understand that I could create a business that satisfies each of these levels while having a deliberate intention to furnish inaccurate data, correct?

MR. MUELLER:  Objection, calls for

speculation.  Incomplete hypothetical.

THE WITNESS:  It is possible.

BY MR. RISTVEDT:

Q.   And I could have written policies that I just choose not to follow, correct?

MR. MUELLER:  Same objection.

THE WITNESS:  That is possible.

BY MR. RISTVEDT:

Q.   So in other words, each of these items relates to whether a company is legitimate, whether it's operational, whether it has certain policies, but there's no inquiry performed by Experian to actually determine that a data furnisher's data is accurate, correct?

MR. MUELLER:  Objection, foundation.

THE WITNESS:  Well, I think you're talking specifically about our credentialing policies and procedures, correct.

BY MR. RISTVEDT:

Q.   Yes, correct.  About this document, there's nothing in here that evaluates the accuracy of a data furnisher's actual data, correct?

A.   Correct.

Q.   One moment.  The end of this document, at McCall Experian 616, this really relates to the sort of nuts and bolts of here's how you finalize your investigation,

correct?

A.   Yes.

Q.   So within SalesForce, you would submit the investigation for decision review, you'd fill out some fields in SalesForce, and that's how it completes the investigation, right?

A.   Yes.

Q.   I think I asked a similar question in the other document.  I assume the same answer is true here.  But do you know the identity of the person who made the redactions in the Change Control section?

MR. MUELLER:  I'll do the same objection here.  Object to the extent it calls for attorney-client privileged information, and I'll instruct the witness not to answer, unless he knows independently.

THE WITNESS:  Same response.  I'm not going to answer that.

MR. RISTVEDT:  Understood.

I'm going to place on the screen now what I will designate as Plaintiff's 4.

(Deposition Exhibit 4 was marked for
     identification.)

BY MR. RISTVEDT:

Q.   Have you seen this document before, Mr. Henke?

A.   Yes.

Q.    You're familiar with this one?

A.    Yes.

Q.    What is this one?

A.    The Credentialing Services Data Reporting Policy.

Q.    And this is a considerably shorter policy.  On McCall Experian 641, it says, "The purpose of this policy statement is to establish and define the requirements for accepting new data reporters to FileOne, Experian's consumer credit" report -- or "Experian's consumer credit database, or to the Clarity database."  Did I read that correct?

A.    Yes.

Q.    And I see this states that --

A.    Can you zoom in again, please?

Q.    Oh, certainly.  My apologies.

There's a section here that says, "The FCRA requires Experian . . . to follow reasonable procedures to assure maximum possible accuracy."  Did I read that part correctly?

A.    Yes.

Q.    And then it says, "This policy represents one reasonable procedure to ensure [that] these standards are met," right?

A.    Yes.

Q.    So in other words, this policy is one of these

reasonable procedures to assure maximum possible accuracy that's identified in the preceding sentence, yes?

A.   Yes.

Q.   Now, this one says that the policy is applicable to data reporter -- or data furnishers who report consumer data on accounts originating in the United States in an automated fashion.  Do you agree?

A.   Yes.

Q.   And then it says to qualify for automated reporting, you must comply with the credentialing reporter -- reporting only procedures.

Does that refer to a different document?

A.   No.  The reporting procedures were rolled into the due diligence procedures.

Q.   Understood.

So this is really saying in order to qualify for automated reporting, they would need to qualify through those due diligence procedures we just examined in Exhibit 3.  Is that all right?

A.   Yes.

Q.   And then it does have this exception that we looked at earlier, banks, credit unions, savings and loans, Fannie Mae, and Freddie Mac.  These are largely those exceptions we discussed relating to the physical and virtual inspections, yes?

A.    Yes.

MR. MUELLER:  Objection, misstates prior testimony.

BY MR. RISTVEDT:

Q.    There's also this note here, "Additionally, any new data furnisher must meet all other data contribution policies."

When it says "all other data contribution policies," does that relate to those -- the other due diligence policies from Exhibit 3, or is that a separate group of policies entirely?

A.    There are no other policies and procedures that they have to relate to other than the ones you received there.

Q.    Okay.

A.    So that procedure is the same due diligence procedure.

Q.    Understood.

In the Policy section, it says "New data furnishers must meet all Credentialing requirements in accordance with the Potential Subscriber Investigation Policy."  Now this one I understand is a different discrete policy.  Is that true?

A.    Yeah, it's a different credentialing policy.

Q.    And if I can jump to Exhibit 5 for just a moment.

You can see Exhibit 5 is in fact the Potential Subscriber Investigation Requirements Policy, yes.

A.   Yes.

Q.   I also note that it says, "In addition, all new data furnishers will be required to provide proof of financing by either a lending license or the lender terms and conditions, and application the potential client has the consumers sign, or by another form of documentation, with the exception of" -- and then it lists some exceptions there.  Do you see that?

A.   Yes.

Q.   Does this relate to when we looked at those different permissible purposes, the documentation that they're required to provide, is it those requirements, or is this separate and additional to those requirements?

A.   It's those requirements --

Q.   Okay.

A.   -- in the due diligence procedure.

Q.   Moving on to McCall Experian 642.  There's a section on Unacceptable Data.  This section relates to different types of data that Experian does not accept for credit reporting, true?

A.   Yes.

Q.   So for instance, Experian does not report or accept data for, like, towing charges, different fines and

fees, from this first bullet point, correct?

A.    Correct.

Q.    And then the same would be true for these sort of clubs, like health clubs, karate clubs, DVD or book clubs, correct?

A.    Correct.

Q.    So I just want to confirm these sections that identify the different types of data Experian does not accept, this doesn't relate to, say, different tradelines reported by furnishers, but rather different types of debts that Experian will not accept credit reporting data for.  Is that true?

                MR. MUELLER:  Objection, vague.  Foundation.

                THE WITNESS:  Can you clarify the question, please?

BY MR. RISTVEDT:

Q.    Sure.  Really what I want to make certain I understand is this really is only saying we don't accept data for these types of debts.  Is that true?

A.    Yes, it's true.

Q.    So nothing within this document -- similar question that I had throughout Exhibit 3 -- nothing relates to the accuracy or reliability of data furnishers and their data within this document.  Is that true?

A.    It doesn't pertain to their actual data.  That's

what you're asking, correct?

Q.    Correct.

A.    Yes, that's true.

(Deposition Exhibit 5 was marked for identification.)

BY MR. RISTVEDT:

Q.    Moving on to Exhibit 5.  This is the Potential Subscriber Investigation Requirements Policy we discussed a few moments ago, is it not?

A.    Yes.

Q.    This is another short policy.  This one on McCall Experian 632.  This says, "The purpose of this policy is to fulfill the requirements outlined in the FCRA and the GLBA in order to protect consumer privacy and the integrity of Experian's consumer credit database."

Did I read that correctly?

A.    Yes.

Q.    Now, this one says the scope is it applies to all clients requesting access to consumer credit data regulated by the FCRA, by the GLBA, and clients requesting the ability to report data regulated by the FCRA and the GLBA, correct?

A.    Yes.

Q.    So this does apply to data furnishers who are supplying Experian with credit information based on that

third bullet point, true?

   A.   Yes.

   Q.   This relates to, it says -- the Policy says, "To access consumer credit information, Experian clients must comply with the Credentialing Services Industry Risk Policy in addition to meeting the following standards." Did I read that correctly?

   A.   Yes.

   Q.   Now a number of these items appear to relate to the due diligence procedure that we looked at in Exhibit 2.  For instance, being a bona fide or legitimate entity, Experian's physical inspection, financial responsibility, things like that that we looked at in Exhibit 2, correct?

   A.   Correct.

   Q.   So in other words, same question as Exhibit 4, nothing herein relates to the actual accuracy of a furnisher's data.  Rather, it specifies that the furnisher has to comply with those procedures from Exhibit 3 that we looked at earlier, correct?

            MR. MUELLER:  Form.

            THE WITNESS:  With the due diligence procedure.  I forgot what exhibit number it was, but yeah.
BY MR. RISTVEDT:

   Q.   It was Exhibit 3.

And I may have had a jumbled up compound question, so let me restate that.

Exhibit 5 does not relate to the actual accuracy of a data furnisher's data, true?

A.    It does not relate specifically to the data itself or the data's accuracy.

Q.    I'm going to move on to Plaintiff's Exhibit 6.

(Deposition Exhibit 6 was marked for identification.)

BY MR. RISTVEDT:

Q.    Have you seen this document before?

A.    Yes.

Q.    And are you familiar with this one?

A.    Yes.

Q.    What is this one?

A.    Credentialing Services Industry Risk Policy - FCRA.

Q.    And if I continue on to McCall Experian 648, this one talks about which industries Experian declines to do business with, correct?

A.    Correct.

Q.    Now, I understand there were those tables we looked at in the due diligence procedures.  Do you recall that?

A.    Yes.

Q.    Is this policy in addition to those tables, or is this the same kind of information?

A.    It's the same information.

Q.    Okay.  So in other words, this is essentially restating the information that we looked at in Exhibit 3 talking about the different industries and different types of businesses that present some risk component.  Is that true?

A.    It covers the same -- so this is the policy and the procedures, how we enforce the policies.  So it's the same from that context.

Q.    Got it.

So in other words, the policy sort of describes what it is and why it exists, the procedure explains what Experian actually does to comply with the policy.  Is that a fair summary?

A.    Yes.

Q.    I'm going to move on to Plaintiff's Exhibit 7.

MR. RISTVEDT:  Although, I think -- Ryan, correct me if I'm wrong, I think we've been going about an hour?

MR. MUELLER:  Yeah, I believe so.

MR. RISTVEDT:  Okay.  I'm guessing I have maybe 45 minutes left.  Now seems like a pretty natural stop point.  We could take another five minutes, if that's

good.

MR. MUELLER:  Sure.  Let's go off the record real quick.

THE COURT REPORTER:  We are off the record. Time is 1:20 p.m.

(A recess ensued.)

THE COURT REPORTER:  We are on the record. Time is 1:25 p.m.

BY MR. RISTVEDT:

Q.   Okay.  Perfect.

And, Mr. Henke, you understand you still remain under oath, yes?

A.   Yes.

Q.   Okay.  Just a couple exhibits left.  I'm going to place Exhibit 7 on the screen.

(Deposition Exhibit 7 was marked for identification.)

BY MR. RISTVEDT:

Q.   Have you seen this document before?

A.   Yes.

Q.   And you're familiar with this one?

A.   I am.

Q.   What is this document?

A.   Again, if you could please zoom in a little bit.

But it's the Credentialing Services

Procedure Recredentialing Procedure.

Q.    And by recredentialing, my understanding is this would be credentialing procedure that applies to customers who have already been credentialed at some point in the past.  Is that accurate?

A.    Yes.

Q.    Now, I want to ask you about the application of this procedure.  And I see here on McCall Experian 545, there is a section Introduction.  Do you see that?

A.    Yes.

Q.    And it says, "This procedure applies specifically to permissible purpose certification of all Experian Information Services and Clarity inquiry clients on an annual basis," correct?

A.    Yes.

Q.    The second sentence says, "This includes information governed by the FCRA and/or the Gramm-Leach-Bliley Act."  Do you see that?

A.    Yes.

Q.    Now, in previous documents, there's been some sort of reference to information sent to Experian under the FCRA or FileOne, but I'm not seeing anything similar here.

So similar question that I had to the other documents, does this apply to data furnishers in addition

to the permissible purpose certification, or is it only the permissible purpose certification?

A.   It also applies to data furnishers.

Q.   So this document --

A.   Sorry.

Q.   That's quite all right.

This document describes how Experian will perform recredentialing each fiscal year, which runs from April 1 through March 31, correct?

A.   Correct.

Q.   Now, this first step says that Experian creates the annual targeted list, which is done by contacting data management and mainframe to get the current list of data furnishers, right?

A.   Correct.

Q.   Are all data furnishers subject to this annual recredentialing process, or are there specific ones that are identified by the data management and mainframe team?

A.   It's all active furnishers.

Q.   So all data furnishers, every single year, go through this recredentialing process.  Am I understanding you correctly?

A.   All active furnishers.

Q.   My apologies.

So all furnishers who are actively

furnishing data to Experian would be subject to recredentialing each year?

A.   Yes.

Q.   Okay.  I also noted there is a reference here that says, "Credentialing will start a Recredentialing review if a client has been identified by Compliance Investigations or the Data Furnisher Monitoring Committee, as well as upon request by any other area."  Do you see that?

A.   Yes.

Q.   Why would the Compliance Investigations or Data Furnisher Monitoring Committee request a recredentialing review?

A.   Well, anybody can request it.  We re-review a client for any reason.  So if we have an employee in our investigations or from our Data Furnisher Monitoring Committee that identify some aspect of the client that they feel is in -- I don't know -- they feel needs validation, they could notify us and we would kick off a recredentialing request of that entity.

Q.   Have you received requests like that?

A.   Yes.

Q.   Do those requests ever relate to a data furnisher's repeated disputes or frequent allegations that the data furnisher has furnished inaccurate information?

A.   Yes.

Q.   And when those types of requests come, do they come from the Compliance Investigations team or the Data Furnisher Monitoring Committee or both?

A.   It can come from anyone.  But typically, the request that you specifically described would more likely come from the data furnisher team.

Q.   Who is the Data Furnisher Monitoring Committee?

        MR. MUELLER:  Objection, outside the scope of the notice.

        THE WITNESS:  Yeah, it's -- it's a group of employees that review the data of a data furnisher.

BY MR. RISTVEDT:

Q.   Are those employees within the credentialing department or another department?

A.   So there are employees in credentialing that can be on the committee but don't review the specific data. So I guess the committee -- if I could maybe clarify, they review the results of the data reviews.

Q.   So the Data Furnisher Monitoring Committee is some group of Experian employees that in some capacity evaluates Experian's data furnishers.  Am I understanding that at a high level correctly?

A.   They evaluate the data furnisher's data and then the credentialing department validates the data furnisher.

Q.   When you say they evaluate the data furnisher's data, do you have any knowledge about what their analysis entails?

MR. MUELLER:  Objection, outside the scope of the notice.

THE WITNESS:  I don't do the analysis, so I wouldn't know the specifics.

BY MR. RISTVEDT:

Q.   So I understand there are a bunch of different sections of this recredentialing.  Some of them may be inapplicable, but I want to ensure that I understand this process.

Initially, the list, which is referenced as the annual targeted list, is developed to identify the furnishers that will be -- or the customers, rather, that will be subject to recredentialing that year, correct?

A.   Yes.

Q.   And then it says that these requests are then bulk loaded into SalesForce at the beginning of the fiscal year, a SalesForce case is created for the recredentialing process, correct?

A.   Yes.

Q.   When Experian performs its annual recredentialing, how does that process differ from the initial credentialing that's performed as part of the due

diligence procedure from Exhibit 3?

A.   It differs in that the client is already existing.  So, for example, their application is already at Experian, in-house.  We've already validated certain aspects in our history with that client, so it's a repeat, but they're existing.

Q.   Understood.

So some of the tasks performed in the onboarding and credentialing of new furnishers does not need to be repeated for recredentialing.  Have I understood your testimony correctly?

A.   No.  Gathering of some information, like an application, wouldn't need to be repeated.

Q.   Understood.

A.   Yeah, if you see -- in the procedure it describes the due diligence is the same and references the due diligence procedure.

Q.   Number 3 says that "Each Request [is] processed through a Recredentialing bot for completion."

When it refers to request, what does the term "request" mean in this context?

A.   Request is the object in SalesForce.  So it's how we described earlier, they're bulk loaded into SalesForce, each one is bulk loaded as a request.

Q.   So the request relates to the -- that's just

another name for the investigation for the recredentialing process. Is that correct?

A. Yeah, it's this particular recredentialing for a particular client. So it's the one that's assigned to that account in SalesForce.



Q.    When there's this reference to a Triggers Program, what does that mean or what's the significance of a Triggers Program?

A.    The Triggers Program is essentially another input to creating recredentialing requests. We use the -- what we refer to as that targeted list or the target list, and we load them into an Experian product that monitors those companies for certain activities, and if those instances happen, then we can be alerted to it and then validate through a recredentialing request.

Q.    When you say it sort of evaluates for certain activities, what types of activities is it evaluating for?

A.    Yeah, it's -- it's monitoring the account for activities. For instance, there's an active flag if the company is -- terminates their articles of incorporation and is no longer an active company, we can be notified. I think they're listed lower. Bankruptcy might be one of them.

Q.    And here on McCall Experian 548, is this the list you're referring to?

A.    Yes.

Q.   So when you said the -- in an instance where the articles of incorporation might be rescinded or no longer active, would that be this activity indicator change or AIC?

A.   Yes.

Q.   So this is some sort of ongoing alert.  I see that there's a reference to it gets downloaded and then saved in some capacity.  For instance, here on McCall Experian 549, there's a reference to the Triggers Excel file from January 31 of 2022.  Do you see that?

A.   Yeah.

Q.   How often is this Triggers alert file saved?

A.   I don't have a specific answer for that.

Q.   But in other words, I guess, is it an ongoing thing where it's every few weeks or every few months, some periodic basis?

A.   Yeah, it's, exactly, a periodic basis.  And then depending on if there are Triggers -- I mean, it could be that none of the clients had Triggers.  But it's --

Q.   My apologies.  Go ahead.

A.   But it is an ongoing basis, correct.

Q.   So the next section relates to confirming the entity is active, beginning on McCall Experian 549, page 7 of this document.  Do you agree?

A.   Yes.

Q.   Now, this spans for roughly nine pages, ten pages, down to page 16.  But as I understand all of this Confirming Entity is Active really relates to similar things that we looked at in the due diligence portion, making sure this company is still active, they are a legitimate business, right?

A.   No.

Q.   Oh, okay.  What's the distinction between this Confirming Entity is Active section in the recredentialing process?

A.   This pertains to the does the entity have an active account with Experian.

Q.   Oh, okay.  So this relates to are they currently using Experian's services and/or furnishing data currently to Experian.  Is that it?

A.   Yes.

Q.   Okay.  And it looks like that's done through some mechanism of reviewing data from Experian's various software.  Is that correct?

A.   Yes.

Q.   So in other words, this is not, as we've been discussing throughout the day, it's not relating to the accuracy of data, but rather is this company currently using Experian's services and/or furnishing data, correct?

A.   That's what this section is, correct.

Q.    Going to page 16, the Investigation Requirements beginning on McCall Experian 558.  Here, this section begins with Due Diligence.  Do you see that?

A.    Yes.

Q.    And it references that FCRA clients should have completed at least a Level 5 due diligence.  When it says "should have completed," am I correct in understanding this is past tense?  In other words, saying they should have already done this?

A.    No.  It means that they should complete Level 5 to continue.  In other words, to pass the recredentialing evaluation.

Q.    Okay.

A.    So in other words, they should have completed a Level 5 to complete the recredentialing process.

Q.    Understood.

So "should have" in this context is not past tense, but they're saying they should have this done as part of the recredentialing.  Am I understanding you?

A.    Yes.  It's referencing that the analyst should be essentially applying the due diligence procedure Level 5 in order to complete the process.

Q.    These next sections relate again to those Levels 1 through 5 from the due diligence document that we already looked at today, correct?

A. Yes, it's a repeat.

Q. Now continuing on, there are some specific items for things -- for different lenders. But as I understand it, these generally relate to similar requirements to those from the due diligence procedures document that we looked at in Exhibit 3. Is that also correct?

A. Yes, that's correct.

Q. I want to go down to page 26. This is McCall Experian 568. This is a section on suspensions and rejections, correct?

A. Yes.

Q. And when I see suspensions and rejections, my assumption is that this relates to suspending an entity's

ability to use Experian's products and services.  Is that true?

A.    Yes, suspending or terminating the account, that's what the rejection refers to.

Q.    And so essentially this relates to there are some instances where either a subscriber or a furnisher may have their account suspended or potentially terminated, depending on circumstances.  Is that accurate?

A.    Yes.

Q.    So Number 1 doesn't seem to relate to when a suspension occurs.  But Number 2 says that it can relate to circumstances where the client is reporting unacceptable data, correct.

A.    Yes.

Q.    And this relates to those types of data that we looked at earlier, so, you know, the club -- the ongoing clubs or -- or things like that, criminal records, that Experian does not accept as data, correct?

A.    Correct.

Q.    And so in those instances, the response is we request that the furnisher immediately stop doing this, we provide them with the ineligible data list, and we say, you can't report that data anymore, right?

A.    Yes.

Q.    And then it says the sort of outcome of that is

if the customer disagrees -- in other words, they say, "Well, we want to keep reporting this karate club information" -- at that point Experian might potentially terminate their account, yes?

A. Correct.

Q. It also makes reference to suspensions due to discrepancies about the client's permissible purpose eligibility in Number 3. Do you see that?

A. I do.

Q. When it makes reference to discrepancies in the permissible purpose eligibility, does Experian perform any sort of audit into the permissible purpose inquiries made by a subscriber in the previous year?

MR. MUELLER: Objection, foundation.

THE WITNESS: Credentialing will not look at the actual inquiries on the credit report.

BY MR. RISTVEDT:

Q. So is the analysis of the client's permissible purpose eligibility referenced here, does that relate to the providing of documentation that we looked at earlier for each of the different types of permissible purposes?

A. Yes, that would pertain here.

Q. So in other words, like if I was a creditor providing firm offers of credit and when I was recredentialed this year, I failed to provide the

necessary documents, that would be one of these discrepancies for client's permissible purpose eligibility.  Have I understood this correctly?

A.    Yes, that could fall into this category.

Q.    And then I assume the same is true as it relates to the discrepancies related to the client's business information, if I fail to provide information or if the due diligence procedure identifies a discrepancy with, say, my address or phone number, that could potentially result in a suspension or termination, correct?

A.    Yes.

Q.    Are there any suspensions or rejections or account -- or account terminations that are made based on, say, the number of disputes that a data furnisher received in a particular year?

MR. MUELLER:  Objection, foundation. Outside the scope.

THE WITNESS:  Not in the credentialing department.

BY MR. RISTVEDT:

Q.    And yes, I should clarify.

Limiting our discussion solely to this recredentialing process, does any of this recredentialing process consider in any way the number of disputes that a data furnisher received the prior year?

APPENDIX 1579

A.    Not from our credentialing process, no.

Q.    What about the accuracy of the data that the data furnisher submitted in the prior year?

A.    Again, not in the credentialing process.

Q.    I also note, if we continue on to McCall Experian 572, there's a section Suspension & Rejection Escalated Accounts Committee.  Do you see that?

A.    Yes.

Q.    Is this a committee within the credentialing department or something else entirely?

A.    This one is within the credentialing department.

Q.    Who is on the Suspension & Rejection Escalated Accounts Committee?

A.    It's the credentialing --

        MR. MUELLER:  Objection, vague.

BY MR. RISTVEDT:

Q.    And I'm sorry.  I didn't quite catch that.

        You said the credentialing what?

        THE WITNESS:  I don't know.  Ryan, did you finish?

        MR. MUELLER:  Yeah, I just said objection, vague.

        Go ahead.

BY MR. RISTVEDT:

Q.    Oh, my apologies.

A.    It's the credentialing leadership team that we referenced earlier.

Q.    Okay.  So in this case, this is referencing escalated accounts that are potentially going to be suspended or rejected, presumably based on those items we looked at previously, correct?

A.    This stuff from the due diligence procedure, correct.

Q.    Okay.  Are there any exceptions to the annual recredentialing that exists either with respect to particular industries or particular companies?

MR. MUELLER:  Objection, compound.

THE WITNESS:  Can you clarify, exceptions to what exactly?

BY MR. RISTVEDT:

Q.    Sure.

So for instance, earlier we were talking about the physical and virtual inspection of companies, and there are certain industries for which that requirement does not exist.  There are exceptions where those companies don't have to go through those inspections, right?

A.    Yes.

Q.    So my question is, are there exceptions for the recredentialing process on an annual basis?

A.   So is there an exception to the -- what I had mentioned earlier about all active clients being recredentialed?

Q.   Correct, yes.

A.   No.  All active clients are -- land on the target list and are recredentialed.

Q.   Understood.

So in other words, for Capital One, the furnisher at issue in this case, they've been subject to an annual recredentialing every year for presumably the last however long this recredentialing process has been in place.  Is that fair?

A.   Yes, with the exception of maybe the first or second year.  It took more than one year to launch the program.

Q.   Understood.

And if I go down to the change control, I see this policy was -- or this procedure rather -- was implemented in August of 2020.  So you're saying it would have been implemented in 2020, but potentially not fully rolled out until sometime in 2021.  Is that fair?

A.   Yeah, that's fair.

Q.   And so for Capital One, for instance, presumably they would have at least recredentialing from 2021, '22, '23, '24, and potentially '25 since I think the fiscal

year is March to April.  Is that true?

A.    Yeah.

Q.    And the results of those recredentialing investigations would each be saved in Capital One's SalesForce file, true?

MR. MUELLER:  Objection, form.  Vague.

THE WITNESS:  Yeah, the record of each recredentialing would be under the Capital One SalesForce account.

BY MR. RISTVEDT:

Q.    The last exhibit I'm going to show you -- this is Plaintiff's Exhibit 8.

(Deposition Exhibit 8 was marked for identification.)

BY MR. RISTVEDT:

Q.    Have you seen this document before?

A.    Yes.

Q.    And you're familiar with this one?

A.    I am.

Q.    What is this one?

A.    The Credentialing Services Recredentialing Policy.

Q.    So this is the policy.  And as we've discussed earlier, the policy sort of gives a higher level overview of what it entails and what it's for, whereas the

procedure that we just looked at in Exhibit 7 provides more of the details about how the policy is carried out. Is that all true?

A.   Yes.

Q.   So going to McCall Experian 625, it says, "The purpose of this policy statement is to establish and define the requirements for not only verifying existing client's certified permissible purpose for accessing Experian's consumer credit database, but also existing data furnishers to FileOne.  This policy includes information governed by the FCRA and/or the GLB."  Did I read all that correctly?

A.   Yes.  But can -- I have to ask if you can zoom in?

Q.   Yes, of course.

Is that better?

A.   Yep.

Q.   So this essentially is saying what we've already discussed, which is that this is applicable to both validating that the permissible purposes that subscribers are using are still correct and validating -- or in going through the recredentialing process with furnishers, correct?

A.   Yeah.  It states we'll do the recredentialing on both the subscribers that are inquiring and the data

furnishing subscribers.

Q.    And this one again says that this policy represents one of those reasonable procedures to assure maximum possible accuracy that we discussed earlier, yes?

MR. MUELLER:  Objection, to the extent mischaracterizes the document.

BY MR. RISTVEDT:

Q.    And my apologies, Mr. Henke.  Your answer?

A.    Yes, that's what it reads.

Q.    So in a nutshell, this document really just says that our policy is that you have to go through this recredentialing process, and that Exhibit 7 we looked at has all of the actual steps that are entailed by that recredentialing process, yes?

A.    Yes.

Q.    And effectively, the steps for that recredentialing process are the same as the steps from Exhibit 3, the due diligence procedure, correct?

A.    Correct.

Q.    There's a reference here to unacceptable data.  I just want to ensure I understand this is the same sort of list that we've looked at a couple times in other capacities, correct?

A.    Yes.

Q.    So the last -- I don't have any additional

exhibits to share, but I do have some questions concerning Capital One as a data furnisher.

Capital One has been furnishing data to Experian since prior to 2020.  Is that true?

A.    That's my understanding, yes.

Q.    And so as I understand your testimony from earlier, Capital One has never provided Experian with any sort of data accuracy policy and procedure since they were grandfathered in prior to that policy requirement being put in place.  Is that true?

MR. MUELLER:  Objection, to the extent it mischaracterizes testimony.

THE WITNESS:  I don't know for certain, but I don't believe they have.

BY MR. RISTVEDT:

Q.    In order to confirm whether they had or not, you would review the SalesForce account file, correct?

A.    Yes.

Q.    And that would have an attachment that's like a PDF or something like that, if they had provided that?

A.    Yes.

Q.    Do you know when Capital One was first credentialed by Experian?

A.    I am not certain when their first credentialing took place.

APPENDIX 1586

Q.    Would that also be in the SalesForce account file?

A.    It most likely would be.  I think our account with Capital One predates our SalesForce implementation, but I believe it should have transitioned in there, yes.

Q.    So to the extent that it does exist, it would be in that SalesForce account file.  Is that fair?

A.    Yes.

Q.    And I assume the same would be true if whatever kind of prior iteration of the credentialing application that Capital One submitted, if that was in existence, it would be maintained within the SalesForce account file that Experian has for Capital One.  Is that true?

A.    Yes.

Q.    As we sit here today, do you have any knowledge as to whether or not Experian has ever performed an on-site physical inspection for Capital One in conjunction with a credentialing due diligence investigation?

A.    No, I'm not aware of an on-site inspection for Capital One.

Q.    And other than the recredentialing that Capital One would be subject to each year, is there anything that you're aware of that Experian has done from a credentialing perspective with respect to due diligence investigations of Capital One?

A.    Within credentialing, beyond the recredentialing, no.

Q.    So in other words, the extent of the credentialing department's inquiry into Capital One would consist solely of the recredentialing investigations from roughly 2021 through the present, and then potentially whatever documents are maintained within that SalesForce account file we've been discussing.  Is that all true?

MR. MUELLER:  Objection, form.

THE WITNESS:  I mean, there is a possibility that they've requested a new product, which warranted us re-reviewing their account, which would look similar to a recredentialing report.

BY MR. RISTVEDT:

Q.    If they had done that, that would also be documented within the SalesForce account file, correct?

A.    Yes.

Q.    Okay.  So basically anything that would relate to the credentialing department's evaluation of Capital One, it would all be maintained, to the extent it exists, within that SalesForce account file, fair?

A.    Yes, that's correct.

Q.    And as we've discussed throughout the day, at least from the credentialing department, there would never be an inquiry from anybody within the credentialing

department as to the accuracy of Capital One's data, true?

A.    That's correct.  We wouldn't ask specifically about data because we don't have the data to look at on our side.

MR. RISTVEDT:  Okay.  If we can take a five-minute break just so I can go over my notes.  I think I'm wrapped up, but I want to make sure I haven't -- I've sort of been off script for quite a while, so I want to make sure I haven't missed anything.

Daniel, can we take a five-minute break to just go off the record and come back?

THE COURT REPORTER:  We are off the record. Time is 2:06 p.m.

(A recess ensued.)

THE COURT REPORTER:  We're on the record. Time is 2:10 p.m.

BY MR. RISTVEDT:

Q.    Okay.  Mr. Henke, I did not mean to get your hopes up.  I do have just a couple more minutes of questions, but I expect should be no more than five minutes or so.

I think I know the answer to the majority of the questions I have remaining, but I want to ensure that I ask and have clarity.

I'm going to reshare my screen.  This is

Exhibit 1 containing the topics for today.  Do you recall looking at this early on in the deposition?

A.    Yes.

Q.    One of the topics relates to data audits.  And I understand from looking at the credentialing procedures that the credentialing procedures don't get into sort of the technical data audit or data conformity reviews with the furnishers.  Is my understanding correct?

A.    Yes, that's correct.

Q.    In other words, your department, the credentialing department, things like data audits and reviewing Metro 2 conformity, things like that, that would not be within the purview of the credentialing department. Is that true?

A.    Yes, that's correct.

Q.    Similarly, one of the things that Experian has made representations about is that there are certain contractual provisions that require a data furnisher to agree to furnishing accurate information.

It's my understanding from our review today that the credentialing department does not involve a review of, say, contractual provisions or a furnisher's compliance with contractual provisions.  Is my understanding correct about that as well?

MR. MUELLER:  I'll just object to the

introduction to that question to the extent it mischaracterizes the record.

Go ahead.

THE WITNESS:  We'll review to ensure the appropriate contracts are in place with the data furnisher, but we don't audit the data furnisher to the contract.

BY MR. RISTVEDT:

Q.   Understood.

In other words, it's more of a do we have the contract?  Is it signed?  Things like that, as opposed to look at a substantive review of the provisions.  Have I understood you correctly?

A.   Yes.

Q.   Okay.  The other thing I want to make sure I understand, we discussed the -- I'm returning now to Exhibit 3.

We discussed the Level 5, the Data Accuracy Furnisher Policy and Procedure, the requirement that a new data furnisher has to provide Experian with written copies of its data accuracy policies and procedures.  Do you recall our discussion about this section earlier?

A.   Yes.

Q.   And I know I had asked you a number of questions about whether Experian makes any inquiry into the efficacy

of those policies or whether they're followed, things like that. Do you recall my questions to that effect?

A. I recall them.

Q. Within the credentialing process, and specifically the due diligence process, is there any requirement that a furnisher provide any sort of certification that it does, in fact, follow the procedures that it provides to Experian?

A. No.

Q. Is there any sort of requirement that the furnisher certify that the policies and procedures are effective?

A. I'm not aware of that certification.

Q. Beyond the requirement that the policies and procedures are provided to Experian, is there any other requirement associated with this Data Accuracy Policies and Procedures section that's not detailed in this document?

A. I would say no. I mean, not that there's not already documented here.

MR. RISTVEDT: Okay. Ryan, I have nothing further. I will pass the witness.

MR. MUELLER: Mr. Henke, I want to thank you for your time today. I don't have any questions.

I have a couple of housekeeping matters. We

will designate this transcript read and sign -- we will read and sign this transcript for errata.  And we will provide confidentiality designations pursuant to the confidentiality order on file.  And we ask that in the interim, until we are able to provide those designations pursuant to the confidentiality order, this is designated as confidential, attorneys' eyes only.

MR. RISTVEDT:  Understood.

Well, we'll wait for the confidentiality designations and go from there.

Daniel, before we go off the record, plaintiff will take -- I'll do my usual, e-tran only.  I don't need exhibits.  But I will have -- I don't think it's going to be Sean because I think he's out the rest of the day, but I will have the exhibits circulated to you and opposing counsel probably by end of day.  But if not, it may be by Monday, dependent upon availability of folks who can do it.

THE COURT REPORTER:  Okay.  Sure.  Fair enough.  That's fine.

Ryan, a copy for you or just read and sign for the witness?

MR. MUELLER:  Let's just do a read and sign for now.  And I'll get your contact information and we can reach out later if we need a copy of something.

THE COURT REPORTER:  Got it.

MR. MUELLER:  You can send the read and sign to me, and I'll get it over to Mr. Henke.

THE COURT REPORTER:  You bet.  Okay.  We are off the record.  Time is 2:17 p.m.

(The deposition was concluded at 2:17 p.m.)


_____
                    PETER HENKE

Charles McCall vs. Experian Information Solutions, Inc. -
30(b)(6) and 30(b)(1) Experian Information Solutions, Inc. - Peter Henke

October 3, 2025
162

STATE OF ARIZONA )

COUNTY OF MARICOPA )

BE IT KNOWN the foregoing proceedings were taken before me at the time and place herein set forth; that I was then and there a Certified Electronic Reporter and Notary Public in and for the County of Maricopa, State of Arizona; that the questions propounded by counsel and the answers of the witness thereto were taken by me electronically and thereafter reduced into typewritten form under my direction; that the foregoing pages are a full, true, and accurate transcript of all proceedings and testimony, all to the best of my skill and ability.

I FURTHER CERTIFY that I am in no way related to nor employed by any parties hereto nor am I in any way interested in the outcome hereof.

DATED at Phoenix, Arizona, this 13th day of October, 2025.

_____
Daniel Rohan, CER
Certified Electronic Reporter #4137
and Notary Public
My Commission Expires: June 28, 2027

Charles McCall vs. Experian Information Solutions, Inc. -
30(b)(6) and 30(b)(1) Experian Information Solutions, Inc. - Peter Henke

October 3, 2025
Index: $500..acceptable

**$**

**$500** 78:22

**(**

**(a)** 23:22

**(c)** 85:21

**(d)** 86:2

**(i)** 88:25

**1**

**1** 22:15,19 23:22 48:18 49:7,10 50:12,13,18 66:12,22 68:13 70:11 82:5,15 84:6 87:11 89:17 99:15 102:17,23 109:19 113:24 114:16 132:9 142:24 143:12,17 144:10

**1.0** 106:2

**10** 7:3,4,6 10:17

**10:02** 5:4

**10th** 38:11

**11** 143:9

**11:01** 45:9

**11:07** 45:12

**12** 11:25

**123** 38:10

**12:05** 83:19

**12:12** 83:22

**12:42** 104:1

**12:43** 104:4

**15** 7:3,4,5,6,7

**16** 141:2 142:1

**1:20** 130:5

**1:25** 130:8

**1a** 84:21,23

**1b** 85:2

**2**

**2** 22:25 23:3 24:15,18 26:12 47:3,18 48:18 49:10 50:13 66:9,11 69:4 70:10 75:5 82:4,6,8 84:6 86:8 89:18 95:19 96:5,7,17 102:12,17,23 104:20 114:16 127:11,14 144:11

**2002** 11:15,22 12:1,12 13:25

**2002-ish** 11:13

**2003** 14:15

**2007** 15:11,14 17:3

**2014** 17:6,8,19 18:16

**2020** 19:8 149:19,20 153:4

**2021** 41:18 149:21,24 155:6

**2022** 106:3,9,20 107:2,4,8 140:10

**2025** 5:4

**22** 149:24

**23** 11:12 149:25

**24** 7:23 149:25

**25** 149:25

**26** 143:20

**27** 106:3

**2:06** 156:13

**2:10** 156:16

**3**

**3** 5:4 27:17 45:21,22 48:19 49:10 50:14 84:7 87:24 89:16,18,19 96:18 98:11 104:7 114:20 115:3,5 122:19 123:10 125:22 127:19,25 129:5 136:1,18 137:25 138:3,7 143:6 145:8 152:18

**30(b)(6)** 5:5

**31** 132:9 140:10

**3rd** 80:21

**4**

**4** 46:19 49:10 61:15 79:6 88:5 90:3 91:3,8 95:9,23 96:3 98:19,21 99:4,23 120:20,21 127:16

**40** 60:13

**42-page** 46:7

**45** 129:24

**472** 5:11

**5**

**5** 7:3,4,6,7 10:17 49:9,11 62:25 75:22 79:12 89:14 91:9 99:10 102:13 104:7 114:16,20 123:25 124:1 126:4,7 128:3 142:6,10, 15,21,24 143:12,17

**50** 75:21 82:25 83:1

**545** 131:8

**548** 139:23

**549** 140:9,23

**558** 142:2

**568** 143:21

**572** 147:6

**582** 46:11

**583** 46:11

**584** 46:19 48:25

**587** 71:2

**592** 80:20

**6**

**6** 64:16 115:9 116:12 128:7,8

**60013** 5:12

**606** 96:22

**610** 103:5 104:17

**611** 104:17

**616** 119:24

**617** 105:25

**625** 151:5

**632** 126:12

**637** 28:15,19

**638** 40:15

**641** 121:6

**642** 124:19

**648** 128:18

**7**

**7** 22:25 23:3 115:25 129:18 130:15,16 140:23 151:1 152:12

**8**

**8** 101:15 116:6 150:12,13

**9**

**9** 104:18

**987** 38:10

**99** 75:22

**9:01** 45:6

**9:06** 45:7

**A**

**a.m.** 5:4 45:9,12

**abbreviated** 28:14

**ABC** 51:13,15,17 55:4,6 88:7 93:13,17 95:2,7 99:16,19

**ability** 7:23 8:3 9:24 22:7 41:21 98:24 104:21 117:4 118:7 126:21 144:1

**absolutely** 28:4 103:22 117:24

**absorbed** 20:2

**accept** 124:21,25 125:9, 11,18 144:18

**acceptable** 49:19 64:18 84:23

Charles McCall vs. Experian Information Solutions, Inc. -
30(b)(6) and 30(b)(1) Experian Information Solutions, Inc. - Peter Henke

October 3, 2025
Index: accepted..April

**accepted** 100:8

**accepting** 121:8

**access** 35:9 36:2 44:12 47:22 61:2 62:6 85:10 113:9 126:19 127:4

**accesses** 48:4

**accessing** 46:23 47:15 151:8

**accordance** 123:21

**account** 50:24 51:3,15, 17,23 52:4,10,12,14,25 54:1,22 55:6 59:4 66:14 79:3 94:10 100:12 115:6 137:5,11 139:17 141:12 144:3,7 145:4 146:13 150:9 153:17 154:1,3,7,12 155:8,12,16,21

**accounted** 102:9

**accounting** 52:16

**accounts** 41:21 50:13,23 51:6 122:6 147:7,13 148:4

**accuracy** 26:8 98:22 99:1 102:18,24 103:6,13 104:7, 12,19 106:6,15,22,25 107:7,18 108:1,6,12,15 109:6,13,18 110:10,16 113:25 114:21 115:4 116:18 117:1,7,14 119:20 121:18 122:1 125:23 127:17 128:4,6 141:23 147:2 152:4 153:8 156:1

**accurate** 25:22 66:23 67:2,11 68:1,4,22 82:9,17 86:14 90:1 98:25 99:5,8 111:20 112:5,18 117:5 119:13 131:5 144:8

**accurately** 7:20,24 8:3 118:8

**accusations** 64:12

**accused** 64:8

**achieve** 102:8

**acronym** 57:19 69:5 70:17

**acronyms** 70:18

**act** 30:5 46:24 63:11,13 131:18

**action** 91:22 93:14,17

**actions** 50:7,18 53:16,20, 22 68:17 91:18 92:1,25 93:24 95:3 116:16

**active** 64:17,23 65:8 67:10,16 78:5 118:13 132:19,23 139:18,20 140:3,23 141:3,5,9,12 149:2,5

**actively** 132:25

**activities** 47:22 68:17 139:12,16,18

**activity** 37:9,15,22 140:3

**actual** 14:5,6 15:3,23 16:3 43:5 68:15 78:25 99:8 103:7 115:4,6 116:18,21 117:3,21 118:4, 18 119:21 125:25 127:17 128:3 145:16 152:13

**add** 16:25

**added** 19:11 20:11,17

**addition** 74:5 81:1 124:4 127:6 129:1 131:25

**additional** 20:8 54:6 77:11,12,20,22 82:3 92:6 100:25 113:20 114:4 124:15 152:25

**Additionally** 123:5

**address** 5:9 39:2 42:12 73:6,18 74:21 75:10 86:3, 6 93:3 109:1 146:9

**addressed** 94:9 108:18 113:22 114:8

**addresses** 52:8 61:7,8

**adds** 84:22

**adequately** 22:8

**administrative** 91:22 92:2

**administrator** 85:8

**admonishments** 7:15

**affect** 8:2

**affiliates** 81:20 82:2

**agencies** 31:15,22 72:7 88:16,20 96:19 104:14

**agency** 65:4 88:17 115:17

**agent** 93:15

**agents** 81:10,11,15

**agree** 30:12 33:15,18 46:9 47:5 66:24 68:2,9,22 82:7 98:21 99:5 102:16 114:20 115:2 116:10,16 117:2,11 122:7 140:24

**agreed** 114:18

**agreement** 73:23

**ahead** 7:9 10:8 16:10 26:3 47:10 59:7 67:14 77:10 140:20 147:23

**AIC** 140:4

**alcohol** 7:22

**alert** 50:14 55:16,18,21 56:20 57:8 140:6,12

**alerted** 139:13

**alerts** 56:7

**allegations** 25:9 133:24

**allowed** 78:24

**allude** 138:15

**alternative** 74:4,7,16,22

**Amazing** 101:16

**America** 59:23

**analogous** 65:14

**analysis** 70:10 135:2,6 145:18

**analyst** 12:5,6,17,21 14:2,4,14 16:3,16,24 17:2 47:23 53:21 54:13 61:12 62:22 63:22 64:16 94:2 97:14 101:17 109:4,24 113:21 114:5 138:17 142:20

**analysts** 14:24 16:12 62:10,14 101:20 108:24 143:10

**analyzes** 108:21

**and/or** 13:1 19:16 21:18 25:22 29:3 39:18 79:21 91:18 131:17 141:14,24

151:11

**angle** 19:10

**annual** 131:14 132:12,16 135:14,23 148:9,25 149:10

**answering** 10:14 16:11, 15 18:5 44:5 88:13,19

**answers** 8:13 9:4

**anxious** 38:1

**anymore** 144:23

**apologies** 7:9 47:10 59:7 67:13 116:13 121:15 132:24 140:20 147:25 152:8

**app** 42:2

**appearances** 5:21

**applicable** 47:25 53:3 74:14 91:11 96:11 115:20 122:4 151:19

**applicant** 77:12,14

**application** 58:11,13,18, 22 59:3,12,16 60:6,7,15, 16,19,20,23 73:7,18 75:11 78:13 80:24 86:4,14,19,25 88:12 89:21 93:21 110:15, 16 124:7 131:7 136:3,13 154:10

**applications** 75:21 76:15

**applied** 31:1 32:19 75:17 76:8

**applies** 29:7,11,21 30:3 47:19 95:21 126:18 131:3, 11 132:3

**apply** 31:4 96:7 126:24 131:25

**applying** 14:9 19:17 31:9 58:16,20 83:6 89:20 91:4 142:21

**approved** 34:3 35:1 39:7, 15

**approximately** 6:22,23, 25 9:12,14 11:10,12,24,25 14:3 15:11 19:7 44:21

**April** 132:9 150:1

Charles McCall vs. Experian Information Solutions, Inc. -
30(b)(6) and 30(b)(1) Experian Information Solutions, Inc. - Peter Henke

October 3, 2025
Index: area..Capital

**area** 133:8

**areas** 36:9,10 52:19

**Arizona** 83:9

**articles** 65:2 139:19 140:2

**aspect** 16:5 133:17

**aspects** 116:24 136:5

**assessment** 33:6,21

**assigned** 137:4 138:17

**assist** 17:2 28:25

**assistance** 17:2

**assistant** 14:17,22 15:1, 8,17 16:3,24 92:12

**associate** 5:25

**assume** 10:12 14:19,22 17:15 36:2 52:24 58:23 59:22 62:17 69:17 78:20 92:11 110:25 113:9 120:9 146:5 154:9

**assuming** 27:25 85:3

**assumption** 15:20 18:1,6 36:4 58:25 62:15 109:19 143:25

**assumptions** 8:25

**assure** 121:18 122:1 152:3

**attached** 54:15

**attachment** 153:19

**attempt** 66:1,2

**attention** 63:5

**attorney** 5:23 9:22 35:18 39:5,13 41:1 44:17

**attorney's** 10:13

**attorney-client** 10:11 41:10 120:13

**attorneys** 41:12 62:15

**attributes** 57:15

**audit** 110:22 111:6 145:12

**August** 149:19

**authenticating** 87:24

**Authentication** 84:17 87:11

**auto** 31:16,22 96:19

**automated** 122:7,9,17 137:22

**automation** 137:8 138:1

**aware** 32:10 35:11 39:25 51:20 63:24 66:15 108:13 154:19,23

---

**B**

**back** 11:21 12:11 19:12 20:3 26:12 29:16 45:11,15 59:10 63:2 84:2 94:1,8 95:2 114:13 156:11

**background** 62:18

**bad** 24:4

**balance** 80:5

**balances** 79:21 80:1

**ballpark** 75:20

**bangs** 10:2

**bank** 59:23 74:19 75:7 76:19

**Bankruptcy** 139:21

**banks** 31:15,22 59:23 74:20 96:18 103:12 122:22

**barring** 74:17

**base** 32:6

**based** 9:14 34:9 38:16 49:1 53:5 70:4 87:6 118:12 126:25 146:13 148:5

**baseline** 48:19 84:7,13 90:3 98:12

**basically** 49:7 87:13 91:17 99:23 155:18

**basis** 32:15 131:14 140:16,17,21 148:25

**Bates** 28:5,14,16

**BCI** 65:17,24 66:3 69:17

70:4 73:22 75:10 88:2,11

**began** 13:25

**begin** 7:11,19

**beginning** 12:1 14:15 28:20 135:19 140:23 142:2

**begins** 142:3

**behalf** 5:24 6:2 84:18

**behavior** 61:9,15

**behaviors** 61:19

**beings** 87:21 138:2

**Beneficiaries** 50:14 58:5

**benefit** 37:19

**big** 26:14

**bigger** 59:22

**bills** 70:6,9

**birth** 30:8 58:14

**bit** 28:12 43:9 76:21 89:15 111:10 130:24 143:14

**blank** 58:23

**Blockbuster** 11:17,19,21

**blue** 26:14,18

**bold** 26:14

**bolts** 98:8 119:25

**bona** 127:11

**book** 125:4

**books** 78:21

**boring** 10:3

**bot** 136:19 137:7,17,18, 19,22 138:16,20 139:2 143:10,13,16,19

**bots** 137:22

**bottom** 27:19

**box** 76:11

**BPI** 57:20,25

**Bradstreet** 65:15,18 69:18,24

**branches** 82:3 83:9

**brand** 61:12

**break** 10:16,18,21,23 11:5 44:21 83:15 103:18 156:6,10

**building** 38:25 68:6 82:23

**bulk** 135:19 136:23,24

**bullet** 31:11 102:10 125:1 127:1

**bulleted** 96:16

**bullets** 100:9

**bunch** 53:15 64:18 93:14 95:3 135:9

**Bureau** 103:13 107:24

**business** 29:2 33:7,21 38:10 42:12 56:1,10,14 57:23 58:7 59:20,25 60:3 61:9 64:17,22,23 65:2,6,9, 10 66:4,14,16,20 67:10,16 68:18 69:1 70:12,13 71:1, 15 72:10,12,17 73:17 75:8 78:5,7,12,15 79:8,17 80:4, 10,15 81:23,25 82:16 85:22,23 87:21 89:20,22 90:7,8,11,16,17 91:4 95:11 96:8,24 98:24 99:17 100:18 107:14,15 114:17 118:19,22 128:20 141:6 146:6

**businesses** 65:12 71:21 72:9 89:22 90:23 129:7

**button** 98:9

---

**C**

**cabinets** 77:6

**call** 45:7 88:6,13,18,21,23

**called** 7:15 9:5 10:4,11 12:12 21:8 28:5 33:11 42:2 65:15

**calls** 118:25 120:13

**capacities** 152:23

**capacity** 16:1 19:1 103:7 134:21 140:8

**Capital** 51:20,22 59:24 60:12,21 63:16 106:19,21,

Charles McCall vs. Experian Information Solutions, Inc. -
30(b)(6) and 30(b)(1) Experian Information Solutions, Inc. - Peter Henke

October 3, 2025
Index: captured..Connect

24 115:16,17 149:8,23 150:4,8 153:2,3,7,22 154:4,11,13,17,20,21,25 155:4,19 156:1

**captured** 54:7

**card** 58:12

**cards** 59:24

**carried** 151:2

**carry** 72:11

**Cary** 5:12

**case** 8:19 10:1,25 22:11 28:1 35:14 51:19 94:4 113:5 135:20 148:3 149:9

**cases** 93:2 115:13

**catch** 19:2 61:25 147:17

**categories** 91:21

**category** 146:4

**CE** 71:9,10

**centered** 19:15 82:15

**Central** 5:4

**certification** 131:12 132:1,2

**certified** 6:10 151:8

**cetera** 48:19,20 105:9

**CFPB** 64:13 91:14,18 92:17 93:15 94:10

**change** 16:2,23 17:8,11, 19 40:15,18,21 41:18 42:6 105:24 120:11 140:3 149:17

**changed** 12:13 17:14 18:22

**characterization** 113:19

**charged** 79:21 80:1

**charges** 124:25

**Charles** 5:25

**Chase** 59:23

**check** 48:18 49:7,25 50:19 66:13 68:9 110:6

**checkbox** 76:8

**checking** 79:16

**checklist** 34:4,6,7 35:1,8 37:1,3,16,20 39:5,8 44:10 54:21 76:24 97:1,24

**choose** 119:5

**circumstances** 20:1,10, 14 107:24 108:10 144:8, 12

**City** 9:8

**civil** 63:8,13 91:22 93:14, 17

**claim** 78:5

**claims** 80:8

**clarify** 13:14 20:14 27:5 38:13 48:2 50:9 53:12 63:6 86:20 125:14 134:18 146:21 148:13

**clarifying** 48:14

**clarity** 79:13 80:8,9,10, 11,12 121:10 131:13 156:24

**clean** 110:5,6,8 114:14 116:22

**cleaned** 110:7

**clear** 8:12,13 99:2 102:22 116:23 117:24

**click** 84:9 98:8

**client** 12:22,24 24:25 26:13 27:12 29:22 31:5 43:23 50:4 56:16 57:4 58:20 60:9 62:3 73:6 77:14 85:10 86:12,17 94:9 97:1,13 124:7 133:6,15,17 136:2,5 137:4 144:12

**client's** 80:23 94:8,11 113:15 145:7,18 146:2,6 151:8

**clients** 12:23 14:10 18:10 29:12 60:20 72:5,7 126:19,20 127:4 131:13 140:19 142:5 149:2,5

**closed** 77:6

**club** 144:16 145:2

**clubs** 72:8 125:4 144:17

**collect** 80:5

**collection** 88:16,17,20 101:24

**collections** 100:17

**color** 69:23 70:1

**column** 41:2

**commercial** 79:8 86:3 96:9

**commingled** 36:15

**committed** 63:12

**committee** 133:7,12,17 134:4,8,17,18,20 147:7,9, 13

**common** 10:18

**communicate** 94:1

**communicated** 41:12 93:9

**communication** 37:15

**communications** 94:22

**companies** 39:18,25 60:3 72:6,16 80:22 116:2 139:12 148:11,18,21

**company** 34:9,11,12,13 38:3 40:2 51:3,13,15,17 52:8 55:4,6 60:21 61:7 62:23 63:11,16 64:8,12,17 65:6,15 67:20,24,25 68:4, 6,14 69:20 70:5 71:20 75:3 80:23 82:25 87:1 88:2,7 93:13 95:2,7,9 99:16,19 106:19 115:16, 21 118:16,18 119:10 139:19,20 141:5,23

**company's** 34:14 67:25 70:10 83:3 87:25 93:17

**compare** 111:6

**compared** 90:8 108:25

**comparison** 38:15

**complete** 9:10 35:4 54:5, 21 58:18,21,24 59:15 91:8 142:10,15,22

**completed** 10:8 30:16 49:1,3,4,13,15,22 50:7 53:7,23 59:12 60:15 98:19

114:15 116:15 142:6,7,14 143:13

**completely** 88:8

**completes** 44:4 59:2 116:9 120:5

**completing** 15:5 58:12 89:21 138:2

**completion** 136:19

**compliance** 14:7 25:19 39:16 61:12 62:14,22 65:2,10 79:25 104:20,23 109:3 133:6,11 134:3

**comply** 105:19 122:10 127:5,19 129:15

**component** 20:2,4,11,19 21:5 52:25 129:7

**components** 38:16,24 104:18 108:18,23 109:1,2, 8 113:16,18,22 114:6,7

**comport** 70:14

**compound** 77:10 128:1 148:12

**comprised** 32:6

**comprises** 31:14 62:24

**computer** 36:3

**conceivable** 110:11

**concepts** 48:8

**concern** 99:11

**concerns** 70:5,7

**conditions** 124:7

**conduct** 61:5 62:4,9,12, 25 63:4,7,18,22,24 64:5

**confirm** 77:5 78:21 97:18 99:18 100:22 109:7 125:7 153:16

**confirmed** 95:12

**confirming** 86:2 140:22 141:3,9

**confusing** 8:18

**conjunction** 154:17

**Connect** 79:13 80:8,9,11

Charles McCall vs. Experian Information Solutions, Inc. -
30(b)(6) and 30(b)(1) Experian Information Solutions, Inc. - Peter Henke

October 3, 2025
Index: connection..data

**connection** 35:14 40:4

**connotes** 27:23

**consent** 98:17 100:19

**consequence** 97:7
115:12

**considerably** 121:5

**consist** 155:5

**consistent** 21:11 87:19

**consolidated** 50:14
55:16,18,21 56:5,20 57:8,
10

**consumed** 7:22

**consumer** 29:1,22 30:3,
7,17 48:13 57:23 63:17
67:2 78:25 80:17 90:12,
14,23 91:25 100:3 104:13
115:17,25 116:2 121:9
122:5 126:14,15,19 127:4
151:9

**consumers** 13:10 90:17
98:17 124:8

**contact** 38:1 61:7 84:16
85:4,15,22,23 86:12,17,20

**contacting** 132:12

**contacts** 52:9 137:12

**contained** 98:2

**contention** 25:18,25

**contents** 46:12 48:17

**context** 12:24 39:17 48:6
50:23 55:22 69:5,11 80:9
90:4 129:11 136:21
142:17

**continue** 15:2,23 16:20
18:9 114:9 128:18 142:11
147:5

**continued** 15:6

**continuing** 94:13 143:2

**contract** 84:18,24

**contracts** 52:9,23

**contrast** 38:24

**contribution** 123:6,8

**control** 40:15,18 104:23

105:24 120:11 149:17

**conversation** 95:6

**converse** 67:15

**convicted** 72:6

**copies** 105:15 106:15

**copy** 39:4 94:21 103:13
107:5 108:1,6,11

**core** 80:17 85:9

**correct** 11:8,14 12:15,25
13:6 14:21 18:1,7 19:19,
24 21:13 26:21 27:3,4
28:4 29:9,23 30:5 32:13
33:4 37:9 38:20 39:10
43:7,22 45:17,18 47:7
49:5,11,12,17,23 50:3,6,8,
20,21 56:18 57:14 58:8
59:13,16 61:3 62:16 63:15
64:19 66:8 67:22 68:23
69:10 71:5,14,15 73:21
79:1,11 82:2 83:25 84:20
85:3,19 86:6 88:24 89:23
90:2 91:2,3,15,19,20,23
95:13,22,25 96:1,20,21,
24,25 98:14,22 99:7,13,14
102:19,24 103:8 104:8,9
105:9 106:3 110:13
112:19,20 113:10 114:21
115:4,10,18,19 116:5,19,
21 118:2,3,24 119:5,13,
17,19,21,22 120:1 121:11
125:1,2,5,6 126:1,2,22
127:14,15,20 128:20,21
129:20 131:14 132:9,10,
15 135:16,21 137:2
138:13,14 140:21 141:19,
24,25 142:7,25 143:6,7,
11,18,22 144:13,18,19
145:5 146:10 148:6,8
149:4 151:21,23 152:18,
19,23 153:17 155:16,22
156:2

**correctly** 12:11 19:2
29:4,6 30:22 31:6 35:6
41:22 43:11,13,19 44:6
46:25 48:6 49:22 54:17
56:11 60:17 61:10 62:7
72:22 78:18 80:14 86:11
87:7 101:23 102:3 103:15
104:14,25 107:19 108:2
121:19 126:16 127:7
132:22 134:23 136:11

137:23 146:3 151:12

**cost** 23:22

**costs** 23:19 24:11

**counsel** 5:21

**countries** 89:5,7,8

**country** 83:10

**couple** 27:6 79:20 130:14
152:22 156:19

**court** 5:3,10,13,20 6:4
28:1,9 45:8,11 83:18,21
103:25 104:3 130:4,7
156:12,15

**covered** 71:12 113:16

**covers** 129:9

**CPB** 57:25

**CPD** 57:19

**CRA** 115:23

**create** 68:6 118:22

**created** 93:6 135:20

**creates** 132:11

**creating** 139:9

**credentialed** 131:4
153:23

**credentialing** 12:6,9,14
15:2,24 17:12,25 18:18,22
19:6,14,17,22 20:5,7,19
21:3,6,11,16,17,22 24:25
25:6,20 26:15 27:1,7,8,11
31:10 32:12 35:12 36:7,
15,24,25 39:15 46:5 52:20
53:21 54:13 55:17,18
58:11,18,22 59:3,12,16
60:5 62:4,10 64:5,10 68:8
72:21 73:2,7 75:11,16
86:4,14,18,24 88:12 89:21
92:9,12 93:15,20 109:4,24
110:15,21 111:18 112:8,
15 114:5 119:16 121:4
122:10 123:20,24 127:5
128:16 130:25 131:3
133:5 134:14,16,25
135:25 136:9 138:17
145:15 146:18 147:1,4,9,
11,14,18 148:1 150:21
153:24 154:10,18,24
155:1,4,19,24,25

**credentials** 85:9

**credit** 13:7,9,16,17,18
29:1,22 31:15,22 48:13
58:12 59:24 63:11 67:3
68:21,25 72:7 74:15,21
76:19 78:9 80:17 82:9
90:1,12,14 96:19 99:12,
24,25 100:3,17 103:12
116:3 121:9 122:22
124:22 125:11 126:15,19,
25 127:4 145:16,24 151:9

**creditor** 107:22 145:23

**Creditors** 40:4

**criminal** 63:7,13 144:17

**criteria** 62:11,25

**curious** 20:16

**current** 5:8 18:18 19:5,
15,18 40:9 132:13

**customer** 32:6 44:4,8
48:19 50:24 60:13,24 69:6
77:1 78:4 81:1 84:20,25
85:4,15,18,24 86:12,17
97:3 109:7 145:1

**customer's** 14:7 32:20
42:12 77:25

**customers** 13:5,7 14:1
16:21 18:10 19:16,18
32:16 44:13 52:4 65:25
82:21 91:11 105:2 109:5
131:3 135:15

**cut** 67:14

---

**D**

**d(ii)** 97:17

**Daniel** 103:23 156:10

**DAPP** 102:8

**dark** 9:10

**data** 13:1,9,17 14:11
21:18 25:20,22 26:8,9
29:1,13,22 30:4,8,20,25
31:4 47:4,6,15,16,19,22,
24 48:4,5 51:7,13,19
57:18 62:6 63:23 66:23
67:1,6,7,11,17 68:4,8
70:8,21 72:18 74:15
77:12,17,20,22 78:11,25

Charles McCall vs. Experian Information Solutions, Inc. -
30(b)(6) and 30(b)(1) Experian Information Solutions, Inc. - Peter Henke

October 3, 2025
Index: data's..document

80:12 81:5,9,11,15 82:8,
11,12,17 89:25 90:2,12,14
96:9 98:22,25 99:1,4,5,8,
11 100:3 102:18,21,24
103:3,6,7,10,11,13 104:7
105:7,8,11,12,13 106:6,8,
13,15,18,22,25 107:1,6,7,
9,12,15,18,20,22,25
108:1,6,12,15,17,22 109:6
110:1,10,14,16,18,22
111:2,7,19,20 112:4,18,21
113:3,13 114:3,19,21
115:4,5,7,13,21 116:3,18,
20,21,25 117:1,3,4,5,6,7,
14,16,17,19,21,22,25
118:4,7,12,14,24 119:12,
13,20,21 121:4,8 122:5,6
123:6,8,19 124:5,20,21,25
125:8,11,19,23,24,25
126:19,21,24 127:18
128:4,5 131:25 132:3,12,
13,16,18,20 133:1,7,11,
16,23,25 134:3,7,8,12,17,
19,20,22,24,25 135:1,2
141:14,18,23,24 144:13,
15,18,22,23 146:14,25
147:2 151:10,25 152:20
153:2,3,8 156:1,3

**data's** 99:1 128:6

**database** 30:21 49:18
65:3 121:10 126:15 151:9

**date** 5:4 6:24 30:8 40:20
58:14

**day** 22:5 28:13 141:22
155:23

**day-to-day** 15:23 17:25

**dba** 99:15 102:13

**deal** 116:6

**dealers** 31:16,23 96:20

**dealing** 47:14,24

**debts** 125:11,19

**decade** 32:13 39:23

**decades** 22:1 59:20 60:1
105:12

**December** 106:3,9,14,20
107:2,8

**decide** 93:25

**decision** 72:21 77:13
93:3,11 120:4

**decisions** 93:5

**declines** 128:19

**decrease** 18:13

**decreased** 18:1,14

**deem** 94:3

**deemed** 71:21

**deems** 97:14

**defendant** 6:3

**define** 28:24 121:7 151:7

**definition** 51:14 95:24

**degree** 38:7

**deliberate** 118:23

**deliberately** 68:7

**deliver** 39:12 80:11

**delivered** 30:18

**demonstrate** 40:19
101:5

**department** 12:7,12,14
14:20 15:2,9,15 17:4,9,10,
15,19,22 18:9,21,22 19:14
20:6 21:6,9,16 25:7 27:1,
3,7,8,9,14 32:12 37:4
92:13 110:21 111:19
112:15 134:15,25 139:1
146:19 147:10,11 155:24
156:1

**department's** 155:4,19

**departments** 36:16,21

**depend** 74:9

**depending** 52:19 92:24
93:23 140:18 144:8

**depends** 74:6,8

**deposed** 25:13

**deposition** 5:5 6:19 8:7
22:15 24:15 25:13 45:22
120:21 126:4 128:8
130:16 150:13

**depositions** 7:1

**describe** 47:6 48:10
55:23 58:3 61:17,18 85:8

138:19

**describes** 81:15 129:14
132:7 136:15

**describing** 38:2

**description** 40:22 42:6
95:20

**descriptions** 61:21

**designate** 22:19 45:21
85:2,6,7 120:20

**designated** 23:9

**designed** 68:13 118:17

**desk** 9:12

**detail** 12:19 33:10,16
42:16 50:7 53:8 54:1 93:7
102:1 113:18

**detailed** 33:10

**details** 33:23 46:8,12,21
84:22 108:9 151:2

**determination** 92:24
93:1

**determinations** 93:7

**determine** 12:23 14:11
25:21 75:8 99:1 109:25
111:1 118:17 119:12

**developed** 135:14

**dictate** 108:19

**dictates** 42:19

**differ** 135:24

**difference** 43:15 67:23
68:3 96:6

**differentiating** 13:23

**differently** 138:19

**differs** 136:2

**difficult** 76:21 102:9

**difficulty** 38:2

**diligence** 14:10 15:3,24
16:2,4,21 17:25 33:12
34:19 46:5,9 48:18 53:6,8,
16 54:2 55:4 61:14 66:7
67:19 75:16 80:25 81:21
82:3 84:3 99:11 102:8
109:5 122:14,18 123:10,

16 124:18 127:10,22
128:23 136:1,16,17
137:10,13,16,25 138:6
141:4 142:3,6,21,24
143:5,12 146:8 148:7
152:18 154:18,24

**direct** 18:9 90:17,23
115:25 116:2

**direct-to-consumer**
90:13 98:16

**directions** 34:8

**director** 17:9,10,14,18,24
18:8,13,18 19:4,5 20:23
21:2,6,8,11,12,15 27:2
56:9

**disagrees** 145:1

**discount** 118:9

**discovered** 57:2

**discovery** 35:14 113:5

**discrepancies** 145:7,10
146:2,6

**discrepancy** 146:8

**discrete** 50:18 123:23

**discuss** 24:13 89:11

**discussed** 29:9 78:15
82:8 95:16 96:17 97:24
102:16 116:19 122:24
126:8 143:13 150:23
151:19 152:4 155:23

**discusses** 31:8

**discussing** 57:4 66:12
84:6 87:20 106:5 141:22
155:8

**discussion** 71:6 146:22

**discussions** 94:21

**displaying** 45:20

**disputes** 104:21 133:24
146:14,24

**distinction** 9:6,18 13:6,
11,13,21,22 29:9 48:3
141:8

**document** 22:13,20,23
24:19,24 25:3,16 26:25
27:17 28:1,7 32:1 33:11,

Charles McCall vs. Experian Information Solutions, Inc. -
30(b)(6) and 30(b)(1) Experian Information Solutions, Inc. - Peter Henke

October 3, 2025
Index: documentation..exhibit

12,13,14,15,22 35:3,12 41:1,8 45:25 46:7,13 47:19 50:5 52:24 54:5 56:7 57:23 58:1 60:8 63:20 93:19 97:2,11,22 98:3 106:2,9 112:22 113:1,3,13 114:4 119:19,23 120:9,24 122:12 125:21,24 128:11 130:19,23 132:4,7 140:24 142:24 143:5 150:16 152:6,10

**documentation** 54:6 55:18 56:22 60:6 64:18 93:6 98:12,15 99:22 100:9,25 102:15 114:18 124:8,13 145:20

**documented** 155:16

**documents** 22:9 26:18 35:13,18,22 36:12,15,24,25 40:18 48:7 53:3,6,7,11,25 55:3 68:7 79:3 80:24 99:24 100:4,13,21 101:4,11,12,17,24 105:21 131:20,25 146:1 155:7

**doors** 77:5 78:9

**downloaded** 140:7

**draft** 110:10

**drafted** 106:3,10

**dramatic** 9:25

**drink** 10:24

**drugs** 7:22

**due** 14:10 15:3,24 16:2 33:11 46:5,9 53:6,8,16 54:2 55:4 61:14 66:7 79:25 82:3 84:3 99:10 102:8 109:5 122:14,18 123:9,16 124:18 127:10,22 128:23 135:25 136:16 137:9,13,16,25 138:6 141:4 142:3,6,21,24 143:5,12 145:6 146:8 148:7 152:18 154:18,24

**duly** 6:9

**Dun** 65:15,18 69:18,23

**duplicate** 50:13,22 51:3

**duties** 12:21 17:19 21:7

**duty** 19:23

**DVD** 125:4

---

**E**

**earlier** 8:5 19:17 29:9 48:3,11 55:3 69:17 71:23 73:10 95:16 96:17 97:2,24 102:10 113:23 114:16 118:21 122:22 127:20 136:23 138:1 143:13 144:16 145:20 148:2,17 149:2 150:24 152:4 153:7

**EDGAR** 65:3

**editor** 41:2

**EDQ** 70:17 71:3

**effect** 8:23 114:1

**effective** 111:2,16

**effectively** 152:16

**efficacy** 112:2,16

**efficiently** 7:14

**EIS** 81:25 90:18 91:7

**EIS's** 91:11

**eligibility** 145:8,11,19 146:3

**eligible** 12:23 14:12 62:5 77:14 117:19

**email** 61:8 86:3,5 93:9 94:1,8,16,21,22 97:18

**employed** 11:7,10,15 111:2

**employee** 14:5 23:9,18 37:11 38:17,22 42:11 84:19 85:18,25 133:15

**employees** 24:7,12 34:21 55:12 78:6 102:1 134:12,14,16,21

**employment** 100:19

**EMS** 70:17 71:3

**end** 89:15 111:14 119:23

**enforce** 129:10

**enforcement** 62:18 91:17 92:1 93:24 95:3

**engaged** 62:3 64:4 116:3

**ensued** 45:10 83:20 104:2 130:6 156:14

**ensure** 22:8 43:11 54:11 60:11 61:8 62:5 67:19 71:19 75:1 107:20 110:22 116:23 121:22 135:11 152:21 156:23

**ensuring** 28:25

**entail** 21:7,21 33:17,24 57:4 113:19

**entailed** 152:13

**entails** 32:24 40:23 46:9 135:3 150:25

**Entertainment** 11:19

**entire** 137:20

**entirety** 82:4

**entities** 13:9 29:2,7 31:15 32:4,7,8 55:25 57:11 58:7 59:19,25 60:5 62:5 70:24,25 71:4 72:9,11 81:6 90:18 96:12,18 101:9

**entitled** 9:4

**entity** 11:18 13:15 31:9,18 38:3 51:16 56:8,9 63:4 64:17 66:19 67:7 68:16 71:12,17 72:19 80:25 81:1 82:12 98:24 102:21 117:18,19 118:11,13 127:12 133:20 140:23 141:3,9,11

**entity's** 102:21 103:3 143:25

**EPS** 90:3,4,8,16 91:4 98:12

**escalated** 18:6 58:8 62:4 64:5,9 73:2 92:5,20,21 94:4 147:6,12 148:4

**escalation** 93:1 94:15

**escalations** 93:5 94:20

**essentially** 28:6 38:4 42:20 49:1 50:23 56:6 64:21 70:4 80:3,21 84:23 85:14 95:15 129:4 139:8 142:21 144:5 151:18

**establish** 104:11 121:7 151:6

**establishes** 64:16 65:6

**establishing** 67:16

**estimate** 9:5,7,19 32:16

**evaluate** 93:19 134:24 135:1

**evaluates** 92:16 119:20 134:22 139:15

**evaluating** 14:7 19:15 139:16

**evaluation** 32:25 33:4,20 92:6 114:15 142:12 155:19

**evidence** 37:8

**exact** 6:24 10:21

**examination** 6:12 10:23

**examine** 22:4

**examined** 6:10 122:18 138:1

**examining** 84:3

**Excel** 55:19 56:7 140:9

**excepted** 31:23

**exception** 10:9 29:4 32:19 74:17,19 75:17,22 76:8,9 88:10,23 95:21 122:21 124:9 149:1,13

**exception-type** 32:7

**exceptions** 30:21 31:11,14 32:17 75:4 96:14,15,17 122:24 124:10 148:9,13,20,24

**excuse** 47:9 84:19 109:3

**exempt** 32:4 88:16,20,22,23

**exempted** 60:6

**exhibit** 22:3,15 23:4 24:15,18 26:12 44:20 45:21,22 47:3,18 75:5 96:17,18 120:21 122:19 123:10,25 124:1 125:22 126:4,7 127:11,14,16,19,23,25 128:3,7,8 129:5,18 130:15,16 136:1 137:25

APPENDIX 1602

Charles McCall vs. Experian Information Solutions, Inc. -
30(b)(6) and 30(b)(1) Experian Information Solutions, Inc. - Peter Henke

October 3, 2025
Index: exhibits..frame

138:3,7 143:6 150:11,12, 13 151:1 152:12,18

**exhibits** 22:5 130:14 153:1

**exist** 13:11 104:18 109:8 148:20 154:6

**existed** 60:4 105:13

**existence** 67:24 154:11

**existing** 136:3,6 151:7,9

**exists** 129:14 148:10 155:20

**expanded** 15:19 18:25

**expect** 6:24 15:18 62:13 156:20

**Experian** 5:6 6:3 11:11 12:2,3 13:1,2,8,10 14:6 18:11 19:16 23:6,9 25:10, 18,21 26:19 28:15,19,25 29:8 31:2,9 32:5 33:11 34:3,18,21 35:1,3,13,17 37:17 39:7,22 40:1,15,18 43:21 44:3 46:11,19,22 47:20 48:5,24,25 51:6,14 53:15 56:10 58:1,19 59:11,20,24 60:4,16,24 61:13 62:6 65:11,24 67:2 68:7 70:21,24,25 71:2,4, 22 72:8 76:25 80:13,20 82:21 84:19 85:10 87:10 88:5 90:5,6,9 91:5 93:19 95:12 96:22 97:7 99:12 100:13,22 102:1 103:5 104:17 105:2,3,12,15,25 106:9,13,15,20,23 108:16 109:23 110:15,17 112:1 115:14,22 119:12,24 121:6,17 124:19,21,24 125:8,11 126:12,25 127:4 128:18,19 129:15 131:8, 12,21 132:7,11 133:1 134:21 135:23 136:4 139:11,23 140:9,23 141:12,15 142:2 143:21 144:18 145:3,11 147:5 151:5 153:4,7,23 154:13, 16,23

**Experian's** 8:7 11:7,16 12:7 13:5 14:8 19:17 21:17 23:12 25:25 26:18 35:18,22 36:2,6 42:16

48:4,7 51:7,23 52:4 53:5 60:13 72:20 84:18 111:14 121:8,9 126:15 127:12 134:22 141:14,18,24 144:1 151:9

**experience** 101:20

**experiences** 101:19,25 102:7

**explain** 9:5

**explains** 129:15

**explanation** 48:25 56:22

**explore** 57:3

**exposed** 56:2

**extensions** 100:17

**extent** 26:2 31:25 41:11 102:4 108:3 114:24 120:13 152:5 153:11 154:6 155:3,20

**eyes** 24:4

---

**F**

**fact** 9:14 38:10 69:1 124:1

**factored** 72:20

**factors** 94:14

**facts** 25:9

**fail** 146:7

**failed** 145:25

**fair** 9:1 22:1 26:23 27:2 33:24 36:3 38:12,22 39:2 42:14 49:4 50:25 53:23 63:10 65:20 66:17 69:2, 14,21 71:7 73:3 78:23 80:6 83:11 85:15 87:15,22 89:6,12 90:25 98:17 105:5,19 106:23 111:3 112:5 113:19 129:16 149:12,21,22 154:7 155:21

**fall** 32:16 146:4

**familiar** 24:22 33:12,14 42:4 46:2 65:14 121:1 128:13 130:21 150:18

**familiarity** 26:18 40:17

**Fannie** 122:23

**fashion** 122:7

**fax** 61:7

**FCRA** 25:20 29:23 30:16 46:23 47:14,23,24 48:12 63:17 64:9 74:14 96:9 100:9 104:18,23 105:3 121:16 126:13,20,21 128:17 131:17,22 142:5 151:11

**FCRA/GLB** 99:10

**Fe** 5:11

**federal** 63:11 92:1 101:10

**feel** 10:23 23:16 24:13 61:20 118:14 133:18

**fees** 125:1

**feet** 9:16

**felons** 72:7

**fide** 127:11

**field** 76:7 87:5

**fields** 54:4,8,12 58:3 120:5

**figure** 33:23 76:14 87:25

**figured** 70:2

**file** 32:21 36:7 54:16 55:13,19 59:4 60:22 68:6 77:6 94:18,23 95:7 138:18 140:10,12 150:5 153:17 154:2,7,12 155:8,16,21

**filed** 91:18

**Fileone** 30:20,25 47:4 121:8 131:22 151:10

**files** 35:22 52:25

**fill** 58:13 120:4

**filters** 91:25

**finalize** 119:25

**finalized** 73:3

**financial** 69:9,11 127:12

**financing** 52:20 124:6

**find** 39:12 51:3,12 55:3 105:24

**finding** 57:7 92:24

**findings** 62:2 92:16,19, 22 93:2,4

**fine** 45:5

**finer** 25:17

**fines** 124:25

**finish** 138:17 147:20

**firm** 100:17 145:24

**fiscal** 132:8 135:19 149:25

**fit** 113:25

**five-minute** 156:6,10

**flag** 56:10,12 76:12 93:14 139:18

**flags** 97:6,9,17

**focus** 77:24 90:13

**focused** 90:17,18,22

**folder** 36:6

**folks** 15:4 27:14

**follow** 10:13 35:4 97:8 110:11 119:5 121:17

**follow-up** 111:13

**foot** 42:13

**forget** 10:18

**forgot** 127:23

**form** 26:22 28:14 29:10 31:25 35:23 39:6 41:3 53:10 55:8 59:5 63:19 67:4 94:24 124:8 127:21 150:6 155:9

**format** 93:8

**forward** 93:20

**forwards** 93:16

**found** 92:19 118:10

**foundation** 20:13 27:24 32:9 39:6 41:4 51:9,24 90:10 110:20 113:6 119:14 125:13 145:14 146:16

**frame** 7:1 9:9,16 11:13 15:12 17:6,7 75:22

Charles McCall vs. Experian Information Solutions, Inc. -
30(b)(6) and 30(b)(1) Experian Information Solutions, Inc. - Peter Henke

October 3, 2025
Index: framed..ideal

**framed** 26:6 112:12

**franchise** 31:22

**franchised** 31:16 96:19

**fraud** 18:19 19:1,6,10,21 20:2,4,11 21:3,4 48:18 49:7,25 50:18 66:12,17,18 68:12

**fraudulent** 118:10

**Freddie** 122:23

**frequency** 42:23

**frequent** 133:24

**FTC** 91:14,18,25 92:17 94:10

**fulfill** 34:9 126:13

**Full** 98:13

**fully** 149:20

**function** 20:18 76:25 77:2,3

**functions** 12:21 14:6,23 15:19 16:2 18:1 20:12 137:9 138:10 143:17

**furnish** 47:22 118:24

**furnished** 104:20 106:8, 13 109:14 116:18 133:25

**furnisher** 13:17,22 31:5 48:4,8 51:13,19 66:23 67:2 103:6 104:7 107:2,20 108:11 110:1,14,18 111:2, 15,24 112:3,21 113:3,13 114:3 116:20,25 117:4,17 118:2 123:6 127:18 133:7, 12,16,25 134:4,7,8,12,20, 25 144:6,21 146:14,25 147:3 149:9 153:2

**furnisher's** 26:8,9 82:9 90:1 98:22 99:5 102:18,24 103:7 108:25 111:7,15 112:4,18 115:4,5 117:1,3 119:13,21 127:18 128:4 133:24 134:24 135:1

**furnishers** 13:2,9 21:18 25:20,22 30:12,14 31:1 47:19 51:7 99:12 103:12 105:8,11,13 106:7,8 107:4,6,9,25 108:17,22 110:22 114:19,21 115:13

116:18 122:5 123:20 124:5 125:10,23 126:24 131:25 132:3,14,16,19,20, 23,25 134:22 135:15 136:9 151:10,22

**furnishes** 104:13

**furnishing** 14:11 29:13 47:6,16 74:15 105:12 106:20 107:2,8,21 115:22 116:3 133:1 141:14,24 152:1 153:3

---

**G**

**game** 8:11

**gather** 101:21

**gathered** 56:16

**Gathering** 136:12

**gave** 55:3 88:12

**gavel** 10:2

**general** 26:17

**generalized** 25:5

**generally** 19:18 21:7 33:18 66:17 143:4

**give** 5:16 61:21

**GLB** 29:4 30:5,20 74:14 100:24 151:11

**GLBA** 126:14,20,22

**good** 6:14 13:14 14:13 20:22 45:3 72:3 75:11 83:14 95:5 130:1

**Google** 73:22

**gotta** 58:13

**governed** 47:22 131:17 151:11

**government** 31:22 65:4 94:12 96:19 101:9,10,19

**government's** 55:24

**governmental** 31:15

**governments** 101:11

**grab** 10:24

**Gramm-leach-bliley** 30:4 46:24 131:18

**grandfathered** 105:18, 20 106:7,10 107:10,21,25 108:10 153:9

**granular** 12:18 113:17

**greater** 33:10

**green** 34:2 69:25

**ground** 7:16 8:5

**grounds** 20:13 41:10

**group** 26:19 112:9 123:11 134:11,21

**guess** 9:3,6,9,18 19:11 52:12 68:11 75:24 76:2 107:16 117:13 134:18 137:23 140:14

**guessing** 8:11,14 129:23

**guidance** 114:4

**Guide** 101:16

**guidelines** 71:22

**guys** 69:23

---

**H**

**H-E-N-K-E** 6:18

**half** 30:24

**hand** 5:14 9:11 22:7

**handle** 92:21

**happen** 139:13

**happened** 17:12

**happening** 10:2

**happy** 11:1 22:12

**header** 26:19

**heading** 29:18

**headquartered** 83:7

**headquarters** 83:3,8

**health** 71:15,17 125:4

**healthcare** 71:14

**hear** 19:21 28:13 58:11

**heard** 9:1

**helpful** 101:17

**helps** 118:6

**Henke** 5:5,7 6:8,14,18,20 16:10 22:21 24:20 32:3 36:1 44:25 45:4,14,25 59:7 83:24 104:6 120:24 130:11 152:8 156:18

**Hey** 16:16 73:24 78:20 93:17 110:5 111:12

**high** 12:19 32:23 40:21 46:18 56:7 69:19,24 134:23

**higher** 150:24

**highlighted** 34:2

**highly** 68:10

**hire** 34:13

**hired** 61:13

**history** 20:18 68:16,17 79:21 80:1 136:5

**hit** 8:19

**hits** 93:14 137:14,15

**hold** 103:17

**honest** 76:22

**hopes** 156:19

**Hosted** 81:5

**hosters** 81:7

**hosting** 81:5

**hot** 55:24 137:13

**hour** 10:17,19 44:21 83:14 129:21

**hours** 7:23

**house** 79:10

**human** 87:21 138:2,8,9, 23

**hypothetical** 109:20 119:1

**hypothetically** 94:6

---

**I**

**idea** 92:4

**ideal** 10:20

Charles McCall vs. Experian Information Solutions, Inc. -
30(b)(6) and 30(b)(1) Experian Information Solutions, Inc. - Peter Henke

October 3, 2025
Index: Ideally..items

**Ideally** 85:16

**identification** 22:16 24:16 30:4,8,17 45:23 120:22 126:5 128:9 130:17 150:14

**identified** 22:24 23:3 56:15 68:17 72:9,25 73:20 74:3 75:4 91:21 93:24 94:9 122:2 132:18 133:6

**identifies** 26:19 31:10 37:16 38:18 46:21 64:17 65:11 146:8

**identify** 29:15 55:7 60:22 62:10 65:5 68:14 69:8 80:21 98:22 125:8 133:17 135:14 137:14,15

**identifying** 40:20

**identity** 24:7,12 87:22 120:10

**ii** 79:24 97:16

**illegal** 62:4,9,12,24 63:4, 6,18,24 64:4

**Illinois** 5:12

**imagine** 9:8 17:24

**immediately** 19:22 144:21

**impair** 7:23 8:2

**implement** 104:11

**implementation** 154:4

**implemented** 27:14 149:19,20

**important** 7:17 49:23

**in-house** 136:4

**inaccurate** 68:8 118:12, 24 133:25

**inapplicable** 31:19 135:11

**inbound** 62:21

**inch** 9:13

**include** 12:25 19:1 33:7 54:19 56:2 64:12 81:25

**included** 52:3 56:4 81:11, 13 87:2 113:12

**includes** 32:25 33:3 46:23 73:9,11 91:21 94:17 131:16 151:10

**including** 103:12

**Incomplete** 109:20 119:1

**incorporated** 6:3 138:11, 12

**incorporation** 65:2 139:19 140:2

**independent** 29:20

**independently** 120:15

**indicating** 76:12

**indication** 72:18

**indications** 62:3 64:4

**indicative** 37:22

**indicator** 69:19 140:3

**individual** 85:9 87:17 93:24

**individuals** 56:15 92:9

**industries** 72:5,16 101:22 102:2,9 128:19 129:6 148:11,19

**industry** 70:15 71:14 72:20 101:16,18 127:5 128:16

**ineligible** 144:22

**info** 73:23

**information** 5:6 6:3 11:8 13:8,10,17,18 25:21,23 29:8 30:1,9 31:2 37:21,25 41:1 44:10 46:23 47:20 48:13 50:19 51:12,13,16 52:3,7,11 55:7,14 58:13, 15,19 61:2 63:2 65:4,5,12 66:24 67:3 68:1,21,25 70:13 77:12 80:13 81:13 82:9 90:1,9 91:5 98:2 99:12 101:21 104:13,20 107:23 109:14 113:12,15, 20 120:14 126:25 127:4 129:2,3,5 131:13,17,21 133:25 136:12 137:12 145:3 146:7 151:11

**infrequently** 40:6

**inhibit** 7:23 8:2

**initial** 61:19 94:15 135:25 137:25

**initially** 106:17 135:13

**input** 54:13 139:8

**inquire** 111:12

**inquiries** 77:7 100:12 118:17 145:12,16

**inquiring** 151:25

**inquiry** 109:25 110:17 111:1,14 112:1 119:11 131:13 155:4,25

**insight** 65:10

**Insights** 65:3

**inspection** 25:1 26:13 27:13 28:23 30:16 31:8 32:24 33:3 34:3,6,8,11,12, 18 35:1,5,8 37:1,2,12,16, 19 39:5,8 41:20 42:2,3,8, 11,17,18,20 44:9,10,13 54:20,21 74:3,12,13,16,22 75:12 76:9,17,24 77:1,3, 11,18,19,25 78:1 83:5,6, 11 95:10,13,16,20 96:5,11 97:4,8,12,19,24 98:5 127:12 148:18 154:17,19

**inspections** 23:23 28:25 32:4 34:14,18,22 39:16 41:21 42:7,12,24,25 43:1, 5,7,12,17,21,22,24 44:2 73:10,13 74:13 82:20 83:2,4 96:13,23 97:1,7,23 98:3,7 122:25 148:22

**inspector** 34:2,8,25 37:8, 10 78:24

**instance** 9:7 11:3 37:1 38:9,25 47:2 48:18 49:9 50:2,12 51:12,18 56:9 59:22 62:13 63:10 64:3 65:2 69:16 80:23 86:3 88:15 100:12 101:2 106:21 109:14 118:10 124:24 127:11 139:18 140:1,8 148:17 149:23

**instances** 10:12 41:25 42:10 54:14 86:12,19 87:1,6,9,13 137:21 138:15,25 139:12 144:6,

20

**instruct** 41:13 120:14

**instructions** 10:13 43:25 44:3,8,12

**instructs** 10:11

**insurance** 100:19

**integrity** 104:12,20 109:14 118:8 126:15

**intended** 8:10

**intention** 118:23

**interaction** 18:10

**interactions** 16:20 107:16

**interested** 21:4

**International** 89:4

**internet** 61:5,6 63:1

**intro** 114:23

**introduction** 46:20 131:9

**investigate** 46:22

**investigating** 104:21

**investigation** 19:6,21 21:4 64:13 94:18,23 119:25 120:4,6 123:21 124:2 126:8 137:1 142:1 143:9 154:18

**investigations** 18:19 19:1,10 21:3 49:1 79:25 133:7,11,16 134:3 150:4 154:25 155:5

**invoice** 69:13

**involve** 25:20 72:6

**involved** 16:4 61:9

**involvement** 15:23 16:1, 5 17:24

**involves** 41:11

**issue** 51:19 94:12 149:9

**issues** 18:5 52:16,20 79:25 80:5 85:4 94:9

**item** 57:23 95:9

**items** 23:23 31:21 33:10, 16,19 67:19 74:4 78:3,16

Charles McCall vs. Experian Information Solutions, Inc. -
30(b)(6) and 30(b)(1) Experian Information Solutions, Inc. - Peter Henke

October 3, 2025
Index: iteration..make

82:7 105:4 108:14 119:9 127:9 138:2 143:2 148:5

**iteration** 154:10

## J

**James** 5:23 78:22

**James'** 99:17

**James@abccompany. com** 86:4

**January** 140:10

**job** 12:20,21 15:14 16:2 17:19,25 19:23 20:11,18, 23 21:7

**John** 52:15 93:16

**joined** 5:25

**judge** 9:23,24 10:2

**judgment** 63:3

**July** 41:18

**jumbled** 128:1

**jump** 123:25

## K

**karate** 72:8 125:4 145:2

**kick** 133:19

**kid** 110:5,7

**kind** 7:6 11:13 15:12 33:17 36:14,15 56:6 58:6 66:16 76:14 95:4 96:4 105:18 113:17 114:1 129:2 154:10

**kinda** 18:4 87:19

**kinds** 65:5 96:24

**knowledge** 8:9 21:16,19, 20,22 25:9,12 27:22 37:20 41:7 42:23 135:2 154:15

**KOB's** 96:25

**KYC** 48:19 69:4,5

## L

**lack** 26:20

**land** 149:5

**language** 108:20

**laptop** 36:3

**large** 70:11

**largely** 66:13 82:15 84:13 122:23

**larger** 59:23

**lastly** 10:16 101:8

**launch** 149:14

**laundry** 12:18

**law** 62:18 63:8,11

**laws** 62:23

**lawsuit** 25:9,19

**leadership** 62:5 64:5,10 73:2 92:5,8,14,15,20,21 93:10,16,18,25 94:16 95:3 97:18 148:1

**lease** 73:23

**left** 129:24 130:14

**legal** 63:22 65:8 68:16 71:17

**legitimacy** 33:7,21 82:11

**legitimate** 29:2 57:3 67:8,20,25 68:4,14 70:12 78:15 82:16 86:5 87:14,21 89:22,23 100:18 117:19 118:13,16,19 119:10 127:11 141:6

**legs** 10:24

**lender** 101:3 124:6

**lenders** 101:4 143:3

**lending** 124:6

**letter** 75:1 85:21

**letters** 26:14

**level** 12:20 32:23 40:21 46:18 48:18,19 49:2,3,7,9, 10,11,25 50:8,12,18 56:7 66:9,11,12,22 68:13,21 69:4 82:4,5,6,8,15 84:6,7 87:11 89:16,18,19 90:3 91:3,8,9 93:1 95:9,19,23 96:3,5,7,10,12,23 98:19, 21 99:4,10,23 102:13

104:7 114:10,16,20 115:9, 22 116:12 134:23 142:6, 10,15,21 143:12,17 150:24

**leveling** 48:15,21,25

**levels** 48:17 49:5,12,21 50:6 89:17 95:24 98:20 102:17 116:9,11,14,15,17, 24 117:14 118:23 142:23

**leverage** 96:23

**Lexis** 57:12,16,18

**Lexisnexis** 57:7,8,11

**liability** 63:14

**license** 64:23 124:6

**lie** 110:7

**lift** 57:15

**limitation** 138:21

**limited** 30:7

**limiting** 77:24 146:22

**lines** 47:3

**link** 88:2 94:19

**list** 12:18 31:11,14 34:7 50:14,17 55:17,18,21,23, 24 56:3,5,8,14,17,21,23 57:8,10 62:3,9,12 71:10 72:25 81:6,7,9,11,15 104:16,24 105:4 108:9,13, 14 132:12,13 135:13,14 139:10,23 144:22 149:6 152:22

**listed** 74:4 139:21

**lists** 31:21 50:7,9 55:24, 25 57:10 66:15 124:9 137:13

**lit** 93:17

**literal** 109:13

**literally** 91:11

**litigation** 63:3 91:22

**load** 139:11

**loaded** 30:20,25 135:19 136:23,24

**loans** 122:23

**local** 101:11

**located** 38:3,4 56:8,20 58:6 73:6,18 83:9

**location** 5:8 38:25 42:1 44:5 75:9 78:4,7 83:7

**locations** 82:22,25 83:1, 2,5

**locks** 77:5 78:9

**log** 98:4

**long** 9:12,15,17 11:10,24 14:1 15:8 17:4 149:11

**longer** 40:10 139:20 140:2

**looked** 16:6 95:4,19 99:22 114:16 116:9 122:22 124:12 127:10,13, 20 128:23 129:5 138:6 141:4 142:25 143:6 144:16 145:20 148:6 151:1 152:12,22

**lot** 52:6 91:7

**lots** 52:18

**low** 69:20,24

**lower** 61:17,22,25 95:24 139:21

## M

**Mac** 122:23

**made** 15:1 24:6 25:18 40:21 48:3 62:14 93:6 120:10 145:12 146:13

**Mae** 122:23

**magic** 109:13

**mainframe** 132:13,18

**Mainframe/d2p4** 79:13

**maintain** 32:5

**maintained** 27:13 114:21 154:12 155:7,20

**maintains** 51:6 58:1

**majority** 43:4,12 156:22

**make** 7:12 8:25 9:19 10:14 11:5 13:4,20,22

Charles McCall vs. Experian Information Solutions, Inc. -
30(b)(6) and 30(b)(1) Experian Information Solutions, Inc. - Peter Henke

October 3, 2025
Index: makes..nutshell

25:24 26:10 28:9,17 47:8 53:22 56:14,16 64:21 79:3 84:24 85:17,23,25 86:5 87:13 88:18 89:3 93:12 96:2 98:9 99:2,23 104:21 110:17 111:14 112:13 114:14 117:23 125:17 156:7,9

**makes** 37:14 52:25 85:11 89:2,3 145:6,10

**making** 87:20 141:5

**manage** 52:11

**managed** 11:23

**management** 16:19 39:15 104:23 107:14,23 132:13,18

**manager** 14:17,22 15:2, 9,15,17,18,22 16:3,24 17:4,16,20 18:4,14

**managerial** 14:23 15:18 17:21

**managers** 92:12

**managing** 15:4 52:10

**manipulate** 22:12

**Map** 101:15

**Mapquest** 73:23

**March** 132:9 150:1

**mark** 8:20 10:19,21 76:11

**marked** 22:15 24:15 45:22 120:21 126:4 128:8 130:16 150:13

**Marketing** 70:21

**match** 57:2,3 74:21 88:11 137:12

**matches** 62:3 75:10 92:5

**materials** 37:3 60:23

**matter** 5:24

**maximum** 121:18 122:1 152:4

**Mccall** 5:25 25:10 28:15, 19 40:14 46:11,19 48:24 71:2 80:20 96:22 103:5 104:17 105:25 119:23 121:6 124:19 126:11

128:18 131:8 139:23 140:8,23 142:2 143:20 147:5 151:5

**MCCALL_EXP_000637** 27:20 28:11

**meaning** 13:7,9,16,17 31:23 42:11,20 77:20 84:17 87:25 96:18 105:8

**means** 8:10 10:5 39:20 142:10

**measures** 78:8,17

**mechanism** 141:18

**medications** 8:2

**medium** 69:20,25

**meet** 108:23

**meet all** 123:6,20

**meeting** 127:6

**meets** 95:12

**Mehak** 6:1

**membership** 12:4,6,8, 12,17,21 14:1,4,9,14,20, 24 15:9 16:16 17:3,10,12, 14,18 18:8,21 19:5,14 21:9,12

**mention** 47:2

**mentioned** 9:3 27:6 38:16 52:22 78:8 149:2

**met** 62:11 121:23

**Metro** 104:20

**Metronet** 87:10

**Mind** 101:15

**minimum** 105:4

**minute** 103:17,19,24

**minutes** 10:17 44:23,24 83:15 129:24,25 156:19, 21

**mischaracterizes** 26:2 32:1 63:20 102:5,25 108:4 114:24 152:6 153:12

**Misleading** 63:19 67:4 117:9

**misread** 116:13

**missed** 156:9

**misstates** 97:10 112:6 123:2

**mix** 78:14

**moment** 10:6 105:23 119:23 123:25

**moments** 126:9

**money** 69:12

**monitoring** 133:7,12,16 134:4,8,20 139:17

**monitors** 139:11

**month** 76:15

**months** 140:15

**morning** 6:14

**mouthful** 28:12

**move** 44:19 66:10 85:21 93:20 128:7 129:18

**movies** 9:25

**moving** 69:4 84:7 86:2,8 90:3 115:9 124:19 126:7

**Mueller** 6:2 9:22 10:5,10 16:9 20:13,20 26:1,22 27:24 28:8 29:10 31:25 32:9 35:23 36:18 39:6 41:3,9 44:25 51:9,24 52:5, 17 53:1,10 54:3,24 55:8 56:25 59:5 63:19 67:4 77:9 83:16 90:10,20 94:24 97:10 99:6 102:4,25 103:20 108:3 109:20 110:20 111:4,17 112:6 113:6 114:23 117:9 118:25 119:6,14 120:12 123:2 125:13 127:21 129:22 130:2 134:9 135:4 145:14 146:16 147:15,21 148:12 150:6 152:5 153:11 155:9

**multiple** 101:3

---

**N**

**names** 23:19 61:7

**National** 40:4

**natural** 44:21 83:14 129:24

**nature** 66:16

**NCCI** 40:3

**necessarily** 12:18 43:14, 16 49:15 62:22 63:12 66:18

**necessitated** 49:9

**necessity** 49:21

**needed** 17:2 74:17 75:12

**negative** 112:11

**non-excepted** 32:7

**non-fcra** 96:7

**Nonetheless** 10:9

**notation** 27:19,23 32:20

**note** 44:20 52:15 83:16 88:10 123:5 124:4 147:5

**noted** 30:21 133:4

**notes** 52:14,18 156:6

**notice** 20:21 36:19 51:25 57:1 90:21 134:10 135:5

**notified** 139:20

**notify** 133:19

**nuances** 102:1

**number** 8:25 9:1,10 22:24 26:6 28:2,5,6,10,14, 16 30:9 50:13,14 55:9,25 58:14 61:15 62:25 64:16 67:18 70:3 74:20 78:3,16 79:6,12,20,24 86:8,9,13, 18,23 87:2,14,24,25 88:1, 5,6 93:22 94:14 98:11 99:15 102:12,17,23 107:16 109:19 113:24 115:3,5,25 116:6 127:9,23 136:18 143:9 144:10,11 145:8 146:9,14,24

**numbered** 50:6,9,17

**numbers** 24:9 43:15 50:17 52:9 61:8 116:12

**numerous** 82:21

**nuts** 98:8 119:24

**nutshell** 152:10

Coash Court Reporting & Video, LLC
staff@coashcrv.com

602-258-1440
www.CoashCourtReportingandVideo.com

Charles McCall vs. Experian Information Solutions, Inc. -
30(b)(6) and 30(b)(1) Experian Information Solutions, Inc. - Peter Henke

October 3, 2025
Index: oath..physical

## O

**oath** 45:16 83:25 130:12

**object** 20:21 26:1 36:18 41:10 114:23 120:13 136:22

**objection** 9:22 10:6,7,10 20:20 27:24 29:10 32:9 35:23 39:6 41:3,9 51:9,24, 25 53:10 54:3,24 55:8 56:25 59:5 63:19 67:4 77:10 90:20 94:24 97:10 99:6 102:4,25 108:3 110:20 111:4,17 112:6 113:6 117:9 118:25 119:6, 14 120:12 123:2 125:13 134:9 135:4 145:14 146:16 147:15,21 148:12 150:6 152:5 153:11 155:9

**objections** 10:3 23:7,8, 12,15 52:5,17 53:1

**objective** 38:8,11,13

**obligated** 8:8 9:3

**oblige** 11:1

**observation** 38:6 70:8

**observations** 34:10

**observe** 63:23

**obtain** 35:21 98:11 99:21 102:14 114:17

**obtained** 35:17

**obtaining** 116:3

**obtains** 108:16

**occasions** 6:22

**occur** 19:4 93:5 95:24,25

**occurred** 107:17

**occurs** 144:11

**October** 5:4

**OFAC** 55:24

**offering** 71:20

**offers** 100:17 145:24

**office** 95:10,11

**officer** 56:8

**official** 27:7,10

**officially** 45:15

**on-site** 23:23 34:14 43:5 154:17,19

**onboarded** 105:9

**onboarding** 14:8 19:22 53:16 73:3 136:9

**One's** 150:4 156:1

**one-hour** 10:21

**ongoing** 56:6 140:6,14, 21 144:16

**operate** 62:24 94:13

**operated** 138:8

**operating** 69:1 79:8

**operational** 118:18 119:10

**opinion** 38:5,16,18,21 39:1 89:13 118:8

**opportunity** 23:2

**opposed** 30:1 90:17

**order** 8:13 25:7,21 49:13, 20 52:11 62:10 75:8 95:23 100:21 122:16 126:14 142:22 153:16

**ordered** 97:13

**organized** 36:20

**originating** 122:6

**outcome** 144:25

**outlined** 25:15 126:13

**outsourced** 34:22,24

**outstanding** 69:13

**overarching** 25:4

**overly** 38:1

**overruled** 10:1

**overseeing** 109:4

**overseen** 32:12

**oversight** 14:23 15:18 17:22

**overview** 150:24

**owe** 69:12 79:4

**owes** 78:22

**Owners** 50:14 58:5

**owns** 26:20

## P

**P-E-T-E-R** 6:18

**p.m.** 83:19,22 104:1,4 130:5,8 156:13,16

**pages** 22:25 23:3 141:1,2

**paperwork** 61:1 69:2

**paragraph** 37:7

**parent** 110:5

**part** 12:6 20:17 25:19 34:19 38:22 46:25 66:6 70:3,11 80:21 110:15 116:12 121:18 135:25 142:19

**parties** 41:20 80:21

**Partner** 90:5,6

**pass** 68:8 138:23 142:11

**past** 79:18 80:4 131:5 142:8,17

**path** 55:17

**pause** 10:6 102:12 105:23

**pay** 67:20 69:14 70:5

**paying** 70:9

**payment** 79:21 80:1

**PDF** 54:7,14 153:20

**penalty** 5:18

**pending** 11:3 91:22

**people** 79:3 85:25 87:20 89:22,23

**PEPS** 56:3,4

**percent** 75:21,22

**percentage** 32:6,16 75:16 115:15

**perfect** 45:6 84:12 88:11 130:10

**perform** 34:21 41:20,21 42:3 43:7 51:2 53:21 65:24 97:3 132:8 137:8,9, 19 138:10 143:16 145:11

**performed** 12:19 34:19 41:7 42:8,13 50:1,2 61:6 77:7,17 116:16 119:12 135:25 136:8 137:17 138:7 154:16

**performing** 14:6 35:5 37:11 39:16 43:23 44:13

**performs** 34:13,17 42:24 43:21,22 53:15 54:20 135:23

**periodic** 104:22 140:16, 17

**perjury** 5:18

**permissible** 29:3 98:11 99:21 100:2,4,10,22 101:12 102:14 114:17 124:13 131:12 132:1,2 145:7,11,12,18,21 146:2 151:8,20

**person** 22:6 35:17 84:17, 25 85:3,13,18 87:17 120:10

**personal** 21:16,19

**persons** 56:2

**perspective** 154:24

**pertain** 82:10,11 90:2 99:7 117:20 125:25 145:22

**pertaining** 101:21

**pertains** 103:9 141:11

**Peter** 5:5 6:8,18

**Phoenix** 83:9,10

**phone** 52:9 61:7 87:25 88:1,7,18,19 146:9

**photo** 43:25

**photos** 44:5

**phrase** 13:13 109:13 113:20

**phrasing** 8:18

**physical** 5:9 23:23 32:25

APPENDIX 1608

Charles McCall vs. Experian Information Solutions, Inc. -
30(b)(6) and 30(b)(1) Experian Information Solutions, Inc. - Peter Henke

October 3, 2025
Index: physical/virtual..prospecting

33:4,7,20 34:17,18,22 35:5 37:12 41:19 42:10, 17,21,25 43:5,7,12,15,21 44:5 54:20 73:9,12 74:2, 12 75:12 76:16,23 77:1,3, 18,24 78:1 82:19 83:1,10 95:16,20 96:4 97:8,12,19, 23 98:2,7 122:24 127:12 148:18 154:17

**physical/virtual** 95:12

**physically** 42:1 98:5

**pick** 88:18

**picked** 88:7

**place** 5:16 7:2 22:3 26:12 38:12 39:1 56:19 83:11 84:2 93:23 94:16,20 120:19 130:15 149:12 153:10,25

**placement** 73:5,13 75:3

**plaintiff** 5:24 35:14

**Plaintiff's** 22:19 24:18 45:21 120:20 128:7 129:18 150:12

**planning** 104:24

**platform** 51:8

**point** 8:16 10:10,22 12:13 15:19 18:21 21:25 22:10 25:17 28:6 31:11 38:9 44:22 59:13 63:23 68:13 69:16 70:8 72:18 74:16 75:24 77:20,22 83:15 85:14 96:12 107:22 125:1 127:1 129:25 131:4 145:3

**pointed** 78:16

**pointing** 81:22

**points** 77:12,17 102:10

**policies** 14:8 19:17 21:17,21,23,25 25:6 26:7 36:8,24 42:16 60:4 92:15 103:9,13 104:12,19,22 105:3,13,15 106:6,15,18, 22,25 107:5,7,18 108:2,7, 12,15,19,22,25 109:6,23 110:16,19,23 111:7,15,24, 25 112:2,3 113:15 114:21 115:5 117:16,17,25 118:2 119:4,11,16 123:7,9,10,

11,12 129:10

**policy** 25:1,2 26:13,20 27:13 28:24 29:7,11,21 31:4,8,19,23,24 33:11,13 35:12,21 40:19 42:19 53:5 72:1 74:12,13 79:24 103:6 104:8 105:19 107:10 109:8,12,25 110:10 111:1, 5,12,14 112:22 113:4,13 114:3 121:4,5,6,21,25 122:4 123:19,22,23,24 124:2 126:8,11,12 127:3,6 128:16 129:1,9,13,16 149:18 150:22,23,24 151:2,6,10 152:2,11 153:8,9

**politically** 56:2

**poor** 79:21

**portion** 30:22 66:2 75:3 141:4

**portions** 143:12

**position** 12:2 21:6

**positive** 112:12

**possibility** 107:3 110:12 155:10

**post-order/post-judgment** 91:23

**posterity** 7:18

**potential** 12:25 13:1 64:18 66:17 78:17 123:21 124:1,7 126:7

**potentially** 37:9,14,17,22 38:18 59:25 60:4 63:8 69:9,13 70:5 72:19 75:2 80:25 91:10 92:11 143:11 144:7 145:3 146:9 148:4 149:20,25 155:6

**practice** 111:6

**practices** 71:24 101:25

**preceding** 122:2

**predates** 154:4

**premises** 32:25 33:4,20 42:14

**premium** 57:15

**prepare** 23:13

**prepared** 23:16 24:13,14

**Prequalification** 116:6

**prescription** 8:1

**present** 21:2 108:15 129:7 155:6

**preserved** 10:4

**pretty** 24:4 79:6 129:24

**previous** 12:8 49:3 79:16 85:24 98:20 102:7 131:20 145:13

**previously** 17:16 148:6

**primarily** 15:4 19:15

**primary** 85:14

**principal** 86:21

**principal's** 87:1

**principals** 86:22,25

**prior** 11:15 23:2 39:16 49:5 106:9,13 107:2,4,8, 12 112:6 114:24 123:2 146:25 147:3 153:4,9 154:10

**privacy** 126:14

**privilege** 10:11 41:10

**privileged** 120:14

**procedure** 14:10 33:12, 13 35:13,22 40:20 46:6,21 50:5 53:6 60:18 61:18,22, 25 72:2,3 84:3 103:6 104:8 110:11 112:22 113:4,13 114:3 117:17 121:22 123:16,17 124:18 127:10,23 129:14 131:1,3, 8,11 136:1,15,17 137:10, 14 138:7 142:21 146:8 148:7 149:18 151:1 152:18 153:8

**procedures** 21:17,21,23, 25 25:6,19 26:8 28:24 36:8,24 42:16 56:19 103:14 104:11,19,22 105:3,16 106:6,16,18,23, 25 107:5,8,18 108:2,7,12, 16,19,22,25 109:6,9 110:17,19,23 111:7,13,16, 25 112:1,2,4 113:16 115:6 117:17 118:1 119:17

121:17 122:1,11,13,14,18 123:12 127:19 128:23 129:10 143:5 152:3

**proceed** 6:5 95:5

**proceeding** 91:23

**PROCEEDINGS** 5:1

**process** 16:21 31:10 32:24 33:3 34:19 46:9 49:15 53:6,8 54:2 57:23 61:23 66:7 76:16,19 81:17 92:1 132:17,21 135:12,21, 24 137:2,20,21 141:10 142:15,22 146:23,24 147:1,4 148:25 149:11 151:22 152:12,14,17

**processed** 136:18 137:6

**processes** 75:17

**processor** 81:10,11

**processors** 81:16

**procure** 78:11

**produce** 106:22 111:24

**produced** 35:13 40:25 112:25 113:2,4

**producing** 111:25

**product** 49:2,8 50:1 65:11 139:11 155:11

**products** 29:2 30:17 52:9 57:12,15,16 74:14 144:1

**Profile** 57:23

**program** 139:6,7,8 149:15

**progressing** 10:20

**prohibited** 72:5,13,15

**promotion** 15:17

**prompt** 107:17

**proof** 124:5

**proper** 118:13

**properly** 98:17 118:7

**property** 54:20 77:25 107:13,23

**prospecting** 71:10

Charles McCall vs. Experian Information Solutions, Inc. -
30(b)(6) and 30(b)(1) Experian Information Solutions, Inc. - Peter Henke

October 3, 2025
Index: prospective..relationships

**prospective** 13:25 16:21 18:10 19:16,18 65:25

**protect** 126:14

**protection** 92:1

**provide** 5:7 23:9 32:15 34:8,15 37:8 39:4 44:16 46:8 58:15,19 86:13,18, 20,22 87:9 101:4,9,10,12 103:13 105:2,14 106:14, 17,25 107:7 108:1 124:5, 14 144:22 145:25 146:7

**provided** 23:6 35:18 37:21 42:4 44:13 57:11 58:24 62:10 108:22 109:7 110:23 153:7,20

**providing** 56:22 66:23 67:2 82:12 108:11 143:10 145:20,24

**public** 76:20 88:2

**publicly** 31:18 76:20 96:18

**publicly-traded** 31:14

**pull** 69:17 87:10 94:4

**pulled** 75:9 88:11

**pulling** 29:13 78:9

**purchase** 13:7

**purchasing** 13:16 71:9

**purpose** 25:5 28:20,23 29:3 77:4 98:11 99:21 100:2,5,10,22 102:14 114:18 121:6 126:12 131:12 132:1,2 145:7,11, 12,19 146:2 151:6,8

**purposes** 21:5 100:19 101:12 124:13 145:21 151:20

**purview** 20:5

**put** 25:17 103:17 110:3 114:13 153:10

**Q**

**qualification** 38:11,14

**qualifications** 38:8

**qualify** 122:9,16,17

**quality** 70:22 104:22

**queries** 76:6,14

**question** 8:17,19,21,22, 24 10:8,12,14 11:3,4 21:10 36:1 45:15 47:17 53:12,25 74:2 82:19 94:8 110:14 111:10,13 112:12 113:23 114:24 116:1 117:13 120:8 125:14,22 127:16 128:2 131:24 143:16 148:24

**question's** 43:9

**questions** 8:8,9,12 9:23 10:19 16:12,15 17:1 18:5 23:13 25:2,4,8 26:6 27:18 34:7 44:6 82:5 89:17,18 98:20 153:1 156:20,23

**quick** 103:18 130:3

**quote** 61:8

**R**

**raise** 5:13 63:5

**raises** 9:22 10:5,10

**ran** 16:16

**range** 7:6,7

**re-review** 133:14

**re-reviewing** 155:12

**read** 22:8 29:4 30:21 41:22 46:25 61:10 62:6 103:14 104:14,24 121:10, 18 126:16 127:7 151:12

**reads** 27:20 152:9

**real** 130:3

**reason** 7:19 133:15

**reasonable** 28:24 104:11 121:17,22 122:1 152:3

**reasons** 107:9

**recall** 24:9 113:23 128:23

**receive** 44:9 77:14 82:3 117:21

**received** 123:13 133:21 146:14,25

**receives** 109:23

**receiving** 43:24 60:19 100:4

**recess** 45:10 83:20 104:2 130:6 156:14

**recollection** 8:9

**record** 5:3,22 6:17 7:17 10:4,7 26:2 45:8,11,16 53:19,22 54:14 83:17,18, 21 95:6 99:3 102:22 103:23,25 104:3 114:14 116:22 130:2,4,7 150:7 156:11,12,15

**records** 144:17

**recredentialed** 145:25 149:3,6

**recredentialing** 131:1,2 132:8,17,21 133:2,5,12,20 135:10,16,20,24 136:10, 19 137:1,3,7,17,21 138:12,16 139:9,14 141:9 142:11,15,19 146:23 148:10,25 149:10,11,24 150:3,8,21 151:22,24 152:12,14,17 154:21 155:1,5,13

**red** 56:9,12 69:24 97:6,9, 17

**redact** 41:1

**redactions** 41:8 120:11

**refer** 28:14 30:12,13 48:7 50:17 57:9 63:7 92:8 122:12 139:10

**reference** 9:9,16 24:6 28:1,6,9,10,16 37:14 48:16 75:23 80:24 81:20 101:15,24 112:21 131:21 133:4 139:5 140:7,9 143:9 145:6,10 152:20

**referenced** 37:2 97:22 135:13 145:19 148:2

**references** 33:17 42:6 55:17 80:8,22 81:4 136:16 142:5

**referencing** 142:20 148:3

**referred** 27:6 73:10 97:2

**referring** 23:21,24 24:8 28:17 33:2 39:11,18 42:7 48:22 50:10 57:16 71:25 77:18,19 93:10 96:4 100:7 139:24

**refers** 37:10 50:23 55:16, 19 57:25 58:5,10 136:20 144:4

**refrain** 10:13

**regard** 16:23 26:7 28:16 47:17

**registered** 65:12

**regulated** 29:23 30:4,20 46:23 47:15 74:14 126:20, 21

**reject** 94:2

**rejected** 148:5

**rejection** 93:25 94:5 144:4 147:6,12

**rejections** 143:22,24 146:12

**relate** 26:8 66:17,22 67:1 69:11 78:17 89:20 102:23 103:2,7 114:19,20 115:3 116:24 117:1,3,6,7,14 118:4 123:9,13 124:12 125:9 127:9 128:3,5 133:23 142:23 143:4 144:10,11 145:19 155:18

**related** 80:13 146:6

**relates** 14:24 21:5 54:15 68:21,25 69:5 71:13 72:24 73:5 79:6,12,16 81:24 82:8 84:14 85:17 86:25 87:24 89:5 99:4 102:18 105:7 115:5,9,25 116:1, 17,20 117:4 118:1 119:9, 24 124:20 125:23 127:3, 17 136:25 140:22 141:3, 13 143:25 144:5,15 146:5

**relating** 81:1 122:24 141:22

**relation** 89:11,25 91:5

**relationship** 101:3

**relationships** 79:17

APPENDIX 1610

Charles McCall vs. Experian Information Solutions, Inc. -
30(b)(6) and 30(b)(1) Experian Information Solutions, Inc. - Peter Henke

October 3, 2025
Index: relevant..safe

101:5

**relevant** 71:6

**reliability** 26:9 125:23

**reliable** 25:22 68:25

**remain** 45:16 83:24 130:12

**remaining** 156:23

**remediate** 56:21 139:2

**remediated** 94:11

**remediation** 56:19 94:7

**remember** 6:24 14:16 17:11

**remote** 42:8,18 75:2

**remotely** 8:11 42:3,13

**Removed** 41:19

**renders** 38:5

**rent** 68:6 103:12 107:24

**Rentbureau** 107:15

**repair** 72:7

**repeat** 86:15 136:5 143:1

**repeated** 133:24 136:10, 13

**rephrase** 8:22,24 47:11

**report** 65:3,10,17,18,24 67:11,17 69:17 70:4 73:22 75:10 88:2,11 96:9 98:25 107:11 117:5 118:7,11,14 121:9 122:5 124:24 126:21 144:23 145:16 155:13

**reported** 67:6 107:12 117:20,21 125:10

**reporter** 5:3,10,13,20 6:4, 10 45:8,11 83:18,21 103:25 104:3 122:5,11 130:4,7 156:12,15

**reporters** 121:8

**reporting** 63:11 67:7 104:13 107:4,14,23 115:17 121:4 122:10,11, 13,17 124:22 125:11 144:12 145:2

**reports** 13:7,16 69:18 74:15 78:10 99:24,25 116:3

**represent** 25:18

**representation** 25:24

**representative** 5:5

**represented** 70:14

**represents** 78:7 121:21 152:3

**reputable** 98:24

**request** 70:25 74:6,9 94:2 97:8 98:5,9 133:8,12,14, 20 134:6 136:18,20,21,22, 24,25 139:14 144:21

**requested** 49:2 50:1 52:9 77:15 155:11

**requesting** 14:11 29:7,22 30:1 99:24,25 100:3 108:6 126:19,20

**requests** 11:1 12:22,24 70:23 96:7 98:13 100:24 133:21,23 134:2 135:18 138:13 139:9

**require** 49:10 100:13 107:5

**required** 31:9 37:8 42:17 74:23 83:4,6 87:5 95:10, 21 96:13 97:13 98:12 100:21 105:21 106:14,17, 24 107:7 124:5,14

**requirement** 41:20 60:8 63:22 95:11 105:14 106:22 111:23 148:20 153:9

**requirements** 95:12 96:11,14 102:8 112:22 113:4,14 114:4 121:7 123:20 124:2,14,15,16 126:8,13 142:1 143:4 151:7

**requires** 105:2 121:17

**requiring** 60:19

**rescinded** 140:2

**research** 76:1,3

**researching** 32:18

**resell** 57:12

**reseller** 98:16 114:10 115:18,19 116:7

**resellers** 90:25 115:10,23 116:1,2,6

**reselling** 90:13

**reshare** 156:25

**residential** 72:7

**resolved** 95:5

**resolving** 18:5

**resource** 104:24

**resources** 73:19 88:3

**respect** 105:11 107:1 148:10 154:24

**response** 11:4 23:7 82:10 94:11 98:23 102:20 116:23 120:16 144:20

**responsibilities** 17:22, 23 21:10

**responsibility** 12:22 20:8,24 127:13

**rest** 30:15 72:24 89:14

**restate** 128:2

**restating** 129:5

**restricted** 81:6 89:8

**restrictions** 89:5,7

**result** 54:13,15 146:10

**results** 53:8,20 54:2 55:4 93:18 94:17 134:19 150:3

**retained** 53:7 54:1 93:7 94:22

**return** 11:2 48:16

**returning** 48:24 106:5

**review** 23:3 58:8 89:4 100:12 108:24 109:6 120:4 133:6,13 134:12,17, 19 138:24 153:17

**reviewed** 92:23 118:1

**reviewing** 16:12 141:18

**reviews** 104:22 109:24 134:19

**revolve** 67:19

**rifling** 79:2

**risk** 57:15 69:9,11,13,19, 20,24,25 70:9 72:11,19 127:5 128:16 129:7

**risks** 72:6 73:1

**Ristvedt** 5:23,24 6:4,6,13 16:13 20:15,25 22:17 24:17 26:5,24 28:3 29:14 32:2,11 35:24 36:22 39:9 41:6,16 44:19 45:3,6,13, 24 51:11 52:2,13,21 53:4, 13 54:9 55:1,11 57:5 59:6 64:1 67:12 77:16 78:22 83:13,23 90:15,24 95:1 97:15 99:9 102:11 103:4, 22 104:5 108:8 109:22 110:24 111:9,21 112:10 113:8 115:1 117:12 119:3, 8,18 120:18,23 123:4 125:16 126:6 127:24 128:10 129:19,23 130:9, 18 134:13 135:8 145:17 146:20 147:16,24 148:15 150:10,15 152:7 153:15 155:14 156:5,17

**Rizvi** 6:1

**road** 7:12

**role** 12:2 14:1,15 15:3,6,9 16:19 17:4,16,19,20 18:3, 8,16,25 19:5,11 20:6 21:15

**rolled** 122:13 149:21

**rolling** 45:2

**room** 110:6,7

**roughly** 141:1 155:6

**rules** 7:12,16 8:6

**run** 76:14

**runs** 132:8

**Ryan** 6:2 16:7 44:23 83:14 129:19 147:19

---

**S**

**safe** 14:22 15:20 17:15 18:6 52:23 58:25 62:15 109:19

Charles McCall vs. Experian Information Solutions, Inc. -
30(b)(6) and 30(b)(1) Experian Information Solutions, Inc. - Peter Henke

October 3, 2025
Index: Salesforce..specific

**Salesforce** 32:21 51:2,8, 14,22 52:4,7,18 54:1,16, 22 55:6,13 58:4 59:4 60:22 76:6 79:12 94:23 95:7 120:3,5 135:19,20 136:22,23 137:5 150:5,8 153:17 154:1,4,7,12 155:7,16,21

**Santa** 5:11

**satisfied** 114:6

**satisfies** 118:22

**satisfy** 62:25 63:18,22 109:18

**save** 89:15

**saved** 59:3 95:7 140:8,12 150:4

**savings** 122:22

**scope** 20:21 25:13 29:18 30:15 36:19 51:25 56:25 90:21 126:18 134:9 135:4 146:17

**screen** 22:3,5,9,18 26:12 45:20 50:11 84:3,4 120:19 130:15 156:25

**screening** 100:18 107:15

**screenshot** 94:17,19

**screenshots** 143:10

**script** 156:8

**scroll** 22:11,23

**SDN** 55:24

**search** 49:19 50:13,22 51:2 61:5,6 63:2,25 73:22 75:2,3 79:13 87:10 91:15 93:15,17

**searches** 56:16 68:13 92:4,17

**searching** 65:3

**SEC** 65:3

**Secretary** 65:13

**section** 29:17 30:15,19 36:14,23 40:15,23 46:20 48:15 50:12,19 53:2 56:13 57:6,7,9 58:5 61:5 62:2 63:18 67:1,5 68:12,15,24

70:11 71:3,19 72:4,13,15, 24 73:5 79:14 80:3,20 82:4,14,15 84:15,16 85:17 86:2,9,22,25 87:2,24 89:14 96:3,16 100:24 101:8,15 102:15 103:5 105:24 109:17 113:25 114:20 115:2 117:18 118:1 120:11 121:16 123:19 124:20 131:9 140:22 141:9,25 142:2 143:9,21 147:6

**sections** 28:20 29:21 40:18 46:13 72:17 114:16 125:7 135:10 142:23

**secure** 78:10

**security** 30:9 33:8 58:14 78:8,17 85:2,4,6,7 86:8, 13,18,21,23 87:2,14

**segregated** 36:13

**self-examination** 97:3

**sell** 90:12,23

**send** 68:7 97:18

**sends** 51:13

**sense** 9:19 10:14 11:5 13:22 25:24 26:10 28:17 85:11 89:2,3

**sensitive** 29:1

**sentence** 30:13,24 37:7, 10 47:6,13 103:11,14 104:10 122:2 131:16

**separate** 19:23 20:7 33:11 56:3 123:10 124:15

**separately** 36:20

**sequential** 49:15

**service** 34:15 42:4 52:20

**servicer** 101:3

**servicers** 100:25 101:2

**services** 14:11 24:25 26:15 27:1,8 29:2 30:17 36:11 38:2 41:24 46:5 58:21 70:21 71:20 77:15 121:4 127:5 128:16 130:25 131:13 141:14,24 144:1 150:21

**set** 7:15 58:3 93:8

**setting** 42:13

**share** 22:4,18 101:20 153:1

**shared** 36:11

**sharing** 22:5 36:7

**short** 126:11

**shorter** 121:5

**shot** 9:10

**show** 8:11 150:11

**shows** 9:25 98:16

**shut** 94:12

**sic** 23:22

**side** 85:10 94:8 156:4

**sign** 78:6 124:8

**significance** 139:6

**significant** 49:13

**signifies** 27:23

**signing** 84:18,24

**silly** 7:17

**similar** 8:11 18:4,14 31:21 44:9,11 47:17 60:5, 7 65:17,20 70:11 76:18 82:5 89:17 90:11 91:25 96:6 99:22 102:6 120:8 125:21 131:22,24 141:3 143:4 155:12

**similarly** 138:8

**simple** 75:9

**simply** 8:21 10:25

**single** 12:19 13:15 82:23 132:20

**sir** 5:10,20

**sit** 75:15 154:15

**sitting** 9:13

**situation** 138:24

**skip** 89:14

**slight** 111:10

**slightly** 113:2

**Smith** 93:16

**social** 30:9 58:14 86:8,13, 18,21,23 87:2,14

**software** 137:19,23 138:8,9 141:19

**solely** 30:7 116:2 146:22 155:5

**solemnly** 5:15

**Solutions** 5:6 6:3 11:8 80:14 81:5 87:11 90:5,6,9 91:5

**somebody's** 72:25

**sort** 6:25 7:11,13,15 8:14 12:20 14:7,23 15:18 16:4, 20 17:15,21 19:10,22 20:2,6,17,18 25:3,4,13 26:19 32:5,20 33:15 36:13 40:21 44:4 52:15,24 53:22 58:7,23 66:15 69:18 71:23 75:1,2,16,17,22 76:13 80:5 81:19 84:22 85:22 88:1 92:6 95:6 97:3,8 99:17 101:24 106:7 109:24 111:24 113:24 116:1 119:24 125:3 129:13 131:21 138:17 139:15 140:6 144:25 145:12 150:24 152:21 153:8 156:8

**sound** 7:16

**sounds** 18:25 19:23 21:24 38:7 40:5 43:4,11 45:3 52:22 54:12 55:5 60:12 78:14 94:16 101:24 107:20 109:11

**source** 118:7

**sources** 25:22

**spanning** 104:16

**spans** 141:1

**specific** 14:16 20:6 23:18,19 24:9 47:13 50:7 67:6 70:23,25 74:6,8 76:12 77:7 81:22 83:2 95:18 98:25 100:2 102:2 109:12 115:23 116:7 132:17 134:17 140:13 143:2

Charles McCall vs. Experian Information Solutions, Inc. -
30(b)(6) and 30(b)(1) Experian Information Solutions, Inc. - Peter Henke

October 3, 2025
Index: specifically..testimony

**specifically** 30:11,13 31:3 33:19 47:15,16 72:12 78:1 81:4 117:20 119:16 128:5 131:11 134:6 137:19 156:2

**specifics** 61:22 93:23 135:7

**specifies** 127:18

**speculation** 119:1

**spell** 6:17

**spot** 55:5

**spots** 55:10

**SSN** 87:10

**staffing** 104:24

**stand** 57:22 70:18,20 71:11 90:4

**standards** 121:22 127:6

**stands** 40:3 57:20

**start** 49:8 76:5 107:14 133:5

**started** 11:16 12:1,17 107:21

**starting** 61:13

**state** 5:21 6:16 10:7 47:16 62:23 65:4,13 73:12 101:11

**stated** 8:5 78:12

**statement** 23:8 121:7 151:6

**states** 31:3 62:23 83:1 121:13 122:6 151:24

**statistics** 32:5

**step** 17:16 19:11 20:3 29:15 50:22 55:16 59:10 69:8,16 70:10 77:21 89:4 91:14 92:25 132:11

**steps** 46:21 49:24 77:21 98:21 137:9 138:20,22,23 152:13,16,17

**stop** 129:25 144:21

**storage** 52:24

**stores** 11:23

**straightforward** 79:7

**Street** 38:10,11

**stretch** 10:24

**stuff** 148:7

**subject** 23:7,12,15 31:24 48:12 63:13 64:13 75:4,21 81:21 83:1 92:16 105:14 106:21 107:10 108:11 132:16 133:1 135:16 138:1 149:9 154:22

**subjective** 38:22 61:20

**submit** 25:21 43:25 99:12 105:21 120:3

**submits** 110:14,16

**submitted** 47:4 60:23 147:3 154:11

**submitting** 115:13

**subnumbers** 116:13

**subscriber** 13:16,21 29:25 47:21,24 48:3,7,8, 11 53:16 54:23 58:18,21 59:2,11,13,14,15 60:24 61:14 64:4 115:22 123:21 124:1 126:8 144:6 145:13

**subscriber's** 59:4

**subscribers** 13:1,7 21:18 29:9,12 46:22 47:14 48:1 51:7 58:24 91:6,7 151:20,25 152:1

**subsection** 73:17 74:3,4, 5 81:24 97:16 100:8 104:7

**subsections** 79:20

**subsequent** 138:22

**substantiate** 67:7 101:5

**substantive** 33:16 46:8

**subsumes** 73:9

**successfully** 138:23

**sued** 63:16

**sufficient** 45:4 62:25 63:18

**suggest** 10:18

**summary** 129:16

**supplied** 56:15

**supplies** 48:4

**supply** 13:9

**supplying** 13:18 30:1 31:2 47:20 126:25

**support** 54:6 99:25 100:4 101:12

**supporting** 98:12 99:21 100:9 101:10 102:8,14 114:18

**supports** 67:16

**supposed** 38:4 79:9

**suspect** 67:11 118:12

**suspended** 144:7 148:5

**suspending** 143:25 144:3

**suspension** 144:11 146:10 147:6,12

**suspensions** 143:21,24 145:6 146:12

**suspicious** 37:9,14,17, 22 38:6,19

**sustained** 10:1

**swear** 5:15

**sworn** 5:14 6:9

**synonymous** 42:21

**system** 36:3,7 47:5 48:16,21,25 51:23 54:8 58:1 69:23 70:1 80:11

**systems** 85:8,10

---

**T**

**table** 9:12,15 46:12 48:17

**tables** 72:4 128:22 129:1

**takes** 15:11 94:16

**taking** 8:1 44:5

**talk** 13:5,20 48:21 72:4 76:23

**talked** 52:15 106:6 137:13

**talking** 33:19 75:21 119:15 129:6 148:17

**talks** 32:23 47:4,14 48:15 100:8 128:19

**tall** 9:14

**target** 139:10 149:5

**targeted** 132:12 135:14 139:10

**targeting** 71:10

**task** 12:19

**tasks** 15:5,24 89:19 136:8 137:16 138:7 139:2

**team** 47:23 92:14,16,20, 21 93:16,18,25 95:3 117:22 132:18 134:3,7 139:1 148:1

**tech** 85:13

**technically** 40:9,12 43:23 137:18

**telephone** 49:18

**tells** 110:5

**template** 58:24

**ten** 44:23 141:1

**tenant** 100:18 107:15

**tense** 142:8,18

**term** 8:18 42:20 136:21

**terminate** 145:4

**terminated** 144:7

**terminates** 139:19

**terminating** 144:3

**termination** 146:10

**terminations** 146:13

**terms** 13:21,22,23 25:25 32:6 75:20 87:20 92:16 124:6

**terrible** 36:1

**testified** 6:10 24:10 115:3

**testify** 7:20,24 8:3 23:17

**testimony** 5:15 23:10 35:2,6 40:7 43:10,18 44:6 48:5 72:21 87:6 102:2,5

Charles McCall vs. Experian Information Solutions, Inc. -
30(b)(6) and 30(b)(1) Experian Information Solutions, Inc. - Peter Henke

October 3, 2025
Index: That'll..validating

103:1 108:4 112:7 114:25 123:3 136:11 153:6,12

**That'll** 89:15

**theft** 87:22

**theory** 68:5

**there'd** 95:6

**thing** 11:2 45:1 58:17 68:1 85:22 94:5 95:17 97:25 140:15

**things** 16:17 33:18,24 52:14,16 56:22 65:5 66:16 67:20 69:2 72:6,8 73:23 77:6 93:22 95:5 98:9 108:14 112:15 127:13 141:4 143:3 144:17

**thinking** 85:12

**third-party** 39:14,17,22 40:9,12

**thresholds** 73:1

**thrown** 88:25

**tick** 76:11

**ticked** 76:7

**ties** 58:7

**time** 5:4,16 7:1,14 10:20 11:13 12:4 14:9,20 15:12 17:6,7 21:9 60:14 83:19, 22 89:15 104:1,4 130:5,8 156:13,16

**times** 9:21 27:6 28:13 86:22 152:22

**timing** 49:23

**title** 12:4 14:16 15:14 17:8 18:18 21:2

**titled** 103:6

**titles** 84:23

**today** 5:16,25 6:14 7:14, 20,24 8:7 9:13,24 18:17 22:20 23:2,13,17 24:13 25:13 26:6 60:16 71:6 75:15 89:11 105:9 138:9 142:25 154:15

**today's** 10:23 21:5

**tomorrow** 105:9

**tool** 52:10

**top** 26:14 28:21

**topic** 23:22 52:19

**topics** 22:24,25 23:3,7, 10,13,16 24:6,7,11,12

**totally** 49:19

**towing** 124:25

**traded** 31:18 76:20 96:18

**tradelines** 125:9

**Trail** 5:11

**trained** 62:15

**training** 104:23

**TRANSCRIPT** 5:1

**transition** 15:1 16:6 19:4

**transitioned** 15:22 16:19,24 17:3 154:5

**transmits** 44:3

**Trendsource** 34:14,16, 17,23,24 35:3,4 37:11,16, 21 38:17,22 39:18,19,23 41:25 42:4,8,11,24 43:2,8, 16,20 44:10 54:20 98:4

**Trendsource's** 41:24

**Triggers** 139:5,7,8 140:9, 12,18,19

**true** 18:23 23:8 27:15 30:1,9 31:16,19,24 33:8 34:19 51:6,16,22 53:9,17 55:7,14 59:20 60:1,24 62:19 65:7 70:6,15 72:10 73:7 75:13,18 81:2,21,23 82:2,17,23 87:11 88:3 90:1 91:6 92:2 94:18 95:7 99:19 100:1,16 101:6 106:16 107:1 108:17 109:15 110:25 115:14 116:4 117:8 120:9 123:23 124:22 125:3,12,19,20,24 126:3 127:1 128:4 129:8 139:3 144:2 146:5 150:1,5 151:3 153:4,10 154:9,13 155:8 156:1

**truth** 5:17

**truthfully** 7:20,24 8:3

**TV** 9:25

**two-plus** 21:25

**type** 11:18 42:8 49:2 52:3 55:13 58:17 60:7,20 78:12 81:13 90:8 93:6 100:10 107:22 108:5 113:12 116:7

**types** 36:25 37:21,24 47:25 72:5 79:25 107:16 124:21 125:8,10,19 129:6 134:2 139:16 144:15 145:21

**typical** 9:5

**typically** 10:16 27:11 40:19 94:25 134:5

---

**U**

**ultimately** 59:8 93:3,20

**unable** 7:20 139:2

**unacceptable** 61:9,15, 19,21 71:21,24 124:20 144:13 152:20

**unclear** 8:15

**understand** 8:19,21 9:20 11:7 13:4,11,24 18:22 19:13 22:8 23:6 24:10 26:4,7,11,13 31:1 45:14, 16 46:7 47:8,18,25 49:25 53:5 56:13 63:10 64:3 67:13,18,23 68:11,12 73:16 76:24 83:24 84:13 89:19 93:12 95:23 96:2,15 105:7 111:11 114:5 117:25 118:15,21 123:22 125:18 128:22 130:11 135:9,11 138:6 141:2 143:3 152:21 153:6

**understanding** 12:25 13:6 19:13,24 25:5 26:17, 21 29:6 31:5 35:2,16 37:10 39:19 40:6,17,23 41:25 43:10,13,20 47:23 50:5,8,16,19 54:16 57:14 66:2 80:14 86:11 87:6 91:3 92:6 101:23 112:14 131:2 132:21 134:22 137:23 142:7,19 143:11 153:5

**understood** 8:25 11:20 12:10 14:18 15:7 18:20 20:9 21:1 23:20 35:5 37:5 41:17 44:1,6 45:19 54:10 57:13 60:10 65:23 66:21 68:19 70:24 71:18 72:14, 21 74:24 77:23 78:17 81:18 87:18 89:9 100:6 102:2 108:2 109:9 111:22 112:13 115:8 120:18 122:15 123:18 136:7,11, 14 142:16 146:3 149:7,16

**underwriting** 100:18

**unfamiliar** 101:18

**unions** 31:15,22 74:21 76:19 96:19 103:12 122:22

**unique** 28:7 101:21

**unit** 71:15 80:10,15 90:7, 8,11,16 91:4

**United** 62:23 122:6

**units** 71:1 81:23,25 96:8

**unsure** 8:17

**update** 41:19

**updates** 104:21

**uploaded** 54:22

**utilize** 34:3,25

**utilized** 40:6

---

**V**

**vague** 35:23 53:10 54:3, 24 55:8 59:5 77:10 94:24 99:6 111:4,17 117:9 125:13 147:15,22 150:6

**valid** 87:14

**validate** 57:3 73:13,17,24 87:16 95:9 102:21 111:7, 19 118:6 138:21,22 139:13

**validated** 136:4

**validates** 98:23 102:20 134:25

**validating** 73:6 75:1 109:1 151:20,21

Charles McCall vs. Experian Information Solutions, Inc. -
30(b)(6) and 30(b)(1) Experian Information Solutions, Inc. - Peter Henke

October 3, 2025
Index: validation..zoom

**validation** 99:15 102:14 114:17 133:19

**variety** 52:7,10 92:25

**vendor** 40:10,11,12 104:23

**vendors** 39:15,17,22

**verbiage** 109:12

**verification** 86:9 99:18

**verify** 84:17 85:21 88:6, 13 95:11 112:16,17

**verifying** 84:14 151:7

**Version** 106:2

**versus** 9:6,15,18 13:8,21 32:7 42:17,24 43:15 67:25

**vet** 12:22

**vetting** 13:25 14:6,8 49:18 81:16 98:13

**Video** 11:19

**view** 57:15

**vii** 23:22

**violated** 63:17

**violates** 63:12

**violating** 64:8

**violations** 63:8 79:24

**virtual** 41:21 42:2,7,18, 22,24 43:1,13,16,17,22,24 44:2,9,13 73:10,12 74:2 75:12 76:16,23 77:1,2,18, 25 78:1 82:20 83:2,10 95:16,20 96:4,23 97:1,7 122:25 148:18

**visits** 42:11

---

### W

**Wait** 77:9

**wanted** 13:20 20:23 28:9 51:12 55:3 73:16

**warrant** 93:2 108:6

**warranted** 155:11

**warrants** 93:25

**water** 10:25

**ways** 78:10

**website** 70:11,13 98:5,8

**websites** 36:11 65:4

**weeks** 140:15

**weigh** 9:24

**weighed** 77:13

**Widgets** 99:17

**windows** 9:8

**witnesses** 9:6

**word** 26:20 41:19 51:7

**words** 8:13 13:15 19:23 21:20 26:25 27:12 28:8 29:8 30:11 33:22 38:15,17 50:2 53:20 55:2,12 58:15 68:5,20 72:15 78:10 79:2 82:14,22 83:8 88:17 89:10 97:16 99:15 109:12,17 111:23 112:16 115:16,20 119:9 121:25 127:16 129:4,13 140:14 141:21 142:8,11,14 145:1,23 149:8 155:3

**work** 16:12

**working** 11:16 12:1 21:24

**works** 84:25

**wrapped** 156:7

**written** 48:7 92:15 100:19 104:12,18 105:3,13,15 108:15 109:8,23 111:24, 25 119:4

**wrong** 38:12 39:1 91:3 129:20

**wrote** 48:2

---

### Y

**year** 14:3,4,14 132:8,20 133:2 135:16,20 145:13, 25 146:15,25 147:3 149:10,14 150:1 154:22

**years** 7:3,4,5,6,7,10 11:12,25 15:10 17:5 19:7 60:13 91:19 93:15

**yellow** 69:25

**York** 9:8

---

### Z

**zone** 79:8

**zoning** 79:6

**zoom** 22:10,11 24:1 46:15 73:22 84:9 121:14 130:24 143:14 151:13

# EXHIBIT S
# FILED UNDER SEAL
(Appendix 1616-1618)

# EXHIBIT T

Victor Manuel Ramirez Najera vs. Experian Information Solutions Inc. -
30(b)(6) Experian Information Solutions Inc. - Teresa Iwanski

November 14, 2025

1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF TEXAS

VICTOR MANUEL RAMIREZ NAJERA, )
)
    Plaintiff, )
)  Case No.:
v. )  4:25-cv-00443-P
)
EXPERIAN INFORMATION SOLUTIONS, )
INC.; APPFOLIO, INC.; and )
NATIONSTAR MORTGAGE, LLC d/b/a )
RUSHMORE SERVICING, )
)
    Defendants. )
_____)


30(b)(6) VIDEOCONFERENCE DEPOSITION OF
EXPERIAN INFORMATION SOLUTIONS, INC.
BY TERESA IWANSKI


Richland, Washington

November 14, 2025


Prepared by:

Michelle Clark, CER
Certified Electronic Reporter
CER No. 4440

CERTIFIED
TRANSCRIPT

                                    I N D E X

THE WITNESS                                                          PAGE

  TERESA IWANSKI

        Examination by Mr. Ristvedt                                    7




                              EXHIBITS MARKED

  EXHIBIT                    DESCRIPTION                              PAGE

  Exhibit 1      Plaintiff's 30(b)(6) Notice of                        11
                 Deposition of Experian information
                 Solutions, Inc.
                 Case No. 4:25-cv-00443-P

  Exhibit 3      Declaration of Iwanski (Ohai)                         21

  Exhibit 4      Due Diligence Procedure                               30
                 EXPERIAN_NAJERA_0291 - 0332
                 CONFIDENTIAL

  Exhibit 5      Recredentialing Procedure                            105
                 EXPERIAN_NAJERA_0347 - 0384
                 CONFIDENTIAL

  Exhibit 6      Recredentialing Policy                               113
                 EXPERIAN_NAJERA_0385 - 0391
                 CONFIDENTIAL

  Exhibit 7      Data Reporting Policy                                116
                 EXPERIAN_NAJERA_0333 - 0339
                 CONFIDENTIAL

  Exhibit 8      Potential Subscriber Investigation                   124
                 Requirements Policy
                 EXPERIAN_NAJERA_0282 - 0286
                 CONFIDENTIAL

  Exhibit 9      Rushmore Credentialing Application                   126

  Exhibit 10     Rushmore Contract                                     95

Victor Manuel Ramirez Najera vs. Experian Information Solutions Inc. -                    November 14, 2025
30(b)(6) Experian Information Solutions Inc. - Teresa Iwanski                                                    3

```
Exhibit 11    Consumer Credit Report Accuracy         142
              Program
              EXPERIAN_NAJERA_0468 - 0473
              CONFIDENTIAL

Exhibit 15    Industry Risk Policy                     43
              EXPERIAN_NAJERA_0340 - 0346
              CONFIDENTIAL
```

30(b)(6) VIDEOCONFERENCE DEPOSITION OF

EXPERIAN INFORMATION SOLUTIONS, INC.

BY TERESA IWANSKI

was taken on November 14, 2025, commencing at 9:03 a.m.,

with the witness appearing from Richland, Washington; with

all other participants appearing via videoconference from

their respective locations, before Michelle Clark, a

Certified Electronic Reporter and Notary in the State of

Arizona.

                          *    *    *

APPEARANCES:

     For the Plaintiff:
          CONSUMER JUSTICE LAW FIRM, PLC
          By:  James Ristvedt, Esq.
               8095 North 85th Way
               Scottsdale, Arizona  85258
               480-626-1956
               jristvedt@consumerjustice.com

          and

          THE CREDIT ATTORNEY, INC.
          By:  Youssef H. Hammoud, Esq.
               601 North Parkcenter Drive
               Suite 202
               Santa Ana, California  92705
               949-301-9692
               yhammoud@thecreditattorney.com

APPENDIX 1623

For the Defendant:
     JONES DAY
     By:  Rebecca W. Anthony, Esq.
          2727 North Harwood Street
          Suite 500
          Dallas, Texas  75201
          214-220-3939
          ranthony@jonesday.com

Also present:  Shaun Pambid

TRANSCRIPT OF PROCEEDINGS

THE COURT REPORTER:  I'll now take us on the record.  The time is 9:03 a.m. Pacific time.

Would counsels please identify themselves for the record and state who they represent, starting with the noticing attorney.

MR. RISTVEDT:  Yes.  It's attorney James Ristvedt today, appearing on behalf of the plaintiff, Mr. Ramirez Najera.  I'm joined by my co-counsel, Youssef Hammoud and my paralegal Shaun Pambid.

MS. ANTHONY:  This is Rebecca Anthony, appearing on behalf of the defendant, Experian Information Solutions.

THE COURT REPORTER:  Thank you.

And, Ms. Iwanski, can you please let us know where you're located at the moment.

THE WITNESS:  Richland, Washington.

THE COURT REPORTER:  And could I have an address?

THE WITNESS:  I normally don't give out my personal address, but I can give you a business address.

THE COURT REPORTER:  Sure.

THE WITNESS:  It's 701 Experian Parkway, Allen, Texas 75013.

THE COURT REPORTER:  Thank you.

THE WITNESS:  Otherwise, you can contact me through counsel.

THE COURT REPORTER:  Okay.  Okay.  Thank you so much.  So I'm now going to swear you in.

(The witness was sworn.)

THE COURT REPORTER:  Counsel, you may now begin.


TERESA IWANSKI,

the witness herein, having been first duly sworn by the

Certified Reporter, was examined and testified as follows:


EXAMINATION

BY MR. RISTVEDT:

   Q.   Okay.  Good morning, Ms. Iwanski.  How are you today?

   A.   Good.  How are you?

   Q.   Very well.  Thank you.

         Could I have you please state and spell your first and last name for the record?

   A.   First name is Teresa T-e-r-e-s-a, last name Iwanski, I-w-a-n-s-k-i.

   Q.   Is it Iwanski?  I've been saying Iwanski this whole time, so I apologize if that's mispronouncing.  Is

it Iwanski?

A.    You might be getting the Polish version, which is Iwanski.

Q.    Fair enough.  Well, I want to get it right.  I've got a last name most people get wrong.

So, Ms. Iwanski, is there any reason you'd be unable to testify truthfully or accurately today?

A.    No.

Q.    Have you consumed any drugs or alcohol in the last 24 hours that would impair your ability to testify truthfully or accurately?

A.    No.

Q.    Are you currently on any prescription medications that would affect your ability to testify truthfully or accurately?

A.    No.

Q.    So as you know, we are here for your deposition today.  I get to ask questions.  You're obligated to answer those questions truthfully to the best of your ability and recollection.  As you know from past depositions, this is not intended to be a trivia contest, game show, anything like that.

Hopefully, I will do my job well and ask you very clear questions for which you are able to provide very clear answers.  That being said, most attorneys,

myself included, have a tendency to at times ramble on and we get to a question mark and we have no idea where that question started.  So if that is the case -- in other words, if I ask a question where you get to the question mark and you don't know what I'm asking you, perhaps I've phrased it poorly, perhaps I've used terms you don't understand or are unfamiliar with, I would ask in those circumstances you just let me know by saying, "I didn't understand you.  Could you please rephrase?  What do you mean by X?"  Some variation thereof.

However, if you answer my question, I'm going to draw two assumptions from that.  Number one, you heard my question.  Number two, you understood my question.  Is that fair?

A.   Yes.

Q.   As you know, you are not obligated to guess at answers to any of my questions.  Any guesses or something that -- actually, this is one of the few tests in history that "I don't know" is a perfectly reasonable and acceptable and correct response.

With that being said, I am entitled to what's called your best estimate, the typical example I give to draw a distinction between these two concepts is if I were to ask you, for instance, "Ms. Iwanski, how many windows are there in New York City," I imagine you have

zero frame of reference.  You might not know how many buildings there are, let alone how many windows per building, et cetera.  Therefore, any answer you'd give me would just be a pure shot in the dark.

On the other hand, if I said, "Ms. Iwanski, approximately how long is the table or desk at which you're sitting," you may not know down to the millimeter how long that desk is, but you have a pretty good basis for, "Okay.  I know I can reach out about six feet.  I can almost fit this entire desk in my wing span.  It's about six feet long."

Does this distinction between a best estimate with a versus basis a pure guess make sense to you?

A.   Yes, it does.

Q.   I do try and take breaks once every hour or so, but time does fly when one is having fun, so I often forget to suggest a break.  Therefore, if at some point, whether it's at the hour mark or in between, if you need a break, if you need to stand up, stretch your legs, let the dog out, grab a drink of water, whatever the case may be, please just ask me.  I am more than happy to oblige.

The only thing I will ask you in return is if I have a question that is currently pending or, say, I've got an interrelated series of questions that are all

kind of connected, I'll ask that you allow me to complete that question or those questions before we break. Is that fair?

A. Yes, it is.

Q. I'm going to be sharing a number of exhibits today on the screen because we're not in person. I can't just dupe you the exhibit and have you flip through it. But I do want to ensure that you're able to review it, that you're able to examine however you need, therefore, if at some point you need me to zoom in, zoom out, scroll down, scroll up, please let me know. I'm happy to manipulate the document however you need. Is that fair?

A. Yes, it is.

    (Plaintiff Exhibit 1 was marked for
    identification.)

BY MR. RISTVEDT:

Q. Okay. This first document I will designate as Plaintiff's 1. This is a four-page document. I'll briefly scroll through here.

    Do you recognize the document in Exhibit 1?

A. Yes, I do.

Q. What do you understand this to be?

A. This is the notice of deposition that I'm here for today, and these are topics for this deposition.

Q. Absolutely correct.

And as you know, there are six topics for today's 30(b)(6) deposition listed, spanning from page 2 to page 3 of this document.

Now, I understand your attorney has issued some objections in response to this deposition notice. Is that your understanding as well?

A. Yes.

Q. So subject to those objections, are you the person that Experian has designated to testify about the topics in Exhibit 1?

A. Yes. I will be answering those questions to the best of my ability.

Q. Prior to today, did you have an opportunity to review the topics in Exhibit 1?

A. Yes.

Q. Did you prepare specifically to answer questions about the topics in Exhibit 1?

A. Yes, I did.

Q. Are you knowledgeable to provide testimony about the topics in Exhibit 1?

A. I am knowledgeable enough to be able to answer the questions or refer to manuals that were produced in this case.

Q. Are there any of these topics that you don't feel prepared to discuss today?

A.   No.

Q.   I want to draw your attention specifically to Topics 5 and 6 on page 3 of this document.  Do you see those on the screen?

A.   Yes, I do.

Q.   And specifically, these are some furnisher specific topics that relate to one of the furnishers at issue in this case, Nationstar aka Rushmore.  Do you see that?

A.   Yes, I do.

Q.   Topic 5 relates to credentialing and recredentialing performed by Experian with respect to Rushmore, and Topic 6 relates to data audits Experian performed with respect to Rushmore and the results of both of those things.  Would you agree?

A.   Yes, that's what the topics state.

Q.   Did you have an opportunity to prepare to answer questions about Topics 5 and 6?

A.   Yes.  And I will be also referring to exhibits, manuals that were produced in this case.

Q.   So I understand you had your deposition taken a month or so ago by my colleague, Mr. Hammoud.  Do you recall that deposition?

A.   Yes, I do.

Q.   I understand that during that deposition,

Mr. Hammoud had asked you some questions about the credentialing process, the data audits that Experian performs, things like that.  Do you recall his questions, generally?

A.    Generally -- sorry.

MS. ANTHONY:  Object to the scope of the question.

THE WITNESS:  Generally, I do remember discussing those kinds of topics.  Verbatim, I don't remember specifically what I -- what I responded with.

BY MR. RISTVEDT:

Q.    Would it refresh your recollection at all to look at the deposition transcript?

MS. ANTHONY:  Object, outside the scope.

THE WITNESS:  I don't believe so.  If there's a particular question, I'm prepared to answer questions as it relates to the topics in this deposition notice.

BY MR. RISTVEDT:

Q.    Well, what I want to understand is -- I understand at the time your deposition was taken a month or so ago, you had referred to your knowledge about the credentialing process as sort of high level without knowledge of the specifics.  Do you recall testifying to that effect?

MS. ANTHONY:  Object to the scope.

THE WITNESS:  Yes, my knowledge at that time was on a high level.

BY MR. RISTVEDT:

Q.   And I understand that was October 8, so about a month and a week or so ago.  Is that right?

MS. ANTHONY:  Object to the scope.

THE WITNESS:  I don't remember the exact date.

BY MR. RISTVEDT:

Q.   Does that sound about the right range?

A.   I believe it was a month ago.  I just don't remember the exact date.

Q.   My understanding from your attorney is that you were designated by Experian for today's Topics around two weeks ago on or about October 30th.  Is my understanding correct?

MS. ANTHONY:  Object to the scope.

THE WITNESS:  I don't remember the exact date getting notice of this particular deposition.

BY MR. RISTVEDT:

Q.   Well, what I want to understand is, as we sit here today, you've said you do now have more sort of detailed knowledge about the credentialing process and the data audits Experian performs.  Is that fair?

A.   Correct.  It was based off of the manuals that were produced for this deposition, that's where I would have that knowledge.

Q.   Got it.  So that's really what I want to make certain is clear and that I sort of understand the universe of how you've arrived at this newfound knowledge.

So you said you reviewed the documents that Experian produced in this case relating to credentialing and the data audits processes.  Is that right?

A.   Yes, I did.

MS. ANTHONY:  Object to the scope.

THE WITNESS:  Yes.

BY MR. RISTVEDT:

Q.   Did you have any discussions with any Experian employees who oversee either of these sets of procedures?

A.   No, I did not.

Q.   Are you familiar with an Experian employee named Peter Henke, who was deposed in another matter on the credentialing procedures a few months back?

A.   Yes, I am.

Q.   Did you have an opportunity to read the transcript from Mr. Henke's deposition on these topics?

A.   Yes, I have.

Q.   So would it be fair to say that your knowledge about the credentialing process is specifically --  Well,

strike that.

Setting aside the data audits for a moment and focusing specifically on the credentialing topics, would it be fair to say that your knowledge about those topics and the specific details of the credentialing procedures has been obtained within the last month based on, number one, the documents, and number two, your review of Mr. Henke's deposition transcript?

A.    Generally, yes.

Q.    Is there any other source of the information that you've learned within the last month to provide you this more detailed understanding?

A.    No, I don't believe so.

Q.    If you've read Mr. Henke's transcript, I expect you know he's been in his sort of credentialing role for 25-ish years.  Do you recall reading that?

A.    I don't remember the exact time frame, but I believe it was in the 20 range, 20 years' range.

Q.    And did you think it would be helpful to discuss with Mr. Henke aspects of the credentialing process or ask questions with him prior to today?

MS. ANTHONY:  Object to the scope.  Object to the form.

THE WITNESS:  No.  I was able to review his deposition transcript, and I was also able to review the

manuals that were produced in this case.  I had a high level knowledge, and now I have a better understanding as far as the step by step by step, which were produced in this case.  I would not need to speak to Peter to receive anything outside of what was in the manual.

BY MR. RISTVEDT:

Q.   Okay.  Understood.

So now setting aside the credentialing procedures, I understand that Experian has also produced some documents which detail the data auditing process that's performed by the data development department.  Is that your understanding as well?

A.   Yes.  I believe those were produced.

Q.   And the data development department, that's a different department within Experian than the credentialing department that Mr. Henke heads up.  Is that true?

A.   Yes, I believe so.

Q.   In fact, the credentialing department has no involvement with the data processing and data development department.  Is that true as well?

MS. ANTHONY:  Object to the scope.

THE WITNESS:  I don't know their specific relationship, and anything that they would be doing either together or have information of each other, to my

knowledge, they're two different departments.

BY MR. RISTVEDT:

Q.   Well, in other words, what I wanted to make certain I understood is the -- the deposition I took of Mr. Henke did not touch on the data audit process because he didn't have knowledge of those processes sufficient to provide testimony.  Are you aware of that?

MS. ANTHONY:  Object to the form.

THE WITNESS:  I did not review topics prior to reading his deposition testimony, so I don't -- I didn't know what he was designated to talk about.  I do understand his position and what he's responsible for.

BY MR. RISTVEDT:

Q.   Well, in other words, I want to make certain I understand sort of, again, that the universe of information you've sort of ingested in the last month sufficient to have the knowledge you now have about the data audit process.  And so specifically, I understand for the credentialing procedures, you read the credentialing manuals and the documents, and then you also read Mr. Henke's transcript which touched on specifics of those procedures.  Is that fair?

MS. ANTHONY:  Objection to the scope. Object to the form.

THE WITNESS:  Yes, generally, that's exactly

what I was reviewing.

BY MR. RISTVEDT:

Q.   So with respect to the beta audits, I assume you read those procedures that have been disclosed by Experian in this case.  Is that true?

A.   Yes.

Q.   Did you do anything else to develop knowledge concerning the data audits processes that are performed by the data development department?

A.   No.  In reviewing the manuals, there was sufficient information for me to understand what their process would be.

Q.   You've never worked in the credentialing department or the data development department.  Is that true?

A.   Yes, that's true.

Q.   Now, I know previously you had described your knowledge of these procedures as sort of high level.  How would you characterize your knowledge about these procedures as we sit here today?

A.   I believe I have a more detailed understanding of what the process would be in a step-by-step kind of scenario.  And I have the manuals that I also can point to to gauge any kind of answers that may come up.

Q.   You've provided sort of high level testimony

about both the credentialing processes and the data audit

processes more generally in previous cases.  Is that fair?

                    MS. ANTHONY:  Object to the scope.

                    THE WITNESS:  Yes.

BY MR. RISTVEDT:

    Q.    Have you ever submitted declarations in other

cases that refer at all to these procedures?

                    MS. ANTHONY:  Object to the scope.

                    THE WITNESS:  I don't believe so.

                    MR. RISTVEDT:  I want to share another

exhibit.

                    Ms. Clark, I'm going to skip Plaintiff's 2,

so I will note that for the record.  I am going to display

now what I'll designate as Plaintiff's 3.  I'm going to

show this on the screen.

                    (Plaintiff Exhibit 3 was marked for

        identification.)

BY MR. RISTVEDT:

    Q.    Ms. Iwanski, can you see the document on the

screen okay?

    A.    Yes, I can.

    Q.    Have you ever seen this document before today?

    A.    Well, it has my name on it.  I just don't

remember specifically any specifics about it.

    Q.    I understand.  This was filed in a case in the

Northern District of Georgia called Emmanuel Ohai v. Experian, involving a pro se plaintiff.  And you would agree this is a declaration made by you in support of Experian's motion for summary judgment in that case, would you not?

          MS. ANTHONY:  Object to scope.

          THE WITNESS:  It does have my name on it.

BY MR. RISTVEDT:

   Q.    Going to the last page, page 17 of this document, this was signed by you under penalty of perjury on January 13 of this year.  Is that fair?

   A.    Yes.

   Q.    I want to draw your attention to -- I want to go to page 7 of this document, paragraph 16 -- or excuse me -- 17.

        Paragraph 17 says, "In addition to the procedures described above, Experian has developed many other procedures to assure maximum possible accuracy. These include the procedures followed during the acceptance of information reported to Experian by its data furnishers.  In order to report credit information to Experian, a furnisher must pass through a rigorous credentialing and due diligence process and execute appropriate contracts.  Experian utilizes procedures designed to verify the reliability of furnishers,

including on-site inspections, audits of furnishers' credit data, and a requirement that furnishers certify that they will comply with the FCRA and Experian's policies and provide only accurate information."

Have I read the highlighted text correctly?

MS. ANTHONY:  Objection to the scope.

THE WITNESS:  Yes, you did.

BY MR. RISTVEDT:

Q.   So this is a description, generally, of steps that Experian takes that Experian believes relate to the reliability or accuracy of data furnishers.  Is that true?

MS. ANTHONY:  Object to the scope.

THE WITNESS:  Yes, it is explaining the process that Experian goes through.  Like I said, this is the high level explanation of the process where Experian is either deciding to onboard a data furnisher or continue with that data furnisher as well.

BY MR. RISTVEDT:

Q.   There's one other paragraph where you talk about some of the steps that Experian takes in making its determinations about data furnishers and the reliability and/or accuracy in paragraph 19.  Do you see that on the screen on page 8?

MS. ANTHONY:  Objection to scope.

THE WITNESS:  Yes, I do see that.

BY MR. RISTVEDT:

Q.   And this one says, "Even after a determination is made that a furnisher can be considered a reliable source of credit information, Experian subjects incoming data from the furnisher to the aforementioned rigorous quality control and statutory compliance procedures designed to ensure that only accurate information is reported, including analysis for unusual trends and/or aberrations in the data.  Experian will reject information that is illogical or fails to conform to industry standards.  Experian recredentials its furnishers on an annual basis."

Did I read that one correctly?

MS. ANTHONY:  Object to the scope.

THE WITNESS:  Yes.  Again, this is that high level explanation and knowledge that I had at that time.

BY MR. RISTVEDT:

Q.   And I should clarify, I don't in any way mean to imply, and this is not intended to be a gotcha, you actually did provide this testimony.  More what I am trying to make certain I understand is you've submitted declarations like this one in support of Experian's motions in cases to delineate the procedures Experian maintains for furnisher reliability and accuracy.  Is that fair?

MS. ANTHONY:  Object to the form.  Object to

the scope.

THE WITNESS:  As far as this declaration goes, again, it's on a high level.  To answer the question yes, this would be my knowledge of Experian and ensuring maximum possible accuracy in the steps that Experian takes with data furnishers.

BY MR. RISTVEDT:

Q.   So the function of showing you this -- I'm not interested at all in this Mr. Ohai's case, but I do want to make certain I understand fully the entirety of what these furnisher reliability and accuracy procedures entail.

So you can see I have numbered several different things in this document going from 1 in paragraph 17 through 5, and 6 through 7 in paragraph 19. Do you see that?

A.   Yes, I do.

Q.   And so I want to make certain -- and I believe this is what we're here to discuss today -- but paragraph 17, you make reference to Experian's procedures to assure maximum possible accuracy, correct?

MS. ANTHONY:  Object to the scope.

THE WITNESS:  Correct.

BY MR. RISTVEDT:

Q.   When you say "accuracy," what do you mean by

"accuracy"?

A.   The maximum possible accuracy is meaning that Experian's ultimate goal is to have accurate information available to consumers and data furnishers or third parties.  And Experian has procedures in place to look at the data as it's coming in, look at the data as it's coming in back from ACDV responses, as well as other types of audits that Experian has in order to look at the data, making sure that they are submitting information on a logical basis as well as within the Metro 2 standards.

Q.   That last point is one thing I want to make certain I understand.  Because I know you testified to Mr. Hammoud about the data furnisher obligation to report in compliance with Metro 2 standards.  Do you recall that?

MS. ANTHONY:  Object to the form.  Object to the scope.

THE WITNESS:  I don't specifically remember that particular answer, but I have testified regarding Metro 2.

BY MR. RISTVEDT:

Q.   What I want to make certain I understand is when you say "maximum possible accuracy," you understand that Experian's obligation is to report information that is accurate within a consumer credit report, correct?

MS. ANTHONY:  Object to the form.

Coash Court Reporting & Video, LLC
staff@coashcrv.com
602-258-1440
www.CoashCourtReportingandVideo.com

APPENDIX 1645

THE WITNESS:  As far as any kind of reporting, Experian has developed procedures to report the maximum possible accuracy.

The reason for that is there are instances where there are data furnishers that may type in a wrong date of birth or type in a misspelling of a name.  We would not independently know that that would be a typo, and we make that information available to consumers so that they can dispute that information and correct that information on their consumer reports as well.

BY MR. RISTVEDT:

Q.   Does Experian understand that there's a distinction between reporting accurate information and reporting data that complies with Metro 2's requirements?

A.   I believe that they go together as far as the information complying with the FCRA.  And Experian has procedures in place to also look at the data as it's coming in and look at the data furnisher as well.

So in addition to making the information available to consumers, Experian also has a rigorous process in place to make sure that these data furnishers are reporting accurately and applying the Metro 2 standards.

Q.   I think you may have answered a question different than my question.  So maybe an example would be

useful.

Metro 2 enumerates a number of different standards that Experian requires data furnishers to report information consistent with.  Is that true?

A.    Generally, yes.

Q.    So if I were to go out today and I, you know, registered an LLC and I started -- I went through the credentialing process, I started furnishing information to Experian.  I could furnish information that complies with Metro 2's requirements while intentionally furnishing, say, inaccurate balances.  Would you agree with me?

MS. ANTHONY:  Object to form.

THE WITNESS:  There is a possibility of situations where there might be a balance that may come in inaccurately or the timing of payments may be different as far as the reporting cycle for that company.  We have a rigorous contract in order to make sure that we're dealing with people that we believe are reporting accurate information.

BY MR. RISTVEDT:

Q.    Well, I understand that.  And I understand there's contractual provisions and there are these other controls Experian believes relate to this reliability and/or accuracy issue.

But my question is -- so if I've got, say,

an account where Youssef Hammoud owes $500 to James Ristvedt, LLC, but instead I deliberately report to Experian actually that balance is $5 million, I could do that consistent with Metro 2's requirement even though I've deliberately reported false information, right?

MS. ANTHONY:  Object to the form.

THE WITNESS:  I don't know if Metro 2 has a million dollar balance.  I would have to look that up.

BY MR. RISTVEDT:

Q.   Sure.  Well, what I'm trying to get at is you understand there's a distinction between reporting information that complies with Metro 2 and reporting account information that is literally accurate.  Those are two different things, right?

A.   I believe that they are combined.  When Experian says it's reporting maximum possible accuracy, it means that there are times that we may not independently know if the balance is wrong if we're receiving it from a data furnisher.  Experian does not have access to the data furnisher's payment histories for consumers, things of that nature.  Any time that consumers receive a copy of their report, that's information that they can dispute and information that Experian would send to data furnishers as well.

Q.   So Experian acknowledges that it does not

literally know whether the data furnished by a data furnisher is accurate, true?

A.    We believe the information --

MS. ANTHONY:  Object to the scope.

THE WITNESS:  We believe the information reported to Experian is accurate.  We would not have any independent knowledge outside of that.  That's when if a consumer looks at something and they believe that that information is inaccurate, there is a process in place for the consumers to dispute information, and that's the reinvestigation role that Experian has.

BY MR. RISTVEDT:

Q.    Got it.  I suspect we'll come back to that.

The first item that you note here as the procedures to assure maximum possible accuracy with respect to data furnishers is this:  Number 1, you say "a furnisher must pass through a rigorous credentialing and due diligence process."  Did I read that correctly?

A.    Yes.

Q.    I want to place on the screen what I'm going to designate now as Plaintiff's 4.

(Plaintiff Exhibit 4 was marked for identification.)

BY MR. RISTVEDT:

Q.    Have you seen this document before?

A.    Yes, I have.

Q.    This is an Experian document Bates stamp Experian 291 through 332.  What do you understand this document to be?

A.    This -- I believe this is one of a couple of manuals that were produced.  It's more of a step-by-step in the credentialing process and explains what the Experian department in the credentialing services does in order to onboard data furnishers as well as yearly kind of credentialing.

Q.    When you say step-by-step, I understand that Experian separates its internal documents with a distinction between what Experian calls policies versus one like this called a procedure.  Would you agree?

A.    Well, we do have policies and procedures.  This one just happens to say "procedure" on the manual.

Q.    What I mean to say is my understanding from past depositions of Experian employees is that policies tend to be more kind of high level, "Here's what our goals are going to be," and a procedure, as you note, is more of a step-by-step, "Here's what we actually do to effectuate that procedure" -- or excuse me -- "that policy."  Is that distinction more or less correct?

A.    Generally.  They might bleed together, but generally that is.

Q.   So I understand the data furnisher we're here to discuss today, Rushmore, went through the process of applying to become an Experian customer in or around early 2016.  Is that your understanding?

A.   I don't remember the exact date, but right around 2016.

Q.   I want to jump down to EXPERIAN NAJERA 327.  This is the section of the due diligence procedure containing the change control log.  Do you see that?

A.   Yes.

Q.   And as I understand it, within the vernacular of Experian, the change control log essentially provides a history of Experian's internal documents, when it was created, the various different changes that were made, who made them, things to that effect.  Is that true?

A.   Yes.

Q.   The document we're looking at says that it was first created with an initial draft on December 27 of 2022.  Would you agree with me?

A.   For this particular manual, yes.

Q.   So this would've been brought into existence roughly six years and change after Rushmore had already been onboarded as a new furnisher, correct?

A.   There may have been another manual with a different name at that time, but this particular manual

shows the creation of it in 2022.

Q.   When you say that there may have been another manual with a different name at that time, is that based on some understanding you have of a different document or are you speculating that such a document may exist?

MS. ANTHONY:  Object to the form.

THE WITNESS:  What I'm saying is Experian has had procedures prior to 2016.  Looking at the date here, there may be another manual.  I don't -- I do not have knowledge of a particular manual.  But it is possible that there may be another manual that -- that was in effect at that time.  But we're looking at 2022 right now.

BY MR. RISTVEDT:

Q.   Okay.  But in other words, that's what I wanted to make certain I understood.  Is as we sit here today, are you aware of a previous version of this procedure that was in effect in 2016?

MS. ANTHONY:  Object to the scope.

THE WITNESS:  No.

BY MR. RISTVEDT:

Q.   So at least as we sit here today, do you have any knowledge about whether the step-by-step procedure detailed in this document would have been applied to Rushmore in any way when it was onboarded in 2016?

MS. ANTHONY:  Object to the scope.

I'll let her answer, but if you don't mind.

THE WITNESS: As far as what would be in place at that time, since I don't have the manual in 2016, I don't know if certain things were done a little bit differently. But generally, this is the process that we have in place for data furnishers.

BY MR. RISTVEDT:

Q. And when you say "generally," I want to make certain I understand. You're saying generally, since 2022, this procedure has detailed the process, correct?

A. Yes.

MS. ANTHONY: No objection, sorry.

James, I just note that your notice says the relevant time period is from the beginning of the dispute information or four years ago. So the relevant time period notice for this deposition is consistent with this policy. To the extent -- I don't want to take much of your time, but I just wanted to point that out here.

MR. RISTVEDT: Understood.

BY MR. RISTVEDT:

Q. So, Ms. Iwanski, I want to ask you some questions about this document, not withstanding whether it was in place at the time of Rushmore's credentialing.

I'm here on EXPERIAN NAJERA 294. This section has a heading of "Introduction." Do you see that?

A.   Yes, I do.

Q.   And generally, this paragraph says this procedure takes you through step-by-step about how to investigate new Experian customers, whether they're regulated under the FCRA or Gramm-Leach-Bliley, fair?

A.   Yes.

Q.   The last line in this paragraph, it says that these -- the steps in this procedure are "to assist Experian with compliance of Policies and applicable legislation."  Did I read that correctly?

A.   Yes.

Q.   When it says "policies and applicable legislation," how would I identify the policies and/or legislation to which that line refers?

A.   I do not believe it's designated in the manuals.

Q.   It is kind of generally policies and legislation?

A.   That's my understanding, yes.

Q.   The procedure lays out that leveling system Experian uses where the lower levels are completed and then they kind of go incrementally from Level 1 to Level 2, Level 3, so on and so forth, correct?

A.   I do not think that Level 1 -- I'm sorry, hold on one second.

If you can scroll down just a little bit, I want to make sure to see which manual I'm looking at.

There was a few of them the other day.

Q.    Would it be helpful for me to go to the index of this manual?

A.    One second.  Okay.

Sorry.  Now, what was the question again?

Q.    Well, I want to make certain I understand the leveling system.  And actually I'm going to go to the index here on EXPERIAN NAJERA 292 and 293.

I see that the procedure is separated by the various levels.  So Level 1, fraud check; Level 2, KYC, for Know Your Customer; Level 3, baseline, so on and so forth, right?

A.    Yes, I do see that.

Q.    And it's my understanding from my prior chat with Mr. Henke that when a party is subject to a particular level, for instance, data furnishers are subject to at least Level 5, that the party is subject to that level and all of the levels that preceded it.  In other words, furnishers would be subject not just to Level 5, but also to Level 4, Level 3, Level 2, and Level 1.  Is that your understanding as well?

A.    That's my understanding throughout the process.  And not all companies have a particular Level 5.

Q.    Right.  In other words, there might be some companies that are just -- we just do Level 1 and that's

all we need consistent with our policies, fair?

A.    Generally.

Q.    So Level 1 consists of this fraud check where essentially the function is we want to make sure that, first, there's not a duplicate account for this particular entity, right?

A.    Correct.

Q.    And to do that, Experian maintains a Salesforce platform containing all of its customer information, and the instruction here is to run a Salesforce search on that entity, right?

A.    On the interface system, correct.

Q.    It refers here in 1c to a COID.  Do you see that?

A.    Yes, I do.

Q.    What does COID stand for in this context?

A.    It's the company's ID.

Q.    So in this first step, it's basically saying we want to make sure there's not a duplicate and that this company isn't already operating with us, right?

A.    Yes.  Those are the steps that they would take.

Q.    There's also this reference to a consolidated alert list where the Experian employee searches through this Excel document for relevant company names, contact names, addresses, phone numbers, and email address to find out is this entity that's currently applying with us on

this list of alerts that we know of, right?

A.    Correct.

Q.    What type of information is included on this alert list?

A.    My understanding, from reviewing Peter's deposition, it would be companies that may -- Experian may not be doing business with.

Q.    Presenting -- oh, my apologies.  Go ahead.

A.    I'm sorry.  I guess I was done.

Q.    No worries.

Does that include entities that are on, say, the O Fact list?

A.    Yes.

Q.    What about politically exposed persons or PEPs?

A.    Yes.

Q.    What about those on, say, terrorism watch lists?

A.    I don't know specifically if there's, like, a company in that kind of situation.  I don't remember reading that in Peter's deposition.  But it would be companies that would be flagged, for whatever reason, depending on what that company is doing, what services they have.

Q.    I understand that part of that alert list Excel document contains information derived from LexisNexis, another consumer reporting agency, right?

A.    Yes, I believe there is a product that they're using for that as well.

Q.    Setting aside the data that is derived from Lexis, where does the rest of the data in that alert list come from?

A.    I don't know specifically where it comes from. It is gathered in a process that Experian has created, however, I just do not know where -- who does it and how it's assembled.

Q.    Do you have any knowledge about whether it's assembled from a product operated by Experian or some third party, like, say Thomson Reuters CLEAR World-Check, something like that?

A.    I really don't know.  I can't -- if there was anything in the deposition, I don't remember seeing that.

Q.    The next part of this fraud check relates to owners and beneficiaries, and essentially, it's we look at the credentialing application, whoever the owner is, and if they're headquartered in or if they're -- they've got a principal place of business in another country, say, China, Russia, Cuba, Venezuela, these countries that might put Experian on alert, that would be something that gets noted during the due diligence process, fair?

A.    Yes.  Experian only does business with US data furnishers.

Q.   Does that include data furnishers that, say, are operating in the United States but are owned by, say, a foreign company?

A.   Through the credentialing process, they are looking for the business name, DBAs, things of that nature.  And if there were anything related to a different country, my understanding of what I reviewed, that Experian would not do business with those companies.  The business is -- data furnishers are supposed to be just US companies reporting for US consumers.

Q.   And I may not have fully understood your answer, so I want to make certain I do.  And if I've misunderstood, then please clarify.

I understand your answer just now to mean that if a data furnisher is located in the United States and reporting about United States' consumers, but owned by a foreign entity, then Experian may not do business with that data furnisher?  Have I understood your testimony correctly?

MS. ANTHONY:  Object to form.

THE WITNESS:  Yes.  And it outlines which companies that we are looking at that would be at high risk in number 3.

BY MR. RISTVEDT:

Q.   Step 4 relates to an internet search about

company names, contact names, address, phone numbers, email addresses, et cetera, basically to make sure the entity is not involved in what Experian calls unacceptable behavior.  Would you agree?

A.    That's what it says.

Q.    What internet search provider is used to perform these internet searches?

A.    Experian has -- it has -- I guess with the common type of search type of engines to do internet searches. If they use something different outside of that, I do not have knowledge.  But in reading this, it could be just Chrome, Google, whatever we're using just to do a regular internet search.

Q.    Well, I want to make certain I understand.

It sounds like -- again, if I've misunderstood, please let me know -- but it sounds like you're saying you don't know what -- with certainty, what the mechanism is in order to perform that internet search, but you're assuming it would be something like a regular internet search, like a Google search.  Is that fair?

A.    Based off of what I'm reading, it looks like a search is done through the regular processes of looking on the internet.  I do not see if there's a specific site that's being used, but it looks like a general internet search.

Victor Manuel Ramirez Najera vs. Experian Information Solutions Inc. -
30(b)(6) Experian Information Solutions Inc. - Teresa Iwanski

November 14, 2025
42

Q.   Got it.  So in other words, as we sit here today, you wouldn't be able to say whether it's, like, Google, Bing or, like, Ask Jeeves, something like that?

A.   We believe -- I believe we use Google and Edge primarily, so it would probably be either one of those.

Q.   Okay.  The next section, Findings, says that if there's a list match or some indication that the customer's engaged in illegal conduct, in those instances, it gets escalated to credential -- credentialing leadership to sort of further review, right?

A.   Yes, that's what it says.

Q.   When these terms are used in 4 and 5, "unacceptable behavior," "illegal conduct," is there any definition anywhere that I could review to identify what Experian considers to be unacceptable behavior?

MS. ANTHONY:  Object to the form.

THE WITNESS:  I believe there was a manual that did outline certain companies, if they're dealing with marijuana or any entity like that.  Because there was -- there was a few that I think we just recently produced may have been in that -- gave a better list of what that might be.

BY MR. RISTVEDT:

Q.   And I believe you're talking about the FCRA exceptions list or something like that, where it sort of

details the various different types of kind of accounts and data that Experian does not accept.  Is that what you're referring to?

A.  Yes.  And that can help me -- or help to understand -- or the process that Experian goes through, if that is determined that unacceptable behavior, meaning this company is selling marijuana or things of that nature, then that's not a company that we would want to do business with.

MR. RISTVEDT:  I want to quickly take a very brief diversion.  Ms. Clark, I apologize.  I'm going out of order once again.  This is going to -- we're going to jump to Plaintiff's 15.

(Plaintiff Exhibit 15 was marked for identification.)

BY MR. RISTVEDT:

Q.  Ms. Iwanski, do you see the document on the screen?

A.  Yes, I do.

Q.  And this is Bates stamped EXPERIAN NAJERA 340 through 346.  What do you understand this document to be?

A.  This is more of specific information about credentialing and really what is entailed in that process.

Q.  If I jump down to it EXPERIAN NAJERA 343, this is where there are ineligible businesses that are identified,

right?  So, like, a residential business, companies involved with illegal activity, companies involved with child labor, things about that, right?

A.    Yes.

Q.    When you referred to the different types of companies with which Experian does not do business, is this the information to which you were referring?

A.    Yes, that would be my understanding of the types of businesses we would not do business with.  And through the process where Experian is looking at the information, either online or various places, if those types of entities have some sort of behavior, is that that's where it would get escalated and follow this particular process.

Q.    So the term "unacceptable behavior," you're saying that relates to is the business involved in one of these areas that Experian does not wish to do business with?  Have I understood you correctly?

A.    Generally, yes.  If there's anything that's just off about a company or, for whatever reason, the person that's doing the search is finding it unusual, depending on the company type they were expecting, that information will also be escalated.  But generally, the top -- top entities that Experian does not do business with, anything like that would also be escalated.  Outside of that, it would just be up to that person to escalate information if

they find something to them that also looks unacceptable or suspicious.

Q.   If I were a credentialing analyst and it's, you know, my first day, I'm learning about the Experian way of life and how I run a due diligence search, what resources could I consult in order to determine, as you say, whether something looks off to me?

A.   I'm not sure the specific resources or training that that individual would have outside of what we're looking at right now.

But my understanding, understanding the business, understanding what Experian may find suspicious, first of all, that person starting their first day would not be sitting there alone doing this by themselves, but also the process of going through and finding something suspicious is -- is maybe just taught on the job in sort of a training type of scenario that's typical for what we do as a business.  We do have training.  So outside of that, it would be that person knowing to look for something that maybe that business said that they're doing, but we're finding something different or off about the internet search.

Q.   Got it.  So an example would be, like, if this company says, "Hey, we're in mortgage lending," and then you look at the website and it says, "Actually, we're a

used car dealership," that might be an instance where somebody flags it and goes, "Hey, Boss, can you take a look at this," fair?

A.    Yeah.  Yes.

Q.    What about for something like we ran a search on this contact name, and it says that John Smith, the owner of this company, was accused of sexual harassment, would that be something sufficient to notify a supervisor?

A.    I don't know if somebody would have that kind of information out on the internet, being accused of it. That information can be sent to the next step, if that's -- if that's what the person that's reviewing that information is finding that suspicious, for whatever reason.  It really depends on what that person is seeing and how that is coming across during the search.

Q.    What about for things like people can go on Google and review a business and say, like, "One star, this company ripped me off, they're scammers," something like that.  Would that be something that Experian would expect credentialing analysts to flag in this internet search portion?

A.    I don't believe so.  I think -- I think what we're looking for here in this kind of an internet search is really the type of business that they're doing, whether or not they look like they're doing something illegal,

whether or not they're -- they're portraying themselves as a different kind of company when we were expecting something different, and so those are the things that we'd be looking for.

Q.    What about for, say, business websites, like the Better Business Bureau, if there were consumer complaints lodged against the applicant company on the Better Business Bureau, would the credentialing analyst be instructed to flag those results for supervisor review?

A.    I believe so.  I think -- I think any kind of government type of complaints is also looked at.

Q.    The next step is to establish that the company is an active business entity, and then there's a bunch of different types of acceptable documentation that are identified.  Do you see that?

A.    Yes, I do.

Q.    I understand this first item, the Business Compliance Insights, or BCI report, that relates to an Experian product that contains information about businesses.  Is that your understanding as well?

A.    Yes, that's my understanding.

Q.    And I understand from Mr. Henke the BCI information is -- I think he called it similar, but better to what I am familiar with from things like Dun & Bradstreet, what people would call a business credit

APPENDIX 1666

report.  Is that your understanding of what the BCI reports consist of as well?

A.   Generally, I don't -- I'm not familiar with the one that you had just mentioned, but that's my understanding of what it's made for or what it's created to do.

Q.   So this acceptable documentation list is essentially if the credentialing agent can identify something from this list, that's sufficient to check off this box that they are in fact a real company and an active business entity, right?

A.   Yes.  Each of these would be very important to have, articles of incorporation, that's just like a -- we need to have that just to see, you know, who's -- who we're dealing with.  And each of those steps are going to be -- I'm sorry, I'm just reading a couple different -- yes.  So those are the locations where we can find the information that the agent -- or sorry -- that the credentialing person would be looking for.

Q.   Is the credentialing analyst required to secure each of these items as acceptable documentation, or is one of them sufficient to meet this requirement?

A.   So in looking at this, it says these are acceptable documentation and includes the list, but it's not limited to.  So in addition to other resources that

they might have access to, it really depends on the type of business, so that if they're not a tribal, then a lot of those would not pertain to them.  If they, for whatever reason, have -- for whatever reason the person is looking up information about either DBAs, they might look other places, but generally this is the list.  And would they need every single one of these?  No.  These are the acceptable documentation.  They're compiling this information to make sure that we are dealing with the company that is saying who they are, and we're getting proof of that with these different types of documents.

Q.   The reason I ask is -- what I wanted to make certain I understood, I think when you had mentioned the articles of incorporation -- and I'm paraphrasing here -- but I think you had said something to the effect of, you know, obviously we want to get the articles of incorporation, something to that effect.

So my question is, if I were a credentialing analyst and I successfully pull a BCI report, am I still required to also secure the articles of incorporation or is only one of these required?

A.   So I think that it's -- it's a lot more than just getting the BCI or getting the articles of incorporation. We want to know if this is an active company, and we want to know certain information about this company.  And so

these are the locations that that agent can go in and look for information, and those are different links that they click onto and are able to search for that information.

Q.   Got it.  So potentially I could just pull a BCI report and if there's information in that report that establishes this is an active business entity, that would be enough for me to satisfy this requirement.  Is that fair?

A.   No.  What we're trying to do is establish a confidence that this company is active in what they're doing.  And so my understanding by reading this, that these are the places where the agent or the credentialing person would be going through, but it doesn't encompass everything.  There may be additional places that they would be able to locate information.  This is more of -- appears to be a starting point, a list, for like maybe just the healthcare or maybe just the tribal or other government websites that we can use.  But this is -- again, just giving the list to that person for them to start their process, making sure that it is an active company, and those are the places that the agent -- or the credentialing person can go through and look at to retrieve documents to build the confidence that that's a viable company.

Q.   Got it.  So it sounds like your answer is

actually -- I was -- I had it flipped.

The BCI report would not be enough on its own.  There would need to be additional steps taken.  Have I understood you?

MS. ANTHONY:  Object to the form.

THE WITNESS:  Well, I've never actually seen a BCI report.  And whether or not the information below is already included in the BCI, I don't know.

My understanding by reading this topic is these are the places where -- for the person to go to in gathering information about the company.

BY MR. RISTVEDT:

Q.   I understand this documentation can either be derived by the analyst in accordance with their due diligence investigation or it can actually be provided by the customer themselves, right?

A.   Yes, that's what it states.

Q.   I note we've been going just over an hour, so I'd like to take a break.  Before we do, I just want to make certain I understand.

This first section of the due diligence procedures.  This relates to what Experian calls a fraud check, in other words, is this a real company and do they actually seem to exist, and are they in business, are they on watch lists, things in that realm.  All fair?

A.    That's my understanding.

Q.    You would agree with me that there's nothing in any of the steps we just looked at that relates to checking if the company's credit information is accurate or anything to do with the accuracy of credit data provided by that company, correct?

A.    As I'm reading this, this is the -- this is where the -- we are confirming this is a true company, what they're doing, and we haven't even gotten to the point where they're reporting data yet.

Q.    Right.  And so in other words, your answer is yes, that is correct, right?

MS. ANTHONY:  Object to the form.

THE WITNESS:  I sometimes just have to explain myself and not necessarily a yes or a no.  But in reviewing this, we haven't gotten to the point where we're talking about data.  We're talking about the company at this point.

BY MR. RISTVEDT:

Q.    Understood.  And I should say I didn't mean to suggest your answer.  What I more would like to ensure I've got is clarity for the purposes of the record.

So in this first section, you agree with me that there's nothing that relates to whether or not a data furnisher's data is accurate, correct?

MS. ANTHONY:  Answered.

THE WITNESS:  Yes.  It's just showing information about the company.

MR. RISTVEDT:  Okay.  I've got 11:12. Ms. Iwanski, is five minutes okay?  Do you prefer more time?  I'm happy to defer to you.

THE WITNESS:  Five minutes is fine.

MR. RISTVEDT:  Okie-doke.

THE COURT REPORTER:  Okay.  The time is 10:12 a.m.  We're now going off the record.

(A recess ensued.)

THE COURT REPORTER:  The time is 10:22 a.m. We're now going back on the record.

BY MR. RISTVEDT:

Q.   And, Ms. Iwanski, I think you may be muted.

There we are.

You understand you remain under oath, correct?

A.   Yes, sir.

Q.   I'm going to reshare my screen.  We were discussing Exhibit 4, the due diligence procedure, correct?

A.   Yes.

Q.   The second level relates to KYC, also known as Know Your Customer steps that Experian takes, correct?

A.    Yes.

Q.    The first portion of that level is ascertaining the financial risk for the customer through this BCI report and determining what type of financial risk is associated with the customer, true?

A.    That's my understanding.

Q.    What does Experian do with the information that a customer is a high risk financial company?

A.    It would depend on the reason for that.  There are some high risks that Experian would just not do business with.  One second.

Okay.  There is a mention about any of the clients defined as medium or high risk on the BCI report, add recommend prepayment or autopay in the approval email.

Q.    And so you're referring to this bullet point iii, correct?

A.    Yes.

Q.    Now, I understand, again, your knowledge concerning these procedures relates to your review of the Henke transcript and then reading these documents.  It looks like you're sort of reading some of these as we go in response to my question.  Would you agree with my characterization?

A.    When you're asking questions, yes, I'm looking for the portion of the manual that I will be able to

answer it from.  I did not memorize every line, every piece of information contained in these manuals.  So as I'm reading it, I'm also going to be referring to it, if that is the answer that I'm giving.

Q.    Understood.  Do you see the portion of text I've just highlighted in cyan where it says "For EMS/EBQ"?

A.    Yes.

Q.    My understanding from Mr. Henke's testimony was this relates to some Experian -- I think, like, Experian medical solutions or something -- or no, excuse me, Experian Marketing Solutions, and then Experian Data Quality.  In other words, different Experian entities than your employer, Experian Information Solutions.  Is that your understanding as to what those acronyms connote?

A.    I've heard of these, the terms before.  I haven't seen it in this kind of an acronym.  But those are the types of companies or entities that are -- have products and services.

Q.    So in other words, what I want to make certain I understand is, this third bullet point that you're referencing in terms of the remediating actions that Experian takes when a company is identified as medium-high or higher risk, you would agree that that bullet point indicates that it applies to those specific Experian entities, yes?

A.   That's how I'm reading it.  And again, since this is information that's available in this manual, it's given in this kind of readable format for people that would already have knowledge about what we're reading.  So as I'm reading it, it does appear to be for those two entities, any client defined as medium or high on the BCI report, that that portion of it would be a pre-pay or autopay in the approval email.

Q.   Right.  I just mean that within these instructions, there's no indication about how, say, Experian Information Solutions, or EIS, treats, if at all, medium-high or high risk scores.  Would you agree?

MS. ANTHONY:  Object to form.

THE WITNESS:  Yeah, at this point, we're just talking about credentialing, and this is the process that we would go through for that credentialing process.

BY MR. RISTVEDT:

Q.   The second step is the Business Website.  It's a review of the company website primarily to document the company name, what services do they provide, do those match to the kind of business, or KOB, that is going to be listed in their Experian account, things of that nature, right?

A.   Yes.

Q.   Jumping down next to EXPERIAN NAJERA 297.  Do you

see there's this portion of black boxes which appear to have been redacted from this document?

A.    Yes.

Q.    Do you know the identity of the person or persons who performed these redactions?

MS. ANTHONY:  Object to the scope.

THE WITNESS:  I don't remember if it was mentioned in Peter's deposition.  I really don't -- I don't remember if there was somebody mentioned.  I don't know.

BY MR. RISTVEDT:

Q.    The portion of text I've highlighted on EXPERIAN NAJERA 297 relates back to something you testified about earlier, which is this review to make sure that the applicant customer is not in one of these business areas offering services deemed unacceptable by Experian, right?

A.    Correct.

Q.    And then this is where it's got lists of things like narcotics or child labor, convicted felons, residential clients, karate club dues, things like that, yes?

MS. ANTHONY:  Object to the form.

THE WITNESS:  Yeah.  I think you were skipping around a little bit as far as like the data and the company.  But generally, that's what it states.

BY MR. RISTVEDT:

Q. Well, really, what I want to make certain is clear is this table that spans several pages, this relates to prohibited clients, prohibited industries, and prohibited activities based on Experian's policies, yes?

A. Yes, that does include that information.

Q. Jumping down to EXPERIAN NAJERA 300, here it says that if you identify that your client is a match for one of these elevated risk industries, and then it has some different steps that the credentialing analyst would take, which is more or less you complete this intake form with an elevated risk and then that gets sent on to the credentialing department head, Peter Henke, for further review, along with a summary, yes?

MS. ANTHONY: Object to the form. Mischaracterizes the document.

THE WITNESS: It includes information that was found. I don't know if it's a summary of it, but it is supposed to be information that was found that would show that those are the types of companies that are doing those types of businesses and that information is escalated through that process.

BY MR. RISTVEDT:

Q. In the third bullet point on B here it says, "Complete your due diligence and put your investigation

together."  Do you see that?

A.   Yes, I do.

Q.   So is investigation used as a term within Experian to refer to the results of a due diligence search process?

A.   Well, it's a term that's used in this manual.  I don't know if it's something that they are using it for any other reason.  On the dispute side, Experian's roles are reinvestigation.  This is a little bit different in what they're doing to see if this -- if Experian's going to do business with these companies.  So if they're calling it an investigation, then that's the term they're using to compile information regarding a particular company.

Q.   I'm going down to EXPERIAN NAJERA 301.  There's a step about placement.  And the Placement step is validating that the business is actually located at the address that's identified in the credentialing app, right?

A.   Yes.

Q.   I understand that there are a number of different ways Experian's credentialing analysts can achieve that goal, a BCI report, the articles of incorporation, Mapquest, Google, things like that, yes?

A.   Yes.  They're trying to locate by using tools out there that we normally used in locating businesses, and

those are the places that that -- that we could go through and locate that company.

Q.   There's an option in here for the physical or virtual inspections, which at least in this setup, those are used if either A, we can't successfully place the company; or B, if we've spotted some sort of red flag. For example, the address matches that alert list or there are ineligible businesses in the same space, correct?

A.   That's what I'm -- that's what it -- basically what it's stating that that would be the next step in following that process, where if there's something that's flagged, then there's further research that needs to be done.

Q.   And then the fourth step here is Zoning, basically is the client actually in a business or commercial area as opposed to, say, a neighborhood or something like that, yes?

A.   Yes, that's correct.

Q.   The fifth step here is Salesforce, Mainframe/D2P4 & Clarity Connect.  Essentially this step says we want to look at do they have any previous relationships with any Experian companies, and did they pay us last time, stuff like that, right?

A.   Yes.

Q.   And it also notes if there was an Experian policy

violation or if Experian terminated their account, something like that, that would be another thing that might get flagged, yes?

MS. ANTHONY: Object to form.

THE WITNESS: Yes, that's another thing that would be escalated to ensure that we are able to do business with this company and they don't have a past issue with Experian.

BY MR. RISTVEDT:

Q. When it uses AE throughout, what does "AE" stand for?

A. I am not sure.

Q. Does it -- does applicant entity sound right?

A. I would be more comfortable saying applicable -- I just don't know that term as it's used in that sentence. It is part of the manual, so if it's defined later, then I would be able to look at that further.

Q. The next step in this level is Identify 3rd Parties, and this is basically looking for are there other either companies or people that should be included within this due diligence process, yes?

A. There's -- yes. So the inspection would be looking for the company server and if it's hosted solutions or clouds, additional company names or other company type of credentialing elsewhere.

APPENDIX 1680

Q.   Step 6, the Identify 3rd Parties, that's the last step within this level, the KYC Level 2, yes?

A.   Yes.

Q.   Do any of the steps in Level 2 relate to a data furnisher's credit information being accurate?

MS. ANTHONY:  Object to the form.

THE WITNESS:  So at this point, we are looking at the company.  And I believe that we were just looking at the place where we would also see if there was a relationship where we had with this company previously and if they violated any kind of procedures with Experian in reporting information.  So that is looked at.

BY MR. RISTVEDT:

Q.   So you're referring to step number 5, the Salesforce Mainframe D2P4 and Clarity Connect search, correct?

A.   Yes.  Were Experian's policy violations and/or compliance investigation and cancellations due to these types of issues.

Q.   And so you're saying that that step relates to whether or not a data furnisher's credit information is accurate.  Am I understanding your testimony correctly?

A.   So when we're talking about accuracy, if Experian has worked with a company previously in some other capacity, if there's any violations that Experian can

find, whether it be something regarding their data, whether it be other reasons, this information would be -- would need to be looked at by management.

Q.    Well, I understand that.  My question is a little bit simpler.

My question is just I want to understand.  I think I asked do any of these steps relate to whether or not a furnisher is giving Experian accurate credit information.  You identified this one, that we look at if we did business with them in the past, did they violate Experian's policies?

All I'm interested at this point is, is it your testimony that this step of the procedure relates to whether or not a data furnisher's credit information is accurate?

MS. ANTHONY:  Object to the form.

THE WITNESS:  No.  We're just looking at the credentialing part to see if we can do business with the company.

BY MR. RISTVEDT

Q.    Understood.  Continuing to Level 3, this is EXPERIAN NAJERA 304.  This is the Baseline level, yes?

A.    Yes, that's what it states.

Q.    As I understand it, the baseline level largely relates to let's make sure that we know information about

these people.  So for instance, step 1 you see Contact Authentication, where we're literally going to verify the person signing this contract is employed by the customer, right?

A.   Yes.

Q.   And the security designate, or SD, there's also a step to verify that that person is actually an employee of the customer?

A.   Yes, and that's the steps that we go through.

Q.   And then step C is we look at if there's another person, if there's a different business compact, for instance.  We also want to verify them, are they actually employed by this customer, right?

A.   Yes, that's the steps they would take to do that.

Q.   Step B is we look at the commercial email address, make sure they've actually got, like, @WellsFargo.com instead of, you know, @Yahoo.com, something like that, right?

A.   Yes.  Those are the steps they would look at as well.

Q.   Step 2 relates to verifying the social security number of the principal of the company, if that information is provided, right?

A.   Correct.

Q.   And as I understand it from Mr. Henke, this

APPENDIX 1683

information is generally not required, but some companies choose to provide it in their credentialing application. Is that your understanding as well?

A.   I believe there's a section for that.  When it's used or when it's not used, I'm not sure.  But it does -- there is a section for -- for that, I believe.

Q.   Section 3 says "Authenticate company's primary phone number," and this is about establishing some sort of link between the company and whatever phone number they gave us.  So do we find it in the phone book?  Does it show up in the BCI report we pulled on this company?  Is it on their website?  Things of that nature, right?

A.   Yes.  And those are the steps that they would go through to try and find that out.

Q.   And then step 4 is interrelated, basically, if we want to make sure if you actually call that, somebody picks up, they say, "Wells Fargo" instead of, like, "Joe's Used Cars," right?

A.   Yes.

Q.   And then this last step is we look at International Review.  There are these restricted companies [sic] that we won't work with, right?

            MS. ANTHONY:  Object to the form.

            THE WITNESS:  Countries, correct.

BY MR. RISTVEDT:

Q.    I'm scrolling down.  There's a bunch of stuff on that.  That's the last step in the Level 3 process.  You would agree?

MS. ANTHONY:  Object to the form.

THE WITNESS:  Yes, that's where it starts the next level on that page.

BY MR. RISTVEDT:

Q.    So within the steps that we just looked at in the Baseline level, similar question to those I've asked you previously, which of these steps relates to whether or not the data furnisher's credit information is accurate?

MS. ANTHONY:  Object to the form.

THE WITNESS:  At this point, we're just looking at onboarding to see if we can do business with this company, and we have not looked at their data.

BY MR. RISTVEDT:

Q.    Got it.  So in other words, the answer, at least to Level 3, is none of the steps in Level 3 relate to accuracy of credit data.  You would agree?

MS. ANTHONY:  Object to the form.

THE WITNESS:  Correct.  Right now we're just confirming that it is a true company, and these are the steps that we take.

BY MR. RISTVEDT:

Q.    Now going down to EXPERIAN NAJERA 314.  This is a second Baseline section.  This is EPS in the parenthetical.  Do you agree?

A.    Yes, I do.

Q.    What does "EPS" stand for in this context?

A.    I don't know.

Q.    The first step here is there's a search of CFPB records and FTC records, right?

A.    Yes.

Q.    And then there's a qualifier that says we only care about stuff that's within the last seven years, yes?

A.    Yes.

Q.    The first step is a search of the CFPB's records, the Consumer Financial Protection Bureau, one of the federal agencies that has or had oversight over the Fair Credit Reporting Act.  Is that true?

A.    Correct.

Q.    And there are some specific instructions about kind of how to run this search, which categories, what the type of information is being searched, with some screenshots to show what should be selected, right?

A.    Yes, I do see that.

Q.    I understand this is a search for enforcement actions under the FCRA -- or excuse me -- under the CFPB.

Is that your understanding as well?

A.    That is my understanding.

Q.    Does Experian perform any search of the consumer complaint database that's maintained by the CFPB?

MS. ANTHONY:  Object to form.

THE WITNESS:  At this point, we're looking at the company, not on a consumer level.  So it would just be about the company.

BY MR. RISTVEDT:

Q.    Well, Experian's aware that the CFPB maintains a consumer complaint database wherein consumers can lodge complaints about consumer reporting agencies like Experian or financial services providers, correct?

A.    Correct.

Q.    And -- oh, sorry, Rebecca.

MS. ANTHONY:  Object to the scope.

BY MR. RISTVEDT:

Q.    And you understand that those consumer complaints, those can be searched by a company?  Like, I could go search for all the consumer complaints about Experian right now, yes?

MS. ANTHONY:  Object to the form.

THE WITNESS:  Yes.  There is a portal just for those types of complaints.

BY MR. RISTVEDT:

Q.    So my question is -- I know this step that's on the screen relates specifically to enforcement actions.

My question is, as part of this due diligence process, does Experian perform any search or inquiry of the CFPB's consumer complaint database about company applying for credentialing?

A.    I do not believe so.

Q.    The FTC search, that's similar to CFPB search looking for any sort of enforcement actions or consent orders entered by the FTC against the applicant company, correct?

A.    Yes, that's my understanding.

Q.    Now, in instances where there are search results -- and actually, let me take a step back.

Throughout this due diligence process, there are a number of different items that we've already looked at and throughout the rest of the document where there are sort of if there's a result, flag it, and bring it to the attention of management, right?

A.    Generally, yes.

Q.    My understanding from Mr. Henke is that when there are results throughout this due diligence procedure, Experian saves a copy of whatever results there are as a PDF, which is then saved to the customer's Salesforce

account.  Is that your understanding as well?

A.    Based off of -- sorry.

Based off of the review of Mr. Henke's deposition, I believe there was retention of some information, whether it's a PDF or whether or not it's data entry, I'm not entirely sure, but it is somehow retained.

Q.    Understood.  And that's a fair point.

So regardless of the format, whether it's a PDF, Excel doc entered directly into Salesforce, my understanding from Mr. Henke is that if there is a credentialing investigation performed, there are records about it that are saved to the customer's Salesforce account file.  It sounds like you're saying that's consistent with your understanding.  Is that correct?

A.    Based off of my review of Mr. Henke's deposition, since he is in that position and would have that knowledge, that's where I'm getting that information from. How it's kept, how it's retained, how long it's retained, any of that information, I just do not have knowledge of.

Q.    I'm now on EXPERIAN NAJERA 315.  Do you see the second step in this Level 4 that says "Validate Company Office Inspection Required"?

A.    Yes, I do see that.

Q.    Now, this step of Level 4 relates to the onsite

physical inspection or the virtual inspection to which a new customer is potentially subjected.  Is that correct?

A.    Yes.

Q.    And I want to go back for a moment to Exhibit 3, which contains your declaration from the Ohai matter earlier this year.

Within that declaration, under number 3, you referred to on-site inspections.  Do you agree?

A.    Yes.  It does include on-site inspections.

Q.    So when you refer to on-site inspections, is this what you're talking about -- sorry, for the purposes of the transcript, returning to Exhibit 4 on EXPERIAN NAJERA 315, when you refer in your Ohai declaration to on-site inspections, is this what you're talking about, the inspection during the due diligence process?

A.    Yes, that was my understanding at the time of signing the declaration.

Q.    I understand the first step in this process is to determine whether or not the business is required to be subjected to a physical or virtual inspection, right?

A.    Yes.

Q.    Only certain Experian customers are ultimately subjected to inspections, and that's based on whether or not they're going to be either furnishing or purchasing regulated data under the FCRA or GLB, correct?

A.   No.  It would be for the same, either data furnishers or companies that are pulling information from Experian.

Q.   Yes.  And I apologize if my question was inarticulate.  I meant to ask what I think you answered, but let me try again just so I've got clarity.

My understanding is that not all Experian customers are required to undergo an inspection.  However, if a company is either furnishing regulated data or purchasing regulated data, those companies do have to go through inspection.  Is that correct?

A.   There are instances where -- where a live inspection may not have to take place, whether or not they're a publicly-traded company, things of that nature.

Q.   And I want to ask you about those exceptions.

I see here you're referring to the list in Letter C, the inspection is not required exceptions list, correct?

A.   Yes.

Q.   Now, I understand that these are entities for whom there is no inspection required, meaning neither virtual, nor physical, correct?

A.   That is my understanding.

Q.   The first group is publicly-traded entities, meaning they're traded on a major stock exchange like the

New York Stock Exchange, yes?

A.    Yes.

Q.    And there's actually a clarification that if the parent company or the holding company, if they're publicly traded, similarly, no inspection needed, right?

A.    Correct.

Q.    The next one is banks or credit unions.  Does this refer only to businesses that are registered as banks and as credit unions, or does it also relate to other financial institutions that lend money?

A.    So as I'm reading it, it is distinguishing it as banks and credit unions.  It is not distinguishing it as a finance company.  It is banks and credit unions.

Q.    So like a mortgagee would not be included within this exceptions list unless it was publicly traded or owned by a company that was publicly traded.  Is that true?

A.    That's my understanding.

Q.    Letter D says that Experian can leverage what it calls virtual inspections for all kinds of business, yes?

A.    That's what it states.

Q.    And then there's this virtual inspections checklist that's referred to.  Are you familiar with the virtual inspections checklist?

A.    I have not seen one.

Q.   Do you know what types of requirements are enumerated within that checklist?

A.   It would be specific information that Experian is looking for.  What that information is, I do not know.

Q.   When it says, "We can leverage virtual inspections for all kinds of businesses," am I correct in understanding that all potential customers of Experian can do a virtual inspection rather than a physical inspection?

A.   It does not state specifically what conditions or what situations it would apply to.  It just says we can leverage it and not just stating for the -- for the -- all kinds of the different business entities.  And it just would depend if -- if there would be a reason for it.

Q.   What would be a reason that a company would be ineligible for a virtual inspection?

MS. ANTHONY:  Object to the form.

THE WITNESS:  It just states that if there's any flags, and that could be something either with their data or with something that comes up that -- that we would need to follow up on to make sure that they are -- they do have a secure location, that they are in that physical place still, things of that nature.

BY MR. RISTVEDT:

Q.   When you say if there are flags, I assume you're referring to d ii, where it says, "If there are red flags,

[then] we can request a physical inspection," yes?

A.    Yes.

Q.    When it refers to red flags, are those red flags that are identified during the virtual inspection process or in other levels of the due diligence procedure or both?

A.    It could be in both or recredentialing, wherever that information's coming up.  If there's a reason for it, that's the process Experian would have.

Q.    The steps that we've looked at thus far, are those performed by a human being or by an automated process, which Experian sometimes calls a bot?

A.    My understanding, each of these steps would be done by a person.  If they are using a bot to assemble information, I just would not have that independent knowledge.  But these steps are -- these tasks are initiated by a bio person, by a live person.

Q.    You're aware that Experian does annualized recredentialing of its data furnishers, yes?

A.    Yes.

Q.    And my understanding is that the recredentialing process is essentially just the same steps as the due diligence procedure with a few variations.  Is that your understanding as well?

A.    Without looking at the manual, I wouldn't be able to tell you specifically what those variations would be,

but it is quite similar.

Q.    Do you know whether the recredentialing process is also carried out by a human being or if that's handled by an automated process?

A.    I believe it would be either -- either a human being initiating the process itself or Experian using a third party.  It really would depend on what's available at that time to this process.

Q.    When a physical inspection is required for a data furnisher, there's this other document, "Physical Inspections How to."  Have you ever seen that document?

A.    I have not.

Q.    Do you know what it entails or what it consists of?

A.    Just by reading the topic of it is they're confirming some information about the physical location. But steps in the information, I do not have knowledge of.

Q.    Well, for instance, like, I've done a physical inspection in conjunction, incidentally, with a credentialing application for a different type of company. And I was asked to do things like check if there are locks on the doors and are there papers just sitting out in the break room.

Do you have any knowledge about the specific requirements that are enumerated in the physical

inspection list that Experian provides to its vendor?

A.    I don't know specifically what's on that list, but in looking at the information, as far as what Experian has within its own policies and procedures, security is one of them and making sure that the data is also secured. How it's described on the checklist, I don't know.

Q.    And when you say that the inquiry also examines whether the data itself is secured, where are you getting that information from?

A.    You had mentioned leaving papers around, so things of that nature, making sure that there's not a situation where consumers' identification isn't sitting on somebody's desk in a printed kind of a format.  They should have some sort of measures in place to ensure the security of identification information for consumers.

Q.    Now, I understand you haven't seen the Physical Inspections How To or the virtual inspections checklist.

Do you know whether there is any inquiry performed by Experian's vendor that relates to, say, data security, like, checking the computer systems operated by the customer?

MS. ANTHONY:  Object to the form.

THE WITNESS:  My understanding of reviewing these manuals is security would be part of a process where that's looked at.  I don't know if it's on that particular

checklist, but it would be Experian somehow receiving that information, either electronically or otherwise, making sure that they do have the security in place in order to report information to Experian.

BY MR. RISTVEDT:

Q.    Do you know which of Experian's procedures these data security requirements would be detailed in?

MS. ANTHONY:  Object to the scope.

THE WITNESS:  I'm not exactly sure if it would have been the -- something within the reporting of the information, but it would be part of the onboarding process.  How that's done and what processes that they have in place to ensure that the security for identification information is properly sent to Experian is done, but I don't know what -- specifically what page it would be, but it is the onboarding process.

BY MR. RISTVEDT:

Q.    And when you say you know it's done, from where did you obtain this knowledge that this process is done?

MS. ANTHONY:  Object to form.

THE WITNESS:  In reviewing the information to prepare for this deposition, I did go through the process where I reviewed all the manuals.  I did not memorize every single manual.  So on my next screen, I have manuals that I can look at that were produced in this

APPENDIX 1697

case.

BY MR. RISTVEDT:

Q.   Well, and that's what I wanted to make certain that I understand.

When you talk about this knowledge of data security, it sounds like you're saying -- and I don't wish to put words in your mouth -- but it sounds like you are saying your knowledge of that is based on your review of the documents in this case.  Is that correct?

A.   No.  So my knowledge of it, prior to this -- this deposition, was more at a high level, and I know that that process happens.  As far as the onboarding, my knowledge was more on the onboarding and security requirements and the type of security that's required at that time, and basically information sharing to make sure that they have a secure environment.  Specifics about it would be more information in the manuals, but my understanding was more on a high level type of situation.

Q.   Okay.  So you're saying somewhere in the manuals it discusses data security, and you may not have knowledge of all of the specifics, but you know at a high level there's some form of data security inquiry performed by Experian during the onboarding process.  Have I understood your testimony properly?

A.   That is my understanding, correct.

APPENDIX 1698

Victor Manuel Ramirez Najera vs. Experian Information Solutions Inc. -
30(b)(6) Experian Information Solutions Inc. - Teresa Iwanski

November 14, 2025
80

Q.   With respect to the on-site inspections -- this is -- if I can return to Exhibit 3, your declaration from Ohai -- the on-site inspections, those are -- those make up one component of what you identified as Experian's procedures to ensure maximum possible accuracy that relate to accuracy of data furnishers, right?

A.   It is one of the steps that Experian goes through in credentialing and onboarding data furnishers.

Q.   What company does Experian employ in order to perform the physical inspections of a new customer?

A.   It could be Experian or Experian may use a third party.

Q.   My understanding from Mr. Henke was that no Experian employees do any physical inspections.  Are you saying that's not your understanding, that there are some Experian employees who do?

A.   I believe it's -- in my understanding of it and how I interpret the information is that somehow Experian's -- whatever department, depending on if there's any kind of reason for Experian to do an on-site visit.  I do not believe that those are performed by a third party or another company for Experian.  That is based off of -- off of my understanding of what I was able to review.

Q.   And my apologies, I just want to make certain I'm following.  I think you just testified that when Experian

determines that a physical or on-site inspection is necessary or appropriate, that in those instances the person or persons performing that on-site inspection is an Experian employee.  Have I understood you correctly?

A.   That's my understanding.  If it was said differently in Peter's -- Peter Henke's deposition, my interpretation of it is that somehow Experian would be involved.  How that is, I don't know exactly.  And I -- there was a trend source company, and I don't remember the exact relationship with Experian and that company, but somehow it would be a direction of Experian to do any kind of like on-site visits if one was needed and there would be a particular reason why.

Q.   What about the virtual inspection.  How does that process work?

MS. ANTHONY:  Object to form.

THE WITNESS:  As far as the virtual inspections, there is also a checklist.  And in reading the particular manual that we have in front of us today, I don't see it a step-by-step scenario, so I would be guessing at this point.  And I don't want to guess.

So just my understanding, it'd be some sort of virtual, if it's through electronic means of sharing information or virtual, as in face to face with some sort of Zoom type or other ways of gathering that information.

Coash Court Reporting & Video, LLC
staff@coashcrv.com                                                  602-258-1440
                                              www.CoashCourtReportingandVideo.com

I just don't have a particular knowledge of that.

BY MR. RISTVEDT:

Q.    So at least as we sit here today, it sounds like you could sort of maybe make some assumptions about what that process entails, but you don't know what that process entails.  Is that fair?

A.    So the process would be -- would be like the physical inspection, meaning we're trying to gather that information.  If it is done electronically, like as in somehow information is shared, if we ask for information, they would share it rather than us looking at the information provided at the location or whatever means that -- that we -- that Experian can complete that task.  I'm just not familiar with the exact steps that they take.

Q.    The final step in Level 4 is Experian obtains documentation relating to the permissible purpose that the customer has identified will be the basis for their credit report pull, right?

A.    Correct.

Q.    So that is the final step in Level 4.  You would agree with me?

A.    Yes.

Q.    And if we go back through the similar question that we've discussed previously, is there anything in the steps for Level 4 that relates specifically to the

accuracy of a data furnisher's credit information?

MS. ANTHONY:  Object to the form.

THE WITNESS:  Not at this point.  We're just looking at the company to see if we're going to do business with them.

BY MR. RISTVEDT:

Q.    And I know you identified in your declaration that the on-site inspection that's part of Experian's overall procedures to assure maximum possible accuracy and you've testified to that in depositions in the past, correct?

A.    Yes.  These are the steps that we would go through to make sure we can rely on a company's data.  And these are the steps that we would take in order to ensure that they would be reporting data that they say that they're going to report, and they're the kind of company that they say that they are, and these are the steps that we would go through to ensure that they would be reporting under the guidelines of the FCRA.  And that's part of the contract that we would finally have with the company once Experian is going through the process of credentialing.

Q.    So when you say "reliable," you're talking about can we trust that they're sending us the kinds of data that we expect they're going to be sending us, and are they a real business that we can trust we're actually

doing business with a legitimate company?  Things to that effect, yes?

A.    That's the steps and the information we've reviewed.  But in addition to that, Experian also has an agreement, a contract with the company, that they are going to report accurate information, as well as participate in s dispute process.

So when we contact companies because consumers have disputes, they'll respond and then certify that information to be accurate.  So there's lots of steps that we're not looking at right now, but this is more of an onboarding kind of situation.

MR. RISTVEDT:  Sorry.  Your volume just spiked.  And I -- Rebecca, I saw you jump as well.  So I know that scared you the same way.

BY MR. RISTVEDT:

Q.    And I understand that, Ms. Iwanski.  And I understand that there's a contract that Experian has wherein data furnishers make certain representations about what they will and will not do with Experian, that's what you're referring to, yes?

MS. ANTHONY:  Object to the form.

THE WITNESS:  Generally, yes.

And is my voice really high still?

MR. RISTVEDT:  No.  It's just fine now.  It

Victor Manuel Ramirez Najera vs. Experian Information Solutions Inc. -
30(b)(6) Experian Information Solutions Inc. - Teresa Iwanski

November 14, 2025
85

was just one split second that was terrifying, but it sounds fine now.

BY MR. RISTVEDT:

Q.    And I get that.  I understand that there are multiple different aspects of what you've described here in Exhibit 3, your declaration.

Right now my question is very specific and narrowly focused on number 3, the on-site inspection.  You would agree that whether a company has a lock on its door, that doesn't have anything to do with is their credit data accurate, right?

A.    So part of the ability to have a relationship with a company, there are lots of steps that Experian takes.  One of them is the security, make sure that they have a secure environment.  And the other steps are to make sure that we can have a relationship with that company because they have passed all the credentialing processes.  And we have a contract that states that they're going to report accurate information to Experian, that they participate in the dispute process.  And we also look at their data before it's loaded into the database.  And there's other avenues of audits that we look at to see if we're seeing any kind of trends or situations, anomalies that do not match what they state that they're going to be reporting.  All that information is to assure

maximum possible accuracy.

Q.    I understand all of that.

My question is a much simpler one.  Does having a lock on a building's doors have a relationship with whether that company's credit data is accurate?

A.    So even before we got to that point, if there is a situation where they are not locking their doors, Experian would not be doing business with that company.

So in order for Experian to do business with the company, part of that is security to make sure that they are treating identification information in a secure manner, that they have security in place.  And if not, if they have a situation where they don't lock the doors, then that would be a security risk and Experian would not be doing business -- sorry -- business with a company that's not locking their doors.

Q.    Okay.  I don't know whether you answered my question, but I think we are closer to an answer to my question.

It sounds like you're saying that the on-site inspection relates to the security of the business and whether Experian can even do business with that entity, yes?

A.    All the steps in the credentialing and onboarding are the steps that Experian would take to ensure that

Coash Court Reporting & Video, LLC
staff@coashcrv.com
602-258-1440
www.CoashCourtReportingandVideo.com

APPENDIX 1705

we're going to have a relationship with that company.  So it's not just in one location.  There's a lot of steps that are involved through that process.

Q.   And I understand that.  But what I'm discussing right now relates specifically to whether or not a company's credit data is accurate.

And you understand that I could go out down the street to a building, I could rent office space, I could pass the credentialing, I could pass the on-site inspection, and then I could deliberately report false data and say, "Actually, Mr. Hammoud's account is 50,000, not 5,000."  I could do all of those things and still pass an on-site inspection provided that I satisfied the checklist, yes?

MS. ANTHONY:  Object to the form.

THE WITNESS:  Well, part of that checklist is making sure that you are a real company and that you are meeting these requirements.  And if you're not a publicly-traded company, we would come to the -- to the location and look at what you have.  And if you're in a basement somewhere or you're in an office where you just rented and there seems to be some red flags, then we wouldn't do business with you.  So part of those requirements is a trust and that they are going to report information to Experian accurately, that they are

complying with the FCRA and their own requirements, and Experian would then have a contract with that company to do business with them.

BY MR. RISTVEDT:

Q.    Sure.  Do you understand that the contract is separate from the on-site inspection, yes?

A.    The contract is what I'm -- when I refer to it, is very specific information about how they are going to report accurate information to Experian.

So when I say that credentialing is -- are the steps that go on before the contract is signed.  But that's my understanding that we would need to get to all those steps in order to have a relationship with that company.

Q.    Okay.  So let me maybe try a different way.

When I asked Mr. Henke the same question, does an on-site inspection of a business relate at all to whether that company's credit data is accurate, he told me, no, it doesn't.

So is Mr. Henke, with his 20-plus years of experience in credentialing wrong, or are you wrong?

MS. ANTHONY:  Object to the form.

This is borderline harassing.  I understand you don't like her question -- her answers.

MR. RISTVEDT:  Okay.  I would love to bring

this one to the court, Rebecca.  I would love to.

          MS. ANTHONY:  I'm going to let her answer.
I'm just going to say, like, at a certain point you,
like --

          MR. RISTVEDT:  Yeah, once I get an answer to
my question, I can move on.  When I don't get an answer to
the question, it means I have to ask the same question 52
times.  That's just part of how depositions work,
unfortunately.

          MS. ANTHONY:  If you want to restate your
question.  Or, Teresa, if you remember it, and you can
answer.

          THE WITNESS:  No, if you could just restate
the question, please.

BY MR. RISTVEDT:

     Q.    Sure.  So I asked Mr. Henke that same question,
whether or not on-site inspections relate to whether a
data furnisher's credit information is accurate or not.
And he told me, no, it doesn't.  It just relates to
whether or not they pass our inspection.

          So is he incorrect when he said that?

          MS. ANTHONY:  Object to the form.

          THE WITNESS:  I think we're talking about
two different situations here.

          So when -- when I read his deposition

transcript, he's answering the question as you're stating it.  When I'm answering the question, I'm saying there's a lot of steps that are involved, and part of that is the contract and the fact that we would have to go through all these steps to get to the contract to have a relationship with a company where they state that they're going to report accurate information to Experian.

BY MR. RISTVEDT:

Q.   Okay.  So I think I understand the disjunction between my questions and your answers.

So you're saying that your answer considers the several other steps that are part of those overall procedures.  Did I understand your answer correctly?

A.   Yes.  And when I was signing that declaration that you had up a minute ago, those are the steps that -- that Experian goes through to have a relationship with a company to make sure that they are reporting accurate information.  Experian's ultimate goal is to have maximum possible accuracy.

Q.   Okay.  So now I believe I've understood you properly.  And with that understanding, in mind, let me rephrase.

I understand that the contract and the other aspects of those procedures relate in some way to accuracy.  Focusing only on the inspection and ignoring

those other steps, you would agree with me that the on-site inspection does not relate to whether a credit furnisher's data is literally accurate, yes?

MS. ANTHONY:  Object to the form.

THE WITNESS:  You're taking one piece out of the entire process, and that -- as a standalone, no.  As it relates to all the different pieces and then eventually ending up with a contract, then, yes.

BY MR. RISTVEDT:

Q.   Okay.  So I want to make certain I've understood your answer before I move on.

You're saying as a standalone piece, the on-site inspection does not relate to accuracy.  However, as part of the broader set of procedures, you're saying it does because it is a prerequisite to the contract.  Have I understood all of your testimony correctly?

MS. ANTHONY:  Object to the form.

THE WITNESS:  Yes, you have.

MR. RISTVEDT:  Okay.  With that, I think we've been going an hour.  So why don't we take a break.  Ms. Iwanski, would you prefer more than five minutes?  Is that sufficient?

I note we're on -- I don't know if other people eat lunch.  I do not.  So certainly -- and obviously our court reporter, I want to be respectful to

you both as well.

THE WITNESS:  I'm going to defer to Rebecca. And I apologize, I thought there was a time limit on today's deposition.

MS. ANTHONY:  There is.  It's -- I think we're at a max of four hours.  But there's also -- I don't know -- I assume we will stop sometime before four hours because there will be another deposition within that same four-hour period.

So maybe, James, it might be helpful if you gave us a sense of how -- how much longer you expect to go, if you expect to use three and a half hours for this deposition, then maybe we take a longer break now.  And if you expect to only go for 30 more minutes, maybe we just take five minutes.

MR. RISTVEDT:  I've got two hours 11 on the record as of now.  I expect to use the full four hours today.

MS. ANTHONY:  So are we not going to do a 30(b)(1) deposition of Ms. Hamilton?

MR. RISTVEDT:  I'm -- I think we're just doing a 30(b)(1) with Hamilton as it relates to her -- the steps that she took.  That's my understanding.

MS. ANTHONY:  I think -- let's go ahead and go off the record, but we need to talk about this timing

thing.  Because what you're saying is inconsistent with our agreement.  So -- and I've been asking about this, and you haven't answered my questions, which maybe is because you're trying to do something inconsistent with our agreement.  Let's go ahead and go off the record, then.  If that's okay with you, James, obviously.

MR. RISTVEDT:  Yeah.

THE WITNESS:  And I'm just going to take a quick 10-minute break.

MS. ANTHONY:  Okay.  Sounds great.

THE COURT REPORTER:  Okay.  The time is 11:26 a.m.  We're now going off the record.

(A recess ensued.)

THE COURT REPORTER:  The time is 11:50 a.m. We're now back on the record.

BY MR. RISTVEDT:

Q.   Ms. Iwanski, you understand you remain under oath, correct?

A.   Yes, sir.

Q.   And you sound just a little quiet to me.  I don't know if that's just my end.

A.   Yes, sir.

Q.   Oh, there we go.

All right.  We were discussing the due diligence procedure.  I'm placing that back on the

screen.  We're at EXPERIAN NAJERA 316, Level 5.  Do you see that?

A.    Yes, I do.

Q.    Now, this section relates to due diligence for companies operating under the FCRA and Gramm-Leach-Bliley.  Do you agree?

A.    Yes, that's what it states.

Q.    The first item is validation of the company's DB or fictitious business name, yes?

A.    Doing business as, yeah, this is part of the name validation process.

Q.    The second is similar to one of the other items from Level 4, obtaining permissible purpose supporting documentation.  Do you agree?

A.    Yes.  Those are the steps to take to ensure that they have that information or steps in process.

Q.    And specifically, Experian obtains supporting documentation for a company's permissible purposes, and that documentation that's required is different depending on what type of permissible purpose will be requested.  Is that true?

A.    Yes.  The main thing is having the permissible purpose, basically knowledge of what they're pulling for and what they say they're pulling for, and those are the steps that we would need to take in order to ensure that

they're going to be pulling information with a permissible purpose.

Q. On EXPERIAN NAJERA 317, there's a section for the permissible purpose extend firm offer of credit, which is the permissible purpose used by Rushmore. Is that true?

A. I don't remember specifically what the inquiry -- if it was a hard inquiry, then, yes, it was a firm offer of credit.

(Plaintiff Exhibit 10 was marked for identification.)

BY MR. RISTVEDT:

Q. Got it. And if I can, I'll just jump ahead. I'm going to place Exhibit 10 -- Plaintiff's 10 on the screen. This document is not yet Bates stamped.

But have you seen this document before?

A. I think it was -- I may have briefly looked at it. Fully, no. But I am -- I'm reviewing it now.

Q. Do you see here on page 3 of this document where it says one party to this contract is Experian, the other party is Rushmore Loan Management Services, LLC?

A. Yes, I do see that.

Q. And if I go down to -- an actually, I might even be on the wrong document.

Let's go to Plaintiff's 9.

Have you seen this one before?

A.    I believe I did.

Q.    And what do you understand this one to be?

A.    This is more of the application process.

Q.    Now, I understand in 2016, when Rushmore completed its application, the department now known as the credentialing department was then known as the membership department, correct?

A.    Yes, that's my understanding.

Q.    So this would be what is now known as a credentialing application, only from 2016, yes?

A.    Based off of the credentialing steps and then basically looking at the fact that this was a written form at that time, certainly times have changed and their format, but it appears to be similar.  I don't know if the same steps applied back then or not.

Q.    You agree the permissible purpose identified by Rushmore is firm offer of credit, right?

A.    Yes, I do see that.

Q.    So returning to Exhibit 4, the section of Level 5 for accepted documentation to support a firm offer of credit is this numbered list here on EXPERIAN NAJERA 317, right?

A.    Yes.

Q.    So assuming Experian either credentialed or at some point recredentialed Rushmore, Experian would have

APPENDIX 1715

these documents saved as attachments to the Salesforce account file for Rushmore, right?

A.   I do not believe we were using Salesforce in 2016.  How it's retained initially, onboarding, I don't know where that information is kept.  Or if it's kept, how it's kept.

Q.   I'm going to jump down to EXPERIAN NAJERA 320. This is the next step of Level 5.

Do you see number 3, Data Accuracy Furnisher Policy & Procedure?

A.   Yes, I do.

Q.   Now, I've asked you throughout the course of today's deposition whether or not specific steps in the procedure relate to whether a furnisher's data is accurate or not.

You would agree that this step, Data Accuracy Furnisher Policy & Procedure, does relate to whether a data furnisher's data is accurate or not, correct?

A.   Yes.  It does have an accuracy and integrity of the furnished information.

Q.   And the specific requirement is that a data furnisher is required to provide Experian with a copy of the furnisher's data accuracy policies and procedures, right?

A.   That's my understanding.

Q.   And there's a numbered list of nine components that are required to exist within those accuracy policies and procedures maintained by the furnisher, right?

A.   Correct.  They must exist within the FCRA policies and procedures as follows.

Q.   Now, my understanding from Mr. Henke was that it's not like a magic spell from Harry Potter, like, it doesn't have to say "accuracy and integrity of furnished information."  There could be a section that says something like "accurate information," or something else. In other words, it doesn't have to have literally these words.  Is that true?

A.   That's my understanding.  But each and every one of these will -- if it doesn't say that, it has to explain that.  So as we're talking at Metro 2 compliance, well, that -- that's a firm Metro 2 compliance scenario, accuracy and integrity of furnished information.  They might say it different, but as long as it's explained in that proper format.  Outside of that, you know, they may have a different word for quality control, but it's still the action itself would still be the same.

Q.   So to your point, when it says "Metro 2 Compliance," there would have to be some element of that data furnisher's policies and procedures that enumerate,

here's how we comply with the Metro 2 guidelines, and here's what we do to make sure that our information complies with those guidelines, fair?

A.    That's my understanding.

Q.    Now, I understand this is a requirement for all new data furnishers.  If you're going to start doing business with Experian, you must provide these written data accuracy policies and procedures containing these nine items, right?

A.    Correct.

Q.    But I also understand, from Mr. Henke's testimony, that if a data furnisher had a business relationship with Experian prior to the writing of this document in December of 2022, that those data furnishers were grandfathered in and do not need to comply with this requirement.  Is that your understanding?

MS. ANTHONY:  Objection, outside the scope.

THE WITNESS:  I did not read that portion in Mr. Henke's deposition testimony.  There would be something like this.  So however it's compiled, if it's in the contract at that time, then maybe that's where they would find that information in the contract.  But still, this would still be some sort of process in place, whether or not it looked different prior to 2022, I don't know for sure -- or I'm sorry -- prior to August 11, 2025.  It may

look different, but generally it would be the same type of information.  And I don't know what would be grandfathered in or not grandfathered in.

BY MR. RISTVEDT:

Q.    So I just want to go back to EXPERIAN NAJERA 327, Change Control.  You would agree this document was first drafted December 27 of 2022, yes?

A.    Correct.

Q.    And it's your testimony that you believe this step on EXPERIAN NAJERA 320 and 321 regarding a requirement of data furnisher's policies and procedures, you're saying you believe there was some similar requirement prior to December of 2022.  Have I understood you correctly?

MS. ANTHONY:  Object to the scope.

THE WITNESS:  Again, it may be just in the agreement with the data furnisher or through the process we are looking at their data so that we may be able to capture that information differently back then as opposed to current dates.  But the steps and the components that they may -- that they need to adhere to the FCRA would be given.  Again, it may be just in the contract or other information that we received from that data furnisher.

BY MR. RISTVEDT:

Q.    And I understand you're saying that the contract

Coash Court Reporting & Video, LLC
staff@coashcrv.com                                    602-258-1440
                                    www.CoashCourtReportingandVideo.com

APPENDIX 1719

would contain some sort of certification that we're going to be accurate, right?  That's what you're testifying to?

A.   That they're going to report accurate information to Experian, correct.

Q.   So I understand that Experian may have received that kind of information.

My question is, prior to December of 2022, was there an Experian policy or procedure that required this information to be provided by a data furnisher as part of the credentialing process?

A.   These exact steps, I do not know.

Q.   Do you know if there was any requirement that the data furnisher provide any policies and procedures relating to accuracy?

A.   Again, I don't know if it's just part of the contract that they're going to report accurate information to Experian.  Outside of that, I just don't have that knowledge.

Q.   Okay.  And I just want to clarify.  I think the answer is no, but I want to ensure I've understood you correctly.

You're saying, as we sit here today, you don't know with certainty whether this requirement existed prior to December of 2022.  Is that accurate?

MS. ANTHONY:  Object to the scope.

Coash Court Reporting & Video, LLC
staff@coashcrv.com
602-258-1440
www.CoashCourtReportingandVideo.com
APPENDIX 1720

THE WITNESS:  The FCRA component and following -- abiding by the FCRA and reporting accurate information would be part of the agreement contract with the company.  The other pieces, I'm just not sure.

BY MR. RISTVEDT:

Q.   So you're saying it would have been a requirement in the contract, but you don't know whether there was a requirement that the written policies and procedures were provided.  Is that fair?

MS. ANTHONY:  Object to the scope.

THE WITNESS:  Yes.  I just do not know.

BY MR. RISTVEDT:

Q.   There's also this document referenced, the "Data Furnisher Policy & Procedure Requirements."  Have you ever seen that document?

A.   No, I have not.

Q.   Do you know what type of information is in it?

A.   Above is the -- the points that we're looking for.  Specifically what it states, I do not know.

Q.   The next levels relate to -- you see Level 6 is Reseller, Level 7 is Direct to Consumer Resellers, and Level 8 is a Prequalification Resellers, right?

A.   Yes.

Q.   And if I scroll back up to EXPERIAN NAJERA 293, looking at the index, you can see it stops at Level 6,

Victor Manuel Ramirez Najera vs. Experian Information Solutions Inc. -
30(b)(6) Experian Information Solutions Inc. - Teresa Iwanski

November 14, 2025
103

Reseller; Level 7 Direct to Consumer Reseller; Level 8,
Prequalification Reseller, yes?

A.   Yes, I do see that.

Q.   So throughout the course of the day, I've been
asking you, sort of does anything in this step relate to
whether a data furnisher's credit information is accurate.
And up until Level 5, all of the other steps were dealing
with can we do business with this company?  Are they
legitimate?  Are they in operation?  Are they precluded?
All of those types of things, yes?

MS. ANTHONY:  Objection to the form.

THE WITNESS:  Yes.  In order to get to the
contract, those are the steps we would have to complete.

BY MR. RISTVEDT:

Q.   And then Level 5, you would agree that the data
accuracy step, that does refer to whether a furnisher's
data is accurate or not, as we discussed, right?

A.   Yes, because we've gotten through the different
steps in order to get to the place we are going to look at
doing business with this company.

Q.   To be clear, the other two steps in Level 5, the
validating a company's DBA, and then also getting
documentation that supports their permissible purpose,
those don't relate to whether the data furnisher's credit
data that it's sending to Experian is accurate.  Those are

different issues, yes?

MS. ANTHONY:  Object to the form.

THE WITNESS:  Yes.  So at this point, again, we're -- we're confirming the business, what their permissible purpose would be, and seeing if we're going to be able to do business with that company.

BY MR. RISTVEDT:

Q.  So of the due diligence procedures, setting aside things like the contract and other aspects of Experian's procedures not contained within this document, the specific component of the due diligence procedure that relates to whether a data furnisher's data is accurate is Level 5, Section 3, titled "Data Accuracy Furnisher Policy & Procedure," correct?

MS. ANTHONY:  Object to the form.

THE WITNESS:  Correct.  So we've gone through the different levels, and at that point, we are going to be doing business with this particular company, and that's the piece of accuracy policy and procedure that we would need.

BY MR. RISTVEDT:

Q.  And I just want to go back for a moment to that data accuracy policy and procedure.  This is on EXPERIAN NAJERA 320, spilling into 321.

It's your testimony today that -- actually,

I don't know -- let me ask you this.

Do you have any knowledge, as we sit here today, whether data furnishers doing business with Experian prior to December 2022 were exempted or grandfathered in from having to comply with this requirement?

MS. ANTHONY:  Object to the scope.

THE WITNESS:  Only your reference from Peter's deposition testimony.  Outside of that, I don't have any type of independent knowledge.  My knowledge at the -- prior to this deposition, we were more on a high level scenario where the data furnishers that have a contract with Experian are going to be reporting accurate information and participate in the dispute process.  So whether or not that was different or part of a different document prior to that time, I really don't know.

(Plaintiff Exhibit 5 was marked for
        identification.)

BY MR. RISTVEDT:

Q.   I'm going to place on the screen what I'm going to designate as Plaintiff's 5.

Have you ever seen this document before?

A.   Yes, I have.

Q.   What do understand this one to be?

A.   This is the recredentialing procedure.  So this

is somebody we have a relationship with, and we're recredentialing on a yearly basis.

Q.   So to put a finer point on it, the initial meeting of a new customer, that would be the credentialing process.  Once the customer has gone through that, they sign a contract with Experian, have a business relationship that continues on, and then this procedure would control on an annual basis Experian's process for recredentialing that customer.  Is that all correct?

A.   Yes, that's my understanding.

Q.   Now, again, we discussed it a bit at a high level.  But my understanding is that, with a few exceptions, the process for recredentialing is essentially we take the credentialing process and we just redo it each year.  Again, is that consistent with your understanding of what the recredentialing procedure entails?

A.   Generally.

Q.   I'm going to jump down to EXPERIAN NAJERA 379.  This is the Change Control section.  You see this document was drafted in August of 2020, right?

A.   Yes, I do see that.

Q.   So Mr. Henke told me that this document was drafted in '20 and that Experian began recredentialing its customers sometime over the course of the next year, meaning the first recredentialing of customers took place

in or around 2021.  Is my recollection of my discussion with Mr. Henke consistent with what you understand Experian's policies and procedures to be?

A.  My understanding is there was still a -- some sort of recon- -- going back to the company, maybe not on a yearly basis, but periodically according to whatever was required at that time.  But as far as the yearly and how it's set up, August 2020 shows the creation of this particular document.

Q.  Well, in other words, what I want to understand is -- it sounds like you're saying you believe that prior to August of 2020, Experian was doing some form of annualized recredentialing.  Have I understood your testimony correctly?

A.  No, sir.  I wasn't saying annually.

My understanding would be if they needed, for whatever reason, to go through that process, there was an ability and a process in place.  But a yearly recredentialing, this is the -- around that time, August of 2020.

Q.  Have you ever seen any Experian documents that relate to written policies or procedures for recredentialing prior to August of 2020?

MS. ANTHONY:  Object to the scope.

THE WITNESS:  No, I have not.

BY MR. RISTVEDT:

Q.    I'm going to jump down to EXPERIAN NAJERA 349. Do you see the section titled "Introduction"?

A.    Yes, I do.

Q.    And it identifies who this procedure applies to specifically.  Do you agree?

A.    Yes.

Q.    It says it applies to "permissible purpose certification of all Experian Information Services and Clarity inquiry clients," right?

A.    Yes.

Q.    And there is not a second group, you would agree with me?

A.    They're putting it into -- into Experian Information Services and Clarity.

Q.    So in other words, this recredentialing procedure focuses on the permissible purpose certification of those customers, right?

A.    Of the data furnishers, yes, that's correct.

Q.    So the primary function of the recredentialing procedures is to, on an annualized basis, investigate the permissible purpose certification of those customers.  You would agree?

MS. ANTHONY:  Object to the form.

THE WITNESS:  Well, there's a permissible

purpose certification process that they would need to go through, correct.

BY MR. RISTVEDT:

Q.    Well, in other words, what I wanted to make certain, there's nothing in here that says this procedure applies to data furnishers who send us credit information?

MS. ANTHONY:  Objection to the form.

BY MR. RISTVEDT:

Q.    I'm sorry.  Ms. Iwanski, I may have missed your answer.

Do you agree with me that there's a reference to this applying to permissible purpose certification?

A.    My understanding, it would be both data furnishers and third parties requesting a copy of someone's credit report.

Q.    What is your understanding in that regard based upon?

A.    My understanding is, is the credentialing is the same for a data furnisher that it would be from a third party just requesting a credit report.

Q.    Can a data furnisher have their account suspended during the recredentialing process?

A.    Yes.  They can have their account suspended during any time.  It doesn't have to be just during the

Coash Court Reporting & Video, LLC
staff@coashcrv.com
602-258-1440
www.CoashCourtReportingandVideo.com

recredentialing process.  If there's a reason why Experian finds information and is then gathering and assessing their data at some point, they could be suspended or Experian terminates that agreement with that data furnisher.

Q.   What percentage of data furnishers are terminated each year?

A.   I have no idea.

Q.   Do you recall earlier we looked at some exceptions to the on-site inspection requirements, things like the publicly-traded companies, banks, credit unions, things like that?

A.   Yes, I do remember that.

Q.   Do you know what percentage of data furnishers are exempted from having to comply with the inspection requirements?

A.   I do not know.

Q.   I want to jump to EXPERIAN NAJERA 378.  This is a section titled "Automation."  Do you see that?

A.   Yes, I do.

Q.   Now, this references that "FCRA and GLB clients" -- meaning data furnishers -- "should have completed at least a Level 5 due diligence," meaning during their initial credentialing.  Is that right?

A.   That's my understanding.

Coash Court Reporting & Video, LLC
staff@coashcrv.com
602-258-1440
www.CoashCourtReportingandVideo.com

Q.    And then the second sentence says, "Using the Credentialing Due Diligence Procedure" -- meaning the document we just looked at in Exhibit 4 -- "the Recredentialing bot attempts to complete the following steps."  Did I read that correctly?

A.    Yes, that's what it states.

Q.    And when it refers to this bot, that's referring to an automated process that performs these functions from the due diligence procedure.  Is that right?

A.    Yes.  And any bot is actually created by a person.  So even though it's a bot doing it, it is a live person creating the steps for that bot to take.

Q.    You're talking about the software engineers who program the automation processes.  Is that right?

A.    Yes.  They do work with the departments to create a bot.  So it's very specific for each department and what they're requiring and what that bot needs to do.

Q.    Understood.  But in other words, once the bot is created, it's not like there's a guy who's rewriting a new bot for every data furnisher, right?

A.    I don't know.

Q.    So is it possible that there's a new bot automation program for every single recredentialing?

A.    I don't know if they have several types that are going to be pulling information or what was created for

Coash Court Reporting & Video, LLC
staff@coashcrv.com
602-258-1440
www.CoashCourtReportingandVideo.com

this department.

Q.   So the bot attempts to complete the steps we just looked at in the due diligence procedure, meaning internet search, confirm legal entity is still active, look at a previous request, confirm client placement and zoning, and permissible purpose verification, identify third parties, and then it does these last steps where it validates the data reporter link and contract validation, correct?

A.   Yes, I do see that.

Q.   And, again, that's all -- this is all an automated process being done by some software written by an Experian employee, true?

A.   Correct.  Gathering the information itself in order to complete the tasks for the next steps.

Q.   When the bot is unable to complete portions or all of this process during the recredentialing procedure, what happens next?  Does a human intervene?  Does it just fail?  What's the outcome?

A.   If for some reason there is an issue with a bot, it is then communicated electronically.  And then at that point, the information will be pulled manually.  So just like if it was a bot doing it, but it would be the person doing it.  Or there could be some sort of fix to the bot, it really depends on what's going on, why something was not successful or there was a reject or an error in the --

in the bot itself.

Q.   Where did you derive the knowledge relating to what happens when the bot fails?

A.   It's my own personal knowledge, working for Experian.

Q.   And you mentioned there is an electronic communication of some kind that notifies the relevant parties that the bot had failed?

A.   Yes.

Q.   Are those communications logged somewhere?

A.   I do not know.

(Plaintiff Exhibit 6 was marked for identification.)

BY MR. RISTVEDT:

Q.   I'm going to place on the screen what I will designate Plaintiff's 6.  This runs from EXPERIAN NAJERA 385 through 391.  Have you seen this document before?

A.   Yes, I have.

Q.   And what do you understand this one to be?

A.   So this is the credentialing services, and this is the recredentialing policy as it relates to their recredentialing yearly program, both pulling and reporting.  This includes information governed by the Fair Credit Reporting Act and the Gramm-Leach -- sorry -- GLBA.

Q.   So this particular document is one of those

higher level policy statements that we discussed earlier. Would you agree?

A.   Yeah.

Q.   And the Purpose section here on EXPERIAN NAJERA 387 says that it's to establish and define the requirements for not only verifying existing client's permissible purposes, but also existing data furnishers to FileOne, yes?

A.   That's correct.

Q.   So this is a policy that sort of, at a high level, explains, "We're going to do recredentialing each year for folks accessing information and also furnishing information."  Is that true?

A.   Yes, sir.

Q.   Going to EXPERIAN NAJERA 388, there's this Who, What, Why table about What Every Employee Needs to Know About This Policy.  Do you -- do you agree?

A.   Yes, I do see that.

Q.   And the why indicates that the policy is important because it helps to ensure that only accurate data is furnished to Experian.  Do you agree?

A.   Yes.

Q.   You would agree with me that separate from the contract that we've discussed, there's nothing in the due diligence procedure that addresses a furnisher's credit

data and its accuracy other than the step concerning the policies and procedures, right?

A.   Yes.  That the entire manual is for the steps that Experian would take in order to have a relationship with the company.

Q.   And during the recredentialing process each year, that step that we discussed, the furnisher's requirement to have to provide their policies and procedures on accuracy to Experian, is that step included in the recredentialing process or no?

A.   Yes, I believe it is.

Q.   If Mr. Henke told me it was not, would you have any reason to doubt his testimony?

A.   I wouldn't doubt his testimony.  My understanding is that the recredentialing is the same as the credentialing process.

Q.   So when this policy says that it helps to ensure accurate data, it's referencing the recredentialing procedure and the credential -- or the due diligence procedure that we've already looked at, right?

A.   That's my understanding.

Q.   And in this context, accurate data really is referring to we want to make sure we can do business with them, and then we'll have a contract with them, which says that they're agreeing to furnish accurate information,

APPENDIX 1734

right?

A.   Yes, that's one of the steps.

Q.   When it talks about unacceptable data on EXPERIAN NAJERA 388, this relates to those items we looked at earlier, health club dues, karate dues, criminal data, things like that, yes?

MS. ANTHONY:  Object to the form.

THE WITNESS:  Yes.  Those are all the pieces of information that is not to be reported.

(Plaintiff Exhibit 7 was marked for identification.)

BY MR. RISTVEDT:

Q.   I want to jump to Plaintiff's 7.

Have you seen this document before?

A.   Yes, I have.

Q.   And what do you understand this one to be?

A.   This is on the data reporting side, specifically the data itself.

Q.   And when you say "specifically the data itself," what do you mean by that statement?

A.   At this point, we're talking about data, not just the company.  But now we're talking about the data that the company is going to report to Experian.

Q.   And this is still a credentialing services department document, yes?

A.   Yes, it is.

Q.   When I go down to EXPERIAN NAJERA 335, there's a section titled "Purpose."  Do you see that?

A.   Yes, I do.

Q.   And it says that "The purpose of this policy is to establish and define requirements for accepting new data reporters to FileOne, Experian's consumer credit database, or to the Clarity database," [Quoted as read] correct?

A.   Yes, sir.

Q.   And it says this is one of the policies that makes up Experian's reasonable procedures to assure maximum possible accuracy, fair?

A.   Yes.

Q.   Within the Scope, it talks about what this policy consists of, and it says it's applicable to data furnishers reporting accounts about United States' consumers, right?

A.   Yes.

Q.   And it talks about in order to be able to qualify for automated reporting, the client has to comply with the Credentialing Reporting Only Procedures.  Do you agree?

A.   Yes, it does show Credentialing Reporting Only Procedures.

Q.   What are the requirements of the Credentialing

Reporting Only Procedures?

A.   I do not know reporting only procedures.  I don't know what exactly it's referring to, whether or not it's in a different manual, or if it's in a different manual with the exact language.

But to qualify automated reporting, meaning we would need to have a relationship with this company, they would need to meet security requirements, and there would be something within that credentialing reporting procedures that would state what those would be.

Q.   Have you ever seen the Credentialing Reporting Only Procedures document?

MS. ANTHONY:  Object to the form.

THE WITNESS:  No, I have not.

BY MR. RISTVEDT:

Q.   Would it be fair to say you would not know whether there's any requirement relating to accuracy of credit data in that procedure?

MS. ANTHONY:  Object to the form.

THE WITNESS:  So for the -- okay.  So to qualify for automated reporting, meaning there needs to be a relationship, those steps were already made at some point.  Then we're going through the process of credentialing the reporting only procedures.  So within that process that we were just looking at in the

credentialing, we would already have the contract at this point that they are going to be reporting accurate information.  So now we're talking about the automated reporting.  And that's -- my understanding is the Credentialing Reporting Only Procedures would have some sort of information about the automated reporting.

BY MR. RISTVEDT:

Q.    Got it.  So it sounds like you may not have knowledge about what is in this Credentialing Reporting Only Procedures, but you're saying because the contract at that point would be signed and the contract has these accuracy certifications, you can understand that that contract has already been done.  Have I understood your testimony?

A.    Yes, that's my understanding.

Q.    This policy also notes that new data furnishers have to meet the credentialing requirements in another document called the Potential Subscriber Investigation Policy.  Would you agree?

A.    Yes, I do see that.

Q.    And it has some exceptions for -- for different data furnishers that may not have to submit these items like a lending license.  One of them is federally-regulated financial institutions.  Would you agree?

A.   Yes, it does say that.

Q.   Another would be Fannie Mae or Freddie Mac servicers or lenders, yes?

A.   Yes.

Q.   Is it your understanding that Rushmore falls into one or both of these bullet points?

A.   I believe so.

Q.   So in other words, Rushmore would not have had to provide things like a lending license or their lender terms and conditions pursuant to these exceptions.  Is that fair?

A.   Can you go back up just a little bit?

Q.   Certainly.

A.   So these are for the new data furnishers coming in.  So back in 2016, it may have looked different on what information that Experian received.

The recredentialing part of it would be something that we may not need the proof of -- proof of financing by the lending license or the lender's actual terms and conditions.  Basically, if there's another way for Experian to receive that information, we could.  It just doesn't seem like it's required in that avenue.

Q.   Moving on to EXPERIAN NAJERA 336, there's this portion Unacceptable Data.  It identifies the same types of data that we looked at in other documents that Experian

does not accept, correct?

A.    Correct.

Q.    Now, a similar question I've been asking you all day, setting aside the contract, which I understand contains certifications about accuracy, there's nothing in this policy that specifically relates to steps Experian takes to make sure that data furnishers furnish accurate credit information.  You would agree?

MS. ANTHONY:  Form.

THE WITNESS:  Part of what this is explaining, more on a high level scenario, is not giving like the step-by-step-by-step processes and what Experian is using to have knowledge that they are reporting accurate information.

So by this alone, it is not going to explain the entirety of Experian's process to ensuring that the information that is being reported to Experian is accurate.

BY MR. RISTVEDT:

Q.    And I understand, like we've discussed, there are other aspects.  There's the contract, I understand.

My question is, in this document, there's nothing that relates to efforts to ensure that a data furnisher's credit information is accurate.  You would agree?

MS. ANTHONY:  Object to the form.

THE WITNESS:  I'm sorry.  Can you tell me the name of the manual we're looking at?  Is it credentialing services?

BY MR. RISTVEDT:

Q.  Yes.  This is Data Reporting Policy.

Or maybe I'll just ask it this way, which portion of this, unrelated to the contract, relates to a data furnisher giving Experian accurate credit information?

A.  Well, it's -- in the scope, it is saying to qualify for automated reporting, client must comply with the credentialing and reporting.

So credentialing and reporting that we've looked at in the previous manual, part of that is meeting all of those steps and ensuring that Experian believes that they are a trustworthy company, and then Experian would be able to do business with them, and that Experian would have a contract with these companies.  So --

Q.  Experian --

A.  -- the credentialing reporting part, it would be part of what would be the accuracy, ensuring the accuracy of this particular company and how it's automated reporting is complying with the CRRG, all the requirements, Metro 2.

Q.    I want to go back to Exhibit 4, EXPERIAN NAJERA 321 -- or 320 and 321.  This is that section regarding data accuracy policy and procedures we discussed earlier. Do you recall?

A.    Yes, I do.

Q.    When Experian gets a data furnisher's policy and procedures, if it contains these nine items in this list, it satisfies this requirement, correct?

A.    Well, the nine items would need to be provided to Experian in its entirety, not just we are going to have Metro 2 compliance.  There needs to be something more involved in that and Experian can see what that is.  But those are the nine pieces of information that Experian requires.

Q.    Does Experian require any sort of certification in a signed document saying that the data furnisher is swearing that it will follow its policies and procedures?

MS. ANTHONY:  Object to the form.

THE WITNESS:  I believe there'd be something in the contract that they are going to be reporting accurate information.  Throughout the process of the credentialing is to ensure that they are going to be following their own procedures.  By giving those procedures to Experian, we're believing that they're going to follow those procedures.

BY MR. RISTVEDT:

Q.   So -- and I understand again, there's a clause in the contract that says we're going to give you accurate information.

I'm asking is there anything where they say, "We promise we will follow our own policies and procedures"?

MS. ANTHONY:  Object to the form.

THE WITNESS:  I don't know if there's a -- that particular verbiage someplace.  But by having an agreement with Experian, we believe that they are going to follow their policies and procedures.

(Plaintiff Exhibit 8 was marked for identification.)

BY MR. RISTVEDT:

Q.   I'm going to skip next to the -- let's see -- Plaintiff's 8.  Have you ever seen this document before?

A.   I believe so.

Q.   And what do you understand this one to be?

A.   So this is what appears to be the subscriber investigation requirement policy.  It might outline more of the steps that Experian takes.

Q.   So going down to EXPERIAN NAJERA 284.  It says that this policy is to fulfill the requirements under the FCRA and GLBA to protect consumer privacy and the

integrity of Experian's consumer credit database.  Would you agree?

A.   Yes, that's what it's stating.

Q.   And the policy details that subscribers have to be a real business entity, meet Experian's physical inspection, show financial responsibility, some other items, like have a phone number, not share office space with an ineligible business, things to that effect, yes?

A.   Yes, that's pieces of the information.

Q.   Is there anything within this list that says the data furnisher has to provide accurate or reliable credit data?

MS. ANTHONY:  Object to the form.

THE WITNESS:  So at this point, we are deciding whether or not to provide access to a company, and these are the steps that they would have to meet in order to have access to the company.  So we're not talking about data at this point.

BY MR. RISTVEDT:

Q.   Got it.  In other words, just so I've got a clear record, the answer is no, there's nothing in this list that says the subscriber must furnish accurate or reliable information.  You would agree?

MS. ANTHONY:  Object to form.

THE WITNESS:  At this point, the policy

itself, it has nothing to do with data.  We're talking about the company itself at this point.

(Plaintiff Exhibit 9 was marked for identification.)

BY MR. RISTVEDT:

Q.    Understood.  I'm jumping now to Plaintiff's 9. This is the membership application that we discussed earlier concerning Rushmore, yes?

A.    Yes, I do see that.

Q.    And I see that this was signed on -- it looks like -- I can't really read this person's handwriting -- but May 2, I think, of 2016, yes?

A.    That's what it looks like.

Q.    Understanding that we do not have any documents to examine today containing the credentialing procedures in effect in 2016, one of the topics that you prepared to discuss today was any credentialing or recredentialing that Experian performed with respect to Rushmore.  Is that true?

A.    If it available.

MS. ANTHONY:  Object to the scope of the question.

BY MR. RISTVEDT:

Q.    Sure.  And maybe let me just go back to Exhibit 1 for a moment.

Coash Court Reporting & Video, LLC
staff@coashcrv.com    602-258-1440
www.CoashCourtReportingandVideo.com

APPENDIX 1745

Topic 5 reads, "The credentialing and/or recredentialing that Experian performed with respect to Nationstar/Rushmore and the results thereof."  Did I read that right?

A.   Yes, I do see that.

Q.   And you recall earlier we looked at this, and I had asked you, are you prepared to talk about these?  Do you feel unprepared to talk about these, that kind of thing.  And you had said that yes, you were prepared to discuss them, and that no, you weren't unprepared to discuss them.  Do you recall that?

A.   Based on my review of the manuals and preparing for today's testimony, I am prepared to discuss those.

Q.   Okay.  So when Experian received this membership application from Rushmore, what specific steps did Experian take to process this membership application?

MS. ANTHONY:  Object to the scope.  Outside the time period of the notice.

THE WITNESS:  So back in 2016, there would be a process in place.  The steps may have been similar. We're going to make sure that they are a true company. We're going to make sure that they seem to be a trustworthy company.  It might have been a little bit different in -- during that time frame, maybe -- maybe more, like, documents, things of that nature would have

APPENDIX 1746

been requested.  Specific information was not available to me to review any specific information about this particular application during that timeframe, but it would be something similar to what we have today.

BY MR. RISTVEDT:

Q.   Okay.  So I want to make certain that I've got as clear a transcript as possible.

I heard a bunch of words during your response, it may, it would, I think, I believe.  I'm asking a question about very specific personal knowledge, what you know sitting here today.

So my question is, setting aside what you believe would have happened or would likely have been the case, do you have any personal knowledge about any steps that were taken to process this membership application?

MS. ANTHONY:  Object to the scope.

You can answer if you know it.

THE WITNESS:  The application kind of speaks for itself.  It is explaining the name of the company, the address of the company.  We have a business email talking about how many monthly reports it's going to send to Experian.  And if we scroll down, we might be able to find out more about their application information.  But this application is going to speak for itself back in 2016.

BY MR. RISTVEDT:

Q. Okay. So I'm going to have to ask the question as many times as I need to in order to actually get an answer.

My question is, sitting here today under oath, under penalty of perjury, do you know any steps that were taken to process this application and have actual knowledge of those steps?

MS. ANTHONY: Object to the scope.

You can answer if you have knowledge.

THE WITNESS: I do not have personal knowledge being the fact that I was not in membership application during that 2016 timeframe.

However, the data furnisher filled out the application. And the application itself is going to speak for itself as far as what steps and what requirements of information Experian needed at that time.

BY MR. RISTVEDT:

Q. Okay. So it would be true to say you are not prepared to discuss the credentialing Experian performed with respect to Rushmore or the results of that credentialing?

MS. ANTHONY: Object to the question.

James, if you scroll up on your -- on your exhibit, you'll see that the time --

MR. RISTVEDT:  Rebecca, I would love to bring this to the court.  I would love to.  The question -- the topic is very clear.  So whether it happened in 1905 or 2005, the topic relates to the credentialing Experian performed with Rushmore.  You can try and play parliamentary procedure all you'd like to with the court.

MS. ANTHONY:  Parliamentary, my understanding of this was that you all had reasonably limited it to a reasonable time period.  And it says credentialing or recredentialing.  Many of your documents are clearly recycled.  And if the time period --

MR. RISTVEDT:  Okay.

MS. ANTHONY:  You know, this --

MR. RISTVEDT:  Good luck.  Good luck.

BY MR. RISTVEDT:

Q.    Ms. Iwanski, today, you are unprepared to discuss the steps that Experian took in 2016 to credential Rushmore Loan Management Services, LLC, true?

A.    No, that's not true.

MS. ANTHONY:  Object to the scope of the question.

THE WITNESS:  And if you want to look at the membership application, we can see that -- the steps that Experian was requiring at that time.  We have -- first we

have the business information, we're looking at the business name. Like the credentialing side that we were looking at in the manual, those are the steps that we would take.

This form actually has those steps in the form itself, in the application. So if you scroll down, we will see the address. It looks like there's a Dallas, Texas, on Wittington Place, Suite 400. We have telephone numbers, length of time they were in business. And if you keep scrolling down, I could -- I could tell you the rest. And that is, again, speaking for itself in 2016.

BY MR. RISTVEDT:

Q. So this document would have been filled out by Rushmore, yes?

A. This would be filled out by the data furnisher, signed by their person that is authorized to sign those types of contracts.

Q. Okay. So the data furnisher took steps to complete this membership application. Experian did not do anything in creating the membership application.

My question is, what did Experian do when it received this membership application?

MS. ANTHONY: Object to the scope.

THE WITNESS: So Experian did create this document. This document is -- is a document that Experian

created and ask that that company fill out.  So these are the pieces of information, kind of like we were looking at with the credentialing, but now we're looking at it in like an older kind of format where it's an application process.  So -- and right now, you're not letting me look at the entirety of that particular application.  So what I'm looking at is just the first section where it says "Business Information."  It stops about the place where it explains the address of that company.  And those steps were also given in the manual when we're talking about credentialing.  So this -- like I said, this -- this document speaks for itself and what was requested at that time.

MR. RISTVEDT:  Okay.  Rebecca, I'm going to hold the deposition open.  She's obviously unprepared to discuss the steps that were taken in 2016.  I understand they're apparently subject to your objection, we'll meet-and-confer after the deposition.

MS. ANTHONY:  Yeah, I'll note that her preparedness on that topic was limited expressly by your instructions on the 30(b)(6) notice, and therefore she was not prepared to talk about something that happened nearly ten years ago.

BY MR. RISTVEDT:

Q.  Okay.  Ms. Iwanski, the document in Exhibit 10,

this is the document that you referred to, the contract between Experian and Rushmore, correct?

A.   Yes.  Actually, could you make that just a little bit bigger?  And there's a really small font in there, I just want to make sure it's Rushmore Loan Management Services, LLC.

Q.   So this is the Fair, Isaac Credit Scoring Services Agreement, yes?

A.   Yes, that's what it states.

Q.   And when a company has a business relationship with Experian, do they typically have multiple contracts that they sign?

A.   There are multiple -- either service agreements, contracts, really depends on what kind of company they are.

Q.   You've testified today about the certifications that Experian receives from data furnishers as it relates to the data furnisher promising to furnish accurate credit information.  Do you recall that testimony throughout today's deposition?

A.   Yes, that that would be in the agreement or contract with the data furnisher.

Q.   Would it be in the credit scoring portion of the agreement?

A.   I don't believe so.

Victor Manuel Ramirez Najera vs. Experian Information Solutions Inc. -
30(b)(6) Experian Information Solutions Inc. - Teresa Iwanski

November 14, 2025
134

Q.   So I'm going to jump down to page 4.   This is the
Death Master File Addendum.

Would the certification from the data
furnisher to furnish accurate information be contained in
the Death Master File Addendum?

A.   I don't believe so.

Q.   Going down to page 5, there's a section about
Prescreening Services Schedule.   Would the certification
about accurate information be contained in this portion?

A.   I don't believe so.

Q.   The final two pages of the contract we were
provided contains the Experian Standard Terms and
Conditions.   Would it -- would the certification
concerning accuracy be contained in this portion of the
agreement?

A.   I don't know if it's -- if it's actually part of
this or an addendum or some other information.   I would
have to read it.   It's a little bit older agreement.   I
would have to read it.

Q.   Sure.   So paragraph 1 says that it contains the
standard terms and conditions and doesn't say anything
about accuracy.   You would agree?

A.   Yes.

Q.   Section 2 just relates to the term of the
agreement.   Nothing about accuracy, right?

Victor Manuel Ramirez Najera vs. Experian Information Solutions Inc. -
30(b)(6) Experian Information Solutions Inc. - Teresa Iwanski

November 14, 2025
135

A.   Yes.

Q.   3 relates to Client Orders, talks about job specifications Experian plans to provide, client orders, cancellation.  Nothing about accuracy of furnished data, yes?

A.   Not at this point.

Q.   Paragraph 4, limited to a discussion of fees and payment.  Nothing about accuracy of Rushmore's data, yes?

A.   Correct.

Q.   5, confidentiality agreement.  There's nothing in that paragraph that relates to accuracy of Rushmore's data, yes?

A.   That's correct.

Q.   Number 6.  This one says, "Experian shall comply with all federal, state and local laws, rules, regulations and decisions applicable to Experian's provision of Experian data and the Services pursuant to this Agreement."

That first sentence relates to a certification Experian is making, right?

A.   Yes.

Q.   The second one says, "Client" -- meaning Rushmore -- "shall comply with all federal, state and local laws, rules, regulations and decisions applicable to Client's collection and provision to Experian of the

Client data and Client's use of the Experian data and Services provided pursuant to this Agreement."

Did I read that portion correctly?

A.   Yes.

Q.   Now, that one says Rushmore is agreeing to comply with all federal, state, local laws, regulations, and things like that, right?

A.   Yes.

Q.   Is this one of the certifications you've been referring to today?

A.   I have seen the wording of the compliance portion of it, but there is a more detailed certification where they pledge to report accurate information to Experian.

Q.   Got it.  So that would not be this clause that you're talking about, then.  Am I following you?

A.   No, it actually does include that.  But when I was referring to the portion that I've seen in agreements, the wording is different.  But this is saying that the data furnisher will comply with the federal and state laws.

Q.   Okay.  So this would be one of the statements you're referring to their certification, we're going to follow the law, yes?

A.   Again, I'm -- I'm just now reading this particular compliance and laws.  I personally have read it

a little bit differently.  It does have different wording in the -- in the agreements that I've seen.

But in reading this, it's stating that the client will comply with federal, state, and local laws.

Q.   Okay.  And I think I've understood your testimony, but I want to make sure I have.

You're saying this is, in fact, one of the statements that you've been referring to about promises that the furnisher makes to comply with the law, true?

A.   The verbiage that we're looking at right now, I've seen it worded differently.  So as I'm reading this here right now, it's just generally stating client shall comply with federal, state, and local laws.  It's not really describing what laws.  It's not describing the accuracy that I was speaking toward.

Q.   Understood.  The rest of the paragraph in this column says Experian reserves certain rights, and then moves on to the next column, yes?

A.   Yes.

Q.   Paragraph 7 is about who owns the data.  That doesn't say anything about accuracy or compliance with the FCRA, true?

A.   Correct.

Q.   Paragraph 8, this one relates to the circumstances under which the contract can be terminated,

Victor Manuel Ramirez Najera vs. Experian Information Solutions Inc. -
30(b)(6) Experian Information Solutions Inc. - Teresa Iwanski

November 14, 2025
138

but does not contain a promise of accuracy or to follow the FCRA.  Do you agree?

A.   Correct.

Q.   Number 9, this one relates to warranties.  It says, "Experian warrants to Client that Experian will use commercially reasonable efforts to deliver the Services in a timely manner.  Because the Services involve conveying information provided to Experian by other sources, Experian cannot and will not, for the fee charged for the Services, be an insurer or guarantor of the accuracy or reliability of the Services or the data contained in its various databases."

Did I read that first sentence correctly?

A.   Yes.

Q.   That one is Experian making warranties and disclaimers.  Nothing from Rushmore at this point, yes?

A.   Correct.  Experian does not have access to that company's computer systems, their payment histories with consumers.  So outside of that, Experian would not have any -- any independent knowledge of it.

Q.   The remainder of that paragraph, in capital letters, that's again a warranty and disclaimer from Experian saying, "Hey, we can't guarantee this is accurate.  We get it from someone else.  We're not going to be responsible if it's wrong," right?

Victor Manuel Ramirez Najera vs. Experian Information Solutions Inc. -
30(b)(6) Experian Information Solutions Inc. - Teresa Iwanski

November 14, 2025
139

A.   Well, they're talking about services.  They're talking about materials.

Q.   Well, in other words, the only mention of accuracy in any way is Experian saying, "We are disclaiming any express or implied warranties with respect thereto, including without limitation, any warranties as to the accuracy, completeness or currentness of any data." That's the only part that says anything about accuracy, yeah?

A.   In that section, correct.

Q.   The Limitation of Liability portion, this is Rushmore saying, "We are acknowledging Experian maintains several databases and that Experian can't separately investigate every single inquiry or every single request," right?

A.   Yes, it does read that way.

Q.   And then it has some additional certifications from Rushmore saying, "We know the prices are going to change.  We know we're responsible for determining if these services comply with what we expect, we'll tell Experian if they don't."  There's nothing in 10 about accuracy or the FCRA, right?

A.   Well, the client just "therefore agrees that it is responsible for determining that the Services are in accordance with Experian's obligations under the

Victor Manuel Ramirez Najera vs. Experian Information Solutions Inc. -
30(b)(6) Experian Information Solutions Inc. - Teresa Iwanski

November 14, 2025
140

agreement."

Q.   So that sentence is the client saying, "We are agreeing that the services Experian gives us comply with what Experian has promised us."  Would you agree?

A.   Yes.

Q.   And if we continue on to the next page, do you see anything else in the text that remains in this first paragraph about accuracy or the FCRA?

A.   Not at this point, no.

Q.   And then continuing on, the last paragraph, all in caps in section 10?

A.   Not at this point, no.

Q.   Number 11 similarly says nothing about accuracy or the FCRA.  Do you agree?

A.   That's correct.

Q.   12 talks about Experian's right to audit Rushmore and its use of the services, but doesn't say anything about whether Rushmore's data is accurate or complies with the FCRA, right?

A.   Correct.

Q.   13 talks about this agreement is binding on heirs, representatives, successors, et cetera.  Nothing about accuracy or the FCRA, right?

A.   Correct.

Q.   14 talks about Excusable Delays.  Things happen,

Victor Manuel Ramirez Najera vs. Experian Information Solutions Inc. -
30(b)(6) Experian Information Solutions Inc. - Teresa Iwanski

November 14, 2025
141

acts of God.  Nothing about accuracy or the FCRA.  You agree?

A.    Correct.  At this point, no.

Q.    Choice of Law talks about this is governed according to the laws of California.  Nothing about accuracy or the FCRA, correct?

A.    Correct.

Q.    And then 16, same thing, talks about notices to the client and Experian.  Does not reference accuracy or the FCRA, right?

A.    That's correct.

Q.    17 is what we call the incorporation clause, says this agreement is the entire understanding between Experian and the client, "Hey, if we talked about something that doesn't control our obligations."  Nothing about accuracy or the FCRA, right?

A.    That's correct.

Q.    And then looking at the three remaining paragraphs, 18, 19, and 20, you would agree with me there's nothing in any of those that relates to the FCRA or to accuracy, right?

A.    Correct.

Q.    So at least in the contract we've read today, which is all the contracts that we have available to us in this case, there's nothing in any of those sections that

Victor Manuel Ramirez Najera vs. Experian Information Solutions Inc. -
30(b)(6) Experian Information Solutions Inc. - Teresa Iwanski

November 14, 2025
142

relate to Rushmore certifying they're going to give only accurate information, other than this paragraph in number 6 on page 7 of this document that I highlighted in pink. Would you agree?

A. Insofar as what we reviewed, that's the only portion where we're talking -- where it's actually talking about the compliance with federal, state law, and local laws.

(Plaintiff Exhibit 11 was marked for identification.)

BY MR. RISTVEDT:

Q. Okay. I'm going to jump to Plaintiff's Exhibit 11. Have you ever seen this document before?

A. Yes.

Q. And what do you understand this one to be?

A. So there's an accuracy program, and part of that is described in this policy.

Q. So I'm going to jump down -- and for posterity, this document spans from EXPERIAN NAJERA 468 through 473.

I'm going to jump down to EXPERIAN NAJERA 470. This section has a Policy Statement that says that this document "governs the measurement of" -- I think that's supposed to be indicator -- "of accuracy of information on credit reports. Experian strives to maximize data accuracy through proactive identification

and remediation of conflicts and potential errors."  Did I read that right?

A.    Yes.

Q.    Now, Section 2 identifies this distinction between furnisher provided data, which Experian calls furnisher data, and assembled information of the furnisher data into Experian's credit reports, which Experian calls assembled data, right?

A.    Yes.

Q.    And Experian says we focus on both, but the paragraph ends with a sentence that says, "However, because furnishers maintain the system of record and are primarily responsible for the accuracy of furnished data, Experian's primary focus for accuracy is on assembled data."  That second group, right?

A.    Yes, that's what it states.

Q.    The second paragraph has a sentence that begins with, "Experian is not a party to the lending transaction between a lender and a consumer."  That first half of the sentence is saying, "We're not involved in the relationship between, say, Wells Fargo and Joe Consumer, who's got the loan with Wells Fargo," right?

A.    Correct.  Experian does not create the information.  Experian receives the information from data furnishers.

Coash Court Reporting & Video, LLC
staff@coashcrv.com    602-258-1440
www.CoashCourtReportingandVideo.com

APPENDIX 1762

Q.   So the second half says, as a result, "only the lender and the consumer ultimately have direct knowledge of the accuracy of that data."  Did I read that right?

A.   That's correct.  The company that's reporting the information would have knowledge about their own accounts.  And consumers also would have knowledge about their payment histories and information regarding a particular account.

Q.   So Experian doesn't necessarily know when James Ristvedt contacts Experian to dispute, "Hey, that balance is wrong," Experian has no way of knowing if Wells Fargo gave the wrong balance or if James is just wrong.  Is that fair?

A.   Yes.  That's why the process was put into place for Experian's role to reinvestigate to comply with the FCRA.

Q.   When a consumer disputes information, and they provide, say, no evidence, they say, "That balance is wrong, please fix it," and the data furnisher comes back with an ACDV response that says, "Actually, that balance is right, we're keeping it," who does Experian side with?

A.   It's not about --

MS. ANTHONY:  Object to the form of the question.  Sorry.

THE WITNESS:  It's not about siding with,

it's about what Experian receives. If Experian receives a letter or document showing information about a balance, Experian could use information to independently make that change. Outside of that, we contact the company that has knowledge about the account. And so in the ACDV response, they're certifying to Experian that that balance is accurate as of the date that they reported it.

BY MR. RISTVEDT:

Q. Got it. So you're saying if the consumer were to provide some sort of evidence that they're correct, Experian would have the ability to say, "Oh, that consumer is correct," and change the information on their own. Have I understood you correctly?

A. It's not about whether or not we believe somebody is correct. It is about what Experian receives and the role of Experian's processes in the reinvestigation process. So if Experian can use a document, we'll use a document to make an update. Otherwise, our process would be to reinvestigate and contact the company that reported the information to Experian.

Q. Right. You've testified about Experian's reinvestigation procedures on a number of occasions, including in this case. Would you agree?

MS. ANTHONY: Object to the scope.

THE WITNESS: Yes, sir.

BY MR. RISTVEDT:

Q. And based on -- I mean, I've taken your deposition on this issue myself. You would agree that you are very familiar with Experian's policies, yes?

A. Yes, sir.

Q. When Experian gets no evidence from a consumer about their dispute, they just say, "Hey, that balance is wrong, fix it," that's insufficient for Experian to make that change on their own, right?

MS. ANTHONY: Object to the scope.

THE WITNESS: I don't know what you mean by insufficient.

So -- so anytime that a consumer contacts Experian and tells Experian something's wrong, we're going to either use a document -- and if a situation happens where we don't have any documents to use, it's not that the information is insufficient, we're going to start the reinvestigation.

It's not Experian's position to believe or not believe anybody. Our role is the reinvestigation process by contacting the data furnisher who themselves have access to their own computer system or records or payment history, and then reply back to Experian certifying that that information is accurate. Once we give that information to consumers, we also give the

rights of the consumer in case they continue to dispute that information.

BY MR. RISTVEDT:

Q.   So my question is more specific.

You heard the dispute phone call in this case from Mr. Ramirez Najera, yes?

MS. ANTHONY:  Object to the scope.

THE WITNESS:  I believe so.  It was -- it was a little while ago.  I don't remember specifics about it right now.

BY MR. RISTVEDT:

Q.   Do you recall that he told the dispute agent these accounts are not mine.  And Mr. Hammoud asked you a bunch of questions about, "Well, why didn't that dispute agent follow up with additional questions?"  They just let him say not mine, and then they processed the ACDV.  Do you recall that?

MS. ANTHONY:  Object to the scope.

THE WITNESS:  Yes, I do.

BY MR. RISTVEDT:

Q.   So if a consumer just said "not mine," and they gave no evidence, that would not comply with Experian's policies and procedures for modifying account information without generating an ACDV.  Do you agree?

MS. ANTHONY:  Object to the scope.

THE WITNESS:  Correct.  We would need to contact the data furnisher and ask the data furnisher to look at their records and respond to Experian.

BY MR. RISTVEDT:

Q.   And is that because the consumer in that instance would not have provided any evidence to substantiate their dispute?

MS. ANTHONY:  Object to the scope.

THE WITNESS:  Correct.

BY MR. RISTVEDT:

Q.   So when Experian gets an ACDV response, in this case from Rushmore, did Rushmore provide account level documentation to substantiate its ACDV response?

MS. ANTHONY:  Object to the scope.

THE WITNESS:  I don't remember specifically what they responded to on the ACDV, whether they made any changes or updated any other information.  That's not what I was here today to testify to about a deposition I had previously taken, so I don't remember specifically what was on the ACDV.

BY MR. RISTVEDT:

Q.   Well, see, my question relates to this document specifically.  Experian understands that it has zero knowledge about account level information because it's not a part of that relationship between the consumer and the

creditor, correct?  It says that right here in this first sentence of this paragraph.  You agree?

MS. ANTHONY:  Object to the form.

THE WITNESS:  Yes, Experian does not create the information.  It is reported by the data furnishers.

BY MR. RISTVEDT:

Q.   So why then, when a consumer submits a dispute without proof documents, does Experian accept the results from data furnishers which don't have proof documents?

MS. ANTHONY:  Object to the form.  Object to the scope.

THE WITNESS:  Experian is not requesting any kind of proof from the data furnisher.  What was created was the ACDV process that complies with the FCRA.  And through that process, the data furnishers are certifying, replying to Experian that the information is accurate.

BY MR. RISTVEDT:

Q.   So if the consumer included a certification that their dispute was accurate, would that be enough?

MS. ANTHONY:  Object to the form.  Object to the scope.

THE WITNESS:  That alone is not sufficient to make a change.  If that was the case, over a period of time, everyone would have positive credit and there would be no negative credit.  So the information that Experian

receives is from the data furnisher who has knowledge about the account, about the payment histories, and that is where the information is verified then with the data furnisher.

BY MR. RISTVEDT:

Q.   This paragraph here says, "The Consumer Credit Report Accuracy Program is focused on continual improvement to Experian's consumer credit report accuracy, as measured by the Accuracy Indicator Rate," which I've highlighted in green.  Did I read that sentence correctly?

A.   Yes.

Q.   Tell me more about the Accuracy Indicator Rate. What is it?

A.   My understanding is there is an error rate that is compiled based off of different pieces of information, and it appears to be more looking at the data accuracy.

Q.   Is that Accuracy Indicator Rate a measurement of all of Experian's data at large, or is it specific to each individual furnisher?

A.   It is not describing whether or not it is on the company level or just overall data.

Q.   So I guess, as we sit here today, would it be fair to say you don't know whether it's furnisher-specific or a measurement of Experian's data as a whole?

I'm sorry.  Did I miss your answer,

Ms. Iwanski?

A.   No.   I'm reading the policy to make sure that I'm answering the question.

So it appears to be not on the data furnisher level, but on the overall data accuracy.

Q.   Okay.  And you're saying "appears to be" based on your reading of the document.  Am I understanding that correctly?

A.   Yes.

Q.   But as you sit here today, you don't know that with certainty to be the case.  Is that fair?

A.   Well, no.  I'm basing it off of what it's stating within this manual, a higher accuracy rate -- sorry -- "A higher Accuracy Indicator Rate likely correlates to a higher true accuracy rate of credit reports."

So we're talking about credit reports, we're talking about data, not necessarily one company.

Q.   Okay.  So I just want to be certain I am clear.

Sitting here today under oath, your testimony is that you are sure that this is not furnisher-specific.  Have I understood your testimony?

A.   As I'm reading this, that's what it's showing to me.  That's my interpretation.  If there's more information that I'm allowed to read to give you a full answer, I would gladly do that.  I'm just basing it off of

Coash Court Reporting & Video, LLC
staff@coashcrv.com                             602-258-1440
www.CoashCourtReportingandVideo.com

what I'm able to read and what you're showing me on the screen right now.

Q.   No, I understand that.  And that's really what I'm trying to make certain I fully understand.

Your testimony that this is, as a whole, is based on your interpretation of what's in this document, right?

A.   Correct.

Q.   But you don't know whether your interpretation is correct and whether, say, one of these people who have a key responsibility listed might have totally different knowledge, fair?

A.   This particular manual, the knowledge of that person may be more concise and . . .

Q.   But this is a number that is applicable to all of Experian's credit data across all furnishers?

A.   One second.  So I have the manual on my second screen, and I'm just going to go through and read to the best of my ability since I'm answering these questions through what is on the manual itself.  I do not have any other independent knowledge outside of what is in this manual.

Q.   Well, and I think that's really what my main focus was.  Other than this document, you have no knowledge about the data development department and how

this Accuracy Indicator Rate is calculated or what it connotes, agreed?

A.    Only by what is stated in this manual.  I do not have any other independent knowledge outside of what's stated in this manual.

Q.    And you didn't talk to anybody in the data development department about what this manual meant or the information therein, correct?

A.    Correct.

Q.    And similar question, I think to the credentialing processes, other than reading Mr. Henke's deposition transcript, you never spoke with him, asked him any questions about the significance of any of his testimony or the documents you reviewed, correct?

A.    Correct.  I was able to read his testimony.  I was able to look at the manual relating to what he was speaking to.  I didn't have any reasons to reach out to him.

MR. RISTVEDT:  Okay.  Well, Rebecca, I'm at three hours, 40 minutes.  So I will terminate this deposition, but I suspect we will need to meet-and-confer hereafter in any event.

MS. ANTHONY:  Yeah, so I don't -- I guess you're passing the witness.  I don't have any questions.

MR. RISTVEDT:  And, Ms. Clark, I will have

the exhibits circulated to you.  I will note that we will not have a 12, 13, or 14, so it's going to skip around a bit.

THE WITNESS:  Madam Court Reporter, did you have anything for me?

THE COURT REPORTER:  Actually, I have a question for Counsel Ristvedt -- sorry.

MR. RISTVEDT:  Yes.

THE COURT REPORTER:  Did you want to order a copy of the transcript?

MR. RISTVEDT:  Yes.  We'll take an e-tran only.  I do not need exhibits.  We'll have those circulated as well.

THE COURT REPORTER:  Okay, thank you.

And, Counsel Anthony, will you be ordering the transcript?

MS. ANTHONY:  Yes.

THE COURT REPORTER:  Great.  Okay, thank you.  That's all I have.  I'll take us off the record if there's no further business?

Okay.  The time is -- the time is 1:20 p.m., and we are now going off the record.

(The deposition was concluded at 1:20 p.m.)

(Signature not requested)

_____
                              TERESA IWANSKI

APPENDIX 1773

STATE OF ARIZONA    )

COUNTY OF MARICOPA )

BE IT KNOWN the foregoing proceedings were taken before me at the time and place herein set forth; that I was then and there a Certified Electronic Reporter and Notary Public in and for the County of Maricopa, State of Arizona; that the questions propounded by counsel and the answers of the witness thereto were taken by me electronically and thereafter reduced into typewritten form under my direction; that the foregoing pages are a full, true, and accurate transcript of all proceedings and testimony, all to the best of my skill and ability.

I FURTHER CERTIFY that I am in no way related to nor employed by any parties hereto nor am I in any way interested in the outcome hereof.

DATED at Phoenix, Arizona, this 26th day of November, 2025.

_____
Michelle Clark, CER
Certified Electronic Reporter #4440
and Notary Public
My Commission Expires: January 21, 2029

APPENDIX 1774

Victor Manuel Ramirez Najera vs. Experian Information Solutions Inc. -
30(b)(6) Experian Information Solutions Inc. - Teresa Iwanski

November 14, 2025
Index: $5..6

**Exhibits**

**30(b)(6) EIS, Inc.**
 **by Iwanski Exhibit 001**
 2:9 11:14,20 12:10,14,17,
 20 126:24

**30(b)(6) EIS, Inc.**
 **by Iwanski Exhibit 003**
 2:11 21:16 71:4 80:2 85:6

**30(b)(6) EIS, Inc.**
 **by Iwanski Exhibit 004**
 2:12 30:22 53:21 71:12
 96:19 111:3 123:1

**30(b)(6) EIS, Inc.**
 **by Iwanski Exhibit 005**
 2:14 105:17

**30(b)(6) EIS, Inc.**
 **by Iwanski Exhibit 006**
 2:16 113:12

**30(b)(6) EIS, Inc.**
 **by Iwanski Exhibit 007**
 2:18 116:10

**30(b)(6) EIS, Inc.**
 **by Iwanski Exhibit 008**
 2:20 124:13

**30(b)(6) EIS, Inc.**
 **by Iwanski Exhibit 009**
 2:23 126:3

**30(b)(6) EIS, Inc.**
 **by Iwanski Exhibit 010**
 2:24 95:9,13 132:25

**30(b)(6) EIS, Inc.**
 **by Iwanski Exhibit 011**
 3:1 142:9,13

**30(b)(6) EIS, Inc.**
 **by Iwanski Exhibit 015**
 3:3 43:14

---

**$**

**$5** 29:3

**$500** 29:1

---

**1**

**1** 11:14,18,20 12:10,14,17,
 20 25:14 30:16 35:20,22

36:10,20,25 37:3 64:1
 126:24 134:20

**10** 95:9,13 132:25 139:21
 140:11

**10-minute** 93:9

**10:12** 53:10

**10:22** 53:12

**11** 92:16 99:25 140:13
 142:9,13

**11:12** 53:4

**11:26** 93:12

**11:50** 93:14

**12** 140:16 154:2

**13** 22:11 140:21 154:2

**14** 140:25 154:2

**15** 43:13,14

**16** 22:14 141:8

**17** 22:9,15,16 25:15,20
 141:12

**18** 141:19

**19** 23:22 25:15 141:19

**1905** 130:4

**1:20** 154:21,23

**1c** 37:13

---

**2**

**2** 12:2 21:12 26:10,14,19
 27:22 28:2 29:7,12 35:21
 36:10,20 62:2,4 64:21
 98:16,17,23 99:1 122:25
 123:11 126:12 134:24
 143:4

**2's** 27:14 28:10 29:4

**20** 17:18 106:23 141:19

**20-plus** 88:20

**2005** 130:4

**2016** 32:4,6 33:8,17,24
 34:3 96:4,10 97:4 120:15
 126:12,16 127:19 128:24
 129:13 130:18 131:11
 132:16

**2020** 106:20 107:8,12,20,
 23

**2021** 107:1

**2022** 32:19 33:1,12 34:10
 99:14,24 100:7,13 101:7,
 24 105:4

**2025** 99:25

**24** 8:10

**25-ish** 17:16

**27** 32:18 100:7

**284** 124:23

**291** 31:3

**292** 36:8

**293** 36:8 102:24

**294** 34:24

**297** 56:25 57:13

---

**3**

**3** 12:3 13:3 21:14,16 35:21
 36:11,20 40:23 63:21 65:7
 66:3,19 71:4,7 80:2 85:6,8
 95:18 97:9 104:13 135:2

**30** 92:14

**30(b)(1)** 92:20,22

**30(b)(6)** 12:2 132:21

**300** 58:7

**301** 59:15

**304** 63:22

**30th** 15:16

**314** 67:2

**315** 70:21 71:13

**316** 94:1

**317** 95:3 96:21

**320** 97:7 100:10 104:24
 123:2

**321** 100:10 104:24 123:2

**327** 32:7 100:5

**332** 31:3

**335** 117:2

**336** 120:23

**340** 43:20

**343** 43:24

**346** 43:21

**349** 108:2

**378** 110:18

**379** 106:18

**385** 113:17

**387** 114:5

**388** 114:15 116:4

**391** 113:17

**3rd** 61:18 62:1

---

**4**

**4** 30:21,22 36:20 40:25
 42:12 53:21 65:15 70:22,
 25 71:12 82:15,20,25
 94:13 96:19 111:3 123:1
 134:1 135:7

**40** 153:20

**400** 131:8

**468** 142:19

**470** 142:21

**473** 142:19

---

**5**

**5** 13:3,11,18 25:15 36:17,
 19,23 42:12 62:14 94:1
 96:19 97:8 103:7,15,21
 104:13 105:17,21 110:23
 127:1 134:7 135:10

**5,000** 87:12

**50,000** 87:11

**52** 89:7

---

**6**

**6** 13:3,13,18 25:15 62:1
 102:20,25 113:12,16
 135:14 142:3

Victor Manuel Ramirez Najera vs. Experian Information Solutions Inc. -
30(b)(6) Experian Information Solutions Inc. - Teresa Iwanski

November 14, 2025
Index: 7..Anthony

**7**

**7** 22:14 25:15 102:21 103:1 116:10,13 137:20 142:3

**701** 6:24

**75013** 6:25

**8**

**8** 15:5 23:23 102:22 103:1 124:13,17 137:24

**9**

**9** 95:24 126:3,6 138:4

**9:03** 6:4

**@**

**@wellsfargo.com** 64:17

**@yahoo.com** 64:17

**A**

**a.m.** 6:4 53:10,12 93:12, 14

**aberrations** 24:8

**abiding** 102:2

**ability** 8:10,14,20 12:12 85:12 107:18 145:11 152:19

**Absolutely** 11:25

**accept** 43:2 121:1 149:8

**acceptable** 9:20 47:14 48:7,21,24 49:8

**acceptance** 22:20

**accepted** 96:20

**accepting** 117:6

**access** 29:19 49:1 125:15,17 138:17 146:22

**accessing** 114:12

**accordance** 51:14 139:25

**account** 29:1,13 37:5 56:22 61:1 70:1,14 87:11 97:2 109:22,24 144:8 145:5 147:23 148:12,24 150:2

**accounts** 43:1 117:17 144:5 147:13

**accuracy** 22:18 23:11,22 24:23 25:5,11,21,25 26:1, 2,22 27:3 28:24 29:16 30:15 52:5 62:23 66:20 80:5,6 83:1,9 86:1 90:19, 25 91:13 97:9,17,20,24 98:3,9,18 99:8 101:14 103:16 104:13,19,23 115:1,9 117:13 118:17 119:12 121:5 122:22 123:3 134:14,22,25 135:4, 8,11 137:15,21 138:1,10 139:4,7,8,22 140:8,13,23 141:1,6,9,16,21 142:16, 23,25 143:13,14 144:3 150:7,8,9,12,16,17 151:5, 13,14,15 153:1

**accurate** 23:4 24:7 26:3, 24 27:13 28:18 29:13 30:2,6 52:4,25 62:5,22 63:8,15 66:12 84:6,10 85:11,19 86:5 87:6 88:9, 18 89:18 90:7,17 91:3 97:14,18 98:11 101:2,3, 16,24 102:2 103:6,17,25 104:12 105:13 114:20 115:18,22,25 119:2 121:7, 14,18,24 122:9 123:21 124:3 125:11,22 133:18 134:4,9 136:13 138:24 140:18 142:2 145:7 146:24 149:16,19

**accurately** 8:7,11,15 27:22 87:25

**accused** 46:7,10

**ACDV** 26:7 144:20 145:5 147:16,24 148:11,13,16, 20 149:14

**achieve** 59:21

**acknowledges** 29:25

**acknowledging** 139:12

**acronym** 55:16

**acronyms** 55:14

**Act** 67:17 113:24

**action** 98:22

**actions** 55:21 67:25 69:3, 10

**active** 47:13 48:11 49:24 50:6,10,20 112:4

**activities** 58:5

**activity** 44:2

**acts** 141:1

**actual** 120:19 129:7

**add** 54:14

**addendum** 134:2,5,17

**addition** 22:16 27:19 48:25 84:4

**additional** 50:14 51:3 61:24 139:17 147:15

**address** 6:20,22 37:24 41:1 59:18 60:7 64:16 128:20 131:7 132:9

**addresses** 37:24 41:2 114:25

**adhere** 100:21

**AE** 61:10

**affect** 8:14

**aforementioned** 24:5

**agencies** 67:16 68:12

**agency** 38:25

**agent** 48:8,18 50:1,12,21 147:12,15

**agree** 13:15 22:3 28:11 31:14 32:19 41:4 52:2,23 54:22 55:23 56:12 66:4,20 67:4 71:8 82:21 85:9 91:1 94:6,14 96:16 97:16 100:6 103:15 108:6,12,23 109:11 114:2,17,21,23 117:22 119:19,25 121:8, 25 125:2,23 134:22 138:2 140:4,14 141:2,19 142:4 145:23 146:3 147:24 149:2

**agreed** 153:2

**agreeing** 115:25 136:5 140:3

**agreement** 84:5 93:2,5 100:17 102:3 110:4 124:11 133:8,21,24 134:15,18,25 135:10,18 136:2 140:1,21 141:13

**agreements** 133:13 136:17 137:2

**agrees** 139:23

**ahead** 38:8 92:24 93:5 95:12

**aka** 13:8

**alcohol** 8:9

**alert** 37:22 38:4,23 39:4, 22 60:7

**alerts** 38:1

**Allen** 6:25

**allowed** 151:24

**analysis** 24:8

**analyst** 45:3 47:8 48:20 49:19 51:14 58:10

**analysts** 46:20 59:21

**and/or** 23:22 24:8 28:24 35:13 62:17 127:1

**annual** 24:11 106:8

**annualized** 75:17 107:13 108:21

**annually** 107:15

**anomalies** 85:24

**answering** 12:11 90:1,2 151:3 152:19

**answers** 8:25 9:17 20:24 88:24 90:10

**Anthony** 6:12 14:6,14 15:1,7,18 16:11 17:22 18:22 19:8,23 21:3,8 22:6 23:6,12,24 24:13,25 25:22 26:15,25 28:12 29:6 30:4 33:6,18,25 34:12 40:20 42:16 51:5 52:13 53:1 56:13 57:6,22 58:15 61:4 62:6 63:16 65:23 66:5,13, 21 68:5,16,22 74:16 77:22

Victor Manuel Ramirez Najera vs. Experian Information Solutions Inc. -
30(b)(6) Experian Information Solutions Inc. - Teresa Iwanski

November 14, 2025
Index: anytime..Bureau

78:8,20 81:16 83:2 84:22
87:15 88:22 89:2,10,22
91:4,17 92:5,19,24 93:10
99:17 100:15 101:25
102:10 103:11 104:2,15
105:7 107:24 108:24
109:7 116:7 118:13,19
121:9 122:1 123:18 124:8
125:13,24 126:21 127:17
128:16 129:9,23 130:8,14,
21 131:23 132:19 144:23
145:24 146:10 147:7,18,
25 148:8,14 149:3,10,20
153:23 154:15,17

**anytime** 146:13

**apologies** 38:8 80:24

**apologize** 7:25 43:11
72:4 92:3

**app** 59:18

**apparently** 132:17

**appearing** 6:9,13

**appears** 50:16 96:14
124:20 150:16 151:4,6

**applicable** 35:9,12 61:14
117:16 135:16,24 152:15

**applicant** 47:7 57:15
61:13 69:11

**application** 39:18 65:2
76:20 96:3,5,10 126:7
127:15,16 128:3,15,18,23,
24 129:7,13,15 130:24
131:6,19,20,22 132:4,6

**applied** 33:23 96:15

**applies** 55:24 108:5,8
109:6

**apply** 74:10

**applying** 27:22 32:3
37:25 69:7 109:12

**approval** 54:14 56:8

**approximately** 10:6

**area** 60:16

**areas** 44:16 57:15

**arrived** 16:6

**articles** 48:13 49:14,16,
20,23 59:22

**ascertaining** 54:2

**aspects** 17:20 85:5 90:24
104:9 121:21

**assemble** 75:13

**assembled** 39:9,11
143:6,8,14

**assessing** 110:2

**assist** 35:8

**assume** 20:3 74:24 92:7

**assuming** 41:19 96:24

**assumptions** 9:12 82:4

**assure** 22:18 25:20 30:15
83:9 85:25 117:12

**attachments** 97:1

**attempts** 111:4 112:2

**attention** 13:2 22:13
69:20

**attorney** 6:7,8 12:4 15:14

**attorneys** 8:25

**audit** 19:5,18 21:1 140:16

**auditing** 18:10

**audits** 13:13 14:2 15:25
16:9 17:2 20:3,8 23:1 26:8
85:22

**August** 99:25 106:20
107:8,12,19,23

**Authenticate** 65:7

**Authentication** 64:2

**authorized** 131:16

**automated** 75:10 76:4
111:8 112:11 117:21
118:6,21 119:3,6 122:12,
23

**automation** 110:19
111:14,23

**autopay** 54:14 56:8

**avenue** 120:22

**avenues** 85:22

**aware** 19:7 33:16 68:10
75:17

**B**

**back** 16:19 26:7 30:13
53:13 57:13 69:15 71:4
82:23 93:15,25 96:15
100:5,19 102:24 104:22
107:5 120:12,15 123:1
126:24 127:19 128:24
144:19 146:23

**balance** 28:14 29:3,8,18
144:10,12,18,20 145:2,6
146:7

**balances** 28:11

**banks** 73:7,8,12,13
110:11

**based** 16:1 17:6 33:3
41:21 58:5 70:2,3,16
71:23 79:8 80:22 96:11
109:17 127:12 146:2
150:15 151:6 152:6

**baseline** 36:11 63:22,24
66:10 67:3

**basement** 87:21

**basically** 37:17 41:2
60:9,15 61:19 65:15 79:15
94:23 96:12 120:20

**basing** 151:12,25

**basis** 10:8,13 24:11 26:10
82:17 106:2,8 107:6
108:21

**Bates** 31:2 43:20 95:14

**BCI** 47:18,22 48:1 49:19,
23 50:4 51:2,7,8 54:3,13
56:6 59:22 65:11

**began** 106:23

**begin** 7:8

**beginning** 34:14

**begins** 143:17

**behalf** 6:9,13

**behavior** 41:4 42:13,15
43:6 44:12,14

**believes** 23:10 28:23
122:16

**believing** 123:24

**beneficiaries** 39:17

**beta** 20:3

**bigger** 133:4

**binding** 140:21

**Bing** 42:3

**bio** 75:16

**birth** 27:6

**bit** 34:4 35:24 57:24 59:9
63:5 106:11 120:12
127:23 133:4 134:18
137:1 154:3

**black** 57:1

**bleed** 31:24

**book** 65:10

**borderline** 88:23

**Boss** 46:2

**bot** 75:11,13 111:4,7,10,
11,12,16,17,18,20,22
112:2,15,19,22,23 113:1,
3,8

**box** 48:10

**boxes** 57:1

**Bradstreet** 47:25

**break** 10:18,20 11:2
51:19 76:23 91:20 92:13
93:9

**breaks** 10:16

**briefly** 11:19 95:16

**bring** 69:19 88:25 130:2

**broader** 91:14

**brought** 32:21

**build** 50:23

**building** 10:3 87:8

**building's** 86:4

**buildings** 10:2

**bullet** 54:15 55:20,23
58:24 120:6

**bunch** 47:13 66:2 128:8
147:14

**Bureau** 47:6,8 67:15

Victor Manuel Ramirez Najera vs. Experian Information Solutions Inc. -
30(b)(6) Experian Information Solutions Inc. - Teresa Iwanski

November 14, 2025
Index: business..compliance

**business** 6:22 38:7 39:20,24 40:5,8,9,17 43:9 44:1,6,9,15,16,23 45:12, 18,20 46:17,24 47:5,6,8, 13,17,25 48:11 49:2 50:6 51:24 54:11 56:18,21 57:15 59:11,17 60:15 61:7 63:10,18 64:11 66:15 71:19 73:20 74:12 83:5,25 84:1 86:8,9,15,21,22 87:23 88:3,17 94:9,10 99:7,12 103:8,20 104:4,6, 18 105:3 106:6 115:23 122:18 125:5,8 128:20 131:1,2,9 132:8 133:10 154:20

**businesses** 43:25 44:9 47:20 58:21 59:25 60:8 73:8 74:6

**C**

**calculated** 153:1

**California** 141:5

**call** 47:25 65:16 141:12 147:5

**called** 9:22 22:1 31:14 47:23 119:18

**calling** 59:12

**calls** 31:13 41:3 51:22 73:20 75:11 143:5,7

**cancellation** 135:4

**cancellations** 62:18

**capacity** 62:25

**capital** 138:21

**caps** 140:11

**capture** 100:19

**car** 46:1

**care** 67:12

**carried** 76:3

**Cars** 65:18

**case** 9:3 10:21 12:23 13:8,20 16:8 18:1,4 20:5 21:25 22:4 25:9 79:1,9 128:14 141:25 145:23 147:1,6 148:12 149:23

151:11

**cases** 21:2,7 24:22

**categories** 67:20

**certainty** 41:17 101:23 151:11

**certification** 101:1 108:9,17,22 109:1,13 123:15 134:3,8,13 135:20 136:12,22 149:18

**certifications** 119:12 121:5 133:16 136:9 139:17

**Certified** 7:12

**certify** 23:2 84:9

**certifying** 142:1 145:6 146:24 149:15

**cetera** 10:3 41:2 140:22

**CFPB** 67:8,25 68:4,10 69:9

**CFPB's** 67:14 69:6

**change** 32:9,12,22 100:6 106:19 139:19 145:4,12 146:9 149:23

**changed** 96:13

**characterization** 54:23

**characterize** 20:19

**charged** 138:9

**chat** 36:14

**check** 36:10 37:3 39:16 48:9 51:23 76:21

**checking** 52:4 77:20

**checklist** 73:23,24 74:2 77:6,17 78:1 81:18 87:14, 16

**child** 44:3 57:19

**China** 39:21

**Choice** 141:4

**choose** 65:2

**Chrome** 41:12

**circulated** 154:1,13

**circumstances** 9:8

137:25

**City** 9:25

**clarification** 73:3

**clarify** 24:17 40:13 101:19

**clarity** 52:22 60:20 62:15 72:6 108:10,15 117:8

**Clark** 21:12 43:11 153:25

**clause** 124:2 136:14 141:12

**clear** 8:24,25 16:5 39:12 58:3 103:21 125:20 128:7 130:3 151:18

**click** 50:3

**client** 56:6 58:8 60:15 112:5 117:21 122:12 135:2,3,22 136:1 137:4,12 138:5 139:23 140:2 141:9, 14

**client's** 114:6 135:25 136:1

**clients** 54:13 57:20 58:4 108:10 110:22

**closer** 86:18

**clouds** 61:24

**club** 57:20 116:5

**co-counsel** 6:10

**COID** 37:13,15

**colleague** 13:22

**collection** 135:25

**column** 137:17,18

**combined** 29:15

**comfortable** 61:14

**commercial** 60:16 64:15

**commercially** 138:6

**common** 41:8

**communicated** 112:20

**communication** 113:7

**communications** 113:10

**compact** 64:11

**companies** 36:23,25 38:6,20 40:8,10,22 42:18 44:1,2,6 55:17 58:20 59:11 60:22 61:20 65:1,22 72:2,10 84:8 94:5 110:11 122:19

**company** 28:16 37:19,23 38:18,21 40:3 41:1 43:7,8 44:19,21 45:24 46:7,18 47:2,7,12 48:10 49:10,24, 25 50:10,21,24 51:11,23 52:6,8,17 53:3 54:8 55:22 56:19,20 57:25 59:14 60:2,6 61:7,23,24,25 62:8, 10,24 63:19 64:22 65:9,11 66:16,23 68:7,8,19 69:7, 11 70:22 72:9,14 73:4,13, 16 74:14 76:20 80:9,22 81:9,10 83:4,16,20 84:1,5 85:9,13,17 86:8,10,15 87:1,17,19 88:2,14 90:6, 17 102:4 103:8,20 104:6, 18 107:5 115:5 116:22,23 118:7 122:17,23 125:15, 17 126:2 127:21,23 128:19,20 132:1,9 133:10, 14 144:4 145:4,19 150:21 151:17

**company's** 37:16 52:4 65:7 83:13 86:5 87:6 88:18 94:8,18 103:22 138:18

**compile** 59:13

**compiled** 99:20 150:15

**compiling** 49:8

**complaint** 68:4,11 69:6

**complaints** 47:6,11 68:12,19,20,24

**complete** 11:1 58:11,25 82:13 103:13 111:4 112:2, 14,15 131:19

**completed** 35:19 96:5 110:23

**completeness** 139:7

**compliance** 24:6 26:14 35:9 47:18 62:18 98:16, 17,24 123:11 136:11,25 137:21 142:7

Victor Manuel Ramirez Najera vs. Experian Information Solutions Inc. -
30(b)(6) Experian Information Solutions Inc. - Teresa Iwanski

November 14, 2025
Index: complies..customer

**complies** 27:14 28:9
29:12 99:3 140:18 149:14

**comply** 23:3 99:1,15
105:5 110:15 117:21
122:12 135:14,23 136:5,
19 137:4,9,13 139:20
140:3 144:15 147:22

**complying** 27:16 88:1
122:24

**component** 80:4 102:1
104:11

**components** 98:2
100:20

**computer** 77:20 138:18
146:22

**concepts** 9:23

**concise** 152:14

**concluded** 154:23

**conditions** 74:9 120:10,
20 134:13,21

**conduct** 42:8,13

**confidence** 50:10,23

**confidentiality** 135:10

**confirm** 112:4,5

**confirming** 52:8 66:23
76:16 104:4

**conflicts** 143:1

**conform** 24:10

**conjunction** 76:19

**Connect** 60:20 62:15

**connected** 11:1

**connote** 55:14

**connotes** 153:2

**consent** 69:10

**considered** 24:3

**considers** 42:15 90:11

**consist** 48:2

**consistent** 28:4 29:4
34:16 37:1 70:15 106:15
107:2

**consists** 37:3 76:13

117:16

**consolidated** 37:21

**consult** 45:6

**consumed** 8:9

**consumer** 26:24 27:10
30:8 38:25 47:6 67:15
68:3,7,11,12,18,20 69:6
102:21 103:1 117:7
124:25 125:1 143:19,21
144:2,17 145:9,11 146:6,
13 147:1,21 148:5,25
149:7,18 150:6,8

**consumers** 26:4 27:8,20
29:20,21 30:10 40:10,16
68:11 77:15 84:9 117:18
138:19 144:6 146:25

**consumers'** 77:12

**contact** 7:2 37:23 41:1
46:6 64:1 84:8 145:4,19
148:2

**contacting** 146:21

**contacts** 144:10 146:13

**contained** 55:2 104:10
134:4,9,14 138:11

**contest** 8:21

**context** 37:15 67:6
115:22

**continual** 150:7

**continue** 23:16 140:6
147:1

**continues** 106:7

**continuing** 63:21 140:10

**contract** 28:17 64:3
83:20 84:5,18 85:18 88:2,
5,7,11 90:4,5,23 91:8,15
95:19 99:21,22 100:22,25
101:16 102:3,7 103:13
104:9 105:13 106:6 112:8
114:24 115:24 119:1,10,
11,13 121:4,21 122:8,19
123:20 124:3 133:1,22
134:11 137:25 141:23

**contracts** 22:24 131:17
133:11,14 141:24

**contractual** 28:22

**control** 24:6 32:9,12
98:21 100:6 106:8,19
141:15

**controls** 28:23

**conveying** 138:7

**convicted** 57:19

**copy** 29:21 69:24 97:23
109:15 154:10

**correct** 9:20 11:25 15:17
16:1 25:21,23 26:24 27:9
31:23 32:23 34:10 35:21
37:7,12 38:2 52:6,12,25
53:18,22,25 54:16 57:17
60:8,18 62:16 64:24 65:24
66:22 67:18 68:13,14
69:12 70:15 71:2,25
72:11,18,22 73:6 74:6
79:9,25 82:19 83:11 93:18
96:7 97:19 98:5 99:10
100:8 101:4 104:14,16
106:9 108:19 109:2 112:8,
13 114:9 117:9 121:1,2
123:8 133:2 135:9,13
137:23 138:3,17 139:10
140:15,20,24 141:3,6,7,
11,17,22 143:23 144:4
145:10,12,15 148:1,9
149:1 152:8,10 153:8,9,
14,15

**correctly** 23:5 24:12
30:18 35:10 40:19 44:17
62:22 81:4 90:13 91:16
100:14 101:21 107:14
111:5 136:3 138:13
145:13 150:10 151:8

**correlates** 151:14

**counsel** 7:3,7 154:7,15

**counsels** 6:5

**countries** 39:21 65:24

**country** 39:20 40:7

**couple** 31:5 48:16

**court** 6:3,15,19,23 7:1,4,7
53:9,12 89:1 91:25 93:11,
14 130:2,7 154:4,6,9,14,
18

**create** 111:15 131:24
143:23 149:4

**created** 32:14,18 39:7
48:5 111:10,19,25 132:1
149:13

**creating** 111:12 131:20

**creation** 33:1 107:8

**credential** 42:9 115:19
130:18

**credentialed** 96:24

**credentialing** 13:11
14:2,23 15:24 16:8,19,25
17:3,5,15,20 18:8,16,19
19:19 20:13 21:1 22:23
28:8 30:17 31:7,8,10
34:23 39:18 40:4 42:9
43:23 45:3 46:20 47:8
48:8,19,20 49:18 50:12,22
56:15,16 58:10,13 59:18,
21 61:25 63:18 65:2 69:7
70:12 76:20 80:8 83:21
85:17 86:24 87:9 88:10,21
96:6,10,11 101:10 106:4,
14 109:19 110:24 111:2
113:20 115:16 116:24
117:22,23,25 118:9,11,24
119:1,5,9,17 122:4,13,14,
21 123:22 126:15,17
127:1 129:20,22 130:5,11
131:2 132:3,11 153:11

**credit** 22:21 23:2 24:4
26:24 47:25 52:4,5 62:5,
21 63:8,14 66:12,20 67:17
73:7,9,12,13 82:17 83:1
85:10 86:5 87:6 88:18
89:18 91:2 95:4,8 96:17,
21 103:6,24 109:6,16,21
110:11 113:24 114:25
117:7 118:18 121:8,24
122:9 125:1,11 133:7,18,
23 142:24 143:7 149:24,
25 150:6,8 151:15,16
152:16

**creditor** 149:1

**criminal** 116:5

**CRRG** 122:24

**Cuba** 39:21

**current** 100:20

**currentness** 139:7

**customer** 32:3 36:11

Victor Manuel Ramirez Najera vs. Experian Information Solutions Inc. -
30(b)(6) Experian Information Solutions Inc. - Teresa Iwanski

November 14, 2025
Index: customer's..distinction

37:9 51:16 53:25 54:3,5,8 57:15 64:3,8,13 71:2 77:21 80:10 82:17 106:4, 5,9

**customer's** 42:8 69:25 70:13

**customers** 35:4 71:22 72:8 74:7 106:24,25 108:18,22

**cyan** 55:6

**cycle** 28:16

**D**

**D2p4** 62:15

**Dallas** 131:7

**dark** 10:4

**data** 13:13 14:2 15:25 16:9 17:2 18:10,11,14,20 19:5,18 20:8,9,14 21:1 22:20 23:2,11,16,17,21 24:4,9 25:6 26:4,6,8,13 27:5,14,17,18,21 28:3 29:18,19,23 30:1,16 31:9 32:1 34:6 36:16 39:3,4,24 40:1,9,15,18 43:2 52:5,10, 17,24,25 55:11 57:24 62:4,21 63:1,14 66:12,16, 20 70:6 71:25 72:1,9,10 74:19 75:18 76:9 77:5,8, 19 78:7 79:5,20,22 80:6,8 83:1,13,15,23 84:19 85:10,21 86:5 87:6,11 88:18 89:18 91:3 97:9,14, 16,18,22,24 98:25 99:6,8, 12,14 100:11,17,18,23 101:9,13 102:13 103:6,15, 17,24,25 104:12,13,23 105:3,12 108:19 109:6,14, 20,22 110:3,4,6,14,22 111:20 112:8 114:7,21 115:1,18,22 116:3,5,17, 18,19,21,22 117:7,16 118:18 119:16,22 120:14, 24,25 121:7,23 122:6,9 123:3,6,16 125:11,12,18 126:1 129:14 131:15,18 133:17,18,22 134:3 135:4, 8,12,17 136:1,19 137:20 138:11 139:7 140:18 142:25 143:5,6,7,8,13,15,

24 144:3,19 146:21 148:2 149:5,9,13,15 150:1,3,16, 18,21,24 151:4,5,17 152:16,25 153:6

**database** 68:4,11 69:6 85:21 117:8 125:1

**databases** 138:12 139:13

**date** 15:9,13,20 27:6 32:5 33:8 145:7

**dates** 100:20

**day** 36:1 45:4,13 103:4 121:4

**DB** 94:8

**DBA** 103:22

**DBAS** 40:5 49:5

**dealership** 46:1

**dealing** 28:17 42:18 48:15 49:9 103:7

**Death** 134:2,5

**December** 32:18 99:14 100:7,13 101:7,24 105:4

**deciding** 23:16 125:15

**decisions** 135:16,24

**declaration** 22:3 25:2 71:5,7,13,17 80:2 83:7 85:6 90:14

**declarations** 21:6 24:21

**deemed** 57:16

**defendant** 6:13

**defer** 53:6 92:2

**define** 114:5 117:6

**defined** 54:13 56:6 61:16

**definition** 42:14

**Delays** 140:25

**deliberately** 29:2,5 87:10

**delineate** 24:22

**deliver** 138:6

**department** 18:11,14,15, 16,19,21 20:9,14 31:8 58:13 80:19 96:5,6,7

111:16 112:1 116:25 152:25 153:7

**departments** 19:1 111:15

**depend** 54:9 74:13 76:7

**depending** 38:21 44:20 80:19 94:19

**depends** 46:14 49:1 112:24 133:14

**deposed** 16:18

**deposition** 8:17 11:23,24 12:2,5 13:21,23,25 14:13, 17,21 15:20 16:2,22 17:8, 25 19:4,10 34:16 38:6,19 39:15 57:8 70:4,16 78:22 79:11 81:6 89:25 92:4,8, 13,20 97:13 99:19 105:9, 11 132:15,18 133:20 146:3 148:18 153:12,21 154:23

**depositions** 8:21 31:18 83:10 89:8

**derive** 113:2

**derived** 38:24 39:3 51:14

**describing** 137:14 150:20

**description** 23:9

**designate** 11:17 21:14 30:21 64:6 105:21 113:16

**designated** 12:9 15:15 19:11 35:15

**designed** 22:25 24:6

**desk** 10:6,8,10 77:13

**detail** 18:10

**detailed** 15:24 17:12 20:21 33:23 34:10 78:7 136:12

**details** 17:5 43:1 125:4

**determination** 24:2

**determinations** 23:21

**determine** 45:6 71:19

**determined** 43:6

**determines** 81:1

**determining** 54:4 139:19,24

**develop** 20:7

**developed** 22:17 27:2

**development** 18:11,14, 20 20:9,14 152:25 153:7

**differently** 34:5 81:6 100:19 137:1,11

**diligence** 22:23 30:18 32:8 39:23 45:5 51:15,21 53:21 58:25 59:4 61:21 69:5,16,23 71:15 75:5,22 93:25 94:4 104:8,11 110:23 111:2,9 112:3 114:25 115:19

**direct** 102:21 103:1 144:2

**direction** 81:11

**directly** 70:10

**disclaimer** 138:22

**disclaimers** 138:16

**disclaiming** 139:5

**disclosed** 20:4

**discuss** 12:25 17:19 25:19 32:2 126:17 127:10, 11,13 129:20 130:17 132:16

**discussed** 82:24 103:17 106:11 114:1,24 115:7 121:20 123:3 126:7

**discusses** 79:20

**discussing** 14:9 53:21 87:4 93:24

**discussion** 107:1 135:7

**discussions** 16:14

**disjunction** 90:9

**display** 21:13

**dispute** 27:9 29:22 30:10 34:14 59:8 84:7 85:20 105:14 144:10 146:7 147:1,5,12,14 148:7 149:7,19

**disputes** 84:9 144:17

**distinction** 9:23 10:12

Victor Manuel Ramirez Najera vs. Experian Information Solutions Inc. -
30(b)(6) Experian Information Solutions Inc. - Teresa Iwanski

November 14, 2025
Index: distinguishing..exhibits

27:13 29:11 31:13,23
143:4

**distinguishing** 73:11,12

**District** 22:1

**diversion** 43:11

**doc** 70:10

**document** 11:12,17,18,
20 12:3 13:3 21:19,22
22:9,14 25:14 30:25 31:2,
3 32:17 33:4,5,23 34:22
37:23 38:24 43:17,21
56:19 57:2 58:16 69:18
76:10,11 95:14,15,18,23
99:14 100:6 102:13,15
104:10 105:16,22 106:19,
22 107:9 111:3 113:17,25
116:14,25 118:12 119:18
121:22 123:16 124:17
131:13,25 132:12,25
133:1 142:3,13,19,22
145:2,17,18 146:15
148:22 151:7 152:6,24

**documentation** 47:14
48:7,21,24 49:8 51:13
82:16 94:14,18,19 96:20
103:23 148:13

**documents** 16:7 17:7
18:10 19:20 31:12 32:13
49:11 50:23 54:20 79:9
97:1 107:21 120:25
126:14 127:25 130:11
146:16 149:8,9 153:14

**dog** 10:21

**dollar** 29:8

**door** 85:9

**doors** 76:22 86:4,7,13,16

**doubt** 115:13,14

**draft** 32:18

**drafted** 100:7 106:20,23

**draw** 9:12,23 13:2 22:13

**drink** 10:21

**drugs** 8:9

**due** 22:23 30:18 32:8
39:23 45:5 51:14,21 53:21
58:25 59:4 61:21 62:18
69:4,16,23 71:15 75:5,21

93:24 94:4 104:8,11
110:23 111:2,9 112:3
114:24 115:19

**dues** 57:20 116:5

**duly** 7:11

**Dun** 47:24

**dupe** 11:7

**duplicate** 37:5,18

---

**E**

**e-tran** 154:11

**earlier** 57:14 71:6 110:9
114:1 116:5 123:3 126:8
127:6

**early** 32:3

**eat** 91:24

**Edge** 42:4

**effect** 14:25 32:15 33:12,
17 49:15,17 84:2 125:8
126:16

**effectuate** 31:21

**efforts** 121:23 138:6

**EIS** 56:11

**electronic** 81:23 113:6

**electronically** 78:2 82:9
112:20

**element** 98:24

**elevated** 58:9,12

**email** 37:24 41:2 54:14
56:8 64:15 128:20

**Emmanuel** 22:1

**employ** 80:9

**employed** 64:3,13

**employee** 16:17 37:22
64:7 81:4 112:12 114:16

**employees** 16:15 31:18
80:14,16

**employer** 55:13

**EMS/EBQ** 55:6

**encompass** 50:13

**end** 93:21

**ending** 91:8

**ends** 143:11

**enforcement** 67:24 69:3,
10

**engaged** 42:8

**engineers** 111:13

**engines** 41:9

**ensued** 53:11 93:13

**ensure** 11:8 24:7 52:21
61:6 77:14 78:13 80:5
83:14,18 86:25 94:15,25
101:20 114:20 115:17
121:23 123:22

**ensuring** 25:4 121:16
122:16,22

**entail** 25:12

**entailed** 43:23

**entails** 76:13 82:5,6
106:16

**entered** 69:11 70:10

**entire** 10:10 91:6 115:3
141:13

**entirety** 25:10 121:16
123:10 132:6

**entities** 38:11 44:12,23
55:12,17,25 56:6 72:20,24
74:12

**entitled** 9:21

**entity** 37:6,11,25 40:17
41:3 42:19 47:13 48:11
50:6 61:13 86:23 112:4
125:5

**entry** 70:6

**enumerate** 98:25

**enumerated** 74:2 76:25

**enumerates** 28:2

**environment** 79:16
85:15

**EPS** 67:3,6

**error** 112:25 150:14

**errors** 143:1

**escalate** 44:25

**escalated** 42:9 44:13,22,
24 58:22 61:6

**essentially** 32:12 37:4
39:17 48:8 60:20 75:21
106:13

**establish** 47:12 50:9
114:5 117:6

**establishes** 50:6

**establishing** 65:8

**estimate** 9:22 10:13

**event** 153:22

**eventually** 91:7

**evidence** 144:18 145:10
146:6 147:22 148:6

**exact** 15:8,13,19 17:17
32:5 81:10 82:14 101:11
118:5

**EXAMINATION** 7:14

**examine** 11:9 126:15

**examined** 7:12

**examines** 77:7

**Excel** 37:23 38:23 70:10

**exceptions** 42:25 72:15,
17 73:15 106:13 110:10
119:21 120:10

**exchange** 72:25 73:1

**Excusable** 140:25

**excuse** 22:14 31:22
55:10 67:25

**execute** 22:23

**exempted** 105:4 110:15

**exhibit** 11:7,14,20 12:10,
14,17,20 21:11,16 30:22
43:14 53:21 71:4,12 80:2
85:6 95:9,13 96:19 105:17
111:3 113:12 116:10
123:1 124:13 126:3,24
129:25 132:25 142:9,13

**exhibits** 11:5 13:19
154:1,12

Victor Manuel Ramirez Najera vs. Experian Information Solutions Inc. -
30(b)(6) Experian Information Solutions Inc. - Teresa Iwanski

November 14, 2025
Index: exist..form

**exist** 33:5 51:24 98:3,5

**existed** 101:23

**existence** 32:21

**existing** 114:6,7

**expect** 17:14 46:20 83:24 92:11,12,14,17 139:20

**expecting** 44:21 47:2

**Experian** 6:13,24 12:9 13:12,13 14:2 15:15,25 16:8,14,17 18:9,15 20:4 22:2,17,20,22,24 23:10, 14,15,20 24:4,9,11,22 25:4,5 26:5,8 27:2,12,16, 20 28:3,9,23 29:3,15,19, 23,25 30:6,11 31:2,8,12, 13,18 32:3,7,12 33:7 34:24 35:4,9,19 36:8 37:8, 22 38:6 39:7,11,22,24 40:8,17 41:3,8 42:15 43:2, 5,20,24 44:6,10,16,23 45:4,12 46:19 47:19 51:22 53:25 54:7,10 55:9,11,12, 13,22,24 56:11,22,25 57:12,16 58:7 59:4,15 60:22,25 61:1,8 62:11,23, 25 63:8,22 67:2 68:3,12, 21 69:5,24 70:21 71:12,22 72:3,7 73:19 74:3,7 75:8, 11,17 76:6 77:1,3 78:1,4, 14 79:23 80:7,9,11,14,16, 20,22,25 81:4,7,10,11 82:13,15 83:21 84:4,18,20 85:13,19 86:8,9,14,22,25 87:25 88:2,9 90:7,16 94:1, 17 95:3,19 96:21,24,25 97:7,23 99:7,13 100:5,10 101:4,5,8,17 102:24 103:25 104:23 105:4,13 106:6,18,23 107:12,21 108:2,9,14 110:1,4,18 112:12 113:5,16 114:4,15, 21 115:4,9 116:3,23 117:2 120:16,21,23,25 121:6,12, 17 122:9,16,17,18,20 123:1,6,10,12,13,15,24 124:11,22,23 126:18 127:2,14,16 128:22 129:17,20 130:5,18,25 131:19,21,24,25 133:2,11, 17 134:12 135:3,14,17,20, 25 136:1,13 137:17 138:5, 8,9,15,17,19,23 139:4,12,

13,21 140:3,4 141:9,14 142:19,20,24 143:5,7,10, 18,23,24 144:9,10,11,21 145:1,3,6,11,15,17,20 146:6,8,14,23 148:3,11,23 149:4,8,12,16,25

**Experian's** 22:4 23:3 24:21 25:20 26:3,23 32:13 58:5 59:8,10,21 62:17 63:11 68:10 77:19 78:6 80:4,19 83:8 90:18 104:9 106:8 107:3 117:7,12 121:16 125:1,5 135:16 139:25 140:16 143:7,14 144:15 145:16,21 146:4, 19 147:22 150:8,18,24 152:16

**experience** 88:21

**explain** 52:15 98:15 121:15

**explained** 98:19

**explaining** 23:13 121:11 128:19

**explains** 31:7 114:11 132:9

**explanation** 23:15 24:15

**exposed** 38:14

**express** 139:5

**expressly** 132:20

**extend** 95:4

**extent** 34:17

---

**F**

**face** 81:24

**fact** 18:19 38:12 48:10 90:4 96:12 129:12 137:7

**fail** 112:18

**failed** 113:8

**fails** 24:10 113:3

**fair** 8:4 9:14 11:3,12 15:25 16:24 17:4 19:22 21:2 22:11 24:24 35:5 37:1 39:23 41:20 46:3 50:8 51:25 67:16 70:8 82:6 99:3 102:9 113:23 117:13

13,21 140:3,4 141:9,14 142:19,20,24 143:5,7,10, 18,23,24 144:9,10,11,21 145:1,3,6,11,15,17,20 146:6,8,14,23 148:3,11,23 149:4,8,12,16,25

**falls** 120:5

**false** 29:5 87:10

**familiar** 16:17 47:24 48:3 73:23 82:14 146:4

**Fannie** 120:2

**Fargo** 65:17 143:21,22 144:11

**FCRA** 23:3 27:16 35:5 42:24 67:25 71:25 83:19 88:1 94:5 98:5 100:21 102:1,2 110:21 124:25 137:22 138:2 139:22 140:8,14,19,23 141:1,6, 10,16,20 144:16 149:14

**federal** 67:16 135:15,23 136:6,19 137:4,13 142:7

**federally-regulated** 119:24

**fee** 138:9

**feel** 12:24 127:8

**fees** 135:7

**feet** 10:9,11

**felons** 57:19

**fictitious** 94:9

**file** 70:14 97:2 134:2,5

**filed** 21:25

**Fileone** 114:8 117:7

**fill** 132:1

**filled** 129:14 131:13,15

**final** 82:15,20 134:11

**finally** 83:20

**finance** 73:13

**financial** 54:3,4,8 67:15 68:13 73:10 119:24 125:6

**financing** 120:19

**find** 37:24 45:1,12 48:17 63:1 65:10,14 99:22 128:22

118:16 120:11 133:7 144:13 150:23 151:11 152:12

**finding** 44:20 45:15,21 46:13

**Findings** 42:6

**finds** 110:2

**fine** 53:7 84:25 85:2

**finer** 106:3

**firm** 95:4,7 96:17,20 98:17

**fit** 10:10

**fix** 112:23 144:19 146:8

**flag** 46:20 47:9 60:6 69:19

**flagged** 38:20 60:12 61:3

**flags** 46:2 74:18,24,25 75:3 87:22

**flip** 11:7

**flipped** 51:1

**fly** 10:17

**focus** 143:10,14 152:24

**focused** 85:8 150:7

**focuses** 108:17

**focusing** 17:3 90:25

**folks** 114:12

**follow** 44:13 74:20 123:17,25 124:6,12 136:23 138:1 147:15

**font** 133:4

**foreign** 40:3,17

**forget** 10:18

**form** 17:23 19:8,24 24:25 26:15,25 28:12 29:6 33:6 40:20 42:16 51:5 52:13 56:13 57:22 58:11,15 61:4 62:6 63:16 65:23 66:5,13, 21 68:5,22 74:16 77:22 78:20 79:22 81:16 83:2 84:22 87:15 88:22 89:22 91:4,17 96:12 103:11 104:2,15 107:12 108:24 109:7 116:7 118:13,19 121:9 122:1 123:18 124:8 125:13,24 131:5,6 144:23 149:3,10,20

Victor Manuel Ramirez Najera vs. Experian Information Solutions Inc. -
30(b)(6) Experian Information Solutions Inc. - Teresa Iwanski

November 14, 2025
Index: format..hold

**format** 56:3 70:9 77:13 96:14 98:20 132:4

**found** 58:18,19

**four-hour** 92:9

**four-page** 11:18

**fourth** 60:14

**frame** 10:1 17:17 127:24

**fraud** 36:10 37:3 39:16 51:22

**Freddie** 120:2

**front** 81:19

**FTC** 67:9 69:9,11

**fulfill** 124:24

**full** 92:17 151:24

**fully** 25:10 40:11 95:17 152:4

**fun** 10:17

**function** 25:8 37:4 108:20

**functions** 111:8

**furnish** 28:9 115:25 121:7 125:22 133:18 134:4

**furnished** 30:1 97:21 98:9,18 114:21 135:4 143:13

**furnisher** 13:6 22:22 23:16,17 24:3,5,23 25:11 26:13 27:18 29:19 30:2,17 32:1,23 40:15,18 63:8 76:10 97:9,17,23 98:4 99:12 100:17,23 101:9,13 102:14 104:13 109:20,22 110:5 111:20 122:9 123:16 125:11 129:14 131:15,18 133:18,22 134:4 136:19 137:9 143:5, 6 144:19 146:21 148:2 149:13 150:1,4,19 151:5

**furnisher's** 29:20 52:25 62:5,21 63:14 66:12 83:1 89:18 91:3 97:14,18,24 98:25 100:11 103:6,16,24 104:12 114:25 115:7 121:24 123:6

**furnisher-specific** 150:23 151:21

**furnishers** 13:7 22:21,25 23:2,11,21 24:11 25:6 26:4 27:5,21 28:3 29:23 30:16 31:9 34:6 36:16,19 39:25 40:1,9 72:2 75:18 80:6,8 84:19 99:6,14 105:3,12 108:19 109:6,15 110:6,14,22 114:7 117:17 119:16,22 120:14 121:7 133:17 143:12,25 149:5,9, 15 152:16

**furnishers'** 23:1

**furnishing** 28:8,10 71:24 72:9 114:12

---

**G**

**game** 8:22

**gather** 82:8

**gathered** 39:7

**gathering** 51:11 81:25 110:2 112:13

**gauge** 20:24

**gave** 42:21 65:10 92:11 144:12 147:22

**general** 41:24

**generally** 14:4,5,8 17:9 19:25 21:2 23:9 28:5 31:24,25 34:5,8,9 35:2,16 37:2 44:18,22 48:3 49:6 57:25 65:1 69:21 84:23 100:1 106:17 137:12

**generating** 147:24

**Georgia** 22:1

**give** 6:21,22 9:23 10:3 124:3 142:1 146:25 151:24

**giving** 50:19 55:4 63:8 121:11 122:9 123:23

**gladly** 151:25

**GLB** 71:25 110:21

**GLBA** 113:24 124:25

**goal** 26:3 59:22 90:18

**goals** 31:19

**God** 141:1

**good** 7:16,18 10:8 130:15

**Google** 41:12,20 42:2,4 46:17 59:23

**gotcha** 24:18

**governed** 113:23 141:4

**government** 47:11 50:18

**governs** 142:22

**grab** 10:21

**Gramm-leach** 113:24

**Gramm-leach-bliley** 35:5 94:5

**grandfathered** 99:15 100:2,3 105:5

**great** 93:10 154:18

**green** 150:10

**group** 72:24 108:12 143:15

**guarantee** 138:23

**guarantor** 138:10

**guess** 9:16 10:13 38:9 41:8 81:21 150:22 153:23

**guesses** 9:17

**guessing** 81:21

**guidelines** 83:19 99:1,3

**guy** 111:19

---

**H**

**half** 92:12 143:19 144:1

**Hamilton** 92:20,22

**Hammoud** 6:11 13:22 14:1 26:13 29:1 147:13

**Hammoud's** 87:11

**hand** 10:5

**handled** 76:3

**handwriting** 126:11

**happen** 140:25

**happened** 128:13 130:4 132:22

**happy** 10:22 11:11 53:6

**harassing** 88:23

**harassment** 46:7

**hard** 95:7

**Harry** 98:8

**head** 58:13

**heading** 34:25

**headquartered** 39:19

**heads** 18:16

**health** 116:5

**healthcare** 50:17

**heard** 9:13 55:15 128:8 147:5

**heirs** 140:22

**helpful** 17:19 36:2 92:10

**helps** 114:20 115:17

**Henke** 16:18 17:20 18:16 19:5 36:15 47:22 54:20 58:13 64:25 69:22 70:11 80:13 88:16,20 89:16 98:7 106:22 107:2 115:12

**Henke's** 16:22 17:8,14 19:21 55:8 70:3,16 81:6 99:11,19 153:11

**Hey** 45:24 46:2 138:23 141:14 144:10 146:7

**high** 14:23 15:3 18:1 20:18,25 23:15 24:14 25:3 31:19 40:22 54:8,10,13 56:6,12 79:11,18,21 84:24 105:11 106:11 114:10 121:11

**higher** 55:23 114:1 151:13,14,15

**highlighted** 23:5 55:6 57:12 142:3 150:10

**histories** 29:20 138:18 144:7 150:2

**history** 9:18 32:13 146:23

**hold** 35:22 132:15

APPENDIX 1783

Victor Manuel Ramirez Najera vs. Experian Information Solutions Inc. -
30(b)(6) Experian Information Solutions Inc. - Teresa Iwanski

November 14, 2025
Index: holding..issue

**holding** 73:4

**hosted** 61:23

**hour** 10:16,19 51:18 91:20

**hours** 8:10 92:6,7,12,16, 17 153:20

**human** 75:10 76:3,5 112:17

**I**

**I-W-A-N-S-K-I** 7:23

**ID** 37:16

**idea** 9:2 110:8

**identification** 11:15 21:17 30:23 43:15 77:12, 15 78:14 86:11 95:10 105:18 113:13 116:11 124:14 126:4 142:10,25

**identified** 43:25 47:15 55:22 59:18 63:9 75:4 80:4 82:17 83:7 96:16

**identifies** 108:5 120:24 143:4

**identify** 6:5 35:13 42:14 48:8 58:8 61:18 62:1 112:6

**identity** 57:4

**ignoring** 90:25

**ii** 74:25

**iii** 54:15

**illegal** 42:8,13 44:2 46:25

**illogical** 24:10

**imagine** 9:25

**impair** 8:10

**implied** 139:5

**imply** 24:18

**important** 48:12 114:20

**improvement** 150:8

**inaccurate** 28:11 30:9

**inaccurately** 28:15

**inarticulate** 72:5

**incidentally** 76:19

**include** 22:19 38:11 40:1 58:6 71:9 136:16

**included** 9:1 38:3 51:8 61:20 73:14 115:9 149:18

**includes** 48:24 58:17 113:23

**including** 23:1 24:8 139:6 145:23

**incoming** 24:4

**inconsistent** 93:1,4

**incorporation** 48:13 49:14,17,20,23 59:22 141:12

**incorrect** 89:21

**incrementally** 35:20

**independent** 30:7 75:14 105:10 138:20 152:21 153:4

**independently** 27:7 29:17 145:3

**index** 36:2,8 102:25

**indication** 42:7 56:10

**indicator** 142:23 150:9, 12,17 151:14 153:1

**individual** 45:9 150:19

**industries** 58:4,9

**industry** 24:10

**ineligible** 43:25 60:8 74:15 125:8

**information** 6:13 17:10 18:25 19:16 20:11 22:20, 21 23:4 24:4,7,9 26:3,9,23 27:8,9,10,13,16,19 28:4,8, 9,19 29:5,12,13,22,23 30:3,5,9,10 34:15 37:9 38:3,24 43:22 44:7,10,21, 25 46:10,11,13 47:19,23 48:18 49:5,9,25 50:2,3,5, 15 51:7,11 52:4 53:3 54:7 55:2,13 56:2,11 58:6,17, 19,21 59:13 62:5,12,21 63:2,9,14,25 64:23 65:1 66:12 67:21 70:5,18,20

72:2 74:3,4 75:14 76:16, 17 77:3,9,15 78:2,4,11,14, 21 79:15,17 80:18 81:24, 25 82:9,10,12 83:1 84:3,6, 10 85:19,25 86:11 87:25 88:8,9 89:18 90:7,18 94:16 95:1 97:5,21 98:10, 11,18 99:2,22 100:2,19,23 101:3,6,9,16 102:3,17 103:6 105:14 108:9,15 109:6 110:2 111:25 112:13,21 113:23 114:12, 13 115:25 116:9 119:3,6 120:16,21 121:8,14,17,24 122:10 123:13,21 124:4 125:9,23 128:1,2,23 129:17 131:1 132:2,8 133:19 134:4,9,17 136:13 138:8 142:2,24 143:6,24 144:5,7,17 145:2,3,12,20 146:17,24,25 147:2,23 148:17,24 149:5,16,25 150:3,15 151:24 153:8

**information's** 75:7

**ingested** 19:16

**initial** 32:18 106:3 110:24

**initially** 97:4

**initiated** 75:16

**initiating** 76:6

**inquiry** 69:6 77:7,18 79:22 95:6,7 108:10 139:14

**Insights** 47:18

**inspection** 61:22 70:23 71:1,15,20 72:8,11,13,17, 21 73:5 74:8,15 75:1,4 76:9,19 77:1 81:1,3,14 82:8 83:8 85:8 86:21 87:10,13 88:6,17 89:20 90:25 91:2,13 110:10,15 125:6

**inspections** 23:1 60:4 71:8,9,10,14,23 73:20,22, 24 74:6 76:11 77:17 80:1, 3,10,14 81:18 89:17

**instance** 9:24 36:16 46:1 64:1,12 76:18 148:5

**instances** 27:4 42:8 69:14 72:12 81:2

**institutions** 73:10 119:24

**instructed** 47:9

**instruction** 37:10

**instructions** 56:10 67:19 132:21

**insufficient** 146:8,12,17

**insurer** 138:10

**intake** 58:11

**integrity** 97:20 98:9,18 125:1

**intended** 8:21 24:18

**intentionally** 28:10

**interested** 25:9 63:12

**interface** 37:12

**internal** 31:12 32:13

**International** 65:21

**internet** 40:25 41:6,7,9, 13,18,20,23,24 45:22 46:10,20,23 112:3

**interpret** 80:18

**interpretation** 81:7 151:23 152:6,9

**interrelated** 10:25 65:15

**intervene** 112:17

**Introduction** 34:25 108:3

**investigate** 35:3 108:21 139:14

**investigation** 51:15 58:25 59:3,12 62:18 70:12 119:18 124:21

**involve** 138:7

**involved** 41:3 44:2,15 81:8 87:3 90:3 123:12 143:20

**involvement** 18:20

**involving** 22:2

**Isaac** 133:7

**issue** 13:8 28:24 61:8 112:19 146:3

Victor Manuel Ramirez Najera vs. Experian Information Solutions Inc. -
30(b)(6) Experian Information Solutions Inc. - Teresa Iwanski

November 14, 2025
Index: issued..luck

**issued** 12:4

**issues** 62:19 104:1

**item** 30:14 47:17 94:8

**items** 48:21 69:17 94:12 99:9 116:4 119:22 123:7,9 125:7

**Iwanski** 6:16 7:10,16,23, 24 8:1,3,6 9:24 10:5 21:19 34:21 43:17 53:5,15 84:17 91:21 93:17 109:9 130:17 132:25 151:1 154:25

**J**

**James** 6:8 29:1 34:13 92:10 93:6 129:24 144:9, 12

**January** 22:11

**Jeeves** 42:3

**job** 8:23 45:16 135:2

**Joe** 143:21

**Joe's** 65:17

**John** 46:6

**joined** 6:10

**judgment** 22:4

**jump** 32:7 43:13,24 84:14 95:12 97:7 106:18 108:2 110:18 116:13 134:1 142:12,18,20

**jumping** 56:25 58:7 126:6

**K**

**karate** 57:20 116:5

**keeping** 144:21

**key** 152:11

**kind** 11:1 20:22,24 27:1 31:9,19 35:16,20 38:18 43:1 46:9,23 47:2,10 55:16 56:3,21 62:11 67:20 77:13 80:20 81:11 83:16 84:12 85:23 101:6 113:7 127:8 128:18 132:2,4 133:14 149:13

**kinds** 14:9 73:20 74:6,12 83:23

**knowing** 45:19 144:11

**knowledge** 14:22,24 15:2,24 16:3,6,24 17:4 18:2 19:1,6,17 20:7,18,19 24:15 25:4 30:7 33:10,22 39:10 41:11 54:18 56:4 70:18,20 75:15 76:17,24 78:19 79:5,8,10,12,20 82:1 94:23 101:18 105:2, 10 113:2,4 119:9 121:13 128:10,14 129:8,10,12 138:20 144:2,5,6 145:5 148:24 150:1 152:12,13, 21,25 153:4

**knowledgeable** 12:19, 21

**KOB** 56:21

**KYC** 36:10 53:24 62:2

**L**

**labor** 44:3 57:19

**language** 118:5

**large** 150:18

**largely** 63:24

**law** 136:23 137:9 141:4 142:7

**laws** 135:15,24 136:6,20, 25 137:4,13,14 141:5 142:8

**lays** 35:18

**leadership** 42:10

**learned** 17:11

**learning** 45:4

**leaving** 77:10

**legal** 112:4

**legislation** 35:10,13,14, 16

**legitimate** 84:1 103:9

**legs** 10:20

**lend** 73:10

**lender** 120:9 143:19 144:2

**lender's** 120:19

**lenders** 120:3

**lending** 45:24 119:23 120:9,19 143:18

**length** 131:9

**let alone** 10:2

**letter** 72:17 73:19 145:2

**letters** 138:22

**letting** 132:5

**level** 14:23 15:3 18:2 20:18,25 23:15 24:15 25:3 31:19 35:20,21,22 36:10, 11,16,17,19,20,23,25 37:3 53:24 54:2 61:18 62:2,4 63:21,22,24 66:3,7,10,19 68:7 70:22,25 79:11,18,21 82:15,20,25 94:1,13 96:19 97:8 102:20,21,22,25 103:1,7,15,21 104:13 105:12 106:12 110:23 114:1,11 121:11 148:12, 24 150:21 151:5

**leveling** 35:18 36:7

**levels** 35:19 36:10,18 75:5 102:20 104:17

**leverage** 73:19 74:5,11

**Lexis** 39:4

**Lexisnexis** 38:24

**Liability** 139:11

**license** 119:23 120:9,19

**life** 45:5

**limit** 92:3

**limitation** 139:6,11

**limited** 48:25 130:10 132:20 135:7

**link** 65:9 112:8

**links** 50:2

**list** 37:22 38:1,4,12,23 39:4 42:7,21,25 48:7,9,24 49:6 50:16,19 60:7 72:16, 17 73:15 77:1,2 96:21

98:2 123:7 125:10,21

**listed** 12:2 56:22 152:11

**lists** 38:16 51:25 57:18

**literally** 29:13 30:1 64:2 91:3 98:12

**live** 72:12 75:16 111:11

**LLC** 28:7 29:2 95:20 130:19 133:6

**loaded** 85:21

**loan** 95:20 130:19 133:5 143:22

**local** 135:15,24 136:6 137:4,13 142:7

**locate** 50:15 59:24 60:2

**located** 6:17 40:15 59:17

**locating** 59:25

**location** 74:21 76:16 82:12 87:2,20

**locations** 48:17 50:1

**lock** 85:9 86:4,13

**locking** 86:7,16

**locks** 76:21

**lodge** 68:11

**lodged** 47:7

**log** 32:9,12

**logged** 113:10

**logical** 26:10

**long** 10:6,8,11 70:19 98:19

**longer** 92:11,13

**looked** 47:11 52:3 62:12 63:3 66:9,16 69:17 75:9 77:25 95:16 99:24 110:9 111:3 112:3 115:20 116:4 120:15,25 122:15 127:6

**lot** 49:2,22 87:2 90:3

**lots** 84:10 85:13

**love** 88:25 89:1 130:1,2

**lower** 35:19

**luck** 130:15

Victor Manuel Ramirez Najera vs. Experian Information Solutions Inc. -
30(b)(6) Experian Information Solutions Inc. - Teresa Iwanski

November 14, 2025
Index: lunch..Northern

**lunch** 91:24

---

**M**

**Mac** 120:2

**Madam** 154:4

**made** 22:3 24:3 32:14,15 48:5 118:22 148:16

**Mae** 120:2

**magic** 98:8

**main** 94:22 152:23

**Mainframe** 62:15

**Mainframe/d2p4** 60:19

**maintain** 143:12

**maintained** 68:4 98:4

**maintains** 24:23 37:8 68:10 139:12

**major** 72:25

**make** 10:13 16:4 19:3,14 24:20 25:10,18,20 26:11, 21 27:8,21 28:17 33:15 34:8 35:25 36:6 37:4,18 40:12 41:2,14 49:9,12 51:19 55:19 57:14 58:2 63:25 64:16 65:16 74:20 79:3,15 80:3,24 82:4 83:13 84:19 85:14,16 86:10 90:17 91:10 99:2 109:4 115:23 121:7 127:21,22 128:6 133:3,5 137:6 145:3,18 146:8 149:23 151:2 152:4

**makes** 117:12 137:9

**making** 23:20 26:9 27:19 50:20 77:5,11 78:2 87:17 135:20 138:15

**management** 63:3 69:20 95:20 130:19 133:5

**manipulate** 11:12

**manner** 86:12 138:7

**manual** 18:5 31:16 32:20, 24,25 33:3,9,10,11 34:3 35:25 36:3 42:17 54:25 56:2 59:6 61:16 75:24 78:24 81:19 115:3 118:4 122:3,15 131:3 132:10

151:13 152:13,17,20,22 153:3,5,7,16

**manually** 112:21

**manuals** 12:22 13:20 16:1 18:1 19:20 20:10,23 31:6 35:15 55:2 77:24 78:23,25 79:17,19 127:12

**Mapquest** 59:23

**marijuana** 42:19 43:7

**mark** 9:2,5 10:19

**marked** 11:14 21:16 30:22 43:14 95:9 105:17 113:12 116:10 124:13 126:3 142:9

**Marketing** 55:11

**Master** 134:2,5

**match** 42:7 56:21 58:8 85:24

**matches** 60:7

**materials** 139:2

**matter** 16:18 71:5

**max** 92:6

**maximize** 142:25

**maximum** 22:18 25:5,21 26:2,22 27:3 29:16 30:15 80:5 83:9 86:1 90:18 117:13

**meaning** 26:2 43:6 72:21, 25 82:8 106:25 110:22,23 111:2 112:3 118:6,21 135:22

**means** 29:16 81:23 82:12 89:7

**meant** 72:5 153:7

**measured** 150:9

**measurement** 142:22 150:17,24

**measures** 77:14

**mechanism** 41:18

**medical** 55:10

**medications** 8:13

**medium** 54:13 56:6

**medium-high** 55:22 56:12

**meet** 48:22 118:8 119:17 125:5,16

**meet-and-confer** 132:18 153:21

**meeting** 87:18 106:4 122:15

**membership** 96:6 126:7 127:14,16 128:15 129:12 130:24 131:19,20,22

**memorize** 55:1 78:24

**mention** 54:12 139:3

**mentioned** 48:4 49:13 57:8,9 77:10 113:6

**Metro** 26:10,14,19 27:14, 22 28:2,10 29:4,7,12 98:16,17,23 99:1 122:25 123:11

**millimeter** 10:7

**million** 29:3,8

**mind** 34:1 90:21

**mine** 147:13,16,21

**minute** 90:15

**minutes** 53:5,7 91:21 92:14,15 153:20

**Mischaracterizes** 58:16

**mispronouncing** 7:25

**missed** 109:9

**misspelling** 27:6

**misunderstood** 40:13 41:16

**modifying** 147:23

**moment** 6:17 17:2 71:4 104:22 126:25

**money** 73:10

**month** 13:22 14:21 15:6, 12 17:6,11 19:16

**monthly** 128:21

**months** 16:19

**morning** 7:16

**mortgage** 45:24

**mortgagee** 73:14

**motion** 22:4

**motions** 24:22

**mouth** 79:7

**move** 89:6 91:11

**moves** 137:18

**Moving** 120:23

**multiple** 85:5 133:11,13

**muted** 53:15

---

**N**

**Najera** 6:10 32:7 34:24 36:8 43:20,24 56:25 57:13 58:7 59:15 63:22 67:2 70:21 71:12 94:1 95:3 96:21 97:7 100:5,10 102:24 104:24 106:18 108:2 110:18 113:16 114:4,15 116:4 117:2 120:23 123:1 124:23 142:19,20 147:6

**named** 16:17

**names** 37:23,24 41:1 61:24

**narcotics** 57:19

**narrowly** 85:8

**Nationstar** 13:8

**Nationstar/rushmore** 127:3

**nature** 29:21 40:6 43:8 56:22 65:12 72:14 74:22 77:11 127:25

**necessarily** 52:15 144:9 151:17

**needed** 73:5 81:12 107:16 129:17

**negative** 149:25

**neighborhood** 60:16

**newfound** 16:6

**Northern** 22:1

Victor Manuel Ramirez Najera vs. Experian Information Solutions Inc. -
30(b)(6) Experian Information Solutions Inc. - Teresa Iwanski

November 14, 2025
Index: note..performed

**note** 21:13 30:14 31:20 34:13 51:18 91:23 132:19 154:1

**noted** 39:23

**notes** 60:25 119:16

**notice** 11:23 12:5 14:18 15:20 34:13,16 127:18 132:21

**notices** 141:8

**noticing** 6:7

**notifies** 113:7

**notify** 46:8

**number** 9:12,13 11:5 17:7 28:2 30:16 40:23 59:20 62:14 64:22 65:8,9 69:17 71:7 85:8 97:9 125:7 135:14 138:4 140:13 142:2 145:22 152:15

**numbered** 25:13 96:21 98:2

**numbers** 37:24 41:1 131:9

**O**

**oath** 53:17 93:18 129:6 151:19

**Object** 14:6,14 15:1,7,18 16:11 17:22 18:22 19:8,24 21:3,8 22:6 23:12 24:13, 25 25:22 26:15,25 28:12 29:6 30:4 33:6,18,25 40:20 42:16 51:5 52:13 56:13 57:6,22 58:15 61:4 62:6 63:16 65:23 66:5,13, 21 68:5,16,22 74:16 77:22 78:8,20 81:16 83:2 84:22 87:15 88:22 89:22 91:4,17 100:15 101:25 102:10 104:2,15 105:7 107:24 108:24 116:7 118:13,19 122:1 123:18 124:8 125:13,24 126:21 127:17 128:16 129:9,23 130:21 131:23 144:23 145:24 146:10 147:7,18,25 148:8, 14 149:3,10,20

**objection** 19:23 23:6,24 34:12 99:17 103:11 109:7 132:17

**objections** 12:5,8

**obligated** 8:18 9:16

**obligation** 26:13,23

**obligations** 139:25 141:15

**oblige** 10:22

**obtain** 78:19

**obtained** 17:6

**obtaining** 94:13

**obtains** 82:15 94:17

**occasions** 145:22

**October** 15:5,16

**offer** 95:4,7 96:17,20

**offering** 57:16

**office** 70:23 87:8,21 125:7

**Ohai** 22:1 71:5,13 80:3

**Ohai's** 25:9

**Okie-doke** 53:8

**older** 132:4 134:18

**on-site** 23:1 71:8,9,10,13 80:1,3,20 81:1,3,12 83:8 85:8 86:21 87:9,13 88:6, 17 89:17 91:2,13 110:10

**onboard** 23:16 31:9

**onboarded** 32:23 33:24

**onboarding** 66:15 78:11, 16 79:12,13,23 80:8 84:12 86:24 97:4

**online** 44:11

**onsite** 70:25

**open** 132:15

**operated** 39:11 77:20

**operating** 37:19 40:2 94:5

**operation** 103:9

**opportunity** 12:13 13:17

16:21

**opposed** 60:16 100:19

**option** 60:3

**order** 22:21 26:8 28:17 31:9 41:18 43:12 45:6 78:3 80:9 83:14 86:9 88:13 94:25 103:12,19 112:14 115:4 117:20 125:17 129:3 154:9

**ordering** 154:15

**orders** 69:11 135:2,3

**outcome** 112:18

**outline** 42:18 124:21

**outlines** 40:21

**oversee** 16:15

**oversight** 67:16

**owes** 29:1

**owned** 40:2,16 73:16

**owner** 39:18 46:6

**owners** 39:17

**owns** 137:20

**P**

**p.m.** 154:21,23

**Pacific** 6:4

**pages** 58:3 134:11

**Pambid** 6:11

**papers** 76:22 77:10

**paragraph** 22:14,16 23:19,22 25:15,19 35:2,7 134:20 135:7,11 137:16, 20,24 138:21 140:8,10 142:2 143:11,17 149:2 150:6

**paragraphs** 141:19

**paralegal** 6:11

**paraphrasing** 49:14

**parent** 73:4

**parenthetical** 67:4

**Parkway** 6:24

**parliamentary** 130:6,8

**part** 38:23 39:16 61:16 63:18 69:4 77:24 78:11 83:8,19 85:12 86:10 87:16,23 89:8 90:3,12 91:14 94:10 101:10,15 102:3 105:15 120:17 121:10 122:15,21,22 134:16 139:8 142:16 148:25

**participate** 84:7 85:20 105:14

**parties** 26:5 61:19 62:1 109:15 112:6 113:8

**party** 36:15,17 39:12 76:7 80:12,21 95:19,20 109:21 143:18

**pass** 22:22 30:17 87:9,12 89:20

**passed** 85:17

**passing** 153:24

**past** 8:20 31:17 61:7 63:10 83:10

**pay** 60:22

**payment** 29:20 135:8 138:18 144:7 146:23 150:2

**payments** 28:15

**PDF** 69:25 70:5,10

**penalty** 22:10 129:6

**pending** 10:24

**people** 8:5 28:18 46:16 47:25 56:3 61:20 64:1 91:24 152:10

**PEPS** 38:14

**percentage** 110:6,14

**perfectly** 9:19

**perform** 41:6,18 68:3 69:5 80:10

**performed** 13:12,14 18:11 20:8 57:5 70:12 75:10 77:19 79:22 80:21 126:18 127:2 129:20 130:5

Victor Manuel Ramirez Najera vs. Experian Information Solutions Inc. -
30(b)(6) Experian Information Solutions Inc. - Teresa Iwanski

November 14, 2025
Index: performing..process

**performing** 81:3

**performs** 14:3 15:25 111:8

**period** 34:14,16 92:9 127:18 130:10,12 149:23

**periodically** 107:6

**perjury** 22:10 129:6

**permissible** 82:16 94:13, 18,20,22 95:1,4,5 96:16 103:23 104:5 108:8,17,22, 25 109:12 112:6 114:7

**person** 11:6 12:9 44:19, 25 45:13,19 46:12,14 48:19 49:4 50:13,19,22 51:10 57:4 64:3,7,11 75:13,16 81:3 111:11,12 112:22 131:16 152:14

**person's** 126:11

**personal** 6:22 113:4 128:10,14 129:11

**personally** 136:25

**persons** 38:14 57:4 81:3

**pertain** 49:3

**Peter** 16:18 18:4 58:13 81:6

**Peter's** 38:5,19 57:8 81:6 105:9

**phone** 37:24 41:1 65:8,9, 10 125:7 147:5

**phrased** 9:6

**physical** 60:3 71:1,20 72:22 74:8,21 75:1 76:9, 10,16,18,25 77:16 80:10, 14 81:1 82:8 125:5

**picks** 65:17

**piece** 55:2 91:5,12 104:19

**pieces** 91:7 102:4 116:8 123:13 125:9 132:2 150:15

**pink** 142:3

**place** 26:5 27:17,21 30:9, 20 34:3,6,23 39:20 60:5 62:9 72:13 74:22 77:14 78:3,13 86:12 95:13 99:23

103:19 105:20 106:25 107:18 113:15 127:20 131:8 132:8 144:14

**placement** 59:16 112:5

**places** 44:11 49:6 50:12, 14,21 51:10 60:1

**placing** 93:25

**plaintiff** 6:9 11:14 21:16 22:2 30:22 43:14 95:9 105:17 113:12 116:10 124:13 126:3 142:9

**Plaintiff's** 11:18 21:12,14 30:21 43:13 95:13,24 105:21 113:16 116:13 124:17 126:6 142:12

**plans** 135:3

**platform** 37:9

**play** 130:6

**pledge** 136:13

**point** 10:18 11:10 20:23 26:11 34:18 50:16 52:9, 16,18 54:15 55:20,23 56:14 58:24 62:7 63:12 66:14 68:6 70:8 81:21 83:3 86:6 89:3 96:25 98:23 104:3,17 106:3 110:3 112:21 116:21 118:23 119:2,11 125:14, 18,25 126:2 135:6 138:16 140:9,12 141:3

**points** 102:18 120:6

**policies** 23:4 31:13,15,18 35:9,12,13,16 37:1 58:5 63:11 77:4 97:24 98:3,6, 25 99:8 100:11 101:13 102:8 107:3,22 115:2,8 117:11 123:17 124:6,12 146:4 147:23

**policy** 31:22 34:17 60:25 62:17 97:10,17 101:8 102:14 104:13,19,23 113:21 114:1,10,17,19 115:17 117:5,15 119:16, 19 121:6 122:6 123:3,6 124:21,24 125:4,25 142:17,21 151:2

**Polish** 8:2

**politically** 38:14

**poorly** 9:6

**portal** 68:23

**portion** 46:21 54:2,25 55:5 56:7 57:1,12 99:18 120:24 122:8 133:23 134:9,14 136:3,11,17 139:11 142:6

**portions** 112:15

**portraying** 47:1

**position** 19:12 70:17 146:19

**positive** 149:24

**possibility** 28:13

**posterity** 142:18

**potential** 74:7 119:18 143:1

**potentially** 50:4 71:2

**Potter** 98:8

**pre-pay** 56:7

**preceded** 36:18

**precluded** 103:9

**prefer** 53:5 91:21

**prepare** 12:16 13:17 78:22

**prepared** 12:25 14:16 126:16 127:7,9,13 129:20 132:22

**preparedness** 132:20

**preparing** 127:12

**prepayment** 54:14

**Prequalification** 102:22 103:2

**prerequisite** 91:15

**Prescreening** 134:8

**prescription** 8:13

**Presenting** 38:8

**pretty** 10:8

**previous** 21:2 33:16 60:21 112:5 122:15

**previously** 20:17 62:10, 24 66:11 82:24 148:19

**prices** 139:18

**primarily** 42:5 56:19 143:13

**primary** 65:7 108:20 143:14

**principal** 39:20 64:22

**printed** 77:13

**prior** 12:13 17:21 19:9 33:8 36:14 79:10 99:13, 24,25 100:13 101:7,24 105:4,11,16 107:11,23

**privacy** 124:25

**pro** 22:2

**proactive** 142:25

**procedure** 31:14,16,20, 22 32:8 33:16,22 34:10 35:2,8,18 36:9 53:21 63:13 69:23 75:5,22 93:25 97:10,14,17 101:8 102:14 104:11,14,19,23 105:25 106:7,16 108:5,16 109:5 111:2,9 112:3,16 114:25 115:19,20 118:18 130:6

**procedures** 16:15,19 17:6 18:9 19:19,22 20:4, 18,20 21:7 22:17,18,19,24 24:6,22 25:11,20 26:5 27:2,17 30:15 31:15 33:8 51:22 54:19 62:11 77:4 78:6 80:5 83:9 90:13,24 91:14 97:24 98:4,6,25 99:8 100:11 101:13 102:8 104:8,10 107:3,22 108:21 115:2,8 117:12,22,24 118:1,2,10,12,24 119:5,10 123:3,7,17,23,24,25 124:7,12 126:15 145:22 147:23

**PROCEEDINGS** 6:1

**process** 14:2,23 15:24 16:25 17:20 18:10 19:5,18 20:12,22 22:23 23:14,15 27:21 28:8 30:9,18 31:7 32:2 34:5,10 36:22 39:7, 23 40:4 43:5,23 44:10,13 45:15 50:20 56:15,16

Victor Manuel Ramirez Najera vs. Experian Information Solutions Inc. -
30(b)(6) Experian Information Solutions Inc. - Teresa Iwanski

November 14, 2025
Index: processed..redactions

58:22 59:5 60:11 61:21 66:3 69:5,16 71:15,18 75:4,8,11,21 76:2,4,6,8 77:24 78:12,16,19,23 79:12,23 81:15 82:5,7 83:21 84:7 85:20 87:3 91:6 94:11,16 96:3 99:23 100:17 101:10 105:14 106:5,8,13,14 107:17,18 109:1,23 110:1 111:8 112:11,16 115:6,10,16 118:23,25 121:16 123:21 127:16,20 128:15 129:7 132:5 144:14 145:17,18 146:21 149:14,15

**processed** 147:16

**processes** 16:9 19:6 20:8 21:1,2 41:22 78:12 85:18 111:14 121:12 145:16 153:11

**processing** 18:20

**produced** 12:22 13:20 16:2,8 18:1,3,9,13 31:6 42:21 78:25

**product** 39:1,11 47:19

**products** 55:17

**program** 111:14,23 113:22 142:16 150:7

**prohibited** 58:4,5

**promise** 124:6 138:1

**promised** 140:4

**promises** 137:8

**promising** 133:18

**proof** 49:11 120:18 149:8, 9,13

**proper** 98:20

**properly** 78:14 79:24 90:21

**protect** 124:25

**Protection** 67:15

**provide** 8:24 12:19 17:11 19:7 23:4 24:19 56:20 65:2 97:23 99:7 101:13 115:8 120:9 125:11,15 135:3 144:18 145:10 148:12

**provided** 20:25 51:15 52:6 64:23 82:12 87:13 101:9 102:9 123:9 134:12 136:2 138:8 143:5 148:6

**provider** 41:6

**providers** 68:13

**provision** 135:16,25

**provisions** 28:22

**publicly** 73:4,15,16

**publicly-traded** 72:14, 24 87:19 110:11

**pull** 49:19 50:4 82:18

**pulled** 65:11 112:21

**pulling** 72:2 94:23,24 95:1 111:25 113:22

**purchasing** 71:24 72:10

**pure** 10:4,13

**purpose** 82:16 94:13,20, 23 95:2,4,5 96:16 103:23 104:5 108:8,17,22 109:1, 12 112:6 114:4 117:3,5

**purposes** 52:22 71:11 94:18 114:7

**pursuant** 120:10 135:17 136:2

**put** 39:22 58:25 79:7 106:3 144:14

**putting** 108:14

---

**Q**

**qualifier** 67:11

**qualify** 117:20 118:6,21 122:12

**quality** 24:5 55:12 98:21

**question** 9:2,3,4,11,13, 14 10:24 11:2 14:7,16 25:3 27:24,25 28:25 36:5 49:18 54:22 63:4,6 66:10 69:2,4 72:4 82:23 85:7 86:3,18,19 88:16,24 89:6, 7,11,14,16 90:1,2 101:7 121:3,22 126:22 128:10, 12 129:2,5,23 130:3,22 131:21 144:24 147:4

148:22 151:3 153:10 154:7

**questions** 8:18,19,24 9:17 10:25 11:2 12:11,16, 22 13:18 14:1,3,17 17:21 34:21 54:24 90:10 93:3 147:14,15 152:19 153:13, 24

**quick** 93:9

**quickly** 43:10

**quiet** 93:20

**Quoted** 117:8

---

**R**

**ramble** 9:1

**Ramirez** 6:10 147:6

**ran** 46:5

**range** 15:11 17:18

**rate** 150:9,12,14,17 151:13,14,15 153:1

**reach** 10:9 153:17

**read** 16:21 17:14 19:19,20 20:4 23:5 24:12 30:18 35:10 89:25 99:18 111:5 117:8 126:11 127:3 134:18,19 136:3,25 138:13 139:16 141:23 143:2 144:3 150:10 151:24 152:1,18 153:15

**readable** 56:3

**reading** 17:16 19:10 38:19 41:11,21 48:16 50:11 51:9 52:7 54:20,21 55:3 56:1,4,5 73:11 76:15 81:18 136:24 137:3,11 151:2,7,22 153:11

**reads** 127:1

**real** 48:10 51:23 83:25 87:17 125:5

**realm** 51:25

**reason** 8:6 27:4 38:20 44:19 46:14 49:4,12 54:9 59:8 74:13,14 75:7 80:20 81:13 107:17 110:1 112:19 115:13

**reasonable** 9:19 117:12 130:10 138:6

**reasons** 63:2 153:17

**Rebecca** 6:12 68:15 84:14 89:1 92:2 130:1 132:14 153:19

**recall** 13:23 14:3,24 17:16 26:14 110:9 123:4 127:6, 11 133:19 147:12,17

**receive** 18:4 29:21 120:21

**received** 100:23 101:5 120:16 127:14 131:22

**receives** 133:17 143:24 145:1,15 150:1

**receiving** 29:18 78:1

**recently** 42:20

**recess** 53:11 93:13

**recognize** 11:20

**recollection** 8:20 14:12 107:1

**recommend** 54:14

**recon-** 107:5

**record** 6:4,6 7:21 21:13 52:22 53:10,13 92:17,25 93:5,12,15 125:21 143:12 154:19,22

**records** 67:9,14 70:12 146:22 148:3

**recredentialed** 96:25

**recredentialing** 13:12 75:6,18,20 76:2 105:25 106:2,9,13,16,23,25 107:13,19,23 108:16,20 109:23 110:1 111:4,23 112:16 113:21,22 114:11 115:6,10,15,18 120:17 126:17 127:2 130:11

**recredentials** 24:11

**recycled** 130:12

**red** 60:6 74:25 75:3 87:22

**redacted** 57:2

**redactions** 57:5

Victor Manuel Ramirez Najera vs. Experian Information Solutions Inc. -
30(b)(6) Experian Information Solutions Inc. - Teresa Iwanski

November 14, 2025
Index: redo..review

**redo** 106:14

**refer** 12:22 21:7 59:4 71:10,13 73:8 88:7 103:16

**reference** 10:1 25:20 37:21 105:8 109:12 141:9

**referenced** 102:13

**references** 110:21

**referencing** 55:21 115:18

**referred** 14:22 44:5 71:8 73:23 133:1

**referring** 13:19 43:3 44:7 54:15 55:3 62:14 72:16 74:25 84:21 111:7 115:23 118:3 136:10,17,22 137:8

**refers** 35:14 37:13 75:3 111:7

**refresh** 14:12

**regard** 109:17

**registered** 28:7 73:8

**regular** 41:12,19,22

**regulated** 35:4 71:25 72:9,10

**regulations** 135:15,24 136:6

**reinvestigate** 144:15 145:19

**reinvestigation** 30:11 59:9 145:16,22 146:18,20

**reject** 24:9 112:25

**relate** 13:7 23:10 28:23 62:4 63:7 66:19 73:9 80:5 88:17 89:17 90:24 91:2,13 97:14,17 102:20 103:5,24 107:22 142:1

**related** 40:6

**relates** 13:11,13 14:17 39:16 40:25 44:15 47:18 51:22 52:3,24 53:24 54:19 55:9 57:13 58:3 62:20 63:13,25 64:21 66:11 69:3 70:25 77:19 82:25 86:21 87:5 89:19 91:7 92:22 94:4 104:12 113:21 116:4 121:6,23 122:8 130:4

133:17 134:24 135:2,11, 19 137:24 138:4 141:20 148:22

**relating** 16:8 82:16 101:14 113:2 118:17 153:16

**relationship** 18:24 62:10 81:10 85:12,16 86:4 87:1 88:13 90:5,16 99:13 106:1,7 115:4 118:7,22 133:10 143:21 148:25

**relationships** 60:21

**relevant** 34:14,15 37:23 113:7

**reliability** 22:25 23:11,21 24:23 25:11 28:23 138:11

**reliable** 24:3 83:22 125:11,22

**rely** 83:13

**remain** 53:17 93:17

**remainder** 138:21

**remaining** 141:18

**remains** 140:7

**remediating** 55:21

**remediation** 143:1

**remember** 14:8,10 15:8, 13,19 17:17 21:24 26:17 32:5 38:18 39:15 57:7,9 81:9 89:11 95:6 110:13 147:9 148:15,19

**rent** 87:8

**rented** 87:22

**rephrase** 9:9 90:22

**reply** 146:23

**replying** 149:16

**report** 22:21 26:13,23,24 27:2 28:3 29:2,22 47:18 48:1 49:19 50:5 51:2,7 54:4,13 56:7 59:22 65:11 78:4 82:18 83:16 84:6 85:19 87:10,24 88:9 90:7 101:3,16 109:16,21 116:23 136:13 150:7,8

**reported** 22:20 24:7 29:5

30:6 116:9 121:17 145:7, 19 149:5

**reporter** 6:3,15,19,23 7:1, 4,7,12 53:9,12 91:25 93:11,14 112:8 154:4,6,9, 14,18

**reporters** 117:7

**reporting** 27:2,13,14,22 28:16,18 29:11,12,16 38:25 40:10,16 52:10 62:12 67:17 68:12 78:10 83:15,18 85:25 90:17 102:2 105:13 113:23,24 116:17 117:17,21,22,23 118:1,2,6,9,11,21,24 119:2,4,5,6,9 121:13 122:6,12,13,14,21,24 123:20 144:4

**reports** 27:10 48:2 128:21 142:24 143:7 151:15,16

**represent** 6:6

**representations** 84:19

**representatives** 140:22

**request** 75:1 112:5 139:14

**requested** 94:20 128:1 132:12 154:24

**requesting** 109:15,21 149:12

**require** 123:15

**required** 48:20 49:20,21 65:1 70:23 71:19 72:8,17, 21 76:9 79:14 94:19 97:23 98:3 101:8 107:7 120:22

**requirement** 23:2 29:4 48:22 50:7 97:22 99:5,16 100:11,13 101:12,23 102:6,8 105:6 115:7 118:17 123:8 124:21

**requirements** 27:14 28:10 74:1 76:25 78:7 79:13 87:18,24 88:1 102:14 110:10,16 114:6 117:6,25 118:8 119:17 122:25 124:24 129:16

**requires** 28:3 123:14

**requiring** 111:17 130:25

**research** 60:12

**Reseller** 102:21 103:1,2

**Resellers** 102:21,22

**reserves** 137:17

**reshare** 53:20

**residential** 44:1 57:20

**resources** 45:5,8 48:25

**respect** 13:12,14 20:3 30:16 80:1 126:18 127:2 129:21 139:5

**respectful** 91:25

**respond** 84:9 148:3

**responded** 14:10 148:16

**response** 9:20 12:5 54:22 128:9 144:20 145:5 148:11,13

**responses** 26:7

**responsibility** 125:6 152:11

**responsible** 19:12 138:25 139:19,24 143:13

**rest** 39:4 69:18 131:10 137:16

**restate** 89:10,13

**restricted** 65:21

**result** 69:19 144:1

**results** 13:14 47:9 59:4 69:15,23,24 127:3 129:21 149:8

**retained** 70:7,19 97:4

**retention** 70:4

**retrieve** 50:23

**return** 10:23 80:2

**returning** 71:12 96:19

**Reuters** 39:12

**review** 11:8 12:14 17:7, 24,25 19:9 42:10,14 46:17 47:9 54:19 56:19 57:14 58:14 65:21 70:3,16 79:8 80:23 127:12 128:2

Victor Manuel Ramirez Najera vs. Experian Information Solutions Inc. -
30(b)(6) Experian Information Solutions Inc. - Teresa Iwanski

November 14, 2025
Index: reviewed..similar

**reviewed** 16:7 40:7 78:23 84:4 142:5 153:14

**reviewing** 20:1,10 38:5 46:12 52:16 77:23 78:21 95:17

**rewriting** 111:19

**Richland** 6:18

**rights** 137:17 147:1

**rigorous** 22:22 24:5 27:20 28:17 30:17

**ripped** 46:18

**risk** 40:23 54:3,4,8,13 55:23 56:12 58:9,12 86:14

**risks** 54:10

**Ristvedt** 6:8,9 7:15 11:16 14:11,19 15:4,10,21 16:13 18:6 19:2,13 20:2 21:5,10, 18 22:8 23:8,18 24:1,16 25:7,24 26:20 27:11 28:20 29:2,9 30:12,24 33:13,20 34:7,19,20 40:24 42:23 43:10,16 51:12 52:19 53:4,8,14 56:17 57:11 58:1,23 61:9 62:13 63:20 66:1,8,17 67:1 68:9,17 69:1 74:23 78:5,17 79:2 82:2 83:6 84:13,16,25 85:3 88:4,25 89:5,15 90:8 91:9,19 92:16,21 93:7,16 95:11 100:4,24 102:5,12 103:14 104:7,21 105:19 108:1 109:3,8 113:14 116:12 118:15 119:7 121:19 122:5 124:1,15 125:19 126:5,23 128:5 129:1,18 130:1,13,15,16 131:12 132:14,24 142:11 144:10 145:8 146:1 147:3, 11,20 148:4,10,21 149:6, 17 150:5 153:19,25 154:7, 8,11

**role** 17:15 30:11 144:15 145:16 146:20

**roles** 59:8

**room** 76:23

**roughly** 32:22

**rules** 135:15,24

**run** 37:10 45:5 67:20

**runs** 113:16

**Rushmore** 13:8,13,14 32:2,22 33:24 95:5,20 96:4,17,25 97:2 120:5,8 126:8,18 127:15 129:21 130:5,19 131:14 133:2,5 135:23 136:5 138:16 139:12,18 140:16 142:1 148:12

**Rushmore's** 34:23 135:8,11 140:18

**Russia** 39:21

---

**S**

**Salesforce** 37:8,10 60:19 62:15 69:25 70:10,13 97:1,3

**satisfied** 87:13

**satisfies** 123:8

**satisfy** 50:7

**saved** 69:25 70:13 97:1

**saves** 69:24

**scammers** 46:18

**scared** 84:15

**scenario** 20:23 45:17 81:20 98:17 105:12 121:11

**Schedule** 134:8

**scope** 14:6,14 15:1,7,18 16:11 17:22 18:22 19:23 21:3,8 22:6 23:6,12,24 24:13 25:1,22 26:16 30:4 33:18,25 57:6 68:16 78:8 99:17 100:15 101:25 102:10 105:7 107:24 117:15 122:11 126:21 127:17 128:16 129:9 130:21 131:23 145:24 146:10 147:7,18,25 148:8, 14 149:11,21

**scores** 56:12

**scoring** 133:7,23

**screen** 11:6 13:4 21:15, 20 23:23 30:20 43:18

53:20 69:3 78:24 94:1 95:13 105:20 113:15 152:2,18

**screenshots** 67:22

**scroll** 11:10,11,19 35:24 102:24 128:22 129:24 131:6

**scrolling** 66:2 131:10

**SD** 64:6

**search** 37:10 40:25 41:6, 9,13,18,20,22,25 44:20 45:5,22 46:5,15,21,23 50:3 59:4 62:15 67:8,14, 20,24 68:3,20 69:5,9,14 112:4

**searched** 67:21 68:19

**searches** 37:22 41:7,9

**section** 32:8 34:25 42:6 51:21 52:23 65:4,6,7 67:3 94:4 95:3 96:19 98:10 104:13 106:19 108:3 110:19 114:4 117:3 123:2 132:7 134:7,24 139:10 140:11 142:21 143:4

**sections** 141:25

**secure** 48:20 49:20 74:21 79:16 85:15 86:11

**secured** 77:5,8

**security** 64:6,21 77:4,15, 20,24 78:3,7,13 79:6,13, 14,20,22 85:14 86:10,12, 14,21 118:8

**selected** 67:22

**selling** 43:7

**send** 29:23 109:6 128:21

**sending** 83:23,24 103:25

**sense** 10:13 92:11

**sentence** 61:15 111:1 135:19 138:13 140:2 143:11,17,20 149:2 150:10

**separate** 88:6 114:23

**separated** 36:9

**separately** 139:13

**separates** 31:12

**series** 10:25

**server** 61:23

**service** 133:13

**servicers** 120:3

**services** 31:8 38:21 55:18 56:20 57:16 68:13 95:20 108:9,15 113:20 116:24 122:4 130:19 133:6,8 134:8 135:17 136:2 138:6,7,10,11 139:1,20,24 140:3,17

**set** 91:14 107:8

**sets** 16:15

**setting** 17:2 18:8 39:3 104:8 121:4 128:12

**setup** 60:4

**sexual** 46:7

**share** 21:10 82:11 125:7

**shared** 82:10

**sharing** 11:5 79:15 81:23

**Shaun** 6:11

**shot** 10:4

**show** 8:22 21:15 58:20 65:11 67:22 117:23 125:6

**showing** 25:8 53:2 145:2 151:22 152:1

**shows** 33:1 107:8

**sic** 65:22

**side** 59:8 116:17 131:2 144:21

**siding** 144:25

**sign** 106:6 131:16 133:12

**signature** 154:24

**signed** 22:10 88:11 119:11 123:16 126:10 131:16

**significance** 153:13

**signing** 64:3 71:17 90:14

**similar** 47:23 66:10 69:9 76:1 82:23 94:12 96:14

Victor Manuel Ramirez Najera vs. Experian Information Solutions Inc. -
30(b)(6) Experian Information Solutions Inc. - Teresa Iwanski

November 14, 2025
Index: similarly..supposed

100:12 121:3 127:20 128:4 153:10

**similarly** 73:5 140:13

**simpler** 63:5 86:3

**single** 49:7 78:24 111:23 139:14

**sir** 53:19 93:19,22 107:15 114:14 117:10 145:25 146:5

**sit** 15:22 20:20 33:15,21 42:1 82:3 101:22 105:2 150:22 151:10

**site** 41:23

**sitting** 10:7 45:14 76:22 77:12 128:11 129:5 151:19

**situation** 38:18 77:12 79:18 84:12 86:7,13 146:15

**situations** 28:14 74:10 85:23 89:24

**skip** 21:12 124:16 154:2

**skipping** 57:24

**small** 133:4

**Smith** 46:6

**social** 64:21

**software** 111:13 112:11

**solutions** 6:14 55:10,11, 13 56:11 61:24

**somebody's** 77:13

**someone's** 109:16

**someplace** 124:10

**something's** 146:14

**sort** 14:23 15:23 16:5 17:15 19:15,16 20:18,25 42:10,25 44:12 45:16 54:21 60:6 65:8 69:10,19 77:14 81:22,24 82:4 99:23 101:1 103:5 107:5 112:23 114:10 119:6 123:15 145:10

**sound** 15:11 61:13 93:20

**sounds** 41:15,16 50:25

70:14 79:6,7 82:3 85:2 86:20 93:10 107:11 119:8

**source** 17:10 24:3 81:9

**sources** 138:8

**space** 60:8 87:8 125:7

**span** 10:10

**spanning** 12:2

**spans** 58:3 142:19

**speak** 18:4 128:24 129:15

**speaking** 131:11 137:15 153:17

**speaks** 128:18 132:12

**specific** 13:7 17:5 18:23 41:23 43:22 45:8 55:24 67:19 74:3 76:24 85:7 88:8 97:13,22 104:11 111:16 127:15 128:1,2,10 147:4 150:18

**specifically** 12:16 13:2,6 14:10 16:25 17:3 19:18 21:24 26:17 38:17 39:6 69:3 74:9 75:25 77:2 78:15 82:25 87:5 94:17 95:6 102:19 108:6 116:17, 19 121:6 148:15,19,23

**specifications** 135:3

**specifics** 14:24 19:21 21:24 79:16,21 147:9

**speculating** 33:5

**spell** 7:20 98:8

**spiked** 84:14

**spilling** 104:24

**split** 85:1

**spoke** 153:12

**spotted** 60:6

**stamp** 31:2

**stamped** 43:20 95:14

**stand** 10:20 37:15 61:10 67:6

**standalone** 91:6,12

**standard** 134:12,21

**standards** 24:10 26:10, 14 27:23 28:3

**star** 46:17

**start** 50:20 99:6 146:17

**started** 9:3 28:7,8

**starting** 6:6 45:13 50:16

**starts** 66:6

**state** 6:6 7:20 13:16 74:9 85:24 90:6 118:10 135:15, 23 136:6,19 137:4,13 142:7

**stated** 153:3,5

**statement** 116:20 142:21

**statements** 114:1 136:21 137:8

**states** 40:2,15 51:17 57:25 63:23 73:21 74:17 85:18 94:7 102:19 111:6 133:9 143:16

**States'** 40:16 117:17

**stating** 60:10 74:11 90:1 125:3 137:3,12 151:12

**statutory** 24:6

**step** 18:3 37:17 40:25 46:11 47:12 56:18 59:16 60:10,14,19,20 61:18 62:1,2,14,20 63:13 64:1,7, 10,15,21 65:15,20 66:3 67:8,14 69:2,15 70:22,25 71:18 82:15,20 97:8,16 100:10 103:5,16 115:1,7,9

**step-by-step** 20:22 31:6, 11,21 33:22 35:3 81:20

**step-by-step-by-step** 121:12

**steps** 23:9,20 25:5 35:8 37:20 48:15 51:3 52:3 53:25 58:10 62:4 63:7 64:9,14,19 65:13 66:9,11, 19,24 75:9,12,15,21 76:17 80:7 82:14,25 83:12,14,17 84:3,10 85:13,15 86:24,25 87:2 88:11,13 90:3,5,12, 15 91:1 92:23 94:15,16,25 96:11,15 97:13 100:20 101:11 103:7,13,19,21

111:5,12 112:2,7,14 115:3 116:2 118:22 121:6 122:16 124:22 125:16 127:15,20 128:14 129:6,8, 16 130:18,24 131:3,5,18 132:9,16

**stock** 72:25 73:1

**stop** 92:7

**stops** 102:25 132:8

**street** 87:8

**stretch** 10:20

**strike** 17:1

**strives** 142:24

**stuff** 60:22 66:2 67:12

**subject** 12:8 36:15,16,17, 19 132:17

**subjected** 71:2,20,23

**subjects** 24:4

**submit** 119:22

**submits** 149:7

**submitted** 21:6 24:20

**submitting** 26:9

**subscriber** 119:18 124:20 125:22

**subscribers** 125:4

**substantiate** 148:6,13

**successful** 112:25

**successfully** 49:19 60:5

**successors** 140:22

**sufficient** 19:6,17 20:11 46:8 48:9,22 91:22 149:22

**suggest** 10:18 52:21

**Suite** 131:8

**summary** 22:4 58:14,18

**supervisor** 46:8 47:9

**support** 22:3 24:21 96:20

**supporting** 94:13,17

**supports** 103:23

**supposed** 40:9 58:19 142:23

Victor Manuel Ramirez Najera vs. Experian Information Solutions Inc. -
30(b)(6) Experian Information Solutions Inc. - Teresa Iwanski

November 14, 2025
Index: suspect..undergo

**suspect** 30:13 153:21

**suspended** 109:22,24 110:3

**suspicious** 45:2,12,16 46:13

**swear** 7:5

**swearing** 123:17

**sworn** 7:6,11

**system** 35:18 36:7 37:12 143:12 146:22

**systems** 77:20 138:18

**T**

**T-E-R-E-S-A** 7:22

**table** 10:6 58:3 114:16

**takes** 23:10,20 25:5 35:3 53:25 55:22 85:14 121:7 124:22

**taking** 91:5

**talk** 19:11 23:19 79:5 92:25 127:7,8 132:22 153:6

**talked** 141:14

**talking** 42:24 52:17 56:15 62:23 71:11,14 83:22 89:23 98:16 111:13 116:21,22 119:3 125:17 126:1 128:20 132:10 136:15 139:1,2 142:6 151:16,17

**talks** 116:3 117:15,20 135:2 140:16,21,25 141:4, 8

**task** 82:13

**tasks** 75:15 112:14

**taught** 45:16

**telephone** 131:8

**tells** 146:14

**ten** 132:23

**tend** 31:18

**tendency** 9:1

**Teresa** 7:10,22 89:11 154:25

**term** 44:14 59:3,6,12 61:15 134:24

**terminate** 153:20

**terminated** 61:1 110:6 137:25

**terminates** 110:4

**terms** 9:6 42:12 55:15,21 120:10,20 134:12,21

**terrifying** 85:1

**terrorism** 38:16

**testified** 7:12 26:12,18 57:13 80:25 83:10 133:16 145:21

**testify** 8:7,10,14 12:9 148:18

**testifying** 14:24 101:2

**testimony** 12:19 19:7,10 20:25 24:19 40:18 55:8 62:22 63:13 79:24 91:16 99:12,19 100:9 104:25 105:9 107:14 115:13,14 119:14 127:13 133:19 137:6 151:20,21 152:5 153:14,15

**tests** 9:18

**Texas** 6:25 131:8

**text** 23:5 55:5 57:12 140:7

**there'd** 123:19

**thereof** 9:10 127:3

**thereto** 139:6

**thing** 10:23 26:11 61:2,5 93:1 94:22 127:9 141:8

**things** 13:15 14:3 25:14 29:14,20 32:15 34:4 40:5 43:7 44:3 46:16 47:3,24 51:25 56:22 57:18,20 59:23 65:12 72:14 74:22 76:21 77:11 84:1 87:12 103:10 104:9 110:10,12 116:6 120:9 125:8 127:25 136:7 140:25

**Thomson** 39:12

**thought** 92:3

**time** 6:4 7:25 10:17 14:21 15:2 17:17 24:15 29:21 32:25 33:3,12 34:3,14,15, 18,23 53:6,9,12 60:22 71:16 76:8 79:14 92:3 93:11,14 96:13 99:21 105:16 107:7,19 109:25 127:18,24 129:17,25 130:10,12,25 131:9 132:13 149:24 154:21

**timeframe** 128:3 129:13

**timely** 138:7

**times** 9:1 29:17 89:8 96:13 129:3

**timing** 28:15 92:25

**titled** 104:13 108:3 110:19 117:3

**today** 6:9 7:17 8:7,18 11:6,24 12:13,25 15:23 17:21 20:20 21:22 25:19 28:6 32:2 33:15,21 42:1 81:19 82:3 92:18 101:22 104:25 105:3 126:15,17 128:4,11 129:5 130:17 133:16 136:10 141:23 148:18 150:22 151:10,19

**today's** 12:2 15:15 92:4 97:13 127:13 133:20

**told** 88:18 89:19 106:22 115:12 147:12

**tools** 59:24

**top** 44:22

**topic** 13:11,13 51:9 76:15 127:1 130:3,4 132:20

**topics** 11:24 12:1,10,14, 17,20,24 13:3,7,16,18 14:9,17 15:15 16:22 17:3, 5 19:9 126:16

**totally** 152:11

**touch** 19:5

**touched** 19:21

**traded** 72:25 73:5,15,16

**training** 45:8,17,18

**transaction** 143:18

**transcript** 6:1 14:13 16:22 17:8,14,25 19:21 54:20 71:12 90:1 128:7 153:12 154:10,16

**treating** 86:11

**treats** 56:11

**trend** 81:9

**trends** 24:8 85:23

**tribal** 49:2 50:17

**trivia** 8:21

**true** 18:17,21 20:5,15,16 23:11 28:4 30:2 32:15 52:8 54:5 66:23 67:17 73:17 94:21 95:5 98:13 112:12 114:13 126:19 127:21 129:19 130:19,20 137:9,22 151:15

**trust** 83:23,25 87:24

**trustworthy** 122:17 127:23

**truthfully** 8:7,11,14,19

**type** 27:5,6 38:3 41:9 44:21 45:17 46:24 47:11 49:1 54:4 61:25 67:21 76:20 79:14,18 81:25 94:20 100:1 102:17 105:10

**types** 26:7 43:1 44:5,8,11 47:14 49:11 55:17 58:20, 21 62:19 68:24 74:1 103:10 111:24 120:24 131:17

**typical** 9:22 45:17

**typically** 133:11

**typo** 27:7

**U**

**ultimate** 26:3 90:18

**ultimately** 71:22 144:2

**unable** 8:7 112:15

**unacceptable** 41:3 42:13,15 43:6 44:14 45:1 57:16 116:3 120:24

**undergo** 72:8

APPENDIX 1793

Victor Manuel Ramirez Najera vs. Experian Information Solutions Inc. -
30(b)(6) Experian Information Solutions Inc. - Teresa Iwanski

November 14, 2025
Index: understand..zoom

**understand** 9:7,9 11:22 12:4 13:21,25 14:20,21 15:5,22 16:5 18:9 19:12, 15,18 20:11 21:25 24:20 25:10 26:12,21,22 27:12 28:21 29:11 31:3,11 32:1, 11 34:9 36:6 38:23 40:14 41:14 43:5,21 47:17,22 51:13,20 53:17 54:18 55:20 59:20 63:4,6,24 64:25 67:24 68:18 71:18 72:20 77:16 79:4 84:17,18 85:4 86:2 87:4,7 88:5,23 90:9,13,23 93:17 96:2,4 99:5,11 100:25 101:5 105:24 107:2,10 113:19 116:16 119:12 121:4,20, 21 124:2,19 132:16 142:15 152:3,4

**understanding** 12:6 15:14,16 17:12 18:2,12 20:21 31:17 32:4 33:4 35:17 36:14,21,22 38:5 40:7 44:8 45:11,12 47:20, 21 48:1,5 50:11 51:9 52:1 54:6 55:8,14 62:22 65:3 68:1,2 69:13,22 70:1,11, 15 71:16 72:7,23 73:18 74:7 75:12,20,23 77:23 79:17,25 80:13,15,17,23 81:5,22 88:12 90:21 92:23 96:8 98:1,7,14 99:4,16 106:10,12,15 107:4,16 109:14,17,19 110:25 115:14,21 119:4,15 120:5 126:14 130:9 141:13 150:14 151:7

**understands** 148:23

**understood** 9:13 18:7 19:4 33:15 34:19 40:11,18 44:17 49:13 51:4 52:20 55:5 63:21 70:8 79:23 81:4 90:20 91:10,16 100:13 101:20 107:13 111:18 119:13 126:6 137:5,16 145:13 151:21

**unfamiliar** 9:7

**unions** 73:7,9,12,13 110:11

**United** 40:2,15,16 117:17

**universe** 16:6 19:15

**unprepared** 127:8,10 130:17 132:15

**unrelated** 122:8

**unusual** 24:8 44:20

**update** 145:18

**updated** 148:17

**utilizes** 22:24

---

**V**

**Validate** 70:22

**validates** 112:7

**validating** 59:17 103:22

**validation** 94:8,11 112:8

**variation** 9:10

**variations** 75:22,25

**vendor** 77:1,19

**Venezuela** 39:21

**Verbatim** 14:9

**verbiage** 124:10 137:10

**verification** 112:6

**verified** 150:3

**verify** 22:25 64:2,7,12

**verifying** 64:21 114:6

**vernacular** 32:11

**version** 8:2 33:16

**versus** 10:13 31:13

**viable** 50:24

**violate** 63:10

**violated** 62:11

**violation** 61:1

**violations** 62:17,25

**virtual** 60:4 71:1,20 72:22 73:20,22,24 74:5,8,15 75:4 77:17 81:14,17,23,24

**visit** 80:20

**visits** 81:12

**voice** 84:24

**volume** 84:13

---

**W**

**wanted** 19:3 33:14 34:18 49:12 79:3 109:4

**warranties** 138:4,15 139:5,6

**warrants** 138:5

**warranty** 138:22

**Washington** 6:18

**watch** 38:16 51:25

**water** 10:21

**ways** 59:21 81:25

**website** 45:25 56:18,19 65:12

**websites** 47:5 50:18

**week** 15:6

**weeks** 15:16

**Wells** 65:17 143:21,22 144:11

**windows** 9:25 10:2

**wing** 10:10

**withstanding** 34:22

**Wittington** 131:8

**word** 98:21

**worded** 137:11

**wording** 136:11,18 137:1

**words** 9:4 19:3,14 33:14 36:18,24 42:1 51:23 52:11 55:12,19 66:18 79:7 98:12,13 107:10 108:16 109:4 111:18 120:8 125:20 128:8 139:3

**work** 65:22 81:15 89:8 111:15

**worked** 20:13 62:24

**working** 113:4

**World-check** 39:12

**worries** 38:10

**would've** 32:21

**writing** 99:13

**written** 96:12 99:7 102:8 107:22 112:11

**wrong** 8:5 27:5 29:18 88:21 95:23 138:25 144:11,12,19 146:8,14

---

**Y**

**year** 22:11 71:6 106:15,24 110:7 114:12 115:6

**yearly** 31:9 106:2 107:6, 7,18 113:22

**years** 17:16 32:22 34:15 67:12 88:20 132:23

**years'** 17:18

**York** 9:25 73:1

**Youssef** 6:10 29:1

---

**Z**

**zoning** 60:14 112:5

**zoom** 11:10 81:25

# EXHIBIT U

# FILED UNDER SEAL

(Appendix 1795-1803)

# EXHIBIT V
# FILED UNDER SEAL

(Appendix 1804-2074)

# EXHIBIT W

# FILED UNDER SEAL

(Appendix 2075-2203)

# EXHIBIT X

## FILED UNDER SEAL

(Appendix 2204-2313)

# EXHIBIT Y

# FILED UNDER SEAL

(Appendix 2314-2354)

# EXHIBIT Z

---

# PLAINTIFF'S EXPERT WITNESS REPORT

---

---

*Victor Manual Ramirez Najera*
*v.*
*Experian Information Solutions, Inc., et al.*

---

Douglas A. Hollon
September 22, 2025

Credit Experts of North Texas, LLC
1101 Mockingbird Dr.
Aubrey, TX 76227

APPENDIX 2356

**INTRODUCTION**

This Expert Report was prepared pursuant to Federal Rules of Civil Procedure 26(a)(2) regarding the case of ***Victor Manuel Ramirez Najera v. Experian Information Solutions, Inc., et al.,*** U.S. District Court, Northern District of Texas (Case: 4:25-cv-00443-P).

I have been asked to provide an opinion of the Consumer Reporting Information, and other related documents pertaining to Victor Manuel Ramierz Najera, ("Plaintiff" or "Mr. Ramirez Najera") I have also been asked to opine on the "Defendant's," Experian Information Solutions, Inc. ("Defendant" or "Experian"), actions regarding Victor Manuel Ramirez Najera's  consumer file/report with said Defendant.

**QUALIFICATIONS AND METHODOLOGY**

I am the Owner of Credit Experts of North Texas, LLC. I have worked in the consumer reporting industry since 2005 where I began working with Experian Information Solutions, Inc. Experian is a national Consumer Reporting Agency, with its United States corporate headquarters located in Costa Mesa, CA. During my time at Experian I was based in Allen, TX at the National Consumer Assistance Center (NCAC), now known as My Customer Experience (MCE). This location is the main dispute processing center for Experian. Initially, I assisted consumers with their mail or telephone disputes of items listed on their consumer file. In 2006, I was promoted to Consumer Affairs Special Services (CASS), now known as Experian Consumer Affairs (ECA). In ECA, I handled escalated credit report disputes. These escalated disputes were submitted on consumers by attorneys, State Attorney General's Offices, the Federal Trade Commission, Consumer Financial Protection Bureau, Better Business Bureau, members of Congress, and other government agencies. I also performed duties as the Government Liaison working with Experian's lobbyists, I was responsible for assisting "High Profile Consumers", and I also performed duties as an Alternate Custodian of Records.

In addition to my dispute training, I received specialized training involving fraud (identity theft) disputes and mixed file disputes. I also gained expertise in Experian's database operations, called File One, which is the name of the database used to store the consumer reporting data for the 200 million plus consumers in the United States. While employed at Experian, I was informed by management that I was considered a Subject Matter Expert and that Experian's Law Department designated me as an expert witness. As a result, I served as a company representative witness under Rule 30(b)(6), testifying in approximately 20 Fair Credit Reporting Act (FCRA) cases. My experience and training also included credit scores and score factors enabling me to explain these to consumers, attorneys, federal and state congressmen, State Attorney General personnel, and other government agencies. Furthermore, my experience and training included the review and investigation of Reseller disputes and understanding of

2

information received from Public Record Vendors, including the reliability of that information.

Along with my experience with Experian, through the study of regulatory agency publications, case law, deposition transcripts, company manuals or publications, and other related documents, I possess extensive knowledge of other Consumer Reporting Agencies' (CRAs) and Data Furnishers' credit dispute operations. I am well-versed in the policies, procedures, processes, and operations, of Experian, Equifax, TransUnion, Innovis, and other CRAs and Data Furnishers, as well as the rules, regulations, and requirements for complying with the Fair Credit Reporting Act within the industry standards.

While working in the Consumer Reporting Industry for over 19 years, I have assisted tens of thousands of consumers. In 2022, I was invited to speak at a credit convention, along with other credit experts, and in 2024, I was invited to speak at events, speaking alongside banking and mortgage industry personnel, to educate consumers about the Consumer Reporting Industry. Also, as a Credit Expert Witness, I have been qualified by Federal and State courts in Fair Credit Reporting Act (FCRA) litigation.

In addition to my specialized training in the Consumer Reporting Industry, I have earned a Bachelor's of Science Degree in Business Finance from Liberty University, and I have received Fair Credit Reporting Act (FCRA) Certifications (CRAs and Data Furnishers) from the Consumer Data Industry Association (CDIA).[1] Furthermore, I completed a 35-hour training course and earned the Credit Analyst Certificate from the New York Institute of Finance, I have completed over 60 hours and earned the certificates in Credit Risk Modeling and Credit Scorecard Development from SAS Institute, Inc., and I have completed the American Bankers Association Certificate in Lending Compliance for Compliance Professionals.

As an expert, I possess and use specialized knowledge, skills, experiences, training and education, which I apply with a methodology which helps with the trier of fact to understand the evidence and/or facts of a case involving the industry standards of consumer reporting, scores, and the impact of those reports and scores on a consumer's creditworthiness and/or character. Application of my specialized knowledge, skills, experiences, training, education and methodology are to allow a proper frame of reference of consumer reporting, and to evaluate whether the information reported was reported using industry standards, or if the standards were disregarded. Additionally, my analysis and opinions are intended to help the trier of fact to understand the systematization of inaccuracy in Plaintiff's case. Further, another purpose of my specialized knowledge, skills, experiences, training, education, plus methodology, is to help with the trier of fact of damages incurred by Plaintiff regarding

---

[1] "The Consumer Data Industry Association (CDIA) is the voice of the consumer reporting industry, representing consumer reporting agencies including the nationwide credit bureaus, regional and specialized credit bureaus, background check companies, and others. Founded in 1906, CDIA promotes the responsible use of consumer data to help consumers achieve their financial goals, and to help businesses, governments and volunteer organizations avoid fraud and manage risk." https://www.cdiaonline.org/about/about-cdia/ The CDIA FCRA Certification is a self-paced, interactive online course which is comprised of five training modules and a final exam.

3

creditworthiness and/or character attributable to Defendant's actions/inactions with the reporting of information.

My curriculum vitae is attached to this report.

## SUMMARY OF OPINIONS

In my opinion, Experian failed to maintain adequate procedures to ensure accuracy in its reports regarding Plaintiff.

In my opinion, Experian failed to have adequate procedures, or mechanisms, to prevent mixed files from being created.

In my opinion, Experian wrongly created a mixed/merged file between Mr. Ramirez Najera and another consumer, Plaintiff's father, and as a result, Experian reported information about another consumer on Mr. Ramierz Najera's Experian file to third-parties.

In my opinion, Experian failed to conduct adequate reinvestigations into Plaintiff's disputes.

In my opinion, Experian failed to review and/or consider the information that Plaintiff provided to Experian through his dispute letter.

In my opinion, Experian's failure to have adequate procedures to ensure accuracy and failure to conduct adequate investigations/reinvestigations resulted in inaccurate, damaging information remaining in Plaintiff's Experian file. If Experian had adequate procedures to ensure accuracy and conducted adequate investigations/reinvestigations, it would have maintained an accurate credit file for Plaintiff as required by the FCRA.

In my opinion, Experian's failure to have adequate procedures to assure accuracy and failure to conduct adequate investigations/reinvestigations resulted in inaccurate, damaging information being reported about Plaintiff by Experian. If Experian had adequate procedures to assure accuracy, it would have verified the inaccurate information before reporting the information on Plaintiff's file/report. Because it did not, when Experian sent reports about Plaintiff to third-party users, the reports falsely contained information about another consumer.

As of the writing of this report, it is unknown if Plaintiff's file was fully corrected and protected by Experian to prevent the storing and reporting of another consumer's information on Plaintiff's file/report. If Experian did take the steps to unmerge/unmix these two consumers, Plaintiff and his father, it would place a "Do Not Combine"

4

APPENDIX 2359

indicator on Plaintiff's file. However, Experian has known about its mixed/merged files for decades yet has refused to implement the simple fix of matching a full SSN or other criteria which would have prevented this merged/mixed file from occurring in the first place.

## INTRODUCTION AND FACTUAL BACKGROUND

In my opinion, Mr. Victor M. Ramirez Najera's Experian file was mixed with his father, Victor Manuel Ramirez.

In May 2023, Mr. Ramirez Najera applied for housing with Appfolio in Tennessee. Appfolio requested information for its Tenant Screening Reports from other consumer reporting agencies, including Experian. Appfolio's Tenant Screening Reports includes credit information that was obtained from Experian. In May 2023, Experian sold a consumer report to Appfolio pertaining to Plaintiff.

On or about May 22, 2023, Appfolio took the information provided by Experian and prepared a Tenant Screening Report about Plaintiff, Mr. Ramirez Najera, and provided the report to its client, Alexander Forrest Investments, for a studio apartment located at Hartford House Apartments, in Nashville, TN.

Upon Plaintiff reading the Appfolio Tenant Screening Report, Mr. Ramirez Najera discovered that there was credit information on the report, provided by Experian, that was inaccurate and misleading for the account information did not belong to him. The report contained two mortgage accounts, Rushmore Loan Management Services (aka Nationstar Mortgage) and PennyMac Loan Services, with both accounts reported open in 2009 when Mr. Ramirez Najera was 13 years of age.

Upon review of the report, Mr. Ramirez Najera discovered that the inaccurate information on his consumer report was not his, but the information reported by Experian actually belonged to his father.

Beginning in or around February 2024, Mr. Ramirez Najera disputed the inaccurate mortgage accounts with Experian.

## Consumer Reporting Agency (CRA) Background

The definition of a consumer reporting agency (aka credit reporting agency, credit bureau) from the Fair Credit Reporting Act (FCRA) is: "means any person [company or business] which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer

5

APPENDIX 2360

reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports."[2]

The "Big 3" CRAs, Nationwide CRAs, are Equifax, Experian, and TransUnion. There are other CRAs that operate in the United States that may be lessor known, such as Innovis, Lexis-Nexis, RentGrow, Clarity Services, ChexSystems, CoreLogic Credco, SageStream, and others. The Consumer Financial Protection Bureau (CFPB), a federal regulatory agency who monitors the consumer reporting industry, has a list of over 60 credit reporting agencies that operate in the United States. The Federal Trade Commission (FTC) is another federal agency who oversees or monitors the consumer reporting industry.

The CRAs are not government agencies. The CRAs are companies who operate on a for-profit basis, and are subject to the decisions of company executives, boards of directors, shareholders, and/or stakeholders. Equifax and TransUnion are publicly traded companies on the New York Stock Exchange. Experian is a publicly traded company on the London Stock Exchange. TransUnion's headquarters is located in Chicago, IL; Equifax's headquarters is located in Atlanta, GA; and Experian's North American headquarters is located in Costa Mesa, CA.

The Big 3 CRAs compile and store data in their databases on over 200 million consumers in the United States. This data is used to create credit files. This data is used to create credit files and consumer reports or credit reports. CRAs sell credit reports, or information from credit files, to generate income. Consumers can purchase his or her credit file from a CRA, however, the CRAs true customers are not consumers, but Data Furnishers or Subscribers. The CRAs' primary purpose is to store credit information and to sell this information to its customers, i.e., businesses and government agencies. CRAs generate billions of dollars each year from selling consumer data to Subscribers stored within their respective databases.

### Data Furnishers / Subscribers Background

Data Furnisher / Subscribers are those companies or businesses who enter into a contractual agreement with a CRA to provide data to a CRA and/or are able to receive data from a CRA. This contractual agreement means that the business or company is "subscribing" to the service of accessing/storing/receiving the data in the database held by the CRAs. Essentially, the CRAs are the keeper of the data, and the subscribers can access the data as long as they pay the CRAs for access. Types of Data Furnishers / Subscribers include banks, credit unions, credit card issuers, collections agencies, mortgage lenders and servicers, and auto loan lenders. There are also public record vendors who will gather data, such as bankruptcies and tax liens, and sell this data to CRAs, so the CRAs can store the data in their database.

---

[2] Fair Credit Reporting Act 15 U.S.C. § 1681, et seq.

## <u>Consumer Reports</u>

The Fair Credit Reporting Act defines a consumer report as:

"any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for (A) credit or insurance to be used primarily for personal, family, or household purposes; (B) employment purposes; or (C) any other purpose authorized under section 604 [§ 1681b]."[3].

Consumer Reports are published by CRAs. The consumer reporting industry is an integral part of the US economy and people's lives are affected by what is published in a person's credit report. Let's say you wish to purchase a home, auto, rent an apartment, or attain insurance, it is likely a credit report is involved in the decision-making process for prospective lenders or landlords. When a prospective creditor or lender requests a credit report from a CRA, the following information is typically compiled and provided in the report:

- **Personal Information of the Applicant**: Name, Address, SSN (may be redacted), Date of Birth
- **Credit History**: Account Names, Numbers, Payment History, Balance, Original Loan Amount or Credit Limit, Date Account Opened
- **Public Record Information**: Bankruptcies, Tax liens
- **Inquiries**: Hard or Soft inquiries of those entities who have received a person's credit report
- **Statements**: Fraud or Active-Duty Alert, Personalized Consumer Statement

In my opinion, most credit decisions are based upon the credit report provided to a prospective lender/landlord. The decision could be as simple as approve or decline, but other factors are affected by the credit report and score. For example, if the loan or credit is approved, these areas may be affected by the credit report and score provided: loan amount, credit limit, payment amount, deposit requirements, A.P.R. and Interest rate. Again, the credit report is an integral part of many people's lives, and it is important for the consumer report to be accurate.

---

[3] § 603. Definitions; rules of construction [15 U.S.C. § 1681a]; https://www.ftc.gov/legal-library/browse/statutes/fair-credit-reporting-act

7

**Credit Reporting Resource Guide (CRRG)**

The CRRG explains the roles and responsibilities for reporting of credit reporting data by stating: "Credit reporting information is sensitive data. The issues of accuracy and completeness of information and fairness to consumers are not just a concern of the consumer reporting agencies; credit grantor participation is also required."

The CRRG identifies specific guidelines for data furnishers to report credit information using a format called Metro 2. **Metro 2** is a standard electronic data reporting format that is used by the consumer reporting industry, CRAs and Data Furnishers, to report credit data. Metro 2 is the language used, and Metro 2 was adopted as the standard language so each entity reporting credit data can understand the information being conveyed.

Metro 2 formatting and codes are published in the "Credit Reporting Resource Guide" published and sold by the Consumer Data Industry Association (CDIA). This guide is created by the "Metro 2 Format Task Force," representatives from Equifax, Experian, Innovis, and TransUnion whose "mission is to provide a standardized method for reporting of accurate, complete and timely data." All participants, CRAs and Data Furnishers, reporting in the Metro 2 format and codes are encouraged to purchase and train with this guide.

Along with the Metro 2 language, there are messages used to transfer information. The messages are:

- **Batch Reporting** – this is the monthly reporting of credit data from the Data Furnisher to the CRA. A batch report may contain hundreds of consumers credit data compiled and reported by a Data Furnisher to the CRA.
- **Automated Consumer Dispute Verification (ACDV)** – this is an electronic message used during the dispute process. This message is generated and sent by the CRA to the Data Furnisher. Once received, the Data Furnisher is supposed to investigate the dispute and reply to the CRA with an answer.
- **Automated Universal Data (AUD)** form – this is an electronic message sent from a Data Furnisher to a CRA outside the normal monthly reporting cycle to update or delete credit data for a specific consumer.
  For example, let's say the Data Furnisher normally reports their batch information on the 5th of each month. On the 10th, the Data Furnisher's customer contacts them to update an account (maybe pay the account off). Instead of waiting until the 5th of the next month, to update the account with the CRA with batch reporting, the Data Furnisher could send an AUD to the CRA to tell the CRA to update the specific consumer's account data.
- **Carbon Copy** – this electronic message is used by a Data Furnisher to update or delete credit data for a specific consumer stored by other CRAs not involved in the ACDV dispute process.
  For example, let's say ABC company received an ACDV from a CRA, called XYZ company. After ABC company investigates and responds to XYZ company with the

8

ACDV, ABC company can also send to any other CRAs they report credit data to, the account update using a Carbon Copy.

It should be noted that the CRRG was created by the CDIA (Consumer Data Industry Association) which is not a government agency. The standards set by the CRRG are not state or federal law, and the Metro 2 format does not supersede federal law.

**Accuracy & Completeness**

Senator William Proxmire, who is considered by some to be the Father of the FCRA, indicated that inaccurate and misleading information was serious problem in the credit reporting industry. He stated:

"Perhaps the most serious problem in the credit reporting industry is the problem of inaccurate or misleading information. There have been no definitive studies made of just how accurate is the information in the files of consumer reporting agencies. Even if it is 99 percent accurate—and I doubt that it is that good—the 1 percent inaccuracy represents over a million people. While the credit industry might be satisfied with a 1 percent error, this is small comfort to the one million citizens whose reputations are unjustly maligned. Moreover, the composition of the 1 million persons is constantly shifting. Everyone is a potential victim of an inaccurate credit report. If not today, then perhaps tomorrow."[4]

Senator Proxmire further indicated that there were five types of inaccuracies where abuses were happening that required a legislative response. The five types of inaccuracies were noted as follows: the confusion of information about persons with similar or identical names, biased or one-sided information, malicious gossip and hearsay, computer errors, and incomplete information.

The Consumer Reporting Agencies and Data Furnishers are to "verify" information as part of the investigation / reinvestigation process. According to the Oxford Languages Dictionary, the word "verify" means "make sure or demonstrate that (something) is true, accurate or justified."

The Consumer Financial Protection Bureau (CFPB), who regulates the consumer reporting industry, has stated, "both furnishers and CRAs have independent obligations under the FCRA related to the accuracy of information and to the investigation of consumer disputes."[5]

In my opinion, perhaps the most important standard in consumer reporting industry is accuracy. If the consumer reporting information is inaccurate, then it can harm consumers, financial institutions, users of consumer reports, and possibly, the economy as a whole.

---

[4] 91st Congress, 1st Session 1 (1969) and FTC Decisions 1981
[5] CFPB Compliance Bulletin 2016-01, dated February 3, 2016

9

In the Consumer Reporting Resource Guide (CRRG), published by the Consumer Data Industry Association (CDIA)[6], the trade association for the consumer reporting industry, in the "Responsibilities and Roles" section, its states:

"Credit reporting information is sensitive data. The issues of accuracy and completeness of information and fairness to consumers are not just a concern of the consumer reporting agencies; credit grantor participation is also required. Federal and state laws already regulate certain aspects of credit reporting. In order to protect your ability to conduct business without the further intervention of external forces, you must participate in the accuracy process.

Both credit grantors and consumers depend on consumer reporting agencies to acquire and maintain accurate credit histories."

Note: CRAs, like Experian, contributed to the creation of the CRRG.

Accuracy and completeness are supposed to be a concern for both CRAs and Data Furnishers (Credit Grantors).

Further in the CRRG, the term "Accuracy" is defined:

The 2010 FACT Act Data Furnisher rules define the term "Accuracy" to mean that information that a furnisher provides to a consumer reporting agency about an account or other relationship with the consumer correctly:

• Reflects the terms of and liability for the account or other relationship;
• Reflects the consumer's performance and other conduct with respect to the account or other relationship; and
• Identifies the appropriate consumer.

Accuracy's importance is emphasized throughout the consumer reporting industry through such common items as the subscriber contracts and user agreements between CRAs and Data Furnishers.

Using the standards promoted in the CRRG, regarding the accuracy of Plaintiff's file, Experian inaccurately reported information about Plaintiff that belonged to another consumer.

In my opinion, Defendant's continued actions to not adequately have and maintain policies and procedures, or mechanisms, to **prevent** mixed files, demonstrated its disregard for accuracy.

In the past 19 plus years of working in the Consumer Reporting Industry, I learned many things. Below are some of the things I have learned:

---

[6] https://www.cdiaonline.org/regulatory-compliance/. CRAs, like Experian, Equifax and TransUnion, contributed to the creation of the CRRG.

**Cost Driven** - In my opinion, many operation decisions by CRAs are cost driven from data monitoring to the Automated Consumer Dispute Verification (ACDV) process to deceased verification/reporting.

Regarding the creation and reporting of mixed files, in my opinion, Experian has demonstrated it is not willing to undertake and/or implement the necessary protocols in its database to prevent mixed files. Through my experience and knowledge, I saw where Experian did not wish to spend the resources (time, money, effort, etc.) to update its File One database to prevent mixed files. I watched thousands of consumers who had mixed files contact Experian by letter or telephone, and Experian may or may not correct the file.

In my opinion, Experian's continued actions, for over 30 years, to not update its database to **prevent** mixed files, demonstrates its reckless disregard for accuracy.

## Impact of Inaccuracies on Credit Report

In 15 U.S.C. 1681a, a "Consumer Report" is defined as "written …communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, …character, and general reputation…."

With my experience and knowledge, it is my opinion, consumers have faced certain obstacles with obtaining credit due to the misreporting on a credit report. The effects of the reporting of inaccurate information on a credit file may cause higher interest rates on loans, the reduction of credit limits on credit card accounts, higher insurance rates, denial of housing, or the possibility of not being selected for certain employment positions.

In this case, Plaintiff's consumer reports were sent to third parties, which included the inaccurate accounts that did not belong to Mr. Ramirez Najera as well as, names, employment, and telephone numbers that did not belong to Mr. Ramirez Najera. In my opinion, the inaccurate information would have a negative impact on Plaintiff's creditworthiness or character. In my opinion, the substantial factor in denials or less favorable credit terms would have to have been the inaccurate information listed on Plaintiff's Experian file/report.

My opinion is supported by reviewing Mr. Ramirez Najera's Experian Credit Reports, and other related documents in this case.

Consumer Reporting Agencies, like Experian, are aware of the effect and consequence of credit errors to consumers. Although not every consumer may have an actual inaccuracy like Plaintiff, there have been in my experience many instances where consumers did have inaccuracies on their report. I recall listening to tens of thousands of persons on the telephone pour out their hearts and display how distraught they were over the misreported items on their credit files. I recall reading tens of thousands of letters of consumers explaining the pain and anguish they were experiencing because

11

APPENDIX 2366

of the misreported items on their credit reports. I remember reading or hearing about the struggles of persons attempting to make a better life for themselves, but they could not qualify for the mortgage loan or denied rental housing to provide a good home for their family; or, they could not qualify for an automobile loan to provide reliable transportation for their family; or, they did not get the job offer for their dream job, so they could better take care of their family. All because of the incorrect items on their credit reports.

## **Credit Scores**

Credit scores are a valuable tool in the credit reporting industry. Creditors rely on credit scores in the credit decision-making process. Credit scores are typically a three-digit number which represents a person's credit worthiness. Over the years there have been many types of scores used by creditors. The scores are: Beacon, Plus Score, Credit Optics Score, RiskView Score, Anthem Score, Credit Vision Score, FICO Score and Vantage Score. One thing to keep in mind about scores is that scores can be tailored to what is important to the creditor using a specific score. An explanation of this point is shared below. FICO Scores and Vantage Scores are the most widely used scores in the credit industry. These two scores are explained further below.

FICO Score

FICO (Fair Isaac Company) was founded in the 1950s and created its first credit scoring system in 1958. In 1981, FICO introduced the first FICO credit bureau risk score. In 1991, the FICO credit bureau risk scores were made available to the Big 3 CRAs, Equifax, Experian, and TransUnion. In 2005, FICO announced it had sold its 10 millionth credit score to U.S. consumers through myFICO and its partners. In recent years, FICO scores are used by 90% of the top lenders.[7]

FICO Score has a range of 300 – 850 with a score in the higher score range allowing a consumer to qualify for many credit products.

---

[7] https://www.myfico.com/credit-education/blog/history-of-the-fico-score ; https://www.fico.com/en/history

12

APPENDIX 2367



When a creditor is evaluating whether to extend credit to a consumer, the FICO score model used to evaluate a consumer's overall credit report, will follow the criteria below



8

The precise workings of the FICO score are highly proprietary and therefore closely guarded. However, the general parameters relating to creating a FICO score are publicly available:

**35% -- Payment history.** Late payments; i.e. credit cards, mortgages, installment loans, etc.; How overdue delinquent payments are, currently or past; Amount of money

---

8 https://www.myfico.com/credit-education/whats-in-your-credit-score

13

still owed on delinquent or collections accounts; Number of past due accounts, plus any public records; length of time passed since the derogatory items were reported on the credit file; number of accounts being paid on time.

**30% -- Amounts Owed.** The amount of available credit used. The amount used on all accounts listed on the credit file, plus the amount used on different types of accounts (i.e., credit cards vs. installment loans); the number of accounts that have a balance; credit utilization of revolving credit accounts (amount of credit available vs. balance)

**15% -- Length of Credit History.** The length of time credit accounts have been established and listed on the credit report (oldest account, newest account); also, the length of time since a credit account has been used.

**10% -- How Much New Credit.** Based upon research, opening numerous credit accounts in a short amount time might indicate a significant risk; a red flag to lenders.

**10% -- Credit Mix.** FICO scores consider a person's mix of types of credit, i.e., mortgage loans, retail cards, credit cards, installment loans, etc.

<u>Vantage Score</u>

In 2006, the VantageScore, a consumer credit-scoring system, was created in a joint venture of the Big 3 CRAs (Equifax, Experian, and TransUnion) and VantageScore Solutions, LLC. In my experience, skills, and knowledge, the VantageScore was created to be an alternative to the FICO Score and to compete against the FICO Score. To be clear, the FICO Score and the VantageScore are competitors, and FICO didn't assist in the creation of the VantageScore.

Initially, the VantageScore had a unique score range and used a letter system similar to the grading system used in schools.

A: 900–990
B: 800–899
C: 700–799
D: 600–699
F: 501–599

This score range was used from 2006 to 2013, and from my experience and knowledge caused a lot of confusion amongst the public. Consumers had a difficult time understanding the VantageScore score and model. As a result, in 2013, VantageScore 3.0 was introduced with a score range of 300 – 850. In 2017, VantageScore 4.0 was introduced to the public.

The general parameters of VantageScore 4.0 are:

14

| Factor | Weight |
| --- | --- |
| Payment history | 41% |
| Depth of credit | 20% |
| Credit utilization | 20% |
| Recent credit | 11% |
| Balances | 6% |
| Available credit | 2% |

*Data source: VantageScore Solutions.*                                                                9

**41% -- Payment history.** Are any late payments present on the credit report. The more late payments a person has, the more serious the impact on the score.

**20% -- Depth of credit.** Age of the credit accounts on file, i.e. average age of accounts, oldest and youngest account ages. Older accounts help the credit score. Also, measures types of credit, i.e., revolving vs. installment.

**20% -- Credit utilization.** This measure the amount of credit that is used and how much credit is available.

**11% -- Recent credit.** This measures the number of new credit accounts and the number of hard inquiries. Hard inquiries represent a credit application being submitted. Too many hard inquiries within a certain amount of time could indicate high risk.

**6% -- Balances.** This looks at the total balances on all the credit accounts, both current and delinquent. High balances can hurt the credit score.

**2% -- Available credit.** This category looks at how much credit is available on a consumer's revolving credit accounts.

In addition to the scores, when a creditor receives a score, there will typically be factors given which explain the reasons for the credit score.

There are dozens of score factors. Some examples are:

- -38 SERIOUS DELINQUENCY, AND PUBLIC RECORDS OR COLLECTION FILED (CODE 038)

- -13 TIME SINCE DELINQUENCY IS TOO RECENT OR UNKNOWN (CODE 013)

---

[9] https://www.vantagescore.com/press_releases/the-complete-guide-to-your-vantagescore/

15

APPENDIX 2370

- -27 TOO FEW ACCOUNTS CURRENTLY PAID AS AGREED (CODE 027)

- -04 LACK OF RECENT INSTALLMENT LOAN INFORMATION (CODE004)

In my experience, skills, and knowledge, factors are typically given whether the score is low or high and are given even if a person qualifies and receives the loan or credit card.

Explaining credit scores further, mentioned previously are brand name credit scores, i.e. Beacon, Plus Score, Credit Optics Score, RiskView Score, Anthem Score, Credit Vision Score, FICO Score and VantageScore. These brand name scores are the foundational scores but can be expanded into 100s of credit scores. VantageScore has five scoring models, and FICO has 40 scoring models. Since lenders can take the scoring models and tweak the algorithms to fit their business needs, this means there are hundreds of scoring models being used in the banking and credit industry. This would explain how a consumer received different credit scores from different sources.[10]

### Mixed Files

A Mixed file "means a Consumer report in which some or all of the information pertains to Persons other than the Person who is the subject of that Consumer Report."[11]

In my experience and knowledge, a mixed file is a credit file where two or more persons' consumer/credit data is combined onto one report. Mixed files involve consumers who have similar personal identification information, i.e., Name, SSN, Address, and Date of Birth, which are called Mixed File Indicators. Common mixed files involve Father/Son, Mother/Daughter, and Siblings. Mixed files also happen with those persons who have similar names, SSN, addresses, and Dates of Birth. For example, I have seen mixed files for consumers who had similar personal identification and the credit files mixed because they lived in the same city or geographical location. A Consumer Reporting Agencies' (CRA) database uses a matching logic to match accounts with a consumer's personal identification. When a mixed file happens, the CRAs database is not certain what data belongs on which consumer's credit file.

In my experience, in one particular instance, I personally un-mixed a credit file which contained four separate consumers' data on one credit file. Conservatively, of the tens

---

[10] https://www.creditkarma.com/advice/i/how-many-credit-scores-do-i-have ; https://www.bankrate.com/personal-finance/credit/different-types-of-credit-scores/ ; https://www.experian.com/blogs/ask-experian/why-do-i-have-so-many-credit-scores/#:~:text=One%20reason%20there%20are%20so,you%20check%20your%20credit%20scores.

[11] FTC Consent Order, TRW, Inc., USDC, NDTX, Civil Action No. 3-91CV2661-H, filed December 10, 1991

16

of thousands of consumers I have assisted serving in the credit industry, I estimate I personally helped hundreds of consumers with their mixed files.

Mixed files are more common than people believe. In my experience and knowledge, Experian admitted that 3 percent of the database was mixed. Specifically, with Equifax, in 2013, Equifax's expert witness stated that mixed files may occur in 1 – 2 percent of all files.

Also, in 2004, the Federal Trade Commission issued a Report to Congress reporting information regarding mixed files. In this report, the CRAs, including Experian, estimated that as much as five percent of its database contained mixed files.[12]

Two or Three or Five percent is a significant number when there are over 200 million credit files in the United States. Two or Three or Five percent would equal four to ten million credit files being mixed. Four to Ten Million consumers who are affected by nothing they have done. It is the CRA's database that causes the mixed file.

Mixed files are not a new phenomenon. In my experience and knowledge, mixed files have existed since CRAs have been using computer technology. Experian signed a consent order in 1991 containing the definition of a mixed file, which shows that Experian was aware and has been dealing with mixed files for over 30 years.[13] In 2015, Experian, along with Equifax and TransUnion, entered into a settlement agreement with the New York Attorney General's (NYAG) Office, and one of the issues addressed in the settlement agreement was mixed files.[14] The NYAG stated that it received consumer complaints regarding consumers having mixed files with the CRAs, including Experian. With this settlement agreement in 2015, in my opinion, it showed that Experian was aware that mixed files continued to happen with the matching criteria Experian used in its database.

CRAs have personnel trained to un-mix files because mixed files do happen, due to no fault of the consumer. Some examples are:

In an article dated July 24, 2022, published by Experian,[15] a person asked what they should do if they believe their credit file is mixed with another person.

---

[12] https://www.ftc.gov/sites/default/files/documents/reports/under-section-318-and-319-fair-and-accurate-credit-transaction-act-2003/041209factarpt.pdf
[13] FTC v. TRW Inc. (nka Experian), Case 3-91CV2661-H, Filed December 10, 1991
[14] http://nylawyer.nylj.com/adgifs/decisions15/031015settlement.pdf
[15] https://www.experian.com/blogs/ask-experian/separating-credit-reports-of-father-and-son/

17

>  Dear Experian,
>
> **How do you go about repairing credit when it has been commingled with your son? Both father and son have the same name.**
>
> - ILB

**Dear ILB,**

Commingling credit histories, commonly referred to as having a mixed credit file, fortunately is rare in terms of the number of credit reports maintained by Experian and the other national credit reporting companies. When it does happen, it is most often because of the situation you describe —a father and son sharing the same name.

Experian's answer was:

# How Does a Mixed File Happen?

Mixed credit files are caused by two individuals sharing nearly identical identifying information, such as names, addresses, dates of birth and even Social Security numbers.

For example, a father and son may share the same name, with the exception of a generation indicator, such as Jr., Sr. or III. They may also share the same address, be born in the same month and perhaps on or close to the same day of the month. Surprisingly, their Social Security numbers may even vary by only one or two digits.

If the father or son applies for credit but does not provide the generation indicator or other identification elements, it can be quite difficult to distinguish between them, and so account information could appear on the wrong person's report.

I have also seen instances in which mothers and daughters have shared the same name. This is common in some cultures, and can result in the same difficulty.

The same can also happen with siblings, especially if they are twins who share the same date of birth and have similar names.

18

APPENDIX 2373

## Can a Mixed File Be Prevented?

To help prevent the problem, Experian recommends that you always provide complete identifying information, and always use the same name and other identifying information when completing an application. It is essential that the generation identifier always be provided.

The best thing to do when you share a name with another family member is always use your full, given name as it appears on your birth certificate. It may not be the name you go by on a day-to-day basis, but it does help prevent a mixed credit file issue.

Experian explained in this article that a mixed file is rare compared to how many credit files houses in its database. Experian further explained how a consumer can prevent mixed files.

In my opinion, Experian was being disingenuous in their article about mixed files due to the number of mixed files (3%) contained in its database, and placing responsibility of mixed files on consumers, when in-fact, mixed files are created by a CRAs own database and not something a consumer causes.

**Congressional Testimony**

In testimony before US Congress sub-committee, Chi Chi Wu, National Consumer Law Center, testified regarding examples of mixed files:

CFPB Consumer Complaint Database

Mixed file

Georgia complaint

XXXX XXXX is reporting on my credit file and I have never had an account with them. My name is very common and I often have issues with Mixed files. I called XXXX XXXX and was on the phone for over an hour and they cannot find me in their system under any of my information. They also agreed that maybe it is another XXXX XXXX that is accidentally reporting on my credit or this is fraud. I need this removed as there is nothing you have on file with my information. CFPB Complaint No. 4239075, filed March 23, 2021

Florida complaint

I am requesting that you immediately delete information off of my credit report that isn't mine. I have filed an Identity Report and I have attached this document below. Also, I do not recognize these accounts

19

and have never incurred debt with these creditors. Thus, I am requesting that you please verify the validity of these accounts, and remove them once its confirmed that they are not mine. It could also be possible you are mixing up these accounts with someone that has a similar name as me. CFPB Complaint No. 4094395, filed January 26, 2021

## Texas complaint

I've contacted this company; I haven't been able to get ahold of anyone. I've never been to this Radiology company. You can compare my social security number to the social on file with this company as well as my date of birth. Nothing will match, I believe this file may be mixed up with someone else. I've done business or had any services from this business. CFPB Complaint No. 4160271, filed February 23, 2021

## Court cases

## Angela Williams v. Equifax

Angela Williams of Cocoa, FL, had an Equifax report that included at least 25 accounts that did not belong to her. The accounts which had negative information belonged to a stranger with a similar name and Social Security number. Angela spent 13 years trying to get her credit report fixed.

## Julie Miller v. Equifax

Julie Miller of Marion County, Oregon first discovered a problem with her credit report when a bank denied her a loan in early December 2009. Equifax had merged Miller's credit file with a different person who had the same name and a similar Social Security number, but who lived in a different state and who had a bad credit record. Miller alerted Equifax 8 times between 2009 and 2011 to correct the inaccuracies.
https://financialservices.house.gov/events/eventsingle.aspx?EventID=400748

## James Rennick v. Equifax

It was January 2017 and Angela, his high-school sweetheart and wife of five decades, was dying of lung, kidney, bone and brain cancer. He needed a home-equity loan for renovations including a full downstairs bathroom, an air conditioner so Angela could breathe in the Florida heat, and porch screening so his wife could be outside even with her "extreme allergy to the bugs in the area."

A mortgage broker said there was a problem with his Equifax and Experian credit reports. That was the start of an ordeal consumer advocates say is all too common: Rennick's credit-history information was mixed up with that of another man.

The files stated that Rennick was dead, according to the broker. Equifax and Experian, two of the three major credit-reporting agencies gathering data on a person's creditworthiness, had somehow blended his credit history with an unrelated James Palmer, Rennick's 2017 lawsuit said. Rennick was in desperate need of money to help his ailing wife, with an incorrect credit report standing in his way, his lawsuit alleged.

Rennick, 70, passed away in May 2018 with his lawsuit pending. "He died of a broken heart," his daughter Michele Malverty said in a deposition last September. Rennick and his wife were both cremated because there wasn't enough money for the more expensive option of burial, court papers said.

20

APPENDIX 2375

Malverty is preparing for a November trial against Equifax in a Tampa, Fla. federal court.

The other James — James Palmer — resided in Granville, N.Y. and died in 2016 at age 71. The two men shared the same first name, but as the case progressed Malverty would discover that, due to a series of alleged missteps by the companies involved, they shared more than that.

https://www.marketwatch.com/story/this-woman-says-equifax-mixed-up-her-fathers-credit-report-and-destroyed-his-life-now-she-hopes-to-convince-a-jury-2019-10-25

## Charles Michael O'GARA, III, v. Equifax

This case cites: Mr. O'Gara brings this lawsuit alleging purported violations of the Fair Credit Reporting Act ("FCRA") against Equifax. O'Gara avers that when he was eighteen years old and living at home with his father, he received documents that showed that he was liable for unpaid property taxes. Eventually Plaintiff learned that the property taxes in question were actually taxes levied against Plaintiff's father, Charles Michael O'Gara II. From 2007 to 2015, Plaintiff was denied credit on several occasions. From 2007 to 2015, Plaintiff was denied credit on several occasions. In 2016, after being contacted by O'Gara (for the first time), Equifax removed the tax lien on his file.

O'Gara asserts his denial was "entirely caused by Equifax's matching procedures." O'Gara details the "matching procedures" match public record information, like tax liens, without regard to matching unique personal identifiers (i.e., social security numbers or dates of birth), but instead relies on matching names in the public record to identify which file the public record should be associated with.
https://casetext.com/case/ogara-v-equifax-info-servs-llc

Testimony before Congress regarding mixed files has taken place for over 10 years with, in my opinion, the CRAs, like Experian, have not adequately addressed the issue.

Further, in 2015, Experian signed a settlement agreement with the State of New York Attorney General's Office, which addressed mixed files. In my opinion, this settlement agreement supports that there were concerns with Experian continuing to create mixed files in its database.[16]

Furthermore, since 2021, as an expert, I am aware of at least 35 mixed file litigation cases involving Experian; cases in which I have been involved with or learned about because of the cases which I was involved with.

## **Experian Mixed File Policy**

With my experience and knowledge, Experian's Policy to its personnel on how to handle Mixed files includes as follows:

- Perform a PIN / SSN Search
- Delete Conflicts
- Add the Do Not Combine (DNC)

---

[16] http://nylawyer.nylj.com/adgifs/decisions15/031015settlement.pdf

21

Experian is to search its database using an SSN Search to determine if there are multiple PINs associated with a consumer. If Experian discovers that a consumer's file was mixed with another consumer, then Experian should delete any conflicts and separate the files to their own PIN. Afterwards, Experian would add a Do Not Combine (DNC) to the consumer's file to prevent file mixing going forward.

As can be seen by the information above, Experian has caused or was aware of mixed/merged files in its database for over 30 years (1991), and, in my opinion, Experian has not implemented procedures or made improvements to its database to ensure mixed files do not happen. Instead, it is my opinion that Experian knows that mixed files in its database will happen, so it has personnel trained in mixed file procedures, and has a mixed file procedures manual that outlines the steps for its agents to correct mixed files.

It is Experian's policy to add a DNC (Do Not Combine) indicator on every file that it unmixes or unmerges. Below are the matching rules Experian applies to files with a DNC indicator. In Experian's previous testimony in other cases involving mixed files, the corporate witness could not explain why Experian did not implement the DNC logic all the time for every consumer.

With my experience and knowledge, Experian's DNC rules are:

- First name has to be exact
- Middle name has to be exact, initials, or omitted
- Last name has no restrictions and can be different
- Date of birth must be correct or omitted
- Social Security number has to be exact
- Generation Codes, such as Jr., Sr., 2nd, etc., has to be exact or omitted

The DNC Rules were to be applied regarding the storing information on a consumer's file when a DNC was added to a consumer's Experian file.

Also, Experian has testified in multiple cases that its implementation of its Mixed file polices and procedures is not triggered until a consumer submits a "not mine" or ownership dispute of an account to Experian. Experian has admitted on multiple occasions that it does not have a mechanism in place to prevent mixed files from being created in its database.

This case is an example of a consumer submitting multiple "not mine" or ownership disputes to Experian, and, in my opinion, Experian failed to correct the file/report when the file was a mixed/merged file. In previous testimony by Experian, it indicated that if the consumer simply notified Experian and provided a "not mine" dispute to Experian, Experian would identify the mixed file and correct the mixed file.

With this case, in my opinion, Experian's previous testimony of correcting a mixed file when notified by the consumer of an ownership dispute, was not true. Plaintiff did notify

22

Experian on more than one occasion that information on his Experian file was not his. Plaintiff's first not mine dispute was in February 2024, and his second not mine dispute was in July / August 2024. With both instances, there was no evidence in this case that Experian corrected Plaintiff's mixed file. As seen below, it is my opinion that Plaintiff's Experian file was not corrected until in or around June 2025, approximately 16 months after Plaintiff initially notified Experian of the inaccuracies on his file. [See Consumer Disputes section]

## BASIC FACTS OF THIS CASE

In my opinion, Mr. Victor M. Ramirez Najera's Experian file was mixed with his father, Victor Manuel Ramirez.

In May 2023, Mr. Ramirez Najera applied for housing with Appfolio in Tennessee. Appfolio requested information for its Tenant Screening Reports from other consumer reporting agencies, such as Experian. Appfolio's Tenant Screening Reports includes credit information that was obtained from Experian. In May 2023, Experian sold a consumer report to Appfolio pertaining to Plaintiff.

On or about May 22, 2023, Appfolio took the information provided by Experian and prepared a Tenant Screening Report about Plaintiff, Mr. Ramirez Najera, and provided the report to its client, Alexander Forrest Investments, for a studio apartment located at Hartford House Apartments, in Nashville, TN.

Upon Plaintiff reading the Appfolio Tenant Screening Report, Mr. Ramirez Najera discovered that there was credit information on the report, provided by Experian, that was inaccurate and misleading for the account information did not belong to him. The report contained two mortgage accounts, Rushmore Loan Management Services (aka Nationstar Mortgage) and PennyMac Loan Services, with both accounts reported open in 2009 when Mr. Ramirez Najera was 13 years of age.

**Credit and Collection History** Provided by Experian™

| Creditor | Type | Status | Last Updated | Origination Date | High Credit/ Original Amt. | Current Balance | Past Due Amt. | Delinquency (2 yrs.) | |
|---|---|---|---|---|---|---|---|---|---|
| **RUSHMORE LOAN MGMT SER** | Mortgage | Account Transferred | 01/05/2023 | 01/27/2009 | $109,370 | $0 | — | 30+ days: | 11 |
| | | | | | | | | 60+ days: | 6 |
| | | | | | | | | 90+ days: | 0 |

CONVENTIONAL REAL ESTATE LOAN, INCLUDING PURCHASE MONEY FIRST; ACCOUNT TRANSFERRED TO ANOTHER OFFICE; ACCOUNT TRANSFERRED TO ANOTHER OFFICE; TRANSFERRED TO ANOTHER LENDER

23



Upon review of the report, Mr. Ramirez Najera discovered that the inaccurate information on his consumer report was not his, but the information reported by Experian actually belonged to his father.

Beginning in or around February 2024, Mr. Ramirez Najera disputed the inaccurate mortgage accounts with Experian.

### **Inaccuracy and Harms to Mr. Ramirez Najera's Creditworthiness**

As it relates to Experian's credit reporting of Plaintiff's report/file, there is no question that the reporting was inaccurate and misleading.

Experian reported multiple accounts, which belonged to another consumer, Plaintiff's father, with the multiple accounts having derogatory payment history, i.e., late payments. Accounts that were open when Plaintiff was 13 years of age.

Reviewing the evidence in this case, in my opinion, dozens of Plaintiff's credit reports, containing the inaccurate information, were provided to numerous third-parties.

### **Plaintiff's Personal Identification Information (PII)**

Name:          Victor Manuel Ramirez Najera

SSN:            xxx-xx-0996 (redacted only for purposes of this report)

Addresses:     ███████████████ Fort Worth, TX 76106

DOB:           ███████████ 1995

24

## Disclosure

February 2024

On or about February 12, 2024, Plaintiff contacted Experian, and requested his consumer report.

Experian Credit Report number 2392-7442-85, dated February 12, 2024 was provided to Mr. Ramirez Najera.

The report contained inaccuracies, such as two inaccurate accounts for Mr. Ramirez Najera. The two inaccurate accounts were considered "Potentially Negative Accounts."



Reading the report, it could be seen that two mortgage accounts, PennyMac and Rushmore (aka Nationstar) as reported to Plaintiff's Experian file were inaccurate for the accounts were opened in 2009 when Mr. Ramirez Najera was 13 years of age.

25

The PennyMac account above reported as Transferred, Closed, past due 30 days, and Opened in January 2009.

The Rushmore (Nationstar) account reported as Transferred, Closed, past due 60 days, and Opened in January 2009.

With my experience and knowledge, in my opinion, a person could not typically or legally contract for a mortgage loan at the age of 13. In my experience and knowledge, it is my opinion that a 13-year-old, a minor, cannot legally contract for a mortgage loan in the United States, and any such contract would be voidable due to lack of legal capacity, plus, lenders will not extend mortgages to minors. Also, reading the evidence in this case, it is my opinion that the mortgage accounts listed on Plaintiff's Experian file belonged to Plaintiff's father, Victor Manuel Ramirez.

## Consumer Disputes

### Dispute One

On or about February 12, 2024, Plaintiff contacted Experian and disputed multiple accounts as not his. The accounts were: PennyMac Loan Services, account number 6181000034165, and Nationstar Mortgage (Rushmore), account number 1027602149296.

On or about March 7, 2024, Experian sent the dispute results to Plaintiff representing that Experian's processing of Plaintiff's disputes were complete.

The dispute results reported that the PennyMac account was deleted.

Reviewing the ACDV for this dispute, the Personal Identification Information (PII) Experian used to send the ACDV to PennyMac, and the PII PennyMac responded with was not entirely the same.

| | CONSUMER IDENTIFICATION | | SUBSCRIBER CONSUMER ID | |
|---|---|---|---|---|
| Name: | VICTOR RAMIREZ | | VICTOR MANUEL RAMIREZ | |
| SSN: DOB: | ▮▮0996 | ▮▮1995 | ▮▮5014 | ▮▮1970 |
| Curr Address: | ▮▮▮▮ | | ▮▮▮▮ | |
| | FORT WORTH, TX | | FORT WORTH, TX | |
| ZIP: | 76106 | | 76106 | |
| Prev Addr 1: | | | | |
| Prev Addr 2: | | | | |
| Account Name: | | | | |

The "CONSUMER IDENTIFICATION" section was what Experian had in its files when it sent the ACDV to PennyMac. The "SUBSCRIBER CONSUMER ID" section is what PennyMac responded to Experian with. It can be seen that PennyMac provided to Experian a different SSN and Date of Birth with its ACDV response.

26

The disputed, inaccurate Rushmore (Nationstar) account was verified as accurate and/or updated by Experian and remained on Mr. Ramirez Najera's file/report.

**Your Potentially Negative Account Activity (Continued)**

**RUSHMORE LOAN MGMT SERVI** Partial Acct # 102760214....          Status (Jan 2023) Transferred,closed.
15480 LAGUNA CANYON RD STE 100 IRVINE CA 92618; (888) 504 6700

| **Date opened** Jan 2009 | **Terms** 30 Years | **Recent Balance** Not reported | Payment history: May 2019 - Jan 2023 |
|---|---|---|---|

Payment history grid:

| | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2023 | CLS | | | | | | | | | | | |
| 2022 | 30 | OK | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 60 | 30 | 60 |
| 2021 | ND | ND | ND | ND | ND | 60 | 30 | 60 | 60 | 30 | 60 | OK |
| 2020 | OK | 30 | 60 | ND | ND | ND | ND | ND | OK | ND | ND | ND |
| 2019 | | | | | 30 | OK | OK | 30 | 30 | 30 | OK | 30 |

**Address ID #** 0701387387

**Type** Mortgage

**Responsibility** Individual

**Monthly payment** Not reported

**Credit limit or original amount** $109,370

**High Balance** Not reported

**Comment:** Transferred to another lender

This item remained unchanged from our processing of your dispute in Feb 2024.

| | Dec22 | Nov22 | Oct22 | Sep22 | Aug22 | Jul22 | Jun22 | May22 | Apr22 | Mar22 |
|---|---|---|---|---|---|---|---|---|---|---|
| Account Balance | $95,397 | $94,967 | $95,915 | $95,483 | $95,739 | $95,944 | $96,150 | $96,434 | $96,717 | $96,999 |
| Date Payment Received | 10.31.22 | 10.31.22 | 08.27.22 | 08.27.22 | 08.05.22 | 06.18.22 | 05.31.22 | 04.18.22 | 04.02.22 | 01.29.22 |
| Scheduled Payment Amount | $1,248 | $1,248 | $1,248 | $1,248 | $1,248 | $1,198 | $1,198 | $1,196 | $1,196 | $1,196 |
| Actual Amount Paid | No Data | $2,496 | No Data | $1,248 | $1,248 | $1,198 | $1,196 | $1,196 | $1,196 | No Data |

*The original amount of this account was $109,370*

The Rushmore (Nationstar) account reported as Transferred, Closed, past due 60 days, and Opened in January 2009.

In my opinion, Experian did not adequately investigate Mr. Ramirez Najera's dispute of the Rushmore account.

Considering this evidence, along with my experience and knowledge, it is my opinion, no one at Experian performed a reinvestigation of Plaintiff's disputes. Experian simply "parroted"[17] the account with the information that was reported by the data furnisher on the ACDV. In other cases, Experian has admitted that its Dispute Agents were not trained to investigate consumer disputes. Experian has testified that basically Dispute Agents were trained to start the reinvestigation process by essentially sending an ACDV to the data furnisher. It is also my opinion that if Experian had conducted a true investigation of Mr. Ramirez Najera's disputes, it would have seen the contradictory information reported by PennyMac, which should have prompted Experian to investigate further. PennyMac provided its contradictory PII regarding Plaintiff's dispute on February 15, 2024,and Experian notified Mr. Ramirez Najera that its investigation was completed on March 7, 2024, which gave, in my opinion, Experian a substantial amount of time for Experian to investigate further.

Also, based on the evidence provided in this case, plus my experience and knowledge, in my opinion, there was no indication that Experian reasonably[18] reinvestigated

---

[17] Blindly accept
[18] Dictionary definition – fair, sensible, using sound judgment

27

Plaintiff's disputes. With these account disputes, there was no evidence that Experian reinvestigated Plaintiff's disputes. Rather than conduct a reinvestigation, Experian simply used the ACDV exchange, which notified the data furnishers of the dispute. In my opinion, Experian did not conduct a true investigation (much less a reasonable one) by simply sending ACDVs and blindly accepting the response. There was no evidence that Experian contacted outside sources (other than using the ACDV exchange). The FCRA allows a CRA up to 30 days to conduct a reinvestigation. With these disputes, the process was about 25 days. [See ACDV Processing Section]

**Dispute Two**

On or about July 10, 2024, Plaintiff contacted Experian, by certified mail, and disputed an account as not his. The account was: Rushmore Loan Mgmt Service, (aka Nationstar Mortgage) account number 102760xxxx, dated opened January 27, 2009, with an Original Balance of $109,370. (Rushmore), account number 1027602149296.

Along with Mr. Ramirez Najera's detailed dispute letter, he provided the following supporting documents:

- Copy of Birth Certificate
- Copy of School Records
- Copy of Social Security Card
- Copy of Father's IRS Individual Taxpayer Identification Number
- Copy of Father's mortgage loan documents, dated in January 2009
- Copy of Passport
- Copy of Texas Driver's License

Upon receipt of Plaintiff's dispute letter and supporting documents, it is my opinion that Experian did not need to send an ACDV to the data furnisher Nationstar (Rushmore). It was clear by reading the evidence that Plaintiff was 13 years of age when the Nationstar (Rushmore) was opened, and in my opinion, Experian had sufficient information to correct Plaintiff's mixed file, and remove the information that did not belong to him.

Instead, on August 1, 2024, Experian sent an ACDV to Nationstar (Rushmore) mortgage with Plaintiff's dispute letter attached.

On or about August 19, 2024, Experian sent the dispute results to Plaintiff representing that Experian's processing of Plaintiff's dispute was complete.

The disputed, inaccurate Rushmore (Nationstar) account was verified as accurate and/or updated by Experian and remained on Mr. Ramirez Najera's file/report.

28



The Rushmore (Nationstar) account reported as Transferred, Closed, past due 60 days, and Opened in January 2009.

In my opinion, Experian did not adequately investigate Mr. Ramirez Najera's dispute of the Rushmore account.

Considering this evidence, along with my experience and knowledge, it is my opinion, no one at Experian performed a reinvestigation of Plaintiff's disputes. Experian simply "parroted"[19] the account with the information that was reported by the data furnisher on the ACDV. In other cases, Experian has admitted that its Dispute Agents were not trained to investigate consumer disputes. Experian has testified that basically Dispute Agents were trained to start the reinvestigation process by essentially sending an ACDV to the data furnisher. It is also my opinion that if Experian had conducted a true investigation of Mr. Ramirez Najera's disputes, it would have seen the contradictory information reported by PennyMac, which should have prompted Experian to investigate further. With Plaintiff's first dispute to Experian, PennyMac provided its contradictory PII regarding Plaintiff's dispute on February 15, 2024, and Experian informed Mr. Ramirez Najera that its investigation was completed on March 7, 2024. With my experience and knowledge, in my opinion, to perform a true investigation/reinvestigation, Experian should have reviewed Plaintiff's previous dispute information and the data furnisher's responses from February / March 2024, and noted the contradictory PII that was reported.

---

[19] Blindly accept

29

Also, based on the evidence provided in this case, plus my experience and knowledge, in my opinion, there was no indication that Experian reasonably[20] reinvestigated Plaintiff's dispute. With this account dispute, there was no evidence that Experian reinvestigated Plaintiff's dispute. Rather than conduct a reinvestigation, Experian simply used the ACDV exchange, which notified the data furnisher of the dispute. In my opinion, Experian did not conduct a true investigation (much less a reasonable one) by simply sending an ACDV and blindly accepting the response. There was no evidence that Experian contacted outside sources (other than using the ACDV exchange). The FCRA allows a CRA up to 30 days to conduct a reinvestigation. With this dispute, the process was about 20 days. [See ACDV Processing Section]

**Dispute Three**

Experian has admitted in previous testimony that upon receiving a notice of a lawsuit filed against Experian by a consumer, that the lawsuit was classified by Experian as Experian receiving a dispute from the consumer. As of the writing of this report, there was no Experian Dispute Response (DR) Log or Disclosure Log provided by Experian in this case which would have shown any disputes processed or investigation/reinvestigations conducted by Experian.

However, in this case, there were Experian Dispute Results, dated June 11, 2025, which indicated that Experian corrected Mr. Ramirez Najera's file/report. With my experience and knowledge, it is my opinion that the Dispute Results dated June 11, 2025 were the result of post-litigation dispute actions taken by Experian.

Reading Experian Dispute Results, Report 1783-0192-08, dated June 11, 2025, the following was noted:

---

[20] Dictionary definition – fair, sensible, using sound judgment

30

Here are your results

Credit items

RUSHMORE LOAN MGMT SER 102760214.... Outcome: Deleted - This item was removed from your credit report. Please review your report for the details.

Personal information

Name Updated Before Dispute VICTOR MANUEL RAMIREZ After Dispute VICTOR MANUEL RAMIREZ NAJERA
Social Security Number Updated After Dispute XXXXX0996
Name Updated Before Dispute VICTOR MANUEL RAMIREZ After Dispute VICTOR MANUEL RAMIREZ NAJERA
Name Updated Before Dispute VICTOR RAMIREZ After Dispute VICTOR MANUEL RAMIREZ NAJERA
Social Security Number Updated After Dispute XXXXX0996

EXPERIAN_0166

0787150565        VICTOR MANUEL RAMIREZ NAJERA Report # 1783-0192-08 for 06/11/2025        page 1 of 4

Dispute Results (Continued)

Name Updated Before Dispute VICTOR RAMIREZ After Dispute VICTOR MANUEL RAMIREZ NAJERA
Name Updated Before Dispute VICTOR MANUEL RAMIREZ Jr After Dispute VICTOR MANUEL RAMIREZ NAJERA
Name Updated Before Dispute VICTOR M RAMIREZ After Dispute VICTOR MANUEL RAMIREZ NAJERA
Telephone number Deleted Before Dispute 8179487891, Type: Cellular
Telephone number Deleted Before Dispute 8179132581, Type: Cellular
Telephone number Deleted Before Dispute 8172374637, Type: Residential
Employer Deleted Before Dispute INTEGRATED INTERIORS IN,FORT WORTH TX 76118

Reading the Dispute Results above, with my experience and knowledge, the results were indicative of mixed file processing conducted by Experian.[21]

At this time, June 11, 2025, approximately 16 months after Plaintiff, Mr. Ramierz Najera first notified Experian that the Rushmore (Nationstar) account was not his, the account was removed from his Experian file/report.

Inquiries

Reading Plaintiff's Experian consumer report, Report Number 173-5028-26, dated June 11, 2025, and Experian Report Number 2307-4879-15, dated July 9, 2024, and Experian Report Number 2392-7442-85, dated February 12, 2024, the following inquiries were noted:

Xactus-Avantus/GenFin
Centennial Bank (multiple)
JPMCB Card (multiple)
Credit One Bank (multiple)
Affirm
AXCSFN/The Cash Store
CCB Rise
Clarity/Cap Com Bk

---

[21] Additional evidence is required, i.e., Disclosure Log, Dispute Response (DR) Log to confirm mixed file processing.

31

CMS SLS RBA OnlineNew
CMS/DHS
Comenity Bank
Comenity Servicing ((multiple)
First Premier Bank
One Main
Xactus-Avantus/Credit In
Oportun/Progresso Financial
American Express
Clarity/Big Picture Loan
Clarity/Essential Lending
Conn Appliances (multiple)
Petal Card
Appfolio Resident Screening
Clarity/Credit Ninja
Clarity/Community Loans
First Advantage/Employment
Santander

From February 2023 to June 2025, these inquiries indicate that the inaccurate information on Plaintiff's Experian consumer file was shared with third-parties.

Please note that it is published that soft inquiries do not impact credit scores, however, in my experience and knowledge, soft inquiries do impact credit decisions.

**Financial Analysis**

**Experian Information Solutions, Inc.**

**Background**

Experian Informational Solutions, Inc. (Experian) is a subsidiary of Experian PLC. Experian is a multinational data analytics and consumer credit reporting company that offers credit information, data analytical tools, and marketing services to clients around the world. Experian is headquartered in Dublin, Ireland, and its North American headquarters is located in Costa Mesa, CA.

Financial Performance of Experian

Experian plc, Annual Report 2022

32

Total Revenue 2022 – 6,288 millions

Profit 2022 – 1,167 millions

Total Revenue 2021 – 5,372 millions

Profit 2021 – 802 millions

From 2021 to 2022, Experian's profit increased by 365 million.

https://www.experianplc.com/investors/results-reports-presentations/reports?listing-type=1&year=2022%2C2021&type=Financial

[Remainder of page intentionally left blank]

33

## Group income statement
for the year ended 31 March 2022

| | Notes | 2022 Benchmark[1] US$m | 2022 Non-benchmark[2] US$m | 2022 Total US$m | 2021 Benchmark[1] US$m | 2021 Non-benchmark[2] US$m | 2021 Total US$m |
|---|---|---|---|---|---|---|---|
| **Revenue** | 8, 9 | 6,288 | — | **6,288** | 5,372 | — | **5,372** |
| Labour costs | 11(a) | (2,302) | (11) | **(2,313)** | (1,965) | (30) | **(1,995)** |
| Data and information technology costs | | (1,000) | — | **(1,000)** | (861) | — | **(861)** |
| Amortisation and depreciation charges | 12 | (484) | (174) | **(658)** | (453) | (138) | **(591)** |
| Marketing and customer acquisition costs | | (503) | — | **(503)** | (417) | — | **(417)** |
| Other operating charges | | (357) | (88) | **(445)** | (295) | (150) | **(445)** |
| Total operating expenses | | (4,646) | (273) | **(4,919)** | (3,991) | (318) | **(4,309)** |
| Net profit on disposal of business and associates | 14(b), 14(c) | — | 47 | **47** | — | 120 | **120** |
| **Operating profit/(loss)** | | 1,642 | (226) | **1,416** | 1,381 | (198) | **1,183** |
| Finance income | | 15 | 169 | **184** | 12 | — | **12** |
| Finance expense | | (125) | — | **(125)** | (133) | (6) | **(139)** |
| Net finance income/(costs) | 15 | (110) | 169 | **59** | (121) | (6) | **(127)** |
| Share of post-tax (loss)/profit of associates | | 3 | (31) | **(28)** | 5 | 16 | **21** |
| **Profit/(loss) before tax** | 9 | 1,535 | (88) | **1,447** | 1,265 | (188) | **1,077** |
| Tax (charge)/credit | 16 | (394) | 98 | **(296)** | (328) | 53 | **(275)** |
| Profit/(loss) for the financial year from continuing operations | | 1,141 | 10 | **1,151** | 937 | (135) | **802** |
| Profit for the financial year from discontinued operations | 17 | — | 16 | **16** | — | — | **—** |
| **Profit/(loss) for the financial year** | | 1,141 | 26 | **1,167** | 937 | (135) | **802** |
| | | | | | | | |
| **Attributable to:** | | | | | | | |
| Owners of Experian plc | | 1,138 | 27 | **1,165** | 938 | (135) | **803** |
| Non-controlling interests | | 3 | (1) | **2** | (1) | — | **(1)** |
| **Profit/(loss) for the financial year** | | 1,141 | 26 | **1,167** | 937 | (135) | **802** |
| | | | | | | | |
| **Total Benchmark EBIT[1]** | 9(a)(i) | 1,645 | | | 1,386 | | |

| | Notes | US cents | US cents | US cents | US cents | US cents | US cents |
|---|---|---|---|---|---|---|---|
| **Earnings/(loss) per share** | | | | | | | |
| Basic | 18(a) | 124.5 | 3.0 | **127.5** | 103.1 | (14.9) | **88.2** |
| Diluted | 18(a) | 123.6 | 2.9 | **126.5** | 102.3 | (14.7) | **87.6** |
| | | | | | | | |
| **Earnings/(loss) per share from continuing operations** | | | | | | | |
| Basic | 18(a) | 124.5 | 1.2 | **125.7** | 103.1 | (14.9) | **88.2** |
| Diluted | 18(a) | 123.6 | 1.2 | **124.8** | 102.3 | (14.7) | **87.6** |
| | | | | | | | |
| Benchmark PBT per share[1,3] | | 167.9 | | | 139.0 | | |
| | | | | | | | |
| **Full-year dividend per share[1]** | 19 | | | **51.75** | | | **47.00** |

1 Total Benchmark EBIT, Benchmark PBT per share and Full-year dividend per share are non-GAAP measures, defined in note 6.

2 The loss before tax for non-benchmark items of US$88m (2021: US$188m) comprises a net credit for Exceptional items of US$21m (2021: US$35m) and net charges for other adjustments made to derive Benchmark PBT of US$109m (2021: US$223m). Further information is given in note 14.

3 Benchmark PBT per share is calculated by dividing Benchmark PBT of US$1,535m (2021: US$1,265m) by the weighted average number of ordinary shares of 914 million (2021: 910 million). The amount is stated in US cents per share.

| | 2022 US$m | 2021 US$m |
|---|---|---|
| **Profit for the financial year** | **1,167** | 802 |

*Financial statements* (side margin)

34

## <u>Median Hourly Wages</u>

**OES data**

May 2022 Metropolitan and Nonmetropolitan Area Occupational Employment and Wage Estimates

Los Angeles-Long Beach-Anaheim, CA[22]

https://www.bls.gov/oes/2022/may/oes_31080.htm#43-0000

**Credit Authorizers, Checkers, and Clerks**

| Year | Median wage | Annual Wage |
|------|-------------|-------------|
| 2022 | $22.45 | $48,240 |
| 2021 | $18.40 | $44,810 |

2021 – 2022 Average Annual Median Wages:    $46,525

**Customer Service Representatives**

| Year | Median wage | Annual Wage |
|------|-------------|-------------|
| 2022 | $20.41 | $46,190 |
| 2021 | $18.38 | $43,340 |

2021 – 2022 Average Annual Median Wages:    $44,765

**Information and Record Clerks**

| Year | Median wage | Annual Wage |
|------|-------------|-------------|
| 2022 | $23.88 | $52,940 |
| 2021 | $23.39 | $51,100 |

2021 – 2022 Average Annual Median Wages:    $52,020

---

[22] California was one of the top states who had the highest employment salaries from 2021 to 2022, and was used as an example for this analysis. States or regions with lower salaries would mean that additional employees could be hired.

35

APPENDIX 2390

Experian's ability to hire Dispute Processing Agents

Based on the profitability data from 2021 and 2022, using the three occupational categories listed above, and considered in the analysis, the number of agents Experian could have hired using the profits generated in 2021 and 2022:

|  | **2021** | **2022** |
|---|---|---|
| **Experian Net Profits[23]** | $802,000,000 | $1,167,000,000 |

**Credit Authorizers, Checkers, and Clerks**

| | 2021 | 2022 |
|---|---|---|
| Median Annual Wage | $44,810 | $48,240 |
| Ability to Hire (Count) | 17,898 | 24,192 |

**Customer Service Representatives**

| | 2021 | 2022 |
|---|---|---|
| Median Annual Wage | $43,340 | $46,190 |
| Ability to Hire (Count) | 18,505 | 25,265 |

**Information and Record Clerks**

| | 2021 | 2022 |
|---|---|---|
| Median Annual Wage | $51,100 | $52,940 |
| Ability to Hire (Count) | 15,695 | 22,044 |

Based upon the above analysis, it is my opinion that Experian had sufficient profits to hire up to or between roughly 15,000 and 25,000 Dispute Processing Agents during the period of 2021 – 2022, depending on the pay level that agents would be offered. In my opinion, the hiring of additional personnel would enable Experian to conduct actual investigations/reinvestigations to verify the truth and accuracy of reported information.

---

[23] Since this analysis had been conducted, Experian's Profit for 2023 was $773,000,000; and its 2024 Profit was reported as $1,203,000,000.
https://www.experianplc.com/content/dam/marketing/global/plc/en/assets/documents/reports/2024/experian_annual_report_2024_web.pdf

36

Plus, in my opinion, by the hiring of additional agents, Experian would not have to deem tens of thousands of pieces of consumer mail as suspicious mail or frivolous, and process the consumer disputes.[24]

Note:  Experian operates Dispute Centers in Texas, Costa Rica, and Chile. The Dispute Centers in Costa Rica and Chile were established to reduce employment costs. With this in mind, salaries for agents outside the United States would be less, which would, in my opinion, enable Experian to hire even more Dispute Agents.

Also with this analysis, it does not consider employer sponsored benefits and required benefits typically paid by employers in the United States. While the inclusion of employer sponsored benefits would reduce the count of the number of individuals that could have been hired using Experian profits, it is my opinion that an adjustment would not result in a meaningful change in Experian's ability to hire additional Dispute Agents.

I reserve the right to amend my opinion of this financial analysis if new relevant information is provided to me.

Furthermore, while working at Experian, I recall questioning Experian management on multiple occasions why Experian did not hire more personnel or dispute agents. I recall on one occasion, when working mandatory overtime at Experian, that it was published that Experian's CEO at the time received a bonus of about $1.6 million dollars. I questioned Experian management that if Experian's CEO could be paid a bonus of $1.6 million dollars, why couldn't Experian use that money to hire more personnel to handle the consumer dispute mail volume. Keep in mind that Experian put into place mandatory overtime, not voluntary overtime, and if an employee did not work overtime, the employee faced possible termination from employment with Experian. Regarding the $1.6 million dollar bonus, I was informed by Experian management that it was not planning to hire more personnel, and I was basically informed to mind my own business.

## FCRA / Accuracy

The Fair Credit Reporting Act, 15 U.S.C. 1681e(b) states:

"(b) Accuracy of report. Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

---

[24] In my experience and knowledge, Experian as deemed thousands of consumer dispute letters as frivolous, and/or third-party mail, and Experian refused to process the consumer disputes.

37

The Fair Credit Reporting Act, 15 U.S.C. 1681i discusses the procedure and responsibilities of the CRA when the accuracy of an item on a credit report is disputed. This section states as follows:

"if the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency directly, or indirectly through a reseller, of such dispute, the agency shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file in accordance with paragraph (5), before the end of the 30-day period beginning on the date on which the agency receives the notice of dispute from the consumer or reseller."[25]

In my opinion, many CRAs, like Experian, are *reactive* companies, not *proactive* companies, when it comes to ensuring maximum possible accuracy. With my experience, knowledge, and observation, it is my opinion that many CRAs receive and compile data from Data Furnishers and Public Records without any sort of adequate verification process for accuracy. In my opinion, the data is received and accepted from furnishers at face value, with the assumption that the data is accurate. In my experience, CRAs, like Experian, would receive and store the data and rely on the defense of "we received the data from the Data Furnisher," or, "we are only storing the Data Furnisher's data for them," or "the Data Furnisher certified to us that they are reporting the data accurately," attempting to absolve any responsibility for the data being stored in the CRA's database. Also, Experian has testified in other cases that with mixed files, if Experian did not receive a consumer ownership dispute, it was likely the mixed file would not be corrected by Experian.

In my opinion, Experian does have responsibility for the data stored in its database. As an example, reviewing the Membership Application Contractual Agreement Experian provides to Data Furnishers/Subscribers, it states "Experian may, at its option and expense, incorporate Data Provider's Records into its credit reporting system. Once this information is incorporated into Experian's credit reporting system, this information will become Experian's exclusive property." (Membership Application for Data Reporting)[26]

In my opinion, the data is in the "credit reporting system" once that data is being stored in Experian's database and is available to be reported on consumer reports. Keep in

---

[25] In my report, I provide information from the Fair Credit Reporting Act, not to express any legal opinions or conclusions, but because, in my expert opinion, this information provided important insight on how important it is for CRAs to have accurate consumer reports.

[26] https://www.experian.com/content/dam/marketing/na/assets/im/consumer-information/general/Reporting-Data-Contractual-Documents.pdf)

38

mind, it is the data stored in a CRA's databases that is being sold each day to lenders, collection agencies, property management companies, insurance companies, and the like. In this case, Experian sold reports to creditors as shown in the "Inquiries" section of the reports in this case pertaining to Mr. Ramierz Najera. The reports were sold by Experian regardless of whether the reports were accurate or not.

Experian stores data for over 245 million consumers in its database, and in my opinion, millions of lives are affected by what information Experian stores in its database.

In this case, in my opinion, Defendant Experian failed to have mechanisms or procedures in place to **prevent** mixed files. As a result, inaccurate information remained on Plaintiff's Experian file, and Experian falsely reported that Plaintiff had multiple accounts, names, employment, and phone numbers, which were not his.

Furthermore, in my opinion, Experian failed to adequately investigate Plaintiff's disputes. In this case, when Plaintiff provided his written dispute letter and supporting documents, and explained that he was 13 years of age when the disputed Rushmore (Nationstar) was opened and the account belonged to his father, instead of correcting Plaintiff's file, Experian sent an ACDV to the data furnisher. In my opinion, with Plaintiff's July/August 2024 dispute, if Experian conducted a true investigation, Experian would have realized that Plaintiff could not legally contract for a mortgage since he was a minor in 2009 at the time the mortgage account was opened.

In my experience and knowledge, for almost three decades, Experian has used its File One database. Over the years, CRAs, like Experian, have made changes and updated their databases. Some changes were mandated by regulatory agencies, and some were voluntary. As an example, in 2013, I recall the "Big Three CRAs," Equifax, Experian, and TransUnion, had to change their databases to accommodate the attachment of consumer dispute letters to ACDVs. It is my understanding that the changes were made by the Big Three, because they were instructed to do so by the CFPB. It is my opinion, that unless a court or regulatory agency tells Experian to change and modify its database to prevent mixed files, Experian will continue to store and report inaccurate consumer reports, such as in this case, and continuing to harm consumers, like Mr. Ramierz Najera.

### Conclusion

In my opinion, Defendant, Experian, failed to maintain adequate procedures to ensure accuracy in its reports regarding Plaintiff. In my opinion, Experian wrongly created a mixed/merged file between Mr. Ramirez Najera and another consumer, Plaintiff's father, and as a result, Experian reported information about another consumer on Mr. Ramirez Najera's Experian reports to third-parties. In other cases, involving mixed files,

39

Experian has further stated that its "procedures that allowed the files to mix were reasonable."[27]  I disagree.

In my opinion, Experian failed to protect Plaintiff's consumer file by allowing Plaintiff's file to be mixed with another consumer. For almost over 30 years, Experian's database has continued to create mixed files. Experian has admitted that no less than 3 percent of its database contains mixed files. With over 245 million credit files stored in Experian's database, that means that Experian's database contains over 7.35 million mixed files. With my experience and knowledge, and based upon reviewing the evidence in this case, in my opinion, Plaintiff's Experian consumer file contained inaccurate information, i.e., inaccurate accounts, names, telephone numbers, and employment belonging to another consumer.

Plaintiff's case is not an isolated incident but is, in my opinion, the result of Experian's systemic refusal to update its system to ensure mixed files do not happen in the first place. Experian already has the solution – it only needs to adopt its own DNC matching logic as its matching logic, all the time, for every consumer, not just those who complain about a mixed file or fraud (when the issue is really a mixed file). In my opinion, mixed and/or merged files would to a great degree disappear if Experian simply changed its policy. Even if a file was not identified as a mixed file, Experian, upon a consumer's request, will add the DNC ["Do Not Combine"] to the consumer's file. Apparently, even with the cost of lawsuits, Experian earns more money with its loose matching logic that mixes consumers. In other cases, involving Experian mixed files, Experian has stated that it believed its policies and procedures were reasonable, which indicated, in my opinion, that Experian had no desire to correct its database to prevent mixed files from taking place, prior to the submission of an ownership dispute by a consumer. With the evidence in this case, plus other cases, Experian has demonstrated that it had no desire to help prevent mixed files or eliminate mixed files from its database, prior to a consumer submitting an ownership dispute to Experian. In other cases, Experian stated that if an ownership dispute was not submitted by a consumer, then a mixed file within Experian's database would not be discovered and corrected. With this case, Plaintiff did provide ownership disputes and his file was not corrected as the result of his disputes. Reading the evidence, it is my opinion that Plaintiff had to file litigation against Experian to get his Experian file/report corrected.

Consumers have a right to valid and accurate Experian credit files. For decades, Experian has known that its database and logic causes mixed files, yet it has chosen to do very little if anything about it.

In my experience and knowledge, it is my opinion that Experian chooses to allow mixed files to happen in its database. Experian refuses to implement the simple fix of

---

[27] Mary Methvin's report, dated May 23, 2025, Ronald Alexander Garcia Delgado v. Experian Information Solutions, Inc., Case No. 4:24-cv-00637-ALM

40

matching a full SSN or other criteria which would have prevented this mix/merged file from occurring in the first place (a solution they already have in place but choose to use only after the damage is done to the mixed/merged consumer).

Plaintiff, along with over 240 million other consumers in the United States with consumer reports, are counting on Defendant Experian, to report information about their credit history accurately. It is my opinion, that unless a court or regulatory agency tells Experian to change and modify its database to prevent mixed files, Experian will continue to store and report inaccurate consumer reports, such as in this case, and harm consumers, like Mr. Ramirez Najera.

If appropriate, and if justified by the production of additional evidence or discovery, I reserve the right to supplement this report at a future date.

## **FEES**

My fee for a Credit Expert report is $3,500.
My fee is $300 per hour for testimony preparation, consulting, additional reports or declarations; and
My fee is $400 per hour, or a minimum of $1200 per day, for deposition, with $500 for preparation of said testimony; both the $1200 amount and $500 amount are due in advance of said testimony, plus reasonable travel time, plus travel costs and expenses. By requesting my appearance at a deposition, it is agreed to pay me for the entire time I spend at the deposition, including breaks, as well as my $500 preparation fee.

My compensation is not contingent on the outcome of this case.

41

APPENDIX 2396

## MATERIALS CONSIDERED

Plaintiff's counsel provided the following materials which I considered, together with my experience and knowledge, in forming the opinions expressed herein:

1. Plaintiff's Complaint, U.S. District Court, Northern District of Texas
2. Plaintiff's documents
3. Experian's documents, Experian 0001 – 0169
4. Fair Reporting Credit Act, 15 U.S.C. § 1681, et seq.

**Respectfully submitted and executed this 22nd day of September, 2025 in Aubrey, Texas**

_____

Douglas A. Hollon
Credit Experts of North Texas, LLC
1101 Mockingbird Dr
Aubrey, TX 76227

42

**Testimony**

Jena Miller ***v. Experian Information Solutions, Inc.*** U.S. District Court, District of Minnesota (Case: 0:24-cv-03177). Rebuttal Expert Report. Deposition. (2025)

D'Marius Dobbins ***v. Experian Information Solutions, Inc.*** U.S. District Court, Western District of Oklahoma (Case: 5:24-cv-01030-JD). Expert Report. Deposition. (2025)

Andrew F. Smith ***v. Experian Information Solutions, Inc.,*** American Arbitration Association, Case Number: 01-24-0007-5081. Testimony. (2024)

Bianca M. Jones ***v. Nelnet Servicing, LLC***, U.S. District Court, Western District of Tennessee (Memphis Division) (Case: 2:24-cv-02325). Expert Report. Deposition. (2025)

Ronald A. Garcia Delgado ***v. Experian Information Solutions, Inc.*** U.S. District Court, Eastern District of Texas (Sherman Division) (Case: 4:24-cv-00637). Expert Report. Deposition. (2025)

Oleksandr Panchenko ***v. Comenity Capital Bank, and Bank of America, N.A.***; U.S. District Court, Northern District of California (Case: 5:23-cv-04965-BLF). Expert Report. Deposition. (2025)

Marcelino Albuerne and Ruby Jenkins ***v. Rent Recovery Solutions, LLC;*** U.S. District Court, District of Kansas (Case: 5:24-cv-04043). Expert Report. Deposition. (2025)

Michael R. Libbra ***v. Experian Information Solutions, Inc. and TransUnion, LLC,*** U.S. District Court, Central District of Illinois (Case: 3:23-cv-03298-CRL-KLM). Expert Report. Deposition. (2025)

Tamara Allen ***v. Experian Information Solutions, Inc. and USAA Federal Savings Bank,*** U.S. District Court, Southern District of Texas (Houston Division) (Case: 4:23-cv-03406) Expert Report. Deposition. (2025)

Ivy Acorin ***v. Wells Fargo Bank, NA***, U.S. District Court, Southern District of California (Case: 3:24-cv-00034-AJB-BLM). Expert Report. Deposition. (2025)

Alana Cimillo **v. *Experian Information Solutions, Inc.,*** Judicial Arbitration and Mediation Services (JAMS), (JAMS Reference Number: 5425001310). Expert Report. Testimony (2025)

Alycia Johns ***v. Experian Information Solutions, Inc.; Equifax Information Services, LLC; Nelnet; First Premier Bank: TransUnion, LLC; LVNV Funding; et al.***, U.S. District Court, Eastern District of Pennsylvania (Case: 2:22-cv-04791-KBH) Expert Report. Deposition. (February 2025)

Alycia Johns ***v. TransUnion, LLC; Experian Information Solutions, Inc.; Equifax Information Services, LLC; Nelnet; First Premier Bank:; LVNV Funding; et al.***, U.S. District Court, Eastern District of Pennsylvania (Case: 2:22-cv-04791-KBH) Expert Report. Deposition. (January 2025)

43

Richard Leroy Brasmer *v. Experian Information Solutions, Inc.* U.S. District Court, Eastern District of Washington (Case: 2:24-cv-00063). Expert Report. Deposition. (2025)

Cecelia Colette Grant *v. Experian Information Solutions, Inc.,* American Arbitration Association, (Case Number 01-24-0004-3912), Testimony (2025)

James Breitenbach *v. SageStream, LLC,* U.S. District Court, Eastern District of Pennsylvania, (Case: 2:24-cv-00893). Expert Report. Deposition. (2024); Testimony (2025)

Danny K *v. Experian Information Solutions, Inc.* U.S. District Court, Middle District of North Carolina, Greensboro Division (Case: 1:23-cv-00856). Expert Report. Deposition. (2024)

Demetre Durham *v. Experian Information Solutions, Inc., et al.,* U.S. District Court, District of Hawaii Case: 1:23-cv-00255-JAO-KJM). Expert Report. Deposition. (2024)

Saran Nuth and Kevin O'Neill *v. Newrez LLC dba Shellpoint Mortgage Servicing, and Experian Information Solutions, Inc. et al.*, U.S. District Court, Northern District of California (Case: 3:23-cv-03476-WHA). Expert Report. Deposition. (2024)

Austin Stuart Fraase *v. Advantage Credit Bureau,* U.S. District Court, District of North Dakota (Eastern Division) (Case: 3:23-cv-00117-ARS). Expert Report. Deposition. (2024)

James N. Osborne *v. RentGrow, Inc.*, U.S. District Court, District of Massachusetts (Case: 1:23-cv-10572) Expert Report. Deposition. (2024)

Alexandra Husted-Mai *v. Hunter Warfield, Granite Management, LLC, and Tailwind West Lafayette*, LLC, State of Indiana, Circuit Court of Tippecanoe County (Cause No. 79C01-1908-CT-000114) Trial Testimony. (2024)

Daniel Wright *v. HireRight, LLC,* U.S. District Court, District of Arizona (Case: 2:23-cv-00493-SMM) Expert Report. Deposition. (2024)

Shane W. Young *v. Experian Information Solutions, Inc., and First Advantage Background Services Corp.,* U.S. District Court, Northern District of Illinois (Western Division) (Case: 3:22-cv-50222) Expert Report. Deposition. (2024)

Crystal Lovelady *v. Experian Information Solutions, Inc., and General Business Recoveries, Inc.,* U.S. District Court, District of Arizona (Case: 4:23-cv-00136-SHR). Expert Report. Deposition. (2024)

Ernest Lee Duncan, Jr. *v. Experian Information Solutions, Inc.,* JAMS Arbitration, Ref. No. 5410000458. Testimony. (2024)

Fabian Huizar *v. TransUnion, Inc.,* U.S. District Court, Northern District of Indiana (Lafayette Division) (Case: 4:22-cv-00086-PPS-JEM) Expert Report. Deposition. (2024)

Fabian Huizar *v. Horizon Bank,* U.S. District Court, Northern District of Indiana (Lafayette Division) (Case: 4:22-cv-00060-PPS-JEM) Expert Report. Deposition. (2024)

44

Fabian Huizar *v. Experian Information Solutions, Inc.,* U.S. District Court, Northern District of Indiana (Lafayette Division) (Case: 4:22-cv-00085-PPS-JEM) Expert Report. Deposition. (2024)

Fabian Huizar *v. Equifax Information Services, LLC,* U.S. District Court, Northern District of Indiana (Lafayette Division) (Case: 4:22-cv-00090-PPS-JEM) Expert Report. Deposition. (2024)

Lawrence Whaley *v. RentGrow, Inc.,* U.S. District Court, District of South Carolina (Case: 2:23-cv-01393-DCN). Expert Report. Deposition. (2024)

Sean Algaier *v. Credit Control Services, Inc., et al.,* U.S. District Court, Western District of North Carolina (Case: 3:22-cv-00475-RJC-DCK). Expert Report. Deposition. (2023)

Aaron Rubin *v. US Bank Home Mortgage, Experian Information Solutions, Inc., Equifax Information Services, LLC, TransUnion, LLC.,* U.S. District Court, Western District of New Jersey (Case: 3:22-cv-00906-FLW-DE). Expert Report. Deposition. (2023)

Lyla Stephens *v. Experian Information Solutions, Inc.,* American Arbitration Association, Case Number: 01-22-0003-5590. Expert Report. Testimony. (2023)

Melissa L. Walker *v. Missouri Higher Education Loan Authority, Equifax Information Services, LLC, and TransUnion, LLC,* U.S. District Court, Eastern District of California (Case: 1:21-at-00607). Expert Report. Deposition. (2023)

Zavian Allen *v. Experian Information Solutions, Inc., Equifax Information Services, LLC, TransUnion, LLC, and Innovis Data Solutions, Inc., et al.,* U.S. District Court, Eastern District of Texas (Sherman Division) (Case: 4:22-cv-00128-ALM). Expert Report. Deposition. (2023)

Eunice Hernandez *v. Experian Information Solutions, Inc., Equifax Information Services, LLC, TransUnion, LLC, and Innovis Data Solutions, Inc., et al.,* U.S. District Court, Eastern District of Texas (Case: 4:22-cv-00455-SDJ). Expert Report. Deposition. (2023)

Erin Livesay *v. National Credit Systems, Inc.,* U.S. District Court, Northern District of Indiana (Lafayette Division) (Case: 4:22-cv-19-TLS-JEM). Expert Report. Deposition. (2023)

Mark Cebrynski and Kristen Cebrynski *v. Wells Fargo Bank, N.A., and Experian Information Solutions, Inc.,* U.S. District Court, District of Arizona (Case: 2:21-cv-01965-DJH). Expert Report. Deposition. (2023)

Genaris Haston *v. Gold Coast Federal Credit Union, et al.,* U.S. District Court, Southern District of Florida (Case 9:22-80004-CIV-SMITH). Expert Report. Deposition. (2022)

Jeff Wellemeyer *v. TransUnion, LLC, et al,* U.S. District Court for the Western District of Kentucky, Louisville Division (Case number: 3:20cv814 DJH-LLK). Expert Report. Deposition. (2022)

Thomas Lynch and Rosemary Nelson *v. Experian Information Solutions, Inc.,* U.S. District Court, District of Minnesota (Case 0:20-cv-02535).  Expert Report. Deposition. (2022)

45

Matthew Koerner ***v. Santander Consumer USA, Inc. and Equifax Information Services, LLC and Experian Information Solutions, Inc., and Trans Union, LLC,*** U.S. District Court for the Northern District of Illinois (Case 1:20-cv-522). Expert report. Deposition. (2021)

John D. Myers, on behalf of himself and those similarly situated, ***v. Equifax Information Services, LLC and Experian Information Solutions, Inc., and Trans Union, LLC,*** U.S. District Court for the Southern District of Indiana (Case 1:20-cv-00392-JMS-DLP). Expert report. Deposition. (2021)

46

# DOUGLAS A. HOLLON

469.544.4792 | doug@hollon.biz

## CREDIT EXPERT

### CORE COMPETENCIES AND ACHIEVEMENTS

**CDIA FCRA Certifications**
**NYIF Credit Analyst Certificate**
**SAS Credit Risk Modeling and Credit Score Development**
**American Bankers Association Lending Compliance Certificate**
**Trial Testimony.** Provided crucial testimony about a data furnisher in an FCRA case which resulted in a $2.25 million jury verdict for the Plaintiff/Client.
**Arbitration Testimony.** Provided crucial testimony about a CRA in an FCRA case which resulted in a $1.1 million decision for the Plaintiff/Client.
**30(b)(6) Corporate Representative Witness.** Testified on behalf of company; having specialized knowledge of company policies, procedures and operations.
**Credit Reporting Analysis.** Analyzed tens of thousands of credit reports in order to help customers.
**Credit Score Analysis.** Analyzed thousands of credit scores in order to help consumers and others.
**E-Oscar.** Reviewed and studied e-Oscar reporting from companies to ensure accuracy.
**Compliance.** Reviewed laws and regulations and reviewed company processes to ensure compliance.
**Public Speaking.** Invited to speak at Credit Con 2022, along with another credit expert, plus speaking event at Paul Quinn College.
**Investigative techniques.** Learned and applied investigative techniques to various crime scene situations and criminal cases.
**Contact Center Operations.** Helped customers by telephone and mail resolving complaints.
**Customer Service.** Diffused hundreds of escalated customer interactions with peaceful resolutions. Red carpet service.
**Effective Communication.** Listened to customers and asked questions to understand in order to best assist them.
**Coaching.** Guided dozens of people in leadership and management skills to help with their success.
**Legal Research and Analysis.** Reviewed and studied pre-litigation complaints, company documents, and explained results to company legal personnel.
**Contract Management.** Studied government (FAR) and commercial contracts. Master's Certificate Contract Management, Villanova University

### PROFESSIONAL EXPERIENCE

**CREDIT EXPERTS OF NORTH TEXAS, LLC** | Aubrey, TX | 2020 - Present
President/Owner

- Prepare Expert Witness Reports
- Analyze litigation case documents
- Legal Research
- Deposition and Trial Testimony
- Compliance
- Consultation/Training/Speaking

47

**EXPERIAN** | Allen, TX | 2005–2019
**Credit Reporting, Compliance**
- 30(b)(6) Corporate Representative Witness (2016-2018) Testified on behalf of company; having specialized knowledge of company policies, procedures and operations.
- Analyzed and defused escalated customer situations to prevent lawsuits by managing processes from beginning to end
- Provided leadership advice to current supervisors based on observation of company operations increasing department efficiency
- Maintained relations between high profile customers and company reassuring customers that their information is secure and safe as the Project Manager for High Profile Security Breach
- Developed close relationships with customers in order to resolve their issues by learning various personalities and how to interact
- Government Liaison to Congressmen, managing customer cases and providing in-depth reports
- Managed security breaches involving high profile consumers, creating policies and procedures to prevent future breaches
- Processed subpoena requests as the Custodian of Records for Federal Courts, State Courts, IRS, etc.

**U.S. ARMY** | Germany | 1989 – 2005
**Senior Paralegal, CID Agent**
- Top Secret SCI clearance
- Investigated General Crimes and Economic Crimes
- Supervised operations for Prosecutor's office, including 7 branch offices, overseeing over 15 personnel (this office had the largest criminal case load in the Army for the years I was there)
- Maintained an overall office budget, including supplies, equipment, and travel, totaling over $40,000
- Implemented and manage computerized file tracking system, providing 100 % accountability of all pending cases
- Updated office filing system for files up to 10 years old increasing capacity
- Non-Commissioned Officer of the Year candidate for military installation

## EDUCATION AND CERTIFICATIONS

**Bachelor of Science in Business Finance** | Liberty University | Lynchburg, VA | Honors
**Bachelor of Arts in Religion**, Bethany Divinity College and Seminary | Dothan, AL | Summa Cum Laude
**Master's Certificate in Contract Management** | Villanova University | Villanova, PA
**Ziglar Legacy Certified Trainer**
**D.I.S.C. Personality Profile Certified Trainer**
**NYIF Credit Analyst Certificate**
**CDIA FCRA Certifications**
**SAS Credit Risk Modeling and Credit Score Development**
**American Bankers Association Lending Compliance Certificate**

## TECHNICAL SUMMARY

Series 6 License, Microsoft Word, Excel, PowerPoint, Outlook, and Customer Relationship Management System, Public Speaking; Training Facilitator, Notary Public

48

APPENDIX 2403

# EXHIBIT AA

## CERTIFICATE OF SERVICE

I hereby certify that on November 12, 2025, I served a true and correct copy of the document(s) described as "**PLAINTIFF'S SUPPLEMENTAL EXPERT WITNESS REPORT**" via e-mail to the following:

Rebecca Wernicke Anthony
Camden Douglas
**JONES DAY**
2727 North Harwood Street
Dallas, Texas  75201
ranthony@jonesday.com
cdouglas@jonesday.com

*Counsel for Defendant*
*Experian Information Solutions, Inc.*

**CONSUMER JUSTICE LAW FIRM PLC**
By: */s/ Shaun Pambid*
Shaun Pambid

APPENDIX 2405

_____

# PLAINTIFF'S SUPPLEMENTAL EXPERT WITNESS REPORT
_____

_____

*Victor Manual Ramirez Najera*
*v.*
*Experian Information Solutions, Inc., et al.*
_____

Douglas A. Hollon
November 12, 2025

Credit Experts of North Texas, LLC
1101 Mockingbird Dr.
Aubrey, TX 76227

APPENDIX 2406

## INTRODUCTION

This Supplemental Expert Report was prepared pursuant to Federal Rules of Civil Procedure 26(a)(2) regarding the case of *Victor Manuel Ramirez Najera v. Experian Information Solutions, Inc., et al.,* U.S. District Court, Northern District of Texas (Case: 4:25-cv-00443-P).

After submitting my expert report in this case, dated September 22, 2025, additional evidence was provided. With the new evidence in this case, I have been asked to provide additional opinions of the Consumer Reporting Information, and other related documents pertaining to Victor Manuel Ramierz Najera, ("Plaintiff" or "Mr. Ramirez Najera"). I have also been asked to opine on the "Defendant's," Experian Information Solutions, Inc. ("Defendant" or "Experian"), actions regarding Victor Manuel Ramirez Najera's  consumer file/report with said Defendant.

**Deposition**

**Deposition of Experian**

On October 8, 2025, Teresa Iwanski, Experian 30(b)(6) witness, was deposed. Below are some of the highlights of the testimony.

Witness has worked for Experian from 2003 to 2013. Witness did not work for Experian from 2013 to 2021. In 2021, Witness returned to work at Experian in the same role she had when she left Experian in 2013. Her current title is Senior Litigation Analyst.

Experian did not know the name of any person who worked in Experian's Regulatory Compliance Department.

Experian has not spoken to anyone from Experian's Legal Team regarding how Experian keeps up to date with requirements of the Fair Credit Reporting Act (FCRA).

Experian is regulated by the FCRA, meaning the FCRA sets out duties and obligations by which Experian is required to follow.

Regarding the allegations, Experian understood that Plaintiff was disputing two mortgages listed on his Experian report/file that did not belong to him.  One account was Rushmore Mortgage, aka Nationstar, and the other mortgage was Pennymac.

Regarding consumer disputes, if a consumer dispute was by mail, an ACDV would be sent to the data furnisher. If the dispute was by phone, an ACDV would be sent to the data furnisher. Experian is going to send an ACDV to the data furnisher and ask them to look at their records and report back to Experian with the ACDV. With online

2

disputes, consumers are allowed to attach documents. Consumers start the process, upload a documents, then Experian would attach the documents to the ACDV.

Experian understood that it was required to perform a reasonable reinvestigation in response to a consumer's dispute. Experian stated it has created policies and procedures to have those reasonable reinvestigations. Experian's attorneys would define what a reasonable reinvestigation was.

Experian's legal team would make the determination of what that definition of a reasonable reinvestigation was and then craft policies and procedures for how to carry out reasonable reinvestigations. Experian did not know of any specific details regarding the process conducted by Experian's legal team.

Experian's understanding of a reasonable reinvestigation was to create policies and procedures for agents to follow; policies and procedures that the agents are educated and trained and monitored to follow policies and procedures. With that, the agents then would be able to process mail, process phone calls, and be able to apply those policies and procedures to do whatever it is that they're trying to do, if they're trying to internally update something or send out an ACDV, and those procedures were in place for the agents to follow.

In its policies and procedures, Experian does not define what a reasonable reinvestigation is.

With an online consumer dispute, if documents were not uploaded, a live human would not review the dispute before the dispute was sent to the data furnisher.

Experian's agents are trained to follow Experian's policies and procedures.

Regarding Experian reasonably reinvestigating Plaintiff's disputes, there was an instance where the agent made a mistake. There was an instance where Experian's agent did not follow policy and procedure. It was with the mail correspondence sent to Experian by Plaintiff. There was a mistake in handling the dispute sent by the plaintiff to Experian in the mail. Experian's dispute agent, who handled Plaintiff's mail correspondence, did not follow Experian's policies and procedures.

Experian stated that even though its agent failed to follow its policies and procedures, Experian's position was that the investigation was still reasonable.

Experian is to maintain reasonable procedures to assure maximum possible accuracy of the consumer information about which it reports. this means that these procedures apply and they're intended to assure maximum possible accuracy even before a

3

APPENDIX 2408

dispute is submitted by a consumer. There is a process in place that looks at information before it's loaded into the database.

The process was to review the information; the data that that data furnisher was supplying to Experian; looking at the data to see what's making -- making sure that it's complying with Metro 2.  If there's instances where the trade is either illogical or it's not complying with Metro 2, Experian will then  communicate that information to the data furnisher, either that we're [Experian] not loading it to the database or for them to correct that information.

Also, Experian has agreements with data furnishers to participate in the dispute process. And then during the dispute process, the data furnisher would then be certifying in the  response to the ACDV sent to Experian that that information was accurately reporting.

Metro 2 is the standardized electronic data format that's used by furnishers when transmitting credit information to consumer reporting agencies such as Experian.

As far as the data furnishers supply the information, the data furnishers, as part of the agreement between the data furnisher and Experian, agree to supply accurate information to Experian. The structure itself to – to comply with Metro 2 is ensuring that -- that it meets standards for display. Using the Metro 2 format doesn't determine if the data itself was accurate. Experian reviews information provided by a data furnisher to make sure the furnisher was reporting using the correct format.

At the point that it's given for each and every piece of information, Experian would believe the information to be accurate as reported by the data furnisher. Experian believes the information reported by a data furnisher to be accurate. The data furnishers were certifying to Experian that the information was accurate.

Experian has seen agreements between Experian and data furnishers, and believed the agreements were all the same. Part of the agreements was the data furnishers to report accurate information and participate in the dispute process; and to enter into those agreements with data furnishers, the vetting and credentialing process must occur by Experian.

Experian stated it was familiar with the data furnisher vetting process, but only at a high level. Experian did not know the day-to-day specifics.

Experian has not seen Experian's credentialing department's procedures for vetting and credentialing new data furnishers. Experian's knowledge of the credentialing department would have been knowledge received prior to 2013. Experian did not know if Rushmore went through the credential process, but believed it did.

4

APPENDIX 2409

Metric Reports  were a comprehensive summary of some sort that tells the data furnisher whether they're complying with the Metro 2 formatting standard when transmitting data to Experian.  Metric Reports monitor Metro 2 formatting, not accuracy.

Experian will not know if data reported by a data furnisher was accurate. Experian has in place a dispute process for consumers to dispute information, and that is where the data furnishers would then certify to Experian that the information was accurate.

Experian has dispute agents located in Texas, Costa Rica, India, and possibly Chile. Experian does not have investigators.

For bonus payments, Experian dispute agents would need to do a certain amount of processing of consumer disputes, but their quality was part of that. Dispute Agents would have to process a certain number of disputes or respond to a certain number of disputes and ensure that the quality of the disputes meet a certain level to qualify for bonuses.  Agents are watched and viewed to make sure that they are being productive, that they are -- they have policies and procedures down, that they are accurately processing mail or telephone calls as well.

Experian dispute agents are located in India, Chile, Costa Rica. They're trained the same way that the Texas employees are trained, the Texas  dispute agents. the same manuals, same training.

Regarding a consumer dispute, instead of sending an ACDV, Experian could use internal reason codes. Internal reason codes are specific to whatever the consumer's disputing. Experian has policies to update information depending on what is being disputed, how the account looks, and what policies Experian is using in order to make the internal update or delete.

Regarding Plaintiff's dispute, an internal reason code was not applied. To Experian's knowledge, the manual related to the internal dispute codes, or internal reason code for the dispute that should have been applied was not produced by Experian in this case.

A mixed file is when two consumers are on one PIN.

And by "PIN," Experian meant the unique personal identification number that Experian associates with each and every consumer it has a file on in its database. Experian's ultimate goal is for each person to have their own PIN.  The PIN  is a special number assigned to each person's file.

Experian has agents who were specifically trained to process mixed files.

5

If a consumer just called in to Experian and said, "I want to dispute this account because it's not mine," at that point, the agent would look to see if there's any conflicts and process the dispute as it's given by the consumer.

With a consumer dispute, a not mine-fraud dispute was different than not mine, and a not mine-mixed dispute was different than a not mine. If a consumer just states "not mine," the agent just processes the dispute as a not mine.

When asked about follow-up questions on the telephone to a "not mine" dispute, Experian indicated that follow-up questions may or may not be asked by Experian's agent, depending on the conversation.

When Experian was asked:  "a "not mine" alone without anything more from the consumer, it wouldn't result in the dispute agent -- or the policies and procedures don't tell the dispute agents to ask any follow-up questions on a just "These are not mine"?

Experian answered:  "That's correct."   "just a regular not mine, they can call in and -- and say something, "This does not belong to me," and Experian would start the reinvestigation process as an ownership dispute.

Experian named several "not mine" disputes:  "not mine-fraud, not mine-block, not mine-belongs to ex-spouse, not mine-not liable, not mine-mixed file, potential mixed file."  Six to Eight different "not mine" codes.

With six to eight different or potential, not mine dispute codes,  Experian's answer was "it depends," regarding dispute agents asking follow-up questions to try and identify which is the code that applies here or the specific scenario that applies to the consumer dispute. Agents are trained to listen to certain statements or key phrases by a consumer on the telephone, and then, the dispute agent may ask for more information.

Experian maintains dispute procedures that relate to not mine disputes where the account was opened before the consumer was 18 years old. Those are the minor disputes, when a consumer is under the age of 18 when an account was opened. If Experian received proof, the policy is to delete the account. If Experian received proof of age and -- Experian will look at the open date. So, by the open date of the account and if Experian received proof, Experian has policies to delete the account.

Any data furnisher can report a person's date of birth.

Once a date of birth was associated with a consumer's file reported by the first data furnisher, that date of birth would be the one that "sticks" on the consumer's credit file, regardless if data furnishers afterward, report a different date of birth for a consumer.

6

Experian believed the information that's reported to Experian by data furnishers was accurate.

Experian stated that a consumer must state that an account was opened before he or she was age 18 before Experian will look at the account further. It had to be communicated at that time.

Before a consumer is transferred to a phone dispute agent, Experian's system will authenticate the consumer, using Social Security number and date of birth.

Exhibit 2 was reviewed.  Plaintiff's Experian Disclosure Log

This will contain the consumer's name, social security number, address, date of birth, if given, as well as the report number that's generated at that time.

Reading Bates 217 – 218, the log showed a phone dispute to Experian on February 12, 2024.

Exhibit 5 was reviewed.  Plaintiff's Dispute Response (DR) Log

On 2/12/2024, telephone disputes were was listed on the DR Log, which was created with the report number 3466487041.

A phone recording was provided in this case. Experian typically retained phone recordings for two years.

Exhibit 3 was listened to.  Phone recording.

The Pennymac and Rushmore tradelines were disputed. Plaintiff told the agent the accounts were not his.

Experian agreed that Experian's Dispute Agent did not ask any clarifying questions of Plaintiff about the disputed accounts. Experian admitted that there was nothing, no conversation or supplemental information that was being requested by Experian on the telephone recording.

The dispute agent did not ask plaintiff for any other information, except email address, that would be helpful in resolving his dispute. There were not any discussions other than the fact that the consumer was saying, "This was not mine."  Experian stated "it would've been best if the agent asked additional questions, asking if the consumer knows who this belongs to or otherwise engaging in this kind of a dispute."  It would have been more helpful for the agent to ask Mr. Ramirez Najera some additional follow-up questions.

With this telephone call, Experian's agent did not follow the policy and procedures or the training that Experian expects of them.

7

APPENDIX 2412

Exhibit 4 was reviewed.  Plaintiff's Experian Credit Report, Report # 2392-7442-85

The disputed Pennymac and Rushmore accounts were listed on this report.

Experian agreed that the mortgage with Pennymac was transferred from Pennymac to Rushmore in or around May 2019. These accounts were dealing with the same mortgage.

On February 12, 2024, the dispute agent chose the dispute of "not mine, provide complete ID" for both the Rushmore and Pennymac accounts.

Exhibit 6 was reviewed. Pennymac ACDV, Bates 147

An ACDV response consisted of information that Experian provides to the data furnisher based on what Experian had on file for that consumer at the time the ACDV was created.

The portion in the red boxes was information that Experian had in its database for plaintiff at the time the ACDV was generated.

Reading this ACDV, Pennymac responded to Experian on February 15, 2024.

Pennymac responded to Experian on the ACDV with a different Social Security number (SSN) and different date of birth.  With the response, Experian deleted the account from Plaintiff's file.

On this ACDV, the SSNs were different from what Experian had on file and what Pennymac responded with.

At the point when the ACDV was returned with a different SSN, Experian would not look further to determine if the file was a mixed file or not. The agent was processing according to how the -- how the dispute was initiated and with the differences and the return of the different social security number and date of birth, the process was to just delete the account.

Exhibit 7 was reviewed. Nationstar Mortgage ACDV. Bates 146

Reading this ACDV, Nationstar responded on February 28, 2024.

Reading Exhibit 5, Bates 220, the response indicated "Agent ID= AR 00001," this meant that Experian automatically updated the information in Experian's database without a live person at Experian reviewing it first. Based off the fact that Nationstar gave a full match of Plaintiff's ID, date of birth, and that matched back to what was given on the ACDV as far as what Experian was contacted with, the account remained unchanged, and the ACDV response was processed through automation.

8

<u>Exhibit 8</u> was reviewed.   Experian Dispute Results, Report # 3466-4870-41, dated March 7, 2024

These were the dispute results for Plaintiff's disputes provided on February 12, 2024.

<u>Exhibit 9</u> was reviewed. Experian Admin Report for Plaintiff, dated June 3, 2025

The admin report is going to be a snapshot of what the full account [consumer's file] looked like for a particular PIN, and it's going to house the names, the addresses, trade accounts, inquiries that are displayable to the consumer or that are also just not displayable but within Experian's records.

A long admin is going to house every time company reported information to Experian on each and every account in trade and how Experian builds that information. It's going to house information about bankruptcies, things of that nature. Outside of that is going to be the same thing that the regular admin would have. The long admin contains more tradeline information. It would have more information regarding account payment history.

FileOne is Experian's computer system [database], houses the information as like we're seeing here on the PIN level for consumers.

Experian requires a minimum of name and address (first name, last name, and an address) for information to be acceptable data that it receives from any source. There are some data furnishers that do not report with a social security number or date of birth. To Experian's knowledge, it's not a required field.

A single consumer file can have different name variations and multiple addresses listed on it.

To Experian's knowledge, only one date of birth can be recorded on a consumer's file. It was the first date of birth Experian received from a furnisher about a consumer that would stick to the file.

"YOBSRC" meant year of birth source. And "AF" meant the source was a tradeline, a data furnisher.

The date of birth on Plaintiff's file was updated on July 11, 2019.

Experian did not know the Rushmore account was inaccurate until the lawsuit was received. Once Experian received the – the lawsuit complaint, Plaintiff's file was analyzed to see if it's a mixed file. At that time, based off of the direction of counsel, the -- the file then was unmixed, and a do not combine was placed on Plaintiff's file.

9

Plaintiff did provide information to Experian prior to the lawsuit, but prior to the lawsuit, Experian did not analyze Plaintiff's file as a mixed file.

Would be mail correspondence; if the mail correspondence Experian received from Plaintiff, was transferred to a mixed trained agent at that time, Plaintiff's file could have been analyzed. But, instead, Plaintiff's file was not analyzed as a mixed file until Experian received this lawsuit complaint.

Prior to the lawsuit, Experian had sufficient information for Experian to determine that Plaintiff's file was a mixed file; if the agent followed policy and transferred Plaintiff's correspondence to a mixed file trained agent.

Plaintiff's Experian file was un-mixed, at the direction of counsel, after Experian received the lawsuit. Christina Hamilton un-mixed Plaintiff's Experian file.

Experian estimated that the disputed Rushmore account was first associated with Plaintiff's PIN on May 15, 2019, based upon reading the Admin Report.

Rushmore did not report an SSN for the disputed account. Experian stated that the minimum information needed to report an account was name and address. There were some data furnishers that only report with name and address and no social security number or date of birth.

Name Identification Number (NIN) 26591 was the name associated with the Rushmore account on Plaintiff's file. This NIN has been associated with plaintiff since August 3, 2008. August 2, 2008 to May 15, 2019 was the date range for this NIN reported to Experian. And the NIN was reported by a data furnisher.

Rushmore account came to exist on plaintiff's consumer credit report or was associated with his PIN based upon the association of the name and the address.

The mixing of Plaintiff's credit file that occurred here, where the Rushmore account that doesn't belong to Plaintiff appeared on his report, this was something that happened on Experian's end. Based off the information that Experian received from data furnishers, this is what -- the PIN that Experian believed belonged to this one person, instead of two.

Experian did not know if anyone from Experian reviewed Plaintiff's Dad's Experian file after the filing of the lawsuit.

With the inquiries listed on the Admin Report, it was possible that the companies listed could have received a consumer report pertaining to Plaintiff.

Exhibit 10 was reviewed. Plaintiff's Dispute Package, dated July 10, 2024

10

Experian received this dispute letter on July 30, 2024.

Reading the dispute package, Experian agreed that Plaintiff provided numerous documents to support his dispute, and he noted to Experian that he was 13 years of age when the disputed mortgage account was opened, and that Plaintiff informed Experian that the mortgage belonged to his father.

Experian understood that in Hispanic tradition children have two surnames, and there were times when consumers would use two different last names.

Experian agreed that Plaintiff provided more than sufficient information for Experian to delete the disputed account from his credit report. Experian stated that with Plaintiff's dispute, the dispute package should have been transferred to a mixed trained agent for analyzation and ultimate removal of the disputed account from Plaintiff's file.

There's nothing further that Experian would have required of Mr. Ramirez Najera to do other than what he did do to have his file corrected. On a scale of 1 to 5, with five being that the plaintiff gave Experian everything it needed to process this dispute and delete the inaccurate account, Experian would give Plaintiff a five.

The correct procedure for Plaintiff's dispute package was that the package should have been sorted to the mixed file dispute queue.

Exhibit 11 was reviewed. Rushmore ACDV August 2024, Bates 145

Rushmore did not respond with an SSN on this ACDV.

A response with an SSN was not required by Experian of Rushmore at the time of this ACDV. An SSN was not required at this time. The missing social security number was not something that -- that Experian would use to cause a deletion.

Based on the mail correspondence received by Experian, the wrong dispute code of "112" was used for this dispute. The dispute package should have been transferred to a mixed file trained agent for processing.

Exhibit 12.  Experian Dispute Results, Report # 0690-8455-24, dated August 19, 2024

With these dispute results from Experian, Experian indicated to Plaintiff that the Rushmore account that the Plaintiff disputed was verified and updated by Experian.

Exhibit 13. Plaintiff's Experian Credit Report, Report # 0943-3966-80, dated May 28, 2025.

Experian agreed that on this report the disputed Rushmore account was still reporting on Plaintiff's credit file.

11

On this report, a hard inquiry was listed from Xactus, dated April 27, 2025. Experian admitted that based upon this document, Xactus would have received plaintiff's credit information [credit report] including the disputed, inaccurate Rushmore account.

Exhibit 14 was reviewed. Reseller Dispute. Bates 164 - 165

Reading the Disclosure Log, this dispute was submitted by a Reseller on May 28, 2025.

Experian stated an ACDV was sent to Rushmore based upon this Reseller dispute. Experian sent an ACDV on behalf of the Reseller on 6-2-2025.

Experian stated that it did not get a response to the ACDV from Rushmore because Experian stopped the ACDV cycle to process Plaintiff's file internally.

There would not be a copy that would be generated, it's just whatever is in our DR log. Experian stopped that cycle from -- from a response coming back.

Regarding the ACDV sent to Rushmore on June 2, 2025, If Experian pulled the litigation case information on 6/3/2025, at that time Experian had not received a response back from the data furnisher.

Exhibit 15 was reviewed. Experian Dispute Results, Report # 1783-0192-08, dated June 11, 2025

The dispute results showed to Plaintiff that Experian removed the Rushmore account based upon mixed file processing. This was due to the litigation in this case.

Experian agreed that Plaintiff disputed the Pennymac and Rushmore account beginning in February of 2024.


Regarding the February 2024 telephone call to Experian by Plaintiff, Experian stated it wanted to clear up its testimony. Experian originally stated that the dispute agent on the telephone call should have asked follow-up questions. Experian changed its testimony and stated that as far as the Experian's policy itself, it's not policy for the agents to ask additional questions, so the agent did not commit an error.


**Conclusion of Testimony**

Experian admitted that prior to the lawsuit, Experian had sufficient information for Experian to determine that Plaintiff's file was a mixed file; and the agent should have followed policy and transferred Plaintiff's correspondence to a mixed file trained agent.

12

In my opinion, Experian basically stated it blindly accepted the information from data furnishers as accurate: "At the point that it's given for each and every piece of information, Experian would believe the information to be accurate as reported by the data furnisher." Experian's testimony indicated that Experian believes the information reported by a data furnisher to be accurate, because the data furnishers have agreements with Experian, and were certifying to Experian that the information was accurate. Unfortunately, Experian has elected to shift the primary duty to investigate to the furnisher and otherwise uses poorly-trained foreign agents who do not speak English as their native language which contributes to their failure to follow written procedures causing disputed information to continue to appear. Based on my experience working at Experian as well as the plethora of cases I have reviewed and opined on, there is a widespread and system issue with resolving mixed file disputes regardless of the amount of proof submitted by the consumer.

Vetting

Experian testified about Furnisher Vetting and Metric Reports were tools used by Experian to gauge the furnisher's reporting of information to Experian. However, in my opinion, Experian could not give specific details of the vetting process, and Experian agreed that the Metric Reports only focused on Metro 2 formatting and not accuracy of the information reported.

This further supports my opinion that Experian cannot rely on the vetting process it has in place to determine the reliability of the information provided by furnishers. Experian takes no steps to ensure that the furnisher has a reasonable dispute resolution process such that Experian could rely on that furnisher to conduct a reasonable investigation. Instead, Experian relies on "certification" by the furnisher rather than actually take steps to ensure accuracy.

Furthermore, I have personal knowledge about Experian's vetting process. The vetting process primarily relates to Experian's efforts to verify that new data furnishers/subscribers are real companies in existence so that Experian can ensure that it will receive payment for the services Experian renders to its customers. There are no steps that Ms. Iwanski testified about, or of which I am aware based on my existing knowledge of Experian's vetting procedures, that relate to the actual accuracy of a data furnisher's credit information.

Phone dispute

Regarding the telephone dispute by Plaintiff in February 2024, Experian originally stated that the dispute agent on the telephone call should have asked follow-up questions. Experian changed its testimony and stated that as far as the Experian's policy itself, it's not policy for the agents to ask additional questions, so the agent did

13

APPENDIX 2418

not commit an error.  I find this testimony troubling. In my experience and knowledge of working in the credit industry for approximately 20 years, I have not seen or heard of a Consumer Reporting Agency not having a policy of asking clarifying questions on the telephone.

I recall working at Experian for over 14 years and helping consumers with their telephone disputes, and referring to Experian's phone dispute training materials, and other materials, in which these materials contained numerous samples of questions to ask consumers on the telephone to clarify what their disputes or complaints were. One of the materials I used when speaking with consumers on the telephone were what was known as "talk tracks." Talk tracks were examples of questions to ask consumers when they gave certain disputes.  For example, one of the set of questions to ask was specifically when a consumer stated that an account was not his or hers.  The questions that were supposed to be asked regarding "not mine" disputes were designed to clarify if the consumer was a victim of identity theft or possibly a mixed file.

Questions like:  Do you know who the account belongs to?

Did you notice any personal identification information, i.e., names, addresses, phone numbers, etc., on your report that was not accurate?

Do you believe you are a victim of fraud?

Have you ever lost your driver's license or similar item?

While on the phone, if a consumer indicated by his or her answers that they were a fraud victim or possible mixed file, if the agent on the telephone was not trained to handle those types of disputes, then the consumer's call had to be transferred to the team or agents who could process the disputes. Experian admitted that with Plaintiff's dispute package, the package should have been transferred to a mixed file trained agent. Dispute telephone calls from consumers follow the same concept. The clarifying or follow-up questions will help determine if the consumer is getting help from the correct department or trained agent.

Based upon Experian's testimony in this case, if clarifying questions or follow-up questions, were not required to be asked, then, in my opinion, Experian's policies and procedures were not adequate regarding consumer telephone disputes.

To further explain, when I worked at Experian I told on multiple occasions that the advantage of talking with a consumer on the telephone, as opposed to reading the consumer's dispute mail, was that on the phone questions could be asked. Questions

14

APPENDIX 2419

to clarify what the exact disputes were and the reasons for the disputes. Another reason to ask clarifying questions, was to ensure the consumer's dispute was handled by the trained agent. For example, a consumer telephoned Experian and the agent received the call. The initial agent would need to ask questions about a "not mine" dispute to understand why the account did not belong to the consumer, to ensure the agent was trained to handle the consumer's dispute, or if the call had to transferred to another agent.

An Experian Phone Dispute Manual or Participant's Guide, or similar, was not provided in this case, but in my opinion, the manual or guide would help show the types of talk tracks and training Experian agents would receive.

In this case, Experian testified that Experian's policy itself, it's not policy for the agents to ask additional questions, so the agent did not commit an error. I disagree based upon my experience and knowledge of working at Experian for over 14 years, and my continuation to review and be an expert on litigation cases involving Experian, since my leaving employment at Experian.

Using this case as an example, when Mr. Ramirez Najera telephoned Experian in February 2024 and told the agent that the accounts were not his, the agent should have asked clarifying questions to understand why Mr. Ramirez Najera believed the accounts were not his. If the Experian agent on the February 2024 call was not trained to handle the not mine disputes of fraud or mixed, then, Mr. Ramirez Najera's call would have to be transferred to a trained agent in those specialties. In this case, the Experian agent failed to ask clarifying questions of Mr. Ramirez Najera, so as a result, in my opinion, Experian failed to adequately reinvestigate Mr. Ramierz Najera's disputes.

Also, with Experian's testimony, Experian stated that with "not mine" disputes, agents were to look for conflicts. With my experience and knowledge, looking for conflicts meant looking at the consumer's file for additional Social Security numbers, or any information that did not make sense, i.e., looking at account open dates and the consumer's date of birth. In this case, it is my opinion that Experian failed to look for conflicting data on Plaintiff's file when he disputed the account information with Experian. If Experian looked at Plaintiff's date of birth and the account open dates for the disputed accounts, it is my opinion, Experian should have seen that the accounts were opened when Plaintiff was 13 years of age. My opinion here is that Experian likely committed perjury on the issue of whether there was a policy to ask follow up questions during a phone dispute. Unless Experian has recently changed its policy, the witness changed her testimony to enhance Experian's defense posture in this case.

15

ACDV

There was testimony regarding an ACDV sent to Rushmore on June 2, 2025. Experian stated that it did not get a response to the ACDV from Rushmore, because Experian stopped the ACDV cycle to process Plaintiff's file internally. With my experience and knowledge, this was not true. Just because Experian stopped the dispute cycle and processed the file internally, does not mean the ACDV response was not received by Experian. In this case, after the ACDV was sent out, Rushmore would not typically know that Experian updated Plaintiff's file internally. I have seen on many occasions while I worked at Experian where an ACDV was sent to the data furnisher, and Experian stopped the dispute cycle, but the data furnisher still provided an ACDV response. The ACDV response may not record on the DR Log due to the dispute cycle being stopped, but I have seen where Experian did receive the responses from the data furnishers. In my opinion, either Experian failed to search for the ACDV response from the June 2, 2025 Reseller dispute, or Experian possesses the ACDV response and failed to produce it in this case.

Mixed files

Further, Experian stated that Rushmore did not report an SSN for the disputed account. Experian stated that the minimum information needed to report an account was name and address. Experian testified that there were some data furnishers that only report with name and address and no social security number or date of birth.

With this in mind, in my opinion, this testimony indicated that Experian allowed mixed files to happen in its database. With my experience and knowledge, Experian's database allows a loose matching logic regarding consumer's credit files. When Experian was notified of a consumer file being possibly mixed, Experian will typically place a "Do Not Combine" on a consumer's Experian file to prevent the file from being mixed with another consumer. In order to place the Do Not Combine on the consumer's file, the consumer's Social Security Number (SSN) was required. In my opinion, since Experian allows data furnishers to report tradeline accounts to Experian without SSNs, Experian allows mixed files to happen.

Also, with the Pennymac dispute in February 2024, Pennymac responded to the dispute with a different SSN and date of birth. Experian stated that its agent deleted the Pennymac account, but Experian had no policies and procedures in place for the agent to further look to see if Plaintiff's file was mixed at that time. With my experience and knowledge, with an ACDV response with different SSNs and dates of birth, coupled with a similar name and same address, this would indicate that the file was a possible mixed file. At a minimum, upon Experian's receipt of Pennymac's ACDV response, it is my opinion, Experian should have reviewed Plaintiff's file to see if it was a mixed file. Experian's agent allegedly reviewed Pennymac's ACDV response and deleted the

16

account based upon the different SSN and date of birth provided. In my opinion, Pennymac's ACDV response was an indicator that Plaintiff's file was, at the time, possibly mixed with a person with a similar name and address. With this ACDV response, it is my opinion that Experian admitted that it did not have a mechanism, or policy and procedure, in place to further investigate in order to prevent mixed files.

Minor

Experian stated that it maintained dispute procedures that relate to not mine disputes where the account was opened before the consumer was 18 years old. Based on reading the evidence in this case, in my opinion, those procedures were ineffective.

Reading Experian's Admin Report, the disputed Rushmore account was opened in January 2009. Further reading Experian's Admin Report, Experian reported Plaintiff's date of birth as December 14, 1995. Experian testified that it received the date of birth information from a data furnisher, and Experian stated it believed data furnishers to report accurately to Experian because of the agreements that were in place. Using simple math, Plaintiff was 13 years of age when the Rushmore account was opened. In the past Experian has testified that persons under the age of 18 cannot contract and therefore typically would not have any accounts on a credit report that pre-date the age of 18. Experian has published on its website that a person under the age of 18 likely would not have a credit report, but it was possible due to being an authorized user, joint account holder, or identity theft.[1]

Reading the evidence in this case, the Rushmore account was opened in 2009; Experian had Plaintiff's date of birth as December 14, 1995; Experian was aware that accounts typically were not opened by someone under the age of 18; so, in my opinion, Experian failed to note the inaccurate Rushmore account on Plaintiff's file until the litigation was filed. Reading the DR Log, from February 2024 to June 2025, Mr. Ramirez Najera disputed the Rushmore account three times with Experian. Experian testified that once Experian received Mr. Ramirez Najera's litigation complaint, then, Experian analyzed Mr. Ramirez Najera's file and corrected it.

## Metric Reports

There were Metric Reports provided in this case. With my experience and knowledge, in my opinion, the reports measure whether the data furnishers are reporting in the proper Metro format, and not accuracy (i.e., ownership, status). Even when I worked

---

[1] https://www.experian.com/blogs/ask-experian/does-your-child-have-a-credit-report/ ; https://www.experian.com/blogs/ask-experian/requesting-report-for-minor-to-protect-from-fraud/#:~:text=Dear%20RNS%2C,your%20child's%20Social%20Security%20card

17

at Experian, I was trained on and read the Metric Reports and understood that the reports did not reflect the true accuracy of the accounts, i.e., ownership or status of the account (payment history, balance, etc.), reported by the data furnishers. The reports only measured if the data furnishers placed the correct Metro 2 coding in the correct format (box or line) on the reports.

With my experience and knowledge, in my opinion, the "Fatal Error Percentage" on the Metric Report was misleading. The Fatal Error Percentage on the report showed a very small number percentage, but the number does not represent the true accuracy (ownership or status) of the account. In my experience and knowledge, the Metric Report showed when a data furnisher entered the wrong code or failed to enter the correct code in a particular box or line when reporting batch data to Experian.

Experian's testimony in this case, and in other cases, corroborated my opinion about the Metric Reports.

**Conclusion**

In my opinion, Defendant, Experian, failed to maintain adequate procedures (or to follow the ones it did have) to ensure accuracy in its reports regarding Plaintiff. In my opinion, Experian wrongly created a mixed/merged file between Mr. Ramirez Najera and another consumer, Plaintiff's father, and as a result, Experian reported information about another consumer on Mr. Ramirez Najera's Experian reports to third-parties. In other cases, involving mixed files, Experian has further stated that its "procedures that allowed the files to mix were reasonable."[2]  I disagree.

In my opinion, Experian failed to protect Plaintiff's consumer file by allowing Plaintiff's file to be mixed with another consumer. For almost over 30 years, Experian's database has continued to create mixed files. Experian has admitted that no less than 3 percent of its database contains mixed files. With over 245 million credit files stored in Experian's database, that means that Experian's database contains over 7.35 million mixed files. With my experience and knowledge, and based upon reviewing the evidence in this case, in my opinion, Plaintiff's Experian consumer file contained inaccurate information, i.e., inaccurate accounts, names, telephone numbers, and employment belonging to another consumer.

Plaintiff's case is not an isolated incident but is, in my opinion, the result of Experian's systemic refusal to update its system to ensure mixed files do not happen in the first place. Experian already has the solution – it only needs to adopt its own DNC matching logic as its matching logic, all the time, for every consumer, not just those who complain about a mixed file or fraud (when the issue is really a mixed file). In my opinion, mixed

---

[2] Mary Methvin's report, dated May 23, 2025, Ronald Alexander Garcia Delgado v. Experian Information Solutions, Inc., Case No. 4:24-cv-00637-ALM

18

and/or merged files would to a great degree disappear if Experian simply changed its policy. Even if a file was not identified as a mixed file, Experian, upon a consumer's request, will add the DNC ["Do Not Combine"] to the consumer's file. Apparently, even with the cost of lawsuits, Experian earns more money with its loose matching logic that mixes consumers. In other cases, involving Experian mixed files, Experian has stated that it believed its policies and procedures were reasonable, which indicated, in my opinion, that Experian had no desire to correct its database to prevent mixed files from taking place, prior to the submission of an ownership dispute by a consumer. With the evidence in this case, plus other cases, Experian has demonstrated that it had no desire to help prevent mixed files or eliminate mixed files from its database, prior to a consumer submitting an ownership dispute to Experian. In other cases, Experian stated that if an ownership dispute was not submitted by a consumer, then a mixed file within Experian's database would not be discovered and corrected. With this case, Plaintiff did provide ownership disputes and his file was not corrected as the result of his disputes. Reading the evidence, it is my opinion that Plaintiff had to file litigation against Experian to get his Experian file/report corrected.

Consumers have a right to valid and accurate Experian credit files. For decades, Experian has known that its database and logic causes mixed files, yet it has chosen to do very little if anything about it.

In my experience and knowledge, it is my opinion that Experian chooses to allow mixed files to happen in its database. Experian refuses to implement the simple fix of matching a full SSN or other criteria which would have prevented this mix/merged file from occurring in the first place (a solution they already have in place but choose to use only after the damage is done to the mixed/merged consumer).

Plaintiff, along with over 240 million other consumers in the United States with consumer reports, are counting on Defendant Experian, to report information about their credit history accurately. It is my opinion, that unless a court or regulatory agency tells Experian to change and modify its database to prevent mixed files, Experian will continue to store and report inaccurate consumer reports, such as in this case, and harm consumers, like Mr. Ramirez Najera.

If appropriate, and if justified by the production of additional evidence or discovery, I reserve the right to supplement this report at a future date.

19

**FEES**

My fee for a Credit Expert report is $3,500.

My fee is $300 per hour for testimony preparation, consulting, document review and preparation of supplemental reports or declarations; and

My fee is $400 per hour, with a minimum of $1200 per day, for all testimony AND $500 for preparation of said testimony; both the $1200 amount and $500 amount are due 10 days in advance of said testimony, plus reasonable travel time which is also billed out at $400 for in person testimony, plus travel costs and expenses.

By requesting my appearance at a deposition, it is agreed to pay me for the entire time I spend at the deposition, including breaks, as well as my $500 preparation fee.

My compensation is not contingent on the outcome of this case.

## MATERIALS CONSIDERED

Plaintiff's counsel provided the following materials which I considered, together with my experience and knowledge, in forming the opinions expressed herein:

1.  Plaintiff's Complaint, U.S. District Court, Northern District of Texas
2.  Plaintiff's documents
3.  Experian's documents, Experian 0001 – 0461
4.  Telephone recording, Experian 0170
5.  Metric Reports, Experian 0457 – 0461
6.  Deposition of Teresa Iwanski, Experian 30(b)(6)
7.  Fair Reporting Credit Act, 15 U.S.C. § 1681, et seq.


**Respectfully submitted and executed this 12th day of November, 2025 in Aubrey, Texas**

_____

Douglas A. Hollon
Credit Experts of North Texas, LLC
1101 Mockingbird Dr
Aubrey, TX 76227

20

**Testimony**

David Miller ***v. DILLIGAF Enterprises, LLC; and PNC Bank, N.A.,*** American Arbitration Association, Case Number:  01-23-0002-7045. Expert Report. Deposition. (2025)

Jena Miller ***v. Experian Information Solutions, Inc.*** U.S. District Court, District of Minnesota (Case: 0:24-cv-03177). Rebuttal Expert Report. Deposition. (2025)

D'Marius Dobbins ***v. Experian Information Solutions, Inc.*** U.S. District Court, Western District of Oklahoma (Case: 5:24-cv-01030-JD). Expert Report. Deposition. (2025)

Andrew F. Smith ***v. Experian Information Solutions, Inc.,*** American Arbitration Association, Case Number: 01-24-0007-5081. Testimony. (2024)

Bianca M. Jones ***v. Nelnet Servicing, LLC***, U.S. District Court, Western District of Tennessee (Memphis Division) (Case: 2:24-cv-02325). Expert Report. Deposition. (2025)

Ronald A. Garcia Delgado ***v. Experian Information Solutions, Inc.*** U.S. District Court, Eastern District of Texas (Sherman Division) (Case: 4:24-cv-00637). Expert Report. Deposition. (2025)

Oleksandr Panchenko ***v. Comenity Capital Bank, and Bank of America, N.A.***; U.S. District Court, Northern District of California (Case: 5:23-cv-04965-BLF). Expert Report. Deposition. (2025)

Marcelino Albuerne and Ruby Jenkins ***v. Rent Recovery Solutions, LLC;*** U.S. District Court, District of Kansas (Case: 5:24-cv-04043). Expert Report. Deposition. (2025)

Michael R. Libbra ***v. Experian Information Solutions, Inc. and TransUnion, LLC,*** U.S. District Court, Central District of Illinois (Case: 3:23-cv-03298-CRL-KLM). Expert Report. Testimony (2025)

Tamara Allen ***v. Experian Information Solutions, Inc. and USAA Federal Savings Bank,*** U.S. District Court, Southern District of Texas (Houston Division) (Case: 4:23-cv-03406)

Ivy Acorin ***v. Wells Fargo Bank, NA***, U.S. District Court, Southern District of California (Case: 3:24-cv-00034-AJB-BLM). Expert Report. Testimony (2025)

Alana Cimillo **v.** ***Experian Information Solutions, Inc.,*** Judicial Arbitration and Mediation Services (JAMS), (JAMS Reference Number: 5425001310). Expert Report. Testimony (2025)

Alycia Johns ***v. Experian Information Solutions, Inc.; Equifax Information Services, LLC; Nelnet; First Premier Bank: TransUnion, LLC; LVNV Funding; et al.***, U.S. District Court, Eastern District of Pennsylvania (Case: 2:22-cv-04791-KBH) Expert Report. Deposition. (February 2025)

Alycia Johns ***v. TransUnion, LLC; Experian Information Solutions, Inc.; Equifax Information Services, LLC; Nelnet; First Premier Bank; LVNV Funding; et al.***, U.S. District Court, Eastern District of Pennsylvania (Case: 2:22-cv-04791-KBH) Expert Report. Deposition. (January 2025)

21

Richard Leroy Brasmer *v. Experian Information Solutions, Inc.* U.S. District Court, Eastern District of Washington (Case: 2:24-cv-00063). Expert Report. Deposition. (2025)

Cecelia Colette Grant *v. Experian Information Solutions, Inc.,* American Arbitration Association, (Case Number 01-24-0004-3912), Testimony (2025)

James Breitenbach *v. SageStream, LLC,* U.S. District Court, Eastern District of Pennsylvania, (Case: 2:24-cv-00893). Expert Report. Deposition. (2024)

Demetre Durham *v. Experian Information Solutions, Inc., et al., U.S.* District Court, District of Hawaii Case: 1:23-cv-00255-JAO-KJM). Expert Report. Deposition. (2024)

Saran Nuth and Kevin O'Neill *v. Newrez LLC dba Shellpoint Mortgage Servicing, and Experian Information Solutions, Inc. et al.*, U.S. District Court, Northern District of California (Case: 3:23-cv-03476-WHA). Expert Report. Deposition. (2024)

Austin Stuart Fraase *v. Advantage Credit Bureau, U.S.* District Court, District of North Dakota (Eastern Division) (Case: 3:23-cv-00117-ARS). Expert Report. Deposition. (2024)

James N. Osborne *v. RentGrow, Inc.*, U.S. District Court, District of Massachusetts (Case: 1:23-cv-10572) Expert Report. Deposition. (2024)

Alexandra Husted-Mai *v. Hunter Warfield, Granite Management, LLC, and Tailwind West Lafayette*, LLC, State of Indiana, Circuit Court of Tippecanoe County (Cause No. 79C01-1908-CT-000114) Trial Testimony. (2024)

Daniel Wright *v. HireRight, LLC,* U.S. District Court, District of Arizona (Case: 2:23-cv-00493-SMM) Expert Report. Deposition. (2024)

Shane W. Young *v. Experian Information Solutions, Inc., and First Advantage Background Services Corp.,* U.S. District Court, Northern District of Illinois (Western Division) (Case: 3:22-cv-50222) Expert Report. Deposition. (2024)

Crystal Lovelady *v. Experian Information Solutions, Inc., and General Business Recoveries, Inc.,* U.S. District Court, District of Arizona (Case: 4:23-cv-00136-SHR). Expert Report. Deposition. (2024)

Ernest Lee Duncan, Jr. *v. Experian Information Solutions, Inc.,* JAMS Arbitration, Ref. No. 5410000458. Testimony. (2024)

Fabian Huizar *v. TransUnion, Inc.,* U.S. District Court, Northern District of Indiana (Lafayette Division) (Case: 4:22-cv-00086-PPS-JEM) Expert Report. Deposition. (2024)

Fabian Huizar *v. Horizon Bank,* U.S. District Court, Northern District of Indiana (Lafayette Division) (Case: 4:22-cv-00060-PPS-JEM) Expert Report. Deposition. (2024)

Fabian Huizar *v. Experian Information Solutions, Inc.,* U.S. District Court, Northern District of Indiana (Lafayette Division) (Case: 4:22-cv-00085-PPS-JEM) Expert Report. Deposition. (2024)

22

Fabian Huizar *v. Equifax Information Services, LLC,* U.S. District Court, Northern District of Indiana (Lafayette Division) (Case: 4:22-cv-00090-PPS-JEM) Expert Report. Deposition. (2024)

Lawrence Whaley *v. RentGrow, Inc.,* U.S. District Court, District of South Carolina (Case: 2:23-cv-01393-DCN). Expert Report. Deposition. (2024)

Sean Algaier *v. Credit Control Services, Inc., et al.,* U.S. District Court, Western District of North Carolina (Case: 3:22-cv-00475-RJC-DCK). Expert Report. Deposition. (2023)

Aaron Rubin *v. US Bank Home Mortgage, Experian Information Solutions, Inc., Equifax Information Services, LLC, TransUnion, LLC.,* U.S. District Court, Western District of New Jersey (Case: 3:22-cv-00906-FLW-DE). Expert Report. Deposition. (2023)

Lyla Stephens *v. Experian Information Solutions, Inc.,* American Arbitration Association, Case Number: 01-22-0003-5590. Expert Report. Deposition. (2023)

Melissa L. Walker *v. Missouri Higher Education Loan Authority, Equifax Information Services, LLC, and TransUnion, LLC, U.S.* District Court, Eastern District of California (Case: 1:21-at-00607). Expert Report. Deposition. (2023)

Zavian Allen *v. Experian Information Solutions, Inc., Equifax Information Services, LLC, TransUnion, LLC, and Innovis Data Solutions, Inc., et al.,* U.S. District Court, Eastern District of Texas (Sherman Division) (Case: 4:22-cv-00128-ALM). Expert Report. Deposition. (2023)

Eunice Hernandez *v. Experian Information Solutions, Inc., Equifax Information Services, LLC, TransUnion, LLC, and Innovis Data Solutions, Inc., et al.,* U.S. District Court, Eastern District of Texas (Case: 4:22-cv-00455-SDJ). Expert Report. Deposition. (2023)

Erin Livesay *v. National Credit Systems, Inc., U.S.* District Court, Northern District of Indiana (Lafayette Division) (Case: 4:22-cv-19-TLS-JEM). Expert Report. Deposition. (2023)

Mark Cebrynski and Kristen Cebrynski *v. Wells Fargo Bank, N.A., and Experian Information Solutions, Inc.,* U.S. District Court, District of Arizona (Case: 2:21-cv-01965-DJH). Expert Report. Deposition. (2023)

Genaris Haston *v. Gold Coast Federal Credit Union, et al.,* U.S. District Court, Southern District of Florida (Case 9:22-80004-CIV-SMITH). Expert Report. Deposition. (2022)

Jeff Wellemeyer *v. TransUnion, LLC, et al,* U.S. District Court for the Western District of Kentucky, Louisville Division (Case number: 3:20cv814 DJH-LLK). Expert Report. Deposition. (2022)

Thomas Lynch and Rosemary Nelson *v. Experian Information Solutions, Inc.,* U.S. District Court, District of Minnesota (Case 0:20-cv-02535).  Expert Report. Deposition. (2022)

Matthew Koerner *v. Santander Consumer USA, Inc. and Equifax Information Services, LLC and Experian Information Solutions, Inc., and Trans Union, LLC,* U.S. District Court for the Northern District of Illinois (Case 1:20-cv-522). Expert report. Deposition. (2021)

23

John D. Myers, on behalf of himself and those similarly situated, ***v. Equifax Information Services, LLC and Experian Information Solutions, Inc., and Trans Union, LLC,*** U.S. District Court for the Southern District of Indiana (Case 1:20-cv-00392-JMS-DLP). Expert report. Deposition. (2021)

24

# DOUGLAS A. HOLLON

469.544.4792 | doug@hollon.biz

---

## CREDIT EXPERT

### CORE COMPETENCIES AND ACHIEVEMENTS

**CDIA FCRA Certifications**
**NYIF Credit Analyst Certificate**
**SAS Credit Risk Modeling and Credit Score Development**
**American Bankers Association Lending Compliance Certificate**
**Expert witness for FCRA victim's $20M trial win against a data furnisher**
**Trial Testimony.** Provided crucial testimony about a data furnisher in an FCRA case which resulted in a $2.25 million jury verdict for the Plaintiff/Client.
**Arbitration Testimony.** Provided crucial testimony about a CRA in an FCRA case which resulted in a $1.1 million decision for the Plaintiff/Client.
Provided crucial testimony about a CRA in an FCRA case which resulted in a $325,000 decision for the Plaintiff/Client.
**30(b)(6) Corporate Representative Witness.** Testified on behalf of company; having specialized knowledge of company policies, procedures and operations.
**Credit Reporting Analysis.** Analyzed tens of thousands of credit reports in order to help customers.
**Credit Score Analysis.** Analyzed thousands of credit scores in order to help consumers and others.
**E-Oscar.** Reviewed and studied e-Oscar reporting from companies to ensure accuracy.
**Compliance.** Reviewed laws and regulations and reviewed company processes to ensure compliance.
**Public Speaking.** Invited to speak at Credit Con 2022, along with another credit expert, plus speaking event at Paul Quinn College.
**Investigative techniques.** Learned and applied investigative techniques to various crime scene situations and criminal cases.
**Customer Service.** Diffused hundreds of escalated customer interactions with peaceful resolutions. Red carpet service.
**Legal Research and Analysis.** Reviewed and studied pre-litigation complaints, company documents, and explained results to company legal personnel.
**Contract Management.** Studied government (FAR) and commercial contracts. Master's Certificate Contract Management, Villanova University

### PROFESSIONAL EXPERIENCE

**CREDIT EXPERTS OF NORTH TEXAS, LLC** | Aubrey, TX | 2020 - Present
President/Owner

- Prepare Expert Witness Reports
- Analyze litigation case documents
- Legal Research
- Deposition and Trial Testimony
- Compliance
- Consultation/Training/Speaking

**EXPERIAN** | Allen, TX | 2005–2019

25

**Credit Reporting, Compliance**
- 30(b)(6) Corporate Representative Witness (2016-2018) Testified on behalf of company; having specialized knowledge of company policies, procedures and operations.
- Analyzed and defused escalated customer situations to prevent lawsuits by managing processes from beginning to end
- Provided leadership advice to current supervisors based on observation of company operations increasing department efficiency
- Maintained relations between high profile customers and company reassuring customers that their information is secure and safe as the Project Manager for High Profile Security Breach
- Developed close relationships with customers in order to resolve their issues by learning various personalities and how to interact
- Government Liaison to Congressmen, managing customer cases and providing in-depth reports
- Managed security breaches involving high profile consumers, creating policies and procedures to prevent future breaches
- Processed subpoena requests as the Custodian of Records for Federal Courts, State Courts, IRS, etc.

**U.S. ARMY** | Germany | 1989 – 2005
**Senior Paralegal, CID Agent**
- Top Secret SCI clearance
- Investigated General Crimes and Economic Crimes
- Supervised operations for Prosecutor's office, including 7 branch offices, overseeing over 15 personnel (this office had the largest criminal case load in the Army for the years I was there)
- Maintained an overall office budget, including supplies, equipment, and travel, totaling over $40,000
- Implemented and manage computerized file tracking system, providing 100 % accountability of all pending cases
- Updated office filing system for files up to 10 years old increasing capacity
- Non-Commissioned Officer of the Year candidate for military installation

**EDUCATION AND CERTIFICATIONS**
**Bachelor of Science in Business Finance** | Liberty University | Lynchburg, VA | Honors
**Bachelor of Arts in Religion**, Bethany Divinity College and Seminary | Dothan, AL | Summa Cum Laude
**Master's Certificate in Contract Management** | Villanova University | Villanova, PA
**Ziglar Legacy Certified Trainer**
**D.I.S.C. Personality Profile Certified Trainer**
**NYIF Credit Analyst Certificate**
**CDIA FCRA Certifications**
**SAS Credit Risk Modeling and Credit Score Development**
**American Bankers Association Lending Compliance Certificate**

**TECHNICAL SUMMARY**
Series 6 License, Microsoft Word, Excel, PowerPoint, Outlook, and Customer Relationship Management System, Public Speaking; Training Facilitator, Notary Public

26

APPENDIX 2431

# EXHIBIT BB

# FILED UNDER SEAL

(Appendix 2432-2438)

# EXHIBIT CC

PO Box 9701
Allen, TX 75013



VICTOR M RAMIREZ
██████████████████
FORT WORTH TX 76106

## Your Credit Report

Report # 0943-3966-80 for **May 28, 2025**



# Hi, Victor M. Welcome to your Credit Report.

# What's In Your Credit Report?

Your Potentially Negative Account Activity (Accounts and Bankruptcies). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

Your Positive Account Activity. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2

Who Has Viewed Your Credit Information. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   5

Your Personal Information. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   5

How to Contact Experian. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6

Your Rights as a Consumer. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6

# Payment History Legend




| | | |
|---|---|---|
| **OK** Current / Terms met | **150** Past due 150 Days | **VS** Voluntarily surrendered | **D** Defaulted on contract |
| **30** Past due 30 Days | **180** Past due 180 Days | **R** Repossession | **C** Collection |
| **60** Past due 60 Days | **CRD** Creditor received deed | **PBC** Paid by creditor | **CO** Charge off |
| **90** Past due 90 Days | **FS** Foreclosure proceedings started | **IC** Insurance claim | **CLS** Closed |
| **120** Past due 120 Days | **F** Foreclosure | **G** Claim filed with government | **ND** No data for this period |

# ⚠️ Your Potentially Negative Account Activity

The most common items in this section are late payments, accounts that have been charged off or sent to collection, accounts settled for less than full value, and items that may need closer attention, such as transferred accounts.

APPENDIX 2440

EXPERIAN_NAJERA_0115

**Your Potentially Negative Account Activity (Continued)**

## CAPITAL ONE Partial Acct # 515676761372....
PO BOX 31293 SALT LAKE CITY UT 84131; (800) 955 7070

**Status (May 2023)** Paid, Closed. $416 written off.

| | |
|---|---|
| **Date opened** Jun 2021 | **Terms** Not reported |
| **Address ID #** 0701387387 | **Monthly payment** Not reported |
| **Type** Credit card | **Credit limit or original amount** $300 |
| **Responsibility** Individual | **High Balance** $416 |

**Recent Balance** Not reported

**Comment:** Account closed at credit grantor's request.

**Payment history:** Jul 2021 - May 2023

| | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2023** | CO | CO | CO | CO | CLS | | | | | | | |
| **2022** | OK | OK | OK | OK | 30 | 60 | 90 | 120 | 150 | CO | CO | CO |
| **2021** | | | | | | | OK | OK | OK | OK | OK | OK |

**Comment History**
Account closed at credit grantor's request.| Apr 2023 - Sep 2022

## OPORTUN/PROGRESO FINANCI Partial Acct # 567....
PO BOX 560910 THE COLONY TX 75056; (866) 488 6090

**Status (May 2023)** Refinanced, closed.

| | |
|---|---|
| **Date opened** Sep 2022 | **Terms** 22 Months |
| **Address ID #** 0701387387 | **Monthly payment** Not reported |
| **Type** Unsecured | **Credit limit or original amount** $2,000 |
| **Responsibility** Individual | **High Balance** Not reported |

**Recent Balance** Not reported

**Comment:** Account closed due to refinance.

**Payment history:** Sep 2022 - May 2023

| | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2023** | ND | 60 | 90 | 90 | CLS | | | | | | | |
| **2022** | | | | | | | | | OK | OK | OK | OK |

## RUSHMORE LOAN MGMT SERVI Partial Acct # 102760214....
15480 LAGUNA CANYON RD STE 100 IRVINE CA 92618; (888) 504 6700

**Status (Jan 2023)** Transferred,closed.

| | |
|---|---|
| **Date opened** Jan 2009 | **Terms** 30 Years |
| **Address ID #** 0701387387 | **Monthly payment** Not reported |
| **Type** Mortgage | **Credit limit or original amount** $109,370 |
| **Responsibility** Individual | **High Balance** Not reported |

**Recent Balance** Not reported

**Comment:** Transferred to another lender

This item was updated from our processing of your dispute in Aug 2024.

**Payment history:** May 2019 - Jan 2023

| | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2023** | CLS | | | | | | | | | | | |
| **2022** | 30 | OK | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 60 | 30 | 60 |
| **2021** | ND | ND | ND | ND | ND | 60 | 30 | 60 | 60 | 30 | 60 | OK |
| **2020** | OK | 30 | 60 | ND | ND | ND | ND | ND | OK | ND | ND | ND |
| **2019** | | | | | 30 | OK | OK | 30 | 30 | 30 | OK | 30 |

#  Your Positive Account Activity

These accounts may stay on your credit report for as long as they are open. Closed or paid-off accounts may continue to appear on your report for up to 10 years. Each of the items in this section has a positive payment history, meaning that no delinquencies or derogatory statuses are reported in the displayable payment history.

✅ Great job paying these accounts on time! Payment history is the biggest factor of your credit score.

**Your Positive Account Activity (Continued)**

### ACIMA DIGITAL FKA SIMPLE Partial Acct # 526....

**Status (Feb 2021)** Paid, Closed/Never late.

13907 S MINUTEMAN DR FL 5 DRAPER UT 84020; (801) 297 1920

| **Type** | **Date opened** | **Address ID #** | **Credit limit or original amount** | **Recent Balance** | **Responsibility** |
|---|---|---|---|---|---|
| Lease | Nov 2020 | 0701387387 | $3,010 | Not reported | Individual |
| **Terms** | **Monthly payment** | **High Balance** | | | This account is scheduled |
| 12 Months | Not reported | Not reported | | | to continue on record until Feb 2031. |

### ACIMA DIGITAL FKA SIMPLE Partial Acct # 772....

**Status (Oct 2021)** Paid, Closed/Never late.

13907 S MINUTEMAN DR FL 5 DRAPER UT 84020; (801) 297 1920

| **Type** | **Date opened** | **Address ID #** | **Credit limit or original amount** | **Recent Balance** | **Responsibility** |
|---|---|---|---|---|---|
| Lease | Jul 2021 | 0701387387 | $5,179 | Not reported | Individual |
| **Terms** | **Monthly payment** | **High Balance** | | | This account is scheduled |
| 12 Months | Not reported | Not reported | | | to continue on record until Oct 2031. |

### AFFIRM INC Partial Acct # MRFR....

**Status (Aug 2022)** Paid, Closed/Never late.

650 CALIFORNIA ST FL 12 SAN FRANCISCO CA 94108; (855) 423 3729

| **Type** | **Date opened** | **Address ID #** | **Credit limit or original amount** | **Recent Balance** | **Responsibility** |
|---|---|---|---|---|---|
| Unsecured | Feb 2022 | 0701387387 | $351 | Not reported | Individual |
| **Terms** | **Monthly payment** | **High Balance** | | | This account is scheduled |
| 6 Months | Not reported | Not reported | | | to continue on record until Aug 2032. |

### COMENITYBANK/HELZBERG Partial Acct # 778850607323....

**Status (Apr 2025)** Open/Never late.

PO BOX 182789 COLUMBUS OH 43218; No phone # available

| **Type** | **Date opened** | **Address ID #** | **Credit limit or original amount** | **Recent Balance** | **Responsibility** |
|---|---|---|---|---|---|
| Charge Card | Nov 2024 | 0701387387 | $1,000 | $237 as of Apr 2025 | Individual |
| **Terms** | **Monthly payment** | **High Balance** | **Recent payment** | | |
| Not reported | $37 | $1,020 | $100 as of 04/20/2025 | | |

| | Mar25 | Feb25 | Jan25 | Dec24 |
|---|---|---|---|---|
| **Account Balance** | $300 | $900 | $970 | $1,020 |
| **Date Payment Received** | 03.08.25 | 02.18.25 | 01.11.25 | No Data |
| **Scheduled Payment Amount** | $37 | $37 | $34 | $36 |
| **Actual Amount Paid** | $600 | $100 | $50 | No Data |

*Between Dec 2024 and Mar 2025, your credit limit/high balance was $1,000*

### CREDIT ONE BANK Partial Acct # 444796278572....

**Status (May 2025)** Open/Never late.

PO BOX 98875 LAS VEGAS NV 89193; (877) 825 3242

| **Type** | **Date opened** | **Address ID #** | **Credit limit or original amount** | **Recent Balance** | **Responsibility** |
|---|---|---|---|---|---|
| Credit card | Jul 2024 | 0701387387 | $500 | $351 as of May 2025 | Individual |
| **Terms** | **Monthly payment** | **High Balance** | **Recent payment** | | |
| Not reported | $30 | $351 | $30 as of 05/18/2025 | | |

| | Apr25 | Mar25 | Feb25 | Jan25 | Dec24 | Nov24 | Oct24 | Sep24 | Aug24 | Jul24 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Account Balance** | $201 | $183 | $166 | $221 | $287 | $164 | $156 | $301 | $249 | $75 |
| **Date Payment Received** | 04.20.25 | 03.19.25 | 02.16.25 | 01.09.25 | 11.28.24 | 11.03.24 | 09.27.24 | 09.13.24 | No Data | No Data |
| **Scheduled Payment Amount** | $30 | $30 | $30 | $30 | $30 | $30 | $30 | $30 | $30 | $30 |
| **Actual Amount Paid** | $75 | $30 | $280 | $287 | $45 | $150 | $277 | $110 | No Data | No Data |

*Between Mar 2025 and Apr 2025, your credit limit/high balance was $500*         *Between Jul 2024 and Feb 2025, your credit limit/high balance was $300*

APPENDIX 2442

EXPERIAN_NAJERA_0117

**Your Positive Account Activity (Continued)**

### OPORTUN/PROGRESO FINANCI Partial Acct # 262....
PO BOX 560910 THE COLONY TX 75056; (866) 488 6090

**Status (Sep 2018)** Paid, Closed/Never late.

| Type | Date opened | Address ID # | Credit limit or original amount | Recent Balance | Responsibility |
|---|---|---|---|---|---|
| Unsecured | Jan 2018 | 0701387387 | | Not reported | Individual |
| **Terms** | **Monthly payment** | **High Balance** | $642 | | This account is scheduled to continue on record until Sep 2028. |
| 8 Months | Not reported | Not reported | | | |

### OPORTUN/PROGRESO FINANCI Partial Acct # 350....
PO BOX 560910 THE COLONY TX 75056; (866) 488 6090

**Status (Jan 2020)** Paid, Closed/Never late.

| Type | Date opened | Address ID # | Credit limit or original amount | Recent Balance | Responsibility |
|---|---|---|---|---|---|
| Unsecured | May 2019 | 0701387387 | | Not reported | Individual |
| **Terms** | **Monthly payment** | **High Balance** | $540 | | This account is scheduled to continue on record until Jan 2030. |
| 8 Months | Not reported | Not reported | | | |

### OPORTUN/PROGRESO FINANCI Partial Acct # 429....
PO BOX 560910 THE COLONY TX 75056; (866) 488 6090

**Status (Oct 2021)** Paid, Closed/Never late.

| Type | Date opened | Address ID # | Credit limit or original amount | Recent Balance | Responsibility |
|---|---|---|---|---|---|
| Unsecured | Sep 2020 | 0701387387 | | Not reported | Individual |
| **Terms** | **Monthly payment** | **High Balance** | $1,080 | | This account is scheduled to continue on record until Oct 2031. |
| 16 Months | Not reported | Not reported | | | |

### OPORTUN/PROGRESO FINANCI Partial Acct # 489....
PO BOX 560910 THE COLONY TX 75056; (866) 488 6090

**Status (Sep 2022)** Refinanced, closed/Never late.

| Type | Date opened | Address ID # | Credit limit or original amount | Recent Balance | Responsibility |
|---|---|---|---|---|---|
| Unsecured | Oct 2021 | 0701387387 | | Not reported | Individual |
| **Terms** | **Monthly payment** | **High Balance** | $2,625 | **Comment:** Account closed due to refinance. | This account is scheduled to continue on record until Sep 2032. |
| 19 Months | Not reported | Not reported | | | |

### PATHWARD NA/OPORTUN Partial Acct # 599....
2 CIRCLE STAR WAY SAN CARLOS CA 94070; (866) 488 6090

**Status (Apr 2025)** Open/Never late.

| Type | Date opened | Address ID # | Credit limit or original amount | Recent Balance | Responsibility |
|---|---|---|---|---|---|
| Unsecured | May 2023 | 0701387387 | $2,096 | $1,471 as of Apr 2025 | Individual |
| **Terms** | **Monthly payment** | **High Balance** | **Recent payment** $54 as of 04/26/2025 | | |
| 49 Months | $54 | Not reported | | | |

| | Mar25 | Feb25 | Jan25 | Dec24 | Nov24 | Oct24 | Sep24 | Aug24 | Jul24 | Jun24 | May24 | Apr24 | Mar24 | Feb24 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Account Balance | $1,499 | $1,525 | $1,567 | $1,514 | $1,551 | $1,590 | $1,627 | $1,663 | $1,698 | $1,732 | $1,858 | $1,798 | $1,831 | $1,861 |
| Date Payment Received | 03.26.25 | 02.26.25 | 12.26.24 | 12.26.24 | 11.26.24 | 10.26.24 | 09.26.24 | 08.26.24 | 07.26.24 | 06.26.24 | 04.26.24 | 04.26.24 | 03.26.24 | 02.26.24 |
| Scheduled Payment Amount | $54 | $54 | $77 | $77 | $77 | $77 | $77 | $77 | $77 | $77 | $77 | $77 | $77 | $77 |
| Actual Amount Paid | $54 | $54 | No Data | $77 | $107 | $77 | $77 | $77 | $77 | $169 | No Data | $77 | $77 | $77 |

| | Jan24 | Dec23 | Nov23 | Oct23 | Sep23 | Aug23 | Jul23 | Jun23 | May23 |
|---|---|---|---|---|---|---|---|---|---|
| Account Balance | $1,894 | $1,923 | $2,043 | $1,980 | $2,007 | $2,034 | $2,060 | $2,085 | $2,111 |
| Date Payment Received | 01.26.24 | 12.26.23 | 10.26.23 | 10.26.23 | 09.26.23 | 08.26.23 | 07.26.23 | 06.26.23 | No Data |
| Scheduled Payment Amount | $77 | $77 | $77 | $77 | $77 | $77 | $77 | $77 | $77 |
| Actual Amount Paid | $77 | $169 | No Data | $77 | $77 | $77 | $77 | $77 | No Data |

*The original amount of this account was $2,096*

# Who Has Viewed Your Consumer Information

## CREDIT APPLICATIONS / HARD INQUIRIES

*Hard inquiries* are requests for your consumer information based on an action or process initiated by you, generally related to a credit or other monetary obligation, such as when you apply for credit, rental property, or utility service, or default on a loan causing it to be sent to a collection agency.

⚠ Hard inquiries may stay on your report up to two years.

**XACTUS-AVANTUS/GENFIN** 180 S ARIZONA AVE STE 310 CHANDLER AZ 85225 **No phone # available**    **Apr 27, 2025**

**REASON:** Real Estate.
**DURATION:** This inquiry is scheduled to continue on record until May 2027.

**CCR/CENTENNIAL BANK** 28202 CABOT RD STE 245 LAGUNA NIGUEL CA 92677 **No phone # available**    **Apr 24, 2025**

**REASON:** Real Estate.
**DURATION:** This inquiry is scheduled to continue on record until May 2027.

**CCR/CENTENNIAL BANK** **No phone # available**    **Feb 12, 2025**

**REASON:** Real Estate.
**DURATION:** This inquiry is scheduled to continue on record until Mar 2027.

**JPMCB CARD** PO BOX 15077 WILMINGTON DE 19850 (800) 453 9719    **Jan 17, 2025**

**REASON:** Credit card with 0 Months repayment terms.
**DURATION:** This inquiry is scheduled to continue on record until Feb 2027.

**CREDIT ONE BANK** PO BOX 98875 LAS VEGAS NV 89193 (877) 825 3242    **Jul 10, 2024**

**REASON:** Unspecified.
**DURATION:** This inquiry is scheduled to continue on record until Aug 2026.

**JPMCB CARD** PO BOX 15077 WILMINGTON DE 19850 (800) 453 9719    **Apr 11, 2024**

**REASON:** Credit card with 0 Months repayment terms.
**DURATION:** This inquiry is scheduled to continue on record until May 2026.

# Your Personal Information

The following information is reported by you, your creditors, or other sources each of which may report your personal information differently. This is why there may be variations of your name, address, Social Security Number, etc.

ℹ Personal information DOES NOT impact your credit score at all.

**NAMES**

| | |
|---|---|
| VICTOR RAMIREZ | Name ID #:6683 |
| VICTOR MANUEL RAMIREZ | Name ID #:20731 |
| VICTOR RAMIREZ NAJERA | Name ID #:23749 |
| VICTOR MANUEL RAMIREZ NAJERA | Name ID #:5919 |
| VICTOR M RAMIREZ NAJERA | Name ID #:30766 |
| VICTOR MANUEL RAMIREZ Jr | Name ID #:12380 |
| VICTOR M RAMIREZ | Name ID #:20115 |

**ADDRESSES**

▆▆▆▆▆▆▆▆
FORT WORTH TX 76106-2604

▆▆▆▆▆▆▆▆
JOELTON TN 37080-8761

APPENDIX 2444

EXPERIAN_NAJERA_0119

0787150565    **VICTOR M RAMIREZ** Report # **0943-3966-80** for **05/28/2025**    page 5 of 8

**Your Personal Information** (Continued)



FORT WORTH TX 76135-3807

FORT WORTH TX 76135

FORT WORTH TX 76135-3852

**SOCIAL SECURITY NUMBER VARIATIONS**

None

**YEAR OF BIRTH**

1995

**TELEPHONE NUMBERS**

**SPOUSE OR CO-APPLICANT**

MARIA

**FORMER OR CURRENT EMPLOYERS**

INTEGRATED INTERIORS IN FORT WORTH TX 76118

## How to Contact Experian

If you see information that is incorrect, contact us through one of the methods below.

### CALL US

**(833) 796 8634**

M - F 9am - 5pm in your time zone.

### WRITE TO US

Experian, NCAC
PO BOX 9701
Allen, TX 75013

### GO ONLINE (for fastest results)

**Visit experian.com/disputes**

  

Dispute Online
for faster results

Check Status
Online

**Notification of Rights for Texas Consumers**

Your rights under Texas law include:

You may obtain a copy of your consumer report or file from a consumer reporting agency. Upon request and with proper identification provided by you, the agency must disclose to you in writing all information about you in their file at the time of the request. The agency may charge a reasonable fee for a file disclosure request. However, the agency may not charge for such a request if made within 60 days of an adverse action taken against you.

You may dispute incomplete or inaccurate information in your file. If you identify information in your file that you believe is incomplete or inaccurate, and you notify the consumer reporting agency directly of the dispute, the agency must reinvestigate without charge and record the current status of the disputed information before the end of 30 business days. A consumer reporting agency may terminate a reinvestigation of disputed information if the agency determines that the dispute is frivolous or irrelevant.

You may file a legal action in court to enforce an obligation of a consumer reporting agency. Or, if agreed to by both parties, after following the normal dispute procedures and receiving notice of the results of the dispute investigation, you may submit the matter to binding arbitration in the manner provided by the rules of the American Arbitration Association.

# A Summary of Your Rights Under the Fair Credit Reporting Act

Para informacion en espanol, visite *www.consumerfinance.gov/learnmore* o escribe a la Consumer Financial Protection Bureau, 1700 G Street N.W., Washington, D.C. 20552.

The federal Fair Credit Reporting Act (FCRA) promotes the accuracy, fairness, and privacy of information in the files of consumer reporting agencies. There are many types of consumer reporting agencies, including credit bureaus and specialty agencies (such as agencies that sell information about check writing histories, medical records, and rental history records). Here is a summary of your major rights under the FCRA.

**For more information, including information about additional rights, go to:** *www.consumerfinance.gov/learnmore* **or write to:**    Consumer Financial Protection Bureau, 1700 G Street N.W., Washington, D.C. 20552

**A Summary of Your Rights Under the Fair Credit Reporting Act** (Continued)

**YOU MUST BE TOLD IF INFORMATION IN YOUR FILE HAS BEEN USED AGAINST YOU.** Anyone who uses a credit report or another type of consumer report to deny your application for credit, insurance, or employment or to take another adverse action against you must tell you, and must give you the name, address, and phone number of the agency that provided the information.

**YOU HAVE THE RIGHT TO KNOW WHAT IS IN YOUR FILE.** You may request and obtain all the information about you in the files of a consumer reporting agency (your "file disclosure"). You will be required to provide proper identification, which may include your Social Security number. In many cases, the disclosure will be free. You are entitled to a free file disclosure if:a person has taken adverse action against you because of information in your credit report; you are the victim of identify theft and place a fraud alert in your file; your file contains inaccurate information as a result of fraud; you are on public assistance; you are unemployed but expect to apply for employment within 60 days.All consumers are entitled to one free disclosure every 12 months upon request from each nationwide credit bureau and from nationwide specialty consumer reporting agencies. See www.consumerfinance.gov/learnmore for additional information. *www.consumerfinance.gov/learnmore.* for additional information.

**YOU HAVE THE RIGHT TO ASK FOR A CREDIT SCORE.** Credit scores are numerical summaries of your credit-worthiness based on information from credit bureaus. You may request a credit score from consumer reporting agencies that create scores or distribute scores used in residential real property loans, but you will have to pay for it. In some mortgage transactions, you will receive credit score information for free from the mortgage lender.

**YOU HAVE THE RIGHT TO DISPUTE INCOMPLETE OR INACCURATE INFORMATION.** If you identify information in your file that is incomplete or inaccurate, and report it to the consumer reporting agency, the agency must investigate unless your dispute is frivolous. See www.consumerfinance.gov/learnmore for an explanation of dispute procedures.

**CONSUMER REPORTING AGENCIES MUST CORRECT OR DELETE INACCURATE, INCOMPLETE, OR UNVERIFIABLE INFORMATION.** Inaccurate, incomplete or unverifiable information must be removed or corrected, usually within 30 days. However, a consumer reporting agency may continue to report information it has verified as accurate.

**CONSUMER REPORTING AGENCIES MAY NOT REPORT OUTDATED NEGATIVE INFORMATION.** In most cases, a consumer reporting agency may not report negative information that is more than seven years old, or bankruptcies that are more than 10 years old.

**ACCESS TO YOUR FILE IS LIMITED.** A consumer reporting agency may provide information about you only to people with a valid need -- usually to consider an application with a creditor, insurer, employer, landlord, or other business. The FCRA specifies those with a valid need for access.

**YOU MUST GIVE YOUR CONSENT FOR REPORTS TO BE PROVIDED TO EMPLOYERS.** A consumer reporting agency may not give out information about you to your employer, or a potential employer, without your written consent given to the employer. Written consent generally is not required in the trucking industry. For more information, go to www.consumerfinance.gov/learnmore.

**YOU MAY LIMIT "PRESCREENED" OFFERS OF CREDIT AND INSURANCE YOU GET BASED ON INFORMATION IN YOUR CREDIT REPORT.** Unsolicited "prescreened" offers for credit and insurance must include a toll-free phone number you can call if you choose to remove your name and address from the lists these offers are based on. You may opt-out with the nationwide credit bureaus at 1 888 5OPTOUT (1 888 567 8688).

**CONSUMERS HAVE THE RIGHT TO OBTAIN A SECURITY FREEZE** You have a right to place a security freeze on your credit report, which will prohibit a consumer reporting agency from releasing information in your credit report without your express authorization. The security freeze is designed to prevent credit, loans, and services from being approved in your name without your consent. However, you should be aware that using a security freeze to take control over who gets access to the personal and financial information in your credit report may delay, interfere with, or prohibit the timely approval of any subsequent request or application you make regarding a new loan, credit, mortgage, or any other account involving the extension of credit.As an alternative to a security freeze, you have the right to place an initial or extended fraud alert on your credit file at no cost. An initial fraud alert is a 1-year alert that is placed on a consumer's credit file. Upon seeing a fraud alert display on a consumer's credit file, a business is required to take steps to verify the consumer's identity before extending new credit. If you are a victim of identity theft, you are entitled to an extended fraud alert, which is a fraud alert lasting 7 years.A security freeze does not apply to a person or entity, or its affiliates, or collection agencies acting on behalf of the person or entity, with which you have an existing account that requests information in your credit report for the purposes of reviewing or collecting the account. Reviewing the account includes activities related to account maintenance, monitoring, credit line increases, and account upgrades and enhancements.

**YOU MAY SEEK DAMAGES FROM VIOLATORS.** If a consumer reporting agency, or, in some cases, a user of consumer reports or a furnisher of information to a consumer reporting agency violates the FCRA, you may be able to sue in state or federal court.

**IDENTITY THEFT VICTIMS AND ACTIVE DUTY MILITARY PERSONNEL HAVE ADDITIONAL RIGHTS.** For more information, visit *www.consumerfinance.gov/learnmore.*

**STATE RIGHTS INFORMATION.**States may enforce the FCRA, and many states have their own consumer reporting laws. In some cases, you may have more rights under state law. For more information, contact your state or local consumer protection agency or your state Attorney General.

**FEDERAL RIGHTS INFORMATION.**For more information about your federal rights, you can contact relevant federal agencies listed at the bottom of the page linked here: https://www.experian.com/FCRA.

Medical Information
By law, we cannot disclose certain medical information (relating to physical, mental, or behavioral health or condition). Although we do not generally collect such information, it could appear in the name of a data furnisher (i.e., "Cancer Center") that reports your payment history to us. If so, those names display on your report, but on reports to others they display only as "MEDICAL PAYMENT DATA." Consumer statements included on your report at your request that contain medical information are disclosed to others.

About your FICO® Score 8
Your FICO® Score 8 powered by Experian® Date is formulated using the information in your credit file at the time it is requested. Your FICO® Score 8 can range between 300 and 850, with a higher score indicating a lower risk. There are many scoring models used in the marketplace. The type of score used, and its associated risk levels, may vary from lender to lender. But regardless of what scoring model is used, they all have one purpose: to summarize your creditworthiness. Keep in mind that your score is just one factor used in the application process. Other factors, such as your annual salary and length of employment, may also be considered by lenders when you apply for a loan.

What this means to you:
Credit scoring can help you understand your overall credit rating and help companies better understand how to serve you. Overall benefits of credit scoring have included faster credit approvals, reduction in human error and bias, consistency, and better terms and rates for American consumers through reduced costs and losses for lenders. The Credit Score we provide is FICO® Score 8. Your lender or insurer may use a different FICO® Score than FICO® Score 8, or different scoring models to determine how you score.

APPENDIX 2446

EXPERIAN_NAJERA_0121

THIS PAGE INTENTIONALLY LEFT BLANK

EXPERIAN_NAJERA_0122

# EXHIBIT DD

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

SHANGO BUTLER,

        Plaintiff,

    v.

TRANS UNION, LLC and EXPERIAN
INFORMATION SOLUTIONS, INC.,

        Defendants.

Case No. 1:24-cv-00211

---

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT EXPERIAN**
**INFORMATION SOLUTIONS, INC.'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Shango Butler's ("Plaintiff") claims under the Fair Credit Reporting Act ("FCRA") are baseless, unsupported by the record and the law. Plaintiff is one of the hundreds of thousands of consumers who file bankruptcy each year. In October 2018, Plaintiff filed a Chapter 13 bankruptcy, scheduling 18 unsecured claims, but the bankruptcy was dismissed for failure to make plan payments. Five years later, Plaintiff filed again for a Chapter 7 bankruptcy, this time scheduling 22 unsecured claims. Now, he alleges that Experian violated the FCRA by failing to report one of these debts as discharged, even though the data furnisher, WebBank/Fingerhut ("Fingerhut"), had instructed Experian *not to* report the account as included in bankruptcy and there is no evidence that Experian had notice of an issue with Fingerhut's reporting. Indeed, Plaintiff inexplicably opted *not to* notify Experian of a problem. It has long been the law in this Circuit and others that the FCRA does not impose strict liability and so a consumer reporting agency ("CRA") like Experian does not violate the FCRA by reporting information received from financial institutions without notice of a problem, even if that reporting turns out to be inaccurate or incomplete.

- 1 -

APPENDIX 2449

It is also the law in this Circuit, and increasingly throughout the country, that 15 U.S.C. § 1681e(b), the FCRA's reasonable procedures provision (Plaintiff's sole claim), does not require Experian to wade into individual bankruptcies and determine which debts are discharged and which are not. The volume of consumer bankruptcies, the number of debts involved, the variety of exceptions to discharge, all coupled with the volume of data Experian handles make this type of *sua sponte* investigation wildly inefficient and unreasonable. This is especially true in cases like this one, where Plaintiff chose to forego the FCRA's primary mechanism for correcting inaccurate information: the dispute and reinvestigation provisions of 15 U.S.C. § 1681i.

Moreover, the record shows that Plaintiff has not suffered any actual damages, another required element of his claim. And he cannot show that it was objectively unreasonable for Experian to report information that it had received from a reliable furnisher, further defeating his willful claim. Therefore, Plaintiff's claim necessarily fails, and his case should be dismissed with prejudice.

**BACKGROUND**

I.      **LEGAL LANDSCAPE**

A.      **The Fair Credit Reporting Act.**

The FCRA requires CRAs to follow "reasonable procedures to assure maximum possible accuracy" of consumer reports. 15 U.S.C. § 1681e(b). To comply, CRAs must "accurately transcribe, store and communicate consumer information received from a source that it reasonably believes to be reputable, in a manner that is logical on its face." Fed'l Trade Comm'n, 40 Years of Experience with the Fair Credit Reporting Act, Jul. 2011, 59 (*available at* https://www.ftc.gov/sites/default/files/documents/reports/40-years-experience-fair-credit-reporting-act-ftc-staff-report-summary-interpretations/110720fcrareport.pdf). The FCRA has been amended over the years to ensure that consumers can obtain free copies of their credit files, 15 U.S.C. § 1681g; and if the consumer spots an error, the consumer can contact the CRA directly to dispute the

- 2 -

information, and the CRA must then conduct a reasonable reinvestigation free of charge. *See id.* at § 1681i. Congress has structured the FCRA with the knowledge that the volume of data CRAs process makes perfection impossible, so the dispute and reinvestigation provisions are central to the FCRA's accuracy regime:

> The Committee is aware that the consumer reporting system handles almost two billion pieces of data per month and will never be perfectly accurate. Mistakes will occur, and not all of them can be prevented. **Section [1681i] is the heart of the Committee's efforts to ensure the ultimate accuracy of consumer reports by placing important requirements upon consumer reporting agencies after inaccuracies have been detected. Therefore, section [1681i] is designed to ensure that consumers are able to address problems and correct errors in a timely fashion.**

S. REP. NO. 104-185, at 43 (1995) (*available at* https://www.congress.gov/congressional-report/104th-congress/senate-report/185/1) (emphasis added).

The FCRA explicitly authorizes the reporting of consumer bankruptcies. 15 U.S.C. § 1681c(a)(1). And the FCRA authorizes CRAs to report other derogatory information, including "[a]ccounts placed for collection or charged to profit and loss which antedate the report by more than seven years." *Id.* at § 1681c(a)(4).

**B.      Chapter 7 of the U.S. Bankruptcy Code.**

"Chapter 7 of the Bankruptcy Code . . . permits insolvent debtors to discharge their debts by liquidating assets to pay creditors." *Taggart v. Lorenzen*, 139 S. Ct. 1795, 1799–800 (2019) (citing 11 U.S.C. §§ 704(a)(1), 726). Once that process is completed, the bankruptcy court typically enters a discharge order that prevents creditors from taking any collection actions against the debtor. *See* 11 U.S.C. § 524, 727. While most pre-petition debts are discharged, there are also many exceptions. *See*, *e.g.*, 11 U.S.C. § 524(c) (reaffirmed debts not discharged); *id*. at § 523(2)(A) (debts incurred under false pretenses are not discharged); *id*. at § 523(2)(C) (consumer debts of more than $500 incurred within 90 days of filing or cash advances of more than $750 incurred within 70 days of filing are not

APPENDIX 2451

dischargeable); *id*. at § 523(3) (unscheduled debts not discharged). Debts incurred after the debtor files bankruptcy are not discharged, *In re Papi*, 427 B.R. 457, 461 (Bankr. N.D. Ill. 2010), and credit card purchases made near the filing may not be dischargeable, depending on the debtor's intent. *See, e.g. In re Faulk*, 69 B.R. 743, 756 (Bankr. N.D. Ind. 1986) (purchases made within 18 days of filing bankruptcy were not dischargeable); *In re Pozucek*, 73 B.R. 110, 112 (Bankr. N.D. Ill. 1987) (pattern of increased credit card purchases immediately before filing bankruptcy rendered debts non-dischargeable).

## II.    FACTUAL BACKGROUND

### A.    Experian's Procedures.

Experian obtains and reports consumer credit information from financial institutions like WebBank/Fingerhut ("Fingerhut"), referred to as "data furnishers." Experian's Rule 56.1 Statement of Undisputed Material Facts ("SOF") ¶ 3.[1] Before accepting consumer credit information, Experian investigates the data furnisher to ensure they are reputable and capable of furnishing accurate information. SOF ¶ 4. Experian then monitors the information provided by the data furnisher, rejecting information that is illogical or fails to conform to industry standards. *Id.*

Experian obtains bankruptcy related information in several ways. *First*, Experian obtains general public record information (date, jurisdiction, and Chapter) regarding consumer bankruptcies information from its public records vendor, LexisNexis. SOF ¶ 2. *Second*, data furnishers can report account-level bankruptcy information, indicating when an account has been included or discharged in a bankruptcy, or when the account has been reaffirmed or excluded from the bankruptcy. *See* SOF ¶ 3. *Third*, Experian has procedures to address bankruptcy-related consumer disputes, including

---

[1] With respect to Fingerhut specifically, Experian obtains consumer credit information from Fingerhut through its subscriber entity, Bluestem Brands, Inc. ("Bluestem"). SOF ¶ 7.

- 4 -

procedures that allow it to quickly update accounts a consumer claims were discharged in their bankruptcy, provided the account meets certain conditions. SOF ¶ 6. *Finally*, Experian employs a specific set of procedures referred to as its "bankruptcy scrub," to assure that credit information is properly updated following a consumer bankruptcy. SOF ¶ 5. This scrub is the result of an injunctive order issued in the *White-Hernandez* litigation, a nationwide class action prosecuted in the Central District of California, designed to implement reasonable assumptions about which debts are, or are not discharged. *White v. Experian Info. Sols., Inc.*, No. 05-CV-1073, 2008 WL 11518799, at *7–*13 (C.D. Cal. Aug. 19, 2008) (the "*White* Order"). The *White* Order also provides specific exceptions when Experian *should not* assume that a debt was discharged. Relevant here, when a data furnisher reports a Consumer Information Indicator of "Q" – the industry-standard means of indicating that a debt was not included or discharged in a consumer's bankruptcy, the *White* order indicates that the account may be excluded from the scrub update. *Id.* at *12.

**B.**     **Plaintiff's Bankruptcy and Experian File.**

On October 24, 2018, Plaintiff filed a Chapter 13 bankruptcy. Included in his schedules was a debt with Fingerhut. SOF ¶ 8. On May 26, 2021, Plaintiff's Chapter 13 bankruptcy was dismissed due to lack of payment. SOF ¶ 9; Ex. B (Order Granting Dismissal). On May 18, 2023, Plaintiff filed a Petition for Chapter 7 bankruptcy, and LexisNexis notified Experian of that fact the same day. SOF ¶ 12. On August 30, 2023, a discharge order was entered in Plaintiff's bankruptcy case, and LexisNexis informed Experian of that fact the next day. SOF ¶ 13. The discharge order warns the reader:

> This information is only a general summary of the bankruptcy discharge; some exceptions exist. Because the law is complicated, you should consult an attorney to determine the exact effect of the discharge in this case.

APPENDIX 2453

Ex. E at 2 (Discharge Order).

Experian's initial bankruptcy scrub ran within eight days of Plaintiff's Chapter 7 discharge.

SOF ¶ 14. At that time, Fingerhut was reporting a CII Code of "Q." In accordance with the *White*

order, Experian did not update the Fingerhut account as a part of Experian's bankruptcy scrub.

In January 2024, when this case began, the Fingerhut account was reporting as shown:



SOF ¶ 15.

Prior to filing this case, Plaintiff did not contact Experian to dispute this reporting or to ask

Experian to note that the account was discharged in Plaintiff's bankruptcy. SOF ¶ 18. Once Experian

had notice of the issue via Plaintiff's complaint, Experian applied the same procedures that it applies

to consumer disputes, updating the account to report as discharged:



SOF ¶ 17.

APPENDIX 2454

**STANDARD OF REVIEW**

Summary judgment is warranted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.56(a). The moving party has the initial burden to show, based on the pleadings and record evidence, the "absence of a genuine issue of material fact," *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), meaning any "fact[] that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Once the moving party has shown that no dispute of a material fact exists, the burden shifts to the non-moving party, to show that the record, "if reduced to admissible evidence, would be sufficient to carry [his] burden of proof at trial." *Celotex*, 477 U.S. at 327; *see Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 627 (7th Cir. 2014). While the evidence is "viewed in the light most favorable" to the non-moving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *see also Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 457 (7th Cir. 2020), a non-movant cannot rely on "[c]onclusory allegations" to create the existence of a material fact. *Igasaki v. Illinois Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 956 (7th Cir. 2021).

**ARGUMENT**

Plaintiff's claim is nothing more than an attempt to impose strict liability under the FCRA, ignoring settled-law. The structure of the FCRA and a wealth of case law all teach the same lesson: the reasonable procedures provision of § 1681e(b) does not require Experian to accurately determine the effects of a consumer's bankruptcy on individual debts. Once Plaintiff learned of an error in his credit report, his next step was to contact Experian and ask Experian to correct the error, not resort to federal litigation on a theory that necessarily fails. Moreover, Plaintiff has not produced any evidence of actual damages, a necessary element of his negligence claim. And, because Experian's procedures are well-grounded in both the text and law of the FCRA, Experian's actions cannot have been willful. Summary judgment is the "put up or shut up" moment in a federal lawsuit, *Brown v. CACH, LLC*, 94

- 7 -

F.4th 665, 667 (7th Cir. 2024), and Plaintiff has no evidence to support his theories. His case should

be dismissed.

## I.    THERE IS NO EVIDENCE THAT EXPERIAN VIOLATED SECTION 1681e(b) OF THE FAIR CREDIT REPORTING ACT.

### A.    Plaintiff's Theory of Inaccuracy.

To survive summary judgment, Plaintiff must "show that a consumer reporting agency

prepared a report containing 'inaccurate' information." *Denan v. Trans Union LLC*, 959 F.3d 290, 294

(7th Cir. 2020). "Accuracy is not defined in the statute, but it has long been understood that "accuracy"

encompasses both truth and completeness—a report that is misleading or materially incomplete is

inaccurate." *Chaitoff v. Experian Info. Sols., Inc.*, 79 F.4th 800, 809 (7th Cir. 2023).

Here, Plaintiff must depend on a theory that Experian's reporting was incomplete. There is no

evidence that the information Experian was reporting was factually incorrect. For instance, there is

no evidence that Fingerhut did not charge off this account or that the historical facts Experian was

reporting were incorrect. Courts have repeatedly recognized that a bankruptcy court's discharge order

does not rewrite history or render accurate pre-discharge information incorrect. *See*, *e.g.*, *Doster v.*

*Experian Info. Sols., Inc.*, No. 16-CV-04629-LHK, 2017 WL 264401, at *5 (N.D. Cal. Jan. 20, 2017)

(collecting cases and explaining "the legal status of a debt does not change until the debtor is

discharged from bankruptcy . . . it is not misleading or inaccurate to report delinquent debt during the

pendency of a bankruptcy proceeding but before discharge."). Conversely, Courts have held that post-

discharge reporting of a debt that was discharged can be misleading because it may imply that the

consumer remains personally obligated to pay the debt. *See*, *e.g.*, *Gagnon v. JPMorgan Chase Bank,*

*N.A.*, No. 15-CV-9526, 2017 WL 11891678, at *3 (N.D. Ill. Apr. 13, 2017); *see also*, Fed. Trade.

Comm'n, 40 Years of Experience With the Fair Credit Reporting Act, 2011 WL 3020575, at *61 ("A

consumer report may include an account that was discharged in bankruptcy (as well as the bankruptcy

APPENDIX 2456

itself), as long as it reports a zero balance to reflect the fact that the consumer is no longer liable for the discharged debt.").

In short, there is no evidence that any of Experian's factual reporting was wrong, and Plaintiff's claim can only be one of incompleteness: That after his August 30, 2023 bankruptcy discharge order was entered, Experian's reporting omitted the fact that the debt was discharged and reported a $108 balance as of September 2023.[2]

**B.    Section 1681e(b) Does Not Require Experian To Determine When a Debt Is Discharged in Bankruptcy.**

In addition to showing that Experian's reporting was inaccurate, Plaintiff must also show that this inaccuracy was "due to [Experian's] failure to follow reasonable procedures to assure maximum possible accuracy." *Benson v. Trans Union, LLC*, 387 F. Supp. 2d 834, 840 (N.D. Ill. 2005); 15 U.S.C. § 1681e(b). But the FCRA's plain text and controlling case law all show that Plaintiff cannot meet this requirement.

It is black-letter law that "the Fair Credit Reporting Act is not a strict liability statute." *Walton v. BMO Harris Bank*, 761 F. App'x 589, 592 (7th Cir. 2019). The Seventh Circuit has clearly established the parameters of § 1681e(b). In *Henson v. CSC Credit Servs.*, the Court held that CRAs' reliance on public court dockets was reasonable as a matter of law until a consumer notified the CRA of a problem. *See* 29 F.3d 280, 285 (7th Cir. 1994). In *Sarver v. Experian Info. Sols.*, a case also involving the impact of a consumer's bankruptcy on individual debts, the Seventh Circuit extended this reasoning to reliance on information furnished by financial institutions. *See* 390 F.3d 969, 972–73 (7th Cir. 2004). In *Childress v. Experian Info. Sols., Inc.*, the court similarly explained that it would be *unreasonable* for CRAs to "require a live human being . . . to review every bankruptcy dismissal"

---

[2] To be sure, the record is devoid of evidence to show that anyone was actually misled by Experian's reporting.

APPENDIX 2457

to determine whether an individual bankruptcy withdrawal was voluntary or involuntary. *See* 790 F.3d 745, 747 (7th Cir. 2015).

These cases all lead to the same conclusion: § 1681e(b) does not require CRAs to account for the many unique exceptions and vagaries that can arise in an individual consumer's bankruptcy, especially when the general discharge order expressly informs the reader that it is only a summary and instructs the debtor to obtain legal counsel to ascertain the exact effects on a specific debt. *See, e.g.*, *Hupfauer v. Citibank, N.A.*, No. 16 C 475, 2016 WL 4506798, at *7 (N.D. Ill. Aug. 19, 2016) (citing *Childress*, 790 F.3d at 747). Nor are these cases outliers, as numerous other Circuit courts have adopted similar principles. *E.g.*, *Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997); *Losch v. Nationstar Mortg. LLC*, 995 F.3d 937, 945 (11th Cir. 2021) (adopting *Cushman*, *Henson*, and *Sarver* and affirming grant of summary judgment for Experian).

Building on these courts' reasoning, the Eighth Circuit affirmed dismissal of a § 168e(b) claim against Experian involving nearly identical facts as presented here. *See Rydholm v. Equifax Info. Servs. LLC*, 44 F.4th 1105, 1109 (8th Cir. 2022). In *Rydholm*, the consumer obtained a Chapter 7 bankruptcy but sued Experian for failing to report one account as discharged in the plaintiff's bankruptcy. *See id.* at 1107. The Eighth Circuit rejected the same theory Plaintiff advances here:

> Though both CRAs had notice of Rydholm's general discharge, that fact alone is insufficient to trigger a duty to investigate. The bankruptcy code provides numerous exceptions to discharge and even authorizes a debtor to reaffirm certain obligations afterwards. Absent notice that the discharge specifically included the *1765 account, neither CRA had information contrary to what Wells Fargo reported to them.

> The practical effect of finding a § 1681e(b) violation here would be to require CRAs to wade into individual bankruptcy dockets to discern whether a debt survived discharge. Consumers file hundreds of thousands of Chapter 7 bankruptcy petitions every year. We join our sister circuits in rejecting the invitation to mandate that CRAs hire individuals with legal training to preemptively determine the validity of reported debts. Simply put, "the cost of verifying the accuracy of the source" outweighs "the possible harm inaccurately reported information may cause" a consumer. The FCRA requires reasonable—not perfect—procedures.

APPENDIX 2458

*Rydholm,* 44 F.4th at 1109 (quoting *Henson*, 29 F.3d at 287) (citing *Childress*, 790 F.3d at 747; *Wright v. Experian Info. Sols., Inc.*, 805 F.3d 1232, 1241 (10th Cir. 2015)) (other citations omitted).

**C.    There Is No Evidence That Experian Had Any Notice That The Fingerhut Account Was Discharged Or Reporting Inaccurately.**

The reasoning of *Henson*, *Sarver*, *Childress*, and *Rydholm*  is equally true here. Plaintiff was just one of hundreds of thousands of consumers who filed bankruptcy in 2023. *See Table F-2: U.S. Bankruptcy Courts—Business and Nonbusiness Cases Commenced, by Chapter of the Bankruptcy Code, During the 12-Month Period Ending December 31, 2023*, USCourts.gov, *https://www.uscourts.gov/file/78080/download* (showing 261,277 Chapter 7 bankruptcies filed in 2023). Plaintiff scheduled 22 unsecured claims in his Chapter 7 filing, including the Fingerhut account at issue here. See Ex. D at 23–32 (Plaintiff's Chapter 7 Bankruptcy Petition). Plaintiff's own discharge order notes that "[s]ome debts are not discharged," including, for example, such debts the court has otherwise decided are not discharged, improperly listed debts, and reaffirmed debts. Ex. E at 2 (Discharge Order). Moreover, the account furnisher itself was reporting that the debt was not included in bankruptcy. *See* SOF ¶ 14 (describing Fingerhut's continued reporting of a CII Code of "Q" for the account). There were a multitude of legitimate reasons explaining why Fingerhut might continue to report Plaintiff's account as Charged Off following his Chapter 7 bankruptcy.

More importantly, the Seventh Circuit has repeatedly emphasized the consumer's role in identifying inaccurate information, then contacting the CRA to dispute and correct that information:

> Requiring credit reporting agencies to look beyond the face of every court document to find the rare case when a document incorrectly reports the result of the underlying action would be unduly burdensome and inefficient. ***The consumer is in a better position than the credit reporting agency to detect errors*** appearing in court documents dealing with the consumer's own prior litigation history. ***Once the information is erroneously reported on the consumer's credit report, the consumer will be alerted to the error and can then seek correction of the error by notifying the credit reporting agency or the court itself . . . . A credit reporting agency that has***

- 11 -

> ***been notified of potentially inaccurate information in a consumer's credit report is in a very different position than one who has no such notice.***

*Henson*, 29 F.3d at 285–87 (emphasis added) (affirming dismissal of claims under § 1681e(b), but remanding claims under § 1681i).

Again, *Sarver* is on all fours with Plaintiff's theory and disposes of his claims:

> In his attempt to show that Experian's procedures are unreasonable, Sarver argues that someone should have noticed that only the Cross Country accounts were shown to have been involved in bankruptcy. That anomaly should have alerted Experian, Sarver says, to the fact that the report was inaccurate. ***What Sarver is asking, then, is that each computer-generated report be examined for anomalous information and, if it is found, an investigation be launched. In the absence of notice of prevalent unreliable information from a reporting lender, which would put Experian on notice that problems exist, we cannot find that such a requirement to investigate would be reasonable given the enormous volume of information Experian processes daily.***

> We found in *Henson* that a consumer reporting agency was not liable, as a matter of law, for reporting information from a judgment docket unless there was prior notice from the consumer that the information might be inaccurate . . . The same could be said for records from financial institutions.

*Sarver*, 390 F.3d at 972 (emphasis added).

There is no evidence that Experian had any notice of a problem with Fingerhut's reporting, and that lack of notice is compounded by Plaintiff's unusual choice not to contact Experian when he first noticed the issue. Plaintiff was "in a better position" than Experian to identify any errors in Plaintiff's report. *Ruffin-Thompkins v. Experian Info. Sols., Inc.*, 422 F.3d 603, 608 (7th Cir. 2005). Once Plaintiff identified the error he complains of in this case, his next call should have been to Experian, notifying Experian of the problem and requiring Experian to reinvestigate. That is the mechanism Congress created, not rushing to the courthouse at the first sign of an issue.

Without evidence of actual notice of a problem with Fingerhut's reporting, Plaintiff's claims fail as a matter of law.

APPENDIX 2460

## II.  PLAINTIFF HAS NOT SUFFERED ANY ACTUAL DAMAGES.

"The FCRA does not presume damages . . . the consumer must affirmatively prove that she is entitled to damages." *Ruffin-Thompkins*, 422 F.3d at 610. Indeed, "[b]efore any discussion of the reasonableness of the reinvestigation is necessary, however, [the plaintiff] must show that she 'suffered damages as a result of the inaccurate information.'" *Id.* at 608. Plaintiff cannot make this showing, which alone is enough to grant Experian summary judgment.

Plaintiff alleged that Experian's reporting caused "lower overall creditworthiness" and "emotional distress." Compl. ¶¶ 55–56. But discovery has shown these allegations are vacuous and non-existent. As to the alleged reduced creditworthiness, Plaintiff's only evidence is his own testimony that he threw away or deleted one denial letter, which he claims referred to the Fingerhut account. *See* Ex. H, Excerpted Deposition of S. Butler ("Dep. Butler") at 50:5–51:9. Plaintiff's own hearsay testimony is obviously insufficient at this stage, *see*, *e.g.*, *Moore v. W. Illinois Corr. Ctr.*, 89 F.4th 582, 592 (7th Cir. 2023), and his failure to preserve and produce this evidence also requires its exclusion. *See* Fed. R. Civ. P. 37(c)(1); *Chicago Joe's Tea Room, LLC v. Vill. of Broadview*, 94 F.4th 588, 603 (7th Cir. 2024) ("Under Rule 37, the sanction for failure to disclose is automatic and mandatory unless the sanctioned party can show its violation was either justified or harmless."). Moreover, even if Plaintiff had evidence of a credit denial, he cannot show that Experian's reporting harmed his creditworthiness, when his credit score was 30 points *higher* while Experian was reporting the account as Charged Off. *See* Dep. Butler at 57:13–60:5; *cf. Bueno v. Experian Info. Sols., Inc.*, 664 F. Supp. 3d 800, 807 (N.D. Ill. 2023) (granting dismissal on a § 1681e(b) claim where "Experian prepared a credit report that . . . made [the plaintiff] look better, not worse, than it should have.").

That leaves only Plaintiff's conclusory claims for emotional distress. The Seventh Circuit "maintains a strict standard for a finding of emotional damage 'because they are so easy to manufacture.'" *Sarver*, 390 F.3d at 971. Claims to emotional distress must be explained in detail and

- 13 -

not conclusory. *Id.* Courts routinely grant summary judgment where the only evidence of emotional distress is the plaintiff's own testimony. *See, e.g.*, *Persinger v. Sw. Credit Sys., L.P.*, 20 F.4th 1184, 1194 (7th Cir. 2021); *Jackson v. Experian Info. Sols., Inc.*, 236 F. Supp. 3d 1058, 1064 (N.D. Ill. 2017); *Bagby v. Experian Info. Sols., Inc.*, 162 F. App'x 600, 605 (7th Cir. 2006); *Ruffin-Thompkins*, 422 F.3d at 610; *Sarver*, 390 F.3d at 971. Here, Plaintiff claims that he experienced trouble sleeping, stress, and strained personal relationships. Dep. Butler at 61:4–62:2. But he has not produced any documentary evidence, identified precise dates for these issues, or provided any reasonable explanation such that a jury could find Experian caused any of his supposed distress. Instead, Plaintiff's testimony is indistinguishable from the statement in *Jackson* "that dealing with credit reporting agencies was 'mentally and emotionally distressful,'" which the court determined was "too conclusory to support an emotional damages award." *Jackson*, 236 F. Supp. 3d at 1064.

Because Plaintiff cannot show that he suffered any damages due to Experian's reporting, his claims fail as a matter of law.

## III. THERE IS NO EVIDENCE THAT EXPERIAN WILLFULLY VIOLATED THE FCRA.

To prove that Experian willfully violated 15 U.S.C. § 1681e(b), Plaintiff would need to show that Experian acted knowingly or recklessly: either that it knew that its conduct violated the FCRA or its interpretation of the statute was "objectively unreasonable" and "ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Safeco* 551 U.S. at 68-69; *see also Murray v. GMAC Mortg. Corp.*, 434 F.3d 948, 953 (7th Cir. 2006) (contrasting FCRA's willfulness bar with "easier" negligence standard). In *Safeco*, the Supreme Court was clear that a statutory violation is not willful, as a matter of law, where the "statutory text and relevant court and agency guidance allow for more than one reasonable interpretation," and a defendant does not willfully violate the FCRA if it "followed an interpretation that could reasonably have found support in the courts, whatever their subjective intent may have been." *Safeco*, 551 U.S. at 70 n.20.

- 14 -

Nothing in the plain text of the FCRA requires Experian to determine when a debt has been discharged in a consumer's bankruptcy. As explained above, Experian's reliance on Fingerhut is directly in line with Seventh Circuit law on compliance with 15 U.S.C. § 1681e(b). *See supra* at 9–10. Declining to take on the task of wading into bankruptcy dockets is directly supported by the Eight Circuit's opinion in *Rydholm* and the Seventh Circuit's opinion in *Childress*. Likewise, the fact that Experian does not automatically update accounts with a CII of "Q" is supported by (the "*White* Order"). *See supra* at 5. Unsurprisingly, Courts have repeatedly held that compliance with the *White* Order, by itself, forecloses a willful claim under the FCRA. *See*, *e.g.*, *Laura v. Experian Info. Sols., Inc.*, No. 20-CV-01573, 2022 WL 823853, at *4 (N.D. Ill. Mar. 18, 2022); *Ferrin v. Experian Info. Sols., Inc.*, No. 20-CV-841, 617 F. Supp. 3d 998, 1009–10 (D. Minn. 2022); *Campbell v. Experian Info. Sols., Inc.*, No. 20-CV-2498, 2022 WL 3716982, at *5–6 (D. Minn. Aug. 29, 2022).

Experian did not violate the FCRA at all, and certainly did not do so willfully.

## CONCLUSION

For the above reasons, Experian respectfully requests an order of summary judgment dismissing Plaintiff's claims with prejudice.

Dated: October 25, 2024                          Respectfully submitted,

By: */s/ John Robert B. DeLaney*
John Robert B. DeLaney,
Bar No. 6345767
rdelaney@jonesday.com

JONES DAY
110 North Wacker Drive, Suite 4800
Chicago, IL  60606
Telephone:    +1.312.269.4207
Facsimile:    +1.312.782.8585

*Counsel for Defendant Experian Information Solutions, Inc.*

- 15 -

APPENDIX 2463

## CERTIFICATE OF SERVICE

I hereby certify that on October 25, 2024, I electronically filed a true and accurate copy of the foregoing with the Clerk of Court via CM/ECF, which sent electronic notice of the same to all parties of record.

/s/ *John Robert B. DeLaney*
John Robert B. DeLaney,
Bar No. 6345767
rdelaney@jonesday.com

JONES DAY
110 North Wacker Drive Suite 4800
Chicago, IL  60606
Telephone:    +1.312.269.4207
Facsimile:    +1.312.782.8585

*Counsel for Defendant Experian
Information Solutions, Inc.*

- 16 -

APPENDIX 2464

# EXHIBIT EE

**THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| SHANGO BUTLER, | ) |
| | ) |
| *Plaintiff,* | ) |
| v. | ) No. 24 C 211 |
| | ) |
| TRANS UNION, LLC, AND | ) Chief Judge Virginia M. Kendall |
| EXPERIAN INFORMATION | ) |
| SOLUTIONS, INC., | ) |
| | ) |
| *Defendants.* | ) |
| | ) |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Shango Butler brought this action against Trans Union, LLC ("Trans Union") and Experian Information Solutions, Inc. ("Experian") for one violation of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 et seq. (Dkt. 1 ¶¶ 58–60). Trans Union was dismissed with prejudice based on a settlement agreement, leaving Experian as the only remaining Defendant. (Dkt. 24). Experian filed for summary judgment. (Dkt. 30). For the below reasons, the Court grants Experian's motion [30].

**BACKGROUND**

The following facts are undisputed unless otherwise indicated. Butler is a "consumer" and Experian a "consumer reporting agency" ("CRA") as defined in the FCRA. 15 U.S.C. § 1681a(c), (f); (Dkt. 1 ¶ 6; Dkt. 18 ¶ 7). Butler alleges that Experian violated the FCRA by failing to "maintain and follow reasonable procedures" to ensure consumers' credit information is appropriately reported, particularly after a discharge in bankruptcy proceedings. § 1681e(b); (*see* Dkt. 1 ¶¶ 59–60).

1

APPENDIX 2466

## I.    Experian's Bankruptcy Procedures

As a CRA, Experian compiles information from various vetted and contracted sources, and uses that information to create files for hundreds of millions of U.S. consumers. With respect to bankruptcy-related information, this data comes from three main sources: public records vendors, vetted data furnishers, and consumers themselves. (Dkt. 31 at 4–5). Additionally, Experian relies on internal policies and procedures to review consumer files after it receives notice of a bankruptcy discharge. (*Id.* at 5)

First, Experian relies on its public records vendor, LexisNexis, to provide it with general information. (Hamilton Decl., Dkt. 32-1 ¶ 9). Whenever a consumer files for bankruptcy, LexisNexis will transmit to Experian that consumer's name, the type of bankruptcy petition they filed, the filing date, and the court of filing. (*Id.*) LexisNexis also informs Experian whether a consumer's bankruptcy has been discharged or dismissed. (*Id.*) LexisNexis does not provide information to Experian about the discharge status of specific consumer debts and accounts. (*Id.*)

For account-specific information, Experian relies on its data furnishers. (Dkt. 32 ¶ 4 ("Def. SOF")). Data furnishers can be banks, credit card companies, or other organizations that are parties in bankruptcy proceedings—usually because they are creditors. (*See id.* ¶ 9). Experian vets all data furnishers before accepting their information to ensure they are reliable and capable of providing accurate information, and it monitors their reporting for logical inconsistencies and other problems. (*Id.* ¶ 4). Vetted data furnishers report when specific accounts are included in, or excluded from, a consumer's bankruptcy. (Def. SOF ¶ 3). To communicate this information, they rely on Consumer Information Indicator ("CII") codes. (Dkt. 32-1 ¶ 10). For example, a data furnisher reports a CII code "H" to show a debt was discharged in a Chapter 13 proceeding and a CII code "E" to show a debt was discharged in a Chapter 7 proceeding. (*Id.*). Data furnishers may also report a CII code

2

"Q," to signal that the subject account was not included or discharged in bankruptcy. (*Id.* ¶ 11). Experian aggregates the data it receives from LexisNexis and its data furnishers to update consumers' credit files.

Experian can also update how an account is reported based on direct communications with the consumer. (Dkt. 36-2 at 55:4-56:1). For example, if a consumer has a debt discharged in bankruptcy, but Experian continues to report the account as having an outstanding balance, the consumer can file a dispute directly with Experian, which will be routed to an investigator. (*Id.* at 31:3–6; 55:4–56:1). Upon receiving the dispute, Experian confirms three things: (1) that the consumer's bankruptcy record is on file; (2) that the account type is generally dischargeable in bankruptcy; and (3)  that the account's opening date predates the bankruptcy filing. (*Id.* at 55:15– 20; Dkt. 32-1 ¶ 13). If these conditions are met, Experian will update its reporting to show the account as having been included or discharged in bankruptcy. (Dkt. 36-2 at 55:20–22; Dkt. 32-1 ¶ 13). This process is consistent with the concept that Chapter 7 presumptively discharges all a consumer's debt, even if there is no such legal presumption codified in the bankruptcy code. (Dkt. 36 ¶ 31 ("Pl. SOF"); Dkt. 36-2 at 20:14–19).

Finally, Experian applies a set of procedures known as a "bankruptcy scrub" to ensure consumers' post-bankruptcy credit files are accurate. Experian's bankruptcy scrub is born of a nationwide injunction entered in *White v. Experian Info. Sols., Inc.*, 2008 WL 11518799 (C.D. Cal. Aug. 19, 2008) concerning how Experian must "implement reasonable assumptions about which debts are, or are not discharged" in consumer bankruptcy proceedings. (Dkt. 31 at 5). Within eight days of receiving notice that a discharge has been entered in a consumer's Chapter 7 bankruptcy, Experian "scrubs" the consumer's file and updates accounts that are reporting as thirty (30) or

3

more days past due so that these accounts report as discharged in the consumer's bankruptcy. (Def. SOF ¶ 5).

## II.    Factual Background

In July 2018, one of Experian's data furnishers reported that Butler had opened a charge card account with WebBank/Fingerhut ("Fingerhut") and began reporting that account on Butler's credit file. (Def. SOF ¶ 7). In October 2018, Butler filed for Chapter 13 bankruptcy and, in doing so, listed the Fingerhut account, which then had a $108 balance. (*Id.* ¶ 8). LexisNexis notified Experian of Butler's bankruptcy the day after he filed. (*Id.*) Butler's Chapter 13 bankruptcy was dismissed on May 26, 2021. (*Id.*) In July 2021, Experian got in touch with the data furnisher responsible for Butler's Fingerhut account to verify the information that it was reporting on that account. (*Id.* ¶ 10). In response, the data furnisher reported a CII code Q and an outstanding balance of $108. (*Id.* ¶ 11). In other words, the data furnisher reported to Experian that Butler's Fingerhut account had *not* been discharged in his Chapter 13 bankruptcy and the amount on the account remained outstanding.

Approximately two years later, in May 2023, Butler filed for Chapter 7 bankruptcy. (*Id.* ¶ 12). He again listed the Fingerhut and its $108 balance in his petition. (*Id.*) Butler's Chapter 7 case was discharged on August 30, 2023, and LexisNexis reported that discharge to Experian the next day. (*Id.* ¶ 13). While the Fingerhut account was excluded from Butler's 2021 Chapter 13 proceeding, the account was discharged as part of his 2023 Chapter 7 filing. But the data furnisher responsible for the Fingerhut account did not update the code Q. By this time, Experian had implemented its bankruptcy scrub procedures, and it ran an initial scrub on Butler's file within eight days of the Chapter 7 discharge. (*Id.* ¶ 14). When that scrub ran, Experian saw the code Q on the Fingerhut account and thus did not report it as having been discharged as part of Butler's 2023

4

Chapter 7. (*Id.*; Dkt. 33 at 1). Experian attributes this inaccurate report to the fact that it did not receive any "objectively verifiable information" either from Butler or the data furnisher that would have caused them to reinvestigate the Fingerhut account's status. (Def. SOF ¶ 14).

In October 2023, Butler applied for a Capital One credit card. (Pl. SOF ¶ 41). Experian's records reflect that Capital One made an inquiry into Butler's credit on October 17, 2023. (*Id.* ¶ 43). Butler claims that Capital One denied his credit application and sent him a letter—which he discarded before this litigation commenced—offering the outstanding Fingerhut balance as a basis for the denial. (*Id.* ¶ 42).[1] This alerted Butler to the inaccuracy on his Experian credit file and caused him to file this lawsuit on January 9, 2024. (Dkt. 1). As a result, Experian investigated the status of Butler's Fingerhut account, confirmed the inaccuracy, and updated the account on February 15, 2024 to show it as discharged in Chapter 7 and with a zero balance. (Def. SOF ¶ 16).

## LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see, e.g.*, *Reed v. Columbia St. Mary's Hosp.*, 915 F.3d 473, 485 (7th Cir. 2019). "A dispute of material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021). The Court "consider[s] all of the evidence in the record in the light most favorable to the non-moving party." *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018) (citation omitted). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the

---

[1] Because the Court does not reach the issue of damages, evidence concerning whether Butler applied for and was denied a Capital One credit card—and for what reason—is unnecessary to the resolution of Experian's Motion for Summary Judgment. Accordingly Experian's hearsay objections to this evidence, (Dkt. 42 ¶¶ 41–42), are denied as moot.

5

evidence submitted in support of and opposition to the motion for summary judgment." *White v. City of Chi.*, 829 F.3d 837, 841 (7th Cir. 2016) (internal citations omitted).

## DISCUSSION

The FCRA was designed "to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy." *Chaitoff v. Experian Info. Sols.*, 79 F.4th 800, 809 (7th Cir. 2023) (quoting *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 52 (2007)). It demands CRAs like Experian "exercise their grave responsibilities with fairness, impartiality, and a respect." *Id.* The FCRA is comprised of two primary private-action provisions: the reasonable procedures requirement, 15 U.S.C. § 1681e(b), and the reasonable reinvestigation requirement, 15 U.S.C. § 1681i(a). Only § 1681e(b) is at issue in this case. (*See generally* Dkt. 1). That provision requires CRAs to "follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." § 1681e(b). "Accuracy is not defined in the statute, but it has long been understood that 'accuracy' encompasses both truth and completeness—a report that is misleading or materially incomplete is inaccurate." *Chaitoff*, 79 F.4th at 809. If a CRA negligently violates any duty imposed by the FCRA, the plaintiff may collect actual damages, costs, and fees. *Ruffin-Thompkins v. Experian Info. Sols.*, 422 F.3d 603, 607 (7th Cir. 2005). If the CRA commits a "willful violation" of the FCRA, the consumer may also recover punitive damages. *Id.*

Experian contends that its procedures in collecting, scrubbing, and reporting bankruptcy-related data are reasonable as a matter of law, entitling it to summary judgment. (*See* Dkt. 31 at 9–11) Butler sees things differently. He points to the undisputed fact that Experian is generally aware that Chapter 7 presumptively discharges all a consumer's debts incurred before the petition was filed as evidence that Experian's existing procedures fail to reasonably prevent inaccurate

6

APPENDIX 2471

reporting after discharge. (Pl. SOF ¶ 3). Butler suggests Experian has "zero" procedures to prevent outdated code Qs from being reported and that it "completely ignored the glaring fact that [his] obsolete Code Q was still on file from [] prior bankruptcies." (Dkt. 33 at 4–5, 7). In the end, this case presents a narrow question of reasonableness: After receiving notice of a Chapter 7 discharge, can a CRA rely on an exclusionary bankruptcy code reported by one of its vetted data furnishers as to a consumer who has been involved in multiple bankruptcy proceedings?

The FCRA is not a strict liability statute; CRAs must only institute reasonable procedures to "assure maximum possible accuracy." 15 U.S.C. § 1681e(b). In other words, the statute strikes a balance, which has a lot to do with the sheer quantity of data Experian collects and reports. For example, in *Sarver v. Experian Info. Sols.*, the court recognized that Experian gathered data from 40,000 sources involving 200 million names and addresses and 2.6 billion trade lines, resulting in more than "50 million updates to trade information each day." 390 F.3d 969, 972 (7th Cir. 2004). Accordingly, courts have declined to impose requirements on CRAs that would force them to examine "each computer-generated report . . . for anomalous information" and launch an investigation if any is found. *Id.* Instead, the cases focus on whether a CRA has "notice of prevalent unreliable information from a reporting lender." *Id.* No § 1681e(b) liability will follow an instance when "an item of information, received from a source that [the CRA] reasonably believes is reputable, turns out to be inaccurate unless the agency receives notice of systemic problems with its procedures." *Id.* The Seventh Circuit has recognized several sources of sufficient trustworthiness that CRAs can rely on as a matter of law. *See, e.g.*, *Henson v. CSC Credit Servs.*, 29 F.3d 280, 285 (7th Cir. 1994) (allowing reliance on "a court's Judgment Docket" absent notice the information may be inaccurate); *Chaitoff*, 79 F.4th at 816–17 (recognizing it is reasonable for CRAs to rely on reports from "major financial institutions").

APPENDIX 2472

Here, Experian reasonably relied on information provided by one of its vetted data furnishers about the status of Butler's Fingerhut account. Without notice of an inaccuracy in the CII code Q attached to that account, "Experian had no reason to suspect that [the] reporting was incomplete." *Chaitoff*, 79 F.4th at 816. CRAs must rely on the research and information financial institutions provide. To hold otherwise would result in ballooning costs that would be passed along to the consumer. *Id.* That leash is not without a limit, though. For example, when a CRA "has been notified of potentially inaccurate information in a consumer's credit report, it is in a very different position than one who has no such notice." *Henson*, 29 F.3d at 286–87 (cleaned up). That is why many FCRA cases also include claims under § 1681i(a), claiming the CRA unreasonably investigated a reported error or inaccuracy. *See, e.g.*, *Young*, 776 F. Supp. 3d at 740–42 (granting summary judgment in Experian's favor on a plaintiff's reasonable procedures claim but denying summary judgment on the same plaintiff's reasonable reinvestigation claim). But that is not the case here. As soon as Experian had notice of the alleged inaccuracy in Butler's credit file—which came by virtue of Butler filing his complaint—it promptly reinvestigated and updated the Fingerhut account status. (Def. SOF ¶ 16; Pl. SOF ¶ 40).

That Butler had been involved in prior bankruptcy proceedings does not alter the reasonableness of Experian's conduct. As Experian notes, there are many reasons why a data furnisher might continue to report a code Q in instances involving subsequent bankruptcy proceedings. (Dkt. 41 at 5–6). For example, the data furnisher might think the debt was improperly scheduled, or that the account is of a kind generally excepted from discharge under federal law. (*Id.*) Thus, the lone fact that Experian received notice of Butler's Chapter 7 discharge does not amount to notice of an error with the CII code attached to his Fingerhut account. (*See* Dkt. 36 ¶ 18). If Butler could hold Experian liable for its reliance on its data furnishers' continued reporting of a

8

code Q, this Court would effectively be creating a rule that would force CRAs to second guess every post-bankruptcy exclusionary code. This is exactly the kind of wading through the docket that other courts have found would result in undue burdens on CRAs considering the sheer amount of data they process. *See Rydholm v. Equifax Info. Sols.*, 44 F.4th 1105, 1109 (8th Cir. 2022) (citing the Seventh Circuit's decision in *Henson*, 29 F.3d at 287 and recognizing that it is not reasonable to require a CRA to "wade into individual bankruptcy dockets to discern whether a debt survived discharge").

The district court opinions on which Butler relies do not compel a different conclusion. *Laura*, the only in-circuit district court case Butler cites is inapposite. *See Laura v. Experian Info. Sols.*, 2022 WL 823853, at *2–*3 (N.D. Ill. Mar. 18, 2022). There, the CRA reported a balance as outstanding for an account that it concluded was discharged in bankruptcy based on a report from a collections agency. *Id.* at *1, 3. The court denied summary judgment and found that a Chapter 7 discharge notice was sufficient to alert Experian that one of the plaintiff's outstanding accounts was discharged, calling into question the reasonableness of Experian's procedures. *Id.* at *3. But, in *Laura*, Experian was not relying on "inaccurate information received from reliable sources without notice of inaccuracy." *Id.* And Experian conceded that it should have assumed the bankruptcy discharged the at-issue debt pursuant to the *White* order and its bankruptcy scrub procedures. *Id.* Here, by contrast, Experian was relying on inaccurate information—the Fingerhut code Q—from one of its vetted data furnishers. And unlike the general account information from the collections agency in *Laura* that the bankruptcy scrub is designed to correct, the more particular code Q in this case is bankruptcy-specific, and signals to a CRA that the debt should *not* be reported as discharged. Thus, the Fingerhut account was not the kind Experian should have assumed was discharged pursuant to the *White* order. Indeed, the *White* injunction, which led Experian to

9

develop its bankruptcy scrub procedures in the first place, specifically references code Qs. *White*, 2008 WL 11518799, at *12. It indicates that when a data furnisher reports a code Q on a particular account, Experian may report that account in a "non-bankruptcy status, provided that [it] has not previously received truthful, objectively verifiable information directly from the Consumer in connection with a non-frivolous/non-irrelevant request for reinvestigation indicating the debt was in fact discharged." *Id.* Of course, Butler did not alert Experian to the need for a reinvestigation in this case, depriving Experian of any information that the code was inaccurate.

Finally, Butler's citations to a line of district court decisions out of the Eighth Circuit do not help his cause. *See Gibson v. Experian Info. Sols.*, 494 F. Supp. 3d 613 (E.D. Mo. 2020); *Morris v. Experian Info. Sols.*, 478 F. Supp. 3d 765, 768–69 (D. Minn. 2020); *Alsibai v. Experian Info. Sols.*, 488 F. Supp. 3d 840 (D. Minn. 2020); *Ferrin v. Experian Info. Sols.*, 617 F. Supp. 3d 998 (D. Minn. 2022). Each of these cases predates the Eighth Circuit's decision in *Rydholm*, which is on all fours with this Court's decision today. 44 F.4th at 1108–09. The court in *Rydholm* found that a plaintiff similarly situated to Butler failed to clear the even lower motion to dismiss standard when alleging that a CRA failed to follow reasonable procedures by reporting an account as open and outstanding after receiving notice of the plaintiff's Chapter 7 discharge. *Id.* at 1107, 1109. Adopting the robust body of Seventh Circuit FCRA case law on reasonable procedures, the *Rydholm* court concluded that the CRA was entitled to rely on information a financial institution provided, even if incorrect, "[a]bsent notice that the discharge specifically included" the at-issue account. *Id.* at 1109.

Experian was entitled to rely on the code Q its data furnisher continued to report on Butler's Fingerhut account considering it had no information—from Butler or anyone else—that would alert it to the possibility that "the source may be unreliable." *Henson*, 29 F.3d at 287. Accordingly,

10

no reasonable juror could conclude that Experian's failed to implement reasonable procedures in this case. The Court thus grants summary judgment in Experian's favor on Butler's § 1681e(b) claim.

## CONCLUSION

For the above reasons, Experian's Motion for Summary Judgment [30] is granted.

Virginia M. Kendall
United States District Judge

Date: September 29, 2025

11

APPENDIX 2476

# EXHIBIT FF

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| VICTOR MANUEL RAMIREZ NAJERA, | Case No.: 4:25-cv-443 |
| Plaintiff, | |
| v. | **DECLARATION OF VICTOR RAMIREZ NAJERA** |
| EXPERIAN INFORMATION SOLUTIONS, INC.; APPFOLIO, INC.; and NATIONSTAR MORTGAGE LLC d/b/a RUSHMORE SERVICING. | |
| Defendant. | |

I, Victor Ramirez Najera, hereby submit this declaration.

1. I have personal knowledge of the facts stated herein and, if called upon to testify, I could and would competently testify thereto.

2. I am the plaintiff in the above-captioned action.

3. During discovery in this case, I was deposed by the Defendant, Experian Information Solutions, Inc. ("Experian") on September 23, 2025. That deposition lasted approximately 7.5 hours.

4. During my deposition, the attorney for Experian asked me many questions about my damages in this case, the events detailed in my complaint, and my credit history.

5. At one point during my deposition, I was asked about whether other credit bureaus had reported the mortgage account from Rushmore in my credit reports. I testified at the time that I knew with certainty that I had never seen the Rushmore account in my Equifax credit report but that I could not recall whether I had ever seen the same account in my Trans Union credit report.

6. In the time since my deposition, I have received information about my mortgage application from my mortgage lender that refreshed my recollection. Specifically, the Rushmore

1

APPENDIX 2478

account did not appear in either the Equifax or Trans Union credit reports that my mortgage lender obtained about me when processing my mortgage application in April 2025.

I swear under penalty of perjury that the foregoing is true and correct to the best of my knowledge and recollection.

*Victor Ramirez Najera*
_____
Victor Ramirez Najera
12-22-2025

- 2 -                                    APPENDIX 2479

Document Ref: AEEJG-WNVFU-QE8HJ-N9P6X